1           **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF PENNSYLVANIA**
2

3   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

    **CARL WILLIAMS,**                    **CIVIL ACTION NUMBER:**
4
        **Plaintiff,**                   **2:22-CV-01618-JDW**
5
        **v.**                           **JURY TRIAL**
6                                         **DAY 1**
    **LINODE LIMITED LIABILITY**
7   **COMPANY, d/b/a LINODE, LLC,**
    **LINODIAN, LLC, d/b/a LINODE,**
8   **LLC, DANIEL SPATARO, and**
    **THOMAS ASARO**
9
        **Defendants.**
10  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11
        U.S. District Court, Eastern District of PA
12      James A. Byrne U.S. Courthouse
        601 Market Street
13      Philadelphia, Pennsylvania 19106
        January 23, 2024
14      Commencing at 9:40 a.m.

15
    **B E F O R E:**              THE HONORABLE JOSHUA D. WOLSON
16                                UNITED STATES DISTRICT JUDGE

17
    **A P P E A R A N C E S:**
18
        DEREK SMITH LAW GROUP, PLLC
19      BY:  SETH D. CARSON  ESQUIRE
        1835 Market Street, Suite 2950
20      Philadelphia, PA 19103
        For the Plaintiff
21

22          Maureen McHugh, Official Court Reporter
                maureen_mchugh@paed.uscourts.gov
23
    Proceedings recorded by mechanical stenography; transcript
24          produced by computer-aided transcription.

25

                    *United States District Court*

```
 1   A P P E A R A N C E S: (Cont'd)

 2

         JACKSON LEWIS, P.C.
 3       BY:  STEPHANIE JILL PEET, ESQUIRE
              JONATHAN CAVALIER, ESQUIRE
 4            TIMOTHY MCCARTHY, ESQUIRE
              1601 Cherry Street, Suite 1350
 5            Philadelphia, PA 19102
              For the Defendants
 6

 7

 8

 9

10

         ALSO PRESENT:
11

12       Melissa Meyer, Paralegal
         Laura Buenzle Roberts, Courtroom Deputy
13

14

15

16

17

18

19

20

21

22

23

24

25
```

*United States District Court*

```
1                          I N D E X

2
    EXAMINATIONS                                        PAGE
3
      CARL WILLIAMS                                      81
4

5                      E X H I B I T S

6

7     PLAINTIFF EXHIBIT 35 WAS RECEIVED IN EVIDENCE       82
      PLAINTIFF EXHIBIT 37 THROUGH 41 WERE RECEIVED IN    83
8     EVIDENCE
      PLAINTIFF EXHIBIT 71 WAS RECEIVED IN EVIDENCE       85
9     PLAINTIFF EXHIBIT 72 WAS RECEIVED IN EVIDENCE       85
      PLAINTIFF EXHIBIT 73 WAS RECEIVED IN EVIDENCE       86
10    PLAINTIFF EXHIBIT 74 WAS RECEIVED IN EVIDENCE       87
      PLAINTIFF EXHIBITS 75 AND 76 WERE RECEIVED IN       88
11    EVIDENCE
      PLAINTIFF EXHIBIT 94 WAS RECEIVED IN EVIDENCE       89
12    PLAINTIFF EXHIBIT 95 WAS RECEIVED IN EVIDENCE       90
      PLAINTIFF EXHIBIT 97 WAS RECEIVED IN EVIDENCE       91
13    PLAINTIFF EXHIBIT 107 WAS RECEIVED IN EVIDENCE      93
      PLAINTIFF EXHIBIT 109 WAS RECEIVED IN EVIDENCE      94
14    PLAINTIFF EXHIBIT 110 WAS RECEIVED IN EVIDENCE      95
      PLAINTIFF EXHIBIT 117 WAS RECEIVED IN EVIDENCE      96
15    PLAINTIFF EXHIBIT 124 WAS RECEIVED IN EVIDENCE      97
      PLAINTIFF EXHIBIT 174 WAS RECEIVED IN EVIDENCE     101
16    PLAINTIFF EXHIBIT 172 WAS RECEIVED IN EVIDENCE     105
      PLAINTIFF EXHIBIT 173 WAS RECEIVED IN EVIDENCE     105
17

18

19

20

21

22

23

24

25
```

1              (PROCEEDINGS held in open court before The Honorable

2    JOSHUA D. WOLSON, United States District Judge, at 9:40 a.m.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Good morning everybody.  Have a seat,

5    please.

6              We do have a jury when you're ready to go, so I just

7    have a few housekeeping things that I guess we need to tackle

8    first.  Let me start with the two issues we left outstanding at

9    the final pretrial conference, which was the questions about

10   the ADEA retaliation complaint and the PHRA and PFPO, which are

11   now subject to a motion to amend.

12             Let me just -- I read the briefing.  Mr. Carson, on

13   the motion to amend, I understand the arguments you made.  Is

14   there a reason why there wasn't a motion to amend before this,

15   before now?

16             MR. CARSON:  Yes, just based on all the circumstances

17   in the case, I guess.  It was kind of a totality of the

18   circumstances.  Where I was the third attorney who was working

19   with Carl Williams, the plaintiff.  And when I picked up the

20   case, the individual defendants were in the case, and the

21   complaint says multiple times that the case is based on the

22   Pennsylvania claims, the Philadelphia claims.  And so, you

23   know, based on that, it was my understanding that they were in

24   the case and so that's the reason.

25             THE COURT:  Okay.  And what about the timing issues

*United States District Court*

1   that the defendants raised with respect to the PHRA claims?

2          MR. CARSON:  So, I don't think that there is a timing

3   issue because there isn't any -- I mean, I submitted a draft of

4   the -- what the amended complaint would look like, and there's

5   not a single word change as far as the facts.  The case doesn't

6   change, the analysis doesn't change --

7          THE COURT:  I'm not asking prejudice.  I'm asking you

8   that that futility and they say that the PHRA are time-barred,

9   about that.

10         MR. CARSON:  Oh, so --

11         THE COURT:  Yeah.

12         MR. CARSON:  Sorry.  You know, it's interesting, I

13  actually did look at that, and the PHRA claims are time-barred

14  if the charge was not filed within 180 days.  That's -- I can

15  argue that.

16         THE COURT:  Okay.

17         MR. CARSON:  But the Philadelphia claims certainly are

18  not.

19         THE COURT:  So you agree that the PHRA claims are

20  time-barred?

21         MR. CARSON:  So, I agree that if the charge was not

22  filed within 180 days, they'd be time-barred.

23         THE COURT:  But are you disputing that?  I mean, they

24  are saying it wasn't -- I mean, they give the timeline here.

25         MR. CARSON:  I know.  You know, the timeline that they

*United States District Court*

1    gave is not something that I have evidence to dispute, Your

2    Honor.

3              THE COURT:  Okay, fine.  All right.  So I'm going to

4    deny the motion to amend then for a couple of reasons.

5              First of all, you know, I flagged this when we were at

6    the final pretrial conference.  The standard here is not

7    Rule 15, at least not in the first instance.  The standard is

8    Rule 16 because this is a motion to amend that is coming after

9    the deadline for amendment.  And the Third Circuit has been

10   clear in the cases Premier Comp Solutions LLC vs. UPMC, it's

11   970 F.3d 316.  The Third Circuit says -- that's a 2020 case --

12   that when a party moves to amend or add a party after the

13   deadline and the district court's scheduling order has passed,

14   the good cause standard of Rule 16(b)(4) applies.

15             I'm not sure that I see good cause here for the lack

16   of a timely amendment, and particularly for the length of

17   passage.  I suspect, Mr. Carson, by the time you got into the

18   case, that deadline had passed.

19             MR. CARSON:  The deadline had passed, Your Honor.

20             THE COURT:  It passed, right.  But that was over a

21   year ago, and so there was ample time -- and, in fact,

22   presumably, one of the things that would happen would be you go

23   back over the pleadings and see the status.  And, you know,

24   this issue of the sort of interplay of timing between the PHRA

25   and its one-year requirement before a claim could become ripe

*United States District Court*

1  versus the 90 days after the right to sue, that is obviously

2  something you deal with all the time as a plaintiff's

3  employment lawyer, so it's something that should have been on

4  your radar.

5          So I don't see good cause here.  But even if I went

6  past the good cause and got to the Rule 15 factors, I do think

7  both the claims are futile.  We just established I think that

8  PHRA claim is time-barred.  The PFPO claim, the Philadelphia

9  Fair Practices Ordinance claim is out because it does not

10  appear that it was administratively exhausted, as the

11  defendants point out.  You know, this is a ruling that I issued

12  in another case, Lee vs. Bay LLC, which is 2023 WL 1971209,

13  where I held that the exhaustion requirements under the

14  Philadelphia Fair Practices Ordinance are not satisfied by

15  filing or even cross-filing with the EEOC and the PHRC; you

16  have to file with the Philadelphia Human Relations Commission

17  as well.

18          So I think that the failure to do that -- and I

19  haven't seen any suggestion that that happened, and I don't

20  think it did -- would render that claim unexhausted, and so

21  that it would be futile to amend either of those claims.  And

22  so both the lack of a good cause under Rule 16 and the futility

23  under Rule 15, I'm going to deny that motion.

24          Okay.  So the PHRA and the PFPO claims are out of the

25  case.

*United States District Court*

1          MR. CARSON:  May I just respond for the record, Your

2    Honor?

3          THE COURT:  Yeah.

4          MR. CARSON:  So I guess I would point out that the

5    EEOC is designated as an agent of the Philadelphia commission,

6    and that under the expressed language of the agreement between

7    the Philadelphia commission and the EEOC, there doesn't even

8    need to be dual filing because the EEOC is the Philadelphia

9    commission for all intents and purposes.

10          THE COURT:  I'm not aware of anything that says that

11    that Philadelphia commission is an agent -- or the EEOC is an

12    agent of Philadelphia Human Relations Commission.  This was

13    briefed to me before, and I ruled on it, as I said -- and I

14    know other judges in this district have as well, including

15    Judge Murphy recently, have ruled that there has to be

16    exhaustion.  The Pennsylvania Human Relations Commission has

17    that worksharing agreement with the EEOC.  I am not aware of

18    anything to suggest that the Philadelphia Human Relations

19    Commission has that.

20          MR. CARSON:  Your Honor, I submitted it as a piece of

21    evidence with the motion.  There is a worksharing agreement.

22    The worksharing agreement expressly says that the EEOC is an

23    agent of the Philadelphia commission and that the charters

24    don't have to be dual filed.  Because when you file at the

25    EEOC, you are filing with the Philadelphia commission.

*United States District Court*

1           THE COURT:  Where did you submit that?

2           MR. CARSON:  Sorry.  Let me just -- just a moment,

3    Your Honor.  I'm just pulling it up.

4           THE COURT:  Looks like it may be 15 -- Docket 6513.

5    Let me see what that says.

6           MR. CARSON:  Yeah so -- yeah.  Yes, Your Honor, 13 is

7    actually the worksharing agreement, and then Exhibit 14 is the

8    language that the EEOC and the Philadelphia commission have

9    agreed upon.  And the language says, "In recognition of and to

10   the extent of the common jurisdictional goals of the two

11   agencies, in consideration of mutual" --

12           (Court reporter interruption.)

13           MR. CARSON:  I'm sorry.

14           "In recognition of and to the extent of the common

15   jurisdiction and goals of the two agencies and in consideration

16   of the mutual promises and covenants contained herein, the

17   Philadelphia commission" -- it says, "the FEPA and the EEOC

18   hereby agree to the terms of the worksharing agreement, which

19   is designated to provide individuals with efficient procedure

20   for obtaining redress for their grievances under appropriate

21   city, state, and federal laws."

22           And then it goes on to say that "in order to

23   facilitate the assertion of employment rights, the EEOC and

24   FEPA each designate the other as its agent for the purposes of

25   receiving and drafting charges, including those that are not

*United States District Court*

1  jurisdictional but the agency that initially received the

2  charges.  The EEOC's receipt of charges of the Philadelphia

3  commission" -- again, it says "the FEPA." -- "of the FEPA's

4  behalf will automatically initiate the proceedings of both the

5  EEOC and the Philadelphia commission for the purposes of

6  Section 706(c) and (e)(1) of Title VII."  So that's what I was

7  referring to.

8          THE COURT:  And did you submit the charge that was

9  filed?

10         MR. CARSON:  Yes.

11         THE COURT:  Where is that?

12         MR. CARSON:  Sorry.  I believe so.  Let me just pull

13 up...

14         I also -- just for the record, Exhibit 12 is also

15 another document that because of this agreement, the actual --

16 each agency receives money for working on the other's

17 charges.  And the charge that was submitted is Exhibit 6511,

18 Your Honor.

19         THE COURT:  Okay.  But so the charge -- the blanks are

20 things that you fill out, right?

21         MR. CARSON:  I didn't understand the question.

22         THE COURT:  The charge of discrimination -- I'm

23 looking at the charge of discrimination now, which is also 66-2

24 on the docket, and the blanks are things that -- you know, you

25 filled out all the information, right, as counsel for the

*United States District Court*

1  complainant?

2       MR. CARSON:  Yes.  So the charge is actually 65-11,

3  but I think 65-2 is --

4       THE COURT:  No, 66-2.  And the defendants' response

5  also has it.  But it's the same document.  Okay?

6       MR. CARSON:  Okay.

7       THE COURT:  So I'm just noting at the top, where

8  you're filling in which state or local agency you are

9  cross-filing with, just says the Pennsylvania Human Relations

10  Commission.  It doesn't say the Philadelphia Commission on

11  Human Rights.

12       MR. CARSON:  So if you go to the next page, the very

13  first sentence is, "We hereby request that this charge be

14  simultaneously with the Philadelphia Commission on Human

15  Relations and any other state and local agency with whom there

16  is a sharing agreement."

17       THE COURT:  Just point me to the language.

18       MR. CARSON:  So the cover page that you just

19  referenced, Your Honor, if you just go to the next page, the

20  first sentence.

21       THE COURT:  And you are on 65-11?

22       MR. CARSON:  So I went to the one that you --

23       THE COURT:  Or 66-2.  You are at 66-2?

24       MR. CARSON:  Yes.

25       THE COURT:  Just because the pages are in different

*United States District Court*

1   orders.

2          MR. CARSON:  Yes, it's -- 65-11 I think it would be

3   the first page, but this is the second page, 66-2.

4          THE COURT:  Okay.  All right.

5          So, Mr. Cavalier, I mean, I'm not sure if this is

6   going to make a difference, but what about this?  I mean, this

7   does seem like they exhausted the PFPO claims, doesn't it?

8          MR. CAVALIER:  So, Your Honor, let me just say that,

9   first of all, we think it's a moot issue given that Your Honor

10  has already indicated that the good cause standing for amending

11  was not met, so really we're into the secondary reasons for

12  this as well.

13         THE COURT:  Yes.

14         MR. CAVALIER:  To be perfectly honest with you, I

15  think we've set it forth in our briefing as best as can be said

16  and we would say that your ruling in Lee still applies and that

17  you can't manufacture jurisdiction by virtue of adding text to

18  a letter to the agency.

19         THE COURT:  Well, but the issue in Lee was that it

20  hadn't ever been presented to the commission, as far as I knew.

21         MR. CAVALIER:  I guess, Your Honor, my point is that

22  just by virtue of including that sentence with your filing, it

23  doesn't necessarily mean that that agency is going to present

24  it to the city agency.

25         THE COURT:  Well, there are -- no.  But as a

*United States District Court*

1    plaintiff, aren't you entitled to rely on that?

2          If there's a worksharing agreement out there and you

3    know that you can file and that they have been designated as an

4    agent, you've checked your boxes, right?  What else are you

5    supposed to do?

6          MR. CAVALIER:  I think that's accurate, Your Honor,

7    put that way.

8          THE COURT:  All right.  So it's a fair correction,

9    Mr. Carson, and I appreciate you pointing it out.

10          I'm still going to deny the motion.  I still don't

11    think it satisfies good cause under Rule 16, as I said.  I

12    think that the PHRA claim also would be futile for the

13    time-barred reasons that we have discussed.

14          You know, I will say I was not as persuaded with

15    respect to the prejudice aspects under Rule 15, if I got to

16    Rule 15.  It does change the damages -- we've talked about that

17    some at the final pretrial conference -- but not dramatically.

18    But I don't think we're at good cause, so I'm going to deny it

19    for that reason under Rule 16.

20          Okay.  So now let's turn to the ADEA retaliation

21    claim.  And, you know, Mr. Carson, with respect to the ADEA

22    retaliation claim, I looked for some guidance on this.  There's

23    not a lot out there that kind of tracks this factual situation.

24    There are obviously a lot of guidance about cases with pro se,

25    mostly plaintiffs submitted shotgun pleadings.  That's not

*United States District Court*

1  really this case, right?

2      What I have here is a complaint that does break out

3  into separate counts the different claims that are being

4  asserted.  Probably that was necessary under Rule 10(b), but

5  it's not a hundred percent clear to me where the line is here

6  as to what does and doesn't constitute a separate transaction

7  or occurrence in the course of all of this.  Right?

8      I mean, I know you've got a few different elements of

9  retaliatory conduct in the sense of both the termination and

10  some of the subsequent compensation decisions, maybe those are

11  separate, but to the extent that Title VII has -- you know,

12  covers the termination, for example, on the ADEA, it covers the

13  termination and arguably that's a single transaction or

14  occurrence, although they have different protected conduct

15  because they are predicates.

16      I think ultimately where I come down on this one,

17  there is a fair amount of discussion in the complaint about the

18  age discrimination.  I know it's not listed out as a separate

19  count.  It is referenced as one of the -- the ADEA is one of

20  the bases for retaliation that's referenced in the pretrial

21  memorandum the plaintiff submitted.  There is a counter

22  availing element to that that there was no jury instruction

23  submitted on that.

24      But I think on balance and given the preference for

25  resolving disputes on the merits, I'm going to conclude that

*United States District Court*

1  that is and has been in the case.  I mean, absent having seen

2  something in discovery suggesting that you asked what's in the

3  case and were told confirmatively this isn't, I'm going to

4  conclude that that is in the case.  So we'll fold that in -- I

5  think that was a question that came up in the context of maybe

6  preliminary jury instructions and preliminary statement to the

7  case that I'll read to the jury.  And then, in addition,

8  there's a question about -- I mean, there's really that and

9  then you guys need to know what you are doing for openings.

10 Okay.

11         Last housekeeping issue is just the issue that I got

12 the email from Mr. Cavalier last night with respect to the

13 issues that are coming up today.  You know, Mr. Carson, there's

14 obviously -- you missed the deadline for the filing of the

15 motion to amend.  I could have denied it on that basis.  I

16 didn't.  But these deadlines are an advisory.

17         Are you using demonstratives in openings?

18         MR. CARSON:  No, Your Honor.

19         THE COURT:  Okay.  So check that box, that's easy

20 enough.

21         MR. CARSON:  And I did send an email to Mr. Cavalier,

22 it was after he sent the email to the Court, and I told him

23 exactly who would testify today and what they would be

24 testifying about and the exhibits that would be used, so I

25 could do that after --

1          THE COURT:  All right.

2          MR. CARSON:  And I won't let that happen again.

3          THE COURT:  All right.  So are there any issues that

4   need to be resolved with respect to any of that for today,

5   anything housekeeping wise?

6          MR. CAVALIER:  With respect to that, Your Honor, no.

7          THE COURT:  Or generally anything you all are

8   anticipating with respect to openings or things like that that

9   we have to take up before lunch?  I don't know how quick the

10  jury will go.

11         MR. CAVALIER:  Very briefly, if I may?

12         THE COURT:  Yes.

13         MR. CAVALIER:  One issue that occurred to me as we

14  were talking this morning, I'm going to assume it goes without

15  saying, but I want to mention it anyway.  Presumably there

16  should be no reference to the past representation of

17  Mr. Williams as any part of this case on either side.

18         THE COURT:  By Ms. Shikunov, you mean?

19         MR. CAVALIER:  Or any prior attorney.

20         MR. CARSON:  I didn't plan to do that anyway.

21         THE COURT:  I mean, it's not inconceivable to me at

22  some point that there will be a document -- I don't think there

23  are any, but if some document in Ms. Shikunov's name comes up

24  and -- you know, we don't have to leave the jury in the dark.

25  Is Ms. Shikunov your lawyer?  Yes.  Right?  But we don't need

1    to get into any of the back and forth of her changing firms and

2    all that sort of thing.

3            MR. CAVALIER:  Terrific.  As far as scheduling goes, I

4    believe we're going to tell this jury that we hope to have the

5    case in their hands by Friday.

6            THE COURT:  Yeah.  I'm not going to commit to that.

7    My plan is to say to them we're hoping to be done this week,

8    but there's a -- I'll probably say to each jury there's a real

9    chance that it's going to roll into the beginning of next week

10   as I fish around for hardship issues.  Okay?

11           MR. CAVALIER:  Okay.  On that note, I've been told by

12   the very reluctant Dr. Miao in no uncertain terms that he's

13   available only on Friday morning.  I still have concerns about

14   whether we're going to need to send some people down there to

15   encourage his appearance.  But I wanted to raise with Mr.

16   Carson -- I haven't done so yet -- but the possibility of

17   taking him via deposition designation.  His transcript is only

18   20 pages long.  And presuming -- and I haven't talked to him

19   about it yet, but if we are able to reach an agreement on that,

20   would the Court have any objection if we switched tracks and

21   did it that way?

22           THE COURT:  No.  I mean, if you all are in agreement

23   to do it by deposition, that's fine with me.  If you can't

24   reach agreement, then that's fine.  I mean, I'm not telling you

25   you have to agree, Mr. Carson.  You have a right just like

*United States District Court*

1  everybody else to say, no, there's no good cause.  The rules

2  say you can use a deposition upon a showing of good cause,

3  right?  I think that's Rule 32, Federal Rules of Civil

4  Procedure 32, about remote testimony in lieu of live testimony.

5          And otherwise the witness is available, the deposition

6  is probably hearsay.  So if you all want to agree, fine.  If

7  you think that what you need is there, or for whatever other

8  reason you think it's okay, fine.  If not, you know.  But if

9  the evidence is important enough and the witness is

10  recalcitrant, I may pause the trial to try to get them down

11  here and -- I don't have a lot of carrots at my disposal, but I

12  have a stick -- try to convince the doctor to testify.  Okay?

13          MR. CARSON:  Yes.  I would prefer to be able to

14  cross-examine the witness during the deposition and ask any

15  questions -- you know, if he's asked questions like, so it's

16  not in the notes, that means it wasn't said, and the notes say

17  one or two words.  And I would -- but he agreed with all that,

18  but obviously that's not true because --

19          THE COURT:  Well, I don't need to get into it.  As I

20  said, it's up to you.  But again, the tradeoff is it may just

21  slow down the progress of the trial if I'm forced to deal with

22  the ancillary issue.

23          So try to get the doctor here.  Again, I don't know

24  how quickly the trial will go.  It's not inconceivable that it

25  will be Friday before he's up, but if we're ready to close, I

1  don't want to hold that up.  That said, if it's, well, he can't

2  be here until Friday, it's Thursday afternoon, he would be up

3  and we have to do a charge conference and his testimony, I

4  don't mind doing the charge conference.

5          So I don't mind -- I'm not looking to create problems,

6  but I'm also not willing to just pause my trial to bend to his

7  schedule.

8          MR. CAVALIER:  And we agree on that certainly.

9          MR. CARSON:  One thing I can suggest is maybe any time

10  he can get here, I agree that we can stop and get him on and

11  take care of him at that time, you know, even if I haven't

12  rested the case in chief.  If that helps make it easier to get

13  him here --

14          MR. CAVALIER:  That's appreciated, Your Honor.  Based

15  on conversations with Mr. Carson, I don't think the Friday

16  scheduling is going to be a problem.  It seems virtually

17  inconceivable to me that we would wrap before Friday.

18          THE COURT:  That's kind of my gut too.

19          MR. CAVALIER:  As long as we can take him out of

20  order, if necessary, Friday morning, I think that solves the

21  issue.

22          On that note also, I've been informed that

23  Mr. Palochko, who is a witness that both parties intended to

24  call, I believe -- not to put words into Mr. Carson's

25  mouth -- I've been told that he is currently on a flight back

*United States District Court*

1    to Texas on Thursday morning, so I would ask -- and again, I
2    haven't talked to Mr. Carson about this yet, but ideally we
3    would be able to take him on Wednesday and send him on his way.
4         THE COURT:  Hopefully that will work out.  Talk to
5    each other and see if we can make that work.
6         Okay.  All right.  Anything else housekeeping wise?
7         MR. CARSON:  Just one quick -- so Chad Staller, the
8    expert, has a very business schedule and asked if he could go
9    on Wednesday afternoon after lunch.  So if Mr. Williams takes
10   the stand tomorrow morning and testifies until lunch, I would
11   just request that we get Chad on and off the stand as fast as
12   possible that afternoon so that he can get out of here, and
13   then Carl can finish after he's done.  Is that okay?
14        THE COURT:  If it's okay with the defense.
15        MR. CAVALIER:  We've offered to stipulate to
16   Mr. Staller's number, but haven't gotten an answer on that.
17   Certainly we don't have any problem taking Mr. Staller out of
18   order or Mr. Palochko out of order.  Whatever is most efficient
19   is fine by us.
20        THE COURT:  Okay.  That's fine.  I can always give the
21   jury an instruction and explain that sometimes we have to do
22   witnesses out of order.  So if that's what we're doing, that's
23   fine.
24        And give another look to the question about -- you
25   know, about the stipulation, Mr. Carson, and maybe that will

*United States District Court*

1    simplify it that much more.  Okay?

2           So we have a jury panel ready.  Why don't we bring

3    them up.  In the meantime, you all can turn your seats around.

4    I am going to ask that we clear out the gallery because we have

5    -- that is where the jury is going to be sitting, the venire is

6    going to be sitting.  People can either move off to the side.

7    If you want to use the jury box for now, that's fine.  If you

8    want to just --

9           (Brief discussion held off the record.)

10           THE COURT:  If you're in the jury box, just understand

11    that you have to stand up at some point as we wrap up jury

12    selection.  If you want a seat for now -- I just don't want

13    people intermingling.  I guess we only have 25, so you can be

14    in the last couple rows of the gallery too.  If you are in the

15    last couple of rows, for the two of you watching, no

16    interacting with the jurors.

17           We'll go off the record.  I'm going to stay here and

18    just get set up for the jury to arrive.  Move your chairs and

19    hang tight.

20           (Brief recess.)

21           (Jury selection held at this time.)

22           (Brief luncheon recess.)

23           (In open court at 1:39 p.m.)

24           THE COURTROOM DEPUTY:  All rise.

25           THE COURT:  All right, have a seat everybody.  Go

*United States District Court*

1   ahead and get the jury.

2            THE COURTROOM DEPUTY:  Okay.

3            All rise for the jury.

4            (Jury enters the courtroom at 1:40 p.m.)

5            THE COURT:  Okay.  Everybody can have a seat, please.

6            All right.  Welcome back everybody.  I apologize to

7   have kept you waiting.  There are times during trial where

8   there are things that we need to sort out sometimes.  It's

9   often easier for me to do it before you come in.

10           As I said, I'm the judge of the law; you're the judge

11  of the facts.  It's often easier for me to do things, whatever

12  administrative things or legal things that need to be done

13  without you being here.  Otherwise, I subject you to additional

14  time.  I just try to spare you that as much as possible.

15           So I appreciate your patience.  I'm sure you'll hear

16  me say that a couple other times as we go.  What we're going to

17  do now is I'm going to give you some preliminary jury

18  instruction, which will basically be instructions about how to

19  consider the evidence in this case and how to do your job as

20  jurors.  And then once we have done that, we'll turn to the

21  evidence in this case -- we'll turn to first the opening

22  statements, which are not evidence, as I'll tell you, and then

23  we'll turn to the evidence in this case.

24           As I give you these preliminary instructions, I'm just

25  going to tell you now there -- you know, I try to be very

*United States District Court*

1  precise.  It's important for me to get things right.  You'll

2  hear me tell you this again before we do the final instructions

3  in the case.  The upshot of that is I've worked on them very

4  carefully to make sure I'm getting the law right and I'm

5  getting what I tell you correct, so I'm going to read them.  So

6  I apologize in advance.  I will try not to be monotone, I will

7  try not to go too fast, but it limits the amount of me looking

8  at you and interacting, making eye contact.  And I know that

9  affects it a little bit, so I apologize in advance.  Okay?

10         Now that you've been sworn, I have the following

11  preliminary instructions for your guidance as jurors in this

12  case.  As jurors, you'll hear the evidence, decide what the

13  facts are, and then apply those facts to the law that I will

14  give you.  You, and only you, will be the judges of the facts.

15  You will have to decide what happened.  I play no part in

16  judging the facts.  You should not take anything I may say or

17  do during the trial as indicating what I think of the evidence

18  or what your verdict should be.

19         You will hear the evidence, decide what the facts are,

20  and then apply those facts to the law that I will give to you.

21  My role is to be the judge of the law.  I make whatever legal

22  decisions must be made during the course of the trial, and I

23  will explain to you the legal principles that must guide you in

24  your decisions.  You must follow that law, whether you agree

25  with it or not.

*United States District Court*

1          This is an employment discrimination case.  Plaintiff

2    Carl Williams claims that Linode LLC discriminated against him

3    because of his sexual orientation and age, subjected him to

4    hostile work environment, and retaliated against him for

5    raising concerns about disparate treatment.  The disparate

6    treatment alleged relates to Mr. Williams' termination, pay,

7    and the withholding of a profit-sharing bonus.

8          Linode denies these allegations and claims that

9    Mr. Williams testified in a criminal proceeding on behalf of

10   someone charged with attempted murder of a child with whom that

11   defendant had previously exchanged inappropriate photographs of

12   a sexual nature and had fired Mr. Williams as a result.

13   Mr. Williams contends that the explanation for his termination

14   is a pretext to cover up discrimination.

15         The evidence from which you are to find the facts

16   consists of the following:  The testimony of the witnesses;

17   documents and other things received as exhibits; any facts that

18   are stipulated, that is, the parties formally agreed to them;

19   and any facts that are judicially noticed, that is, facts that

20   I say you must accept as true even without other evidence.

21         The following things are not evidence:  Statements,

22   arguments, and questions of the lawyers for the parties in this

23   case; objections by the lawyers; any testimony I tell you to

24   disregard; and anything you may see or hear about this case

25   outside the courtroom.

*United States District Court*

1          You must make your decision based only on the evidence
2    that you see and hear in court.  Do not let rumors, suspicions,
3    or anything else that you may see or hear outside of court
4    influence your decision in any way.  You should use your common
5    sense in weighing the evidence, consider it in light of your
6    everyday experience with people and events, and give it
7    whatever weight you believe it deserves.  If your experience
8    tells you that certain evidence reasonably leads to a
9    conclusion, you are free to reach that conclusion.

10          There are rules that control what can be received into
11    evidence.  When a lawyer asks a question or offers an exhibit
12    into evidence and the lawyer on the other side thinks that it
13    is not permitted by the rules of evidence, that lawyer may
14    object.  This simply means that the objecting lawyer is
15    requesting that I make a decision on a particular rule of
16    evidence.

17          Objections to questions are not evidence.  Lawyers
18    have an obligation to their clients to make objections when
19    they believe that the evidence being offered is improper under
20    the rules of evidence.  You should not be influenced by the
21    objection or by my ruling on it.  If I sustain an objection,
22    ignore the question.  If I overrule an objection, treat the
23    answer like any other.  If I instruct you that some item of
24    evidence is received for a limited purpose only, you must
25    follow that instruction.

*United States District Court*

1          Also, I may exclude some evidence or order certain

2     testimony or other evidence stricken from the record.  Do not

3     consider any testimony or other evidence that I struck or

4     excluded.  Do not speculate about what a witness might have

5     said or what an exhibit might have shown.

6          There are two types of evidence that you may use in

7     reaching your verdict.  One type of evidence is called direct

8     evidence.  An example of direct evidence is when a witness

9     testifies about something that a witness knows through his own

10    senses; something the witness has seen, felt, touched, heard,

11    or did.  If a witness testified that he saw it raining outside

12    and you believed him, that would be direct evidence that it was

13    raining.

14         The other type of evidence is circumstantial evidence.

15    Circumstantial evidence is proof of one or more facts from

16    which you could find another fact.  If someone walked into the

17    courtroom wearing a raincoat, covered with drops of water and

18    carrying a wet umbrella, that would be circumstantial evidence

19    from which you could conclude that it was raining, even though

20    you didn't see it for yourself.

21         You should consider both kinds of evidence that are

22    presented to you.  The law makes no distinction in the weight

23    to be given to either direct or circumstantial evidence.  You

24    are to decide how much weight to give any evidence.

25         In deciding what the facts are, you may have to decide

*United States District Court*

1  what testimony you believe and what testimony you do not

2  believe.  You are the sole judges of the credibility of the

3  witnesses.  Credibility means whether a witness is worthy of

4  belief.  You may believe everything a witness says or only part

5  of it or none of it.

6         In deciding what to believe, you may consider a number

7  of factors including the following:  The opportunity and

8  ability of the witness to see or hear or know the things to

9  which the witness testifies; the quality of the witness's

10  understanding and memory; the witness's manner while

11  testifying; whether the witness has an interest in the outcome

12  of the case or any motive, bias, of prejudice; whether anything

13  the witness said or wrote before trial or other evidence

14  contradicts the witness's testimony; how reasonable the

15  witness's testimony is when considered in the light of other

16  evidence that you believe; whether the witness has been

17  convicted of any crime; and any other factors that bear on

18  believability.

19         The weight of the evidence to prove a fact does not

20  necessarily depend on the number of witnesses who testify.

21  What is more important is how believable the witnesses were and

22  how much weight you think their testimony deserves.

23         This is a civil case.  Mr. Williams is the party that

24  brought this lawsuit.  Linode is the party against which the

25  lawsuit was filed.  Mr. Williams has the burden of proving his

*United States District Court*

1  case by what is called the preponderance of the evidence.  That

2  means he must prove to you, in light of all the evidence, that

3  what he claims is more likely so than not so.

4        To say it differently, if you were to put the evidence

5  favorable to Mr. Williams and the evidence favorable to Linode

6  on the opposite side of a balancing scale, Mr. Williams would

7  have to make the scale tip somewhat on his side.  If

8  Mr. Williams fails to meet this burden, the verdict must be for

9  Linode.  If you find, after considering all the evidence, that

10  a claim or fact is more likely so than not so, then the claim

11  or fact has been proved by a preponderance of the evidence.

12        In determining whether any fact has been proved by a

13  preponderance of evidence, you may, unless otherwise

14  instructed, consider the testimony of all witnesses, regardless

15  of who may have called them, and all exhibits received in

16  evidence, regardless of who may have produced them.

17        You may have heard of the term "proof beyond a

18  reasonable doubt."  That is a stricter standard of proof and it

19  applies only to criminal cases.  It does not apply in civil

20  cases like this, so you should put it out of your mind.

21        Each one of us has biases about or certain perceptions

22  or stereotypes of other people.  We may be aware of some of our

23  bias, but we may not share them with others.  We may not be

24  fully aware of some of our other biases.  Our biases often

25  affect how we act favorably or unfavorably towards something.

1  Biases can affect our thoughts, how we remember what we see and

2  hear, whom we believe or disbelieve, and how we make important

3  decisions.

4         As jurors, you are being asked to make very important

5  decisions in this case.  You must not let bias, prejudice, or

6  public opinion influence your decision.  You must not be biased

7  in favor of or against any party or witness because of his or

8  her disability, gender, race, religion, ethnicity, sexual

9  orientation, age, national origin, or socioeconomic status.

10        Your verdict must be based solely on the evidence

11 presented.  You must carefully evaluate the evidence and resist

12 any urge to reach a verdict that is influenced by bias for or

13 against any party or witness.

14        Only the lawyers and I are allowed to ask questions of

15 witness.  You are not permitted to ask questions of witnesses.

16 If you wish, you may take notes during the presentation of

17 evidence, the summation of the attorneys at the conclusion of

18 evidence, and during my instructions to you on the law.

19        My courtroom deputy Ms. Roberts has arranged for

20 pencils and paper.  Remember that your notes are for your own

21 personal use.  They are not to be given or read to anyone else.

