1           **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF PENNSYLVANIA**
2

3  ━━━━━━━━━━━━━━━━━━━━━━━━

**CARL WILLIAMS,**                    **CIVIL ACTION NUMBER:**
4
        **Plaintiff,**               **2:22-CV-01618-JDW**
5
        **v.**                       **JURY TRIAL**
6                                     **DAY 2**
**LINODE LIMITED LIABILITY**
7  **COMPANY, d/b/a LINODE, LLC,**
   **LINODIAN, LLC, d/b/a LINODE,**
8  **LLC, DANIEL SPATARO, and**
   **THOMAS ASARO**
9
        **Defendants.**
10 ━━━━━━━━━━━━━━━━━━━━━━━━

11

12      U.S. District Court, Eastern District of PA
        James A. Byrne U.S. Courthouse
13      601 Market Street
        Philadelphia, Pennsylvania 19106
14      January 24, 2024
        Commencing at 9:17 a.m.

15

16 **B E F O R E:**              **THE HONORABLE JOSHUA D. WOLSON**
                                 **UNITED STATES DISTRICT JUDGE**
17

18 **A P P E A R A N C E S:**

19      DEREK SMITH LAW GROUP, PLLC
        BY:  SETH D. CARSON, ESQUIRE
20      1835 Market Street, Suite 2950
        Philadelphia, PA 19103
21      For the Plaintiff

22          Maureen McHugh, Official Court Reporter
                maureen_mchugh@paed.uscourts.gov
23
    Proceedings recorded by mechanical stenography; transcript
24          produced by computer-aided transcription.

25

*United States District Court*

1    **A P P E A R A N C E S:(Cont'd)**

2

3    JACKSON LEWIS, P.C.
     BY:  STEPHANIE JILL PEET, ESQUIRE
4         JONATHAN CAVALIER, ESQUIRE
          TIMOTHY MCCARTHY, ESQUIRE
5         1601 Cherry Street, Suite 1350
          Philadelphia, PA 19102
6         For the Defendant

7

8

9

10

11   **ALSO PRESENT:**

12   Melissa Meyer, Paralegal

13   Laura Buenzle Roberts, Courtroom Deputy

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

```
 1                        I N D E X

 2
    EXAMINATIONS                                      PAGE
 3
    CARL WILLIAMS
 4  DIRECT EXAMINATION BY MR. CARSON:                 17
                                                      137
 5
    CHAD STALLER
 6  VOIR DIRE DIRECT EXAMINATION BY MR. CARSON:       108
    DIRECT EXAMINATION BY MR. CARSON:                 113
 7  CROSS-EXAMINATION BY MR. CAVALIER:                133
    REDIRECT EXAMINATION BY MR. CARSON:               136
 8

 9

10                      E X H I B I T S

    PLAINTIFF EXHIBIT 175 WAS RECEIVED IN EVIDENCE     23
11  PLAINTIFF EXHIBIT 8 WAS RECEIVED IN EVIDENCE       27
    PLAINTIFF EXHIBIT 10 WAS RECEIVED IN EVIDENCE      29
12  PLAINTIFF EXHIBIT 33 WAS RECEIVED IN EVIDENCE      30
    PLAINTIFF EXHIBIT 18 WAS RECEIVED IN EVIDENCE      49
13  PLAINTIFF EXHIBIT 15 WAS RECEIVED IN EVIDENCE      86
    PLAINTIFF EXHIBIT 34 WAS RECEIVED IN EVIDENCE      95
14  PLAINTIFF EXHIBIT 21 WAS RECEIVED IN EVIDENCE     141
    PLAINTIFF EXHIBIT 166 WAS RECEIVED IN EVIDENCE    156
15  PLAINTIFF EXHIBIT 138 WAS RECEIVED IN EVIDENCE    192

16

17

18

19

20

21

22

23

24

25
```

 1          (PROCEEDINGS held in open court before The Honorable

 2  JOSHUA D. WOLSON, United States District Judge, at 9:17 a.m.)

 3          THE COURTROOM DEPUTY:  All rise.

 4          THE COURT:  Good morning, everybody.  Have a seat,

 5  please.

 6          MR. CARSON:  Good morning, Your Honor.

 7          MR. CAVALIER:  Good morning, Your Honor.

 8          THE COURT:  Okay.  Well, first thing, I don't think I

 9  saw any sort of email last night with any issues; is that

10  right?  There's no sort of trial-related housekeeping issues we

11  need to deal with?

12          MR. CARSON:  I just wanted to point out that today

13  we're going to be getting into the substance of some real

14  testimony.  And so since Mr. Asaro and Mr. Spataro are not

15  parties in the case any longer, I don't think it's appropriate

16  for them to be sitting and watching the trial.

17          MR. CAVALIER:  To that, we would say, Your Honor, is

18  they've been introduced to the jury and they were here

19  yesterday during Mr. Williams' testimony.  Mr. Spataro, if

20  witnesses are sequestered -- well, we think it's waived, but if

21  witnesses are going to be sequestered at this point, we think

22  the jury should be told about why they're not here as opposed

23  to just forming the belief in their own minds that maybe it's

24  not important enough for them to be here.

25          THE COURT:  I'm not aware that it's waived.  There was

*United States District Court*

1  this sort of change in status yesterday, and I don't see the

2  big deal.  In fact, it's, you know, it's not the first thing in

3  the top of mind, Mr. Carson, to force the sequestration when

4  applied.

5          I don't know that it's -- they were introduced as part

6  of the opening.  I think that's fine.  I don't know that it

7  necessarily requires an instruction to the jury.  Frankly, in

8  some respects, I think that calls more attention to it than is

9  necessary.  So but I will enter a sequestration order, and

10 we'll just do it generally.

11         So anyone who's going to be a witness is on the

12 witness list, hasn't testified yet, unless they're a corporate

13 representative, we'll sequester them for testimony.

14         MR. CAVALIER:  Just for the record, Your Honor,

15 Mr. Spataro will serve as corporate representative for Linode.

16         THE COURT:  Okay.  So Mr. Spataro can stay.  Mr. Asaro

17 will have to step out for testimony.  Obviously, he can stay

18 when we're not taking testimony.

19         MR. CARSON:  And Mr. Palochko.

20         THE COURT:  And Mr. Palochko, yes.

21         All right.  So then the other housekeeping issue,

22 Ms. Roberts handed you this copy of this note that I got from

23 Mr. Cannon, who is Juror No. 2.  As you all probably recall,

24 Mr. Cannon is the one who, during voir dire yesterday, when I

25 asked him if he had a hardship, the only thing he flagged, as I

*United States District Court*

1   recall, was the distance that he had to come from the Chadds

2   Ford area, that being about 25, 27 miles away, which puts him

3   inside the bound for which the court would put him in a hotel.

4           He, from my observation, was visibly unhappy when he

5   was picked for the jury.  He approached Ms. Roberts.  This

6   isn't all in the note.  That's why I'm putting it on the

7   record.  He approached Ms. Roberts yesterday immediately after

8   he was seated -- so when we broke for lunch -- to again

9   complain and to tell her that he wanted to appeal the decision

10  that he had been put on the jury.

11          We sort of explained to him, by way of Ms. Roberts

12  having consulted me, we explained to him that, you know, there

13  are rules in terms of where the hotel line is.  We understand

14  it's inconvenient for him, but it is just an inconvenience and

15  not a hardship to have to come from that distance.  I guess

16  that didn't nullify him, and so this note came at the end of

17  the day when we broke.

18          And so I'm going to enter the note into the record.  I

19  don't need to read it all.  You all have a copy of it.  But

20  just in sum, it raises two issues.

21          One is the driving distance, again, which I don't see

22  as a particular hardship.

23          The other is this notion that he's hourly paid and is

24  losing salary.  Typically, you know, in voir dire, that is

25  something that I would deem a hardship and I would excuse

*United States District Court*

1  someone.  I don't know why it wasn't raised.  There was a

2  question that invited him to tell us that, I think, pretty

3  clearly.

4        So I'm open to hearing your reactions.  I'm inclined

5  to bring him out and do a little colloquy with him.  But, you

6  know, any input you have as to this before I do that, I'm open

7  to hearing, and then I'll make some judgments.

8        Mr. Carson?

9        MR. CARSON:  I think John and I both saw him, too,

10  during lunch.  He was outside, and he seemed still pretty

11  heated.  He was on the phone, and he was cursing with somebody.

12  And, you know, he was obviously angry about being here and all

13  the other things.

14        I mean, I guess the options are pretty simple, right?

15  I mean, either we ask you to keep him here or we agree to let

16  him, you know, excuse him.

17        THE COURT:  Yeah.  Do you have a preliminary view that

18  you want to express?  I mean, you can listen to my colloquy and

19  either express a view or otherwise --

20        MR. CARSON:  I don't really have an opinion yet.

21        THE COURT:  Okay.

22        MR. CARSON:  I think I'd be pretty easy going about

23  this, whatever was decided.

24        THE COURT:  Okay.  Mr. Cavalier?

25        MR. CAVALIER:  We would defer to whatever Your Honor

*United States District Court*

1  prefers as the best approach.

2          THE COURT:  There are competing interests here at play

3  that I want balanced.  So let's bring him out, if we could, and

4  then I'll have him stand at the podium for this.  So, you know,

5  to the extent either of you wants to be able to observe and

6  just step up into court, sort of the area where we do sidebar,

7  you're welcome to do this.

8          MR. CAVALIER:  Your Honor, we have two housekeeping

9  issues.  We can wait until after the colloquy.  They are very

10 minor, but I wanted to raise them before we --

11         THE COURT:  Let's do this first.  My understanding is

12 there is one juror who is still stuck in traffic as well.  So

13 let's do this and then give that juror a chance to get here as

14 well, and then we'll tackle the housekeeping.

15         MR. CAVALIER:  Okay.

16         THE COURT:  Good morning, sir.

17         THE JUROR:  Good morning.

18         THE COURT:  All right.  So you gave this note to

19 Ms. Roberts at the end of the day yesterday.  And I know you

20 approached her during the lunch break as well yesterday.

21         So the note you gave me raises two concerns.  One is

22 the distance that you live from the city.  And I know you

23 raised that yesterday as well during voir dire.  And just to be

24 clear on where we are on this, in my view, that falls on the

25 line of inconvenience and not hardship.  I know it's a pain to

1    come here.  The district covers nine counties.  We've drawn a
2    line as to where we will allow a hotel and not allow a hotel.
3    But people come here from Doylestown.  People come from Newtown
4    Square, Berwyn, and other places where it is similarly
5    inconvenient to have to come into the city.  We can't clean
6    them all out of our jury pool, right?  That has a substantial
7    impact on the jury pool.

8            So that issue, we heard you yesterday, listened, and
9    while I understand the frustration, it's not something that
10   rises in my mind to the level of hardship.

11           But I want to follow up, then, on the second issue
12   that you've raised in your note, which is this issue about your
13   being paid hourly.

14           So I guess I want you to start by telling me a little
15   bit more about that.  Do you work regularly?  Is it daily?
16   Tell me little bit about your employment.

17           THE JUROR:  Yeah.  I work a full-time schedule.  My
18   typical work day is 11:00 to 7:00, and I typically work Tuesday
19   through Saturday, a 5-day work week.

20           THE COURT:  Okay.  And it's purely hourly paid?

21           THE JUROR:  Yes.

22           THE COURT:  Are you paid overtime if you work more?

23           THE JUROR:  No.

24           THE COURT:  Do you punch in and out?

25           THE JUROR:  Yes.

*United States District Court*

1          THE COURT:  Okay.  And are you -- okay.  And so if you

2     are not paid for -- well, let me step back.

3          Is the work weather dependent?  I remember it's an

4     installer of some type, but I don't remember exactly what you

5     told me you do.

6          THE JUROR:  I mean, it's not like -- I mean, I've

7     missed work because of snow, but it's not weather dependent.  I

8     mean, I work in the store.

9          THE COURT:  Okay.  And so I guess the other question

10     that I have is why wasn't this raised yesterday?  I asked you

11     if there was a hardship for serving on the jury between now and

12     the beginning of next week, and you didn't say anything

13     about --

14          THE JUROR:  I had mentioned that -- I didn't know that

15     I had to mention the hourly thing, but I had mentioned that

16     there was not going to be someone else at my job that can do my

17     work for me.

18          THE COURT:  That's a different thing, and I hear that

19     a lot from a lot of people in a lot of different jobs.  Again,

20     that's an impact on the workplace, and it's not something that

21     I or most other judges deem as a hardship.  We understand that

22     we're pulling people out of their lives when we do jury duty,

23     and it's an unfortunate consequence of it.  But our legal

24     system requires people to step away and serve on juries.

25          So that's not the same as I'm not going to get paid;

1  it will cause me a financial hardship, right?  So I'm trying to

2  understand why the notion of I won't be paid and here's the

3  financial revocations of that for me wasn't something that was

4  brought up yesterday.

5           THE JUROR:  I'm having a hard time trying to figure

6  out what information I'm supposed to be giving because the

7  questions being asked aren't specific enough.  There's not -- I

8  mean -- I do not feel I was being asked the right questions.

9           THE COURT:  Okay.  And what -- so what are the

10 ramifications for you if you are not paid over the next week?

11          THE JUROR:  I don't get paid for the next week.  I

12 don't -- like, what other ramifications?

13          THE COURT:  Well, how would that affect your financial

14 position?  Will you -- do you have --

15          THE JUROR:  I have student loan payments.

16          THE COURT:  Okay.  Will you be able to pay them?

17          THE JUROR:  Likely from savings, I'm sure, but that's

18 my savings.

19          THE COURT:  Right.  Okay.  I mean, and otherwise?

20 Will there be financial consequences to you other than dipping

21 into your savings is what I'm asking.

22          THE JUROR:  No.

23          THE COURT:  Okay.  All right.  Let me -- just stay

24 tight.  I'm going to ask counsel to come up to sidebar, and

25 then I'll tell you how we will proceed.

*United States District Court*

1              (Sidebar as follows:)

2              THE COURT:  Anybody who wants to offer input as to how

3    you want me to proceed, I want to hear that, having heard him

4    before I make a choice.

5              MR. CARSON:  What do you think, Your Honor?

6              THE COURT:  I'm sorry?

7              MR. CARSON:  What do you think about letting him go?

8              THE COURT:  My lean, and it's not a strong lean, but

9    my lean is to excuse him.  I don't -- if he had raised this

10   yesterday, I think I would have tilted on the side of excusing

11   him.  It's not the I work hourly and support my family and so

12   forth, but I still think he shouldn't have to dip into his

13   savings for a week's worth of salary to serve on a jury.  So I

14   think I would have excused him.

15             I don't have -- one of the reasons I wanted to ask him

16   this morning is I don't have the sense that he is grasping for

17   an excuse to get out.  I think this is real.  Okay.

18             MR. CARSON:  I agree with that.

19             THE COURT:  Okay.  And then the two last competing

20   concerns that are in my mind that I'm weighing are, one, I

21   don't want him in there all week poisoning the jury, which I'm

22   concerned would happen.

23             I guess it's three -- two, is, frankly, based on what

24   I saw yesterday, I'm not sure any of you are getting a

25   meaningful juror in the deliberation process if he's there.  I

*United States District Court*

1  don't think he's going to really pay much attention.  He

2  certainly didn't yesterday.

3        Although, in his defense, you know, and this isn't an

4  aspersion on you, Mr. Carson, but what you had to do yesterday

5  didn't require a lot of attention by the jury.  They're not

6  really doing anything with the foundational questions you

7  asked, and that's fine.  So it's maybe not totally

8  representative.

9        The countervailing concern I have is I don't want the

10  jury to have the sense that, you know, if you gripe, you get

11  released, right?

12        So I think on balance, what I'm going to do is I'm

13  going to excuse him.  I'm not going to let him go back in and

14  talk to the jurors at all.  He's going to have to step out in

15  the hall and wait until we resume and retrieve his stuff and

16  leave.  And I'll tell the jury that we met with him this

17  morning because he had a personal issue come up and that, as a

18  result, I've excused him.  And that's all I'm going to tell

19  them.  Does that work for everybody?

20        MS. PEET:  Yes.

21        MR. CARSON:  Yes.  We agree.  Thanks, Your Honor.

22        MR. CAVALIER:  We agree.  Thank you, Your Honor.

23        (Sidebar concluded.)

24        THE COURT:  Mr. Cannon, we're going to excuse you.  I

25  have to say I think these issues should have been raised

*United States District Court*

 1  yesterday more clearly when you were asked if there was a

 2  hardship.  That was an invitation to talk about financial

 3  hardship, but that, at this point, water under the bridge.

 4          We're going to excuse you.  You're going to have to

 5  wait in the hallway until we resume with the rest of the

 6  jurors.  Okay?

 7          And then once they've come out here and we've resumed

 8  session, you can go in the jury room and retrieve your stuff

 9  and go.  Thank you.

10          THE JUROR:  Thank you.  I apologize.

11          THE COURT:  All right.  Thanks.

12          Just give us a minute.  We're going to check if

13  everyone is here.

14          Oh, we have a couple housekeeping issues to talk

15  about.

16          MR. CAVALIER:  Very, very briefly, Your Honor.  First

17  off, and I didn't email the court about this, and I don't want

18  to make an issue out of it, but we had a little slippage on the

19  timing of your order for the day before last night.

20          Seth and I worked it out.  Today we all knew what to

21  expect.  But I just want to be on the record saying that once

22  we get through today, we're sort of off the charted path of

23  knowing who is going to be called and what the documents are

24  going to be.  So I just wanted to say on the record that I

25  would ask for a reminder for all parties that your order

*United States District Court*

1  requiring us to disclose, especially, exhibits the day before

2  by 6:00 p.m., now that we're into this part of the case, it's

3  really critical for it to be followed.

4         THE COURT:  Yes.  And I think Mr. Carson acknowledged

5  that yesterday.  So I'm less concerned about that.

6         I will just say, too, typically, I mean, it won't be

7  the exhibits.  I know that's important to you.  Typically,

8  during the course of a trial, I'll be asking you pretty

9  regularly what's on deck.  So that will be happening.

10        MR. CAVALIER:  Terrific.

11        THE COURT:  Okay.

12        MR. CAVALIER:  And then lastly, I got an email late

13 last night from Mr. Carson, and we haven't had a chance to

14 discuss where it -- I think -- it appeared that he sent the

15 PHRC a subpoena for documents last night.  Obviously, whatever

16 comes from that, we would object to them being entered into

17 trial at this point.

18        Again, we haven't had a chance to discuss it, but I

19 wanted to raise the issue as something we may need to tackle.

20        THE COURT:  All right.  Well, it doesn't sound like I

21 have anything in front of me right at this point to deal with.

22 So I'm going to leave it be for now.  Frankly...

23        MR. CARSON:  They're not generally very quick, anyway.

24        THE COURT:  I was about to say I'd be a little

25 surprised if you're going to get a response from the PHRC

*United States District Court*

1  during the course of this trial, but we'll see.

2          But if and when that becomes an issue, we'll tackle it

3  then.

4          MR. CAVALIER:  Fair enough.

5          THE COURT:  Okay.  Let's go ahead and bring the jury

6  in.

7          MR. CAVALIER:  Your Honor, at this point would you

8  like Mr. Asaro and Mr. Palochko --

9          THE COURT:  Yes.  We'll have the witnesses step out.

10          THE COURTROOM DEPUTY:  All rise.

11          (Jury enters the courtroom at 9:38 a.m.)

12          THE COURT:  All right.  Good morning, everybody.  You

13  can all be seated.  I'm sorry.

14          First of all, I want to just thank you for your

15  patience as we get started this morning and also for the effort

16  you made to be here on time.  I know that sometimes it's a bit

17  of a struggle, weather or bad traffic that just grinds to a

18  halt, and I appreciate that that can happen.  If it's

19  happening, just give Ms. Roberts a call, and then we can sort

20  of adjust our planning accordingly.  Hopefully -- I think it's

21  supposed to rain the next couple days, but hopefully we'll

22  manage.

23          You noticed there's an absence amongst you.

24  Mr. Cannon, as you saw, came in and spoke to us this morning.

25  He had a personal issue crop up.  So we've had to release him

1  from the jury.  So it will be the seven of you now going

2  forward.  I just wanted you all to know that that's where we

3  are, where we stand.

4          Okay.  We're going to resume this morning with

5  Mr. Williams, right?

6              MR. CARSON:  Yes, Your Honor.

7              THE COURT:  So, Mr. Williams, come on back up.

8              MR. CARSON:  Can I get set up?

9              THE COURT:  Yes.  Sure.

10          Mr. Williams, you're still under oath.  Okay?  You can

11  have a seat.  And we moved the monitor yesterday because of the

12  problems we were having.  Can you all see Mr. Williams?  Does

13  that work?

14              THE JURY:  Yes.

15              THE COURT:  Okay.  Great.

16              MR. CARSON:  I'm ready.

17              THE COURT:  Go ahead.

18                      DIRECT EXAMINATION

19  BY MR. CARSON:

20  Q.  So, Mr. Williams, yesterday we kind of went over some

21  things, just to try to take care of some business before we got

22  into the real substance of your testimony.

23          So just to remind everyone this morning, why don't you

24  just kind of give a little background.  Why don't you say your

25  name and where you're from.

*United States District Court*

1  A.   My name is Carl Williams.  I was born in Johnstown,

2  Pennsylvania, and raised there.

3  Q.   And what year were you born?

4  A.   August 3, 1982.

5  Q.   The year you were born?

6  A.   Excuse me.  August 3, 1964.  I was born in Johnstown, PA.

7  It's a flood city.  We had a large flood there in 1889 that

8  destroyed the entire city.

9  Q.   And did you go to high school in Johnstown?

10  A.   Yes, I did.

11  Q.   What high school did you go to?

12  A.   Bishop McCort High School.

13  Q.   And what year did you graduate?

14  A.   May of 1982.

15  Q.   And after high school, what did you do?

16  A.   I went directly to the university, Kent State University

17  in Kent, Ohio.

18  Q.   And what did you study there?

19  A.   Computer science.

20  Q.   And did you graduate from Kent State?

21  A.   Yes, I did.

22  Q.   What year did you graduate?

23  A.   May of 1986 with a Bachelor's of Science degree in

24  computer science.

25  Q.   And right out of high school, what did you do?  I'm sorry.

*United States District Court*

1  Right after you got your bachelor's degree, what did you do?
2  A.   I worked in 1987 at Hewlett Packard Corporation writing
3  code to evaluate the performance of Hewlett Packard's network
4  file system.
5  Q.   And what did you do next?
6  A.   I went to -- got an internship at Digital Equipment
7  Corporation in Maynard, Massachusetts, working on artificial
8  intelligence.
9  Q.   How long were you in Massachusetts for on that internship?
10 A.   Four months.
11 Q.   And after the internship, where did you go?
12 A.   I went to Firestone Research Labs in Akron, Ohio.  It was
13 30 minutes away from Kent State, where I was working on my
14 Master's of Science degree in computer science at that time to
15 finish up my master's and have employment.
16 Q.   And did you, in fact, finish up your master's?
17 A.   Yes.  I finished up my master's while working as a network
18 administrator at Firestone Research Labs converting and
19 migrating their system to the Unix networking platform, which
20 is our internet-based platform of TCIP, which was new at that
21 time.
22 Q.   Before we get into what you did after that, what year did
23 you receive your master's degree?
24 A.   I received my master's degree in May of 1990.  I completed
25 my master's -- I successfully completed my defense of my

*United States District Court*

1 master's thesis in November of 1989.

2 Q.   And then what did you do after you successfully completed

3 the requirements for your master's?

4 A.   I completed the requirements for my master's, and so I

5 went to Silicon Valley and got a job with NASA at Moffett Field

6 in Silicon Valley, northern California.

7 Q.   Is that the NASA, like, the space and everything?

8 A.   Yes.  I had a pretermed postmaster's degree appointment

9 and worked on system and network administration for Unix.  And

10 I worked as a programmer on NASA's super computers, their

11 high-performance super computers.

12 Q.   And after the work you did with NASA, what did you do

13 next?

14 A.   I spent a decade working at Sun Microsystems.  This was

15 the time of the commercialization of the internet.  To put

16 things into perspective, the beginning of the dot com boom

17 because of the worldwide web services that were being placed on

18 the internet, and worked entirely in networking.

19 Q.   And just to kind of orient in where we are in time, so you

20 said you got your master's in 1990, where are we in time?  What

21 years are we talking about now?

22 A.   We're talking about 1990 to 2008, I was in Silicon Valley.

23 Q.   Did you work for any other companies in California before?

24 A.   Yes, I was in California until 2008.  I worked at large

25 networking vendors and internet service providers such as KDDI,

*United States District Court*

1   the second largest internet service provider in Japan.

2       I worked at the DOD, a contractor with SI International on

3   network architecture and their IP system, Future Way, and there

4   are a host of a number of other companies as an independent

5   consultant.

6   Q.   Did you have any accomplishments that you'd like to tell

7   the jury about that you achieved while you were in California

8   between 1990 and 2008?

9   A.   Yes.  I had -- were granted 12 patents in the area of

10  network communication.

11  Q.   And those patents are your patents?

12  A.   Yes, they are.

13  Q.   And after -- you said you were in California until 2008.

14  What did you do after that?

15  A.   I was invited to come to Comcast here in Philadelphia, to

16  my hometown -- my home state of Pennsylvania.

17  Q.   Did you accept that invitation?

18  A.   Yes, I did.

19  Q.   Did that require you to move?

20  A.   Yes.  I came here, and from 2008 until 2014, lived close

21  by the Comcast Center.  I moved close to the Comcast Center and

22  would walk there every day.

23  Q.   And in 2014, what happened?

24  A.   My contract expired, was up as an independent consultant,

25  and I left Comcast and went to take care of my mother, who was

1  older.

2  Q.   Where did that take you?

3  A.   To Johnstown, Pennsylvania.

4  Q.   So were you working during that time period?

5  A.   No.

6  Q.   How long were you out of the workforce?

7  A.   Until October.  I began -- for about 8 months.

8  Q.   And did you go back to work at some point?

9  A.   Yes.

10  Q.   And when you decided to do that, tell us how you started

11  that process.

12  A.   I came back to Philadelphia in October.

13  Q.   So after you went to take care of your mom in Johnstown in

14  2014, like, what did you do to get back into the workforce?

15  A.   I applied for positions.

16  Q.   And did you make a resume in order to do that?

17  A.   Yes.  I submitted to two positions at Linode, one for

18  network engineering and one for software development.

19  Q.   And had you done network engineering at all those other

20  companies you mentioned before that?

21  A.   Yes.

22  Q.   How long had you been in the network engineering business

23  up until that point?

24  A.   From 1987 to up to that point.

25  Q.   To 2014?

*United States District Court*

1  A.  Yes.

2          MR. CARSON:  And can we please show the witness

3  Exhibit 175.  It will be on that screen next to you.

4  BY MR. CARSON:

5  Q.  It will be on that screen next to you.  Just let us know

6  when you can see it.  Can you see what we just put on that

7  screen, Carl?

8  A.  Yes.

9  Q.  What is that?

10  A.  That's my resume that I submitted, one of the resumes I

11  submitted to Linode.

12  Q.  Is that the resume that you were talking about that you

13  submitted when you wanted to get back into the workforce in

14  2014?

15  A.  Yes, it was one of two.

16          MR. CARSON:  Your Honor, I request that we publish

17  this to the jury.

18          MR. CAVALIER:  No objection.

19          THE COURT:  175 will come into evidence.

20          (PLAINTIFF EXHIBIT 175 WAS RECEIVED IN EVIDENCE.)

21  BY MR. CARSON:

22  Q.  And did you receive any response to that resume and that

23  application?

24  A.  Yes, I did.

25  Q.  And what was that response?

*United States District Court*

1  A.   I received a call shortly after the submission by Vincent

2  Palochko.

3  Q.   Who's Vincent Palochko?

4  A.   He's the HR manager at Linode at the time.

5  Q.   And so what did you guys talk about?  What happened?

6  A.   He said he -- he sees that I submitted two resumes to two

7  different positions.

8  Q.   Was there an interview process?

9  A.   Yes.  He stated that he would like me to interview for the

10  network engineering position.

11  Q.   Did you, in fact, interview?

12  A.   Yes, I did.

13  Q.   Who did you interview with?

14  A.   I interviewed with the owner of Linode, Chris Aker; the

15  chief operating officer, Tom Asaro; network engineer, Andrew

16  Dampf; and network engineer, Alex Forrester.

17  Q.   Was that in person, over the phone?

18  A.   That was in person in Galloway, New Jersey.

19  Q.   Galloway, New Jersey was -- what was that back then?

20  A.   That was Linode's headquarters, their office.

21  Q.   So after that interview, did you receive a phone call or

22  any contact from Linode?

23  A.   Yes, I did.

24  Q.   Tell us about that, please.

25  A.   The next day, Vincent Palochko calls me, stating that my

1  interview went well.  He stated that they would like to have

2  some time to talk to an individual who was on vacation at that

3  time, and it looks good and that they would be reaching back to

4  me when that individual returned.

5  Q.   And did they reach back out to you?

6  A.   Yes, they did.

7  Q.   Who reached back out to you?

8  A.   Vincent Palochko.

9  Q.   And that's the HR person you mentioned?

10  A.   Yes.

11  Q.   And what did he say when he reached back out to you?

12  A.   He offered me a position on behalf of Linode as a network

13  engineer.

14  Q.   Did you guys discuss salary, benefits, things like that?

15  A.   He offered me a position of $115,000 annually.

16  Q.   Did you end up accepting that position?

17  A.   I did, but there was some discussion about benefits, and I

18  asked about stock options.

19  Q.   And what did he say?

20  A.   He stated that we have profit sharing, but they were

21  discussing internally having stock options in the future and

22  that could be an opportunity.  He also offered me benefits as a

23  Christmas bonus each Christmas; contributions to a 401K plan

24  that were independent of my contributions; he offered a cost of

25  living, annual cost of living increases in December, the time

*United States District Court*

1  frame that we would receive them during the Christmas bonus.

2  Q.  Did you tell them that you were interested in an offer?

3  A.  After some negotiations, we came to an agreement of a

4  $120,000 annual salary.

5  Q.  Did that include all those benefits as well that you

6  mentioned?

7  A.  As well as pension plan contribution for the pension plan,

8  and other fringe benefits including health care.  That was what

9  I accepted.

10  Q.  Was there a profit-sharing element of the offer?

11  A.  Yes, an annual profit-sharing contribution.

12      MR. CARSON:  Can we please show the witness Exhibit 8

13  next.

14  BY MR. CARSON:

15  Q.  Carl, just look at the screen and let us know when you see

16  it.

17      When you can, can you please tell the jury what this

18  document is?

19  A.  This is the employment offer letter I received from

20  Linode.

21  Q.  And the date of this offer letter?

22  A.  November 12, 2014.

23  Q.  And just, again, this is the offer letter that you

24  received after that discussion you just mentioned with Vince

25  Palochko?

*United States District Court*

1  A.   Yes.

2         MR. CARSON:  Your Honor, can I please publish this to

3  the jury and ask that it be admitted.

4         MR. CAVALIER:  No objection.

5         THE COURT:  Exhibit 8 will come into evidence.

6         (PLAINTIFF EXHIBIT 8 WAS RECEIVED IN EVIDENCE.)

7  BY MR. CARSON:

8  Q.   And so did you accept this offer?

9  A.   Yes, I did.

10  Q.   And where were you living at that time?

11  A.   Philadelphia.

12  Q.   Did you have to, you know, do anything with regard to

13  where you were living before -- in contemplation that you had

14  just accepted this new job?

15  A.   Yes.  I accepted the job and I didn't want to commute from

16  Philadelphia, so I looked for a place to live in Galloway, New

17  Jersey.

18  Q.   Did you find a place?

19  A.   Yes, I found a house with an individual who's renting

20  rooms and lived there.

21  Q.   And just for the record, do you recall the address of that

22  location?

23  A.   802 Blue Teal Drive, Galloway, New Jersey.

24  Q.   And you said it was someone who was renting rooms.  Who

25  was that, if you recall?

*United States District Court*

1  A.   He was a local attorney.

2  Q.   How many people rented rooms there?

3  A.   Five other individuals were renting rooms, and he and his

4  wife lived in the master bedroom.

5  Q.   Did you know those other people who were renting rooms?

6  A.   No.

7  Q.   So did you, in fact, agree that you were going to be

8  living there after you began your employment at Linode?

9  A.   Yes, I moved there the weekend before I started on Monday

10  at Linode.

11  Q.   And if you recall -- I know it was a long time ago -- do

12  you recall the exact date that you started?

13  A.   November 17, 2014.

14  Q.   Tell us about that first day at work, please.

15  A.   I got up in Galloway and walked to work.  I signed papers.

16  There was another new hire, James Scalia, and we started at the

17  same time.  He was in a different department.  I was asked to

18  -- then shown my office, the network engineering office, that

19  had two other network engineers, and I was asked to get

20  familiar with Linode's data centers and facilitate myself

21  around my job.

22       MR. CARSON:  Can we please show the witness Exhibit 10

23  next.

24  BY MR. CARSON:

25  Q.   Carl, just look at the screen and let us know when you are

1  ready.

2      When you are ready, just kind of please tell the jury what

3  this document is.

4  A.   This is an acknowledgment in receipt of the Linode

5  employee handbook.

6  Q.   And was this one of the documents that -- you signed that,

7  you said you signed some papers that first day.

8      Is that one of those?

9  A.   Yes, yes, it is.

10          MR. CARSON:  Your Honor, can I request that this

11  document be admitted as Exhibit 10.

12          MR. CAVALIER:  No objection.

13          THE COURT:  Exhibit 10 will come in.

14          (PLAINTIFF EXHIBIT 10 WAS RECEIVED IN EVIDENCE.)

15  BY MR. CARSON:

16  Q.   And you said this is an acknowledgment of an employee

17  handbook.

18          MR. CARSON:  Can we please show the witness Document

19  No. 33, I believe.  Let me just get there.  33, sorry.

20  BY MR. CARSON:

21  Q.   Carl, when you are ready, just can you please explain to

22  the jury what this document is.

23  A.   This is the employee handbook contact.

24  Q.   And was this the handbook that you were acknowledging in

25  that document we just looked at?

*United States District Court*

1  A.   Yes.

2  Q.   And did you receive a copy of this employee handbook, if

3  you recall, before you signed that document on that first day?

4  A.   I was given a copy of the handbook, paper was presented to

5  me to sign.

6  Q.   And it looks like this employee handbook is dated

7  October 1, 2014.  Do you see that?

8  A.   Yes, I do.

9       MR. CARSON:  Your Honor, can I request that this

10  document be admitted as Exhibit 33.

11       MR. CAVALIER:  No objection.

12       THE COURT:  All right.  Exhibit 33 will come in.

13       (PLAINTIFF EXHIBIT 33 WAS RECEIVED IN EVIDENCE.)

14  BY MR. CARSON:

15  Q.   So you were saying that the first day you were acclimating

16  yourself to the data center.

17       Can you kind of just briefly let the jury know what a data

18  center is?

19  A.   A data center is where, from the context of Linode, Linode

20  would rent space at various -- at that time, independent data

21  centers around the world.  And we would -- Linode would have

22  their -- both servers and networking equipment, computer

23  servers and networking equipment hosted there.

24  Q.   And just -- I know it's a long time ago, but do you recall

25  where the data centers were or how many there were at that

*United States District Court*

1  time?

2  A.   There were four spread across the United States, one in

3  London and one in Tokyo.  And when I arrived, we were tasked

4  with standing up the data center in Singapore in December of

5  2014, and another one in Frankfurt within six months of my

6  employment.

7  Q.   That one in Frankfurt, that's a data center set up after

8  you began your employment?

9  A.   Yes, the first year.

10  Q.   So going back to when you first started at Linode in

11  November of 2014, so what location were you going to every day?

12  A.   The Galloway, New Jersey office.

13  Q.   And were you assigned to a specific department at Linode?

14  A.   Yes.

15  Q.   What was the name of that department?

16  A.   The network engineering department.

17  Q.   And how many people were in that department at that time

18  when you first started?

19  A.   Three of us.  Two others before I started.

20  Q.   Do you recall their names?

21  A.   Andrew Dampf, and Alex Forrester.

22  Q.   Did you have a supervisor back then?

23  A.   Yes.

24  Q.   What was his name?

25  A.   Tom Asaro.

*United States District Court*

1  Q.   And what was his position?

2  A.   Chief operating officer.

3  Q.   So let's just kind of -- in those early, early days when

4  you worked at Linode in 2014, the first year, did anything

5  happen to you that concerned you regarding the reason we're

6  here today -- let's keep it to your age claim.

7       Did anything happen to you regarding your age?

8  A.   From what I recall, the first time that I realized that

9  age, my age was an issue with other people I work with is when

10  I overheard Andrew Dampf, another network engineer, express his

11  disappointment in hiring me.

12  Q.   What did he say?

13  A.   He stated that if we didn't hire Carl, we could have hired

14  a younger superstar instead of me.

15  Q.   Who was he talking to?

16  A.   He was talking to Alex Forrester in the room.

17  Q.   And you could hear him?

18  A.   Yes.  I was located in that room.

19  Q.   Was there anyone else at Linode at that time that you

20  recall was in their 50s or older?

21  A.   I was 50 at the time and there was another individual who

22  was older than me.

23  Q.   What was his name?

24  A.   Steve Clemens.

25  Q.   And it was just that one other person?

*United States District Court*

1    A.    Yes.

2    Q.    And how many people were employed at Linode at that time?

3    A.    Approximately 60 in 2014-15.

4    Q.    So was there any other times where your age was brought

5    up -- you know, let's keep it in the chronological order, keep

6    it in those early, early days.

7    A.    From what I remember is that Andrew Dampf was talking to

8    Alex Forrester, and Andrew said that he was 33.  Alex Forrester

9    stated his age.  I don't remember his exact number he stated,

10   but he was in his 20s.  I remember Andrew Dampf's age that he

11   stated is 33 because that was the age that Jesus was crucified.

12   And I'm a spiritual person and I just remember that age.

13   Q.    And was there anything wrong with that conversation?

14   A.    No, no.  That's just - that's how I was aware of their

15   age.

16   Q.    How about any other issues at the Galloway office where

17   your age became -- you know, was talked about or was an issue?

18   A.    Lisa Brown was an executive administrator to Tom Asaro.

19   By this time, our department, the network engineering

20   department, moved to the other side of the building in the

21   Galloway office with two other departments, the data center

22   operations department and the system administration department.

23   And Lisa Brown was talking to system administration team

24   members and data center operation team members.

25   Q.    What did she say?

*United States District Court*

1    A.    She said that Carl was one of the oldest people at Linode.

2    She stated that my age was 50.

3    Q.    She said your age?

4    A.    Yes.

5    Q.    And you heard her?

6    A.    Yes.

7    Q.    Where were you sitting kind of -- you know, maybe paint a

8    brief picture of where she was, where you are.

9    A.    She was standing towards the middle of the room, to the

10   back.  She was talking loudly and everybody was listening.

11   Q.    How do you know they were listening?

12   A.    Because that's not her office and she came in and was

13   talking loudly.

14   Q.    In terms of what you saw, could you see anything that

15   indicated that --

16   A.    They were -- she began talking to a system administrative

17   engineer and data center operation engineers, and when she was

18   talking there was about 25 people in the room at this time.

19   And she was the executive administrator and talking very loudly

20   and I was listening.

21   Q.    Did you have a problem with her making those comments?

22   A.    I didn't have a problem with people knowing that I was 50.

23   I'm proud to be 50.  I am 59 today and don't have a problem

24   with people knowing.

25         I did not tell Lisa Brown that I was 50 or my age.  Lisa

*United States District Court*

1  Brown had access to HR information and I don't think that Lisa

2  Brown should have been talking about my age.

3  Q.   What did you do?

4  A.   What could I do?  I thought that Lisa Brown, if she knew

5  my age because of working with upper level management, then she

6  should have known it was confidential information and that she

7  should not be sharing it in that manner.

8  Q.   Did you say anything to anyone or what did you do next?

9  A.   I tried to ignore it and went back to my work.

10 Q.   And just ballpark, what time period are we talking about

11 now?

12 A.   2015.

13 Q.   And how many -- just so we can kind of keep an eye on how

14 the department is thriving, so is there still three people in

15 this department?  Has it grown at all by then?

16 A.   There's three network engineers.

17 Q.   And Tom Asaro, he's still the supervisor?

18 A.   Yes.

19 Q.   So what happened next?  Were there any other times where

20 something came up that concerned you regarding your age?

21 A.   Yes.  There were disrespectful comments and condescending

22 -- and I was talked to in a condescending manner.

23 Q.   What do you mean by that?

24 A.   The network engineering team visited our Newark data

25 center in Newark, New Jersey.  Our Newark data center served

*United States District Court*

1    the east coast and the New York City area for our customers.

2    So the network engineers, Andrew Dampf, myself, and Alex

3    Forrester, along with Tom Asaro went to visit the data center.

4    Q.    Who was there that you were visiting?

5    A.    We were visiting the data center and meeting with the

6    company's network operation team.

7    Q.    Who was that?

8    A.    Dan Spataro.

9    Q.    Okay.  Continue.  Sorry.

10   A.    Who later became my manager about a year later.

11   Q.    The same Dan Spataro in this case?

12   A.    Yes.

13   Q.    Where was he working then?

14   A.    He was working at the company named Net Access.  They

15   owned the Newark data center that Linode was its largest

16   customer.

17   Q.    I'm sorry to interrupt you.  Can you just continue with

18   what you were saying about that story?

19   A.    Yes.  We were meeting at a large board room table in the

20   customer briefing room.  Andrew Dampf, who was a network

21   engineer, told me to sit there and listen and not to say a

22   word.

23   Q.    How did he say it?  Just like that or --

24   A.    I felt it was in a condescending -- that comment I felt

25   was in a condescending manner and he was kind of talking down

*United States District Court*

1   to me.

2   Q.   Do you remember the exact words he used?

3   A.   He said, "Sit there and listen, but don't say a word."

4   Q.   Did you have a problem with him saying that?

5   A.   I felt that the comment was condescending.

6   Q.   How did you feel about it other than that?

7   A.   It was disrespectful.  I felt uncomfortable that we could

8   have --

9   Q.   Go ahead.

10  A.   It's like Linode -- my feeling was -- what I felt was that

11  Andrew -- that there were people at Linode such as Andrew that

12  I could have gotten to know better, I could have shared my

13  skillsets with them and help them, as well as me learning from

14  them.  I was open and have always been able to do that.

15  However, I was prejudged based on something that I could not

16  change.

17  Q.   Did you get an opportunity to have that kind of

18  interaction with these people that you were sharing information

19  like that?

20  A.   No, no, I did not.

21  Q.   Can you kind of give the jury an idea of anything else

22  that happened regarding Andrew Dampf and comments about your

23  age, if anything?

24  A.   Yes.  We had an older gentleman in his 50s interview at

25  Linode, the network engineering team.

*United States District Court*

1  Q.  I don't want to interrupt you.  What do you mean
2  "interview"?  I thought you already worked there.
3  A.  We were interviewing candidates.  Linode is always looking
4  for new talent.
5  Q.  Why were you guys doing the interview?
6  A.  We were asked to -- that new candidates, as part of the
7  position, because Linode was growing and we were looking for
8  new talent because we were a high-tech company.
9  Q.  Again, I apologize for interrupting.  Can you continue
10  with what you are saying about Andrew Dampf from that story?
11  A.  Yeah.  Thank you.
12      What happened was that there was an older candidate who
13  was interviewing.  He was in his 50s.  He was older than I was.
14  Andrew Dampf did not know this person before the interview.
15  After the interview, he says he hates that man.  In the meeting
16  he was very aggressive and disrespectful to the older man.  I
17  felt it was awkward in terms of the way that he was questioning
18  this gentleman.
19  Q.  Did he say why he hated him?
20  A.  He did not know this gentleman.  At that time he didn't
21  say anything more than not treating him with respect and --
22  Q.  Did he --
23  A.  He didn't know him and came out and says, "I hate that
24  man."
25  Q.  How did you feel about that?

*United States District Court*

1  A.   I thought that the gentleman was being questioned in a
2  very aggressive manner and I just felt awkward.
3  Q.   Were there any other times where there was like issues
4  that came up with the way Andrew Dampf was treating people?
5  A.   Yes.  We had a second interview.  The gentleman was a deaf
6  person and he was middle aged.
7  Q.   What happened?
8         MR. CAVALIER:  Objection.  Relevance.
9         THE COURT:  I'll allow it.
10 BY MR. CARSON:
11 Q.   Please continue.
12 A.   The deaf person asked to interview through a video
13 conference because of his disability.  So Alex Forrester and
14 Andrew Dampf were laughing, smiling at each other during the
15 meeting, talking to him in a way that wasn't suitable for an
16 interview.
17 Q.   And then what happened after the interview?
18 A.   Alex Forrester came back into our large room, it's about
19 25 people, he had recorded the video conference.
20 Q.   Did you know he was doing that during the interview?
21 A.   No, I did not.
22 Q.   Sorry.  Please continue.
23 A.   He didn't tell anybody he was recording it.
24 Q.   What did he do with that recording?
25 A.   He told everybody to come around in the room and he

1    started playing the recording and laughing and mocking.  And

2    Andrew Dampf came around and was smiling and laughing with

3    everybody else that was in the room.

4    Q.   What were they laughing about?

5    A.   They were laughing the way that he talked.  You could

6    tell --

7    Q.   Sorry.  Go ahead.

8    A.   You could tell he was deaf by the way he talked.

9    Q.   What did you do after that?

10   A.   We had another interview that there were issues at.

11   Q.   Talk about that interview.

12   A.   There was a gentleman who was disparaging the company,

13   spent a significant amount of time disparaging the company that

14   he worked for.

15   Q.   What was he saying?

16   A.   He worked for Lucent, the Bell Labs building, in the IT

17   department up in Northern New Jersey.  He was talking about the

18   main reason he was wanting to leave Lucent, that there were a

19   lot of old co-workers that Lucent -- he specifically stated

20   that Lucent is a place -- this is the Bell Labs, the old Bell

21   Labs building, is a place where old people go to retire.

22        And Andrew Dampf and Alex Forrester were smiling and

23   nodding in agreement and smiling with him and discussing -- the

24   Lucent person was discussing not wanting to work with the older

25   co-workers.  And it was -- they were talking about it and

*United States District Court*

1  nodding and smiling as if they were discussing some kind of

2  joke about it.

3  Q.   So just as far as time, are we still in 2015 or are we

4  getting close to 2016?

5  A.   Yes, we're at the point where Dan Spataro became -- you

6  know, came to Linode.

7  Q.   What was his position when he came to Linode?

8  A.   His position was the manager of the network engineering

9  team.

10  Q.   About when did he -- if you recall, when did he start at

11  Linode?

12  A.   In February.

13  Q.   February of what year?

14  A.   February in 2016.

15  Q.   Did anyone else start around that time period?  I'm sorry.

16  If I don't say, let's assume all the questions are about

17  network engineering departments.

18  A.   Yes.  Owen Conway.

19  Q.   Do you recall how Owen Conway interviewed or who he

20  interviewed with?

21  A.   He interviewed with Alex Forrester, myself, and Andrew

22  Dampf.

23  Q.   Was that before or after Dan Spataro started?

24  A.   It was before.

25  Q.   Okay.  And so I think you said that Dan Spataro started at

*United States District Court*

1  Linode around February 2016, was it?

2  A.  Yes.

3  Q.  And when he started, can you kind of describe for the jury

4  how that changed the -- you know, the hierarchy and management

5  of networking engineering?

6  A.  So we have at the lowest the network engineers, that was

7  myself, Andrew Dampf, and Alex Forrester reporting to Dan

8  Spataro; and Dan Spataro reporting to Tom Asaro, the chief

9  operating officer; and Tom reporting to Chris Aker, the owner.

10 Q.  And when Dan Spataro first started at Linode, can you

11 explain to the jury what you were thinking, you thought about

12 that?

13 A.  I was optimistic about there being a manager of the

14 network engineering department.

15 Q.  Why?

16 A.  Because I thought it would address or be a solution to

17 some of the inappropriate conduct that I felt uncomfortable

18 with.

19 Q.  And did you talk to Dan Spataro about any of that?  Any of

20 those things -- you know, let's keep it for the first month

21 when he began working at Linode.

22 A.  Yes.  I went to Dan Spataro and asked him for help and

23 told him about the three interviews.

24 Q.  What did he say?

25 A.  There was also the topic of Owen Conway's comment that I

*United States District Court*

1  brought up at the time as well.

2  Q.  What's Owen Conway's comment?

3  A.  Owen Conway started roughly the same time, and we were in

4  the Galloway office in that room.  And I was sitting at my

5  desk, and Owen Conway was sitting at a desk nearby.  Owen

6  Conway asked me what my age was.

7  Q.  What did you say?

8  A.  Well, it was out of the blue.  And I said, "Why do you

9  want to know?"

10  Q.  Did he respond?

11  A.  He said, "Just tell me your age."  And I asked again, "Why

12  do you want to know?"

13       And after a minute of this going back and forth, during

14  this time he was -- his voice was getting very loud.  The tone

15  of his voice was aggressive and it was making me feel

16  uncomfortable.

17  Q.  How did that situation end?

18  A.  After he left the room, another data center engineer said

19  to me, "That is weird."

20       And --

21  Q.  And so --

22  A.  -- I didn't know where this was coming from.

23  Q.  I think you brought that up, you said that was something

24  you also spoke to Dan Spataro about?

25  A.  I did speak to Dan Spataro about the three interviews and

1  Owen Conway at the same time.

2  Q.   And what did he say?  How did he receive that information?

3  A.   He says that this is typical work environment.  He said

4  that this is -- well, when I mentioned discrimination in terms

5  of discriminatory comments, he said it wasn't discrimination.

6  It was a typical work environment and not to worry about it.

7  Q.   How did he seem in terms of -- I don't want you to tell me

8  what he was thinking or anything, but what you could see.  How

9  did he kind of receive that information in terms of his

10  attitude?

11  A.   He just seemed inpatient with me going over this with him.

12  The word that he used was "typical."

13  Q.   So right now in time, we are in what year?

14  A.   From February of 2016 to March.  We're into March of 2016.

15  Q.   And where are you located still or at?

16  A.   The Galloway office.

17  Q.   And so just to keep an eye on how the department was

18  growing, how many people were in the department at this time?

19  A.   There were Andrew Dampf, Alex Forrester, myself.  And Owen

20  Conway came to the Galloway office but spent most of his time

21  now, thereafter in the Haddonfield office.

22  Q.   And then the manager was Dan Spataro?

23  A.   Dan Spataro.

24  Q.   So I counted five, one, two, three, four -- five people at

25  that time?

*United States District Court*

1  A.  Yes.

2  Q.  And so what do you recall next about, you know, in that

3  time period and the issues and the reasons we're here, you know

4  comments about age?  What happened next?

5  A.  At some point, in 2018.

6  Q.  Let's stay in '16 for now.

7  A.  Oh, '16.  Excuse me.

8  Q.  So as far as -- unless there wasn't anything else.  So in

9  2016, was there any other issues that you had, you know, maybe

10  things that Dan Spataro said or anybody else in the department?

11  A.  During 2016, Tom Duff was hired in August of 2016.

12  Q.  And that would make the department six people?

13  A.  Yes.  And Tim Kaufmann was hired as a senior network

14  engineer sometime in November of 2016.

15  Q.  So back in the Galloway office, were there any issues

16  involving comments about age and Dan Spataro?

17  A.  When I had gone to Dan with those comments, I was no

18  longer part of the interview team.

19  Q.  What was that about?

20  A.  Dan said that, "You don't need to interview the candidates

21  when we were interviewing candidates."

22      Andrew Dampf and Alex Forrester, for example, interviewed

23  Tom Duff and other candidates that we were looking at.

24  Q.  After you went to Dan Spataro with those comments about

25  the interviews and the things Owen Conway said, did you ever

*United States District Court*

 1  interview people again?

 2  A.   No.   Between 2014 until I mentioned those comments to Dan

 3  I was never part of the interview team, and I felt excluded.

 4  At some point, I mentioned to Dan, and Dan said, "We don't need

 5  you in the interview teams."

 6       This was a little later when I talked to him about it.

 7  Q.   So just to give the jury an idea, though, so you went to

 8  Dan around March 2016, I think you said; is that correct?

 9  A.   Yes.

10  Q.   And that was right after he started working there?

11  A.   Yes.

12  Q.   And so between the time you started in 2014 and 2016, were

13  you involved in those interviews?

14  A.   Yes.

15  Q.   How often would you do them?

16  A.   We would do them at least twice a month.   It came in

17  spurts, sometimes where we would interview people more often,

18  and then maybe some people just once during that.

19  Q.   And so then Dan Spataro starts working.   You go to him

20  with those comments, and then after that, did you ever

21  interview anyone?

22  A.   No, never again.

23  Q.   And Dan Spataro, did he say why?

24  A.   Yes.   He said I would look at things -- I would always try

25  to find discrimination.

*United States District Court*

1  Q.  Okay.  So we're kind of in '16 now.  So is there anything

2  that happened in 2016 -- and I guess that's kind of the middle

3  of 2016 and the beginning of 2017 regarding Linode and how the

4  company was progressing?

5  A.  The company was progressing.  We were growing.  When...

6  Q.  Were you still at the Galloway office at the time?

7  A.  Yes.

8  Q.  Did that change at some point?

9  A.  I was at the Galloway office.  It was at this time that

10 Owen Conway was promoted to senior network engineer, sometime

11 in early 2017, after one year.

12 Q.  That's the Owen Conway that had just been hired?

13 A.  Yes.

14 Q.  How long -- so he'd been with the company for one year?

15 A.  He was at the company for one year.

16 Q.  And he was promoted to what position?

17 A.  Senior network engineer.

18 Q.  Was there any --

19 A.  He was much younger than I, and I had more experience than

20 he did in terms of my network background.

21 Q.  Did Linode let the department know that a position for

22 senior network engineer had come up?

23 A.  No.  I only found out about the promotion after Owen

24 Conway was promoted to senior network engineer.

25 Q.  So I'll circle back around to that.  At some point, did

*United States District Court*

1  you stay at the Galloway office or at some point did you move

2  to another office?

3  A.   It was announced that -- let's see.  It was announced

4  in -- sometime in 2017.  I think it was around September.

5  Chris Akers got on a company video conference and stated that

6  they were going to close the Galloway office and we would move

7  to Philadelphia and gave a rough time frame for that and asked

8  us to, as many as we could, if we would be willing to move to

9  the Haddonfield office as an intern.

10  Q.   And do you recall when you moved to the Haddonfield

11  office?

12  A.   September, mid September of 2015.

13        MR. CARSON:  And I would like to show the witness

14  Exhibit 18 next, please.

15        THE WITNESS:  Excuse me.  Sorry.  Mid September of

16  2017.

17  BY MR. CARSON:

18  Q.   Sorry.  I didn't catch that.  Thank you.

19  A.   Yeah.

20  Q.   Carl, when you can see what's on the screen, just let us

21  know.

22  A.   Yes, I can see it.

23  Q.   What is this document?

24  A.   This is to Vincent and Chad Lewis, who is our IT

25  department person at the time.

*United States District Court*

1  Q.  Does this refresh your recollection of the exact day --

2  what your last day of the Galloway office was and when you

3  moved to the Haddonfield office?

4  A.  Yes.  I was going to be scheduled to go to the Haddonfield

5  office on September 22nd.

6  Q.  And -- and who did you send -- is this an email that you

7  wrote?

8  A.  Yes.

9  Q.  And who did you send it to?

10 A.  Vincent Palochko and Chad Lewis.

11 Q.  Sorry.  Who is Chad Lewis?

12 A.  He was an IT --

13 Q.  At Linode?

14 A.  -- manager at Linode.  He was a one-person team.

15        MR. CARSON:  Your Honor, I'd like to ask that

16 Exhibit 18 be admitted and published to the jury.

17        MR. CAVALIER:  No objection.

18        THE COURT:  18 will come in.

19        (PLAINTIFF EXHIBIT 18 WAS RECEIVED IN EVIDENCE.)

20 BY MR. CARSON:

21 Q.  So this document says that -- it looks -- why don't I just

22 ask you.  Can you just read the part where it says the day that

23 you're going to be moving to the Galloway office?  Can you just

24 read that sentence, please?

25 A.  "Thursday is my last day here at the Galloway office as

*United States District Court*

1  I'm physically moving Friday to a new house there in

2  Haddonfield.  Then I go to Lisbon for a European hearing forum,

3  where I will be making a presentation for Linode and will be

4  back at the Haddonfield office on Friday, September 22nd."

5       And this was in 2017.

6  Q.  And why did you send this email?

7  A.  I sent the email so that my office would be located in

8  the -- where I'd be sitting inside the network engineering room

9  that they have that I was aware of.

10 Q.  The first sentence says, "If no one is sitting permanently

11 next to Dan, I heard that Michael sits temporarily there a

12 couple days.  I would like to respectfully request that that

13 seat..."

14      So what was that?  There was a seat you wanted there?

15 A.  Yes.  There was a seat.  I wanted to make sure I got a

16 seat, and I was told that there was a seat that was open next

17 to Dan.

18 Q.  We heard in Mr. Cavalier's opening a promise that the jury

19 is going to see all kinds of complaints, including a complaint

20 about moving a desk or a seat.  Do you know if this was what he

21 was talking about or was there some other time that you asked

22 to move a desk or a seat that you recall?

23 A.  This was an email that I sent.

24 Q.  Were you complaining to anyone in this email,

25 Mr. Williams?

*United States District Court*

1  A.   No, I wasn't complaining.

2  Q.   Were you angry or upset or expressing any kind of a

3  disappointment or anything like that?

4  A.   No.  These are email messages.

5  Q.   Well, you just wanted to have a seat somewhere?

6  A.   Yes.

7  Q.   At the new office?

8  A.   Yes.

9  Q.   And you weren't going to be there.  So you were sending an

10  email in advance?

11  A.   Yes, especially since I was going to go on a business

12  trip.

13  Q.   So did you have to do anything as far as where you were

14  living after that move to the Haddonfield office?

15  A.   Yes.

16  Q.   What did you do?

17  A.   So I wouldn't have to commute, I moved to Haddonfield

18  within walking distance of the office.

19  Q.   And when did you actually move into that new place in

20  Haddonfield?

21  A.   I believe it was September 17th that I signed my lease for

22  the house.

23  Q.   And was that before your first day at the new office in

24  Haddonfield?

25  A.   Yes.

*United States District Court*

1  Q.  So now we're at the new office in Haddonfield, and it's

2  2017, is it?

3  A.  Yes.

4  Q.  And can you just kind of describe for the jury, you know,

5  the networking engineering department over there, where you

6  were located, things like that?

7  A.  When we were in Haddonfield, the early birds were Andrew

8  Dampf, Owen Conway, and myself.  Dan Spataro, Tim Kaufmann and,

9  later, Adam Rambo, tended to come in mid after -- mid-morning

10  to late morning, and that was kind of the work style.

11      We had approximately five office -- five desks in this

12  room and a couch out in the front.  And Tom Duff, when he was

13  hired, he tended to sit out on the couch or in one of the empty

14  desks, if there was one.

15  Q.  And I think you mentioned someone by the name of Tim

16  Kaufmann, and I think we skipped him.  So let's go back and let

17  the jury know who that is.

18      Who is Tim Kaufmann?

19  A.  Tim Kaufmann was a network engineer hired in

20  November 2016.  He was hired as a senior network engineer, and

21  it was announced that he was being hired as a senior network

22  engineer.  I only found out when the announcement happened.  I

23  didn't know that he was being hired.

24  Q.  So there was some new names, I think.  So let's kind of --

25  so by this point, and let's say by the time you got to the

*United States District Court*

1  Haddonfield office, how many people in the networking

2  engineering department are there now?  Approximately?

3  A.  Haddonfield, there was...

4  Q.  Tim Kaufmann was there?

5  A.  Tim Kaufmann.

6  Q.  You were there?

7  A.  I was there.

8  Q.  Owen Conway?

9  A.  Owen Conway was there.

10  Q.  Was Andrew Dampf still there?

11  A.  Andrew Dampf was sitting there, yes.

12  Q.  And Dan Spataro was still the supervisor?

13  A.  Dan Spataro was supervisor.  Tom Duff split his time and

14  would regularly visit us at Haddonfield, but he stayed longer

15  at the Galloway office due to where his residence was.

16  Q.  So seven or eight people in the department?

17  A.  Yes.  By this time, Alex Forrester was no longer working

18  at Linode.

19  Q.  Okay.  So now you're at the Haddonfield office.  And so

20  the corporate hierarchy is still what you said before?  Is it

21  network engineers and then is it Dan Spataro and Tom Asaro and

22  Chris Akers at that time?

23  A.  Yes.  That was at the Haddonfield office.

24  Q.  So did anything concerning happen at the Haddonfield

25  office regarding your age claim?

*United States District Court*

1  A.   That brings me up, my memory, to Andrew Dampf.  Because

2  Andrew Dampf made it a point to kick my chair, and he, similar

3  to the way that he treated the older gentleman during the

4  interview, he yelled at me in front of other employees, and he

5  treated me with ridicule.

6  Q.   Was that discrimination or --

7          MR. CAVALIER:  Object to form.

8          THE COURT:  Sustained.

9  BY MR. CARSON:

10 Q.   So how did you feel about that?

11 A.   I felt that I was being treated differently than other

12 employees.  Andrew Dampf was often ridicule -- often ridiculed

13 me and disrespectful.

14 Q.   What about Dan Spataro?  So I think I read in the last

15 exhibit that you were close to his desk?

16 A.   Yes.

17 Q.   Can you kind of just describe where you were or where he

18 was in terms of where you sat at work?

19 A.   I would face the wall on one side, and if Dan was sitting

20 at his desk, his back and my back would be to each other.

21 Q.   And did -- were there any issues that came up regarding

22 your age and Dan Spataro at the Haddonfield office around this

23 time?

24 A.   At this time, there was a project called The NextGen

25 Network Project.  The NextGen Network Project is a fancy

*United States District Court*

1  project term to, basically, describe a new innovation,

2  improvements within our network.  And it was a project.

3  Q.   What happened with that project?  I asked you about Dan

4  Spataro concerning comments, and your brought that up.  Why?

5  A.   I was sitting at my desk.  And Dan Spataro is talking, and

6  he was talking initially about himself, his -- related to his

7  age.  And he was surprised that he was able to get the design

8  of this, at his age, done.  I had asked if I could be part of

9  that project.

10  Q.   What did he say to that?

11  A.   He said that, "This project is not for you."  He said --

12  when I asked -- when I discussed why, he said that, "You're too

13  old to have the technical chops to do this project."

14       I felt disappointed with him because I was trying to be

15  like the other engineers.  He included Andrew Dampf and Adam

16  Rambo and treated them differently.

17  Q.   Technically, were -- can you let the jury know technically

18  your skills versus, like, their skills?

19  A.   Yes.  I told him I was working at Comcast doing network

20  architecture and how long I had been doing network engineering.

21  And he said, "You're not a real network engineer."

22       I didn't know what he meant by you're not a real network

23  engineer.  I explained to him my background and my experience,

24  in case he didn't know it, and I realized at that time that my

25  optimism of having a manager to have oversight over this kind

1  of conduct was not going to happen, and I just went back to

2  work.

3      I wanted to get along with Dan.  He was -- I wanted to

4  have a good rapport, and I focused on my other tasks that were

5  assigned to me and continued to work.

6  Q.  Did you -- I'm sorry to interrupt.  Did you do anything to

7  ask him or let him know that you were still interested in

8  trying to help with that NextGen Project?

9  A.  Within those weeks, I asked to see the design document on

10 a number of occasions.  I never received it through our

11 collaboration system.  He had it open on his display, but would

12 not provide it to me when I asked.

13 Q.  How did you feel about that?

14 A.  He ignored my requests for giving it to me.

15 Q.  Sorry to interrupt you.  How did you feel about that?

16 A.  Excluded.  That's how I felt.  Because he, Mr. Spataro,

17 would routinely share that information with other employees.

18 In fact, I was not on The NextGen Project Slack thread that

19 they had.  There was a special Slack thread.

20 Q.  Who was on that Slack thread?

21 A.  All of the network engineers.

22 Q.  The entire department?

23 A.  Yes.

24 Q.  Was Tom Asaro on it?

25 A.  I don't know if Tom Asaro was on The NextGen thread.

*United States District Court*

1  Q.   But the entire networking engineering department was?

2  A.   There was a network engineering thread, operation team

3  thread, that all the network engineers as well as Tom Asaro and

4  Dan Spataro were on.

5  Q.   But The NextGen one that you said, did you say that the

6  entire networking engineering department was on that thread?

7  A.   Yes.

8  Q.   But you weren't?

9  A.   I was not.

10 Q.   So you were the only person on the network engineering

11 team that wasn't on that thread?

12 A.   I wasn't, and I didn't find out that such a thread existed

13 until later.  And I asked a junior engineer, I heard him

14 talking.  I says, can you add me to that thread?  Because in

15 order to add you, someone in that thread has to add you.

16      So he added me, and I was on there for a small period of

17 time, and I was removed then.

18      When I asked this person who removed me, he said Andrew

19 Dampf told him to remove me.

20 Q.   You said that Dan Spataro said to you, "You're not a real

21 network engineer"?

22 A.   Yes.

23 Q.   Did you respond to that comment?

24 A.   I had given him my background many times and -- and I

25 routinely talked about my company that I worked for a number of

*United States District Court*

1  times, but there was one instance that I talked about Sun

2  Microsystems, that I worked there for a decade, and that I had

3  12 patents granted to me.

4      And when I posted things about Sun Microsystems, because

5  Dan would post about his previous company at Access, he said,

6  "Stop posting things about Sun Microsystems."

7      But others were allowed to post things about their

8  companies.

9  Q.  Was there any other issues with Dan Spataro -- were there

10  any other issues with Dan Spataro around that time period?

11  A.  Well, I went to him about the promotion of Owen Conway.

12  Q.  What did you say?

13  A.  I told him that I had been here longer and did not know

14  that a position of senior network engineer was open.  And I was

15  not even aware that Owen Conway was going to be promoted until

16  after the promotion through an email that was sent to the

17  entire company by Dan.

18  Q.  Did Dan respond to those comments?

19  A.  He said that he can promote anyone that he wants, that he

20  doesn't have to tell me, and that I'm not even up for a

21  promotion.

22      And I also went to Tom Asaro about it.  He said it was

23  Dan's decision and that we don't have to announce for everybody

24  promotions that we do, and the decision is Dan's and to talk to

25  Dan, which --

1  Q.  Did Owen Conway have a master's degree?

2  A.  No, he did not.

3  Q.  Kind of let the jury know what his experience was compared

4  to yours, if you know?

5  A.  His experience was significantly less than mine.  I had

6  interviewed him.  I had a large deep experience.

7  Q.  How many years had you been working in networking by that

8  point?

9  A.  Let's see, 1987, and this was 2017.

10  Q.  Is that 30 years?  '87, '97, '07, '17 -- 30 years?

11  A.  Yeah.  30 years.

12  Q.  And comparatively, do you know how many years Dan -- Owen

13  Conway had been working in network engineering?

14  A.  I know that he worked for Lynx, and that was his primary

15  job in London.  It was significantly less than mine from my

16  interview with him.

17  Q.  Did you have any problem with him getting a promotion,

18  generally?

19  A.  I had no problems with Owen Conway receiving a senior

20  network engineering title and position.

21  Q.  What was the issue, then?

22  A.  The issue was that there was no announcement that a

23  position was available for senior network engineer, and I was

24  disappointed because I was, on one hand, happy for Owen but, on

25  the other hand, I had been there since 2014.  This is 2017, and

*United States District Court*

1  this is a second person who was promoted to senior network

2  engineer.

3  Q.   What were you looking for when you were making those

4  comments?  Were you asking for a promotion?  Were you asking

5  for something else?

6  A.   I was asking to be considered for advancement and --

7  Q.   What -- what did they say?  What did Dan Spataro say

8  specifically?

9  A.   Dan Spataro said that I did not have -- he routinely said

10  I did not have the technical chops and that I was too old to do

11  certain jobs.  And a senior network engineer needed to have

12  some experience that they thought that the younger engineers

13  have.

14  Q.   Comparatively, did Owen Conway's technical chops -- I

15  don't want who's better -- but was he technically more advanced

16  than you in network engineering?

17          MR. CAVALIER:  Object.

18  BY MR. CARSON:

19  Q.   If you know?

20          THE COURT:  Sorry.  Hold on.  There's an objection.

21  Objection is sustained.

22  BY MR. CARSON:

23  Q.   Are you aware of -- did you ever have the opportunity to

24  see Owen Conway's technical skills in network engineering?

25  A.   Yes.

*United States District Court*

 1  Q.  And did you think that he was technically more advanced

 2  than you?

 3          MR. CAVALIER:  Same objection.

 4          THE COURT:  The objection is overruled.

 5          THE WITNESS:  Owen Conway, during his first year,

 6  worked on customer support tickets.  I already had been doing

 7  that plus way more.

 8          I also developed and told Dan that I developed a

 9  strategy for obtaining IP addressees for Linode.

10  BY MR. CARSON:

11  Q.  What are IP addressees?

12  A.  IP addressees are a requirement for creating the product,

13  the virtual product, that Linode sells.  We sell virtual

14  servers.

15  Q.  So what's the issue with IP addresses that companies have?

16  A.  The issue with IP addressees is that there's a limited

17  number of them.

18  Q.  Why?

19  A.  The way that the protocol is designed.

20  Q.  I don't want to get too technical because I don't even

21  know what you're talking about half the time when it gets to

22  the technical stuff.  But can you just kind of describe

23  technically why there's a limited number?

24  A.  There's a limited number due to the way that the protocol

25  is designed.  But that limited the number to approximately 4.2,

*United States District Court*

1  4.3 billion total for all servers and providers around the

2  world to use at the time Vint Cerf, who was the founder of the

3  internet, because I had worked with Vince on IPv6, the next

4  generation.  But we still really deploy the IPv4.

5  Q.  So after those set amount get used, would there ever be

6  anymore?

7  A.  No.

8  Q.  So is there a value ascribed to these IP addresses?

9  A.  Yes.  There's a fixed value assigned depending on that

10  moment in time.

11      As you run out of IP addressees, the different registries

12  where we would petition to obtain them, when the exhaustion was

13  happening for ARIN, the American registry that Linode would go

14  to for North America, those IP addressees, when they ran out,

15  there would be no more, and you would have to purchase them on

16  the black market.

17  Q.  So you said that there's a strategy that you helped with

18  around this time.  Just kind of briefly let the jury know what

19  that is.

20  A.  When I worked at Comcast, as I said, I worked on IPv6,

21  which was the new version that hasn't been widely deployed yet.

22  And Comcast had -- and it's published on ARIN because they had

23  petitioned ARIN to help with that practice policy in place.

24  And I based the strategy, the practice --

25  Q.  You don't have to get too into the strategy.  What did you

*United States District Court*

1  do for Linode?

2  A.   I was able to acquire, before they ran out of IP

3  addressees, while I was working at Linode, when it was

4  exhausted, 230,000 IP addressees.

5  Q.   What was that worth?

6  A.   At the time -- that's a fixed value, and at the time, a

7  year after my employment, at the time of the act of my

8  purchase, they were valued at $15 million.

9  Q.   That 15 million was part of that purchase?

10  A.   Yes.  It was assets sold dollar for dollar.

11  Q.   Did anyone help you with that strategy, was that you or --

12  A.   That was my strategy, and it was implemented before Dan

13  Spataro came.

14      Prior, Tom Asaro purchased, in November of 2014, December

15  of 2014, purchased, on the black market, IP addressees for a

16  half million dollars, just so that we could open the Singapore

17  data center.

18  Q.   So these IP addressees are crucial to Linode's business?

19  A.   Without an IP address, a Linode could not be created.  A

20  Linode is a virtual machine.

21  Q.   Before we move on, do you know how old Owen Conway was,

22  the person you said was promoted to senior network engineer?

23  A.   He was much lower than me in age.

24  Q.   As far as -- we're making good time --

25          THE COURT:  If we're pivoting, why don't we use that

1    as a chance for our morning break.

2              Folks, we're going to take our mid-morning break.

3    We'll call it 10 minutes or so.  Try to be ready to come back

4    in about 10 after 11:00.

5              And again, just caution you, if you're going to be in

6    the backroom, it's not the time to start talking about the

7    testimony you're hearing, the impression of the witnesses, or

8    anything like that.  You should talk about something else, and

9    then there will be an occasion in the future to talk about the

10   case.  Okay?  Thanks.

11             THE COURTROOM DEPUTY:  All rise.

12             (Jury exits the courtroom at 11:00 a.m.)

13             THE COURT:  Okay.  Take 10 minutes.  Thanks,

14   everybody.

15             (Brief recess from 11:00 a.m. to 11:16 a.m.)

16             THE COURTROOM DEPUTY:  All rise.

17             THE COURT:  Have a seat.  We'll go ahead and get the

18   jury.

19             MR. CARSON:  Your Honor, can I go back up?

20             THE COURT:  Yeah, go ahead.  And, Mr. Carson, my

21   thought is we'll go to right around 12:30, depending -- you

22   know, within the flow of your examination, and then we'll break

23   for lunch.  Okay?

24             MR. CARSON:  Okay.  That sounds good.

25             THE COURTROOM DEPUTY:  All rise.

*United States District Court*

1          (Jury enters the courtroom at 11:17 a.m.)

2          THE COURT:  Okay.  You can all have a seat.

3          And, Mr. Carson, you can continue whenever you are

4   ready.

5          MR. CARSON:  Thank you, Your Honor.

6   BY MR. CARSON:

7   Q.   So just to kind of recap, the time period that we are in

8   right now I think is - is it 2017?

9   A.   2017.

10   Q.   And the office where you are located now is - currently is

11   within the narrative that you're telling the jury about is

12   still Haddonfield?

13   A.   Haddonfield office in 2017.

14   Q.   And just to kind of let everyone know where things are

15   heading, how long did Linode remain at the Haddonfield office

16   approximately?

17   A.   We moved into the Philadelphia office sometime in March of

18   2018.  The Corn Exchange building turned into the Linode

19   office, and I moved there in -- we all, the entire department,

20   the entire company moved there in March of 2018.

21   Q.   Did you stay in Haddonfield or did you move to

22   Philadelphia when that happened?

23   A.   I stayed in Haddonfield because I had just moved and

24   signed a lease, and I took PATCO into the Philadelphia...

25   Q.   And I think that there were some other changes to the

*United States District Court*

1  makeup of the network engineering.  Were there any other

2  network engineers hired around that time?

3      Let's just say, you know, between the time you were at the

4  Haddonfield office and March of 2018 when you moved to

5  Philadelphia?

6  A.   Yes.

7  Q.   Who was that?

8  A.   Tim Kaufman, of course, was hired.  I believe he was hired

9  in 2017 -- 2016 in Haddonfield; Tom Duff, 2016; 2017 we hired

10 Adam Rambo.

11 Q.   Who is Adam Rambo?

12 A.   He's a network engineer.

13 Q.   How old is he?

14 A.   He was in his 20s.  I think he's still in his 20s

15 four years later.

16 Q.   And who is Ben Ritchey?  Is that somebody?

17 A.   Ben Ritchey was -- he worked in customer support, kind of

18 focused on network customer tickets, and he was promoted as

19 junior network engineer and joined our team when we were in the

20 Philadelphia office.  The other new hire was Joe Kitonga.

21 Q.   Did you guys call -- did you guys like -- did he have a

22 name?

23 A.   We called him Joe because that's his name.

24 Q.   Joe T, I think I heard somebody say?

25 A.   I didn't call him Joe T, but Mr. Spataro would call him

1    Joe T.

2    Q.   So for Joe T, do you remember when he started, what year

3    it was?

4    A.   He started in January of 2018.  Prior to the move to the

5    Philadelphia office, we were in Haddonfield for a short period

6    of time with him.

7    Q.   And just to round it out, it sounded like you said there

8    was also a junior network engineer level position at that time?

9    A.   The first I knew about it was when Ben Ritchey was

10   transferred over and announced --

11   Q.   Right.

12   A.   -- as a junior network engineer.

13   Q.   So there was junior network engineers and there was still

14   network engineers?

15   A.   Network engineers.

16   Q.   And there were senior network engineers?

17   A.   Senior network engineers.

18   Q.   And then there was -- who was the next level up from

19   senior network engineer?

20   A.   The network operation manager, Dan Spataro.

21   Q.   Was there anyone between Dan Spataro and the senior

22   network engineers?  At any point did that change?

23   A.   Eventually Tim Kaufman was promoted in November of 2018 to

24   the network engineering team manager, the network operation

25   team manager.

*United States District Court*

1  Q.   And I know I'm jumping around in time a little bit and

2  we'll get back to the narrative in chronological order.

3      By that point I have the corporate hierarchy -- please let

4  me know if this is correct -- there's junior network engineers,

5  then there's network engineers and senior network engineers,

6  and then there was a manager of the department which was

7  eventually Tim Kaufman, and then Dan Spataro and Tom Asaro and

8  Chris Aker; is that right?

9  A.   Yes.

10  Q.   And by what time was that the hierarchy of the company?

11  So like around when it was Tim Kaufman's promotion to

12  management?

13  A.   Summer of 2018, Dan Spataro was promoted to director of

14  network operations and data center operations and he received

15  two -- he got --

16  Q.   When did you find out that Tim Kaufman was going to be

17  promoted from senior network engineer to manager?

18  A.   After Dan Spataro sent out an email company wide.

19  Q.   Just date, though.  Do you remember the date?

20  A.   November 9, 2018.

21  Q.   So let's just kind of go back to the Haddonfield office

22  for a moment.

23      When you were at the Haddonfield office, did anything else

24  there occur that you would like to tell the jury about before

25  we kind of do the move to Philadelphia?

*United States District Court*

1  A.    There was a Christmas party.

2  Q.    What year would that be?  So was this between Haddonfield

3  and Philadelphia?

4  A.    The Christmas party took place in December of 2017.

5  Q.    And that's three months before you moved to Philadelphia,

6  correct?

7  A.    Yes.

8  Q.    So wait, why did you bring up the Christmas party?

9  A.    Linode rented a wedding venue where they have grand pianos

10  and lots of flowers and decorations.  It was in Philadelphia at

11  the Wellman Place, I think it's something gardens.

12  Q.    What happened there?

13  A.    We had a Christmas party.  It was formal, I wore a suit.

14  Q.    What did the room look like?

15  A.    It was where they usually have weddings and there were

16  very large, round tables with centerpieces.  And there happened

17  to be place mats, place name for your name on the plate.  So it

18  was organized by, you know, departments and people who worked

19  with -- so I went over.

20  Q.    What do you mean by that?  Like, each table was a

21  department or --

22  A.    Yes.  Some tables are very -- some teams, like the

23  customer support team, crossed multiple tables, I think the

24  development team programmers had a few tables and data center

25  operations.

*United States District Court*

1  Q.  Please continue.

2  A.  The network engineering team had a table, so I went over

3  to find my place mat, place card.  And I'm looking around and

4  I'm not seeing it and confused, and one of the other engineers

5  said, "Carl, your table is over there," smiling.  And I was

6  confused about the whole thing because my name wasn't at the

7  table where all the network engineers were.

8      And I went over and sat -- went over to that table, found

9  my name tag and sat there.  And it was full of new programmers

10  I didn't -- you know, Linode was growing and I didn't know any

11  of them.  But I immediately felt hurt and excluded.  The

12  network engineering team are all talking to each other.

13  Q.  Were all of them at that table?

14  A.  Every single one of them were at that table.  And I did

15  not know ahead of time that I was not going to be at that

16  table.  And I was by myself and sat at the other group's table,

17  and no one came over from -- not Dan and not a single person

18  came over and said bring up a chair or Merry Christmas.  And --

19          MR. CARSON:  Your Honor, may I?

20          THE WITNESS:  -- I sat there for an hour, and they are

21  all talking, enjoying themselves.

22  BY MR. CARSON:

23  Q.  What did you do?

24  A.  I quietly left.  The valet person said, "You're leaving so

25  early."  I got in my car and I cried on the way home.

*United States District Court*

1      They didn't even ask to pull a chair over.  They were

2  focused all on talking to each other.

3  Q.  Was anyone else sitting with a group or a department?

4  A.  No.  All departments were sitting where they should be.

5  Perhaps if they told me ahead of time, I could have been

6  prepared.

7  Q.  Was there still room at --

8  A.  I don't know whose decision it was.

9  Q.  Was there room at the networking table for another person?

10  A.  People sometimes got up and they were walking around, I

11  noticed, and no one -- they were talking to even some other

12  people at other tables.  And they sat there and not one time

13  did Dan Spataro come over and wished me a Merry Christmas at

14  that table.  And I think he could have at least said bring your

15  chair over and sit down with us.

16  Q.  Were people having -- was there food and drinks there?

17  A.  Yes.

18  Q.  Did anyone come over and have a drink with you or

19  anything?

20  A.  No, no.  I watched Dan Spataro and Andrew Dampf drinking.

21  I did not have a drink with Andrew or any of those other

22  engineers.

23  Q.  So you're telling that story in the context of this case,

24  which is a discrimination case.  Why?

25  A.  Exclusion.  The mindset --

*United States District Court*

1  Q.   Was there anyone else?

2  A.   -- of prejudging me based on who I am.  I was by myself.

3  I was not with a wife or children.  I was by myself.  And the

4  mindset, the lack of empathy, the lack of understanding of who

5  I am and prejudging me is the -- and based on previous

6  experience that I had that I already testified to, that's how I

7  felt.  And that's how I went into the office all the time.

8  Q.   Was there anyone else in the network engineering

9  department who was 50 years old or older?

10  A.   No.

11  Q.   So you were the oldest person on the team?

12  A.   Yes.

13  Q.   So I think you said it was around the beginning of 2018

14  when Joe Kitonga or Joe T was hired?

15  A.   Joe Kitonga, yes.  As Dan called him, Joe T.

16  Q.   And then around March of 2018 was this move to the

17  headquarters in Philadelphia?

18  A.   March of --

19  Q.   '18?

20  A.   -- 2018.

21  Q.   And I think you testified at one point there were some

22  people working at the Haddonfield office in Gibbsboro -- I'm

23  sorry, Galloway.

24       Once the move to Philadelphia happened, was it still

25  separated like that or was it something else?

*United States District Court*

1  A.   Eventually everybody -- I think for financial reasons they

2  closed those other two offices down.  There may have been --

3  Q.   What about the network engineering department?  Did the

4  entire department move to Philadelphia?

5  A.   The entire engineering department at this time sat in an

6  open space in a particular area in the bank building

7  headquarters of Linode.

8  Q.   And so at that time, by March of 2018, is Alex Forrester

9  still with the company?

10  A.   No.

11  Q.   So Owen Conway, was he there?

12  A.   No.  He left shortly after he was promoted.

13  Q.   Wait.  So he was -- Owen Conway was hired in 2016, was it?

14  A.   Yes.

15  Q.   And he was promoted to senior network engineer in '17?

16  A.   Yes.

17  Q.   And then what, did he just quit or did he get fired, if

18  you know?

19  A.   He left the company with a number of other employees of

20  Linode and arranged it to leave all on the same day and quit.

21  Q.   Do you know why they all left that day?

22  A.   Due to company culture.

23        MR. CAVALIER:  Objection.

24        THE COURT:  Lay a little more foundation, Mr. Carson,

25  if you can.

*United States District Court*

1          MR. CARSON:  Sure.

2  BY MR. CARSON:

3  Q.  So did you talk to any of the people who left before they

4  left?

5  A.  Yes.

6  Q.  Did they tell you that they were going to leave?

7  A.  Yes.  It was well known -- this is the second time it

8  happened, actually.  And Owen Conway was one of those and they

9  had a party and invited other Linode employees to this

10  organized --

11  Q.  And through your experience at Linode at that time and

12  through your discussions and understanding about what was going

13  on, do you have any personal knowledge as to why these six

14  people left there?

15  A.  The culture is what everybody talked about.

16  Q.  I'll continue.  So --

17  A.  Dan Spataro also said that he was upset with Owen for

18  leaving without finishing his project and being part of that

19  organized effort to --

20  Q.  And so --

21  A.  -- to leave on the same day.

22  Q.  Sorry to interrupt.

23       And so were there any other promotions to that senior

24  network engineering position around this time period?

25  A.  In 2000 --

*United States District Court*

1  Q.   So let me be more specific.  So we're in the Philadelphia

2  office now, it's 2018, so let's just kind of talk about that

3  entire 2018 time period.

4       Any other promotions to the senior network engineering

5  position?

6  A.   Senior network engineering position, a promotion was made.

7  Q.   Who?

8  A.   Andrew Dampf.  They never sent out an email announcement

9  on Andrew Dampf's promotion.  I happened to be looking at HR

10 Bamboo, not even looking at promotion, that's just where we go

11 for HR things, and on HR Bamboo has senior network engineer.

12 Q.   Was this after you had that discussion you testified

13 regarding when Owen Conway was promoted to senior network

14 engineer?  This would have been after you talked to Dan Spataro

15 and Tom Asaro about that?

16 A.   Yes, yes.

17 Q.   So this was the next time they promoted somebody to senior

18 network engineer?

19 A.   Yes, it was.

20 Q.   And it wasn't announced?

21 A.   No, that one was not announced.  It was never announced.

22 As I said, that's how I knew about it.  And I went to Andrew

23 Dampf -- excuse me, to Tom Asaro and he -- when I stated that

24 they promoted Andrew Dampf, Andrew Dampf was only there for a

25 year and a half.  I mean, excuse me, for a month and a half

1    before I was there.

2    Q.    Yeah, I was about to say, wasn't Andrew Dampf the person

3    who was there when you first were hired?

4    A.    Yes.  He was there for about a month and a half.  I think

5    he was hired in September he said.  You could see their hire

6    dates on HR Bamboo.

7    Q.    So he was there longer than you by a month and a half?

8    A.    Yes.

9    Q.    And what about his experience prior to Linode, do you have

10   personal knowledge as to that?

11   A.    Yes.

12   Q.    What?

13   A.    He used to talk in the room in Galloway to Alex Forrester

14   about being a car salesman and his experiences at the

15   dealership, especially in 2008 when they had that program.

16   Q.    He was a car salesman before being a network engineer?

17   A.    He said he was a technician at U Penn for two years right

18   before he joined Linode, and prior to that he was a car

19   salesman.

20   Q.    So we're now in 2018.  Let's kind of reorient to the

21   issues that you want to talk to the jury about regarding your

22   age.

23         Were there any times in 2018 when you recall comments

24   about your age?

25   A.    Yes.

*United States District Court*

1  Q.   Just the first one you can think of.

2  A.   When I went to Andrew -- excuse me, Dan Spataro about

3  Andrew Dampf's promotion, I actually went to Tom Asaro first

4  and discussed it with -- it wasn't really a discussion.  When I

5  mentioned it, he visually was not welcoming with his visual

6  face.  And he said we don't -- again, we're not the company

7  that announces promotions and we can do those when we want.

8  And talk to Dan, Dan makes the decisions.

9       So I talked to Dan, and Dan, again, tells me that I am too

10  old to do those tasks.

11  Q.   He said that?

12  A.   Yes.  And he stated that you can do other tasks.  And the

13  other tasks that he was talking about are the tasks that I

14  already was doing.  And I explained a lot more details about my

15  network architecture, exactly what I was doing at Comcast.

16  This was around the time we were working on the NextGen

17  network.  And I really wanted to be part of the NextGen

18  project, especially since I was doing things globally to bring

19  forth to Linode things that would help us for the NextGen

20  project.

21  Q.   Is this the same NextGen project that you were talking

22  about that started in the Haddonfield office?

23  A.   Yes, it started there.  Of course it's our big project.

24  Q.   Just to help the jury understand, what is the NextGen

25  project?  What does that mean?

*United States District Court*

1  A.   The NextGen project we were -- we could not scale in our

2  data centers our network with the number of servers.

3  Technically all the servers were on the same LAN.  It's almost

4  like you're at your house, you have one LAN, one local area

5  network.  And our data center with not just our physical

6  servers, but we had virtual servers, so you would multiply

7  those virtual servers and all that network traffic that has to

8  be distinguished on a single LAN.  You could imagine the

9  scalability problems that we had with the performance

10 issues.

11     And it was looked over from just putting together quickly

12 a data center with servers, and the easiest thing to do

13 initially before I came was to have one LAN.  So there were new

14 techniques and companies who were developing software,

15 proposing different architectures -- I'm keeping it high level

16 -- to implement the NextGen network.

17     In fact, I went to California, which I met with a vendor

18 -- it was an approved business trip -- sent out a Slack message

19 to the network operations team that I was going to this

20 meeting.  I was the one who announced it.  It was approved and

21 I went.  In order to show my efforts to Dan that I could do

22 these things.

23 Q.   Did anything happen on that trip, that vendor event, in

24 California?

25 A.   Lo and behold, Andrew Dampf and Tom Duff show up to the

*United States District Court*

1  meeting.

2  Q.  Did you know they were coming?

3  A.  No.

4  Q.  Did they know you were going to be there?

5  A.  Yes, I announced -- they found out from my announcement

6  about this meeting.

7  Q.  So what happened at the meeting?

8  A.  We were having discussions with the vendor.  And after

9  presentation -- the presentation was done by someone who was

10  very well experienced from Cisco who helped do the

11  presentation.  He was much older than me with, what I thought,

12  more experience than me.

13     After the presentation, during a break, I'm sitting on one

14  side of the room and Andrew Dampf comes in.  And I said,

15  "Wasn't he great with so much experience?"

16     And he said, "Who?  That old man with bladder problems?"

17  Q.  What did you say?

18  A.  The comment wasn't going to get a reaction from me.  I did

19  not react.  It didn't deserve a reaction.

20  Q.  Did anything -- so, I'm sorry, I think you were talking

21  about -- you know, we kind of were jumping around a little bit,

22  but before that you were talking about a conversation that you

23  had with Dan Spataro after Andrew Dampf was promoted, was it?

24  A.  Yes.

25  Q.  Do you want to continue telling the jury about that for a

1  moment?

2  A.   As I said, he said that you did not have the technical

3  jobs that I -- he thought of himself as well, of his own age

4  and doing network architecture, although he did it.  He was

5  surprised that he could do it.  And he said we're going to let

6  the younger engineers do this, that I'm too old to do this, and

7  he stated to me that -- the comment that he made was, "You're

8  not a real network engineer," to my comments and the way he

9  responded to me detailing my more specific experiences at

10  Comcast.

11  Q.   Did you talk to Tom Asaro about that?

12  A.   Yeah.  Before I went to Dan, I stated that was his visual

13  expression, and he didn't seem to want to talk about that and

14  told me what I already testified to.

15  Q.   So again, now I think we're kind of in the middle to the

16  end of 2018ish, and were there any other concerns that you had

17  that you'd like to talk to the jury about before we kind of

18  move forward in time a little more?

19  A.   2018.  Dan Spataro was promoted in the summer of 2018.

20  Q.   To what position?

21  A.   Director.

22  Q.   He was not a director prior to that?

23  A.   No.

24  Q.   And so that promotion to a director position, did it

25  change like, you know, his responsibilities in terms of who he

*United States District Court*

1  was responsible for, who he managed?

2  A.    He managed the data -- this is when he became the director

3  of the title -- it was a long title at this time -- director of

4  network and data center operations.  It was a very long title.

5  Q.    What's data center operations?

6  A.    He got control of the data center team.  They are the ones

7  who evaluate capacity for virtualization, virtual servers on

8  the physical servers.  They actually take care of the shipping,

9  the logistics of servers and much, much more, just to be sure.

10  Q.    When Mr. Spataro was promoted to that director position

11  and also became responsible for the data center, he was still

12  supervising network operations department, network engineers as

13  well?

14  A.    Yes.  That was his title.  And during this time, it was at

15  this time where he needed more help.  It was stated at a

16  meeting that possibly a program manager, Sal, would come over

17  and help, they may be looking for a manager to take care of

18  managing directly the network -- operations network engineering

19  team.

20  Q.    Did you see an opportunity?  Do you think you could help?

21  A.    Right after that meeting, I went up to Tom Asaro, I said

22  that -- I went into his office, I opened the door.  How I got

23  in, whether I peeked in and he let me in -- it was a glass

24  door.  I said that I would like to apply for the network

25  management position.  And he -- I asked him if I could.  He

*United States District Court*

1  said yes, but Dan will be making the decision.

2       There was no like email announcement, Dan was just saying

3  that Sal may be coming over to help.  He didn't mention anybody

4  else's name.

5  Q.  Was there any kind of -- you know, Linode is a tech

6  company.  I imagine in a lot of ways they communicate in an

7  electronic format.  You know, tech messages, Slack messages,

8  company chat.

9       Was there any kind of electronic communication of any sort

10 where it was made known that Linode was looking for help in

11 this regard, managers or people to move up?  Anything like

12 that?

13 A.  No.

14 Q.  So you had this conversation with Tom Asaro.  He said you

15 could apply for the position?

16 A.  Yes.  I asked him can I apply, and he said yes, but Dan

17 will make the decision, talk to Dan.

18 Q.  What did you do next?

19 A.  I talked to Dan.

20 Q.  Tell the jury about that.

21 A.  He said that I am too old to be on a management track, I

22 would never be a manager at Linode.

23 Q.  Did he say anything else?

24 A.  He said that I -- in response to what I said, I was

25 talking about some micro systems and where I was in charge of

*United States District Court*

1  five individuals.  And that during -- while I was a consultant

2  at Comcast, there were two summer interns and a high school

3  student who got to experience Comcast for a month, and I was

4  their mentor.  It's unusual for a contractor, but they

5  considered me an employee essentially at that time.

6  Q.  So that conversation with Dan Spataro, when was that?  Was

7  it around the summer of 2018?

8  A.  Yes.  As soon as he was making those comments, he wasn't,

9  like, inviting.  I just heard it and immediately then wanted to

10 be considered.

11 Q.  You're talking about when he said that he -- at the

12 meeting when he --

13 A.  Yes.  Because he was still running the -- he was the

14 manager of us directly and he was still running the network

15 engineering team meetings each week.

16 Q.  Okay, so he was the team --

17 A.  Yes, he was still running our weekly meetings and that's

18 where --

19 Q.  And then so after that, I think you said first you went to

20 Tom and then you went and spoke to Dan Spataro.

21 A.  Yes.

22 Q.  When you spoke to Dan Spataro, did you raise any concerns

23 about any of the issues that you had experienced up until that

24 point?

25 A.  Yes.  I continued to talk about age and how it's affecting

*United States District Court*

1  people's view of me, and he got short tempered.  He was

2  impatient, maybe is the better word, and said that I'm always

3  looking at things -- where I place the word "discrimination" on

4  everything.

5  Q.  What about -- were you talking to him about opportunities

6  or offering ways to help or anything like that during that

7  meeting as well?

8  A.  I said that I could show him -- he had put two system

9  engineers in charge eventually -- excuse me, the data center

10  engineers, they were all young.  And the oldest one he didn't

11  want to advance at that time.  He made comments to me about

12  Brett Kaplan.

13      MR. CARSON:  Can we show the witness Exhibit 15,

14  please?

15  BY MR. CARSON:

16  Q.  Carl, look at your computer screen, and when you can see

17  that, just let me know.  I'm going to ask you a couple

18  questions about it.

19      But my first question is can you tell the jury what this

20  is?

21  A.  This is a snippet of a Slack thread between myself and Dan

22  Spataro, and this is just a snippet.  The Slack thread runs

23  multiple years, and this is one snippet of that.

24  Q.  One of the things that we heard Mr. Cavalier say in his

25  opening statement is that there was this long thread between

*United States District Court*

1  you and Vince Palochko that the jury is going to see.  Do you

2  remember that?

3  A.  Yes.

4  Q.  So I'm not talking about the exhibit now in front of you.

5  So when he was saying there's this long thread between you and

6  Vince Palochko that the jury is going to see, was that a Slack

7  thread he was talking about, too?

8  A.  He only talked about a Slack thread, John did, during his

9  opening remarks.

10  Q.  Is that Slack, is that what we're talking about?

11  A.  Yes.  Slack is a --

12  Q.  What is Slack?

13  A.  Slack is like a messaging system, as you can see from this

14  snippet.  It was our collaboration messaging system.

15      A thread means a particular thread.  And just like

16  messaging, you can have a team --

17  Q.  Yeah --

18  A.  -- where you have multiple people.

19  Q.  -- if I look at my phone, I have a text message between me

20  and my daughter's mother that goes back 5 years.  That's a

21  thread.  Is that what you're talking about?

22  A.  Yes.  That would be one thread.  If you had your daughter

23  and your mother and your daughter's mother, that would be a

24  separate thread.

25  Q.  That would be a group thread, right?

*United States District Court*

1  A.   Yeah, three people.  And then there were team threads.

2  Q.   Using that as an idea -- as a framework so we understand

3  what we're talking about, this, what we're looking at here,

4  looks like a screenshot from a much longer thread?

5  A.   Yes.

6  Q.   And so did you and Dan Spataro have a thread where just

7  the two of you spoke?

8  A.   Yes.

9  Q.   And is this part of that thread?

10  A.   Yes.  This is a snippet from that thread.

11       MR. CARSON:  Your Honor, could we -- I'm sorry.  Can I

12  please ask this be admitted?

13       MR. CAVALIER:  No objection.

14       THE COURT:  Okay.  Exhibit 15 will be admitted.

15       (PLAINTIFF EXHIBIT 15 WAS RECEIVED IN EVIDENCE.)

16  BY MR. CARSON:

17  Q.   All right.  So in this screenshot of the thread that we

18  have in front of us, Dan Spataro looks like he's talking to you

19  about that conversation you had.  Is that --

20  A.   Yes.

21  Q.   So is this the same conversation that you were saying that

22  you -- when you went to Tom first, Tom Asaro first and then

23  went to Dan Spataro, if you know?

24  A.   We didn't have this topic of conversation, which is being

25  conveyed here.

1  Q.   But, generally, before we get into it --

2  A.   It was right after my discussions that I just testified to

3  about wanting to apply for that position.

4  Q.   So sometime before this was sent, you did have a

5  conversation with Dan Spataro?

6  A.   Yes.  Uh-huh.

7  Q.   And did you receive this after that discussion?

8  A.   Yes.  Yes.  I received this after that discussion.  We

9  didn't -- this -- this was never --

10  Q.   Did Mr. Spataro talk to you during that discussion about a

11  position called manager of interconnection and IP strategy?

12  A.   And IP strategy?

13  Q.   So I'm reading from the first line.  It says, "In regards

14  to our conversation the other day about manager of

15  interconnection and IP strategy versus principal engineer

16  versus network operations manager."

17       So I guess I'm just going to ask this question:  Did you

18  have a conversation with him the other day?  So, you know,

19  let's just say the time period before September 2018, did you

20  have a conversation with Mr. Spataro about these three

21  management or other positions?

22  A.   No.  We didn't have a conversation -- principal network

23  engineer and -- verbally.

24  Q.   What is a principal network engineer?

25  A.   A principal network engineer is an engineer who is above a

*United States District Court*

1  senior network engineer who tends to do a lot of the things

2  that I was doing plus more.

3       For example, the NextGen Operation Project, that person

4  would kind of help lead those efforts as well as other efforts.

5  Q.   Were there any principal network engineers at Linode prior

6  to that?

7  A.   No.  There was -- there was not.

8  Q.   Were there any principal network engineers during your

9  employment after this?

10 A.   No.

11 Q.   Have you ever heard of a principal network engineer at

12 Linode?

13 A.   There was not a principal network engineer at Linode.

14 Q.   Did you discuss that position with Dan Spataro in this

15 meeting that he's referring to?

16 A.   I had mentioned, during one of those meetings, that at

17 Comcast, my manager considered me as a principal network

18 engineer.

19 Q.   So putting aside -- my question is:  Did you and Dan

20 Spataro have this conversation that he's saying that you had?

21 A.   No.  I don't why he was discussing this in a Slack

22 message.

23 Q.   Was there any follow-up to this email?  Did Dan Spataro

24 come to you any time after this in September or October or

25 November of 2018 and say, yeah, I want to follow up on those

*United States District Court*

1  positions that I told you about?

2  A.   No.

3  Q.   Did that happen?

4  A.   Not before December, no.

5  Q.   Yeah.  We're going to talk about December in a minute.

6       But so he sent this email to you about all these

7  opportunities, and then was there anything after that?

8  A.   No.

9  Q.   Was there an email where he said, hey, let's set up a

10 meeting and talk about these things?

11 A.   No.  He's sitting right there in his office.  So I was a

12 bit confused why we're doing personnel things in a Slack

13 message when you're in your office.

14 Q.   Is that -- so your response -- you can read it.  Why don't

15 you just read your response to the jury?

16 A.   Can you move up the thing so...

17 Q.   I'll read it for you.

18      It says, "Hi, Dan.  Personnel issues should never be put

19 in a Slack like this.  That is my knee-jerk reaction to this

20 protracted write up."

21      Right?  You wrote that?

22 A.   Yes.

23 Q.   And just briefly, why did you write that?

24 A.   Because he's right in his office, and I received this

25 Slack.  And he's -- I'm just -- he's thinking that we had some

*United States District Court*

1  long discussion about all of these things or was trying to

2  convey that, and I didn't know why he was doing that.

3  Q.   What did you actually discuss at that meeting?

4  A.   We discussed age discrimination.

5  Q.   And just because you mentioned it, so let's --

6  A.   I wanted to apply for the position.  He was telling me

7  reasons why -- and I told him that I'm not being considered.

8  He told me that I didn't have the technical chops and that was

9  due to my age.

10      And I am saying that I am being viewed in a way that is

11  not who I am.  I have all of this experience.  I was never

12  given a chance when younger network engineers would be given

13  many opportunities to not only learn more, but Dan communicated

14  with them in a different way than he was communicating with me.

15  Q.   So what do you mean by that?  How did he communicate with

16  you versus younger people?

17  A.   A number of times he yelled at me in front of people.

18  Q.   Did he do that to the younger people?

19  A.   No.  No.  I never seen him yell at younger people.  I

20  mean, there were some significant issues where some people, in

21  which I have recorded, should have been disciplined, but they

22  weren't.  He would just raise his voice.

23      There was an example where he's out in the open area

24  outside of his office and some discussion about diversity,

25  because we're in Philadelphia.  And there were many new hires

*United States District Court*

1 who demanded change in the culture and demanded diversity.

2      And Dan said loudly, in front of the entire floor -- I was

3 there in our area where Dan's desk was -- that he doesn't care

4 about diversity.  He only cares if they can get on a router and

5 configure it.

6 Q.  Did you say anything to Dan about that comment?

7 A.  I had stated that, from my journey, that diversity doesn't

8 mean just what is a diverse group of people, women, men, you

9 know, African American.

10      But diversity also means diverse backgrounds that may come

11 along with those individual people and that -- I mentioned a

12 presentation where they say that diversity in the workplace

13 actually improves the bottom line, if they wanted economic

14 reasons.

15      But he just wanted --

16 Q.  What did he say in response to this?

17 A.  He just wanted someone -- his response was always to me.

18 He only wants someone to be able to get on to a router and know

19 how to configure it.

20 Q.  He said the words "I don't care about diversity"?

21 A.  That was his exact words.  There's many other things that

22 came thereafter, but this was the first time because of

23 Philadelphia.

24      We're not in Galloway and we're not in Haddonfield.  We're

25 in Philadelphia, and I worked at Comcast.  And, yes, they have

*United States District Court*

1   a large diversity program, but even when I worked there in

2   2008, before diversity became a focus, it was pretty diverse.

3   And I explained to him, but he didn't need to be explained

4   because he tended to lean towards I'm only interested in

5   someone who can get on a router.  Because his background was he

6   got his CC -- the highest level of certification that you can

7   get.  So he was a top-notch router expert.

8        I was able to steal moments of his time to learn some

9   things that I could have learned a lot more.  I had my

10  director, a distinguished engineer at Comcast, prior, I told

11  him, had both.  And he was able to help me, and he was much

12  younger than me.

13       He not only helped me technically, but he helped me get my

14  certifications, even though I had a master degree.  I had

15  certifications in CCNA I was required to get.  He encouraged me

16  to get those.  And then I had a CCNP switch and a CCNP route

17  certificate.

18  Q.  What are those?

19  A.  Those are industry-wide certifications.  My experience

20  with the certifications were of the distinguished engineer who

21  also had the title of director back then at Comcast and Dan.

22  And Dan had one of the two highest level of CCIE, I believe, or

23  CCIP -- he had a CCIP one, which was the highest one.  They no

24  longer have it.  It's the internet provider.  He said he never

25  maintained it, but, in his mind, he was, and he was, a

*United States District Court*

1    top-notch routing person.

2    Q.    So let me, before we put this exhibit away and go to

3    something else, let me ask you this question:  Doesn't this

4    message that he sent indicate or suggest that he's considering

5    you for some sort of promotion?

6    A.    I don't see this as a promotion because I was doing these

7    things already.

8    Q.    We can talk about this in a little bit.

9         But doesn't it, at least, suggest that, you know, he was

10    talking about these other positions?  Doesn't it suggest that

11    he's, at least, considering you for these other positions?

12    A.    No.  I was already doing those things.

13         MR. CARSON:  Your Honor, I'm about to switch gears and

14    it's 12:10.  Do you want me to keep going a little longer?

15         THE COURT:  Yeah.  Let's keep going.

16         MR. CARSON:  We can put this exhibit down.

17    BY MR. CARSON:

18    Q.    I think around 2018, because it's in September, I thought

19    you said November was when Tim Kaufmann was promoted?

20    A.    Tim Kaufmann was promoted on November 9, 2018.

21    Q.    Why do you remember that date specifically?

22    A.    It was the date that I filed my Philadelphia Human

23    Commission -- the Pennsylvania Human Relations Commission,

24    right after Dan sent out an announcement that the position of

25    network engineering manager was given to Tim Kaufmann.

*United States District Court*

1  Q.   So -- so the reason why you remember that date is because

2  it was the day that you filed a charge at the Pennsylvania

3  Human Relations Commission?

4  A.   Yes.

5       MR. CARSON:   Could we please show the witness

6  Exhibit 34.

7  BY MR. CARSON:

8  Q.   Let us know when you can see it.

9  A.   Yes.

10 Q.   So please tell the jury what this is?

11 A.   This is the form that I filled out when I asked -- when I

12 told the intake officer that I wanted to file an age

13 discrimination charge against Linode.

14 Q.   Sorry.  So you filled this out?

15 A.   Yes.

16 Q.   And did you fill it out -- it looks like it has a stamp on

17 it.  Who put that stamp on it?

18 A.   The intake officer put a stamp on it and gave me a copy.

19 Q.   The intake specialist at the Pennsylvania Human Relations

20 Commission?

21 A.   Yes.  I went directly into the office.

22 Q.   And you said you went there in person?

23 A.   Yes.

24 Q.   And you saw them put this stamp on it?

25 A.   Yes.

*United States District Court*

1  Q.   And you filled this out that day in person?

2  A.   Yes.

3        MR. CARSON:  Your Honor, I'd like to move to admit

4  exhibit -- what is this?  34?  34, please.

5        MR. CAVALIER:  No objection.

6        THE COURT:  Okay.  Exhibit 34 will come into evidence.

7        (PLAINTIFF EXHIBIT 34 WAS RECEIVED IN EVIDENCE.)

8  BY MR. CARSON:

9  Q.   So it looks like there's some black lines on it.  It looks

10 like your address was redacted and your phone number, but -- so

11 we can't see those things.  But everything else that we see

12 here, you wrote those things, correct?

13 A.   Yes.

14 Q.   And so when you went to the Pennsylvania Human Relations

15 Commission that day.  And you --

16        MR. CARSON:  Can we just scroll down so the witness

17 can see Page 2, which is Bates labelled Williams 006.

18 BY MR. CARSON:

19 Q.   So you wrote, "Linode never informed me or gave a reason

20 for not promoting me to the open position of network manager.

21 I asked to apply for the position, but I was never

22 interviewed."

23        Is that what it says?

24 A.   Yes.

25 Q.   And you also, the next -- the next thing that you wrote

*United States District Court*

1  says, "I was waiting to be interviewed for the position

2  according to standards and internal policy and practices.  I

3  was never interviewed and never told I didn't re" -- Carl, can

4  you help me?  What's that word?

5  A.   "I didn't receive the job.  I only heard from the public

6  announcement that another engineer was promoted to the

7  position."

8  Q.   Okay.  And you identified that person as Tim Kaufmann?

9  A.   Tim Kaufmann.

10  Q.   And the next line says, "I am 54 years old.  I wish" --

11  why don't you read it?

12  A.   "I am 54 years old.  I was informed of Tim Kauf -- I was

13  informed Tim" --

14  Q.   It says, "I was informed of Tim Kaufmann last year that he

15  was in his late 30s."

16  A.   Possibly 40, yes.

17  Q.   Or 39, possibly 40 now.  And you were saying 40 now

18  because a year had went by since you heard that, correct?

19  A.   Yes.  He was in or around that age, and I didn't want to

20  put an exact age to get it wrong.

21  Q.   And so you also said, "Tim Kaufmann received a promotion

22  to the position I asked to apply for.  I had seniority over

23  this person and held management positions in my 34-year career,

24  where Tim Kaufmann lacked that."

25  A.   Experience.

*United States District Court*

1   Q.   Experience.  And then the last line, it looks like you ran

2   out of space.  It says, "I can describe details of background,

3   of history, of me being over the age of 50 old -- years old."

4         And then can you tell me what you wrote after that?

5   A.   Of my being over the age of 50 years old was a time

6   that -- I was 50 years old -- was when --

7   Q.   What do you?

8   A.   -- I --

9   Q.   Sorry.

10  A.   Go ahead.

11  Q.   So it says 50 years old.  I can't see what it says after

12  that.  Do you know what you wrote there?

13  A.   "I can describe the details of the background and history

14  of my being over the age of 50 years old and" --

15  Q.   If you don't know --

16  A.   I was trying to convey that of my experience --

17  Q.   So let me ask this question.  What did you mean by you can

18  tell them about the background and the history of your age?

19  What were you trying to say?

20  A.   What happened during my time at Linode and my experience

21  that I had and when they would contact me, I can describe the

22  details through the investigator's -- a potential

23  investigator's inquiry.

24  Q.   And did you understood that there was going to be a

25  further follow-up discussion with someone at the Pennsylvania

*United States District Court*

1  Human Relations Commission?

2  A.   Yes.  I was talking to the intake specialist --

3  Q.   Just your understanding is all --

4  A.   -- during this.  And that's why I was putting that,

5  because they said that an investigator would be assigned, that

6  Linode would receive notification.  And I put Chris Akers'

7  phone number, his personal cell phone number, because I had

8  gone to Tom and Dan multiple times, and I thought I should put

9  Chris Akers' phone number.  And while I was scared, I was

10  hoping that he would help.

11  Q.   So you said you went to Tom and Dan multiple times.  Had

12  that helped anything at all up until this point?

13  A.   No.  No.

14       MR. CARSON:  And can you just scroll down so the

15  witness can see the last thing he wrote in this document before

16  we move on?  Just all the way at the bottom.

17       MS. MEYER:  Sorry.

18  BY MR. CARSON:

19  Q.   Why don't you just read that part?

20  A.   "I can provide supporting documents and background

21  during -- a background that, during an interview Q and A, will

22  show that being over the age of 50 was the reason" --

23  Q.   For not being --

24  A.   "For not promoted to the network management

25  position."

1  Q.   And this was what you provided the Pennsylvania Human

2  Relations Commission on November 7, 2018, correct?

3  A.   Yes.

4  Q.   And so after this, did anything happen at Linode that

5  indicated that what you said in this charge was going to be

6  addressed?

7  A.   We did have a meeting about the charge in December.  I

8  thought it was at the end of November, but I recall it was

9  December because I, on that day, that exact day that we had the

10  conversation, is when I released the charge.

11  Q.   So you said that there was a meeting scheduled.  Where was

12  that meeting held?

13  A.   That meeting was held in the Philadelphia headquarters.

14  Q.   Somebody's office?

15  A.   Yes.  There was an appointment calendar.

16  Q.   Whose office was it?

17  A.   Tom Asaro.

18  Q.   And you were about to say there was an appointment

19  calendar.  What did you mean by that?

20  A.   We had Outlook.  I think we were using Outlook.  Or was it

21  Slack?

22  Q.   Either Outlook or Slack?

23  A.   We had an Outlook calendar.  You can have different

24  individuals on our corporate meetings.

25  Q.   And you can use that tool to schedule meetings?

*United States District Court*

1  A.   Yes.

2  Q.   And the meeting was scheduled to discuss this charge?

3  A.   Yes.

4  Q.   And did that meeting happen?

5  A.   Yes.

6  Q.   And who was at that meeting?

7  A.   Tom Asaro, Dan Spataro, Chris Aker.  Chris Aker was on the

8  appointment, but he was not present in the office.

9  Q.   Okay.  But you attended?

10  A.   Yes.

11  Q.   And what did you discuss during that meeting?

12  A.   We discussed the charge that I filed at the Pennsylvania

13  Human Relations Commission.

14  Q.   What else did you say?  What do you remember hearing?

15  What do you remember saying?

16  A.   I said that I was not interviewed for the position.  I

17  didn't even receive an interview, that I wanted to, at least,

18  be interviewed.

19      I went over all the comments that had been made to me

20  to -- and described them in a new way for the first time as a

21  totality, using the word ageism.  And I used the word ageism

22  multiple times, at least three times that I remember, during

23  the meeting to press upon Dan and Tom that ageism is what is

24  going on with the way in which I am being treated versus the

25  other engineers who are getting promoted.

*United States District Court*

1  Q.  Really briefly, what's ageism in a nutshell?

2  A.  It's a form of discrimination that -- of age

3  discrimination in which you're prejudged on stereotypes of age.

4  Q.  And you -- continue with what you were saying.  I'm sorry.

5  A.  I was summarizing my journey so that they were not -- I

6  could see that they were not visually happy.  So I was trying

7  to convey my innermost feelings in response to the --

8      Tom's face was, like, cringing.  He wasn't open to what I

9  was saying.  He -- I felt that he was in denial because I had

10  brought up discrimination numerous times.

11      Dan thought that I was a troublemaker.  And at some point,

12  he thought --

13  Q.  I don't want to hear what you think he thought.  What did

14  he say?

15  A.  He stated that I was a troublemaker.  He connected that to

16  a comment that he routinely said about me that I wanted to blow

17  up Linode.

18  Q.  Did you want to blow up Linode?

19  A.  No. No.  I had a goal.

20  Q.  What was your goal?

21  A.  My goal, I was working with Chris Aker -- Chris Aker.

22  Q.  What were you trying to accomplish?

23  A.  We were a high-tech startup.  And if you go back to my

24  interview, the reason we're at startups and not at big

25  corporations making -- doing, you know, making a lot of money

*United States District Court*

1    and having stability, we're working and taking risks.  And,

2    yes, we were growing, but that was never guaranteed.

3         So my goal was I had spent and invested so much time at

4    Linode for a reason, and I wanted to enjoy the benefits of the

5    exit strategy that high-tech companies have.

6    Q.   And so were you trying to accomplish that goal?  Were you

7    trying to increase Linode's size?

8    A.   Yes.

9    Q.   Were you trying to increase its value?

10   A.   I was trying to use my background and my experience to

11   understand and to fill in those gaps that Linode lacked and to

12   advance Linode from both -- I'm a technical person -- but both

13   from a technical point of view as well as a business point of

14   view, given my background and people I know in the industry.

15        So I was trying to advance that in order to advance --

16   it's a profit-making company -- the profits and the bottom

17   line.

18   Q.   Let's get back to that meeting.  So it's December of 2018.

19   You were in Tom Asaro's office.  Dan Spataro is there.  You

20   were talking about this charge of discrimination.  What

21   happened next?

22   A.   Tom Asaro said, "How are we going to settle this," the

23   complaint.  How are we going to resolve this?

24        Dan Spataro responded by saying, "We can make you a

25   director," which was the same title he had.  That he

*United States District Court*

1  mentioned -- Tom said, "Director of what?"

2      And Dan said, "There are industry-wide positions called

3  director of network strategy," and he mentioned a couple.

4  Q.  What was Tom Asaro's response when he heard that

5  suggestion, that one resolution could be to make you a

6  director?

7  A.  He said, "Would that be a solution for you?"

8      I had then mentioned that could -- Dan also said, then,

9  interconnection, and I said and volunteered the word

10  innovation.  Because I worked in the CTO office at Comcast, and

11  I'm innovating.  I'm bringing up -- I'm working on cutting edge

12  things for all those years.  So actually, everything was

13  cutting edge because I worked in the internet when the internet

14  wasn't the internet it is today.

15      So that's been my mindset and my experience, and I wanted

16  to make a statement that I would kind of be like the person --

17  if I'm director -- that you would see at a Comcast CTO office.

18  Not that I would be a CTO, but that that's -- if that's what

19  they were offering me, then I would agree to resolve the

20  complaint that I filed.

21  Q.  We've heard through Mr. Cavalier's opening statement that

22  Linode is saying they never saw this charge before.  Is that

23  true?

24  A.  No, it's not true.  I don't know why --

25  Q.  Go ahead.

*United States District Court*

1  A.   -- Mr. Cavalier is stating that.

2  Q.   This meeting in December 2018, are you certain that this

3  charge was discussed at that meeting?

4  A.   Yes, I discussed it in December right after the meeting.

5  I dismissed that same day my Philadelphia Human -- the

6  Philadelphia Human Relations Commission complaint.

7  Q.   The same day of the meeting you did that?

8  A.   Yes, that afternoon.

9  Q.   So you left the meeting and what did you do?

10 A.   I went over to the Philadelphia Human Rights Commission

11 office and I said that I would like to dismiss it.

12 Q.   And why did you do that?

13 A.   Because we had an agreement.  And I told him that we had

14 an agreement and that the promotion that Dan gave me as

15 director was, in my view at that point, higher than that

16 position of the network manager.

17 Q.   If you really were a director at Linode, where would that

18 have put you in the corporate hierarchy -- well, let me do it

19 with questions.

20      That would have put you higher than a network engineer,

21 correct?

22 A.   Yes.

23 Q.   Would that have put you higher than a senior network

24 engineer?

25 A.   It should, yes.

*United States District Court*

1  Q.  And that would also put you higher than Tim Kaufman's

2  position, manager of network engineers?

3  A.  As a director, yes.

4  Q.  That would put you on the same level that Dan Spataro was,

5  right?

6  A.  Yes.

7  Q.  But I think -- would you still be reporting to Dan Spataro

8  if you were the director or would you now be reporting to

9  someone else, according to this position?

10  A.  We didn't --

11  Q.  It's not hypothetical.

12  A.  We didn't discuss salary or who I would be reporting to

13  during this meeting.  It was just about the complaint and the

14  -- what I, at that time I considered a promotion.

15  Q.  And you said at that time --

16          MR. CARSON:  Do you want me to keep going?

17          THE COURT:  If you're about to transition, this is a

18  good time for a break.

19          MR. CARSON:  I think I am, yeah.

20          THE COURT:  Okay.  So let's take our lunch break now.

21  We plan to take about an hour, resume about 25 to 2:00.

22          So again, same caution.  Don't talk about the case

23  with each other, don't talk about it with folks at home, if you

24  check in with them, work or friends or anyone.  And don't go

25  looking things up.  This is the context where the internet is

*United States District Court*

1   not your friend.  Okay?

2          But clear your head, enjoy your lunch, and I'll see

3   you back here in about an hour.  Okay.

4          THE COURTROOM DEPUTY:  Please rise.

5          (Jury exits the courtroom at 12:34 p.m.)

6          THE COURT:  See everyone back here in an hour.

7          MR. CARSON:  Thank you Your Honor.

8          THE COURT:  Thanks.

9          (Luncheon recess taken from 12:35 p.m. to 1:46 p.m.)

10          THE COURTROOM DEPUTY:  All rise.

11          THE COURT:  Have a seat everybody.

12          Mr. Carson, what's the plan now?  Are we pivoting or

13   are we continuing with Mr. Williams?

14          MR. CARSON:  Yes, Your Honor, Mr. Staller is present

15   and I was planning to call him next.

16          THE COURT:  All right.  Let's bring in the jury.

17          THE COURTROOM DEPUTY:  All rise.

18          (Jury enters the courtroom at 1:48 p.m.)

19          THE COURT:  All right.  You can all have a seat.  All

20   right.

21          Members of the jury, when we left off, we were hearing

22   from Mr. Williams.  Trials sometimes are fluid in terms of

23   schedule.  We have our schedule and we have to make them match

24   up with these schedules of people who are coming in to testify,

25   which every once in a while requires us to pivot and hear from

*United States District Court*

1  someone during the window when they are available.  So that's

2  something we are going to do now.

3          So we'll continue with Mr. Williams' testimony in a

4  little bit, but right now plaintiff has a witness who's

5  available that he's going to call just so we can match our

6  schedule up with evidence.

7          So you shouldn't read anything into that.  Okay?

8          Mr. Carson, go ahead.

9          MR. CARSON:  Your Honor, I would like to call

10  Mr. Staller to the stand.

11          THE COURT:  Mr. Staller, come on up.  Stand there for

12  the moment.

13          THE COURTROOM DEPUTY:  Raise your right hand.

14          (**CHAD STALLER**, HAVING BEEN DULY SWORN OR DULY

15  AFFIRMED, TESTIFIED AS FOLLOWS:)

16          THE WITNESS:  Yes I do.

17          THE COURTROOM DEPUTY:  Please state your full name and

18  spell your name for the record.

19          THE WITNESS:  Yes.  My full name is Chad, C-H-A-D,

20  middle name is Lawrence, L-A-W-R-E-N-C-E, last name is Staller,

21  S-T-A-L-L-E-R.

22          THE COURT:  You can have a seat.

23          THE WITNESS:  Thank you.

24          THE COURT:  Good afternoon.

25          THE WITNESS:  Hello.

*United States District Court*

1          THE COURT:  Get the mic closer to you, Mr. Carson.

2                    VOIR DIRE DIRECT EXAMINATION

3    BY MR. CARSON:

4    Q.   Are you prepared to provide an opinion regarding the

5    economic losses of my client, Carl Williams?

6    A.   Yes, I am.

7    Q.   And before we go into that, I'm just going to go over some

8    information regarding your qualifications, if that's okay.

9    A.   That works for me.

10   Q.   So let's talk about your experience first.

11        Have you ever -- start with your educational experience.

12   What's your background and education?

13   A.   Yes.  Education, so I completed high school in Rockville,

14   Maryland.  After high school, I went to Lehigh University,

15   where I received my bachelor's of science degree in economics.

16   After Lehigh, I came to Philadelphia to Temple University, to

17   the Beasley School of Law, where I received my law degree,

18   graduating with honors in 2001.

19        After law school, I returned to Temple University several

20   years later to the Fox School of Business, where I received my

21   MBA, my master's of business administration, graduated with

22   honors in 2005.

23        I returned to formal schooling one more time, going a

24   little further west to Villanova University, where I received a

25   master's of accountancy degree in 2006.

*United States District Court*

1  Q.   And, Mr. Staller, can you please just describe for the

2  Court and for the jury what your occupation is?

3  A.   Yes.  I'm a forensic economist.  So with the term

4  "forensic" in front of "economist" or "economics," it might

5  make my daily job seem a little more exciting than what it

6  really is.  There's no lab coat, blue light, CSI

7  investigations.

8       The term "forensic" comes from the Latin term "forens,"

9  which means public forum.  The courthouse, a public forum.  And

10  what I do is apply economic analysis, theory, research, and

11  thought to various types of disputes that will end up or

12  possibly end up in a public forum of a courthouse.  So that's

13  how the two terms get brought together.  So in TV, I was

14  thinking about it, that's a little bit of a LA lifestyle change

15  into the word "forensics."  It's a discipline that may get into

16  the courthouse.

17  Q.   And, Mr. Staller, where do you currently work?

18  A.   I work for a company.  We were based in Center City

19  Philadelphia until the COVID years.  We relocated to Cherry

20  Hill, New Jersey for a company called the Center for Forensic

21  Economic Studies.

22  Q.   In today's society, we hear a lot of about forensics.

23       Can you please just describe for the jury what a forensic

24  economist is?

25  A.   Sure.  So kind of just mentioned, it's an economist that's

*United States District Court*

1  taking economic theory and research and blending it into

2  various types of legal disputes.  So what I'll do is I'll get

3  case-specific material, then I will do economic research, blend

4  the two together, typically prepare reports, and then come to

5  the courthouse and testify when I need to.

6  Q.  And in other words, like, what does your daily work

7  consist of?

8  A.  Daily work would consist of working with either

9  plaintiff's lawyers or defense lawyers, getting case

10 specific-materials, learning about a case, learning about a

11 person, learning about a business, then developing an economic

12 loss model.  There has been some economic consequence because

13 of some event.  It could be because of a firing; it could be

14 because of a business dispute or breach of contract; a personal

15 injury event, someone can't work as they are injured.  So I'm

16 going to get all the fact-specific material and then review

17 that and then do economic research and then put it all together

18 in one economic report.

19 Q.  And do you provide those types of services for both

20 plaintiffs and defendants?

21 A.  Yes, I do.

22 Q.  Are you a member of any professional societies or

23 services?

24 A.  Yes, I am.

25 Q.  Can you briefly describe that?

*United States District Court*

1 A.   Sure.  The national group of forensic economists, there is

2 such a group, that's called NAFE, N-A-F-E.  That's the National

3 Association of Forensic Economics.  And then a companion group

4 would be the American Academy of Economic and Financial

5 Experts.  I'm a member of both those organizations.

6 Q.   And have you ever done any teaching or lecturing in the

7 field of forensic economics?

8 A.   Yes, I have.

9 Q.   Can you also describe that, please?

10 A.   Yes.  After spending five or six years at Temple

11 University as a student, I returned in 2008 as an adjunct

12 faculty member within their LL.M program.  Just by background

13 to the jury, when you go to law school, the degree you're

14 provided when you graduate is a juris doctorate, a JD.

15 Practicing lawyers can go back to get an advanced degree in the

16 law.  That advanced degree would be an LL.M, a master's of

17 legal letters.

18      Temple University provides such a program.  I have

19 lectured within that program since 2008 on the topic of

20 forensic economics, economic damages in litigation, and the

21 calculation of economic damages to those students pursuing

22 their advanced degree in the law.

23          In addition to Temple, in many jurisdictions,

24 including the Commonwealth of Pennsylvania, there is something

25 called CLE requirements, continuing legal education

*United States District Court*

1  requirements.  For practicing lawyers each year to maintain

2  their license must attend a certain number of credit hours,

3  lectures, to keep their licenses active.

4        I'm frequently called upon to lecture to practicing

5  lawyers on topics in forensic economics.  I've also done the

6  same type of lecturing to CPAs, certified public accountants,

7  as well as financial advisors that have continuing education

8  requirements.

9  Q.  I'm going to turn now to publishing.  Have you had any

10  articles published in professional journals or publications in

11  the field that we're asking you to talk about here in court

12  today?

13  A.  Yes.  So I began my career in 2005 as a forensic economist

14  after completing my MBA.  Since that time, I have authored

15  approximately 10 to 12 articles relating to various topics in

16  forensic economics.  Lost earnings, lost pension benefits.

17  Items outside of issues today, but the cost of future medical

18  care, the loss of earning capacity.

19  Q.  And have you been called upon to testify in court before?

20  A.  Yes, I have.

21  Q.  And can you briefly just kind of list some of those

22  courts?

23  A.  I've testified here in the federal court for the Eastern

24  District; I've testified at the Court of Common Pleas, which is

25  at City Call; I've testified in most of the counties within the

*United States District Court*

1  Commonwealth of Pennsylvania.

2      Outside of the Commonwealth, I've testified, I believe, in

3  15 or 16 other states, multiple other federal court

4  jurisdictions.

5          MR. CARSON:  Your Honor, at this point I would offer

6  Mr. Staller as an expert in the area of forensic economics.

7          MR. CAVALIER:  No objection.

8          THE COURT:  Okay.  So he'll be received on that topic.

9                    DIRECT EXAMINATION

10  BY MR. CARSON:

11  Q.  Mr. Staller, did you have an opportunity to conduct an

12  analysis of the losses that Carl Williams sustained due to

13  separation from employment when he discontinued working at

14  Linode in August of 2020?

15  A.  Yes, I did.

16  Q.  And can you just describe what you did to evaluate those

17  losses?

18  A.  Sure.  So in Mr. Williams' case, this is the finite period

19  loss, a limited period of loss.  Subsequent to his termination

20  with Linode on August 19, 2020, Mr. Williams has been

21  successful in catching up to his earnings, same level of

22  earnings and total compensation.  So my calculations in this

23  particular case are for a limited period.  They run from the

24  date of separation, August of 2020, up through December 31st of

25  2022.

*United States District Court*

1      After that, there is no future loss of earnings for

2   Mr. Williams based upon his subsequent performance and

3   re-employment at his current employer.  So to do my

4   calculation, I looked at his historical earnings at Linode,

5   other types of benefits, bonus, contribution to a

6   profit-sharing plan, and then to arrive at the total earnings

7   and benefits he was entitled to as an employee.  And then I

8   measure that out until his subsequent employment with a group

9   called Pinnacle.  Once he obtained his employment with

10  Pinnacle, he was able to generate equal to earnings that he was

11  having at Linode.

12  Q.   And in order to conduct that analysis that you just

13  described, did you have an opportunity to review any documents?

14  A.   Yes.  I received a lot of documents related to the

15  compensation of Mr. Williams from Linode, pay stubs, W-2s,

16  various pay stubs from subsequent employers after leaving

17  Linode in 2020.  So I had information from one group called

18  Kentech Tech, and then ultimately the group where he's

19  currently at, Pinnacle, I had pay stubs and earning statements

20  from Pinnacle.

21      So for my purposes mainly, the financial documents, what's

22  the total sources of the compensation, and how much

23  compensation did Mr. Williams receive from Linode and then his

24  other places of employment after leaving Linode.

25  Q.   And the documents that you're referring to, are those

*United States District Court*

1  documents and sources the types of documents and sources that

2  are reasonably relied upon in the area of economics and

3  specifically forensic economics when conducting these types of

4  analyses?

5  A.   Yes.

6  Q.   And so I would like to direct your attention, if I could,

7  to your conclusions.

8       Do you have the -- so after conducting all these analyses,

9  did you prepare some kind of report that explains your

10 findings?

11 A.   Yes.  After reviewing the relevant earnings documents for

12 Mr. Williams, I prepared a report in April of last year, so

13 just about 11 months ago, 10 months ago.

14 Q.   And that report is based on what his economic losses were

15 at that time that you prepared the report; is that correct?

16 A.   Yes, based upon the information I had available to me in

17 April of 2023, correct.

18 Q.   And I think you said that as of April 2023, Carl Williams

19 had found another position where his total compensation package

20 was at least equal to what you found his compensation package

21 at Linode was; is that correct?

22 A.   Total economic benefits.  It was comprised a little

23 differently.

24      So at Linode, Mr. Williams was receiving a base salary,

25 did receive a bonus each year and a contribution to profit

*United States District Court*

1  sharing.  At Pinnacle, he was receiving just one form of

2  economic compensation but a significantly higher hourly rate.

3      So from an economic perspective, he was on par when you

4  combine the three elements from Linode, compare to what the one

5  compensation element was at Pinnacle.  They were on par as of

6  December 31, 2022.

7  Q.  But prior to that, prior to when he -- you know, when his

8  total economic value had reached that point where it was at

9  least equal to what he earned at Linode, prior to that, there

10  was losses; is that correct?

11  A.  Correct.  So there were losses for the portion of the year

12  in 2020.  He was terminated middle, end of August of 2020, so

13  there's 33 percent of the year left in 2020.

14      And then in 2021, there was a loss period and in 2022

15  there was a loss period, yes.

16  Q.  And I think that you wrote a very detailed report, but the

17  summary of the losses that you're describing appears in certain

18  tables in your report?

19  A.  Yes.  In my report there's Table A that summarizes the

20  earning history for Mr. Linode -- I'm sorry, Mr. Williams.  And

21  then Table 1 outlines my calculations of damages for

22  Mr. Williams.

23  Q.  Can I direct your attention to Table A, please.  And would

24  you please describe what your conclusions are as far as Table A

25  is concerned?

*United States District Court*

1  A.   Currently being published is --

2        THE COURT:  Hold on.

3        MR. CARSON:  So --

4        THE WITNESS:  Wasn't me to --

5        THE COURT:  Well, there's no reason to be publishing

6  that right now.

7        MS. MEYER:  It's on mine, but it was just on.

8        MR. CARSON:  I don't know what happened.  I can't see

9  what everyone else is seeing.

10        THE COURT:  But I guess my question is, are you

11  showing him something?

12        MR. CARSON:  Yes.  I would like to show Mr. Staller

13  the report that he prepared to help him refresh his

14  recollection of what his conclusions are.

15        THE COURTROOM DEPUTY:  Is it from your computer or

16  your --

17        MS. MEYER:  Mine.

18        MR. CARSON:  Sorry.

19        THE COURT:  I don't know if we've established a need

20  to do that quite yet.

21        MR. CARSON:  Okay.

22        THE COURT:  So I think you need to lay a foundation to

23  do that if you're going to do that.

24        MR. CARSON:  Okay.  I can do that.  But technically,

25  everything is...

*United States District Court*

1  BY MR. CARSON:

2  Q.   So, Mr. Staller, Table A that you talked about, can you

3  just kind of describe what Table A is again for the jury,

4  please?

5  A.   Table A from my report would be a summary of Mr. Williams'

6  earning history while at Linode, and I believe I included more

7  contemporaneous years from Pinnacle as well.  So it summarized

8  total compensation off of W- 2s.

9  Q.   And do you recall what those -- the numbers that you

10 included in Table A are?

11 A.   Mr. Williams' salary increased each year when he was at

12 Linode.  So I believe he started around November of 2015.  He

13 was around $125,000 when he started.  And when he left in 2020,

14 I believe he was around $139,000 in base salary.

15 Q.   And can I please direct your attention to Table B.  Can

16 you just describe what the conclusions that you came to in

17 Table B are?

18 A.   So I just -- that's Table 1.

19 Q.   Sorry.  Table 1.  Thank you.

20 A.   It's okay.  Table 1 in my report just does the

21 calculations, where it does the expected earnings at Linode,

22 which included base salary, he was receiving from his

23 historical awards about $10,000 in bonus per year from Linode,

24 and he was given a profit-sharing contribution each year.  So

25 my Table 1 summarizes the economic benefits he was getting from

*United States District Court*

1    Linode.

2        Mr. Williams did have a contribution to his health care at

3    that time, so I deduct his bi-weekly contribution to health

4    care.  And then I run that out -- I believe Mr. Williams got

5    re-employed initially at Kentech Tech in 2021, so I do deduct

6    his earnings that he did receive from Kentech in 2021 as a

7    subtraction.  And also do the same thing when he got employment

8    from Pinnacle, I believe in January of 2022.

9        So there's a small loss in 2022 because he ultimately will

10   catch up after that year, in 2023, last year.  But there's a

11   small loss in 2022, and then losses for '21, and then a portion

12   of a loss in 2020.

13   Q.   And so what were his total losses in 2020, please?

14   A.   In 2020, the loss was $61,921.

15       MR. CAVALIER:  Objection.  Sorry.  Is the witness

16   reading from something?

17       THE WITNESS:  I have a copy of my report.

18       THE COURT:  The report is not in evidence.  We can't

19   read from the report, Mr. Carson.  You also haven't referenced

20   the fact that he's holding it.

21       MR. CARSON:  Okay.  So --

22       THE COURT:  Well, you keep pointing him to things.  I

23   thought he was testifying from memory.  Okay.

24       So if you need him to refresh his recollection, then

25   you need to lay the foundation to do that.  If you want him to

*United States District Court*

1  use the report, you need to lay the foundation to do that.

2  It's not evidence.

3       MR. CARSON:  I understand.  I can do that.  I can do

4  that, Your Honor.

5       THE COURT:  Okay.

6  BY MR. CARSON:

7  Q.  So, Mr. Staller, if you close the report and kind of just

8  put it to the side for just a moment.

9  A.  Sure.

10 Q.  So you mentioned that Table 1 provides conclusions that

11 you came to for Carl Williams' losses for each year until he

12 was able -- I'll call it, mitigate those losses.

13      Is that correct?

14 A.  Yes.

15 Q.  And so for 2020, if he was terminated in August 2020, then

16 would the losses that you calculated for 2020 be from the date

17 of the termination in August until December 31, 2020?

18 A.  Correct.

19 Q.  And so is what you did, essentially you took his income

20 that he was earning at that time and you calculated what it

21 would have been had he continued working at Linode from August

22 until December 31, 2020?

23 A.  Yes.  I looked at his last full year of earnings, which

24 was 2019, and then looked at that as a base to establish his

25 projected earnings through 2020.

*United States District Court*

1 Q. And then to that number, I think you had to -- tell me if
2 this is correct -- did you add up what the value of all the
3 benefits he received from Linode are?
4 A. Correct. So you get total compensation. That's when I'm
5 looking at 2019, we had a full year of compensation for base of
6 earnings, bonus, and then his profit-sharing contribution.
7 Q. And all the other -- you know, health insurance benefits,
8 and all the other benefits he received were also calculated
9 into that?
10 A. The only other benefit is actually the deduction for
11 health insurance. So any health insurance that Mr. Williams
12 consumed, he consumed the benefit of health insurance, but he
13 had to pay for that health insurance. So it's just the
14 deduction -- his contribution towards his premium that I had to
15 deduct.
16 Q. Understood. So do you recall what the total loss based on
17 that calculation was from the date of the termination,
18 August 2020, to December 31, 2020?
19 A. Not from memory. I'd have to look at the table.
20      MR. CARSON: Your Honor, can Mr. Staller review his
21 table to refresh his recollection about how he --
22      THE COURT: I mean, you have a copy of the report, I
23 take it, Mr. Cavalier?
24      MR. CAVALIER: I believe I do.
25      THE COURT: Okay. You can look at the report. I

*United States District Court*

1  don't want you reading into evidence what it says, but you can

2  look at it to see if it refreshes your recollection.

3        THE WITNESS:  Thank you.

4  BY MR. CARSON:

5  Q.  And so can you just -- the total amount, total losses for

6  2020, what were they?

7  A.  $61,921.

8  Q.  Did you do that same calculations for the following year,

9  2021?

10  A.  Yes.  So I adjust Mr. Williams' expected earnings for

11  inflation, to adjust it from 2020 to 2021 dollars, and then I

12  do the same calculation from a full year from January 1st to

13  December 31st, expected earnings at Linode, which would be base

14  salary, bonus, profit-sharing contribution.  And then there is

15  a deduction because Mr. Williams did have employment from this

16  Kentech, so his reported earnings are subtracted from Kentech.

17  Q.  So coming to the total earnings, it would have been minus

18  what he earned, what was the final number?

19  A.  I'd have to check my report for that.  Is that okay?

20        MR. CARSON:  Your Honor?

21        THE COURT:  Again, if you don't remember, you can look

22  at your report to refresh your recollection.

23        THE WITNESS:  Thank you.  The loss in 2021 would be

24  $164,918.

25  BY MR. CARSON:

*United States District Court*

1  Q.  And for 2022, did you also conduct the same analysis?

2  A.  I did.  Same setup, yes.

3  Q.  Except in 2022, I believe is the year when the Pinnacle

4  income was at least equal to the -- you know, the total losses

5  that he would receive for that year had he stayed at Linode?

6  A.  So it was close.  Mr. Williams did receive total

7  compensation from Pinnacle of $176,000 rounded from Pinnacle in

8  2022.  But when you add up those three elements, the base,

9  bonus, and profit sharing, there was a small loss still for

10 that year.

11 Q.  And so what was the total losses for 2020?

12 A.  2020 the loss --

13 Q.  Sorry, for 2022.

14 A.  2022 is $10,119.

15 Q.  And in your report did you add those numbers up to figure

16 out what the total losses are?

17 A.  I did.  Yes, I added those three years.

18 Q.  And what were they?

19 A.  The total is $236,958.

20 Q.  And so does that number reflect the amount of money that

21 Carl Williams would have made had he not been separated from

22 his employment with Linode from the date of the termination

23 until the date you did the report?

24 A.  It reflects his earnings from Linode through December 31,

25 2022, his expected earnings had he not been separated, and it

*United States District Court*

1  subtracts out what he did make over those years to get to a net

2  loss of earnings.

3  Q.  So I want to direct your attention to the profit sharing

4  part.  So it's -- can you just describe Linode's profit sharing

5  benefit, please?

6         MR. CAVALIER:  Objection.

7         THE COURT:  Sounds like you're withdrawing that

8  question?

9         MR. CARSON:  No, I was going to let him do his

10 objection.

11        THE COURT:  Okay.  The objection is sustained.

12        MR. CARSON:  I can --

13        THE COURT:  Rephrase it.  Go ahead.

14 BY MR. CARSON:

15 Q.  So in conducting the analyses that you just described and

16 -- you had an opportunity to review the benefits that employees

17 receive through their employment at Linode?

18 A.  Yes.

19 Q.  And specifically, did you have an opportunity to review

20 the benefits that Mr. Williams received during his employment

21 at Linode?

22 A.  Yes.  I had a packet that outlined the benefits that

23 Mr. Williams received, yes.

24 Q.  And those benefit that Mr. Williams received, did they

25 include -- what did they include?  Can you just briefly tell us

1  what they are?

2  A.  Sure.  It was health care.  It was a profit sharing

3  contribution.  Fringe might be consideration of a bonus payment

4  and then standard other benefits such as a paid vacation.

5  That's a fringe benefit.

6  Q.  And is the profit sharing just one number or is it broken

7  down into different categories?

8  A.  My recollection of the plan, it was broken down into two

9  categories, a profit sharing contribution and then, I believe,

10  a 401K contribution.

11  Q.  And did you have an opportunity, in conducting your

12  analysis, to review the terms of the profit sharing plan that

13  Carl Williams received?

14  A.  I reviewed the profit sharing plan document, yes.

15  Q.  And what is a profit sharing plan document?

16  A.  A plan document sets forth the rules and requirements for

17  employees to get such a benefit.

18     It sets, first, the terms of service, how the benefit's

19  calculated, how the payment is made.  So it gives -- basically,

20  it's a contract between the employer or the profit sharing

21  administrator and the employees of how benefits will be grown,

22  developed and then paid out over time.

23  Q.  And according to this contract that you reviewed, Carl

24  Williams was owed a profit sharing in exchange for the work he

25  performed at Linode; is that correct?

*United States District Court*

1  A.  He was entitled to a profit sharing contribution, yes.

2  Q.  And regarding his entitlement to the profit sharing

3  contribution, did you have an opportunity to review what the

4  eligibility requirements are for him to be entitled for each

5  year to that profit share?

6          MR. CAVALIER:  Objection.

7          THE COURT:  The objection is overruled.  The question

8  is, did he review it?

9          THE WITNESS:  Yes.

10  BY MR. CARSON:

11  Q.  And what does that document say?

12          MR. CAVALIER:  I'll restate the objection.

13          THE COURT:  That objection is sustained.

14  BY MR. CARSON:

15  Q.  Do you know whether or not, based on what you read and

16  what you reviewed, whether the profit sharing payment that

17  employees are -- that Carl Williams received during his

18  employment at Linode, whether there was any kind of a

19  requirement for the numbers of hours you have to work in order

20  to be eligible for it?

21          MR. CAVALIER:  Objection.

22          THE COURT:  Sustained.

23          MR. CARSON:  Your Honor, can I sidebar for a moment?

24          THE COURT:  Yes.  We can go to sidebar.

25          (Sidebar as follows:)

*United States District Court*

1          MR. CARSON:  So can't I factually just ask him

2    questions about what he reviewed and his understanding of the

3    document?

4          THE COURT:  You can ask him factually what he

5    reviewed.  You can't have him be the factual sponsor of

6    evidence because he's not a fact witness.  So he can say he

7    reviewed it.  He can say in his conclusion it applied based on

8    his review of it, right?  Or even that he assumed it applied.

9          I don't know whether he reached a conclusion or

10   whether he made an assumption either at your direction or on

11   his own.  He can testify to all that because that's his expert

12   methodology.

13         He can't offer fact testimony because he's not a fact

14   witness.

15         MR. CARSON:  Can't I ask him hypotheticals about

16   evidence that's been admitted?

17         THE COURT:  You can ask him hypothetical questions,

18   right?  But that's -- you didn't ask him hypothetical

19   questions.

20         MR. CARSON:  Okay.

21         THE COURT:  You asked him questions about what

22   specific documents say about the terms of the profit sharing

23   plan.

24         MR. CARSON:  Okay.

25         THE COURT:  He's not a fact witness.  He can't offer

*United States District Court*

1    that testimony.

2              MR. CARSON:  I'll fix it.  Okay.  I'll adjust.

3              THE COURT:  Okay.

4              (Sidebar concluded.)

5              MR. CARSON:  Could we show the witness a document that

6    has previously been admitted into evidence, and that document

7    is 172, please.

8    BY MR. CARSON:

9    Q.  Mr. Staller, can you see the document that has been placed

10   in front of you?

11   A.  Yes, I see the --

12             MR. CAVALIER:  Are we publishing this document?

13             MR. CARSON:  It's already been admitted, but I don't

14   need it to be published, I don't think.

15             THE COURT:  I need to hear the question to understand

16   what you are about to do.

17   BY MR. CARSON:

18   Q.  So my question is this:  So this is one of the documents

19   that you reviewed in order to do the analyses that you

20   described to the jury, where you calculated the total losses

21   that Mr. Williams received or sustained, caused by the

22   separation of employment correct?

23   A.  Yes, I reviewed this document.

24   Q.  And hypothetically, if an employee at Linode who had the

25   same position as Carl Williams, worked a thousand hours in a

*United States District Court*

1  year, would they be entitled to profit sharing under this

2  document?

3         MR. CAVALIER:  Objection.

4         THE COURT:  Sustained.

5  BY MR. CARSON:

6  Q.  So do you know -- when you did your calculations, did you

7  base it on the information that you reviewed in this document?

8         MR. CAVALIER:  Objection.

9         THE COURT:  Again, he can describe his methodologies.

10  The objection is overruled to the extent that the question is

11  what did he do.

12  BY MR. CARSON:

13  Q.  Here's what I'm asking, Mr. Staller.  I'm going to wrap it

14  up.

15         In order to come to the conclusion that Carl Williams'

16  total losses caused by the termination from Linode caused him

17  to lose $236,458, in order to come to that calculation, you had

18  to familiarize yourself with the profit sharing plan; is that

19  correct?

20  A.  Yes.  I looked at the profit sharing plan document and the

21  payouts that Mr. Williams had received historically for profit

22  sharing awards.

23  Q.  And your analysis is based on the assumption that he would

24  have continued to receive this profit sharing had he continued

25  to be employed at Linode, right?

*United States District Court*

1    A.    Yes.  One of my assumptions is for the years 2021, 2022,

2    yes, he would have gotten similar to his historical

3    contribution rate.

4    Q.    And that's because the document, the profit sharing plan

5    and, specifically, the plan we're looking at here, states that

6    if Carl Williams is employed at Linode and works a certain

7    number of hours, he would be entitled to profit sharing, right?

8    A.    That is correct.

9    Q.    And what is the number of hours that he has to work in

10   order to be entitled to the profit sharing that you used in

11   order to conduct the analysis and come to this conclusion?

12          MR. CAVALIER:  Objection.

13          THE COURT:  That objection is sustained.

14   BY MR. CARSON:

15   Q.    How did you know that he was entitled to the profit

16   sharing?

17   A.    From looking at the profit sharing plan documents and then

18   in my model, but for his termination in 2020, it's assumed he

19   would have continued employment into the future with Linode

20   through 2022.

21   Q.    And you said you looked at this document here in front of

22   you, right?

23   A.    Yes.

24   Q.    And this document, it confirms that if Carl Williams works

25   at Linode and satisfies the terms of this -- that are listed in

1  this document, he should get the profit sharing, right?

2          MR. CAVALIER:  Objection.

3          THE COURT:  Sustained.

4  BY MR. CARSON:

5  Q.  Well, how did you know he was entitled to the profit

6  sharing?  I mean, if your analysis is based on the assumption

7  that he would receive the profit sharing, how did you know that

8  he would receive it?

9  A.  From his historical performance that, each year when he

10  was there, once he became eligible under the plan requirements,

11  he did receive a profit sharing contribution.

12          So in my model, assuming full-time employment for the

13  years 2021 and 2022, he would have met the criteria set forth

14  in the profit sharing plan to get a profit sharing

15  contribution.

16  Q.  He had to be eligible under the plan requirements, right?

17  A.  Yes.  You have to follow the rules of the document to get

18  the benefits, yes.

19  Q.  Okay.  And so was he eligible for the profit sharing in

20  2019 and did he receive it in 2019?

21          MR. CAVALIER:  Objection.

22          THE COURT:  Sustained.

23  BY MR. CARSON:

24  Q.  Do you know whether you reviewed documents that confirmed

25  whether he received profit sharing in 2019?

*United States District Court*

1  A.   I did review documents that he did receive profit sharing

2  in 2019.

3  Q.   Okay.  And you assume that -- how about in 2020?  Did you

4  review documents that he received profit sharing in 2020?

5  A.   2020, I saw some emails exchanged about the payout of the

6  benefit, but I don't know if he ever actually received the

7  profit sharing contribution.

8  Q.   And do you know when the profit sharing contribution was

9  supposed to be paid?

10  A.   The way this profit sharing works, like most others, in

11  the subsequent calendar year.  So you performed the work in

12  2020, and then the contribution to your 2020 -- for your work

13  in 2020 is paid, usually, in the first or second quarter of the

14  subsequent year.

15       So in that scenario, 2021.

16  Q.   So the profit sharing that Carl Williams received in 2019

17  was for the 2018 year, right?

18  A.   That's true.

19  Q.   And the profit sharing he received in 2020 was from 2019

20  year he worked?

21            MR. CAVALIER:  Objection.

22            THE COURT:  Sustained.

23  BY MR. CARSON:

24  Q.   Do you know specifically that he received profit sharing

25  in 2020 from 2019?  Is that one of the numbers you used in

*United States District Court*

1  order to come to your conclusions?

2  A.  For his 2019 -- correct.  That was paid out in 2020.

3  Q.  So in 2020, he received profit sharing, correct?

4  A.  In 2020?

5  Q.  Yeah.  For 2020, he received the profit sharing for the

6  year 2019 he worked, right?

7  A.  For what they call plan year 2019, yes.

8  Q.  So you don't know whether he received it for 2020, right?

9  A.  I do not know.

10  Q.  He would have received that in 2021, but you don't know

11  whether he received it, right?

12  A.  I do not know.

13         MR. CARSON:  Okay.  That's all.

14         THE COURT:  Mr. Cavalier.

15         MR. CAVALIER:  Yes.

16         MR. CARSON:  Thank you, Mr. Staller.

17         THE WITNESS:  Yes.

18                    CROSS-EXAMINATION

19  BY MR. CAVALIER:

20  Q.  Good afternoon, Mr. Staller.

21  A.  Hello.

22  Q.  Let me see if I can clear something up there we were

23  talking about at the end.  You didn't make any determination

24  factually as to whether Mr. Williams was entitled to any profit

25  sharing?  You assumed that he was entitled to it as part of

*United States District Court*

1  your analysis, correct?

2  A.    Correct, based upon the historical performance and

3  benefits he received in prior years, yes.

4  Q.    And ultimately, your conclusion, the conclusion that you

5  are opining on today is, essentially, that due to his

6  separation from Linode, Carl Williams suffered an economic loss

7  of $236,958, correct?

8  A.    Yes.

9  Q.    Were you aware before you testified today that defendants

10  were willing to stipulate to that number as the figure for

11  economic damages --

12          MR. CARSON:  Objection.

13          THE COURT:  That's sustained.  That's sustained.

14  BY MR. CAVALIER:

15  Q.    Do you agree that your analysis on economic damages here

16  is only relevant to the jury if Mr. Williams is able to prove

17  liability on one or more of his underlying claims?

18          MR. CARSON:  Objection.

19          THE COURT:  That's overruled.

20          THE WITNESS:  Yes, I agree that they have to have a

21  finding of liability first, and then damages would come into

22  play after finding of liability.

23  BY MR. CAVALIER:

24  Q.    And just so we're all clear on the bounds of your opinion,

25  you're offering no opinion today on whether Mr. Williams

*United States District Court*

1  suffered any unlawful discrimination, any harassment, any

2  retaliation, or was wrongfully terminated?

3  A.   No opinion with regard to the liability claims.

4  Q.   Okay.  And again, just to be clear, you're offering no

5  opinion as to whether there was any age discrimination going on

6  at Linode?

7  A.   I have no opinion about any alleged age discrimination at

8  Linode.

9  Q.   And no opinion on whether there was any sexual orientation

10  discrimination going on at Linode, correct?

11  A.   No opinion with regard to any alleged sexual orientation

12  discrimination.

13  Q.   Do you have any opinions at all as to why the plaintiff

14  was terminated?

15  A.   The why?  I do not, no.

16  Q.   Do you have any opinion here today to offer the jury on

17  whether the amount of time that it took Mr. Williams to find

18  work was reasonable or unreasonable?

19  A.   I wasn't asked to examine that.  I have no opinion for the

20  jury.  I'm familiar with those topics, but I discuss it in my

21  report.

22  Q.   And in fairness to you, you're not here today to testify

23  as a vocational expert, correct?

24  A.   True.

25        MR. CAVALIER:  That's all I have.  Thank you.

*United States District Court*

1          THE COURT:  Mr. Carson.

2          MR. CARSON:  Just one question.

3                    REDIRECT EXAMINATION

4    BY MR. CARSON:

5    Q.   Mr. Staller, either way, whether it was discrimination or

6    whether it wasn't discrimination, the losses that you testified

7    about here today occurred, correct?  He did lose that money and

8    he did receive $236,000 and change less than he would have

9    received had he continued to work at Linode, correct?

10   A.   Correct.  So the economic impact, to a reasonable degree

11   of economic certainty, is $236,000 from the time period of

12   August 2020 through December 31st, 2022.  I have no opinion to

13   the cause of that loss.

14   Q.   That's what happened because he was separated from his

15   employment, right?

16   A.   That's correct.  Because he no longer worked at Linode

17   over that time period, that's the loss for that time period.

18         MR. CARSON:  That's all.

19         THE COURT:  Mr. Cavalier.

20         MR. CAVALIER:  Nothing further.

21         THE COURT:  All right.  Mr. Staller, you can step

22   down.  Thank you.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  Do you want to resume with Mr. Williams

25   now?

*United States District Court*

1          MR. CARSON:  Yes, Your Honor.

2          THE COURT:  Mr. Williams, come back up.

3                    DIRECT EXAMINATION

4    BY MR. CARSON:

5    Q.   Good afternoon, Mr. Williams.  So when we stopped before

6    lunch, you were talking about the meeting in December of 2018

7    with Tom Asaro and Dan Spataro where you discussed the charge

8    of discrimination.  Do you recall that?

9    A.   Yes.

10   Q.   And that meeting led to an agreement, you testified,

11   right?

12   A.   Yes.

13   Q.   And that agreement was that you were going to withdraw the

14   charge or not pursue the charge and you were going to receive

15   the -- this title change that you testified about, right?

16          MR. CAVALIER:  Objection.

17          THE COURT:  It's overruled.

18          MR. CARSON:  I'm just trying to get us back to where

19   we were.

20   BY MR. CARSON:

21   Q.   You can answer.

22   A.   Yes.

23   Q.   Okay.  And the title change, can you just say what that

24   was again?  What was the new title supposed to be?

25   A.   Director of network strategy and innovation.  Sometimes

*United States District Court*

1  they use the word "interconnection" sometimes to describe the

2  innovation.  Because what I testified earlier, that was the

3  director of network strategy and innovation.

4  Q.  And during the meeting, did you talk about any of the

5  other network engineers or senior network engineers that were

6  employed at Linode at that time?

7  A.  Yes.

8  Q.  Which one?  The senior network engineers or the --

9  A.  The senior network engineers.

10  Q.  Who were the senior network engineers who were employed at

11  Linode, either at that time or sometime before that?

12  A.  Tim Kaufmann, during the time that he was the senior

13  network engineer, Andrew Dampf, Owen Conway.

14  Q.  And what was the context under which you spoke to them at

15  that meeting about Andrew Dampf, Owen Conway, and Tim Kaufmann?

16  A.  Not having the opportunity to apply and given a chance for

17  a position that was reported thereafter.

18  Q.  And were you trying to say that you were better than them

19  or you should have promoted ahead of them during that meeting?

20  Was that your point?

21  A.  No.

22  Q.  What was your point?

23  A.  My point was that I was not allowed to apply.  I was not

24  interviewed by -- and I'm fine in my heart with people getting

25  promoted, but the problem was that if you interviewed me and

*United States District Court*

1  you allow me to apply, then I can show you what my background

2  is and why I should be given the opportunity to, at least,

3  apply.

4      If Linode thinks that someone else is okay for the

5  position or better than me, then I would accept that and I

6  would look for other advancement opportunities.

7      I told Dan that -- I looked at Dan and I told him that we

8  don't need duplicates, that diversity brings various technical

9  areas that helps the entire group.

10 Q.  And did Dan Spataro call you any names at that meeting?

11 A.  He called -- he just said I was a troublemaker.  And as I

12 reported earlier, he said that I wanted to blow up Linode.  I

13 wanted -- I mentioned the management position.  This was a

14 focus, and he said that I would never be a manager at Linode.

15 Q.  Did you tell him why you filed the charge of

16 discrimination at the Pennsylvania Human Relations Commission?

17 A.  Because I was not given the opportunity to interview for

18 the position in which, on that day it was announced, that Tim

19 Kaufmann received the promotion.

20 Q.  And so this change in job title that you testified about

21 before lunch, did you talk about what your job responsibilities

22 in this new position would be at that meeting?

23 A.  Just what I testified to earlier.

24 Q.  Just remind the jury.

25 A.  Innovation.  I was at the CTO office at Comcast.  So I

*United States District Court*

1  thought that I could provide that strategic perspective.

2  Q.  So what I'm asking is, like, did Dan Spataro and Tom Asaro

3  review what your new job responsibilities would be pursuant to

4  this new position at that meeting?

5  A.  No.

6  Q.  And you agreed, right?  You would withdraw the charge in

7  exchange for this position.  You agreed?

8  A.  Yes.

9  Q.  Did you talk about salary increases as a result of this

10  new position?

11  A.  No.

12  Q.  So what happened next?

13  A.  An email announcement was sent out in January.

14  Q.  Do you remember the date?

15  A.  I don't recall.

16  Q.  I am going to show you a document.

17       MR. CARSON:  Could we please show the witness

18  Exhibit 21.  And just the witness, not the jury.

19  BY MR. CARSON:

20  Q.  So did a document just appear on the screen in front of

21  you, Mr. Williams?

22  A.  Yes, it did.

23  Q.  Okay.  What is this document?

24  A.  This looks like the email announcement to everyone at

25  Linode.com.

*United States District Court*

1  Q.  What's the date on it?

2  A.  January 25, 2019.

3  Q.  Were you copied on this email when it was sent on

4  January 25, 2019?

5  A.  I was part of the everyone.

6  Q.  Everyone is what?

7  A.  The entire company.

8  Q.  The shortcut for sending it to the entire company?

9  A.  Yes.

10  Q.  And so who sent this email on January 25, 2019?

11  A.  Dan Spataro.

12        MR. CARSON:  Can I move to have this

13  document admitted, Your Honor?

14        MR. CAVALIER:  No objection.

15        THE COURT:  Exhibit 21 will be admitted.

16        (PLAINTIFF EXHIBIT 21 WAS RECEIVED IN EVIDENCE.)

17  BY MR. CARSON:

18  Q.  So as you can see, Mr. Williams, you received some

19  congratulations by employees at Linode, correct?

20  A.  Yes.

21  Q.  Did Adam Dampf respond to this email?

22  A.  Andrew Dampf.

23  Q.  I'm sorry.  Did Andrew Dampf respond to this email?

24  A.  No.

25  Q.  He was working at Linode at the time?

*United States District Court*

 1  A.  Yes.

 2  Q.  And you had worked with him since 2014?

 3  A.  Yes.

 4  Q.  And you worked with him in the same department since 2014?

 5  A.  Yes.

 6  Q.  And you had worked with him at the Galloway office and the

 7  Haddonfield office and the Philadelphia office?

 8  A.  Yes.

 9  Q.  What about Adam Rambo?  Did he respond and congratulate

10  you for the change in job title?

11  A.  No.

12  Q.  And you had worked with him in the same department and the

13  same room since the day he started, correct?

14  A.  Yes.

15  Q.  And how about did Tom Asaro respond to this?

16  A.  I don't believe he did.  Can you scan down?  I don't

17  remember Tom Asaro responding.

18  Q.  You had worked with Tom Asaro since the day you were

19  hired.  Actually, you met him at your job interview, right?

20  A.  Yes.

21  Q.  Tim Kaufmann, do you know, did he respond and say

22  congratulations?

23  A.  No.

24  Q.  You had been working with him since 2016, right?

25  A.  Yes.

*United States District Court*

1  Q.   All these other people --
2  A.   At that time he was actually my manager.  Because I was
3  reporting to Tim Kaufmann after he got promoted.  And from the
4  time that he got promoted and the promotion announcement was
5  made until this email was sent out, I reported to Tim Kaufmann.
6  Q.   Who are these other people responding?  I don't recognize
7  any names.  Who is Ben Ellis?  Without looking, do you even
8  know who Ben Ellis is?  Have you ever heard of him before?
9  Don't look at the document, just look at me.  Do you know who
10 Ben Ellis is?
11 A.   I don't remember.
12 Q.   Can you picture his face?
13 A.   No.
14 Q.   Do you know if he worked at Linode or not?
15 A.   I don't.
16 Q.   How about Michael Quatrani?  You ever hear -- do you know
17 who that is?
18 A.   Michael Quatrani.  I can't think of any, no.
19 Q.   And so Linode had how many employees at this time?
20 A.   200.
21 Q.   And so the people who had sent congratulations, they were
22 strangers, right?  You didn't even know them?
23 A.   There were a few that I can see that I knew.
24 Q.   But the people that you were closest with at Linode, the
25 people you worked with the longest at Linode, not one of them

*United States District Court*

1  just said "thank you," "congratulations," just like none of

2  them wished you a Merry Christmas on Christmas, right?

3  A.  That's correct.

4  Q.  All right.  So you started in 2014, and now we're -- you

5  know, we talked about 2014, '15, '16, '17, '18, and we're in

6  2019 now.

7     Can you talk about what life was like at Linode in the

8  beginning of 2019 just generally?

9  A.  2019 is when Chris Aker announced through an all-hands

10 meeting that Linode employees would receive equity in the

11 company.  He paused, and then he said, "but I can't promise

12 anything."  And I remember that.

13 Q.  Did things get better after this agreement that you made

14 in the December of 2019 meeting?

15 A.  At some point I was doing my job and I believed that

16 things were good, but things got bad.

17 Q.  Sorry.  Leaving the meeting, how did you feel?

18 A.  I felt comfortable, excited.  Went over to the

19 Pennsylvania Human Relations Commission and told them that I

20 thought the position that was promised to me would satisfy my

21 complaint as a solution and I was very excited.

22 Q.  Did you ask them to do anything with the charge when you

23 went over there?

24 A.  I asked them to drop the charge.

25 Q.  And did anything happen shortly thereafter that caused

*United States District Court*

1  concern?

2  A.   Yes.

3  Q.   What happened?

4  A.   There were issues with topics regarding diversity.  And

5  when I raised some of the diversity issues, Dan, he didn't --

6  Q.   So let me just stop you because I think we already kind of

7  talked about that a little bit.  I just want to keep everything

8  moving forward.

9       So let me ask you this question:  Did anyone say anything

10  to you after this meeting that -- about the promotion or --

11  A.   That was in 2018.

12  Q.   So right now in time -- I'm sorry if I'm not being clear.

13  I'll try to put my detail into my questions.

14       So in January -- after the January 25, 2019, email,

15  right, and after the meeting and after the only people who

16  congratulated you were strangers, after all that happened, did

17  anything happen after that that caused you concern?

18  A.   Well, after my meeting with Dan and Tom, there were

19  comments by Adam Rambo and Tim Kaufman, my manager.

20  Q.   All right.  Talk about those comments.

21  A.   I had just complained -- when I was in the room, I was

22  discussing my complaint and used the exact word "ageism"

23  several times.  Within a day or two, Adam Rambo, who sits

24  across by facing this way a few desks down, was standing and

25  began to raise his voice that he doesn't know what ageism is.

*United States District Court*

1  I mean, he's directing his comments to me.  Tim Kaufman, our

2  manager, was sitting next to him.

3  Q.   What exactly was he saying?

4  A.   He says he doesn't know what ageism is, he doesn't believe

5  in ageism.  When I responded to him stating --

6  Q.   What did you say?

7  A.   I stated comments explaining ageism as I explained it

8  to --

9  Q.   What exactly did you say to him, though?

10  A.   I explained that ageism is a form of discrimination.  And

11  he says that he didn't learn the word "ageism" when he was in

12  the university.  He said -- at some point Tim Kaufmann says,

13  "Adam."  And he says that, I'm not going to let Tim or anyone

14  else tell me what I can believe and what I can't believe, and

15  he says that he doesn't believe in ageism and that he could do

16  whatever he wants.

17        Tim Kaufman is still sitting -- who's my manager, is

18  sitting right next to him while he went on this rant.

19  Q.   And did he say anything else?

20  A.   I mean, he was openly talking.  And if there were people

21  sitting further down, they certainly heard him.

22  Q.   What did you do, if anything, after this incident?

23  A.   I asked -- I reported to Tom Asaro because I was concerned

24  that my -- what we said in the room got around.  And he said

25  that he discussed it with no one and -- he didn't have good

*United States District Court*

1  expressions on his face, and he told me not to worry about it.

2  Q.   Okay.  Did you talk to anyone else about it?

3  A.   Dan Spataro.

4  Q.   What did Dan Spataro say?

5  A.   He said don't worry about it, no one said anything to

6  anybody.  That was the kind of response that I got from both of

7  them.

8  Q.   And --

9  A.   But it was the exact words that I used.  I never used

10  "ageism" in any of my former discussions.

11  Q.   Did you have any other concerns regarding age

12  discrimination after the meeting with Tom Asaro and Dan

13  Spataro?

14  A.   Well, within that period of time, it may have been within

15  that same week, when we're all sitting at our open tables and

16  we're on our Slack channel -- because we're always in our

17  network operations team Slack channel default opening, people

18  were discussing me and putting the old man emoji into the chat

19  channel.

20  Q.   What's an old man emoji?

21  A.   One of the standard emojis.  It's an old man, almost like

22  the smiley face, but his hair is bald like this and there's

23  hair here.  It's called the old man emoji, and they were

24  putting it in there.

25  Q.   Like the symbols you text, do you mean?

*United States District Court*

1  A.   Yes.  Someone uploaded a lot of emojis that are not part

2  of the standard company emojis, but that may have been one I

3  don't know, but they routinely put a lot of emojis.

4  Q.   Do you know who was putting that?

5  A.   That was Adam Rambo and, unfortunately, I think Tom Duff

6  got caught up in all of that.

7  Q.   How do you know it was them?

8  A.   Because you can see in the Slack channel, as you see in

9  the messaging, the name of the -- this was in the network

10  engineering channel.

11  Q.   Who is all on that channel?

12  A.   All the network engineers, Tim Kaufmann, who is now the

13  manager, Dan Spataro, and Tom Asaro.

14  Q.   Did anyone say anything to him about it that you know of?

15  A.   Say anything to who?

16  Q.   They were putting the old man emoji up --

17  A.   They are making fun of the old man emoji while I am

18  talking.

19  Q.   My question is, do you know if Dan Spataro or Tom Asaro,

20  did they ever say anything about that afterwards?

21  A.   No.

22  Q.   Did they say anything to you about it afterwards?

23  A.   No.

24  Q.   How about after the announcement?  We're skipping around a

25  little bit, and that's okay.  You already talked about the --

*United States District Court*

1 let me ask you this:  Was the announcement before or after the

2 issue with Adam Rambo asking about ageism, the announcement

3 about your change in job title/promotion?

4 A.  Oh, that came -- that came -- you mean the announcement

5 that came after this incident that happened during the week

6 after I was in Tom Asaro and Dan Spataro --

7 Q.  In time.  So it was the meeting with Dan Spataro and Tom

8 Asaro, and then what happened next?  The old man emoji thing,

9 the comments from Adam Rambo about age, or the announcement in

10 January?

11 A.  Uh-huh.

12 Q.  Put it in chronological order.  Which one came next?

13 A.  I was -- the email announcement was sent out within --

14 during the announcement of the email, within that period of

15 time, when somebody was discussing my commotion, stating the

16 title, Adam Rambo said "in name only."

17 Q.  Wait.  That was when?

18 A.  What's that?

19 Q.  When was that?

20 A.  That was after this announcement was sent out.

21 Q.  After the January 25th announcement that we saw?

22 A.  Yes.

23 Q.  He saw that and said "in name only"?

24 A.  Yes.  Within a period of time and people were talking

25 about my promotion.

*United States District Court*

1  Q.   And where were you when he said that?

2  A.   I was present, sitting at my desk.

3  Q.   And you heard him say that?

4  A.   Yes.

5  Q.   Who was he saying it to?

6  A.   I mean, to everybody in response to people talking about

7  -- I mean, there was a big, open area and we had maybe 15

8  engineers, part of the network operations group, Dan Spataro in

9  his office, and other engineers and program managers.  Anybody

10  who was there could hear it.

11  Q.   Was that the only time that someone said a comment like

12  that about your change in job title?

13  A.    I routinely bring up vendors and people -- partners and

14  people that Linode worked with, show them around.  Chris liked

15  me showing people around the Philadelphia headquarters.  It was

16  the Corn Bank building --

17  Q.   Chris Aker?

18  A.   The owner of the company.  Because I would give a good

19  tour and connect it to a high-tech company mode of working and

20  also putting the historical perspectives and aspects to the

21  tour as well to make it exciting for partners and vendors to

22  want to connect with Linode.

23  Q.   And what happened during this tour?

24  A.   I gave my business card at this time when I paid -- had to

25  pay for my business card because Linode gave me a card where my

*United States District Court*

1  title was -- it was a long title and it was on this side and

2  formed two lines and they printed out a whole box.

3  Q.  What happened?

4  A.  It looked bad, and so I went to Kinkos and paid $60 or

5  something for my own business cards.

6  Q.  And then what happened?

7  A.  I had them there at my desk and gave one to one of our

8  routine vendors from New York City.  And I also took him around

9  and gave him the card at my desk because we were at my desk at

10  this point, and he noticed my -- the reason I gave him the

11  card, because I have a job title change, and he noticed it and

12  said it.  And Adam Rambo said, "in name only," and he looked

13  puzzled on his face.

14  Q.  Who, Adam or the vendor?

15  A.  The vendor.

16  Q.  Adam said that in front of the vendor?

17  A.  Yes.

18  Q.  Did anybody else say anything in front of the vendor?

19  A.  No.  I just -- I mean, I'm embarrassed, but this is just

20  typical.  And so I just moved on.  I wasn't going to expose --

21  or, I mean, discuss things that are private to our vendor.

22  Q.  So after you get this change in job title and now you have

23  a director level position at Linode and you're at the

24  Philadelphia headquarters, did things get better?

25  A.  In my heart I made the effort to work as a team, came up

*United States District Court*

1  with some new network strategy solutions.  The biggest one was

2  edge computing.  The edge computing paradigm was something that

3  I brought to Linode.  I was the one who talked and discussed

4  and researched at the various meetings that we're going to.  I

5  would go up to New York City on my own time in the evening, go

6  to New York City network operation group meetings and many

7  different meetings and I brought edge computing.  So I was

8  trying to make that effort and present.  I had meetings with

9  Chris Aker and provided presentations to him.  And I was

10 leading that effort.

11      And Dan, he would sometimes attend these meetings, and I

12 thought things initially -- at that point I was very

13 optimistic.

14 Q.  So as far as --

15 A.  But I continued to do basically the same, the same thing

16 that I was doing before.

17 Q.  And regarding the work you were doing, after January 25,

18 2020, did it change at all?

19 A.  No.  I was already -- I was progressing my ideals but I --

20 without the title change, I would have progressed those ideals.

21 There was no -- no one gave me any of the respected authority

22 that one needs to show support to further the company.

23 Q.  Did you receive a document that had your new job

24 responsibilities on it, for example?

25 A.  No, I did not.

*United States District Court*

1  Q.   Did you receive any emails that --

2  A.   There was an email that had some bullet points that Dan

3  sent out.

4  Q.   Is there any -- are you talking about the email from

5  September 2019 or -- I'm talking about after January 25, 2020.

6  A.   Just the January 25th email announcement.

7  Q.   So other than that announcement that had some bullet

8  points on it, did you receive any other emails from Dan

9  Spataro, Tom Asaro, Chris Aker, or anyone where they were like,

10  hey, listen, now that you're a director, here's what you are

11  going to be doing?

12  A.   No.

13  Q.   Any Slack messages like that?

14  A.   No.

15  Q.   Any meetings where they talked about, hey, now that you're

16  director, we need to get you on this project or that project?

17  Anything like that?

18  A.   No.  I was always the one that was going out.

19       MR. CARSON:  Can I please put a document in front of

20  the witness?  And it will be Exhibit 176.

21       THE COURT:  Why don't we take 10 minutes, stretch our

22  legs, clear our heads a little bit, come back quarter after

23  3:00.

24       Again, don't talk about the case, don't chat about it

25  in the back.  Okay?  And I'll see you in 10 minutes.

*United States District Court*

1          THE COURTROOM DEPUTY:  Please rise.

2          (Jury exits the courtroom at 3:05 p.m.)

3          THE COURT:  Okay.  Come back in 10 minutes.

4          (Brief recess at 3:06 p.m. to 3:27 p.m.)

5          THE COURTROOM DEPUTY:  All rise.

6          THE COURT:  All right.  Have a seat.  Bring the jury

7  in.

8          Is this direct going to go through the rest of the

9  afternoon, Mr. Carson?

10          MR. CARSON:  I think so.  I think we'll be close

11  enough that we'll probably start cross tomorrow, Your Honor.

12          THE COURT:  Okay.

13          THE COURTROOM DEPUTY:  Please rise.

14          (Jury enters the courtroom at 3:28 p.m.)

15          THE COURT:  All right.  You can all have a seat.

16          Mr. Williams, come on back up.

17  BY MR. CARSON:

18  Q.  So before we took our afternoon break, I was going to show

19  you an exhibit, and the exhibit that I would like to show you

20  is 166.  Please let me know when it's on the screen in front of

21  you.

22          And, Mr. Williams, what do you see?  What is this

23  document?

24  A.  This was inside -- I don't know why that day I took the

25  photo.

*United States District Court*

1  Q.   I don't need to know how you got it.  What is it?

2  A.   This is the inside of our HR Bamboo, my information.

3  Q.   And what does it show?

4  A.   Employment information at a particular moment in time

5  during my employment.

6  Q.   And that moment of time would have been what year?

7  A.   2019.

8  Q.   And so this is actually a picture of the HR Bamboo system

9  that we've heard mentioned a few times in this trial, correct?

10 A.   Yes.  Linode had some system.

11 Q.   Correct?

12 A.   Yes.

13 Q.   And so HR Bamboo is a software?

14 A.   Yes.

15 Q.   And it's a human resource software?

16 A.   Yes, for employees to look at their information.

17 Q.   And so the point of the software is to help HR systems and

18 employees kind of share information, I think; is that correct?

19 A.   Yes.

20 Q.   And this is actually Linode's Bamboo HR software that

21 we're looking at right here?

22 A.   Yes.

23 Q.   And this is your employee file that we're looking at?

24 A.   Yes.

25          MR. CARSON:  I'd like to move to publish this to the

*United States District Court*

1    jury and admit it into evidence.

2            MR. CAVALIER:  No objection.

3            THE COURT:  166 will be received into evidence.

4            (PLAINTIFF EXHIBIT 166 WAS RECEIVED IN EVIDENCE.)

5    BY MR. CARSON:

6    Q.   And so the screen that you took a picture of when you took

7    a picture of the HR Bamboo system at Linode that day

8    demonstrates the income levels that you had at Linode during

9    your employment between 2014 and 2020 -- sorry, between 2014

10   and 2019?

11   A.   2014?

12   Q.   Yeah.  So --

13   A.   Yes, but it says "show one more," and that would show my

14   base salary.

15   Q.   That one more would be 2014 salary?

16   A.   Yeah, the 120,000 per year.

17   Q.   So the starting number that you receive would be the

18   number that was reflected into the offer letter of $120,000 a

19   year, correct?

20   A.   Yes.

21   Q.   And so the next time that your income changed at Linode

22   was on May 29, 2017, when it became $127,200; is that right?

23   A.   Yes.

24   Q.   And stayed at 127,200 from May 29, 2017, until January 28,

25   2019, right?

*United States District Court*

1   A.   January 1, 2 --

2   Q.   January 28, 2019, is that what I said?

3   A.   Yeah, January --

4   Q.   Sorry.  Yeah.  I should have said -- it continued to be

5   128 -- now I'm saying it wrong too.

6        The income level that you received at Linode -- I'll just

7   go one by one.  On May 29, 2017, it was $127,200, correct?

8   A.   Yes.

9   Q.   And the next time it reflects, it says what it was on

10  November 16, 2017, and it was still $127,200; is that right?

11  A.   Yes.

12  Q.   And that's per year, right?

13  A.   Yes.

14  Q.   And the next time that it's reflected in this document is

15  January 1, 2019, and at that point it is $127,585.75, right?

16  A.   Yes.

17  Q.   And do you know why it went up $385.75 there?

18  A.   I never even noticed.

19  Q.   So the next time that we see an income level reflected was

20  on January 28, 2019, which would have been a couple of days

21  after that email where your job title was announced, and it

22  says -- still says $127,585.75; is that right?

23  A.   That is correct.

24  Q.   And so the next time that we see a change is on

25  February 22, 2019, and it went up to $135,000, right?

*United States District Court*

1  A.  Yes.

2  Q.  And I think you said there was one more time that it went

3  up, but it hadn't happened yet before your employment ended,

4  and that was sometime after February 22, 2019.  And what did it

5  go up to?

6  A.  It went up by three percent for an annual cost of living

7  raise.

8  Q.  And why do you say three percent?  Is that something that

9  was told to you or something that you received?

10  A.  Yes.

11  Q.  What was it?  How did you find out?

12  A.  Dan Spataro.

13  Q.  What did he say about that three percent?

14  A.  He said that everybody would get a three percent in

15  January, February 2020, I believe is the time frame.

16  Q.  So if I multiply $135,000 times 1.03, it equals $139,050.

17  Is that what it went up to, 139,050?

18  A.  Yes, 139,000.

19  Q.  Okay.  Did it ever go up after that?

20  A.  No.

21  Q.  So the increase that you testified about, that

22  three percent, was that just you that received that

23  three percent?

24  A.  As I said, Dan Spataro said that he was giving everybody a

25  three percent.

*United States District Court*

1  Q.  Everyone at Linode or --

2  A.  Everybody within his organization, he was directed to give

3  three percent.

4  Q.  And that was taking that work operations and data center

5  operations?

6  A.  Yes, whoever was reporting to him.  That's what I was

7  told.  What happened, I don't know.

8  Q.  That's what was announced?

9  A.  Yes.

10  Q.  And so the only other increase I see is this one that says

11  135.  So what's that?  $7,415 or $14.25, something like that.

12      So what was that bump there?  What was that for, the

13  127,585 to the 135, do you know why that occurred?

14  A.  That's a six percent cost of living raise that I assume I

15  got.  I mean, I didn't -- no one said you were getting a --

16  everybody received that at that period of time.

17  Q.  So the reason I'm asking is, you know, we can all see the

18  word "promotion" there.  And it wasn't the exact day, but it's

19  kind of close, I guess, in time.  It's about a month later.

20      So was it your understanding that that $7,000 and change,

21  that that bump had anything to do with the change in job title

22  from a network engineer to two levels up to a director?

23  A.  My understanding was it came at the exact time.  And how

24  it's being characterized here, no one said to me you're getting

25  this as a performance -- I mean, it would be from my

*United States District Court*

1 understanding --

2 Q.  Have you ever attributed that being the change in job

3 title to director?  Have you ever attributed that $7,000 bump

4 to the director change?

5 A.  No.

6 Q.  And you've been in the industry and you work at Linode.

7 And so based on your knowledge, based on your experience, based

8 on your conversations with people and just based on everything

9 you know, I want you to let me know, let the jury know whether

10 or not a 7,000 and change increase in salary would even make

11 sense if you were getting a promotion from a network engineer

12 to a director level position?

13        MR. CAVALIER:  Objection.

14        THE COURT:  Sustained.

15        MR. CARSON:  How about this -- I'll do it this way.

16 BY MR. CARSON:

17 Q.  Network engineer -- I'm going to do a corporate hierarchy.

18 So if junior network engineers are down here -- and this is

19 only --

20 A.  Uh-huh.

21 Q.  And the next level up would be a network engineer.  And

22 then the next level up would be senior network engineer; is

23 that correct?

24 A.  Yes.

25 Q.  And the next level up one would be like a Tim Kaufman

*United States District Court*

1  position, a manager of network engineers, right?

2  A.   Yes.

3  Q.   And then the next level up would be a director, right?

4  A.   Yes.

5  Q.   So if -- is $135,000 a year what senior network engineers

6  customarily get in the networking engineering industry?

7        MR. CAVALIER:  Objection.

8        THE COURT:  Sustained.

9  BY MR. CARSON:

10  Q.   Let me do it like this.  Do you have any personal

11  knowledge as to what the income levels of network engineers

12  versus senior network engineers are in the network engineering

13  industry?

14  A.   Yes.

15  Q.   Do you have any personal knowledge -- and so where does

16  that personal knowledge come from?

17  A.   That personal knowledge comes from applying for positions.

18  And the company that I was applying to gave me a salary of --

19  the base salary -- AWS, Amazon Web Services I applied to, the

20  base salary for a network entry level, they called it an entry

21  level position, 120,000, and the senior network engineers would

22  be at that mid 150,000 kind of range and then from -- up to

23  some other range.  And then the principal network engineers

24  would be closer to 200,000.  This was conversations I had with

25  AWS.

*United States District Court*

1    Q.    What would directors make with AWS, for example?

2          MR. CAVALIER:  Objection.

3          THE COURT:  Well, if he knows and had the

4    conversation.  He testified --

5          THE WITNESS:  The person who was hiring me, I worked

6    with his company before, IPv6 training, as a consultant in the

7    Silicon Valley, and he was a director at AWS and currently a

8    senior director at Oracle, and he's making 250,000, $260,000.

9    He gave me that information.  I didn't apply for that job.  But

10   I was applying for -- during my job hunt is when I found that

11   out.

12   BY MR. CARSON:

13   Q.    Did anyone at Linode ever talk to you about you're going

14   to get a $7,000 bump because we're going to kick you up three

15   levels in position?

16         We're not going to promote you to a senior network

17   engineer, we're not even going to promote you to a principal

18   network engineer, we're not even going to promote you to a

19   manager.  We're going to promote you all the way up to a

20   director level position and we're going to give you 7,000 more

21   dollars.  Did anyone say that to you or mention that to you?

22         MR. CAVALIER:  Objection.

23         THE COURT:  The objection's overruled.

24         THE WITNESS:  No.

25   BY MR. CARSON:


*United States District Court*

1  Q.   Did anyone suggest it to you in any way, shape, or form?

2  A.   No.

3  Q.   Tim Kaufman, Tom Asaro, Chris Aker, anybody?  Dan Spataro?

4  A.   No.

5  Q.   Richard Ford?  Do you know who Richard Ford is?

6  A.   Yes.

7  Q.   Is he an employee at Linode?

8  A.   Yes.

9  Q.   What's his position?

10 A.   They refer to him internally as the chief financial

11 operator but --

12 Q.   CFO?

13 A.   -- he likes to be called vice president of finance because

14 he doesn't like the word "chief" in front of his name.

15 Q.   Okay.  Either way, he's one of Linode's highest level

16 financial employees or he was at the time you were employed

17 there?

18 A.   Yes.

19 Q.   Was there anyone higher than him that handled Linode

20 finances at Linode, other than the owner, Chris Aker?

21 A.   Yes, Chris Aker would.

22 Q.   The only one other than him, right?

23 A.   Finances?

24 Q.   Yes.

25 A.   Yes.

*United States District Court*

1  Q.   So did he ever talk to you about increasing your salary?

2  A.   No.

3  Q.   Did you ever come to the conclusion -- Adam Rambo made

4  these comments to you about your director role being in name

5  only.

6       Did you ever think about that and make any conclusions

7  about those comments?

8            MR. CAVALIER:  Objection.  Leading.

9            THE COURT:  No, it's overruled.

10           THE WITNESS:  Yes, I did.

11  BY MR. CARSON:

12  Q.   What did you think about it?

13  A.   My -- my goal was to help Chris Aker and -- which I was

14  actively doing -- with him connecting with different founders

15  and different potential buyers.  I can name many of them.  And

16  I put up with the low salary because I thought that the exit

17  strategy would be compensation when we have that exit strategy.

18       Chris said he was even thinking about selling the company

19  to Comcast.  But I'd worked there, and I explained to him that

20  it wouldn't be a fit, but I don't think they would be

21  interested.

22       But putting that aside, that was -- that's what was in my

23  mind and that was my conjecture and I thought that I knew -- I

24  could see that I had a low salary, and I just went to work.

25  Those were the thoughts and the conjectures that were in my

*United States District Court*

1  mind.

2  Q.   Did Linode promote any other or hire or promote any other

3  senior network engineers after the three people you mentioned

4  already, Owen Conway, Andrew Dampf, and Tim Kaufmann?

5  A.   Yes.

6  Q.   And who was that?

7  A.   Steve Shaw.

8  Q.   Do you know when Steve Shaw's employment at Linode began?

9  A.   I know it was in 2019.

10  Q.   And did you have anything to do or did you have notice

11  that Steve Shaw would be hired as a senior network engineer in

12  2019?

13  A.   I was asked to put together a -- a -- as part of my

14  presentation to the New York City Network Operators Group

15  meeting, a slide to advertise to the New York City Network

16  Operators Group meeting two new positions that now were placed

17  on our website.

18       And so I helped Dan Spataro in putting together that slide

19  that I inserted in with my technical presentation to the New

20  York City Network Operators Group meeting that gave our entire

21  group, the network engineering team at the time as well as two

22  positions, senior network engineer and network engineer.

23  Q.   And shortly after that, Steve Shaw's appointment began?

24  A.   Yes.

25  Q.   And --

*United States District Court*

1   A.   I didn't interview Steve Shaw.

2   Q.   Oh, you interviewed him?

3   A.   No, I did not.

4   Q.   You did not.  So after you reported to Dan Spataro, back

5   in 2016, those issues that those interviews that you did

6   attempt, did you ever do an interview again for Linode?

7   A.   No.

8   Q.   We're getting close to the final year of employment here.

9   So can you kind of talk about how things were with Dan Spataro

10  by that point, by mid 2019?

11  A.   Mid 2019, an individual named Tara Taylor, she was

12  hired -- well, not she.  She goes by the singular pronoun of

13  they or them, not the plural version.

14       So what I'm describing, I want to point that out, Tara

15  Taylor, she was organizing -- I mean, Tara was organizing an

16  LGBT event that was being held at the Linode offices in June of

17  2019.

18  Q.   What happened with that event?

19  A.   Well, there were many things that happened but --

20  Q.   So the question that you started to answer there, when you

21  brought that up, was did anything happen with regard to Dan

22  Spataro and concerns in that final year of employment or

23  ballpark that final year.  So with regard to Dan Spataro and

24  comments, what happened at that event?

25  A.   Dan Spataro did not show up to that event.

*United States District Court*

1  Q.  Did he make any comments about the event?

2  A.  Yes.

3  Q.  To you?

4  A.  Yes.

5  Q.  What did he say?

6  A.  The event got around to -- inside of Linode.  There were

7  many friends of LGBTQ members who invited people from outside

8  in the Philadelphia area.  There were drinks and snacks.  Many

9  of the usual executives who attend regularly other venues, did

10 not attend, but Chris Aker was present.

11 Q.  What did Dan Spataro say?

12 A.  It got around that we were inviting other friends.  And we

13 were discussing -- there were topics of discussion of concern

14 of murders of various LGBT community members in Philadelphia

15 who had unsolved murders and were murdered for who they are.

16 And it was that kind of, you know, discussions that were

17 happening at -- there was no -- I don't think there was a

18 microphone, but people got up and were talking about it.

19     And Dan said many things about Tara Taylor.  And at this

20 point in time, he's talking about that they're having

21 activists -- that we were activists and troublemakers.

22 Q.  What do you remember exactly what he said?  What words?

23 A.  Exactly, troublemakers, activists, part of the woke -- I

24 think he used the word "society."  Perhaps, on other occasions,

25 he used woke culture.

*United States District Court*

1  Q.  Did he say anything about the people that were attending

2  or the friends that attended?

3  A.  Activists and troublemaker were the words that came out of

4  his mouth.

5  Q.  Was he -- what were his feelings that he verbalized to you

6  about the fact that this event was even happening?

7  A.  He did not attend the event, and he said it's going to be

8  an activist meeting.  He didn't understand why that we were

9  having so many people come in.

10        MR. CAVALIER:  Objection.

11        THE COURT:  Hold on.  Wait.  Wait.  Wait.

12  Mr. Williams, you've got to stop when there's an objection.

13        THE WITNESS:  Oh, I'm sorry.

14        THE COURT:  All right.  I want you to limit yourself

15  to the questions that are asked specifically.  Okay?  All

16  right.

17        Mr. Carson, ask another question.

18        MR. CARSON:  Sure.

19  BY MR. CARSON:

20  Q.  I don't want you to testify here about things that he

21  thought.  Even if you were right, it doesn't matter.  What I'm

22  asking are things that he said.

23     So did he say he didn't understand why they were there?

24  A.  Dan Spataro did not understand why they were bringing --

25        MR. CAVALIER:  Objection.

*United States District Court*

1      THE COURT:  Again, you can say what he said.  You do
2  not know what's in his head, and you may not testify to what's
3  in his head.
4      THE WITNESS:  What I was trying to say is that --
5  BY MR. CARSON:
6  Q.  Use the words that he said.  Use the words you heard.
7  A.  His exact words were he, Dan, said, "I don't understand
8  why they are bringing in people from the outside."
9  Q.  Were there other events at Linode like that that were not
10  LGBT events?
11  A.  Yes.
12  Q.  Did he ever express any kind of concern or issue with
13  those events?
14  A.  No.
15  Q.  Did you say anything in response to those comments?
16  A.  I gave him my journey of being -- being gay throughout my
17  life.
18  Q.  Where were you during this conversation?
19  A.  We were in the offices at Linode.  There were other
20  occasions where this, my journey, also came up.
21  Q.  Do you recall any other time when Dan Spataro spoke about
22  those kinds of issues?
23  A.  Yes.
24  Q.  By "those kind of issues," I mean issues related to
25  diversity or LGBT rights, those types of things.

*United States District Court*

1  A.   There were a number.

2  Q.   Tell us about it.

3  A.   When we were in Panama in October of 2019, he brought

4  James G.  I don't know his last name, but that's how we

5  referred to him.  It was his friend and also one of the

6  vendors.

7        And on a particular night, he said that he was going out

8  with James G., and they would routinely go out and not invite

9  me.  And they were going out because there were girls and that

10  I wouldn't be interested.

11  Q.   Did he say that?

12  A.   Yes.

13  Q.   And this was during a trip to Panama?

14  A.   That was in Panama, and it was a particular evening where

15  they were going out, James G. and Dan Spataro.

16  Q.   So let me ask you a couple questions about that Panama

17  trip.  So when did you have to go to Panama in 2019?

18  A.   October of 2019.

19  Q.   Okay.  And what was happening in Panama?

20  A.   We were going to open a data center in Brazil.  We were

21  looking at it, at least, and Panama was where they were having

22  the South America Interconnection meeting.  And so I made plans

23  to go down and do due diligence by talking with the Brazilian

24  networking community, who would all be at the South America

25  Interconnection meeting in Panama.  It happened to be held in

*United States District Court*

 1  Panama that year.

 2  Q.   And you did that on behalf of Linode?

 3  A.   Yes.

 4  Q.   And did you let anyone at Linode know that you were going

 5  to attend this event?

 6  A.   I proposed the event.

 7  Q.   And how is that?  What's the process for that?

 8  A.   I look around, looking at different areas.

 9  Q.   How do you tell someone at Linode?  Who would you tell, I

10  want to go to this vendor, that vendor?

11  A.   I sent out an email to the executives.

12  Q.   And then --

13  A.   I also talked to Dan.

14  Q.   Okay.  And is there like an approval process?  Someone

15  says, yeah, sure, that sounds great?

16  A.   Yes.

17  Q.   And then -- so then you did all that and it was approved

18  and you went?

19  A.   Yes.

20  Q.   And how did Dan Spataro end up on the -- there with you?

21  A.   He wanted to go with me.

22  Q.   Had he been to previous events with you like that?

23  A.   Yes, the same way.

24  Q.   And it was -- did he -- you said he brought a friend with

25  him during this trip?

*United States District Court*

1  A.  He arranged to have James G. to join him on the event.

2  Q.  Who is James G?

3  A.  James G. is a long-time friend of him from his former

4  company who sold Linode --

5  Q.  And during this --

6  A.  -- equipment.

7  Q.  And during this event, these comments that you testified

8  about, that's when they happened?

9  A.  Yes.  It was during this particular night that he said

10 that.

11 Q.  Did he say anything else?

12 A.  That I wouldn't -- that I wouldn't want to go any ways.

13 Q.  Did he say why you wouldn't want to go?

14 A.  Well, I mean, he's talking about going out and there would

15 be girls there.  So I didn't.

16 Q.  Is that true?  I mean, would that have been something that

17 would have bothered you, in any way?

18 A.  No.  No.  I mean, if it's going to a place where there are

19 men and women, I mean, I don't have anything against girls.  I

20 mean, I can -- I'm a sociable person.  I don't know what he

21 meant by it.  I mean, I know previous things but --

22 Q.  Were there any other comments made during that trip

23 specifically?

24 A.  In the Panama trip?

25 Q.  Yes.

*United States District Court*

1  A.   He was always talking about the -- those that were -- we

2  would meet at tables.  And the other -- and we would arrange

3  all these meetings, it was a big open space, and we would

4  arrange pairing meetings.

5      And generally, there were -- a more senior person would

6  bring their junior people with them.

7  Q.   And what did Dan Spataro say?

8  A.   He stated that everybody else has younger network

9  engineers with them.  And he didn't think that I was a network

10 engineer.  I mean, he did compliment me on setting up the

11 booths and those kind of things.

12      But when it came to the actual pairing meeting, this was

13 the kind of comments that he made while we're sitting, waiting

14 for other meetings, and he's looking around and just talking

15 his own mind.

16 Q.   So I'm not --

17 A.   He's telling me these things and we're only there.

18 Q.   So the next question I'm not limiting to the Panama trip.

19 Just in general, in that time period -- so we've kind of walked

20 through things in chronological order, and we're now in 2019,

21 and we're getting into the final year of your employment.

22      So around that time, was there any other comments that Dan

23 Spataro said about your age?

24 A.   Yes.

25 Q.   Or anybody's age, I guess, in the context of age

*United States District Court*

1  discrimination?

2  A.   I did recommend to Dan a particular older individual a

3  little bit younger than me to be a manager.

4  Q.   How old were you at that time, just for the record?

5  A.   2019.  It was in my -- is it 2019?

6  Q.   Yeah.

7  A.   So 2019, 54.  Late 2019.  Sometime in 2019, 53, 54.

8  Q.   Was this other gentleman, was he in his 50s?

9  A.   He was a little bit younger than me, but I assumed he was

10  in his 50s.

11  Q.   And what did Dan say?

12  A.   He was too old to be on the management track at Linode.

13  Dan placed two other engineers, who were much younger in their

14  20s, to be his managers in that department.  There were two of

15  them, and they were sharing responsibilities.

16  Q.   And as far as that time period, did anything else happen

17  regarding Dan Spataro and what you want to talk to the jury

18  about?

19  A.   2019 in Panama, we went to another pairing meeting that I

20  arranged in Malaysia that I got approved.  Richard Ford had

21  given me data that Southeast Asia was a fast-growing customer

22  area, from what he seen from our data.

23       And I mentioned to Rich Ford about going to that Southeast

24  Asia region to an interconnection meeting to find information

25  about sub-city cable systems, how we could do some edge

*United States District Court*

1   computing with partners there.  Those are just a few examples.

2       And so I got approval to go to Malaysia, and I was also

3   asked to present there.  That's how I found out about the

4   meeting.  I made two presentations.

5   Q.   Did Dan Spataro accompany you on that trip as well?

6   A.   Yes.

7   Q.   And was it the same process?  You submitted a request to

8   the executive team, it was approved, and you went?

9   A.   Yes.

10  Q.   And I'm sorry.  Continue with what went on in that trip.

11  A.   In Malaysia, it was the same comments.

12  Q.   Tell us what you heard on the trip.

13  A.   Yeah.  So I would get up early.  I would put up our booth.

14  We did a booth.  I didn't do the booth to do marketing.  I did

15  the booth to gain attention and credibility and to meet others

16  and use that as a backdrop to having technical discussions.

17      We're at pairing tables of meetings that I arranged, and

18  Dan is also making the comment, yet again, about how others --

19  and he mentioned the guy from Fastley -- about how he brings in

20  the younger network engineer and sits with them at the table

21  and discusses whatever we need to discuss.

22      And I said that I discuss way more than the network

23  engineers at the table.  I do due diligence on our business

24  strategy.

25  Q.   What were the comments?  So what did Dan say that was

*United States District Court*

1  concerning?  What did he say?

2  A.  He said this similar comment that this guy from Fastley,

3  they're a content delivery like Akamai.

4  Q.  The comment?

5  A.  The comment was that he's bringing younger network

6  engineers and that he wants to do the same thing.

7      And I said, "I don't think that that is our purpose, and

8  I'm -- my experience as someone older with experience can do

9  more than -- a network engineer."

10  Q.  Were there any other comments on that trip, the Malaysia

11  trip?

12  A.  The Malaysia trip, those were -- those were age-related

13  comments that I remember in Malaysia.

14  Q.  Were there any others in Malaysia?  And if not, we'll move

15  on to the next one.

16  A.  Yeah.  Those were the comments.

17  Q.  So around that time period, when the Malaysia trip

18  happened, where are we now in time?

19  A.  We're at -- we're at the beginning of 2020.

20  Q.  And did you do any other trips that year?

21  A.  In 2020?

22  Q.  Yeah.  June 2019 to June 2020, anywhere in there?

23  A.  I went to New York City Operators Group meeting.

24  Q.  Did anything happen there that you want to talk to the

25  jury about?

*United States District Court*

1   A.   Just what I already said.

2   Q.   How about any other trips where you had to travel to some

3   other country or something like that in connection with your

4   people networking part of your job?

5   A.   Philippines.

6   Q.   You went to the Philippines, too.  Was that the same

7   process?  You had to submit a report and the trip was approved?

8   A.   Yes.

9   Q.   And did you go on that trip alone or did anyone come with?

10  A.   Dan wanted to come along.

11  Q.   Okay.  And did he come along?

12  A.   Yes.

13  Q.   Did anything on the trip occur that was concerning to you

14  in connection with your claims in this case and what you think

15  the jury needs to hear?

16  A.   Yes.

17  Q.   What was that?

18  A.   There were two sets of comments.

19  Q.   Do the first one, please.

20  A.   The first one of the evenings we were at dinner, he told

21  me that I would not be coming on these trips again and that

22  Adam Rambo would accompany him.

23  Q.   Did he say why?

24  A.   He says that he wants a younger network engineer to come

25  with him.

*United States District Court*

1  Q.   Did you -- how did you respond?

2  A.   I didn't respond at this time.  I thought that I could

3  deal with it later, like, perhaps, when I got back.

4  Q.   Right.

5  A.   Because he was -- I did say that that would be taking away

6  a lot of my responsibilities, but I didn't -- I didn't go into

7  it with him.

8  Q.   And those are responsibilities that you were doing as a

9  director now, correct?

10  A.   Yes.

11  Q.   And he was a director, too, at that time?

12  A.   Yes.

13  Q.   Okay.  Continue, please.  Was there any other things said

14  at that dinner that you would like the jury to know before you

15  go to the second thing?

16  A.   We had a dinner later.  Before the Philippines social,

17  there were things said.

18       But relating to my age at that meeting, the -- I think

19  he's from the Philippines.  He was the individual who invited

20  me.  And Dan said that I would not -- he invited us to another

21  meeting and stated to this individual, in front of me, that

22  Carl won't be back for that meeting, that he would be bringing

23  someone else with him, a much younger engineer.

24  Q.   When?  Like later that week or like --

25  A.   In the middle of the week, when this individual was

*United States District Court*

1  talking, and it was after my presentation and he came up to me.

2  Q.  Was Dan saying you are not going to be back that day or

3  was he saying you are not going to be at the conference?

4  A.  Yeah.  I would not be doing this anymore and there would

5  be someone else accompanying him.

6  Q.  And what did that person say to that?

7  A.  Well, he knows me.  He --

8          MR. CAVALIER:  Objection hearsay.

9          THE COURT:  That's sustained.

10          MR. CARSON:  We'll move on.

11  BY MR. CARSON:

12  Q.  So then I think you said there was something else that

13  happened on the Philippines trip?

14  A.  Yes.

15  Q.  So what, if anything, else happened on the Philippines

16  trip?

17  A.  We were at dinner, and he asked me about a network

18  operation group meeting with what we were -- that he heard

19  about.  He stated that he heard about -- a couple weeks earlier

20  about the meeting.

21  Q.  What happened at this meeting a couple weeks earlier, if

22  you know?

23  A.  Yes.  I was a presenter at the meeting.  It was a network

24  operation team meeting.  So I attended and Tim Kaufmann runs

25  them.  Dan sometimes attends them and pops in and sometimes he

*United States District Court*

1  doesn't.  Because Tim is in charge, I would always attend them

2  regardless of, you know, I wasn't directly reporting to Tim

3  because I'm the director of network strategy and innovation.

4  And --

5  Q.  What happened at the meeting that -- so we're kind of

6  going back in time.  So if you were there.  Did anything happen

7  at that meeting of consequence?

8  A.  Yes.

9  Q.  What happened?

10  A.  A medium from the medium blog post was being discussed and

11  laughed at.

12  Q.  What was the blog post that was being discussed and

13  laughed at?

14        MR. CAVALIER:  Objection.

15        THE COURT:  Overruled.

16        THE WITNESS:  It was a blog post posted by now former

17  employee named Tara Taylor, who was fired two weeks earlier or

18  a week earlier or somewhere around that time frame.

19  BY MR. CARSON:

20  Q.  Did you and the people at Linode -- well, let me ask you

21  this:  Did you read the post?

22  A.  Yes.  I didn't read it in that room.

23  Q.  Do you have knowledge to whether anyone else read the

24  post?

25  A.  Yes.  They were discussing it.

*United States District Court*

1  Q.  At a Linode network engineering meeting?

2  A.  Yes.  Andrew Dampf and Tim Kaufmann were actually both

3  laughing at the article while reading it in front of others,

4  including Joe.  Dan calls him Joe T.  The article was about --

5  Q.  Who is the author of the article?

6  A.  Tara Taylor.

7  Q.  Was Tara Taylor still employed at Linode?

8  A.  No.  She was fired.

9  Q.  What was that article about?

10       MR. CAVALIER:  Objection.

11       THE COURT:  Overruled.

12       THE WITNESS:  The article was about Tara Taylor's

13  experience at Linode, which she alleges discrimination and a

14  hostile work environment.

15  BY MR. CARSON:

16  Q.  And so people were reading that and laughing at this

17  meeting?

18  A.  Yeah.  Because she, Tara Taylor, pronouns they and them,

19  Tara Taylor copied a snippet of her interactions with Vincent

20  Palochko and put them in her medium articles.

21       And -- and she was talking about Tara Taylor, they or

22  them, was talking about her, Tara Taylor's, experience as a

23  member of the LGBTQ community experience at Linode.  And she --

24  excuse me -- Tara Taylor wrote two articles.

25       MR. CAVALIER:  Objection.

*United States District Court*

1          THE COURT:  Hold on.  Okay.  The testimony now is

2  about the article that you saw people laughing about.  We're

3  not mustering beyond that.

4          THE WITNESS:  Sorry.

5          THE COURT:  So that the question was about that

6  article.  If you had read that article and you know people were

7  laughing about that article, you can testify in general about

8  that article.

9          THE WITNESS:  Okay.

10          MR. CARSON:  The issue is hearsay.

11          THE COURT:  It's more than that, Mr. Carson.  So let's

12  not state what the rules are.  Okay?

13  BY MR. CARSON:

14  Q.   It doesn't matter.  Let's just move on.

15       So the reason that this got brought up was because you

16  said that there was a conversation in the Philippines with Dan

17  Spataro when he was asking what happened at the meeting,

18  correct?

19  A.   Yes.

20  Q.   And did you tell him about what happened at the meeting?

21  A.   Yes.

22  Q.   You don't have to say it again.  You've already told us.

23  A.   I described that to Dan Spataro, and he asked me.  And it

24  was within the time frame of a week or two that we were in the

25  Philippines.

*United States District Court*

1  Q.   So what did he say during that conversation as you were

2  talking about what happened at the meeting and anything else?

3  A.   He, Dan Spataro, stated that he read both articles, both

4  medium blogs.  Dan Spataro said that Tara was an activist.  And

5  we were -- I was discussing what Tara Taylor's position was at

6  this time.  Because Dan was telling me -- what motivated my

7  discussion was Dan was describing to me what upper-level

8  management was doing in response to what Dan told me that Peter

9  Fu stated was a complaint from Tara Taylor to Linode.  And Dan

10 told me that she was an activist and the article --

11 Q.   Let's hear the words that he said to you.

12 A.   He said that Tara Taylor is an activist.

13 Q.   Did he say anything else besides that?

14 A.   She's part -- he used the pronoun she.  He referred to

15 Tara as she.

16 Q.   Okay.  What did he say?

17 A.   She's part of the echo chamber of the woke culture, the

18 woke society.

19 Q.   Did he say anything else?

20 A.   He discussed and referenced the diversity channel that we

21 had that Dan was in.  Dan talked about the -- one of the

22 articles.  He wanted me to resend the second article to him

23 because he wanted to have it.

24      And he was talking -- at this point, we're outside of

25 the -- during this discussion, it continued to the social,

*United States District Court*

1  where this part of the discussion is happening.  And we stopped
2  at the one part.
3  Q.   Before you move on, I was under the impression that we
4  were talking about an article.  Is there more than one
5  articles?
6  A.   There are two articles.
7  Q.   Okay.  And who was the author of the second article?
8  A.   Tara Taylor.
9  Q.   So they wrote two articles?
10 A.   Yes.  Tara wrote two articles.  I think there were -- yes.
11 Q.   And both articles were about Linode?
12 A.   Yes, Linode.
13 Q.   Generally the same subject matter?  We don't have to get
14 into what they said.
15      And then you were continuing.  You said that there was
16 more comments later on.  What happened?
17 A.   With the two Australian gentleman, Dan Spataro was talking
18 to them.
19 Q.   Slow down for just a second.  So where did the two
20 Australian gentleman come from?
21 A.   They were at the event social the last evening.
22 Q.   Okay.  And this is the Philippines trip still, right?
23 A.   Philippines trip.
24 Q.   Where was the social held?
25 A.   At the hotel that the conference was held at.

*United States District Court*

1  Q.   Okay.  And so you were talking to some other people there,

2  is that what happened?

3  A.   Yes.

4  Q.   And please continue.

5  A.   Well, the two gentlemen from Sydney, who were part of the

6  event, said, "We don't have that problem in Australia."

7  Q.   What problem?

8  A.   The problem -- Dan was talking about woke society and

9  about the LGBT community, and he said that they are woke, they

10  are part of the woke society, the woke culture.  The exact

11  words of "culture" and "society" interchanged.  And the two

12  Australian gentlemen said, "We don't have that problem in

13  Australia."  And Dan responded, "I wish we didn't have that

14  problem in the United States, the U.S."

15       The conversation continued on the second article.  And

16  based on something that was said in the article, it was

17  discussed, without stating that, but Dan stated, "Even if she

18  had a dick, she would have still been fired."

19  Q.   Did anyone respond to that?

20  A.   They were laughing and talking negatively.  This was -- at

21  some point during this conversation, I was telling Dan about

22  one of the other transgender persons that was at Linode.  She

23  was -- he, went by she at that point, was homeless, and I was

24  talking about how difficult it is for a transgendered person.

25  She was actually sleeping on Linode's couch in Galloway and

*United States District Court*

1  trying to -- I believe that I was just trying to respond to

2  these comments.

3       And I've worked in LGBTQ issues with the ACLU in

4  volunteering in my life, other things I won't get into, so

5  that's the way that I responded.  And I talked about how

6  transgender people are murdered all the time, and he had no

7  empathy towards this.

8  Q.   Okay.  Let's not talk about his feelings, though.

9  A.   Okay.  Yeah.

10 Q.   Let's talk about what you heard people say.

11      So regarding this trip to the Philippines, did anything

12 else occur during that trip that you heard that caused you

13 concern?

14 A.   Yes.

15 Q.   What else happened?  What else was said?

16 A.   He said that they are troublemakers.  He stated that there

17 was a candidate, a job candidate that was interviewing, and

18 they -- they being Linode or whoever was in charge of hiring --

19 were apprehensive of hiring this individual because that person

20 told Dan they're troublemakers.  And --

21 Q.   The person told Dan -- what did the person say?

22 A.   The person told Dan.  Dan told me that the person told him

23 that --

24 Q.   Wait.

25 A.   -- they had concerns about the candidate because they're

*United States District Court*

1    -- that person claimed to Dan, Dan told me that they're

2    troublemakers.

3            MR. CAVALIER:  Objection.

4            THE COURT:  The objection is sustained.

5            MR. CARSON:  Yes.  I was trying to take care of it

6    before the objection.

7    BY MR. CARSON:

8    Q.   So let's set it up a little and figure out if this is

9    something that we can put into evidence.

10           When you say "that person," who are you talking about?

11   A.   Dan said that, one of his managers.

12   Q.   One of his managers.  Okay.

13           Who was the manager?

14   A.   I asked who the manager was, and he refused to tell me.

15   Q.   That's it.  And that manager, it was your understanding

16   that that manager did an interview with somebody, is that the

17   what, the job interview?

18   A.   Yes.

19   Q.   And that the candidate wasn't going to be considered

20   because of their status; is that fair?

21   A.   Yes.

22   Q.   And Dan said that?

23   A.   Yes.

24   Q.   Did he actually say that to you?  Dan actually said that?

25   A.   Yes, he did.

*United States District Court*

1  Q.  So I think that we can kind of return to America now from

2  all these trips, but you mentioned that you were told that Adam

3  Rambo was going to be going on these trips in the future?

4  A.  Yes.

5  Q.  How old is Adam Rambo?

6  A.  He was in his --

7  Q.  At the time?

8  A.  At the time, he was in his 20s.

9  Q.  And how long had he been employed with Linode?

10 A.  Adam Rambo was hired in late 20 --

11 Q.  If you know.

12 A.  I do know.  I have to get the 2017 and --

13 Q.  Were you at the Haddonfield office still?

14 A.  Haddonfield.

15 Q.  So that would have been 2017 then?

16 A.  2017, late.  I think it was November of 2017.

17 Q.  And Adam Rambo's position, was he a senior network

18 engineer or a principal network engineer?

19 A.  Network engineer.

20 Q.  So after all those comments that happened at the -- I said

21 we are going to come back to America.

22      After all those comments that happened at the -- the

23 conversation at the event, the hotel in the Philippines, and

24 the two guys from Sydney are there, what did you do?  How did

25 that end?  Did you stay and talk?  Did you -- were any more

*United States District Court*

1  comments said?

2  A.   After these comments and after Dan said that he wasn't

3  going to tell me the name of the manager when I asked, he said,

4  "You would just blow up Linode and be like Tara Taylor and be a

5  troublemaker," I sat down my glass of wine and left the social

6  event.

7  Q.   So what time are we in now?  So now you're back from the

8  Philippines.  I think you said the Philippines trip was 2020.

9  So where are we now in time?

10 A.   When we came back, we were quarantined because --

11 Q.   COVID?

12 A.   Yeah, COVID.  Dan and I had to work from home.

13 Q.   Where are we in time?  What month is it?

14 A.   That was the end of February and then we're into March.

15 Q.   March 2020.  So your termination is August 19, 2020?

16 A.   Yes.

17 Q.   So five months from the termination.

18     Did anything happen -- so let's talk about that last five

19 months.  Was there anything that Dan Spataro said to you in

20 those final five months of your employment that you think the

21 jury should know when they consider all the evidence in this

22 case?

23 A.   During COVID, Dan said on a number of occasions during our

24 meetings that if I wanted to leave Linode, that he -- that

25 Chris Aker would be generous.  And on another occasion he

*United States District Court*

1  brought it up during another meeting about that he would

2  arrange a servant's[Sic] package for me if I left Linode and --

3  Q.   What were you --  sorry to interrupt.

4  A.   Yes.  If I wanted to leave, he would arrange a servant's

5  package.

6  Q.   A severance package?

7  A.   Severance.  Excuse me.

8  Q.   That's okay.  And did you ever express an interest or

9  indicate that you were considering leaving Linode?

10  A.   No.

11  Q.   Did he explain why he was suggesting that you should

12  leave?

13  A.   No.  It was just out of the blue.  I ignored the comment.

14  Q.   Was it your plan to leave at any time soon?

15  A.   No.  I worked very long years there and -- as I said, I

16  had that goal.

17  Q.   And I think we've already covered a bit.  Just very, very

18  briefly, if you can, what was that goal that you're talking

19  about?

20  A.   The goal of some exit strategy that I helped work for.  I

21  actually, during the summer of 2020, brought in new customers,

22  one from our competitor, who that company that was founded, he

23  contacted me, the founder, through LinkedIn -- I talked to him

24  through LinkedIn about a year and a half before, and then he

25  contacted me saying based on my presentation of Barcelona and

*United States District Court*

1   on the edge computing things, he'd like to go ahead with

2   something from Linode, and that was in 2020.

3   Q.   What about --

4            MR. CARSON:  Can we please show Mr. Williams

5   Exhibit 138?

6   BY MR. CARSON:

7   Q.   Just let me know when you can see the exhibit that's on

8   the screen in front of you.

9            MS. MEYER:  Paralegal 138?

10           MR. CARSON:  138, please.  And I'm going to pull it up

11  myself, actually.

12  BY MR. CARSON:

13  Q.   Can you see that, Carl?

14  A.   Yes.

15  Q.   So we can scroll around a little for you if you need us

16  to, but do you -- can you recognize that just from what you see

17  there?

18  A.   Yes, I recognize this.

19  Q.   So what is that, just generally this exhibit, what is it?

20  A.   That exhibit I was asked to turn over through discovery.

21  Q.   So just -- what is it?  What are we looking at?  Where did

22  it come from?

23  A.   Text messages on my phone between myself and Chris Aker,

24  the owner.

25  Q.   Okay.  And so these text messages were pulled from your

*United States District Court*

1  personal device?

2  A.   Yes.

3  Q.   And every one of these messages is from you to the owner

4  of the company, Chris Aker, or from Chris Aker, the owner, to

5  you?

6  A.   Yes, just the two of us.

7  Q.   And these messages were sent between, it looks like,

8  March 1, 2018, is when the thread begins, and the last one

9  looks like it was read on 6/21/2000 - yeah, 6/21/2000 (sic).

10      Is that what you see as well?

11 A.   Yes.

12          MR. CARSON:  Your Honor, I move to admit Exhibit 138.

13          MR. CAVALIER:  All 66 pages?

14          THE COURT:  Are you moving the whole thing in,

15 Mr. Carson?

16          MR. CARSON:  I am.  Is he --

17          THE COURT:  I'm not asking you -- I'm asking --

18          MR. CARSON:  It's just easier, yes.  Yes, I am, Your

19 Honor.

20          MR. CAVALIER:  I have a relevance objection, but I'm

21 not going to stand on it.

22          THE COURT:  Okay.  I'll admit it.  And I assume that

23 some of these are beyond the scope, but that's okay.

24          (PLAINTIFF EXHIBIT 138 WAS RECEIVED IN EVIDENCE.)

25          MR. CARSON:  Yeah, I think it's just as easy like

*United States District Court*

1    this.

2    BY MR. CARSON:

3    Q.   So, Carl, you and Chris Aker maintained a pretty close

4    working relationship during your employment at Linode, correct?

5    A.   Yes.

6    Q.   And was he -- did he maintain a close working relationship

7    with, like, all the employees, that's just how he was, or was

8    there a reason why he was working directly with you?

9    A.   He was working with me because I was introducing him to

10   potential co-founders, the co-founder of the internet, Vint

11   Cerf, I introduced him to; I introduced him to Scott McNealy,

12   which you'll see here who was the co-founder of Sun

13   Microsystems; I introduced him to the co-founder of Akamai.

14   Q.   So let me take it -- since we're looking at this exhibit,

15   let me take it kind of step by step so we can get through this.

16        So I'm looking at the --  it looks like the second page,

17   and you sent a text of a person that says "founder of Open

18   Forge."

19        What is that?

20   A.   Open Forge at that time was a small company here in

21   Philadelphia.

22   Q.   And you were introducing Chris Aker to the founder?

23   A.   Yes.

24   Q.   What about -- and is that founder of Open Forge -- you

25   know, the next few exhibits look like they are all related to

*United States District Court*

1   that issue.

2       Is that all related to introducing the owner to the

3   founder of another tech company?

4   A.   Yes.

5   Q.   If we go down to here.  If you can look at your screen and

6   tell us what we're looking at here.

7   A.   This was a meeting that I arranged with Kumulus.

8   Q.   Is that Linode that we're looking at?

9   A.   That is Linode's conference room on the first floor.

10  Q.   And that's a meeting you set up with some people from

11  other companies that come to Linode and --

12  A.   For our NextGen project that I --  I was not part of that

13  alias, but, yes.

14  Q.   Okay.  I'm going to keep going.

15      So here we are down here on page 9, and you're sending

16  Mr. Aker -- why don't you just tell us, what are you sending

17  Chris Aker here?

18  A.   This is some designs that I put together, and I'm at the

19  Vision Graphics over here in Old City and taking the photos of

20  our stand that -- a new stand that we were having on those

21  networking related products that I was going to take to

22  whatever meeting that we were having at that time.

23      As you can see here, I have "Peering with Linode," and I

24  have a peering alias that are created called

25  peeringatlinode.com.

*United States District Court*

1  Q.  So you were sharing that information with Chris Aker

2  because that was something that you had done recently?

3  A.  I am spending his money on Vision Graphics.

4  Q.  And so let's go down to 14.  And here, looks like you're

5  sending Chris Aker this screenshot that says -- it looks like

6  it's about hiring people with more diverse backgrounds.  Why

7  were you sending him that?

8  A.  Diversity was the hottest topic in terms of culture at

9  Linode, and I sent these to Chris personally as well as in the

10 Slack thread he and I had internally at Linode.

11 Q.  And here, let's going to page 17.  And here it says,

12 "Artificial platform, CEO here in Philly," and you sent the

13 promotions card.

14      Is this another introduction you're making?

15 A.  Yes.  Chris asked me to introduce him to companies within

16 the high-tech companies here in the local Philadelphia area so

17 we can blend in with them and they possibly can partner with us

18 or use our platform.

19 Q.  And so I'm going to do two more and then I'm going to stop

20 because it looks like -- these types or introductions were

21 things that you did on behalf of Linode and to help the company

22 grow regularly, right?  This is part of your job?

23 A.  Yes.

24 Q.  All right.  Let's go down to 23 when Chris stated to you,

25 "We had a fantastic call.  Thank you very much for setting this

*United States District Court*

1    up.  He was very helpful and wanted to help more.  It was a

2    thrill, Carl, a highlight of my career.  Thank you."

3         What's Chris Aker talking about here?

4    A.  I worked at Sun Microsystems for 10 years.  I met Scott

5    McNealy, the founder and co-founder, at all-hands meetings

6    there.  He doesn't remember me from those all-hands meetings,

7    but there's a lot of -- there was interactions between us

8    because I LinkedIn with him, and he always responds.  And I met

9    him in person.  He asked me to come to breakfast at his home

10   near Palo Alto, where they have all the capitalist --

11   Q.  So what was Chris talking about when he said "the

12   highlight of my career"?  What was that about?

13   A.  At that meeting with Scott, I told him that I want him to

14   help our founder, Chris Aker, in terms of giving him advice on

15   whether he should take private equity offers that he was being

16   offered.  Chris was unclear if he should do that.  And so I

17   asked Scott McNealy what -- you know, you don't know him, but

18   he was a co-founder of a very large -- during the dot com boom,

19   it was all Sun Microsystems servers that were in the dot com

20   boom.  And unfortunately, they got bought out by Oracle because

21   they were going down, with Linux.  And so I introduced him to

22   Scott and I arranged this call.  And you can see on this

23   picture it's a Skype call.

24   Q.  So that -- what you and Chris Aker were discussing there,

25   it was directly related to the objective of trying to -- an

*United States District Court*

1  exit strategy that you've been talking about, about this case;

2  is that right?

3  A.  Yes.

4  Q.  And so --

5          MR. CARSON:  We can take that exhibit down.  I'll move

6  on.

7          THE COURT:  We're moving on, Mr. Carson, let's use

8  that as a chance to break for the day.

9          MR. CARSON:  Yep.

10          THE COURT:  So obviously, we've got in to quite a bit

11  more evidence today, but by no means all of it, so as you go

12  home, clear your head, but don't be talking about the case.

13  Not with each other, not with family, friends, co-workers,

14  anyone you might chat with tonight.  And again, I'll tell you

15  again because it's important, some things may slip, don't look

16  things up, even company names or anything like that.  Just

17  steer clear of looking anything up online.  Okay?

18          And we'll see you back here -- did 9 o'clock work for

19  everyone this morning?  Is it tight?  Do we need to adjust to

20  9:30?  Everybody is good.  I don't see anyone panicking.

21          Let's see you at 9 o'clock tomorrow.  And have a good

22  night.

23          THE COURTROOM DEPUTY:  Please rise.

24          (Jury exits the courtroom at 4:43 p.m.)

25          THE COURT:  Okay.  You can all have a seat.

*United States District Court*

```
 1              Mr. Williams, you can step down.

 2              All right.  Mr. Carson, how much longer do you think

 3    you have on his direct?

 4              MR. CARSON:  So I was trying to think of that because

 5    I knew you were about to ask me.  I'm trying to go as fast as I

 6    can.  May between a half an hour, an hour.

 7              THE COURT:  And --

 8              MR. CARSON:  I still have to do damages, but I'm close

 9    to the end of the story.  The termination is not just a simple

10    subject.  So you know, there's a few more things.

11              THE COURT:  Right.  I understand.  I don't see where

12    you are going to get done in 30 minutes, this direct.  I'm just

13    trying to figure out where we stand.  Okay?

14              MR. CARSON:  The witness I plan to call after that

15    would be Vincent Palochko.

16              THE COURT:  Mr. Palochko would be next.  Okay.  So you

17    need to share the exhibits you're going to use with

18    Mr. Cavalier, in the event we get to Mr. Palochko tomorrow.

19              MR. CARSON:  Yes.

20              THE COURT:  Mr. Cavalier, do you have a sense of your

21    cross for Mr. Williams?

22              MR. CAVALIER:  To be perfectly honest with you, I

23    wasn't expecting the direct to be as long as it has been, so I

24    need to kind of re-evaluate where I want to go on my cross.  I

25    certainly don't want to spend a full day tomorrow on the same
```

*United States District Court*

1  witness, but I really just need to look into that tonight.

2        Given that he needs to be on a plane out of here -- I

3  actually don't know where Mr. Palochko is.  He's been sort of

4  sequestered.

5        THE COURT:  Sequestered, right.

6        MR. CAVALIER:  But given that he has to be on a flight

7  out -- or at least the last time I checked, a flight out -- or

8  a rescheduled flight for Thursday morning to Friday morning,

9  even just as a matter of logistics, I will try to tighten it up

10 as much as I can so that we can get through the witness.

11        I have one more housekeeping issue to raise at the end

12 of the day.

13        THE COURT:  That's fine.

14        Mr. Carson, how long do you expect your examination of

15 Mr. Palochko to be?

16        MR. CARSON:  Obviously nowhere near as long as

17 Mr. Williams.  An hour, I guess maybe hour and a half,

18 somewhere in there, I think.  I'll try to do it --

19        THE COURT:  Okay.  I don't want to keep chopping up

20 Mr. Williams' testimony if I can avoid it, but I recognize the

21 challenges that it poses.  You're going to want to go beyond

22 the scope of what Mr. Carson covers and put on a narrative.

23        MR. CAVALIER:  With Mr. Palochko.

24        THE COURT:  With Mr. Palochko.  So I guess we'll have

25 to play a little bit by ear tomorrow as we see how quickly

*United States District Court*

1    we're going.  But certainly my preference would be to get

2    Mr. Williams done and off the stand if there's any way to do

3    that.  Okay?

4          What else, Mr. Cavalier?

5          MR. CAVALIER:  So the only housekeeping issue that I

6    have -- and I think that I have to raise it as a matter of

7    preserving my record here, is that this goes back to the

8    subpoena issue we talked about pretrial.  And we agreed to

9    accept service of subpoenas for Mr. Spataro, Mr. Palochko, and

10   Mr. Asaro.  Mr. Asaro and Mr. Spataro were at least --

11         THE COURT:  Parties at the time.

12         MR. CAVALIER:  -- arguably parties at the time.  We

13   agreed to accept service of subpoenas for those witnesses so

14   that Mr. Carson and Mr. Williams can call them in plaintiff's

15   case in chief.  We've never gotten any subpoenas compelling

16   them to appear as part of plaintiff's case.

17         Now, I don't want to hang my hat on a technicality

18   here -- and again, I'm just trying to preserve my record, but I

19   do -- I don't know how much authority, given the lack of

20   subpoenas, plaintiff has to call any of these witnesses in his

21   case in chief given that they have not been served any kind of

22   -- they have not been paid the witness fee, none of the normal

23   mechanisms that you would typically go through compelling an

24   opposing party witness to appear in your case.

25         MR. CARSON:  They were parties until yesterday.

*United States District Court*

```
 1              THE COURT:  Well, yeah, so as to Mr. Spataro and
 2   Mr. Asaro, I do think -- I mean, they were parties.  They were
 3   listed on the caption until yesterday, right?  So that does put
 4   it in a somewhat different light I think.  There was no need
 5   for him to serve them or process or do anything else.
 6              Mr. Palochko is somewhat differently situated,
 7   Mr. Carson.  He was never a party.
 8              MR. CARSON:  I think he was served.
 9              THE COURT:  I don't know.  I mean, they told you they
10   would accept the service of a subpoena.
11              Did you send a subpoena?
12              MR. CARSON:  I believe I did.
13              THE COURT:  Did you get it, Mr. Cavalier?  Do you have
14   his subpoena?
15              MR. CARSON:  Well, did you get one for Richard Ford?
16              MR. CAVALIER:  I'd have to check, but I don't think
17   so.
18              MR. CARSON:  Okay.  Well, that I know he got.
19              THE COURT:  That you know who got, Mr. Carson?
20              MR. CARSON:  I know that John got it, Mr. Cavalier.
21              THE COURT:  How do you know that?
22              MR. CARSON:  Because I know that I sent the link to
23   the Dropbox folder, where they were like seven times, to him
24   and I know it's in there.
25              THE COURT:  I don't know exactly what you did or
```

*United States District Court*

1  didn't do and what you sent or didn't send.  I don't know

2  whether you tendered witness fees or any of the other things

3  that are required with the subpoena.

4        You know, typically when you serve a subpoena, you

5  don't -- it was never my practice to put it on a FTP site or

6  any kind of Dropbox where it requires someone to go pull it,

7  you push it to them.

8        MR. CARSON:  Well, they accepted service of it.

9        THE COURT:  I hear you, but typically you actually

10 deliver it to them, you don't put the onus on them to pull it

11 down.  If you said to them, I'm serving subpoenas and made them

12 available on Dropbox, I probably wouldn't stand on that.  But I

13 don't know what was conveyed as a cover to whatever Dropbox

14 link you made available to them.  I don't know if they were on

15 notice that there were subpoenas in there.

16       MR. CARSON:  Your Honor, there's six emails about it.

17 And Vincent Palochko's subpoena is in there.  This was back in

18 December.  I received the email back that he accepted service

19 of the -- it has a notice of intent and --

20       THE COURT:  All right.  Look, if it's going to be a

21 dispute, then I guess tomorrow morning I'm going to want to see

22 the emails.

23       I mean, I can do it now, if you want to show it to me

24 now.  If it's an issue you want to hang your hat on, Mr.

25 Cavalier -- I don't begrudge you doing it, but if you're going

*United States District Court*

1  to make a record, I think you have to hang your hat on it or

2  not --

3          MR. CAVALIER:  And I think -- look, I don't want to

4  commit to it -- commit to it is a better word, given that I'm

5  not -- I need to talk to my clients, I need to talk to -- I

6  don't know where Mr. Palochko is, I don't want to commit to

7  being able to produce him.

8          MR. CARSON:  He was here like six hours ago.

9          THE COURT:  He was sequestered.  I don't know where he

10 went.

11         MR. CAVALIER:  Right.  So the Dropbox issue, this is

12 an issue I've run into -- and I think Your Honor might recall

13 running into it before -- it came up in December of this year

14 where we initially traded pretrial memos, and this plaintiff's

15 pretrial memo listed 31 witnesses.

16         THE COURT:  Uh-huh.

17         MR. CAVALIER:  We started getting word from certain

18 people that they had received a subpoena or a notice of a

19 subpoena, notice of intent to serve a subpoena, so we reached

20 out to them and found out that they had gotten these -- at

21 least ostensibly either a notice of an intent to serve a

22 subpoena or an actual subpoena to appear at trial.  And we have

23 never heard of any subpoenas being served, shared with us, what

24 have you.

25         So I did certainly have communications with Mr. Carson

*United States District Court*

1    and asked him, hey, we're hearing that some people are getting

2    subpoenas, we didn't know you sent any out, did you give us

3    notice?  At that point in time, he pointed us to the Dropbox

4    and said, what I sent is in the Dropbox.  So we went and looked

5    at the Dropbox and there were documents in there.

6          But I certainly don't remember ever being directed to

7    the Dropbox by Mr. Carson where he said, hey, the subpoena that

8    I intend to serve on the people that you accepted service for

9    is in here, and I don't recall seeing those documents in the

10   Dropbox in the run-up of trial either.  If I'm mistaken, I'll

11   take the correction, but I certainly don't remember seeing

12   anything.

13         MR. CARSON:  Is he suggesting that he's going to hide

14   Vince Palochko, he's not going to come?

15         THE COURT:  We're not using the word "hide."  I'm not

16   using the word "hide," Mr. Carson.  I'm not going to tolerate

17   it.  The question right now is whether you perfected service,

18   okay.

19         So I don't know at this point, A, what exactly

20   happened.  Okay?

21         MR. CARSON:  And that --

22         THE COURT:  Mr. Carson, I'm talking.  Don't interrupt

23   me.  Okay?

24         So I have some competing stories from the two of you

25   about what exactly happened.  I don't entirely know.  I can't

1  know without looking and seeing the correspondence and at least
2  screenshots of the Dropbox links and --
3        MR. CARSON:  Well, Your Honor --
4        THE COURT:  Mr. Carson, don't interrupt me.  Okay?  It
5  makes it hard for the court reporter and it's inappropriate.
6  You should know better than that.  Okay?
7        So I don't know what was there, no one is showing it
8  to me, I'm not looking at it.  I don't have a link to the
9  Dropbox.  And I'm not asking you to send me one, just to be
10 clear.
11       So if it's an issue on which the defense is going to
12 rest and say they are not going to produce Mr. Palochko --
13 again, I don't think it's really an issue for Mr. Asaro or
14 Mr. Spataro.  I don't think until 24 hours ago they were
15 subject to a subpoena requirement.  You've got one of them here
16 as a corporate representative, right?  I think they should
17 appear.
18       Mr. Palochko is differently situated, so that's really
19 who we are talking about right now, and anyone else who
20 Mr. Carson is intending to call who hasn't been subject to a
21 subpoena.  Obviously, if someone hasn't been subject to a
22 subpoena, I don't have the power to compel them to show up.
23       So I don't know.  Again, you need to talk about it,
24 Mr. Cavalier, with your client.  You should probably go back
25 and look at the record because -- you know, if the record is

*United States District Court*

1  muddy, ambiguous on this, it's not going to be as easy for me

2  to exclude someone who is a key witness.

3         MR. CAVALIER:  Sure.  Your Honor, I do want to be

4  clear based on the remark that Mr. Carson just made.  This is

5  not necessarily an issue of whether Mr. Palochko is willing to

6  appear.  It's whether I get the right to call him in my case as

7  a witness, as opposed to somebody he's trying to compel in his

8  case, and I think that is a distinction that's important here.

9  Again --

10         MR. CARSON:  And --

11         THE COURT:  Mr. Carson, stop interrupting people.

12         MR. CAVALIER:  I guess I just want to note that I

13  resent the notion of trying to hide anybody.  My purpose was to

14  have Mr. Palochko in the courtroom for the entire trial.

15         THE COURT:  Again, as I said, I'm not interested in

16  aspersions about hiding, okay.  There are rules that govern how

17  this works.  The rules either have or haven't been complied

18  with.  It may be that there's a muddy record as to what they've

19  complied with.  I don't know -- I can't tell you without seeing

20  everything how I'm going to rule.

21         If there's a muddy record with a colorable argument

22  that he's been subpoenaed, I'm probably going to have him here,

23  right?  I'm probably going to have him testify.  That's kind of

24  where I am.  But if it's less clear than that, then maybe I

25  won't.

*United States District Court*

1          So I think you should look at the historical record as

2     to what exactly the correspondence was and what was available

3     to you.  If there's something you want to present to me

4     tomorrow, whether that is -- you know, and I don't know what is

5     -- the context in which this arises.  Right?  It could arise in

6     the context of you saying -- sorry, you, Mr. Cavalier, you

7     could walk in and say, I want a protective order because we

8     don't think this was properly effective service; it could be

9     Mr. Carson walking in and saying, I think I have effected

10    service and he's not here and I'm moving to compel compliance

11    with my subpoena.  I don't know.  Right?

12         So I don't know the posture in which it's going to be

13    presented to me, nor do I know what the actual record is going

14    to show.  My suggestion is that you look at it, and then the

15    two of you talk and try to work it out.  I think that would be

16    a cleaner outcome.  But if I need to rule on it tomorrow, I

17    will.  Okay?

18         MR. CAVALIER:  Thank you.

19         THE COURT:  But I will just say, to the extent it's an

20    issue, you raised it now.  Talk about it now.  If it's going to

21    be an issue, send me something in a 9 o'clock email, I prefer

22    not to walk in at 9:00 a.m. tomorrow morning and hear that it's

23    an issue that I didn't -- you know, if I hear silence, I'm

24    going to assume it's resolved.

25         MR. CAVALIER:  All right.  Thank you.

*United States District Court*

```
1              THE COURT:  Anything else before we break for the day?
2              MR. CARSON:  Yeah, I have something else.
3              THE COURT:  Okay.
4              MR. CARSON:  Your Honor, Mr. Cavalier accepted service
5    on behalf of Mr. Palochko in this court.
6              THE COURT:  Mr. Carson --
7              MR. CARSON:  So why are we talking about whether
8    there's an issue with service?
9              THE COURT:  Mr. Carson, I don't know that anyone
10   accepted service of anything, okay.
11             MR. CARSON:  He said it in this courtroom.
12             THE COURT:  He said he would.  I don't know what was
13   transmitted or in what context.  Again, I'm not going to
14   resolve this now.  I think I just made that pretty clear.
15             So if you don't have something else, you have more
16   argument on the same subject.  That's different.  Right?
17             Is there anything else?  In other words, a different
18   issue that you want to raise?
19             MR. CARSON:  I don't want to raise any issues.
20             THE COURT:  Okay.  Then we're going to break for the
21   night.  You all can look at what was done in the past, you can
22   talk to each other, and you can tell me if it remains an issue.
23   Okay?
24             I'll see everyone in the morning at 9:00 a.m.
25             THE COURTROOM DEPUTY:  All rise.
```

*United States District Court*

1          (Matter adjourned at 4:57 p.m.)

2        - - - - - - - - - - - - - - - - -

3

4          I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  */S/ Maureen McHugh, RPR*
   *Official Court Reporter*

8

9  *January 24, 2024*
       *Date*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

**$**

**$10,000** [1] - 118:23
**$10,119** [1] - 123:14
**$115,000** [1] - 25:15
**$120,000** [2] - 26:4, 156:18
**$125,000** [1] - 118:13
**$127,200** [3] - 156:22, 157:7, 157:10
**$127,585.75** [2] - 157:15, 157:22
**$135,000** [2] - 157:25, 158:16, 161:5
**$139,000** [1] - 118:14
**$139,050** [1] - 158:16
**$14.25** [1] - 159:11
**$15** [1] - 63:8
**$164,918** [1] - 122:24
**$176,000** [1] - 123:7
**$236,000** [2] - 136:8, 136:11
**$236,458** [1] - 129:17
**$236,958** [2] - 123:19, 134:7
**$260,000** [1] - 162:8
**$385.75** [1] - 157:17
**$60** [1] - 151:4
**$61,921** [2] - 119:14, 122:7
**$7,000** [3] - 159:20, 160:3, 162:14
**$7,415** [1] - 159:11

**'**

**'07** [1] - 59:10
**'15** [1] - 144:5
**'16** [4] - 45:6, 45:7, 47:1, 144:5
**'17** [3] - 59:10, 73:15, 144:5
**'18** [2] - 72:19, 144:5
**'21** [1] - 119:11
**'87** [1] - 59:10
**'97** [1] - 59:10

**/**

**/S** [1] - 209:7

**0**

**006** [1] - 95:17

**1**

**1** [10] - 30:7, 116:21, 118:18, 118:19, 118:20, 118:25, 120:10, 157:1,
157:15, 192:8
**1.03** [1] - 158:16
**10** [14] - 3:11, 28:22, 29:11, 29:13, 29:14, 64:3, 64:4, 64:13, 112:15, 115:13, 153:21, 153:25, 154:3, 196:4
**108** [1] - 3:6
**11** [1] - 115:13
**113** [1] - 3:6
**11:00** [4] - 9:18, 64:4, 64:12, 64:15
**11:16** [1] - 64:15
**11:17** [1] - 65:1
**12** [4] - 21:9, 26:22, 58:3, 112:15
**120,000** [2] - 156:16, 161:21
**127,200** [1] - 156:24
**127,585** [1] - 159:13
**128** [1] - 157:5
**12:10** [1] - 93:14
**12:30** [1] - 64:21
**12:34** [1] - 106:5
**12:35** [1] - 106:9
**133** [1] - 3:7
**135** [2] - 159:11, 159:13
**1350** [1] - 2:4
**136** [1] - 3:7
**137** [1] - 3:4
**138** [6] - 3:15, 191:5, 191:9, 191:10, 192:12, 192:24
**139,000** [1] - 158:18
**139,050** [1] - 158:17
**14** [1] - 195:4
**141** [1] - 3:14
**15** [7] - 3:13, 63:9, 84:13, 86:14, 86:15, 113:3, 150:7
**150,000** [1] - 161:22
**156** [1] - 3:14
**16** [2] - 113:3, 157:10
**1601** [1] - 2:4
**166** [4] - 3:14, 154:20, 156:3, 156:4
**17** [3] - 3:4, 28:13, 195:11
**172** [1] - 128:7
**175** [4] - 3:10, 23:3, 23:19, 23:20
**176** [1] - 153:20
**17th** [1] - 51:21
**18** [5] - 3:12, 48:14, 49:16, 49:18, 49:19
**1835** [1] - 1:19
**1889** [1] - 18:7
**19** [2] - 113:20, 189:15

**19102** [1] - 2:5
**19103** [1] - 1:20
**19106** [1] - 1:13
**192** [1] - 3:15
**1964** [1] - 18:6
**1982** [2] - 18:4, 18:14
**1986** [1] - 18:23
**1987** [3] - 19:2, 22:24, 59:9
**1989** [1] - 20:1
**1990** [4] - 19:24, 20:20, 20:22, 21:8
**1:46** [1] - 106:9
**1:48** [1] - 106:18
**1st** [1] - 122:12

**2**

**2** [4] - 1:6, 5:23, 95:17, 157:1
**20** [1] - 188:10
**200** [1] - 143:20
**200,000** [1] - 161:24
**2000** [1] - 74:25
**2001** [1] - 108:18
**2005** [2] - 108:22, 112:13
**2006** [1] - 108:25
**2008** [9] - 20:22, 20:24, 21:8, 21:13, 21:20, 76:15, 92:2, 111:11, 111:19
**2014** [24] - 21:20, 21:23, 22:14, 22:25, 23:14, 26:22, 28:13, 30:7, 31:5, 31:11, 32:4, 46:2, 46:12, 59:25, 63:14, 63:15, 142:2, 142:4, 144:4, 144:5, 156:9, 156:11, 156:15
**2014-15** [1] - 33:3
**2015** [4] - 35:12, 41:3, 48:12, 118:12
**2016** [19] - 41:4, 41:14, 42:1, 44:14, 45:9, 45:11, 45:14, 46:8, 46:12, 47:2, 47:3, 52:20, 66:9, 73:13, 142:24, 166:5
**2017** [22] - 47:3, 47:11, 48:4, 48:16, 50:5, 52:2, 59:9, 59:25, 65:8, 65:9, 65:13, 66:9, 69:4, 156:22, 156:24, 157:7, 157:10, 188:12, 188:15, 188:16
**2018** [30] - 45:5, 65:18, 65:20, 66:4, 67:4,

67:23, 68:13, 68:20, 72:13, 72:16, 72:20, 73:8, 75:2, 75:3, 76:20, 76:23, 80:19, 83:7, 87:19, 88:25, 93:18, 93:20, 99:2, 102:18, 104:2, 132:17, 137:6, 145:11, 192:8
**2018ish** [1] - 80:16
**2019** [45] - 120:24, 121:5, 131:20, 131:25, 132:2, 132:16, 132:19, 132:25, 133:2, 133:6, 133:7, 141:2, 141:4, 141:10, 144:6, 144:8, 144:9, 144:14, 145:14, 153:5, 155:7, 156:10, 156:25, 157:2, 157:15, 157:20, 157:25, 158:4, 165:9, 165:12, 166:10, 166:11, 166:17, 170:3, 170:17, 170:18, 173:20, 174:5, 174:7, 174:19, 176:22
**2020** [50] - 113:14, 113:20, 113:24, 114:17, 116:12, 116:13, 118:13, 119:12, 119:13, 119:14, 120:15, 120:16, 120:17, 120:22, 120:25, 121:18, 122:6, 122:11, 123:11, 123:12, 130:18, 132:3, 132:4, 132:5, 132:12, 132:13, 132:19, 132:25, 133:2, 133:3, 133:4, 133:5, 133:8, 136:12, 152:18, 153:5, 156:9, 158:15, 176:19, 176:21, 176:22, 189:8, 189:15, 190:21, 191:2
**2021** [10] - 116:14, 119:5, 119:6, 122:9, 122:11, 122:23, 130:1, 131:13, 132:15, 133:10
**2022** [16] - 113:25, 116:6, 116:14, 119:8, 119:9, 119:11, 123:1,

**123**:3, 123:8, 123:13, 123:14, 123:25, 130:1, 130:20, 131:13, 136:12
**2023** [3] - 115:17, 115:18, 119:10
**2024** [2] - 1:13, 209:9
**20s** [5] - 33:10, 66:14, 174:14, 188:8
**21** [4] - 3:14, 140:18, 141:15, 141:16
**22** [2] - 157:25, 158:4
**22nd** [2] - 49:5, 50:4
**23** [2] - 3:10, 195:24
**230,000** [1] - 63:4
**24** [3] - 1:13, 205:14, 209:9
**25** [6] - 6:2, 34:18, 39:19, 105:21, 141:2, 141:4, 141:10, 145:14, 152:17, 153:5
**250,000** [1] - 162:8
**25th** [2] - 149:21, 153:6
**27** [2] - 3:11, 6:2
**28** [3] - 156:24, 157:2, 157:20
**29** [4] - 3:11, 156:22, 156:24, 157:7
**2950** [1] - 1:19
**2:00** [1] - 105:21
**2:22-CV-01618-JDW** [1] - 1:4
**2s** [1] - 118:8

**3**

**3** [2] - 18:4, 18:6
**30** [6] - 3:12, 19:13, 59:10, 59:11, 198:12
**30s** [1] - 96:15
**31** [6] - 116:6, 120:17, 120:22, 121:18, 123:24, 203:15
**31st** [3] - 113:24, 122:13, 136:12
**33** [9] - 3:12, 29:19, 30:10, 30:12, 30:13, 33:8, 33:11, 116:13
**34** [6] - 3:13, 94:6, 95:4, 95:6, 95:7
**34-year** [1] - 96:23
**39** [1] - 96:17
**3:00** [1] - 153:23
**3:05** [1] - 154:2
**3:06** [1] - 154:4
**3:27** [1] - 154:4
**3:28** [1] - 154:14

*United States District Court*

## 4

**4.2** [1] - 61:25
**4.3** [1] - 62:1
**40** [3] - 96:16, 96:17
**401K** [2] - 25:23, 125:10
**49** [1] - 3:12
**4:43** [1] - 197:24
**4:57** [1] - 209:1

## 5

**5** [1] - 85:20
**5-day** [1] - 9:19
**50** [12] - 32:21, 34:2, 34:22, 34:23, 34:25, 72:9, 97:3, 97:5, 97:6, 97:11, 97:14, 98:22
**50s** [5] - 32:20, 37:24, 38:13, 174:8, 174:10
**53** [1] - 174:7
**54** [4] - 96:10, 96:12, 174:7
**59** [1] - 34:23

## 6

**6/21/2000** [2] - 192:9
**60** [1] - 33:3
**601** [1] - 1:12
**66** [1] - 192:13
**6:00** [1] - 15:2

## 7

**7** [1] - 99:2
**7,000** [2] - 160:10, 162:20
**7:00** [1] - 9:18

## 8

**8** [5] - 3:11, 22:7, 26:12, 27:5, 27:6
**802** [1] - 27:23
**86** [1] - 3:13

## 9

**9** [6] - 68:20, 93:20, 194:15, 197:18, 197:21, 207:21
**95** [1] - 3:13
**9:00** [2] - 207:22, 208:24
**9:17** [2] - 1:14, 4:2
**9:30** [1] - 197:20
**9:38** [1] - 16:11

## A

**a.m** [9] - 1:14, 4:2, 16:11, 64:12, 64:15, 65:1, 207:22, 208:24
**able** [12] - 8:5, 11:16, 37:14, 55:7, 63:2, 91:18, 92:8, 92:11, 114:10, 120:12, 134:16, 203:7
**above-entitled** [1] - 209:5
**absence** [1] - 16:23
**Academy** [1] - 111:4
**accept** [6] - 21:17, 27:8, 139:5, 200:9, 200:13, 201:10
**accepted** [8] - 26:9, 27:14, 27:15, 202:8, 202:18, 204:8, 208:4, 208:10
**accepting** [1] - 25:16
**Access** [2] - 36:14, 58:5
**access** [1] - 35:1
**acclimating** [1] - 30:15
**accompany** [2] - 175:5, 177:22
**accompanying** [1] - 179:5
**accomplish** [2] - 101:22, 102:6
**accomplishments** [1] - 21:6
**according** [3] - 96:2, 105:9, 125:23
**accordingly** [1] - 16:20
**accountancy** [1] - 108:25
**accountants** [1] - 112:6
**achieved** [1] - 21:7
**acknowledged** [1] - 15:4
**acknowledging** [1] - 29:24
**acknowledgment** [2] - 29:4, 29:16
**ACLU** [1] - 186:3
**acquire** [1] - 63:2
**act** [1] - 63:7
**ACTION** [1] - 1:3
**active** [1] - 112:3
**actively** [1] - 164:14
**activist** [4] - 168:8, 183:4, 183:10, 183:12
**activists** [4] - 167:21,

**167:23, 168:3**
**actual** [3] - 173:12, 203:22, 207:13
**Adam** [22] - 52:9, 55:15, 66:10, 66:11, 141:21, 142:9, 145:19, 145:23, 146:13, 148:5, 149:2, 149:9, 149:16, 151:12, 151:14, 151:16, 164:3, 177:22, 188:2, 188:5, 188:10, 188:17
**add** [6] - 57:14, 57:15, 121:2, 123:8, 123:15
**added** [2] - 57:16, 123:17
**addition** [1] - 111:23
**address** [4] - 27:21, 42:16, 63:19, 95:10
**addressed** [1] - 99:6
**addressees** [10] - 61:9, 61:11, 61:12, 61:16, 62:11, 62:14, 63:3, 63:4, 63:15, 63:18
**addresses** [2] - 61:15, 62:8
**adjourned** [1] - 209:1
**adjunct** [1] - 111:11
**adjust** [5] - 16:20, 122:10, 122:11, 128:2, 197:19
**administration** [4] - 20:9, 33:22, 33:23, 108:21
**administrative** [1] - 34:16
**administrator** [4] - 19:18, 33:18, 34:19, 125:21
**admit** [4] - 95:3, 156:1, 192:12, 192:22
**admitted** [11] - 27:3, 29:11, 30:10, 49:16, 86:12, 86:14, 127:16, 128:6, 128:13, 141:13, 141:15
**advance** [5] - 51:10, 84:11, 102:12, 102:15
**advanced** [5] - 60:15, 61:1, 111:15, 111:16, 111:22
**advancement** [2] - 60:6, 139:6
**advertise** [1] - 165:15

**advice** [1] - 196:14
**advisors** [1] - 112:7
**affect** [1] - 11:13
**affecting** [1] - 83:25
**AFFIRMED** [1] - 107:15
**African** [1] - 91:9
**afternoon** [6] - 104:8, 107:24, 133:20, 137:5, 154:9, 154:18
**afterwards** [2] - 148:20, 148:22
**age** [52] - 32:6, 32:7, 32:9, 33:4, 33:9, 33:10, 33:11, 33:12, 33:15, 33:17, 34:2, 34:3, 34:25, 35:2, 35:5, 35:20, 37:23, 43:6, 43:11, 45:4, 45:16, 53:25, 54:22, 55:7, 55:8, 63:23, 76:22, 76:24, 80:3, 83:25, 90:4, 90:9, 94:12, 96:19, 96:20, 97:3, 97:5, 97:14, 97:18, 98:22, 101:2, 101:3, 135:5, 135:7, 147:11, 149:9, 173:23, 173:25, 176:12, 178:18
**age-related** [1] - 176:12
**aged** [1] - 39:6
**ageism** [14] - 100:21, 100:23, 101:1, 145:22, 145:25, 146:4, 146:5, 146:7, 146:10, 146:11, 146:15, 147:10, 149:2
**aggressive** [3] - 38:16, 39:2, 43:15
**ago** [6] - 28:11, 30:24, 115:13, 203:8, 205:14
**agree** [8] - 7:15, 12:18, 13:21, 13:22, 28:7, 103:19, 134:15, 134:20
**agreed** [4] - 140:6, 140:7, 200:8, 200:13
**agreement** [7] - 26:3, 40:23, 104:13, 104:14, 137:10, 137:13, 144:13
**ahead** [14] - 16:5, 17:17, 37:9, 40:7, 64:17, 64:20, 70:15, 71:5, 97:10, 103:25, 107:8, 124:13,

**138:19, 191:1**
**aided** [1] - 1:24
**Akamai** [2] - 176:3, 193:13
**Aker** [28] - 24:14, 42:9, 68:8, 100:7, 101:21, 144:9, 150:17, 152:9, 153:9, 163:3, 163:20, 163:21, 164:13, 167:10, 189:25, 191:23, 192:4, 193:3, 193:22, 194:17, 195:1, 195:5, 196:3, 196:14, 196:24
**aker** [1] - 194:16
**Akers** [2] - 48:5, 53:22
**Akers'** [2] - 98:6, 98:9
**Akron** [1] - 19:12
**Alex** [16] - 24:16, 31:21, 32:16, 33:8, 36:2, 39:13, 39:18, 40:22, 41:21, 42:7, 44:19, 45:22, 53:17, 73:8, 76:13
**alias** [2] - 194:13, 194:24
**all-hands** [3] - 144:9, 196:5, 196:6
**alleged** [2] - 135:7, 135:11
**alleges** [1] - 181:13
**allow** [4] - 9:2, 39:9, 139:1
**allowed** [2] - 58:7, 138:23
**almost** [2] - 78:3, 147:21
**alone** [1] - 177:9
**ALSO** [1] - 2:10
**Alto** [1] - 196:10
**Amazon** [1] - 161:19
**ambiguous** [1] - 206:1
**America** [5] - 62:14, 170:22, 170:24, 188:1, 188:21
**American** [3] - 62:13, 91:9, 111:4
**amount** [5] - 40:13, 62:5, 122:5, 123:20, 135:17
**analyses** [4] - 115:4, 115:8, 124:15, 128:19
**analysis** [10] - 109:10, 113:12, 114:12, 123:1, 125:12, 129:23, 130:11, 131:6, 134:1, 134:15
**Andrew** [48] - 24:15,

31:21, 32:10, 33:7, 33:8, 33:10, 36:2, 36:20, 37:11, 37:22, 38:10, 38:14, 39:4, 39:14, 40:2, 40:22, 41:21, 42:7, 44:19, 45:22, 52:7, 53:10, 53:11, 54:1, 54:2, 54:12, 55:15, 57:18, 71:20, 71:21, 75:8, 75:9, 75:22, 75:24, 76:2, 77:2, 77:3, 78:25, 79:14, 79:23, 138:13, 138:15, 141:22, 141:23, 165:4, 181:2
**angry** [2] - 7:12, 51:2
**announce** [1] - 58:23
**announced** [13] - 48:3, 52:21, 67:10, 75:20, 75:21, 78:20, 79:5, 139:18, 144:9, 157:21, 159:8
**announcement** [21] - 52:22, 59:22, 75:8, 79:5, 82:2, 93:24, 96:6, 140:13, 140:24, 143:4, 148:24, 149:1, 149:2, 149:4, 149:9, 149:13, 149:14, 149:20, 149:21, 153:6, 153:7
**announces** [1] - 77:7
**annual** [4] - 25:25, 26:4, 26:11, 158:6
**annually** [1] - 25:15
**answer** [2] - 137:21, 166:20
**anyway** [1] - 15:23
**apologize** [2] - 14:10, 38:9
**appeal** [1] - 6:9
**appear** [6] - 140:20, 200:16, 200:24, 203:22, 205:17, 206:6
**appeared** [1] - 15:14
**application** [1] - 23:23
**applied** [5] - 5:4, 22:15, 127:7, 127:8, 161:19
**apply** [13] - 81:24, 82:15, 82:16, 87:3, 90:6, 95:21, 96:22, 109:10, 138:16, 138:23, 139:1, 139:3, 162:9
**applying** [3] - 161:17, 161:18, 162:10

**appointment** [5] - 20:8, 99:15, 99:18, 100:8, 165:23
**appreciate** [1] - 16:18
**apprehensive** [1] - 186:19
**approach** [1] - 8:1
**approached** [3] - 6:5, 6:7, 8:20
**appropriate** [1] - 4:15
**approval** [2] - 171:14, 175:2
**approved** [6] - 78:18, 78:20, 171:17, 174:20, 175:8, 177:7
**April** [3] - 115:12, 115:17, 115:18
**architecture** [4] - 21:3, 55:20, 77:15, 80:4
**architectures** [1] - 78:15
**area** [14] - 6:2, 8:6, 21:9, 36:1, 73:6, 78:4, 90:23, 91:3, 113:6, 115:2, 150:7, 167:8, 174:22, 195:16
**areas** [2] - 139:9, 171:8
**arguably** [1] - 200:12
**argument** [2] - 206:21, 208:16
**ARIN** [3] - 62:13, 62:22, 62:23
**arise** [1] - 207:5
**arises** [1] - 207:5
**arrange** [4] - 173:2, 173:4, 190:2, 190:4
**arranged** [6] - 73:20, 172:1, 174:20, 175:17, 194:7, 196:22
**arrive** [1] - 114:6
**arrived** [1] - 31:3
**article** [3] - 181:3, 181:4, 181:5, 181:9, 181:12, 182:2, 182:6, 182:7, 182:8, 183:10, 183:22, 184:4, 184:7, 185:15, 185:16
**articles** [11] - 112:10, 112:15, 181:20, 181:24, 183:3, 183:22, 184:5, 184:6, 184:9, 184:10, 184:11
**Artificial** [1] - 195:12
**artificial** [1] - 19:7
**AS** [1] - 107:15

**ASARO** [1] - 1:8
**asaro** [1] - 205:13
**Asaro** [42] - 4:14, 5:16, 16:8, 24:15, 31:25, 33:18, 35:17, 36:3, 42:8, 53:21, 56:24, 56:25, 57:3, 58:22, 63:14, 68:7, 75:15, 75:23, 77:3, 80:11, 81:21, 82:14, 86:22, 99:17, 100:7, 102:22, 137:7, 140:2, 142:15, 142:17, 142:18, 146:23, 147:12, 148:13, 148:19, 149:6, 149:8, 153:9, 163:3, 200:10, 201:2
**Asaro's** [2] - 102:19, 103:4
**ascribed** [1] - 62:8
**Asia** [2] - 174:21, 174:24
**aside** [2] - 88:19, 164:22
**aspects** [1] - 150:20
**aspersion** [1] - 13:4
**aspersions** [1] - 206:16
**assets** [1] - 63:10
**assigned** [4] - 31:13, 56:5, 62:9, 98:5
**Association** [1] - 111:3
**assume** [4] - 41:16, 132:3, 159:14, 192:22, 207:24
**assumed** [4] - 127:8, 130:18, 133:25, 174:9
**assuming** [1] - 131:12
**assumption** [3] - 127:10, 129:23, 131:6
**assumptions** [1] - 130:1
**attempt** [1] - 166:6
**attend** [7] - 112:2, 152:11, 167:9, 167:10, 168:7, 171:5, 180:1
**attended** [3] - 100:9, 168:2, 179:24
**attending** [1] - 168:1
**attends** [1] - 179:25
**attention** [8] - 5:8, 13:1, 13:5, 115:6, 116:23, 118:15, 124:3, 175:15
**attitude** [1] - 44:10

**attorney** [1] - 28:1
**attributed** [2] - 160:2, 160:3
**August** [13] - 18:4, 18:6, 45:11, 113:14, 113:20, 113:24, 116:12, 120:15, 120:17, 120:21, 121:18, 136:12, 189:15
**Australia** [2] - 185:6, 185:13
**Australian** [3] - 184:17, 184:20, 185:12
**author** [2] - 181:5, 184:7
**authored** [1] - 112:14
**authority** [2] - 152:21, 200:19
**available** [7] - 59:23, 107:1, 107:5, 115:16, 202:12, 202:14, 207:2
**avoid** [1] - 199:20
**awards** [2] - 118:23, 129:22
**aware** [6] - 4:25, 33:14, 50:9, 58:15, 60:23, 134:9
**awkward** [2] - 38:17, 39:2
**AWS** [4] - 161:19, 161:25, 162:1, 162:7

# B

**Bachelor's** [1] - 18:23
**bachelor's** [2] - 19:1, 108:15
**backdrop** [1] - 175:16
**background** [15] - 17:24, 47:20, 55:23, 57:24, 92:5, 97:2, 97:13, 97:18, 98:20, 98:21, 102:10, 102:14, 108:12, 111:12, 139:1
**backgrounds** [2] - 91:10, 195:6
**backroom** [1] - 64:6
**bad** [3] - 16:17, 144:16, 151:4
**balance** [1] - 13:12
**balanced** [1] - 8:3
**bald** [1] - 147:22
**ballpark** [2] - 35:10, 166:23
**Bamboo** [6] - 75:10, 75:11, 76:6, 155:2,

155:8, 155:13, 155:20, 156:7
**Bank** [1] - 150:16
**bank** [1] - 73:6
**Barcelona** [1] - 190:25
**base** [11] - 115:24, 118:14, 118:22, 120:24, 121:5, 122:13, 123:8, 129:7, 156:14, 161:19, 161:20
**based** [23] - 12:23, 19:20, 37:15, 62:24, 72:2, 72:5, 109:18, 114:2, 115:14, 115:16, 121:16, 126:15, 127:7, 129:23, 131:6, 134:2, 160:7, 160:8, 185:16, 190:25, 206:4
**Bates** [1] - 95:17
**Beasley** [1] - 108:17
**became** [8] - 33:17, 36:10, 41:5, 81:2, 81:11, 92:2, 131:10, 156:22
**becomes** [1] - 16:2
**bedroom** [1] - 28:4
**BEEN** [1] - 107:14
**began** [9] - 22:7, 28:8, 31:8, 34:16, 42:21, 112:13, 145:25, 165:8, 165:23
**beginning** [6] - 10:12, 20:16, 47:3, 72:13, 144:8, 176:19
**begins** [1] - 192:8
**begrudge** [1] - 202:25
**behalf** [4] - 25:12, 171:2, 195:21, 208:5
**behold** [1] - 78:25
**belief** [1] - 4:23
**Bell** [3] - 40:16, 40:20
**Ben** [6] - 66:16, 66:17, 67:9, 143:7, 143:8, 143:10
**benefit** [7] - 121:10, 121:12, 124:5, 124:24, 125:5, 125:17, 132:6
**benefit's** [1] - 125:18
**benefits** [21] - 25:14, 25:17, 25:22, 26:5, 26:8, 102:4, 112:16, 114:5, 114:7, 115:22, 118:25, 121:3, 121:7, 121:8, 124:16, 124:20, 124:22, 125:4,

125:21, 131:18, 134:3
**Berwyn** [1] - 9:4
**best** [1] - 8:1
**better** [9] - 37:12, 60:15, 84:2, 138:18, 139:5, 144:13, 151:24, 203:4, 205:6
**between** [18] - 10:11, 21:8, 46:2, 46:12, 66:3, 67:21, 69:2, 84:21, 84:25, 85:5, 85:19, 125:20, 156:9, 191:23, 192:7, 196:7, 198:6
**beyond** [3] - 182:3, 192:23, 199:21
**bi** [1] - 119:3
**bi-weekly** [1] - 119:3
**big** [5] - 5:2, 77:23, 101:24, 150:7, 173:3
**biggest** [1] - 152:1
**billion** [1] - 62:1
**birds** [1] - 52:7
**bishop** [1] - 18:12
**bit** [17] - 9:15, 9:16, 16:16, 68:1, 79:21, 89:12, 93:8, 107:4, 109:14, 145:7, 148:25, 153:22, 174:3, 174:9, 190:17, 197:10, 199:25
**black** [3] - 62:16, 63:15, 95:9
**bladder** [1] - 79:16
**blend** [2] - 110:3, 195:17
**blending** [1] - 110:1
**blog** [3] - 180:10, 180:12, 180:16
**blogs** [1] - 183:4
**blow** [4] - 101:16, 101:18, 139:12, 189:4
**Blue** [1] - 27:23
**blue** [3] - 43:8, 109:6, 190:13
**board** [1] - 36:19
**bonus** [9] - 25:23, 26:1, 114:5, 115:25, 118:23, 121:6, 122:14, 123:9, 125:3
**boom** [3] - 20:16, 196:18, 196:20
**booth** [4] - 175:13, 175:14, 175:15
**booths** [1] - 173:11
**born** [4] - 18:1, 18:3, 18:5, 18:6

**bothered** [1] - 172:17
**bottom** [3] - 91:13, 98:16, 102:16
**bought** [1] - 196:20
**bound** [1] - 6:3
**bounds** [1] - 134:24
**box** [1] - 151:2
**Brazil** [1] - 170:20
**Brazilian** [1] - 170:23
**breach** [1] - 110:14
**break** [11] - 8:20, 64:1, 64:2, 64:22, 79:13, 105:18, 105:20, 154:18, 197:8, 208:1, 208:20
**breakfast** [1] - 196:9
**Brett** [1] - 84:12
**bridge** [1] - 14:3
**brief** [1] - 34:8
**Brief** [2] - 64:15, 154:4
**briefing** [1] - 36:20
**briefly** [9] - 14:16, 30:17, 62:18, 89:23, 101:1, 110:25, 112:21, 124:25, 190:18
**bring** [11] - 7:5, 8:3, 16:5, 69:8, 70:18, 71:14, 77:18, 106:16, 150:13, 154:6, 173:6
**bringing** [5] - 103:11, 168:24, 169:8, 176:5, 178:22
**brings** [3] - 54:1, 139:8, 175:19
**broke** [2] - 6:8, 6:17
**broken** [2] - 125:6, 125:8
**brought** [15] - 11:4, 33:4, 43:1, 43:23, 55:4, 101:10, 109:13, 152:3, 152:7, 166:21, 170:3, 171:24, 182:15, 190:1, 190:21
**Brown** [6] - 33:18, 33:23, 34:25, 35:1, 35:2, 35:4
**Buenzle** [1] - 2:12
**building** [6] - 33:20, 40:16, 40:21, 65:18, 73:6, 150:16
**bullet** [2] - 153:2, 153:7
**bump** [4] - 159:12, 159:21, 160:3, 162:14
**business** [13] - 17:21,

22:22, 51:11, 63:18, 78:18, 102:13, 108:21, 110:11, 110:14, 150:24, 150:25, 151:5, 175:23
**Business** [1] - 108:20
**buyers** [1] - 164:15
**BY** [75] - 1:19, 2:3, 3:4, 3:6, 3:6, 3:7, 3:7, 17:19, 23:4, 23:21, 26:14, 27:7, 28:24, 29:15, 29:20, 30:14, 39:10, 48:17, 49:20, 54:9, 60:18, 60:22, 61:10, 65:6, 70:22, 74:2, 84:15, 86:16, 93:17, 94:7, 95:8, 95:18, 98:18, 108:3, 113:10, 118:1, 120:6, 122:4, 122:25, 124:14, 126:10, 126:14, 128:8, 128:17, 129:5, 129:12, 130:14, 131:4, 131:23, 132:23, 133:19, 134:14, 134:23, 136:4, 137:4, 137:20, 140:19, 141:17, 154:17, 156:5, 160:16, 161:9, 162:12, 162:25, 164:11, 168:19, 169:5, 179:11, 180:19, 181:15, 182:13, 187:7, 191:6, 191:12, 193:2
**Byrne** [1] - 1:12

---

## C

**cable** [1] - 174:25
**calculated** [5] - 120:16, 120:20, 121:8, 125:19, 128:20
**calculation** [5] - 111:21, 114:4, 121:17, 122:12, 129:17
**calculations** [5] - 113:22, 116:21, 118:21, 122:8, 129:6
**calendar** [4] - 99:15, 99:19, 99:23, 132:11
**California** [7] - 20:6, 20:23, 20:24, 21:7, 21:13, 78:17, 78:24
**candidate** [5] - 38:12,

186:17, 186:25, 187:19
**candidates** [5] - 38:3, 38:6, 45:20, 45:21, 45:23
**cannon** [1] - 16:24
**Cannon** [3] - 5:23, 5:24, 13:24
**capacity** [2] - 81:7, 112:18
**capitalist** [1] - 196:10
**caption** [1] - 201:3
**car** [4] - 70:25, 76:14, 76:16, 76:18
**card** [7] - 70:3, 150:24, 150:25, 151:9, 151:11, 195:13
**cards** [1] - 151:5
**care** [13] - 17:21, 21:25, 22:13, 26:8, 81:8, 81:17, 91:3, 91:20, 112:18, 119:2, 119:4, 125:2, 187:5
**career** [4] - 96:23, 112:13, 196:2, 196:12
**cares** [1] - 91:4
**Carl** [29] - 18:1, 23:7, 26:15, 28:25, 29:21, 32:13, 34:1, 48:20, 70:5, 84:16, 96:3, 108:5, 113:12, 115:18, 120:11, 123:21, 125:13, 125:23, 126:17, 128:25, 129:15, 130:6, 130:24, 132:16, 134:6, 178:22, 191:13, 193:3, 196:2
**CARL** [2] - 1:3, 3:3
**Carson** [35] - 5:3, 7:8, 13:4, 15:4, 15:13, 64:20, 65:3, 73:24, 106:12, 107:8, 108:1, 119:19, 136:1, 154:9, 168:17, 182:11, 192:15, 197:7, 198:2, 199:14, 199:22, 200:14, 201:7, 201:19, 203:25, 204:7, 204:16, 204:22, 205:4, 205:20, 206:4, 206:11, 207:9, 208:6, 208:9
**CARSON** [183] - 1:19, 181:13, 182:10, 182:13, 187:5,

3:4, 3:6, 3:6, 3:7, 4:6, 4:12, 5:19, 7:9, 7:20, 7:22, 12:5, 12:7, 12:18, 13:21, 15:23, 17:6, 17:8, 17:16, 17:19, 23:2, 23:4, 23:16, 23:21, 26:12, 26:14, 27:2, 27:7, 28:22, 28:24, 29:10, 29:15, 29:18, 29:20, 30:9, 30:14, 39:10, 48:13, 48:17, 49:15, 49:20, 54:9, 60:18, 60:22, 61:10, 64:19, 64:24, 65:5, 65:6, 70:19, 70:22, 74:1, 74:2, 84:13, 84:15, 86:11, 86:16, 93:13, 93:16, 93:17, 94:5, 94:7, 95:3, 95:8, 95:16, 95:18, 98:14, 98:18, 105:16, 105:19, 106:7, 106:14, 107:9, 108:3, 113:5, 113:10, 117:3, 117:8, 117:12, 117:18, 117:21, 117:24, 118:1, 119:21, 120:3, 120:6, 121:20, 122:4, 122:20, 122:25, 124:9, 124:12, 124:14, 126:10, 126:14, 126:23, 127:1, 127:15, 127:20, 127:24, 128:2, 128:5, 128:8, 128:13, 128:17, 129:5, 129:12, 130:14, 131:4, 131:23, 132:23, 133:13, 133:16, 134:12, 134:18, 136:2, 136:4, 136:18, 137:1, 137:4, 137:18, 137:20, 140:17, 140:19, 141:12, 141:17, 153:19, 154:10, 154:17, 155:25, 156:5, 160:15, 160:16, 161:9, 162:12, 162:25, 164:11, 168:18, 168:19, 169:5, 179:10, 179:11, 180:19, 181:15, 182:10, 182:13, 187:5,

187:7, 191:4, 191:6,
191:10, 191:12,
192:12, 192:16,
192:18, 192:25,
193:2, 197:5, 197:9,
198:4, 198:8,
198:14, 198:19,
199:16, 200:25,
201:8, 201:12,
201:15, 201:18,
201:20, 201:22,
202:8, 202:16,
203:8, 204:13,
204:21, 205:3,
206:10, 208:2,
208:4, 208:7,
208:11, 208:19
**case** [24] - 4:15, 15:2,
36:11, 55:24, 64:10,
71:23, 71:24,
105:22, 110:3,
110:9, 110:10,
113:18, 113:23,
153:24, 177:14,
189:22, 197:1,
197:12, 200:15,
200:16, 200:21,
200:24, 206:6, 206:8
**case-specific** [1] -
110:3
**catch** [2] - 48:18,
119:10
**catching** [1] - 113:21
**categories** [2] - 125:7,
125:9
**caught** [1] - 148:6
**caused** [6] - 128:21,
129:16, 144:25,
145:17, 186:12
**caution** [2] - 64:5,
105:22
**CAVALIER** [76] - 2:3,
3:7, 4:7, 4:17, 5:14,
7:25, 8:8, 8:15,
13:22, 14:16, 15:10,
15:12, 16:4, 16:7,
23:18, 27:4, 29:12,
30:11, 39:8, 49:17,
54:7, 60:17, 61:3,
73:23, 86:13, 95:5,
113:7, 119:15,
121:24, 124:6,
126:6, 126:12,
126:21, 128:12,
129:3, 129:8,
130:12, 131:2,
131:21, 132:21,
133:15, 133:19,
134:14, 134:23,
135:25, 136:20,
137:16, 141:14,

156:2, 160:13,
161:7, 162:2,
162:22, 164:8,
168:10, 168:25,
179:8, 180:14,
181:10, 181:25,
187:3, 192:13,
192:20, 198:22,
199:6, 199:23,
200:5, 200:12,
201:16, 203:3,
203:11, 203:17,
206:3, 206:12,
207:18, 207:25
**Cavalier** [15] - 7:24,
84:24, 104:1,
121:23, 133:14,
136:19, 198:18,
198:20, 200:4,
201:13, 201:20,
202:25, 205:24,
207:6, 208:4
**Cavalier's** [1] - 50:18
**cavalier's** [1] - 103:21
**CC** [1] - 92:6
**CCIE** [1] - 92:22
**CCIP** [2] - 92:23
**CCNA** [1] - 92:15
**CCNP** [2] - 92:16
**cell** [1] - 98:7
**Center** [4] - 21:21,
109:18, 109:20
**center** [26] - 30:16,
30:18, 30:19, 31:4,
31:7, 33:21, 33:24,
34:17, 35:25, 36:3,
36:5, 36:15, 43:18,
63:17, 68:14, 69:24,
78:5, 78:12, 81:4,
81:5, 81:6, 81:11,
84:9, 159:4, 170:20
**centerpieces** [1] -
69:16
**centers** [4] - 28:20,
30:21, 30:25, 78:2
**CEO** [1] - 195:12
**Cerf** [2] - 62:2, 193:11
**certain** [6] - 60:11,
104:2, 112:2,
116:17, 130:6,
203:17
**certainly** [7] - 13:2,
146:21, 198:25,
200:1, 203:25,
204:6, 204:11
**certainty** [1] - 136:11
**certificate** [1] - 92:17
**certification** [1] - 92:6
**certifications** [4] -
92:14, 92:15, 92:19,

92:20
**certified** [1] - 112:6
**certify** [1] - 209:4
**CFO** [1] - 163:12
**CHAD** [3] - 3:5,
107:14, 107:19
**Chad** [4] - 48:24,
49:10, 49:11, 107:19
**Chadds** [1] - 6:1
**chair** [4] - 54:2, 70:18,
71:1, 71:15
**challenges** [1] -
199:21
**chamber** [1] - 183:17
**chance** [7] - 8:13,
15:13, 15:18, 64:1,
90:12, 138:16, 197:8
**change** [24] - 5:1,
37:16, 47:8, 67:22,
80:25, 91:1, 109:14,
136:8, 137:15,
137:23, 139:20,
142:10, 149:3,
150:12, 151:11,
151:22, 152:18,
152:20, 157:24,
159:20, 159:21,
160:2, 160:4, 160:10
**changed** [2] - 42:4,
156:21
**changes** [1] - 65:25
**channel** [7] - 147:16,
147:17, 147:19,
148:8, 148:10,
148:11, 183:20
**characterized** [1] -
159:24
**charge** [21] - 82:25,
84:9, 94:2, 94:13,
99:5, 99:7, 99:10,
100:2, 100:12,
102:20, 103:22,
104:3, 137:7,
137:14, 139:15,
140:6, 144:22,
144:24, 180:1,
186:18
**charted** [1] - 14:22
**chat** [4] - 82:8, 147:18,
153:24, 197:14
**check** [4] - 14:12,
105:24, 122:19,
201:16
**checked** [1] - 199:7
**Cherry** [2] - 2:4,
109:19
**chief** [7] - 24:15, 32:2,
42:8, 163:10,
163:14, 200:15,
200:21

**children** [1] - 72:3
**choice** [1] - 12:4
**chopping** [1] - 199:19
**chops** [4] - 55:13,
60:10, 60:14, 90:8
**Chris** [39] - 24:14,
42:9, 48:5, 53:22,
68:8, 98:6, 98:9,
100:7, 101:21,
144:9, 150:14,
150:17, 152:9,
153:9, 163:3,
163:20, 163:21,
164:13, 164:18,
167:10, 189:25,
191:23, 192:4,
193:3, 193:22,
194:17, 195:1,
195:5, 195:9,
195:15, 195:24,
196:3, 196:11,
196:14, 196:16,
196:24
**Christmas** [11] -
25:23, 26:1, 69:1,
69:4, 69:8, 69:13,
70:18, 71:13, 144:2
**chronological** [4] -
33:5, 68:2, 149:12,
173:20
**circle** [1] - 47:25
**Cisco** [1] - 79:10
**city** [5] - 8:22, 9:5,
18:7, 18:8, 174:25
**City** [11] - 36:1,
109:18, 112:25,
151:8, 152:5, 152:6,
165:14, 165:15,
165:20, 176:23,
194:19
**CIVIL** [1] - 1:3
**claim** [2] - 32:6, 53:25
**claimed** [1] - 187:1
**claims** [3] - 134:17,
135:3, 177:14
**CLE** [1] - 111:25
**clean** [1] - 9:5
**cleaner** [1] - 207:16
**clear** [13] - 8:24,
106:2, 133:22,
134:24, 135:4,
145:12, 153:22,
197:12, 197:17,
205:10, 206:4,
206:24, 208:14
**clearly** [2] - 7:3, 14:1
**Clemens** [1] - 32:24
**client** [2] - 108:5,
205:24
**clients** [1] - 203:5

**close** [13] - 21:20,
21:21, 41:4, 48:6,
54:15, 120:7, 123:6,
154:10, 159:19,
166:8, 193:3, 193:6,
198:8
**closed** [1] - 73:2
**closer** [2] - 108:1,
161:24
**closest** [1] - 143:24
**co** [2] - 40:19, 40:25,
193:10, 193:12,
193:13, 196:5,
196:18, 197:13
**co-founder** [5] -
193:10, 193:12,
193:13, 196:5,
196:18
**co-founders** [1] -
193:10
**co-workers** [3] -
40:19, 40:25, 197:13
**coast** [1] - 36:1
**coat** [1] - 109:6
**code** [1] - 19:3
**collaboration** [2] -
56:11, 85:14
**colloquy** [3] - 7:5,
7:18, 8:9
**colorable** [1] - 206:21
**com** [3] - 20:16,
196:18, 196:19
**combine** [1] - 116:4
**Comcast** [19] - 21:15,
21:21, 21:25, 55:19,
62:20, 62:22, 77:15,
80:10, 83:2, 83:3,
88:17, 91:25, 92:10,
92:21, 103:10,
103:17, 139:25,
164:19
**comfortable** [1] -
144:18
**coming** [6] - 43:22,
79:2, 82:3, 106:24,
122:17, 177:21
**Commencing** [1] -
1:14
**comment** [15] - 36:24,
37:5, 42:25, 43:2,
57:23, 79:18, 80:7,
91:6, 101:16,
150:11, 175:18,
176:2, 176:4, 176:5,
190:13
**comments** [44] -
34:21, 35:21, 37:22,
44:5, 45:4, 45:16,
45:17, 45:24, 46:2,
46:20, 55:4, 58:18,

60:4, 76:23, 80:8,
83:8, 84:11, 100:19,
145:19, 145:20,
146:1, 146:7, 149:9,
164:4, 164:7,
166:24, 167:1,
169:15, 172:7,
172:22, 173:13,
173:22, 175:11,
175:25, 176:10,
176:13, 176:16,
177:18, 184:16,
186:2, 188:20,
188:22, 189:1, 189:2
**commercialization** [1]
- 20:15
**Commission** [12] -
93:23, 94:3, 94:20,
95:15, 98:1, 99:2,
100:13, 104:6,
104:10, 139:16,
144:19
**commit** [3] - 203:4,
203:6
**Common** [1] - 112:24
**Commonwealth** [3] -
111:24, 113:1, 113:2
**commotion** [1] -
149:15
**communicate** [2] -
82:6, 90:15
**communicated** [1] -
90:13
**communicating** [1] -
90:14
**communication** [2] -
21:10, 82:9
**communications** [1] -
203:25
**community** [4] -
167:14, 170:24,
181:23, 185:9
**commute** [2] - 27:15,
51:17
**companies** [10] -
20:23, 21:4, 22:20,
58:8, 61:15, 78:14,
102:5, 194:11,
195:15, 195:16
**companion** [1] - 111:3
**COMPANY** [1] - 1:7
**company** [41] - 36:14,
38:8, 40:12, 40:13,
47:4, 47:5, 47:14,
47:15, 48:5, 57:25,
58:5, 58:17, 65:20,
68:10, 68:18, 73:9,
73:19, 73:22, 77:6,
82:6, 82:8, 102:16,
109:18, 109:20,

141:7, 141:8,
144:11, 148:2,
150:18, 150:19,
152:22, 161:18,
162:6, 164:18,
172:4, 190:22,
192:4, 193:20,
194:3, 195:21,
197:16
**company's** [1] - 36:6
**comparatively** [2] -
59:12, 60:14
**compare** [1] - 116:4
**compared** [1] - 59:3
**compel** [3] - 205:22,
206:7, 207:10
**compelling** [2] -
200:15, 200:23
**compensation** [13] -
113:22, 114:15,
114:22, 114:23,
115:19, 115:20,
116:2, 116:5, 118:8,
121:4, 121:5, 123:7,
164:17
**competing** [3] - 8:2,
12:19, 204:24
**competitor** [1] -
190:22
**complain** [1] - 6:9
**complained** [1] -
145:21
**complaining** [2] -
50:24, 51:1
**complaint** [8] - 50:19,
102:23, 103:20,
104:6, 105:13,
144:21, 145:22,
183:9
**complaints** [1] - 50:19
**completed** [5] - 19:24,
19:25, 20:2, 20:4,
108:13
**completing** [1] -
112:14
**compliance** [1] -
207:10
**complied** [2] - 206:17,
206:19
**compliment** [1] -
173:10
**comprised** [1] -
115:22
**computer** [7] - 1:24,
18:19, 18:24, 19:14,
30:22, 84:16, 117:15
**computer-aided** [1] -
1:24
**computers** [2] - 20:10,
20:11

**computing** [5] - 152:2,
152:7, 175:1, 191:1
**concern** [6] - 13:9,
145:1, 145:17,
167:13, 169:12,
186:13
**concerned** [6] - 12:22,
15:5, 32:5, 35:20,
116:25, 146:23
**concerning** [4] -
53:24, 55:4, 176:1,
177:13
**concerns** [7] - 8:21,
12:20, 80:16, 83:22,
147:11, 166:22,
186:25
**concluded** [1] - 13:23,
128:4
**conclusion** [7] -
127:7, 127:9,
129:15, 130:11,
134:4, 164:3
**conclusions** [7] -
115:7, 116:24,
117:14, 118:16,
120:10, 133:1, 164:6
**condescending** [5] -
35:21, 35:22, 36:24,
36:25, 37:5
**conduct** [6] - 42:17,
56:1, 113:11,
114:12, 123:1,
130:11
**conducting** [4] -
115:3, 115:8,
124:15, 125:11
**conference** [6] -
39:13, 39:19, 48:5,
179:3, 184:25, 194:9
**confidential** [1] - 35:6
**configure** [2] - 91:5,
91:19
**confirmed** [1] - 131:24
**confirms** [1] - 130:24
**confused** [3] - 70:4,
70:6, 89:12
**congratulate** [1] -
142:9
**congratulated** [1] -
145:16
**congratulations** [4] -
141:19, 142:22,
143:21, 144:1
**conjecture** [1] -
164:23
**conjectures** [1] -
164:25
**connect** [2] - 150:19,
150:22
**connected** [1] -

101:15
**connecting** [1] -
164:14
**connection** [2] -
177:3, 177:14
**consequence** [3] -
10:23, 110:12, 180:7
**consequences** [1] -
11:20
**consider** [1] - 189:21
**consideration** [1] -
125:3
**considered** [7] - 60:6,
83:5, 83:10, 88:17,
90:7, 105:14, 187:19
**considering** [3] - 93:4,
93:11, 190:9
**consist** [2] - 110:7,
110:8
**consultant** [4] - 21:5,
21:24, 83:1, 162:6
**consulted** [1] - 6:12
**consumed** [2] -
121:12
**contact** [3] - 24:22,
29:23, 97:21
**contacted** [2] -
190:23, 190:25
**contemplation** [1] -
27:13
**contemporaneous** [1]
- 118:7
**content** [1] - 176:3
**context** [8] - 30:19,
71:23, 105:25,
138:14, 173:25,
207:5, 207:6, 208:13
**continue** [14] - 36:9,
36:17, 38:9, 39:11,
39:22, 65:3, 70:1,
74:16, 79:25, 101:4,
107:3, 175:10,
178:13, 185:4
**continued** [11] - 56:5,
83:25, 120:21,
129:24, 130:19,
136:9, 152:15,
157:4, 183:25,
185:15
**continuing** [4] -
106:13, 111:25,
112:7, 184:15
**contract** [4] - 21:24,
110:14, 125:20,
125:23
**contractor** [2] - 21:2,
83:4
**contribution** [21] -
26:7, 26:11, 114:5,
115:25, 118:24,

119:2, 119:3, 121:6,
121:14, 122:14,
125:3, 125:9,
125:10, 126:1,
126:3, 130:3,
131:11, 131:15,
132:7, 132:8, 132:12
**contributions** [2] -
25:23, 25:24
**control** [1] - 81:6
**conversation** [21] -
33:13, 79:22, 82:14,
83:6, 86:19, 86:21,
86:24, 87:5, 87:14,
87:18, 87:20, 87:22,
88:20, 99:10, 162:4,
169:18, 182:16,
183:1, 185:15,
185:21, 188:23
**conversations** [2] -
160:8, 161:24
**converting** [1] - 19:18
**convey** [3] - 90:2,
97:16, 101:7
**conveyed** [2] - 86:25,
202:13
**Conway** [28] - 41:18,
41:19, 43:3, 43:5,
43:6, 44:1, 44:20,
45:25, 47:10, 47:12,
47:24, 52:8, 53:8,
53:9, 58:11, 58:15,
59:1, 59:13, 59:19,
61:5, 63:21, 73:11,
73:13, 74:8, 75:13,
138:13, 138:15,
165:4
**Conway's** [4] - 42:25,
43:2, 60:14, 60:24
**copied** [2] - 141:3,
181:19
**copy** [7] - 5:22, 6:19,
30:2, 30:4, 94:18,
119:17, 121:22
**Corn** [2] - 65:18,
150:16
**corporate** [8] - 5:12,
5:15, 53:20, 68:3,
99:24, 104:18,
160:17, 205:16
**Corporation** [2] -
19:2, 19:7
**corporations** [1] -
101:25
**correct** [45] - 46:8,
68:4, 69:6, 95:12,
96:18, 99:2, 104:21,
115:15, 115:17,
115:21, 116:10,
116:11, 120:13,

120:18, 121:2,
121:4, 125:25,
128:22, 129:19,
130:8, 133:2, 133:3,
134:1, 134:2, 134:7,
135:10, 135:23,
136:7, 136:9,
136:10, 136:16,
141:19, 142:13,
144:3, 155:9,
155:11, 155:18,
156:19, 157:7,
157:23, 160:23,
178:9, 182:18,
193:4, 209:4
correction [1] - 204:11
correspondence [2] -
205:1, 207:2
cost [5] - 25:24, 25:25,
112:17, 158:6,
159:14
couch [3] - 52:12,
52:13, 185:25
counsel [1] - 11:24
counted [1] - 44:24
countervailing [1] -
13:9
counties [2] - 9:1,
112:25
country [1] - 177:3
couple [9] - 14:14,
16:21, 50:12, 84:17,
103:3, 157:20,
170:16, 179:19,
179:21
course [4] - 15:8,
16:1, 66:8, 77:23
COURT [169] - 1:1,
4:4, 4:8, 4:25, 5:16,
5:20, 7:17, 7:21,
7:24, 8:2, 8:11, 8:16,
8:18, 9:20, 9:22,
9:24, 10:1, 10:9,
10:18, 11:9, 11:13,
11:16, 11:19, 11:23,
12:2, 12:6, 12:8,
12:19, 13:24, 14:11,
15:4, 15:11, 15:20,
15:24, 16:5, 16:9,
16:12, 17:7, 17:9,
17:15, 17:17, 23:19,
27:5, 29:13, 30:12,
39:9, 49:18, 54:8,
60:20, 61:4, 63:25,
64:13, 64:17, 64:20,
65:2, 73:24, 86:14,
93:15, 95:6, 105:17,
105:20, 106:6,
106:8, 106:11,
106:16, 106:19,

107:11, 107:22,
107:24, 108:1,
113:8, 117:2, 117:5,
117:10, 117:19,
117:22, 119:18,
119:22, 120:5,
121:22, 121:25,
122:21, 124:7,
124:11, 124:13,
126:7, 126:13,
126:22, 126:24,
127:4, 127:17,
127:21, 127:25,
128:3, 128:15,
129:4, 129:9,
130:13, 131:3,
131:22, 132:22,
133:14, 134:13,
134:19, 136:1,
136:19, 136:21,
136:24, 137:2,
137:17, 141:15,
153:21, 154:3,
154:6, 154:12,
154:15, 156:3,
160:14, 161:8,
162:3, 162:23,
164:9, 168:11,
168:14, 169:1,
179:9, 180:15,
181:11, 182:1,
182:5, 182:11,
187:4, 192:14,
192:17, 192:22,
197:7, 197:10,
197:25, 198:7,
198:11, 198:16,
198:20, 199:5,
199:13, 199:19,
199:24, 200:11,
201:1, 201:9,
201:13, 201:19,
201:21, 201:25,
202:9, 202:20,
203:9, 203:16,
204:15, 204:22,
205:4, 206:11,
206:15, 207:19,
208:1, 208:3, 208:6,
208:9, 208:12,
208:20
court [10] - 4:1, 6:3,
8:6, 14:17, 112:11,
112:19, 112:23,
113:3, 205:5, 208:5
Court [5] - 1:11, 1:22,
109:2, 112:24, 209:7
courthouse [4] -
109:9, 109:12,
109:16, 110:5
Courthouse [1] - 1:12

Courtroom [1] - 2:12
courtroom [10] -
16:11, 64:12, 65:1,
106:5, 106:18,
154:2, 154:14,
197:24, 206:14,
208:11
COURTROOM [16] -
4:3, 16:10, 64:11,
64:16, 64:25, 106:4,
106:10, 106:17,
107:13, 107:17,
117:15, 154:1,
154:5, 154:13,
197:23, 208:25
courts [1] - 112:22
cover [1] - 202:13
covered [1] - 190:17
covers [2] - 9:1,
199:22
COVID [4] - 109:19,
189:11, 189:12,
189:23
CPAs [1] - 112:6
created [2] - 63:19,
194:24
creating [1] - 61:12
credibility [1] - 175:15
credit [1] - 112:2
cried [1] - 70:25
cringing [1] - 101:8
criteria [1] - 131:13
critical [1] - 15:3
crop [1] - 16:25
cross [3] - 154:11,
198:21, 198:24
CROSS [2] - 3:7,
133:18
CROSS-
EXAMINATION [2] -
3:7, 133:18
crossed [1] - 69:23
crucial [1] - 63:18
crucified [1] - 33:11
CSI [1] - 109:6
CTO [4] - 103:10,
103:17, 103:18,
139:25
culture [8] - 73:22,
74:15, 91:1, 167:25,
183:17, 185:10,
185:11, 195:8
current [1] - 114:3
cursing [1] - 7:11
customarily [1] -
161:6
customer [7] - 36:16,
36:20, 61:6, 66:17,
66:18, 69:23, 174:21
customers [2] - 36:1,

190:21
cutting [2] - 103:11,
103:13

### D

d/b/a [2] - 1:7, 1:7
daily [4] - 9:15, 109:5,
110:6, 110:8
damages [7] - 111:20,
111:21, 116:21,
134:11, 134:15,
134:21, 198:8
Dampf [41] - 24:16,
31:21, 32:10, 33:7,
36:2, 36:20, 37:22,
38:10, 38:14, 39:4,
39:14, 40:2, 40:22,
41:22, 42:7, 44:19,
45:22, 52:8, 53:10,
53:11, 54:1, 54:2,
54:12, 55:15, 57:19,
71:20, 75:8, 75:23,
75:24, 76:2, 78:25,
79:14, 79:23,
138:13, 138:15,
141:21, 141:22,
141:23, 165:4, 181:2
Dampf's [3] - 33:10,
75:9, 77:3
dan [1] - 168:24
Dan [162] - 36:8,
36:11, 41:5, 41:23,
41:25, 42:7, 42:8,
42:10, 42:19, 42:22,
43:24, 43:25, 44:22,
44:23, 45:10, 45:16,
45:17, 45:20, 45:24,
46:2, 46:4, 46:8,
46:19, 46:23, 50:11,
50:17, 52:8, 53:12,
53:13, 53:21, 54:14,
54:19, 54:22, 55:3,
55:5, 56:3, 57:4,
57:20, 58:5, 58:9,
58:10, 58:17, 58:18,
58:25, 59:12, 60:7,
60:9, 61:8, 63:12,
67:20, 67:21, 68:7,
68:13, 68:18, 70:17,
71:13, 71:20, 72:15,
74:17, 75:14, 77:2,
77:8, 77:9, 78:21,
79:23, 80:12, 80:19,
82:1, 82:2, 82:16,
82:17, 82:19, 83:6,
83:20, 83:22, 84:21,
86:6, 86:18, 86:23,
87:5, 88:14, 88:19,
88:23, 89:18, 90:13,
91:2, 91:6, 92:21,

92:22, 93:24, 98:8,
98:11, 100:7,
100:23, 101:11,
102:19, 102:24,
103:2, 103:8,
104:14, 105:4,
105:7, 137:7, 139:7,
139:10, 140:2,
141:11, 145:5,
145:18, 147:3,
147:4, 147:12,
148:13, 148:19,
149:6, 149:7, 150:8,
152:11, 153:2,
153:8, 158:12,
158:24, 163:3,
165:18, 166:4,
166:9, 166:21,
166:23, 166:25,
167:11, 167:19,
169:7, 169:21,
170:15, 171:13,
171:20, 173:7,
173:22, 174:2,
174:11, 174:13,
174:17, 175:5,
175:18, 175:25,
177:10, 178:20,
179:2, 179:25,
181:4, 182:16,
182:23, 183:3,
183:4, 183:6, 183:7,
183:8, 183:9,
183:21, 184:17,
185:8, 185:13,
185:17, 185:21,
186:20, 186:21,
186:22, 187:1,
187:11, 187:22,
187:24, 189:2,
189:12, 189:19,
189:23
Dan's [3] - 58:23,
58:24, 91:3
DANIEL [1] - 1:8
data [33] - 28:20,
30:16, 30:17, 30:19,
30:20, 30:25, 31:4,
31:7, 33:21, 33:24,
34:17, 35:24, 35:25,
36:3, 36:5, 36:15,
43:18, 63:17, 68:14,
69:24, 78:2, 78:5,
78:12, 81:2, 81:4,
81:5, 81:6, 81:11,
84:9, 159:4, 170:20,
174:21, 174:22
Date [1] - 209:9
date [14] - 26:21,
28:12, 68:19, 93:21,
93:22, 94:1, 113:24,

120:16, 121:17,
123:22, 123:23,
140:14, 141:1
**dated** [1] - 30:6
**dates** [1] - 76:6
**daughter** [1] - 85:22
**daughter's** [2] - 85:20,
85:23
**DAY** [1] - 1:6
**days** [5] - 16:21, 32:3,
33:6, 50:12, 157:20
**deaf** [3] - 39:5, 39:12,
40:8
**deal** [4] - 4:11, 5:2,
15:21, 178:3
**dealership** [1] - 76:15
**decade** [2] - 20:14,
58:2
**December** [23] -
25:25, 31:4, 63:14,
69:4, 89:4, 89:5,
99:7, 99:9, 102:18,
104:2, 104:4,
113:24, 116:6,
120:17, 120:22,
121:18, 122:13,
123:24, 136:12,
137:6, 144:14,
202:18, 203:13
**decided** [2] - 7:23,
22:10
**decision** [6] - 6:9,
58:23, 58:24, 71:8,
82:1, 82:17
**decisions** [1] - 77:8
**deck** [1] - 15:9
**decorations** [1] -
69:10
**deduct** [3] - 119:3,
119:5, 121:15
**deduction** [3] -
121:10, 121:14,
122:15
**deem** [2] - 6:25, 10:21
**deep** [1] - 59:6
**default** [1] - 147:17
**Defendant** [1] - 2:5
**Defendants** [1] - 1:9
**defendants** [2] -
110:20, 134:9
**defense** [4] - 13:3,
19:25, 110:9, 205:11
**defer** [1] - 7:25
**degree** [16] - 18:23,
19:1, 19:14, 19:23,
19:24, 20:8, 59:1,
92:14, 108:15,
108:17, 108:25,
111:13, 111:15,
111:16, 111:22,

136:10
**deliberation** [1] -
12:25
**deliver** [1] - 202:10
**delivery** [1] - 176:3
**demanded** [2] - 91:1
**demonstrates** [1] -
156:8
**denial** [1] - 101:9
**department** [37] -
28:17, 31:13, 31:15,
31:16, 31:17, 33:19,
33:20, 33:22, 35:14,
35:15, 40:17, 42:14,
44:17, 44:18, 45:10,
45:12, 47:21, 48:25,
52:5, 53:2, 53:16,
56:22, 57:1, 57:6,
65:19, 68:6, 69:21,
71:3, 72:9, 73:3,
73:4, 73:5, 81:12,
142:4, 142:12,
174:14
**departments** [4] -
33:21, 41:17, 69:18,
71:4
**dependent** [2] - 10:3,
10:7
**deploy** [1] - 62:4
**deployed** [1] - 62:21
**DEPUTY** [16] - 4:3,
16:10, 64:11, 64:16,
64:25, 106:4,
106:10, 106:17,
107:13, 107:17,
117:15, 154:1,
154:5, 154:13,
197:23, 208:25
**Deputy** [1] - 2:12
**DEREK** [1] - 1:18
**describe** [19] - 42:3,
52:4, 54:17, 55:1,
61:22, 97:2, 97:13,
97:21, 109:1,
109:23, 110:25,
111:9, 113:16,
116:24, 118:3,
118:16, 124:4,
129:9, 138:1
**described** [5] -
100:20, 114:13,
124:15, 128:20,
182:23
**describing** [3] -
116:17, 166:14,
183:7
**deserve** [1] - 79:19
**design** [2] - 55:7, 56:9
**designed** [2] - 61:19,
61:25

**designs** [1] - 194:18
**desk** [12] - 43:5,
50:20, 50:22, 54:15,
54:20, 55:5, 91:3,
150:2, 151:7, 151:9
**desks** [3] - 52:11,
52:14, 145:24
**destroyed** [1] - 18:8
**detail** [1] - 145:13
**detailed** [1] - 116:16
**detailing** [1] - 80:9
**details** [4] - 77:14,
97:2, 97:13, 97:22
**determination** [1] -
133:23
**developed** [3] - 61:8,
125:22
**developing** [2] -
78:14, 110:11
**development** [2] -
22:18, 69:24
**device** [1] - 192:1
**dick** [1] - 185:18
**different** [16] - 10:18,
10:19, 24:7, 28:17,
62:11, 78:15, 90:14,
99:23, 125:7, 152:7,
164:14, 164:15,
171:8, 201:4,
208:16, 208:17
**differently** [5] - 54:11,
55:16, 115:23,
201:6, 205:18
**difficult** [1] - 185:24
**Digital** [1] - 19:6
**diligence** [2] - 170:23,
175:23
**dinner** [4] - 177:20,
178:14, 178:16,
179:17
**dip** [1] - 12:12
**dipping** [1] - 11:20
**DIRE** [2] - 3:6, 108:2
**dire** [3] - 5:24, 6:24,
8:23
**direct** [8] - 115:6,
116:23, 118:15,
124:3, 154:8, 198:3,
198:12, 198:23
**DIRECT** [7] - 3:4, 3:6,
3:6, 17:18, 108:2,
113:9, 137:3
**directed** [2] - 159:2,
204:6
**directing** [1] - 146:1
**direction** [1] - 127:10
**directly** [7] - 18:16,
81:18, 83:14, 94:21,
180:2, 193:8, 196:25
**director** [34] - 68:13,

80:21, 80:22, 80:24,
81:2, 81:3, 81:10,
92:10, 92:21,
102:25, 103:3,
103:6, 103:17,
104:15, 104:17,
105:3, 105:8,
137:25, 138:3,
151:23, 153:10,
153:16, 159:22,
160:3, 160:4,
160:12, 161:3,
162:7, 162:8,
162:20, 164:4,
178:9, 178:11, 180:3
**Director** [1] - 103:1
**directors** [1] - 162:1
**disability** [1] - 39:13
**disappointed** [2] -
55:14, 59:24
**disappointment** [2] -
32:11, 51:3
**discipline** [1] - 109:15
**disciplined** [1] - 90:21
**disclose** [1] - 15:1
**discontinued** [1] -
113:13
**discovery** [1] - 191:20
**discrimination** [25] -
44:4, 44:5, 46:25,
54:6, 71:24, 84:3,
90:4, 94:13, 101:2,
101:3, 101:10,
102:20, 135:1,
135:5, 135:7,
135:10, 135:12,
136:5, 136:6, 137:8,
139:16, 146:10,
147:12, 174:1,
181:13
**discriminatory** [1] -
44:5
**discuss** [12] - 15:14,
15:18, 25:14, 88:14,
90:3, 100:2, 100:11,
105:12, 135:20,
151:21, 175:21,
175:22
**discussed** [13] -
55:12, 77:4, 90:4,
100:12, 104:3,
104:4, 137:7,
146:25, 152:3,
180:10, 180:12,
183:20, 185:17
**discusses** [1] - 175:21
**discussing** [12] -
25:21, 40:23, 40:24,
41:1, 88:21, 145:22,
147:18, 149:15,

167:13, 180:25,
183:5, 196:24
**discussion** [14] -
25:17, 26:24, 75:12,
77:4, 87:7, 87:8,
87:10, 90:1, 90:24,
97:25, 167:13,
183:7, 183:25, 184:1
**discussions** [6] -
74:12, 79:8, 87:2,
147:10, 167:16,
175:16
**dismiss** [1] - 104:11
**dismissed** [1] - 104:5
**disparaging** [2] -
40:12, 40:13
**display** [1] - 56:11
**dispute** [2] - 110:14,
202:21
**disputes** [2] - 109:11,
110:2
**disrespectful** [4] -
35:21, 37:7, 38:16,
54:13
**distance** [5] - 6:1,
6:15, 6:21, 8:22,
51:18
**distinction** [1] - 206:8
**distinguished** [3] -
78:8, 92:10, 92:20
**DISTRICT** [3] - 1:1,
1:1, 1:16
**district** [1] - 9:1
**District** [4] - 1:11, 4:2,
112:24
**diverse** [4] - 91:8,
91:10, 92:2, 195:6
**diversity** [15] - 90:24,
91:1, 91:4, 91:7,
91:10, 91:12, 91:20,
92:1, 92:2, 139:8,
145:4, 145:5,
169:25, 183:20,
195:8
**doctorate** [1] - 111:14
**document** [38] -
26:18, 29:3, 29:11,
29:22, 29:25, 30:3,
30:10, 48:23, 49:21,
56:9, 98:15, 125:14,
125:15, 125:16,
126:11, 127:3,
128:5, 128:6, 128:9,
128:12, 128:23,
129:2, 129:7,
129:20, 130:4,
130:21, 130:24,
131:1, 131:17,
140:16, 140:20,
140:23, 141:13,

143:9, 152:23,
153:19, 154:23,
157:14
**Document** [1] - 29:18
**documents** [19] -
14:23, 15:15, 29:6,
98:20, 114:13,
114:14, 114:21,
114:25, 115:1,
115:11, 127:22,
128:18, 130:17,
131:24, 132:1,
132:4, 204:5, 204:9
**DOD** [1] - 21:2
**dollar** [2] - 63:10
**dollars** [3] - 63:16,
122:11, 162:21
**done** [9] - 22:19, 55:8,
79:9, 111:6, 112:5,
195:2, 198:12,
200:2, 208:21
**door** [2] - 81:22, 81:24
**dot** [3] - 20:16,
196:18, 196:19
**down** [24] - 36:25,
71:15, 73:2, 93:16,
95:16, 98:14, 125:7,
125:8, 136:22,
142:16, 145:24,
146:21, 160:18,
170:23, 184:19,
189:5, 194:5,
194:15, 195:4,
195:24, 196:21,
197:5, 198:1, 202:11
**Doylestown** [1] - 9:3
**drawn** [1] - 9:1
**drink** [2] - 71:18,
71:21
**drinking** [1] - 71:20
**drinks** [2] - 71:16,
167:8
**Drive** [1] - 27:23
**driving** [1] - 6:21
**drop** [1] - 144:24
**Dropbox** [12] - 201:23,
202:6, 202:12,
202:13, 203:11,
204:3, 204:4, 204:5,
204:7, 204:10,
205:2, 205:9
**due** [8] - 53:15, 61:24,
73:22, 90:9, 113:12,
134:5, 170:23,
175:23
**Duff** [7] - 45:11, 45:23,
52:12, 53:13, 66:9,
78:25, 148:5
**DULY** [2] - 107:14
**duplicates** [1] - 139:8

**during** [60] - 4:19,
5:24, 7:10, 8:20,
8:23, 15:8, 16:1,
22:4, 26:1, 39:14,
39:20, 43:13, 45:11,
46:18, 54:3, 61:5,
79:13, 81:14, 83:1,
84:6, 85:8, 87:10,
88:8, 88:16, 97:20,
98:4, 98:21, 100:11,
100:22, 105:13,
107:1, 124:20,
126:17, 138:4,
138:12, 138:19,
149:5, 149:14,
150:23, 155:5,
156:8, 162:10,
169:18, 170:13,
171:25, 172:5,
172:7, 172:9,
172:22, 183:1,
183:25, 185:21,
186:12, 189:23,
190:1, 190:21,
193:4, 196:18
**duty** [1] - 10:22

## E

**ear** [1] - 199:25
**early** [8] - 32:3, 33:6,
47:11, 52:7, 70:25,
175:13
**earned** [2] - 116:9,
122:18
**earning** [5] - 112:18,
114:19, 116:20,
118:6, 120:20
**earnings** [20] - 112:16,
113:21, 113:22,
114:1, 114:4, 114:6,
114:10, 115:11,
118:21, 119:6,
120:23, 120:25,
121:6, 122:10,
122:13, 122:16,
122:17, 123:24,
123:25, 124:2
**easier** [1] - 192:18
**easiest** [1] - 78:12
**east** [1] - 36:1
**EASTERN** [1] - 1:1
**Eastern** [2] - 1:11,
112:23
**easy** [3] - 7:22,
192:25, 206:1
**echo** [1] - 183:17
**economic** [22] - 91:13,
108:5, 109:10,
110:1, 110:3,
110:11, 110:12,

110:17, 110:18,
111:20, 111:21,
115:14, 115:22,
116:2, 116:3, 116:8,
118:25, 134:6,
134:11, 134:15,
136:10, 136:11
**Economic** [2] -
109:21, 111:4
**Economics** [1] - 111:3
**economics** [9] -
108:15, 109:4,
111:7, 111:20,
112:5, 112:16,
113:6, 115:2, 115:3
**economist** [5] - 109:3,
109:4, 109:24,
109:25, 112:13
**economists** [1] -
111:1
**edge** [7] - 103:11,
103:13, 152:2,
152:7, 174:25, 191:1
**education** [4] -
108:12, 108:13,
111:25, 112:7
**educational** [1] -
108:11
**effected** [1] - 207:9
**effective** [1] - 207:8
**effort** [5] - 16:15,
74:19, 151:25,
152:8, 152:10
**efforts** [3] - 78:21,
88:4
**eight** [1] - 53:16
**either** [12] - 7:15, 7:19,
8:5, 99:22, 110:8,
127:10, 136:5,
138:11, 163:15,
203:21, 204:10,
206:17
**electronic** [2] - 82:7,
82:9
**element** [2] - 26:10,
116:5
**elements** [2] - 116:4,
123:8
**eligibility** [1] - 126:4
**eligible** [4] - 126:20,
131:10, 131:16,
131:19
**Ellis** [3] - 143:7, 143:8,
143:10
**email** [34] - 4:9, 14:17,
15:12, 49:6, 50:6,
50:7, 50:23, 50:24,
51:4, 51:10, 58:16,
68:18, 75:8, 82:2,
88:23, 89:6, 89:9,

140:13, 140:24,
141:3, 141:10,
141:21, 141:23,
143:5, 145:14,
149:13, 149:14,
153:2, 153:4, 153:6,
157:21, 171:11,
202:18, 207:21
**emails** [5] - 132:5,
153:1, 153:8,
202:16, 202:22
**embarrassed** [1] -
151:19
**emoji** [6] - 147:18,
147:20, 147:23,
148:16, 148:17,
149:8
**emojis** [4] - 147:21,
148:1, 148:2, 148:3
**empathy** [2] - 72:4,
186:7
**employed** [9] - 33:2,
119:5, 129:25,
130:6, 138:6,
138:10, 163:16,
181:7, 188:9
**employee** [11] - 29:5,
29:16, 29:23, 30:2,
30:6, 83:5, 114:7,
128:24, 155:23,
163:7, 180:17
**employees** [16] - 54:4,
54:12, 56:17, 73:19,
74:9, 124:16,
125:17, 125:21,
126:17, 141:19,
143:19, 144:10,
155:16, 155:18,
163:16, 193:7
**employer** [2] - 114:3,
125:20
**employers** [1] -
114:16
**employment** [33] -
9:16, 19:15, 26:19,
28:8, 31:6, 31:8,
63:7, 88:9, 113:13,
114:3, 114:8, 114:9,
114:24, 119:7,
122:15, 123:22,
124:17, 124:20,
126:18, 128:22,
130:19, 131:12,
136:15, 155:4,
155:5, 156:9, 158:3,
165:8, 166:8,
166:22, 173:21,
189:20, 193:4
**empty** [1] - 52:13
**encouraged** [1] -

92:15
**end** [15] - 6:16, 8:19,
25:16, 43:17, 80:16,
99:8, 109:11,
109:12, 116:12,
133:23, 171:20,
188:25, 189:14,
198:9, 199:11
**ended** [1] - 158:3
**engineer** [69] - 24:15,
24:16, 25:13, 32:10,
34:17, 36:21, 43:18,
45:14, 47:10, 47:17,
47:22, 47:24, 52:19,
52:20, 52:22, 55:21,
55:23, 57:13, 57:21,
58:14, 59:23, 60:2,
60:11, 63:22, 66:12,
66:19, 67:8, 67:12,
67:19, 68:17, 73:15,
75:11, 75:14, 75:18,
76:16, 80:8, 87:15,
87:23, 87:24, 87:25,
88:1, 88:11, 88:13,
88:18, 92:10, 92:20,
96:6, 104:20,
104:24, 138:13,
159:22, 160:11,
160:17, 160:21,
160:22, 162:17,
162:18, 165:11,
165:22, 173:10,
175:20, 176:9,
177:24, 178:23,
188:18, 188:19
**engineering** [43] -
22:18, 22:19, 22:22,
24:10, 28:18, 31:16,
33:19, 35:24, 37:25,
41:8, 41:17, 42:5,
42:14, 50:8, 52:5,
53:2, 55:20, 57:1,
57:2, 57:6, 57:10,
59:13, 59:20, 60:16,
60:24, 66:1, 67:24,
70:2, 70:12, 72:8,
73:3, 73:5, 74:24,
75:4, 75:6, 81:18,
83:15, 93:25,
148:10, 161:6,
161:12, 165:21,
181:1
**engineers** [52] - 28:19,
34:17, 35:16, 36:2,
42:6, 53:21, 55:15,
56:21, 57:3, 60:12,
66:2, 67:13, 67:14,
67:15, 67:16, 67:17,
67:22, 68:4, 68:5,
70:4, 70:7, 71:22,
80:6, 81:12, 84:9,

*84:10, 88:5, 88:8,*
*90:12, 100:25,*
*105:2, 138:5, 138:8,*
*138:9, 138:10,*
*148:12, 150:8,*
*150:9, 160:18,*
*161:1, 161:5,*
*161:11, 161:12,*
*161:21, 161:23,*
*165:3, 173:9,*
*174:13, 175:23,*
*176:6*
**enjoy** *[2] - 102:4,*
*106:2*
**enjoying** *[1] - 70:21*
**enter** *[2] - 5:9, 6:18*
**entered** *[1] - 15:16*
**enters** *[4] - 16:11,*
*65:1, 106:18, 154:14*
**entire** *[16] - 18:8,*
*56:22, 57:1, 57:6,*
*58:17, 65:19, 65:20,*
*73:4, 73:5, 75:3,*
*91:2, 139:9, 141:7,*
*141:8, 165:20,*
*206:14*
**entirely** *[2] - 20:18,*
*204:25*
**entitled** *[11] - 114:7,*
*126:1, 126:4, 129:1,*
*130:7, 130:10,*
*130:15, 131:5,*
*133:24, 133:25,*
*209:5*
**entitlement** *[1] - 126:2*
**entry** *[2] - 161:20*
**environment** *[3] -*
*44:3, 44:6, 181:14*
**equal** *[4] - 114:10,*
*115:20, 116:9, 123:4*
**equals** *[1] - 158:16*
**Equipment** *[1] - 19:6*
**equipment** *[3] - 30:22,*
*30:23, 172:6*
**equity** *[2] - 144:10,*
*196:15*
**especially** *[4] - 15:1,*
*51:11, 76:15, 77:18*
**ESQUIRE** *[4] - 1:19,*
*2:3, 2:3, 2:4*
**essentially** *[3] - 83:5,*
*120:19, 134:5*
**establish** *[1] - 120:24*
**established** *[1] -*
*117:19*
**European** *[1] - 50:2*
**evaluate** *[4] - 19:3,*
*81:7, 113:16, 198:24*
**evening** *[3] - 152:5,*
*170:14, 184:21*

**evenings** *[1] - 177:20*
**event** *[20] - 78:23,*
*110:13, 110:15,*
*166:16, 166:18,*
*166:24, 166:25,*
*167:1, 167:6, 168:6,*
*168:7, 171:5, 171:6,*
*172:1, 172:7,*
*184:21, 185:6,*
*188:23, 189:6,*
*198:18*
**events** *[4] - 169:9,*
*169:10, 169:13,*
*171:22*
**eventually** *[4] - 67:23,*
*68:7, 73:1, 84:9*
**EVIDENCE** *[20] - 3:10,*
*3:11, 3:11, 3:12,*
*3:12, 3:13, 3:13,*
*3:14, 3:14, 3:15,*
*23:20, 27:6, 29:14,*
*30:13, 49:19, 86:15,*
*95:7, 141:16, 156:4,*
*192:24*
**evidence** *[15] - 23:19,*
*27:5, 95:6, 107:6,*
*119:18, 120:2,*
*122:1, 127:6,*
*127:16, 128:6,*
*156:1, 156:3, 187:9,*
*189:21, 197:11*
**exact** *[13] - 28:12,*
*33:9, 37:2, 49:1,*
*91:21, 96:20, 99:9,*
*145:22, 147:9,*
*159:18, 159:23,*
*169:7, 185:10*
**exactly** *[10] - 10:4,*
*77:15, 146:3, 146:9,*
*167:22, 167:23,*
*201:25, 204:19,*
*204:25, 207:2*
**EXAMINATION** *[11] -*
*3:4, 3:6, 3:6, 3:7,*
*3:7, 17:18, 108:2,*
*113:9, 133:18,*
*136:3, 137:3*
**examination** *[2] -*
*64:22, 199:14*
**EXAMINATIONS** *[1] -*
*3:2*
**examine** *[1] - 135:19*
**example** *[5] - 45:22,*
*88:3, 90:23, 152:24,*
*162:1*
**examples** *[1] - 175:1*
**except** *[1] - 123:3*
**Exchange** *[1] - 65:18*
**exchange** *[2] -*
*125:24, 140:7*

**exchanged** *[1] - 132:5*
**excited** *[2] - 144:18,*
*144:21*
**exciting** *[1] - 109:5,*
*150:21*
**exclude** *[1] - 206:2*
**excluded** *[3] - 46:3,*
*56:16, 70:11*
**exclusion** *[1] - 71:25*
**excuse** *[16] - 6:25,*
*7:16, 12:9, 12:17,*
*13:13, 13:24, 14:4,*
*18:6, 45:7, 48:15,*
*75:23, 75:25, 77:2,*
*84:9, 181:24, 190:7*
**excused** *[2] - 12:14,*
*13:18*
**excusing** *[1] - 12:10*
**executive** *[3] - 33:18,*
*34:19, 175:8*
**executives** *[2] - 167:9,*
*171:11*
**exhausted** *[1] - 63:4*
**exhaustion** *[1] - 62:12*
**EXHIBIT** *[20] - 3:10,*
*3:11, 3:11, 3:12,*
*3:12, 3:13, 3:13,*
*3:14, 3:14, 3:15,*
*23:20, 27:6, 29:14,*
*30:13, 49:19, 86:15,*
*95:7, 141:16, 156:4,*
*192:24*
**exhibit** *[12] - 54:15,*
*85:4, 93:2, 93:16,*
*95:4, 154:19, 191:7,*
*191:19, 191:20,*
*193:14, 197:5*
**Exhibit** *[19] - 23:3,*
*26:12, 27:5, 28:22,*
*29:11, 29:13, 30:10,*
*30:12, 48:14, 49:16,*
*84:13, 86:14, 94:6,*
*95:6, 140:18,*
*141:15, 153:20,*
*191:5, 192:12*
**exhibits** *[4] - 15:1,*
*15:7, 193:25, 198:17*
**existed** *[1] - 57:12*
**exit** *[5] - 102:5,*
*164:16, 164:17,*
*190:20, 197:1*
**exits** *[4] - 64:12,*
*106:5, 154:2, 197:24*
**expect** *[2] - 14:21,*
*199:14*
**expected** *[4] - 118:21,*
*122:10, 122:13,*
*123:25*
**expecting** *[1] - 198:23*
**experience** *[28] -*

*47:19, 55:23, 59:3,*
*59:5, 59:6, 60:12,*
*72:6, 74:11, 76:9,*
*79:12, 79:15, 83:3,*
*90:11, 92:19, 96:25,*
*97:1, 97:16, 97:20,*
*102:10, 103:15,*
*108:10, 108:11,*
*160:7, 176:8,*
*181:13, 181:22,*
*181:23*
**experienced** *[2] -*
*79:10, 83:23*
**experiences** *[2] -*
*76:14, 80:9*
**expert** *[4] - 92:7,*
*113:6, 127:11,*
*135:23*
**Experts** *[1] - 111:5*
**expired** *[1] - 21:24*
**explain** *[3] - 29:21,*
*42:11, 190:11*
**explained** *[9] - 6:11,*
*6:12, 55:23, 77:14,*
*92:3, 146:7, 146:10,*
*164:19*
**explaining** *[1] - 146:7*
**explains** *[1] - 115:9*
**expose** *[1] - 151:20*
**express** *[5] - 7:18,*
*7:19, 32:10, 169:12,*
*190:8*
**expressing** *[1] - 51:2*
**expression** *[1] - 80:13*
**expressions** *[1] -*
*147:1*
**extent** *[3] - 8:5,*
*129:10, 207:19*
**eye** *[2] - 35:13, 44:17*

**F**

**face** *[7] - 54:19, 77:6,*
*101:8, 143:12,*
*147:1, 147:22,*
*151:13*
**facilitate** *[1] - 28:20*
**facing** *[1] - 145:24*
**fact** *[13] - 5:2, 19:16,*
*24:11, 28:7, 56:18,*
*78:17, 110:16,*
*119:20, 127:6,*
*127:13, 127:25,*
*168:6*
**fact-specific** *[1] -*
*110:16*
**factual** *[1] - 127:5*
**factually** *[3] - 127:1,*
*127:4, 133:24*
**faculty** *[1] - 111:12*

**fair** *[2] - 16:4, 187:20*
**fairness** *[1] - 135:22*
**falls** *[1] - 8:24*
**familiar** *[2] - 28:20,*
*135:20*
**familiarize** *[1] -*
*129:18*
**family** *[2] - 12:11,*
*197:13*
**fancy** *[1] - 54:25*
**fantastic** *[1] - 195:25*
**far** *[7] - 41:3, 45:8,*
*51:13, 63:24,*
*116:24, 152:14,*
*174:16*
**fast** *[2] - 174:21, 198:5*
**fast-growing** *[1] -*
*174:21*
**Fastley** *[1] - 175:19,*
*176:2*
**February** *[9] - 41:12,*
*41:13, 41:14, 42:1,*
*44:14, 157:25,*
*158:4, 158:15,*
*189:14*
**federal** *[2] - 112:23,*
*113:3*
**fee** *[1] - 200:22*
**feelings** *[3] - 101:7,*
*168:5, 186:8*
**fees** *[1] - 202:2*
**felt** *[16] - 36:24, 37:5,*
*37:7, 37:10, 38:17,*
*39:2, 42:17, 46:3,*
*54:11, 55:14, 56:16,*
*70:11, 72:7, 101:9,*
*144:18*
**few** *[7] - 69:24,*
*143:23, 145:24,*
*155:9, 175:1,*
*193:25, 198:10*
**Field** *[1] - 20:5*
**field** *[2] - 111:7,*
*112:11*
**figure** *[5] - 11:5,*
*123:15, 134:10,*
*187:8, 198:13*
**file** *[3] - 19:4, 94:12,*
*155:23*
**filed** *[5] - 93:22, 94:2,*
*100:12, 103:20,*
*139:15*
**fill** *[2] - 94:16, 102:11*
**filled** *[3] - 94:11,*
*94:14, 95:1*
**final** *[6] - 122:18,*
*166:8, 166:22,*
*166:23, 173:21,*
*189:20*
**finance** *[1] - 163:13*

*finances* [2] - 163:20, 163:23
*financial* [10] - 11:1, 11:3, 11:13, 11:20, 14:2, 73:1, 112:7, 114:21, 163:10, 163:16
*Financial* [1] - 111:4
*findings* [1] - 115:10
*fine* [4] - 5:6, 13:7, 138:24, 199:13
*finish* [2] - 19:15, 19:16
*finished* [1] - 19:17
*finishing* [1] - 74:18
*finite* [1] - 113:18
*fired* [4] - 73:17, 180:17, 181:8, 185:18
*Firestone* [2] - 19:12, 19:18
*firing* [1] - 110:13
*first* [37] - 4:8, 5:2, 8:11, 14:16, 16:14, 28:14, 29:7, 30:3, 30:15, 31:9, 31:10, 31:18, 32:4, 32:8, 42:10, 42:20, 50:10, 51:23, 61:5, 67:9, 76:3, 77:1, 77:3, 83:19, 84:19, 86:22, 87:13, 91:22, 100:20, 108:10, 125:18, 132:13, 134:21, 177:19, 177:20, 194:9
*fit* [1] - 164:20
*five* [10] - 28:3, 44:24, 52:11, 83:1, 111:10, 189:17, 189:18, 189:20
*fix* [1] - 128:2
*fixed* [2] - 62:9, 63:6
*flagged* [1] - 5:25
*flight* [3] - 199:6, 199:7, 199:8
*flood* [2] - 18:7
*floor* [2] - 91:2, 194:9
*flow* [1] - 64:22
*flowers* [1] - 69:10
*fluid* [1] - 106:22
*focus* [2] - 92:2, 139:14
*focused* [3] - 56:4, 66:18, 71:2
*folder* [1] - 201:23
*folks* [2] - 64:2, 105:23
*follow* [5] - 9:11, 88:23, 88:25, 97:25, 131:17

*follow-up* [2] - 88:23, 97:25
*followed* [1] - 15:3
*following* [1] - 122:8
*follows* [2] - 12:1, 126:25
*FOLLOWS* [1] - 107:15
*food* [1] - 71:16
*force* [1] - 5:3
*Ford* [6] - 6:2, 163:5, 174:20, 174:23, 201:15
*foregoing* [1] - 209:4
*forens* [1] - 109:8
*forensic* [12] - 109:3, 109:4, 109:8, 109:23, 111:1, 111:7, 111:20, 112:5, 112:13, 112:16, 113:6, 115:3
*Forensic* [2] - 109:20, 111:3
*forensics* [2] - 109:15, 109:22
*Forge* [3] - 193:18, 193:20, 193:24
*form* [6] - 54:7, 94:11, 101:2, 116:1, 146:10, 163:1
*formal* [2] - 69:13, 108:23
*format* [1] - 82:7
*formed* [1] - 151:2
*former* [3] - 147:10, 172:3, 180:16
*forming* [1] - 4:23
*Forrester* [16] - 24:16, 31:21, 32:16, 33:8, 36:3, 39:13, 39:18, 40:22, 41:21, 42:7, 44:19, 45:22, 53:17, 73:8, 76:13
*forth* [5] - 12:12, 43:13, 77:19, 125:16, 131:13
*forum* [4] - 50:2, 109:9, 109:12
*forward* [3] - 17:2, 80:18, 145:8
*foundation* [4] - 73:24, 117:22, 119:25, 120:1
*foundational* [1] - 13:6
*founded* [1] - 190:22
*founder* [13] - 62:2, 190:23, 193:10, 193:12, 193:13, 193:17, 193:22,

193:24, 194:3, 196:5, 196:14, 196:18
*founders* [2] - 164:14, 193:10
*four* [4] - 19:10, 31:2, 44:24, 66:15
*Fox* [1] - 108:20
*frame* [5] - 26:1, 48:7, 158:15, 180:18, 182:24
*framework* [1] - 86:2
*Frankfurt* [2] - 31:5, 31:7
*frankly* [2] - 5:7, 12:23
*frankly..* [1] - 15:22
*frequently* [1] - 112:4
*Friday* [3] - 50:1, 50:4, 199:8
*friend* [4] - 106:1, 170:5, 171:24, 172:3
*friends* [5] - 105:24, 167:7, 167:12, 168:2, 197:13
*fringe* [3] - 26:8, 125:3, 125:5
*front* [19] - 15:21, 52:12, 54:4, 85:4, 86:18, 90:17, 91:2, 109:4, 128:10, 130:21, 140:20, 151:16, 151:18, 153:19, 154:20, 163:14, 178:21, 181:3, 191:8
*frustration* [1] - 9:9
*FTP* [1] - 202:5
*Fu* [1] - 183:9
*full* [9] - 9:17, 70:9, 107:17, 107:19, 120:23, 121:5, 122:12, 131:12, 198:25
*full-time* [2] - 9:17, 131:12
*fun* [1] - 148:17
*Future* [1] - 21:3
*future* [6] - 25:21, 64:9, 112:17, 114:1, 130:19, 188:3

## G

*gain* [1] - 175:15
*Galloway* [25] - 24:18, 24:19, 27:16, 27:23, 28:15, 31:12, 33:16, 33:21, 43:4, 44:16, 44:20, 45:15, 47:6, 47:9, 48:1, 48:6,

49:2, 49:23, 49:25, 53:15, 72:23, 76:13, 91:24, 142:6, 185:25
*gaps* [1] - 102:11
*gardens* [1] - 69:11
*gay* [1] - 169:16
*gears* [1] - 93:13
*general* [2] - 173:19, 182:7
*generally* [8] - 5:10, 15:23, 59:18, 87:1, 144:8, 173:5, 184:13, 191:19
*generate* [1] - 114:10
*generation* [1] - 62:4
*generous* [1] - 189:25
*gentleman* [10] - 37:24, 38:18, 38:20, 39:1, 39:5, 40:12, 54:3, 174:8, 184:17, 184:20
*gentlemen* [2] - 185:5, 185:12
*Gibbsboro* [1] - 72:22
*girls* [3] - 170:9, 172:15, 172:19
*given* [16] - 30:4, 57:24, 90:12, 93:25, 102:14, 118:24, 138:16, 139:2, 139:17, 174:21, 199:2, 199:6, 200:19, 200:21, 203:4
*glass* [2] - 81:23, 189:5
*globally* [1] - 77:18
*goal* [9] - 101:19, 101:20, 101:21, 102:3, 102:6, 164:13, 190:16, 190:18, 190:20
*govern* [1] - 206:16
*graduate* [4] - 18:13, 18:20, 18:22, 111:14
*graduated* [1] - 108:21
*graduating* [1] - 108:18
*grand* [1] - 69:9
*granted* [2] - 21:9, 58:3
*Graphics* [2] - 194:19, 195:3
*grasping* [1] - 12:16
*great* [3] - 17:15, 79:15, 171:15
*grinds* [1] - 16:17
*gripe* [1] - 13:10
*Group* [4] - 165:14, 165:16, 165:20,

176:23
*group* [14] - 71:3, 85:25, 91:8, 111:1, 111:2, 111:3, 114:8, 114:17, 114:18, 139:9, 150:8, 152:6, 165:21, 179:18
*GROUP* [1] - 1:18
*group's* [1] - 70:16
*grow* [1] - 195:22
*growing* [6] - 38:7, 44:18, 47:5, 70:10, 102:2, 174:21
*grown* [2] - 35:15, 125:21
*guaranteed* [1] - 102:2
*guess* [16] - 6:15, 7:14, 9:14, 10:9, 12:23, 47:2, 87:17, 117:10, 159:19, 173:25, 199:17, 199:24, 202:21, 206:12
*guy* [2] - 175:19, 176:2
*guys* [6] - 24:5, 25:14, 38:5, 66:21, 188:24

## H

*Haddonfield* [37] - 44:21, 48:9, 48:10, 49:3, 49:4, 50:2, 50:4, 51:14, 51:17, 51:20, 51:24, 52:1, 52:7, 53:1, 53:3, 53:14, 53:19, 53:23, 53:24, 54:22, 65:12, 65:13, 65:15, 65:21, 65:23, 66:4, 66:9, 67:5, 68:21, 68:23, 69:2, 72:22, 77:22, 91:24, 142:7, 188:13, 188:14
*hair* [2] - 147:22, 147:23
*half* [9] - 61:21, 63:16, 75:25, 76:4, 76:7, 190:24, 198:6, 199:17
*hall* [1] - 13:15
*hallway* [1] - 14:5
*halt* [1] - 16:18
*hand* [3] - 59:24, 59:25, 107:13
*handbook* [7] - 29:5, 29:17, 29:23, 29:24, 30:2, 30:4, 30:6
*handed* [1] - 5:22
*handled* [1] - 163:19
*hands* [3] - 144:9,

196:5, 196:6
**hang** [3] - 200:17,
202:24, 203:1
**happy** [2] - 59:24,
101:6
**harassment** [1] -
135:1
**hard** [2] - 11:5, 205:5
**hardship** [11] - 5:25,
6:15, 6:22, 6:25,
8:25, 9:10, 10:11,
10:21, 11:1, 14:2,
14:3
**hat** [3] - 200:17,
202:24, 203:1
**hate** [1] - 38:23
**hated** [1] - 38:19
**hates** [1] - 38:15
**HAVING** [1] - 107:14
**head** [4] - 106:2,
169:2, 169:3, 197:12
**heading** [1] - 65:15
**headquarters** [6] -
24:20, 72:17, 73:7,
99:13, 150:15,
151:24
**heads** [1] - 153:22
**health** [9] - 26:8,
119:2, 119:3, 121:7,
121:11, 121:12,
121:13, 125:2
**hear** [14] - 10:18, 12:3,
32:17, 101:13,
106:25, 109:22,
128:15, 143:16,
150:10, 177:15,
183:11, 202:9,
207:22, 207:23
**heard** [25] - 9:8, 12:3,
34:5, 50:11, 50:18,
57:13, 66:24, 83:9,
84:24, 88:11, 96:5,
96:18, 103:4,
103:21, 143:8,
146:21, 150:3,
155:9, 169:6,
175:12, 179:18,
179:19, 186:10,
186:12, 203:23
**hearing** [7] - 7:4, 7:7,
50:2, 64:7, 100:14,
106:21, 204:1
**hearsay** [2] - 179:8,
182:10
**heart** [2] - 138:24,
151:25
**heated** [1] - 7:11
**held** [8] - 4:1, 96:23,
99:12, 99:13,
166:16, 170:25,

184:24, 184:25
**hello** [2] - 107:25,
133:21
**help** [23] - 37:13,
42:22, 56:8, 62:23,
63:11, 77:19, 77:24,
81:15, 81:17, 81:20,
82:3, 82:10, 84:6,
88:4, 92:11, 96:4,
98:10, 117:13,
155:17, 164:13,
195:21, 196:1,
196:14
**helped** [7] - 62:17,
79:10, 92:13, 98:12,
165:18, 190:20
**helpful** [1] - 196:1
**helps** [1] - 139:9
**Hewlett** [2] - 19:2,
19:3
**Hi** [1] - 89:18
**hide** [4] - 204:13,
204:15, 204:16,
206:13
**hiding** [1] - 206:16
**hierarchy** [6] - 42:4,
53:20, 68:3, 68:10,
104:18, 160:17
**high** [14] - 18:9, 18:11,
18:15, 18:25, 20:11,
38:8, 78:15, 83:2,
101:23, 102:5,
108:13, 108:14,
150:19, 195:16
**High** [1] - 18:12
**high-performance** [1]
- 20:11
**high-tech** [5] - 38:8,
101:23, 102:5,
150:19, 195:16
**higher** [6] - 104:15,
104:20, 104:23,
105:1, 116:2, 163:19
**highest** [4] - 92:6,
92:22, 92:23, 163:15
**highlight** [2] - 196:2,
196:12
**Hill** [1] - 109:20
**himself** [2] - 55:6,
80:3
**hire** [5] - 28:16, 32:13,
66:20, 76:5, 165:2
**hired** [21] - 32:13,
45:11, 45:13, 47:12,
52:13, 52:19, 52:20,
52:21, 52:23, 66:2,
66:8, 66:9, 72:14,
73:13, 76:3, 76:5,
142:19, 165:11,
166:12, 188:10

**hires** [1] - 90:25
**hiring** [5] - 32:11,
162:5, 186:18,
186:19, 195:6
**historical** [7] - 114:4,
118:23, 130:2,
131:9, 134:2,
150:20, 207:1
**historically** [1] -
129:21
**history** [5] - 97:3,
97:13, 97:18,
116:20, 118:6
**hold** [4] - 60:20,
117:2, 168:11, 182:1
**holding** [1] - 119:20
**home** [6] - 21:16,
70:25, 105:23,
189:12, 196:9,
197:12
**homeless** [1] - 185:23
**hometown** [1] - 21:16
**honest** [1] - 198:22
**Honor** [42] - 4:6, 4:7,
4:17, 5:14, 7:25, 8:8,
12:5, 13:21, 13:22,
14:16, 16:7, 17:6,
23:16, 27:2, 29:10,
30:9, 49:15, 64:19,
65:5, 70:19, 86:11,
93:13, 95:3, 106:7,
106:14, 107:9,
113:5, 120:4,
121:20, 122:20,
126:23, 136:23,
137:1, 141:13,
154:11, 192:12,
192:19, 202:16,
203:12, 205:3,
206:3, 208:4
**HONORABLE** [1] -
1:15
**Honorable** [1] - 4:1
**honors** [2] - 108:18,
108:22
**hopefully** [2] - 16:20,
16:21
**hoping** [1] - 98:10
**host** [1] - 21:4
**hosted** [1] - 30:23
**hostile** [1] - 181:14
**hotel** [6] - 6:3, 6:13,
9:2, 184:25, 188:23
**hottest** [1] - 195:8
**hour** [8] - 70:20,
105:21, 106:3,
106:6, 198:6, 199:17
**hourly** [6] - 6:23, 9:13,
9:20, 10:15, 12:11,
116:2

**hours** [7] - 112:2,
126:19, 128:25,
130:7, 130:9, 203:8,
205:14
**house** [4] - 27:19,
50:1, 51:22, 78:4
**housekeeping** [7] -
4:10, 5:21, 8:8, 8:14,
14:14, 199:11, 200:5
**HR** [13] - 24:4, 25:9,
35:1, 75:9, 75:11,
76:6, 155:2, 155:8,
155:13, 155:17,
155:20, 156:7
**human** [1] - 155:15
**Human** [13] - 93:22,
93:23, 94:3, 94:19,
95:14, 98:1, 99:1,
100:13, 104:5,
104:6, 104:10,
139:16, 144:19
**hunt** [1] - 162:10
**hurt** [1] - 70:11
**hypothetical** [3] -
105:11, 127:17,
127:18
**hypothetically** [1] -
128:24
**hypotheticals** [1] -
127:15

---

## I

**idea** [3] - 37:21, 46:7,
86:2
**ideals** [2] - 152:19,
152:20
**identified** [1] - 96:8
**ignore** [1] - 35:9
**ignored** [2] - 56:14,
190:13
**imagine** [2] - 78:8,
82:6
**immediately** [3] - 6:7,
70:11, 83:9
**impact** [3] - 9:7,
10:20, 136:10
**impatient** [1] - 84:2
**implement** [1] - 78:16
**implemented** [1] -
63:12
**important** [4] - 4:24,
15:7, 197:15, 206:8
**impression** [2] - 64:7,
184:3
**improvements** [1] -
55:2
**improves** [1] - 91:13
**IN** [20] - 3:10, 3:11,
3:11, 3:12, 3:12,

3:13, 3:13, 3:14,
3:14, 3:15, 23:20,
27:6, 29:14, 30:13,
49:19, 86:15, 95:7,
141:16, 156:4,
192:24
**inappropriate** [2] -
42:17, 205:5
**incident** [2] - 146:22,
149:5
**inclined** [1] - 7:4
**include** [3] - 26:5,
124:25
**included** [4] - 55:15,
118:6, 118:10,
118:22
**including** [4] - 26:8,
50:19, 111:24, 181:4
**income** [2] - 120:19,
123:4, 156:8,
156:21, 157:6,
157:19, 161:11
**inconvenience** [2] -
6:14, 8:25
**inconvenient** [2] -
6:14, 9:5
**increase** [5] - 102:7,
102:9, 158:21,
159:10, 160:10
**increased** [1] - 118:11
**increases** [2] - 25:25,
140:9
**increasing** [1] - 164:1
**independent** [4] -
21:4, 21:24, 25:24,
30:20
**indicate** [2] - 93:4,
190:9
**indicated** [2] - 34:15,
99:5
**individual** [11] - 25:2,
25:4, 27:19, 32:21,
91:11, 166:11,
174:2, 178:19,
178:21, 178:25,
186:19
**individuals** [3] - 28:3,
83:1, 99:24
**industry** [6] - 92:19,
102:14, 103:2,
160:6, 161:6, 161:13
**industry-wide** [2] -
92:19, 103:2
**inflation** [1] - 122:11
**information** [18] -
11:6, 35:1, 35:6,
37:18, 44:2, 44:9,
56:17, 108:8,
114:17, 115:16,
129:7, 155:2, 155:4,

155:16, 155:18,
162:9, 174:24, 195:1
**informed** [4] - 95:19,
96:12, 96:13, 96:14
**injured** [1] - 110:15
**injury** [1] - 110:15
**innermost** [1] - 101:7
**innovating** [1] -
103:11
**innovation** [7] - 55:1,
103:10, 137:25,
138:2, 138:3,
139:25, 180:3
**inpatient** [1] - 44:11
**input** [2] - 7:6, 12:2
**inquiry** [1] - 97:23
**inserted** [1] - 165:19
**inside** [5] - 6:3, 50:8,
154:24, 155:2, 167:6
**installer** [1] - 10:4
**instance** [1] - 58:1
**instead** [1] - 32:14
**instruction** [1] - 5:7
**insurance** [5] - 121:7,
121:11, 121:12,
121:13
**intake** [4] - 94:12,
94:18, 94:19, 98:2
**intelligence** [1] - 19:8
**intend** [1] - 204:8
**intending** [1] - 205:20
**intent** [3] - 202:19,
203:19, 203:21
**interaction** [1] - 37:18
**interactions** [2] -
181:19, 196:7
**interchanged** [1] -
185:11
**Interconnection** [2] -
170:22, 170:25
**interconnection** [5] -
87:11, 87:15, 103:9,
138:1, 174:24
**interest** [1] - 190:8
**interested** [6] - 26:2,
56:7, 92:4, 164:21,
170:10, 206:15
**interests** [1] - 8:2
**intern** [1] - 48:9
**internal** [1] - 96:2
**internally** [3] - 25:21,
163:10, 195:10
**International** [1] -
21:2
**internet** [12] - 19:20,
20:15, 20:18, 20:25,
21:1, 62:3, 92:24,
103:13, 103:14,
105:25, 193:10
**internet-based** [1] -

19:20
**interns** [1] - 83:2
**internship** [3] - 19:6,
19:9, 19:11
**interrupt** [8] - 36:17,
38:1, 56:6, 56:15,
74:22, 190:3,
204:22, 205:4
**interrupting** [2] - 38:9,
206:11
**interview** [36] - 24:8,
24:9, 24:11, 24:13,
24:21, 25:1, 37:24,
38:2, 38:5, 38:14,
38:15, 39:5, 39:12,
39:16, 39:17, 39:20,
40:10, 40:11, 45:18,
45:20, 46:1, 46:3,
46:5, 46:17, 46:21,
54:4, 59:16, 98:21,
100:17, 101:24,
139:17, 142:19,
166:1, 166:6,
187:16, 187:17
**interviewed** [14] -
24:14, 41:19, 41:20,
41:21, 45:22, 59:6,
95:22, 96:1, 96:3,
100:16, 100:18,
138:24, 138:25,
166:2
**interviewing** [4] -
38:3, 38:13, 45:21,
186:17
**interviews** [5] - 42:23,
43:25, 45:25, 46:13,
166:5
**introduce** [1] - 195:15
**introduced** [6] - 4:18,
5:5, 193:11, 193:13,
196:21
**introducing** [3] -
193:9, 193:22, 194:2
**introduction** [1] -
195:14
**introductions** [1] -
195:20
**invested** [1] - 102:3
**investigations** [1] -
109:7
**investigator** [1] - 98:5
**investigator's** [2] -
97:22, 97:23
**invitation** [2] - 14:2,
21:17
**invite** [1] - 170:8
**invited** [6] - 7:2,
21:15, 74:9, 167:7,
178:19, 178:20
**inviting** [2] - 83:9,

167:12
**involved** [1] - 46:13
**involving** [1] - 45:16
**IP** [17] - 21:3, 61:9,
61:11, 61:12, 61:15,
61:16, 62:8, 62:11,
62:14, 63:2, 63:4,
63:15, 63:18, 63:19,
87:11, 87:12, 87:15
**IPv4** [1] - 62:4
**IPv6** [3] - 62:3, 62:20,
162:6
**is..** [1] - 117:25
**issue** [34] - 5:21, 9:8,
9:11, 9:12, 13:17,
14:18, 15:19, 16:2,
16:25, 32:9, 33:17,
59:21, 59:22, 61:15,
61:16, 149:2,
169:12, 182:10,
194:1, 199:11,
200:5, 200:8,
202:24, 203:11,
203:12, 205:11,
205:13, 206:5,
207:20, 207:21,
207:23, 208:8,
208:18, 208:22
**issues** [29] - 4:9, 4:10,
6:20, 8:9, 13:25,
14:14, 33:16, 39:3,
40:10, 45:3, 45:9,
45:15, 54:21, 58:9,
58:10, 76:21, 78:10,
83:23, 89:18, 90:20,
112:17, 145:4,
145:5, 166:5,
169:22, 169:24,
186:3, 208:19
**IT** [3] - 40:16, 48:24,
49:12
**items** [1] - 112:17

**J**

**JACKSON** [1] - 2:2
**James** [8] - 1:12,
28:16, 170:4, 170:8,
170:15, 172:1,
172:2, 172:3
**January** [23] - 1:13,
67:4, 119:8, 122:12,
140:13, 141:2,
141:4, 141:10,
145:14, 149:10,
149:21, 152:17,
153:5, 153:6,
156:24, 157:1,
157:2, 157:3,
157:15, 157:20,
158:15, 209:9

**Japan** [1] - 21:1
**JD** [1] - 111:14
**jerk** [1] - 89:19
**Jersey** [8] - 24:18,
24:19, 27:17, 27:23,
31:12, 35:25, 40:17,
109:20
**Jesus** [1] - 33:11
**JILL** [1] - 2:3
**job** [28] - 10:16, 20:5,
27:14, 27:15, 28:21,
59:15, 96:5, 109:5,
139:20, 139:21,
140:3, 142:10,
142:19, 144:15,
149:3, 150:12,
151:11, 151:22,
152:23, 157:21,
159:21, 160:2,
162:9, 162:10,
177:4, 186:17,
187:17, 195:22
**jobs** [3] - 10:19, 60:11,
80:3
**Joe** [12] - 66:20,
66:23, 66:24, 66:25,
67:1, 67:2, 72:14,
72:15, 181:4
**John** [3] - 7:9, 85:8,
201:20
**Johnstown** [5] - 18:1,
18:6, 18:9, 22:3,
22:13
**join** [1] - 172:1
**joined** [2] - 66:19,
76:18
**joke** [1] - 41:2
**JONATHAN** [1] - 2:3
**JOSHUA** [2] - 1:15,
4:2
**journals** [1] - 112:10
**journey** [4] - 91:7,
101:5, 169:16,
169:20
**Judge** [1] - 4:2
**JUDGE** [1] - 1:16
**judges** [1] - 10:21
**judgments** [1] - 7:7
**jumping** [2] - 68:1,
79:21
**June** [3] - 166:16,
176:22
**junior** [8] - 57:13,
66:19, 67:8, 67:12,
67:13, 68:4, 160:18,
173:6
**juries** [1] - 10:24
**juris** [1] - 111:14
**jurisdictions** [2] -
111:23, 113:4

**Juror** [1] - 5:23
**juror** [3] - 8:12, 8:13,
12:25
**JUROR** [13] - 8:17,
9:17, 9:21, 9:23,
9:25, 10:6, 10:14,
11:5, 11:11, 11:15,
11:17, 11:22, 14:10
**jurors** [2] - 13:14, 14:6
**Jury** [8] - 16:11,
64:12, 65:1, 106:5,
106:18, 154:2,
154:14, 197:24
**JURY** [2] - 1:5, 17:14
**jury** [68] - 4:18, 4:22,
5:7, 6:5, 6:10, 9:6,
9:7, 10:11, 10:22,
12:13, 12:21, 13:5,
13:10, 13:16, 14:8,
16:5, 17:1, 21:7,
23:17, 26:17, 27:3,
29:2, 29:22, 30:17,
37:21, 42:3, 42:11,
46:7, 49:16, 50:18,
52:4, 52:17, 55:17,
59:3, 62:18, 64:18,
65:11, 68:24, 76:21,
77:24, 79:25, 80:17,
82:20, 84:19, 85:1,
85:6, 89:15, 94:10,
106:16, 106:21,
109:2, 109:23,
111:13, 118:3,
128:20, 134:16,
135:16, 135:20,
139:24, 140:18,
154:6, 156:1, 160:9,
174:17, 176:25,
177:15, 178:14,
189:21

**K**

**Kaplan** [1] - 84:12
**Kauf** [1] - 96:12
**Kaufman** [9] - 66:8,
67:23, 68:7, 68:16,
145:19, 146:1,
146:17, 160:25,
163:3
**Kaufman's** [2] - 68:11,
105:1
**Kaufmann** [26] -
45:13, 52:8, 52:16,
52:18, 52:19, 53:4,
53:5, 93:19, 93:20,
93:25, 96:8, 96:9,
96:14, 96:21, 96:24,
138:12, 138:15,
139:19, 142:21,
143:3, 143:5,

146:12, 148:12,
165:4, 179:24, 181:2
**KDDI** [1] - 20:25
**keep** [15] - 7:15, 32:6,
33:5, 35:13, 42:20,
44:17, 93:14, 93:15,
105:16, 112:3,
119:22, 145:7,
194:14, 199:19
**keeping** [1] - 78:15
**Kent** [4] - 18:16,
18:17, 18:20, 19:13
**Kentech** [5] - 114:18,
119:5, 119:6, 122:16
**key** [1] - 206:2
**kick** [2] - 54:2, 162:14
**kind** [64] - 17:20,
17:24, 20:19, 29:2,
30:17, 32:3, 34:7,
35:13, 36:25, 37:17,
37:21, 41:1, 42:3,
44:9, 47:1, 47:2,
51:2, 52:4, 52:10,
52:24, 54:17, 55:25,
59:3, 61:22, 62:18,
65:7, 65:14, 66:17,
68:21, 68:25, 75:2,
76:20, 79:21, 80:15,
80:17, 82:5, 82:9,
88:4, 103:16,
109:25, 112:21,
115:9, 118:3, 120:7,
126:18, 145:6,
147:6, 155:18,
159:19, 161:22,
166:9, 167:16,
169:12, 169:24,
173:11, 173:13,
173:19, 180:5,
188:1, 193:15,
198:24, 200:21,
202:6, 206:23
**kinds** [2] - 50:19,
169:22
**Kinkos** [1] - 151:4
**Kitonga** [3] - 66:20,
72:14, 72:15
**knee** [1] - 89:19
**knee-jerk** [1] - 89:19
**knowing** [3] - 14:23,
34:22, 34:24
**knowledge** [8] -
74:13, 76:10, 160:7,
161:11, 161:15,
161:16, 161:17,
180:23
**known** [3] - 35:6, 74:7,
82:10
**knows** [2] - 162:3,
179:7

**Kumulus** [1] - 194:7

## L

**LA** [1] - 109:14
**lab** [1] - 109:6
**labelled** [1] - 95:17
**Labs** [5] - 19:12,
19:18, 40:16, 40:20,
40:21
**lack** [3] - 72:4, 200:19
**lacked** [2] - 96:24,
102:11
**LAN** [4] - 78:3, 78:4,
78:8, 78:13
**large** [8] - 18:7, 20:24,
36:19, 39:18, 59:6,
69:16, 92:1, 196:18
**largest** [2] - 21:1,
36:15
**last** [20] - 4:9, 12:19,
14:19, 15:13, 15:15,
49:2, 49:25, 54:14,
96:14, 97:1, 98:15,
107:20, 115:12,
119:10, 120:23,
170:4, 184:21,
189:18, 192:8, 199:7
**lastly** [1] - 15:12
**late** [6] - 15:12, 52:10,
96:15, 174:7,
188:10, 188:16
**Latin** [1] - 109:8
**laughed** [2] - 180:11,
180:13
**laughing** [10] - 39:14,
40:1, 40:2, 40:4,
40:5, 181:3, 181:16,
182:2, 182:7, 185:20
**Laura** [1] - 2:12
**LAW** [1] - 1:18
**Law** [1] - 108:17
**law** [5] - 108:17,
108:19, 111:13,
111:16, 111:22
**Lawrence** [1] - 107:20
**LAWRENCE** [1] -
107:20
**lawyers** [5] - 110:9,
111:15, 112:1, 112:5
**lay** [4] - 73:24, 117:22,
119:25, 120:1
**lead** [1] - 88:4
**leading** [2] - 152:10,
164:8
**lean** [4] - 12:8, 12:9,
92:4
**learn** [3] - 90:13, 92:8,
146:11
**learned** [1] - 92:9

**learning** [4] - 37:13,
110:10, 110:11
**lease** [2] - 51:21,
65:24
**least** [15] - 46:16,
71:14, 93:9, 93:11,
100:17, 100:22,
115:20, 116:9,
123:4, 139:2,
170:21, 199:7,
200:10, 203:21,
205:1
**leave** [10] - 13:16,
15:22, 40:18, 73:20,
74:6, 74:21, 189:24,
190:4, 190:12,
190:14
**leaving** [6] - 70:24,
74:18, 114:16,
114:24, 144:17,
190:9
**lecture** [1] - 112:4
**lectured** [1] - 111:19
**lectures** [1] - 112:3
**lecturing** [2] - 111:6,
112:6
**led** [1] - 137:10
**left** [15] - 21:25, 43:18,
70:24, 73:12, 73:19,
73:21, 74:3, 74:4,
74:14, 104:9,
106:21, 116:13,
118:13, 189:5, 190:2
**legal** [4] - 10:23,
110:2, 111:17,
111:25
**legs** [1] - 153:22
**Lehigh** [2] - 108:14,
108:16
**less** [5] - 15:5, 59:5,
59:15, 136:8, 206:24
**letter** [4] - 26:19,
26:21, 26:23, 156:18
**letters** [1] - 111:17
**letting** [1] - 12:7
**level** [22] - 9:10, 35:5,
67:8, 67:18, 78:15,
92:6, 92:22, 105:4,
113:21, 151:23,
157:6, 157:19,
160:12, 160:21,
160:22, 160:25,
161:3, 161:20,
161:21, 162:20,
163:15, 183:7
**levels** [4] - 156:8,
159:22, 161:11,
162:15
**LEWIS** [1] - 2:2
**Lewis** [3] - 48:24,

49:10, 49:11
**LGBT** [5] - 166:16,
167:14, 169:10,
169:25, 185:9
**LGBTQ** [3] - 167:7,
181:23, 186:3
**LIABILITY** [1] - 1:6
**liability** [4] - 134:17,
134:21, 134:22,
135:3
**license** [1] - 112:2
**licenses** [1] - 112:3
**life** [3] - 144:7, 169:17,
186:4
**lifestyle** [1] - 109:14
**light** [2] - 109:6, 201:4
**likely** [1] - 11:17
**limit** [1] - 168:14
**limited** [6] - 61:16,
61:23, 61:24, 61:25,
113:19, 113:23
**LIMITED** [1] - 1:6
**limiting** [1] - 173:18
**line** [8] - 6:13, 8:25,
9:2, 87:13, 91:13,
96:10, 97:1, 102:17
**lines** [2] - 95:9, 151:2
**link** [3] - 201:22,
202:14, 205:8
**LinkedIn** [3] - 190:23,
190:24, 196:8
**links** [1] - 205:2
**Linode** [178] - 5:15,
22:17, 23:11, 24:4,
24:14, 24:22, 25:12,
26:20, 28:8, 28:10,
29:4, 30:19, 30:21,
31:10, 31:13, 32:4,
32:19, 33:2, 34:1,
36:15, 37:10, 37:11,
37:25, 38:3, 38:7,
41:6, 41:7, 41:11,
42:1, 42:10, 42:21,
47:3, 47:21, 49:13,
49:14, 50:3, 53:18,
61:9, 61:13, 62:13,
63:1, 63:3, 63:19,
63:20, 65:15, 65:18,
69:9, 70:10, 73:7,
73:20, 74:9, 74:11,
76:9, 76:18, 77:19,
82:5, 82:10, 82:22,
88:5, 88:12, 88:13,
94:13, 95:19, 97:20,
98:6, 99:4, 101:17,
101:18, 102:4,
102:11, 102:12,
103:22, 104:17,
113:14, 113:20,
114:4, 114:11,

114:15, 114:17,
114:23, 114:24,
115:21, 115:24,
116:4, 116:9,
116:20, 118:6,
118:12, 118:21,
118:23, 119:1,
120:21, 121:3,
122:13, 123:5,
123:22, 123:24,
124:17, 124:21,
125:25, 126:18,
128:24, 129:16,
129:25, 130:6,
130:19, 130:25,
134:6, 135:6, 135:8,
135:10, 136:9,
136:16, 138:6,
138:11, 139:4,
139:12, 139:14,
141:19, 141:25,
143:14, 143:19,
143:24, 143:25,
144:7, 144:10,
150:14, 150:22,
150:25, 151:23,
152:3, 155:10,
156:7, 156:8,
156:21, 157:6,
159:1, 160:6,
162:13, 163:7,
163:19, 163:20,
165:2, 165:8, 166:6,
166:16, 167:6,
169:9, 169:19,
171:2, 171:4, 171:9,
172:4, 174:12,
180:20, 181:1,
181:7, 181:13,
181:23, 183:9,
184:11, 184:12,
185:22, 186:18,
188:9, 189:4,
189:24, 190:2,
190:9, 191:2, 193:4,
194:8, 194:11,
194:23, 195:9,
195:10, 195:21
**LINODE** [3] - 1:6, 1:7,
1:7
**Linode's** [9] - 24:20,
28:20, 63:18, 102:7,
124:4, 155:20,
163:15, 185:25,
194:9
**Linode.com** [1] -
140:25
**LINODIAN** [1] - 1:7
**Linux** [1] - 196:21
**Lisa** [6] - 33:18, 33:23,
34:25, 35:1, 35:4

**Lisbon** [1] - 50:2
**list** [2] - 5:12, 112:21
**listed** [3] - 130:25, 201:3, 203:15
**listen** [4] - 7:18, 36:21, 37:3, 153:10
**listened** [1] - 9:8
**listening** [3] - 34:10, 34:11, 34:20
**litigation** [1] - 111:20
**live** [2] - 8:22, 27:16
**lived** [3] - 21:20, 27:20, 28:4
**lives** [1] - 10:22
**living** [8] - 25:25, 27:10, 27:13, 28:8, 51:14, 158:6, 159:14
**LL.M** [2] - 111:12, 111:16
**LLC** [3] - 1:7, 1:7, 1:8
**lo** [1] - 78:25
**loan** [1] - 11:15
**local** [3] - 28:1, 78:4, 195:16
**located** [5] - 32:18, 44:15, 50:7, 52:6, 65:10
**location** [2] - 27:22, 31:11
**logistics** [2] - 81:9, 199:9
**London** [2] - 31:3, 59:15
**long-time** [1] - 172:3
**longest** [1] - 143:25
**look** [25] - 26:15, 28:25, 46:24, 69:14, 84:16, 85:19, 121:19, 121:25, 122:2, 122:21, 139:6, 143:9, 155:16, 171:8, 193:25, 194:5, 197:15, 199:1, 202:20, 203:3, 205:25, 207:1, 207:14, 208:21
**looked** [12] - 27:16, 29:25, 78:11, 114:4, 120:23, 120:24, 129:20, 130:21, 139:7, 151:4, 151:12, 204:4
**looking** [29] - 38:3, 38:7, 45:23, 60:3, 70:3, 75:9, 75:10, 81:17, 82:10, 84:3, 86:3, 105:25, 121:5, 130:5, 130:17, 143:7, 155:21,

155:23, 170:21, 171:8, 173:14, 191:21, 193:14, 193:16, 194:6, 194:8, 197:17, 205:1, 205:8
**looks** [16] - 25:3, 30:6, 49:21, 86:4, 86:18, 94:16, 95:9, 97:1, 140:24, 192:7, 192:9, 193:16, 195:4, 195:5, 195:20
**lose** [2] - 129:17, 136:7
**losing** [1] - 6:24
**loss** [19] - 110:12, 112:18, 113:19, 114:1, 116:14, 116:15, 119:9, 119:11, 119:12, 119:14, 121:16, 122:23, 123:9, 123:12, 124:2, 134:6, 136:13, 136:17
**losses** [19] - 108:5, 113:12, 113:17, 115:14, 116:10, 116:11, 116:17, 119:11, 119:13, 120:11, 120:12, 120:16, 122:5, 123:4, 123:11, 123:16, 128:20, 129:16, 136:6
**lost** [2] - 112:16
**loud** [1] - 43:14
**loudly** [4] - 34:10, 34:13, 34:19, 91:2
**low** [2] - 164:16, 164:24
**lower** [1] - 63:23
**lowest** [1] - 42:6
**Lucent** [5] - 40:16, 40:18, 40:19, 40:20, 40:24
**lunch** [6] - 6:8, 7:10, 8:20, 64:23, 105:20, 106:2, 137:6, 139:21
**Luncheon** [1] - 106:9
**Lynx** [1] - 59:14

## M

**machine** [1] - 63:20
**main** [1] - 40:18
**maintain** [2] - 112:1, 193:6
**maintained** [2] - 92:25, 193:3

**makeup** [1] - 66:1
**Malaysia** [8] - 174:20, 175:2, 175:11, 176:10, 176:12, 176:13, 176:14, 176:17
**man** [11] - 38:15, 38:16, 38:24, 79:16, 147:18, 147:20, 147:21, 147:23, 148:16, 148:17, 149:8
**manage** [1] - 16:22
**managed** [2] - 81:1, 81:2
**management** [11] - 35:5, 42:4, 68:12, 81:25, 82:21, 87:21, 96:23, 98:24, 139:13, 174:12, 183:8
**manager** [38] - 24:4, 36:10, 41:8, 42:13, 44:22, 49:14, 55:25, 67:20, 67:24, 67:25, 68:6, 68:17, 81:16, 81:17, 82:22, 83:14, 87:11, 87:14, 87:16, 88:17, 93:25, 95:20, 104:16, 105:2, 139:14, 143:2, 145:19, 146:2, 146:17, 148:13, 161:1, 162:19, 174:3, 187:13, 187:14, 187:15, 187:16, 189:3
**managers** [2] - 82:11, 150:9, 174:14, 187:11, 187:12
**managing** [1] - 81:18
**manner** [4] - 35:7, 35:22, 36:25, 39:2
**March** [12] - 44:14, 46:8, 65:17, 65:20, 66:4, 72:16, 72:18, 73:8, 189:14, 189:15, 192:8
**Market** [2] - 1:12, 1:19
**market** [2] - 62:16, 63:15
**marketing** [1] - 175:14
**Maryland** [1] - 108:14
**Massachusetts** [2] - 19:7, 19:9
**master** [2] - 28:4, 92:14
**Master's** [1] - 19:14
**master's** [14] - 19:15, 19:16, 19:17, 19:23,

19:24, 19:25, 20:1, 20:3, 20:4, 20:20, 59:1, 108:21, 108:25, 111:16
**mat** [1] - 70:3
**match** [2] - 106:23, 107:5
**material** [2] - 110:3, 110:16
**materials** [1] - 110:10
**mats** [1] - 69:17
**matter** [6] - 168:21, 182:14, 184:13, 199:9, 200:6, 209:5
**Matter** [1] - 209:1
**maureen** [1] - 1:22
**Maureen** [1] - 209:7
**maureen.mchugh@paed.uscourts.gov** [1] - 1:22
**Maynard** [1] - 19:7
**MBA** [2] - 108:21, 112:14
**MCCARTHY** [1] - 2:4
**McCort** [1] - 18:12
**McHugh** [2] - 1:22, 209:7
**McNealy** [3] - 193:11, 196:5, 196:17
**mean** [43] - 7:14, 7:15, 7:18, 10:6, 10:8, 11:8, 11:19, 15:6, 35:23, 38:1, 69:20, 75:25, 77:25, 90:15, 90:20, 91:8, 97:17, 99:19, 121:22, 131:6, 146:1, 146:20, 147:25, 149:4, 150:6, 150:7, 151:19, 151:21, 159:15, 159:25, 166:15, 169:24, 172:14, 172:16, 172:18, 172:19, 172:20, 172:21, 173:10, 201:2, 201:9, 202:23
**meaningful** [1] - 12:25
**means** [4] - 85:15, 91:10, 109:9, 197:11
**meant** [2] - 55:22, 172:21
**measure** [1] - 114:8
**mechanical** [1] - 1:23
**mechanisms** [1] - 200:23
**medical** [1] - 112:17
**medium** [4] - 180:10, 181:20, 183:4
**meet** [2] - 173:2,

175:15
**meeting** [78] - 36:5, 36:19, 38:15, 39:15, 78:20, 79:1, 79:6, 79:7, 81:16, 81:21, 83:12, 84:7, 88:15, 89:10, 90:3, 99:7, 99:11, 99:12, 99:13, 100:2, 100:4, 100:6, 100:11, 100:23, 102:18, 104:2, 104:3, 104:4, 104:7, 104:9, 105:13, 137:6, 137:10, 138:4, 138:15, 138:19, 139:10, 139:22, 140:4, 144:10, 144:14, 144:17, 145:10, 145:15, 145:18, 147:12, 149:7, 165:15, 165:16, 165:20, 168:8, 170:22, 170:25, 173:12, 174:19, 174:24, 175:4, 176:23, 178:18, 178:21, 178:22, 179:18, 179:20, 179:21, 179:23, 179:24, 180:5, 180:7, 181:1, 181:17, 182:17, 182:20, 183:2, 190:1, 194:7, 194:10, 194:22, 196:13
**meetings** [18] - 83:15, 83:17, 88:16, 99:24, 99:25, 152:4, 152:6, 152:7, 152:8, 152:11, 153:15, 173:3, 173:4, 173:14, 175:17, 189:24, 196:5, 196:6
**Melissa** [1] - 2:11
**member** [4] - 110:22, 111:5, 111:12, 181:23
**members** [5] - 33:24, 106:21, 167:7, 167:14
**memo** [1] - 203:15
**memory** [3] - 54:1, 119:23, 121:19
**memos** [1] - 203:14
**men** [2] - 91:8, 172:19
**mention** [3] - 10:15, 82:3, 162:21
**mentioned** [25] -

10:14, 10:15, 22:20,
25:9, 26:6, 26:24,
44:4, 46:2, 46:4,
52:15, 77:5, 88:16,
90:5, 91:11, 103:1,
103:3, 103:8,
109:25, 120:10,
139:13, 155:9,
165:3, 174:23,
175:19, 188:2
**mentor** [1] - 83:4
**Merry** [3] - 70:18,
71:13, 144:2
**message** [5] - 78:18,
85:19, 88:22, 89:13,
93:4
**messages** [8] - 51:4,
82:7, 153:13,
191:23, 191:25,
192:3, 192:7
**messaging** [4] -
85:13, 85:14, 85:16,
148:9
**met** [6] - 13:16, 78:17,
131:13, 142:19,
196:4, 196:8
**methodologies** [1] -
129:9
**methodology** [1] -
127:12
**Meyer** [1] - 2:11
**MEYER** [4] - 98:17,
117:7, 117:17, 191:9
**mic** [1] - 108:1
**Michael** [3] - 50:11,
143:16, 143:18
**micro** [1] - 82:25
**microphone** [1] -
167:18
**Microsystems** [7] -
20:14, 58:2, 58:4,
58:6, 193:13, 196:4,
196:19
**mid** [8] - 48:12, 48:15,
52:9, 64:2, 161:22,
166:10, 166:11
**mid-morning** [2] -
52:9, 64:2
**middle** [7] - 34:9,
39:6, 47:2, 80:15,
107:20, 116:12,
178:25
**might** [4] - 109:4,
125:3, 197:14,
203:12
**migrating** [1] - 19:19
**miles** [1] - 6:2
**million** [3] - 63:8,
63:9, 63:16
**mind** [7] - 5:3, 9:10,

12:20, 92:25,
164:23, 165:1,
173:15
**minds** [1] - 4:23
**mindset** [3] - 71:25,
72:4, 103:15
**mine** [4] - 59:5, 59:15,
117:7, 117:17
**minor** [1] - 8:10
**minus** [1] - 122:17
**minute** [3] - 14:12,
43:13, 89:5
**minutes** [7] - 19:13,
64:3, 64:13, 153:21,
153:25, 154:3,
198:12
**missed** [1] - 10:7
**mistaken** [1] - 204:10
**mitigate** [1] - 120:12
**mocking** [1] - 40:1
**mode** [1] - 150:19
**model** [3] - 110:12,
130:18, 131:12
**Moffett** [1] - 20:5
**mom** [1] - 22:13
**moment** [8] - 62:10,
68:22, 80:1, 107:12,
120:8, 126:23,
155:4, 155:6
**moments** [1] - 92:8
**Monday** [1] - 28:9
**money** [4] - 101:25,
123:20, 136:7, 195:3
**monitor** [1] - 17:11
**month** [8] - 42:20,
46:16, 75:25, 76:4,
76:7, 83:3, 159:19,
189:13
**months** [9] - 19:10,
22:7, 31:5, 69:5,
115:13, 189:17,
189:19, 189:20
**morning** [22] - 4:4,
4:6, 4:7, 8:16, 8:17,
12:16, 13:17, 16:12,
16:15, 16:24, 17:4,
17:23, 52:9, 52:10,
64:1, 64:2, 197:19,
199:8, 202:21,
207:22, 208:24
**most** [4] - 10:21,
44:20, 112:25,
132:10
**mother** [4] - 21:25,
85:20, 85:23
**motivated** [1] - 183:6
**mouth** [1] - 168:4
**move** [27] - 21:19,
48:1, 48:6, 48:8,
50:22, 51:14, 51:19,

63:21, 65:21, 67:4,
68:25, 72:16, 72:24,
73:4, 80:18, 82:11,
89:16, 95:3, 98:16,
141:12, 155:25,
176:14, 179:10,
182:14, 184:3,
192:12, 197:5
**moved** [14] - 17:11,
21:21, 28:9, 33:20,
48:10, 49:3, 51:17,
65:17, 65:19, 65:20,
65:23, 66:4, 69:5,
151:20
**moving** [7] - 49:23,
50:1, 50:20, 145:8,
192:14, 197:7,
207:10
**MR** [257] - 3:4, 3:6,
3:6, 3:7, 3:7, 4:6,
4:7, 4:12, 4:17, 5:14,
5:19, 7:9, 7:20, 7:22,
7:25, 8:8, 8:15, 12:5,
12:7, 12:18, 13:21,
13:22, 14:16, 15:10,
15:12, 15:23, 16:4,
16:7, 17:6, 17:8,
17:16, 17:19, 23:2,
23:4, 23:16, 23:18,
23:21, 26:12, 26:14,
27:2, 27:4, 27:7,
28:22, 28:24, 29:10,
29:12, 29:15, 29:18,
29:20, 30:9, 30:11,
30:14, 39:8, 39:10,
48:13, 48:17, 49:15,
49:17, 49:20, 54:7,
54:9, 60:17, 60:18,
60:22, 61:3, 61:10,
64:19, 64:24, 65:5,
65:6, 70:19, 70:22,
73:23, 74:1, 74:2,
84:13, 84:15, 86:11,
86:13, 86:16, 93:13,
93:16, 93:17, 94:5,
94:7, 95:3, 95:5,
95:8, 95:16, 95:18,
98:14, 98:18,
105:16, 105:19,
106:7, 106:14,
107:9, 108:3, 113:5,
113:7, 113:10,
117:3, 117:8,
117:12, 117:18,
117:21, 117:24,
118:1, 119:15,
119:21, 120:3,
120:6, 121:20,
121:24, 122:4,
122:20, 122:25,
124:6, 124:9,

124:12, 124:14,
126:6, 126:10,
126:12, 126:14,
126:21, 126:23,
127:1, 127:15,
127:20, 127:24,
128:2, 128:5, 128:8,
128:12, 128:13,
128:17, 129:3,
129:5, 129:8,
129:12, 130:12,
130:14, 131:2,
131:4, 131:21,
131:23, 132:21,
132:23, 133:13,
133:15, 133:16,
133:19, 134:12,
134:14, 134:18,
134:23, 135:25,
136:2, 136:4,
136:18, 136:20,
137:1, 137:4,
137:16, 137:18,
137:20, 140:17,
140:19, 141:12,
141:14, 141:17,
153:19, 154:10,
154:17, 155:25,
156:2, 156:5,
160:13, 160:15,
160:16, 161:7,
161:9, 162:2,
162:12, 162:22,
162:25, 164:8,
164:11, 168:10,
168:18, 168:19,
168:25, 169:5,
179:8, 179:10,
179:11, 180:14,
180:19, 181:10,
181:15, 181:25,
182:10, 182:13,
187:3, 187:5, 187:7,
191:4, 191:6,
191:10, 191:12,
192:12, 192:13,
192:16, 192:18,
192:20, 192:25,
193:2, 197:5, 197:9,
198:4, 198:8,
198:14, 198:19,
198:22, 199:6,
199:16, 199:23,
200:5, 200:12,
200:25, 201:8,
201:12, 201:15,
201:16, 201:18,
201:20, 201:22,
202:8, 202:16,
203:3, 203:8,
203:11, 203:17,

204:13, 204:21,
205:3, 206:3,
206:10, 206:12,
207:18, 207:25,
208:2, 208:4, 208:7,
208:11, 208:19
**MS** [5] - 13:20, 98:17,
117:7, 117:17, 191:9
**muddy** [3] - 206:1,
206:18, 206:21
**multiple** [7] - 69:23,
84:23, 85:18, 98:8,
98:11, 100:22, 113:3
**multiply** [2] - 78:6,
158:16
**murdered** [2] - 167:15,
186:6
**murders** [2] - 167:14,
167:15
**must** [1] - 112:2
**mustering** [1] - 182:3

**N**

**N-A-F-E** [1] - 111:2
**NAFE** [1] - 111:2
**name** [27] - 17:25,
18:1, 31:15, 31:24,
32:23, 52:15, 66:22,
66:23, 69:17, 70:6,
70:9, 82:4, 107:17,
107:18, 107:19,
107:20, 148:9,
149:16, 149:23,
151:12, 163:14,
164:4, 164:15,
170:4, 189:3
**named** [3] - 36:14,
166:11, 180:17
**names** [5] - 31:20,
52:24, 139:10,
143:7, 197:16
**narrative** [2] - 65:11,
68:2, 199:22
**NASA** [3] - 20:5, 20:7,
20:12
**NASA's** [1] - 20:10
**national** [1] - 111:1
**National** [1] - 111:2
**near** [2] - 196:10,
199:16
**nearby** [1] - 43:5
**necessarily** [2] - 5:7,
206:5
**necessary** [1] - 5:9
**need** [28] - 4:11, 6:19,
15:19, 45:20, 46:4,
92:3, 110:5, 117:19,
117:22, 119:24,
119:25, 120:1,

128:14, 128:15,
139:8, 153:16,
155:1, 175:21,
191:15, 197:19,
198:17, 198:24,
199:1, 201:4, 203:5,
205:23, 207:16
**needed** [2] - 60:11,
81:15
**needs** [3] - 152:22,
177:15, 199:2
**negatively** [1] -
185:20
**negotiations** [1] - 26:3
**net** [1] - 124:1
**Net** [1] - 36:14
**network** [176] - 19:3,
19:17, 20:9, 21:3,
21:10, 22:18, 22:19,
22:22, 24:10, 24:15,
24:16, 25:12, 28:18,
28:19, 31:16, 32:10,
33:19, 35:16, 35:24,
36:2, 36:6, 36:20,
37:25, 41:8, 41:17,
42:6, 42:14, 45:13,
47:10, 47:17, 47:20,
47:22, 47:24, 50:8,
52:19, 52:20, 52:21,
53:21, 55:2, 55:19,
55:20, 55:21, 55:22,
56:21, 57:2, 57:3,
57:10, 57:21, 58:14,
59:13, 59:20, 59:23,
60:1, 60:11, 60:16,
60:24, 63:22, 66:1,
66:2, 66:12, 66:18,
66:19, 67:8, 67:12,
67:13, 67:14, 67:15,
67:16, 67:17, 67:19,
67:20, 67:22, 67:24,
68:4, 68:5, 68:14,
68:17, 70:2, 70:7,
70:12, 72:8, 73:3,
73:15, 74:24, 75:4,
75:6, 75:11, 75:13,
75:18, 76:16, 77:15,
77:17, 78:2, 78:5,
78:7, 78:16, 78:19,
80:4, 80:8, 81:4,
81:12, 81:18, 81:24,
83:14, 87:16, 87:22,
87:24, 87:25, 88:1,
88:5, 88:8, 88:11,
88:13, 88:17, 90:12,
93:25, 95:20, 98:24,
103:3, 104:16,
104:20, 104:23,
105:2, 137:25,
138:3, 138:5, 138:8,
138:9, 138:10,

138:13, 147:17,
148:9, 148:12,
150:8, 152:1, 152:6,
159:22, 160:11,
160:17, 160:18,
160:21, 160:22,
161:1, 161:5,
161:11, 161:12,
161:20, 161:21,
161:23, 162:16,
162:18, 165:3,
165:11, 165:21,
165:22, 173:8,
173:9, 175:20,
175:22, 176:5,
176:9, 177:24,
179:17, 179:23,
180:3, 181:1,
188:17, 188:18,
188:19
**Network** [5] - 54:25,
165:14, 165:15,
165:20
**networking** [16] -
19:19, 20:18, 20:25,
30:22, 30:23, 42:5,
52:5, 53:1, 57:1,
57:6, 59:7, 71:9,
161:6, 170:24,
177:4, 194:21
**never** [24] - 46:3,
46:22, 56:10, 75:8,
75:21, 82:22, 87:9,
89:18, 90:11, 90:19,
92:24, 95:19, 95:21,
96:3, 102:2, 103:22,
139:14, 147:9,
157:18, 200:15,
201:7, 202:5, 203:23
**New** [16] - 24:18,
24:19, 27:16, 27:23,
31:12, 35:25, 36:1,
40:17, 109:20,
151:8, 152:5, 152:6,
165:14, 165:15,
165:19, 176:23
**new** [29] - 19:20,
27:14, 28:16, 38:4,
38:6, 38:8, 50:1,
51:7, 51:19, 51:23,
52:1, 52:24, 55:1,
62:21, 66:20, 70:9,
78:13, 90:25,
100:20, 137:24,
139:22, 140:3,
140:4, 140:10,
152:1, 152:23,
165:16, 190:21,
194:20
**Newark** [4] - 35:24,
35:25, 36:15

**Newtown** [1] - 9:3
**next** [45] - 10:12,
11:10, 11:11, 16:21,
19:5, 20:13, 23:3,
23:5, 24:25, 26:13,
28:23, 35:8, 35:19,
45:2, 45:4, 48:14,
50:11, 50:16, 62:3,
67:18, 75:17, 82:18,
95:25, 96:10,
102:21, 106:15,
140:12, 146:2,
146:18, 149:8,
149:12, 156:21,
157:9, 157:14,
157:19, 157:24,
160:21, 160:22,
160:25, 161:3,
173:18, 176:15,
193:25, 198:16
**NextGen** [15] - 54:24,
54:25, 56:8, 56:18,
56:25, 57:5, 77:16,
77:17, 77:19, 77:21,
77:24, 78:1, 78:16,
88:3, 194:12
**night** [8] - 4:9, 14:19,
15:13, 15:15, 170:7,
172:9, 197:22,
208:21
**nine** [1] - 9:1
**none** [2] - 144:1,
200:22
**normal** [1] - 200:22
**North** [1] - 62:14
**northern** [1] - 20:6
**Northern** [1] - 40:17
**notch** [2] - 92:7, 93:1
**note** [8] - 5:22, 6:6,
6:16, 6:18, 8:18,
8:21, 9:12, 206:12
**nothing** [1] - 136:20
**notice** [7] - 165:10,
202:15, 202:19,
203:18, 203:19,
203:21, 204:3
**noticed** [5] - 16:23,
71:11, 151:10,
151:11, 157:18
**notification** [1] - 98:6
**notion** [3] - 6:23, 11:2,
206:13
**November** [17] - 20:1,
26:22, 28:13, 31:11,
45:14, 52:20, 63:14,
67:23, 68:20, 88:25,
93:19, 93:20, 99:2,
99:8, 118:12,
157:10, 188:16
**nowhere** [1] - 199:16

**nullify** [1] - 6:16
**number** [27] - 21:4,
33:9, 56:10, 57:25,
61:17, 61:23, 61:24,
61:25, 73:19, 78:2,
90:17, 95:10, 98:7,
98:9, 112:2, 121:1,
122:18, 123:20,
125:6, 130:7, 130:9,
134:10, 156:17,
156:18, 170:1,
189:23
**NUMBER** [1] - 1:3
**numbers** [4] - 118:9,
123:15, 126:19,
132:25
**numerous** [1] - 101:10
**nutshell** [1] - 101:1

### O

**o'clock** [3] - 197:18,
197:21, 207:21
**oath** [1] - 17:10
**object** [3] - 15:16,
54:7, 60:17
**objection** [51] - 23:18,
27:4, 29:12, 30:11,
39:8, 49:17, 60:20,
60:21, 61:3, 61:4,
73:23, 86:13, 95:5,
113:7, 124:6,
124:10, 124:11,
126:6, 126:7,
126:12, 126:13,
126:21, 129:3,
129:8, 129:10,
130:12, 130:13,
131:2, 131:21,
132:21, 134:12,
134:18, 137:16,
141:14, 156:2,
160:13, 161:7,
162:2, 162:22,
164:8, 168:10,
168:12, 168:25,
179:8, 180:14,
181:10, 181:25,
187:3, 187:4, 187:6,
192:20
**Objection** [1] - 119:15
**objection's** [1] -
162:23
**objective** [1] - 196:25
**observation** [1] - 6:4
**observe** [1] - 8:5
**obtain** [1] - 62:12
**obtained** [1] - 114:9
**obtaining** [1] - 61:9
**obviously** [6] - 5:17,

7:12, 15:15, 197:10,
199:16, 205:21
**occasion** [2] - 64:9,
189:25
**occasions** [4] - 56:10,
167:24, 169:20,
189:23
**occupation** [1] - 109:2
**occur** [3] - 68:24,
177:13, 186:12
**occurred** [2] - 136:7,
159:13
**October** [6] - 22:7,
22:12, 30:7, 88:24,
170:3, 170:18
**OF** [1] - 1:1
**offer** [12] - 12:2, 26:2,
26:10, 26:19, 26:21,
26:23, 27:8, 113:5,
127:13, 127:25,
135:16, 156:18
**offered** [5] - 25:12,
25:15, 25:22, 25:24,
196:16
**offering** [4] - 84:6,
103:19, 134:25,
135:4
**offers** [1] - 196:15
**office** [71] - 24:20,
28:18, 31:12, 33:16,
33:21, 34:12, 43:4,
44:16, 44:20, 44:21,
45:15, 47:6, 47:9,
48:1, 48:2, 48:6,
48:9, 48:11, 49:2,
49:3, 49:5, 49:23,
49:25, 50:4, 50:7,
51:7, 51:14, 51:18,
51:23, 52:1, 52:11,
53:1, 53:15, 53:19,
53:23, 53:25, 54:22,
65:10, 65:13, 65:15,
65:17, 65:19, 66:4,
66:20, 67:5, 68:21,
68:23, 72:7, 72:22,
75:2, 77:22, 81:22,
89:11, 89:13, 89:24,
90:24, 94:21, 99:14,
99:16, 100:8,
102:19, 103:10,
103:17, 104:11,
139:25, 142:6,
142:7, 150:9, 188:13
**officer** [5] - 24:15,
32:2, 42:9, 94:12,
94:18
**offices** [3] - 73:2,
166:16, 169:19
**Official** [2] - 1:22,
209:7

**often** [4] - 46:15, 46:17, 54:12
**Ohio** [2] - 18:17, 19:12
**Old** [1] - 194:19
**old** [30] - 40:19, 40:20, 40:21, 55:13, 60:10, 63:21, 66:13, 72:9, 77:10, 79:16, 80:6, 82:21, 96:10, 96:12, 97:3, 97:5, 97:6, 97:11, 97:14, 147:18, 147:20, 147:21, 147:23, 148:16, 148:17, 149:8, 174:4, 174:12, 188:5
**older** [13] - 22:1, 32:20, 32:22, 37:24, 38:12, 38:13, 38:16, 40:24, 54:3, 72:9, 79:11, 174:2, 176:8
**oldest** [3] - 34:1, 72:11, 84:10
**once** [7] - 14:7, 14:21, 46:18, 72:24, 106:25, 114:9, 131:10
**one** [107] - 5:24, 6:21, 8:12, 8:21, 12:15, 12:20, 22:17, 22:18, 23:10, 23:15, 29:6, 29:8, 31:2, 31:3, 31:5, 31:7, 32:25, 34:1, 44:24, 47:11, 47:14, 47:15, 49:14, 50:10, 52:13, 52:14, 54:19, 57:5, 58:1, 59:24, 70:4, 70:14, 70:17, 71:11, 71:12, 72:21, 74:8, 75:21, 77:1, 78:4, 78:13, 78:20, 79:13, 84:10, 84:23, 84:24, 85:22, 88:16, 92:22, 92:23, 103:5, 108:23, 110:18, 114:17, 116:1, 116:4, 125:6, 128:18, 130:1, 132:25, 134:17, 136:2, 138:8, 143:25, 146:25, 147:5, 147:21, 148:2, 149:12, 151:7, 152:1, 152:3, 152:21, 152:22, 153:18, 156:13, 156:15, 157:7, 158:2, 159:10, 159:15, 159:24, 160:25, 163:15, 163:22, 170:5,

176:15, 177:19, 177:20, 183:21, 184:2, 184:4, 185:22, 187:11, 187:12, 190:22, 192:3, 192:8, 199:11, 201:15, 205:7, 205:9, 205:15
**one-person** [1] - 49:14
**ones** [1] - 81:6
**online** [1] - 197:17
**onus** [1] - 202:10
**Open** [2] - 193:17, 193:24
**open** [17] - 4:1, 7:4, 7:6, 37:14, 50:16, 56:11, 58:14, 63:16, 73:6, 90:23, 95:20, 101:8, 147:15, 150:7, 170:20, 173:3, 193:20
**opened** [1] - 81:22
**opening** [6] - 5:6, 50:18, 84:25, 85:9, 103:21, 147:17
**openly** [1] - 146:20
**operating** [3] - 24:15, 32:2, 42:9
**Operation** [1] - 88:3
**operation** [9] - 33:24, 34:17, 36:6, 57:2, 67:20, 67:24, 152:6, 179:18, 179:24
**operations** [14] - 33:22, 68:14, 69:25, 78:19, 81:4, 81:5, 81:12, 81:18, 87:16, 147:17, 150:8, 159:4, 159:5
**operator** [1] - 163:11
**Operators** [4] - 165:14, 165:16, 165:20, 176:23
**opining** [1] - 134:5
**opinion** [12] - 7:20, 108:4, 134:24, 134:25, 135:3, 135:5, 135:7, 135:9, 135:11, 135:16, 135:19, 136:12
**opinions** [1] - 135:13
**opportunities** [4] - 84:5, 89:7, 90:13, 139:6
**opportunity** [13] - 25:22, 37:17, 60:23, 81:20, 113:11, 114:13, 124:16, 124:19, 125:11,

126:3, 138:16, 139:2, 139:17
**opposed** [2] - 4:22, 206:7
**opposing** [1] - 200:24
**optimism** [1] - 55:25
**optimistic** [2] - 42:13, 152:13
**options** [3] - 7:14, 25:18, 25:21
**OR** [1] - 107:14
**Oracle** [2] - 162:8, 196:20
**order** [20] - 5:9, 14:19, 14:25, 22:16, 33:5, 57:15, 68:2, 78:21, 102:15, 114:12, 126:19, 128:19, 129:15, 129:17, 130:10, 130:11, 133:1, 149:12, 173:20, 207:7
**organization** [1] - 159:2
**organizations** [1] - 111:5
**organized** [3] - 69:18, 74:10, 74:19
**organizing** [2] - 166:15
**orient** [1] - 20:19
**orientation** [2] - 135:9, 135:11
**ostensibly** [1] - 203:21
**otherwise** [2] - 7:19, 11:19
**outcome** [1] - 207:16
**outlined** [1] - 124:22
**outlines** [1] - 116:21
**Outlook** [4] - 99:20, 99:22, 99:23
**outside** [7] - 7:10, 90:24, 112:17, 113:2, 167:7, 169:8, 183:24
**overheard** [1] - 32:10
**overruled** [9] - 61:4, 126:7, 129:10, 134:19, 137:17, 162:23, 164:9, 180:15, 181:11
**oversight** [1] - 55:25
**overtime** [1] - 9:22
**owed** [1] - 125:24
**Owen** [34] - 41:18, 41:19, 42:25, 43:2, 43:3, 43:5, 44:1, 44:19, 45:25, 47:10, 47:12, 47:23, 52:8,

53:8, 53:9, 58:11, 58:15, 59:1, 59:12, 59:19, 59:24, 60:14, 60:24, 61:5, 63:21, 73:11, 73:13, 74:8, 74:17, 75:13, 138:13, 138:15, 165:4
**own** [6] - 4:23, 80:3, 127:11, 151:5, 152:5, 173:15
**owned** [1] - 36:15
**owner** [6] - 24:14, 42:9, 150:18, 163:20, 191:24, 192:3, 192:4, 194:2

**P**

**P.C** [1] - 2:2
**p.m** [11] - 15:2, 106:5, 106:9, 106:18, 154:2, 154:4, 154:14, 197:24, 209:1
**PA** [4] - 1:11, 1:20, 2:5, 18:6
**package** [5] - 115:19, 115:20, 190:2, 190:5, 190:6
**Packard** [1] - 19:2
**Packard's** [1] - 19:3
**packet** [1] - 124:22
**PAGE** [1] - 3:2
**Page** [1] - 95:17
**page** [3] - 193:16, 194:15, 195:11
**pages** [1] - 192:13
**paid** [17] - 6:23, 9:13, 9:20, 9:22, 10:2, 10:25, 11:2, 11:10, 11:11, 125:4, 125:22, 132:9, 132:13, 133:2, 150:24, 151:4, 200:22
**pain** [1] - 8:25
**paint** [1] - 34:7
**pairing** [4] - 173:4, 173:12, 174:19, 175:17
**Palo** [1] - 196:10
**Palochko** [28] - 5:19, 5:20, 16:8, 24:2, 24:3, 24:25, 25:8, 26:25, 49:10, 85:1, 85:6, 181:20, 198:15, 198:16, 198:18, 199:3, 199:15, 199:23,

199:24, 200:9, 201:6, 203:6, 204:14, 205:12, 205:18, 206:5, 206:14, 208:5
**Palochko's** [1] - 202:17
**Panama** [12] - 170:3, 170:13, 170:14, 170:16, 170:17, 170:19, 170:21, 170:25, 171:1, 172:24, 173:18, 174:19
**panicking** [1] - 197:20
**paper** [1] - 30:4
**papers** [2] - 28:15, 29:7
**par** [2] - 116:3, 116:5
**paradigm** [1] - 152:2
**Paralegal** [2] - 2:11, 191:9
**part** [29] - 5:5, 15:2, 38:6, 45:18, 46:3, 49:22, 55:8, 63:9, 74:18, 77:17, 86:9, 98:19, 124:4, 133:25, 141:5, 148:1, 150:8, 165:13, 167:23, 177:4, 183:14, 183:17, 184:1, 184:2, 185:5, 185:10, 194:12, 195:22, 200:16
**particular** [9] - 6:22, 73:6, 85:15, 113:23, 155:4, 170:7, 170:14, 172:9, 174:2
**parties** [6] - 4:15, 14:25, 200:11, 200:12, 200:25, 201:2
**partner** [1] - 195:17
**partners** [3] - 150:13, 150:21, 175:1
**party** [7] - 69:1, 69:4, 69:8, 69:13, 74:9, 200:24, 201:7
**past** [1] - 208:21
**PATCO** [1] - 65:24
**patents** [4] - 21:9, 21:11, 58:3
**path** [1] - 14:22
**patience** [1] - 16:15
**paused** [1] - 144:11
**pay** [7] - 11:16, 13:1, 114:15, 114:16, 114:19, 121:13, 150:25

**payment** [3] - 125:3, 125:19, 126:16
**payments** [1] - 11:15
**payout** [1] - 132:5
**payouts** [1] - 129:21
**peeked** [1] - 81:23
**Peering** [1] - 194:23
**peering** [1] - 194:24
**peeringatlinode.com** [1] - 194:25
**PEET** [2] - 2:3, 13:20
**Penn** [1] - 76:17
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania** [15] - 1:13, 18:2, 21:16, 22:3, 93:23, 94:2, 94:19, 95:14, 97:25, 99:1, 100:12, 111:24, 113:1, 139:16, 144:19
**pension** [3] - 26:7, 112:16
**people** [83] - 9:3, 10:19, 10:22, 10:24, 28:2, 28:5, 31:17, 32:9, 33:2, 34:1, 34:18, 34:22, 34:24, 35:14, 37:11, 37:18, 39:4, 39:19, 40:21, 44:18, 44:24, 45:12, 46:1, 46:17, 46:18, 53:1, 53:16, 69:18, 71:10, 71:12, 71:16, 72:22, 74:3, 74:14, 82:11, 85:18, 86:1, 90:16, 90:17, 90:18, 90:19, 90:20, 91:8, 91:11, 102:14, 106:24, 138:24, 143:1, 143:6, 143:21, 143:24, 143:25, 145:15, 146:20, 147:17, 149:24, 150:6, 150:13, 150:14, 150:15, 160:8, 165:3, 167:7, 167:18, 168:1, 168:9, 169:8, 173:6, 177:4, 180:20, 181:16, 182:2, 182:6, 185:1, 186:6, 186:10, 194:10, 195:6, 203:18, 204:1, 204:8, 206:11
**people's** [1] - 84:1
**per** [3] - 118:23, 156:16, 157:12
**percent** [10] - 116:13,

158:6, 158:8, 158:13, 158:14, 158:22, 158:23, 158:25, 159:3, 159:14
**perfected** [1] - 204:17
**perfectly** [1] - 198:22
**performance** [7] - 19:3, 20:11, 78:9, 114:2, 131:9, 134:2, 159:25
**performed** [2] - 125:25, 132:11
**perhaps** [3] - 71:5, 167:24, 178:3
**period** [26] - 22:4, 35:10, 41:15, 45:3, 57:16, 58:10, 65:7, 67:5, 74:24, 75:3, 87:19, 113:18, 113:19, 113:23, 116:14, 116:15, 136:11, 136:17, 147:14, 149:14, 149:24, 159:16, 173:19, 174:16, 176:17
**permanently** [1] - 50:10
**person** [43] - 24:17, 24:18, 25:9, 32:25, 33:12, 38:14, 39:6, 39:12, 40:24, 48:25, 49:14, 57:10, 57:18, 60:1, 63:22, 70:17, 70:24, 71:9, 72:11, 76:2, 88:3, 93:1, 94:22, 95:1, 96:8, 96:23, 102:12, 103:16, 110:11, 162:5, 172:20, 173:5, 179:6, 185:24, 186:19, 186:21, 186:22, 187:1, 187:10, 193:17, 196:9
**personal** [11] - 13:17, 16:25, 74:13, 76:10, 98:7, 110:14, 161:10, 161:15, 161:16, 161:17, 192:1
**personally** [1] - 195:9
**personnel** [2] - 89:12, 89:18
**persons** [1] - 185:22
**perspective** [3] - 20:16, 116:3, 140:1
**perspectives** [1] - 150:20

**Peter** [1] - 183:8
**petition** [1] - 62:12
**petitioned** [1] - 62:23
**Philadelphia** [38] - 1:13, 1:20, 2:5, 21:15, 22:12, 27:11, 27:16, 48:7, 65:17, 65:22, 66:5, 66:20, 67:5, 68:25, 69:3, 69:5, 69:10, 72:17, 72:24, 73:4, 75:1, 90:25, 91:23, 91:25, 93:22, 99:13, 104:5, 104:6, 104:10, 108:16, 109:19, 142:7, 150:15, 151:24, 167:8, 167:14, 193:21, 195:16
**Philadelphia..** [1] - 65:24
**Philippines** [14] - 177:5, 177:6, 178:16, 178:19, 179:13, 179:15, 182:16, 182:25, 184:22, 184:23, 186:11, 188:23, 189:8
**Philly** [1] - 195:12
**phone** [9] - 7:11, 24:17, 24:21, 85:19, 95:10, 98:7, 98:9, 191:23
**photo** [1] - 154:25
**photos** [1] - 194:19
**PHRC** [2] - 15:15, 15:25
**physical** [2] - 78:5, 81:8
**physically** [1] - 50:1
**pianos** [1] - 69:9
**picked** [1] - 6:5
**picture** [6] - 34:8, 143:12, 155:8, 156:6, 156:7, 196:23
**Pinnacle** [11] - 114:9, 114:10, 114:19, 114:20, 116:1, 116:5, 118:7, 119:8, 123:3, 123:7
**pivot** [1] - 106:25
**pivoting** [2] - 63:25, 106:12
**Place** [1] - 69:11
**place** [13] - 27:16, 27:18, 40:20, 40:21, 51:19, 62:23, 69:4, 69:17, 70:3, 84:3, 172:18

**placed** [4] - 20:17, 128:9, 165:16, 174:13
**places** [2] - 9:4, 114:24
**PLAINTIFF** [20] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 23:20, 27:6, 29:14, 30:13, 49:19, 86:15, 95:7, 141:16, 156:4, 192:24
**Plaintiff** [2] - 1:4, 1:20
**plaintiff** [3] - 107:4, 135:13, 200:20
**plaintiff's** [4] - 110:9, 200:14, 200:16, 203:14
**plaintiffs** [1] - 110:20
**plan** [23] - 25:23, 26:7, 105:21, 106:12, 114:6, 125:8, 125:12, 125:14, 125:15, 125:16, 127:23, 129:18, 129:20, 130:4, 130:5, 130:17, 131:10, 131:14, 131:16, 133:7, 190:14, 198:14
**plane** [1] - 199:2
**planning** [2] - 16:20, 106:15
**plans** [1] - 170:22
**plate** [1] - 69:17
**platform** [4] - 19:19, 19:20, 195:12, 195:18
**play** [3] - 8:2, 134:22, 199:25
**playing** [1] - 40:1
**Pleas** [1] - 112:24
**PLLC** [1] - 1:18
**plural** [1] - 166:13
**plus** [2] - 61:7, 88:2
**podium** [1] - 8:4
**point** [46] - 4:12, 4:21, 14:3, 15:17, 15:21, 16:7, 22:8, 22:23, 22:24, 41:5, 45:5, 46:4, 47:8, 47:25, 48:1, 52:25, 54:2, 59:8, 67:22, 68:3, 72:21, 83:24, 98:12, 101:11, 102:13, 104:15, 113:5, 116:8, 138:20, 138:22, 138:23, 144:15, 146:12,

151:10, 152:12, 155:17, 157:15, 166:10, 166:14, 167:20, 183:24, 185:21, 185:23, 204:3, 204:19
**pointed** [1] - 204:3
**pointing** [1] - 119:22
**points** [2] - 153:2, 153:8
**poisoning** [1] - 12:21
**policy** [2] - 62:23, 96:2
**pool** [2] - 9:6, 9:7
**pops** [1] - 179:25
**portion** [2] - 116:11, 119:11
**poses** [1] - 199:21
**position** [58] - 11:14, 24:10, 25:12, 25:15, 25:16, 32:1, 38:7, 41:7, 41:8, 47:16, 47:21, 58:14, 59:20, 59:23, 67:8, 74:24, 75:5, 75:6, 80:20, 80:24, 81:10, 81:25, 82:15, 87:3, 87:11, 88:14, 90:6, 93:24, 95:20, 95:21, 96:1, 96:7, 96:22, 98:25, 100:16, 104:16, 105:2, 105:9, 115:19, 128:25, 138:17, 139:5, 139:13, 139:18, 139:22, 140:4, 140:7, 140:10, 144:20, 151:23, 160:12, 161:1, 161:21, 162:15, 162:20, 163:9, 183:5, 188:17
**positions** [12] - 22:15, 22:17, 24:7, 87:21, 89:1, 93:10, 93:11, 96:23, 103:2, 161:17, 165:16, 165:22
**possibly** [5] - 81:16, 96:16, 96:17, 109:12, 195:17
**post** [7] - 58:5, 58:7, 180:10, 180:12, 180:16, 180:21, 180:24
**posted** [2] - 58:4, 180:16
**posting** [1] - 58:6
**postmaster's** [1] - 20:8
**posture** [1] - 207:12

**potential** [3] - 97:22, 164:15, 193:10
**power** [1] - 205:22
**practice** [3] - 62:23, 62:24, 202:5
**practices** [1] - 96:2
**practicing** [3] - 111:15, 112:1, 112:4
**prefer** [1] - 207:21
**preference** [1] - 200:1
**prefers** [1] - 8:1
**prejudged** [2] - 37:15, 101:3
**prejudging** [2] - 72:2, 72:5
**preliminary** [1] - 7:17
**premium** [1] - 121:14
**prepare** [2] - 110:4, 115:9
**prepared** [5] - 71:6, 108:4, 115:12, 115:15, 117:13
**present** [7] - 100:8, 106:14, 150:2, 152:8, 167:10, 175:3, 207:3
**PRESENT** [1] - 2:10
**presentation** [10] - 50:3, 79:9, 79:11, 79:13, 91:12, 165:14, 165:19, 179:1, 190:25
**presentations** [2] - 152:9, 175:4
**presented** [2] - 30:4, 207:13
**presenter** [1] - 179:23
**preserve** [1] - 200:18
**preserving** [1] - 200:7
**president** [1] - 163:13
**press** [1] - 100:23
**pretermed** [1] - 20:8
**pretrial** [3] - 200:8, 203:14, 203:15
**pretty** [8] - 7:2, 7:10, 7:14, 7:22, 15:8, 92:2, 193:3, 208:14
**previous** [4] - 58:5, 72:5, 171:22, 172:21
**previously** [1] - 128:6
**primary** [1] - 59:14
**principal** [12] - 87:15, 87:22, 87:24, 87:25, 88:5, 88:8, 88:11, 88:13, 88:17, 161:23, 162:17, 188:18
**printed** [1] - 151:2
**private** [2] - 151:21, 196:15

**problem** [11] - 34:21, 34:22, 34:23, 37:4, 59:17, 138:25, 185:6, 185:7, 185:8, 185:12, 185:14
**problems** [4] - 17:12, 59:19, 78:9, 79:16
**proceed** [2] - 11:25, 12:3
**proceedings** [1] - 209:5
**Proceedings** [1] - 1:23
**PROCEEDINGS** [1] - 4:1
**process** [8] - 12:25, 22:11, 24:8, 171:7, 171:14, 175:7, 177:7, 201:5
**produce** [2] - 203:7, 205:12
**produced** [1] - 1:24
**product** [2] - 61:12, 61:13
**products** [1] - 194:21
**professional** [2] - 110:22, 112:10
**profit** [54] - 25:20, 26:10, 26:11, 102:16, 114:6, 115:25, 118:24, 121:6, 122:14, 123:9, 124:3, 124:4, 125:2, 125:6, 125:9, 125:12, 125:14, 125:15, 125:20, 125:24, 126:1, 126:2, 126:5, 126:16, 127:22, 129:1, 129:18, 129:20, 129:21, 129:24, 130:4, 130:7, 130:10, 130:15, 130:17, 131:1, 131:5, 131:7, 131:11, 131:14, 131:19, 131:25, 132:1, 132:4, 132:7, 132:8, 132:10, 132:16, 132:19, 132:24, 133:3, 133:5, 133:24
**profit-making** [1] - 102:16
**profit-sharing** [6] - 26:10, 26:11, 114:6, 118:24, 121:6, 122:14
**profits** [1] - 102:16
**program** [7] - 76:15,

81:16, 92:1, 111:12, 111:18, 111:19, 150:9
**programmer** [1] - 20:10
**programmers** [2] - 69:24, 70:9
**progressed** [1] - 152:20
**progressing** [3] - 47:4, 47:5, 152:19
**project** [17] - 54:24, 55:1, 55:2, 55:3, 55:9, 55:11, 55:13, 74:18, 77:18, 77:20, 77:21, 77:23, 77:25, 78:1, 153:16, 194:12
**Project** [5] - 54:25, 56:8, 56:18, 88:3
**projected** [1] - 120:25
**promise** [2] - 50:18, 144:11
**promised** [1] - 144:20
**promote** [7] - 58:19, 162:16, 162:17, 162:18, 162:19, 165:2
**promoted** [27] - 47:10, 47:16, 47:24, 58:15, 60:1, 63:22, 66:18, 67:23, 68:13, 68:17, 73:12, 73:15, 75:13, 75:17, 75:24, 79:23, 80:19, 81:10, 93:19, 93:20, 96:6, 98:24, 100:25, 138:19, 138:25, 143:3, 143:4
**promoting** [1] - 95:20
**promotion** [23] - 47:23, 58:11, 58:16, 58:21, 59:17, 60:4, 68:11, 75:6, 75:9, 75:10, 77:3, 80:24, 93:5, 93:6, 96:21, 104:14, 105:14, 139:19, 143:4, 145:10, 149:25, 159:18, 160:11
**promotions** [5] - 58:24, 74:23, 75:4, 77:7, 195:13
**pronoun** [2] - 166:12, 183:14
**pronouns** [1] - 181:18
**properly** [1] - 207:8
**proposed** [1] - 171:6
**proposing** [1] - 78:15
**protective** [1] - 207:7
**protocol** [2] - 61:19, 61:24

**protracted** [1] - 89:20
**proud** [1] - 34:23
**prove** [1] - 134:16
**provide** [5] - 56:12, 98:20, 108:4, 110:19, 140:1
**provided** [3] - 99:1, 111:14, 152:9
**provider** [2] - 21:1, 92:24
**providers** [2] - 20:25, 62:1
**provides** [2] - 111:18, 120:10
**public** [5] - 96:5, 109:9, 109:12, 112:6
**publications** [1] - 112:10
**publish** [3] - 23:16, 27:2, 155:25
**published** [5] - 49:16, 62:22, 112:10, 117:1, 128:14
**publishing** [3] - 112:9, 117:5, 128:12
**pull** [4] - 71:1, 191:10, 202:6, 202:10
**pulled** [1] - 191:25
**pulling** [1] - 10:22
**punch** [1] - 9:24
**purchase** [3] - 62:15, 63:8, 63:9
**purchased** [2] - 63:14, 63:15
**purely** [1] - 9:20
**purpose** [2] - 176:7, 206:13
**purposes** [1] - 114:21
**pursuant** [1] - 140:3
**pursue** [1] - 137:14
**pursuing** [1] - 111:21
**push** [1] - 202:7
**put** [35] - 6:3, 6:10, 20:15, 23:6, 84:8, 89:18, 93:2, 93:16, 94:17, 94:18, 94:24, 96:20, 98:6, 98:8, 104:18, 104:20, 104:23, 105:1, 105:4, 110:17, 120:8, 145:13, 148:3, 149:12, 153:19, 164:16, 165:13, 175:13, 181:20, 187:9, 194:18, 199:22, 201:3, 202:5, 202:10
**puts** [1] - 6:2
**putting** [1] - 6:6, 78:11, 88:19, 98:4,

147:18, 147:24, 148:4, 148:16, 150:20, 164:22, 165:18
**puzzled** [1] - 151:13

## Q

**qualifications** [1] - 108:8
**quarantined** [1] - 189:10
**quarter** [2] - 132:13, 153:22
**Quatrani** [2] - 143:16, 143:18
**questioned** [1] - 39:1
**questioning** [1] - 38:17
**questions** [13] - 11:7, 11:8, 13:6, 41:16, 84:18, 104:19, 127:2, 127:17, 127:19, 127:21, 145:13, 168:15, 170:16
**quick** [1] - 15:23
**quickly** [2] - 78:11, 199:25
**quietly** [1] - 70:24
**quit** [2] - 73:17, 73:20
**quite** [2] - 117:20, 197:10

## R

**rain** [1] - 16:21
**raise** [12] - 8:10, 15:19, 83:22, 90:22, 107:13, 145:25, 158:7, 159:14, 199:11, 200:6, 208:18, 208:19
**raised** [9] - 7:1, 8:23, 9:12, 10:10, 12:9, 13:25, 18:2, 145:5, 207:20
**raises** [2] - 6:20, 8:21
**Rambo** [17] - 52:9, 55:16, 66:10, 66:11, 142:9, 145:19, 145:23, 148:5, 149:2, 149:9, 149:16, 151:12, 164:3, 177:22, 188:3, 188:5, 188:10
**Rambo's** [1] - 188:17
**ramifications** [2] - 11:10, 11:12
**ran** [3] - 62:14, 63:2, 97:1

**range** [2] - 161:22, 161:23
**rant** [1] - 146:18
**rapport** [1] - 56:4
**rate** [2] - 116:2, 130:3
**re** [4] - 96:3, 114:3, 119:5, 198:24
**re-employed** [1] - 119:5
**re-employment** [1] - 114:3
**re-evaluate** [1] - 198:24
**reach** [1] - 25:5
**reached** [5] - 25:7, 25:11, 116:8, 127:9, 203:19
**reaching** [1] - 25:3
**react** [1] - 79:19
**reaction** [3] - 79:18, 79:19, 89:19
**reactions** [1] - 7:4
**read** [18] - 6:19, 49:22, 49:24, 54:14, 89:14, 89:15, 89:17, 96:11, 98:19, 107:7, 119:19, 126:15, 180:21, 180:22, 180:23, 182:6, 183:3, 192:9
**reading** [5] - 87:13, 119:16, 122:1, 181:3, 181:16
**ready** [6] - 17:16, 29:1, 29:2, 29:21, 64:3, 65:4
**real** [7] - 4:13, 12:17, 17:22, 55:21, 55:22, 57:20, 80:8
**realized** [2] - 32:8, 55:24
**really** [13] - 7:20, 13:1, 13:6, 15:3, 62:4, 77:4, 77:17, 101:1, 104:17, 109:6, 199:1, 205:13, 205:18
**reason** [12] - 32:5, 40:18, 94:1, 95:19, 98:22, 101:24, 102:4, 117:5, 151:10, 159:17, 182:15, 193:8
**reasonable** [2] - 135:18, 136:10
**reasonably** [1] - 115:2
**reasons** [5] - 12:15, 45:3, 73:1, 90:7, 91:14
**recap** [1] - 65:7

**receipt** [1] - 29:4
**receive** [30] - 19:23, 23:22, 24:21, 26:1, 30:2, 44:2, 44:9, 87:7, 96:5, 98:6, 100:17, 114:23, 115:25, 119:6, 123:5, 123:6, 124:17, 129:24, 131:7, 131:8, 131:11, 131:20, 132:1, 136:8, 137:14, 144:10, 152:23, 153:1, 153:8, 156:17
**RECEIVED** [20] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 23:20, 27:6, 29:14, 30:13, 49:19, 86:15, 95:7, 141:16, 156:4, 192:24
**received** [46] - 19:24, 24:1, 26:19, 26:24, 56:10, 68:14, 87:8, 89:24, 96:21, 108:15, 108:17, 108:20, 108:24, 113:8, 114:14, 121:3, 121:8, 124:20, 124:23, 124:24, 125:13, 126:17, 128:21, 129:21, 131:25, 132:4, 132:6, 132:16, 132:19, 132:24, 133:3, 133:5, 133:8, 133:10, 133:11, 134:3, 136:9, 139:19, 141:18, 156:3, 157:6, 158:9, 158:22, 159:16, 202:18, 203:18
**receiving** [4] - 59:19, 115:24, 116:1, 118:22
**recently** [1] - 195:2
**recess** [3] - 64:15, 106:9, 154:4
**recognize** [4] - 143:6, 191:16, 191:18, 199:20
**recollection** [7] - 49:1, 117:14, 119:24, 121:21, 122:2, 122:22, 125:8
**recommend** [1] - 174:2

**record** [18] - 5:14, 6:7, 6:18, 14:21, 14:24, 27:21, 107:18, 174:4, 200:7, 200:18, 203:1, 205:25, 206:18, 206:21, 207:1, 207:13, 209:5
**recorded** [3] - 1:23, 39:19, 90:21
**recording** [3] - 39:23, 39:24, 40:1
**redacted** [1] - 95:10
**REDIRECT** [2] - 3:7, 136:3
**refer** [1] - 163:10
**referenced** [2] - 119:19, 183:20
**referred** [2] - 170:5, 183:14
**referring** [2] - 88:15, 114:25
**reflect** [1] - 123:20
**reflected** [3] - 156:18, 157:14, 157:19
**reflects** [2] - 123:24, 157:9
**refresh** [5] - 49:1, 117:13, 119:24, 121:21, 122:22
**refreshes** [1] - 122:2
**refused** [1] - 187:14
**regard** [6] - 27:12, 82:11, 135:3, 135:11, 166:21, 166:23
**regarding** [17] - 32:5, 32:7, 35:20, 37:22, 47:3, 53:25, 54:21, 75:13, 76:21, 108:4, 108:8, 126:2, 145:4, 147:11, 152:17, 174:17, 186:11
**regardless** [1] - 180:2
**regards** [1] - 87:13
**region** [1] - 174:24
**registries** [1] - 62:11
**registry** [1] - 62:13
**regularly** [5] - 9:15, 15:9, 53:14, 167:9, 195:22
**related** [9] - 4:10, 55:6, 114:14, 169:24, 176:12, 193:25, 194:2, 194:21, 196:25
**relating** [2] - 112:15, 178:18
**Relations** [10] - 93:23, 94:3, 94:19, 95:14,

98:1, 99:2, 100:13, 104:6, 139:16, 144:19
**relationship** [2] - 193:4, 193:6
**release** [1] - 16:25
**released** [2] - 13:11, 99:10
**relevance** [2] - 39:8, 192:20
**relevant** [2] - 115:11, 134:16
**relied** [1] - 115:2
**relocated** [1] - 109:19
**remain** [1] - 65:15
**remains** [1] - 208:22
**remark** [1] - 206:4
**remarks** [1] - 196:9
**remember** [25] - 10:3, 10:4, 33:7, 33:9, 33:10, 33:12, 37:2, 67:2, 68:19, 85:2, 93:21, 94:1, 100:14, 100:15, 100:22, 122:21, 140:14, 142:17, 143:11, 144:12, 167:22, 176:13, 196:6, 204:6, 204:11
**remind** [2] - 17:23, 139:24
**reminder** [1] - 14:25
**remove** [1] - 57:19
**removed** [2] - 57:17, 57:18
**rent** [1] - 30:20
**rented** [2] - 28:2, 69:9
**renting** [4] - 27:19, 27:24, 28:3, 28:5
**reorient** [1] - 76:20
**rephrase** [1] - 124:13
**report** [24] - 110:18, 115:9, 115:12, 115:14, 115:15, 116:16, 116:18, 116:19, 117:13, 118:5, 118:20, 119:17, 119:18, 119:19, 120:1, 120:7, 121:22, 121:25, 122:19, 122:22, 123:15, 123:23, 135:21, 177:7
**reported** [6] - 122:16, 138:17, 139:12, 143:5, 146:23, 166:4
**Reporter** [2] - 1:22, 209:7
**reporter** [1] - 205:5

**reporting** [9] - 42:7, 42:8, 42:9, 105:7, 105:8, 105:12, 143:3, 159:6, 180:2
**reports** [1] - 110:4
**representative** [4] - 5:13, 5:15, 13:8, 205:16
**request** [5] - 23:16, 29:10, 30:9, 50:12, 175:7
**requests** [1] - 56:14
**require** [2] - 13:5, 21:19
**required** [2] - 92:15, 202:3
**requirement** [3] - 61:12, 126:19, 205:15
**requirements** [9] - 20:3, 20:4, 111:25, 112:1, 112:8, 125:16, 126:4, 131:10, 131:16
**requires** [4] - 5:7, 10:24, 106:25, 202:6
**requiring** [1] - 15:1
**rescheduled** [1] - 199:8
**research** [4] - 109:10, 110:1, 110:3, 110:17
**Research** [2] - 19:12, 19:18
**researched** [1] - 152:4
**resend** [1] - 183:22
**resent** [1] - 206:13
**residence** [1] - 53:15
**resolution** [1] - 103:5
**resolve** [3] - 102:23, 103:19, 208:14
**resolved** [1] - 207:24
**resource** [1] - 155:15
**respect** [1] - 38:21
**respected** [1] - 152:21
**respectfully** [1] - 50:12
**respects** [1] - 5:8
**respond** [12] - 43:10, 57:23, 58:18, 141:21, 141:23, 142:9, 142:15, 142:21, 178:1, 178:2, 185:19, 186:1
**responded** [5] - 80:9, 102:24, 146:5, 185:13, 186:5
**responding** [2] - 142:17, 143:6
**responds** [1] - 196:8
**response** [14] - 15:25,

23:22, 23:25, 82:24, 89:14, 89:15, 91:16, 91:17, 101:7, 103:4, 147:6, 150:6, 169:15, 183:8
**responsibilities** [7] - 80:25, 139:21, 140:3, 152:24, 174:15, 178:6, 178:8
**responsible** [2] - 81:1, 81:11
**rest** [3] - 14:5, 154:8, 205:12
**restate** [1] - 126:12
**result** [2] - 13:18, 140:9
**resume** [9] - 13:15, 14:5, 17:4, 22:16, 23:10, 23:12, 23:22, 105:21, 136:24
**resumed** [1] - 14:7
**resumes** [2] - 23:10, 24:6
**retaliation** [1] - 135:2
**retire** [1] - 40:21
**retrieve** [2] - 13:15, 14:8
**return** [1] - 188:1
**returned** [4] - 25:4, 108:19, 108:23, 111:11
**review** [12] - 110:16, 114:13, 121:20, 124:16, 124:19, 125:12, 126:3, 126:8, 127:8, 132:1, 132:4, 140:3
**reviewed** [10] - 125:14, 125:23, 126:16, 127:2, 127:5, 127:7, 128:19, 128:23, 129:7, 131:24
**reviewing** [1] - 115:11
**revocations** [1] - 11:3
**Rich** [1] - 174:23
**Richard** [4] - 163:5, 174:20, 201:15
**ridicule** [2] - 54:5, 54:12
**ridiculed** [1] - 54:12
**Rights** [1] - 104:10
**rights** [1] - 169:25
**rise** [13] - 4:3, 16:10, 64:11, 64:16, 64:25, 106:4, 106:10, 106:17, 154:1, 154:5, 154:13, 197:23, 208:25
**rises** [1] - 9:10

**risks** [1] - 102:1
**Ritchey** [3] - 66:16, 66:17, 67:9
**Roberts** [7] - 2:12, 5:22, 6:5, 6:7, 6:11, 8:19, 16:19
**Rockville** [1] - 108:13
**role** [1] - 164:4
**room** [24] - 14:8, 32:16, 32:18, 34:9, 34:18, 36:19, 36:20, 39:18, 39:25, 40:3, 43:4, 43:18, 50:8, 52:12, 69:14, 71:7, 71:9, 76:13, 79:14, 142:13, 145:21, 146:24, 180:22, 194:9
**rooms** [5] - 27:20, 27:24, 28:2, 28:3, 28:5
**rough** [1] - 48:7
**roughly** [1] - 43:3
**round** [2] - 67:7, 69:16
**rounded** [1] - 123:7
**route** [1] - 92:16
**router** [4] - 91:4, 91:18, 92:5, 92:7
**routine** [1] - 151:8
**routinely** [7] - 56:17, 57:25, 60:9, 101:16, 148:3, 150:13, 170:8
**routing** [1] - 93:1
**RPR** [1] - 209:7
**rule** [2] - 206:20, 207:16
**rules** [6] - 6:13, 125:16, 131:17, 182:12, 206:16, 206:17
**run** [5] - 62:11, 113:23, 119:4, 203:12, 204:10
**run-up** [1] - 204:10
**running** [4] - 83:13, 83:14, 83:17, 203:13
**runs** [2] - 84:22, 179:24

### S

**S-T-A-L-L-E-R** [1] - 107:21
**S:(Cont'd** [1] - 2:1
**Sal** [2] - 81:16, 82:3
**salary** [20] - 6:24, 12:13, 25:14, 26:4, 105:12, 115:24, 118:11, 118:14, 118:22, 122:14,

140:9, 156:14, 156:15, 160:10, 161:18, 161:19, 161:20, 164:1, 164:16, 164:24
**salesman** [3] - 76:14, 76:16, 76:19
**sat** [8] - 54:18, 70:8, 70:9, 70:16, 70:20, 71:12, 73:5, 189:5
**satisfies** [1] - 130:25
**satisfy** [1] - 144:20
**Saturday** [1] - 9:19
**savings** [4] - 11:17, 11:18, 11:21, 12:13
**saw** [11] - 4:9, 7:9, 12:24, 16:24, 34:14, 94:24, 103:22, 132:5, 149:21, 149:23, 182:2
**scalability** [1] - 78:9
**scale** [1] - 78:1
**Scalia** [1] - 28:16
**scan** [1] - 142:16
**scared** [1] - 98:9
**scenario** [1] - 132:15
**schedule** [5] - 9:17, 99:25, 106:23, 107:6
**scheduled** [3] - 49:4, 99:11, 100:2
**schedules** [1] - 106:24
**school** [9] - 18:9, 18:11, 18:15, 18:25, 83:2, 108:13, 108:14, 108:19, 111:13
**School** [3] - 18:12, 108:17, 108:20
**schooling** [1] - 108:23
**science** [4] - 18:19, 18:24, 19:14, 108:15
**Science** [2] - 18:23, 19:14
**scope** [2] - 192:23, 199:22
**Scott** [5] - 193:11, 196:4, 196:13, 196:17, 196:22
**screen** [12] - 23:3, 23:5, 23:7, 26:15, 28:25, 48:20, 84:16, 140:20, 154:20, 156:6, 191:8, 194:5
**screenshot** [3] - 86:4, 86:17, 195:5
**screenshots** [1] - 205:2
**scroll** [3] - 95:16, 98:14, 191:15

**seat** [17] - 4:4, 17:11, 50:14, 50:15, 50:16, 50:20, 50:22, 51:5, 64:17, 65:2, 106:11, 106:19, 107:22, 154:6, 154:15, 197:25
**seat..** [1] - 50:13
**seated** [2] - 6:8, 16:13
**second** [12] - 9:11, 21:1, 39:5, 60:1, 74:7, 132:13, 178:15, 183:22, 184:7, 184:19, 185:15, 193:16
**see** [64] - 5:1, 6:21, 16:1, 17:12, 23:6, 26:15, 30:7, 34:14, 44:8, 48:3, 48:20, 48:22, 50:19, 56:9, 59:9, 60:24, 76:5, 81:20, 84:16, 85:1, 85:6, 85:13, 93:6, 94:8, 95:11, 95:17, 97:11, 98:15, 101:6, 103:17, 106:2, 106:6, 117:8, 122:2, 128:9, 128:11, 133:22, 141:18, 143:23, 148:8, 153:25, 154:22, 157:19, 157:24, 159:10, 159:17, 164:24, 191:7, 191:13, 191:16, 192:10, 193:12, 194:23, 196:22, 197:18, 197:20, 197:21, 198:11, 199:25, 202:21, 208:24
**seeing** [6] - 70:4, 117:9, 204:9, 204:11, 205:1, 206:19
**seem** [3] - 44:7, 80:13, 109:5
**sees** [1] - 24:6
**sell** [1] - 61:13
**selling** [1] - 164:18
**sells** [1] - 61:13
**send** [7] - 49:6, 49:9, 50:6, 201:11, 202:1, 205:9, 207:21
**sending** [6] - 51:9, 141:8, 194:15, 194:16, 195:5, 195:7
**Senior** [1] - 67:17
**senior** [43] - 45:13, 47:10, 47:17, 47:22,

47:24, 52:20, 52:21, 58:14, 59:19, 59:23, 60:1, 60:11, 63:22, 67:16, 67:19, 67:21, 68:5, 68:17, 73:15, 74:23, 75:4, 75:6, 75:11, 75:13, 75:17, 88:1, 104:23, 138:5, 138:8, 138:9, 138:10, 138:12, 160:22, 161:5, 161:12, 161:21, 162:8, 162:16, 165:3, 165:11, 165:22, 173:5, 188:17
**seniority** [1] - 96:22
**sense** [4] - 12:16, 13:10, 160:11, 198:20
**sent** [28] - 15:14, 50:7, 50:23, 58:16, 68:18, 75:8, 78:18, 87:4, 89:6, 93:4, 93:24, 140:13, 141:3, 141:10, 143:5, 143:21, 149:13, 149:20, 153:3, 171:11, 192:7, 193:17, 195:9, 195:12, 201:22, 202:1, 204:2, 204:4
**sentence** [2] - 49:24, 50:10
**separate** [1] - 85:24
**separated** [4] - 72:25, 123:21, 123:25, 136:14
**separation** [4] - 113:13, 113:24, 128:22, 134:6
**September** [12] - 48:4, 48:12, 48:15, 49:5, 50:4, 51:21, 76:5, 87:19, 88:24, 93:18, 153:5
**sequester** [1] - 5:13
**Sequestered** [1] - 199:5
**sequestered** [4] - 4:20, 4:21, 199:4, 203:9
**sequestration** [2] - 5:3, 5:9
**servant's** [1] - 190:4
**servant's[Sic** [1] - 190:2
**serve** [8] - 5:15, 10:24, 12:13, 201:5, 202:4, 203:19, 203:21,

*United States District Court*

*204*:8
**served** *[4]* - 35:25,
200:21, 201:8,
203:23
**servers** *[14]* - 30:22,
30:23, 61:14, 62:1,
78:2, 78:3, 78:6,
78:7, 78:12, 81:7,
81:8, 81:9, 196:19
**service** *[15]* - 20:25,
21:1, 125:18, 200:9,
200:13, 201:10,
202:8, 202:18,
204:8, 204:17,
207:8, 207:10,
208:4, 208:8, 208:10
**Services** *[1]* - 161:19
**services** *[3]* - 20:17,
110:19, 110:23
**serving** *[2]* - 10:11,
202:11
**session** *[1]* - 14:8
**set** *[7]* - 17:8, 31:7,
62:5, 89:9, 131:13,
187:8, 194:10
**Seth** *[1]* - 14:20
**SETH** *[1]* - 1:19
**sets** *[3]* - 125:16,
125:18, 177:18
**setting** *[2]* - 173:10,
195:25
**settle** *[1]* - 102:22
**setup** *[1]* - 123:2
**seven** *[3]* - 17:1,
53:16, 201:23
**several** *[2]* - 108:19,
145:23
**severance** *[2]* - 190:6,
190:7
**sexual** *[2]* - 135:9,
135:11
**shape** *[1]* - 163:1
**share** *[4]* - 56:17,
126:5, 155:18,
198:17
**shared** *[2]* - 37:12,
203:23
**sharing** *[56]* - 25:20,
26:10, 26:11, 35:7,
37:18, 114:6, 116:1,
118:24, 121:6,
122:14, 123:9,
124:3, 124:4, 125:2,
125:6, 125:9,
125:12, 125:14,
125:15, 125:20,
125:24, 126:1,
126:2, 126:16,
127:22, 129:1,
129:18, 129:20,

129:22, 129:24,
130:4, 130:7,
130:10, 130:16,
130:17, 131:1,
131:6, 131:7,
131:11, 131:14,
131:19, 131:25,
132:1, 132:4, 132:7,
132:8, 132:10,
132:16, 132:19,
132:24, 133:3,
133:5, 133:25,
174:15, 195:1
**Shaw** *[3]* - 165:7,
165:11, 166:1
**Shaw's** *[2]* - 165:8,
165:23
**shipping** *[1]* - 81:8
**short** *[2]* - 67:5, 84:1
**shortcut** *[1]* - 141:8
**shortly** *[4]* - 24:1,
73:12, 144:25,
165:23
**show** *[28]* - 23:2,
26:12, 28:22, 29:18,
48:13, 78:21, 78:25,
84:8, 84:13, 94:5,
98:22, 117:12,
128:5, 139:1,
140:16, 140:17,
150:14, 152:22,
154:18, 154:19,
155:3, 156:13,
166:25, 191:4,
202:23, 205:22,
207:14
**showing** *[3]* - 117:11,
150:15, 205:7
**shown** *[1]* - 28:18
**SI** *[1]* - 21:2
**sic)** *[1]* - 192:9
**side** *[6]* - 12:10, 33:20,
54:19, 79:14, 120:8,
151:1
**sidebar** *[4]* - 8:6,
11:24, 126:23,
126:24
**Sidebar** *[4]* - 12:1,
13:23, 126:25, 128:4
**sign** *[1]* - 30:5
**signed** *[6]* - 28:15,
29:6, 29:7, 30:3,
51:21, 65:24
**significant** *[2]* - 40:13,
90:20
**significantly** *[3]* -
59:5, 59:15, 116:2
**silence** *[1]* - 207:23
**Silicon** *[4]* - 20:5,
20:6, 20:22, 162:7

**similar** *[3]* - 54:2,
130:2, 176:2
**similarly** *[1]* - 9:4
**simple** *[2]* - 7:14,
198:9
**Singapore** *[2]* - 31:4,
63:16
**single** *[3]* - 70:14,
70:17, 78:8
**singular** *[1]* - 166:12
**sit** *[3]* - 36:21, 52:13,
71:15
**Sit** *[1]* - 37:3
**site** *[1]* - 202:5
**sits** *[3]* - 50:11,
145:23, 175:20
**sitting** *[20]* - 4:16,
34:7, 43:4, 43:5,
50:8, 50:10, 53:11,
54:19, 55:5, 71:3,
71:4, 79:13, 89:11,
146:2, 146:17,
146:18, 146:21,
147:15, 150:2,
173:13
**situated** *[2]* - 201:6,
205:18
**situation** *[1]* - 43:17
**six** *[7]* - 31:5, 45:12,
74:13, 111:10,
159:14, 202:16,
203:8
**size** *[1]* - 102:7
**skills** *[3]* - 55:18,
60:24
**skillsets** *[1]* - 37:13
**skipped** *[1]* - 52:16
**skipping** *[1]* - 148:24
**Skype** *[1]* - 196:23
**Slack** *[23]* - 56:18,
56:19, 56:20, 78:18,
82:7, 84:21, 84:22,
85:6, 85:8, 85:10,
85:11, 85:12, 88:21,
89:12, 89:19, 89:25,
99:21, 99:22,
147:16, 147:17,
148:8, 153:13,
195:10
**slack** *[1]* - 85:13
**sleeping** *[1]* - 185:25
**slide** *[2]* - 165:15,
165:18
**slip** *[1]* - 197:15
**slippage** *[1]* - 14:18
**slow** *[1]* - 184:19
**small** *[5]* - 57:16,
119:9, 119:11,
123:9, 193:20
**smiley** *[1]* - 147:22

**smiling** *[6]* - 39:14,
40:2, 40:22, 40:23,
41:1, 70:5
**SMITH** *[1]* - 1:18
**snacks** *[1]* - 167:8
**snippet** *[6]* - 84:21,
84:22, 84:23, 85:14,
86:10, 181:19
**snow** *[1]* - 10:7
**so..** *[1]* - 89:16
**sociable** *[1]* - 172:20
**social** *[5]* - 178:16,
183:25, 184:21,
184:24, 189:5
**societies** *[1]* - 110:22
**society** *[6]* - 109:22,
167:24, 183:18,
185:8, 185:10,
185:11
**software** *[6]* - 22:18,
78:14, 155:13,
155:15, 155:17,
155:20
**sold** *[2]* - 63:10, 172:4
**solution** *[3]* - 42:16,
103:7, 144:21
**solutions** *[1]* - 152:1
**someone** *[24]* - 7:1,
10:16, 27:24, 52:15,
57:15, 79:9, 91:17,
91:18, 92:5, 97:25,
105:9, 107:1,
110:15, 139:4,
148:1, 150:11,
171:9, 171:14,
176:8, 178:23,
179:5, 202:6,
205:21, 206:2
**sometime** *[8]* - 45:14,
47:10, 48:4, 65:17,
87:4, 138:11, 158:4,
174:7
**sometimes** *[9]* -
16:16, 46:17, 71:10,
106:22, 137:25,
138:1, 152:11,
179:25
**somewhat** *[2]* - 201:4,
201:6
**somewhere** *[3]* - 51:5,
180:18, 199:18
**soon** *[2]* - 83:8,
190:14
**sorry** *[38]* - 12:6,
16:13, 18:25, 29:19,
36:9, 36:17, 39:22,
40:7, 41:15, 48:15,
48:18, 49:11, 56:6,
56:15, 60:20, 72:23,
74:22, 79:20, 86:11,

94:14, 97:9, 98:17,
101:4, 116:20,
117:18, 118:19,
119:15, 123:13,
141:23, 144:17,
145:12, 156:9,
157:4, 168:13,
175:10, 182:4,
190:3, 207:6
**sort** *[10]* - 4:9, 4:10,
5:1, 6:11, 8:6, 14:22,
16:19, 82:9, 93:5,
199:3
**sound** *[1]* - 15:20
**sounded** *[1]* - 67:7
**sounds** *[3]* - 64:24,
124:7, 171:15
**sources** *[3]* - 114:22,
115:1
**South** *[2]* - 170:22,
170:24
**Southeast** *[2]* -
174:21, 174:23
**space** *[5]* - 20:7,
30:20, 73:6, 97:2,
173:3
**Spataro** *[112]* - 4:14,
4:19, 5:15, 5:16,
36:8, 36:11, 41:5,
41:23, 41:25, 42:8,
42:10, 42:19, 42:22,
43:24, 43:25, 44:22,
44:23, 45:10, 45:16,
45:24, 46:19, 46:23,
52:8, 53:12, 53:13,
53:21, 54:14, 54:22,
55:4, 55:5, 56:16,
57:4, 57:20, 58:9,
58:10, 60:7, 60:9,
63:13, 66:25, 67:20,
67:21, 68:7, 68:13,
68:18, 71:13, 71:20,
74:17, 75:14, 77:2,
79:23, 80:19, 81:10,
83:6, 83:20, 83:22,
84:22, 86:6, 86:18,
86:23, 87:5, 87:10,
87:20, 88:14, 88:20,
88:23, 100:7,
102:19, 102:24,
105:4, 105:7, 137:7,
139:10, 140:2,
141:11, 147:3,
147:4, 147:13,
148:13, 148:19,
149:6, 149:7, 150:8,
153:9, 158:12,
158:24, 163:3,
165:18, 166:4,
166:9, 166:22,
166:23, 166:25,

*167*:11, *168*:24, *169*:21, *170*:15, *171*:20, *173*:7, *173*:23, *174*:17, *175*:5, *182*:17, *182*:23, *183*:3, *183*:4, *184*:17, *189*:19, *200*:9, *200*:10, *201*:1, *205*:14
**SPATARO** [1] - *1*:8
**special** [1] - *56*:19
**specialist** [2] - *94*:19, *98*:2
**specific** [8] - *11*:7, *31*:13, *75*:1, *80*:9, *110*:3, *110*:10, *110*:16, *127*:22
**specific-materials** [1] - *110*:10
**specifically** [9] - *40*:19, *60*:8, *93*:21, *115*:3, *124*:19, *130*:5, *132*:24, *168*:15, *172*:23
**spell** [1] - *107*:18
**spend** [1] - *198*:25
**spending** [2] - *111*:10, *195*:3
**spent** [4] - *20*:14, *40*:13, *44*:20, *102*:3
**spiritual** [1] - *33*:12
**split** [1] - *53*:13
**sponsor** [1] - *127*:5
**spread** [1] - *31*:2
**spurts** [1] - *46*:17
**Square** [1] - *9*:4
**stability** [1] - *102*:1
**Staller** [18] - *106*:14, *107*:10, *107*:11, *107*:20, *109*:1, *109*:17, *113*:6, *113*:11, *117*:12, *118*:2, *120*:7, *121*:20, *128*:9, *129*:13, *133*:16, *133*:20, *136*:5, *136*:21
**STALLER** [2] - *3*:5, *107*:14
**stamp** [4] - *94*:16, *94*:17, *94*:18, *94*:24
**stand** [10] - *8*:4, *17*:3, *107*:10, *107*:11, *192*:21, *194*:20, *198*:13, *200*:2, *202*:12
**standard** [3] - *125*:4, *147*:21, *148*:2
**standards** [1] - *96*:2

**standing** [3] - *31*:4, *34*:9, *145*:24
**start** [6] - *9*:14, *41*:10, *41*:15, *64*:6, *108*:11, *154*:11
**started** [26] - *16*:15, *22*:10, *28*:9, *28*:12, *28*:16, *31*:10, *31*:18, *31*:19, *40*:1, *41*:23, *41*:25, *42*:3, *42*:10, *43*:3, *46*:10, *46*:12, *67*:2, *67*:4, *77*:22, *77*:23, *118*:12, *118*:13, *142*:13, *144*:4, *166*:20, *203*:17
**starting** [1] - *156*:17
**starts** [1] - *46*:19
**startup** [1] - *101*:23
**startups** [1] - *101*:24
**state** [3] - *21*:16, *107*:17, *182*:12
**State** [3] - *18*:16, *18*:20, *19*:13
**statement** [3] - *84*:25, *103*:16, *103*:21
**statements** [1] - *114*:19
**States** [3] - *4*:2, *31*:2, *185*:14
**STATES** [2] - *1*:1, *1*:16
**states** [2] - *113*:3, *130*:5
**stating** [5] - *24*:25, *104*:1, *146*:5, *149*:15, *185*:17
**status** [2] - *5*:1, *187*:20
**stay** [7] - *5*:16, *5*:17, *11*:23, *45*:6, *48*:1, *65*:21, *188*:25
**stayed** [4] - *53*:14, *65*:23, *123*:5, *156*:24
**steal** [1] - *92*:8
**steer** [1] - *197*:17
**stenography** [1] - *1*:23
**step** [10] - *5*:17, *8*:6, *10*:2, *10*:24, *13*:14, *16*:9, *136*:21, *193*:15, *198*:1
**STEPHANIE** [1] - *2*:3
**stereotypes** [1] - *101*:3
**Steve** [6] - *32*:24, *165*:7, *165*:8, *165*:11, *165*:23, *166*:1
**still** [34] - *7*:10, *8*:12, *12*:12, *17*:10, *35*:14,

*35*:17, *41*:3, *44*:15, *47*:6, *53*:10, *53*:12, *53*:20, *56*:7, *62*:4, *65*:12, *66*:14, *67*:13, *71*:7, *72*:24, *73*:9, *81*:11, *83*:13, *83*:14, *83*:17, *105*:7, *123*:9, *146*:17, *157*:10, *157*:22, *181*:7, *184*:22, *185*:18, *188*:13, *198*:8
**stipulate** [1] - *134*:10
**stock** [2] - *25*:18, *25*:21
**stop** [4] - *145*:6, *168*:12, *195*:19, *206*:11
**Stop** [1] - *58*:6
**stopped** [2] - *137*:5, *184*:1
**store** [1] - *10*:8
**stories** [1] - *204*:24
**story** [4] - *36*:18, *38*:10, *71*:23, *198*:9
**strangers** [2] - *143*:22, *145*:16
**strategic** [1] - *140*:1
**strategy** [20] - *61*:9, *62*:17, *62*:24, *62*:25, *63*:11, *63*:12, *87*:11, *87*:12, *87*:15, *102*:5, *103*:3, *137*:25, *138*:3, *152*:1, *164*:17, *175*:24, *180*:3, *190*:20, *197*:1
**Street** [3] - *1*:12, *1*:19, *2*:4
**stretch** [1] - *153*:21
**strong** [1] - *12*:8
**struggle** [1] - *16*:17
**stubs** [3] - *114*:15, *114*:16, *114*:19
**stuck** [1] - *8*:12
**student** [3] - *11*:15, *83*:3, *111*:11
**students** [1] - *111*:21
**Studies** [1] - *109*:21
**study** [1] - *18*:18
**stuff** [3] - *13*:15, *14*:8, *61*:22
**style** [1] - *52*:10
**sub** [1] - *174*:25
**sub-city** [1] - *174*:25
**subject** [6] - *184*:13, *198*:10, *205*:15, *205*:20, *205*:21, *208*:16
**submission** [1] - *24*:1
**submit** [1] - *177*:7
**submitted** [6] - *22*:17,

*23*:10, *23*:11, *23*:13, *24*:6, *175*:7
**subpoena** [18] - *15*:15, *200*:8, *201*:10, *201*:11, *201*:14, *202*:3, *202*:4, *202*:17, *203*:18, *203*:19, *203*:22, *204*:7, *205*:15, *205*:21, *205*:22, *207*:11
**subpoenaed** [1] - *206*:22
**subpoenas** [8] - *200*:9, *200*:13, *200*:15, *200*:20, *202*:11, *202*:15, *203*:23, *204*:2
**subsequent** [6] - *113*:19, *114*:2, *114*:8, *114*:16, *132*:11, *132*:14
**substance** [2] - *4*:13, *17*:22
**substantial** [1] - *9*:6
**subtracted** [1] - *122*:16
**subtraction** [1] - *119*:7
**subtracts** [1] - *124*:1
**successful** [1] - *113*:21
**successfully** [2] - *19*:25, *20*:2
**suffered** [2] - *134*:6, *135*:1
**suggest** [4] - *93*:4, *93*:9, *93*:10, *163*:1
**suggesting** [2] - *190*:11, *204*:13
**suggestion** [2] - *103*:5, *207*:14
**suit** [1] - *69*:13
**suitable** [1] - *39*:15
**Suite** [2] - *1*:19, *2*:4
**sum** [1] - *6*:20
**summarized** [1] - *118*:7
**summarizes** [2] - *116*:19, *118*:25
**summarizing** [1] - *101*:5
**summary** [2] - *116*:17, *118*:5
**summer** [5] - *68*:13, *80*:19, *83*:2, *83*:7, *190*:21
**Sun** [7] - *20*:14, *58*:1, *58*:4, *58*:6, *193*:12, *196*:4, *196*:19

**super** [2] - *20*:10, *20*:11
**superstar** [1] - *32*:14
**supervising** [1] - *81*:12
**supervisor** [4] - *31*:22, *35*:17, *53*:12, *53*:13
**support** [5] - *12*:11, *61*:6, *66*:17, *69*:23, *152*:22
**supporting** [1] - *98*:20
**supposed** [4] - *11*:6, *16*:21, *132*:9, *137*:24
**surprised** [3] - *15*:25, *55*:7, *80*:5
**sustained** [18] - *54*:8, *60*:21, *113*:12, *124*:11, *126*:13, *126*:22, *128*:21, *129*:4, *130*:13, *131*:3, *131*:22, *132*:22, *134*:13, *160*:14, *161*:8, *179*:9, *187*:4
**switch** [2] - *92*:16, *93*:13
**SWORN** [1] - *107*:14
**Sydney** [2] - *185*:5, *188*:24
**symbols** [1] - *147*:25
**system** [15] - *10*:24, *19*:4, *19*:19, *20*:9, *21*:3, *33*:22, *33*:23, *34*:16, *56*:11, *84*:8, *85*:13, *85*:14, *155*:8, *155*:10, *156*:7
**systems** [3] - *82*:25, *155*:17, *174*:25

### T

**Table** [15] - *116*:19, *116*:21, *116*:23, *116*:24, *118*:2, *118*:3, *118*:5, *118*:10, *118*:15, *118*:17, *118*:18, *118*:19, *118*:20, *118*:25, *120*:10
**table** [16] - *36*:19, *69*:20, *70*:2, *70*:5, *70*:7, *70*:8, *70*:13, *70*:14, *70*:16, *71*:9, *71*:14, *121*:19, *121*:21, *175*:20, *175*:23
**tables** [9] - *69*:16, *69*:22, *69*:23, *69*:24, *71*:12, *116*:18, *147*:15, *173*:2,

*175*:17
**tackle** *[3]* - 8:14,
15:19, 16:2
**tag** *[1]* - 70:9
**talent** *[2]* - 38:4, 38:8
**Tara** *[21]* - 166:11,
166:14, 166:15,
167:19, 180:17,
181:6, 181:7,
181:12, 181:18,
181:19, 181:21,
181:22, 181:24,
183:4, 183:5, 183:9,
183:12, 183:15,
184:8, 184:10, 189:4
**tasked** *[1]* - 31:3
**tasks** *[5]* - 56:4, 77:10,
77:12, 77:13
**Taylor** *[14]* - 166:11,
166:15, 167:19,
180:17, 181:6,
181:7, 181:18,
181:19, 181:21,
181:24, 183:9,
183:12, 184:8, 189:4
**Taylor's** *[3]* - 181:12,
181:22, 183:5
**TCIP** *[1]* - 19:20
**teaching** *[1]* - 111:6
**Teal** *[1]* - 27:23
**team** *[31]* - 33:23,
33:24, 35:24, 36:6,
37:25, 41:9, 45:18,
46:3, 49:14, 57:2,
57:11, 66:19, 67:24,
67:25, 69:23, 69:24,
70:2, 70:12, 72:11,
78:19, 81:6, 81:19,
83:15, 83:16, 85:16,
86:1, 147:17,
151:25, 165:21,
175:8, 179:24
**teams** *[2]* - 46:5, 69:22
**tech** *[8]* - 38:8, 82:5,
82:7, 101:23, 102:5,
150:19, 194:3,
195:16
**Tech** *[2]* - 114:18,
119:5
**technical** *[13]* - 55:13,
60:10, 60:14, 60:24,
61:20, 61:22, 80:2,
90:8, 102:12,
102:13, 139:8,
165:19, 175:16
**technicality** *[1]* -
200:17
**technically** *[8]* -
55:17, 60:15, 61:1,
61:23, 78:3, 92:13,

*117*:24
**technician** *[1]* - 76:17
**techniques** *[1]* - 78:14
**tempered** *[1]* - 84:1
**Temple** *[5]* - 108:16,
108:19, 111:10,
111:18, 111:23
**temporarily** *[1]* - 50:11
**tended** *[3]* - 52:9,
52:13, 92:4
**tendered** *[1]* - 202:2
**tends** *[1]* - 88:1
**term** *[4]* - 55:1, 109:3,
109:8
**terminated** *[4]* -
116:12, 120:15,
135:2, 135:14
**termination** *[9]* -
113:19, 120:17,
121:17, 123:22,
129:16, 130:18,
189:15, 189:17,
198:9
**terms** *[17]* - 6:13,
34:14, 38:17, 44:4,
44:7, 44:9, 47:20,
54:18, 80:25,
106:22, 109:13,
125:12, 125:18,
127:22, 130:25,
195:8, 196:14
**terrific** *[1]* - 15:10
**TESTIFIED** *[1]* -
107:15
**testified** *[20]* - 5:12,
72:6, 72:21, 75:12,
80:14, 87:2, 112:23,
112:24, 112:25,
113:2, 134:9, 136:6,
137:10, 137:15,
138:2, 139:20,
139:23, 158:21,
164:2, 172:7
**testify** *[9]* - 106:24,
110:5, 112:19,
127:11, 135:22,
168:20, 169:2,
182:7, 206:23
**testifying** *[1]* - 119:23
**testimony** *[12]* - 4:14,
4:19, 5:13, 5:17,
5:18, 17:22, 64:7,
107:3, 127:13,
128:1, 182:1, 199:20
**text** *[5]* - 85:19,
147:25, 191:23,
191:25, 193:17
**THE** *[223]* - 1:15, 4:3,
4:4, 4:8, 4:25, 5:16,
5:20, 7:17, 7:21,

7:24, 8:2, 8:11, 8:16,
8:17, 8:18, 9:17,
9:20, 9:21, 9:22,
9:23, 9:24, 9:25,
10:1, 10:6, 10:9,
10:14, 10:18, 11:5,
11:9, 11:11, 11:13,
11:15, 11:16, 11:17,
11:19, 11:22, 11:23,
12:2, 12:6, 12:8,
12:19, 13:24, 14:10,
14:11, 15:4, 15:11,
15:20, 15:24, 16:5,
16:9, 16:10, 16:12,
17:7, 17:9, 17:14,
17:15, 17:17, 23:19,
27:5, 29:13, 30:12,
39:9, 48:15, 49:18,
54:8, 60:20, 61:4,
61:5, 63:25, 64:11,
64:13, 64:16, 64:17,
64:20, 64:25, 65:2,
70:20, 73:24, 86:14,
93:15, 95:6, 105:17,
105:20, 106:4,
106:6, 106:8,
106:10, 106:11,
106:16, 106:17,
106:19, 107:11,
107:13, 107:16,
107:17, 107:19,
107:22, 107:23,
107:24, 107:25,
108:1, 113:8, 117:2,
117:4, 117:5,
117:10, 117:15,
117:19, 117:22,
119:17, 119:18,
119:22, 120:5,
121:22, 121:25,
122:3, 122:21,
122:23, 124:7,
124:11, 124:13,
126:7, 126:9,
126:13, 126:22,
126:24, 127:4,
127:17, 127:21,
127:25, 128:3,
128:15, 129:4,
129:9, 130:13,
131:3, 131:22,
132:22, 133:14,
133:17, 134:13,
134:19, 134:20,
136:1, 136:19,
136:21, 136:23,
136:24, 137:2,
137:17, 141:15,
153:21, 154:1,
154:3, 154:5, 154:6,
154:12, 154:13,

154:15, 156:3,
160:14, 161:8,
162:3, 162:5,
162:23, 162:24,
164:9, 164:10,
168:11, 168:13,
168:14, 169:1,
169:4, 179:9,
180:15, 180:16,
181:11, 181:12,
182:1, 182:4, 182:5,
182:9, 182:11,
187:4, 192:14,
192:17, 192:22,
197:7, 197:10,
197:23, 197:25,
198:7, 198:11,
198:16, 198:20,
199:5, 199:13,
199:19, 199:24,
200:11, 201:1,
201:9, 201:13,
201:19, 201:21,
201:25, 202:9,
202:20, 203:9,
203:16, 204:15,
204:22, 205:4,
206:11, 206:15,
207:19, 208:1,
208:3, 208:6, 208:9,
208:12, 208:20,
208:25
**themselves** *[1]* - 70:21
**theory** *[2]* - 109:10,
110:1
**thereafter** *[4]* - 44:21,
91:22, 138:17,
144:25
**thesis** *[1]* - 20:1
**they've** *[3]* - 4:18,
14:7, 206:18
**thinking** *[5]* - 42:11,
44:8, 89:25, 109:14,
164:18
**thinks** *[1]* - 139:4
**THOMAS** *[1]* - 1:8
**thoughts** *[1]* - 164:25
**thousand** *[1]* - 128:25
**thread** *[30]* - 56:18,
56:19, 56:20, 56:25,
57:2, 57:3, 57:6,
57:11, 57:12, 57:14,
57:15, 84:21, 84:22,
84:25, 85:5, 85:7,
85:8, 85:15, 85:21,
85:22, 85:24, 85:25,
86:4, 86:6, 86:9,
86:10, 86:17, 192:8,
195:10
**threads** *[1]* - 86:1

**three** *[24]* - 12:23,
31:19, 35:14, 35:16,
42:23, 43:25, 44:24,
69:5, 86:1, 87:20,
100:22, 116:4,
123:8, 123:17,
158:6, 158:8,
158:13, 158:14,
158:22, 158:23,
158:25, 159:3,
162:14, 165:3
**thrill** *[1]* - 196:2
**thriving** *[1]* - 35:14
**throughout** *[1]* -
169:16
**Thursday** *[2]* - 49:25,
199:8
**tickets** *[2]* - 61:6,
66:18
**tight** *[2]* - 11:24,
197:19
**tighten** *[1]* - 199:9
**tilted** *[1]* - 12:10
**Tim** *[42]* - 45:13, 52:8,
52:15, 52:18, 52:19,
53:4, 53:5, 66:8,
67:23, 68:7, 68:11,
68:16, 93:19, 93:20,
93:25, 96:8, 96:9,
96:12, 96:13, 96:14,
96:21, 96:24, 105:1,
138:12, 138:15,
139:18, 142:21,
143:3, 143:5,
145:19, 146:1,
146:12, 146:13,
146:17, 148:12,
160:25, 163:3,
165:4, 179:24,
180:1, 180:2, 181:2
**timing** *[1]* - 14:19
**TIMOTHY** *[1]* - 2:4
**title** *[22]* - 59:20, 81:3,
81:4, 81:14, 92:21,
102:25, 137:15,
137:23, 137:24,
139:20, 142:10,
149:16, 150:12,
151:1, 151:11,
151:22, 152:20,
157:21, 159:21,
160:3
**title/promotion** *[1]* -
149:3
**today** *[15]* - 4:12,
14:20, 14:22, 32:6,
34:23, 103:14,
112:12, 112:17,
134:5, 134:9,
134:25, 135:16,

135:22, 136:7,
197:11
**today's** [1] - 109:22
**together** [7] - 78:11,
109:13, 110:4,
110:17, 165:13,
165:18, 194:18
**Tokyo** [1] - 31:3
**tolerate** [1] - 204:16
**Tom** [53] - 24:15,
31:25, 33:18, 35:17,
36:3, 42:8, 42:9,
45:11, 45:23, 52:12,
53:13, 53:21, 56:24,
56:25, 57:3, 58:22,
63:14, 66:9, 68:7,
75:15, 75:23, 77:3,
78:25, 80:11, 81:21,
82:14, 83:20, 86:22,
98:8, 98:11, 99:17,
100:7, 100:23,
102:19, 102:22,
103:1, 103:4, 137:7,
140:2, 142:15,
142:17, 142:18,
145:18, 146:23,
147:12, 148:5,
148:13, 148:19,
149:6, 149:7, 153:9,
163:3
**Tom's** [1] - 101:8
**tomorrow** [9] -
154:11, 197:21,
198:18, 198:25,
199:25, 202:21,
207:4, 207:16,
207:22
**tone** [1] - 43:14
**tonight** [2] - 197:14,
199:1
**took** [9] - 65:24, 69:4,
120:19, 135:17,
151:8, 154:18,
154:24, 156:6
**tool** [1] - 99:25
**top** [3] - 5:3, 92:7,
93:1
**top-notch** [2] - 92:7,
93:1
**topic** [5] - 42:25,
86:24, 111:19,
113:8, 195:8
**topics** [5] - 112:5,
112:15, 135:20,
145:4, 167:13
**total** [21] - 62:1,
113:22, 114:6,
114:22, 115:19,
115:22, 116:8,
118:8, 119:13,

121:4, 121:16,
122:5, 122:17,
123:4, 123:6,
123:11, 123:16,
123:19, 128:20,
129:16
**totality** [1] - 100:21
**totally** [1] - 13:7
**tour** [3] - 150:19,
150:21, 150:23
**towards** [4] - 34:9,
92:4, 121:14, 186:7
**track** [2] - 82:21,
174:12
**traded** [1] - 203:14
**traffic** [3] - 8:12,
16:17, 78:7
**training** [1] - 162:6
**transcript** [2] - 1:23,
209:4
**transcription** [1] -
1:24
**transferred** [1] - 67:10
**transgender** [2] -
185:22, 186:6
**transgendered** [1] -
185:24
**transition** [1] - 105:17
**transmitted** [1] -
208:13
**travel** [1] - 177:2
**treated** [5] - 54:3,
54:5, 54:11, 55:16,
100:24
**treating** [2] - 38:21,
39:4
**TRIAL** [1] - 1:5
**trial** [9] - 4:10, 4:16,
15:8, 15:17, 16:1,
155:9, 203:22,
204:10, 206:14
**trial-related** [1] - 4:10
**trials** [1] - 106:22
**tried** [1] - 35:9
**trip** [26] - 51:12, 78:18,
78:23, 170:13,
170:17, 171:25,
172:22, 172:24,
173:18, 175:5,
175:10, 175:12,
176:10, 176:11,
176:12, 176:17,
177:7, 177:9,
177:13, 179:13,
179:16, 184:22,
184:23, 186:11,
186:12, 189:8
**trips** [5] - 176:20,
177:2, 177:21,
188:2, 188:3

**troublemaker** [5] -
101:11, 101:15,
139:11, 168:3, 189:5
**troublemakers** [5] -
167:21, 167:23,
186:16, 186:20,
187:2
**true** [5] - 103:23,
103:24, 132:18,
135:24, 172:16
**try** [7] - 17:21, 46:24,
64:3, 145:13, 199:9,
199:18, 207:15
**trying** [28] - 11:1, 11:5,
55:14, 56:8, 90:1,
97:16, 97:19, 101:6,
101:22, 102:6,
102:7, 102:9,
102:10, 102:15,
137:18, 138:18,
152:8, 169:4, 186:1,
187:5, 196:25,
198:4, 198:5,
198:13, 200:18,
206:7, 206:13
**Tuesday** [1] - 9:18
**turn** [2] - 112:9,
191:20
**turned** [1] - 65:18
**TV** [1] - 109:13
**twice** [1] - 46:16
**two** [47] - 6:20, 8:8,
8:21, 12:19, 12:23,
22:17, 23:15, 24:6,
28:19, 31:19, 33:21,
44:24, 68:15, 73:2,
76:17, 83:2, 84:8,
86:7, 92:22, 109:13,
110:4, 125:8,
145:23, 151:2,
159:22, 165:16,
165:21, 174:13,
174:14, 175:4,
177:18, 180:17,
181:24, 182:24,
184:6, 184:9,
184:10, 184:17,
184:19, 185:5,
185:11, 188:24,
192:6, 195:19,
204:24, 207:15
**type** [2] - 10:4, 112:6
**types** [8] - 109:11,
110:2, 110:19,
114:5, 115:1, 115:3,
169:25, 195:20
**typical** [5] - 9:18, 44:3,
44:6, 44:12, 151:20
**typically** [8] - 6:24,
9:18, 15:6, 15:7,

110:4, 200:23,
202:4, 202:9

## U

**U.S** [3] - 1:11, 1:12,
185:14
**ultimately** [3] -
114:18, 119:9, 134:4
**unclear** [1] - 196:16
**uncomfortable** [3] -
37:7, 42:17, 43:16
**under** [7] - 14:3,
17:10, 129:1,
131:10, 131:16,
138:14, 184:3
**underlying** [1] -
134:17
**Understood** [1] -
121:16
**understood** [1] -
97:24
**unfortunate** [1] -
10:23
**unfortunately** [2] -
148:5, 196:20
**unhappy** [1] - 6:4
**UNITED** [2] - 1:1, 1:16
**United** [3] - 4:2, 31:2,
185:14
**University** [7] - 18:16,
108:14, 108:16,
108:19, 108:24,
111:11, 111:18
**university** [2] - 18:16,
146:12
**Unix** [2] - 19:19, 20:9
**unlawful** [1] - 135:1
**unless** [2] - 5:12, 45:8
**unreasonable** [1] -
135:18
**unsolved** [1] - 167:15
**unusual** [1] - 83:4
**up** [110] - 8:6, 9:11,
11:4, 11:24, 13:17,
16:25, 17:7, 17:8,
19:15, 19:16, 19:17,
21:24, 22:23, 22:24,
25:16, 28:15, 31:4,
31:7, 33:5, 35:20,
39:4, 40:17, 43:1,
43:23, 47:22, 54:1,
54:21, 55:4, 58:20,
64:19, 67:18, 69:8,
70:18, 71:10, 78:25,
81:21, 82:11, 83:23,
88:23, 88:25, 89:9,
89:16, 89:20, 97:25,
98:12, 101:10,
101:17, 101:18,

103:11, 105:25,
106:24, 107:6,
107:11, 109:11,
109:12, 113:21,
113:24, 119:10,
121:2, 123:8,
123:15, 129:14,
133:22, 137:2,
139:12, 148:6,
148:16, 150:13,
151:25, 152:5,
154:16, 157:17,
157:25, 158:3,
158:5, 158:6,
158:17, 158:19,
159:22, 160:21,
160:22, 160:25,
161:3, 161:22,
162:14, 162:19,
164:16, 166:21,
166:25, 167:18,
169:20, 171:20,
173:10, 175:13,
179:1, 182:15,
187:8, 189:4, 190:1,
191:10, 194:10,
196:1, 197:16,
197:17, 199:9,
199:19, 203:13,
204:10, 205:22
**uploaded** [1] - 148:1
**upper** [2] - 35:5, 183:7
**upper-level** [1] - 183:7
**upset** [2] - 51:2, 74:17
**usual** [1] - 167:9

## V

**vacation** [2] - 25:2,
125:4
**valet** [1] - 70:24
**Valley** [4] - 20:5, 20:6,
20:22, 162:7
**value** [6] - 62:8, 62:9,
63:6, 102:9, 116:8,
121:2
**valued** [1] - 63:8
**various** [8] - 30:20,
109:11, 110:2,
112:15, 114:16,
139:8, 152:4, 167:14
**vendor** [7] - 78:17,
78:23, 79:8, 151:14,
151:15, 151:16,
151:18, 151:21,
171:10
**vendors** [5] - 20:25,
150:13, 150:21,
151:8, 170:6
**venue** [1] - 69:9
**venues** [1] - 167:9

**verbalized** [1] - 168:5
**verbally** [1] - 87:23
**version** [2] - 62:21, 166:13
**versus** [6] - 55:18, 87:15, 87:16, 90:16, 100:24, 161:12
**vice** [1] - 163:13
**video** [3] - 39:12, 39:19, 48:5
**view** [7] - 7:17, 7:19, 8:24, 84:1, 102:13, 102:14, 104:15
**viewed** [1] - 90:10
**Villanova** [1] - 108:24
**Vince** [5] - 26:24, 62:3, 85:1, 85:6, 204:14
**Vincent** [9] - 24:1, 24:3, 24:25, 25:8, 48:24, 49:10, 181:19, 198:15, 202:17
**Vint** [2] - 62:2, 193:10
**virtual** [6] - 61:13, 63:20, 78:6, 78:7, 81:7
**virtualization** [1] - 81:7
**visibly** [1] - 6:4
**Vision** [2] - 194:19, 195:3
**visit** [2] - 36:3, 53:14
**visited** [1] - 35:24
**visiting** [2] - 36:4, 36:5
**visual** [2] - 77:5, 80:12
**visually** [2] - 77:5, 101:6
**vocational** [1] - 135:23
**voice** [4] - 43:14, 43:15, 90:22, 145:25
**voir** [3] - 5:24, 6:24, 8:23
**VOIR** [2] - 3:6, 108:2
**volunteered** [1] - 103:9
**volunteering** [1] - 186:4

**W**

**W-2s** [1] - 114:15
**wait** [10] - 8:9, 13:15, 14:5, 69:8, 73:13, 149:17, 168:11, 186:24
**waiting** [2] - 96:1, 173:13

**waived** [2] - 4:20, 4:25
**walk** [3] - 21:22, 207:7, 207:22
**walked** [2] - 28:15, 173:19
**walking** [3] - 51:18, 71:10, 207:9
**wall** [1] - 54:19
**wants** [7] - 8:5, 12:2, 58:19, 91:18, 146:16, 176:6, 177:24
**WAS** [20] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 23:20, 27:6, 29:14, 30:13, 49:19, 86:15, 95:7, 141:16, 156:4, 192:24
**was..** [1] - 53:3
**watched** [1] - 71:20
**watching** [1] - 4:16
**water** [1] - 14:3
**ways** [3] - 82:6, 84:6, 172:12
**weather** [3] - 10:3, 10:7, 16:17
**Web** [1] - 161:19
**web** [1] - 20:17
**website** [1] - 165:17
**wedding** [1] - 69:9
**weddings** [1] - 69:15
**week** [12] - 9:19, 10:12, 11:10, 11:11, 12:21, 83:15, 147:15, 149:5, 178:24, 178:25, 180:18, 182:24
**week's** [1] - 12:13
**weekend** [1] - 28:9
**weekly** [2] - 83:17, 119:3
**weeks** [4] - 56:9, 179:19, 179:21, 180:17
**weighing** [1] - 12:20
**weird** [1] - 43:19
**welcome** [1] - 8:7
**welcoming** [1] - 77:5
**Wellman** [1] - 69:11
**west** [1] - 108:24
**when..** [1] - 47:5
**whole** [3] - 70:6, 151:2, 192:14
**wide** [3] - 68:18, 92:19, 103:2
**widely** [1] - 62:21
**wife** [2] - 28:4, 72:3
**williams** [1] - 133:24

**WILLIAMS** [2] - 1:3, 3:3
**Williams** [57] - 17:5, 17:7, 17:10, 17:12, 17:20, 18:1, 50:25, 95:17, 106:13, 106:22, 108:5, 113:12, 113:20, 114:2, 114:15, 114:23, 115:12, 115:18, 115:24, 116:20, 116:22, 119:2, 119:4, 121:11, 122:15, 123:6, 123:21, 124:20, 124:23, 124:24, 125:13, 125:24, 126:17, 128:21, 128:25, 129:21, 130:6, 130:24, 132:16, 134:6, 134:16, 134:25, 135:17, 136:24, 137:2, 137:5, 140:21, 141:18, 154:16, 154:22, 168:12, 191:4, 198:1, 198:21, 199:17, 200:2, 200:14
**Williams'** [9] - 4:19, 107:3, 113:18, 118:5, 118:11, 120:11, 122:10, 129:15, 199:20
**willing** [3] - 48:8, 134:10, 206:5
**window** [1] - 107:1
**wine** [1] - 189:5
**wish** [2] - 96:10, 185:13
**wished** [2] - 71:13, 144:2
**withdraw** [2] - 137:13, 140:6
**withdrawing** [1] - 124:7
**witness** [28] - 5:11, 5:12, 23:2, 26:12, 28:22, 29:18, 48:13, 84:13, 94:5, 95:16, 98:15, 107:4, 119:15, 127:6, 127:14, 127:25, 128:5, 140:17, 140:18, 153:20, 198:14, 199:1, 199:10, 200:22, 200:24, 202:2, 206:2, 206:7

**WITNESS** [24] - 48:15, 61:5, 70:20, 107:16, 107:19, 107:23, 107:25, 117:4, 119:17, 122:3, 122:23, 126:9, 133:17, 134:20, 136:23, 162:5, 162:24, 164:10, 168:13, 169:4, 180:16, 181:12, 182:4, 182:9
**witnesses** [7] - 4:20, 4:21, 16:9, 64:7, 200:13, 200:20, 203:15
**woke** [8] - 167:23, 167:25, 183:17, 183:18, 185:8, 185:9, 185:10
**WOLSON** [2] - 1:15, 4:2
**women** [2] - 91:8, 172:19
**word** [20] - 36:22, 37:3, 44:12, 84:2, 84:3, 96:4, 100:21, 103:9, 109:15, 138:1, 145:22, 146:11, 159:18, 163:14, 167:24, 203:4, 203:17, 204:15, 204:16
**words** [13] - 37:2, 91:20, 91:21, 110:6, 147:9, 167:22, 168:3, 169:6, 169:7, 183:11, 185:11, 208:17
**wore** [1] - 69:13
**workers** [3] - 40:19, 40:25, 197:13
**workforce** [3] - 22:6, 22:14, 23:13
**workplace** [2] - 10:20, 91:12
**works** [5] - 108:9, 130:6, 130:24, 132:10, 206:17
**world** [2] - 30:21, 62:2
**worldwide** [1] - 20:17
**worry** [3] - 44:6, 147:1, 147:5
**worth** [2] - 12:13, 63:5
**wrap** [1] - 129:13
**write** [2] - 89:20, 89:23
**writing** [1] - 19:2
**wrongfully** [1] - 135:2
**wrote** [12] - 49:7, 89:21, 95:12, 95:19,

95:25, 97:4, 97:12, 98:15, 116:16, 181:24, 184:9, 184:10

**Y**

**year** [60] - 18:3, 18:5, 18:13, 18:22, 19:22, 31:9, 32:4, 36:10, 41:13, 44:13, 47:11, 47:14, 47:15, 61:5, 63:7, 67:2, 69:2, 75:25, 96:14, 96:18, 112:1, 115:12, 115:25, 116:11, 116:13, 118:11, 118:23, 118:24, 119:10, 120:11, 120:23, 121:5, 122:8, 122:12, 123:3, 123:5, 123:10, 126:5, 129:1, 131:9, 132:11, 132:14, 132:17, 132:20, 133:6, 133:7, 155:6, 156:16, 156:19, 157:12, 161:5, 166:8, 166:22, 166:23, 171:1, 173:21, 176:20, 190:24, 203:13
**years** [30] - 20:21, 59:7, 59:10, 59:11, 59:12, 66:15, 72:9, 76:17, 84:23, 85:20, 96:10, 96:12, 97:3, 97:5, 97:6, 97:11, 97:14, 103:12, 108:20, 109:19, 111:10, 118:7, 123:17, 124:1, 130:1, 131:13, 134:3, 190:15, 196:4
**yell** [1] - 90:19
**yelled** [2] - 54:4, 90:17
**yesterday** [20] - 4:19, 5:1, 5:24, 6:7, 8:19, 8:20, 8:23, 9:8, 10:10, 11:4, 12:10, 12:24, 13:2, 13:4, 14:1, 15:5, 17:11, 17:20, 200:25, 201:3
**York** [8] - 36:1, 151:8, 152:5, 152:6, 165:14, 165:15, 165:20, 176:23
**young** [1] - 84:10
**younger** [17] - 32:14, 47:19, 60:12, 80:6,

*90:12, 90:16, 90:18,*
*90:19, 92:12, 173:8,*
*174:3, 174:9,*
*174:13, 175:20,*
*176:5, 177:24,*
*178:23*
**yourself** *[3] - 30:16,*
*129:18, 168:14*