22 As you see, we have a court reporter here, who will be

23 transcribing the testimony during the course of the trial, but

24 you should not assume that the transcripts will be available

25 for your review during your deliberations, nor should you

*United States District Court*

1  consider notes that you or fellow jurors may take as a kind of
2  written transcript.  Instead, as you listen to the testimony,
3  keep in mind that you will be relying on your recollection of
4  that testimony during your deliberations.
5          Here are some other specific points to keep in mind
6  about note-taking.  Note-taking is permitted, not required.
7  Each of you may take notes, no one is required to take notes.
8  Be brief.  Do not try to summarize all the testimony.  Notes
9  are for the purpose of refreshing memory.  They are
10 particularly helpful when dealing with measurements, times,
11 distances, identities, and relationships.
12         Overuse of note-taking may be distracting.  You must
13 determine the credibility of witnesses, so you must observe the
14 demeanor and appearance of each person on the witness stand.
15 Note-taking must not distract you from that task.  If you wish
16 to make a note, you need not sacrifice the opportunity to make
17 important observations of the witnesses.  You may make your
18 note after having made an observation.
19         Do not use your notes or any other jurors' notes as
20 authority to persuade fellow jurors.  In your deliberations,
21 give no more or no less weight to the views of a fellow juror
22 just because that juror did or did not take notes.  As I
23 mentioned earlier, your notes are not official transcripts,
24 they are not evidence, and they are by no means a complete
25 outline of the proceedings or a list of the highlights at the

*United States District Court*

1  trial.  They are valuable, if at all, only as a way to refresh

2  your memory.

3          Your memory is what you should be relying on when it

4  comes time to deliberate and render your verdict in this case.

5  You, therefore, are not to use your notes as authority to

6  persuade fellow jurors of what the evidence was during the

7  trial.  Notes are not to be used in place of the evidence.

8          Do not take your notes away from court.  I repeat, at

9  the end of each session, please leave your notes in the jury

10  room.  If you do take notes, take them with you each time you

11  leave the courtroom, and please leave them in the jury room

12  when you leave at night.  At the conclusion of the case, after

13  you've used your notes in deliberations, either Ms. Roberts or

14  another court officer will collect and destroy them to protect

15  the secrecy of your deliberations.

16          During the trial, it may be necessary for me to talk

17  with the lawyers out of your hearing by having a bench

18  conference.  If that happens, please be patient.  We are not

19  trying to keep important information from you.  These

20  conferences are necessary for me to fulfill my responsibility,

21  which is to be sure that evidence is presented to you correctly

22  under the law.  We will of course do what we can to keep the

23  number and length of these conferences to a minimum.  I might

24  not always grant an attorney's request for a conference.  Do

25  not consider my granting or denying a request for a conference

*United States District Court*

1  as any indication of my opinion of the case or what your

2  verdict should be.

3         The presentation of evidence will proceed in phases.

4  First, the attorney for the plaintiff may make an opening

5  statement to you.  Next, the attorney for the defendant may

6  make an opening statement.  What is said in the opening

7  statements is not evidence, but it is simply an outline to help

8  you understand what each party expects the evidence to show

9  when it is presented.

10        After the opening statements, each party is given an

11  opportunity to present its evidence.  When the parties present

12  evidence, the plaintiff goes first because, as plaintiff, he

13  has the burden of proof.  The attorney for plaintiff will

14  present witnesses.  Counsel for the defendant may cross-examine

15  those witnesses.  The attorney for plaintiff may also present

16  evidence such as documents.  Following plaintiff's presentation

17  of evidence, the attorneys for the defendant may present

18  evidence and can call witnesses.  The attorney for plaintiff

19  may cross-examine defense's witnesses.

20        After each party present their case, they may be

21  permitted to present what is called rebuttal evidence.  After

22  all the evidence is presented, I will instruct you on the law.

23  Once I've done that, the attorney for the plaintiff and the

24  attorney for the defendant will present to you closing

25  arguments to summarize and interpret the evidence in a way that

1   is helpful to their client's positions.  As with opening

2   statements, closing statements are not evidence.

3          Once the closing arguments are completed, I will give

4   you a few final instructions on the deliberation process.

5   After that, you will retire to the jury room to deliberate on

6   your verdict in the case.

7          Now a few words about your conduct as jurors.  First,

8   during the trial you are to avoid contact with any witness, the

9   parties, any lawyer, or anyone else who may have an interest in

10   the outcome of this case.  Do not talk to them or have any

11   other communication.  Because you may not know whether a

12   particular person in the courthouse falls into one of these

13   categories, during breaks you should not speak to anyone in the

14   courthouse you do not know.  If anyone tries to talk to you

15   about the case, bring it to my attention promptly.  You can let

16   Ms. Roberts know.

17          If any lawyer, party, or witness passes you in the

18   hall and does not speak to you, remember, it's not because they

19   are being rude.  It's because they are under the same rules and

20   they're not supposed to talk with you or visit with you.

21   That's one of the reasons you are asked to wear your juror

22   tags.  It shows that you're someone who is not to be approached

23   in any way.

24          Second, during the trial, you are not to discuss the

25   case with anyone or permit anyone to discuss it with you.  This

*United States District Court*

1  prohibition includes your family, friends, and co-workers.
2  Even if you have a friend or family member in attendance at the
3  trial, you may not discuss it with them before the trial ends.
4  This prohibition also includes any form of communication
5  whatsoever, whether over the internet such as email, instant
6  messaging, Twitter, Facebook, Instagram or other social media
7  posts, websites and blogs, the use of cell phones for text
8  messaging or video or audio recording or the use of any other
9  recording or transmitting device.
10          People who aren't in the courtroom and haven't heard
11  the evidence might still express opinions about the case.  Your
12  verdict is not to be based on what others say about the case,
13  only on what the evidence is.  So don't post or email or tweet
14  or text anything about this case and don't read anything anyone
15  else might post, email, tweet, or text about this case.  And of
16  course, don't talk about the case and don't listen to anyone
17  else talk about the case.
18          The prohibition even includes amongst all of you.  You
19  should refrain from case-related discussions with one another
20  until all the evidence is received, final instructions are
21  given, and you retire to the jury room to deliberate on your
22  verdict.  One of the main reasons for this in that discussing
23  the case can lead to forming an opinion, and that is not a good
24  idea before you've heard all the evidence.  Even after
25  deliberations begin, you may talk about the case among your

*United States District Court*

1  fellow jurors only when all are present.  Don't do it if you

2  take a break or something like that.

3         Third, during the trial, you are not to gather

4  information, investigate, or do anything else to learn about

5  the case outside of the properly admitted evidence.  For

6  example, do not attempt to investigate the case on the internet

7  or travel to a particular location that may be of interest in

8  the trial.  You should also avoid exposure to media coverage of

9  the charges or trial, if there is any, until after you render

10  your verdict.

11         So don't read or listen to any news or internet

12  reports about the case if there are any.  That includes

13  newspaper reports, radio or TV shows, or articles on the

14  internet.  Just like tweets and internet posts, things on the

15  internet or in the media are often inaccurate or incomplete and

16  they are certainly not given under oath with all the parties

17  present, nor are they subject to cross-examination and close

18  scrutiny like the evidence you will hear in the courtroom.

19         During the trial you will receive all evidence which

20  may be properly considered in reaching your verdict.  I know

21  you may be used to looking things up online, but doing any type

22  of research is unfair to the parties, can lead to bad

23  decisions, and can cause major problems and require us to start

24  all over, so it's best not to do it.

25         Finally, do not form any opinion until all the

*United States District Court*

1  evidence is in.  The last witness is often just as important as
2  the first witness.  So keep an open mind until I instruct you
3  to start deliberations at the end of the case.  I'll likely
4  repeat or summarize these instructions regularly throughout the
5  trial.  Not because I think you aren't paying attention, but
6  because in my experience jurors find some of these instructions
7  difficult to follow.  I know of no other situation in our
8  culture where we ask strangers to sit together watching and
9  listening to something, then go into a little room together and
10  not talk about the one thing they have in common; what they
11  just watched together.  We are almost all wired into a digital
12  world and used to looking stuff up online and talking or
13  posting about our lives.  So please remember the reasons I gave
14  you about why there are rules against this in the context of
15  this trial and let me know if there are any problems with
16  following these instructions either on your own part or by your
17  fellow jurors.  Keep your discussions amongst yourselves away
18  from these proceedings.
19       Okay.  So those are my preliminary instructions for
20  you.  As I said, we're going to turn now to the opening
21  statement.
22       Just so you have an idea of what to expect on an
23  ongoing basis, we'll generally go for close to an hour and a
24  half and then take a break on a regular basis.  So we'll start
25  in the morning, go for about an hour and a half, take a break,

*United States District Court*

1  go for another hour and a half, take a lunch break, come back,

2  hour and a half in the afternoon, break, hour and a half, go

3  home.

4        So I'll try to stick with that today.  As I said,

5  we're going to break around 3:45 today, so let me see how

6  things shake out with openings statements, and we'll figure out

7  where to take that short break this afternoon as well.

8        And as we're going, if some of you ever need a break,

9  just flag Ms. Roberts or me down, let us know.  We don't want

10 you sitting there uncomfortable and distracted during the

11 proceedings.  Okay?

12       So with that, I'm going to call on Mr. Carson for the

13 plaintiff's opening.

14       MR. CARSON:  Thank you.

15       Good afternoon.  My name is Seth Carson and I

16 represent the plaintiff Carl Williams in this case.

17       Carl, please stand up for a moment.

18       So this is Carl Williams.  And again, he's the

19 plaintiff in this case.  And Carl Williams is 59 years old

20 today and he's a gay man.  Carl Williams filed this case

21 because the defendants, the defendant Linode and employees who

22 work for the defendant, including Dan Spataro, Tom Asaro, and

23 Vince Palochko -- so those three people represent the human

24 resources department and the chief operating officer and the

25 high-level employees who were making decisions at Linode at

*United States District Court*

1    that time -- because they engaged in discriminatory conduct to
2    which my client was subjected because of his age and because of
3    his sexual orientation, because he's gay.
4           And when they engaged in this conduct, my client
5    reported it.  He did what he was supposed to do.  He spoke to
6    them about it.  He asked for help.  And they engaged in what we
7    call retaliation, which means that they did not appreciate his
8    reports and they subjected him to further discrimination after
9    the reports.
10          Carl's lawsuit was filed to remedy injuries that Carl
11   suffered because of the conduct that you're going to hear about
12   in this case, and those injuries are significant.  You're going
13   to see from the evidence that Carl suffered injuries in several
14   ways, but one of the ways that he suffered injuries is due to
15   the amount of money, the amount of benefits, the amount of
16   income that he lost when he was terminated from his employment,
17   when he was separated from his employment after nearly
18   six years of hard work, of contributions, of helping Linode
19   grow to achieve a goal, and he was separated from his
20   employment after all of that.  Not for a legitimate reason,
21   because of his age and because of his sexual orientation and
22   because of retaliation.
23          So to begin with, Carl suffered real calculable
24   financial harm because of the termination, and that's what
25   we're going to prove in this case.  So another way to say that

*United States District Court*

1    is that you're going to be calculate -- so when we're done and

2    when we present all of the evidence, we're going to ask you to

3    calculate the dollar amount of the losses that Carl suffered

4    because he was separated from his employment.

5          And how are you going to do these calculations?

6    You're going to do it by considering the evidence that we're

7    going to present, which will -- and add up the value of every

8    part of Carl Williams' employment benefits and the income that

9    he lost because of the illegal termination.

10          So this is based on evidence that will show that Carl

11    Williams would have continued his employment at Linode and that

12    he'd still be at Linode today but for the illegal conduct, but

13    for the discrimination because of his age, because of his

14    sexual orientation, and because of the retaliation.

15          The evidence is going to show that Carl Williams would

16    still be at Linode today, and Carl will show that through

17    testimony and through other evidence that the intention, the

18    understanding and the objective was for Carl Williams to help

19    Linode grow in size and to help Linode grow in value, toward

20    reaching a common goal.

21          So you're going to hear about the type of work that

22    Carl performed in this case.  You're going to hear about the

23    position that Carl held.  And it was also a high-level

24    position.  Carl is a network engineer and he has a significant

25    amount of experience.  He graduated from high school in the

1    1980s, he got his Master's in computer science in 1990, and

2    he's been working as a network engineer for more than 30 years.

3          So when he was added to the Linode team in 2014, he

4    was added so that Linode could capitalize upon that experience,

5    upon his connections, upon his knowledge of the industry, and

6    so that Linode could grow and accomplish a certain goal.  That

7    was why they hired Carl, that's why Carl was there.  And right

8    before Linode achieved that goal, they separated him from his

9    employment, again, for no legitimate business reason.

10          You're going to hear about the people both at Linode

11    and within the cloud-hosting industry that Carl worked with and

12    the relationships that he forged to benefit Linode, and that

13    those relationships continued to benefit Linode after Carl

14    Williams' termination and today.

15          Carl is going to show you that the work that he did,

16    the aspirations, his goals, his contributions, they were all

17    disregarded, thrown aside by Dan Spataro because he decided he

18    didn't want to work with the old gay guy anymore.  That's what

19    he was thinking.

20          And you're also going to see through the evidence a

21    complete lack of any legitimate business reason for this

22    decision.  They just don't have one.  They are not even going

23    to try to tell you one.  It doesn't exist.

24          And the evidence will show you that Dan Spataro, with

25    the help of Vincent Palochko and Tom Asaro, so with the help of

*United States District Court*

1    chief operating officer and the director of human resources,

2    worked to cover up the real reason why Carl was fired, the

3    reason why he was just terminated abruptly in August of 2020.

4         You're going to see a coordinated plan of concealment

5    intended to hide the real reasons, the motives behind why Carl

6    was fired.  You're going to see evidence that the real reason

7    was because Carl was treated so badly because of his age and

8    his sexual orientation, so they had to come up with some other

9    reason to tell you in this case, and that's the reason you're

10   going to hear in this court and it's going to lack all

11   credibility.

12        And this is why Carl is no longer at Linode today.

13   This is why Carl suffered a significant amount of losses.  And

14   we're going to show you what those losses are in this case.  It

15   is also the reason why Carl didn't accomplish the goal that he

16   spent six years working with Linode to accomplish.

17        Linode continued without Carl.  And Linode -- and

18   you're going to see evidence that Linode did realize the

19   benefit of Carl's work after Carl was cast aside by Dan Spataro

20   because he didn't want to work with the old gay guy.

21        During Carl's nearly six years of employment, he was a

22   high-level employee who worked directly with Linode's owner,

23   Chris Akers.  You're going to see evidence that he and Chris

24   Akers worked together to achieve the goal that I'm going to

25   tell you about in this case.  And that Carl used nearly 30

*United States District Court*

1  years of his experience working industry leaders and networking

2  and cloud computing, and that that was an asset that Linode

3  used and that Chris Akers capitalized upon.

4          And the goal that I'm talking about for a tech -- so

5  Linode is a tech company.  And when you are a tech company and

6  you start small and you grow, the goal is an exit strategy.

7  And Linode's exit strategy was realized in 2022 when Linode was

8  acquired by a company named Akamai for $900 million.  And

9  during the time that Carl was there, Linode was the fastest

10  cloud computing service in this world, growing to approximately

11  800,000 customers in 196 countries.

12          You're going to see evidence that Carl Williams'

13  personal goals directly aligned with Linode's goals, and that

14  Chris Akers tasked Carl Williams with making connections in the

15  industry with an eye toward that exit strategy, and that Carl

16  Williams worked with Chris Akers to solidify a relationship

17  with the very person who ended up purchasing Linode, the very

18  person who founded the company that ended up purchasing Linode.

19          Carl Williams is the person who introduced the owner

20  of Linode to the founder of Akamai, and then Carl Williams is

21  terminated because of his age and sexual orientation and

22  because of retaliation.  And then that relationship led to this

23  $900 million purchase.

24          The evidence will demonstrate that Carl Williams was

25  one of the few employees who worked directly with Chris Akers

*United States District Court*

1  and introducing Chris Akers to other industry leaders.  And

2  Carl will present evidence that it was Carl who, again,

3  introduced Chris Akers to the Akamai founder.

4        You're going to hear testimony, you're going to see

5  documents, there's going to be electronic communications,

6  there's going to be income verification statements that are

7  going to show that had Carl Williams not been fired, he would

8  be at Linode today.  Linode today is Akamai.  But the people

9  who work at Linode are still there and they work under the

10  Akamai name.  And Carl would be there too if he wasn't thrown

11  aside because of his age and because of his sexual orientation.

12        Carl Williams' dreams and aspirations and his

13  six years of dedication, his hard work, his contributions were

14  cast aside by Dan Spataro.  He decided one day he didn't want

15  to work with him, with Carl, and then he teamed up with Tom

16  Asaro and Vince Palochko, and together they hatched a plan.

17  And the evidence is going to show that they did this and that

18  the plan worked and Carl was fired.

19        Defendants are going to try to convince you of

20  something very different, right?  They are going to stand up

21  and they're going to tell you a very different story.  And at

22  the end of this case, you are going to be asked to consider

23  whether Carl should recover for the damages that he suffered.

24  And that consideration, that determination is going to be based

25  on the most important thing you're going to decide in this

*United States District Court*

1  case, and that is credibility.

2       Credibility is how you're going to decide this case.
3  It's the most important issue you're going to decide.  Who to
4  believe.  Who's telling the truth.  Who's concealing the truth.
5  It's the most important issue in this case because you're going
6  to hear two starkly different accounts of Carl's nearly six
7  years' of employment.  Carl Williams started at Linode in 2014.
8  He was fired by Dan Spataro and Vince Palochko with the
9  assistance and with the support of Tom Asaro in August of 2020.
10  And you're going to hear what it was like for Carl to work at
11  Linode.  You're going to hear what it was like every year that
12  he was there, 2014, 2015, '16, '17, '18, '19 and '20.

13       Again, you're going to hear a polar opposite account
14  from the defendants.  And your job will be to decide
15  credibility.  Who do you believe?  What does the evidence mean?
16  What does it show?  Who was lying and who's telling the truth?
17  Who's concealing and who is being honest?

18       Nobody but the jury can decide credibility.  Judge
19  Wolson is going to give you the law.  The lawyers will present
20  evidence, and Carl and the parties will give their accounts.
21  But you're going to decide credibility, and that will decide
22  this case.  Who's lying?  Who is telling the truth.

23       Sometimes credibility is very difficult to determine,
24  and sometimes it can be impossible.  But there are times when
25  it's not hard at all.  There are some people that make

*United States District Court*

1    credibility determinations very, very easy to see.

2         After opening statements, Judge Wolson is going to

3    direct me to call my first witness to the stand, and that's

4    very easy.  I'm going to ask Carl Williams to take the stand.

5    He's going to get up there, and he's going to tell you a

6    credible account of what it was like for him to work at Linode

7    for those 6 years.

8         You will hear from Carl what Carl heard from Dan

9    Spataro.  You will hear from Carl what he heard from Tom Asaro

10   and Vince Palochko and the other network engineers he worked

11   with.  You're going to hear about Linode's growth.  You're

12   going to learn about network engineering from a high level,

13   from a, you know, thousand-mile view.  And you're going to hear

14   what Carl heard.

15        Linode is a cloud-based computing company, which means

16   that they do business through what's called data centers.  And

17   data centers are places strategically placed around the world

18   where there's hardware and software.  And that's how companies

19   get their products and services and their websites online, and

20   that's the product that Linode sold.

21        When Carl started at the company, Linode had these

22   data centers in Dallas, Atlanta, New York, London.  When Carl

23   left the company, they had data centers in Tokyo, Frankfurt,

24   Singapore, Toronto, Dubai, Sydney.  You will hear the evidence

25   about Linode, a cloud-based hosting company that provides

*United States District Court*

1 resources to companies to get online, and you're going to hear

2 about the network engineers like Carl, who are responsible for

3 building its infrastructure.

4        The evidence will show that Linode grew significantly

5 in the years of Carl's employment, 2014 to 2020.  And the

6 evidence is going to show that Carl worked intricately and

7 contributed significantly to that growth.

8        When Carl started, Linode was located in, I want to

9 say, Gibbsboro.  It's Galloway, New Jersey.  And then Linode

10 moved to Haddonfield, and today Linode is at their headquarters

11 in Philadelphia.  They bought a building that used to be a

12 bank, and that's their headquarters today in Old City.  And

13 Carl was there for every one of those moves.

14        He was on the team that helped build Linode's network

15 over the years, and when Carl started, there was only three

16 network engineers at Linode.  It was Carl and it was two other

17 network engineers, much younger.  One was in their 30s; one was

18 in their 20s.  Carl is in his 50s, the only network engineer in

19 his 50s at -- the entire time Carl was there, they didn't hire

20 one other person in their 50s.  Everyone was younger.  The

21 other two, their names are Andrew Dampf and Alex Forrester.

22        Carl was the most experienced person on the team, by

23 far, with over 30 years' of experience in computer networking

24 and network engineering.  Carl helped Linode owner Chris Akers,

25 because of his 30 years' of experience, and Carl used his

*United States District Court*

1  relationships and his connections to help forge new

2  relationships for Linode.  And again, it was these connections

3  that helped Linode capitalize and grow and exit through the

4  Akamai acquisition in 2022, just a year after Carl was

5  terminated.

6        Carl Williams' position, experience, and future at

7  Linode is relevant because he is asking the jury to consider

8  whether he would still be at Linode had Dan Spataro not

9  terminated him because he didn't want to work with the old gay

10  guy.

11        If you find that Carl Williams would still be at

12  Linode today, you will be asked to calculate Carl's losses

13  caused by the separation.  Carl will present evidence in

14  connection with these calculations, and you are going hear what

15  his income was, his benefits was, what his bonuses were, what

16  his profit sharing was, and those things all be added together

17  so that you can calculate the amount of money that Carl would

18  have received had he still been at Linode today.

19        In connection with these calculations, Carl is going

20  to present income verification statements and other income

21  benefit statements.  When Carl is finished he is going to

22  ask -- the plaintiff will ask you to consider the evidence and

23  decide how much Carl's past wage loss claim is worth.  So

24  that's the first measure of damages that the plaintiff will

25  submit to you, and that's how much money, in all those benefits

*United States District Court*

1    and bonuses, would he have earned from the day the

2    discrimination started until today, everything in the past.

3         Carl Williams also makes a claim based for -- I'll

4    just back up a little bit.  So we're going to present evidence

5    that's going to show that the base level of these damages is

6    this past wage lost that I just told you about, just based on

7    his income, just based on his health insurance benefits and his

8    401K.  So just the basic benefit package is worth about

9    $240,000.

10        Carl Williams is also going to present evidence by

11   showing you what similarly situated younger network engineers

12   earned between that time and today.  Those people are the

13   people that remained at Linode.  And so the perfect person to

14   compare Carl to would be a senior-level network engineer who

15   worked with Carl in the same department as Carl, the same

16   location as Carl, and who continued to work after Carl was

17   terminated, just like Carl would have.

18        Plaintiff will also present a claim for emotional

19   impact caused by the 2015 through the present, so nine years of

20   emotional impact.  To support this emotional impact claim, Carl

21   is going to get on the stand and tell you what it was like to

22   be subjected to discrimination based on his age, his sexual

23   orientation, and retaliation by the people he worked with, some

24   of the people he was closest to for those years.

25        He's also going to present evidence in the form of

*United States District Court*

1 medical records, which are going to show that Carl Williams

2 required medication. And he started taking this medication, he

3 started seeing this doctor while he was at Linode. And that

4 about a month after the termination, for the first time, his

5 medical records will show that he didn't just suffer from

6 anxiety, he also suffered from depression.

7       Carl Williams will also support his emotional distress

8 claim through his own testimony describing the impact. You're

9 going to hear how Carl Williams had to seek medical treatment,

10 and you're going to hear how Carl Williams was prescribed the

11 medication I told you about.

12       Carl Williams' damages are those things that would not

13 have happened if defendants did not subject him to

14 discrimination based on his age and sexual orientation and if

15 they did not retaliate against Carl because he complained or

16 reported these issues.

17       However, before you get to that, before you're asked

18 to count up what he lost and the value of all these things, you

19 have to decide whether he was subjected to discrimination in

20 the first place. And again, that will decide the single most

21 important issue in this case, which is credibility, who is

22 lying, who is telling the truth, who is concealing, and whose

23 conduct shows disclosure.

24       You're going to hear what it was like for Carl in

25 2014, when he was at the Galloway offices in Linode, and you're

*United States District Court*

1 going to hear about the comments about his age and the

2 ridicule.  You're going to hear about the abuse.  You're going

3 to hear the things he heard.  Carl will provide you details

4 about the network engineering team and what Linode was like

5 back then.

6         And then you're going to hear about how the department

7 grew to what it was like in 2020, when he was fired.  Andrew

8 Dampf, I mentioned this earlier, Andrew Dampf and Alex Forester

9 were the only other network engineers who worked at Linode when

10 he started.

11         And when he left, when he was terminated, the

12 department had grown to -- there was multiple levels.  When

13 Carl started, there was no manager.  It was just the three

14 network engineers trying to grow this young cloud-based starter

15 company.

16         When he left, there was junior network engineers.

17 There were senior network engineers.  There was regular network

18 engineers.  There was a manager.  There was a supervisor.  It

19 became a real department of a successful large cloud-based

20 computer company that was worth $900 million when it was sold.

21 You're going to hear about how it grew.

22         So in 2016 is when Dan Spataro started.  So two years

23 after Carl is when Dan Spataro started.  And he started, and he

24 was introduced to the team as the manager.  And it was in that

25 position that the discrimination based on age and sexual

*United States District Court*

1    orientation got a lot worse.

2          Owen Conway was hired in 2016, he was promoted to

3    senior network engineer in 2017.  Carl was still a network

4    engineer at that time, even though he had more experience, even

5    though that he had more seniority than Owen Conway.

6          You're going to hear about Dan Spataro's behavior, how

7    he treated the LGBT community.  You'll hear how Dan Spataro

8    didn't want to work with LGBT people and how he wouldn't hire

9    LGBT candidates and how he would exclude them from

10   consideration.  You're going to hear how he spoke openly about

11   it to Carl, a member of the LGBT community, and those comments,

12   in and of themselves, are discrimination.

13         You're going to see evidence of Dan Spataro's

14   discriminatory animus toward older people, toward older network

15   engineers specifically, and what he thought of them through the

16   comments that Carl experienced, you know, that Carl couldn't

17   get the job done anymore and he's not a real network engineer.

18   He wants to work with younger guys that he can go out with and

19   he can party with.  You're going to hear the ridicule that came

20   from Dan Spataro that Carl couldn't get the job done.

21         And then in 2018, you're going to hear about the move

22   to the Corn Exchange National Bank building in Old City,

23   Philadelphia.  And 2018 is kind of a pivotal year in this case.

24   The evidence is going to show that Carl developed strategies by

25   that point, strategies that resulted in Linode's value

*United States District Court*

1 increasing significantly, tens of millions of dollars of real

2 value added to Linode that Linode capitalized on when it was

3 purchased.  Linode got that money that Carl's strategies

4 single-handedly secured for Linode, and then Carl was excluded

5 from the company because of his age and sexual orientation just

6 before that happened.

7          The evidence is going to show that because of the age

8 discrimination and because of the comments about his age, he

9 went to the Pennsylvania Human Relations Commission and he

10 filed a charge, and he asked for help.

11          The evidence is going to show that when that charge

12 was served on the defendants that -- strike that.  When the

13 charge was served on Linode and Dan Spataro and Tom Asaro and

14 Vince Palochko, when they received the charge, there was a

15 meeting set up to discuss the charge and to discuss Carl's

16 issues.  And this meeting occurred in December 2018, and during

17 that meeting, a deal was struck.

18          You know, Carl had been there, by that point, for '14,

19 '15, '16, you know, more than 3 years.  And he was in the same

20 position earning almost the same amount of money.  Other

21 younger guys are getting promoted ahead of him who came after

22 him with less experience, less seniority.  And he's watching it

23 happen and, you know, he's wondering what's going on.

24          And they struck a deal, and the deal was that Carl

25 would receive this change in job title from network engineer to

1  director of network strategy and innovation interconnection.

2  And in exchange, Carl wouldn't pursue the charge.

3          And so in January of 2019, an email was sent out

4  announcing that now Carl was now the director of strategy and

5  innovation and that this was his new job title.  So now Carl is

6  a director at one of the fastest growing cloud-based computing

7  companies on the planet.  He's not getting paid like a

8  director.  He's not getting paid, even, like a senior network

9  engineer.  He's not getting paid what the younger guys were

10  getting paid.  That's what the evidence is going to show.

11          You're going to see that as the director of network

12  strategy and innovation, even Dan Spataro compared Carl to some

13  of the most senior-level well-known tech people in the

14  industry.  And you may not know these names if you're not in

15  the industry, but Dan Spataro compared Carl Williams to Martin

16  Levy from Cloudflare.  He was a network strategy specialist.

17  He compared him to Martin Hennigan from Twitch, the senior

18  interconnection manager.  He compared Carl to the director of

19  interconnection at GTT.  He compared Carl to the director of

20  network strategy at Pilot Fiber, and to Marty Strong from

21  Facebook.

22          And you're going to see that this meeting and this

23  time period, 2018, December 2018 to January 2019, was kind of a

24  benchmark in this case.  Because after that, you know, we get

25  close and into the final year of Carl's employment, when things

*United States District Court*

1  got really bad and it became very obvious that Carl wasn't

2  wanted anymore, that Dan Spataro just didn't want to work with

3  Carl anymore after Carl filed the charge and after the change

4  in job title and after Carl began excelling in his new

5  position.

6        Dan Spataro made it clear he did not want to work with

7  Carl anymore and that it was personal.  It wasn't because of

8  his performance at work.  Carl has never once been accused of

9  performance issues, not once.  Carl has never been written up.

10 You will see no formal write-up in his file.  He just didn't

11 want to work with the old gay guy.

12       You're going to hear what Carl heard.  You're going to

13 hear the statements -- Dan Spataro's feelings about LGBT

14 candidates, how he ridiculed and disparaged them.  He called

15 them troublemakers.  He called them activists, the same words

16 he used to describe Carl when Carl filed this charge.

17       You're going to hear about his dislike for LGBT

18 employees like Carl and his dislike for LGBT -- that LGBT

19 employees were even permitted to bring friends to headquarters.

20 There was an event once, and it was an event organized by one

21 of the LGBT employees.  And by that point, Linode had grown to

22 a couple hundred people working there.  And so there would be

23 events there.  And Dan Spataro, at this event, was very upset

24 by the fact that all these gay people could come there and hang

25 out.

*United States District Court*

1           As director of network strategy and interconnection,
2  it was Carl's job to help Linode grow and do networking.  And
3  this isn't the networking of computers that Carl was an expert
4  in and spent 30 years working in, honing his skills in.  This
5  was actually a network of people.  Because Carl is also
6  excellent when it comes to the networking of people.  And this
7  is a position and this was a -- these were responsibilities
8  that Carl was asked to do because of his skills in that area
9  and because of his connections in the industry.  And this is
10  part of his written job description as the director of
11  interconnection.
12           So Carl starts going -- you know, to execute his
13  responsibilities, he starts attending events all around the
14  world where, you know, now, remember, Linode had servers in all
15  these different countries, Malaysia, the Philippines.  Forging
16  relationships with founders and owners of other companies.
17           So Dan Spataro started going on these trips.  You see,
18  the way it worked there was when Carl went to go on a trip, he
19  would see an event, and he would think, hey, that looks like
20  something that could really benefit Linode.  Let me go meet
21  this person there, and he would set it up so that he would go
22  to this event.  And they were these big conferences, and he
23  would speak at these events and he would talk about Linode and
24  he would meet people.
25           And so he would write up a report, a justification

*United States District Court*

1    report, and he'd submit it.  And then it would get approved,

2    and he would travel there.  And Dan Spataro started attending

3    these events with Carl.  Carl wasn't attending with Dan

4    Spataro.  Dan was going with Carl because this was Carl's

5    written job responsibilities.  These are things Carl was going

6    to do either way.

7            And you're going to see evidence that Dan Spataro

8    preferred younger company on these trips.  And he spoke about

9    it.  He articulated his preference for younger network

10   engineers.  During these trips, he wanted younger people he

11   could go out with.  He said younger people I want to party

12   with, drink with, and go get girls with.  And these comments

13   were made to Carl, specifically on one trip when he brought a

14   friend and they were going out that night, and Carl was told he

15   can't come.  We don't want you here because he's gay, because

16   he's older.

17           And it was during one of these trips to the

18   Philippines, right before COVID hit, and if you don't remember,

19   COVID started in this country, the lockdown started in March of

20   2020.

21           So right before that, there was this trip to the

22   Philippines.  And during this trip, Dan Spataro informed Carl,

23   at a dinner, he said, You're not going to be going on these

24   trips anymore.  It's part of his written job description, a

25   large part, a significant part.  So that was taken away from

1    Carl.

2            And he said that the reason you're not going on these

3    events anymore is because I decided I want Adam Rambo to come

4    with me instead of you.  Adam Rambo is a kid in his 20s that

5    had just started working there as a network engineer.  He was

6    two levels lower than Carl in the corporate hierarchy.  He had,

7    you know, tremendously less experience than Carl.  He had less

8    time, less seniority.  He had just started working there, I

9    think, in 2018.  But he was going to replace Carl because Dan

10   Spataro wanted someone young he could hang out with.

11           You are going to hear the discriminatory comments.

12   You're going to see the discriminatory animus.  You will hear

13   and see the issues of defendant's credibility, the single most

14   important issue you have to decide in this case.  And you're

15   going to have to make these credibility determinations to try

16   to decide who's credible and who's not.

17           And that takes us to the termination, and that's what

18   I'm going to talk to you about, termination, before I sit down.

19           So remember, sometimes people make it easy to

20   determine credibility.  Sometimes they don't.  In this case, I

21   suggest the evidence demonstrates it won't be hard for you.

22   Carl was terminated by Dan Spataro and Vince Palochko during a

23   video call on August 19, 2020.  Plaintiff has to prove by

24   preponderance of the evidence that the termination was caused

25   by an unlawful reason because of his membership in a protected

1   class, because of his age, because of his sexual orientation,

2   because of protected activity, which means retaliation.

3          Defendants are going to present you with another

4   reason for termination.  They have to.  They have to try to

5   explain why they did this thing.  So they're going to tell you

6   it's called a legitimate nondiscriminatory reason for their

7   termination.  It's their excuse.  It's also the pretext under

8   which Carl was fired.

9          But the defendants are going to tell you this

10  legitimate -- so called legitimate nondiscriminatory reason for

11  the termination, and then you're going to be asked to decide

12  whether you believe what the defendant says or whether you

13  believe what the plaintiff says.

14         And if you don't believe the defendant, then you are

15  going to be asked to consider the reason for their -- the real

16  reason behind their actions.  The real reason why -- because if

17  you don't believe them, it means you decided their reason was

18  false.  And then you're going to have to decide why they're

19  giving you false reason, and that's what the case will turn on.

20         Your ultimate decision may turn on whether or not you

21  believe the defendant's reason for Carl's firing.  So it might

22  be the most important issue in this case, is you deciding if

23  you believe what defendants tell you about the termination.

24         Defendant's reason, at least the reason that they're

25  going to tell you here today, two and a half years later, is

1  intended to shock.  And you're going to see it's not the reason
2  they told Carl the day he was fired.
3       In fact, the evidence is going to confirm that the
4  reason they're going to tell you here today, they denied that
5  was the reason the day that Carl was fired.  They didn't just
6  deny it once.  It wasn't like, hey, just don't want to get into
7  it, right?  They denied it repeatedly over and over again.
8       So I'm going to tell you what you're going to hear
9  from the defendants and the one -- and when I tell you that,
10 what I mean is I'm going to tell you what they're going to tell
11 you in court here today, the reason they're going to claim that
12 they fired Carl.
13      And it's a story about a former employee who worked at
14 Linode for years.  And this other employee, not Carl, this
15 other person worked at Linode for several years.  His name is
16 John Musbach.  And it's a story that has all the trappings of a
17 binge-worthy or cringe-worthy prime time soap opera drama.
18 You're going to hear about allegations of child pornography.
19 You're going to hear about the dark web, secret Bitcoin
20 transactions.  You're going to hear about contract killing
21 services and FBI hacks and files.  And you're going to hear
22 about internet scams.  And you're going to be sitting there,
23 and you'll be asking yourself what does this have to do with
24 Carl Williams, and you're right to ask that question.  The
25 answer is nothing.  Absolutely nothing.

*United States District Court*

1          The evidence is going to show that Carl Williams has

2  never in his life been accused of a single crime, and

3  defendants will not suggest that Carl has ever been accused of

4  a single crime.

5          Defendants are going to claim that because Carl

6  Williams had a romantic relationship with this guy, they had to

7  just fire him.  They didn't have a choice.  Out of nowhere.

8          Remember they denied all of this then.  This is what

9  they're going to tell you now.  Defendants are going to tell

10  you this is all based on an internet article, and because

11  Carl's name was at the bottom of the article, there was just no

12  choice.  We did what anyone would do, they're going to say.

13          The evidence is going to show that there's no

14  credibility in any of these statements.  Because the evidence

15  is going to show that defendants did not make this argument

16  until years after Carl's termination, after defendants fired

17  him, after they hired a legal team, after a lawsuit was filed,

18  and all of a sudden this is the reason.  That's what you're

19  going to see in this case.

20          Before all of that, you will see nothing to suggest

21  that defendant's termination had anything to do with what they

22  claim in court today.  The day of the termination and for years

23  after, defendants presented and maintained a completely

24  different excuse for the termination.  And plaintiff is going

25  to show you evidence that defendant's reasons for termination

*United States District Court*

1   was pretextual, which means false, a false reason to hide

2   discrimination, the illegal conduct.

3         And plaintiff is going to show you evidence that

4   defendants have been trying to figure out -- so the evidence is

5   going to demonstrate that no matter what the reason is,

6   defendants decided they couldn't tell Carl.  They couldn't talk

7   about it.  They had to hide it.  So the evidence is going to

8   show that defendants decided that they had to hide their true

9   motives for terminating Carl Williams.

10        And that takes us full circle, to back to the issue of

11  credibility.  You're going to have to decide whether

12  defendant's excuse for the termination is credible.  Are they

13  telling the truth about why Carl was fired or are they telling

14  you something false.  And like I said, sometimes people make it

15  easy, don't they.

16        The evidence is going to show that they wanted to fire

17  Carl Williams.  And by "they," I mean Dan Spataro wanted to

18  fire Carl Williams.  The evidence will show that clearly, that

19  this was Dan Spataro's objective, his goal, and that he was

20  joined and assisted by Tom Asaro and by Vincent Palochko.  And

21  together they coordinated an effort.  Whatever Dan Spataro's

22  reason to fire Carl was -- and the evidence is going to show

23  that was personal -- but whatever the reason was, when he got

24  together with Tom Asaro and Vince Palochko, they decided they

25  couldn't say what that reason was.  They had to hide it.  They

*United States District Court*

1    had to work together to hide it.

2            And so that's what they did.  They worked together to

3    hide it.  They spent the entire week before the termination

4    working together, trying to come up with some reason.  We can't

5    tell them what it really is.  We got to think of something.

6            And so they made a list of all these false reasons for

7    the termination.  They're going to tell you the false --

8    they're going to tell you that none of those things on that

9    list were why he was fired.  But that's the list that they

10   made, and that's the list that they told Carl he was terminated

11   based on.  So you're going to have to decide why -- what they

12   were hiding.

13           Based on the evidence, you have to decide why they hid

14   the truth.  Was it to avoid the disclosure of something

15   legitimate to something they didn't have to worry about?

16           Plaintiff's position is clear, and the evidence is

17   going to show that, no matter which way you look at it,

18   defendants engaged in dishonesty regarding the single most

19   important issue in this case, the reason for termination.

20   Defendants will tell you that they did a lot of these things,

21   which is why I said sometimes credibility is easy to determine,

22   and sometimes people make it very, very easy.  Thank you.

23           THE COURT:  Okay.  Thank you, Mr. Carson.  It's now

24   time for defendant's opening.  Are you all okay for another 20,

25   30 minutes?  I'm not trying to cap Mr. Cavalier, but that's an

*United States District Court*

1    estimate.  Are you all okay?

2              Okay.  Thank you.  Go ahead.

3              MR. CAVALIER:  Thank you, Your Honor.

4              Good afternoon, folks.  My name is John Cavalier, and

5    as you heard earlier today, I'm a lawyer at Jackson Lewis, and

6    I represent the defendant in this case, Linode.

7              And before I start into the details here, I do want to

8    extend a very heartfelt thank you to all of you for being here

9    and for your willingness to serve on this jury.  You're brave

10   to be called to be here today.  I know that you're all from

11   outside of the city, form the outlying counties.  So you also

12   braved the commute into Philadelphia today and for the next

13   several days, and I know that's not easy.

14             This case is important to my clients.  And, frankly,

15   it's important to Mr. Williams as well.  And we know that you

16   give up that time away from your jobs, from your families, from

17   whatever else you'd like to do other than this, to come in here

18   and decide this dispute.  And we don't take that sacrifice on

19   your part lightly.  So by the end of this trial, I promise you

20   you're going to be sick of hearing people say thank you.

21   Between the judge, the lawyers here, the court staff, the

22   people in the courthouse outside of this courtroom, you'll hear

23   thank you a thousand times this week.  And the reason for that,

24   just like Judge Wolson told you earlier, this whole thing, this

25   system does not work without at least eight of you willing to

1    come in here, give up your time, and render a judgment on the

2    facts in this case, and so we appreciate that.

3          We won't waste any of your time.  I promise you we

4    will try to speed things along as much as we can out of respect

5    for that time.

6          So having said that, let me introduce you to a couple

7    people on our side of the courtroom.

8          First, you met these two earlier today.  This is

9    Stephanie Peet and Tim McCarthy, who are lawyers who work with

10   me at my firm, Jackson Lewis.  And together we represent

11   Linode.

12         A bit about Linode, briefly.  You heard that it is a

13   cloud-hosting provider that was founded in Galloway, New

14   Jersey, in 2003 by a guy named Chris Akers.  It provides cloud

15   infrastructure, virtual machines, and manages computing

16   services.  And if that sounds like a foreign language or some

17   kind of black magic to you, it does to me.  We'll have people

18   come in and explain, certainly better than I can, what those

19   terms mean and what the business at hand here actually is.

20         And as you heard during Mr. Carson's opening, in 2022,

21   Linode was acquired by Akamai Technologies.  It's another

22   company, essentially, engaged in the same kind of business.  So

23   if you hear Linode or Akamai during this trial, you'll know how

24   they relate to one another.  All of the event's underlying

25   facts here happened when the company was called Linode.

1          But again, today it's called Akamai.  Some of the

2   people who worked previous -- Linode employees will be

3   testifying today as Akamai employees, just so you understand

4   the distinction.

5          You heard a couple of these names in Mr. Carson's

6   opening.  Let me introduce you to the actual people.

7          You look out there, that gentleman up there in the

8   second row, that's Tom Asaro.  He is the former chief operating

9   officer at Linode.  He was employee No. 3 at the company and is

10  a life-long friend of the company's founder.

11         At the end of that row, that's Dan Spataro.  You heard

12  a lot about him in Mr. Carson's opening.  He was, at times,

13  Mr. Williams' boss at Linode.  He was his colleague at Linode,

14  and he was at Linode, and has been, since 2016, when he was

15  brought into the company at the recommendation of Mr. Williams

16  himself.

17         Vince Palochko or Vinny, as he's known, is in the

18  middle of those two guys.  Vinny was at Linode, or has been at

19  Linode, since 2012.  He was hired as a human resources manager.

20  The company promoted him shortly after that, and he became

21  Linode's director of people operations, which is the top HR

22  person in the company.

23         Now, you heard from Mr. Carson during his opening

24  statement that a lot of the facts in this case are undisputed.

25  And here's some good news for you:  We agree with that.  Many

*United States District Court*

1    of the facts are undisputed and, in fact, many of our witnesses

2    are the same.  And because of that, we are going to do things,

3    I think, a little differently than you might be expecting this

4    week.

5            Normally, you know, coming in from the outside, you

6    might expect a trial to be half the plaintiff.  Then the

7    plaintiff is done and the defendant goes.

8            Here, in order to try to make this as efficient as we

9    can, to the extent that plaintiff calls any of our witnesses,

10   and especially those three people, those three guys in the pews

11   out there, to the stand, rather than recalling them to the

12   stand later in the week, we're going to try to take all of

13   their testimony at once.

14           And the hope is that will make things a little bit

15   more efficient, speed things along, and not waste any of your

16   time.

17           So ultimately, what's this case about?  Mr. Carson is

18   right.  It has a lot to do with credibility.  At its core,

19   you're going to hear about a company that tried to do things

20   the right way.  You're going to hear about a company that tries

21   to do right by its employees at all terms.  You're going to

22   hear about a company that at all times provided its employees

23   with a mechanism for reporting the kinds of things that

24   Mr. Williams is now alleging today, without any fear of

25   retaliation, to either HR or the management team in place at

*United States District Court*

1    the time.

2         And it's about an employee or a former employee,

3    Mr. Williams, who was always one of the highest paid employees

4    at Linode, by the way, and who never availed himself of those

5    protections while he was an employee.

6         In simple terms, I agree with Mr. Carson, this case is

7    about credibility.  It's about Mr. Williams' credibility

8    weighed against the credibility of Mr. Asaro, Mr. Palochko, and

9    Mr. Spataro.  Each side tells a very different story and only

10   one of those can be true.  We agree on that.

11        Mr. Williams claims he was subjected to discrimination

12   and harassment on a daily basis from the beginning of his

13   employment to the day of his termination, and then was

14   unlawfully terminated in retaliation for his complaints due to

15   his age and his sexual orientation.

16        Now, Mr. Spataro and Mr. Asaro and Mr. Palochko are

17   going to take that stand and they're going to tell you that

18   they never saw any such harassment or discrimination against

19   Mr. Williams, and they're going to tell you they certainly

20   never engaged in any of that themselves.  They are going to

21   tell you that Mr. Williams never complained to anyone at Linode

22   about some discrimination or harassment that he was suffering

23   due to his sexual orientation or his age.  He was hired at age

24   50.  And certainly no one cared about his sexual orientation at

25   a tech company in 2020 or 2018 or 2015.  You'll hear about that

*United States District Court*

1    from our witnesses on the stand.

2         You'll hear that only once during his six-year tenure

3    of employment did Mr. Williams ever raise this issue of his

4    age.  He never raised the issue of sexual orientation subject

5    to harassment that he was receiving.  But once he raised his

6    age, and that was in 2018 when he was passed over for a

7    promotion to a position that he felt he was qualified for.

8         Now, you're going to hear Mr. Spataro tell you that he

9    lacked the technical expertise that that position required.

10   But what you are also going to hear Mr. Spataro tell you is how

11   the company, recognizing Mr. Williams' value to the

12   organization and appreciating his service as an employee,

13   created a new position, a new promoted position for him to

14   fill.  They give him a director title, they gave him director

15   responsibilities.  And after he was promoted into that

16   position, at least from the perspective of these gentlemen in

17   the company, things were going just fine.

18        You won't have to take Mr. Spataro's word on any of

19   this, by the way.  You'll see documents, copious documents in

20   this case that are completely free of any of the normal

21   evidence that you would expect in a tech company run on

22   computers to show that there was some kind of discrimination

23   going on in the background here.  You would see some emails,

24   you would see some reports, you would see communications

25   between Mr. Williams and the HR department alleging that this

*United States District Court*

1   was going on, complaining about it, asking for it to be

2   stopped.  You will not see any of that in this case.

3           In fact, you are going to see a 100-page document, a

4   message chain between Mr. Williams and Mr. Palochko that spans

5   four years of communication between the two of them.  And

6   you're going to see them going back and forth about a variety

7   of issues and complaints that Mr. Williams had at the time.

8   You are going to see Mr. Williams complain to Mr. Palochko

9   about his desk being moved without permission; he was

10  complaining about his office being too cold to Mr. Palochko; he

11  complains about PTO being denied; he complains about his

12  personal issues; he complains about health issues; he complains

13  about the way the company was doing its recruiting; he

14  complains about a smirk emoji that one fellow employee clicked

15  on to one of his posts about a competing business that he

16  wanted to highlight for the team; he complains about the fact

17  that his new title, that he now alleges was a sham, wasn't on

18  his business card; he complaints about one day he found a bug

19  in the lobby of the building and he was reporting it and even

20  noted for Mr. Palochko that he kept it in his trash can in case

21  anybody wanted to verify what it was.

22          They talk about everything.  And Mr. Williams

23  certainly was not shy about complaining.  He even complains

24  about other companies' diversity and inclusion programs, while

25  praising Linode's initiatives in that respect.

1          In fact, in February of 2020, Mr. Williams wrote to

2   Mr. Palochko, the director of HR at Linode who he is now

3   accusing of engaging in this discrimination coverup, that Chris

4   Aker, the founder of Linode, and Mr. Palochko himself, as the

5   director of HR, have "done a great job and been very

6   accommodating on LGBTQ+ issues."

7          What you won't see in those 100 pages anywhere is one

8   single instance of Mr. Williams complaining about this alleged

9   discrimination or harassment.  Not one message saying, hey,

10  another employee made a really crude remark to me today, or

11  listen, Mr. Palochko, Mr. Spataro is really riding me about my

12  sexual orientation, or anything like that.  There's nothing.

13  You'll have this as an exhibit.  You'll have this back in the

14  jury room to see it with your own eyes.

15         By way of another example, during his time at Linode

16  Mr. Williams had a chance to evaluate Mr. Spataro as his

17  manager.  And he did so freely.  You'll see this evaluation.

18  It will be an exhibit for you.  And it is glowingly positive.

19  There is no mention in that evaluation of Mr. Spataro harassing

20  or discriminating against Mr. Williams and no mention of

21  Mr. Spataro or anyone else failing to stop this alleged

22  harassment or discrimination that was apparently or allegedly

23  ongoing during that time.

24         So you heard a lot about -- so there's really two ways

25  to think about this case.  You have the alleged harassment and

*United States District Court*

1  discrimination taking place during the term of Mr. Williams'

2  employment, which again, we contend there's absolutely no

3  evidence for.  And so Mr. Carson is right, you are going to

4  have to make a credibility determination here between what

5  Mr. Williams tells you and the other witnesses and the

6  documents tell you.

7          The second piece of this case is the termination.

8  That begins -- the path to this termination begins in 2016.

9  Okay?  And Mr. Carson is right, there was a fellow named John

10 Musbach who previously worked at Linode.  And in 2016, he was

11 charged with and convicted of sexual misconduct with a minor.

12 Apparently he was exchanging pornographic photos with a

13 13-year-old boy.  He eventually pled guilty to that crime.  And

14 of course, as soon as the company found out that these charges

15 were happening and that the FBI had seized his company laptop,

16 they fired Mr. Musbach.  Out of sight, out of mind.  Great.

17          Apparently during this time -- and unbeknownst to

18 anyone at Linode and, frankly, didn't care who or what

19 Mr. Williams was doing or seeing in his spare time --

20 Mr. Williams struck up a relationship with Mr. Musbach.  And

21 you'll hear some testimony about how that relationship

22 developed and what was going on during the intervening years.

23 But what actually matters here is that in 2020, four years

24 after the original charges and while Mr. Musbach and

25 Mr. Williams were in a relationship, Mr. Musbach was

*United States District Court*

1  investigated again and charged by the federal government, this

2  time with attempting to hire a hitman on the dark web to

3  assassinate the 13-year-old victim that he believed was the

4  primary witness against him in the previous case to which he

5  eventually pleaded guilty.

6         Apparently -- and I don't have to say "apparently"

7  because it's part of the record now, but Mr. Musbach admitted

8  to paying $25,000 in Bitcoin to a person --

9         MR. CARSON:  Objection.  Objection.

10        THE COURT:  Objection is overruled.

11        MR. CARSON:  Your Honor --

12        THE COURT:  Mr. Carson, don't argue with me.  The

13  objection is overruled.

14        MR. CARSON:  Can we talk at sidebar?

15        THE COURT:  No.  The objection is overruled.

16        MR. CAVALIER:  Mr. Musbach paid $25,000 in Bitcoin to

17  a person he believed at the time could kill this child.  And

18  fortunately, for I think everybody involved, including

19  Mr. Musbach, the site that he used to hire this hitman turned

20  out to be a scam.

21        Mr. Williams, who by this time had been in a

22  relationship with Mr. Musbach for four years, then testified on

23  behalf of Mr. Musbach at a pretrial detention hearing in August

24  of 2020.  The hearing was covered by the Philadelphia Inquirer

25  paper of record in this city, and Mr. Williams was quoted in

*United States District Court*

1  the article acknowledging that Mr. Musbach was his partner,

2  that he had appeared at the hearing in support of Mr. Musbach,

3  and that he had long known about Mr. Williams'(sic) issues with

4  child pornography, but that he had, at least to that point,

5  been unaware of Mr. Musbach's attempts to have his victim

6  killed.

7       As you can imagine, this article and its publication

8  caused a huge commotion at Linode.  The same day the article

9  appeared, a Linode employee sent a digital copy of the article

10  to Mr. Spataro, expressing concern that Mr. Williams had been

11  mentioned in this article about Mr. Musbach.  And Mr. Spataro,

12  who is, again, Mr. Williams' boss at this time and frequent

13  travel partner, and who has two teenage kids of his own,

14  immediately went to Mr. Asaro and said, bottom line, either he

15  goes or I go, I will not work with him anymore.

16       To be clear, it had nothing to do with his sexuality,

17  it had nothing to do with his age.  It merely had to do with

18  his support of someone, his public support of someone who had

19  engaged in such reprehensible behavior.

20       At the same time this was going on, separate and apart

21  from Mr. Spataro, numerous other Linode employees who had seen

22  this article reached out to Mr. Palochko, as the head of HR,

23  and essentially told him the same thing, that they were

24  uncomfortable with Mr. Williams' continued employment with the

25  company under these circumstances and that they would resign if

*United States District Court*

1    he remained with the company.

2         Obviously, the company had never been confronted with

3    a situation like this before.  Here they were faced with an

4    employee being quoted in a paper of record in a city where

5    their business was headquartered, acknowledging a relationship

6    -- not only a relationship, but a supporting relationship with

7    somebody who had been charged with these horrible crimes.  They

8    were worried about the reputation of the company and how

9    customers and vendors would react to the news.

10        You heard Mr. Carson say that a key part of

11   Mr. Williams' job was his ability to network.  With this now

12   out in the public, his support for this gentleman, they worried

13   that that networking would no longer be effective.  They were

14   worried about all of these employees, including Mr. Spataro,

15   who was, by all accounts, a superstar at the company,

16   threatening to resign.

17        They were worried, frankly, about how Mr. Williams was

18   going to react to this.  And as you will hear, he doesn't have

19   the best track record of reacting appropriately to bad news or

20   criticism.  And frankly, they were worried about how the

21   ongoing investigation into Mr. Musbach and his second series of

22   crimes would be impacted by their decision since the FBI was,

23   at that point in time, continuing to investigate Linode's

24   systems, where again, Mr. Musbach had once worked.

25        One thing they did know almost immediately was that

1   they were going to be left with no choice but to end

2   Mr. Williams' employment with the company.  Once that was

3   decided, they had to decide how they were going to tell him of

4   their decision.  And they were very concerned, again, for the

5   reasons I just told you.  They were considering a lot of

6   different inputs from a lot of different angles under very

7   stressful circumstances and dealing with what was, in effect, a

8   crisis at that point in time in the company, an unprecedented

9   crisis.

10          So they decided to tell Mr. Williams that he was being

11   terminated for the blandest reason they could think of.  They

12   told him that he was being terminated for generic company

13   policy violations.  And in doing so, they believed at the time

14   that this was the least disruptive, least risky way to

15   effectuate this termination.

16          You are going to hear each and every Linode witness

17   tell you the real reason Mr. Williams was terminated was

18   because of his public support for this person who sexually

19   abused a child and then tried to have that child murdered, and

20   to the reaction -- for the reaction of other employees at

21   Linode to --

22          MR. CARSON:  Your Honor, for the record, I want to

23   object again.

24          THE COURT:  The objection is overruled.

25          MR. CARSON:  And I would like to --

*United States District Court*

1          THE COURT:  Mr. Carson, the objection is overruled.

2          MR. CARSON:  -- request a sidebar again.

3          THE COURT:  No.

4          MR. CARSON:  I just want to make a record, Your Honor.

5          MR. CAVALIER:  Make no mistake, Mr. Williams was no

6    more terminated for policy violations than he was for his age

7    or his sexual orientation.  But Mr. Williams will invite you

8    and has invited you, through his counsel's opening statement,

9    to take the long leap from the reason that he was given at the

10   time to a finding that he was terminated due to his sexual

11   orientation or age.  In other words, Mr. Williams will claim

12   that Linode, Mr. Asaro, and Mr. Spataro were just looking for

13   an excuse to terminate him because he was older or because he

14   was gay, and that, lo and behold, this article pops out and

15   provides the perfect excuse for them to cover this

16   discrimination.  I'll leave it up to you to decide whether that

17   makes any sense.

18        As Judge Wolson will tell you when he gives you his

19   final instructions, separate and apart from anything that

20   Mr. Williams was told at the time of his termination, he bears

21   the burden of persuading you and proving to you by a

22   preponderance of the evidence that he was actually and in fact

23   terminated based on his age or his sexual orientation.  And as

24   I think you'll soon see once the actual evidence begins, he

25   will fall short of carrying that burden.

*United States District Court*

1        In addition to the testimony of Mr. Asaro,

2  Mr. Spataro, and Mr. Palochko, you're also going to hear

3  testimony from Richard Ford.  He is the former CFO of Linode.

4  He is going to tell you that Mr. Williams liked to play fast

5  and loose with the company credit card and that he wanted to

6  fire Mr. Williams several times over the course of his

7  employment for that reason.

8        And he'll tell you that he tried to go to Mr. Spataro

9  and Mr. Asaro and have him fired for those reasons, and he was

10  overruled by Mr. Asaro and Mr. Spataro, the very people who

11  Mr. Williams is now accusing of simply wanting to get rid of

12  him due to his sex and age.  I mean, does that sound like the

13  conduct of people who are just waiting for an excuse to get rid

14  of him?  That question will be one of many left that does need

15  an answer.

16        In the end, we expect you to answer those and all the

17  other questions you're going to be presented with in favor of

18  the defendant Linode, and the reason for that, quite simply,

19  folks, is that the evidence isn't there.  And you'll see that

20  it's not there.

21        Remember again, Mr. Williams is claiming that he was

22  discriminated and harassed on a daily basis for six years and

23  then fired because of his sexual orientation and age.  You

24  won't see any of the evidence that will naturally accumulate,

25  that you would expect to accumulate in a situation like that,

*United States District Court*

1    especially at a tech company like Linode.  You will be severely

2    underwhelmed at the quantity and the quality of the evidence

3    that Mr. Williams presents to you supporting his claims.

4            So again, these are just examples of what you'll see

5    and what you won't see.  I'll leave it up to you to make those

6    determinations, make the credibility calls that we both agree

7    that you are going to make in this case.  I know you're eager

8    to get to the evidence.  Lawyers love to talk.

9            I'll leave you with this:  A long time ago, when I was

10   a young lawyer learning how this whole system works, trials go,

11   I took a class in this building held by a federal judge a lot

12   like Judge Wolson, much older than Judge Wolson at that time,

13   who was teaching us about the civil trial system.  And he said

14   that an opening statement is a promise to the jury about what

15   the evidence is going to show.  And if a lawyer keeps those

16   promises during a case, he earns the right to come back at the

17   end and ask the jury to rule in favor of his clients.

18           That's always made a lot of sense to me.  It's a

19   lesson I've always followed.  So I'm making a promise to you

20   now that when all is said and done this week, the evidence in

21   this case will show that Linode, Mr. Asaro, and Mr. Spataro did

22   not discriminate, harass, retaliate, or terminate Mr. Williams

23   on the basis of his sexual orientation or age.  Hold me to my

24   promises that I'm making to you in this opening statement and

25   hold Mr. Carson to his.

*United States District Court*

1            This case is, again, very important to Linode, but
2    it's also very important to Mr. Spataro, Mr. Asaro, and
3    Mr. Palochko.  They're not named defendants in this action.
4    But make no mistake, their reputations are at issue here.
5    Mr. Williams is accusing them of being bigots, he's accusing
6    them of illegally discriminating.  And I'm sure you folks know,
7    that in this day and age, once somebody slaps that scarlet
8    letter on you, it's almost impossible to get it off.
9            You're going to hear from them on what that's been
10   like since this whole thing started.  It's been hanging over
11   them for more than three years.  And at the end of all of this,
12   you're going to be offered the opportunity to allow them to
13   begin to repair the damage that's been done over those years.
14           So on their behalf and on behalf of Linode, I do thank
15   you in advance for your time today and this week and for giving
16   this matter the attention it deserves.  And we'll talk again
17   soon.  Thank you.
18           THE COURT:  Thank you, Mr. Cavalier.  All right.
19           Folks, so it's about five after 3:00, so we've been
20   going here for about an hour and a half.  Do you all want to
21   take a short break before we start with the testimony?  As I
22   said, we are going to be done today between 3:45 -- before
23   4:00.  So we can go for a half hour or 45 minutes now.  But if
24   someone wants to take a break for five, ten minutes, that seems
25   reasonable to me.  Just raise your hand if you do.

*United States District Court*

1          No.  Don't be shy as we go through this week about

2    asking for breaks.  All right?

3          Mr. Carson, call your first witness.

4          MR. CARSON:  I'm going to call Carl Williams.

5          THE COURT:  All right.  Mr. Williams, come on up.

6    Step up and stay standing for a moment.

7          THE COURTROOM DEPUTY:  Please raise your right hand.

8          (**CARL WILLIAMS**, HAVING BEEN DULY SWORN OR DULY

9    AFFIRMED, TESTIFIED AS FOLLOWS:)

10          THE COURTROOM DEPUTY:  Please state your full name and

11    spell your name for the record.

12          THE WITNESS:  Carl, C-A-R-L, Williams,

13    W-I-L-L-I-A-M-S.

14          THE COURT:  Go ahead and have a seat, sir.

15          MR. CARSON:  Sorry, Your Honor, I'm just doing some

16    technical.

17          I can't see Carl at all because of the computer.  Can

18    I move the stand.

19          THE COURT:  We'll deal with the screen.  Put it right

20    against the...

21          MR. CARSON:  I'm going to start showing the exhibits

22    right away.

23          THE COURT:  You're showing the exhibits right away?

24          (Discussion held off the record.)

25          MR. CARSON:  Is that okay?

*United States District Court*

```
 1           THE WITNESS:  Yes.
 2           THE COURT:  Okay.  All right.  That works, Mr. Carson.
 3           Can you see, Mr. Cavalier?  You are not obstructed?
 4           MR. CAVALIER:  I'm obstructed by the video screen.
 5           THE COURT:  We'll work on it overnight.
 6           MR. CAVALIER:  That's fine.  Thank you, Your Honor.
 7           MR. CARSON:  Your Honor, may I proceed?
 8           THE COURT:  Yes.  Go ahead, Mr. Carson.
 9                D I R E C T   E X A M I N A T I O N
10  BY MR. CARSON:
11  Q.   So I'm going to start by just admitting some evidence or
12  some income verification evidence, but can you just start by
13  introducing yourself to the jury, Carl?
14  A.   Hello.  My name is Carl Williams.
15  Q.   And, Mr. Williams, where were you employed in November of
16  2014?
17  A.   Linode.
18  Q.   And how long were you employed at Linode?
19  A.   For nearly six years.  I was terminated August 19th of
20  2020.
21  Q.   Thank you.  And when you were at Linode, did you receive
22  any -- like a compensation package?
23  A.   Yes, I did.
24  Q.   And did that consist of a base salary?
25  A.   Yes.
```

*United States District Court*

1    Q.   I would like to just show you some exhibits and just kind

2    of admit some evidence before we get started, just get some

3    housecleaning out of the way.

4              MR. CARSON:  I would like to show Mr. Williams what

5    has been premarked as Exhibit 35.  Can we just show the witness

6    that document?

7    BY MR. CARSON:

8    Q.   Can you see what's on the screen there, Mr. Williams?

9    Carl?

10   A.   Yes, I can.

11   Q.   What is that?

12   A.   That's my W-2 form from Linode in 2014, which shows my

13   salary at the end of 2014.

14   Q.   And the amount -- the largest number on there, is that the

15   total amount that you received in base pay from Linode that

16   year?

17   A.   Yes.

18             MR. CARSON:  Your Honor, I'd like to admit this and

19   publish it to the jury.

20             MR. CAVALIER:  No objection.

21             THE COURT:  All right.  Exhibit 35 will be received in

22   evidence.

23             (PLAINTIFF EXHIBIT 35 WAS RECEIVED IN EVIDENCE.)

24   BY MR. CARSON:

25   Q.   So the next exhibit I'd like to show you has been

*United States District Court*

1  premarked as Exhibit 36.

2         MR. CARSON:  Can you please put that on the screen?

3  BY MR. CARSON:

4  Q.  Let me know when you can see that, Mr. Williams.

5  A.  Yes.

6  Q.  And what is that document?

7  A.  That's my W-2 form from Linode in 2015, my total salary

8  compensation.

9  Q.  And the largest number on that document, is that the total

10 amount of income you received during your employment at Linode

11 for that year?

12 A.  Yes.

13        MR. CARSON:  Your Honor, I'd like to admit this

14 document as well.

15        MR. CAVALIER:  Again, no objection.  Your Honor, we

16 would stipulate to the admissibility of any W-2s of what

17 Mr. Williams earned from Linode.

18        THE COURT:  All right.

19        MR. CARSON:  All right.  Based on that, I would like

20 to admit Exhibit 37, 38, 39, 40, and 41, which is the W-2s from

21 2016 through 2020.

22        THE COURT:  37 through 41 you said?

23        MR. CARSON:  Yes, Your Honor.

24        THE COURT:  Okay.  37 through 41 will come in.

25        (GOVERNMENT EXHIBITS 37 THROUGH 41 WERE RECEIVED IN

*United States District Court*

1  EVIDENCE.)

2  BY MR. CARSON:

3  Q.   Mr. Williams, each year of your employment at Linode,

4  2014, every year until 2020, you received one of those W-2

5  statements that I just showed you?

6  A.   Yes.

7  Q.   And every single one of those statements that I showed you

8  has the -- the largest number on each one of those statements

9  represents the amount that you received in base income from

10  Linode in that year?

11  A.   Yes.

12      MR. CARSON:   The next document I would like to admit

13  is -- let's do Exhibit 71.

14  BY MR. CARSON:

15  Q.   Just let me know, Carl, when you can see the document.

16  A.   Yes, I can see it.

17  Q.   And Exhibit 71, what is that?

18  A.   That's the health plan benefits that I received when I was

19  at Linode.

20  Q.   And during your employment at Linode, were you offered

21  health insurance as part of your total compensation package?

22  A.   Yes, I was offered health insurance as part of the total

23  compensation benefits.

24  Q.   And this document in front of you represents that health

25  insurance benefit?

*United States District Court*

1   A.   Yes.

2        MR. CARSON:  Your Honor, I'd like to admit Exhibit 71.

3        MR. CAVALIER:  No objection.

4        THE COURT:  All right.  71 will come in.

5        (PLAINTIFF EXHIBIT 71 WAS RECEIVED IN EVIDENCE.)

6        MR. CARSON:  And can you please show the witness

7   Exhibit 72, please.

8   BY MR. CARSON:

9   Q.   Carl, as soon as you can see it on the screen, just tell

10  me.

11  A.   Yes, it's on the screen.

12  Q.   All right.  So what is this document?

13  A.   This was part of my benefits at Linode for -- at some

14  point they changed insurance and this represents my health

15  insurance and dental insurance and other fringe benefits.

16  Q.   And is this one of the parts of your compensation package

17  that you received while you were employed at Linode?

18  A.   Yes, it was.

19       MR. CARSON:  Your Honor, I'd like to admit 72.

20       MR. CAVALIER:  No objection.

21       THE COURT:  All right.  Permitted.

22       (PLAINTIFF EXHIBIT 72 WAS RECEIVED IN EVIDENCE.)

23       MR. CARSON:  Just for the record, I'm getting this out

24  of the way because of the issue with the testimony tomorrow.

25  I'd like to get all that in before then.

*United States District Court*

1          THE COURT:  Okay.

2          MR. CARSON:  Okay.  So let's do Exhibit 73, please.

3  You know what, we're going to skip 73.  73 -- but it looks like

4  there's two 73s in the second one.

5  BY MR. CARSON:

6  Q.   There should be a green document in front of you, Carl.

7  A.   Yes, I see it.

8  Q.   What is that?

9  A.   This is the Linode employee benefits, the total benefits

10  that I was given when I was at Linode outlined here.

11  Q.   And did -- while you were employed at Linode, did you ever

12  receive this document?

13  A.   Yes.

14  Q.   And this document outlines?

15  A.   The benefits that I received in 2016 to '17 because they

16  were changed.

17          MR. CARSON:  Your Honor, I'd like to admit Exhibit 73.

18          MR. CAVALIER:  No objection.

19          THE COURT:  73 is permitted.

20          (PLAINTIFF EXHIBIT 73 WAS RECEIVED IN EVIDENCE.)

21          MR. CARSON:  Please do 74 next.

22  BY MR. CARSON:

23  Q.   Carl, let me know when it's in front of you.  It should be

24  the -- it's 2017-2018, Carl; is that right?

25  A.   Yes.  That's the --

*United States District Court*

1   Q.   Let me just ask the question for the record, Carl.

2        So, Carl, what is this document?

3   A.   This is the benefits of Linode during the 2017-18 year.

4   Q.   And, Carl, did you receive this document while you were

5   employed at Linode?

6   A.   Yes, I did.

7   Q.   And are the benefits in this document benefits you

8   received while you were employed at Linode?

9   A.   Yes.

10           MR. CARSON:  Your Honor, could I admit Exhibit 74?

11           MR. CAVALIER:  No objection.

12           THE COURT:  74 comes in.

13           (PLAINTIFF EXHIBIT 74 WAS RECEIVED IN EVIDENCE.)

14           MR. CARSON:  Could we please do 75 next.

15   BY MR. CARSON:

16   Q.   Carl, this is in front of you?

17   A.   Yes.

18   Q.   Could you please describe for the jury what this is,

19   please?

20   A.   This is the benefits for the 2018-2019 year that I

21   received.

22   Q.   And these are benefits you received while you were

23   employed at Linode?

24   A.   Yes.

25   Q.   And did you ever see this document?

*United States District Court*

1  A.   Yes.

2  Q.   And do they accurately reflect the benefits you received?

3  A.   Yes, they do.

4          MR. CARSON:  Your Honor, can I admit Exhibit 75?

5          MR. CAVALIER:  No objection.  It's 75?

6          MR. CARSON:  Yes.

7          MR. CAVALIER:  And we'll stip to 76, '19 to '20 also.

8          MR. CARSON:  Yeah, same thing, '19, '20.

9          THE COURT:  75 and 76.  Okay.

10         (PLAINTIFF EXHIBITS 75 AND 76 WERE RECEIVED IN

11 EVIDENCE.)

12         MR. CARSON:  Let's do 94.

13 BY MR. CARSON:

14 Q.   Carl, let me know when that's in front of you.

15 A.   Yes, it's in front of me.

16 Q.   Okay.  What is that?

17 A.   That is compensation that I received after I was

18 terminated from Linode, doing some consulting work, and that

19 was part of that pay.

20 Q.   The company name on there, it says Kentik Technologies,

21 K-E-N-T-I-K.  So the company listed on this document, called

22 Kentik Technologies -- and I'm sorry for talking fast -- can

23 you just please tell the jury who that is?

24 A.   This is the compensation I received for doing some work at

25 Kentik at some point after my termination, and this is the

1  total amount that I ever received from Kentik.

2  Q.  And so after your termination, did you try to find other

3  work?

4  A.  Yes, I did.

5  Q.  And was this -- did you find this?

6  A.  This was a temporary position as consultant.

7  Q.  Let me ask the question first, just to keep the record

8  clean.

9      So is this one of those jobs that you found after your

10  employment ended at Linode?

11  A.  Yes.

12  Q.  Thank you.

13          MR. CARSON:  Can I move 94 in, Your Honor?

14          MR. CAVALIER:  No objection.

15          THE COURT:  94 in.

16          (PLAINTIFF EXHIBIT 94 WAS RECEIVED IN EVIDENCE.)

17          MR. CARSON:  And I think we'll do 95 next.

18  BY MR. CARSON:

19  Q.  Carl, are you ready?

20  A.  Yes.

21  Q.  So, Carl, can you just briefly describe what this is that

22  you see in front of you?

23  A.  This is my pay stub from Linode.

24  Q.  And it says --

25  A.  My last pay stub -- sorry -- from Linode.

*United States District Court*

1  Q.   The pay period for this pay stub says that the pay period

2  is August 16, 2020, through August 29, 2020.  Is that what you

3  see?

4  A.   Yes.

5  Q.   And what does that represent?

6  A.   That represents my last pay stub at Linode.

7  Q.   And does this accurately reflect the amount of

8  compensation you received in that last pay stub?

9  A.   Yes, it does.

10         MR. CARSON:  Your Honor, can I please move 95 in?

11         MR. CAVALIER:  No objection.

12         THE COURT:  Is this 95 or 96?

13         MR. CARSON:  I think I have it as 95.

14         THE COURT:  95.  Okay.

15         MR. CAVALIER:  No objection to 95.

16         THE COURT:  Okay.

17         (PLAINTIFF EXHIBIT 95 WAS RECEIVED IN EVIDENCE.)

18         MR. CARSON:  Let me just keep going.  I'm going to

19  do -- can we please show the witness Exhibit 97.

20  BY MR. CARSON:

21  Q.   Carl, let me know when you're ready.

22  A.   I am ready.

23  Q.   Okay.  What is this?

24  A.   This was the Linode profit sharing check that I received

25  in --

*United States District Court*

1    Q.   What year did you receive this check?

2    A.   2016.

3    Q.   And what is Linode's profit share -- can you briefly

4    describe what Linode's profit sharing plan is?

5    A.   Linode had an annual profit sharing contribution, and it

6    appears that this is part.

7    Q.   And did you receive this back in 2016?

8    A.   Yes, I did.

9    Q.   And was this one of the benefits that you earned through

10   your employment at Linode?

11   A.   Yes.

12           MR. CARSON:  Your Honor, can I move Exhibit 97 in,

13   please?

14           MR. CAVALIER:  No objection.

15           THE COURT:  Exhibit 97 will come in.

16           (PLAINTIFF EXHIBIT 97 WAS RECEIVED IN EVIDENCE.)

17           MR. CARSON:  Can we please show the witness 106 next.

18   BY MR. CARSON:

19   Q.   And this is a few pages, Carl.  So we'll just kind of take

20   it one page at a time, and we can skip some of the things we

21   already talked about.  So I'm just going to go through --

22           MR. CARSON:  Your Honor, it appears that this exhibit

23   is a duplicate and has already been admitted.  So I'm going to

24   move on.  We're going to skip this one.  These are just W-2s.

25           THE COURT:  Mr. Carson, make sure you speak up into

*United States District Court*

1    the microphone.  We have to take down what you are saying.

2            MR. CARSON:  Sorry.  I will, Your Honor.

3            Can we please put Exhibit 107 for the witness next.

4    BY MR. CARSON:

5    Q.   Carl, can you see the exhibit in front of you?

6    A.   Yes.

7    Q.   Okay.  Can you just briefly describe what this is?

8    A.   This was compensation that I received as a consultant to

9    Comcast working through Pinnacle.

10   Q.   What's the document though?

11   A.   It's...

12   Q.   Is it a pay stub?

13   A.   It's a pay stub.

14   Q.   And Pinnacle Technologies is listed on this pay stub?

15   A.   Yes, it is.

16   Q.   And just very briefly, who is Pinnacle Technologies?

17   A.   Pinnacle was the payroll service that I worked through

18   when I was consulting for Comcast -- when I was consulting for

19   Comcast after my employment.

20   Q.   So this was a position you held after your employment with

21   Linode?

22   A.   It is.

23   Q.   And did you receive compensation from this company?

24   A.   Yes.

25   Q.   And does this reflect that compensation?

*United States District Court*

1   A.   Yes, it does.

2   Q.   All right.  So this document is three pages, Carl.  Can

3   you confirm that your testimony is true for all three of these

4   documents?  It looks like three pay stubs.  Can you just look

5   through them?

6   A.   Yes, that is a correct pay stub.

7            MR. CARSON:  Your Honor, can I move 107 into evidence,

8   please?

9            MR. CAVALIER:  No objection.

10            THE COURT:  107 will come in.

11            (PLAINTIFF EXHIBIT 107 WAS RECEIVED IN EVIDENCE.)

12            MR. CARSON:  Can we please show the witness 108.

13   Let's skip 108.  Can we do 109 now, please.

14   BY MR. CARSON:

15   Q.   Carl, let me know when you can see that.

16   A.   Yes, I can see it.

17   Q.   All right.  What is this document?

18   A.   This is the details of Linode's profit sharing plan, the

19   way in which they -- the procedures.

20   Q.   Is this the same profit sharing plan that we saw in the

21   yearly statement forms we just looked at?

22   A.   Yes.

23   Q.   And did you receive this during your employment, this

24   document?  Did you receive it during your employment with

25   Linode?

*United States District Court*

1  A.   Yes, I did.

2  Q.   And does it reflect the terms of Linode's profit sharing

3  plan that you received?

4  A.   Yes.

5       MR. CARSON:  And, Your Honor, can I please move to

6  admit Exhibit 109?

7       MR. CAVALIER:  No objection.

8       THE COURT:  109 will come in.

9       (PLAINTIFF EXHIBIT 109 WAS RECEIVED IN EVIDENCE.)

10      MR. CARSON:  And let's do 110.  Please can we show the

11 witness Exhibit 110 next.

12 BY MR. CARSON:

13 Q.   Carl, can you see it?

14 A.   Yes, I can.

15 Q.   Just what is this?

16 A.   This is the W-2 form.

17 Q.   What year?

18 A.   Two thousand...

19 Q.   At the bottom.

20 A.   '22 from Pinnacle.

21 Q.   And Pinnacle, is that the company where you testified you

22 worked after Linode?

23 A.   Yes.

24 Q.   And does this reflect the yearly income that you received

25 for 2022 during your employment at Linode?

*United States District Court*

1    A.   Yes.

2    Q.   I'm sorry -- during your employment at Pinnacle?

3    A.   Yes, it is.

4           MR. CARSON:  Your Honor, can I please move to admit

5    Exhibit 110?

6           MR. CAVALIER:  No objection.

7           THE COURT:  All right.  110 will be received.

8           (PLAINTIFF EXHIBIT 110 WAS RECEIVED IN EVIDENCE.)

9           MR. CARSON:  Can we please show the witness 117 next.

10   BY MR. CARSON:

11   Q.   Carl, let me know when you can see that.

12   A.   Yes, I can see that.

13   Q.   What is this document, briefly?

14   A.   That's the terms of employment for Pinnacle.

15   Q.   Is this the same Pinnacle that we saw W-2 and the pay stub

16   for?

17   A.   Yes, it is.

18   Q.   And does this show the terms of your employment with that

19   company?

20   A.   Yes, it does.

21   Q.   And again, this is where you worked after Linode, correct?

22   A.   Yes.

23           MR. CARSON:  Your Honor, can I move in 117, please?

24           MR. CAVALIER:  No objection.

25           THE COURT:  All right.  117 will come into evidence.

*United States District Court*

1          MR. CARSON:  Thank you.

2          (PLAINTIFF EXHIBIT 117 WAS RECEIVED IN EVIDENCE.)

3          MR. CARSON:  Please show the witness Exhibit 124.

4  BY MR. CARSON:

5  Q.  Carl, let me know when you're ready.

6  A.  Yes.

7  Q.  And what is this document?

8  A.  This is the Linode 401K profit sharing plan.

9  Q.  And this is something different than that other one?

10 A.  Yes.  There's different terms in here, and it's part of

11 the overall rules and procedures for...

12 Q.  Are we talking about two benefits that you received?  You

13 had a 401K benefit and a profit sharing benefit?

14 A.  Yes.

15 Q.  And does this show that 401K benefit?

16 A.  Yes.

17 Q.  And are these the terms of that benefit?

18 A.  Yes, it is.

19 Q.  And did you receive this while employed at Linode?

20 A.  Yes.

21 Q.  And it was part of your total compensation package?

22 A.  It was.

23          MR. CARSON:  Your Honor, can I please move to admit

24 Exhibit 124.

25          MR. CAVALIER:  No objection.

*United States District Court*

```
 1            THE COURT:  All right.  124 will be received.

 2            MR. CARSON:  Thank you.

 3            (PLAINTIFF EXHIBIT 124 WAS RECEIVED IN EVIDENCE.)

 4            MR. CARSON:  Can we please show the witness

 5  Exhibit 166.

 6            THE COURT:  You said 166, right, Mr. Carson?

 7            MR. CARSON:  Yes, Your Honor.

 8            THE COURT:  Okay.

 9  BY MR. CARSON:

10  Q.  Can you see it?

11            THE VIDEO TECHNICIAN:  I don't think we have that.

12            MR. CARSON:  I'll skip that one for now because I

13  don't want to waste any time, but we'll come back to it.

14            Can we then do 160 -- can we please do 168 next.

15  BY MR. CARSON:

16  Q.  Carl, can you see that?

17  A.  Yes, I can.

18  Q.  What is this?

19  A.  This is an email stating that I would receive -- can you

20  move up a little?

21  Q.  Sorry.  Take your time and look at it, too.

22  A.  Yes.  This is from Milberg Consulting, an email.

23  Q.  Who is Milberg Consulting?

24  A.  They were the administrator for Linode's profit sharing.

25  Q.  And it looks like the email is with somebody named Tricia
```

*United States District Court*

1  Povish?

2  A.   Yes.

3  Q.   And who's Tricia Povish?

4  A.   She worked at Milberg Consulting.

5  Q.   What is the email about?

6       THE COURT:  Hold on, Mr. Carson.  I don't want to

7  summarize its contents until it's in evidence.  So let's lay

8  the foundation and get it in before you start talking about the

9  substance of it.

10      MR. CARSON:  Sorry.

11 BY MR. CARSON:

12 Q.  And did you receive this email while you were employed at

13 Linode -- sorry -- did you receive this email in January of

14 2021 after you were employed at Linode?

15 A.  Yes.

16      MR. CARSON:  Your Honor, can I move Exhibit 168 in?

17      MR. CAVALIER:  Your Honor, this one I do have an

18 objection based on relevance and the fact that it lacks an

19 attachment that it expressly says should be included.  Do we

20 have a attachment?

21      THE COURT:  For now, I'm going to sustain the

22 objection.  I don't know if there's enough foundation for me to

23 admit this at this point.

24      MR. CARSON:  Your Honor -- I'm sorry.

25 BY MR. CARSON:

*United States District Court*

1  Q.   Mr. Williams, this email looks like it was forwarded to

2  you from John Eastlack.  Who is John Eastlack?

3  A.   John Eastlack was an attorney that I hired because --

4  Q.   Just who is he?

5  A.   After my --

6  Q.   You said he's your attorney?

7  A.   Yes.

8  Q.   Okay.  And did you ask your attorney to ask Tricia Povish,

9  the administrator of Linode's profit sharing program, any

10  questions back in January of 2021?

11  A.   Yes.

12  Q.   What were you interested in?

13  A.   Since I was terminated in August of 2020, I wanted to make

14  sure that I received my profit sharing for the year of 2020.

15  Q.   And did you find -- did you learn whether or not you were

16  entitled to that profit sharing for the year 2020?

17  A.   Yes.

18  Q.   And were you entitled to it?

19  A.   Yes, I was.

20  Q.   Okay.  And what's your understanding of the -- the reason

21  that you were entitled to it?

22  A.   I worked the thousand hours that I was required to work at

23  the time of my termination, and that was -- with all those

24  rules and procedures, I should have received the profit sharing

25  contribution.

*United States District Court*

 1  Q.  Did you receive it?

 2  A.  No, I did not.

 3      MR. CARSON:  Can we show -- I'll move on -- move on to

 4  the next exhibit.

 5      Can we please show the witness Exhibit 174.

 6  BY MR. CARSON:

 7  Q.  Can you see that?

 8  A.  Yes.

 9  Q.  Okay.  What is this?

10  A.  This is an email from Vincent Palochko.

11  Q.  To who?

12  A.  To my attorney.

13  Q.  Are you on this email?

14  A.  Yes, I'm CC'd.

15  Q.  And you received this email from Vincent Palochko?

16  A.  Yes, I did.

17  Q.  And you received it on August 30, 2016, at 11:16 a.m.?

18  A.  Yes, I did.

19  Q.  And the subject line of the email is Linode 401K and

20  Profit Sharing Plan?

21  A.  Yes.

22      MR. CARSON:  Your Honor, can I move 174 into evidence?

23      MR. CAVALIER:  Again, Your Honor, I don't see the

24  foundation or the relevance at this point for this document.  I

25  don't understand what's being offered.

*United States District Court*

```
 1          THE COURT:  I'll overrule the objection.  The exhibit
 2   will be admitted.
 3          (PLAINTIFF EXHIBIT 174 WAS RECEIVED IN EVIDENCE.)
 4   BY MR. CARSON:
 5   Q.   So you just testified a moment ago that your understanding
 6   was that you had to work 1,000 hours in order to be eligible
 7   for profit sharing; is that correct?
 8   A.   Yes.
 9   Q.   And is that 1,000 hours total or 1,000 a year?  What is
10   that?
11   A.   1,000 for the entire year.
12   Q.   And in 2019, did you work a thousand hours at Linode?
13   A.   Yes.
14   Q.   And did you receive profit sharing?
15   A.   For --
16   Q.   For 2019 I'm talking about.
17   A.   2019, yes, I did.
18   Q.   And when did you receive the profit sharing for your
19   thousand hours of work in 2019 from Linode?  When did you
20   actually receive that check?
21   A.   Sometime in July 2020.  It's always the following year,
22   sometime, you know, after the second quarter.
23   Q.   And so you were terminated on August 19, 2020, correct?
24   A.   Yes, I was.
25   Q.   By August 19, 2020, had you worked the thousand hours?
```

*United States District Court*

1  A.   Yes, I did.

2  Q.   And so were you eligible even though you didn't work there

3  anymore?

4  A.   Yes, I was.

5  Q.   And did you ask Vincent Palochko about that ever?

6  A.   Yes.

7  Q.   And what did he say?

8  A.   He states in this email that you don't have to be an

9  employee, further down.

10  Q.   Can you just read the line that you are referring to for

11  the jury, please?

12  A.   Linode's profit sharing allocations are not paid until

13  after the end of the plan year.  They are then paid out for the

14  entirety of the eligibility period where the eligible employee

15  was active with Linode regardless of their employment status at

16  that time.

17  Q.   So it's your understanding that -- what did that mean

18  according to your understanding?

19  A.   During the period of time of January 1, 2020, to my

20  termination on August --

21  Q.   Sorry.  Maybe -- what does that mean with regard to

22  whether or not you were owed the profit sharing for the work

23  you did in 2020?

24  A.   Yes, I was owed the profit sharing.  I worked the thousand

25  hours.

*United States District Court*

1  Q.  And did you receive that profit sharing?

2  A.  No, I did not.

3  Q.  And so you said that usually you get paid the profit

4  sharing for the year that you worked sometime in the following

5  year; is that right?

6  A.  Yes.

7  Q.  So 2021 -- just do August.  Any time in 2021, did you

8  receive it?

9  A.  No, I did not.

10  Q.  How about in 2022?

11  A.  No.

12  Q.  How about 2023?  Did you receive it?

13  A.  No, I did not.

14  Q.  Did you receive it this year?

15  A.  No.

16  Q.  They have not paid you profit sharing for the work you did

17  in 2020 yet?

18  A.  They have not.

19         MR. CARSON:  Your Honor, this was already moved into

20  evidence, correct?

21         THE COURT:  Yes.

22         MR. CARSON:  Can we please show the witness

23  Exhibit 172.

24  BY MR. CARSON:

25  Q.  Just let me know when you can see it, Carl.

*United States District Court*

1  A.   Yes, I can see it.

2  Q.   So this looks similar to another document we already saw,

3  but I think it's for another year.  But can you just briefly

4  describe what this is?

5  A.   These are additional details on the procedure for the

6  Linode profit sharing.

7  Q.   And just because you said there's two benefits that kind

8  of sound similar, but one benefit is a 401K benefit and another

9  is a profit sharing benefit?

10  A.   Yes.

11  Q.   Let's just refer to them that way.  We'll call them the

12  401K benefit, the 401K benefit and the profit sharing will be

13  the other one.  Okay?  Do you understand that?

14  A.   Yes.

15  Q.   Which one is this?

16  A.   This has...

17  Q.   Is it the 401K or the profit sharing or both?

18  A.   It's both.  It has both details in it.

19  Q.   Okay.  And did you receive this document while you were

20  employed at Linode?

21  A.   Yes, I did.

22  Q.   And it details and provides the terms of the benefits that

23  you received?

24  A.   Yes.

25          MR. CARSON:  Your Honor, can I move into evidence 172,

*United States District Court*

1   please?

2          THE COURT:  All right.  172 will come in.

3          (PLAINTIFF EXHIBIT 172 WAS RECEIVED IN EVIDENCE.)

4          MR. CARSON:  I believe the next one is 173, please.

5   BY MR. CARSON:

6   Q.   And they look very similar, but I think if you look, this

7   one is a little different.  And so can you please just briefly

8   describe what this is?

9   A.   This is the actual summary plan description.  I think it's

10  signed by the owner at the end of it, and this lays out the

11  framework for the profit sharing plan.

12  Q.   The profit sharing benefit?

13  A.   Yes.

14  Q.   And did you receive this document -- it's dated -- it

15  looks like the first page is dated January 1, 2016.  Did you

16  receive it while you were employed at Linode?

17  A.   Yes, I did.

18  Q.   And it details the terms of one of the benefits you

19  received?

20  A.   Yes.

21          MR. CARSON:  Your Honor, can I please move Exhibit 173

22  into evidence?

23          MR. CAVALIER:  No objection.

24          THE COURT:  All right.  173 comes in.

25          (PLAINTIFF EXHIBIT 173 WAS RECEIVED IN EVIDENCE.)

*United States District Court*

1          MR. CARSON:  So I think I just finished.  So I believe

2    I finished the exhibits.  I need to do the examination of

3    the -- of Mr. Staller on Wednesday afternoon.  So I'm going to

4    turn now --

5          THE COURT:  Why don't we -- rather than have you start

6    something new at 20 of 4:00, given my schedule, Mr. Carson, why

7    don't we use that as sort of a logical break for the day.

8          MR. CARSON:  Okay.

9          THE COURT:  Mr. Williams, go ahead and step down.

10         MR. CARSON:  Your Honor, can I break this PC down?

11         THE COURT:  Yes.

12         Okay.  So we're going to use that as an opportunity to

13   break for the day.  You know, I know that none of you are in

14   the city.  I don't know how many of you have long commutes

15   tomorrow.  You may not have made arrangements for tonight.  So

16   we can start at 9:00 or at 9:30.

17         So let me pose the question is 9 o'clock a problem for

18   anyone?  If it is, just raise your hand.  No?

19         So just plan to start at 9 o'clock.  So if you could

20   be here a few minutes before that, check in with Ms. Roberts.

21   That would be appreciated.

22         I'm going to tell you what I told you before lunch.

23   You heard a little bit more about the case.  You've heard the

24   opening.  We've given you summaries about them.  You heard a

25   little evidence here, but not a lot.  It's not an opportunity

*United States District Court*

1    for you to go looking into the case, talking about the case

2    with each other or others.  They may want to know what the case

3    is about, and this is just not the time to tell them.  Tell

4    them it's a case.  It's in court.  As you see, there's people

5    who sometimes come watch.  So if anybody wants to come watch,

6    they can, but you can't talk to them about it, even if they

7    come.  Okay?

8            Just steer clear of doing that, and steer clear of

9    looking anything up.  You heard, at least, a couple of

10   newspaper articles at one point that were relevant to the case.

11   You should not be looking to find those or see them or research

12   anything else about this case.  You just decide the case based

13   on the evidence in this case.  Okay?

14           So with that, I'll send you on your way for the

15   evening, and I'll see you back here in the morning.  Thanks,

16   everybody.

17           THE COURTROOM DEPUTY:  All rise.

18           (Jury exits the courtroom at 3:43 p.m.)

19           THE COURT:  Okay.  You can all have a seat.  I don't

20   know that there's any particular housekeeping we need to tackle

21   right now.  If there is --

22           Is your plan to continue with Mr. Williams in the

23   morning, Mr. Carson, and then call Mr. Howard in the afternoon?

24   Is that what you were saying?

25           MR. CARSON:  Yes.  So he can't verify the documents or

*United States District Court*

1   authenticate them.  I had to get them in before --

2         THE COURT:  I understand.  Sometimes there's some

3   value in just ripping off the Band-Aid with some of that.  I

4   get it.

5         MR. CAVALIER:  Do we think that's going to be the

6   whole day tomorrow?

7         MR. CARSON:  I'm going to be quick with Mr. Staller.

8   So I think we'll get through a lot of Mr. Williams in the

9   morning.  It usually takes us longer than a couple hours when

10  we practice, but I guess I'll say I think that probably

11  Mr. Staller will go on in the afternoon by the time he's done.

12  If we have time --

13        THE COURT:  Make your disclosures tonight for

14  Mr. Staller to Mr. Cavalier.  I think you need to be ready to

15  cross Mr. Williams.  I don't think we'll be doing anything else

16  besides those two things tomorrow.

17        MR. CAVALIER:  That's fine.  The reason I ask is

18  because once we go beyond those, we get into witnesses that I

19  need to have here that haven't been subpoenaed either by normal

20  process or via acceptance of service.

21        So I want to make sure that everybody's -- has the

22  same understanding of what witnesses are coming when and when

23  they need to be here.

24        THE COURT:  Well, have a conversation with Mr. Carson

25  about that, but you all, obviously, know better than I do how

1  long Mr. Williams will be.  Even if Mr. Staller is an hour,

2  based on what you all told me about Mr. Williams, it seems like

3  that's going to eat up tomorrow.

4       But if not, again, I don't want to put some witness on

5  the stand for 20 minutes at the end of the day.  But given my

6  need to break early today and to break early Thursday, I'd like

7  to get in as much as we can tomorrow.

8       So talk about that.  See how long each of you have.

9  If you have some available, you do.  I don't know if they're a

10 few blocks away at the office, either, in which case really

11 easy to get them over here.  Okay?

12      All right, so trade your emails tonight.  We can raise

13 anything else.

14      MR. CARSON:  Just to avoid it happening again, we can

15 do it tomorrow morning, but I just wanted to ask you if I could

16 let you know why I was objecting during the opening.

17      THE COURT:  I assume it was the reference to the

18 murder charge, but go ahead.

19      MR. CARSON:  No.  It was because he was saying things

20 that didn't happen until years after the termination.  They

21 shouldn't be said in this courtroom.  So he said that Chad --

22 that Mr. Musbach admitted to the charges.  That happened years

23 afterwards.  None of that --

24      THE COURT:  Well, the only time I heard him say he

25 admitted to the charges was when he sort of acknowledged that

*United States District Court*

1  he could talk about them.  I don't think that was a problem,

2  and it certainly wasn't what was recurring.

3          In any event, you know --

4          MR. CARSON:  The only thing that had happened at the

5  time of termination is the arrest bail hadn't even been put

6  off.  So any suggestion that these charges were admitted to or

7  that he was convicted or that he pled or anything is just not

8  relevant.

9          THE COURT:  I think I agree.  I think we went over

10  that at the final pretrial conference.  I gave a little bit of

11  leeway because the way I heard it was just, well, it's okay.  I

12  can talk about this now, and I think that's fine.  I'm going to

13  give you some leeway, too, despite the fact that you got into

14  the purchase price repeatedly, which I told you not to do.

15          So I did cut everyone some slack on the openings, but

16  I didn't see it as problematic.  As we get into the witness's

17  testimony, the witness is going to testify as to what they knew

18  at the time of termination.

19          MR. CARSON:  That's fine.

20          THE COURT:  Okay.  With that, we'll break until the

21  morning.  Try to be here and ready to go at 9:00.  Hopefully,

22  the jurors will as well and we can get started promptly.

23  Thanks, everybody.  Have a good evening.

24          (Matter adjourned at 3:47 p.m.)

25          - - - - - - - - - - - - - - - - -

*United States District Court*

1

2          I certify that the foregoing is a correct transcript

3   from the record of proceedings in the above-entitled matter.

4

5   */S/ Maureen McHugh, RPR*
    *Official Court Reporter*

6

7   *January 23, 2024*
        *Date*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

**$**

**$240,000** *[1] - 48:9*
**$25,000** *[2] - 72:8, 72:16*
**$900** *[3] - 42:8, 42:23, 50:20*

**'**

**'14** *[1] - 52:18*
**'15** *[1] - 52:19*
**'16** *[2] - 44:12, 52:19*
**'17** *[2] - 44:12, 86:15*
**'18** *[1] - 44:12*
**'19** *[3] - 44:12, 88:7, 88:8*
**'20** *[3] - 44:12, 88:7, 88:8*
**'22** *[1] - 94:20*

**/**

**/S** *[1] - 111:5*

**1**

**1** *[3] - 1:6, 102:19, 105:15*
**1,000** *[4] - 101:6, 101:9, 101:11*
**10(b** *[1] - 14:4*
**100** *[1] - 70:7*
**100-page** *[1] - 69:3*
**101** *[1] - 3:15*
**105** *[2] - 3:16, 3:16*
**106** *[1] - 91:17*
**107** *[5] - 3:13, 92:3, 93:7, 93:10, 93:11*
**108** *[2] - 93:12, 93:13*
**109** *[5] - 3:13, 93:13, 94:6, 94:8, 94:9*
**110** *[6] - 3:14, 94:10, 94:11, 95:5, 95:7, 95:8*
**117** *[5] - 3:14, 95:9, 95:23, 95:25, 96:2*
**11:16** *[1] - 100:17*
**12** *[1] - 10:14*
**124** *[5] - 3:15, 96:3, 96:24, 97:1, 97:3*
**13** *[1] - 9:6*
**13-year-old** *[2] - 71:13, 72:3*
**1350** *[1] - 2:4*
**14** *[1] - 9:7*
**15** *[6] - 6:7, 7:6, 7:23, 9:4, 13:15, 13:16*
**16** *[5] - 6:8, 7:22, 13:11, 13:19, 90:2*

**16(b)(4** *[1] - 6:14*
**160** *[1] - 97:14*
**1601** *[1] - 2:4*
**166** *[2] - 97:5, 97:6*
**168** *[2] - 97:14, 98:16*
**172** *[5] - 3:16, 103:23, 104:25, 105:2, 105:3*
**173** *[5] - 3:16, 105:4, 105:21, 105:24, 105:25*
**174** *[4] - 3:15, 100:5, 100:22, 101:3*
**180** *[2] - 5:14, 5:22*
**1835** *[1] - 1:19*
**19** *[3] - 57:23, 101:23, 101:25*
**19102** *[1] - 2:5*
**19103** *[1] - 1:20*
**19106** *[1] - 1:13*
**196** *[1] - 42:11*
**1971209** *[1] - 7:12*
**1980s** *[1] - 40:1*
**1990** *[1] - 40:1*
**19th** *[1] - 81:19*
**1:39** *[1] - 21:23*
**1:40** *[1] - 22:4*

**2**

**20** *[4] - 17:18, 62:24, 106:6, 109:5*
**2003** *[1] - 64:14*
**2012** *[1] - 65:19*
**2014** *[9] - 40:3, 44:7, 44:12, 46:5, 49:25, 81:16, 82:12, 82:13, 84:4*
**2015** *[4] - 44:12, 48:19, 67:25, 83:7*
**2016** *[11] - 50:22, 51:2, 65:14, 71:8, 71:10, 83:21, 86:15, 91:2, 91:7, 100:17, 105:15*
**2017** *[1] - 51:3*
**2017-18** *[1] - 87:3*
**2017-2018** *[1] - 86:24*
**2018** *[8] - 51:21, 51:23, 52:16, 53:23, 57:9, 67:25, 68:6*
**2018-2019** *[1] - 87:20*
**2019** *[5] - 53:3, 53:23, 101:12, 101:16, 101:17, 101:19*
**2020** *[25] - 6:11, 41:3, 44:9, 44:6, 50:7, 56:20, 57:23, 67:25, 70:1, 71:23, 72:24, 81:20, 83:21, 84:4, 90:2, 99:13, 99:14, 99:16, 101:21,*

**101:23, 101:25, 102:19, 102:23, 103:17**
**2021** *[4] - 98:14, 99:10, 103:7*
**2022** *[5] - 42:7, 47:4, 64:20, 94:25, 103:10*
**2023** *[2] - 7:12, 103:12*
**2024** *[2] - 1:13, 111:7*
**20s** *[2] - 46:18, 57:4*
**23** *[2] - 1:13, 111:7*
**25** *[1] - 21:13*
**29** *[1] - 90:2*
**2950** *[1] - 1:19*
**2:22-CV-01618-JDW** *[1] - 1:4*

**3**

**3** *[2] - 52:19, 65:9*
**30** *[7] - 42:10, 41:25, 46:23, 46:25, 55:4, 62:25, 100:17*
**30s** *[1] - 46:17*
**316** *[1] - 6:11*
**32** *[2] - 18:3, 18:4*
**35** *[4] - 3:7, 82:5, 82:21, 82:23*
**36** *[1] - 83:1*
**37** *[5] - 3:7, 83:20, 83:22, 83:24, 83:25*
**38** *[1] - 83:20*
**39** *[1] - 83:20*
**3:00** *[1] - 79:19*
**3:43** *[1] - 107:18*
**3:45** *[2] - 37:5, 79:22*
**3:47** *[1] - 110:24*

**4**

**40** *[1] - 83:20*
**401K** *[9] - 48:8, 96:8, 96:13, 96:15, 100:19, 104:8, 104:12, 104:17*
**41** *[5] - 3:7, 83:20, 83:22, 83:24, 83:25*
**45** *[1] - 79:23*
**4:00** *[2] - 79:23, 106:6*

**5**

**50** *[1] - 67:24*
**50s** *[3] - 46:18, 46:19, 46:20*
**59** *[1] - 37:19*

**6**

**6** *[1] - 45:7*
**601** *[1] - 1:12*

**65-11** *[3] - 11:2, 11:21, 12:2*
**65-2** *[1] - 11:3*
**6511** *[1] - 10:17*
**6513** *[1] - 9:4*
**66-2** *[5] - 10:23, 11:4, 11:23, 12:3*

**7**

**706(c** *[1] - 10:6*
**71** *[6] - 3:8, 84:13, 84:17, 85:2, 85:4, 85:5*
**72** *[4] - 3:9, 85:7, 85:19, 85:22*
**73** *[7] - 3:9, 86:2, 86:3, 86:17, 86:19, 86:20*
**73s** *[1] - 86:4*
**74** *[5] - 3:10, 86:21, 87:10, 87:12, 87:13*
**75** *[6] - 3:10, 87:14, 88:4, 88:5, 88:9, 88:10*
**76** *[4] - 3:10, 88:7, 88:9, 88:10*

**8**

**800,000** *[1] - 42:11*
**81** *[1] - 3:3*
**82** *[1] - 3:7*
**83** *[1] - 3:7*
**85** *[2] - 3:8, 3:9*
**86** *[1] - 3:9*
**87** *[1] - 3:10*
**88** *[1] - 3:10*
**89** *[1] - 3:11*

**9**

**9** *[2] - 106:17, 106:19*
**90** *[2] - 3:12, 7:1*
**91** *[1] - 3:12*
**93** *[1] - 3:13*
**94** *[6] - 3:11, 3:13, 88:12, 89:13, 89:15, 89:16*
**95** *[9] - 3:12, 3:14, 89:17, 90:10, 90:12, 90:13, 90:14, 90:15, 90:17*
**96** *[2] - 3:14, 90:12*
**97** *[6] - 3:12, 3:15, 90:19, 91:12, 91:15, 91:16*
**970** *[1] - 6:11*
**9:00** *[2] - 106:16, 110:21*
**9:30** *[1] - 106:16*

**9:40** *[2] - 1:14, 4:2*

**A**

**a.m** *[3] - 1:14, 4:2, 100:17*
**ability** *[2] - 27:8, 74:11*
**able** *[3] - 17:19, 18:13, 20:3*
**above-entitled** *[1] - 111:3*
**abruptly** *[1] - 41:3*
**absent** *[1] - 15:1*
**absolutely** *[2] - 59:25, 71:2*
**abuse** *[1] - 50:2*
**abused** *[1] - 75:19*
**accept** *[1] - 24:20*
**acceptance** *[1] - 108:20*
**accommodating** *[1] - 70:6*
**accomplish** *[3] - 40:6, 41:15, 41:16*
**according** *[1] - 102:18*
**account** *[2] - 44:13, 45:6*
**accounts** *[3] - 44:6, 44:20, 74:15*
**accumulate** *[2] - 77:24, 77:25*
**accurate** *[1] - 13:6*
**accurately** *[2] - 88:2, 90:7*
**accused** *[2] - 54:8, 60:2, 60:3*
**accusing** *[4] - 70:3, 77:11, 79:5*
**achieve** *[2] - 38:19, 41:24*
**achieved** *[1] - 40:8*
**acknowledged** *[1] - 109:25*
**acknowledging** *[2] - 73:1, 74:5*
**acquired** *[2] - 42:8, 64:21*
**acquisition** *[1] - 47:4*
**act** *[1] - 28:25*
**ACTION** *[1] - 1:3*
**action** *[1] - 79:3*
**actions** *[1] - 58:16*
**active** *[1] - 102:15*
**activists** *[1] - 54:15*
**activity** *[1] - 58:2*
**actual** *[4] - 10:15, 65:6, 76:24, 105:9*
**Adam** *[2] - 57:3, 57:4*
**add** *[2] - 6:12, 39:7*
**added** *[4] - 40:3, 40:4,*

47:16, 52:2
**adding** [1] - 12:17
**addition** [2] - 15:7, 77:1
**additional** [2] - 22:13, 104:5
**ADEA** [5] - 4:10, 13:20, 13:21, 14:12, 14:19
**adjourned** [1] - 110:24
**administrative** [1] - 22:12
**administratively** [1] - 7:10
**administrator** [2] - 97:24, 99:9
**admissibility** [1] - 83:16
**admit** [14] - 82:2, 82:18, 83:13, 83:20, 84:12, 85:2, 85:19, 86:17, 87:10, 88:4, 94:6, 95:4, 96:23, 98:23
**admitted** [7] - 35:5, 72:7, 91:23, 101:2, 109:22, 109:25, 110:6
**admitting** [1] - 81:11
**advance** [3] - 23:6, 23:9, 79:15
**advisory** [1] - 15:16
**affect** [2] - 28:25, 29:1
**affects** [1] - 23:9
**AFFIRMED** [1] - 80:9
**afternoon** [10] - 19:2, 20:9, 20:12, 37:2, 37:7, 37:15, 63:4, 106:3, 107:23, 108:11
**afterwards** [1] - 109:23
**age** [30] - 14:18, 24:3, 29:9, 38:2, 38:21, 39:13, 41:7, 42:21, 43:11, 48:22, 49:14, 50:1, 50:25, 52:5, 52:7, 52:8, 58:1, 67:15, 67:23, 68:4, 68:6, 73:17, 76:6, 76:11, 76:23, 77:12, 77:23, 78:23, 79:7
**agencies** [2] - 9:11, 9:15
**agency** [7] - 10:1, 10:16, 11:8, 11:15, 12:18, 12:23, 12:24
**agent** [6] - 8:5, 8:11, 8:12, 8:23, 9:24, 13:4

**ago** [3] - 6:21, 78:9, 101:5
**agree** [13] - 5:19, 5:21, 9:18, 17:25, 18:6, 19:8, 19:10, 23:24, 65:25, 67:6, 67:10, 78:6, 110:9
**agreed** [3] - 9:9, 18:17, 24:18
**agreement** [12] - 8:6, 8:17, 8:21, 8:22, 9:7, 9:18, 10:15, 11:16, 13:2, 17:19, 17:22, 17:24
**ahead** [7] - 22:1, 52:21, 63:2, 80:14, 81:8, 106:9, 109:18
**Aid** [1] - 108:3
**aided** [1] - 1:24
**Akamai** [10] - 42:8, 42:20, 43:3, 43:8, 43:10, 47:4, 64:21, 64:23, 65:1, 65:3
**Aker** [1] - 70:4
**Akers** [10] - 41:23, 41:24, 42:3, 42:14, 42:16, 42:25, 43:1, 43:3, 46:24, 64:14
**Alex** [2] - 46:21, 50:8
**aligned** [1] - 42:13
**allegations** [2] - 24:8, 59:18
**alleged** [4] - 24:6, 70:8, 70:21, 70:25
**allegedly** [1] - 70:22
**alleges** [1] - 69:17
**alleging** [2] - 66:24, 68:25
**allocations** [1] - 102:12
**allow** [1] - 79:12
**allowed** [1] - 29:14
**almost** [4] - 36:11, 52:20, 74:25, 79:8
**ALSO** [1] - 2:10
**amend** [8] - 4:11, 4:13, 4:14, 6:4, 6:8, 6:12, 7:21, 15:15
**amended** [1] - 5:4
**amending** [1] - 12:10
**amendment** [2] - 6:9, 6:16
**amount** [16] - 14:17, 23:7, 38:15, 39:3, 39:25, 41:13, 47:17, 52:20, 82:14, 82:15, 83:10, 84:9, 89:1, 90:7
**ample** [1] - 6:21
**analysis** [1] - 5:6

**ancillary** [1] - 18:22
**AND** [2] - 3:10, 88:10
**Andrew** [3] - 46:21, 50:7, 50:8
**angles** [1] - 75:6
**animus** [2] - 51:14, 57:12
**announcing** [1] - 53:4
**annual** [1] - 91:5
**answer** [5] - 20:16, 25:23, 59:25, 77:15, 77:16
**anticipating** [1] - 16:8
**anxiety** [1] - 49:6
**anyway** [2] - 16:15, 16:20
**apart** [2] - 73:20, 76:19
**apologize** [3] - 22:6, 23:6, 23:9
**appear** [1] - 7:10
**appearance** [2] - 17:15, 30:14
**appeared** [2] - 73:2, 73:9
**applies** [3] - 6:14, 12:16, 28:19
**apply** [3] - 23:13, 23:20, 28:19
**appreciate** [4] - 13:9, 22:15, 38:7, 64:2
**appreciated** [2] - 19:14, 106:21
**appreciating** [1] - 68:12
**approached** [1] - 33:22
**appropriate** [1] - 9:20
**appropriately** [1] - 74:19
**approved** [1] - 56:1
**area** [1] - 55:8
**arguably** [1] - 14:13
**argue** [2] - 5:15, 72:12
**argument** [1] - 60:15
**arguments** [4] - 4:13, 24:22, 32:25, 33:3
**arranged** [1] - 29:19
**arrangements** [1] - 106:15
**arrest** [1] - 110:5
**arrive** [1] - 21:18
**article** [9] - 60:10, 60:11, 73:1, 73:7, 73:8, 73:9, 73:11, 73:22, 76:14
**articles** [2] - 35:13, 107:10
**articulated** [1] - 56:9
**AS** [1] - 80:9

**Asaro** [18] - 37:22, 40:25, 43:16, 44:9, 45:9, 52:13, 61:20, 61:24, 65:8, 67:8, 67:16, 73:14, 76:12, 77:1, 77:9, 77:10, 78:21, 79:2
**ASARO** [1] - 1:8
**aside** [4] - 40:17, 41:19, 43:11, 43:14
**aspects** [1] - 13:15
**aspirations** [2] - 40:16, 43:12
**assassinate** [1] - 72:3
**asserted** [1] - 14:4
**assertion** [1] - 9:23
**asset** [1] - 42:2
**assistance** [1] - 44:9
**assisted** [1] - 61:20
**assume** [3] - 16:14, 29:24, 109:17
**Atlanta** [1] - 45:22
**attachment** [2] - 98:19, 98:20
**attempt** [1] - 35:6
**attempted** [1] - 24:10
**attempting** [1] - 72:2
**attempts** [1] - 73:5
**attendance** [1] - 34:2
**attending** [3] - 55:13, 56:2, 56:3
**attention** [3] - 33:15, 36:5, 79:16
**attorney** [13] - 4:18, 16:19, 32:4, 32:5, 32:13, 32:15, 32:18, 32:23, 32:24, 99:3, 99:6, 99:8, 100:12
**attorney's** [1] - 31:24
**attorneys** [2] - 29:17, 32:17
**audio** [1] - 34:8
**August** [13] - 41:3, 44:9, 57:23, 72:23, 81:19, 90:2, 99:13, 100:17, 101:23, 101:25, 102:20, 103:7
**authenticate** [1] - 108:1
**authority** [2] - 30:20, 31:5
**automatically** [1] - 10:4
**available** [4] - 17:13, 18:5, 29:24, 109:9
**availed** [1] - 67:4
**availing** [1] - 14:22
**avoid** [4] - 33:8, 35:8, 62:14, 109:14

**aware** [4] - 8:10, 8:17, 28:22, 28:24

## B

**background** [1] - 68:23
**bad** [3] - 35:22, 54:1, 74:19
**badly** [1] - 41:7
**bail** [1] - 110:5
**balance** [1] - 14:24
**balancing** [1] - 28:6
**Band** [1] - 108:3
**Band-Aid** [1] - 108:3
**bank** [1] - 46:12
**Bank** [1] - 51:22
**barred** [6] - 5:8, 5:13, 5:20, 5:22, 7:8, 13:13
**base** [4] - 48:5, 81:24, 82:15, 84:9
**Based** [1] - 83:19
**based** [27] - 4:16, 4:21, 4:23, 19:14, 25:1, 29:10, 34:12, 39:10, 43:24, 45:15, 45:25, 48:3, 48:6, 48:7, 48:22, 49:14, 50:14, 50:19, 50:25, 53:6, 60:10, 62:11, 62:13, 76:23, 98:18, 107:12, 109:2
**bases** [1] - 14:20
**basic** [1] - 48:8
**basis** [6] - 15:15, 36:23, 36:24, 67:12, 77:22, 78:23
**Bay** [1] - 7:12
**bear** [1] - 27:17
**bears** [1] - 76:20
**became** [3] - 50:19, 54:1, 65:20
**become** [1] - 6:25
**BEEN** [1] - 80:8
**began** [1] - 54:4
**begin** [3] - 34:25, 38:23, 79:13
**beginning** [2] - 17:9, 67:12
**begins** [3] - 71:8, 76:24
**behalf** [5] - 10:4, 24:9, 72:23, 9:14
**behavior** [2] - 51:6, 73:19
**behind** [2] - 41:5, 58:16
**behold** [1] - 76:14
**belief** [1] - 27:4

**believability** [1] - 27:18
**believable** [1] - 27:21
**bench** [1] - 31:17
**benchmark** [1] - 53:24
**bend** [1] - 19:6
**benefit** [17] - 40:12, 40:13, 41:19, 47:21, 48:8, 55:20, 84:25, 96:13, 96:15, 96:17, 104:8, 104:9, 104:12, 105:12
**benefits** [23] - 38:15, 39:8, 47:15, 47:25, 48:7, 84:18, 84:23, 85:13, 85:15, 86:9, 86:15, 87:3, 87:7, 87:20, 87:22, 88:2, 91:9, 96:12, 104:7, 104:22, 105:18
**best** [3] - 12:15, 35:24, 74:19
**better** [2] - 64:18, 108:25
**between** [9] - 6:24, 8:6, 48:12, 63:21, 68:25, 69:4, 69:5, 71:4, 79:22
**beyond** [2] - 28:17, 108:18
**bias** [4] - 27:12, 28:23, 29:5, 29:12
**biased** [1] - 29:6
**biases** [3] - 28:21, 28:24
**Biases** [1] - 29:1
**big** [1] - 55:22
**bigots** [1] - 79:5
**binge** [1] - 59:17
**binge-worthy** [1] - 59:17
**bit** [6] - 23:9, 48:4, 64:12, 66:14, 106:23, 110:10
**Bitcoin** [3] - 59:19, 72:8, 72:16
**black** [1] - 64:17
**blandest** [1] - 75:11
**blanks** [2] - 10:19, 10:24
**blocks** [1] - 109:10
**blogs** [1] - 34:7
**bonus** [1] - 24:7
**bonuses** [2] - 47:15, 48:1
**boss** [2] - 65:13, 73:12
**bottom** [3] - 60:11, 73:14, 94:19
**bought** [1] - 46:11
**box** [3] - 15:19, 21:7, 21:10
**boxes** [1] - 13:4
**boy** [1] - 71:13
**brave** [1] - 63:9
**braved** [1] - 63:12
**break** [17] - 14:2, 35:2, 36:24, 36:25, 37:1, 37:2, 37:5, 37:7, 37:8, 79:21, 79:24, 106:7, 106:10, 106:13, 109:6, 110:20
**breaks** [2] - 33:13, 80:2
**brief** [1] - 30:8
**Brief** [2] - 21:9, 21:20, 21:22
**briefed** [1] - 8:13
**briefing** [2] - 4:12, 12:15
**briefly** [9] - 16:11, 64:12, 89:21, 91:3, 92:7, 92:16, 95:13, 104:3, 105:7
**bring** [3] - 21:2, 33:15, 54:19
**brought** [3] - 27:24, 56:13, 65:15
**Buenzle** [1] - 2:12
**bug** [1] - 69:18
**build** [1] - 46:14
**building** [5] - 46:3, 46:11, 51:22, 69:19, 78:11
**burden** [5] - 27:25, 28:8, 32:13, 76:21, 76:25
**business** [9] - 20:8, 40:9, 40:21, 45:16, 64:19, 64:22, 69:15, 69:18, 74:5
**BY** [29] - 1:19, 2:3, 81:10, 82:7, 82:24, 83:3, 84:2, 84:14, 85:8, 86:5, 86:22, 87:15, 88:13, 89:18, 90:20, 91:18, 92:4, 93:14, 94:12, 95:10, 96:4, 97:9, 97:15, 98:11, 98:25, 100:6, 101:4, 103:24, 105:5
**Byrne** [1] - 1:12

### C

**calculable** [1] - 38:23
**calculate** [4] - 39:1, 39:3, 47:12, 47:17
**calculations** [3] - 39:5, 47:14, 47:19
**candidates** [2] - 51:9, 54:14
**cap** [1] - 62:25
**capitalize** [2] - 40:4, 47:3
**capitalized** [2] - 42:3, 52:2
**card** [2] - 69:18, 77:5
**care** [2] - 19:11, 71:18
**cared** [1] - 67:24
**carefully** [2] - 23:4, 29:11
**CARL** [4] - 1:3, 3:3, 80:8, 80:12
**Carl** [182] - 4:19, 20:13, 24:2, 37:16, 37:17, 37:18, 37:19, 37:20, 38:10, 38:13, 38:23, 39:3, 39:8, 39:10, 39:15, 39:16, 39:18, 39:22, 39:23, 39:24, 40:7, 40:11, 40:13, 40:15, 41:2, 41:5, 41:7, 41:12, 41:13, 41:15, 41:17, 41:19, 41:25, 42:9, 42:12, 42:14, 42:15, 42:19, 42:20, 42:24, 43:2, 43:7, 43:10, 43:12, 43:15, 43:18, 43:23, 44:10, 44:20, 45:4, 45:8, 45:9, 45:14, 45:21, 45:22, 46:2, 46:6, 46:8, 46:13, 46:15, 46:16, 46:19, 46:22, 46:24, 46:25, 47:4, 47:6, 47:11, 47:13, 47:17, 47:19, 47:21, 48:3, 48:10, 48:14, 48:15, 48:16, 48:17, 48:20, 49:1, 49:7, 49:9, 49:10, 49:12, 49:15, 49:24, 50:3, 50:13, 50:23, 51:3, 51:11, 51:16, 51:20, 51:24, 52:4, 52:18, 52:24, 53:2, 53:4, 53:5, 53:12, 53:15, 53:18, 53:19, 54:1, 54:3, 54:4, 54:7, 54:8, 54:9, 54:12, 54:16, 54:18, 55:3, 55:5, 55:8, 55:12, 55:18, 56:3, 56:4, 56:5, 56:13, 56:14, 56:22, 57:1, 57:6, 57:7, 57:9, 57:22, 58:8, 59:2, 59:5, 59:12, 59:14, 59:24, 60:1, 60:3, 60:5, 61:6, 61:9, 61:13, 61:17, 61:18, 61:22, 62:10, 80:4, 80:12, 80:17, 81:13, 81:14, 82:9, 84:15, 85:9, 86:6, 86:23, 86:24, 87:1, 87:2, 87:4, 87:16, 88:14, 89:19, 89:21, 90:21, 91:19, 92:5, 93:2, 93:15, 94:13, 95:11, 96:5, 97:16, 103:25
**carl** [2] - 44:7, 46:18
**Carl's** [15] - 38:10, 41:19, 41:21, 44:6, 46:5, 47:12, 47:23, 52:3, 52:15, 53:25, 55:2, 56:4, 58:21, 60:11, 60:16
**carrots** [1] - 18:11
**carrying** [2] - 26:18, 76:25
**carson** [2] - 74:10, 107:23
**CARSON** [134] - 1:19, 4:16, 5:2, 5:10, 5:12, 5:17, 5:21, 5:25, 6:19, 8:1, 8:4, 8:20, 9:2, 9:6, 9:13, 10:10, 10:12, 10:21, 11:2, 11:6, 11:12, 11:18, 11:22, 11:24, 12:2, 15:18, 15:21, 16:2, 16:20, 18:13, 19:9, 20:7, 37:14, 72:9, 72:11, 72:14, 75:22, 75:25, 76:2, 76:4, 80:4, 80:15, 80:21, 80:25, 81:7, 81:10, 82:4, 82:7, 82:18, 82:24, 83:2, 83:3, 83:13, 83:19, 83:23, 84:2, 84:12, 84:14, 85:2, 85:6, 85:8, 85:19, 85:23, 86:2, 86:5, 86:17, 86:21, 86:22, 87:10, 87:14, 87:15, 88:4, 88:6, 88:8, 88:12, 88:13, 89:13, 89:17, 89:18, 90:10, 90:13, 90:18, 90:20, 91:12, 91:17, 91:18, 91:22, 92:2, 92:4, 93:7, 93:12, 93:14, 94:5, 94:10, 94:12, 95:4, 95:9, 95:10, 95:23, 96:1, 96:3, 96:4, 96:23, 97:2, 97:4, 97:7, 97:9, 97:12, 97:15, 98:10, 98:11, 98:16, 98:24, 98:25, 100:3, 100:6, 100:22, 101:4, 103:19, 103:22, 103:24, 104:25, 105:4, 105:5, 105:21, 106:1, 106:8, 106:10, 107:25, 108:7, 109:14, 109:19, 110:4, 110:19
**Carson** [29] - 4:12, 6:17, 13:9, 13:21, 15:13, 17:16, 17:25, 19:15, 20:2, 20:25, 37:12, 37:15, 62:23, 65:23, 66:17, 67:6, 71:3, 71:9, 72:12, 76:1, 78:25, 80:3, 81:2, 81:8, 91:25, 97:6, 98:6, 106:6, 108:24
**Carson's** [4] - 19:24, 64:20, 65:5, 65:12
**case** [100] - 4:17, 4:20, 4:21, 4:24, 5:5, 6:11, 6:18, 7:12, 7:25, 14:1, 15:1, 15:3, 15:4, 15:7, 16:17, 17:5, 19:12, 22:19, 22:21, 22:23, 23:3, 23:12, 24:1, 24:23, 24:24, 27:12, 27:23, 28:1, 29:5, 31:4, 31:12, 32:1, 32:20, 33:6, 33:10, 33:15, 33:25, 34:11, 34:12, 34:14, 34:15, 34:16, 34:17, 34:19, 34:23, 34:25, 35:5, 35:6, 35:12, 36:3, 37:16, 37:19, 37:20, 38:12, 38:25, 39:22, 41:9, 41:14, 41:25, 43:22, 44:1, 44:2, 44:5, 44:22, 49:21, 51:23, 53:24, 57:14, 57:20, 58:19, 58:22, 60:19, 62:19, 63:6, 63:14, 64:2, 65:24, 66:17, 67:6, 68:20, 69:2, 69:20, 70:25, 71:7, 72:4, 78:7, 78:16, 78:21, 79:1, 106:23, 107:1, 107:2, 107:4, 107:10, 107:12, 107:13, 109:10
**case-related** [1] - 34:19
**cases** [4] - 6:10,

13:24, 28:19, 28:20
cast [2] - 41:19, 43:14
categories [1] - 33:13
caused [4] - 47:13,
48:19, 57:24, 73:8
Cavalier [8] - 12:5,
15:12, 15:21, 62:25,
63:4, 79:18, 81:3,
108:14
CAVALIER [42] - 2:3,
12:8, 12:14, 12:21,
13:6, 16:6, 16:11,
16:13, 16:19, 17:3,
17:11, 19:8, 19:14,
19:19, 20:15, 63:3,
72:16, 76:5, 81:4,
81:6, 82:20, 83:15,
85:3, 85:20, 86:18,
87:11, 88:5, 88:7,
89:14, 90:11, 90:15,
91:14, 93:9, 94:7,
95:6, 95:24, 96:25,
98:17, 100:23,
105:23, 108:5,
108:17
CC'd [1] - 100:14
cell [1] - 34:7
centers [4] - 45:16,
45:17, 45:22, 45:23
certain [4] - 25:8,
26:1, 28:21, 40:6
certainly [9] - 5:17,
19:8, 20:17, 35:16,
64:18, 67:19, 67:24,
69:23, 110:2
certify [1] - 111:2
CFO [1] - 77:3
Chad [3] - 20:7, 20:11,
109:21
chain [1] - 69:4
chairs [1] - 21:18
chance [2] - 17:9,
70:16
change [6] - 5:5, 5:6,
13:16, 52:25, 54:3
changed [2] - 85:14,
86:16
changing [1] - 17:1
charge [20] - 5:14,
5:21, 10:8, 10:17,
10:19, 10:22, 10:23,
11:2, 11:13, 19:3,
19:4, 52:10, 52:11,
52:13, 52:14, 52:15,
53:2, 54:3, 54:16,
109:18
charged [4] - 24:10,
71:11, 72:1, 74:7
charges [10] - 9:25,
10:2, 10:17, 35:9,

71:14, 71:24,
109:22, 109:25,
110:6
charters [1] - 8:23
check [5] - 15:19,
90:24, 91:1, 101:20,
106:20
checked [1] - 13:4
Cherry [1] - 2:4
chief [4] - 19:12,
37:24, 41:1, 65:8
child [6] - 24:10,
59:18, 72:17, 73:4,
75:19
choice [3] - 60:7,
60:12, 75:1
Chris [11] - 41:23,
42:3, 42:14, 42:16,
42:25, 43:1, 43:3,
46:24, 64:14, 70:3
circle [1] - 61:10
Circuit [2] - 6:9, 6:11
circumstances [4] -
4:16, 4:18, 73:25,
75:7
circumstantial [4] -
26:14, 26:15, 26:18,
26:23
city [6] - 9:21, 12:24,
63:11, 72:25, 74:4,
106:14
City [2] - 46:12, 51:22
civil [3] - 27:23, 28:19,
78:13
Civil [1] - 18:3
CIVIL [1] - 1:3
claim [19] - 6:25, 7:8,
7:9, 7:20, 13:12,
13:21, 13:22, 28:10,
47:23, 48:3, 48:18,
48:20, 49:8, 59:11,
60:5, 60:22, 76:11
claiming [1] - 77:21
claims [16] - 4:22, 5:1,
5:13, 5:17, 5:19, 7:7,
7:21, 7:24, 12:7,
14:3, 24:2, 24:8,
28:3, 67:11, 78:3
class [2] - 58:1, 78:11
clean [1] - 89:8
clear [8] - 6:10, 14:5,
21:4, 54:6, 62:16,
73:16, 107:8
clearly [1] - 61:18
clicked [1] - 69:14
client [2] - 38:2, 38:4
client's [1] - 33:1
clients [3] - 25:18,
63:14, 78:17
close [4] - 18:25,

35:17, 36:23, 53:25
closest [1] - 48:24
closing [3] - 32:24,
33:2, 33:3
cloud [10] - 40:11,
42:2, 42:10, 45:15,
45:25, 50:14, 50:19,
53:6, 64:13, 64:14
cloud-based [5] -
45:15, 45:25, 50:14,
50:19, 53:6
cloud-hosting [2] -
40:11, 64:13
Cloudflare [1] - 53:16
co [1] - 34:1
co-workers [1] - 34:1
cold [1] - 69:10
colleague [1] - 65:13
collect [1] - 31:14
Comcast [3] - 92:9,
92:18, 92:19
coming [4] - 6:8,
15:13, 66:5, 108:22
Commencing [1] -
1:14
comments [6] - 50:1,
51:11, 51:16, 52:8,
56:12, 57:11
Commission [8] -
7:16, 8:12, 8:16,
8:19, 11:10, 11:14,
52:9
commission [11] - 8:5,
8:7, 8:9, 8:11, 8:23,
8:25, 9:8, 9:17, 10:3,
10:5, 12:20
commit [1] - 17:6
common [5] - 9:10,
9:14, 25:4, 36:10,
39:20
commotion [1] - 73:8
communication [3] -
33:11, 34:4, 69:5
communications [2] -
43:5, 68:24
community [2] - 51:7,
51:11
commute [1] - 63:12
commutes [1] -
106:14
Comp [1] - 6:10
companies [4] -
45:18, 46:1, 53:7,
55:16
companies' [1] -
69:24
company [43] - 42:5,
42:8, 42:18, 45:15,
45:21, 45:23, 45:25,
50:15, 50:20, 52:5,

56:8, 64:22, 64:25,
65:9, 65:15, 65:20,
65:22, 66:19, 66:20,
66:22, 67:25, 68:11,
68:17, 68:21, 69:13,
71:14, 71:15, 73:25,
74:1, 74:2, 74:8,
74:15, 75:2, 75:8,
75:12, 77:5, 78:1,
88:20, 88:21, 92:23,
94:21, 95:19
COMPANY [1] - 1:7
company's [1] - 65:10
compare [1] - 48:14
compared [5] - 53:12,
53:15, 53:17, 53:18,
53:19
compensation [13] -
14:10, 81:22, 83:8,
84:21, 84:23, 85:16,
88:17, 88:24, 90:8,
92:8, 92:23, 92:25,
96:21
competing [1] - 69:15
complain [1] - 69:8
complainant [1] - 11:1
complained [2] -
49:15, 67:21
complaining [4] -
69:1, 69:10, 69:23,
70:8
complains [7] - 69:11,
69:12, 69:14, 69:16,
69:23
complaint [5] - 4:10,
4:21, 5:4, 14:2,
14:17
complaints [3] -
67:14, 69:7, 69:18
complete [2] - 30:24,
40:21
completed [1] - 33:3
completely [2] -
60:23, 68:20
computer [5] - 1:24,
40:1, 46:23, 50:20,
80:17
computer-aided [1] -
1:24
computers [2] - 55:3,
68:22
computing [5] - 42:2,
42:10, 45:15, 53:6,
64:15
concealing [3] - 44:4,
44:17, 49:22
concealment [1] -
41:4
concern [1] - 73:10
concerned [1] - 75:4

concerns [2] - 17:13,
24:5
conclude [3] - 14:25,
15:4, 26:19
conclusion [4] - 25:9,
29:17, 31:12
conduct [10] - 14:9,
14:14, 33:7, 38:1,
38:4, 38:11, 39:12,
49:23, 61:2, 77:13
conference [4] - 4:9,
6:6, 13:17, 19:3,
19:4, 31:18, 31:24,
31:25, 110:10
conferences [3] -
31:20, 31:23, 55:22
confirm [1] - 59:3,
93:3
confirmatively [1] -
15:3
confronted [1] - 74:2
connection [2] -
47:14, 47:19
connections [5] -
40:5, 42:14, 47:1,
47:2, 55:9
consider [12] - 22:19,
25:5, 26:3, 26:21,
27:6, 28:14, 30:1,
31:25, 43:22, 47:7,
47:22, 58:15
consideration [4] -
9:11, 9:15, 43:24,
51:10
considered [2] -
27:15, 35:20
considering [3] - 28:9,
39:6, 75:5
consist [1] - 81:24
consists [1] - 24:16
constitute [1] - 14:6
consultant [2] - 89:6,
92:8
Consulting [3] -
97:22, 97:23, 98:4
consulting [1] - 88:18,
92:18
contact [2] - 23:8,
33:8
contained [1] - 9:16
contend [1] - 71:2
contends [1] - 24:13
contents [1] - 98:7
context [2] - 15:5,
36:14
continue [1] - 107:22
continued [5] - 39:11,
40:13, 41:17, 48:16,
73:24
continuing [1] - 74:23

**contract** [1] - 59:20
**contradicts** [1] - 27:14
**contributed** [1] - 46:7
**contribution** [2] - 91:5, 99:25
**contributions** [3] - 38:18, 40:16, 43:13
**control** [1] - 25:10
**conversation** [1] - 108:24
**conversations** [1] - 19:15
**convicted** [3] - 27:17, 71:11, 110:7
**convince** [2] - 18:12, 43:19
**Conway** [2] - 51:2, 51:5
**coordinated** [2] - 41:4, 61:21
**copious** [1] - 68:19
**copy** [1] - 73:9
**core** [1] - 66:18
**Corn** [1] - 51:22
**corporate** [1] - 57:6
**correct** [7] - 23:5, 93:6, 95:21, 101:7, 101:23, 103:20, 111:2
**correction** [1] - 13:8
**correctly** [1] - 31:21
**counsel** [2] - 10:25, 32:14
**counsel's** [1] - 76:8
**count** [2] - 14:19, 49:18
**counter** [1] - 14:21
**counties** [1] - 63:11
**countries** [2] - 42:11, 55:15
**country** [1] - 56:19
**counts** [1] - 14:3
**couple** [9] - 6:4, 21:14, 21:15, 22:16, 54:22, 64:6, 65:5, 107:9, 108:9
**course** [7] - 14:7, 23:22, 29:23, 31:22, 34:16, 71:14, 77:6
**COURT** [101] - 1:1, 4:4, 4:25, 5:7, 5:11, 5:16, 5:19, 5:23, 6:3, 6:20, 8:3, 8:10, 9:1, 9:4, 10:8, 10:11, 10:19, 10:22, 11:4, 11:7, 11:17, 11:21, 11:23, 11:25, 12:4, 12:13, 12:19, 12:25, 13:8, 15:19, 16:1, 16:3, 16:7, 16:12,

16:18, 16:21, 17:6, 17:22, 18:19, 19:18, 20:4, 20:14, 20:20, 21:10, 21:25, 22:5, 62:23, 72:10, 72:12, 72:15, 75:24, 76:1, 76:3, 79:18, 80:5, 80:14, 80:19, 80:23, 81:2, 81:5, 81:8, 82:21, 83:18, 83:22, 83:24, 85:4, 85:21, 86:1, 86:19, 87:12, 88:9, 89:15, 90:12, 90:14, 90:16, 91:15, 91:25, 93:10, 94:8, 95:7, 95:25, 97:1, 97:6, 97:8, 98:6, 98:21, 101:1, 103:21, 105:2, 105:24, 106:5, 106:9, 106:11, 107:19, 108:2, 108:13, 108:24, 109:17, 109:24, 110:9, 110:20
**court** [13] - 4:1, 9:12, 21:23, 25:2, 25:3, 29:22, 31:8, 31:14, 41:10, 59:11, 60:22, 63:21, 107:4
**Court** [5] - 1:11, 1:22, 15:22, 17:20, 111:5
**court's** [1] - 6:13
**courthouse** [3] - 33:12, 33:14, 63:22
**Courthouse** [1] - 1:12
**courtroom** [11] - 22:4, 24:25, 26:17, 29:19, 31:11, 34:10, 35:18, 63:22, 64:7, 107:18, 109:21
**Courtroom** [1] - 2:12
**COURTROOM** [6] - 4:3, 21:24, 22:2, 80:7, 80:10, 107:17
**covenants** [1] - 9:16
**cover** [4] - 11:18, 24:14, 41:2, 76:15
**coverage** [1] - 35:8
**covered** [2] - 26:17, 72:24
**covers** [2] - 14:12
**coverup** [1] - 70:3
**COVID** [2] - 56:18, 56:19
**create** [1] - 19:5
**created** [1] - 68:13
**credibility** [24] - 27:2, 27:3, 30:13, 41:11, 44:1, 44:2, 44:15,

44:18, 44:21, 44:23, 45:1, 49:21, 57:13, 57:15, 57:20, 60:14, 61:11, 62:21, 66:18, 67:7, 67:8, 71:4, 78:6
**credible** [3] - 45:6, 57:16, 61:12
**credit** [1] - 77:5
**crime** [4] - 27:17, 60:2, 60:4, 71:13
**crimes** [2] - 74:7, 74:22
**criminal** [2] - 24:9, 28:19
**cringe** [1] - 59:17
**cringe-worthy** [1] - 59:17
**crisis** [2] - 75:8, 75:9
**criticism** [1] - 74:20
**cross** [7] - 7:15, 11:9, 18:14, 32:14, 32:19, 35:17, 108:15
**cross-examination** [1] - 35:17
**cross-examine** [3] - 18:14, 32:14, 32:19
**cross-filing** [2] - 7:15, 11:9
**crude** [1] - 70:10
**culture** [1] - 36:8
**customers** [2] - 42:11, 74:9
**cut** [1] - 110:15

**D**

**d/b/a** [2] - 1:7, 1:7
**daily** [2] - 67:12, 77:22
**Dallas** [1] - 45:22
**damage** [1] - 79:13
**damages** [5] - 13:16, 43:23, 47:24, 48:5, 49:12
**Dampf** [3] - 46:21, 50:8
**Dan** [33] - 37:22, 40:17, 40:24, 41:19, 43:14, 44:8, 45:8, 47:8, 50:22, 50:23, 51:6, 51:7, 51:13, 51:20, 52:13, 53:12, 53:15, 54:2, 54:6, 54:13, 54:23, 55:17, 56:2, 56:3, 56:4, 56:7, 56:22, 57:9, 57:22, 61:17, 61:19, 61:21, 65:11
**DANIEL** [1] - 1:8
**dark** [3] - 16:24,

59:19, 72:2
**data** [4] - 45:16, 45:17, 45:22, 45:23
**Date** [1] - 111:7
**dated** [2] - 105:14, 105:15
**DAY** [1] - 1:6
**days** [4] - 5:14, 5:22, 7:1, 63:13
**deadline** [5] - 6:9, 6:13, 6:18, 6:19, 15:14
**deadlines** [1] - 15:16
**deal** [6] - 7:2, 18:21, 52:17, 52:24, 80:19
**dealing** [2] - 30:10, 75:7
**December** [2] - 52:16, 53:23
**decide** [26] - 23:12, 23:15, 23:19, 26:24, 26:25, 43:25, 44:2, 44:3, 44:14, 44:18, 44:21, 47:23, 49:19, 49:20, 57:14, 57:16, 58:11, 58:18, 61:11, 62:11, 62:13, 63:18, 75:3, 76:16, 107:12
**decided** [9] - 40:17, 43:14, 57:3, 58:17, 61:6, 61:8, 61:24, 75:3, 75:10
**deciding** [3] - 26:25, 27:6, 58:22
**decision** [8] - 25:1, 25:4, 25:15, 29:6, 40:22, 58:20, 74:22, 75:4
**decisions** [7] - 14:10, 23:22, 23:24, 29:3, 29:5, 35:23, 37:25
**dedication** [1] - 43:13
**defendant** [12] - 24:11, 32:5, 32:14, 32:17, 32:24, 37:21, 37:22, 58:12, 58:14, 63:6, 66:7, 77:18
**defendant's** [7] - 57:13, 58:21, 58:24, 60:21, 60:25, 61:12, 62:24
**defendants** [24] - 4:20, 5:1, 7:11, 37:21, 43:19, 44:14, 49:13, 52:12, 58:3, 58:9, 58:23, 59:9, 60:3, 60:5, 60:9, 60:15, 60:16, 60:23, 61:4, 61:6, 61:8, 62:18, 62:20, 79:3

**Defendants** [2] - 1:9, 2:5
**defendants'** [1] - 11:4
**defense** [1] - 20:14
**defense's** [1] - 32:19
**deliberate** [3] - 31:4, 33:5, 34:21
**deliberation** [1] - 33:4
**deliberations** [7] - 29:25, 30:4, 30:20, 31:13, 31:15, 34:25, 36:3
**demeanor** [1] - 30:14
**demonstrate** [2] - 42:24, 61:5
**demonstrates** [1] - 57:21
**demonstratives** [1] - 15:17
**denied** [5] - 15:15, 59:4, 59:7, 60:8, 69:11
**denies** [1] - 24:8
**dental** [1] - 85:15
**deny** [5] - 6:4, 7:23, 13:10, 13:18, 59:6
**denying** [1] - 31:25
**department** [6] - 37:24, 48:15, 50:6, 50:12, 50:19, 68:25
**deposition** [5] - 17:17, 17:23, 18:2, 18:5, 18:14
**depression** [1] - 49:6
**DEPUTY** [6] - 4:3, 21:24, 22:2, 80:7, 80:10, 107:17
**Deputy** [1] - 2:12
**deputy** [1] - 29:19
**DEREK** [1] - 1:18
**describe** [7] - 54:16, 87:18, 89:21, 91:4, 92:7, 104:4, 105:8
**describing** [1] - 49:8
**description** [3] - 55:10, 56:24, 105:9
**deserves** [3] - 25:7, 27:22, 79:16
**designate** [1] - 9:24
**designated** [3] - 8:5, 9:19, 13:3
**designation** [1] - 17:17
**desk** [1] - 69:9
**despite** [1] - 110:13
**destroy** [1] - 31:14
**details** [7] - 50:3, 63:7, 93:18, 104:5, 104:18, 104:22, 105:18

**detention** [1] - 72:23
**determination** [2] - 43:24, 71:4
**determinations** [3] - 45:1, 57:15, 78:6
**determine** [4] - 30:13, 44:23, 57:20, 62:21
**determining** [1] - 28:12
**developed** [2] - 51:24, 71:22
**device** [1] - 34:9
**difference** [1] - 12:6
**different** [15] - 11:25, 14:3, 14:8, 14:14, 43:20, 43:21, 44:6, 55:15, 60:24, 67:9, 75:6, 96:9, 96:10, 105:7
**differently** [2] - 28:4, 66:3
**difficult** [2] - 36:7, 44:23
**digital** [2] - 36:11, 73:9
**dinner** [1] - 56:23
**direct** [5] - 26:7, 26:8, 26:12, 26:23, 45:3
**directly** [3] - 41:22, 42:13, 42:25
**director** [15] - 41:1, 53:1, 53:4, 53:6, 53:8, 53:11, 53:18, 53:19, 55:1, 55:10, 65:21, 68:14, 70:2, 70:5
**disability** [1] - 29:8
**disbelieve** [1] - 29:2
**disclosure** [2] - 49:23, 62:14
**disclosures** [1] - 108:13
**discovery** [1] - 15:2
**discriminate** [1] - 78:22
**discriminated** [2] - 24:2, 77:22
**discriminating** [2] - 70:20, 79:6
**discrimination** [24] - 10:22, 10:23, 14:18, 24:1, 24:14, 38:8, 39:13, 48:2, 48:22, 49:14, 49:19, 50:25, 51:12, 52:8, 61:2, 67:11, 67:18, 67:22, 68:22, 70:3, 70:9, 70:22, 71:1, 76:16
**discriminatory** [4] - 38:1, 51:14, 57:11,

57:12
**discuss** [5] - 33:24, 33:25, 34:3, 52:15
**discussed** [1] - 13:13
**discussing** [1] - 34:22
**discussion** [2] - 14:17, 21:9
**Discussion** [1] - 80:24
**discussions** [2] - 34:19, 36:17
**dishonesty** [1] - 62:18
**dislike** [2] - 54:17, 54:18
**disparaged** [1] - 54:14
**disparate** [2] - 24:5
**disposal** [1] - 18:11
**dispute** [2] - 6:1, 63:18
**disputes** [1] - 14:25
**disputing** [1] - 5:23
**disregard** [1] - 24:24
**disregarded** [1] - 40:17
**disruptive** [1] - 75:14
**distances** [1] - 30:11
**distinction** [2] - 26:22, 65:4
**distract** [1] - 30:15
**distracted** [1] - 37:10
**distracting** [1] - 30:12
**distress** [1] - 49:7
**DISTRICT** [3] - 1:1, 1:1, 1:16
**district** [2] - 6:13, 8:14
**District** [3] - 1:11, 4:2
**diversity** [1] - 69:24
**docket** [1] - 10:24
**Docket** [1] - 9:4
**doctor** [3] - 18:12, 18:23, 49:3
**document** [31] - 10:15, 11:5, 16:22, 16:23, 69:3, 82:6, 83:6, 83:9, 83:14, 84:12, 84:15, 84:24, 85:12, 86:6, 86:12, 86:14, 87:2, 87:4, 87:7, 87:25, 88:21, 92:10, 93:2, 93:17, 93:24, 95:13, 96:7, 100:24, 104:2, 104:19, 105:14
**documents** [8] - 24:17, 32:16, 43:5, 68:19, 71:6, 93:4, 107:25
**dollar** [1] - 39:3
**dollars** [1] - 52:1
**done** [15] - 17:7, 17:16, 20:13, 22:12,

22:20, 32:23, 39:1, 51:17, 51:20, 66:7, 70:5, 78:20, 79:13, 79:22, 108:11
**doubt** [1] - 28:18
**down** [10] - 14:16, 17:14, 18:10, 18:21, 37:9, 57:18, 92:1, 102:9, 106:9, 106:10
**Dr** [1] - 17:12
**draft** [1] - 5:3
**drafting** [1] - 9:25
**drama** [1] - 59:17
**dramatically** [1] - 13:17
**dreams** [1] - 43:12
**drink** [1] - 56:12
**drops** [1] - 26:17
**dual** [2] - 8:8, 8:24
**Dubai** [1] - 45:24
**due** [5] - 38:14, 67:14, 67:23, 76:10, 77:12
**DULY** [2] - 80:8
**duplicate** [1] - 91:23
**during** [43] - 18:14, 22:7, 23:17, 23:22, 29:16, 29:18, 29:23, 29:25, 30:4, 31:6, 31:16, 33:8, 33:13, 33:24, 35:3, 35:19, 37:10, 41:21, 42:9, 52:16, 56:10, 56:17, 56:22, 57:22, 64:20, 64:23, 65:23, 68:2, 70:15, 70:23, 71:1, 71:17, 71:22, 78:16, 83:10, 84:20, 87:3, 93:23, 93:24, 94:25, 95:2, 102:19, 109:16

---

### E

**e)(1** [1] - 10:6
**eager** [1] - 78:7
**early** [2] - 109:6
**earned** [4] - 48:1, 48:12, 83:17, 91:9
**earning** [1] - 52:20
**earns** [1] - 78:16
**easier** [3] - 19:12, 22:9, 22:11
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:11
**Eastlack** [3] - 99:2, 99:3
**easy** [9] - 15:19, 45:1, 45:4, 57:19, 61:15, 62:21, 62:22, 63:13, 109:11
**eat** [1] - 109:3

**EEOC** [12] - 7:15, 8:5, 8:7, 8:8, 8:11, 8:17, 8:22, 8:25, 9:8, 9:17, 9:23, 10:5
**EEOC's** [1] - 10:2
**effect** [1] - 75:7
**effective** [1] - 74:13
**effectuate** [1] - 75:15
**efficient** [4] - 9:19, 20:18, 66:8, 66:15
**effort** [1] - 61:21
**eight** [1] - 63:25
**either** [11] - 7:21, 16:17, 21:6, 26:23, 31:13, 36:16, 56:6, 66:25, 73:14, 108:19, 109:10
**electronic** [1] - 43:5
**element** [1] - 14:22
**elements** [1] - 14:8
**eligibility** [1] - 102:14
**eligible** [3] - 101:6, 102:2, 102:14
**email** [19] - 15:12, 15:21, 15:22, 34:5, 34:13, 34:15, 53:3, 97:19, 97:22, 97:25, 98:5, 98:12, 98:13, 99:1, 100:10, 100:13, 100:15, 100:19, 102:8
**emails** [2] - 68:23, 109:12
**emoji** [1] - 69:14
**emotional** [4] - 48:18, 48:20, 49:7
**employed** [12] - 81:15, 81:18, 85:17, 86:11, 87:5, 87:8, 87:23, 96:19, 98:12, 98:14, 104:20, 105:16
**employee** [15] - 41:22, 59:13, 59:14, 65:9, 67:2, 67:5, 68:12, 69:14, 70:10, 73:9, 74:4, 86:9, 102:9, 102:14
**employees** [14] - 37:21, 37:25, 42:25, 54:18, 54:19, 54:21, 65:2, 65:3, 66:21, 66:22, 67:3, 73:21, 74:14, 75:20
**employment** [34] - 7:3, 9:23, 24:1, 38:16, 38:17, 38:20, 39:4, 39:8, 39:11, 40:9, 41:21, 44:7, 46:5, 53:25, 67:13, 68:3, 71:2, 73:24,

75:2, 77:7, 83:10, 84:3, 84:20, 89:10, 91:10, 92:19, 92:20, 93:23, 93:24, 94:25, 95:2, 95:14, 95:18, 102:15
**encourage** [1] - 17:15
**end** [13] - 31:9, 36:3, 43:22, 63:19, 65:11, 75:1, 77:16, 78:17, 79:11, 82:13, 102:13, 105:10, 109:5
**ended** [3] - 42:17, 42:18, 89:10
**ends** [1] - 34:3
**engaged** [7] - 38:1, 38:4, 38:6, 62:18, 64:22, 67:20, 73:19
**engaging** [1] - 70:3
**engineer** [10] - 39:24, 40:2, 46:18, 48:14, 51:3, 51:4, 51:17, 52:25, 53:9, 57:5
**engineering** [3] - 45:12, 46:24, 50:4
**engineers** [12] - 45:10, 46:2, 46:16, 46:17, 48:11, 50:9, 50:14, 50:16, 50:17, 50:18, 51:15, 56:10
**enters** [1] - 22:4
**entire** [3] - 46:19, 62:3, 101:11
**entirety** [1] - 102:14
**entitled** [5] - 13:1, 99:16, 99:18, 99:21, 111:3
**environment** [1] - 24:4
**especially** [2] - 66:10, 78:1
**ESQUIRE** [4] - 1:19, 2:3, 2:3, 2:4
**essentially** [2] - 64:22, 73:23
**established** [1] - 7:7
**estimate** [1] - 63:1
**ethnicity** [1] - 29:8
**evaluate** [1] - 29:11, 70:16
**evaluation** [2] - 70:17, 70:19
**evening** [1] - 107:15, 110:23
**event** [6] - 54:20, 54:23, 55:19, 55:22, 110:3
**event's** [1] - 64:24
**events** [6] - 25:6,

54:23, 55:13, 55:23, 56:3, 57:3
**eventually** [2] - 71:13, 72:5
**everyday** [1] - 25:6
**evidence** [147] - 6:1, 8:21, 18:9, 22:19, 22:21, 22:22, 22:23, 23:12, 23:17, 23:19, 24:15, 24:20, 24:21, 25:1, 25:5, 25:8, 25:11, 25:12, 25:13, 25:16, 25:17, 25:19, 25:20, 25:24, 26:1, 26:2, 26:3, 26:6, 26:7, 26:8, 26:12, 26:14, 26:15, 26:18, 26:21, 26:23, 26:24, 27:13, 27:16, 27:19, 28:1, 28:2, 28:4, 28:5, 28:9, 28:11, 28:13, 28:16, 29:10, 29:11, 29:17, 29:18, 30:24, 31:6, 31:7, 31:21, 32:3, 32:7, 32:8, 32:11, 32:12, 32:16, 32:17, 32:18, 32:21, 32:22, 32:25, 33:2, 34:11, 34:13, 34:20, 34:24, 35:5, 35:18, 35:19, 36:1, 38:13, 39:2, 39:6, 39:10, 39:15, 39:17, 40:20, 40:24, 41:6, 41:18, 41:23, 42:12, 42:24, 43:2, 43:17, 44:15, 44:20, 45:24, 46:4, 46:6, 47:13, 47:22, 48:4, 48:10, 48:25, 51:13, 51:24, 52:7, 52:11, 53:10, 56:7, 57:21, 57:24, 59:3, 60:1, 60:13, 60:14, 60:25, 61:3, 61:4, 61:7, 61:16, 61:18, 61:22, 62:13, 62:16, 68:21, 71:3, 76:22, 76:24, 77:19, 77:24, 78:2, 78:8, 78:15, 78:20, 81:11, 81:12, 82:2, 82:22, 93:7, 95:25, 98:7, 100:22, 103:20, 104:25, 105:22, 106:25, 107:13
**EVIDENCE** [36] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16,

3:16, 82:23, 84:1, 85:5, 85:22, 86:20, 87:13, 88:11, 89:16, 90:17, 91:16, 93:11, 94:9, 95:8, 96:2, 97:3, 101:3, 105:3, 105:25
**exactly** [1] - 15:23
**examination** [2] - 35:17, 106:2
**EXAMINATIONS** [1] - 3:2
**examine** [3] - 18:14, 32:14, 32:19
**example** [4] - 14:12, 26:8, 35:6, 70:15
**examples** [1] - 78:4
**excellent** [1] - 55:6
**excelling** [1] - 54:4
**Exchange** [1] - 51:22
**exchange** [1] - 53:2
**exchanged** [1] - 24:11
**exchanging** [1] - 71:12
**exclude** [2] - 26:1, 51:9
**excluded** [2] - 26:4, 52:4
**excuse** [6] - 58:7, 60:24, 61:12, 76:13, 76:15, 77:13
**execute** [1] - 55:12
**exhausted** [2] - 7:10, 12:7
**exhaustion** [2] - 7:13, 8:16
**exhibit** [9] - 25:11, 26:5, 70:13, 70:18, 82:25, 91:22, 92:5, 100:4, 101:1
**EXHIBIT** [33] - 3:7, 3:7, 3:8, 3:9, 3:9, 3:10, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 82:23, 85:5, 85:22, 86:20, 87:13, 89:16, 90:17, 91:16, 93:11, 94:9, 95:8, 96:2, 97:3, 101:3, 105:3, 105:25
**Exhibit** [29] - 9:7, 10:14, 10:17, 82:5, 82:21, 83:1, 83:20, 84:13, 84:17, 85:2, 85:7, 86:2, 86:17, 87:10, 88:4, 90:19, 91:12, 91:15, 92:3, 94:6, 94:11, 95:5,

96:3, 96:24, 97:5, 98:16, 100:5, 103:23, 105:21
**exhibits** [7] - 15:24, 24:17, 28:15, 80:21, 80:23, 82:1, 106:2
**EXHIBITS** [3] - 3:10, 83:25, 88:10
**exist** [1] - 40:23
**exit** [4] - 42:6, 42:7, 42:15, 47:3
**exits** [1] - 107:18
**expect** [5] - 36:22, 66:6, 68:21, 77:16, 77:25
**expecting** [1] - 66:3
**expects** [1] - 32:8
**experience** [12] - 25:6, 25:7, 36:6, 39:25, 40:4, 42:1, 46:23, 46:25, 47:6, 51:4, 52:22, 57:7
**experienced** [2] - 46:22, 51:16
**expert** [2] - 20:8, 55:3
**expertise** [1] - 68:9
**explain** [4] - 20:21, 23:23, 58:5, 64:18
**explanation** [1] - 24:13
**exposure** [1] - 35:8
**express** [1] - 34:11
**expressed** [1] - 8:6
**expressing** [1] - 73:10
**expressly** [2] - 8:22, 98:19
**extend** [1] - 63:8
**extent** [4] - 9:10, 9:14, 14:11, 66:9
**eye** [2] - 23:8, 42:15
**eyes** [1] - 70:14

**F**

**F.3d** [1] - 6:11
**Facebook** [2] - 34:6, 53:21
**faced** [1] - 74:3
**facilitate** [1] - 9:23
**fact** [15] - 6:21, 26:16, 27:19, 28:10, 28:11, 28:12, 54:24, 59:3, 66:1, 69:3, 69:16, 70:1, 76:22, 98:18, 110:13
**factors** [3] - 7:6, 27:7, 27:17
**facts** [18] - 5:5, 22:11, 23:13, 23:14, 23:16, 23:19, 23:20, 24:15,

24:17, 24:19, 26:15, 26:25, 64:2, 64:25, 65:24, 66:1
**factual** [1] - 13:23
**failing** [1] - 70:21
**fails** [1] - 28:8
**failure** [1] - 7:18
**Fair** [2] - 7:9, 7:14
**fair** [2] - 13:8, 14:17
**fall** [1] - 76:25
**falls** [1] - 33:12
**false** [7] - 58:18, 58:19, 61:1, 61:14, 62:6, 62:7
**families** [1] - 63:16
**family** [2] - 34:1, 34:2
**far** [4] - 5:5, 12:20, 17:3, 46:23
**fast** [4] - 20:11, 23:7, 77:4, 88:22
**fastest** [2] - 42:9, 53:6
**favor** [3] - 29:7, 77:17, 78:17
**favorable** [2] - 28:5
**favorably** [1] - 28:25
**FBI** [3] - 59:21, 71:15, 74:22
**fear** [1] - 66:24
**February** [1] - 70:1
**Federal** [1] - 18:3
**federal** [3] - 9:21, 72:1, 78:11
**feelings** [1] - 54:13
**fellow** [8] - 30:1, 30:20, 30:21, 31:6, 35:1, 36:17, 69:14, 71:9
**felt** [2] - 26:10, 68:7
**FEPA** [3] - 9:17, 9:24, 10:3
**FEPA's** [1] - 10:3
**few** [8] - 4:7, 14:8, 33:4, 33:7, 42:25, 91:19, 106:20, 109:10
**Fiber** [1] - 53:20
**figure** [2] - 37:6, 61:4
**file** [4] - 7:16, 8:24, 13:3, 54:10
**filed** [15] - 5:14, 5:22, 8:24, 10:9, 27:25, 37:20, 38:10, 52:10, 54:3, 54:16, 60:17
**files** [1] - 59:21
**filing** [7] - 7:15, 8:8, 8:25, 11:9, 12:22, 15:14
**fill** [2] - 10:20, 68:14
**filled** [1] - 10:25
**filling** [1] - 11:8

**final** [9] - 4:9, 6:6, 13:17, 23:2, 33:4, 34:20, 53:25, 76:19, 110:10
**Finally** [1] - 35:25
**financial** [1] - 38:24
**fine** [14] - 6:3, 17:23, 17:24, 18:6, 18:8, 20:19, 20:20, 20:23, 21:7, 68:17, 81:6, 108:17, 110:12, 110:19
**finish** [1] - 20:13
**finished** [3] - 47:21, 106:1, 106:2
**fire** [5] - 60:7, 61:16, 61:18, 61:22, 77:6
**fired** [17] - 24:12, 41:2, 41:6, 43:7, 43:18, 44:8, 50:7, 58:8, 59:2, 59:5, 59:12, 60:16, 61:13, 62:9, 71:16, 77:9, 77:23
**firing** [1] - 58:21
**firm** [1] - 64:10
**firms** [1] - 17:1
**first** [20] - 4:8, 6:5, 6:7, 11:13, 11:20, 12:3, 12:9, 22:21, 32:4, 32:12, 33:7, 36:2, 45:3, 47:24, 49:4, 49:20, 64:8, 80:3, 89:7, 105:15
**fish** [1] - 17:10
**five** [2] - 79:19, 79:24
**flag** [1] - 37:9
**flagged** [1] - 6:5
**flight** [1] - 19:25
**fold** [1] - 15:4
**folks** [4] - 63:4, 77:19, 79:6, 79:19
**follow** [3] - 23:24, 25:25, 36:7
**followed** [1] - 78:19
**following** [6] - 23:10, 24:16, 24:21, 27:7, 32:16, 36:16, 101:21, 103:4
**FOLLOWS** [1] - 80:9
**for..** [1] - 96:11
**forced** [1] - 18:21
**Ford** [1] - 77:3
**foregoing** [1] - 111:2
**foreign** [1] - 64:16
**Forester** [1] - 50:8
**forge** [1] - 47:1
**forged** [1] - 40:12
**forging** [1] - 55:15
**form** [7] - 34:4, 35:25, 48:25, 63:11, 82:12,

83:7, 94:16
*formal* [1] - 54:10
*formally* [1] - 24:18
*former* [4] - 59:13, 65:8, 67:2, 77:3
*forming* [1] - 34:23
*forms* [1] - 93:21
*Forrester* [1] - 46:21
*forth* [3] - 12:15, 17:1, 69:6
*fortunately* [1] - 72:18
*forwarded* [1] - 99:1
*foundation* [2] - 98:8, 98:22, 100:24
*founded* [2] - 42:18, 64:13
*founder* [4] - 42:20, 43:3, 65:10, 70:4
*founders* [1] - 55:16
*four* [3] - 69:5, 71:23, 72:22
*framework* [1] - 105:11
*Frankfurt* [1] - 45:23
*frankly* [4] - 63:14, 71:18, 74:17, 74:20
*free* [2] - 25:9, 68:20
*freely* [1] - 70:17
*frequent* [1] - 73:12
*Friday* [7] - 17:5, 17:13, 18:25, 19:2, 19:15, 19:17, 19:20
*friend* [3] - 34:2, 56:14, 65:10
*friends* [2] - 34:1, 54:19
*fringe* [1] - 85:15
*front* [8] - 84:24, 86:6, 86:23, 87:16, 88:14, 88:15, 89:22, 92:5
*fulfill* [1] - 31:20
*full* [2] - 61:10, 80:10
*fully* [1] - 28:24
*futile* [3] - 7:7, 7:21, 13:12
*futility* [1] - 5:8, 7:22
*future* [1] - 47:6

## G

*gallery* [2] - 21:4, 21:14
*Galloway* [3] - 46:9, 49:25, 64:13
*gather* [1] - 35:3
*gay* [9] - 37:20, 38:3, 40:18, 41:20, 47:9, 54:11, 54:24, 56:15, 76:14
*gender* [1] - 29:8

*generally* [2] - 16:7, 36:23
*generic* [1] - 75:12
*gentleman* [2] - 65:7, 74:12
*gentlemen* [1] - 68:16
*Gibbsboro* [1] - 46:9
*girls* [1] - 56:12
*given* [12] - 12:9, 14:24, 26:23, 29:21, 32:10, 34:21, 35:16, 76:9, 86:10, 106:6, 106:24, 109:5
*glowingly* [1] - 70:18
*goal* [9] - 38:19, 39:20, 40:6, 40:8, 41:15, 41:24, 42:4, 42:6, 61:19
*goals* [5] - 9:10, 9:15, 40:16, 42:13
*GOVERNMENT* [1] - 83:25
*government* [1] - 72:1
*graduated* [1] - 39:25
*grant* [1] - 31:24
*granting* [1] - 31:25
*great* [2] - 70:5, 71:16
*green* [1] - 86:6
*grew* [3] - 46:4, 50:7, 50:21
*grievances* [1] - 9:20
*GROUP* [1] - 1:18
*grow* [8] - 38:19, 39:19, 40:6, 42:6, 47:3, 50:14, 55:2
*growing* [2] - 42:10, 53:6
*grown* [2] - 50:12, 54:21
*growth* [2] - 45:11, 46:7
*GTT* [1] - 53:19
*guess* [6] - 4:7, 4:17, 8:4, 12:21, 21:13, 108:10
*guidance* [3] - 13:22, 13:24, 23:11
*guide* [1] - 23:23
*guilty* [2] - 71:13, 72:5
*gut* [1] - 19:18
*guy* [6] - 40:18, 41:20, 47:10, 54:11, 60:6, 64:14
*guys* [6] - 15:9, 51:18, 52:21, 53:9, 65:18, 66:10

## H

*hacks* [1] - 59:21

*Haddonfield* [1] - 46:10
*half* [9] - 36:24, 36:25, 37:1, 37:2, 58:25, 66:6, 79:20, 79:23
*hall* [1] - 46:10
*hand* [4] - 64:19, 79:25, 80:7, 106:18
*handedly* [1] - 52:4
*hands* [1] - 17:5
*hang* [3] - 21:19, 54:24, 57:10
*hanging* [1] - 79:10
*harass* [1] - 78:22
*harassed* [1] - 77:22
*harassing* [1] - 70:19
*harassment* [7] - 67:12, 67:18, 67:22, 68:5, 70:9, 70:22, 70:25
*hard* [4] - 38:18, 43:13, 44:25, 57:21
*hardship* [1] - 17:10
*hardware* [1] - 45:18
*harm* [1] - 38:24
*has..* [1] - 104:16
*hatched* [1] - 43:16
*HAVING* [1] - 80:8
*head* [1] - 73:22
*headquartered* [1] - 74:5
*headquarters* [3] - 46:10, 46:12, 54:19
*health* [7] - 48:7, 69:12, 84:18, 84:21, 84:22, 84:24, 85:14
*hear* [64] - 22:15, 23:2, 23:12, 23:19, 24:24, 25:2, 25:3, 27:8, 29:2, 35:18, 38:11, 39:21, 39:22, 40:10, 41:10, 43:4, 44:6, 44:10, 44:11, 44:13, 45:8, 45:9, 45:11, 45:13, 45:24, 46:1, 47:14, 49:9, 49:10, 49:24, 50:1, 50:2, 50:3, 50:6, 50:21, 51:6, 51:7, 51:10, 51:19, 51:21, 54:12, 54:13, 54:17, 57:11, 57:12, 59:8, 59:18, 59:19, 59:20, 59:21, 63:22, 64:23, 66:19, 66:20, 66:22, 67:25, 68:2, 68:8, 68:10, 71:21, 74:18, 75:16, 77:2, 79:9
*heard* [23] - 26:10, 28:17, 34:10, 34:24,

45:8, 45:9, 45:14, 50:3, 54:12, 63:5, 64:12, 64:20, 65:5, 65:11, 65:23, 70:24, 74:10, 106:23, 106:24, 107:9, 109:24, 110:11
*hearing* [5] - 31:17, 63:20, 72:23, 72:24, 73:2
*hearsay* [1] - 18:6
*heartfelt* [1] - 63:8
*held* [8] - 4:1, 7:13, 21:9, 21:21, 39:23, 78:11, 80:24, 92:20
*hello* [1] - 81:14
*help* [9] - 32:7, 38:6, 39:18, 39:19, 40:25, 47:1, 52:10, 55:2
*helped* [3] - 46:14, 46:24, 47:3
*helpful* [2] - 30:10, 33:1
*helping* [1] - 38:18
*helps* [1] - 19:12
*Hennigan* [1] - 53:17
*hereby* [2] - 9:18, 11:13
*herein* [1] - 9:16
*hid* [1] - 62:13
*hide* [7] - 41:5, 61:1, 61:7, 61:8, 61:25, 62:1, 62:3
*hiding* [1] - 62:12
*hierarchy* [1] - 57:6
*high* [5] - 37:25, 39:23, 39:25, 41:22, 45:12
*high-level* [3] - 37:25, 39:23, 41:22
*highest* [1] - 67:3
*highlight* [1] - 69:16
*highlights* [1] - 30:25
*himself* [3] - 65:16, 67:4, 70:4
*hire* [4] - 46:19, 51:8, 72:2, 72:19
*hired* [6] - 40:7, 51:2, 60:17, 65:19, 67:23, 99:3
*hit* [1] - 56:18
*hitman* [2] - 72:2, 72:19
*hold* [4] - 19:1, 78:23, 78:25, 98:6
*home* [1] - 37:3
*honest* [2] - 12:14, 44:17
*honing* [1] - 55:4
*Honor* [51] - 6:2, 6:19,

8:2, 8:20, 9:3, 9:6, 10:18, 11:19, 12:8, 12:9, 12:21, 13:6, 15:18, 16:6, 19:14, 63:3, 72:11, 75:22, 76:4, 80:15, 81:6, 81:7, 82:18, 83:13, 83:15, 83:23, 85:2, 85:19, 86:17, 87:10, 88:4, 89:13, 90:10, 91:12, 91:22, 92:2, 93:7, 94:5, 95:4, 95:23, 96:23, 97:7, 98:16, 98:17, 98:24, 100:22, 100:23, 103:19, 104:25, 105:21, 106:10
*Honorable* [1] - 4:1
*HONORABLE* [1] - 1:15
*hope* [2] - 17:4, 66:14
*hopefully* [2] - 20:4, 110:21
*hoping* [1] - 17:7
*horrible* [1] - 74:7
*hostile* [1] - 24:4
*hosting* [3] - 40:11, 45:25, 64:13
*hour* [8] - 36:23, 36:25, 37:1, 37:2, 79:20, 79:23, 109:1
*hours* [8] - 99:22, 101:6, 101:9, 101:12, 101:19, 101:25, 102:25, 108:9
*housecleaning* [1] - 82:3
*housekeeping* [5] - 4:7, 15:11, 16:5, 20:6, 107:20
*Howard* [1] - 107:23
*HR* [6] - 65:21, 66:25, 68:25, 70:2, 70:5, 73:22
*huge* [1] - 73:8
*Human* [8] - 7:16, 8:12, 8:16, 8:18, 11:9, 11:11, 11:14, 52:9
*human* [3] - 37:23, 41:1, 65:19
*hundred* [2] - 14:5, 54:22

## I

*idea* [2] - 34:24, 36:22
*ideally* [1] - 20:2
*identities* [1] - 30:11

*ignore* [1] - 25:22
*illegal* [3] - 39:9, 39:12, 61:2
*illegally* [1] - 79:6
*imagine* [1] - 73:7
*immediately* [2] - 73:14, 74:25
*impact* [4] - 48:19, 48:20, 49:8
*impacted* [1] - 74:22
*important* [19] - 18:9, 23:1, 27:21, 29:2, 29:4, 30:17, 31:19, 36:1, 43:25, 44:3, 44:5, 49:21, 57:14, 58:22, 62:19, 63:14, 63:15, 79:1, 79:2
*impossible* [2] - 44:24, 79:8
*improper* [1] - 25:19
*IN* [36] - 3:7, 3:7, 3:8, 3:9, 3:9, 3:10, 3:10, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 82:23, 83:25, 85:5, 85:22, 86:20, 87:13, 88:10, 89:16, 90:17, 91:16, 93:11, 94:9, 95:8, 96:2, 97:3, 101:3, 105:3, 105:25
*inaccurate* [1] - 35:15
*inappropriate* [1] - 24:11
*included* [1] - 98:19
*includes* [4] - 34:1, 34:4, 34:18, 35:12
*including* [7] - 8:14, 9:25, 12:22, 27:7, 37:22, 72:18, 74:14
*inclusion* [1] - 69:24
*income* [11] - 38:16, 39:8, 43:6, 47:15, 47:20, 48:7, 81:12, 83:10, 84:9, 94:24
*incomplete* [1] - 35:15
*inconceivable* [3] - 16:21, 18:24, 19:17
*increasing* [1] - 52:1
*indicated* [1] - 12:10
*indicating* [1] - 23:17
*indication* [1] - 32:1
*individual* [1] - 4:20
*individuals* [1] - 9:19
*industry* [8] - 40:5, 40:11, 42:1, 42:15, 43:1, 53:14, 53:15, 55:9
*influence* [2] - 25:4,

29:6
*influenced* [2] - 25:20, 29:12
*information* [3] - 10:25, 31:19, 35:4
*informed* [2] - 19:22, 56:22
*infrastructure* [2] - 46:3, 64:15
*initiate* [1] - 10:4
*initiatives* [1] - 69:25
*injuries* [4] - 38:10, 38:12, 38:13, 38:14
*innovation* [3] - 53:1, 53:5, 53:12
*inputs* [1] - 75:6
*Inquirer* [1] - 72:24
*Instagram* [1] - 34:6
*instance* [2] - 6:7, 70:8
*instant* [1] - 34:5
*instead* [2] - 30:2, 57:4
*instruct* [3] - 25:23, 32:22, 36:2
*instructed* [1] - 28:14
*instruction* [4] - 14:22, 20:21, 22:18, 25:25
*instructions* [13] - 15:6, 22:18, 22:24, 23:2, 23:11, 29:18, 33:4, 34:20, 36:4, 36:6, 36:16, 36:19, 76:19
*insurance* [7] - 48:7, 84:21, 84:22, 84:25, 85:14, 85:15
*intended* [3] - 19:23, 41:5, 59:1
*intention* [1] - 39:17
*intents* [1] - 8:9
*interacting* [2] - 21:16, 23:8
*interconnection* [5] - 53:1, 53:18, 53:19, 55:1, 55:11
*interest* [3] - 27:11, 33:9, 35:7
*interested* [1] - 99:12
*interesting* [1] - 5:12
*intermingling* [1] - 21:13
*internet* [8] - 34:5, 35:6, 35:11, 35:14, 35:15, 59:22, 60:10
*interplay* [1] - 6:24
*interpret* [1] - 32:25
*interruption* [1] - 9:12
*intervening* [1] - 71:22

*intricately* [1] - 46:6
*introduce* [1] - 64:6, 65:6
*introduced* [3] - 42:19, 43:3, 50:24
*introducing* [2] - 43:1, 81:13
*investigate* [3] - 35:4, 35:6, 74:23
*investigated* [1] - 72:1
*investigation* [1] - 74:21
*invite* [1] - 76:7
*invited* [1] - 76:8
*involved* [1] - 72:18
*issue* [20] - 5:3, 6:24, 12:9, 12:19, 15:11, 16:13, 18:22, 19:21, 44:3, 44:5, 49:21, 57:14, 58:22, 61:10, 62:19, 68:3, 68:4, 79:4, 85:24
*issued* [1] - 7:11
*issues* [14] - 4:8, 4:25, 15:13, 16:3, 17:10, 49:16, 52:16, 54:9, 57:13, 69:7, 69:12, 70:6, 73:3
*it's...* [1] - 92:11
*item* [1] - 25:23

## J

*Jackson* [2] - 63:5, 64:10
*JACKSON* [1] - 2:2
*James* [1] - 1:12
*January* [8] - 1:13, 53:3, 53:23, 98:13, 99:10, 102:19, 105:15, 111:7
*Jersey* [2] - 46:9, 64:14
*JILL* [1] - 2:3
*job* [13] - 22:19, 44:14, 51:17, 51:20, 52:25, 53:5, 54:4, 55:2, 55:10, 56:5, 56:24, 70:5, 74:11
*jobs* [2] - 63:16, 89:9
*John* [6] - 59:16, 63:4, 71:9, 99:2, 99:3
*joined* [1] - 61:20
*JONATHAN* [1] - 2:3
*JOSHUA* [2] - 1:15, 4:2
*Judge* [7] - 4:2, 8:15, 45:2, 63:24, 76:18, 78:12
*JUDGE* [1] - 1:16

*judge* [6] - 22:10, 23:21, 44:18, 63:21, 78:11
*judges* [3] - 8:14, 23:14, 27:2
*judging* [1] - 23:16
*judgment* [1] - 64:1
*judicially* [1] - 24:19
*July* [1] - 101:21
*junior* [1] - 50:16
*jurisdiction* [2] - 9:15, 12:17
*jurisdictional* [2] - 9:10, 10:1
*juror* [3] - 30:21, 30:22, 33:21
*jurors* [13] - 21:16, 22:20, 23:11, 23:12, 29:4, 30:1, 30:20, 31:6, 33:7, 35:1, 36:6, 36:17, 110:22
*jurors'* [1] - 30:19
*jury* [33] - 4:6, 14:22, 15:6, 15:7, 16:10, 16:24, 17:4, 17:8, 20:21, 21:2, 21:5, 21:7, 21:10, 21:11, 21:18, 22:1, 22:3, 22:17, 31:9, 31:11, 33:5, 34:21, 44:18, 47:7, 63:9, 70:14, 78:14, 78:17, 81:13, 82:19, 87:18, 88:23, 102:11
*JURY* [1] - 1:5
*Jury* [3] - 21:21, 22:4, 107:18
*justification* [1] - 55:25

## K

*K-E-N-T-I-K* [1] - 88:21
*keep* [8] - 30:3, 30:5, 31:19, 31:22, 36:2, 36:17, 89:7, 90:18
*keeps* [1] - 78:15
*Kentik* [4] - 88:20, 88:22, 88:25, 89:1
*kept* [2] - 22:7, 69:20
*key* [1] - 74:10
*kid* [1] - 57:4
*kids* [1] - 73:13
*kill* [1] - 72:17
*killed* [1] - 73:6
*killing* [1] - 59:20
*kind* [12] - 4:17, 13:23, 19:18, 30:1, 51:23, 53:23, 64:17, 64:22, 68:22, 82:1, 91:19,

104:7
*kinds* [2] - 26:21, 66:23
*knowledge* [1] - 40:5
*known* [3] - 53:13, 65:17, 73:3
*knows* [1] - 26:9

## L

*lack* [4] - 6:15, 7:22, 40:21, 41:10
*lacked* [1] - 68:9
*lacks* [1] - 98:18
*language* [5] - 8:6, 9:8, 9:9, 11:17, 64:16
*laptop* [1] - 71:15
*large* [2] - 50:19, 56:25
*largest* [3] - 82:14, 83:9, 84:8
*last* [8] - 15:11, 15:12, 21:14, 21:15, 36:1, 89:25, 90:6, 90:8
*laura* [1] - 2:12
*law* [11] - 22:10, 23:4, 23:13, 23:20, 23:21, 23:24, 26:22, 29:18, 31:22, 32:22, 44:19
*LAW* [1] - 1:18
*laws* [1] - 9:21
*lawsuit* [4] - 27:24, 27:25, 38:10, 60:17
*lawyer* [11] - 7:3, 16:25, 25:11, 25:12, 25:13, 25:14, 33:9, 33:17, 63:5, 78:10, 78:15
*lawyers* [9] - 24:22, 24:23, 25:17, 29:14, 31:17, 44:19, 63:21, 64:9, 78:8
*lay* [1] - 98:7
*lays* [1] - 105:10
*lead* [2] - 34:23, 35:22
*leaders* [2] - 42:1, 43:1
*leads* [1] - 25:8
*leap* [1] - 76:9
*learn* [3] - 35:4, 45:12, 99:15
*learning* [1] - 78:10
*least* [8] - 6:7, 58:24, 63:25, 68:16, 73:4, 75:14, 107:9
*leave* [6] - 16:24, 31:9, 31:11, 31:12, 76:16, 78:5, 78:9
*led* [1] - 42:22

**Lee** [3] - 7:12, 12:16, 12:19
**leeway** [2] - 110:11, 110:13
**left** [6] - 4:8, 45:23, 50:11, 50:16, 75:1, 77:14
**legal** [4] - 22:12, 23:21, 23:23, 60:17
**legitimate** [7] - 38:20, 40:9, 40:21, 58:6, 58:10, 62:15
**length** [2] - 6:16, 31:23
**less** [6] - 30:21, 52:22, 57:7, 57:8
**lesson** [1] - 78:19
**letter** [2] - 12:18, 79:8
**level** [7] - 37:25, 39:23, 41:22, 45:12, 48:5, 48:14, 53:13
**levels** [2] - 50:12, 57:6
**Levy** [1] - 53:16
**LEWIS** [1] - 2:2
**Lewis** [2] - 63:5, 64:10
**LGBT** [9] - 51:7, 51:8, 51:9, 51:11, 54:13, 54:17, 54:18, 54:21
**LGBTQ** [1] - 70:6
**LIABILITY** [1] - 1:6
**lieu** [1] - 18:4
**life** [2] - 60:2, 65:10
**life-long** [1] - 65:10
**light** [3] - 25:5, 27:15, 28:2
**lightly** [1] - 63:19
**likely** [3] - 28:3, 28:10, 36:3
**limited** [1] - 25:24
**LIMITED** [1] - 1:6
**limits** [1] - 23:7
**line** [4] - 14:5, 73:14, 100:19, 102:10
**linode** [1] - 52:3
**LINODE** [3] - 1:6, 1:7, 1:7
**Linode** [147] - 24:2, 24:8, 27:24, 28:5, 28:9, 37:21, 37:25, 38:18, 39:11, 39:12, 39:16, 39:19, 40:3, 40:4, 40:6, 40:8, 40:10, 40:12, 40:13, 41:12, 41:16, 41:17, 41:18, 42:2, 42:5, 42:7, 42:9, 42:17, 42:18, 42:20, 43:8, 43:9, 44:7, 44:11, 45:6, 45:15, 45:20, 45:21, 45:25, 46:4,

46:8, 46:9, 46:10, 46:16, 46:24, 47:2, 47:3, 47:7, 47:8, 47:12, 47:18, 48:13, 49:3, 49:25, 50:4, 50:9, 52:2, 52:4, 52:13, 54:21, 55:2, 55:14, 55:20, 55:23, 59:14, 59:15, 63:6, 64:11, 64:12, 64:21, 64:23, 64:25, 65:2, 65:9, 65:13, 65:14, 65:18, 65:19, 67:4, 67:21, 70:2, 70:4, 70:15, 71:10, 71:18, 73:8, 73:9, 73:21, 75:16, 75:21, 76:12, 77:3, 77:18, 78:1, 78:21, 79:1, 79:14, 81:17, 81:18, 81:21, 82:12, 82:15, 83:7, 83:10, 83:17, 84:3, 84:10, 84:19, 84:20, 85:13, 85:17, 86:9, 86:10, 86:11, 87:3, 87:5, 87:8, 87:23, 88:18, 89:10, 89:23, 89:25, 90:6, 90:24, 91:5, 91:10, 92:21, 93:25, 94:22, 94:25, 95:21, 96:8, 96:19, 98:13, 98:14, 100:19, 101:12, 101:19, 102:15, 104:6, 104:20, 105:16
**Linode's** [16] - 41:22, 42:7, 42:13, 45:11, 46:14, 51:25, 65:21, 69:25, 74:23, 91:3, 91:4, 93:18, 94:2, 97:24, 99:9, 102:12
**LINODIAN** [1] - 1:7
**list** [5] - 30:25, 62:6, 62:9, 62:10
**listed** [3] - 14:18, 88:21, 92:14
**listen** [4] - 30:2, 34:16, 35:11, 70:11
**listening** [1] - 36:9
**live** [1] - 18:4
**lives** [1] - 36:13
**LLC** [6] - 1:7, 1:7, 1:8, 6:10, 7:12, 24:2
**lo** [1] - 76:14
**lobby** [1] - 69:19
**local** [2] - 11:8, 11:15
**located** [1] - 46:8
**location** [2] - 35:7, 48:16

**lockdown** [1] - 56:19
**logical** [1] - 106:7
**London** [1] - 45:22
**look** [9] - 5:4, 5:13, 20:24, 62:17, 65:7, 93:4, 97:21, 105:6
**looked** [2] - 13:22, 93:21
**looking** [9] - 10:23, 19:5, 23:7, 35:21, 36:12, 76:12, 107:1, 107:9, 107:11
**looks** [8] - 9:4, 55:19, 86:3, 93:4, 97:25, 99:1, 104:2, 105:15
**loose** [1] - 77:5
**loss** [1] - 47:23
**losses** [4] - 39:3, 41:13, 41:14, 47:12
**lost** [4] - 38:16, 39:9, 48:6, 49:18
**love** [1] - 78:8
**lower** [1] - 57:6
**lunch** [5] - 16:9, 20:9, 20:10, 37:1, 106:22
**luncheon** [1] - 21:22
**lying** [3] - 44:16, 44:22, 49:22

## M

**machines** [1] - 64:15
**magic** [1] - 64:17
**main** [1] - 34:22
**maintained** [1] - 60:23
**major** [1] - 35:23
**Malaysia** [1] - 55:15
**man** [1] - 37:20
**management** [1] - 66:25
**manager** [6] - 50:13, 50:18, 50:24, 53:18, 65:19, 70:17
**manages** [1] - 64:15
**manner** [1] - 27:10
**manufacture** [1] - 12:17
**March** [1] - 56:19
**Market** [2] - 1:12, 1:19
**Martin** [2] - 53:15, 53:17
**Marty** [1] - 53:20
**Master's** [1] - 40:1
**Matter** [1] - 110:24
**matter** [4] - 61:5, 62:17, 79:16, 111:3
**matters** [1] - 71:23
**maureen** [1] - 1:22
**Maureen** [1] - 111:5

**paed.uscourts.gov** [1] - 1:22
**McCarthy** [1] - 64:9
**MCCARTHY** [1] - 2:4
**McHugh** [2] - 1:22, 111:5
**mean** [20] - 5:3, 5:23, 5:24, 12:5, 12:6, 12:23, 14:8, 15:1, 15:8, 16:18, 16:21, 17:22, 17:24, 44:15, 59:10, 61:17, 64:19, 77:12, 102:17, 102:21
**means** [10] - 18:16, 25:14, 27:3, 28:2, 30:24, 38:7, 45:15, 58:2, 58:17, 61:1
**meantime** [1] - 21:3
**measure** [1] - 47:24
**measurements** [1] - 30:10
**mechanical** [1] - 1:23
**mechanism** [1] - 66:23
**media** [3] - 34:6, 35:8, 35:15
**medical** [3] - 49:1, 49:5, 49:9
**medication** [3] - 49:2, 49:11
**meet** [3] - 28:8, 55:20, 55:24
**meeting** [4] - 52:15, 52:16, 52:17, 53:22
**Melissa** [1] - 2:12
**member** [2] - 34:2, 51:11
**membership** [1] - 57:25
**memorandum** [1] - 14:21
**memory** [4] - 27:10, 30:9, 31:2, 31:3
**mention** [3] - 16:15, 70:19, 70:20
**mentioned** [3] - 30:23, 50:8, 73:11
**merely** [1] - 73:17
**merits** [1] - 14:25
**message** [2] - 69:4, 70:9
**messaging** [2] - 34:6, 34:8
**met** [2] - 12:11, 64:8
**Meyer** [1] - 2:12
**Miao** [1] - 17:12
**microphone** [1] - 92:1
**middle** [1] - 65:18
**might** [8] - 26:4, 26:5,

31:23, 34:11, 34:15, 58:21, 66:3, 66:6
**Milberg** [3] - 97:22, 97:23, 98:4
**mile** [1] - 45:13
**million** [3] - 42:8, 42:23, 50:20
**millions** [1] - 52:1
**mind** [7] - 19:4, 19:5, 28:20, 30:3, 30:5, 36:2, 71:16
**minimum** [1] - 31:23
**minor** [1] - 71:11
**minutes** [5] - 62:25, 79:23, 79:24, 106:20, 109:5
**misconduct** [1] - 71:11
**missed** [1] - 15:14
**mistake** [2] - 76:5, 79:4
**moment** [4] - 9:2, 37:17, 80:6, 101:5
**money** [6] - 10:16, 38:15, 47:17, 47:25, 52:3, 52:20
**monotone** [1] - 23:6
**month** [1] - 49:4
**moot** [1] - 12:9
**morning** [12] - 4:4, 16:14, 17:13, 19:20, 20:1, 20:10, 36:25, 107:15, 107:23, 108:9, 109:15, 110:21
**most** [10] - 20:18, 43:25, 44:3, 44:5, 46:22, 49:20, 53:13, 57:13, 58:22, 62:18
**mostly** [1] - 13:25
**motion** [9] - 4:11, 4:13, 4:14, 6:4, 6:8, 7:23, 8:21, 13:10, 15:15
**motive** [1] - 27:12
**motives** [2] - 41:5, 61:9
**mouth** [1] - 19:25
**move** [20] - 21:6, 21:18, 51:21, 80:18, 89:13, 90:10, 91:12, 91:24, 93:7, 94:5, 95:4, 95:23, 96:23, 97:20, 98:16, 100:3, 100:22, 104:25, 105:21
**moved** [3] - 46:10, 69:9, 103:19
**moves** [2] - 6:12, 46:13

**MR** [174] - 4:16, 5:2, 5:10, 5:12, 5:17, 5:21, 5:25, 6:19, 8:1, 8:4, 8:20, 9:2, 9:6, 9:13, 10:10, 10:12, 10:21, 11:2, 11:6, 11:12, 11:18, 11:22, 11:24, 12:2, 12:8, 12:14, 12:21, 13:6, 15:18, 15:21, 16:2, 16:6, 16:11, 16:13, 16:19, 16:20, 17:3, 17:11, 18:13, 19:8, 19:9, 19:14, 19:19, 20:7, 20:15, 37:14, 63:3, 72:9, 72:11, 72:14, 72:16, 75:22, 75:25, 76:2, 76:4, 76:5, 80:4, 80:15, 80:21, 80:25, 81:4, 81:6, 81:7, 81:10, 82:4, 82:7, 82:18, 82:20, 82:24, 83:2, 83:3, 83:13, 83:15, 83:19, 83:23, 84:2, 84:12, 84:14, 85:2, 85:3, 85:6, 85:8, 85:19, 85:20, 85:23, 86:2, 86:5, 86:17, 86:18, 86:21, 86:22, 87:10, 87:11, 87:14, 87:15, 88:4, 88:5, 88:6, 88:7, 88:8, 88:12, 88:13, 89:13, 89:14, 89:17, 89:18, 90:10, 90:11, 90:13, 90:15, 90:18, 90:20, 91:12, 91:14, 91:17, 91:18, 91:22, 92:2, 92:4, 93:7, 93:9, 93:12, 93:14, 94:5, 94:7, 94:10, 94:12, 95:4, 95:6, 95:9, 95:10, 95:23, 95:24, 96:1, 96:3, 96:4, 96:23, 96:25, 97:2, 97:4, 97:7, 97:9, 97:12, 97:15, 98:10, 98:11, 98:16, 98:17, 98:24, 98:25, 100:3, 100:6, 100:22, 100:23, 101:4, 103:19, 103:22, 103:24, 104:25, 105:4, 105:5, 105:21, 105:23, 106:1, 106:8, 106:10, 107:25, 108:5, 108:7, 108:17, 109:14, 109:19, 110:4,

110:19
**multiple** [2] - 4:21, 50:12
**murder** [2] - 24:10, 109:18
**murdered** [1] - 75:19
**Murphy** [1] - 8:15
**Musbach** [17] - 59:16, 71:10, 71:16, 71:20, 71:24, 71:25, 72:7, 72:16, 72:19, 72:22, 72:23, 73:1, 73:2, 73:11, 74:21, 74:24, 109:22
**Musbach's** [1] - 73:5
**must** [15] - 23:22, 23:23, 23:24, 24:20, 25:1, 25:24, 28:2, 28:8, 29:5, 29:6, 29:10, 29:11, 30:12, 30:13, 30:15
**mutual** [2] - 9:11, 9:16

## N

**name** [10] - 16:23, 37:15, 43:10, 59:15, 60:11, 63:4, 80:10, 80:11, 81:14, 88:20
**named** [5] - 42:8, 64:14, 71:9, 79:3, 97:25
**names** [3] - 46:21, 53:14, 65:5
**national** [1] - 29:9
**National** [1] - 51:22
**naturally** [1] - 77:24
**nature** [1] - 24:12
**nearly** [5] - 38:17, 41:21, 41:25, 44:6, 81:19
**necessarily** [2] - 12:23, 27:20
**necessary** [4] - 14:4, 19:20, 31:16, 31:20
**need** [19] - 4:7, 8:8, 15:9, 16:4, 16:25, 17:14, 18:7, 18:19, 22:8, 22:12, 30:16, 37:8, 77:14, 106:2, 107:20, 108:14, 108:19, 108:23, 109:6
**network** [33] - 39:24, 40:2, 45:10, 45:12, 46:2, 46:14, 46:16, 46:17, 46:18, 46:24, 48:11, 48:14, 50:4, 50:9, 50:14, 50:16, 50:17, 51:3, 51:14,

51:17, 52:25, 53:1, 53:8, 53:11, 53:16, 53:20, 55:1, 55:5, 56:9, 57:5, 74:11
**networking** [6] - 42:1, 46:23, 55:2, 55:3, 55:6, 74:13
**never** [9] - 54:8, 54:9, 60:2, 67:4, 67:18, 67:20, 67:21, 68:4, 74:2
**New** [3] - 45:22, 46:9, 64:13
**new** [7] - 47:1, 53:5, 54:4, 68:13, 69:17, 106:6
**news** [4] - 35:11, 65:25, 74:9, 74:19
**newspaper** [2] - 35:13, 107:10
**next** [17] - 11:12, 11:19, 17:9, 32:5, 63:12, 82:25, 84:12, 86:21, 87:14, 89:17, 91:17, 92:3, 94:11, 95:9, 97:14, 100:4, 105:4
**night** [3] - 15:12, 31:12, 56:14
**nine** [1] - 48:19
**nobody** [1] - 44:18
**nondiscriminatory** [2] - 58:6, 58:10
**none** [4] - 27:5, 62:8, 106:13, 109:23
**normal** [2] - 68:20, 108:19
**normally** [1] - 66:5
**note** [8] - 17:11, 19:22, 30:6, 30:12, 30:15, 30:16, 30:18
**note-taking** [4] - 30:6, 30:12, 30:15
**noted** [1] - 69:20
**notes** [18] - 18:16, 29:16, 29:20, 30:1, 30:7, 30:8, 30:19, 30:22, 30:23, 31:5, 31:7, 31:8, 31:9, 31:10, 31:13
**nothing** [6] - 59:25, 60:20, 70:12, 73:16, 73:17
**noticed** [1] - 24:19
**noting** [1] - 11:7
**November** [1] - 81:15
**nowhere** [1] - 60:7
**number** [7] - 20:16, 27:6, 27:20, 31:23, 82:14, 83:9, 84:8

**NUMBER** [1] - 1:3
**numerous** [1] - 73:21

## O

**o'clock** [2] - 106:17, 106:19
**oath** [1] - 35:16
**object** [2] - 25:14, 75:23
**objecting** [2] - 25:14, 109:16
**objection** [31] - 17:20, 25:21, 25:22, 72:9, 72:10, 72:13, 72:15, 75:24, 76:1, 82:20, 83:15, 85:3, 85:20, 86:18, 87:11, 88:5, 89:14, 90:11, 90:15, 91:14, 93:9, 94:7, 95:6, 95:24, 96:25, 98:18, 98:22, 101:1, 105:23
**Objections** [1] - 25:17
**objections** [2] - 24:23, 25:18
**objective** [2] - 39:18, 61:19
**obligation** [1] - 25:18
**observation** [1] - 30:18
**observations** [1] - 30:17
**observe** [1] - 30:13
**obstructed** [2] - 81:3, 81:4
**obtaining** [1] - 9:20
**obvious** [1] - 54:1
**obviously** [6] - 7:1, 13:24, 15:14, 18:18, 74:2, 108:25
**occurred** [2] - 16:13, 52:16
**occurrence** [2] - 14:7, 14:14
**OF** [1] - 1:1
**offered** [6] - 20:15, 25:19, 79:12, 84:20, 84:22, 100:25
**offers** [1] - 25:11
**office** [2] - 69:10, 109:10
**officer** [4] - 31:14, 37:24, 41:1, 65:9
**offices** [1] - 49:25
**Official** [2] - 1:22, 111:5
**official** [1] - 30:23
**often** [5] - 22:9, 22:11, 28:24, 35:15, 36:1

**Old** [2] - 46:12, 51:22
**old** [5] - 37:19, 40:18, 41:20, 47:9, 54:11
**older** [5] - 51:14, 56:16, 76:13, 78:12
**Once** [1] - 33:3
**once** [14] - 22:20, 32:23, 54:8, 54:9, 54:20, 59:6, 66:13, 68:2, 68:5, 74:24, 75:2, 76:24, 79:7, 108:18
**one** [63] - 6:22, 6:25, 11:22, 14:16, 14:19, 16:13, 18:17, 19:9, 20:7, 26:7, 26:15, 28:21, 30:7, 33:12, 33:21, 34:19, 34:22, 36:10, 38:14, 40:22, 40:23, 42:25, 43:14, 46:13, 46:17, 46:20, 53:6, 54:20, 56:13, 56:17, 59:9, 64:24, 67:3, 67:10, 67:24, 69:14, 69:15, 69:18, 70:7, 70:9, 74:25, 77:14, 84:4, 84:7, 84:8, 85:16, 86:4, 89:9, 91:9, 91:20, 91:24, 96:9, 97:12, 98:17, 104:8, 104:13, 104:15, 105:4, 105:7, 105:18, 107:10
**one-year** [1] - 6:25
**ongoing** [3] - 36:23, 70:23, 74:21
**online** [4] - 35:21, 36:12, 45:19, 46:1
**open** [3] - 4:1, 21:23, 36:2
**opening** [19] - 22:21, 32:4, 32:6, 32:10, 33:1, 36:20, 37:13, 45:2, 62:24, 64:20, 65:6, 65:12, 65:23, 76:8, 78:14, 78:24, 106:24, 109:16
**openings** [5] - 15:9, 15:17, 16:8, 37:6, 110:15
**openly** [1] - 51:10
**opera** [1] - 59:17
**operating** [3] - 37:24, 41:1, 65:8
**operations** [1] - 65:21
**opinion** [4] - 29:6, 32:1, 34:23, 35:25
**opinions** [1] - 34:11
**opportunity** [6] - 27:7,

30:16, 32:11, 79:12, 106:12, 106:25
**opposite** [2] - 28:6, 44:13
**OR** [1] - 80:8
**order** [9] - 6:13, 9:22, 19:20, 20:18, 20:22, 26:1, 66:8, 101:6
**orders** [1] - 12:1
**Ordinance** [2] - 7:9, 7:14
**organization** [1] - 68:12
**organized** [1] - 54:20
**orientation** [23] - 24:3, 29:9, 38:3, 38:21, 39:14, 41:8, 42:21, 43:11, 48:23, 49:14, 51:1, 52:5, 58:1, 67:15, 67:23, 67:24, 68:4, 70:12, 76:7, 76:11, 76:23, 77:23, 78:23
**origin** [1] - 29:9
**original** [1] - 71:24
**otherwise** [3] - 18:5, 22:13, 28:13
**outcome** [2] - 27:11, 33:10
**outline** [2] - 30:25, 32:7
**outlined** [1] - 86:10
**outlines** [1] - 86:14
**outlying** [1] - 63:11
**outside** [7] - 24:25, 25:3, 26:11, 35:5, 63:11, 63:22, 66:5
**outstanding** [1] - 4:8
**overall** [1] - 96:11
**overnight** [1] - 81:5
**overrule** [2] - 25:22, 101:1
**overruled** [6] - 72:10, 72:13, 72:15, 75:24, 76:1, 77:10
**overuse** [1] - 30:12
**owed** [2] - 102:22, 102:24
**Owen** [2] - 51:2, 51:5
**own** [6] - 26:9, 29:20, 36:16, 49:8, 70:14, 73:13
**owner** [4] - 41:22, 42:19, 46:24, 105:10
**owners** [1] - 55:16

**P**

**P.C** [1] - 2:2
**p.m** [4] - 21:23, 22:4,

107:18, 110:24
**PA** [3] - 1:11, 1:20, 2:5
**package** [5] - 48:8, 81:22, 84:21, 85:16, 96:21
**page** [7] - 11:12, 11:18, 11:19, 12:3, 91:20, 105:15
**PAGE** [1] - 3:2
**pages** [5] - 11:25, 17:18, 70:7, 91:19, 93:2
**paid** [10] - 53:7, 53:8, 53:9, 53:10, 67:3, 72:16, 102:12, 102:13, 103:3, 103:16
**Palochko** [27] - 19:23, 20:18, 37:23, 40:25, 43:16, 44:8, 45:10, 52:14, 57:22, 61:20, 61:24, 65:17, 67:8, 67:16, 69:4, 69:8, 69:10, 69:20, 70:2, 70:4, 70:11, 73:22, 77:2, 79:3, 100:10, 100:15, 102:5
**panel** [1] - 21:2
**paper** [3] - 29:20, 72:25, 74:4
**Paralegal** [1] - 2:12
**part** [19] - 16:17, 23:15, 27:4, 36:16, 39:8, 55:10, 56:24, 56:25, 63:19, 72:7, 74:10, 84:21, 84:22, 85:13, 88:19, 91:6, 96:10, 96:21
**particular** [4] - 25:15, 33:12, 35:7, 107:20
**particularly** [2] - 6:16, 30:10
**parties** [8] - 19:23, 24:18, 24:22, 32:11, 33:9, 35:16, 35:22, 44:20
**partner** [2] - 73:1, 73:13
**parts** [1] - 85:16
**party** [12] - 6:12, 27:23, 27:24, 29:7, 29:13, 32:8, 32:10, 32:20, 33:17, 51:19, 56:11
**passage** [1] - 6:17
**passed** [5] - 6:13, 6:18, 6:19, 6:20, 68:6
**passes** [1] - 33:17
**past** [5] - 7:6, 16:16,

47:23, 48:2, 48:6
**path** [1] - 71:8
**patience** [2] - 22:15
**patient** [1] - 31:18
**pause** [2] - 18:10, 19:6
**pay** [16] - 24:6, 82:15, 88:19, 89:23, 89:25, 90:1, 90:6, 90:8, 92:12, 92:13, 92:14, 93:4, 93:6, 95:15
**paying** [2] - 36:5, 72:8
**payroll** [1] - 92:17
**PC** [1] - 106:10
**Peet** [1] - 64:9
**PEET** [1] - 2:3
**pencils** [1] - 29:20
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania** [5] - 1:13, 4:22, 8:16, 11:9, 52:9
**People** [1] - 21:6
**people** [37] - 17:14, 21:13, 25:6, 28:22, 34:10, 37:23, 40:10, 43:8, 44:25, 48:12, 48:13, 48:23, 48:24, 51:8, 51:14, 53:13, 54:22, 54:24, 55:5, 55:6, 55:24, 56:10, 56:11, 57:19, 61:14, 62:22, 63:20, 63:22, 64:7, 64:17, 65:2, 65:6, 65:21, 66:10, 77:10, 77:13, 107:4
**percent** [1] - 14:5
**perceptions** [1] - 28:21
**perfect** [2] - 48:13, 76:15
**perfectly** [1] - 12:14
**performance** [2] - 54:8, 54:9
**performed** [1] - 39:22
**period** [5] - 53:23, 90:1, 102:14, 102:19
**permission** [1] - 69:9
**permit** [1] - 33:25
**permitted** [6] - 25:13, 29:15, 30:6, 32:21, 54:19, 86:19
**Permitted** [1] - 85:21
**person** [14] - 30:14, 33:12, 42:17, 42:18, 42:19, 46:20, 46:22, 48:13, 55:21, 59:15, 65:22, 72:8, 72:17, 75:18
**personal** [5] - 29:21, 42:13, 54:7, 61:23,

69:12
**perspective** [1] - 68:16
**persuade** [2] - 30:20, 31:6
**persuaded** [1] - 13:14
**persuading** [1] - 76:21
**pews** [1] - 66:10
**PFPO** [4] - 4:10, 7:8, 7:24, 12:7
**phases** [1] - 32:3
**Philadelphia** [26] - 1:13, 1:20, 2:5, 4:22, 5:17, 7:8, 7:14, 7:16, 8:5, 8:7, 8:8, 8:11, 8:12, 8:18, 8:23, 8:25, 9:8, 9:17, 10:2, 10:5, 11:10, 11:14, 46:11, 51:23, 63:12, 72:24
**Philippines** [3] - 55:15, 56:18, 56:22
**phones** [1] - 34:7
**photographs** [1] - 24:11
**photos** [1] - 71:12
**PHRA** [9] - 4:10, 5:1, 5:8, 5:13, 5:19, 6:24, 7:8, 7:24, 13:12
**PHRC** [1] - 7:15
**picked** [1] - 4:19
**piece** [2] - 8:20, 71:7
**Pilot** [1] - 53:20
**Pinnacle** [9] - 92:9, 92:14, 92:16, 92:17, 94:20, 94:21, 95:2, 95:14, 95:15
**pivotal** [1] - 51:23
**place** [4] - 31:7, 49:20, 66:25, 71:1
**placed** [1] - 45:17
**places** [1] - 45:17
**plaintiff** [23] - 4:19, 13:1, 14:21, 24:1, 32:4, 32:12, 32:13, 32:15, 32:18, 32:23, 37:16, 37:19, 47:22, 47:24, 48:18, 57:23, 58:13, 60:24, 61:3, 66:6, 66:7, 66:9
**PLAINTIFF** [35] - 3:7, 3:7, 3:8, 3:9, 3:9, 3:10, 3:10, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 82:23, 85:5, 85:22, 86:20, 87:13, 88:10, 89:16, 90:17, 91:16, 93:11, 94:9,

95:8, 96:2, 97:3, 101:3, 105:3, 105:25
**Plaintiff** [1] - 1:4, 1:20
**plaintiff's** [4] - 7:2, 32:16, 37:13, 62:16
**plaintiffs** [1] - 13:25
**plan** [16] - 16:20, 17:7, 41:4, 43:16, 43:18, 84:18, 91:4, 93:18, 93:20, 94:3, 96:8, 102:13, 105:9, 105:11, 106:19, 107:22
**Plan** [1] - 100:20
**planet** [1] - 53:7
**play** [2] - 23:15, 77:4
**pleaded** [1] - 72:5
**pleadings** [2] - 6:23, 13:25
**pled** [2] - 71:13, 110:7
**PLLC** [1] - 1:18
**point** [17] - 7:11, 8:4, 11:17, 12:21, 16:22, 21:11, 51:25, 52:18, 54:21, 73:4, 74:23, 75:8, 85:14, 88:25, 98:23, 100:24, 107:10
**pointing** [1] - 13:9
**points** [1] - 30:5
**polar** [1] - 44:13
**policy** [2] - 75:13, 76:6
**pops** [1] - 76:14
**pornographic** [1] - 71:12
**pornography** [2] - 59:18, 73:4
**pose** [1] - 106:17
**position** [15] - 39:23, 39:24, 47:6, 50:25, 52:20, 54:5, 55:7, 62:16, 68:7, 68:9, 68:13, 68:16, 89:6, 92:20
**positions** [1] - 33:1
**positive** [1] - 70:18
**possibility** [1] - 17:16
**possible** [2] - 20:12, 22:14
**post** [2] - 34:13, 34:15
**posting** [1] - 36:13
**posts** [3] - 34:7, 35:14, 69:15
**Povish** [3] - 98:1, 98:3, 99:8
**practice** [1] - 108:10
**Practices** [2] - 7:9, 7:14
**praising** [1] - 69:25
**precise** [1] - 23:1

**predicates** [1] - 14:15
**prefer** [1] - 18:13
**preference** [2] - 14:24, 56:9
**preferred** [1] - 56:8
**prejudice** [4] - 5:7, 13:15, 27:12, 29:5
**preliminary** [6] - 15:6, 22:17, 22:24, 23:11, 36:19
**premarked** [2] - 82:5, 83:1
**Premier** [1] - 6:10
**preponderance** [5] - 28:1, 28:11, 28:13, 57:24, 76:22
**prescribed** [1] - 49:10
**present** [23] - 12:23, 32:11, 32:14, 32:15, 32:17, 32:20, 32:21, 32:24, 35:1, 35:17, 39:2, 39:7, 43:2, 44:19, 47:13, 47:20, 48:4, 48:10, 48:18, 48:19, 48:25, 58:3
**PRESENT** [1] - 2:10
**presentation** [3] - 29:16, 32:3, 32:16
**presented** [8] - 12:20, 26:22, 29:11, 31:21, 32:9, 32:22, 60:23, 77:17
**presents** [1] - 78:3
**presumably** [2] - 6:22, 16:15
**presuming** [1] - 17:18
**pretext** [2] - 24:14, 58:7
**pretextual** [1] - 61:1
**pretrial** [6] - 4:9, 6:6, 13:17, 14:20, 72:23, 110:10
**previous** [2] - 65:2, 72:4
**previously** [2] - 24:11, 71:10
**price** [1] - 110:14
**primary** [1] - 72:4
**prime** [1] - 59:17
**principles** [1] - 23:23
**pro** [1] - 13:24
**problem** [4] - 19:16, 20:17, 106:17, 110:1
**problematic** [1] - 110:16
**problems** [3] - 19:5, 35:23, 36:15
**procedure** [2] - 9:19, 104:5
**Procedure** [1] - 18:4

**procedures** [3] - 93:19, 96:11, 99:24
**proceed** [2] - 32:3, 81:7
**proceeding** [1] - 24:9
**Proceedings** [1] - 1:23
**PROCEEDINGS** [1] - 4:1
**proceedings** [5] - 10:4, 30:25, 36:18, 37:11, 111:3
**process** [2] - 33:4, 108:20
**produced** [2] - 1:24, 28:16
**product** [1] - 45:20
**products** [1] - 45:19
**profit** [31] - 24:7, 47:16, 90:24, 91:3, 91:4, 91:5, 93:18, 93:20, 94:2, 96:8, 96:13, 97:24, 99:9, 99:14, 99:16, 99:24, 101:7, 101:14, 101:18, 102:12, 102:22, 102:24, 103:1, 103:3, 103:16, 104:6, 104:9, 104:12, 104:17, 105:11, 105:12
**Profit** [1] - 100:20
**profit-sharing** [1] - 24:7
**program** [1] - 99:9
**programs** [1] - 69:24
**progress** [1] - 18:21
**prohibition** [3] - 34:1, 34:4, 34:18
**promise** [4] - 63:19, 64:3, 78:14, 78:19
**promises** [3] - 9:16, 78:16, 78:24
**promoted** [5] - 51:2, 52:21, 65:20, 68:13, 68:15
**promotion** [1] - 68:7
**promptly** [2] - 33:15, 110:22
**proof** [4] - 26:15, 28:17, 28:18, 32:13
**properly** [2] - 35:5, 35:20
**protect** [1] - 31:14
**protected** [3] - 14:14, 57:25, 58:2
**protections** [1] - 67:5
**prove** [4] - 27:19, 28:2, 38:25, 57:23

**proved** [2] - 28:11, 28:12
**provide** [2] - 9:19, 50:3
**provided** [1] - 66:22
**provider** [1] - 64:13
**provides** [4] - 45:25, 64:14, 76:15, 104:22
**proving** [2] - 27:25, 76:21
**PTO** [1] - 69:11
**public** [4] - 29:6, 73:18, 74:12, 75:18
**publication** [1] - 73:7
**publish** [1] - 82:19
**pull** [1] - 10:12
**pulling** [1] - 9:3
**purchase** [2] - 42:23, 110:14
**purchased** [1] - 52:3
**purchasing** [2] - 42:17, 42:18
**purpose** [2] - 25:24, 30:9
**purposes** [3] - 8:9, 9:24, 10:5
**pursue** [1] - 53:2
**put** [9] - 13:7, 19:24, 28:4, 28:20, 80:19, 83:2, 92:3, 109:4, 110:5

## Q

**qualified** [1] - 68:7
**quality** [2] - 27:9, 78:2
**quantity** [1] - 78:2
**quarter** [1] - 101:22
**questions** [9] - 4:9, 18:15, 24:22, 25:17, 29:14, 29:15, 77:17, 99:10
**quick** [3] - 16:9, 20:7, 108:7
**quickly** [1] - 18:24
**quite** [1] - 77:18
**quoted** [2] - 72:25, 74:4

## R

**race** [1] - 29:8
**radar** [1] - 7:4
**radio** [1] - 35:13
**raincoat** [1] - 26:17
**raining** [2] - 26:11, 26:13, 26:19
**raise** [6] - 17:15, 68:3, 79:25, 80:7, 106:18, 109:12

**raised** [3] - 5:1, 68:4, 68:5
**raising** [1] - 24:5
**Rambo** [2] - 57:3, 57:4
**rather** [2] - 66:11, 106:5
**reach** [4] - 17:19, 17:24, 25:9, 29:12
**reached** [1] - 73:22
**reaching** [1] - 26:7, 35:20, 39:20
**react** [2] - 74:9, 74:18
**reacting** [1] - 74:19
**reaction** [1] - 75:20
**read** [7] - 4:12, 15:7, 23:5, 29:21, 34:14, 35:11, 102:10
**ready** [9] - 4:6, 18:25, 21:2, 89:19, 90:21, 90:22, 96:5, 108:14, 110:21
**real** [11] - 17:8, 38:23, 41:2, 41:5, 41:6, 50:19, 51:17, 52:1, 58:15, 58:16, 75:17
**realize** [1] - 41:18
**realized** [1] - 42:7
**really** [10] - 12:11, 14:1, 15:8, 54:1, 55:20, 62:5, 70:10, 70:11, 70:24, 109:10
**reason** [46] - 4:14, 4:24, 13:19, 18:8, 38:20, 40:9, 40:21, 41:2, 41:3, 41:6, 41:9, 41:15, 57:2, 57:25, 58:4, 58:6, 58:10, 58:15, 58:16, 58:17, 58:19, 58:21, 58:24, 59:1, 59:4, 59:5, 59:11, 60:18, 61:1, 61:5, 61:22, 61:23, 61:25, 62:4, 62:19, 63:23, 75:11, 75:17, 76:9, 77:7, 77:18, 99:20, 108:17
**reasonable** [3] - 27:14, 28:18, 79:25
**reasonably** [1] - 25:8
**reasons** [11] - 6:4, 12:11, 13:13, 33:21, 34:22, 36:13, 41:5, 60:25, 62:6, 75:5, 77:9
**rebuttal** [1] - 32:21
**recalcitrant** [1] - 18:10
**recalling** [1] - 66:11
**receipt** [1] - 10:2
**receive** [25] - 35:19, 52:25, 81:21, 86:12,

87:4, 91:1, 91:7, 92:23, 93:23, 93:24, 96:19, 97:19, 98:12, 98:13, 100:1, 101:14, 101:18, 101:20, 103:1, 103:8, 103:12, 103:14, 104:19, 105:14, 105:16
**received** [37] - 10:1, 24:17, 25:10, 25:24, 28:15, 34:20, 47:18, 52:14, 82:15, 82:21, 83:10, 84:4, 84:9, 84:18, 85:17, 86:15, 87:8, 87:21, 87:22, 88:2, 88:17, 88:24, 89:1, 90:8, 90:24, 92:8, 94:3, 94:24, 95:7, 96:12, 97:1, 99:14, 99:24, 100:15, 100:17, 104:23, 105:19
**RECEIVED** [36] - 3:7, 3:7, 3:8, 3:9, 3:9, 3:10, 3:10, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 82:23, 83:25, 85:5, 85:22, 86:20, 87:13, 88:10, 89:16, 90:17, 91:16, 93:11, 94:9, 95:8, 96:2, 97:3, 101:3, 105:3, 105:25
**receives** [1] - 10:16
**receiving** [2] - 9:25, 68:5
**recently** [1] - 8:15
**recess** [2] - 21:20, 21:22
**recognition** [2] - 9:9, 9:14
**recognizing** [1] - 68:11
**recollection** [1] - 30:3
**recommendation** [1] - 65:15
**record** [17] - 8:1, 10:14, 21:9, 21:17, 26:2, 72:7, 72:25, 74:4, 74:19, 75:22, 76:4, 80:11, 80:24, 85:23, 87:1, 89:7, 111:3
**recorded** [1] - 1:23
**recording** [2] - 34:8, 34:9
**records** [2] - 49:1,

*United States District Court*

49:5
**recover** [1] - 43:23
**recruiting** [1] - 69:13
**recurring** [1] - 110:2
**redress** [1] - 9:20
**refer** [1] - 104:11
**reference** [2] - 16:16, 109:17
**referenced** [3] - 11:19, 14:19, 14:20
**referring** [2] - 10:7, 102:10
**reflect** [5] - 88:2, 90:7, 92:25, 94:2, 94:24
**refrain** [1] - 34:19
**refresh** [1] - 31:1
**refreshing** [1] - 30:9
**regard** [1] - 102:21
**regarding** [1] - 62:18
**regardless** [3] - 28:14, 28:16, 102:15
**regular** [2] - 36:24, 50:17
**regularly** [1] - 36:4
**relate** [1] - 64:24
**related** [1] - 34:19
**relates** [1] - 24:6
**Relations** [7] - 7:16, 8:12, 8:16, 8:18, 11:9, 11:15, 52:9
**relationship** [10] - 42:16, 42:22, 60:6, 71:20, 71:21, 71:25, 72:22, 74:5, 74:6
**relationships** [6] - 30:11, 40:12, 40:13, 47:1, 47:2, 55:16
**relevance** [2] - 98:18, 100:24
**relevant** [3] - 47:7, 107:10, 110:8
**religion** [1] - 29:8
**reluctant** [1] - 17:12
**rely** [1] - 13:1
**relying** [2] - 30:3, 31:3
**remained** [2] - 48:13, 74:1
**remark** [1] - 70:10
**remedy** [1] - 38:10
**remember** [9] - 29:1, 29:20, 33:18, 36:13, 55:14, 56:18, 57:19, 60:8, 77:21
**remote** [1] - 18:4
**render** [4] - 7:20, 31:4, 35:9, 64:1
**repair** [1] - 79:13
**repeat** [2] - 31:8, 36:4
**repeatedly** [2] - 59:7, 110:14

**replace** [1] - 57:9
**report** [2] - 55:25, 56:1
**reported** [2] - 38:5, 49:16
**reporter** [2] - 9:12, 29:22
**Reporter** [2] - 1:22, 111:5
**reporting** [2] - 66:23, 69:19
**reports** [5] - 35:12, 35:13, 38:8, 38:9, 68:24
**reprehensible** [1] - 73:19
**represent** [5] - 37:16, 37:23, 63:6, 64:10, 90:5
**representation** [1] - 16:16
**represents** [4] - 84:9, 84:24, 85:14, 90:6
**reputation** [1] - 74:8
**reputations** [1] - 79:4
**request** [5] - 11:13, 20:11, 31:24, 31:25, 76:2
**requesting** [1] - 25:15
**require** [1] - 35:23
**required** [5] - 30:6, 30:7, 49:2, 68:9, 99:22
**requirement** [1] - 6:25
**requirements** [1] - 7:13
**research** [2] - 35:22, 107:11
**resign** [2] - 73:25, 74:16
**resist** [1] - 29:11
**resolved** [1] - 16:4
**resolving** [1] - 14:25
**resources** [4] - 37:24, 41:1, 46:1, 65:19
**respect** [9] - 5:1, 13:15, 13:21, 15:12, 16:4, 16:6, 16:8, 64:4, 69:25
**respond** [1] - 8:1
**response** [1] - 11:4
**responsibilities** [4] - 55:7, 55:13, 56:5, 68:15
**responsibility** [1] - 31:20
**responsible** [1] - 46:2
**rested** [1] - 19:12
**result** [1] - 24:12
**resulted** [1] - 51:25
**retaliate** [2] - 49:15,

78:22
**retaliated** [1] - 24:4
**retaliation** [12] - 4:10, 13:20, 13:22, 14:20, 38:7, 38:22, 39:14, 42:22, 48:23, 58:2, 66:25, 67:14
**retaliatory** [1] - 14:9
**retire** [2] - 33:5, 34:21
**review** [1] - 29:25
**Richard** [1] - 77:3
**rid** [2] - 77:11, 77:13
**ridicule** [2] - 50:2, 51:19
**ridiculed** [1] - 54:14
**riding** [1] - 70:11
**Rights** [1] - 11:11
**rights** [1] - 9:23
**ripe** [1] - 6:25
**ripping** [1] - 108:3
**rise** [4] - 4:3, 21:24, 22:3, 107:17
**risky** [1] - 75:14
**Roberts** [5] - 2:12, 29:19, 31:13, 33:16, 37:9
**roberts** [1] - 106:20
**role** [1] - 23:21
**roll** [1] - 17:9
**romantic** [1] - 60:6
**room** [6] - 31:10, 31:11, 33:5, 34:21, 36:9, 70:14
**row** [2] - 65:8, 65:11
**rows** [2] - 21:14, 21:15
**RPR** [1] - 111:5
**rude** [1] - 33:19
**rule** [2] - 25:15, 78:17
**Rule** [12] - 6:7, 6:8, 6:14, 7:6, 7:22, 7:23, 13:11, 13:15, 13:16, 13:19, 14:4, 18:3
**ruled** [2] - 8:13, 8:15
**rules** [8] - 18:1, 25:10, 25:13, 25:20, 33:19, 36:14, 96:11, 99:24
**Rules** [1] - 18:3
**ruling** [3] - 7:11, 12:16, 25:21
**rumors** [1] - 25:2
**run** [1] - 68:21

## S

**S:(Cont'd** [1] - 2:1
**sacrifice** [2] - 30:16, 63:18
**salary** [3] - 81:24, 82:13, 83:7
**satisfied** [1] - 7:14

**satisfies** [1] - 13:11
**saw** [5] - 26:11, 67:18, 93:20, 95:15, 104:2
**scale** [2] - 28:6, 28:7
**scam** [1] - 72:20
**scams** [1] - 59:22
**scarlet** [1] - 79:7
**schedule** [3] - 19:7, 20:8, 106:6
**scheduling** [3] - 6:13, 17:3, 19:16
**school** [1] - 39:25
**science** [1] - 40:1
**screen** [6] - 80:19, 81:4, 82:8, 83:2, 85:9, 85:11
**scrutiny** [1] - 35:18
**se** [1] - 13:24
**seat** [6] - 4:4, 21:12, 21:25, 22:5, 80:14, 107:19
**seats** [1] - 21:3
**second** [7] - 12:3, 33:24, 65:8, 71:7, 74:21, 86:4, 101:22
**secondary** [1] - 12:11
**secrecy** [1] - 31:15
**secret** [1] - 59:19
**Section** [1] - 10:6
**secured** [1] - 52:4
**see** [78] - 6:15, 6:23, 7:5, 9:5, 20:5, 24:24, 25:2, 25:3, 26:20, 27:8, 29:1, 29:22, 37:5, 38:13, 40:20, 41:4, 41:6, 41:18, 41:23, 42:12, 43:4, 45:1, 51:13, 53:11, 53:22, 54:10, 55:17, 55:19, 56:7, 57:12, 57:13, 59:1, 60:19, 60:20, 68:19, 68:23, 68:24, 69:2, 69:3, 69:6, 69:8, 70:7, 70:14, 70:17, 76:24, 77:19, 77:24, 78:4, 78:5, 80:17, 81:3, 82:8, 83:4, 84:15, 84:16, 85:9, 86:7, 87:25, 89:22, 90:3, 92:5, 93:15, 93:16, 94:13, 95:11, 95:12, 97:10, 97:16, 100:7, 100:23, 103:25, 104:1, 107:4, 107:11, 107:15, 109:8, 110:16
**seeing** [2] - 49:3, 71:19
**seek** [1] - 49:9

**seem** [1] - 12:7
**seized** [1] - 71:15
**selection** [2] - 21:12, 21:21
**send** [4] - 15:21, 17:14, 20:3, 107:14
**senior** [6] - 48:14, 50:17, 51:3, 53:8, 53:13, 53:17
**senior-level** [2] - 48:14, 53:13
**seniority** [3] - 51:5, 52:22, 57:8
**sense** [4] - 14:9, 25:5, 76:17, 78:18
**senses** [1] - 26:10
**sent** [3] - 15:22, 53:3, 73:9
**sentence** [3] - 11:13, 11:20, 12:22
**separate** [6] - 14:3, 14:6, 14:11, 14:18, 73:20, 76:19
**separated** [4] - 38:17, 38:19, 39:4, 40:8
**separation** [1] - 47:13
**series** [1] - 74:21
**serve** [1] - 63:9
**served** [2] - 52:12, 52:13
**servers** [1] - 55:14
**service** [4] - 42:10, 68:12, 92:17, 108:20
**services** [3] - 45:19, 59:21, 64:16
**session** [1] - 31:9
**set** [4] - 12:15, 21:18, 52:15, 55:21
**SETH** [1] - 1:19
**Seth** [1] - 37:15
**several** [4] - 38:13, 59:15, 63:13, 77:6
**severely** [1] - 78:1
**sex** [1] - 77:12
**sexual** [25] - 24:3, 24:12, 29:8, 38:3, 38:21, 39:14, 41:8, 42:21, 43:11, 48:22, 49:14, 50:25, 52:5, 58:1, 67:15, 67:23, 67:24, 68:4, 70:12, 71:11, 76:7, 76:10, 76:23, 77:23, 78:23
**sexuality** [1] - 73:16
**sexually** [1] - 75:18
**shake** [1] - 37:6
**sham** [1] - 69:17
**share** [2] - 28:23, 91:3
**sharing** [31] - 11:16, 24:7, 47:16, 90:24,

*91*:4, 91:5, 93:18, 93:20, 94:2, 96:8, 96:13, 97:24, 99:9, 99:14, 99:16, 99:24, 101:7, 101:14, 101:18, 102:12, 102:22, 102:24, 103:1, 103:4, 103:16, 104:6, 104:9, 104:12, 104:17, 105:11, 105:12

**Sharing** [1] - 100:20

**Shikunov** [2] - 16:18, 16:25

**Shikunov's** [1] - 16:23

**shock** [1] - 59:1

**short** [3] - 37:7, 76:25, 79:21

**shortly** [1] - 65:20

**shotgun** [1] - 13:25

**show** [49] - 32:8, 39:10, 39:15, 39:16, 40:15, 40:24, 41:14, 43:7, 43:17, 44:16, 46:4, 46:6, 48:5, 49:1, 49:5, 51:24, 52:7, 52:11, 53:10, 60:1, 60:13, 60:15, 60:25, 61:3, 61:8, 61:16, 61:18, 61:22, 62:17, 68:22, 78:15, 78:21, 82:1, 82:4, 82:5, 82:25, 85:6, 90:19, 91:17, 93:12, 94:10, 95:9, 95:18, 96:3, 96:15, 97:4, 100:3, 100:5, 103:22

**showed** [2] - 84:5, 84:7

**showing** [4] - 18:2, 48:11, 80:21, 80:23

**shown** [1] - 26:5

**shows** [4] - 33:22, 35:13, 49:23, 82:12

**shy** [2] - 69:23, 80:1

**sick** [1] - 63:20

**side** [7] - 16:17, 21:6, 25:12, 28:6, 28:7, 64:7, 67:9

**sidebar** [2] - 72:14, 76:2

**sight** [1] - 71:16

**signed** [1] - 105:10

**significant** [4] - 38:12, 39:24, 41:13, 56:25

**significantly** [3] - 46:4, 46:7, 52:1

**similar** [3] - 104:2, 104:8, 105:6

**similarly** [1] - 48:11

**simple** [1] - 67:6

**simplify** [1] - 21:1

**simply** [4] - 25:14, 32:7, 77:11, 77:18

**simultaneously** [1] - 11:14

**Singapore** [1] - 45:24

**single** [10] - 5:5, 14:13, 49:20, 52:4, 57:13, 60:2, 60:4, 62:18, 70:8, 84:7

**single-handedly** [1] - 52:4

**sit** [2] - 36:8, 57:18

**site** [1] - 72:19

**sitting** [4] - 21:5, 21:6, 37:10, 59:22

**situated** [1] - 48:11

**situation** [4] - 13:23, 36:7, 74:3, 77:25

**six** [8] - 38:18, 41:16, 41:21, 43:13, 44:6, 68:2, 77:22, 81:19

**six-year** [1] - 68:2

**size** [1] - 39:19

**skills** [2] - 55:4, 55:8

**skip** [5] - 86:3, 91:20, 91:24, 93:13, 97:12

**slack** [1] - 110:15

**slaps** [1] - 79:7

**slow** [1] - 18:21

**small** [1] - 42:6

**smirk** [1] - 69:14

**SMITH** [1] - 1:18

**soap** [1] - 59:17

**social** [1] - 34:6

**socioeconomic** [1] - 29:9

**software** [1] - 45:18

**sold** [2] - 45:20, 50:20

**sole** [1] - 27:2

**solely** [1] - 29:10

**solidify** [1] - 42:16

**Solutions** [1] - 6:10

**solves** [1] - 19:20

**someone** [7] - 24:10, 26:16, 33:22, 57:10, 73:18, 79:24

**sometime** [3] - 101:21, 101:22, 103:4

**sometimes** [11] - 20:21, 22:8, 44:23, 44:24, 57:19, 57:20, 61:14, 62:21, 62:22, 107:5, 108:2

**somewhat** [1] - 28:7

**soon** [4] - 71:14, 76:24, 79:17, 85:9

**sorry** [14] - 5:12, 9:2, 9:13, 10:12, 80:15, 88:22, 89:25, 92:2, 95:2, 97:21, 98:10, 98:13, 98:24, 102:21

**sort** [5] - 6:24, 17:2, 22:8, 106:7, 109:25

**sound** [2] - 77:12, 104:8

**sounds** [1] - 64:16

**spans** [1] - 69:4

**spare** [2] - 22:14, 71:19

**Spataro** [45] - 37:22, 40:17, 40:24, 41:19, 43:14, 44:8, 45:9, 47:8, 50:22, 50:23, 51:7, 51:20, 52:13, 53:12, 53:15, 54:2, 54:6, 54:23, 55:17, 56:2, 56:4, 56:7, 56:22, 57:10, 57:22, 61:17, 65:11, 67:9, 67:16, 68:8, 68:10, 70:11, 70:16, 70:19, 70:21, 73:10, 73:11, 73:21, 74:14, 76:12, 77:2, 77:8, 77:10, 78:21, 79:2

**SPATARO** [1] - 1:8

**Spataro's** [6] - 51:6, 51:13, 54:13, 61:19, 61:21, 68:18

**specialist** [1] - 53:16

**specific** [1] - 30:5

**specifically** [2] - 51:15, 56:13

**speculate** [1] - 26:4

**speed** [2] - 64:4, 66:15

**spell** [1] - 80:11

**spent** [3] - 41:16, 55:4, 62:3

**staff** [1] - 63:21

**Staller** [2] - 20:7, 106:3

**staller** [5] - 20:17, 108:7, 108:11, 108:14, 109:1

**staller's** [1] - 20:16

**stand** [15] - 20:10, 20:11, 21:11, 30:14, 37:17, 43:20, 45:3, 45:4, 48:21, 66:11, 66:12, 67:17, 68:1, 80:18, 109:5

**standard** [4] - 6:6, 6:7, 6:14, 28:18

**standing** [2] - 12:10, 80:6

**starkly** [1] - 44:6

**start** [14] - 4:8, 35:23, 36:3, 36:24, 42:6, 63:7, 79:21, 80:21, 81:11, 81:12, 98:8, 106:5, 106:16, 106:19

**started** [21] - 44:7, 45:21, 46:8, 46:15, 48:2, 49:2, 49:3, 50:10, 50:13, 50:22, 50:23, 55:17, 56:2, 56:19, 57:5, 57:8, 79:10, 82:2, 110:22

**starter** [1] - 50:14

**starts** [2] - 55:12, 55:13

**state** [4] - 9:21, 11:8, 11:15, 80:10

**statement** [9] - 15:6, 32:5, 32:6, 36:21, 65:24, 76:8, 78:14, 78:24, 93:21

**statements** [16] - 22:22, 24:21, 32:7, 32:10, 33:2, 37:6, 43:6, 45:2, 47:20, 47:21, 54:13, 60:14, 84:5, 84:7, 84:8

**States** [1] - 4:2

**states** [1] - 102:8

**STATES** [2] - 1:1, 1:16

**stating** [1] - 97:19

**status** [3] - 6:23, 29:9, 102:15

**stay** [2] - 21:17, 80:6

**steer** [1] - 107:8

**stenography** [1] - 1:23

**step** [2] - 80:6, 106:9

**Stephanie** [1] - 64:9

**STEPHANIE** [1] - 2:3

**stereotypes** [1] - 28:22

**stick** [2] - 18:12, 37:4

**still** [12] - 12:16, 13:10, 17:13, 34:11, 39:12, 39:16, 43:9, 47:8, 47:11, 47:18, 51:3

**stip** [1] - 88:7

**stipulate** [2] - 20:15, 83:16

**stipulated** [1] - 24:18

**stipulation** [1] - 20:25

**stop** [2] - 19:10, 70:21

**stopped** [1] - 69:2

**story** [4] - 43:21, 59:13, 59:16, 67:9

**strangers** [1] - 36:8

**strategically** [1] -

45:17

**strategies** [3] - 51:24, 51:25, 52:3

**strategy** [9] - 42:6, 42:7, 42:15, 53:1, 53:4, 53:12, 53:16, 53:20, 55:1

**Street** [3] - 1:12, 1:19, 2:4

**stressful** [1] - 75:7

**stricken** [1] - 26:2

**stricter** [1] - 28:18

**strike** [1] - 52:12

**Strong** [1] - 53:20

**struck** [4] - 26:3, 52:17, 52:24, 71:20

**stub** [10] - 89:23, 89:25, 90:1, 90:6, 90:8, 92:12, 92:13, 92:14, 93:6, 95:15

**stubs** [1] - 93:4

**stuff** [1] - 36:12

**subject** [6] - 4:11, 22:13, 35:17, 49:13, 68:4, 100:19

**subjected** [6] - 24:3, 38:2, 38:8, 48:22, 49:19, 67:11

**submit** [4] - 9:1, 10:8, 47:25, 56:1

**submitted** [6] - 5:3, 8:20, 10:17, 13:25, 14:21, 14:23

**subpoenaed** [1] - 108:19

**subsequent** [1] - 14:10

**substance** [1] - 98:9

**successful** [1] - 50:19

**sudden** [1] - 60:18

**sue** [1] - 7:1

**suffer** [1] - 49:5

**suffered** [8] - 38:11, 38:13, 38:14, 38:23, 39:3, 41:13, 43:23, 49:6

**suffering** [1] - 67:22

**suggest** [5] - 8:18, 19:9, 57:21, 60:3, 60:20

**suggesting** [1] - 15:2

**suggestion** [2] - 7:19, 110:6

**Suite** [2] - 1:19, 2:4

**summaries** [1] - 106:24

**summarize** [4] - 30:8, 32:25, 36:4, 98:7

**summary** [1] - 105:9

**summation** [1] - 29:17

**superstar** [1] - 74:15
**supervisor** [1] - 50:18
**support** [8] - 44:9, 48:20, 49:7, 73:2, 73:18, 74:12, 75:18
**supporting** [2] - 74:6, 78:3
**supposed** [3] - 13:5, 33:20, 38:5
**suspect** [1] - 6:17
**suspicions** [1] - 25:2
**sustain** [2] - 25:21, 98:21
**switched** [1] - 17:20
**SWORN** [1] - 80:8
**sworn** [1] - 23:10
**Sydney** [1] - 45:24
**system** [3] - 63:25, 78:10, 78:13
**systems** [1] - 74:24

**T**

**tackle** [2] - 4:7, 107:20
**tags** [1] - 33:22
**task** [1] - 30:15
**tasked** [1] - 42:14
**teaching** [1] - 78:13
**team** [8] - 40:3, 46:14, 46:22, 50:4, 50:24, 60:17, 66:25, 69:16
**teamed** [1] - 43:15
**tech** [7] - 42:4, 42:5, 53:13, 67:25, 68:21, 78:1
**technical** [2] - 68:9, 80:16
**TECHNICIAN** [1] - 97:11
**Technologies** [5] - 64:21, 88:20, 88:22, 92:14, 92:16
**teenage** [1] - 73:13
**temporary** [1] - 89:6
**ten** [1] - 79:24
**tens** [1] - 52:1
**tenure** [1] - 68:2
**term** [2] - 28:17, 71:1
**terminate** [2] - 76:13, 78:22
**terminated** [20] - 38:16, 41:3, 42:21, 47:5, 47:9, 48:17, 50:11, 57:22, 62:10, 67:14, 75:11, 75:12, 75:17, 76:6, 76:10, 76:23, 81:19, 88:18, 99:13, 101:23
**terminating** [1] - 61:9
**termination** [37] -

14:9, 14:12, 14:13, 24:6, 24:13, 38:24, 39:9, 40:14, 49:4, 57:17, 57:18, 57:24, 58:4, 58:7, 58:11, 58:23, 60:16, 60:21, 60:22, 60:24, 60:25, 61:12, 62:3, 62:7, 62:19, 67:13, 71:7, 71:8, 75:15, 76:20, 88:25, 89:2, 99:23, 102:20, 109:20, 110:5, 110:18
**terms** [12] - 9:18, 17:12, 64:19, 66:21, 67:6, 94:2, 95:14, 95:18, 96:10, 96:17, 104:22, 105:18
**terrific** [1] - 17:3
**testified** [5] - 24:9, 26:11, 72:22, 94:21, 101:5
**TESTIFIED** [1] - 80:9
**testifies** [3] - 20:10, 26:9, 27:9
**testify** [4] - 15:23, 18:12, 27:20, 110:17
**testifying** [3] - 15:24, 27:11, 65:3
**testimony** [28] - 18:4, 19:3, 24:16, 24:23, 26:2, 26:3, 27:1, 27:14, 27:15, 27:22, 28:14, 29:23, 30:2, 30:4, 30:8, 39:17, 43:4, 49:8, 66:13, 71:21, 77:1, 77:3, 79:21, 85:24, 93:3, 110:17
**Texas** [1] - 20:1
**text** [4] - 12:17, 34:7, 34:14, 34:15
**THE** [10] - 1:15, 4:3, 4:4, 4:25, 5:7, 5:11, 5:16, 5:19, 5:23, 6:3, 6:20, 8:3, 8:10, 9:1, 9:4, 10:8, 10:11, 10:19, 10:22, 11:4, 11:7, 11:17, 11:21, 11:23, 11:25, 12:4, 12:13, 12:19, 12:25, 13:8, 15:19, 16:1, 16:3, 16:7, 16:12, 16:18, 16:21, 17:6, 17:22, 18:19, 19:18, 20:4, 20:14, 20:20, 21:10, 21:24, 21:25, 22:2, 22:5, 62:23, 72:10, 72:12, 72:15, 75:24, 76:1, 76:3,

79:18, 80:5, 80:7, 80:10, 80:12, 80:14, 80:19, 80:23, 81:1, 81:2, 81:5, 81:8, 82:21, 83:18, 83:22, 83:24, 85:4, 85:21, 86:1, 86:19, 87:12, 88:9, 89:15, 90:12, 90:14, 90:16, 91:15, 91:25, 93:10, 94:8, 95:7, 95:25, 97:1, 97:6, 97:8, 97:11, 98:6, 98:21, 101:1, 103:21, 105:2, 105:24, 106:5, 106:9, 106:11, 107:17, 107:19, 108:2, 108:13, 108:24, 109:17, 109:24, 110:9, 110:20
**the..** [1] - 80:20
**themselves** [2] - 51:12, 67:20
**therefore** [1] - 31:5
**thinking** [1] - 40:19
**thinks** [1] - 25:12
**third** [1] - 4:18
**Third** [3] - 6:9, 6:11, 35:3
**THOMAS** [1] - 1:8
**thoughts** [1] - 29:1
**thousand** [7] - 45:13, 63:23, 99:22, 101:12, 101:19, 101:25, 102:24
**thousand-mile** [1] - 45:13
**thousand..** [1] - 94:18
**threatening** [1] - 74:16
**three** [9] - 37:23, 46:15, 50:13, 66:10, 79:11, 93:2, 93:3, 93:4
**THROUGH** [2] - 3:7, 83:25
**throughout** [1] - 36:4
**thrown** [2] - 40:17, 43:10
**Thursday** [3] - 19:2, 20:1, 109:6
**tight** [1] - 21:19
**Tim** [1] - 64:9
**time-barred** [6] - 5:8, 5:13, 5:20, 5:22, 7:8, 13:13
**timeline** [2] - 5:24, 5:25
**timely** [1] - 6:16

timing [3] - 4:25, 5:2, 6:24
**TIMOTHY** [1] - 2:4
**tip** [1] - 28:7
**title** [5] - 52:25, 53:5, 54:4, 68:14, 69:17
**Title** [2] - 10:6, 14:11
**today** [33] - 15:13, 15:23, 16:4, 37:4, 37:5, 37:20, 39:12, 39:16, 40:14, 41:12, 43:8, 46:10, 46:12, 47:12, 47:18, 48:2, 48:12, 58:25, 59:4, 59:11, 60:22, 63:5, 63:10, 63:12, 64:8, 65:1, 65:3, 66:24, 70:10, 79:15, 79:22, 109:6
**together** [12] - 36:8, 36:9, 36:11, 41:24, 43:16, 47:16, 61:21, 61:24, 62:1, 62:2, 62:4, 64:10
**Tokyo** [1] - 45:23
**Tom** [9] - 37:22, 40:25, 43:15, 44:9, 45:9, 52:13, 61:20, 61:24, 65:8
**tomorrow** [2] - 20:10, 85:24, 106:15, 108:6, 108:16, 109:3, 109:7, 109:15
**tonight** [3] - 106:15, 108:13, 109:12
**took** [1] - 78:11
**top** [2] - 11:7, 65:21
**Toronto** [1] - 45:24
**total** [9] - 82:15, 83:7, 83:9, 84:21, 84:22, 86:9, 89:1, 96:21, 101:9
**totality** [1] - 4:17
**touched** [1] - 26:10
**toward** [4] - 39:19, 42:15, 51:14
**towards** [1] - 28:25
**track** [1] - 74:19
**tracks** [2] - 13:23, 17:20
**trade** [1] - 109:12
**tradeoff** [1] - 18:20
**transaction** [2] - 14:6, 14:13
**transactions** [1] - 59:20
**transcribing** [1] - 29:23
**transcript** [4] - 1:23, 17:17, 30:2, 111:2

**transcription** [1] - 1:24
**transcripts** [2] - 29:24, 30:23
**transmitting** [1] - 34:9
**trappings** [1] - 59:16
**trash** [1] - 69:20
**travel** [3] - 35:7, 56:2, 73:13
**treat** [1] - 25:22
**treated** [2] - 41:7, 51:7
**treatment** [3] - 24:5, 24:6, 49:9
**tremendously** [1] - 57:7
**trial** [26] - 18:10, 18:21, 18:24, 19:6, 22:7, 23:17, 23:22, 27:13, 29:23, 31:1, 31:7, 31:16, 33:8, 33:24, 34:3, 35:3, 35:8, 35:9, 35:19, 36:5, 36:15, 63:19, 64:23, 66:6, 78:13
**TRIAL** [1] - 1:5
**trials** [1] - 78:10
**Tricia** [3] - 97:25, 98:3, 99:8
**tried** [2] - 66:19, 75:19, 77:8
**tries** [2] - 33:14, 66:20
**trip** [4] - 55:18, 56:13, 56:21, 56:22
**trips** [5] - 55:17, 56:8, 56:10, 56:17, 56:24
**troublemakers** [1] - 54:15
**true** [5] - 18:18, 24:20, 61:8, 67:10, 93:3
**truth** [7] - 44:4, 44:16, 44:22, 49:22, 61:13, 62:14
**try** [10] - 18:10, 18:12, 18:23, 22:14, 22:25, 23:6, 23:7, 30:8, 37:4, 40:23, 43:19, 57:15, 58:4, 64:4, 66:8, 66:12, 89:2, 110:21
**trying** [5] - 31:19, 50:14, 61:4, 62:4, 62:25
**turn** [9] - 13:20, 21:3, 22:20, 22:21, 22:23, 36:20, 58:19, 58:20, 106:4
**turned** [1] - 72:19
**TV** [1] - 35:13
**tweet** [2] - 34:13, 34:15

**tweets** [1] - 35:14
**Twitch** [1] - 53:17
**Twitter** [1] - 34:6
**two** [22] - 4:8, 9:10, 9:15, 18:17, 21:15, 26:6, 44:6, 46:16, 46:21, 50:22, 57:6, 58:25, 64:8, 65:18, 69:5, 70:24, 73:13, 86:4, 94:18, 96:12, 104:7, 108:16
**type** [4] - 26:7, 26:14, 35:21, 39:21
**types** [1] - 26:6

## U

**U.S** [2] - 1:11, 1:12
**ultimate** [1] - 58:20
**ultimately** [2] - 14:16, 66:17
**umbrella** [1] - 26:18
**unaware** [1] - 73:5
**unbeknownst** [1] - 71:17
**uncertain** [1] - 17:12
**uncomfortable** [2] - 37:10, 73:24
**under** [17] - 7:13, 7:22, 7:23, 8:6, 9:20, 13:11, 13:15, 13:19, 14:4, 25:19, 31:22, 33:19, 35:16, 43:9, 58:7, 73:25, 75:6
**underlying** [1] - 64:24
**underwhelmed** [1] - 78:2
**undisputed** [2] - 65:24, 66:1
**unexhausted** [1] - 7:20
**unfair** [1] - 35:22
**unfavorably** [1] - 28:25
**United** [1] - 4:2
**UNITED** [2] - 1:1, 1:16
**unlawful** [1] - 57:25
**unlawfully** [1] - 67:14
**unless** [1] - 28:13
**unprecedented** [1] - 75:8
**up** [46] - 4:19, 9:3, 15:5, 15:13, 16:9, 16:23, 18:20, 18:25, 19:1, 19:2, 21:3, 21:11, 21:18, 24:14, 35:21, 36:12, 37:17, 39:7, 41:2, 41:8, 42:17, 42:18, 43:15, 43:20, 45:5, 48:4,

49:18, 52:15, 54:9, 54:10, 55:21, 55:25, 62:4, 63:16, 64:1, 65:7, 71:20, 76:16, 78:5, 80:5, 80:6, 91:25, 97:20, 107:9, 109:3
**up..** [1] - 10:13
**UPMC** [1] - 6:10
**upset** [1] - 54:23
**upshot** [1] - 23:3
**urge** [1] - 29:12

## V

**valuable** [1] - 31:1
**value** [7] - 39:7, 39:19, 49:18, 51:25, 52:2, 68:11, 108:3
**variety** [1] - 69:6
**vendors** [1] - 74:9
**venire** [1] - 21:5
**verdict** [12] - 23:18, 26:7, 28:8, 29:10, 29:12, 31:4, 32:2, 33:6, 34:12, 34:22, 35:10, 35:20
**verification** [3] - 43:6, 47:20, 81:12
**verify** [2] - 69:21, 107:25
**versus** [1] - 7:1
**via** [2] - 17:17, 108:20
**victim** [2] - 72:3, 73:5
**video** [3] - 34:8, 57:23, 81:4
**VIDEO** [1] - 97:11
**view** [1] - 45:13
**views** [1] - 30:21
**VII** [2] - 10:6, 14:11
**Vince** [8] - 37:23, 43:16, 44:8, 45:10, 52:14, 57:22, 61:24, 65:17
**Vincent** [5] - 40:25, 61:20, 100:10, 100:15, 102:5
**Vinny** [2] - 65:17, 65:18
**violations** [2] - 75:13, 76:6
**virtual** [1] - 64:15
**virtually** [1] - 19:16
**virtue** [2] - 12:17, 12:22
**visit** [1] - 33:20
**vs** [2] - 6:10, 7:12

## W

**W-2** [5] - 82:12, 83:7, 84:4, 94:16, 95:15
**W-2s** [3] - 83:16, 83:20, 91:24
**W-I-L-L-I-A-M-S** [1] - 80:13
**wage** [2] - 47:23, 48:6
**waiting** [2] - 22:7, 77:13
**walked** [1] - 26:16
**wants** [3] - 51:18, 79:24, 107:5
**WAS** [32] - 3:7, 3:8, 3:9, 3:9, 3:10, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 82:23, 85:5, 85:22, 86:20, 87:13, 89:16, 90:17, 91:16, 93:11, 94:9, 95:8, 96:2, 97:3, 101:3, 105:3, 105:25
**waste** [3] - 64:3, 66:15, 97:13
**watch** [2] - 107:5
**watched** [1] - 36:11
**watching** [3] - 21:15, 36:8, 52:22
**water** [1] - 26:17
**ways** [3] - 38:14, 70:24
**wear** [1] - 33:21
**wearing** [1] - 26:17
**web** [2] - 59:19, 72:2
**websites** [2] - 34:7, 45:19
**Wednesday** [3] - 20:3, 20:9, 106:3
**week** [9] - 17:7, 17:9, 62:3, 63:23, 66:4, 66:12, 78:20, 79:15, 80:1
**weighed** [1] - 67:8
**weighing** [1] - 25:5
**weight** [5] - 25:7, 26:22, 26:24, 27:19, 27:22, 30:21
**welcome** [1] - 22:6
**well-known** [1] - 53:13
**WERE** [4] - 3:7, 3:10, 83:25, 88:10
**wet** [1] - 26:18
**whatsoever** [1] - 34:5
**whole** [4] - 63:24, 78:10, 79:10, 108:6
**Williams** [66] - 4:19, 16:17, 20:9, 24:2,

24:9, 24:12, 24:13, 27:23, 27:25, 28:6, 28:8, 37:16, 37:18, 37:19, 37:20, 39:11, 39:15, 39:18, 42:14, 42:16, 42:19, 42:20, 42:24, 43:7, 44:7, 45:4, 47:11, 48:3, 48:10, 49:1, 49:7, 49:9, 49:10, 53:15, 59:24, 60:1, 60:6, 61:9, 61:17, 61:18, 63:15, 65:15, 66:24, 67:3, 67:19, 67:21, 68:3, 69:4, 69:7, 69:22, 70:16, 70:20, 71:5, 71:19, 71:20, 71:25, 72:21, 72:25, 73:10, 80:4, 80:12, 81:14, 81:15, 82:4, 109:1, 109:2
**williams** [30] - 28:5, 67:11, 68:25, 69:8, 70:1, 70:8, 74:17, 75:10, 75:17, 76:5, 76:7, 76:11, 76:20, 77:4, 77:6, 77:11, 77:21, 78:3, 78:22, 79:5, 80:5, 82:8, 83:4, 83:17, 84:3, 99:1, 106:9, 107:22, 108:8, 108:15
**WILLIAMS** [3] - 1:3, 3:3, 80:8
**williams'** [3] - 73:12, 73:24, 74:11
**Williams'** [12] - 24:6, 39:8, 40:14, 42:12, 43:12, 47:6, 49:12, 65:13, 67:7, 68:11, 71:1, 75:2
**Williams'(sic** [1] - 73:3
**willing** [1] - 19:6, 63:25
**willingness** [1] - 63:9
**wired** [1] - 36:11
**wise** [2] - 16:5, 20:6
**wish** [2] - 29:16, 30:15
**withholding** [1] - 24:7
**WITNESS** [2] - 80:12, 81:1
**witness** [42] - 18:5, 18:9, 18:14, 19:23, 26:4, 26:8, 26:9, 26:10, 26:11, 27:3, 27:4, 27:8, 27:9, 27:11, 27:13, 27:16, 29:7, 29:13, 29:15, 30:14, 33:8, 33:17,

36:1, 36:2, 45:3, 72:4, 75:16, 80:3, 82:5, 85:6, 90:19, 91:17, 92:3, 93:12, 94:11, 95:9, 96:3, 97:4, 100:5, 103:22, 109:4, 110:17
**witness's** [5] - 27:9, 27:10, 27:14, 27:15, 110:16
**witnesses** [19] - 20:22, 24:16, 27:3, 27:20, 27:21, 28:14, 29:15, 30:13, 30:17, 32:14, 32:15, 32:18, 32:19, 66:1, 66:9, 68:1, 71:5, 108:18, 108:22
**WL** [1] - 7:12
**Wolson** [6] - 44:19, 45:2, 63:24, 76:18, 78:12
**WOLSON** [2] - 1:15, 4:2
**wondering** [1] - 52:23
**word** [2] - 5:5, 68:18
**words** [5] - 18:17, 19:24, 33:7, 54:15, 76:11
**workers** [1] - 34:1
**works** [2] - 78:10, 81:2
**worksharing** [6] - 8:17, 8:21, 8:22, 9:7, 9:18, 13:2
**world** [4] - 36:12, 42:10, 45:17, 55:14
**worried** [5] - 74:8, 74:12, 74:14, 74:17, 74:20
**worry** [1] - 62:15
**worse** [1] - 51:1
**worth** [3] - 47:23, 48:8, 50:20
**worthy** [3] - 27:3, 59:17
**wrap** [2] - 19:17, 21:11
**write** [2] - 54:10, 55:25
**write-up** [1] - 54:10
**written** [5] - 30:2, 54:9, 55:10, 56:5, 56:24
**wrote** [2] - 27:13, 70:1

## Y

**year** [26] - 6:21, 6:25, 44:11, 47:4, 51:23, 53:25, 68:2, 82:16, 83:11, 84:3, 84:4, 84:10, 87:3, 87:20,

*United States District Court*

91:1, 94:17, 99:14,
99:16, 101:9,
101:11, 101:21,
102:13, 103:4,
103:5, 103:14, 104:3
**yearly** [2] - 93:21,
94:24
**years** [30] - 37:19,
38:18, 40:2, 41:16,
41:21, 42:1, 43:13,
45:7, 46:5, 46:15,
48:19, 48:24, 50:22,
52:19, 55:4, 58:25,
59:14, 59:15, 60:16,
60:22, 69:5, 71:22,
71:23, 72:22, 77:22,
79:11, 79:13, 81:19,
109:20, 109:22
**years'** [3] - 44:7,
46:23, 46:25
**York** [1] - 45:22
**young** [3] - 50:14,
57:10, 78:10
**younger** [10] - 46:17,
46:20, 48:11, 51:18,
52:21, 53:9, 56:8,
56:9, 56:10, 56:11
**yourself** [3] - 26:20,
59:23, 81:13
**yourselves** [1] - 36:17

*United States District Court*