1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
2

3  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

   CARL WILLIAMS,                    CIVIL ACTION NUMBER:
4
       Plaintiff,                    2:22-CV-01618-JDW
5
       v.                            JURY TRIAL
6                                    DAY 3
   LINODE LIMITED LIABILITY
7  COMPANY, d/b/a LINODE, LLC,
   LINODIAN, LLC, d/b/a LINODE,
8  LLC, DANIEL SPATARO, and
   THOMAS ASARO
9
       Defendants.
10 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11

12     U.S. District Court, Eastern District of PA
       James A. Byrne U.S. Courthouse
       601 Market Street
13     Philadelphia, Pennsylvania 19106
       January 25, 2024
14     Commencing at 9:34 a.m.

15

   B E F O R E:              THE HONORABLE JOSHUA D. WOLSON
16                           UNITED STATES DISTRICT JUDGE

17
   A P P E A R A N C E S:
18
       DEREK SMITH LAW GROUP, PLLC
19     BY:  SETH D. CARSON  ESQUIRE
       1835 Market Street, Suite 2950
20     Philadelphia, PA 19103
       For the Plaintiff
21

22          Maureen McHugh, Official Court Reporter
               maureen_mchugh@paed.uscourts.gov
23
    Proceedings recorded by mechanical stenography; transcript
24        produced by computer-aided transcription.

25

                    *United States District Court*

1 **A P P E A R A N C E S**:**(Cont'd)**

2

3       JACKSON LEWIS, P.C.
       BY:  STEPHANIE JILL PEET, ESQUIRE
4            JONATHAN CAVALIER, ESQUIRE
            TIMOTHY MCCARTHY, ESQUIRE
5            1601 Cherry Street, Suite 1350
            Philadelphia, PA 19102
6            For the Defendant

7

8

9

10

       **ALSO PRESENT:**

11

12       Melissa Meyer, Paralegal

13       Laura Buenzle Roberts, Courtroom Deputy

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

1                          I N D E X

2

EXAMINATIONS                                    PAGE

3
**CARL WILLIAMS**
4    DIRECT EXAMINATION BY MR. CARSON:              7
     CROSS-EXAMINATION BY MR. CAVALIER:            59
5

6                      E X H I B I T S

7

     PLAINTIFF EXHIBIT 49 WAS RECEIVED IN EVIDENCE      14
8    PLAINTIFF EXHIBIT 84 WAS RECEIVED IN EVIDENCE      29
     PLAINTIFF EXHIBIT 42 WAS RECEIVED IN EVIDENCE      35
9    PLAINTIFF EXHIBIT 177 WAS RECEIVED IN EVIDENCE     54
     PLAINTIFF EXHIBIT 178 WAS RECEIVED IN EVIDENCE     55
10   DEFENDANT EXHIBIT 22 WAS RECEIVED IN EVIDENCE      88
     DEFENDANT EXHIBIT 89 WAS RECEIVED IN EVIDENCE     104

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1             (PROCEEDINGS held in open court before The Honorable

 2    JOSHUA D. WOLSON, United States District Judge, at 9:34 a.m.)

 3             THE COURTROOM DEPUTY:  All rise.

 4             THE COURT:  Have a seat everybody.  Good morning.

 5             All right.  A little bit of a delay this morning.  I

 6    gather, you know, when we are going to start at 9:00, you'll be

 7    here.  Mr. Williams, I think you were the holdup this morning.

 8             THE PLAINTIFF:  Yes, Your Honor.

 9             THE COURT:  I know things happen, but if we are going

10    to start at 9:00, plan to be here before that.  So the jurors

11    were here and I don't like having them held up.

12             Okay.  I understand that -- let me put it this way, I

13    didn't get anything last night, so I infer from that that you

14    have worked things out with respect to Mr. Palochko; is that

15    right?

16             MR. CAVALIER:  That's right, Your Honor.  I would just

17    add that on that note, we would -- I'll just say it plainly.

18    We really need to finish with Mr. Palochko and Mr. Asaro by the

19    end of the day tomorrow.  They've rearranged their travel

20    multiple times.  We were initially told that the plaintiff's

21    case was going to be in by midday Thursday.  It will cause

22    great difficulty if they are not finished their testimony by

23    tomorrow.

24             Tomorrow is a full day.  My understanding is that the

25    plaintiff expects to call Mr. Palochko and Mr. Asaro in that

*United States District Court*

 1  order, so I don't see any reason why that would be problematic,

 2  but at least from our standpoint we are voluntarily producing

 3  them for plaintiff's case.  It would be very problematic and a

 4  great hardship if they are not finished their testimony

 5  tomorrow by the close of business.

 6          THE COURT:  Well, let's see where we stand.  I mean,

 7  you know, we need to finish up Mr. Williams.  And what are you

 8  doing with respect to the doctor?

 9          MR. CAVALIER:  We were debating that today.  I think

10  given the way the trial has gone, the schedule just -- we are

11  going to let him go.

12          THE COURT:  Okay.  I mean, that's up to you.  Again,

13  he's subject to a subpoena.

14          MR. CAVALIER:  Sure.

15          THE COURT:  I don't have a ton of patience for the

16  idea that we're here at people's whim.  Right?  We're here --

17          MR. CAVALIER:  Sure.  And listen, we may decide, based

18  on how the plaintiff's case finishes -- we're not going to

19  release him from the subpoena.  We may bring him in next week.

20  But certainly -- you know, he was initially that -- he told us,

21  I should say, that he could only do Friday morning.  We sort of

22  had a tentative agreement to take him out of order if that were

23  the case.  I would prefer not to do that in the middle of --

24  or in the front of Mr. Palochko's testimony, especially since

25  the plaintiff's case hasn't finished yet.

1            THE COURT:  Right.

2            MR. CAVALIER:  So we're going to keep him subject to

3    the subpoena and decide when the plaintiff finishes what we're

4    going to do with him.

5            THE COURT:  Okay.

6            MR. CAVALIER:  It would certainly be next week at this

7    point.

8            THE COURT:  Okay.  Fine.

9            Let's bring the jury in then.

10           MR. CAVALIER:  Your Honor, just one brief point.  I

11   know you don't want to hold the jury up.

12           Since we're getting close to the end of the

13   plaintiff's direct testimony, this is the part of the story

14   where I would ask the Court to remind the plaintiff that the

15   purchase price of the acquisition is off limits.

16           THE COURT:  Yeah, we're not getting into that.

17           MR. CARSON:  Okay.

18           MR. CAVALIER:  Thank you.

19           THE COURTROOM DEPUTY:  Please rise.

20           (Jury enters the courtroom at 9:37 a.m.)

21           THE COURT:  All right.  You can all have a seat.  Good

22   morning, everybody.

23           I understand we managed to navigate the weather and be

24   here on time, and I appreciate that.  We were sorting a couple

25   things out here.  I apologize for that.

*United States District Court*

1          We're going to continue with Mr. Williams' testimony

2    this morning.

3          So, Mr. Williams, come on back up.

4                    DIRECT EXAMINATION

5    BY MR. CARSON:

6    Q.   Good morning, Mr. Williams.

7          So we stopped yesterday and we were in time -- in 2020,

8    you had gone on a business trip to the Philippines that year,

9    and you've talked about many events that were concerning to you

10   in connection with your age and in connection with your sexual

11   orientation.

12         And so my first question today would be, why did you put

13   up with it all?

14   A.   Personally I was working towards my end goal.  I had been

15   at Linode for six years, nearly six years, I made significant

16   contributions and put a lot of time and effort into that place

17   that added value.

18         When I started, there were three of us.  The company as a

19   whole progressed.  And even if my title was in name only, I was

20   the director of a high-tech successful startup and I was proud

21   of the accomplishments that I made and proud today.

22   Q.   Can you describe the way that you were treated in the

23   months -- so in time, you got back from the Philippines in

24   February of 2020, and COVID put everyone in their homes around

25   March 2020.

*United States District Court*

1       So from around that time up until August, those last five

2  or six months, can you describe what it was like?  You know,

3  how were you treated, you know, by the people you worked with

4  leading up to the separation?

5  A.   I was treated badly.  It was apparent to me that Dan did

6  not want to work with me anymore.  I was subjected to constant,

7  continuous insults and ridicule.  I was told I was too old to

8  do the job and I was too gay.

9       And from a perspective of my own personal experience, I

10 was denied equal opportunities at Linode and I was

11 discriminated against continually based on my sex and age in

12 the workplace.

13 Q.   And what are you basing -- so you said that Dan Spataro

14 did not want to work with you any longer.

15      Why are you saying that?  What are you basing that upon?

16 A.   He had offered, actually, a severance package to me,

17 saying if I wanted to leave Linode, that Chris Aker would be

18 very generous, as I've testified before, not to go into that

19 again.  And the comments that he made in the Philippines that I

20 would not be back at these events for that next year, in

21 particular, the one that we were discussing.

22      There was also Dan stopped communicating with me as we

23 normally were doing during this period of time, and he did not

24 complete my midterm performance review that was scheduled early

25 that year, in May of 2020.

*United States District Court*

1  Q.  Can you help the jury understand what you mean by the

2  performance review?  What -- I'll start with, so how did the

3  performance reviews work at Linode prior to this time?

4  A.  After you submit -- the Linode standard is that after you

5  submit -- once the self-review is submitted, the manager

6  completes the performance review.

7  Q.  And so what's the first step in this performance review

8  process?  Who's the first person who kind of initiates the

9  process?

10  A.  Well, the director of HR usually sends out an email.  And

11  instead of doing it in June, this year they did it in May.  The

12  peer-reviews are standard practice part of Linode's -- you

13  know, peer-reviews are what Linode's standards are for allowing

14  other employees to evaluate.  And the self-review is where you

15  come up with your own -- it's part of Linode's process, a

16  self-review is where you review and provide some feedback to

17  the manager.

18  Q.  And did you do a self-review in 2020?

19  A.  I did.

20  Q.  And when did you do that?

21  A.  In 2020.

22  Q.  What month?

23  A.  May of 2020.

24  Q.  And do you know whether the peer-reviews were done too?

25  A.  Eventually, yes.

*United States District Court*

1  Q.   When you say "eventually," you mean eventually you found

2  out?

3  A.   Eventually I found out that they were from Dan Spataro.

4  Q.   And did Dan Spataro do -- who was the person who would

5  have done the primary part of the performance review?  Who

6  would have reviewed your performance for that year as your

7  supervisor?

8  A.   Dan Spataro.

9  Q.   And did he do the performance review that year?

10 A.   No.

11 Q.   Did you ask him about it?

12 A.   Yes, I asked him many times, and he blew me off.  And

13 those were in Slack messages between Dan and myself.

14 Q.   You sent Slack messages, like an electronic communication,

15 to Dan Spataro?

16 A.   Yes.

17 Q.   And you asked him about the performance review?

18 A.   Yes.  The same thread we seen earlier from that snippet

19 was -- if you see the entire thread, you would see during this

20 period of time.

21 Q.   How many times did you ask him?

22 A.   Multiple times.

23 Q.   And did you ask him in person too or did you do it mainly

24 on Slack?

25 A.   We did it on Slack, but I discussed it also in our

1  twice-a-month, every-other-week, one-on-one meetings.

2  Q.  Was he attending all those meetings at this point in time?

3  A.  He cancelled a number of them.  I had to -- it was me

4  taking initiative to run him down because I did not receive it

5  and I wanted to verify that he read my self-review.  He stated

6  he did.  I asked him about the peer-reviews, and he said he

7  also read those.

8          MR. CARSON:  And I would like to show the witness,

9  please, Exhibit 49, just for the witness.

10  BY MR. CARSON:

11  Q.  Mr. Williams, can you look at the screen, let me know when

12  you can see what's on there, and I'll ask you a couple

13  questions about it.

14      Do you see that?

15  A.  Yes.

16  Q.  Okay.  So I'm going to do some scrolling, so actually I'm

17  going to put my computer like that, so you can kind of just

18  stay with me.

19      What is this document that we're looking at?

20  A.  The part of --

21  Q.  Just like the entire document first.

22  A.  This is a document that was handed over by Linode.

23  Q.  All right.  Are these your performance reviews?

24  A.  Can you go to the 2020 mid-year review?

25  Q.  Sure.

*United States District Court*

1  A.   Because there are some discrepancies in here and we can go

2  there.  I can -- somehow they put into one --

3         THE COURT:  No, no.

4  BY MR. CARSON:

5  Q.   Just wait for a question.  I'll scroll down, if it will

6  help you try to orient.  So let's go down to page 164.

7  A.   Yes, this 2020 mid-year review.

8  Q.   So this --

9         MR. CARSON:  Are you showing him 164 right now?

10         MS. MEYER:  Oh, 164?

11         MR. CARSON:  Yeah.

12  BY MR. CARSON:

13  Q.   I just want to kind of back up a little bit.  Yeah.

14         So this -- what are we looking at here?  At the bottom.

15  A.   This manager review.

16         THE COURT:  You can't read it into evidence because

17  it's not in evidence.  Okay?  You can identify it for the

18  record.

19         MR. CARSON:  I'm sorry, Your Honor.

20         THE WITNESS:  It appears to be my 2019 year-end

21  review.

22  BY MR. CARSON:

23  Q.   Right.  And so at the end of the year in 2019, you

24  received a performance review, correct?

25  A.   Yes.

*United States District Court*

1  Q.  And Dan Spataro did the performance review?

2  A.  Yes.

3  Q.  And you recognize this as that performance review?

4  A.  Yes.

5  Q.  And you've seen this type of document before?

6  A.  Yes.

7  Q.  And you've worked with this type of document before?

8  A.  It was presented in a different form, but, yes, these

9  questions.

10  Q.  And you have worked with this as someone who's done

11  self-reviews, correct?

12  A.  Yes.

13  Q.  And you've worked with it as someone who's done

14  peer-reviews as well?

15  A.  Yes.

16  Q.  And every year at Linode, this was the process for doing

17  performance reviews, correct?

18  A.  Yes.

19        MR. CARSON:  Your Honor, I'd like to move this into

20  evidence, Exhibit 49.

21        MR. CAVALIER:  Are we moving in just the 2019 review

22  or the entire packet?

23        MR. CARSON:  It's only 18 pages.  I'd like to request

24  the entire packet.

25        MR. CAVALIER:  I'm fine with that.  I just needed to

1   know.

2          THE COURT:   Okay.   So Exhibit 49 in its entirety can

3   come in.

4          (PLAINTIFF EXHIBIT 49 WAS RECEIVED IN EVIDENCE.)

5          MR. CARSON:   So now we're going to go down to -- so

6   169.

7   BY MR. CARSON:

8   Q.   So after the year-end review for 2019, when would have

9   been the next time when, according to the past practice for the

10  last five or six years, when would be the next time that you

11  would have a performance review?

12  A.   The mid-year performance review of 2020.

13  Q.   And can you just look at the screen --

14  A.   Yes.

15  Q.   Is that what this is?

16  A.   Yes.

17  Q.   And what are we looking at here?   Which part of the

18  process are we looking at here?

19  A.   We're looking at the part of the process for the employee

20  mainly, me writing these self-review comments.

21  Q.   So this is the self-review that you just testified about;

22  is that correct?

23  A.   Yes.

24  Q.   And you did this in -- what month did you do this in in

25  2020?

*United States District Court*

1   A.   May.

2   Q.   And if we scroll down to the middle of page 172, what part

3   of the process is this?

4   A.   The peer reviews.

5   Q.   And so these are -- do you know who does these

6   peer-reviews?

7   A.   Peer-reviews are peers -- any person at Linode can

8   actually review you.

9   Q.   So it would have been --

10  A.   And I --

11  Q.   Sorry.

12  A.   -- also can state in the software that is used, the

13  performance software, who I would possibly like, not

14  guaranteed, and Dan Spataro, the manager, can also request

15  different individuals to do peer-reviews.

16  Q.   And Dan Spataro told you that he read these peer-reviews?

17  A.   Yes.

18  Q.   And so the first one says, "Carl is amazing at what he

19  does and, honestly, I do not know half of it.  It is a pleasure

20  to work with him and he's always very thorough in giving

21  detailed explanation.  He has immaculate records."

22       Do you know who wrote that?

23  A.   I do not.  They are anonymous.

24  Q.   Would it be someone who worked on the network engineering

25  department or --

1  A.   It could be anyone, but it's somebody that I definitely

2  worked with.

3  Q.   The next one says, "From my interaction with Carl, I think

4  he is great at what he does.  I have no constructive advice at

5  this time."

6       The next one says, "Carl is like some kind of technology

7  warlock.  I have scarcely met anyone smarter.  Carl does a

8  terrific job in translating his deep expertise into passion.

9  Carl is lively and energetic."

10       Did Dan say anything about these complements to you?

11  A.   No.

12  Q.   At any point in time in the entire 2020 year up until, of

13  course, when you were forced to separate from your employment,

14  did you receive like a written performance review from Dan

15  Spataro?

16  A.   No.

17  Q.   Did anything happen around that time regarding Dan Spataro

18  that concerned you in connection with your claim that he did

19  not want to work with you any longer?

20  A.   Yes.

21  Q.   What was that?

22  A.   I no longer had access to pager duty information.

23  Q.   What is pager duty information?

24  A.   Pager duty information allows me to understand the context

25  of some of the work requirements that I must do, and I have

1  been doing for my entire six years, or nearly six years there
2  up to that point.
3  Q.   Was it an important part of your job?  Did you need that
4  access to do your job?
5  A.   Yes.
6  Q.   And what happened with that?
7  A.   I slacked -- or called using Linode's Slack text thread to
8  Dan making a request for it --
9  Q.   What did he say?
10 A.   -- to put me back on.  He said that I don't need that
11 information any longer.
12 Q.   And you said that was also one of these electronic
13 messages?
14 A.   Yes.
15 Q.   And did he explain why you didn't need access any longer?
16 A.   No.
17 Q.   Did you ask about it again or talk to anybody else?
18 A.   Yes.
19 Q.   And who was that?
20 A.   I talked directly through a Slack message to Tom Asaro, I
21 talked directly through a Slack message with Tim Kaufman, and I
22 also talked through a Slack thread with all three of them and
23 myself.
24 Q.   What do you mean all three of them?
25 A.   The Slack message had Tim, myself, Tom Asaro, and Dan

*United States District Court*

1  Spataro.

2  Q.   So what, there was a specific thread that was yours and

3  Dan Spataro's thread?

4  A.   Yes.

5  Q.   And you had a thread that was yours and Tom Asaro's

6  thread?

7  A.   Yes.

8  Q.   And did you have a thread that was yours and Tim Kaufman's

9  thread?

10  A.   Yes.

11  Q.   And then you said you also had a thread that was Tim

12  Kaufman, Dan Spataro, Tom Asaro and you on the thread?

13  A.   Yes.

14  Q.   And all four of those threads have messages in them where

15  you asked about this access that was their idea?

16  A.   Yes.

17  Q.   And that was in 2020?

18  A.   Yes.

19  Q.   Did you ever get that access back?

20  A.   No.

21  Q.   So in 2020, Dan Spataro told somebody that you wouldn't be

22  there next year, right?

23  A.   Yes.

24  Q.   And he stopped meeting with you as regularly?

25  A.   Yes.

*United States District Court*

1  Q.  And he stopped doing your performance reviews?

2  A.  Yes.

3  Q.  And he started taking away access to resources that you

4  needed to do your job?

5         MR. CAVALIER:  Objection.  Leading.

6         THE COURT:  It's sustained.

7  BY MR. CARSON:

8  Q.  Did he do anything else?

9  A.  He took away my critical pager duty information.

10  Q.  Is that something different than what we were just talking

11  about?  Is that pager duty information what we were just

12  talking about?

13  A.  What we were just talking about.

14  Q.  And did anything else happen during this time period that

15  you'd like to tell the jury about before I move on to the final

16  incident, the termination?

17  A.  Yes.

18  Q.  What is that?

19  A.  Very upsetting.  I was very upset, and on June 15, 2020, I

20  slacked Peter Fu.

21  Q.  By "slacked," you mean sent him a message to him

22  electronically?

23  A.  Yes.

24  Q.  What did you say in that message?

25  A.  What I said in the message is -- initially I remember the

*United States District Court*

1  date because on June 15th, 2020, the Supreme Court announced a

2  landmark ruling giving LGBT rights as a federally protected

3  status.  And I text Peter Fu the Supreme Court decision along

4  with a screenshot of Linode's website that had equal

5  opportunity policy for Linode on it, and those are the two

6  things that I gave him at the start of this real-time Slack

7  message that early morning.

8  Q.   And so just quickly, because I don't want to interrupt

9  what you were trying to tell the jury about, but who is Peter

10 Fu?

11 A.   Peter Fu is an attorney who was Linode's in-house counsel.

12 Q.   So he was a Linode employee?

13 A.   Yes.

14 Q.   And was he on -- was he on management level, or what level

15 was he on as far as in the corporate hierarchy?

16 A.   He was an in-house attorney, the only in-house attorney.

17 He referred to himself -- I forget the title.

18 Q.   Was it a director title or something higher than that?

19 A.   It's a description used for in-house attorneys that are at

20 that top position.

21 Q.   Okay.  And so on June 15th, you sent this message with a

22 picture and a link to this article about the Supreme Court

23 decision.  And what happened next?

24 A.   I was reporting issues related to sexual orientation and

25 age at Linode to Peter Fu in real-time.  We were communicating

*United States District Court*

1    back and forth.

2    Q.    Why did you send a picture of the website, though?

3    A.    I told Peter Fu that the protected status of age, age was

4    removed, because I had looked at it and I screen-shotted it and

5    it was removed, and I sent it to him.

6    Q.    What do you mean removed?

7    A.    It no longer appeared there.

8    Q.    Did the other protected classes appear there?

9    A.    Yes, there were other protected classes.  Race, national

10    origin, gender.  I don't remember them all.

11    Q.    But age wasn't there anymore?

12    A.    Age was not there.

13    Q.    And you'd seen it there prior to that at some point?

14    A.    Yes.

15    Q.    What did Peter Fu say when you let him know that age was

16    removed from the list of protected classes on the website?

17    A.    Well, we had continued -- I was continually talking and --

18    in this Slack thread that due to the Supreme Court decision,

19    that LGBT rights should be added also as one of the parts of

20    the list of protected classes.

21    Q.    And you said it that day because?

22    A.    Because this was -- when I was sending him this, this was

23    about 9:30 a.m., and we're in real-time communication.

24    Approximately 9:30, certainly before 10:00 a.m.  It was early

25    in the morning.  Of course, I'm very happy about the

*United States District Court*

1  decision.

2      And I mentioned to Peter Fu that -- to add that, and in

3  particular, that the way that I read the Supreme Court decision

4  that this also means adding transgender to the list.  And in

5  real-time, Peter Fu -- and I stated because my reason from

6  reading the Supreme Court decision, that -- it's in the Slack

7  message.  And he stated that was my opinion.

8  Q.  What did he say was your opinion?

9  A.  The adding of LGBT individuals to that list because it is

10  now mandated by federal law that everybody in the country is

11  protected.

12  Q.  Wait.  He's a lawyer?

13  A.  Yes.

14  Q.  And he said it was your opinion that --

15  A.  Yes.

16  Q.  Okay.

17  A.  He told me to go to the marketing department to add age

18  when -- this was legal language.

19  Q.  And if we went and looked at the -- let me ask you this,

20  are you familiar with Slack?

21  A.  Yes, I am.

22  Q.  Is it possible to like go look at your Slack messages from

23  a few years ago?

24  A.  Yes.

25  Q.  Why is that possible?

1 A.   I have been working with Slack since 2017 when Linode and

2 Slack became very poplar.  And Linode adopted it and uses it

3 today.

4      And based on my technical knowledge, Slack, the main

5 benefit is when you start a Slack message, it saves the entire

6 history from when the Slack thread was created.

7 Q.   Right.

8 A.   And as an example, if you wanted to search for a word in

9 that particular Slack thread, it would search all the way back

10 to the beginning.  And anybody that was added to that Slack

11 thread, you added an individual, they would see the previous

12 history.

13 Q.   And so this conversation you had with Peter Fu that

14 morning exists in those communications?

15          MR. CAVALIER:  Objection.

16          THE COURT:  Sustained.

17 BY MR. CARSON:

18 Q.   How can we find out whether this conversation actually

19 happened?

20          MR. CAVALIER:  Objection.

21          THE COURT:  Sustained.

22 BY MR. CARSON:

23 Q.   Is there a way to know whether this happened, whether you

24 had this Slack conversation?

25          MR. CAVALIER:  Objection.

*United States District Court*

1          THE COURT:  Sustained.

2          MR. CARSON:  Okay.  I'll move on.

3    BY MR. CARSON:

4    Q.  Did you and Peter Fu have any other discussions by Slack

5    that morning?

6    A.  No.

7    Q.  Did you have any discussions with anyone else by Slack

8    that morning?

9    A.  No.

10   Q.  Did you hear anything else about the reports that you made

11   about, you know, suggesting that the website should add the

12   protected classes that day because of the Supreme Court's

13   decision that day and that age had been removed?  Did you hear

14   anything else about those reports?

15   A.  No.  What I did also state to Peter Fu in the thread was

16   that Linode -- Linode managers need to manage within the law.

17   And I stated to Peter Fu that I took a management within the

18   law course over a four-day period, and it would be beneficial

19   for Linode managers to take a management within the law class.

20        I also stated, when he was talking about it was my

21   opinion, I was also telling Peter Fu that I had worked

22   previously advocating for the change of law and for the statute

23   here in Pennsylvania, actually.

24   Q.  Did he respond to those suggestions and information?

25   A.  No.

*United States District Court*

1  Q.  Do you know when you noticed -- when the last time you

2  noticed that age was part of the website before it was removed?

3  A.  I do not but it was there.

4  Q.  And then it wasn't there?

5  A.  Yes.

6  Q.  And that occurred in 2020 when you noticed that?

7  A.  2020.

8  Q.  Did anyone ever tell you why age was removed from the

9  website that year?

10  A.  Peter Fu suggested that there was some standard language

11  in some standard other site and perhaps someone copied from

12  that site over.

13  Q.  Did he ever direct you to that site or have you ever seen

14  that site?

15  A.  No.

16  Q.  Let's talk about the termination.  So do you remember the

17  day that you were terminated?

18  A.  Yes.

19  Q.  Do you remember the date?  I'll ask you another question.

20  Did you have any meetings scheduled that day?

21  A.  Yes.

22  Q.  And tell me about that.  What did you have scheduled that

23  day?

24  A.  I had -- that particular day, I had already scheduled a

25  one-on-one meeting with Dan Spataro.

*United States District Court*

1  Q.  And what was that meeting scheduled for?

2  A.  It was scheduled for our one-on-one.

3  Q.  Was that meeting specifically scheduled for that day or?

4  A.  No.  It was already scheduled weeks in advance.  It was

5  not -- it was not scheduled.

6  Q.  And did you attend that meeting that day?

7  A.  Yes, I did.

8  Q.  How was that meeting supposed to -- was it in person or

9  was it on the phone?

10  A.  It was through our video conferencing system that Linode

11  uses.

12  Q.  And did you log into that video conference that day?

13  A.  Yes.

14  Q.  And did you notice anything?

15  A.  Yes.

16  Q.  What did you notice?

17  A.  Vincent Palochko was there on the video conference along

18  with Dan Spataro.

19  Q.  And what did you think about that at the time?

20  A.  I'd never seen Vincent Palochko join a video conference

21  with my manager ever, not even for one-on-ones or anything.

22  Q.  What happened next?

23  A.  Dan Spataro immediately began to say, "Don't worry, Carl.

24  We're going to take care of you.  You have been here six years.

25  It will be a good package."

*United States District Court*

1        And I was, like, in shock.

2   Q.   What did you do?

3   A.   Because of -- what I did was I immediately took my phone

4   and began to record it.

5   Q.   How did you do that?

6   A.   I picked up my phone and hit the audio record.  I was

7   recording the conversation.

8   Q.   And so when you first started recording, when was that in

9   the conversation?

10  A.   It's when -- when I picked it up, it was -- by the time I

11  got there, then Vincent Palochko begins to talk and states that

12  I'm going to be terminated.

13  Q.   Do you remember exactly what he said?

14  A.   He gave me the reason that I was not at work the previous

15  Thursday, and I believe that we're on a Thursday when I was

16  terminated.

17  Q.   Were you at work that prior Thursday?

18  A.   Yes, I was.

19  Q.   And how were you -- how was everybody working at that

20  time?

21  A.   It was COVID.  So we were quarantined, and we worked with

22  the laptop in our quarantine location.

23  Q.   Where was your quarantine location?

24  A.   In my apartment.

25  Q.   So at that time, you were working from home?

*United States District Court*

1  A.   Yes, home.

2  Q.   And you had been working from home since when?

3  A.   March of -- the -- possibly the last week of -- as soon as

4  I came back from Philippines because I was quarantined for

5  having gone over there.  And then during the quarantine it was

6  a law.  So we had to work at home.

7          MR. CARSON:  Can we show Carl Exhibit 84, please.

8  BY MR. CARSON:

9  Q.   Can you see that exhibit that was placed in front of you?

10  A.   Yes.

11  Q.   You got it?  Okay.

12  A.   It says Wednesday, August --

13  Q.   Wait for a question.  So what is that?  Not what it says,

14  just what is that?

15  A.   It's a calendar appointment for Dan and my one-on-ones.

16  Q.   And when you say it's a "calendar appointment," what do

17  you mean?  How did you guys use the calendar in this way?

18  A.   We would set up -- there's a standard software at Linode

19  that we would set up calendar appointments, very similar to the

20  calendar appointment that was set up when we discussed my

21  Pennsylvania Human Relations Commission.  That same exact.

22  Q.   Back in 2018?

23  A.   Yes.

24  Q.   And these calendar appointments that you set up, this is

25  one of them?

*United States District Court*

1  A.   Yes.

2  Q.   And you recognize it?

3  A.   Yes, I do.

4  Q.   And you used these throughout your employment at Linode?

5  A.   Yes.

6         MR. CARSON:  I'd like to move Exhibit 84 into

7  evidence.

8         MR. CAVALIER:  No objection.

9         THE COURT:  All right.  84 will come in.

10        (PLAINTIFF EXHIBIT 84 WAS RECEIVED IN EVIDENCE.)

11 BY MR. CARSON:

12 Q.   And when there's a calendar appointment, you can see the

13 date the appointment was made, correct, or the date the

14 appointment is for?

15 A.   The date the appointment is for.

16 Q.   And you see can the people who are scheduled to be at that

17 appointment?

18 A.   Yes.

19 Q.   And on August 19, 2020, there was a meeting scheduled

20 between you and Dan Spataro?

21 A.   Yes.

22 Q.   And is that the time that you're talking about when this

23 conversation occurred where Vincent Palochko joined the video

24 call, too?

25 A.   Yes.

*United States District Court*

1  Q.   So who was it that did the talking during this phone call
2  or at the beginning, the first minute or two?
3  A.   Well, I already stated that Dan started talking.
4  Q.   And then who did the talking for the rest of the call?
5  A.   Vincent Palochko.
6  Q.   And did he, at any point in time, explain to you, you
7  know, precisely why you were being terminated?
8  A.   Precisely?
9  Q.   Yeah.  Did he give you reasons?
10 A.   Yes.  He stated that I was being terminated because I was
11 absent from work the Thursday before.  And Vincent stated to me
12 that because of that, Linode launched an investigation to see
13 if there were other policy violations.
14 Q.   On that Thursday that they said that you weren't working,
15 you were at your house that day?
16 A.   Yes.
17 Q.   Did you leave your house that day?
18 A.   No.
19 Q.   Did you work that day?
20 A.   Yes.
21 Q.   In your position as a network engineer, just from the
22 beginning of your employment to the end of your employment, was
23 there anytime where you had a set schedule?
24 A.   No.
25 Q.   Is there any document that said Carl Williams, 8 o'clock

*United States District Court*

1  to 5 o'clock, and you had to mark whether you were there during

2  those times?

3  A.  No.

4  Q.  Is there a time clock?

5  A.  No.

6  Q.  Timekeeping system?

7  A.  No.

8  Q.  It's a tech company.  You could log in and click a button

9  and that's when you started, and you click another button and

10 that's when you're done?

11 A.  No.

12 Q.  Were there -- did you have to tell someone when you were

13 going to take a lunch break?

14 A.  No.

15 Q.  If you took a lunch break for a couple hours one day and

16 came back and got all your work done that day, was that ever an

17 issue?

18 A.  No.  It was normal.

19 Q.  Did you have the ability to decide what hours during the

20 day you were going to work, generally?

21 A.  Yes.

22 Q.  Did some people at the network engineering department --

23 I'll do it differently.  Did everyone in the network

24 engineering department work the same hours, the same kind of

25 schedule?

*United States District Court*

1  A.   We didn't, but generally, we would work during the daytime

2  hours.

3  Q.   But, you know, did everyone get there, hey, you got to be

4  there at 9 o'clock?

5  A.   No.

6  Q.   Everyone needs to be at their desk at 9:00 logged in?

7  A.   No.  That was never the practice.

8  Q.   Were there people that came early?

9  A.   There were the early birds and there were the latecomers.

10  Q.   And so during this call, you said that it was suggested

11  that you didn't work on Thursday.  Is that what you said?

12  A.   He alleged that.  Vincent Palochko told me that I was --

13  that I was not in the office on the Thursday before.

14  Q.   But the office at that time was your own, right?

15  A.   Yes.

16  Q.   And you were at your home that day?

17  A.   Yes.

18  Q.   And what happened next?  Did you ask any questions?  Did

19  you say anything else?

20  A.   I asked why I was being terminated.

21  Q.   And what did he say?

22  A.   He, again, says I am being terminated due to an

23  investigation that uncovered policy violations.  And he stated

24  that -- at other points in the conversation, he stated that I

25  am not being terminated from something that happened outside of

*United States District Court*

1  Linode, and it was entirely based on these policy violations

2  that occurred at Linode.

3  Q.   What did you say to that?

4  A.   I asked Vincent Palochko -- because I am -- I had

5  invested -- I asked Vincent Palochko to tell me what policy

6  violation and what time I was not in the office on Thursday the

7  previous week.

8  Q.   Did he tell you the policy violations?

9  A.   No.

10 Q.   How long was this call for?

11 A.   20-something minutes, perhaps, approximately.  It's been

12 recorded.  So...

13 Q.   What did you say next?  When you asked about the policy

14 violations, he said -- well, do you remember specifically what

15 he said, to the best of your ability?

16 A.   He said that there was an anonymous complaint that I was

17 not in the office.  I do remember that.  He repeatedly stated

18 that it had nothing to do with my private life or anything

19 outside of Linode.

20 Q.   Did you ask him if it had anything to do with your private

21 life?

22 A.   Yes.

23 Q.   What did you say?

24 A.   I asked him if this had anything to do with John Musbach.

25 Q.   And how did he respond to that?

*United States District Court*

1  A.   He said, no, it only had to do with things that happened

2  at Linode and nothing to do with anything outside of Linode

3  and, in particular, nothing to do with my -- my private life.

4  Q.   You're sure he used the word only?  Like, he said only --

5  A.   Only, yes.  This he repeated many times, and he said,

6  "Carl, I'm absolutely confident that my termination has nothing

7  to do with John Musbach."

8       MR. CARSON:  Your Honor, since we're talking about it

9  and everyone has heard about this recording, I would ask now --

10  I think now is a good time to -- can we -- I'd like to move

11  into evidence the recording and play it for the jury.

12       MR. CAVALIER:  All 27 minutes?

13       MR. CARSON:  I'm not going to play it all.

14       THE COURT:  Let me start with this:  Are you moving

15  the whole 27-minute recording into evidence?

16       MR. CARSON:  Yes.  Yeah.

17       THE COURT:  Okay.  So let's start with that.

18       Mr. Cavalier, any objections to moving it into

19  evidence?

20       MR. CAVALIER:  No.

21       THE COURT:  Okay.  So how is it marked, Mr. Carson?

22       MR. CARSON:  So I have some specific spots but it's

23  really --

24       THE COURT:  No.  No.  No.  It needs to be marked as an

25  exhibit for me to admit it.

*United States District Court*

1          MR. CARSON:  I'm sorry.  I didn't understand the

2    question.  I thought you meant time stamps of the recording.  I

3    can tell you what exhibit it is.  I believe it's 43.

4          MR. CAVALIER:  42.

5          MR. CARSON:  42, Your Honor.

6          THE COURT:  So 42 will be received into evidence, and

7    now it's in evidence.  If you want to play parts of it, you

8    can.

9          (PLAINTIFF EXHIBIT 42 WAS RECEIVED IN EVIDENCE.)

10         MR. CARSON:  I guess we'll use the microphone, maybe,

11   to make it so that...

12         THE COURT:  Mr. Carson, you're not showing a

13   transcript of it while you play it, right?  It's just audio?

14         MR. CARSON:  Yes.  I do -- I do have a transcript

15   but --

16         THE COURT:  We're not introducing that.  You're not

17   playing that, so right?

18         MR. CARSON:  I am only doing the audio.

19         THE COURT:  Okay.

20         THE COURTROOM DEPUTY:  From your computer, it should

21   come out of these speakers.  If you want to try your laptop, I

22   would move the microphone next to your computer speakers, and

23   we can try it that way.  So whatever you prefer.

24         MR. CARSON:  We'll try it this way.  And then if we

25   need to do something different, we will.

*United States District Court*

1         THE COURTROOM DEPUTY:  Okay.  I will turn it on.

2         MR. CARSON:  I have my volume turned down.

3         (Audio playing.)

4         MR. CARSON:  I just want to make sure, can everyone

5    hear that okay?

6         MR. CAVALIER:  Are we going through the whole exhibit?

7         MR. CARSON:  I'm not, no. I'm not.

8         THE COURT:  I think what you need to be doing, though,

9    on the record is marking the time stamps that you're playing so

10   we have some record of that.

11        MR. CARSON:  Sure.  So for the record, the time stamp

12   of this is 00.00, and when we get to the part --

13        THE COURT:  Well, what did you just play?

14        MR. CARSON:  00.00.

15        THE COURT:  Through?

16        MR. CARSON:  Sorry.  I didn't mean to click the

17   button.  So I'm going to start it over.

18        THE COURT:  Do you know what the endpoint will be?

19        MR. CARSON:  I know approximately it's about five

20   minutes in.

21        THE COURT:  So you're playing just this five-minute

22   clip right now?

23        MR. CARSON:  Right now, yes.

24        THE COURT:  So when you finish, I want it noted for

25   the record where the time stamp is.  Okay?

*United States District Court*

1         MR. CARSON:  Yes.  Thank you, Your Honor.

2         (Audio playing.)

3    BY MR. CARSON:

4    Q.   And just for the record, Carl, the person who was talking

5    first -- sorry -- the person who jumped in there in the middle

6    and said, "The reason is you're violating multiple company

7    policies," who was that?

8    A.   Dan Spataro.

9    Q.   And the other person that we hear is?

10   A.   Vince Palochko.

11   Q.   Okay.

12         (Audio playing.)

13         THE COURT:  Is that it?  Okay.  Why don't we use that

14   as an occasion for our mid-morning break.

15         So obviously, it's not a time to be talking about what

16   you've heard.  Just clear your head, talk about something else,

17   and we'll plan to come back in about 15 minutes.  Okay?

18         THE COURTROOM DEPUTY:  Please rise.

19         (Jury exits the courtroom at 10:55 a.m.)

20         THE COURT:  Okay.  You can all be seated.

21         Mr. Carson, what was the endpoint for the record on

22   that recording?

23         MR. CARSON:  25:46.

24         THE COURT:  So it was not five minutes.

25         MR. CARSON:  It just felt wrong to turn it off.  I

*United States District Court*

1  mean, this is why we're here today so --

2        THE COURT:  Mr. Carson, when you tell me something, I

3  use it to assess how I'm going to manage the courtroom.

4        MR. CARSON:  I understand, I apologize.

5        THE COURT:  Even at the end, when I asked you how much

6  longer, you said three minutes, and it went longer.

7        MR. CARSON:  Well, I didn't look --

8        THE COURT:  That's my problem.  You didn't look.  I

9  need you to be accurate with me so that I can then manage the

10  trial.  Okay?

11        I feel like throughout this you have significantly

12  underestimated the length of things, and it's adding collateral

13  consequences.  You asked me not to put you on the clock for

14  this case, and I didn't, but you need to start moving it along.

15  Understood?

16        MR. CARSON:  Yeah, I mean --

17        THE COURT:  Okay.  All right.  Let's take a break, and

18  I want to be back and ready to go by ten after, okay?

19        THE COURTROOM DEPUTY:  All rise.

20        (Brief recess from 10:56 a.m. to 11:12 a.m. )

21        THE COURTROOM DEPUTY:  All rise.

22        THE COURT:  All right.  Have a seat, everybody.  Let's

23  get the jury in.

24        MR. CARSON:  Your Honor, I'm going to try to wrap up

25  before lunch.

*United States District Court*

1          THE COURT:  Okay.

2          MR. CAVALIER:  Do you have any idea when you plan to

3    call for the lunch break today?

4          THE COURT:  My thinking was maybe 12:15 or 12:30.

5    Will that work?

6          MR. CAVALIER:  Yep.

7          THE COURTROOM DEPUTY:  All rise.

8          (Jury enters the courtroom at 11:14 a.m.)

9          THE COURT:  You can all have a seat.  Mr. Williams can

10   come back up.

11   BY MR. CARSON:

12   Q.   So, Mr. Williams, we all just heard what happened.  How

13   did you feel during that call?

14   A.   I spent six years working at Linode, and that was what was

15   in my soul, and gave so much to Linode and was devastated that

16   all that hard work was thrown away.  And I was being

17   manipulated with lies and became emotionally upset.

18   Q.   At the end of the call, we heard you -- you were still

19   asking questions but no one was there.  How did you feel at

20   that moment in time?

21   A.   Distraught.  Distraught that this company that I gave my

22   soul to, worked very hard, made significant contributions, were

23   going to not answer the fundamental question of why I was

24   terminated.

25   Q.   Did anyone ever ask you or mention to you a single

*United States District Court*

1  question about anything that happened related to John Musbach

2  that week?  That month, even?

3  A.  No.

4  Q.  And how long had you worked with Vincent Palochko?  I

5  think you said he called you for the interview.  So how long

6  was that?

7  A.  Nearly six years.

8  Q.  And did you know Vincent Palochko -- you know, you work

9  with people.  You hang out or talk that much.  Did you know him

10  well after the six years?

11  A.  Yes.

12  Q.  What about Dan Spataro?  What was your -- how long -- how

13  long had you known him for?

14  A.  Since 2016.  Well, I didn't meet him at Net Access.

15  Q.  Before --

16  A.  I didn't know Dan.

17  Q.  And you worked with him quite a bit or how often did you

18  work with him in those four years?

19  A.  Yes, he was my manager.

20  Q.  Had you ever been out to a dinner with him?

21  A.  Yes.

22  Q.  Had you ever been out to a lunch with him?

23  A.  Yes.

24  Q.  Often those types of things?  Had this happened a lot?

25  A.  Yes.

1  Q.    And you traveled around the world with him, it sounded

2  like?

3  A.    Yes.  It was shocking to me that individuals would --

4  Q.    This is my question:  Was there ever a time, you know,

5  sometimes you do things formally and you have a conversation

6  with somebody afterward.  Was there ever a time where he came

7  to you and talked to you like a person about any of this stuff,

8  just leveled with you, hey, this is what happened; this is what

9  we did.  Did that ever happen?

10 A.    No.  Never.

11 Q.    Did you ever hear from anyone from Linode again?  Did

12 anyone, Dan Spataro, call you afterwards to wish you good luck

13 or anything like that?

14 A.    No.

15 Q.    Did Vincent Palochko?

16 A.    No.

17 Q.    Did Chris Aker?

18 A.    No.

19 Q.    Tim Kaufmann?

20 A.    No.

21 Q.    Adam Rambo?

22 A.    No.

23 Q.    Andrew Dampf?

24 A.    No.

25 Q.    Text message, hey, good luck, man.  We were together for

*United States District Court*

1    six years growing this company.  Did you get one note from any

2    of them?

3    A.   I got a note from Ben Richie, who was a junior network

4    engineer.  He texted me.

5    Q.   What did he say?

6    A.   He said, "Thank you, Carl, for teaching me so much."  He

7    enjoyed working with me.

8    Q.   There's some tissues there if you need them.

9    A.   I'm fine.

10   Q.   I'm going to switch gears a little bit.  So after this

11   phone call that we heard, what did you do next?

12   A.   Well, I had nothing the next day.  The day before, I had

13   my job before this termination, and that was what was in my

14   mind, how this changed and all that traveling and all the

15   sacrifices and I spent my own money on many things.

16   Q.   Did you --

17   A.   And I made so many significant contributions, and I could

18   not be respected during a meeting, a termination meeting.  And

19   my heart and my soul felt my dignity violated.

20   Q.   Did you ever -- what did you decide to do?

21   A.   I stayed home and called Dr. Sun Miao, made an

22   appointment.

23   Q.   Who is Dr. Sun Miao?

24   A.   He's my primary care physician.

25   Q.   Was he someone that you had been seeing prior to that?

*United States District Court*

1  A.   Yes, since approximately 2015, I think.

2  Q.   So that was after you started at Linode in 2014?

3  A.   Yes.

4  Q.   Did he do anything, you know -- let's start in two

5  thousand -- when you first saw him in 2014, '15.  Did you say

6  '15?

7  A.   Yes.

8  Q.   In 2015, did he treat you for any issues related to

9  emotional distress?

10  A.   He treated me for anxiety.

11  Q.   What did he do for you for your anxiety?

12  A.   He gave me anxiety medicine.

13  Q.   Do you know what the medicine was?

14  A.   At this moment, I can't, I can't recall.

15  Q.   That's okay.  Is that, like, a prescription?

16  A.   Buspirone, I think it was.

17  Q.   And that's a prescription medication?

18  A.   It's a prescription, yes.

19  Q.   And did you take that medication throughout 2015?

20  A.   Yes.

21  Q.   How about in 2016?

22  A.   Yes.

23  Q.   All the way through the end of your employment did you

24  take it?

25  A.   Yes.

*United States District Court*

1  Q.  How about between the day you were fired and today?  Do

2  you still require that medication?

3  A.  Yes, and others.

4  Q.  Let's talk about one at a time to make it easy.  So as far

5  as the antianxiety medication, did you -- what were the reasons

6  why you thought you needed that medication?

7  A.  Due to anxiety.

8  Q.  Was there anything that caused you to have anxiety?

9  A.  I had anxiety at work, things that I talked about this

10  case that caused my anxiety.  As an example, between me filing

11  the human resource -- Pennsylvania Human Resource Commission

12  complaint until the meeting that I had with Dan and Tom Asaro

13  about the complaint.

14      Right after Thanksgiving or right before Thanksgiving, Tom

15  Asaro was treating me very hostile in a Slack message, and I

16  was shaking my legs, this particular leg, and just laid on the

17  couch and was shaking it.  And I was so anxious because I

18  didn't know when I go into work, because I filed the complaint,

19  what I could expect.

20      And we had that meeting.  I was relieved.  And other

21  times, when comments were made, for example, I told Dan --

22  recommended to Dan out in front of everybody to watch the HBO

23  film *West World*, and his immediate response in a snarky manner

24  was, "I'm not into sexuality."

25      And I said, "This is about artificial intelligence."

*United States District Court*

1        Of course, there is --

2   Q.   What channel is that show on?

3   A.   HBO Max.  It's a show.  It's about AI robots.  And he

4   walked away.

5   Q.   Did you --

6   A.   And that was so upsetting for three days.  I had to get

7   additional medication to up it, and I came in and told -- I

8   don't talk to anybody about my personal things, but I told

9   Steve Shaw, because he worked at Google and Facebook, and I

10  thought he might understand that comment and the way it was

11  made.

12       And I said, "Steve, Dan told me, when I told him to watch

13  *West World,* he said to me, 'I'm not into sexuality.'"

14       And Steve responded, Dan --

15            MR. CAVALIER:  Objection.  Hearsay.

16            THE COURT:  Sustained.

17  BY MR. CARSON:

18  Q.   Did that event that you're talking about, did you take

19  your antianxiety medication that you were prescribed?

20  A.   Yes.  I was taking more at that point because, in

21  retrospect, I know now that it was a panic attack or an anxiety

22  attack over those period of days.

23  Q.   What about after the termination?  You said you made an

24  appoint with Dr. Miao?

25  A.   Yes, I did.

*United States District Court*

1  Q.   Did you talk to him about any issues related to your

2  employment?

3  A.   He increased my medication.  I told him that I was really

4  suffering from anxiety and depression.

5  Q.   Did he do anything --

6  A.   -- due to what happened to me at Linode.

7  Q.   You told him due to what happened to you at Linode?

8  A.   Yes.

9  Q.   Did he do anything --

10 A.   -- at my employment.

11 Q.   Did Dr. Miao do anything in response to the report of

12 depression during that appointment after your termination?

13 A.   Did he do what?

14 Q.   Did he do anything for you medically?

15 A.   Medically, he gave me -- he's a primary care physician.  I

16 don't go into his office and sit down on the couch.  He just

17 treats the symptoms and gave me medication.

18 Q.   What kind of medication did he give you for depression?

19 A.   Antidepressant medication.  He increased it to --

20 Escitalopram.  He increased my lorazepam.  At some point, he

21 doubled.

22      When I was -- told him that I was having panic attacks, he

23 reduced, at one point, my lorazepam and increased my beta

24 blocker to help resolve the panic attacks that I was having.

25 Q.   Did you continue to treat with him for issues related to

*United States District Court*

1   the depression and anxiety after, you know, for how long after

2   the termination did you treat with him for those types of

3   issues?

4   A.   Up until the current moment in time.

5   Q.   And as far as how you were emotionally impacted, can you

6   just tell the jury a little bit about that in terms of from the

7   day you were terminated through the present?

8   A.   Excuse me?

9   Q.   Can you tell the jury about the emotional impact caused by

10  the termination, you know, from the time you were terminated

11  through the present?  Can you just talk about how that

12  emotionally affected you?

13  A.   I didn't want to go out of my house.  I had routine panic

14  attacks.  I embraced the position that I always held at Temple

15  University as an adjunct professor, and that helped having that

16  communication.

17  Q.   Did you continue work as a professor at Temple University

18  after the termination?

19  A.   Yes.

20  Q.   Every semester you taught classes there?

21  A.   Tonight I have to teach, but I think I'm going to have to

22  cancel it.

23  Q.   What level of courses in terms of --

24  A.   Senior-level computer networking class, cloud computing

25  class, Kubernetes class, micro services, modern application

*United States District Court*

1  development using cloud-based, cloud native technologies such

2  as micro services.

3  Q.  Did you teach those classes while you were employed at

4  Linode, too?

5  A.  Yes.

6  Q.  Did anyone at Temple ever say anything to you about this

7  John Musbach thing?

8          MR. CAVALIER:  Objection.

9          THE COURT:  It's overruled.

10          THE WITNESS:  No.

11  BY MR. CARSON:

12  Q.  You're teaching students there, and their position is they

13  had to fire you because it's so bad.  Did you get fired from

14  Temple because of this whole John Musbach thing?

15  A.  No, I did not.

16  Q.  How about in terms of looking for another job?  What did

17  you do to try to find work after the termination?

18  A.  I immediately applied to positions.  I contacted contacts

19  initially.  Vint Cerf was one who, at Google is the evangelist,

20  he referred me but he can't decide.  And I applied -- you're

21  only allowed to apply three times a year.  So I applied for one

22  and was very selectively when I was -- after several weeks of

23  interviews, I was a finalist but didn't make it.

24      Again, applied at Google.  I applied at various high-tech

25  companies.  Again, as part of my employment search, I used

1  LinkedIn and contacts and going through interviews.  One

2  interview with a CEO provider went over a period of two and a

3  half months with five interviews, and I really thought I was

4  going to get that position because there were five rounds and I

5  made it to one of the last two finalists in their content

6  delivery network.

7  Q.  What's the first job that you got after the termination?

8  A.  I got a job consulting with Akamai.

9  Q.  Is that the same Akamai that we're talking about --

10  A.  Excuse me.  Kentech.

11  Q.  Sorry.

12  A.  Kentech.  Excuse me, Kentech.  I apologize.

13  Q.  No problem.  I do that all the time.  Who is Kentech?

14  A.  Kentech is a network software-based company that does

15  network observability.

16  Q.  So you did some consulting for them?

17  A.  Yes.

18  Q.  And did you continue to look for work while you were doing

19  that consulting?

20  A.  I actually applied for a position there, but they didn't

21  have a network engineer at that time open.  And I applied for

22  customer support, because I thought I needed something, but

23  customer support is kind of a lower -- I was overqualified for

24  it.

25  Q.  Right.

*United States District Court*

1    A.   So they said they would look for a -- if a part-time

2    position for the network engineer for their operations came

3    open that I would be considered.

4    Q.   So in order to find work, did you -- you expanded the

5    types of jobs you were trying to find?

6    A.   Yes.  Yes, I did.  Usually, people come to me.  Most of my

7    jobs, I never even submitted resumes because I've been in

8    consulting and people would come to me.

9        But this was where, you know, I was 58 at the time and

10   hadn't even lower my resume because it was too long.

11   Q.   Did you find it easier as you got older to get companies

12   to be interested in you as an applicant or more difficult?

13   A.   At this point, it was a little bit -- I wasn't, you know,

14   I would have my interviews, and it was just -- for the people

15   that knew me, there was no issue if there was a position there.

16   Q.   Where did you end, like, you know, the first after

17   Kentech, where did you end up working?

18   A.   My former manager contacted me through LinkedIn and said,

19   "Are you still in Philadelphia?"  He was working at Comcast.

20       And I said, "Yes, I would love to work with you again."

21   And I got a job at Comcast.  They put me through the -- Comcast

22   contacted me.  They put me through one of their payroll

23   services.

24   Q.   I imagine there's an extensive background check process at

25   Comcast?

*United States District Court*

1  A.   Yes.  Yes.  It's a very extensive background check,

2  actually.

3  Q.   Did you go through that background check?  Did you go

4  through that background check?

5  A.   Yes, I did.

6  Q.   Did you have any problems there?

7  A.   No.

8  Q.   Did you end up getting a job at Comcast?

9  A.   Yes.  I am still there today; although, I was transferred

10  to a 5G group recently, and now I'm through a different payroll

11  firm, Essentra, Comcast Essentra, as the -- the title is senior

12  network and device engineer, and it's part of their 5G team.

13  Comcast is building a 5G here and their 5G network out --

14  Q.   So today you are a senior network engineer for Comcast?

15  A.   Senior network and device engineer, the Comcast

16  internal -- the way I'm internally labelled as engineering

17  Level 4, which is between a senior and principal.  A senior is

18  at 3, there's a higher senior level, and then the principal, if

19  I would, like, the person who contacted me, my manager, he's

20  engineering Level 5, but he's a full-time employee.

21  Q.   And do you work full time today?

22  A.   Full time with Comcast.  The contract expires at the end

23  of this year, and then they renew it every -- well, they renew

24  it every year, but they have -- six months is when they can --

25  by practice, it's like an every 6-month kind of thing.

*United States District Court*

1  Q.   We heard Chad Staller, the forensic economist, talk about

2  your wage loss claim.  He said that when you came close or

3  equal to making about the same amount that you had earned at

4  Linode, it was in 2022.

5       So between the time of your termination and that time,

6  were you looking for work continuously?

7  A.   Yes.  I was looking for a permanent position at Comcast

8  and socialized, had lunches, with -- there's numerous of them.

9  And it was primarily at Comcast internally to Comcast that I am

10 meeting for lunch to discuss a permanent position.

11      And they always supported me with the contract and --

12 continuing that on.  And I hope to become a full-time employee.

13 Suggestions have been made about that.

14 Q.   And when you say -- so you said you work full time now as

15 a senior network engineer.  So when you say "I hope to become a

16 full-time employee," kind of explain what you mean so we don't

17 confuse anybody.

18 A.   Comcast has contractors.  I am a contractor.  Essentra

19 right now is who I go through.

20 Q.   Where do you go every day for work?

21 A.   Oh, I go to the Comcast Center.

22 Q.   And you work with people from Comcast every day?

23 A.   Yes.  Comcast Technical Center I was, and now I'm back in

24 the old Comcast Center building, which I was at in 2008 to

25 2014.

*United States District Court*

1  Q.   Those are the big buildings down at 18th and 19th Streets?

2  A.   I meet all the people that I worked with between 2008 to

3  2014.  I see students of mine that see me -- I forget their

4  faces -- and they say, "Professor Williams, what are you doing

5  here?"  And they want to give me a hug.

6  Q.   And I'm pretty close to getting you to the end so we

7  can --

8  A.   Sure.

9  Q.   -- so we can move on.  But I just want to -- I want you

10 to -- before I do that, maybe, let me just see.  Maybe I'll

11 just move a couple things in and then I'll do that.

12      So I'm going to show you a document.

13      MR. CARSON:  And I'm going to ask for it to be shown

14 to the witness only.  And it's going to be Document 143 --

15 sorry.  We did that.  I don't want to waste time.  177.  And

16 I'm going to do this as quickly as I can.

17 BY MR. CARSON:

18 Q.   Tell me when you can see 177.

19 A.   Yes.

20 Q.   And just -- well, can you just follow along with me.  This

21 first page, very briefly, Carl, what is this first page?

22 A.   That's a printout of my retirement account.

23 Q.   And this was the retirement account that you maintained at

24 Linode back when you were employed there?

25 A.   Yes.

*United States District Court*

1    Q.   And then the next couple pages, those pages look like they
2    go with that printout; is that correct?
3    A.   Yes.
4    Q.   And then we go down to the next page, which is 6.
5         And is this another printout from the Linode retirement
6    account?
7    A.   Yes.
8    Q.   And is this related to the 401K benefit that you received
9    while working at Linode?
10   A.   Yes.
11   Q.   I'm going to keep going.  Just all the way down, if we
12   look all the way down to -- all the way down to the last page.
13   Those are all printouts from your Linode 401K benefit
14   retirement account that you maintained while you were employed
15   at Linode; is that correct?
16   A.   Yes.  It also has the annual profit-sharing deposit.  We
17   weren't allowed to get that into our savings account, personal.
18   Linode placed that annual deposit in the retirement account.
19          MR. CARSON:  I'd like to ask that this exhibit, which
20   is 177, be admitted.
21          MR. CAVALIER:  No objection.
22          THE COURT:  177 will come in.
23          (PLAINTIFF  EXHIBIT 177 WAS RECEIVED IN EVIDENCE.)
24          MR. CARSON:  I'm going to show you 178 next.
25   BY MR. CARSON:

*United States District Court*

1  Q.   178 is -- why don't you tell me what it is.  Can you see
2  it there?
3  A.   This is the Linode profit-sharing plan for Carl Williams,
4  myself, that I produced for the year, for the plan year
5  1/1/2016.
6  Q.   And this is another benefit that you received by virtue of
7  your employment at Linode?
8  A.   Yes.
9  Q.   It lists the benefits you received by virtue of your
10  employment at Linode, correct?
11  A.   Yes.
12        MR. CARSON:  I move to have Exhibit 178 moved into
13  evidence.
14        MR. CAVALIER:  No objection.
15        THE COURT:  All right.  178 will come in.
16        (PLAINTIFF EXHIBIT 178 WAS RECEIVED IN EVIDENCE.)
17  BY MR. CARSON:
18  Q.   And so we've heard from Mr. Staller that at the end of
19  every year, after December 31st, and at the end of the year you
20  receive a profit-sharing payment because of the benefit from
21  Linode for the previous year, correct?
22  A.   Yes.
23  Q.   And so that statement we just looked at shows what you
24  received from the profit-sharing for the 2016 year, correct?
25        The one we just looked at, the 2016 statement.  Is it from

1  2016, from the work you did in 2016?

2  A.   So I would have gotten that in --

3  Q.   Just was that what we looked at, that document?  Do you

4  need to see it again?

5  A.   I might need to see it again.

6        MR. CARSON:  You can put 178 back up real quick.

7  Sorry.

8  BY MR. CARSON:

9  Q.   That shows your profit-sharing benefit for that year,

10  right?  2016?  Right?  It says 1/1/16 to 12/31/16, right?

11  A.   Yes.

12  Q.   Right.  Okay.  So when did you receive that profit-sharing

13  payment?

14  A.   That would have been received in the second or third

15  quarter - things changed, but at that point in time it was the

16  second quarter of 2017 for the plan year of 2016.

17  Q.   Let's just keep it simple, though, right?

18        The profit-sharing that you received for the 2016 year,

19  you received in 2017, right?

20  A.   Yes.

21  Q.   Okay.  And the profit-sharing you received for the 2017

22  year, you got in 2018, right?

23  A.   Yes.

24  Q.   And for 2019, you got it in 2020?

25  A.   Yes.

*United States District Court*

1  Q.   And for 2020, did you get it in 2021?

2  A.   No.

3  Q.   You weren't employed there anymore, right?

4  A.   No.

5  Q.   So that was the first time after your employment ended

6  that you weren't working there at the time your profit-sharing

7  should have been paid out, right?

8  A.   Yes.

9  Q.   And did you ask anyone about that, when it didn't come?

10 A.   Yes.

11 Q.   Who did you ask?

12 A.   I hired --

13 Q.   Just who did you ask?  The name?

14 A.   Milberg Consulting.

15 Q.   You asked Milberg Consulting.  And you said that was the

16 plan administrator?

17 A.   Yes.

18 Q.   What did they say?  Did they say whether it was owed to

19 you?

20         MR. CAVALIER:  Objection.  Hearsay.

21         THE COURT:  Overruled.

22         THE WITNESS:  Yes.

23 BY MR. CARSON:

24 Q.   Did they say -- was it owed to you?

25 A.   Yes, they did.

*United States District Court*

1  Q.   Did you ask them why didn't it come?  Yes?  No?

2  A.   No.  At this time I had hired -- I filed an EEOC complaint

3  and I had an attorney, so I let them contact Linode.

4  Q.   Do you know whether they did contact Linode?

5  A.   Yes, they did.

6  Q.   Did they let Linode know that the profit-sharing wasn't

7  received?

8  A.   Yes.

9  Q.   Did you ever receive it?

10 A.   No.

11 Q.   From then until now, had you ever received it?

12 A.   No.

13 Q.   So is it your position that right now you're owed the

14 profit-sharing for the work that you did in 2020?

15 A.   Absolutely.

16 Q.   What do you want from this case?  Can you tell the jury

17 what you'd like to have happen?

18 A.   I want to recover the losses that I suffered from the

19 discrimination that I suffered that happened at Linode.  I just

20 want to be made whole with what my losses were.

21 Q.   And if we're going to break those losses down into

22 categories, can you talk about just one of the categories of

23 losses -- so when you say "I want to be made whole," what do

24 you mean?

25 A.   My back wages.  The profit-sharing should have been given

*United States District Court*

1  to me for plan year 2020 anyways, but I filed an EEOC complaint

2  right after my termination, so...

3  Q.   Is that the complaint that initiated the case that we're

4  all here today for?

5  A.   Yes.  That was something that I did.  And so I have -- I

6  have suffered emotionally.  Emotionally that has taken a toll

7  on my body and my spirit of -- a cutting of my dignity, and I

8  have to suffer for that, always suffer for that because of who

9  I am.

10         MR. CARSON:  I don't have anymore questions, Your

11  Honor.

12         THE COURT:  Okay.

13         MR. CARSON:  Thank you, Carl.

14         THE COURT:  Mr. Williams, you got to stay there.

15         THE WITNESS:  Oh, I'm so sorry.  Sorry, Judge.

16         MR. CAVALIER:  May I, Your Honor?

17         THE COURT:  Go ahead, Mr. Cavalier.

18                    CROSS-EXAMINATION

19  BY MR. CAVALIER:

20  Q.   While I'm getting set up here, let me just ask you, we

21  spent a lot of time talking about this profit-sharing bonus

22  that is in dispute here.  I think we heard lots of testimony on

23  it.

24         Do you know what the amount in dispute there is?

25  A.   Profit-sharing bonus.  It's a profit-sharing plan, it's

*United States District Court*

1    not a bonus.

2    Q.    How much money do you claim to be owed under this

3    profit-sharing plan that you weren't paid by Linode?

4    A.    That number is determined at the end of the plan year by

5    Chris Aker based on company performance.  So that number,

6    whatever it should be, is the number that I lost, and that's

7    how much it is.

8              MR. CARSON:    Sorry, John.

9    BY MR. CAVALIER:

10   Q.    So you'd agree with me here that you're asking the jury to

11   make you whole, I think you said, for, among other things, that

12   profit-sharing plan that you claimed you weren't paid under,

13   correct?

14   A.    Yes.

15   Q.    So how much money are you asking the jury to award you

16   that you weren't paid under the profit-sharing plan?

17   A.    The amount of money -- that I hope that we learn from

18   Richard Ford -- that was given to all employees who met the

19   1,000 hours during the -- the eligibility period is while you

20   were an employee at Linode for that year, you had to have 1,000

21   hours worked.

22   Q.    It's about $3,000, yes?

23   A.    $3,000?

24   Q.    Yes.  At least that's what your expert told us, right?

25   A.    No, no.  That is the 401K contributions that Linode

*United States District Court*

1  independently puts into my retirement plan.  So each and every

2  pay period, because it's a safe harbor plan, if you make more

3  than $120,000, Linode can't put in the normal 401K number that

4  I was given when I made 120, Vincent Palochko told me since I

5  got a pay raise one time, I am now a highly paid employee and

6  they won't be able to give me a 401K contribution anymore.  And

7  I said, "Well, that was promised to me."

8        And after some discussion, he finally admits to me that

9  he's -- that those employees --

10  Q.  So the question is --

11  A.  Those employees would get a contribution every other --

12  you know, the 401K distribution, but it will be marked as

13  profit-sharing in the 401K, and that's what the expert witness

14  stated.

15  Q.  Sir, the question is, do you know how much you claim to be

16  owed under the profit-sharing plan?

17  A.  Generally six percent of your salary is what happened the

18  previous year.

19  Q.  Okay.

20  A.  It changes.

21  Q.  Okay.  Do you -- since you mentioned being highly

22  compensated and the effect that has as to eligibility under

23  certain plans, do you recall reading in the Linode

24  profit-sharing plan that highly compensated employees, in

25  addition to working the 1,000 hours, were also required to be

*United States District Court*

1  employed on the date the bonus was paid in order to receive it?

2  A.   No, that's not true.

3  Q.   So you're not familiar with that part of the plan?

4  A.   I am familiar with the plan.  What you're talking about is

5  the profit-sharing 401K bi-weekly contributions.  That's not

6  the annual profit-sharing deposit.  There are two things as

7  part of that plan.  My 401K contribution, which Linode then had

8  to change that bi-weekly, yes.

9       For my 401K contributions that are -- I have to be an

10  employee to receive that benefit, but not the profit-sharing

11  annual deposits.

12  Q.   So it's a no, you disagree with my statement?

13  A.   Yes.

14  Q.   Okay.

15  A.   It's a no.

16  Q.   Okay.  Let me move on to a different topic then before we

17  break for lunch.  I want to talk to you about the meeting

18  recording that we just listened to.

19  A.   Yes.

20  Q.   Let's just put it out there.  During the meeting at which

21  you were terminated, you believed that you were being

22  terminated by Linode due to your association with John Musbach,

23  correct?

24  A.   I did not have that belief.

25  Q.   Is there a reason -- I tried to count the number of times

1  you asked whether it was because of your affiliation with John

2  Musbach, and I wasn't able to.

3      Do you remember how many times you asked the question

4  about whether your termination was due to your affiliation with

5  John Musbach?

6  A.  Yes, I did ask the question.

7  Q.  Do you know how many times you asked the question?

8  A.  Let the record speak.  I don't --

9          MR. CARSON:  I'll stipulate it's a lot.

10          THE WITNESS:  It's a lot.

11          MR. CAVALIER:  Fair.

12  BY MR. CAVALIER:

13  Q.  So is it fair then to say that you suspected at that time

14  that you were really being terminated due to your association

15  with John Musbach?

16  A.  No.  I believed that the reason was -- what reason they

17  were going to give was, quite frankly, a bullshit reason.  It

18  so happens that I believed that Linode was going to use that as

19  a reason, but it did not happen.

20  Q.  You didn't say in that call that we listened to, you

21  didn't ask Mr. Palochko in one of the many times that you

22  raised John Musbach's name, whether they were using that as an

23  excuse to terminate you.  You asked repeatedly whether you were

24  being terminated due to what happened last week with John

25  Musbach.

*United States District Court*

1    Do you remember hearing that?

2  A.   Yes.

3  Q.   So it's your testimony here today that despite repeatedly

4  asking that question, it was not your belief at the time that

5  you were actually being terminated for, in your words, what

6  happened with John Musbach the prior week?

7          MR. CARSON:  Objection.  Asked and answered.

8          THE COURT:  Overruled.

9          THE WITNESS:  Can I hear the question again?

10          MR. CAVALIER:  Certainly.

11  BY MR. CAVALIER:

12  Q.   My question is that you didn't say during that call,

13  Vincent, as you call him, you're actually terminating me -- let

14  me scratch that and ask you a different way.

15    You didn't say to Mr. Palochko, I have a concern that

16  you're using what happened with Mr. Musbach last week as an

17  excuse to terminate me.  You're asking him repeatedly, this is

18  because of what happened with Mr. Musbach last week, correct?

19  A.   Yes, I said that.

20  Q.   Okay.  And what had happened with Mr. Musbach the prior

21  week?

22  A.   John Musbach was arrested.

23  Q.   For what?

24  A.   For murder for hire.

25  Q.   And what was the nature of the murder for hire that he was

*United States District Court*

1  attempting to perform?

2  A.   What I knew at that time?

3  Q.   You can tell me both, if you'd like.

4        MR. CARSON:  Objection, not both --

5        THE COURT:  No, it's overruled.

6        THE WITNESS:  Murder for hire.  He went to a -- it was

7  alleged that he went to a dark website and paid to hire a

8  person to murder a 14-year-old person.

9  BY MR. CAVALIER:

10  Q.   And what was the context of his relationship with that

11  14-year-old person?

12  A.   He and the 14-year-old person exchanged photos of each

13  other.

14  Q.   What was the nature of the photos they exchanged with each

15  other?

16  A.   Their genitals.

17  Q.   They were pornographic photos, correct?

18  A.   I don't know.  I have no knowledge about -- I have no

19  direct knowledge of that.

20  Q.   We're going to get into a little more of that later, but I

21  want to keep this confined for now to the termination meeting

22  that you recorded.

23       We heard you say during that meeting that if Linode was to

24  terminate you because of your affiliation with John Musbach, it

25  would be defamatory.

*United States District Court*

1       Do you remember hearing yourself say that on that call?

2   A.   If --

3   Q.   That's just a yes-or-no question.

4   A.   Yes.

5   Q.   Do you remember also hearing that if they were to

6   terminate you due to your affiliation with John Musbach, it

7   would put your reputation in a false light?

8   A.   Yes, I said that.

9   Q.   Okay.  Now I'm going to ask you to explain why was that a

10  concern of yours at the time?

11  A.   No matter what the reason they were giving, if I was

12  terminated at this moment, that would put me in a false light,

13  which would be more than Dan terminating me previously.  So --

14  Q.   Why was that?

15  A.   By doing the -- Dan did not want to work with me anymore.

16  By doing it at this moment would put me in this light that

17  somehow I am connected to some kind of despicable conduct that

18  was alleged between John Musbach and this individual, the

19  14-year-old, and I thought having that done at this time the

20  termination made it even worse than terminating me -- the

21  termination would have happened regardless, and now this comes

22  up and I'm being terminated.  I would have been terminated by

23  the end of the year regardless.

24  Q.   So if I understand you correctly, you were concerned that

25  people in the world, outside society, whoever, would see that

*United States District Court*

1  you were being terminated close in time to when Mr. Musbach had

2  these new charges levied against him and that would bring your

3  reputation into disrepute?

4  A.   No.

5  Q.   So who were you concerned about your reputation being

6  defamed in front of?

7  A.   Linode.  Linode.

8  Q.   Only within Linode you were worried about your reputation?

9  A.   Those are the people that I work with.

10 Q.   Okay.  So if you were worried about the people in Linode

11 assuming or seeing your affiliation with Mr. Musbach and

12 viewing you poorly for that relationship under those

13 circumstances, isn't it fair for the company to also worry

14 about the way its employee would be seen as being affiliated

15 with that person?

16          MR. CARSON:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  The company put me in that position.

19 BY MR. CAVALIER:

20 Q.   The company didn't put you in any position with

21 Mr. Musbach.

22          MR. CARSON:  Objection.  Is that a question?

23          THE COURT:  That's sustained.

24 BY MR. CAVALIER:

25 Q.   The company didn't put you in any position with

1  Mr. Musbach, correct?

2  A.    Through the termination they were connected -- by doing

3  the termination at that time, it's putting me in that false

4  light.

5  Q.    So the timing of it is connecting you to Mr. Musbach in a

6  way that you thought reflected negatively on you, correct?

7  A.    Within Linode employees I thought that it was -- for me it

8  would be humiliating to be terminated at that moment, but I

9  would have been terminated regardless.

10 Q.    So again, I'll ask the question.  Given that you were

11 so -- we heard that you were angry in that meeting, right?

12 A.    I was emotionally upset.

13 Q.    You were angry, right?

14 A.    I was upset because I wasn't getting an answer.  So no, I

15 -- I wanted to have the answer given to me.  I wanted the

16 respect that goes along with being an employee for six years,

17 and I wasn't getting that.

18 Q.    And you were upset that the people at Linode would think

19 that you had something to do with Mr. Musbach's behavior,

20 right?

21 A.    I thought that by terminating me in this manner would

22 humiliate me even more, and I could not see the -- I could not

23 see another person at Linode, for example, who would be a

24 female worker whose husband did something like that, would they

25 have fired the female worker?  This, to me, was just consistent

*United States District Court*

1 with discriminatory prejudgments and associations that only was

2 in the minds of Dan Spataro.

3 Q.  You don't know what's in Dan Spataro's mind.

4 A.  I do know what's in his mind from his behavior and conduct

5 towards me.

6 Q.  We're going to talk a lot about that behavior today.

7       But again, I'm going to ask you the question.  Given your

8 fear that you would be humiliated due to others linking you

9 with this association with Mr. Musbach, isn't it fair for

10 Linode to be worried about its reputation when that same

11 relationship is exposed in the newspaper?

12 A.  No, I did not have that fear.

13 Q.  I'm not asking what you had.  I'm asking, isn't it

14 reasonable for Linode to have that fear?

15 A.  No.  Temple University never had that fear.

16 Q.  Well, you don't know if Temple University ever saw the

17 article, do you?

18 A.  It's -- everybody has the same access, John.

19 Q.  Have you ever given them the article?

20 A.  I never gave Linode the article.

21 Q.  Right.  But we know Linode saw the article now, right?

22       MR. CARSON:  Objection.

23       THE COURT:  Overruled.

24 BY MR. CAVALIER:

25 Q.  We don't know whether Temple saw it -- I heard you say

*United States District Court*

1   this when Mr. Carson was asking you questions about whether you

2   need to pass a background check at Comcast.

3       We don't know if Comcast saw the article either, right?

4   We don't know what their reaction would be?

5   A.   Everybody has access to the same information.

6   Q.   That's not the question.  My question is very simple.

7   It's, do you know if Comcast or whether anybody at Comcast ever

8   saw the article at issue in this case?  We're going to look at

9   it later but --

10  A.   I do not know.

11  Q.   You do not know.  You said that you were -- and I'm going

12  to circle back to this, but since you brought it up -- you said

13  you applied to interview at Google several time?

14  A.   Yes.

15  Q.   And you made it into the process a long ways, but

16  eventually were turned down for the job, correct?

17  A.   Yes.

18  Q.   Do you know whether anyone at Google -- pardon the pun,

19  but Googled the article?

20          MR. CARSON:  Objection.  Speculation.

21          THE COURT:  Overruled.

22          THE WITNESS:  No.

23  BY MR. CAVALIER:

24  Q.   So you don't know sitting here today whether the fact that

25  this article is out there is the reason why Google turned you

*United States District Court*

1  down for a job?

2  A.   No.  They told me a different reason.  They never gave me

3  that as a reason.

4  Q.   They told you a different reason, but we don't know

5  whether they ever saw the article, do we?

6          MR. CARSON:  Objection.  Speculation.

7          THE COURT:  Overruled.

8          THE WITNESS:  I don't know.

9          MR. CAVALIER:  Your Honor, this is a natural breaking

10  point, if you want to send the jury to lunch.  I can keep

11  going, whatever your preference is.

12          We're about to get into some long documents, that's

13  why I'm --

14          THE COURT:  We can take a break, that's fine.  Based

15  on my schedule, we're not going to come back until about 1:30.

16  So we'll do that, take a break.

17          Again, you know, go out, clear your heads.  Don't keep

18  thinking about the case, don't be talking about the case --

19  definitely don't be talking about the case.  But don't be

20  talking about the case with anybody, each other, friends,

21  family, anybody else you might chat with over lunch.  Don't

22  look things up.  This is not the time to do that.

23          You have to decide the case only based on what you're

24  hearing and what you will see and hear in here.

25          Okay.  We'll break for lunch, be back at 1:30, and

                    *United States District Court*

1  we'll get started.  Okay.

2          THE COURTROOM DEPUTY:  All rise.

3          (Jury exits the courtroom at 12:13 p.m.)

4      MR. CAVALIER:  Your Honor, I just want to say, I know

5  you work during lunch because we got emails from your chambers

6  this week trying to set conference calls in the other case.

7          THE COURT:  Yeah.  So I have a couple things over

8  lunch.  I usually try to do them -- I don't want to cut things

9  off early, so I usually try to do them at 12:30, 1:00.

10          We'll come back at 1:30 and get started.  Obviously,

11  Mr. Williams is on cross, he should not be talking to

12  Mr. Carson during the lunch break.

13          And just ball-parking it, do you think you'll get done

14  today, Mr. Cavalier?

15      MR. CAVALIER:  I am desperately hoping that I will.

16  I'm less encouraged than I was earlier based on the nature of

17  that exchange, but I will try my best to --

18          THE COURT:  I'm not holding you to it.  I

19  understand --

20      MR. CAVALIER:  And I get that.  The jury -- you know,

21  I have a belief that a jury has a finite attention span, and so

22  I will do my very best to get to a new point in the case by

23  tomorrow.

24      MR. CARSON:  I would like to say just one thing real

25  quick, Your Honor.

*United States District Court*

1           THE COURT:  Yes.

2           MR. CARSON:  So yesterday there was someone that

3    saw -- again, there were some people that came in the

4    afternoon.  And as we were leaving, some of them were talking

5    about the trial and the juries were -- some of the jury members

6    were right there and there was some -- I don't want to say what

7    was said, but it was some pretty subjective ideas of what was

8    going on.

9           I don't think you need to say anything, but I would

10   ask you to just tell both sides that if anyone comes, they need

11   to be very careful about what they say in front of the jury.

12          THE COURT:  Yeah, I don't know who was here.  There

13   were a number of people here, Mr. Carson.  I'm not aware if

14   they were associated with either side.

15          MR. CARSON:  They were from Akamai.

16          THE COURT:  They were from Akamai?

17          MR. CARSON:  Yeah.  And they called my client gay and

18   I think there was a juror right there.

19          THE COURT:  Okay.  But again, I don't know that they

20   were -- how do you know they are from Akamai?

21          MR. CARSON:  Because they were recognized by my

22   client.

23          THE COURT:  Okay.  I'm not aware that that's the case.

24   Some of the people who were in the courtroom, I'm fairly

25   certain, are interns from other judicial chambers in the

*United States District Court*

1  courthouse.

2        MR. CARSON:  Okay.  I'm not mad about what happened

3  yesterday.  I just want everyone to just be mindful.

4        THE COURT:  Again, okay, if there are people who are

5  associated with one side or the other, they should mind

6  themselves and not say anything.  It's very hard for me to

7  police.  And there will be people coming in and out during the

8  course of the week.  I know there's a couple of judges who have

9  a number of interns and they generally look for proceedings to

10 go observe.  So it's hard for me to monitor who's here, who's

11 not, and particularly once they go out those doors, what's

12 being said.

13        But if they are -- you know, certainly if they are

14 associated with one side or the other, they should do their

15 best to keep their chatter down.

16        Okay?  I'll see everybody here at 1:30.

17        MR. CAVALIER:  Thanks, Your Honor.

18        THE COURT:  Okay.

19        (Luncheon recess taken from 12:16 p.m. to 1:38 p.m.)

20        THE COURTROOM DEPUTY:  All rise.

21        THE COURT:  Have a seat, everyone.  Go ahead and get

22 the jury in.

23        MR. CAVALIER:  Your Honor, will you be taking an

24 afternoon break?

25        THE COURT:  Probably, because I feel like going beyond

*United States District Court*

1 two hours is probably a little much for the jury, but let's

2 just see how it goes.  I'll try to keep it short if we do.

3          THE COURTROOM DEPUTY:  All rise.

4          (Jury enters the courtroom at 1:39 p.m.)

5          THE COURT:  All right.  You can all have a seat.

6          Mr. Williams, come on up, and we'll resume

7 Mr. Williams' cross-examination.

8          MR. CAVALIER:  Permission, Your Honor.

9          THE COURT:  Go ahead.

10          MR. CAVALIER:  Thank you.

11 BY MR. CAVALIER:

12 Q.   Mr. Williams, before we broke for the lunch break, we were

13 talking about that recording of your termination meeting.  Do

14 you remember that?

15 A.   Yes.

16 Q.   And we were talking about your remarks, at least your

17 remarks to Mr. Palochko, as to what you thought the real reason

18 for your termination was.  Do you remember that?

19 A.   No.

20 Q.   Do you remember there was discussion about the reason you

21 were being terminated on the call, on the meeting, recording?

22 A.   The discussion was that I was terminated due to repeated

23 policy violations.

24 Q.   Right.  You were asking them for the real reason for your

25 termination, correct?

*United States District Court*

1  A.   I was asking for the reason for my termination many times.

2  Q.   Okay.  Can we at least agree that you never once, during

3  that meeting, when you were asking -- you know, when you were

4  saying to them that the real reason is what happened with

5  Mr. Musbach, wasn't it?  Can we at least agree that you never

6  once said on that phone call the real reason I'm being

7  terminated is because of my age?

8  A.   That is correct.  I did not say that.

9  Q.   Can we also agree that you never said anything on that

10 call asking whether the real reason for the termination was

11 your sexual orientation?

12 A.   I can't say that one way or the other.  Because, in my

13 mind, just the impact on me and...

14 Q.   Setting aside the impact on you, can we agree that you

15 never said, during that meeting, this is because I'm gay, isn't

16 it?

17 A.   When I stated that was discrimination, their -- the --

18 what I considered the false reasons that I thought they were

19 going to put up to me, it in itself --

20      MR. CAVALIER:  Your Honor, I'm going to ask that that

21 be stricken as non-responsive and the witness be directed to

22 answer.

23      THE COURT:  Yeah.  Let's -- I'm not going to strike

24 it, but I want you to answer his questions directly,

25 Mr. Williams.

*United States District Court*

```
 1            THE WITNESS:  Okay.  I'll listen carefully.  I'm
 2    sorry.
 3    BY MR. CAVALIER:
 4    Q.   Can we agree that you never said during that meeting the
 5    real reason you're firing me is because I'm gay?
 6    A.   I didn't use those words, no.
 7    Q.   Okay.  So let me move on from that call for now, at least.
 8    We've been here for the better part of three days now, and
 9    you've been talking with your attorney as he's taking you
10    through your Linode journey, as you call it, correct?
11    A.   No.
12    Q.   No, that's not what we've been doing for the last
13    three days?
14    A.   I've been discussing the -- my discrimination at Linode.
15    Q.   You called the story we've been hearing the last couple
16    days your Linode journey, right?
17    A.   I tried to explain my journey to Dan.  Is that what you're
18    talking about, that part of the testimony?
19    Q.   I thought that that was what we were doing these last
20    couple days in court.  You were explaining to the jurors your
21    Linode journey, your Linode experience?
22    A.   These were things that happened to me at Linode.
23    Q.   Okay.  Can you agree with me that we've looked at lots of
24    documents over the last three days during your testimony?
25    A.   Yes.
```

*United States District Court*

1  Q.   Okay.  And we've seen at least a dozen financial documents

2  during that time period, correct?

3  A.   Yes.

4  Q.   And again, it's day three of trial.  Can you agree with me

5  that we have not yet seen a single document in this case where

6  you say to anybody at Linode, I feel like I'm being

7  discriminated against based on my age?

8  A.   I don't have those documents.

9  Q.   Okay.  So we can agree on that?

10  A.   You -- yes.

11  Q.   Can we also agree that we have not seen a single document

12  in the three days of this trial in which you complained to

13  anyone at Linode about sexual orientation discrimination?

14  A.   Those documents, the ones that do exist, have been --

15        MR. CAVALIER:  I'm going to object to the answer

16  before it comes out, Your Honor.

17        THE COURT:  So the question is:  Have there been any

18  documents shown in this case?

19        THE WITNESS:  Yes.  My Pennsylvania Human Relations

20  Commission document.

21  BY MR. CAVALIER:

22  Q.   That wasn't submitted to anyone at Linode, right?  That

23  was submitted to the PHRC?

24  A.   That was submitted at Linode.

25  Q.   You didn't give it to anybody at Linode, right?

*United States District Court*

1  A.   We discussed it at Linode in that document, yes.

2  Q.   Did you give it to anybody at Linode?

3  A.   Yes.  We were in the room discussing this charge.

4  Q.   I'm going to ask it again.  Did you give that document to

5  anybody at Linode?

6  A.   No.  I had it and we were discussing it.

7  Q.   Okay.  I'm going to ask the original question, again, so

8  we can get a clear answer, and I'll clarify in this way:  Other

9  than the EEOC or the PHRC document that you filed with the

10  PHRC, have we seen any document in this case where you have

11  said to anyone at Linode, hey, I feel like I'm being

12  discriminated against or harassed on the basis of my sexual

13  orientation?

14  A.   Yes.  There are many documents that give context to that

15  that I have shown.

16  Q.   What document have we seen that shows that?

17  A.   The documents relating to Vincent Palochko shortly after

18  my filing of the Pennsylvania Human Relations Committee --

19  Commission document.

20       After my meeting with Dan and Tom, you will see in Vincent

21  Palochko's thread, that you're going to show, my response to

22  what Dan and Tom told me about the reason of not being --

23  not -- of them not promoting me.  And I sent the -- in

24  response, I sent to -- my Temple University evaluation that I

25  just received two weeks later to Vincent Palochko and asked --

United States District Court

1  told him, as you can see in the text, to please put that in my

2  personnel folder.  It shows that I work with and instruct

3  younger people, and it shows how I can work with younger people

4  and manage them.

5      And in April and May, I then got my second performance

6  evaluation from Temple and then submitted that again and asked

7  Vincent to place it in my personnel folder, and he said done.

8  Q.  Let me stop you for a second.  I agree with you.  That's

9  in your communications with Vincent Palochko, and we're going

10  to go through that document at length and we'll see that.

11     But I'm going to ask you again:  What does that have to do

12  with you telling Vincent Palochko, I feel like I'm being

13  discriminated against based on my sexual orientation?

14  A.  Those messages of the Slack messages to Peter Fu on

15  June 15th --

16  Q.  That's not what we're talking about.

17  A.  You have those documents, John.

18     MR. CAVALIER:  I'm going to object and ask that that

19  be stricken.

20     THE COURT:  That will be stricken.

21     Again, Mr. Williams, the question is:  What documents

22  have we seen in this trial so far?  That was the question that

23  was asked of you.  I'm going to ask you your response to that.

24     THE WITNESS:  No.  No. I did not discuss that in Slack

25  messages.  I discussed it --

*United States District Court*

1          MR. CAVALIER:  Objection.

2          THE WITNESS:  No.

3          MR. CARSON:  Can we get a question?

4          THE COURT:  So I think the question is -- and I want

5     you -- the question Mr. Cavalier asked you was:  What documents

6     have been shown in the course of the trial so far that show you

7     complaining about sexual orientation and discrimination?

8          THE WITNESS:  Other than the Pennsylvania Human

9     Relations Committee, no, I don't have those documents.

10    BY MR. CAVALIER:

11    Q.   And in fairness to you, like I said, we're going to go

12    through that document that you had with Mr. Palochko in great

13    detail today.  So I want you to point out to me, as we're going

14    through it, if there's anything you see in there --

15         MR. CARSON:  Objection, Your Honor.

16         THE COURT:  Objection overruled.

17         MR. CAVALIER:  Thank you.

18    BY MR. CAVALIER:

19    Q.   If there's anything you see in that document as we're

20    going through, please point it out to me.  And what we're

21    looking for are instances of you saying to Mr. Palochko, the

22    director of HR for Linode, that you felt you were being

23    discriminated against based on your age or your sexual

24    orientation.  Okay?  So we're going to do that in a couple of

25    minutes.  Fair?

*United States District Court*

1  A.   Yes.

2  Q.   Just briefly, you were hired by Linode in 2014, correct?

3  A.   November of 2014, yes.

4  Q.   Okay.  And I think you talked about this a little earlier,

5  but just give us a reminder.  Who did you meet with during the

6  interview process?

7  A.   Chris Aker.

8  Q.   Anybody else?

9  A.   Tom Asaro.

10  Q.   Anybody else?

11  A.   Andrew Dampf.

12  Q.   And were those meetings in person?

13  A.   Alex Forrester.  Yes.

14  Q.   Okay.  How old were you when you were hired at Linode?

15  A.   50.

16  Q.   The people at Linode who were hiring you were generally

17  aware, since they met with you in person, of how old you were,

18  right?

19  A.   Yes.

20        MR. CAVALIER:  Tim, would you do me a favor and bring

21  up Exhibit 10?  Actually, let's look at Exhibit 33 first.

22        I believe this has been previously admitted, Your

23  Honor.

24        THE COURT:  33 did you say?  Yes.  Okay.  Go ahead.

25  BY MR. CAVALIER:

*United States District Court*

1    Q.   While Tim is pulling that up, let me back up a little bit.

2    When I asked you if you had ever complained about sexual

3    orientation discrimination to anyone at Linode, you referenced

4    your PHRC complaint?

5    A.   Yes.

6    Q.   But you didn't mention anything about sexual

7    discrimination in that complaint, did you?

8    A.   No.  It's an age discrimination complaint.

9    Q.   Okay.  I just wanted to clarify that.

10    A.   Sorry about that.

11    Q.   Mr. Williams, do you recognize this document, this portion

12    of the Linode handbook?

13    A.   Yes.

14    Q.   And what is it?

15    A.   It's the employee policy for non-discrimination.

16    Q.   Okay.  And this was a policy in effect at the time that

17    you were hired, correct?

18    A.   Yes.

19    Q.   And if you would, why don't you just read that first

20    paragraph for us, so we know what we're talking about, out

21    loud.

22    A.   "In order to provide equal employment and advancement

23    opportunities to all individuals, employment decisions at

24    Linode will be based on merit, qualifications and abilities.

25    Linode does not discriminate in employment opportunities or

 1  practices because of age, race, creed, color, national origin,

 2  citizenship, pregnancy, religion, sex, marital status,

 3  disability, genetic information, sexual orientation, or veteran

 4  status."

 5  Q.   Okay.  So can we agree, at least, that as of the time you

 6  were hired at Linode through the end of your employment there,

 7  the stated policy at Linode was that there was to be no

 8  discrimination in employment based on either age or sexual

 9  orientation, among other things?

10  A.   Yes, that's what's stated.

11  Q.   Okay.  And you received this handbook when you started

12  your employment at Linode, correct?

13  A.   Yes, I did.

14          MR. CAVALIER:  Tim, could you bring up exhibit --

15  before we leave that, I'm sorry, can you pop that back.  Let's

16  look at the next paragraph in that section briefly before we

17  move on.

18  BY MR. CAVALIER:

19  Q.   So this paragraph, Mr. Williams, let me know if you

20  disagree, but this is the paragraph that explains to Linode

21  employees what they should do if they feel like they are

22  subject to discrimination, correct?

23  A.   Yes.

24  Q.   All right.  And let's read that to the jury like you did

25  the first paragraph.

A.    "Employees with questions or concerns about discrimination
in the workplace are encouraged to bring these issues to the
attention of the management team and/or human resources.
Employees can raise concerns and make recourse without their
apprisal (phonetic).  Anyone found to be engaging in unlawful
discrimination will be subject to disciplinary action up to and
including termination of employment."

Q.    Okay.  So having read that, can you agree with me that as
of the beginning of your employment with Linode, the company's
stated policy was that if you had concerns that you might be
being discriminated against, for whatever reasons, you could
bring it to either human resources or the management team?

A.    Yes.

Q.    Okay.  And the stated policy of the company throughout the
course of your employment, additionally, was that if anyone was
found to be engaging in any kind of unlawful discrimination
within the workplace, that they would be disciplined up to and
including being fired, correct?

A.    Yes.

Q.    And again, you were aware of that from the outset of your
employment, yes?

A.    Yes.

Q.    By the way, I heard them mention, during your testimony
earlier with your lawyer, that you had written to Peter Fu
about the website, Linode's external website, at some point,

1  not including the designator age within its EEO statement?

2  A.   That was one of the things in this Slack message, yes.

3  Q.   Okay.  Can we at least agree that the policy of the

4  company itself throughout your employment was that age-based

5  discrimination was a violation of policy?

6  A.   Yes.

7  Q.   Okay.  Let's look through that message chain with

8  Mr. Palochko.

9        MR. CAVALIER:  It's Exhibit 22, Tim.

10 BY MR. CAVALIER:

11 Q.   And, Mr. Williams, this is a long document.  So if it

12 would help you, I can give you a paper copy if that would make

13 it easier for us to go through it.  Whatever your preference

14 is.

15 A.   That would probably with be best because I have not read

16 the whole thing.  I remember those two messages, but I'll be

17 quick if something happens.

18        MR. CAVALIER:  Approach the witness, Your Honor?

19        THE COURT:  Go ahead.

20 BY MR. CAVALIER:

21 Q.   Feel free to take it out and look.  Do you agree with me

22 that this document is what I'll refer to as a Slack message

23 chain?  Is that an accurate description?

24 A.   Yes.

25 Q.   Okay.  So the jury knows, a Slack message chain is,

*United States District Court*

1  essentially, a compendium or chronology of messages over a

2  certain period of time with one or more individuals, correct?

3  A.  Yes.

4  Q.  Sort of like a chat, chat text or a chat thread?

5  A.  Yes.

6  Q.  All right.  And can you tell us who this Slack thread

7  involved?

8  A.  This appears to be a conversation between @CWilliams,

9  which is my Linode Slack user name, and Vincent Palochko, the

10  HR manager.

11  Q.  Okay.  And was Mr. Palochko the HR manager at all relevant

12  times during your employment?

13  A.  Yes.

14  Q.  He was promoted at one point, correct, to director of

15  people operations?

16  A.  Director of human resources was his title when he was

17  promoted.

18  Q.  Okay.  But during your employment, as far as human

19  resource issues go, the buck stops with Vincent, correct?

20  A.  He reports to Tom Asaro, but yes.

21  Q.  As far as HR issues go?

22  A.  He -- top two.  There were HR issues and he talked to Tom

23  Asaro about them.  So I, you know.

24  Q.  That's fair.  Let me ask it this way:  In the policy that

25  we just looked at earlier --

*United States District Court*

1  A.   Yes.

2  Q.   -- when it says if you have concerns about discrimination

3  go to the management team or human resources, was it your

4  understanding during your employment that the human resources

5  mentioned in that policy was Vincent --

6  A.   Yes.  Yes, I do.

7  Q.   Okay.  And when did this thread begin?

8  A.   This began on May 1st, 2017.

9  Q.   And it looks like it began with an error, correct?  It

10  looks like Mr. Palochko is trying to reach out to someone named

11  Carl about his comp time being wrong.  But instead, it says,

12  "Shoot, I got the wrong Carl," there, correct?

13  A.   Oh, yeah.  Yes.  There were two Carls at Linode, and,

14  yeah, I see that now.  Thank you.

15  Q.   Okay.  As far as your communications with Mr. Palochko

16  here, they began on July 10, 2017, correct?

17  A.   Yes.

18       MR. CAVALIER:  Your Honor, at this point, I move to

19  admit and publish.

20       MR. CARSON:  No objection.

21       THE COURT:  Okay.  Exhibit 22 will be received.

22       (DEFENDANT EXHIBIT 22 WAS RECEIVED IN EVIDENCE.)

23  BY MR. CAVALIER:

24  Q.   Okay.  So let's go through this a little bit.  So on

25  July 17th, would you agree with me that you were reaching out

*United States District Court*

1   to Vincent Palochko about a money order that you were leaving

2   on his desk in relation to your 401K?

3   A.   That's what it says.

4   Q.   Okay.  So he responds back, "Hey, Carl, perfect.  I'll be

5   in Galloway tomorrow to pick it up."

6        And you discuss some other financial issues, correct?

7   A.   Is that Defendant's 659?

8   Q.   Defendant's 652, actually.  We haven't gotten that far

9   yet.

10  A.   Oh, I'm so sorry.

11  Q.   That's okay.

12  A.   Yes.

13  Q.   Okay.

14  A.   That's Milberg Consulting.

15  Q.   And again, since you referenced the Bates number, this

16  document begins on 0652, and it ends on 0749.  So it's just

17  slightly under a hundred pages long, correct?

18  A.   Yes.

19  Q.   All right.  Before we get into some more details here, is

20  it fair to say that during the four-year period that these

21  messages span that you viewed Mr. Palochko as a friend?

22  A.   I viewed him in a friendly manner.

23  Q.   Okay.  If you could, flip on over to 0653.  It's two pages

24  in.

25  A.   0563.

*United States District Court*

1  Q.   0653?

2  A.   0653.  Yes.

3  Q.   Okay.  And if you see down there, at the bottom,

4  August 14, 2017, you ask Vincent if he will be in Galloway this

5  week, "I need a copy of my old passport that you have in my

6  file as I need to get a new passport and I need that old copy."

7       Do you see that?

8  A.   Yes.

9  Q.   And Vincent responds a couple days later and says, "I

10 might be out there tomorrow.  If not, then definitely Monday or

11 Tuesday next week.  You can check with Tom to get access to

12 your file," right?

13 A.   Yes.

14 Q.   And later on that same chain on the next page, you tell

15 him that you can wait.  You have a discussion with him noting

16 that you and Dan are going to Europe for the European Peering

17 Forum in September.  So you need your new passport, right?

18 A.   Yes.

19 Q.   And then you ask if Linode would pay the fee for the

20 passport since you were going on business, right?

21 A.   Yes.

22 Q.   And if we flip over to the next page, Mr. Palochko tells

23 you that Linode will cover the cost.  You say thanks.

24      So you were discussing travel logistics with him during

25 that period of time, correct?

*United States District Court*

1  A.   I was discussing paying for the passport.

2  Q.   Okay.

3  A.   Because he was the person who approved those.

4  Q.   All right.  And he did respond affirmatively, right --

5  A.   Yes.

6  Q.   -- that the company would cover the passport?

7  A.   Yes.

8  Q.   All right.  If you look further down on that page,

9  October 17, 2017, you send him a message saying that you

10  thought he would find this interesting, and it appears to be an

11  article about a new California law that bans employers from

12  asking applicants about their prior salary.  Do you see that?

13  A.   Yes.

14  Q.   And he responds back on the following page, "Thanks.  They

15  were trying to do this in Philly, too, but the bill wasn't

16  passed."  And he sends you back an article, correct?

17  A.   Yes.

18  Q.   And down below you say, "California did it to help forward

19  women be on par with males in terms of salary," right?

20  A.   Yes.

21  Q.   And Vincent says, "Yep.  That was the intent in Philly,"

22  correct?

23  A.   Yes.

24  Q.   So you were having a discussion with the HR manager about

25  issues relating to human resources and pay, correct?

*United States District Court*

1  A.   Yes.  I shared those with him because I have an

2  understanding of those -- I'm interested in that area.

3  Q.   Right.  And he's the HR guy?

4  A.   That's not the reason I sent them.  Before this, it was

5  2014, and I had been sending them through another collaborative

6  tool.  And I was -- he didn't have human resource background,

7  and I kept on sending him interesting human resource related

8  articles, educational things.

9  Q.   Sure.  You thought they would be of interest to him?

10  A.   Yes, exactly.

11  Q.   And you thought that they might help him better do his

12  job?

13  A.   Exactly.

14  Q.   Okay.  If you could, go on over to 0657.  So if you see

15  that conversation beginning on November 27th, you're having a

16  discussion with him about, it appears, your out-of-network

17  insurance coverage?

18  A.   Yes.

19  Q.   And your deductible?

20  A.   Yes.

21  Q.   And so is it fair to say that he was the person at Linode

22  who you would go to if you had questions about your benefits?

23  A.   That is correct.

24  Q.   Okay.  And it seems like below that he is sort of walking

25  you through some issues that people have been having with

*United States District Court*

1  making benefit selections and tries to steer you in the right

2  direction in that respect, correct?

3  A.   That's what it says.

4  Q.   Okay.  Let's go to -- skip that one for now, and we'll go

5  over to 0659.  It's just one page forward.

6  A.   Page what?

7  Q.   0659, and it's about halfway down the page.  It's

8  January 23, 2018.  We're going to look at that.

9  A.   Yes.

10 Q.   So you write to him, "Hi, Vincent.  I think someone

11 internally is handing out our private cell phone information.

12 I got a call on my cell phone that said 'This is Carl Williams

13 from network'" -- or I'm sorry -- "'Is this Carl Williams from

14 network operations.'  When I asked who this was, he said he has

15 his own business.  And I said I couldn't help him and hung up.

16 I've never given out my cell phone to anyone without listing

17 network operations."

18      And then Vincent responds a little further down, "Okay.

19 I'll keep an eye out in case I hear anything similar."

20      Is it fair to say, then, that you were bringing to

21 Vincent's attention an issue internally where you were

22 concerned that somebody was giving out employee cell phone

23 numbers to external people or organizations?

24 A.   It appears to say that, yes.

25 Q.   Okay.  And it sounds like Vinnie is telling you to keep

*United States District Court*

1  him posted if you hear anything else on that front, correct?

2  A.  Yes.

3  Q.  All right.  Let's flip one more page to 0661.  Are you

4  with me?

5  A.  Yes.

6  Q.  Okay.  On March 8, '20 -- well, let's start at the top.

7  On March 7, 2018, it's looks like you're asking Mr. Palochko

8  about a lunch that was maybe scheduled for the bank building on

9  Wednesday.

10      Do you see that there?

11  A.  Yes.

12  Q.  Okay.  And was that kind of dialogue, sort of casual

13  dialogue about scheduling, was that normal practice for you and

14  Vincent?

15  A.  Scheduling.

16  Q.  Sure.  Was it common for you guys to chat about minor

17  scheduling matters?

18  A.  That's just asking if there's going to be lunch.  I don't

19  know what you mean by "minor scheduling."

20  Q.  Just that's not out of the ordinary for you guys to talk

21  about, right?  That kind of thing?

22  A.  This just says what it says.  I generally would share a

23  lot of human resource related materials that I came across

24  through many different ways.

25  Q.  Sure.  And we'll see more of those as we go through.

*United States District Court*

1  A.   I did that, even technical things, with people.

2  Q.   Sure.  And then on March 8th, a little further down,

3  March 8, 2018, a little further down, you write to him.  It

4  says, "Hi, Vincent.  Can we get the third floor to be warmer?

5  It is the middle of winter."

6       And Vincent writes back to you, "I don't have any control

7  over it, but I will gladly pass on the message to Chris."

8       Right?  So you were reaching out to Vincent to see if he

9  could doing something about the temperature in the office,

10 right?

11 A.   Yes.

12 Q.   And essentially he was telling you that he would see what

13 he could do, but it really wasn't in his purview, correct?

14 A.   That's correct.  Chris would run the -- if he was cold, if

15 he wanted to be cold, we all were cold.  That's...

16 Q.   Okay.  And down at the bottom of that page, on April 16,

17 2018, you note to him that you would like an adjustment on your

18 withholdings for payroll purposes, correct?

19 A.   Yes.

20 Q.   And again, he's the HR guy, so he's the one to go to for

21 that kind of thing, right?

22 A.   Yes.

23 Q.   Okay.  Let's flip to the next page there.  It's 0662.

24 April 20, 2018, you're pinging Vincent back again noting that

25 someone name Sal is playing with the -- I think that's

*United States District Court*

1  thermometer -- up here, the thermostat up here, he claims that

2  it's freezing, just wanted to let you know that he is working

3  on it.  And he writes back and says, "okay."

4       So that's another example of you asking Vincent to see

5  what he could do about the office temperature, correct?

6  A.   Yes.  I was trying to help other people.

7  Q.   Sure.  Sure.  So let's look at the bottom message there,

8  May 3, 2018.

9       Do you see that?

10 A.   Yes.

11 Q.   You say, "Hi, Vincent.  Lisa forgot to leave a large and

12 an extra large T-shirt, Linode, for the CEO of Kentech, who is

13 visiting us at 4:00 p.m. in the first floor conference room."

14      And Vince writes back and says, "Okay.  I'm not the person

15 to speak to about that."

16      You say, "Okay.  Thanks."

17      So again, he's sort of directing you that your issue or

18 your inquiry is better served by somebody else at Linode,

19 correct?

20 A.   Yes.  That was Kentech, our vendor, yeah.

21 Q.   Okay.  Let's flip to the next page and look at 0663

22 briefly.

23 A.   Yes.

24 Q.   So on May 14, 2018, this is an example of what you were

25 talking about earlier, right?  You're sending him an article

*United States District Court*

1    that you presumably think he might find useful in his role as

2    human resource manager, correct?

3    A.   Of the May 14, 2014 article?

4    Q.   Yes.

5    A.   That's correct.

6    Q.   And it looks like that article is from something called

7    Unconventional Leader and is titled or has something has to do

8    with working with complainers, right?

9    A.   Yes.

10   Q.   All right.  On June 15th there, June 15, 2018, there's

11   another discussion there about some kind of photo-shopping

12   being done where you say "I don't think the people who are in

13   the leadership role of the manager should be photo-shopping

14   photos of our employees with guests that we invited here.  I

15   don't think either would like it."

16        And then Vincent essentially says, "We asked you if you

17   asked him to photoshop another photo of Tom."

18        Do you see that there?  Do you remember what this was

19   about?

20   A.   I do.  Thank you for bringing it up.  Do you want me to

21   explain it?

22   Q.   Well, I'd like you to -- I don't want to take too much

23   time on the point but is it fair to say that you were raising

24   an issue that you didn't like with some behavior at the office

25   with the human resources director?

1  A.   If that's the question, I'd have to say there's -- that I
2  was raising the issue of this particular friend of mine that I
3  brought and he was going to get a job interview, and the
4  director of marketing photo-shopped him, turned it around as a
5  fairy, and posted it on our public Slack.  And since he was
6  interviewing --
7  Q.   Right.  He sort of got ahead of it, right, before he was
8  -- he was only interviewing correct?
9  A.   The director of marketing took a photo that I posted of
10 our Linode Philadelphia opening office with my gay friend,
11 photo-shopped it, placed it after my photo and mocked it with
12 him flying as a fairy.
13 Q.   Where does it say that here?
14 A.   You can see it in that Slack channel that's public.  So
15 Vincent saying, "Didn't you ask him to photoshop another photo
16 of Tom"--  his name is Dash Sears.  He worked at the ACLU and
17 was programming and was coming to Linode to apply and ask Peter
18 Fu can he do some coding for him because he's a Python
19 programmer.
20      So Vincent did not respond -- if you see the photo -- and
21 I asked to turn those photos over -- you would see the context
22 of this message.  And it was just he did not respond, and so I
23 put "I'm not happy about this."  Because if he came to get an
24 employment and he got the job, as I said, in Slack he would see
25 this derogatory change in his picture.  And --

*United States District Court*

1  Q.  And you didn't like that, right?

2  A.  It's inappropriate.

3  Q.  Sure.  So you were bringing it to the attention of the

4  director of human resource at the company, correct?

5  A.  Yes, but --

6  Q.  And he immediately says that he deleted those posts and

7  will speak with Dave, right?  So he took care of the issue

8  immediately?

9  A.  No, he did not.

10  Q.  Is that what it says here?

11  A.  He says, "Didn't you ask him to photo" --

12  Q.  I'm looking at the top of the next page where you say --

13  after you say, "Please do speak to him.  I'm not happy about

14  it.  He was a friend of mine.  He was even discussing a job

15  with Richard Ford when he was here."

16  A.  Yes.

17  Q.  He then says, "I deleted those posts and will speak with

18  Dave about it in just a minute."

19      So he handled the issue, right?

20  A.  Yes, he did, but I didn't understand why he tried to be

21  more forceful, but go on.

22  Q.  Well, the question was just -- I thought it was a

23  yes-or-no question, but he handled the issue, right, to your

24  satisfaction?

25  A.  He didn't handle it immediately, but yes, he eventually

1  handled it.

2  Q.   Well, clearly he handled it on the same day at least,

3  right?

4  A.   Yes, after --

5  Q.   After you brought it to his attention?

6  A.   After I expressed more details.

7  Q.   Right.  He asked you, didn't you ask him to do this, and

8  you said no.  And once he found out that you didn't ask him to

9  do it, he deleted it, took care of it, right?

10  A.   No, that's not how it worked.

11  Q.   Is that not what it says here?

12  A.   The other Slack thread is missing, so to understand

13  that --

14  Q.   Is it your contention that Vincent Palochko did not take

15  care of this issue?

16  A.   He eventually deleted it, yes.

17  Q.   Right.  To your satisfaction?

18  A.   Yes.

19  Q.   There's nothing else in here where you follow up and say,

20  hey, Vincent, I'm really still not happy about what happened

21  with that photo, it's still out there, I need you to do

22  something about it, right?

23      He told you, "I deleted those posts and will speak with

24  Dave," and that was the end of it from your perspective, right?

25  A.   Yes.

*United States District Court*

1   Q.  Let's look at that same page June 26th, 0664.

2       Here it looks like Mr. Palochko is bringing an issue to

3   your attention, and he says, "Hey, Carl, would you mind keeping

4   the food pictures to the Food Channel.  They've been pretty

5   off-putting, and I think especially to some people who do not

6   eat meat."  And then he says, "#Philly Foods was set up for

7   this reason."

8       Philly Foods, I'm assuming, is another Slack channel that

9   people can post food pictures and restaurant reviews in?

10  A.  I don't know.  I was never in that channel.  I was in the

11  off-topic channel when I posted the salmon.

12  Q.  You write back to him and say, "Hey, Vinnie, no problem.

13  Do I post meat pictures?"

14      "I don't eat meat anymore, only fish?"

15      And Vincent says, "Fish, yes."

16      And then you describe some of your other favorite foods

17  and the issue is put to bed, correct?

18  A.  Yes.

19  Q.  Would you agree with me that Vincent raised that issue

20  with you in a respectful manner?

21  A.  Yes.

22  Q.  Down at the bottom of that page, it's something that you

23  might remember me mentioning in my opening.  It's August 7,

24  2018, you messaged Vinnie and you say, "There was a bug

25  crawling around in the salad from in lobby.  It was on my

*United States District Court*

1  plate.  It is now in my garbage can if you want to verify."

2       Do you see that?

3  A.  I don't, but I'll agree with it.

4          THE COURT:  It's on the screen in front of you.

5          THE WITNESS:  Oh, there we are.

6  BY MR. CAVALIER:

7  Q.  Do you see that there?

8  A.  Yes.

9  Q.  All right.  So you were raising an issue with the food.

10 If you flip to the next page and we see Vinnie's response, he

11 says, "Sorry that happened to you, Carl."

12      Do you see that?

13 A.  Yes.

14 Q.  So again, you agree with me that you raised an issue to

15 Mr. Palochko and he responded in an empathetic manner, yes?

16 A.  Yes.

17 Q.  Okay.  On that same page, this is still 0665, on

18 September 5, 2018, you reach out and say, "Hi, Vincent."

19      He responds, "Hi, Carl."

20      And you say, "My desk was moved today when I came in."

21      Do you see that?

22 A.  Yes.

23 Q.  And by the way, on your direct examination your attorney

24 showed you a different exhibit and referenced my opening

25 statement and asked you if this was the document that you were

1  complaining about somebody moving your desk, and you said no.

2      Do you remember that?

3  A.  I don't.

4      MR. CAVALIER:  Tim, can you quickly pull up

5  Exhibit 89.

6      Okay.  This is previously admitted, it can be

7  published.

8  BY MR. CAVALIER:

9  Q.  Does this refresh your recollection at all as to the

10  moment I'm referencing from yesterday?

11  A.  Yes.

12  Q.  And I think he asked you whether you heard what I said in

13  my opening and whether this was you complaining about somebody

14  moving your desk, like I had said.

15      Do you remember that?

16  A.  I don't have a recollection of the desk moving here versus

17  here.

18  Q.  That's fair.

19      MR. CAVALIER:  We can take that down, Tim, and pop

20  back to Exhibit 22 at 665.

21          THE COURTROOM DEPUTY:  Is that other one 89?

22          MR. CAVALIER:  89, yes.

23          (Discussion held off the record.)

24          MR. CAVALIER:  Oh, I thought that was admitted

25  yesterday during plaintiff's counsel -- I can have it admitted

*United States District Court*

1  now if it makes a difference.

2          THE COURT:  89 is not in evidence.

3          MR. CAVALIER:  I apologize.  Do you want me to have

4  that admitted, Your Honor, just to clean up the record?

5          THE COURT:  Yes.

6          MR. CAVALIER:  Let's bring that back up, Tim.

7          MR. CARSON:  It's the same one that is admitted, so no

8  objection.

9          MR. CAVALIER:  Did we admit --

10         MR. CARSON:  It's the same document that --

11         THE COURT:  So you're saying it was admitted under a

12  different exhibit number?

13         MR. CAVALIER:  Yes.

14         THE COURT:  Well, I'll admit 89 without objection.

15         MR. CAVALIER:  Thank you.

16         (DEFENDANT EXHIBIT 89 WAS RECEIVED IN EVIDENCE.)

17         MR. CAVALIER:  We're back at 22 on page 0665.  Okay.

18  And we're going to look at the September 5, 2018, entry.

19  BY MR. CAVALIER:

20  Q.  On the third line there, do you see where it says -- you

21  were writing to Mr. Palochko, "My desk was moved today when I

22  came in without notice.  I think if directors or managers want

23  to move someone's desk, they should give them notice that such

24  moves will happen.  I worked 31 years and this is the first

25  time that has happened to me."

*United States District Court*

1     Do you see that?

2   A.   Yes.

3   Q.   So you were upset because somebody in the office moved

4   your desk without telling you, correct?

5   A.   I don't know if that's the right word, but it states what

6   it states.

7   Q.   All right.  And Mr. Palochko writes back to you and says

8   it was moved to accommodate someone named Roland.  And then he

9   asks you, "Was the desk itself just moved over or were all of

10  your belongings moved?"

11     And you write back, "Doesn't matter why.  The fact is that

12  a notice and a proper moving should be done."

13     And Mr. Palochko repeats the question.  He says, "The desk

14  itself just moved over or were all of your belongings moved?"

15     And you say, "Everything was moved."  And then you raise

16  an unrelated problem that you think the fire department will

17  have with the area.

18     Do you see that?

19  A.   Yes.

20  Q.   So is it fair to say that on this particular day in

21  September 2018, you were upset because your desk had been

22  moved?

23  A.   Not really.  What I'm -- I'm sharing information with

24  Vincent because Vincent is in charge, and it's part helping

25  with him with understanding what's going on, with that -- with

1  the types of HR things that I viewed that he did.

2  Q.  So you thought it was important enough to bring it to his

3  attention?

4  A.  Yes.

5  Q.  Okay.  And Vincent writes back to you there at 8:13 a.m.,

6  "Let me see what I can find out about why that happened."

7       And he says, "In re fire department, I'll check out the

8  configuration and make sure we're okay."

9       So he's telling you that he's going to look into the issue

10 that you raised, correct?

11 A.  Yes.

12 Q.  Let's move over to 66, which is on the next page,

13 September 12, 2018.

14      Do you see that there?  Vincent Palochko reaches out to

15 you?

16 A.  Yes.

17 Q.  He says, "Hi, Carl.  I'm just curious, do you do this

18 artwork yourself?  It's pretty neat."

19      Do you remember when he reached out to you about that

20 artwork?

21 A.  Yes, I do.

22 Q.  And you explained to him what artist you were using and

23 where you got the design and how you had him hand draw the

24 illustrations, correct?

25 A.  Yes.

*United States District Court*

1  Q.  And he's complimenting you on the artist you found and

2  this art that you --

3  A.  He's complimenting, yeah, upwork is great.

4  Q.  Let's go over to 668.  This is September 17, 2018.  And

5  you write to Mr. Palochko about a denial of your PTO for

6  Thursday.  And it carries on for some distance, and at the

7  bottom he says, "Unfortunately, I can't carry that amount of

8  hours over."  And he further explains why your PTO is denied,

9  correct?

10  A.  Uh-huh.  It was that it was going to expire because I

11  hadn't used it.  I didn't take PTO, so it expires at a point in

12  time.

13  Q.  Okay.  But you thought that it was an issue that was

14  important enough to you, this PTO issue, to bring it to his

15  attention and see if he can give you some answers on why it was

16  denied, correct?

17  A.  It expires -- the PTO was expiring and I asked if I could

18  extend it for a little bit of a period of time because I didn't

19  go on vacation.

20  Q.  Okay.  And he explained to you why what you were looking

21  for couldn't be done, correct?

22  A.  Yes.

23  Q.  Do you agree with me that he answered your inquiry in a

24  respectful way?

25  A.  Yes.

*United States District Court*

1  Q.  Let's move over to 670.  If you see there, we have some

2  more PTO questions, and then you reach out to let him know that

3  you -- or to ask him whether he got the Linode peering sticker

4  that I left for you on your desk, right?

5  A.  Yes.  I left a Linode peering sticker on his desk, I

6  remember that.

7  Q.  And he wrote back and he said, "I did" -- exclamation

8  point -- "thanks, Carl.  This is really cool."

9  A.  Yes.

10  Q.  So that's a friendly interaction, yes?

11  A.  Yes.

12          MR. CAVALIER:  Let's look at 671.

13  BY MR. CAVALIER:

14  Q.  So here on October 29th, you are sending Vincent an

15  article that it looks like Dan Spataro posted where he says,

16  "I'm going to pitch spending some coin on our next DDOS

17  mitigation strategy."

18      Just real quickly so we know what we're talking about

19  here, why don't you tell the jury in very brief terms what a

20  DDOS attack is.

21  A.  Denial-of-service attack is when you overload -- some bad

22  actor may overload or overwhelm whatever resource that you have

23  posted somewhere on the internet.  It could even be a business.

24  It happened to be we need a DDOS for our cloud services

25  protection.  And to prevent the overwhelming of our network or

*United States District Court*

1  our server, so we need to protect it from this unwanted

2  traffic, otherwise the service would be inoperable or slow or a

3  bad performance would happen.  So there are bad actors.

4  Sometimes traffic that's similar to a DDOS, that is good

5  traffic like when someone wants to download a large movie,

6  overwhelms their local network -- and we have those problems at

7  Comcast all the time.  It's a similar kind of pattern, but that

8  would not be called DDOS, but we also have to watch those at

9  Linode.  And so this is a system for that.

10  Q.  So in simple terms for somebody like me, a DDOS attack is

11  something that you want to be either able to avoid or to stop

12  when it occurs, correct?

13  A.  To mitigate it.

14  Q.  Okay, to mitigate it.  So you send this article to

15  Mr. Palochko, and he writes back, "Hey, Carl.  Any context for

16  me here?"

17      And then you send him a comment it looks like you made on

18  a different article relating to former Sun Microsystems CEO

19  Scott McNealy and his way of operating for being coin operated

20  instead of mission driven.

21      Do you see that there?

22  A.  Where is that at?  Right here?

23  Q.  That's on 672.

24  A.  "Loved your mission statement as well."

25      Oh, yes, I do see Scott's.  I used to work at Sun and I do

*United States District Court*

1    see -- and I know Scott.  And so yes, I do remember that.

2    Q.   Okay.  And so you were sending him more information that

3    you thought might be of use or value to him, correct?

4    A.   Yeah, from a cultural point of view.

5    Q.   Okay.

6         MR. CAVALIER:  If we flip over to 674, which is a

7    little further down the road.

8         THE WITNESS:  Where we at?

9    BY MR. CAVALIER:

10   Q.   674.  We're at November 23, 2018, and the 26th, 2018.

11        Do you see that there?

12   A.   I'll look on the screen.  It seems to be better.

13        Yes, I do see it.

14   Q.   Okay.  And just to summarize briefly, it looks like you

15   got some reminders that the open enrollment period was going on

16   for benefits, and then you got a final reminder, and you missed

17   that deadline and wrote to Mr. Palochko saying, "So sorry I

18   didn't enroll.  I assume I have to wait until the next open

19   period.  Can you let me know what the next period is."

20        Right?

21   A.   That's what it states.

22   Q.   Okay.  And then Mr. Palochko writes back to you and says

23   that he's going to try to get you in via an override if you

24   give him the information that he needs there, right?

25   A.   That's what it states.

*United States District Court*

1  Q.   Okay.  And it goes on for about a page on the other side,

2  and he works with you on those benefits to try to get you set

3  up.  And then at the end there, he says that you're all set.

4       You say, "Thanks so much."

5       He says, "My pleasure."

6       Correct?

7  A.   That is correct.

8  Q.   All right.  I want to take a little detour here and ask

9  you -- that was -- what we just went through in this document

10 was July 10, 2017, through November of 2018, correct?

11 A.   Yes.

12 Q.   When did you file your charge, your first charge, or your

13 questionnaire with PHRC?

14 A.   November 9th.

15 Q.   Of what year?

16 A.   2018.

17 Q.   Okay.  And that centered around a promotion, correct?

18 A.   Yes.

19 Q.   When did that promotion that set that chain of events in

20 motion occur?

21 A.   Can you repeat the question?

22 Q.   Sure.  It was Tim Kaufman's promotion?

23 A.   Yes.

24 Q.   Okay.  When was he promoted?

25 A.   On November 9th, 2018.

*United States District Court*

1  Q.   Okay.  So my question to you is, at least leading up to
2  that point -- we've gone through this in some pretty
3  significant indicative detail, you agree with me there, yes?
4  This document that you have here --
5  A.   From our Slack messages, not from other -- Vince and I
6  would talk with other people on Slack messages and so forth.
7  But just between he and I during that period of time, yes.
8  Q.   Right.  And this is essentially the digital version of an
9  open door to the director of human resources that you have,
10 correct?
11 A.   We were on a friendly, friendly -- he and I were always on
12 a friendly demeanor with each other, especially with our Slack.
13 Q.   Sure.  And you obviously felt comfortable within the
14 context of that friendly demeanor bringing any issues that you
15 might be having to his attention, right?
16      I mean, we saw you told him about the temperature in the
17 office, we saw that you told him about your desk being moved,
18 we saw that you guys talked and he helped you through benefits
19 issues, we saw that you worked through some PTO issues with
20 him.  You felt comfortable to bring any issues that you were
21 having at work to his attention, correct?
22 A.   No, no.  Those weren't any issues.  I -- with my issues
23 with Dan and others, I did not bring those forward to Vincent.
24 Q.   Let me get an answer to the question first.
25 A.   Yes.

*United States District Court*

1   Q.   Your answer to that question is, no, you did not feel

2   comfortable bringing Mr. Palochko issues relating to

3   discrimination you claim that you were feeling at that time?

4   A.   I felt -- I did not want to go to Vincent on those for

5   lots of reasons, but I went to my manager -- I have to work

6   with Dan.  I must have a good rapport with Dan.  If I went to

7   Vincent, then that sets a whole other chain of events.  I did

8   not mind going to Vincent with the director of marketing.

9   Yeah, so...

10  Q.   So we saw earlier that you agree with what it said in the

11  handbook?

12  A.   Yes.

13  Q.   And the handbook that the company issued is telling you if

14  you have issues with discrimination, go to HR, correct?

15  A.   No.  It says go to your manager or HR.

16  Q.   Well, let's be very clear on that.  It says go to -- it

17  says go to leadership, does it not?

18  A.   Manager, leadership, which is Dan and Tom.

19  Q.   So in your view, that meant for discrimination issues you

20  were supposed to go to Dan or Vincent, right?

21  A.   Dan or Tom or Vincent.  Vincent would immediately go to

22  legal.  And that's --

23  Q.   How do you know that?

24  A.   Because he stated it.

25  Q.   Where?

*United States District Court*

1  A.   It was something that he had done before.

2  Q.   How do you know if you never complained to him?

3  A.   Because I have been told of situations that had happened

4  and he would go to legal.

5  Q.   Did you ever of ask him, hey, listen I have something

6  really serious to report, but I got to know if you're going to

7  go to legal or not before I tell you?

8  A.   The reason I went to Dan is --

9  Q.   I'm going to ask you to listen to the question.

10      Did you ever go to Mr. Palochko and say, hey, listen, I

11  have something really important to tell you, but I'm concerned

12  that you are going to go to legal, can you give me assurances

13  that you won't do that if I disclose this to you?

14  A.   Those words, no.

15  Q.   In any words like that?

16  A.   No.

17  Q.   Okay.  So do we have an agreement then that at least as of

18  November of 2018, you had never spoken to Mr. Palochko in his

19  capacity as director of human resources at Linode about any of

20  these issues that you claim were going on at the time?

21  A.   In Galloway, I spoke to him about issues that were going

22  on in the Galloway office.

23  Q.   Those were cultural issues, right?

24  A.   They were inappropriate language that was being used.  And

25  Vincent told me that he was aware of it, and he was trying to

*United States District Court*

1  work on it, but I didn't see any improvements with that type of

2  behavior.

3  Q.   And yet, over the course of -- well, so far, we've only

4  looked at about two and a half years, even though you claim

5  that you never saw any improvement in that kind of behavior,

6  you never raised it in this message chain that we're reading,

7  right?

8  A.   No.  I have my -- this is one of the reasons that Dan was

9  hired, to provide that solution of events that were, you know,

10  the inappropriate conduct.  I thought, very optimistic, that

11  Dan would provide that solution.

12  Q.   When was Dan hired?

13  A.   He was hired in -- I think it was February of 2016.

14  Q.   Okay.  At your recommendation, correct?

15  A.   At my reference and at my recommendation.

16  Q.   Okay.  And according to you now, you're saying that one of

17  the reasons that Mr. Spataro was hired was to address this

18  inappropriate language that was going on, correct?

19  A.   More than inappropriate language.  I already testified to

20  that.

21  Q.   Sure.

22  A.   I was optimistic.  We didn't have a manager of the network

23  engineering department, and it was chaotic.  And I thought that

24  Dan -- or a new manager would be a solution for that.

25  Q.   So in February of 2016, with the hire of Dan Spataro, you

*United States District Court*

1  were optimistic that this inappropriate language was going to

2  be rectified, correct?

3  A.   That the whole conduct didn't -- everything I testified

4  with -- could be dealt with.

5  Q.   So that was February of 2016 when Mr. Spataro was hired,

6  and we're now up to December of 2018.  So that's a little more

7  than two and a half years.  And according to you, I think, what

8  you're saying is that Mr. Spataro didn't remedy the conduct.

9       Did you ever bring it back to Vincent's attention in these

10  messages and say, hey, listen.  Remember five years ago when I

11  complained about inappropriate language and we thought Dan was

12  going to help rectify the issue?  It's not working out.

13  A.   I didn't need to because all the issues I raised with Dan

14  and Tom, Vincent had to know about it.  It was my belief.

15  Q.   Well, okay.  If you thought he knew about them already,

16  why wouldn't you talk to him about it?

17  A.   Because he didn't talk to me about them.  If I'm talking

18  to Dan and Tom and I'm filing a Pennsylvania Human Relations

19  Commission complaint, it had to go to Vincent and to Chris Aker

20  and to Tom.  And we discussed it, and Vincent is right across

21  from Tom.  There's no way that Vincent did not know.

22       And here, on November 21st, the week before Thanksgiving,

23  I am in horrible shape.  I can't even do my health care things.

24  And so I'm asking him for help.

25       I remember this time frame because our meeting with Tom

*United States District Court*

1  Asaro and Dan didn't happen until the first week -- I think it
2  was December 8th -- of December.  So --
3  Q.  Let me stop you there and say --
4  A.  So there is context to those dates here.
5  Q.  Sure.  I understand what you're claiming, that they must
6  have seen this EEOC/PHRC thing.
7      But the earliest, even according to you, that they could
8  have seen that was after you filed it on November 9th, correct?
9  A.  November 9th, I went into the office and filed it.  The
10 next week --
11 Q.  And so that's the earliest they could have seen it, right,
12 after November 9th?
13 A.  Yes.
14 Q.  So what I'm asking you, then, is why, over this
15 two-and-a-half-year period before you went to the PHRC and you
16 claimed that all of this discrimination and harassment and
17 daily taunts and everything you testified were going on, and
18 yet you have two and a half years' of conversation about lots
19 of things, complaints, positives, praise, PTO benefits.  You
20 never once said to the human resources manager that any of this
21 was going on, correct?
22 A.  He knew that was -- he -- my belief was he knew.  I know
23 how Linode works.  He's -- I and Dan and Tom sat in that
24 meeting together, and Vincent is here.  The windows, offices.
25 Q.  So correct me if I'm wrong, but I thought before you said

*United States District Court*

1    you didn't talk to him about this because you would have to go

2    to legal.  But now I'm hearing you say you wouldn't talk to him

3    about it because he already knew?

4    A.   I'm not going to -- I do believe those were both true.

5    And there's more to the way that my -- my thinking that

6    affected my thinking for Vincent.  He's -- he's a witness to

7    behavior that went on before this meeting.  He --

8    Q.   And according to you, he's not doing a thing about it,

9    right?

10   A.   The behavior went on, and he's outside the doorway.

11   There's so much --

12   Q.   According to you now, he's not stopping any of it, right?

13   As the HR manager, he's looking the other way?

14   A.   I'm not saying he's looking the other way.  I don't think

15   that he -- it was just the, you know, people felt intimidated.

16   Q.   By Vinnie?

17   A.   By Vincent?  Not by Vincent.  By Linode's director -- the

18   chain from, you know, I'm not going to go into all that stuff

19   that went on.  But Dan is the person that I went to.

20        I'm not going to do what Dan thinks that I was going to do

21   and blow up Linode or blow up him.  I have to work there.  And

22   Dan and Tom are in charge.

23        Vincent did not have that -- he's going to be talking to

24   Tom because when I raised the issues of lots of comments we

25   haven't heard, that -- in Galloway -- it was Tom who ran the

*United States District Court*

1  meeting with Vincent.  Tom directed the meeting.  Tom had

2  facial expressions of disappointment, and Vincent sat there and

3  was very friendly with me.

4  Q.  Let me stop you.  I'd like to get a clear answer on this

5  question.  Is your answer that you didn't go to Vincent

6  Palochko about any of these issues during this period we just

7  discussed because you didn't think he had the power to do

8  anything about them?

9  A.  No.  As I said, there was many factors into my thinking or

10  just my natural -- my natural not wanting to pawn Vincent --

11       First of all, he already knows.

12       And number two, I mean, I'm -- my way with Vincent was to

13  try to educate, at least from my perspective, not -- educate

14  may not be the right word -- but to share information on human

15  resources, and that's what I did.  I did -- there were --

16  there's some context to some of these readings.

17       Example, the health care, I remember this time frame.

18  Q.  Let me just ask you this, then, having said what you just

19  said.  Wouldn't it have been a great opportunity to educate

20  Vincent if you went to him and said, hey, listen.  I'm hearing

21  these horrible comments from my supervisor.  Here's how I think

22  we should work through them?

23  A.  I did that in Galloway, John.

24  Q.  All right.  And when was the last time you were in

25  Galloway?

*United States District Court*

1  A.   We were -- we were in Galloway until September of 2017.

2  Q.   Right.  And so we're looking at a thread here that goes

3  back to early 2017.  And, again, we're now up to December of

4  2018.  So two years since we left Galloway.

5       Wouldn't it have been a great opportunity to go to Vincent

6  and say, hey, I know we talked about this at Galloway, these

7  inappropriate comments, but nothing's changed.  So I really

8  think we've got to put our heads together and do something

9  about this?

10  A.   I took that approach with Dan.

11  Q.   I'm not asking about Dan or Tom.  I'm asking about Vincent

12  Palochko, the director of human resources, with whom you had a

13  friendly relationship during this time.

14  A.   As I said, I already did that in -- before Dan came.  And

15  that's one of the reasons that I thought that we needed to

16  bring in some oversight that would help oversight the network

17  engineering team.

18  Q.   Right.  But as we've already discussed, at least according

19  to you, from 2016 through the end of 2017, that wasn't working.

20  A.   I just got back to work and did my job, and if I went to

21  Vincent, he's going to go to legal.  That's what he did.

22  Q.   Right.  But we already know, according to you, that,

23  apparently, he already knew about what you're talking about,

24  and he didn't go to legal, right?

25  A.   Then he needs to work it out with his manager, Tom.  I

*United States District Court*

1  mean, my relationship with Vincent is really when he was really

2  a recruiter when I first came.  He was just doing Paycheck.  He

3  came from Paycheck.

4      Rich Ford told me he's not a real HR person.  "He came

5  from Paycheck."  Those were his exact words.

6      So I -- I did a couple of things with him.

7  Q.  Can we at least agree that you didn't do what the policy

8  said to do?

9  A.  No.  I did what the policy said.

10 Q.  Okay.

11 A.  I went to my manager.  I went to his manager.  I went to

12 Tom a number of times.

13 Q.  And according to you, assuming that's true for the moment,

14 when that didn't work out, for some reason, you didn't go to

15 Vinnie because you thought he would go to legal.  That's your

16 testimony?

17 A.  No.  As I said, there were many things that impacted my

18 thinking, and that was one.

19      MR. CAVALIER:  Your Honor --

20      THE COURT:  Let me stop you for a second.  Let me ask

21 the jury what they want to do.

22      And as I told you, today is one of the two days I have

23 to break a little early.  So it's about 2:45 now, 2:50.  We're

24 going to have to stop in about an hour.  Okay?  We can press

25 through for an hour now or we can take a short break, if any of

1  you needs a break.

2          MR. CAVALIER:  I'm not going to lie, Your Honor.  I

3  could use five for a bathroom break.

4          THE COURT:  Okay.  Let's take a very short break.

5  Okay?  Stand up, stretch your legs, and we'll come back in five

6  minutes.  Okay?

7          THE COURTROOM DEPUTY:  All rise.

8          (Jury exits the courtroom at 2:50 p.m.)

9          THE COURT:  Okay.  Keep it real short and come back in

10  five minutes.  Okay?  Thanks.

11          (Brief recess from 2:51 p.m. to 2:59 p.m.)

12          THE COURTROOM DEPUTY:  All rise.

13          THE COURT:  All right.  Have a seat and we can get the

14  jury.

15          THE COURTROOM DEPUTY:  All rise.

16          (Jury enters the courtroom at 3:00 p.m.)

17          THE COURT:  Okay.  You can all have a seat.

18          Mr. Williams, come on back up.

19          MR. CAVALIER:  May I, Your Honor?

20          THE COURT:  Go ahead.

21          MR. CAVALIER:  Thank you.

22  BY MR. CAVALIER:

23  Q.  All right.  Mr. Williams, I'll try to speed this along a

24  little bit as we go, but we're picking up in December of 2018,

25  which, as we just discussed, is about a month after you filed

*United States District Court*

1  your PHRC questionnaire, correct?

2  A.   Where are we at?

3  Q.   676.

4  A.   676.

5       MR. CAVALIER:  Get that up again so the jury can

6  follow long.

7       THE WITNESS:  You mean after our -- after I dismissed

8  the charges?

9  BY MR. CAVALIER:

10 Q.   Well, you had your meeting on the 9th, right?  Or you

11 filed your questionnaire on the 9th, right?

12 A.   November 9th?

13 Q.   Yes.

14 A.   That was my Pennsylvania Human Relationship -- Relations

15 Commission complaint on November 9, 2018.  You're at

16 December 13th.

17 Q.   Right.  We're sort of in the month after that

18 questionnaire was filed with the PHRC, correct?

19 A.   We're at the time where I already dismissed it.

20 Q.   Okay.  Fair enough.  So within the period of time in the

21 month before December 13th, you had filed that questionnaire

22 and also gone back to the PHRC to dismiss it, correct?

23 A.   We're a few days after the dismissal.

24 Q.   Okay.  And is it fair to say, then, between November 9th,

25 when you filed that document, and December 13th -- sorry --

*United States District Court*

1  December 13th, 2018, on 676, there's no mention of either that

2  questionnaire being filed, the questionnaire being withdrawn,

3  or any meeting amongst you Vincent, Tom, or Dan to discuss

4  that, correct?

5  A.   John, you said questionnaire.  I filed a complaint.  So

6  I'll have to answer, no, but it was a complaint.

7  Q.   Well, we'll look at it in a little bit, but can we at

8  least agree that that caption on top of the document says

9  questionnaire?

10 A.   Where is it?

11 Q.   Can we agree on that or do we need to wait until we

12 actually see it?

13 A.   We'll have to wait.

14 Q.   Okay.  That's fair enough.  I'll come back to that.  All

15 right.  So we're into the last part of 2018 and if we go over

16 to 677?

17 A.   Yes.

18 Q.   We see here that after all this has gone down, you're now

19 asking Vincent Palochko about options related to taking loans

20 against your 401K or your profit sharing fund, correct?

21 A.   It's the 401K but they call it -- but the profit sharing

22 goes in there, yes.

23 Q.   Okay.  And then as we go here, you and Mr. Palochko have a

24 conversation, it looks like, about which photo of the bank

25 building to use for that year's Christmas card?

*United States District Court*

1   A.    I created the Christmas card, and, yes, I was giving him

2   different options.

3   Q.    Okay.  And you guys have a friendly exchange about that,

4   correct?

5   A.    Always.

6   Q.    Okay.  If we go over to 680, you mentioned this earlier.

7   So I wanted to give you a chance to talk about it.

8   December 24, 2018, Christmas Eve, you write, "Hi, Vincent.

9   Please print out and put in my personnel folder my student

10  evaluations for Temple University after completing my teaching

11  of the senior-level network architecture class computer

12  networking so that my competency in working with younger

13  students, mentoring, and lecturing skills can be documented.

14  Thanks, Carl," correct?

15  A.    Yes.

16  Q.    So the purpose of that was to let Vincent, the HR manager

17  and the keeper of the personnel files, know that you had

18  achieved something that you wanted documented in your file,

19  correct?

20  A.    No.  I wanted to dock -- I wanted to put in my personnel

21  folder that I had skill sets in the things that I -- in

22  response to that I would never be a manager at Linode and --

23  Q.    Where --

24  A.    -- I wanted that to be placed in my personnel folder.

25        And the second one that I got in April, Vincent says,

*United States District Court*

1    "Done," and that was the reason.  So that's the reason.  No,

2    and that's the reason.

3    Q.    Again, you're agreeing here that you're not saying, hey,

4    Vincent, in response to me being told that I was never going to

5    become a network manager, please put this in my personnel file,

6    right?  You don't mention that?

7    A.    It states what it states.

8    Q.    Okay.  And then a couple days later, on December 28th,

9    again, you send Mr. Palochko another article.  Looks like it

10   was titled Being Friends With Your Boss Can Cost You Real

11   Money.  Do you see that?

12   A.    I send lots of articles.

13   Q.    All right.  We agree?

14   A.    Yes.

15   Q.    So on 681, we're now into the new year, and you are --

16   well, there's another article that it appears you send him.

17   And then on January 8th, you asked him about Betterworks.

18         And he responds, "Neat timing, Carl.  Look out for an

19   email in about three minutes."

20         You say, "Thanks," and then you send him an article, it

21   looks like, and correct me if I'm wrong, that is negatively

22   describing a review system at Facebook and the impact that that

23   review system had on the culture there, correct?

24   A.    Just one of many things.  Nothing to read into, yes.

25   Q.    Okay.  Over on 682, you write to Mr. Palochko about an

*United States District Court*

1  issue that you were having with your co-payments on

2  medications?

3  A.  Yes.

4  Q.  On 684, there on January 25th of 2019, you're raising an

5  issue with Mr. Palochko there about, it looks like, a 401K loan

6  that you didn't get, and you're telling him that Friday's

7  paycheck, it seems like, had a large payment to another loan

8  that you were paying off, correct?

9  A.  That's what it states.

10 Q.  Okay.  And over the course of that conversation, he helps

11 you to work that issue out, correct?

12 A.  That's what it states.

13 Q.  All right.  On 0684 -- sorry -- 0685, this is January 28,

14 2019, correct?

15 A.  January -- go ahead.

16 Q.  You'd just been promoted at this point in time, yes?

17 A.  Yes, the announcement just came out.

18 Q.  All right.  And so you reach out to Vincent, and you say,

19 "May I get a new business card," right?

20 A.  Yes.

21 Q.  You wanted an updated business card with your new title on

22 it, correct?

23 A.  Yes.  I'm going to the Global Peering Forum.

24 Q.  Okay.  And the first thing Vincent says in response is,

25 "Hey, congrats, Carl," right?

*United States District Court*

1  A.   Yes.

2  Q.   So he's congratulating you on that promotion, essentially,

3  that same day, right?

4  A.   Yes.

5  Q.   Okay.  He also tells you that you need to go to somebody

6  else for the business card piece.  But then he follows up and

7  asks you whether you heard anything about the loan issue you

8  raised the day before, correct?

9  A.   That's what it states.

10  Q.   So he was taking the initiative to find out whether your

11  loan issue had been solved?

12  A.   Yes.

13  Q.   Okay.  You also ask him here on the next page, 686, on the

14  same day --

15  A.   Yes.

16  Q.   -- you say, "By the way, does my manager get changed in HR

17  Bamboo?"

18       Am I correct that you're asking him there whether, in

19  Linode's internal systems, your manager will be changed based

20  on your promotion?

21  A.   No.  I -- I did have a change in title, and I'm not going

22  to say today that it was a promotion.  But, yes, there was a

23  change in my manager.  I was asking him about is Tim Kaufmann

24  going to be changed.  He says, "Yep.  That will be done today."

25  Q.   Right.  Because you didn't want Tim Kaufmann to be your

*United States District Court*

1  manager anymore, right?

2  A.   It was, you know, I was told that it was a promotion, and

3  I thought I was above Tim Kaufmann.

4  Q.   Right.  You didn't want to report to him anymore as a

5  result of the promotion, correct?

6  A.   It's not that I didn't want to report to him but, yeah,

7  there was a change.

8  Q.   Okay.  And that change was that your manager or your chain

9  of command, so to speak, would change upwardly from Tim

10  Kaufmann to Dan Spataro, correct?

11  A.   Going back to what it was.

12  Q.   Right, which was your preference at the time?

13  A.   It wasn't a preference.  It was just what happened.  I

14  mean, that's what happened.

15  Q.   So it's your testimony today that, at least as of January

16  of 2019, it didn't matter to you whether your reporting

17  hierarchy would be Tim Kaufmann or to Dan Spataro?

18  A.   I thought that having Dan reporting to -- I didn't have,

19  you know, it wasn't my say.  I was in agreement and very

20  optimistic about that, what I considered a promotion at the

21  time.  So if I was going to be able to do the director of

22  network strategy and innovation, I agreed to that.

23  Q.   You said if you considered it a promotion -- I think you

24  said you considered it a promotion at the time.  I mean,

25  certainly --

*United States District Court*

1  A.  I believed it was a real promotion and --

2  Q.  Right.  The company believed that, too, right, at the

3  time?  That's why they're changing your manager in HR Bamboo?

4  A.  I can't say that the company -- I don't think that -- I

5  mean, later you'll see, but I already testified to all of that.

6  But, yes, there was this -- this, as we showed in one of the

7  exhibits, my HR Bamboo, it showed going to --

8  Q.  Right.  So --

9  A.  -- Dan Spataro and back to where I was in terms of --

10 Q.  Right.  So your upward manager, the person you report to,

11 changed to a higher-ranking person at Linode, right?

12 A.  I went down and went back up to where I was before.

13 Q.  Right.  Because Dan Spataro had also been promoted, right?

14 A.  No.  I -- he was our network manager and he was director.

15 Q.  Let me ask it a different way.  Is it fair to say that at

16 this point in time you wanted your manager to be listed as Dan

17 Spataro and not Tim Kaufmann because Dan Spataro was higher

18 ranking?

19 A.  I didn't -- I didn't have that choice.  I mean, don't

20 understand why I couldn't report like I did before to Tom

21 but...

22 Q.  It's true that the company switched your manager, at that

23 point in time, as of your promotion, from Tim Kaufmann to Dan

24 Spataro, correct?

25 A.  Yes.  I really thought that my agreement -- I was -- there

*United States District Court*

1  was a big change between Thanksgiving and some of the Slack

2  messages that Tom Asaro was hostile to me with many other

3  people on the Slack messages.

4  Q.   Which we haven't seen?

5          MR. CARSON:  Objection.

6          THE COURT:  No.  It's overruled.

7  BY MR. CAVALIER:

8  Q.   We haven't seen those messages in this trial, correct?

9  It's a yes-or-no question.

10  A.   That's correct.

11  Q.   Okay.  So let's try to focus this up a little bit.  So you

12  got the promotion.  At the time -- you say at the time -- you

13  believed it was a promotion, but your manager was changed at

14  that point in time, correct?  Yes or no?

15  A.   My manager went back to being Dan, yes.

16  Q.   A higher-ranking figure at Linode, correct?

17  A.   I was pushed down and I went back up.

18  Q.   He was a higher-ranking figure than Tim Kaufmann?

19  A.   Yes, that is correct.

20  Q.   Okay.  And you got a new title, correct?

21  A.   Yes.

22  Q.   All right.  And it was important enough to you that you

23  got your business cards updated, right?

24  A.   It was important enough that I went over and dropped the

25  charge.  That's how important it was to me at that time.

*United States District Court*

1  Q.   Right.  And it was important enough, as we saw yesterday,

2  that about a month later the company gave you a raise, correct?

3  A.   That was a -- that raise is our normal raises, 6 percent.

4  Q.   Let's take another little detour then.

5       MR. CAVALIER:  Tim, can you pull up -- apologies.

6  We're just going to find that exhibit so we can clear that

7  issue up.  We can maybe hold that and avoid the issue.

8  BY MR. CAVALIER:

9  Q.   You agree with me that on your payroll records that that

10  raise is listed as a raise due to promotion, correct?

11  A.   The HR Bamboo states that.

12  Q.   So it's your belief that it was not related to your

13  promotion?

14  A.   At the time, I never -- everybody got their raise, so no.

15  Q.   But you got more than the normal 3 percent cost-of-living

16  raise that year, right?

17  A.   I haven't received raises for a long period of time.

18  Q.   And part of the reason for that was that starting in 2014,

19  you were always one of the most -- almost the highest paid

20  employee at Linode, right?

21  A.   The entire network team was, yes.

22  Q.   Right.  So it's fair to say, then, that one of the reasons

23  why your salary wasn't increased as quickly as some other

24  employees is because you started off at a very high level?

25  A.   I did not start off at a high level.  I started off at a

*United States District Court*

1   level that I accepted that was not the industry standards.

2   But --

3   Q.   Were you or were you not one of the top ten highest paid

4   employees at Linode?

5   A.   Top ten?

6   Q.   Yes.

7   A.   I don't have that information.

8          MR. CARSON:  Objection.  Speculation.

9          THE COURT:  Was that an objection?

10         MR. CARSON:  Objection.  Speculation.

11         THE COURT:  Objection's overruled.

12         THE WITNESS:  I don't have any information to that.

13  BY MR. CAVALIER:

14  Q.   So you also don't have any information to dispute that,

15  right?

16         MR. CARSON:  Objection.

17         THE WITNESS:  I just have no information.

18  BY MR. CAVALIER:

19  Q.   And by the way, just to clean this up, we see the exhibit

20  there that we were referencing?

21  A.   Yes.

22  Q.   Okay.  This is previously admitted.  I don't know if it's

23  being published.  I guess it is.

24         So you see there it's listed as promotion pay increase,

25  correct?

*United States District Court*

1  A.   Yes.  I turned that over, yes.

2       MR. CAVALIER:  You can take that down, Tim.  We're

3  going to back to 22.  686 on 22.

4  BY MR. CAVALIER:

5  Q.   We're going to pick up on February 3rd, Mr. Williams.  It

6  looks like there you are referring one of your Temple

7  University students to Mr. Palochko as a potential candidate

8  for employment at Linode, correct?

9  A.   Yes.  I was actually asked to refer students by Chris

10  Aker.

11  Q.   Okay.  And it appears, at least from what I can tell here,

12  that this is a student you were very fond of, yes?

13  A.   He was academically a great student.

14  Q.   And you're asking or you're suggesting to Vincent that you

15  can invite him over to show him Linode and ask if they want to

16  talk to him and see if he fits in somewhere, right?

17  A.   That's why we came to Philadelphia, is to hire that kind

18  of talent, yes.

19  Q.   Okay.  And this was, again, a student who you thought

20  would be a good fit at Linode, correct?

21  A.   Yes.  I was not recruiting him, and I specifically state I

22  would not receive a referral bonus.  In fact, would not accept

23  one.

24  Q.   Right.  And again, during this time, at least according to

25  you, you were suffering from daily harassment/discrimination in

*United States District Court*

1 the workplace?

2 A.  This was in February of 2019, shortly after the change of

3 my title.

4 Q.  Right.  And that was the subject of your PHRC

5 questionnaire or charge?  We'll solve that later.

6 A.  Yes.  Yes.

7 Q.  Correct.  But just to clear it up, you didn't complain to

8 the EEOC about any age-based harassment, right?

9 A.  The Philadelphia -- I mean the Pennsylvania Human

10 Relations Commission?

11 Q.  Yeah.  Your charge?  Your questionnaire or charge?

12 A.  My charge was specifically on not having the opportunity

13 to interview and apply for positions, in particular that

14 position.  That was my focus.

15 Q.  Right.  So it didn't include anything about the alleged

16 age-based harassment at Linode, right?

17 A.  I was not -- that -- the result of that was this

18 convergence to this point that my -- that I already stated

19 happened.  So I can't say that that was not part of the

20 complaint.  It was a foundation of the complaint.

21 Q.  Well, foundation or part, it wasn't mentioned in the

22 complaint, correct?

23 A.  It is mentioned.  I'm filing a discrimination complaint.

24 They would -- during the investigation -- because they told me

25 that there would be an investigator assigned.  I went the next

*United States District Court*

1  week, and they said there was one.  That's the process of how

2  such a complaint works.

3  Q.   How do you know that?

4  A.   Because the intake specialist told me, and I went back the

5  next week and asked them.

6  Q.   Had you been through this process before?

7  A.   At the Pennsylvania Human -- no.

8  Q.   At any agency?

9  A.   What kind of agency?

10  Q.   Any employment agency?

11  A.   Employment agency?

12  Q.   Yeah.  Had you ever gone through the charge process

13  before?

14  A.   A charge of what?

15  Q.   Discrimination.

16  A.   I have been through -- over 20 years ago, a -- 25 years

17  ago, a -- an issue that was completely different here, relating

18  to my sexual orientation.

19  Q.   What do you mean by "an issue"?

20  A.   Discrimination.

21  Q.   So are you saying that you charged a former employer with

22  sexual orientation discrimination?

23  A.   There was a charge, yes.

24  Q.   Okay.  Were you able to educate yourself during that

25  process with how the system, with respect to the agency, works?

*United States District Court*

1    A.    That -- that was so long ago.  I would not even remember.

2    Q.    Okay.

3    A.    It's a whole different state and everything.  So there's

4    no --

5    Q.    Okay.  I'll move on here.  Let's keep going and see if we

6    can finish this up today.

7          MR. CAVALIER:  Why don't we skip ahead a little and go

8    to 694.

9    BY MR. CAVALIER:

10   Q.    You with me?

11   A.    Yes.

12   Q.    Okay.  So this starts on April 17, 2019, at the bottom.

13   Okay?  And then rolls over to the next page.

14   A.    Yes.

15   Q.    And you say there that, "Salaries of potential new hires

16   discussed in front of an entire team should be private and

17   confidential.  I wouldn't want to apply for a position at

18   Linode three months after salary was discussed in front of

19   everyone and everybody else knew what my salary was."

20         Do you see that there?

21   A.    Yes.

22   Q.    Vincent responds and says, "Hey, can you provide more

23   info?  When did this happen?  Who discussed this?"

24         And you say, "Hi, Vincent.  I shouldn't have to be the one

25   reporting things, general education to every manager,

*United States District Court*

1  especially new ones."

2      Did I read that correctly?

3  A.   That's what it states.  I...

4  Q.   Well, that's what he's telling you, right?

5  A.   Yeah.

6  Q.   Okay.  And then Vincent responds to that by saying, "I

7  can't act on a disclosure with partial information very

8  effectively."

9      So he's coming back to you and saying, look, if you want

10 me to do something about this issue that you're unhappy with,

11 you need to give me the full info, right?

12 A.   I'm just refreshing my memory because I don't have this at

13 the top of my mind.  Privacy was -- privacy of confidential

14 information was always an issue at Linode.

15 Q.   Right.  It was important enough to you that you raised it

16 with Vincent, right?

17 A.   There was an issue with Tim Kaufmann that was very public

18 regarding Roland, and it was already public.  I wasn't telling

19 him.  It was the reason that a -- it was the reason that a new

20 policy through an email was sent out to the entire Linode team

21 from Vincent.

22 Q.   The question is:  Was Mr. Palochko asking you for more

23 information so that he could address the situation you had

24 raised?

25 A.   Yes, and I provided that.

*United States District Court*

1  Q.  Okay.  And you did provide it.  You say Tim Kaufmann --
2  you go on.  You say that he doesn't want to hire somebody like
3  Roland.  He wants someone in the 60K range.  He wants someone
4  like Adam or John or Ben.
5      It goes on for a bit, and then you say, "I hope Tim did
6  not report my salary to his friend.  He is and was never
7  trained as a manager.  He's green," right?
8  A.  Yes.
9  Q.  And then Vincent writes back to you, "Thank you.  I'll
10  address this as a group, but may also bring it direct to him,
11  if that's okay with you.  I certainly won't mention your name,
12  but let me know if this disclosure can potentially compromise
13  your confidentiality and I will not mention."
14      So he's telling you that he's going to correct this issue
15  that you've raised, right?  And he's telling you that he'll
16  protect you as the source of the information if you want him
17  to, correct?
18  A.  That's what it states, yes.
19  Q.  Okay.  And you say, "If you direct it to him, then you
20  must mention the names.  That would be unfair to him.  I don't
21  behave in that way, so you may mention my name."
22      Right?
23  A.  Yes.
24  Q.  So you're authorizing him to tell Tim Kaufman that you are
25  the one who brought this to his attention, correct?

*United States District Court*

1  A.   Yes.

2  Q.   And then Vincent went out and addressed the issue,

3  correct?

4  A.   I don't know.  I mean, did they say that?

5  Q.   Well, I'm asking you whether you know sitting here today?

6  A.   I don't know.

7  Q.   Okay.  But we can at least see on this, if we flip to 697,

8  that you didn't raise any other issues in that respect,

9  correct?

10  A.   Whatever the document states.

11  Q.   Okay.  So on April 23rd -- and again, I'm going to try to

12  speed this up a little bit - you raise another issue with

13  Vincent here, on 697 at the bottom, where you stated, "I don't

14  like it when people talk poorly about Roland.  It happened

15  again yesterday when a bad diagram was put on the screen in our

16  meeting and Tom Duff, a friend of Tim's, said negatively,

17  Roland must have drawn it.  Bad.  Leave Roland alone."

18       And then a little further down Vincent respond and says,

19  "That's not right.  Thank you for bringing that to my

20  attention."

21       You say, "I don't want to hear bad things at public

22  meetings about Roland.  He did nothing wrong.  Thanks."

23       And Vincent responds, "Nope, he surely did not."

24       So this is you raising an example of another employee

25  being treated poorly for some reason.  You bring it to Vincent

*United States District Court*

 1  in his role as HR manager, and he agrees with you and says he's

 2  going to fix it, right?

 3  A.  Yes.

 4      MR. CAVALIER:  Let's jump ahead.  Let's jump ahead to

 5  703, if you wouldn't mind.

 6  BY MR. CAVALIER:

 7  Q.  Let me know when you're there.

 8  A.  I'll look on the screen here.

 9  Q.  Okay.  So we're at June 28th now, 2019.  You see that?

10  A.  Yes.

11  Q.  All right.  And here, you're writing to Mr. Palochko to

12  complain about a Slack posting by someone named Jessie Alter

13  who appears to be inviting Linode employees to check out a

14  Slack channel, looks like it's dedicated to grilling and other

15  recipes involving meat, correct?

16  A.  That's what it states.

17  Q.  Okay.  And you send that to Vincent, and he responds, "Hi,

18  Carl.  Is there any context around this that I should know

19  about?"

20      Right?

21  A.  That's what it states.

22  Q.  All right.  And you say, "Yes.  Don't you recall that

23  Jessie complained about a photo of meat that I sent out?"

24      And Vincent says, "Honestly, no, I don't."

25      You tell him to scroll back, right?

*United States District Court*

1        And then you say this, "Anyways, I don't think that meat,

2   M-E-A-T, and meet, M-E-E-T, is a good joke.  It is pride week

3   and Richie made the subtle comment to Jessie on the side note.

4   In the gay world, this is a gay (bad joke)."

5        Do you see that there?

6   A.   Yes.

7   Q.   So you were reporting that, I guess, somebody used the

8   phraseology "meet" and "meat" to describe the get-together, and

9   somebody there, it looks like his name was Richie, made the

10  point that, hey, that could be an offensive pun, correct?

11  A.   Ritchie was gay, yes.

12  Q.   Right.  So he was saying, hey, people could take that the

13  wrong way, right?

14  A.   Yes.

15  Q.   And you were reporting that to Vincent as the HR manager

16  of the company, right?

17  A.   Yes.

18  Q.   And you say, "Richie was on to the bad joke and told to

19  back out of the room slowly."

20       Right?

21  A.   I don't remember all those specifics, but yes.  It states

22  what it states.

23  Q.   Right.  So you were reporting this potential issue about

24  what could have been interpreted negatively as an offensive

25  joke to Mr. Palochko, correct?

*United States District Court*

1    A.    That's what it states.

2    Q.    Okay.  Let's skip that.  Let's jump ahead to 711.

3    A.    Is that Defendant's 706, the $800?

4    Q.    I'm sorry?

5    A.    Where are you at?

6    Q.    I'm trying to speed along.  I'm moving ahead to 0711.

7    A.    Oh, 0711?

8    Q.    Yes.  And at the bottom there, August 20, 2019, just to

9    shortcut it there, you are reaching out to Vincent to raise an

10   issue about Tim Kaufman's managerial style and noting that Tim

11   is good technically, but he's green in making personnel

12   decisions.  That's at the top of 712.

13         Do you agree with me that that's what it is?

14   A.    Yeah.  There was this Roland episode, as we discussed

15   before.

16   Q.    Right.  And you were just noting again that you didn't

17   like Tim's management style, correct?

18   A.    I can't get into that Roland episode, but everybody knows.

19   But I'm referencing it here in our chat.  It was the reason

20   that the performance improvement thing was created at Linode.

21   Q.    And just to simplify, you were just telling Vincent that

22   you had a small issue with Tim's management style in this

23   respect, right, and noting it for his attention?

24   A.    That's what it states.

25   Q.    Okay.  Let's jump ahead again because I want to cover

*United States District Court*

1  these two things before we break for the day.

2      Let's go to -- let's start at 721.  This one is a little

3  wonky with how it printed.  It's January 28, 2020, now.

4  A.  Was it printed?

5  Q.  It's a PDF, so it's going to be a little strange.  So

6  that's the date.

7      If you flip to the next page, you see that it looks like

8  you're sending a copy/paste from another Slack channel,

9  correct?

10      MR. CAVALIER:  Tim, you can go to the next page.

11  BY MR. CAVALIER:

12  Q.  That's what that is, right?  It's a copy and paste from

13  another Slack channel?

14  A.  I don't know.

15  Q.  Let's back it up a bit, we can work through it.

16      It looks to me -- and you tell me if you disagree -- if we

17  look at 722 and 723 and 24, it looks to me like you are sending

18  Vincent a post that you did in another Slack channel about

19  Cloudflare?

20  A.  Oh, the off-topic channel.  I don't know.

21  Q.  Do you see that page there where underneath -- where it

22  says -- it has a picture and it says, "Cloudflare access."

23      Do you remember posting that article to the other Slack

24  channel?

25  A.  I really don't.

*United States District Court*

1  Q.   Okay.  Do you see there in the middle of the page where it

2  says, "Amber Burgess reacted with a smirk"?

3  A.   Yes.

4  Q.   If we flip over to 725, when the images end you say,

5  "Please talk to Caker."

6       That's Chris Aker, right?

7  A.   Yeah.  That's his user name, C Acre.

8  Q.   Okay.  "Please talk to Chris Aker and he will fill you in

9  on Cloudflare from a technical company, and what he sees

10 Cloudflare doing in three years."

11      Then you say, "Regardless, we shouldn't behave this way,

12 folks smirking or sarcastically making, remarking emoji remarks

13 about real competitive information that another employee puts

14 out."

15      Do you see that?

16 A.   Yes.

17 Q.   So you were complaining that you had posted this

18 Cloudflare article and that Amber Burgess had clicked on smirk

19 emoji, right?

20 A.   I'm not complaining.  I must have -- Cloudflare was our

21 competitor so...

22 Q.   Right.  But you're noting to Vincent that this is behavior

23 that you don't approve of when Amber clicks the smirk emoji

24 under your post, right?

25 A.   There's background to that, but yes, this did happen.

*United States District Court*

1  Q.   And it bothered you enough to bring it to Vincent's

2  attention, correct?

3  A.   There's emails regarding various things associated with

4  other things that Vincent has.

5  Q.   But none of that is referenced here, right?

6  A.   The context is there with Vincent, but go ahead.

7  Q.   All you're saying here is that people shouldn't be

8  smirking or sarcastically making remarking emoji remarks on

9  people's posts, right?

10 A.   Yes.

11 Q.   And he says right after that, follows up and says, "Hi,

12 Carl.  I addressed the issue.  Can you please let me know if

13 this persists."

14      Right?

15 A.   Yes.

16 Q.   And you say, "Yes.  Thanks."

17      So he was letting you know that he took your complaint

18 seriously and addressed the issue, correct?

19 A.   That's what it seems to state.

20 Q.   Well, that's not what it seems to state, that's what it

21 states, right?

22 A.   I just can't read as fast as you, so yes, I --

23 Q.   Okay.  Let's skip forward to 729.  Let me know when you

24 are there with me.

25 A.   Yes.

*United States District Court*

1  Q.  All right.  So this is February 12, 2020, correct?

2  A.  February 12, 2020.  Go ahead.

3  Q.  All right.  And so at this point you've been promoted for

4  about a year, correct?

5  A.  February 12th of 2020, this was right before the

6  Philippines meeting.  Yes, I do remember this.

7  Q.  Okay.  And you say on February 12th, you're messaging

8  Vincent Palochko again --

9  A.  Yes, I am.

10  Q.  And you say, "Job Slack these to me."

11  A.  Joe.  Joe T slacked that to me, yes.

12  Q.  Didn't know these things were going on.

13      And then it looks like there's a little -- PNG is an image

14  file, correct?

15  A.  Just like the other image files you shared.  I can't see

16  this one.

17  Q.  I can't see it either.  So for whatever reason, we know

18  there was an image there.

19      Would you agree with me that that image is likely those

20  Tara Taylor articles that you mentioned the other day?

21  A.  No.  This image here is the image of the Slack snippet

22  that Tara Taylor and Vincent Palochko had that was published on

23  the internet.

24  Q.  Okay.  Fair enough.  Slightly different description, but

25  we'll agree on that.

*United States District Court*

1      So you then say to Vincent, "My personal opinion is that

2  to lead diversity discussions, you have to listen to everyone,

3  and your reaction when you disagree shouldn't be contention or

4  unaccepting or even hostile toward the other side.  I.e., my

5  comments in the diversity channel on disagreement with what was

6  said about attacking Google when they fired someone for

7  changing a global system without permission."

8      Right?  Did I read that correctly?

9  A.   Yes.

10  Q.   So you're beginning a discussion about diversity with

11  Mr. Palochko, correct?

12  A.   No.  I had empathy for Vincent that this private Slack

13  snippet with his full name, Vincent Palochko, with issues of

14  discrimination with Tara Taylor was published on the internet.

15  I had empathy for him.

16      I like Vincent and I felt this sense to give Vincent my --

17  bit of my support to him because Vincent and I had a

18  relationship since when he called me within a couple hours of

19  me submitting my two resumes, and hired me right away.  So my

20  history with Vincent, you know, from my side, I felt so much

21  empathy for him that something public went on the internet and

22  I was --

23  Q.   Sure.

24  A.   I was supporting him.  The issue here that -- whether

25  you're part of the LGBT community or you're straight or

1  whatever -- in the diversity channel there were -- Tara made a

2  comment that it was okay for an employee on Google internal

3  network to post -- to change code where when any employee

4  logged into their Google system, they were allowed to --

5  Q.   I don't mean to interrupt you.

6  A.   Yeah.  It wasn't about diversity, it was about, be open

7  and --

8  Q.   And again, you say in this 5:34 p.m. message, you are

9  providing to him -- it starts off you providing him your

10  personal opinion about leading diversity discussions, correct?

11  Can we at least agree that that's what the text says?

12  A.   Yes.

13  Q.   Okay.

14  A.   I had to give you that comment, that context to it.

15  Q.   That's fair.

16       And then Vincent Palochko writes back to you and he says,

17  "Hi, Carl.  I agree with you it's a shame this all happened.  I

18  struggle with some of these conversations because diversity to

19  some is purely what someone looks like and turns exclusionary

20  as a result.  It's so much deeper than that."

21       And you respond, "Exactly.  That was my takeaway from the

22  response I received from the channel."

23       Right?

24  A.   Yes, that was the first.

25  Q.   Okay.  And then he gives an example about how diversity

*United States District Court*

1   can be exclusive there at the bottom.

2       And at the top of 730, you say, "Also, you can't exclude

3   others who want to aid diversity by just having a group of all

4   those that are the same.  Many white people went down South to

5   help the voters, right, for everyone in the '60s.  My takeaway

6   is that some who want to lead diversity are not holding the

7   characteristics of respecting and listening to viewpoints.

8   Also, I think Chris Aker, of all people, was very much

9   accepting of LGBT community since I arrived [as yourself] as

10  that is a clear fact.  So disappointed about public attention

11  that distorts that."

12      So you were praising Chris Aker and Vincent Palochko in

13  the way they were accepting of the LGBT community in this

14  message, correct?

15  A.  Can you repeat that?

16  Q.  Sure.

17  A.  I think it just states what it states.

18  Q.  Right.

19  A.  I don't -- I'm not -- I'm not going to go on with

20  background, but it states what it states.

21  Q.  Right.  And --

22  A.  At that moment in time.

23  Q.  And at that moment in time, you thought that Chris Aker

24  was very accepting of the LGBT community since you arrived.

25  Presumably that means arrived at Linode, correct?

*United States District Court*

1  A.   He did not hold hostile opinions or views or actions.  He

2  personally did not.

3  Q.   Right.  And you're including --

4  A.   There were some.

5  Q.   You're including Mr. Palochko here in your praise as to

6  their acceptance of the LGBT community as well, correct?

7  A.   At that time, before I knew background with Dan Spataro

8  and the Philippines, this was a state of mind of mine with

9  Vincent, with public information about, of a private company

10 Slack message.

11 Q.   This was a state of mind that you had six years into your

12 employment at Linode, right?

13 A.   For --

14 Q.   For Chris Aker.

15 A.   Well, for Vincent and Chris Aker, there was an issue at

16 the LGBT --

17 Q.   Again, you don't say that here, right?

18 A.   Because that issue is an un -- you know, there was an

19 issue, but it was a -- some bias that --

20 Q.   Again, I'm going to focus you on my question.

21      My question is simply that as of February of 2020, six

22 years into your Linode employment, you were telling Vincent

23 Palochko, head of HR at Linode, that you thought that Chris

24 Aker and himself were very accepting of the LGBT community

25 since you arrived at Linode?  That's what you were telling him,

1  correct?

2  A.   Yes, that's what it states.

3  Q.   Okay.  And I know since we're up against it, I'm going to

4  jump to the very end of this and just ask you one final

5  question before we break today.

6  A.   Yes.

7  Q.   We just went through in some detail this 100-page document

8  covering four years in which you talked about a variety of

9  things with the director of HR for Linode, some of them

10  complaints that you had, some of them things that you wanted to

11  share with him because you thought they could educate him, some

12  of them holiday related, a variety of topics.  You would agree

13  with me there, correct?

14  A.   Just what it states here.  I'm not going to describe it in

15  that way.

16  Q.   All right.  Well, however you would describe it, you can

17  agree with me that not once in this 100-page document spanning

18  four years of conversation between you and the HR director at

19  Linode, did you ever raise an issue with the way you were

20  treated at Linode based on your sex or your age?  Correct or

21  incorrect?

22  A.   Whatever is stated here.  There's context to some things

23  that happened and -- but there's no explicit statement saying,

24  Vincent, I was discriminated by Dan Spataro and Tom Asaro based

25  on my age or sexual orientation in this document.

*United States District Court*

1  Q.  I think that's the perfect way to end today.

2          THE COURT:  Okay.  So we're going to break for the

3  day.  Plan to start at 9:00 tomorrow again.  That seems to be

4  working for everybody.

5          So again, go home, clear your heads, something other

6  than think about this case.  Certainly don't talk about the

7  case with anybody, with yourselves as you leave or as you

8  arrive in the morning.  It's friends, family, co-workers,

9  anyone else you might chat with.  And don't be looking stuff

10 up, don't be researching.  It's -- you know, you got to decide

11 what case you're hearing here.  Okay?

12         And with that, I'll see you all tomorrow.  Thanks.

13         THE COURTROOM DEPUTY:  All rise.

14         (Jury exits the courtroom at 3:49 p.m.)

15         THE COURT:  All right.  You can all have a seat.

16 Mr. Williams, you can step down.

17         And just -- I mean, Mr. Cavalier, do you have a sense

18 of how much longer you have on cross?

19         MR. CAVALIER:  Probably the morning session until

20 break, that's what I'm going to try for.

21         THE COURT:  Morning session until the mid-morning

22 break, is that what you are saying?

23         MR. CAVALIER:  Correct.

24         THE COURT:  All right.  And then we'll have some

25 redirect and then turn to Mr. Palochko and Mr. Asaro tomorrow.

*United States District Court*

1          MR. CARSON:  My redirect is going to be pretty short

2     too.

3          THE COURT:  All right.  Good.  Maybe we can get

4     through Mr. Palochko, at least his direct, which I guess will

5     be as on cross, by lunch.  We'll see.  Okay.

6          MR. CAVALIER:  I was shooting for 3:45, Your Honor.

7     I'm sorry I missed it by a couple minutes.

8          THE COURT:  It's okay.  If it was a real, real hard

9     stop, I would have stopped you.  That's okay.

10          So I'll see everybody in the morning.  Let's try to

11     start at 9:00, we'll try to get as much in as we can tomorrow

12     so we can drive this thing hopefully towards some sort of

13     resolution.

14          MR. CARSON:  Sorry to interrupt you.  If we do get

15     finished with Mr. Palochko tomorrow, you know, I would prefer

16     to choose who goes next, but it sounds like there's some

17     scheduling things.  Do you want to decide who's coming next

18     now?

19          THE COURT:  My understanding is Mr. Palochko and

20     Mr. Asaro were the ones who had conflicts going into next week.

21          MR. CARSON:  So is that --

22          THE COURT:  I don't know what those conflicts are, I

23     don't know when they are back.  You know -- so again, I don't

24     know what you have in mind.  You can talk to Mr. Cavalier.

25          MR. CARSON:  I'll go with whatever is easiest.

*United States District Court*

1             THE COURT:  Sorry.

2             MR. CARSON:  I'll agree to whatever is the easiest for

3    people's schedules.

4             THE COURT:  Well, just work with Mr. Cavalier then.

5    Again, what I don't want to have happen -- and you all have to

6    talk about this.  Again, I don't know when people are going

7    away.  I know you said Friday.  I don't know where they are

8    going.  I think you said Texas, but I don't know why and I

9    don't know when they are coming back.

10            MR. CAVALIER:  It's where they live, Your Honor, Texas

11    and --

12            THE COURT:  When do they work, Monday through Thursday

13    typically?

14            MR. CAVALIER:  Generally.  There are family issues

15    involved and so forth, but certainly I'll work with Seth to see

16    if we can arrange it in the most conductive way we can.

17            THE COURT:  Yeah.  My concern is if Mr. Palochko drags

18    tomorrow, I'm not going to keep the jury here until 6 o'clock

19    on a Friday to squeeze someone in.  I don't want to have the

20    testimony broken up by multiple days either because of that.

21            So the options are, it seems to me, either A, that

22    could mean whoever is second, Mr. Asaro, would have to be back

23    here Monday, or alternatively, you can do something else after

24    Palochko such that you fill a couple of slots in and then get

25    to Mr. Asaro -- clearly we're going to go to Monday.  I think

*United States District Court*

1  it's unlikely we're going to be done by Tuesday.  We may have

2  closings on Tuesday, but I don't think we're going to be done

3  with all of this before Tuesday.  I think it's unlikely we'll

4  be done Monday.

5        MR. CAVALIER:  We've shortened up our witness list in

6  that respect.

7        THE COURT:  Right.  I appreciate that, I hear you have

8  three witnesses at least who are going to be testifying, maybe

9  four.  Maybe they'll go faster than I think.  But based on the

10 history so far, I think we're going to -- I don't see this --

11 you know, we still -- somewhere in there needs to be a charge

12 conference and all that, too.

13       So I see this as Tuesday at the earliest for us.

14 Okay.  Well, let's -- you know, you all should talk, work out

15 who's going when in the next couple days.  And to the extent

16 you know who's going to go tomorrow, exchange your respective

17 documents.

18       The one thing I would say, Mr. Cavalier, the

19 obligation generally runs to the person calling the witness to

20 make disclosures.  To the extent there are people who are

21 coming who you are going beyond the scope of direct, I think

22 you should make those comparable disclosures to Mr. Carson

23 because then his redirect is really his cross, okay?

24       So with that I will --

25       (Discussion held off the record with courtroom

*United States District Court*

1    deputy.)

2            THE COURT:  All right.  So I'll see everybody tomorrow

3    back here at 9:00.  Okay?  All right, thanks.

4            THE COURTROOM DEPUTY:  All rise.

5            (Matter adjourned at 3:54 p.m.)

6            - - - - - - - - - - - - - - - -

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   */S/ Maureen McHugh, RPR*
     *Official Court Reporter*

12

13   *January 25, 2024*
           *Date*

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

# #

**#Philly** [1] - 101:6

# $

**$120,000** [1] - 61:3
**$3,000** [2] - 60:22, 60:23
**$800** [1] - 143:3

# '

**'15** [2] - 43:5, 43:6
**'20** [1] - 94:6
**'60s** [1] - 150:5
**'1s** [1] - 93:13
**'This** [1] - 93:12

# /

**/S** [1] - 157:11

# 0

**00.00** [2] - 36:12, 36:14
**0563** [1] - 89:25
**0652** [1] - 89:16
**0653** [3] - 89:23, 90:1, 90:2
**0657** [1] - 92:14
**0659** [2] - 93:5, 93:7
**0661** [1] - 94:3
**0662** [1] - 95:23
**0663** [1] - 96:21
**0664** [1] - 101:1
**0665** [2] - 102:17, 104:17
**0684** [1] - 127:13
**0685** [1] - 127:13
**0711** [2] - 143:6, 143:7
**0749** [1] - 89:16

# 1

**1,000** [3] - 60:19, 60:20, 61:25
**1/1/16** [1] - 56:10
**1/1/2016** [1] - 55:5
**10** [3] - 82:21, 88:16, 111:10
**100-page** [2] - 152:7, 152:17
**104** [1] - 3:10
**10:00** [1] - 21:24
**10:55** [1] - 37:19
**10:56** [1] - 38:20
**11:12** [1] - 38:20
**11:14** [1] - 39:8
**12** [3] - 106:13, 147:1,

147:2
**12/31/16** [1] - 56:10
**120** [1] - 61:4
**12:13** [1] - 72:3
**12:15** [1] - 39:4
**12:16** [1] - 74:19
**12:30** [2] - 39:4, 72:9
**12th** [2] - 147:5, 147:7
**1350** [1] - 2:4
**13th** [4] - 123:16, 123:21, 123:25, 124:1
**14** [4] - 3:7, 90:4, 96:24, 97:3
**14-year-old** [4] - 65:8, 65:11, 65:12, 66:19
**143** [1] - 53:14
**15** [3] - 19:19, 37:17, 97:10
**15th** [4] - 20:1, 20:21, 80:15, 97:10
**16** [1] - 95:16
**1601** [1] - 2:4
**164** [3] - 12:6, 12:9, 12:10
**169** [1] - 14:6
**17** [3] - 91:9, 107:4, 137:12
**172** [1] - 15:2
**177** [6] - 3:9, 53:15, 53:18, 54:20, 54:22, 54:23
**178** [7] - 3:9, 54:24, 55:1, 55:12, 55:15, 55:16, 56:6
**17th** [1] - 88:25
**18** [1] - 13:23
**1835** [1] - 1:19
**18th** [1] - 53:1
**19** [1] - 29:19
**19102** [1] - 2:5
**19103** [1] - 1:20
**19106** [1] - 1:13
**19th** [1] - 53:1
**1:00** [1] - 72:9
**1:30** [4] - 71:15, 71:25, 72:10, 74:16
**1:38** [1] - 74:19
**1:39** [1] - 75:4
**1st** [1] - 88:8

# 2

**20** [3] - 95:24, 136:16, 143:8
**20-something** [1] - 33:11
**2008** [2] - 52:24, 53:2
**2014** [9] - 43:2, 43:5, 52:25, 53:3, 82:2,

82:3, 92:5, 97:3, 132:18
**2015** [3] - 43:1, 43:8, 43:19
**2016** [13] - 40:14, 43:21, 55:24, 55:25, 56:1, 56:10, 56:16, 56:18, 115:13, 115:25, 116:5, 120:19
**2017** [12] - 23:1, 56:16, 56:19, 56:21, 88:8, 88:16, 90:4, 91:9, 111:10, 120:1, 120:3, 120:19
**2018** [29] - 28:22, 56:22, 93:8, 94:7, 95:3, 95:17, 95:24, 96:8, 96:24, 97:10, 101:24, 102:18, 104:18, 105:21, 106:13, 107:4, 110:10, 111:10, 111:16, 111:25, 114:18, 116:6, 120:4, 122:24, 123:15, 124:1, 124:15, 125:8
**2019** [12] - 12:20, 12:23, 13:21, 14:8, 56:24, 127:4, 127:14, 129:16, 135:2, 137:12, 141:9, 143:8
**2020** [28] - 7:7, 7:24, 7:25, 8:25, 9:18, 9:21, 9:23, 11:24, 12:7, 14:12, 14:25, 16:12, 18:17, 18:21, 19:19, 20:1, 25:6, 25:7, 29:19, 56:24, 57:1, 58:14, 59:1, 144:3, 147:1, 147:2, 147:5, 151:21
**2021** [1] - 57:1
**2022** [1] - 52:4
**2024** [2] - 1:13, 157:13
**21st** [1] - 116:22
**22** [8] - 3:10, 86:9, 88:21, 88:22, 103:20, 104:17, 134:3
**23** [2] - 93:8, 110:10
**23rd** [1] - 140:11
**24** [2] - 125:8, 144:17
**25** [3] - 1:13, 136:16, 157:13
**25:46** [1] - 37:23
**25th** [1] - 127:4
**26th** [1] - 101:1,

110:10
**27** [1] - 34:12
**27-minute** [1] - 34:15
**27th** [1] - 92:15
**28** [2] - 127:13, 144:3
**28th** [2] - 126:8, 141:9
**29** [1] - 3:8
**2950** [1] - 1:19
**29th** [1] - 108:14
**2:22-CV-01618-JDW** [1] - 1:4
**2:45** [1] - 121:23
**2:50** [2] - 121:23, 122:8
**2:51** [1] - 122:11
**2:59** [1] - 122:11

# 3

**3** [4] - 1:6, 51:18, 96:8, 132:15
**31** [1] - 104:24
**31st** [1] - 55:19
**33** [2] - 82:21, 82:24
**35** [1] - 3:8
**3:00** [1] - 122:16
**3:45** [1] - 154:6
**3:49** [1] - 153:14
**3:54** [1] - 157:5
**3rd** [1] - 134:5

# 4

**4** [1] - 51:17
**401K** [14] - 54:8, 54:13, 60:25, 61:3, 61:6, 61:12, 61:13, 62:5, 62:7, 62:9, 89:2, 124:20, 124:21, 127:5
**42** [5] - 3:8, 35:4, 35:5, 35:6, 35:9
**43** [1] - 35:3
**49** [5] - 3:7, 11:9, 13:20, 14:2, 14:4
**4:00** [1] - 96:13

# 5

**5** [4] - 31:1, 51:20, 102:18, 104:18
**50** [1] - 82:15
**54** [1] - 3:9
**55** [1] - 3:9
**58** [1] - 50:9
**59** [1] - 3:4
**5:34** [1] - 149:8
**5G** [4] - 51:10, 51:12, 51:13

# 6

**6** [3] - 54:4, 132:3, 155:18
**6-month** [1] - 51:25
**601** [1] - 1:12
**60K** [1] - 139:3
**652** [1] - 89:8
**659** [1] - 89:7
**66** [1] - 106:12
**665** [1] - 103:20
**668** [1] - 107:4
**670** [1] - 108:1
**671** [1] - 108:12
**672** [1] - 109:23
**674** [2] - 110:6, 110:10
**676** [3] - 123:3, 123:4, 124:1
**677** [1] - 124:16
**680** [1] - 125:6
**681** [1] - 126:15
**682** [1] - 126:25
**684** [1] - 127:4
**686** [2] - 128:13, 134:3
**694** [1] - 137:8
**697** [2] - 140:7, 140:13

# 7

**7** [3] - 3:4, 94:7, 101:23
**703** [1] - 141:5
**706** [1] - 143:3
**711** [1] - 143:2
**712** [1] - 143:12
**721** [1] - 144:2
**722** [1] - 144:17
**723** [1] - 144:17
**725** [1] - 145:4
**729** [1] - 146:23
**730** [1] - 150:2

# 8

**8** [3] - 30:25, 94:6, 95:3
**84** [5] - 3:8, 28:7, 29:6, 29:9, 29:10
**88** [1] - 3:10
**89** [7] - 3:10, 103:5, 103:21, 103:22, 104:2, 104:14, 104:16
**8:13** [1] - 106:5
**8th** [3] - 95:2, 117:2, 126:17

# 9

**9** [2] - 32:4, 123:15

*United States District Court*

**9:00** [6] - 4:6, 4:10, 32:6, 153:3, 154:11, 157:3
**9:30** [2] - 21:23, 21:24
**9:34** [2] - 1:14, 4:2
**9:37** [1] - 6:20
**9th** [9] - 111:14, 111:25, 117:8, 117:9, 117:12, 123:10, 123:11, 123:12, 123:24

## A

**a.m** [9] - 1:14, 6:20, 21:23, 21:24, 37:19, 38:20, 39:8, 106:5
**abilities** [1] - 83:24
**ability** [2] - 31:19, 33:15
**able** [5] - 61:6, 63:2, 109:11, 129:21, 136:24
**above-entitled** [1] - 157:9
**absent** [1] - 30:11
**absolutely** [2] - 34:6, 58:15
**academically** [1] - 134:13
**accept** [1] - 134:22
**acceptance** [1] - 151:6
**accepted** [1] - 133:1
**accepting** [4] - 150:9, 150:13, 150:24, 151:24
**access** [10] - 16:22, 17:4, 17:15, 18:15, 18:19, 19:3, 69:18, 70:5, 90:11, 144:22
**Access** [1] - 40:14
**accommodate** [1] - 105:8
**accomplishments** [1] - 7:21
**according** [10] - 14:9, 115:16, 116:7, 117:7, 118:8, 118:12, 120:18, 120:22, 121:13, 134:24
**account** [6] - 53:22, 53:23, 54:6, 54:14, 54:17, 54:18
**accurate** [2] - 38:9, 86:23
**achieved** [1] - 125:18
**ACLU** [1] - 98:16
**acquisition** [1] - 6:15
**Acre** [1] - 145:7

**act** [1] - 138:7
**ACTION** [1] - 1:3
**action** [1] - 85:6
**actions** [1] - 151:1
**actor** [1] - 108:22
**actors** [1] - 109:3
**Adam** [2] - 41:21, 139:4
**add** [4] - 4:17, 22:2, 22:17, 24:11
**added** [4] - 7:17, 21:19, 23:10, 23:11
**adding** [3] - 22:4, 22:9, 38:12
**addition** [1] - 61:25
**additional** [1] - 45:7
**additionally** [1] - 85:15
**address** [3] - 115:17, 138:23, 139:10
**addressed** [3] - 140:2, 146:12, 146:18
**adjourned** [1] - 157:5
**adjunct** [1] - 47:15
**adjustment** [1] - 95:17
**administrator** [1] - 57:16
**admit** [4] - 34:25, 88:19, 104:9, 104:14
**admits** [1] - 61:8
**admitted** [9] - 54:20, 82:22, 103:6, 103:24, 103:25, 104:4, 104:7, 104:11, 133:22
**adopted** [1] - 23:2
**advance** [1] - 26:4
**advancement** [1] - 83:22
**advice** [1] - 16:4
**advocating** [1] - 24:22
**affected** [2] - 47:12, 118:6
**affiliated** [1] - 67:14
**affiliation** [5] - 63:1, 63:4, 65:24, 66:6, 67:11
**affirmatively** [1] - 91:4
**afternoon** [2] - 73:4, 74:24
**afterwards** [1] - 41:12
**age** [24] - 7:10, 8:11, 20:25, 21:3, 21:11, 21:12, 21:15, 22:17, 24:13, 25:2, 25:8, 76:7, 78:7, 81:23, 83:8, 84:1, 84:8, 86:1, 86:4, 135:8, 135:16, 152:20, 152:25

**age-based** [3] - 86:4, 135:8, 135:16
**agency** [5] - 136:8, 136:9, 136:10, 136:11, 136:25
**ago** [5] - 22:23, 116:10, 136:16, 136:17, 137:1
**agree** [35] - 60:10, 76:2, 76:5, 76:9, 76:14, 77:4, 77:23, 78:4, 78:9, 78:11, 80:8, 84:5, 85:8, 86:3, 86:21, 88:25, 101:19, 102:3, 102:14, 107:23, 112:3, 113:10, 121:7, 124:11, 126:13, 132:9, 143:13, 147:19, 147:25, 149:11, 149:17, 152:12, 152:17, 155:2
**agreed** [1] - 129:22
**agreeing** [1] - 126:3
**agreement** [4] - 5:22, 114:17, 129:19, 130:25
**agrees** [1] - 141:1
**ahead** [16] - 59:17, 74:21, 75:9, 82:24, 86:19, 98:7, 122:20, 127:15, 137:7, 141:4, 143:2, 143:6, 143:25, 146:6, 147:2
**AI** [1] - 45:3
**aid** [1] - 150:3
**aided** [1] - 1:24
**Akamai** [5] - 49:8, 49:9, 73:15, 73:16, 73:20
**Aker** [14] - 8:17, 41:17, 60:5, 82:7, 116:19, 134:10, 145:6, 145:8, 150:8, 150:12, 150:23, 151:14, 151:15, 151:24
**Alex** [1] - 82:13
**alleged** [4] - 32:12, 65:7, 66:18, 135:15
**allowed** [3] - 48:21, 54:17, 149:4
**allowing** [1] - 9:13
**allows** [1] - 16:24
**almost** [1] - 132:19
**alone** [1] - 140:17
**ALSO** [1] - 2:10
**Alter** [1] - 141:12

**alternatively** [1] - 155:23
**amazing** [1] - 15:18
**Amber** [3] - 145:2, 145:18, 145:23
**amount** [4] - 52:3, 59:24, 60:17, 107:7
**and..** [1] - 76:13
**Andrew** [2] - 41:23, 82:11
**angry** [2] - 68:11, 68:13
**announced** [1] - 20:1
**announcement** [1] - 127:17
**annual** [4] - 54:16, 54:18, 62:6, 62:11
**anonymous** [2] - 15:23, 33:16
**answer** [12] - 39:23, 68:14, 68:15, 76:22, 76:24, 78:15, 79:8, 112:24, 113:1, 119:4, 119:5, 124:6
**answered** [2] - 64:7, 107:23
**answers** [1] - 107:15
**antianxiety** [2] - 44:5, 45:19
**antidepressant** [1] - 46:19
**anxiety** [10] - 43:10, 43:11, 43:12, 44:7, 44:8, 44:9, 44:10, 45:21, 46:4, 47:1
**anxious** [1] - 44:17
**anytime** [1] - 30:23
**anyways** [1] - 59:1
**Anyways** [1] - 142:1
**apartment** [1] - 27:24
**apologies** [1] - 132:5
**apologize** [4] - 6:25, 38:4, 49:12, 104:3
**apparent** [1] - 8:5
**appear** [1] - 21:8
**appeared** [1] - 21:7
**applicant** [1] - 50:12
**applicants** [1] - 91:12
**application** [1] - 47:25
**applied** [8] - 48:18, 48:20, 48:21, 48:24, 49:20, 49:21, 70:13
**apply** [4] - 48:21, 98:17, 135:13, 137:17
**appoint** [1] - 45:24
**appointment** [10] - 28:15, 28:16, 28:20, 29:12, 29:13, 29:14, 29:15, 29:17, 42:22,

46:12
**appointments** [2] - 28:19, 28:24
**appreciate** [2] - 6:24, 156:7
**apprisal** [1] - 85:5
**approach** [2] - 86:18, 120:10
**approve** [1] - 145:23
**approved** [1] - 91:3
**April** [6] - 80:5, 95:16, 95:24, 125:25, 137:12, 140:11
**architecture** [1] - 125:11
**area** [2] - 92:2, 105:17
**arrange** [1] - 155:16
**arrested** [1] - 64:22
**arrive** [1] - 153:8
**arrived** [4] - 150:9, 150:24, 150:25, 151:25
**art** [1] - 107:2
**article** [23] - 20:22, 69:17, 69:19, 69:20, 69:21, 70:3, 70:8, 70:19, 70:25, 71:5, 91:11, 91:16, 96:25, 97:3, 97:6, 108:15, 109:14, 109:18, 126:9, 126:16, 126:20, 144:23, 145:18
**articles** [3] - 92:8, 126:12, 147:20
**artificial** [1] - 44:25
**artist** [2] - 106:22, 107:1
**artwork** [2] - 106:18, 106:20
**Asaro** [17] - 4:18, 4:25, 17:20, 17:25, 18:12, 44:12, 44:15, 82:9, 87:20, 87:23, 117:1, 131:2, 152:24, 153:25, 154:20, 155:22, 155:25
**ASARO** [1] - 1:8
**Asaro's** [1] - 18:5
**aside** [1] - 76:14
**assess** [1] - 38:3
**assigned** [1] - 135:25
**associated** [4] - 73:14, 74:5, 74:14, 146:3
**association** [3] - 62:22, 63:14, 69:9
**associations** [1] - 69:1

**assume** [1] - 110:18
**assuming** [3] - 67:11, 101:8, 121:13
**assurances** [1] - 114:12
**attack** [5] - 45:21, 45:22, 108:20, 108:21, 109:10
**attacking** [1] - 148:6
**attacks** [3] - 46:22, 46:24, 47:14
**attempting** [1] - 65:1
**attend** [1] - 26:6
**attending** [1] - 11:2
**attention** [16] - 72:21, 85:3, 93:21, 99:3, 100:5, 101:3, 106:3, 107:15, 112:15, 112:21, 116:9, 139:25, 140:20, 143:23, 146:2, 150:10
**attorney** [6] - 20:11, 20:16, 58:3, 77:9, 102:23
**attorneys** [1] - 20:19
**audio** [6] - 27:6, 35:13, 35:18, 36:3, 37:2, 37:12
**August** [6] - 8:1, 28:12, 29:19, 90:4, 101:23, 143:8
**authorizing** [1] - 139:24
**avoid** [2] - 109:11, 132:7
**award** [1] - 60:15
**aware** [5] - 73:13, 73:23, 82:17, 85:20, 114:25

### B

**background** [9] - 50:24, 51:1, 51:3, 51:4, 70:2, 92:6, 145:25, 150:20, 151:7
**bad** [9] - 48:13, 108:21, 109:3, 140:15, 140:17, 140:21, 142:4, 142:18
**badly** [1] - 8:5
**ball** [1] - 72:13
**ball-parking** [1] - 72:13
**Bamboo** [4] - 128:17, 130:3, 130:7, 132:11
**bank** [2] - 94:8, 124:24

**bans** [1] - 91:11
**based** [22] - 5:17, 8:11, 23:4, 33:1, 48:1, 49:14, 60:5, 71:14, 71:23, 72:16, 78:7, 80:13, 81:23, 83:24, 84:8, 86:4, 128:19, 135:8, 135:16, 152:20, 152:24, 156:9
**basing** [2] - 8:13, 8:15
**basis** [1] - 79:12
**Bates** [1] - 89:15
**bathroom** [1] - 122:3
**became** [2] - 23:2, 39:17
**become** [3] - 52:12, 52:15, 126:5
**bed** [1] - 101:17
**began** [5] - 26:23, 27:4, 88:8, 88:9, 88:16
**begin** [1] - 88:7
**beginning** [6] - 23:10, 30:2, 30:22, 85:9, 92:15, 148:10
**begins** [2] - 27:11, 89:16
**behave** [2] - 139:21, 145:11
**behavior** [9] - 68:19, 69:4, 69:6, 97:24, 115:2, 115:5, 118:7, 118:10, 145:22
**belief** [6] - 62:24, 64:4, 72:21, 116:14, 117:22, 132:12
**belongings** [2] - 105:10, 105:14
**below** [2] - 91:18, 92:24
**Ben** [2] - 42:3, 139:4
**beneficial** [1] - 24:18
**benefit** [8] - 23:5, 54:8, 54:13, 55:6, 55:20, 56:9, 62:10, 93:1
**benefits** [6] - 55:9, 92:22, 110:16, 111:2, 112:18, 117:19
**best** [5] - 33:15, 72:17, 72:22, 74:15, 86:15
**beta** [1] - 46:23
**better** [4] - 77:8, 92:11, 96:18, 110:12
**Betterworks** [1] - 126:17
**between** [13] - 10:13, 29:20, 44:1, 44:10,

51:17, 52:5, 53:2, 66:18, 87:8, 112:7, 123:24, 131:1, 152:18
**beyond** [2] - 74:25, 156:21
**bi** [2] - 62:5, 62:8
**bi-weekly** [2] - 62:5, 62:8
**bias** [1] - 151:19
**big** [2] - 53:1, 131:1
**bill** [1] - 91:15
**birds** [1] - 32:9
**bit** [16] - 4:5, 12:13, 40:17, 42:10, 47:6, 50:13, 83:1, 88:24, 107:18, 122:24, 124:7, 131:11, 139:5, 140:12, 144:15, 148:17
**blew** [1] - 10:12
**blocker** [1] - 46:24
**blow** [2] - 118:21
**body** [1] - 59:7
**bonus** [5] - 59:21, 59:25, 60:1, 62:1, 134:22
**Boss** [1] - 126:10
**bothered** [1] - 146:1
**bottom** [10] - 12:14, 90:3, 95:16, 96:7, 101:22, 107:7, 137:12, 140:13, 143:8, 150:1
**break** [23] - 31:13, 31:15, 37:14, 38:17, 39:3, 58:21, 62:17, 71:14, 71:16, 71:25, 72:12, 74:24, 75:12, 121:23, 121:25, 122:1, 122:3, 122:4, 144:1, 152:5, 153:2, 153:20, 153:22
**breaking** [1] - 71:9
**brief** [2] - 6:10, 108:19
**Brief** [2] - 38:20, 122:11
**briefly** [5] - 53:21, 82:2, 84:16, 96:22, 110:14
**bring** [17] - 5:19, 6:9, 67:2, 82:20, 84:14, 85:2, 85:12, 104:6, 106:2, 107:14, 112:20, 112:23, 116:9, 120:16, 139:10, 140:25, 146:1
**bringing** [7] - 93:20, 97:20, 99:3, 101:2,

112:14, 113:2, 140:19
**broke** [1] - 75:12
**broken** [1] - 155:20
**brought** [4] - 70:12, 98:3, 100:5, 139:25
**buck** [1] - 87:19
**Buenzle** [1] - 2:13
**bug** [1] - 101:24
**building** [4] - 51:13, 52:24, 94:8, 124:25
**buildings** [1] - 53:1
**bullshit** [1] - 63:17
**Burgess** [2] - 145:2, 145:18
**business** [9] - 5:5, 7:8, 90:20, 93:15, 108:23, 127:19, 127:21, 128:6, 131:23
**Buspirone** [1] - 43:16
**but..** [1] - 130:21
**button** [3] - 31:8, 31:9, 36:17
**BY** [59] - 1:19, 2:3, 3:4, 3:4, 7:5, 11:10, 12:4, 12:12, 12:22, 14:7, 19:7, 23:17, 23:22, 24:3, 28:8, 29:11, 37:3, 39:11, 45:17, 48:11, 53:17, 54:25, 55:17, 56:8, 57:23, 59:19, 60:9, 63:12, 64:11, 65:9, 67:19, 67:24, 69:24, 70:23, 75:11, 77:3, 78:21, 81:10, 81:18, 82:25, 84:18, 86:10, 86:20, 88:23, 102:6, 103:8, 104:19, 108:13, 110:9, 122:22, 123:9, 131:7, 132:8, 133:13, 133:18, 134:4, 137:9, 141:6, 144:11
**Byrne** [1] - 1:12

### C

**Caker** [1] - 145:5
**calendar** [7] - 28:15, 28:16, 28:17, 28:19, 28:20, 28:24, 29:12
**California** [2] - 91:11, 91:18
**cancel** [1] - 47:22
**cancelled** [1] - 11:3
**candidate** [1] - 134:7
**capacity** [1] - 114:19
**caption** [1] - 124:8

**card** [5] - 124:25, 125:1, 127:19, 127:21, 128:6
**cards** [1] - 131:23
**care** [8] - 26:24, 42:24, 46:15, 99:7, 100:9, 100:15, 116:23, 119:17
**careful** [1] - 73:11
**carefully** [1] - 77:1
**CARL** [2] - 1:3, 3:3
**Carl** [31] - 15:18, 16:3, 16:6, 16:7, 16:9, 26:23, 28:7, 30:25, 34:6, 37:4, 42:6, 53:21, 55:3, 59:13, 88:11, 88:12, 89:4, 93:12, 93:13, 101:3, 102:11, 102:19, 106:17, 108:8, 109:15, 125:14, 126:18, 127:25, 141:18, 146:12, 149:17
**Carls** [1] - 88:13
**carries** [1] - 107:6
**carry** [1] - 107:7
**Carson** [8] - 34:21, 35:12, 37:21, 38:2, 70:1, 72:12, 73:13, 156:22
**CARSON** [95] - 1:19, 3:4, 6:17, 7:5, 11:8, 11:10, 12:4, 12:9, 12:11, 12:12, 12:19, 12:22, 13:19, 13:23, 14:5, 14:7, 19:7, 23:17, 23:22, 24:2, 24:3, 28:7, 28:8, 29:6, 29:11, 34:8, 34:13, 34:16, 34:22, 35:1, 35:5, 35:10, 35:14, 35:18, 35:24, 36:2, 36:4, 36:7, 36:11, 36:14, 36:16, 36:19, 36:23, 37:1, 37:3, 37:23, 37:25, 38:4, 38:7, 38:16, 38:24, 39:11, 45:17, 48:11, 53:13, 53:17, 54:19, 54:24, 54:25, 55:12, 55:17, 56:6, 56:8, 57:23, 59:10, 59:13, 60:8, 63:9, 64:7, 65:4, 67:16, 67:22, 69:22, 70:20, 71:6, 72:24, 73:2, 73:15, 73:17, 73:21, 74:2, 81:3, 81:15, 88:20, 104:7,

*104:10, 131:5, 133:8, 133:10, 133:16, 154:1, 154:14, 154:21, 154:25, 155:2*
**case** [25] - 4:21, 5:3, 5:18, 5:23, 5:25, 38:14, 44:10, 58:16, 59:3, 70:8, 71:18, 71:19, 71:20, 71:23, 72:6, 72:22, 73:23, 78:5, 78:18, 79:10, 93:19, 153:6, 153:7, 153:11
**casual** [1] - 94:12
**categories** [2] - 58:22
**caused** [3] - 44:8, 44:10, 47:9
**CAVALIER** [111] - 2:3, 3:4, 4:16, 5:9, 5:14, 5:17, 6:2, 6:6, 6:10, 6:18, 13:21, 13:25, 19:5, 23:15, 23:20, 23:25, 29:8, 34:12, 34:20, 35:4, 36:6, 39:2, 39:6, 45:15, 48:8, 54:21, 55:14, 57:20, 59:16, 59:19, 60:9, 63:11, 63:12, 64:10, 64:11, 65:9, 67:19, 67:24, 69:24, 70:23, 71:9, 72:4, 72:15, 72:20, 74:17, 74:23, 75:8, 75:10, 75:11, 76:20, 77:3, 78:15, 78:21, 80:18, 81:1, 81:10, 81:17, 81:18, 82:20, 82:25, 84:14, 84:18, 86:9, 86:10, 86:18, 86:20, 88:18, 88:23, 102:6, 103:4, 103:8, 103:19, 103:22, 103:24, 104:3, 104:6, 104:9, 104:13, 104:15, 104:17, 104:19, 108:12, 108:13, 110:6, 110:9, 121:19, 122:2, 122:19, 122:21, 122:22, 123:5, 123:9, 131:7, 132:5, 132:8, 133:13, 133:18, 134:2, 134:4, 137:7, 137:9, 141:4, 141:6, 144:10, 144:11, 153:19, 153:23, 154:6, 155:10, 155:14, 156:5*

**cavalier** [1] - 81:5
**Cavalier** [7] - 34:18, 59:17, 72:14, 153:17, 154:24, 155:4, 156:18
**cell** [4] - 93:11, 93:12, 93:16, 93:22
**Center** [3] - 52:21, 52:23, 52:24
**centered** [1] - 111:17
**CEO** [3] - 49:2, 96:12, 109:18
**Cerf** [1] - 48:19
**certain** [3] - 61:23, 73:25, 87:2
**certainly** [9] - 5:20, 6:6, 21:24, 64:10, 74:13, 129:25, 139:11, 153:6, 155:15
**certify** [1] - 157:8
**Chad** [1] - 52:1
**chain** [9] - 86:7, 86:23, 86:25, 90:14, 111:19, 113:7, 115:6, 118:18, 129:8
**chambers** [2] - 72:5, 73:25
**chance** [1] - 125:7
**change** [11] - 24:22, 62:8, 98:25, 128:21, 128:23, 129:7, 129:8, 129:9, 131:1, 135:2, 149:3
**changed** [8] - 42:14, 56:15, 120:7, 128:16, 128:19, 128:24, 130:11, 131:13
**changes** [1] - 61:20
**changing** [2] - 130:3, 148:7
**Channel** [1] - 101:4
**channel** [14] - 45:2, 98:14, 101:8, 101:10, 101:11, 141:14, 144:8, 144:13, 144:18, 144:20, 144:24, 148:5, 149:1, 149:22
**chaotic** [1] - 115:23
**characteristics** [1] - 150:7
**charge** [14] - 79:3, 105:24, 111:12, 118:22, 131:25, 135:5, 135:11, 135:12, 136:12, 136:14, 136:23, 156:11

**charged** [1] - 136:21
**charges** [2] - 67:2, 123:8
**chat** [7] - 71:21, 87:4, 94:16, 143:19, 153:9
**chatter** [1] - 74:15
**check** [8] - 50:24, 51:1, 51:3, 51:4, 70:2, 90:11, 106:7, 141:13
**Cherry** [1] - 2:4
**choice** [1] - 130:19
**choose** [1] - 154:16
**Chris** [16] - 8:17, 41:17, 60:5, 82:7, 95:7, 95:14, 116:19, 134:9, 145:6, 145:8, 150:8, 150:12, 150:23, 151:14, 151:15, 151:23
**Christmas** [3] - 124:25, 125:1, 125:8
**chronology** [1] - 87:1
**circle** [1] - 70:12
**circumstances** [1] - 67:13
**citizenship** [1] - 84:2
**CIVIL** [1] - 1:3
**claim** [7] - 16:18, 52:2, 60:2, 61:15, 113:3, 114:20, 115:4
**claimed** [2] - 60:12, 117:16
**claiming** [1] - 117:5
**claims** [1] - 96:1
**clarify** [2] - 79:8, 83:9
**class** [5] - 24:19, 47:24, 47:25, 125:11
**classes** [7] - 21:8, 21:9, 21:16, 21:20, 24:12, 47:20, 48:3
**clean** [2] - 104:4, 133:19
**clear** [9] - 37:16, 71:17, 79:8, 113:16, 119:4, 132:6, 135:7, 150:10, 153:5
**clearly** [2] - 100:2, 155:25
**click** [3] - 31:8, 31:9, 36:16
**clicked** [1] - 145:18
**clicks** [1] - 145:23
**client** [2] - 73:17, 73:22
**clip** [1] - 36:22
**clock** [2] - 31:4, 38:13
**close** [5] - 5:5, 6:12, 52:2, 53:6, 67:1
**closings** [1] - 156:2

**cloud** [4] - 47:24, 48:1, 108:24
**cloud-based** [1] - 48:1
**Cloudflare** [6] - 144:19, 144:22, 145:9, 145:10, 145:18, 145:20
**co** [2] - 127:1, 153:8
**co-payments** [1] - 127:1
**co-workers** [1] - 153:8
**code** [1] - 149:3
**coding** [1] - 98:18
**coin** [2] - 108:16, 109:19
**cold** [3] - 95:14, 95:15
**collaborative** [1] - 92:5
**collateral** [1] - 38:12
**color** [1] - 84:1
**Comcast** [23] - 50:19, 50:21, 50:25, 51:8, 51:11, 51:13, 51:14, 51:15, 51:22, 52:7, 52:9, 52:18, 52:21, 52:22, 52:23, 52:24, 70:2, 70:3, 70:7, 109:7
**comfortable** [3] - 112:13, 112:20, 113:2
**coming** [6] - 74:7, 98:17, 138:9, 154:17, 155:9, 156:21
**command** [1] - 129:9
**Commencing** [1] - 1:14
**comment** [5] - 45:10, 109:17, 142:3, 149:2, 149:14
**comments** [7] - 8:19, 14:20, 44:21, 118:24, 119:21, 120:7, 148:5
**Commission** [7] - 28:21, 44:11, 78:20, 79:19, 116:19, 123:15, 135:10
**Committee** [2] - 79:18, 81:9
**common** [1] - 94:16
**communicating** [2] - 8:22, 20:25
**communication** [3] - 10:14, 21:23, 47:16
**communications** [3] - 23:14, 80:9, 88:15
**community** [6] - 148:25, 150:9,

**150:13, 150:24, 151:6, 151:24**
**comp** [1] - 88:11
**companies** [2] - 48:25, 50:11
**company** [23] - 7:18, 31:8, 37:6, 39:21, 42:1, 49:14, 60:5, 67:13, 67:18, 67:20, 67:25, 85:14, 86:4, 91:6, 99:4, 113:13, 130:2, 130:4, 130:22, 132:2, 142:16, 145:9, 151:9
**COMPANY** [1] - 1:7
**company's** [1] - 85:9
**comparable** [1] - 156:22
**compendium** [1] - 87:1
**compensated** [2] - 61:22, 61:24
**competency** [1] - 125:12
**competitive** [1] - 145:13
**competitor** [1] - 145:21
**complain** [2] - 135:7, 141:12
**complained** [5] - 78:12, 83:2, 114:2, 116:11, 141:23
**complainers** [1] - 97:8
**complaining** [5] - 81:7, 103:1, 103:13, 145:17, 145:20
**complaint** [20] - 33:16, 44:12, 44:13, 44:18, 58:2, 59:1, 59:3, 83:4, 83:7, 83:8, 116:19, 123:15, 124:5, 124:6, 135:20, 135:22, 135:23, 136:2, 146:17
**complaints** [2] - 117:19, 152:10
**complements** [1] - 16:10
**complete** [1] - 8:24
**completely** [1] - 136:17
**completes** [1] - 9:6
**completing** [1] - 125:10
**complimenting** [2] - 107:1, 107:3
**compromise** [1] - 139:12

**computer** [6] - 1:24, 11:17, 35:20, 35:22, 47:24, 125:11
**computer-aided** [1] - 1:24
**computing** [1] - 47:24
**concern** [3] - 64:15, 66:10, 155:17
**concerned** - 16:18, 66:24, 67:5, 93:22, 114:11
**concerning** [1] - 7:9
**concerns** [4] - 85:1, 85:4, 85:10, 88:2
**conduct** [5] - 66:17, 69:4, 115:10, 116:3, 116:8
**conductive** - 155:16
**conference** [6] - 26:12, 26:17, 26:20, 72:6, 96:13, 156:12
**conferencing** [1] - 26:10
**confident** [1] - 34:6
**confidential** [2] - 137:17, 138:13
**confidentiality** [1] - 139:13
**configuration** [1] - 106:8
**confined** [1] - 65:21
**conflicts** [2] - 154:20, 154:22
**confuse** [1] - 52:17
**congrats** [1] - 127:25
**congratulating** [1] - 128:2
**connected** [2] - 66:17, 68:2
**connecting** [1] - 68:5
**connection** [3] - 7:10, 16:18
**consequences** [1] - 38:13
**considered** [5] - 50:3, 76:18, 129:20, 129:23, 129:24
**consistent** [1] - 68:25
**constant** [1] - 8:6
**constructive** [1] - 16:4
**Consulting** [3] - 57:14, 57:15, 89:14
**consulting** [4] - 49:8, 49:16, 49:19, 50:8
**contact** [2] - 58:3, 58:4
**contacted** [4] - 48:18, 50:18, 50:22, 51:19
**contacts** [2] - 48:18,

49:1
**content** [1] - 49:5
**contention** [2] - 100:14, 148:3
**context** [12] - 16:24, 65:10, 79:14, 98:21, 109:15, 112:14, 117:4, 119:16, 141:18, 146:6, 149:14, 152:22
**continually** [2] - 8:11, 21:17
**continue** [4] - 7:1, 46:25, 47:17, 49:18
**continued** [1] - 21:17
**continuing** [1] - 52:12
**continuous** [1] - 8:7
**continuously** [1] - 52:6
**contract** [2] - 51:22, 52:11
**contractor** [1] - 52:18
**contractors** [1] - 52:18
**contribution** [3] - 61:6, 61:11, 62:7
**contributions** [6] - 7:16, 39:22, 42:17, 60:25, 62:5, 62:9
**control** [1] - 95:6
**convergence** [1] - 135:18
**conversation** [14] - 23:13, 23:18, 23:24, 27:7, 27:9, 29:23, 32:24, 41:5, 87:8, 92:15, 117:18, 124:24, 127:10, 152:18
**conversations** [1] - 149:18
**cool** [1] - 108:8
**copied** [1] - 25:11
**copy** [4] - 86:12, 90:5, 90:6, 144:12
**copy/paste** [1] - 144:8
**corporate** [1] - 20:15
**correct** [129] - 12:24, 13:11, 13:17, 14:22, 29:13, 54:2, 54:15, 55:10, 55:21, 55:24, 60:13, 62:23, 64:18, 65:17, 68:1, 68:6, 70:16, 75:25, 76:8, 77:10, 78:2, 82:2, 83:17, 84:12, 84:22, 85:18, 87:2, 87:14, 87:19, 88:9, 88:12, 88:16, 89:6, 89:17, 90:25, 91:16, 91:22,

91:25, 92:23, 93:2, 94:1, 95:13, 95:14, 95:18, 96:5, 96:19, 97:2, 97:5, 98:8, 99:4, 101:17, 105:4, 106:10, 106:24, 107:9, 107:16, 107:21, 109:12, 110:3, 111:6, 111:7, 111:10, 111:17, 112:10, 112:21, 113:14, 115:14, 115:18, 116:2, 117:8, 117:21, 117:25, 123:1, 123:18, 123:22, 124:4, 124:20, 125:4, 125:14, 125:19, 126:21, 126:23, 127:8, 127:11, 127:14, 127:22, 128:8, 128:18, 129:5, 129:10, 130:24, 131:8, 131:10, 131:14, 131:16, 131:19, 131:20, 132:2, 132:10, 133:25, 134:8, 134:20, 135:7, 135:22, 139:14, 139:17, 139:25, 140:3, 140:9, 141:15, 142:10, 142:25, 143:17, 144:9, 146:2, 146:18, 147:1, 147:4, 147:14, 148:11, 149:10, 150:14, 150:25, 151:6, 152:1, 152:13, 152:20, 153:23, 157:8
**correctly** [3] - 66:24, 138:2, 148:8
**cost** [2] - 90:23, 132:15
**Cost** [1] - 126:10
**cost-of-living** [1] - 132:15
**couch** [2] - 44:17, 46:16
**counsel** [2] - 20:11, 103:25
**count** [1] - 62:25
**country** [1] - 22:10
**couple** [17] - 6:24, 11:12, 31:15, 53:11, 54:1, 72:7, 74:8, 77:15, 77:20, 81:24, 90:9, 121:6, 126:8,

148:18, 154:7, 155:24, 156:15
**course** [9] - 16:13, 21:25, 24:18, 45:1, 74:8, 81:6, 85:15, 115:3, 127:10
**courses** [1] - 47:23
**court** [2] - 4:1, 77:20
**COURT** [109] - 1:1, 4:4, 4:9, 5:6, 5:12, 5:15, 6:1, 6:5, 6:8, 6:16, 6:21, 12:3, 12:16, 14:2, 19:6, 23:16, 23:21, 24:1, 29:9, 34:14, 34:17, 34:21, 34:24, 35:6, 35:12, 35:16, 35:19, 36:8, 36:13, 36:15, 36:18, 36:21, 36:24, 37:13, 37:20, 37:24, 38:2, 38:5, 38:8, 38:17, 38:22, 39:1, 39:4, 39:9, 45:16, 48:9, 54:22, 55:15, 57:21, 59:12, 59:14, 59:17, 64:8, 65:5, 67:17, 67:23, 69:23, 70:21, 71:7, 71:14, 72:7, 72:18, 73:1, 73:12, 73:16, 73:19, 73:23, 74:4, 74:18, 74:21, 74:25, 75:5, 75:9, 76:23, 78:17, 80:20, 81:4, 81:16, 82:24, 86:19, 88:21, 102:4, 104:2, 104:5, 104:11, 104:14, 121:20, 122:4, 122:9, 122:13, 122:17, 122:20, 131:6, 133:9, 133:11, 153:2, 153:15, 153:21, 153:24, 154:3, 154:8, 154:19, 154:22, 155:1, 155:4, 155:12, 155:17, 156:7, 157:2
**Court** [10] - 1:11, 1:22, 6:14, 20:1, 20:3, 20:22, 21:18, 22:3, 22:6, 157:11
**Court's** [1] - 24:12
**courthouse** [1] - 74:1
**Courthouse** [1] - 1:12
**Courtroom** [1] - 2:13
**courtroom** [6] - 6:20, 37:19, 38:3, 39:8, 72:3, 73:24, 75:4, 122:8, 122:16,

153:14, 156:25
**COURTROOM** [17] - 4:3, 6:19, 35:20, 36:1, 37:18, 38:19, 38:21, 39:7, 72:2, 74:20, 75:3, 103:21, 122:7, 122:12, 122:15, 153:13, 157:4
**cover** [3] - 90:23, 91:6, 143:25
**coverage** [1] - 92:17
**covering** [1] - 152:8
**COVID** [2] - 7:24, 27:21
**crawling** [1] - 101:25
**created** [3] - 23:6, 125:1, 143:20
**creed** [1] - 84:1
**critical** [1] - 19:9
**CROSS** [2] - 3:4, 59:18
**cross** [5] - 72:11, 75:7, 153:18, 154:5, 156:23
**cross-examination** [1] - 75:7
**CROSS-EXAMINATION** [2] - 3:4, 59:18
**cultural** [2] - 110:4, 114:23
**culture** [1] - 126:23
**curious** [1] - 106:17
**current** [1] - 47:4
**customer** [2] - 49:22, 49:23
**cut** [1] - 72:8
**cutting** [1] - 59:7
**CWilliams** [1] - 87:8

**D**

**d/b/a** [2] - 1:7, 1:7
**daily** [2] - 117:17, 134:25
**Dampf** [2] - 41:23, 82:11
**Dan** [78] - 8:5, 8:13, 8:22, 10:3, 10:4, 10:8, 10:13, 10:15, 13:1, 15:14, 15:16, 16:10, 16:14, 16:17, 17:8, 17:25, 18:3, 18:12, 18:21, 25:25, 26:18, 26:23, 28:15, 29:20, 30:3, 37:8, 40:12, 40:16, 41:12, 44:12, 44:21, 44:22, 45:12, 45:14, 66:13,

66:15, 69:2, 69:3,
77:17, 79:20, 79:22,
90:16, 108:15,
112:23, 113:6,
113:18, 113:20,
113:21, 114:8,
115:8, 115:11,
115:12, 115:24,
115:25, 116:11,
116:13, 116:18,
117:1, 117:23,
118:19, 118:20,
118:22, 120:10,
120:11, 120:14,
124:3, 129:10,
129:17, 129:18,
130:9, 130:13,
130:16, 130:17,
130:23, 131:15,
151:7, 152:24
**DANIEL** [1] - 1:8
**dark** [1] - 65:7
**Dash** [1] - 98:16
**date** [7] - 20:1, 25:19,
29:13, 29:15, 62:1,
144:6
**Date** [1] - 157:13
**dates** [1] - 117:4
**Dave** [3] - 99:7, 99:18,
100:24
**DAY** [1] - 1:6
**days** [14] - 45:6,
45:22, 77:8, 77:13,
77:16, 77:20, 77:24,
78:12, 90:9, 121:22,
123:23, 126:8,
155:20, 156:15
**daytime** [1] - 32:1
**DDOS** [6] - 108:16,
108:20, 108:24,
109:4, 109:8, 109:10
**deadline** [1] - 110:17
**dealt** [1] - 116:4
**debating** [1] - 5:9
**December** [12] -
55:19, 116:6, 117:2,
120:3, 122:24,
123:16, 123:21,
123:25, 124:1,
125:8, 126:8
**decide** [8] - 5:17, 6:3,
31:19, 42:20, 48:20,
71:23, 153:10,
154:17
**decision** [7] - 20:3,
20:23, 21:18, 22:1,
22:3, 22:6, 24:13
**decisions** [2] - 83:23,
143:12
**dedicated** [1] - 141:14

**deductible** [1] - 92:19
**deep** [1] - 16:8
**deeper** [1] - 149:20
**defamatory** [1] - 65:25
**defamed** [1] - 67:6
**Defendant** [1] - 2:5
**DEFENDANT** [4] -
3:10, 3:10, 88:22,
104:16
**Defendant's** [2] - 89:7,
143:3
**defendant's** [1] - 89:8
**Defendants** [1] - 1:9
**definitely** [3] - 16:1,
71:19, 90:10
**delay** [1] - 4:5
**deleted** [5] - 99:6,
99:17, 100:9,
100:16, 100:23
**delivery** [1] - 49:6
**demeanor** [2] -
112:12, 112:14
**denial** [2] - 107:5,
108:21
**denial-of-service** [1] -
108:21
**denied** [3] - 8:10,
107:8, 107:16
**department** [7] -
15:25, 22:17, 31:22,
31:24, 105:16,
106:7, 115:23
**deposit** [3] - 54:16,
54:18, 62:6
**deposits** [1] - 62:11
**depression** [4] - 46:4,
46:12, 46:18, 47:1
**deputy** [1] - 157:1
**Deputy** [1] - 2:13
**DEPUTY** [17] - 4:3,
6:19, 35:20, 36:1,
37:18, 38:19, 38:21,
39:7, 72:2, 74:20,
75:3, 103:21, 122:7,
122:12, 122:15,
153:13, 157:4
**DEREK** [1] - 1:18
**derogatory** [1] - 98:25
**describe** [6] - 7:22,
8:2, 101:16, 142:8,
152:14, 152:16
**describing** [1] -
126:22
**description** [3] -
20:19, 86:23, 147:24
**design** [1] - 106:23
**designator** [1] - 86:1
**desk** [15] - 32:6, 89:2,
102:20, 103:1,
103:14, 103:16,

104:21, 104:23,
105:4, 105:9,
105:13, 105:21,
108:4, 108:5, 112:17
**desperately** [1] -
72:15
**despicable** [1] - 66:17
**despite** [1] - 64:3
**detail** [3] - 81:13,
112:3, 152:7
**detailed** [1] - 15:21
**details** [2] - 89:19,
100:6
**determined** [1] - 60:4
**detour** [2] - 111:8,
132:4
**devastated** [1] - 39:15
**development** [1] -
48:1
**device** [2] - 51:12,
51:15
**diagram** [1] - 140:15
**dialogue** [2] - 94:12,
94:13
**difference** [1] - 104:1
**different** [18] - 13:8,
15:15, 19:10, 35:25,
51:10, 62:16, 64:14,
71:2, 71:4, 94:24,
102:24, 104:12,
109:18, 125:2,
130:15, 136:17,
137:3, 147:24
**differently** [1] - 31:23
**difficult** [1] - 50:12
**difficulty** [1] - 4:22
**digital** [1] - 112:8
**dignity** [2] - 42:19,
59:7
**dinner** [1] - 40:20
**direct** [8] - 6:13,
25:13, 65:19,
102:23, 139:10,
139:19, 154:4,
156:21
**DIRECT** [2] - 3:4, 7:4
**directed** [2] - 76:21,
119:1
**directing** [1] - 96:17
**direction** [1] - 93:2
**directly** [3] - 17:20,
17:21, 76:24
**director** [19] - 7:20,
9:10, 20:18, 81:22,
87:14, 87:16, 97:25,
98:4, 98:9, 99:4,
112:9, 113:8,
114:19, 118:17,
120:12, 129:21,
130:14, 152:9,

152:18
**directors** [1] - 104:22
**disability** [1] - 84:3
**disagree** [4] - 62:12,
84:20, 144:16, 148:3
**disagreement** [1] -
148:5
**disappointed** [1] -
150:10
**disappointment** [1] -
119:2
**disciplinary** [1] - 85:6
**disciplined** [1] - 85:17
**disclose** [1] - 114:13
**disclosure** [2] - 138:7,
139:12
**disclosures** [2] -
156:20, 156:22
**discrepancies** [1] -
12:1
**discriminate** [1] -
83:25
**discriminated** [7] -
8:11, 78:7, 79:12,
80:13, 81:23, 85:11,
152:24
**discrimination** [25] -
58:19, 76:17, 77:14,
78:13, 81:7, 83:3,
83:7, 83:8, 83:15,
84:8, 84:22, 85:1,
85:6, 85:16, 86:5,
88:2, 113:3, 113:14,
113:19, 117:16,
135:23, 136:15,
136:20, 136:22,
148:14
**discriminatory** [1] -
69:1
**discuss** [4] - 52:10,
80:24, 89:6, 124:3
**discussed** [12] -
10:25, 28:20, 79:1,
80:25, 116:20,
119:7, 120:18,
122:25, 137:16,
137:18, 137:23,
143:14
**discussing** [7] - 8:21,
77:14, 79:3, 79:6,
90:24, 91:1, 99:14
**discussion** [6] - 61:8,
75:20, 75:22, 90:15,
91:24, 92:16, 97:11,
148:10
**Discussion** [2] -
103:23, 156:25
**discussions** [4] -
24:4, 24:7, 148:2,
149:10

**dismiss** [1] - 123:22
**dismissal** [1] - 123:23
**dismissed** [2] - 123:7,
123:19
**dispute** [3] - 59:22,
59:24, 133:14
**disrepute** [1] - 67:3
**distance** [1] - 107:6
**distorts** [1] - 150:11
**distraught** [2] - 39:21
**distress** [1] - 43:9
**distribution** [1] -
61:12
**DISTRICT** [3] - 1:1,
1:1, 1:16
**District** [3] - 1:11, 4:2
**diversity** [10] - 148:2,
148:5, 148:10,
149:1, 149:6,
149:10, 149:18,
149:25, 150:3, 150:6
**dock** [1] - 125:20
**doctor** [1] - 5:8
**document** [34] -
11:19, 11:21, 11:22,
13:5, 13:7, 30:25,
53:12, 56:3, 78:5,
78:11, 78:20, 79:1,
79:4, 79:9, 79:10,
79:16, 79:19, 80:10,
81:12, 81:19, 83:11,
86:11, 86:22, 89:16,
102:25, 104:10,
111:9, 112:4,
123:25, 124:8,
140:10, 152:7,
152:17, 152:25
**Document** [1] - 53:14
**documented** [2] -
125:13, 125:18
**documents** [13] -
71:12, 77:24, 78:1,
78:8, 78:14, 78:18,
79:14, 79:17, 80:17,
80:21, 81:5, 81:9,
156:17
**Done** [1] - 126:1
**done** [17] - 9:24, 10:5,
13:10, 13:13, 31:10,
31:16, 66:19, 72:13,
80:7, 97:12, 105:12,
107:21, 114:1,
128:24, 156:1,
156:2, 156:4
**door** [1] - 112:9
**doors** [1] - 74:11
**doorway** [1] - 118:10
**doubled** [1] - 46:21
**down** [34] - 11:4, 12:5,
12:6, 14:5, 15:2,

*36:2, 46:16, 53:1, 54:4, 54:11, 54:12, 58:21, 70:16, 71:1, 74:15, 90:3, 91:8, 91:18, 93:7, 93:18, 95:2, 95:3, 95:16, 101:22, 103:19, 110:7, 124:18, 130:12, 131:17, 134:2, 140:18, 150:4, 153:16*

**download** [1] - 109:5
**dozen** [1] - 78:1
**Dr** [4] - 42:21, 42:23, 45:24, 46:11
**drags** [1] - 155:17
**draw** [1] - 106:23
**drawn** [1] - 140:17
**drive** [1] - 154:12
**driven** [1] - 109:20
**dropped** [1] - 131:24
**due** [13] - 21:18, 32:22, 44:7, 46:6, 46:7, 62:22, 63:4, 63:14, 63:24, 66:6, 69:8, 75:22, 132:10
**Duff** [1] - 140:16
**during** [38] - 8:23, 10:19, 19:14, 28:5, 30:1, 31:1, 31:19, 32:1, 32:10, 39:13, 42:18, 46:12, 60:19, 62:20, 64:12, 65:23, 72:5, 72:12, 74:7, 76:2, 76:15, 77:4, 77:24, 78:2, 82:5, 85:23, 87:12, 87:18, 88:4, 89:20, 90:24, 103:25, 112:7, 119:6, 120:13, 134:24, 135:24, 136:24
**duty** [5] - 16:22, 16:23, 16:24, 19:9, 19:11

### E

**earliest** [3] - 117:7, 117:11, 156:13
**early** [8] - 8:24, 20:7, 21:24, 32:8, 32:9, 72:9, 120:3, 121:23
**earned** [1] - 52:3
**easier** [2] - 50:11, 86:13
**easiest** [2] - 154:25, 155:2
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:11

**easy** [1] - 44:4
**eat** [2] - 101:6, 101:14
**economist** [1] - 52:1
**educate** [5] - 119:13, 119:19, 136:24, 152:11
**education** [1] - 137:25
**educational** [1] - 92:8
**EEO** [1] - 86:1
**EEOC** [4] - 58:2, 59:1, 79:9, 135:8
**EEOC/PHRC** [1] - 117:6
**effect** [2] - 61:22, 83:16
**effectively** [1] - 138:8
**effort** [1] - 7:16
**either** [10] - 70:3, 73:14, 84:8, 85:12, 97:15, 109:11, 124:1, 147:17, 155:20, 155:21
**electronic** [2] - 10:14, 17:12
**electronically** [1] - 19:22
**eligibility** [2] - 60:19, 61:22
**email** [3] - 9:10, 126:19, 138:20
**emails** [2] - 72:5, 146:3
**embraced** [1] - 47:14
**emoji** [4] - 145:12, 145:19, 145:23, 146:8
**emotional** [2] - 43:9, 47:9
**emotionally** [6] - 39:17, 47:5, 47:12, 59:6, 68:12
**empathetic** [1] - 102:15
**empathy** [3] - 148:12, 148:15, 148:21
**employed** [5] - 48:3, 53:24, 54:14, 57:3, 62:1
**employee** [17] - 14:19, 20:12, 51:20, 52:12, 52:16, 60:20, 61:5, 62:10, 67:14, 68:16, 83:15, 93:22, 132:20, 140:24, 145:13, 149:2, 149:3
**employees** [13] - 9:14, 60:18, 61:9, 61:11, 61:24, 68:7, 84:21, 85:1, 85:4, 97:14, 132:24, 133:4,

*141:13*
**employer** [1] - 136:21
**employers** [1] - 91:11
**employment** [31] - 16:13, 29:4, 30:22, 43:23, 46:2, 46:10, 48:25, 55:7, 55:10, 57:5, 83:22, 83:23, 83:25, 84:6, 84:8, 84:12, 85:7, 85:9, 85:15, 85:21, 86:4, 87:12, 87:18, 88:4, 98:24, 134:8, 136:10, 136:11, 151:12, 151:22
**encouraged** [2] - 72:16, 85:2
**end** [26] - 4:19, 6:12, 7:14, 12:20, 12:23, 14:8, 30:22, 38:5, 39:18, 43:23, 50:16, 50:17, 51:8, 51:22, 53:6, 55:18, 55:19, 60:4, 66:23, 84:6, 100:24, 111:3, 120:19, 145:4, 152:4, 153:1
**ended** [1] - 57:5
**endpoint** [2] - 36:18, 37:21
**ends** [1] - 89:16
**energetic** [1] - 16:9
**engaging** [2] - 85:5, 85:16
**engineer** [8] - 30:21, 42:4, 49:21, 50:2, 51:12, 51:14, 51:15, 52:15
**engineering** [7] - 15:24, 31:22, 31:24, 51:16, 51:20, 115:23, 120:17
**enjoyed** [1] - 42:7
**enroll** [1] - 110:18
**enrollment** [1] - 110:15
**enters** [4] - 6:20, 39:8, 75:4, 122:16
**entire** [10] - 10:19, 11:21, 13:22, 13:24, 16:12, 17:1, 23:5, 132:21, 137:16, 138:20
**entirely** [1] - 33:1
**entirety** [1] - 14:22
**entitled** [1] - 157:9
**entry** [1] - 104:18
**episode** [2] - 143:14, 143:18
**equal** [4] - 8:10, 20:4,

*52:3, 83:22*
**error** [1] - 88:9
**Escitalopram** [1] - 46:20
**especially** [4] - 5:24, 101:5, 112:12, 138:1
**ESQUIRE** [4] - 1:19, 2:3, 2:3, 2:4
**essentially** [5] - 87:1, 95:12, 97:16, 112:8, 128:2
**Essentra** [3] - 51:11, 52:18
**Europe** [1] - 90:16
**European** [1] - 90:16
**evaluate** [1] - 9:14
**evaluation** [2] - 79:24, 80:6
**evaluations** [1] - 125:10
**evangelist** [1] - 48:19
**Eve** [1] - 125:8
**event** [1] - 45:18
**events** [5] - 7:9, 8:20, 111:19, 113:7, 115:9
**eventually** [7] - 9:25, 10:1, 10:3, 70:16, 99:25, 100:16
**every-other-week** [1] - 11:1
**evidence** [11] - 12:16, 12:17, 13:20, 29:7, 34:11, 34:15, 34:19, 35:6, 35:7, 55:13, 104:2
**EVIDENCE** [14] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 14:4, 29:10, 35:9, 54:23, 55:16, 88:22, 104:16
**exact** [2] - 28:21, 121:5
**Exactly** [1] - 149:21
**exactly** [3] - 27:13, 92:10, 92:13
**EXAMINATION** [4] - 3:4, 3:4, 7:4, 59:18
**examination** [2] - 75:7, 102:23
**EXAMINATIONS** [1] - 3:2
**example** [9] - 23:8, 44:10, 44:21, 68:23, 96:4, 96:24, 119:17, 140:24, 149:25
**exchange** [3] - 72:17, 125:3, 156:16
**exchanged** [2] - 65:12, 65:14
**exclamation** [1] -

*108:7*
**exclude** [1] - 150:2
**exclusionary** [1] - 149:19
**exclusive** [1] - 150:1
**excuse** [5] - 47:8, 49:10, 49:12, 63:23, 64:17
**Exhibit** [12] - 11:9, 13:20, 14:2, 28:7, 29:6, 55:12, 82:21, 86:9, 88:21, 103:5, 103:20
**exhibit** [10] - 28:9, 34:25, 35:3, 36:6, 54:19, 84:14, 102:24, 104:12, 132:6, 133:19
**EXHIBIT** [14] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 14:4, 29:10, 35:9, 54:23, 55:16, 88:22, 104:16
**exhibits** [1] - 130:7
**exist** [1] - 78:14
**exists** [1] - 23:14
**exits** [4] - 37:19, 72:3, 122:8, 153:14
**expanded** [1] - 50:4
**expect** [1] - 44:19
**expects** [1] - 4:25
**experience** [2] - 8:9, 77:21
**expert** [2] - 60:24, 61:13
**expertise** [1] - 16:8
**expire** [1] - 107:10
**expires** [3] - 51:22, 107:11, 107:17
**expiring** [1] - 107:17
**explain** [6] - 17:15, 30:6, 52:16, 66:9, 77:17, 97:21
**explained** [2] - 106:22, 107:20
**explaining** [1] - 77:20
**explains** [2] - 84:20, 107:8
**explanation** [1] - 15:21
**explicit** [1] - 152:23
**exposed** [1] - 69:11
**expressed** [1] - 100:6
**expressions** [1] - 119:2
**extend** [1] - 107:18
**extensive** [2] - 50:24, 51:1
**extent** [2] - 156:15, 156:20

*external* [2] - 85:25, 93:23
*extra* [1] - 96:12
*eye* [1] - 93:19

## F

*Facebook* [2] - 45:9, 126:22
*faces* [1] - 53:4
*facial* [1] - 119:2
*fact* [4] - 70:24, 105:11, 134:22, 150:10
*factors* [1] - 119:9
*fair* [19] - 63:11, 63:13, 67:13, 69:9, 81:25, 87:24, 89:20, 92:21, 93:20, 97:23, 103:18, 105:20, 123:20, 123:24, 124:14, 130:15, 132:22, 147:24, 149:15
*fairly* [1] - 73:24
*fairness* [1] - 81:11
*fairy* [2] - 98:5, 98:12
*false* [4] - 66:7, 66:12, 68:3, 76:18
*familiar* [3] - 22:20, 62:3, 62:4
*family* [3] - 71:21, 153:8, 155:14
*far* [11] - 20:15, 44:4, 47:5, 80:22, 81:6, 87:18, 87:21, 88:15, 89:8, 115:3, 156:10
*fast* [1] - 146:22
*faster* [1] - 156:9
*favor* [1] - 82:20
*favorite* [1] - 101:16
*fear* [4] - 69:8, 69:12, 69:14, 69:15
*February* [11] - 7:24, 115:13, 115:25, 116:5, 134:5, 135:2, 147:1, 147:2, 147:5, 147:7, 151:21
*federal* [1] - 22:10
*federally* [1] - 20:2
*fee* [1] - 90:19
*feedback* [1] - 9:16
*felt* [9] - 37:25, 42:19, 81:22, 112:13, 112:20, 113:4, 118:15, 148:16, 148:20
*female* [2] - 68:24, 68:25
*few* [2] - 22:23, 123:23

*figure* [2] - 131:16, 131:18
*file* [6] - 90:6, 90:12, 111:12, 125:18, 126:5, 147:14
*filed* [13] - 44:18, 58:2, 59:1, 79:9, 117:8, 117:9, 122:25, 123:11, 123:18, 123:21, 123:25, 124:2, 124:5
*files* [2] - 125:17, 147:15
*filing* [4] - 44:10, 79:18, 116:18, 135:23
*fill* [2] - 145:8, 155:24
*film* [1] - 44:23
*final* [3] - 19:15, 110:16, 152:4
*finalist* [1] - 48:23
*finalists* [1] - 49:5
*finally* [1] - 61:8
*financial* [2] - 78:1, 89:6
*fine* [4] - 6:8, 13:25, 42:9, 71:14
*finish* [4] - 4:18, 5:7, 36:24, 137:6
*finished* [4] - 4:22, 5:4, 5:25, 154:15
*finishes* [2] - 5:18, 6:3
*finite* [1] - 72:21
*fire* [3] - 48:13, 105:16, 106:7
*fired* [5] - 44:1, 48:13, 68:25, 85:18, 148:6
*firing* [1] - 77:5
*firm* [1] - 51:11
*first* [26] - 7:12, 9:7, 9:8, 11:21, 15:18, 27:8, 30:2, 37:5, 43:5, 49:7, 50:16, 53:21, 57:5, 82:21, 83:19, 84:25, 96:13, 104:24, 111:12, 112:24, 117:1, 119:11, 121:2, 127:24, 149:24
*fish* [1] - 101:14
*Fish* [1] - 101:15
*fit* [1] - 134:20
*fits* [1] - 134:16
*five* [11] - 8:1, 14:10, 36:19, 36:21, 37:24, 49:3, 49:4, 116:10, 122:3, 122:5, 122:10
*five-minute* [1] - 36:21
*fix* [1] - 141:2
*flip* [10] - 89:23, 90:22,

94:3, 95:23, 96:21, 102:10, 110:6, 140:7, 144:7, 145:4
*floor* [2] - 95:4, 96:13
*flying* [1] - 98:12
*focus* [3] - 131:11, 135:14, 151:20
*folder* [5] - 80:2, 80:7, 125:9, 125:21, 125:24
*folks* [1] - 145:12
*follow* [3] - 53:20, 100:19, 123:6
*following* [1] - 91:14
*follows* [2] - 128:6, 146:11
*fond* [1] - 134:12
*food* [3] - 101:4, 101:9, 102:9
*Food* [1] - 101:4
*Foods* [2] - 101:6, 101:8
*foods* [1] - 101:16
*forced* [1] - 16:13
*forceful* [1] - 99:21
*Ford* [3] - 60:18, 99:15, 121:4
*foregoing* [1] - 157:8
*forensic* [1] - 52:1
*forget* [2] - 20:17, 53:3
*forgot* [1] - 96:11
*form* [1] - 13:8
*formally* [1] - 41:5
*former* [3] - 50:18, 109:18, 136:21
*Forrester* [1] - 82:13
*forth* [3] - 21:1, 112:6, 155:15
*Forum* [2] - 90:17, 127:23
*forward* [4] - 91:18, 93:5, 112:23, 146:23
*foundation* [2] - 135:20, 135:21
*four* [7] - 18:14, 24:18, 40:18, 89:20, 152:8, 152:18, 156:9
*four-day* [1] - 24:18
*four-year* [1] - 89:20
*frame* [2] - 116:25, 119:17
*frankly* [1] - 63:17
*free* [1] - 86:21
*freezing* [1] - 96:2
*Friday* [3] - 5:21, 155:7, 155:19
*Friday's* [1] - 127:6
*friend* [6] - 89:21, 98:2, 98:10, 99:14, 139:6, 140:16

*friendly* [1] - 89:22, 108:10, 112:11, 112:12, 112:14, 119:3, 120:13, 125:3
*Friends* [1] - 126:10
*friends* [2] - 71:20, 153:8
*front* [9] - 5:24, 28:9, 44:22, 67:6, 73:11, 94:1, 102:4, 137:16, 137:18
*Fu* [19] - 19:20, 20:3, 20:10, 20:11, 20:25, 21:3, 21:15, 22:2, 22:5, 23:13, 24:4, 24:15, 24:17, 24:21, 25:10, 80:14, 85:24, 98:18
*full* [9] - 4:24, 51:20, 51:21, 51:22, 52:12, 52:14, 52:16, 138:11, 148:13
*full-time* [3] - 51:20, 52:12, 52:16
*fund* [1] - 124:20
*fundamental* [1] - 39:23

## G

*Galloway* [10] - 89:5, 90:4, 114:21, 114:22, 118:25, 119:23, 119:25, 120:1, 120:4, 120:6
*garbage* [1] - 102:1
*gather* [1] - 4:6
*gay* [8] - 8:8, 73:17, 76:15, 77:5, 98:10, 142:4, 142:11
*gears* [1] - 42:10
*gender* [1] - 21:10
*general* [1] - 137:25
*generally* [8] - 31:20, 32:1, 61:17, 74:9, 82:16, 94:22, 155:14, 156:19
*generous* [1] - 8:18
*genetic* [1] - 84:3
*genitals* [1] - 65:16
*get-together* [1] - 142:8
*given* [9] - 5:10, 58:25, 60:18, 61:4, 68:10, 68:15, 69:7, 69:19, 93:16
*gladly* [1] - 95:7
*Global* [1] - 127:23
*global* [1] - 148:7
*goal* [1] - 7:14

*Google* [9] - 45:9, 48:19, 48:24, 70:13, 70:18, 70:25, 148:6, 149:2, 149:4
*Googled* [1] - 70:19
*great* [9] - 4:22, 5:4, 16:4, 81:12, 107:3, 119:19, 120:5, 134:13
*green* [2] - 139:7, 143:11
*grilling* [1] - 141:14
*GROUP* [1] - 1:18
*group* [3] - 51:10, 139:10, 150:3
*growing* [1] - 42:1
*guaranteed* [1] - 15:14
*guess* [4] - 35:10, 133:23, 142:7, 154:4
*guests* [1] - 97:14
*guy* [2] - 92:3, 95:20
*guys* [5] - 28:17, 94:16, 94:20, 112:18, 125:3

## H

*half* [6] - 15:19, 49:3, 115:4, 116:7, 117:15, 117:18
*halfway* [1] - 93:7
*hand* [1] - 106:23
*handbook* [4] - 83:12, 84:11, 113:11, 113:13
*handed* [1] - 11:22
*handing* [1] - 93:11
*handle* [1] - 99:25
*handled* [4] - 99:19, 99:23, 100:1, 100:2
*hang* [1] - 40:9
*happy* [4] - 21:25, 98:23, 99:13, 100:20
*harassed* [1] - 79:12
*harassment* [3] - 117:16, 135:8, 135:16
*harassment/ discrimination* [1] - 134:25
*harbor* [1] - 61:2
*hard* [5] - 39:16, 39:22, 74:6, 74:10, 154:8
*hardship* [1] - 5:4
*HBO* [2] - 44:22, 45:3
*head* [2] - 37:16, 151:23
*heads* [3] - 71:17, 120:8, 153:5

**health** [2] - 116:23, 119:17
**hear** [1] - 24:10, 24:13, 36:5, 37:9, 41:11, 64:9, 71:24, 93:19, 94:1, 140:21, 156:7
**heard** [15] - 34:9, 37:16, 39:12, 39:18, 42:11, 52:1, 55:18, 59:22, 65:23, 68:11, 69:25, 85:23, 103:12, 118:25, 128:7
**hearing** [8] - 64:1, 66:1, 66:5, 71:24, 77:15, 118:2, 119:20, 153:11
**hearsay** [2] - 45:15, 57:20
**heart** [1] - 42:19
**held** [5] - 4:1, 4:11, 47:14, 103:23, 156:25
**help** [12] - 9:1, 12:6, 46:24, 86:12, 91:18, 92:11, 93:15, 96:6, 116:12, 116:24, 120:16, 150:5
**helped** [2] - 47:15, 112:18
**helping** [1] - 105:24
**helps** [1] - 127:10
**Hi** [11] - 93:10, 95:4, 96:11, 102:18, 102:19, 106:17, 125:8, 137:24, 141:17, 146:11, 149:17
**hierarchy** [2] - 20:15, 129:17
**high** [4] - 7:20, 48:24, 132:24, 132:25
**high-tech** [2] - 7:20, 48:24
**higher** [6] - 20:18, 51:18, 130:11, 130:17, 131:16, 131:18
**higher-ranking** [3] - 130:11, 131:16, 131:18
**highest** [2] - 132:19, 133:3
**highly** [3] - 61:5, 61:21, 61:24
**himself** [2] - 20:17, 151:24
**hire** [7] - 64:24, 64:25, 65:6, 65:7, 115:25,

134:17, 139:2
**hired** [12] - 57:12, 58:2, 82:2, 82:14, 83:17, 84:6, 115:9, 115:12, 115:13, 115:17, 116:5, 148:19
**hires** [1] - 137:15
**hiring** [1] - 82:16
**history** [4] - 23:6, 23:12, 148:20, 156:10
**hit** [1] - 27:6
**hold** [3] - 6:11, 132:7, 151:1
**holding** [2] - 72:18, 150:6
**holdup** [1] - 4:7
**holiday** [1] - 152:12
**home** [7] - 27:25, 28:1, 28:2, 28:6, 32:16, 42:21, 153:5
**homes** [1] - 7:24
**Honestly** [1] - 141:24
**honestly** [1] - 15:19
**Honor** [29] - 4:8, 4:16, 6:10, 12:19, 13:19, 34:8, 35:5, 37:1, 38:24, 59:11, 59:16, 71:9, 72:4, 72:25, 74:17, 74:23, 75:8, 76:20, 78:16, 81:15, 82:23, 86:18, 88:18, 104:4, 121:19, 122:2, 122:19, 154:6, 155:10
**HONORABLE** [1] - 1:15
**Honorable** [1] - 4:1
**hope** [4] - 52:12, 52:15, 60:17, 139:5
**hopefully** [1] - 154:12
**hoping** [1] - 72:15
**horrible** [2] - 116:23, 119:21
**hostile** [4] - 44:15, 131:2, 148:4, 151:1
**hour** [2] - 121:24, 121:25
**hours** [10] - 31:15, 31:19, 31:24, 32:2, 60:19, 60:21, 61:25, 75:1, 107:8, 148:18
**house** [7] - 20:11, 20:16, 20:19, 30:15, 30:17, 47:13
**HR** [24] - 9:10, 81:22, 87:10, 87:11, 87:21, 87:22, 91:24, 92:3, 95:20, 106:1,

113:14, 113:15, 118:13, 121:4, 125:16, 128:16, 130:3, 130:7, 132:11, 141:1, 142:15, 151:23, 152:9, 152:18
**hug** [1] - 53:5
**human** [19] - 44:11, 85:3, 85:12, 87:16, 87:18, 88:3, 88:4, 91:25, 92:6, 92:7, 94:23, 97:2, 97:25, 99:4, 112:9, 114:19, 117:20, 119:14, 120:12
**Human** [9] - 28:21, 44:11, 78:19, 79:18, 81:8, 116:18, 123:14, 135:9, 136:7
**humiliate** [1] - 68:22
**humiliated** [1] - 69:8
**humiliating** [1] - 68:8
**hundred** [1] - 89:17
**hung** [1] - 93:15
**husband** [1] - 68:24

## I

**I..** [1] - 138:3
**i.e** [1] - 148:4
**idea** [3] - 5:16, 18:15, 39:2
**ideas** [1] - 73:7
**identify** [1] - 12:17
**illustrations** [1] - 106:24
**image** [6] - 147:13, 147:15, 147:18, 147:19, 147:21
**images** [1] - 145:4
**imagine** [1] - 50:24
**immaculate** [1] - 15:21
**immediate** [1] - 44:23
**immediately** [7] - 26:23, 27:3, 48:18, 99:6, 99:8, 99:25, 113:21
**impact** [4] - 47:9, 76:13, 76:14, 126:22
**impacted** [2] - 47:5, 121:17
**important** [9] - 17:3, 106:2, 107:14, 114:11, 131:22, 131:24, 131:25, 132:1, 138:15
**improvement** [2] - 115:5, 143:20

**improvements** [1] - 115:1
**IN** [14] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 14:4, 29:10, 35:9, 54:23, 55:16, 88:22, 104:16
**in-house** [4] - 20:11, 20:16, 20:19
**inappropriate** [8] - 99:2, 114:24, 115:10, 115:18, 115:19, 116:1, 116:11, 120:7
**incident** [1] - 19:16
**include** [1] - 135:15
**including** [5] - 85:7, 85:18, 86:1, 151:3, 151:5
**incorrect** [1] - 152:21
**increase** [1] - 133:24
**increased** [5] - 46:3, 46:19, 46:20, 46:23, 132:23
**independently** [1] - 61:1
**indicative** [1] - 112:3
**individual** [2] - 23:11, 66:18
**individuals** [5] - 15:15, 22:9, 41:3, 83:23, 87:2
**industry** [1] - 133:1
**infer** [1] - 4:13
**info** [2] - 137:23, 138:11
**information** [24] - 16:22, 16:23, 16:24, 17:11, 19:9, 19:11, 24:24, 70:5, 84:3, 93:11, 105:23, 110:2, 110:24, 119:14, 133:7, 133:12, 133:14, 133:17, 138:7, 138:14, 138:23, 139:16, 145:13, 151:9
**initiated** [1] - 59:3
**initiates** [1] - 9:8
**initiative** [2] - 11:4, 128:10
**innovation** [1] - 129:22
**inoperable** [1] - 109:2
**inquiry** [2] - 96:18, 107:23
**instances** [1] - 81:21
**instead** [3] - 9:11, 88:11, 109:20

**instruct** [1] - 80:2
**insults** [1] - 8:7
**insurance** [1] - 92:17
**intake** [1] - 136:4
**intelligence** [1] - 44:25
**intent** [1] - 91:21
**interaction** [2] - 16:3, 108:10
**interest** [1] - 92:9
**interested** [2] - 50:12, 92:2
**interesting** [2] - 91:10, 92:7
**internal** [3] - 51:16, 128:19, 149:2
**internally** [4] - 51:16, 52:9, 93:11, 93:21
**internet** [4] - 108:23, 147:23, 148:14, 148:21
**interns** [2] - 73:25, 74:9
**interpreted** [1] - 142:24
**interrupt** [3] - 20:8, 149:5, 154:14
**interview** [6] - 40:5, 49:2, 70:13, 82:6, 98:3, 135:13
**interviewing** [2] - 98:6, 98:8
**interviews** [4] - 48:23, 49:1, 49:3, 50:14
**intimidated** [1] - 118:15
**introducing** [1] - 35:16
**invested** [1] - 33:5
**investigation** [3] - 30:12, 32:23, 135:24
**investigator** [1] - 135:25
**invite** [1] - 134:15
**invited** [1] - 97:14
**inviting** [1] - 141:13
**involved** [2] - 87:7, 155:15
**involving** [1] - 141:15
**issue** [45] - 31:17, 50:15, 70:8, 93:21, 96:17, 97:24, 98:2, 99:7, 99:19, 99:23, 100:15, 101:2, 101:17, 101:19, 102:9, 102:14, 106:9, 107:13, 107:14, 116:12, 127:1, 127:5, 127:11, 128:7,

128:11, 132:7,
136:17, 136:19,
138:10, 138:14,
138:17, 139:14,
140:2, 140:12,
142:23, 143:10,
143:22, 146:12,
146:18, 148:24,
151:15, 151:18,
151:19, 152:19
**issued** [1] - 113:13
**issues** [30] - 20:24,
43:8, 46:1, 46:25,
47:3, 85:2, 87:19,
87:21, 87:22, 89:6,
91:25, 92:25,
112:14, 112:19,
112:20, 112:22,
113:2, 113:14,
113:19, 114:20,
114:21, 114:23,
116:13, 118:24,
119:6, 140:8,
148:13, 155:14
**itself** [4] - 76:19, 86:4,
105:9, 105:14

**J**

**JACKSON** [1] - 2:2
**James** [1] - 1:12
**January** [9] - 1:13,
93:8, 126:17, 127:4,
127:13, 127:15,
129:15, 144:3,
157:13
**Jessie** [3] - 141:12,
141:23, 142:3
**JILL** [1] - 2:3
**job** [18] - 8:8, 16:8,
17:3, 17:4, 19:4,
42:13, 48:16, 49:7,
49:8, 50:21, 51:8,
70:16, 71:1, 92:12,
98:3, 98:24, 99:14,
120:20
**Job** [1] - 147:10
**jobs** [2] - 50:5, 50:7
**Joe** [2] - 147:11
**John** [22] - 33:24,
34:7, 40:1, 48:7,
48:14, 60:8, 62:22,
63:1, 63:5, 63:15,
63:22, 63:24, 64:6,
64:22, 65:24, 66:6,
66:18, 69:18, 80:17,
119:23, 124:5, 139:4
**join** [1] - 26:20
**joined** [1] - 29:23
**joke** [3] - 142:2,
142:18, 142:25

**joke)** [1] - 142:4
**JONATHAN** [1] - 2:3
**JOSHUA** [2] - 1:15,
4:2
**journey** [4] - 77:10,
77:16, 77:17, 77:21
**Judge** [2] - 4:2, 59:15
**JUDGE** [1] - 1:16
**judges** [1] - 74:8
**judicial** [1] - 73:25
**July** [3] - 88:16, 88:25,
111:10
**jump** [5] - 141:4,
143:2, 143:25, 152:4
**jumped** [1] - 37:5
**June** [9] - 9:11, 19:19,
20:1, 20:21, 80:15,
97:10, 101:1, 141:9
**junior** [1] - 42:3
**juries** [1] - 73:5
**juror** [1] - 73:18
**jurors** [2] - 4:10, 77:20
**jury** [26] - 6:9, 6:11,
9:1, 19:15, 20:9,
34:11, 38:23, 47:6,
47:9, 58:16, 60:10,
60:15, 71:10, 72:20,
72:21, 73:5, 73:11,
74:22, 75:1, 84:24,
86:25, 108:19,
121:21, 122:14,
123:5, 155:18
**JURY** [1] - 1:5
**Jury** [8] - 6:20, 37:19,
39:8, 72:3, 75:4,
122:8, 122:16,
153:14

**K**

**Kaufman** [3] - 17:21,
18:12, 139:24
**Kaufman's** [3] - 18:8,
111:22, 143:10
**Kaufmann** [1] -
41:19, 128:23,
128:25, 129:3,
129:10, 129:17,
130:17, 130:23,
131:18, 138:17,
139:1
**keep** [13] - 6:2, 54:11,
56:17, 65:21, 71:10,
71:17, 74:15, 75:2,
93:19, 93:25, 122:9,
137:5, 155:18
**keeper** [1] - 125:17
**keeping** [1] - 101:3
**Kentech** [8] - 49:10,
49:12, 49:13, 49:14,

50:17, 96:12, 96:20
**kept** [1] - 92:7
**kind** [19] - 9:8, 11:17,
12:13, 16:6, 31:24,
46:18, 49:23, 51:25,
52:16, 66:17, 85:16,
94:12, 94:21, 95:21,
97:11, 109:7, 115:5,
134:17, 136:9
**knowledge** [3] - 23:4,
65:18, 65:19
**known** [1] - 40:13
**knows** [3] - 86:25,
119:11, 143:18
**Kubernetes** [1] -
47:25

**L**

**labelled** [1] - 51:16
**laid** [1] - 44:16
**landmark** [1] - 20:2
**language** [7] - 22:18,
25:10, 114:24,
115:18, 115:19,
116:1, 116:11
**laptop** [2] - 27:22,
35:21
**large** [4] - 96:11,
96:12, 109:5, 127:7
**last** [16] - 4:13, 8:1,
14:10, 25:1, 28:3,
49:5, 54:12, 63:24,
64:16, 64:18, 77:12,
77:15, 77:19, 77:24,
119:24, 124:15
**latecomers** [1] - 32:9
**launched** [1] - 30:12
**Laura** [1] - 2:13
**LAW** [1] - 1:18
**law** [7] - 22:10, 24:16,
24:18, 24:19, 24:22,
28:6, 91:11
**lawyer** [2] - 22:12,
85:24
**lead** [2] - 148:2, 150:6
**Leader** [1] - 97:7
**leadership** [3] - 97:13,
113:17, 113:18
**leading** [4] - 8:4, 19:5,
112:1, 149:10
**learn** [1] - 60:17
**least** [23] - 5:2, 60:24,
75:16, 76:2, 76:5,
77:7, 78:1, 84:5,
86:3, 100:2, 112:1,
114:17, 119:13,
120:18, 121:7,
124:8, 129:15,
134:11, 134:24,

140:7, 149:11,
154:4, 156:8
**leave** [6] - 8:17, 30:17,
84:15, 96:11,
140:17, 153:7
**leaving** [2] - 73:4, 89:1
**lecturing** [1] - 125:13
**left** [3] - 108:4, 108:5,
120:4
**leg** [1] - 44:16
**legal** [9] - 22:18,
113:22, 114:4,
114:7, 114:12,
118:2, 120:21,
120:24, 121:15
**legs** [2] - 44:16, 122:5
**length** [2] - 38:12,
80:10
**less** [1] - 72:16
**letting** [1] - 146:17
**level** [9] - 20:14,
47:23, 47:24, 51:18,
125:11, 132:24,
132:25, 133:1
**Level** [2] - 51:17,
51:20
**leveled** [1] - 41:8
**levied** [1] - 67:2
**LEWIS** [1] - 2:2
**LGBT** [10] - 20:2,
21:19, 22:9, 148:25,
150:9, 150:13,
150:24, 151:6,
151:16, 151:24
**LIABILITY** [1] - 1:6
**lie** [1] - 122:2
**lies** [1] - 39:17
**life** [3] - 33:18, 33:21,
34:3
**light** [4] - 66:7, 66:12,
66:16, 68:4
**likely** [1] - 147:19
**LIMITED** [1] - 1:6
**limits** [1] - 6:15
**line** [1] - 104:20
**link** [1] - 20:22
**LinkedIn** [2] - 49:1,
50:18
**linking** [1] - 69:8
**LINODE** [3] - 1:6, 1:7,
1:7
**Linode** [132] - 7:15,
8:10, 8:17, 9:3, 9:4,
11:22, 13:16, 15:7,
20:5, 20:12, 20:25,
23:1, 23:2, 24:16,
24:19, 26:10, 28:18,
29:4, 30:12, 33:1,
33:2, 33:19, 34:2,
39:14, 39:15, 41:11,

43:2, 46:6, 46:7,
48:4, 52:4, 53:24,
54:5, 54:9, 54:13,
54:15, 54:18, 55:3,
55:7, 55:10, 55:21,
58:3, 58:4, 58:6,
58:19, 60:3, 60:20,
60:25, 61:3, 61:23,
62:7, 62:22, 63:18,
65:23, 67:7, 67:8,
67:10, 68:7, 68:18,
68:23, 69:10, 69:14,
69:20, 69:21, 77:10,
77:14, 77:16, 77:21,
77:22, 78:6, 78:13,
78:22, 78:24, 78:25,
79:1, 79:2, 79:5,
79:11, 81:22, 82:2,
82:14, 82:16, 83:3,
83:12, 83:24, 83:25,
84:6, 84:7, 84:12,
84:20, 85:9, 87:9,
88:13, 90:19, 90:23,
92:21, 96:12, 96:18,
98:10, 98:17, 108:3,
108:5, 109:9,
114:19, 117:23,
118:21, 125:22,
130:11, 131:16,
132:20, 133:4,
134:8, 134:15,
134:20, 135:16,
137:18, 138:14,
138:20, 141:13,
143:20, 150:25,
151:12, 151:22,
151:23, 151:25,
152:9, 152:19,
152:20
**Linode's** [9] - 9:12,
9:13, 9:15, 17:7,
20:4, 20:11, 85:25,
118:17, 128:19
**LINODIAN** [1] - 1:7
**Lisa** [1] - 96:11
**list** [5] - 21:16, 21:20,
22:4, 22:9, 156:5
**listed** [3] - 130:16,
132:10, 133:24
**listen** [8] - 5:17, 77:1,
114:5, 114:9,
114:10, 116:10,
119:20, 148:2
**listened** [2] - 62:18,
63:20
**listening** [1] - 150:7
**listing** [1] - 93:16
**lists** [1] - 55:9
**live** [1] - 155:10
**lively** [1] - 16:9

*living* [1] - 132:15
*LLC* [3] - 1:7, 1:7, 1:8
*loan* [4] - 127:5, 127:7, 128:7, 128:11
*loans* [1] - 124:19
*lobby* [1] - 101:25
*local* [1] - 109:6
*location* [2] - 27:22, 27:23
*log* [2] - 26:12, 31:8
*logged* [2] - 32:6, 149:4
*logistics* [1] - 90:24
*look* [30] - 11:11, 14:13, 22:22, 38:7, 38:8, 49:18, 50:1, 54:1, 54:12, 70:8, 71:22, 74:9, 82:21, 84:16, 86:7, 86:21, 91:8, 93:8, 96:7, 96:21, 101:1, 104:18, 106:9, 108:12, 110:12, 124:7, 126:18, 138:9, 141:8, 144:17
*looked* [8] - 21:4, 22:19, 55:23, 55:25, 56:3, 77:23, 87:25, 115:4
*looking* [15] - 11:19, 12:14, 14:17, 14:18, 14:19, 48:16, 52:6, 52:7, 81:21, 99:12, 107:20, 118:13, 118:14, 120:2, 153:9
*looks* [20] - 88:9, 88:10, 94:7, 97:6, 101:2, 108:15, 109:17, 110:14, 124:24, 126:9, 126:21, 127:5, 134:6, 141:14, 142:9, 144:7, 144:16, 144:17, 147:13, 149:19
*lorazepam* [2] - 46:20, 46:23
*loss* [1] - 52:2
*losses* [4] - 58:18, 58:20, 58:21, 58:23
*lost* [1] - 60:6
*loud* [1] - 83:21
*love* [1] - 50:20
*loved* [1] - 109:24
*lower* [2] - 49:23, 50:10
*luck* [2] - 41:12, 41:25
*lunch* [17] - 31:13, 31:15, 38:25, 39:3, 40:22, 52:10, 62:17,

71:10, 71:21, 71:25, 72:5, 72:8, 72:12, 75:12, 94:8, 94:18, 154:5
*Luncheon* [1] - 74:19
*lunches* [1] - 52:8

## M

*mad* [1] - 74:2
*main* [1] - 23:4
*maintained* [2] - 53:23, 54:14
*males* [1] - 91:19
*man* [1] - 41:25
*manage* [4] - 24:16, 38:3, 38:9, 80:4
*managed* [1] - 6:23
*management* [8] - 20:14, 24:17, 24:19, 85:3, 85:12, 88:3, 143:17, 143:22
*manager* [42] - 9:5, 9:17, 12:15, 15:14, 26:21, 40:19, 50:18, 51:19, 87:10, 87:11, 91:24, 97:2, 97:13, 113:5, 113:15, 113:18, 115:22, 115:24, 117:20, 118:13, 120:25, 121:11, 125:16, 125:22, 126:5, 128:16, 128:19, 128:23, 129:1, 129:8, 130:3, 130:10, 130:14, 130:16, 130:22, 131:13, 131:15, 137:25, 139:7, 141:1, 142:15
*managerial* [1] - 143:10
*managers* [3] - 24:16, 24:19, 104:22
*mandated* [2] - 22:10
*manipulated* [1] - 39:17
*manner* [5] - 44:23, 68:21, 89:22, 101:20, 102:15
*March* [6] - 7:25, 28:3, 94:6, 94:7, 95:2, 95:3
*marital* [1] - 84:2
*mark* [1] - 31:1
*marked* [3] - 34:21, 34:24, 61:12
*Market* [2] - 1:12, 1:19
*marketing* [4] - 22:17,

98:4, 98:9, 113:8
*marking* [1] - 36:9
*materials* [1] - 94:23
*matter* [4] - 66:11, 105:11, 129:16, 157:9
*Matter* [1] - 157:5
*matters* [1] - 94:17
*maureen* [1] - 1:22
*Maureen* [1] - 157:11
*maureen.mchugh@ paed.uscourts.gov* [1] - 1:22
*Max* [1] - 45:3
*MCCARTHY* [1] - 2:4
*McHugh* [2] - 1:22, 157:11
*McNealy* [1] - 109:19
*mean* [28] - 5:6, 5:12, 9:1, 10:1, 17:24, 19:21, 21:6, 28:17, 36:16, 38:1, 38:16, 52:16, 58:24, 94:19, 112:16, 119:12, 121:1, 123:7, 129:14, 129:24, 130:5, 130:19, 135:9, 136:19, 140:4, 149:5, 153:17, 155:22
*means* [2] - 22:4, 150:25
*meant* [2] - 35:2, 113:19
*MEAT* [1] - 142:2
*meat* [7] - 101:6, 101:13, 101:14, 141:15, 141:23, 142:1, 142:8
*mechanical* [1] - 1:23
*medically* [2] - 46:14, 46:15
*medication* [11] - 43:17, 43:19, 44:2, 44:5, 44:6, 45:7, 45:19, 46:3, 46:17, 46:18, 46:19
*medications* [1] - 127:2
*medicine* [2] - 43:12, 43:13
*meet* [5] - 40:14, 53:2, 82:5, 142:2, 142:8
*MEET* [1] - 142:2
*meeting* [32] - 18:24, 25:25, 26:1, 26:3, 26:6, 26:8, 29:19, 42:18, 44:12, 44:20, 52:10, 62:17, 62:20, 65:21, 65:23, 68:11,

75:13, 75:21, 76:3, 76:15, 77:4, 79:20, 116:25, 117:24, 118:7, 119:1, 123:10, 124:3, 140:16, 147:6
*meetings* [5] - 11:1, 11:2, 25:20, 82:12, 140:22
*Melissa* [1] - 2:12
*members* [1] - 73:5
*memory* [1] - 138:12
*mention* [9] - 39:25, 83:6, 85:23, 124:1, 126:6, 139:11, 139:13, 139:20, 139:21
*mentioned* [7] - 22:2, 61:21, 88:5, 125:6, 135:21, 135:23, 147:20
*mentioning* [1] - 101:23
*mentoring* [1] - 125:13
*merit* [1] - 83:24
*message* [24] - 17:20, 17:21, 17:25, 19:21, 19:24, 19:25, 20:7, 20:21, 22:7, 23:5, 41:25, 44:15, 86:2, 86:7, 86:22, 86:25, 91:9, 95:7, 96:7, 98:22, 115:6, 149:8, 150:14, 151:10
*messaged* [1] - 101:24
*messages* [17] - 10:13, 10:14, 17:13, 18:14, 22:22, 80:14, 80:25, 86:16, 87:1, 89:21, 112:5, 112:6, 116:10, 131:2, 131:3, 131:8
*messaging* [1] - 147:7
*met* [3] - 16:7, 60:18, 82:17
*Meyer* [1] - 2:12
*MEYER* [1] - 12:10
*Miao* [4] - 42:21, 42:23, 45:24, 46:11
*micro* [2] - 47:25, 48:2
*microphone* [2] - 35:10, 35:22
*Microsystems* [1] - 109:18
*mid* [5] - 11:24, 12:7, 14:12, 37:14, 153:21
*mid-morning* [2] - 37:14, 153:21
*mid-year* [3] - 11:24,

12:7, 14:12
*midday* [1] - 4:21
*middle* [5] - 5:23, 15:2, 37:5, 95:5, 145:1
*midterm* [1] - 8:24
*might* [11] - 45:10, 56:5, 71:21, 85:10, 90:10, 92:11, 97:1, 101:23, 110:3, 112:15, 153:9
*milberg* [1] - 57:14
*Milberg* [2] - 57:15, 89:14
*mind* [12] - 42:14, 69:3, 69:4, 74:5, 76:13, 101:3, 113:8, 138:13, 141:5, 151:8, 151:11, 154:24
*mindful* [1] - 74:3
*minds* [1] - 69:2
*mine* [4] - 53:3, 98:2, 99:14, 151:8
*minor* [2] - 94:16, 94:19
*minute* [3] - 30:2, 36:21, 99:18
*minutes* [11] - 33:11, 34:12, 36:20, 37:17, 37:24, 38:6, 81:25, 122:6, 122:10, 126:19, 154:7
*missed* [2] - 110:16, 154:7
*missing* [1] - 100:12
*mission* [2] - 109:20, 109:24
*mitigate* [2] - 109:13, 109:14
*mitigation* [1] - 108:17
*mocked* [1] - 98:11
*modern* [1] - 47:25
*moment* [10] - 39:20, 43:14, 47:4, 66:12, 66:16, 68:8, 103:10, 121:13, 150:22, 150:23
*Monday* [5] - 90:10, 155:12, 155:23, 155:25, 156:4
*money* [5] - 42:15, 60:2, 60:15, 60:17, 89:1
*Money* [1] - 126:11
*monitor* [1] - 74:10
*month* [8] - 9:22, 11:1, 14:24, 40:2, 122:25, 123:17, 123:21, 132:2

**months** [5] - 7:23, 8:2, 49:3, 51:24, 137:18
**morning** [18] - 4:4, 4:5, 4:7, 5:21, 6:22, 7:2, 7:6, 20:7, 21:25, 23:14, 24:5, 24:8, 37:14, 153:8, 153:19, 153:21, 154:10
**most** [3] - 50:6, 132:19, 155:16
**motion** [1] - 111:20
**move** [17] - 13:19, 19:15, 24:2, 29:6, 34:10, 35:22, 53:9, 53:11, 55:12, 62:16, 77:7, 84:17, 88:18, 104:23, 106:12, 108:1, 137:5
**moved** [12] - 55:12, 102:20, 104:21, 105:3, 105:8, 105:9, 105:10, 105:14, 105:15, 105:22, 112:17
**moves** [1] - 104:24
**movie** [1] - 109:5
**moving** [9] - 13:21, 34:14, 34:18, 38:14, 103:1, 103:14, 103:16, 105:12, 143:6
**MR** [204] - 3:4, 3:4, 4:16, 5:9, 5:14, 5:17, 6:2, 6:6, 6:10, 6:17, 6:18, 7:5, 11:8, 11:10, 12:4, 12:9, 12:11, 12:12, 12:19, 12:22, 13:19, 13:21, 13:23, 13:25, 14:5, 14:7, 19:5, 19:7, 23:15, 23:17, 23:20, 23:22, 23:25, 24:2, 24:3, 28:7, 28:8, 29:6, 29:8, 29:11, 34:8, 34:12, 34:13, 34:16, 34:20, 34:22, 35:1, 35:4, 35:5, 35:10, 35:14, 35:18, 35:24, 36:2, 36:4, 36:6, 36:7, 36:11, 36:14, 36:16, 36:19, 36:23, 37:1, 37:3, 37:23, 37:25, 38:4, 38:7, 38:16, 38:24, 39:2, 39:6, 39:11, 45:15, 45:17, 48:8, 48:11, 53:13, 53:17, 54:19, 54:21, 54:24, 54:25, 55:12, 55:14,

55:17, 56:6, 56:8, 57:20, 57:23, 59:10, 59:13, 59:16, 59:19, 60:8, 60:9, 63:9, 63:11, 63:12, 64:7, 64:10, 64:11, 65:4, 65:9, 67:16, 67:19, 67:22, 67:24, 69:22, 69:24, 70:20, 70:23, 71:6, 71:9, 72:4, 72:15, 72:20, 72:24, 73:2, 73:15, 73:17, 73:21, 74:2, 74:17, 74:23, 75:8, 75:10, 75:11, 76:20, 77:3, 78:15, 78:21, 80:18, 81:1, 81:3, 81:10, 81:15, 81:17, 81:18, 82:20, 82:25, 84:14, 84:18, 86:9, 86:10, 86:18, 86:20, 88:18, 88:20, 88:23, 102:6, 103:4, 103:8, 103:19, 103:22, 103:24, 104:3, 104:6, 104:7, 104:9, 104:10, 104:13, 104:15, 104:17, 104:19, 108:12, 108:13, 110:6, 110:9, 121:19, 122:2, 122:19, 122:21, 122:22, 123:5, 123:9, 131:5, 131:7, 132:5, 132:8, 133:8, 133:10, 133:13, 133:16, 133:18, 134:2, 134:4, 137:7, 137:9, 141:4, 141:6, 144:10, 144:11, 153:19, 153:23, 154:1, 154:6, 154:14, 154:21, 154:25, 155:2, 155:10, 155:14, 156:5
**MS** [1] - 12:10
**multiple** [4] - 4:20, 10:22, 37:6, 155:20
**murder** [4] - 64:24, 64:25, 65:6, 65:8
**Musbach** [25] - 33:24, 34:7, 40:1, 48:7, 48:14, 62:22, 63:2, 63:5, 63:15, 63:25, 64:6, 64:16, 64:18, 64:20, 64:22, 65:24, 66:6, 66:18, 67:1, 67:11, 67:21, 68:1, 68:5, 69:9, 76:5

**Musbach's** [2] - 63:22, 68:19
**must** [6] - 16:25, 113:6, 117:5, 139:20, 140:17, 145:20

## N

**name** [11] - 7:19, 57:13, 63:22, 87:9, 95:25, 98:16, 139:11, 139:21, 142:9, 145:7, 148:13
**named** [3] - 88:10, 105:8, 141:12
**names** [1] - 139:20
**national** [2] - 21:9, 84:1
**native** [1] - 48:1
**natural** [3] - 71:9, 119:10
**nature** [3] - 64:25, 65:14, 72:16
**navigate** [1] - 6:23
**nearly** [3] - 7:15, 17:1, 40:7
**neat** [1] - 106:18
**Neat** [1] - 126:18
**need** [27] - 4:18, 5:7, 17:3, 17:10, 17:15, 24:16, 35:25, 36:8, 38:9, 38:14, 42:8, 56:4, 56:5, 70:2, 73:9, 73:10, 90:5, 90:6, 90:17, 100:21, 108:24, 109:1, 116:13, 124:11, 128:5, 138:11
**needed** [5] - 13:25, 19:4, 44:6, 49:22, 120:15
**needs** [6] - 32:6, 34:24, 110:24, 120:25, 122:1, 156:11
**negatively** [4] - 68:6, 126:21, 140:16, 142:24
**Net** [1] - 40:14
**network** [28] - 15:24, 30:21, 31:22, 31:23, 42:3, 49:6, 49:14, 49:15, 49:21, 50:2, 51:12, 51:13, 51:14, 51:15, 52:15, 92:16, 93:14, 93:17, 108:25, 109:6, 115:22, 120:16, 125:11, 126:5,

129:22, 130:14, 132:21, 149:3
**network'** [1] - 93:13
**networking** [2] - 47:24, 125:12
**never** [23] - 26:20, 32:7, 41:10, 50:7, 69:15, 69:20, 71:2, 76:2, 76:5, 76:9, 76:15, 77:4, 93:16, 101:10, 114:2, 114:18, 115:5, 115:6, 117:20, 125:22, 126:4, 132:14, 139:6
**new** [13] - 67:2, 72:22, 90:6, 90:17, 91:11, 115:24, 126:15, 127:19, 127:21, 131:20, 137:15, 138:1, 138:19
**newspaper** [1] - 69:11
**next** [41] - 5:19, 6:6, 8:20, 14:9, 14:10, 16:3, 16:6, 18:22, 20:23, 26:22, 32:18, 33:13, 35:22, 42:11, 42:12, 54:1, 54:4, 54:24, 84:16, 90:11, 90:14, 90:22, 95:23, 96:21, 99:12, 102:10, 106:12, 108:16, 110:18, 110:19, 117:10, 128:13, 135:25, 136:5, 137:13, 144:7, 144:10, 154:16, 154:17, 154:20, 156:15
**night** [1] - 4:13
**non** [2] - 76:21, 83:15
**non-discrimination** [1] - 83:15
**non-responsive** [1] - 76:21
**none** [1] - 146:5
**normal** [5] - 31:18, 61:3, 94:13, 132:3, 132:15
**normally** [1] - 8:23
**note** [5] - 4:17, 42:1, 42:3, 95:17, 142:3
**noted** [1] - 36:24
**nothing** [8] - 33:18, 34:2, 34:3, 34:6, 42:12, 100:19, 126:24, 140:22
**nothing's** [1] - 120:7
**notice** [5] - 26:14, 26:16, 104:22,

104:23, 105:12
**noticed** [3] - 25:1, 25:2, 25:6
**noting** [6] - 90:15, 95:24, 143:10, 143:16, 143:23, 145:22
**November** [14] - 82:3, 92:15, 110:10, 111:10, 111:14, 111:25, 114:18, 116:22, 117:8, 117:9, 117:12, 123:12, 123:15, 123:24
**number** [12] - 11:3, 60:4, 60:5, 60:6, 61:3, 62:25, 73:13, 74:9, 89:15, 104:12, 119:12, 121:12
**NUMBER** [1] - 1:3
**numbers** [1] - 93:23
**numerous** [1] - 52:8

## O

**o'clock** [4] - 30:25, 31:1, 32:4, 155:18
**object** [2] - 78:15, 80:18
**objection** [28] - 19:5, 23:15, 23:20, 23:25, 29:8, 45:15, 48:8, 54:21, 55:14, 57:20, 64:7, 65:4, 67:16, 67:22, 69:22, 70:20, 71:6, 81:1, 81:15, 81:16, 88:20, 104:8, 104:14, 131:5, 133:8, 133:9, 133:10, 133:16
**objection's** [1] - 133:11
**objections** [1] - 34:18
**obligation** [1] - 156:19
**observability** [1] - 49:15
**observe** [1] - 74:10
**obviously** [3] - 37:15, 72:10, 112:13
**occasion** [1] - 37:14
**occur** [1] - 111:20
**occurred** [3] - 25:6, 29:23, 33:2
**occurs** [1] - 109:12
**October** [2] - 91:9, 108:14
**OF** [1] - 1:1
**off-putting** [1] - 101:5
**off-topic** [2] - 101:11,

*144:20*
**offensive** *[2] - 142:10, 142:24*
**offered** *[1] - 8:16*
**office** *[13] - 32:13, 32:14, 33:6, 33:17, 46:16, 95:9, 96:5, 97:24, 98:10, 105:3, 112:17, 114:22, 117:9*
**offices** *[1] - 117:24*
**Official** *[2] - 1:22, 157:11*
**often** *[2] - 40:17, 40:24*
**old** *[6] - 8:7, 52:24, 82:14, 82:17, 90:5, 90:6*
**older** *[1] - 50:11*
**once** *[7] - 9:5, 74:11, 76:2, 76:6, 100:8, 117:20, 152:17*
**one** *[64] - 6:10, 8:21, 11:1, 12:2, 15:18, 16:3, 16:6, 17:12, 21:19, 25:25, 26:2, 26:21, 28:15, 28:25, 31:15, 39:19, 42:1, 44:4, 46:23, 48:19, 48:21, 49:1, 49:5, 50:22, 55:25, 58:22, 61:5, 63:21, 72:24, 74:5, 74:14, 76:12, 86:2, 87:2, 87:14, 93:4, 93:5, 94:3, 95:20, 103:21, 104:7, 115:8, 115:16, 120:15, 121:18, 121:22, 125:25, 126:24, 130:6, 132:19, 132:22, 133:3, 134:6, 134:23, 136:1, 137:24, 139:25, 144:2, 147:16, 152:4, 156:18*
**one-on-one** *[3] - 11:1, 25:25, 26:2*
**one-on-ones** *[2] - 26:21, 28:15*
**ones** *[5] - 26:21, 28:15, 78:14, 138:1, 154:20*
**open** *[7] - 4:1, 49:21, 50:3, 110:15, 110:18, 112:9, 149:6*
**opening** *[4] - 98:10, 101:23, 102:24, 103:13*

**operated** *[1] - 109:19*
**operating** *[1] - 109:19*
**operations** *[4] - 50:2, 87:15, 93:14, 93:17*
**opinion** *[6] - 22:7, 22:8, 22:14, 24:21, 148:1, 149:10*
**opinions** *[1] - 151:1*
**opportunities** *[3] - 8:10, 83:23, 83:25*
**opportunity** *[4] - 20:5, 119:19, 120:5, 135:12*
**optimistic** *[4] - 115:10, 115:22, 116:1, 129:20*
**options** *[3] - 124:19, 125:2, 155:21*
**order** *[6] - 5:1, 5:22, 50:4, 62:1, 83:22, 89:1*
**ordinary** *[1] - 94:20*
**organizations** *[1] - 93:23*
**orient** *[1] - 12:6*
**orientation** *[14] - 7:11, 20:24, 76:11, 78:13, 79:13, 80:13, 81:7, 81:24, 83:3, 84:3, 84:9, 136:18, 136:22, 152:25*
**origin** *[2] - 21:10, 84:1*
**original** *[1] - 79:7*
**otherwise** *[1] - 109:2*
**out-of-network** *[1] - 92:16*
**outset** *[1] - 85:20*
**outside** *[5] - 32:25, 33:19, 34:2, 66:25, 118:10*
**overload** *[2] - 108:21, 108:22*
**overqualified** *[1] - 49:23*
**override** *[1] - 110:23*
**overruled** *[11] - 48:9, 57:21, 64:8, 65:5, 67:16, 69:23, 70:21, 71:7, 81:16, 131:6, 133:11*
**oversight** *[1] - 120:16*
**overwhelm** *[1] - 108:22*
**overwhelming** *[1] - 108:25*
**overwhelms** *[1] - 109:6*
**owed** *[5] - 57:18, 57:24, 58:13, 60:2, 61:16*

**own** *[5] - 8:9, 9:15, 32:14, 42:15, 93:15*

# P

**P.C** *[1] - 2:2*
**p.m** *[13] - 4:2, 72:3, 74:19, 75:4, 96:13, 122:8, 122:11, 122:16, 149:8, 153:14, 157:5*
**PA** *[3] - 1:11, 1:20, 2:5*
**package** *[2] - 8:16, 26:25*
**packet** *[2] - 13:22, 13:24*
**PAGE** *[1] - 3:2*
**page** *[31] - 12:6, 15:2, 53:21, 54:4, 54:12, 90:14, 90:22, 91:8, 91:14, 93:5, 93:6, 93:7, 94:3, 95:16, 95:23, 96:21, 99:12, 101:1, 101:22, 102:10, 102:17, 104:17, 106:12, 111:1, 128:13, 137:13, 144:7, 144:10, 144:21, 145:1*
**pager** *[5] - 16:22, 16:23, 16:24, 19:9, 19:11*
**pages** *[5] - 13:23, 54:1, 89:17, 89:23*
**paid** *[9] - 57:7, 60:3, 60:12, 60:16, 61:5, 62:1, 65:7, 132:19, 133:3*
**Palochko** *[73] - 4:14, 4:18, 4:25, 26:17, 26:20, 27:11, 29:23, 30:5, 32:12, 33:4, 33:5, 37:10, 40:4, 40:8, 41:15, 61:4, 63:21, 64:15, 75:17, 79:17, 79:25, 80:9, 80:12, 81:12, 81:21, 86:8, 87:9, 87:11, 88:10, 88:15, 89:1, 89:21, 90:22, 94:7, 100:14, 101:2, 102:15, 104:21, 105:7, 105:13, 106:14, 107:5, 109:15, 110:17, 110:22, 113:2, 114:10, 114:18, 119:6, 120:12, 124:19, 124:23, 126:9, 126:25,*

*127:5, 134:7, 138:22, 141:11, 142:25, 147:8, 147:22, 148:11, 148:13, 149:16, 150:12, 151:5, 151:23, 153:25, 154:4, 154:15, 154:19, 155:17, 155:24*
**Palochko's** *[2] - 5:24, 79:21*
**panic** *[4] - 45:21, 46:22, 46:24, 47:13*
**paper** *[1] - 86:12*
**par** *[1] - 91:19*
**paragraph** *[5] - 83:20, 84:16, 84:19, 84:20, 84:25*
**Paralegal** *[1] - 2:12*
**pardon** *[1] - 70:18*
**parking** *[1] - 72:13*
**part** *[24] - 6:13, 9:12, 9:15, 10:5, 11:20, 14:17, 14:19, 15:2, 17:3, 25:2, 36:12, 48:25, 50:1, 51:12, 62:3, 62:7, 77:8, 77:18, 105:24, 124:15, 132:18, 135:19, 135:21, 148:25*
**part-time** *[1] - 50:1*
**partial** *[1] - 138:7*
**particular** *[9] - 8:21, 22:3, 23:9, 25:24, 34:3, 44:16, 98:2, 105:20, 135:13*
**particularly** *[1] - 74:11*
**parts** *[2] - 21:19, 35:7*
**pass** *[2] - 70:2, 95:7*
**passed** *[1] - 91:16*
**passion** *[1] - 16:8*
**passport** *[6] - 90:5, 90:6, 90:17, 90:20, 91:1, 91:6*
**past** *[1] - 14:9*
**paste** *[1] - 144:12*
**patience** *[1] - 5:15*
**pattern** *[1] - 109:7*
**pawn** *[1] - 119:10*
**pay** *[5] - 61:2, 61:5, 90:19, 91:25, 133:24*
**paycheck** *[1] - 127:7*
**Paycheck** *[2] - 121:2, 121:3, 121:5*
**paying** *[2] - 91:1, 127:8*
**payment** *[3] - 55:20, 56:13, 127:7*

**payments** *[1] - 127:1*
**payroll** *[4] - 50:22, 51:10, 95:18, 132:9*
**PDF** *[1] - 144:5*
**peer** *[10] - 9:12, 9:13, 9:24, 11:6, 13:14, 15:4, 15:6, 15:7, 15:15, 15:16*
**peer-reviews** *[9] - 9:12, 9:13, 9:24, 11:6, 13:14, 15:6, 15:7, 15:15, 15:16*
**Peering** *[2] - 90:16, 127:23*
**peering** *[2] - 108:3, 108:5*
**peers** *[1] - 15:7*
**PEET** *[1] - 2:3*
**PENNSYLVANIA** *[1] - 1:1*
**Pennsylvania** *[11] - 1:13, 24:23, 28:21, 44:11, 78:19, 79:18, 81:8, 116:18, 123:14, 135:9, 136:7*
**people** *[40] - 8:3, 29:16, 31:22, 32:8, 40:9, 50:6, 50:8, 50:14, 52:22, 53:2, 66:25, 67:9, 67:10, 68:18, 73:3, 73:13, 73:24, 74:4, 74:7, 80:3, 82:16, 87:15, 92:25, 93:23, 95:1, 96:6, 97:12, 101:5, 101:9, 112:6, 118:15, 131:3, 140:14, 142:12, 146:7, 150:4, 150:8, 155:6, 156:20*
**people's** *[3] - 5:16, 146:9, 155:3*
**percent** *[3] - 61:17, 132:3, 132:15*
**perfect** *[2] - 89:4, 153:1*
**perform** *[1] - 65:1*
**performance** *[23] - 8:24, 9:2, 9:3, 9:6, 9:7, 10:5, 10:6, 10:9, 10:17, 11:23, 12:24, 13:1, 13:3, 13:17, 14:11, 14:12, 15:13, 16:14, 19:1, 60:5, 80:5, 109:3, 143:20*
**perhaps** *[2] - 25:11, 33:11*
**period** *[21] - 8:23, 10:20, 19:14, 24:18, 45:22, 49:2, 60:19,*

*61*:2, *78*:2, *87*:2, *89*:20, *90*:25, *107*:18, *110*:15, *110*:19, *112*:7, *117*:15, *119*:6, *123*:20, *132*:17
**permanent** [2] - *52*:7, *52*:10
**permission** [2] - *75*:8, *148*:7
**persists** [1] - *146*:13
**person** [26] - *9*:8, *10*:4, *10*:23, *15*:7, *26*:8, *37*:4, *37*:5, *37*:9, *41*:7, *51*:19, *65*:8, *65*:11, *65*:12, *67*:15, *68*:23, *82*:12, *82*:17, *91*:3, *92*:21, *96*:14, *118*:19, *121*:4, *130*:10, *130*:11, *156*:19
**personal** [5] - *8*:9, *45*:8, *54*:17, *148*:1, *149*:10
**personally** [2] - *7*:14, *151*:2
**personnel** [8] - *80*:2, *80*:7, *125*:9, *125*:17, *125*:20, *125*:24, *126*:5, *143*:11
**perspective** [3] - *8*:9, *100*:24, *119*:13
**Peter** [18] - *19*:20, *20*:3, *20*:9, *20*:11, *20*:25, *21*:3, *21*:15, *22*:2, *22*:5, *23*:13, *24*:4, *24*:15, *24*:17, *24*:21, *25*:10, *80*:14, *85*:24, *98*:17
**Philadelphia** [7] - *1*:13, *1*:20, *2*:5, *50*:19, *98*:10, *134*:17, *135*:9
**Philippines** [6] - *7*:8, *7*:23, *8*:19, *28*:4, *147*:6, *151*:8
**Philly** [3] - *91*:15, *91*:21, *101*:8
**phone** [10] - *26*:9, *27*:3, *27*:6, *30*:1, *42*:11, *76*:6, *93*:11, *93*:12, *93*:16, *93*:22
**phonetic)** [1] - *85*:5
**photo** [13] - *97*:11, *97*:13, *97*:17, *98*:4, *98*:9, *98*:11, *98*:15, *98*:20, *99*:11, *100*:21, *124*:24, *141*:23
**photo-shopped** [2] -

*98*:4, *98*:11
**photo-shopping** [2] - *97*:11, *97*:13
**photos** [5] - *65*:12, *65*:14, *65*:17, *97*:14, *98*:21
**photoshop** [2] - *97*:17, *98*:15
**phraseology** [1] - *142*:8
**PHRC** [10] - *78*:23, *79*:9, *79*:10, *83*:4, *111*:13, *117*:15, *123*:1, *123*:18, *123*:22, *135*:4
**physician** [2] - *42*:24, *46*:15
**pick** [2] - *89*:5, *134*:5
**picked** [2] - *27*:6, *27*:10
**picking** [1] - *122*:24
**picture** [4] - *20*:22, *21*:2, *98*:25, *144*:22
**pictures** [3] - *101*:4, *101*:9, *101*:13
**piece** [1] - *128*:6
**pinging** [1] - *95*:24
**pitch** [1] - *108*:16
**place** [2] - *7*:16, *80*:7
**placed** [4] - *28*:9, *54*:18, *98*:11, *125*:24
**plainly** [1] - *4*:17
**Plaintiff** [2] - *1*:4, *1*:20
**PLAINTIFF** [11] - *3*:7, *3*:8, *3*:8, *3*:9, *3*:9, *4*:8, *14*:4, *29*:10, *35*:9, *54*:23, *55*:16
**plaintiff** [3] - *4*:25, *6*:3, *6*:14
**plaintiff's** [6] - *4*:20, *5*:3, *5*:18, *5*:25, *6*:13, *103*:25
**plan** [21] - *4*:10, *37*:17, *39*:2, *55*:3, *55*:4, *56*:16, *57*:16, *59*:1, *59*:25, *60*:3, *60*:4, *60*:12, *60*:16, *61*:1, *61*:2, *61*:16, *61*:24, *62*:3, *62*:4, *62*:7, *153*:3
**plans** [1] - *61*:23
**plate** [1] - *102*:1
**play** [5] - *34*:11, *34*:13, *35*:7, *35*:13, *36*:13
**playing** [7] - *35*:17, *36*:3, *36*:9, *36*:21, *37*:2, *37*:12, *95*:25
**pleasure** [2] - *15*:19, *111*:5
**PLLC** [1] - *1*:18

**PNG** [1] - *147*:13
**point** [31] - *6*:7, *6*:10, *11*:2, *16*:12, *17*:2, *21*:13, *30*:6, *45*:20, *46*:20, *46*:23, *50*:13, *56*:15, *71*:10, *72*:22, *81*:13, *81*:20, *85*:25, *87*:14, *88*:18, *97*:23, *107*:11, *108*:8, *110*:4, *112*:2, *127*:16, *130*:16, *130*:23, *131*:14, *135*:18, *142*:10, *147*:3
**points** [1] - *32*:24
**police** [1] - *74*:7
**policies** [1] - *37*:7
**policy** [20] - *20*:5, *30*:13, *32*:23, *33*:1, *33*:5, *33*:8, *33*:13, *75*:23, *83*:15, *83*:16, *84*:7, *85*:10, *85*:14, *86*:3, *86*:5, *87*:24, *88*:5, *121*:7, *121*:9, *138*:20
**poorly** [3] - *67*:12, *140*:14, *140*:25
**pop** [2] - *84*:15, *103*:19
**poplar** [1] - *23*:2
**pornographic** [1] - *65*:17
**portion** [1] - *83*:11
**position** [16] - *20*:20, *20*:21, *47*:14, *48*:12, *49*:4, *49*:20, *50*:2, *50*:15, *52*:7, *52*:10, *58*:13, *67*:18, *67*:20, *67*:25, *135*:14, *137*:17
**positions** [2] - *48*:18, *135*:13
**positives** [1] - *117*:19
**possible** [2] - *22*:22, *22*:25
**possibly** [2] - *15*:13, *28*:3
**post** [5] - *101*:9, *101*:13, *144*:18, *145*:24, *149*:3
**posted** [7] - *94*:1, *98*:5, *98*:9, *101*:11, *108*:15, *108*:23, *145*:17
**posting** [2] - *141*:12, *144*:23
**posts** [4] - *99*:6, *99*:17, *100*:23, *146*:9
**potential** [3] - *134*:7, *137*:15, *142*:23

**potentially** [1] - *139*:12
**power** [1] - *119*:7
**practice** [5] - *9*:12, *14*:9, *32*:7, *51*:25, *94*:13
**practices** [1] - *84*:1
**praise** [2] - *117*:19, *151*:5
**praising** [1] - *150*:12
**precisely** [2] - *30*:7, *30*:8
**prefer** [3] - *5*:23, *35*:23, *154*:15
**preference** [4] - *71*:11, *86*:13, *129*:12, *129*:13
**pregnancy** [1] - *84*:2
**prejudgments** [1] - *69*:1
**prescribed** [1] - *45*:19
**prescription** [3] - *43*:15, *43*:17, *43*:18
**PRESENT** [1] - *2*:10
**present** [2] - *47*:7, *47*:11
**presented** [1] - *13*:8
**press** [1] - *121*:24
**presumably** [2] - *97*:1, *150*:25
**pretty** [6] - *53*:6, *73*:7, *101*:4, *106*:18, *112*:2, *154*:1
**prevent** [1] - *108*:25
**previous** [5] - *23*:11, *27*:14, *33*:7, *55*:21, *61*:18
**previously** [5] - *24*:22, *66*:13, *82*:22, *103*:6, *133*:22
**price** [1] - *6*:15
**pride** [1] - *142*:2
**primarily** [1] - *52*:9
**primary** [3] - *10*:5, *42*:24, *46*:15
**principal** [2] - *51*:17, *51*:18
**print** [1] - *125*:9
**printed** [2] - *144*:3, *144*:4
**printout** [1] - *53*:22, *54*:2, *54*:5
**printouts** [1] - *54*:13
**privacy** [2] - *138*:13
**private** [7] - *33*:18, *33*:20, *34*:3, *93*:11, *137*:16, *148*:12, *151*:9
**problem** [4] - *38*:8, *49*:13, *101*:12,

*105*:16
**problematic** [2] - *5*:1, *5*:3
**problems** [2] - *51*:6, *109*:6
**Proceedings** [1] - *1*:23
**proceedings** [2] - *74*:9, *157*:9
**PROCEEDINGS** [1] - *4*:1
**process** [14] - *9*:8, *9*:9, *9*:15, *13*:16, *14*:18, *14*:19, *15*:3, *50*:24, *70*:15, *82*:6, *136*:1, *136*:6, *136*:12, *136*:25
**produced** [2] - *1*:24, *55*:4
**producing** [1] - *5*:2
**professor** [2] - *47*:15, *47*:17
**Professor** [1] - *53*:4
**profit** [26] - *54*:16, *55*:3, *55*:20, *55*:24, *56*:9, *56*:12, *56*:18, *56*:21, *57*:6, *58*:6, *58*:14, *58*:25, *59*:21, *59*:25, *60*:3, *60*:12, *60*:16, *61*:13, *61*:16, *61*:24, *62*:5, *62*:6, *62*:10, *124*:20, *124*:21
**profit-sharing** [24] - *54*:16, *55*:3, *55*:20, *55*:24, *56*:9, *56*:12, *56*:18, *56*:21, *57*:6, *58*:6, *58*:14, *58*:25, *59*:21, *59*:25, *60*:3, *60*:12, *60*:16, *61*:13, *61*:16, *61*:24, *62*:5, *62*:6, *62*:10
**programmer** [1] - *98*:19
**programming** [1] - *98*:17
**progressed** [1] - *7*:19
**promised** [1] - *61*:7
**promoted** [6] - *87*:14, *87*:17, *111*:24, *127*:16, *130*:13, *147*:3
**promoting** [1] - *79*:23
**promotion** [18] - *111*:17, *111*:19, *111*:22, *128*:2, *128*:20, *128*:22, *129*:2, *129*:5, *129*:20, *129*:23, *129*:24, *130*:1,

130:23, 131:12,
131:13, 132:10,
132:13, 133:24
**proper** [1] - 105:12
**protect** [2] - 109:1,
139:16
**protected** [8] - 20:2,
21:3, 21:8, 21:9,
21:16, 21:20, 22:11,
24:12
**protection** [1] -
108:25
**proud** [2] - 7:20, 7:21
**provide** [6] - 9:16,
83:22, 115:9,
115:11, 137:22,
139:1
**provided** [1] - 138:25
**provider** [1] - 49:2
**providing** [2] - 149:9
**PTO** [8] - 107:5, 107:8,
107:11, 107:14,
107:17, 108:2,
112:19, 117:19
**public** [8] - 98:5,
98:14, 138:17,
138:18, 140:21,
148:21, 150:10,
151:9
**publish** [1] - 88:19
**published** [4] - 103:7,
133:23, 147:22,
148:14
**pull** [2] - 103:4, 132:5
**pulling** [1] - 83:1
**pun** [2] - 70:18,
142:10
**purchase** [1] - 6:15
**purely** [1] - 149:19
**purpose** [1] - 125:16
**purposes** [1] - 95:18
**purview** [1] - 95:13
**pushed** [1] - 131:17
**put** [28] - 4:12, 7:12,
7:16, 7:24, 11:17,
12:2, 17:10, 38:13,
50:21, 50:22, 56:6,
61:3, 62:20, 66:7,
66:12, 66:16, 67:18,
67:20, 67:25, 76:19,
80:1, 98:23, 101:17,
120:8, 125:9,
125:20, 126:5,
140:15
**puts** [2] - 61:1, 145:13
**putting** [2] - 68:3,
101:5
**Python** [1] - 98:18

**Q**

**qualifications** [1] -
83:24
**quarantine** [3] - 27:22,
27:23, 28:5
**quarantined** [2] -
27:21, 28:4
**quarter** [2] - 56:15,
56:16
**questionnaire** [11] -
111:13, 123:1,
123:11, 123:18,
123:21, 124:2,
124:5, 124:9, 135:5,
135:11
**questions** [10] - 11:13,
13:9, 32:18, 39:19,
59:10, 70:1, 76:24,
85:1, 92:22, 108:2
**quick** [3] - 56:6, 72:25,
86:17
**quickly** [5] - 20:8,
53:16, 103:4,
108:18, 132:23
**quite** [2] - 40:17,
63:17

**R**

**race** [2] - 21:9, 84:1
**raise** [13] - 61:5, 85:4,
105:15, 132:2,
132:3, 132:10,
132:14, 132:16,
140:8, 140:12,
143:9, 152:19
**raised** [11] - 63:22,
101:19, 102:14,
106:10, 115:6,
116:13, 118:24,
128:8, 138:15,
138:24, 139:15
**raises** [2] - 132:3,
132:17
**raising** [5] - 97:23,
98:2, 102:9, 127:4,
140:24
**Rambo** [1] - 41:21
**ran** [1] - 118:25
**range** [1] - 139:3
**ranking** [4] - 130:11,
130:18, 131:16,
131:18
**rapport** [1] - 113:6
**re** [1] - 106:7
**reach** [4] - 88:10,
102:18, 108:2,
127:18
**reached** [1] - 106:19

**reaches** [1] - 106:14
**reaching** [3] - 88:25,
95:8, 143:9
**reacted** [1] - 145:2
**reaction** [2] - 70:4,
148:3
**read** [13] - 11:5, 11:7,
12:16, 15:16, 22:3,
83:19, 84:24, 85:8,
86:15, 126:24,
138:2, 146:22, 148:8
**reading** [3] - 22:6,
61:23, 115:6
**readings** [1] - 119:16
**ready** [1] - 38:18
**real** [19] - 20:6, 20:25,
21:23, 22:5, 56:6,
72:24, 75:17, 75:24,
76:4, 76:6, 76:10,
77:5, 108:18, 121:4,
122:9, 130:1,
145:13, 154:8
**Real** [1] - 126:10
**real-time** [4] - 20:6,
20:25, 21:23, 22:5
**really** [7] - 4:18,
34:23, 46:3, 49:3,
63:14, 95:13,
100:20, 105:23,
108:8, 114:6,
114:11, 120:7,
121:1, 130:25,
144:25, 156:23
**rearranged** [1] - 4:19
**reason** [36] - 5:1, 22:5,
27:14, 37:6, 62:25,
63:16, 63:17, 63:19,
66:11, 70:25, 71:2,
71:3, 71:4, 75:17,
75:20, 75:24, 76:1,
76:4, 76:6, 76:10,
77:5, 79:22, 92:4,
101:7, 114:8,
121:14, 126:1,
126:2, 132:18,
138:19, 140:25,
143:19, 147:17
**reasonable** [1] - 69:14
**reasons** [9] - 30:9,
44:5, 76:18, 85:11,
113:5, 115:8,
115:17, 120:15,
132:22
**receive** [8] - 11:4,
16:14, 55:20, 56:12,
58:9, 62:1, 62:10,
134:22
**received** [17] - 12:24,
35:6, 54:8, 55:6,
55:9, 55:24, 56:14,

56:18, 56:19, 56:21,
58:7, 58:11, 79:25,
84:11, 88:21,
132:17, 149:22
**RECEIVED** [14] - 3:7,
3:8, 3:8, 3:9, 3:9,
3:10, 3:10, 14:4,
29:10, 35:9, 54:23,
55:16, 88:22, 104:16
**recently** [1] - 51:10
**recess** [3] - 38:20,
74:19, 122:11
**recipes** [1] - 141:15
**recognize** [3] - 13:3,
29:2, 83:11
**recognized** [1] - 73:21
**recollection** [2] -
103:9, 103:16
**recommendation** [2] -
115:14, 115:15
**recommended** [1] -
44:22
**record** [14] - 12:18,
27:4, 27:6, 36:9,
36:10, 36:11, 36:25,
37:4, 37:21, 63:8,
103:23, 104:4,
156:25, 157:9
**recorded** [3] - 1:23,
33:12, 65:22
**recording** [10] - 27:7,
27:8, 34:9, 34:11,
34:15, 35:2, 37:22,
62:18, 75:13, 75:21
**records** [2] - 15:21,
132:9
**recourse** [1] - 85:4
**recover** [1] - 58:18
**recruiter** [1] - 121:2
**recruiting** [1] - 134:21
**rectified** [1] - 116:2
**rectify** [1] - 116:12
**redirect** [3] - 153:25,
154:1, 156:23
**reduced** [1] - 46:23
**refer** [2] - 86:22, 134:9
**reference** [1] - 115:15
**referenced** [4] - 83:3,
89:15, 102:24, 146:5
**referencing** [3] -
103:10, 133:20,
143:19
**referral** [1] - 134:22
**referred** [2] - 20:17,
48:20
**referring** [1] - 134:6
**reflected** [1] - 68:6
**refresh** [1] - 103:9
**refreshing** [1] - 138:12
**regarding** [3] - 16:17,

138:18, 146:3
**Regardless** [1] -
145:11
**regardless** [3] - 66:21,
66:23, 68:9
**regularly** [1] - 18:24
**related** [11] - 20:24,
40:1, 43:8, 46:1,
46:25, 54:8, 92:7,
94:23, 124:19,
132:12, 152:12
**relating** [5] - 79:17,
91:25, 109:18,
113:2, 136:17
**relation** [1] - 89:2
**Relations** [7] - 28:21,
78:19, 79:18, 81:9,
116:18, 123:14,
135:10
**relationship** [6] -
65:10, 67:12, 69:11,
120:13, 121:1,
148:18
**Relationship** [1] -
123:14
**release** [1] - 5:19
**relevant** [1] - 87:11
**relieved** [1] - 44:20
**religion** [1] - 84:2
**remarking** [2] -
145:12, 146:8
**remarks** [4] - 75:16,
75:17, 145:12, 146:8
**remedy** [1] - 116:8
**remember** [29] -
19:25, 21:10, 25:16,
25:19, 27:13, 33:14,
33:17, 63:3, 64:1,
66:1, 66:5, 75:14,
75:18, 75:20, 86:16,
97:18, 101:23,
103:2, 103:15,
106:19, 108:6,
110:1, 116:10,
116:25, 119:17,
137:1, 142:21,
144:23, 147:6
**remind** [1] - 6:14
**reminder** [2] - 82:5,
110:16
**reminders** [1] - 110:15
**removed** [7] - 21:4,
21:5, 21:6, 21:16,
24:13, 25:2, 25:8
**renew** [2] - 51:23
**repeat** [2] - 111:21,
150:15
**repeated** [2] - 34:5,
75:22
**repeatedly** [4] - 33:17,

63:23, 64:3, 64:17
**repeats** [1] - 105:13
**report** [7] - 46:11,
114:6, 129:4, 129:6,
130:10, 130:20,
139:6
**Reporter** [2] - 1:22,
157:11
**reporting** [7] - 20:24,
129:16, 129:18,
137:25, 142:7,
142:15, 142:23
**reports** [3] - 24:10,
24:14, 87:20
**reputation** [5] - 66:7,
67:3, 67:5, 67:8,
69:10
**request** [3] - 13:23,
15:14, 17:8
**require** [1] - 44:2
**required** [1] - 61:25
**requirements** [1] -
16:25
**researching** [1] -
153:10
**resolution** [1] - 154:13
**resolve** [1] - 46:24
**resource** [8] - 44:11,
87:19, 92:6, 92:7,
94:23, 97:2, 99:4,
108:22
**Resource** [1] - 44:11
**resources** [13] - 19:3,
85:3, 85:12, 87:16,
88:3, 88:4, 91:25,
97:25, 112:9,
114:19, 117:20,
119:15, 120:12
**respect** [8] - 4:14, 5:8,
68:16, 93:2, 136:25,
140:8, 143:23, 156:6
**respected** [1] - 42:18
**respectful** [2] -
101:20, 107:24
**respecting** [1] - 150:7
**respective** [1] -
156:16
**respond** [7] - 24:24,
33:25, 91:4, 98:20,
98:22, 140:18,
149:21
**responded** [2] - 45:14,
102:15
**responds** [10] - 89:4,
90:9, 91:14, 93:18,
102:19, 126:18,
137:22, 138:6,
140:23, 141:17
**response** [10] - 44:23,
46:11, 79:21, 79:24,

80:23, 102:10,
125:22, 126:4,
127:24, 149:22
**responsive** [1] - 76:21
**rest** [1] - 30:4
**restaurant** [1] - 101:9
**result** [3] - 129:5,
135:17, 149:20
**resume** [2] - 50:10,
75:6
**resumes** [2] - 50:7,
148:19
**retirement** [6] - 53:22,
53:23, 54:5, 54:14,
54:18, 61:1
**retrospect** [1] - 45:21
**review** [30] - 8:24, 9:2,
9:5, 9:6, 9:7, 9:14,
9:16, 9:18, 10:5,
10:9, 10:17, 11:5,
11:24, 12:7, 12:15,
12:21, 12:24, 13:1,
13:3, 13:21, 14:8,
14:11, 14:12, 14:20,
14:21, 15:8, 16:14,
126:22, 126:23
**reviewed** [1] - 10:6
**reviews** [16] - 9:3,
9:12, 9:13, 9:24,
11:6, 11:23, 13:11,
13:14, 13:17, 15:4,
15:6, 15:7, 15:15,
15:16, 19:1, 101:9
**rich** [1] - 121:4
**Richard** [2] - 60:18,
99:15
**Richie** [4] - 42:3,
142:3, 142:9, 142:18
**ridicule** [1] - 8:7
**rights** [2] - 20:2, 21:19
**rise** [14] - 4:3, 6:19,
37:18, 38:19, 38:21,
39:7, 72:2, 74:20,
75:3, 122:7, 122:12,
122:15, 153:13,
157:4
**Ritchie** [1] - 142:11
**road** [1] - 110:7
**Roberts** [1] - 2:13
**robots** [1] - 45:3
**Roland** [9] - 105:8,
138:18, 139:3,
140:14, 140:17,
140:22, 143:14,
143:18
**role** [3] - 97:1, 97:13,
141:1
**rolls** [1] - 137:13
**room** [3] - 79:3, 96:13,
142:19

**rounds** [1] - 49:4
**routine** [1] - 47:13
**RPR** [1] - 157:11
**ruling** [1] - 20:2
**run** [2] - 11:4, 95:14
**runs** [1] - 156:19

## S

**S:(Cont'd** [1] - 2:1
**sacrifices** [1] - 42:15
**safe** [1] - 61:2
**Sal** [1] - 95:25
**salad** [1] - 101:25
**Salaries** [1] - 137:15
**salary** [7] - 61:17,
91:12, 91:19,
132:23, 137:18,
137:19, 139:6
**salmon** [1] - 101:11
**sarcastically** [2] -
145:12, 146:8
**sat** [2] - 117:23, 119:2
**satisfaction** [2] -
99:24, 100:17
**saves** [1] - 23:5
**savings** [1] - 54:17
**saw** [15] - 43:5, 69:16,
69:21, 69:25, 70:3,
70:8, 71:5, 73:3,
112:16, 112:17,
112:18, 112:19,
113:10, 115:5, 132:1
**scarcely** [1] - 16:7
**schedule** [4] - 5:10,
30:23, 31:25, 71:15
**scheduled** [12] - 8:24,
25:20, 25:22, 25:24,
26:1, 26:2, 26:3,
26:4, 26:5, 29:16,
29:19, 94:8
**schedules** [1] - 155:3
**scheduling** [5] -
94:13, 94:15, 94:17,
94:19, 154:17
**scope** [1] - 156:21
**Scott** [2] - 109:19,
110:1
**Scott's** [1] - 109:25
**scratch** [1] - 64:14
**screen** [7] - 11:11,
14:13, 21:4, 102:4,
110:12, 140:15,
141:8
**screen-shotted** [1] -
21:4
**screenshot** [1] - 20:4
**scroll** [3] - 12:5, 15:2,
141:25
**scrolling** [1] - 11:16

**search** [3] - 23:8,
23:9, 48:25
**Sears** [1] - 98:16
**seat** [9] - 4:4, 6:21,
38:22, 39:9, 74:21,
75:5, 122:13,
122:17, 153:15
**seated** [1] - 37:20
**second** [7] - 56:14,
56:16, 80:5, 80:8,
121:20, 125:25,
155:22
**section** [1] - 84:16
**see** [88] - 5:1, 5:6,
10:19, 11:12, 11:14,
23:11, 28:9, 29:12,
29:16, 30:12, 53:3,
53:10, 53:18, 55:1,
56:4, 56:5, 66:25,
68:22, 68:23, 71:24,
74:16, 75:2, 79:20,
80:1, 80:10, 81:14,
81:19, 88:14, 90:3,
90:7, 91:12, 92:14,
94:10, 94:25, 95:8,
95:12, 96:4, 96:9,
97:18, 98:14, 98:20,
98:21, 98:24, 102:2,
102:7, 102:10,
102:12, 102:21,
104:20, 105:1,
105:18, 106:6,
106:14, 107:15,
108:1, 109:21,
109:25, 110:1,
110:11, 110:13,
115:1, 124:12,
124:18, 126:11,
130:5, 133:19,
133:24, 134:16,
137:5, 137:20,
140:7, 141:9, 142:5,
144:7, 144:21,
145:1, 145:15,
147:15, 147:17,
153:12, 154:5,
154:10, 155:15,
156:10, 156:13,
157:2
**seeing** [2] - 42:25,
67:11
**sees** [1] - 145:9
**selections** [1] - 93:1
**selectively** [1] - 48:22
**self** [8] - 9:5, 9:14,
9:16, 9:18, 11:5,
13:11, 14:20, 14:21
**self-review** [7] - 9:5,
9:14, 9:16, 9:18,
11:5, 14:20, 14:21

**self-reviews** [1] -
13:11
**semester** [1] - 47:20
**send** [10] - 21:2,
71:10, 91:9, 109:14,
109:17, 126:9,
126:12, 126:16,
126:20, 141:17
**sending** [8] - 21:22,
92:5, 92:7, 96:25,
108:14, 110:2,
144:8, 144:17
**sends** [2] - 9:10, 91:16
**senior** [9] - 47:24,
51:11, 51:14, 51:15,
51:17, 51:18, 52:15,
125:11
**senior-level** [2] -
47:24, 125:11
**sense** [2] - 148:16,
153:17
**sent** [9] - 10:14, 19:21,
20:21, 21:5, 79:23,
79:24, 92:4, 138:20,
141:23
**separate** [1] - 16:13
**separation** [1] - 8:4
**September** [7] - 90:17,
102:18, 104:18,
105:21, 106:13,
107:4, 120:1
**serious** [1] - 114:6
**seriously** [1] - 146:18
**served** [1] - 96:18
**server** [1] - 109:1
**service** [2] - 108:21,
109:2
**services** [4] - 47:25,
48:2, 50:23, 108:24
**session** [2] - 153:19,
153:21
**set** [11] - 28:18, 28:19,
28:20, 28:24, 30:23,
59:20, 72:6, 101:6,
111:2, 111:3, 111:19
**Seth** [1] - 155:15
**SETH** [1] - 1:19
**sets** [2] - 113:7,
125:21
**setting** [1] - 76:14
**several** [2] - 48:22,
70:13
**severance** [1] - 8:16
**sex** [3] - 8:11, 84:2,
152:20
**sexual** [15] - 7:10,
20:24, 76:11, 78:13,
79:12, 80:13, 81:7,
81:23, 83:2, 83:6,
84:3, 84:8, 136:18,

136:22, 152:25
**sexuality** [2] - 44:24, 45:13
**shaking** [2] - 44:16, 44:17
**shame** [1] - 149:17
**shape** [1] - 116:23
**share** [3] - 94:22, 119:14, 152:11
**shared** [2] - 92:1, 147:15
**sharing** [27] - 54:16, 55:3, 55:20, 55:24, 56:9, 56:12, 56:18, 56:21, 57:6, 58:6, 58:14, 58:25, 59:21, 59:25, 60:3, 60:12, 60:16, 61:13, 61:16, 61:24, 62:5, 62:6, 62:10, 105:23, 124:20, 124:21
**Shaw** [1] - 45:9
**shirt** [1] - 96:12
**shock** [1] - 27:1
**shocking** [1] - 41:3
**Shoot** [1] - 88:12
**shooting** [1] - 154:6
**shopped** [1] - 98:4, 98:11
**shopping** [2] - 97:11, 97:13
**short** [5] - 75:2, 121:25, 122:4, 122:9, 154:1
**shortcut** [1] - 143:9
**shortened** [1] - 156:5
**shortly** [2] - 79:17, 135:2
**shotted** [1] - 21:4
**show** [9] - 11:8, 28:7, 45:2, 45:3, 53:12, 54:24, 79:21, 81:6, 134:15
**showed** [3] - 102:24, 130:6, 130:7
**showing** [2] - 12:9, 35:12
**shown** [4] - 53:13, 78:18, 79:15, 81:6
**shows** [5] - 55:23, 56:9, 79:16, 80:2, 80:3
**side** [7] - 73:14, 74:5, 74:14, 111:1, 142:3, 148:4, 148:20
**sides** [1] - 73:10
**significant** [4] - 7:15, 39:22, 42:17, 112:3
**significantly** [1] - 38:11

**similar** [4] - 28:19, 93:19, 109:4, 109:7
**simple** [3] - 56:17, 70:6, 109:10
**simplify** [1] - 143:21
**simply** [1] - 151:21
**single** [3] - 39:25, 78:5, 78:11
**sit** [1] - 46:16
**site** [4] - 25:11, 25:12, 25:13, 25:14
**sitting** [2] - 70:24, 140:5
**situation** [1] - 138:23
**situations** [1] - 114:3
**six** [16] - 7:15, 8:2, 14:10, 17:1, 26:24, 39:14, 40:7, 40:10, 42:1, 51:24, 61:17, 68:16, 151:11, 151:21
**skill** [1] - 125:21
**skills** [1] - 125:13
**skip** [4] - 93:4, 137:7, 143:2, 146:23
**Slack** [52] - 10:13, 10:14, 10:24, 10:25, 17:7, 17:20, 17:21, 17:22, 17:25, 20:6, 21:18, 22:6, 22:20, 22:22, 23:1, 23:2, 23:4, 23:5, 23:6, 23:9, 23:10, 23:24, 24:4, 24:7, 44:15, 80:14, 80:24, 86:2, 86:22, 86:25, 87:6, 87:9, 98:5, 98:14, 98:24, 100:12, 101:8, 112:5, 112:6, 112:12, 131:1, 131:3, 141:12, 141:14, 144:8, 144:13, 144:18, 144:23, 147:10, 147:21, 148:12, 151:10
**slacked** [4] - 17:7, 19:20, 19:21, 147:11
**slightly** [2] - 89:17, 147:24
**slots** [1] - 155:24
**slow** [1] - 109:2
**slowly** [1] - 142:19
**small** [1] - 143:22
**smarter** [1] - 16:7
**smirk** [3] - 145:2, 145:18, 145:23
**smirking** [2] - 145:12, 146:8
**SMITH** [1] - 1:18

**snarky** [1] - 44:23
**snippet** [3] - 10:18, 147:21, 148:13
**so..** [4] - 33:12, 59:2, 113:9, 145:21
**socialized** [1] - 52:8
**society** [1] - 66:25
**software** [4] - 15:12, 15:13, 28:18, 49:14
**software-based** [1] - 49:14
**solution** [3] - 115:9, 115:11, 115:24
**solve** [1] - 135:5
**solved** [1] - 128:11
**someone** [18] - 13:10, 13:13, 15:24, 25:11, 31:12, 42:25, 73:2, 88:10, 93:10, 95:25, 105:8, 109:5, 139:3, 141:12, 148:6, 149:19, 155:19
**sometimes** [2] - 41:5, 109:4
**somewhere** [3] - 108:23, 134:16, 156:11
**soon** [1] - 28:3
**Sorry** [1] - 102:11
**sorry** [23] - 12:19, 15:11, 35:1, 36:16, 37:5, 49:11, 53:15, 56:7, 59:15, 60:8, 77:2, 83:10, 84:15, 89:10, 93:13, 110:17, 123:25, 127:13, 143:4, 154:7, 154:14, 155:1
**sort** [8] - 5:21, 87:4, 92:24, 94:12, 96:17, 98:7, 123:17, 154:12
**sorting** [1] - 6:24
**soul** [3] - 39:15, 39:22, 42:19
**sounded** [1] - 41:1
**sounds** [2] - 93:25, 154:16
**source** [1] - 139:16
**South** [1] - 150:4
**span** [1] - 72:21, 89:21
**spanning** [1] - 152:17
**SPATARO** [1] - 1:8
**Spataro** [35] - 8:13, 10:3, 10:4, 10:8, 10:15, 13:1, 15:14, 15:16, 16:15, 16:17, 18:1, 18:12, 18:21, 25:25, 26:18, 26:23, 29:20, 37:8, 40:12, 41:12, 69:2, 108:15,

115:17, 115:25, 116:5, 116:8, 129:10, 129:17, 130:9, 130:13, 130:17, 130:24, 151:7, 152:24
**Spataro's** [2] - 18:3, 69:3
**speakers** [2] - 35:21, 35:22
**specialist** [1] - 136:4
**specific** [2] - 18:2, 34:22
**specifically** [4] - 26:3, 33:14, 134:21, 135:12
**specifics** [1] - 142:21
**speculation** [4] - 70:20, 71:6, 133:8, 133:10
**speed** [3] - 122:23, 140:12, 143:6
**spending** [1] - 108:16
**spent** [3] - 39:14, 42:15, 59:21
**spirit** [1] - 59:7
**spoken** [1] - 114:18
**spots** [1] - 34:22
**squeeze** [1] - 155:19
**Staller** [2] - 52:1, 55:18
**stamp** [2] - 36:11, 36:25
**stamps** [2] - 35:2, 36:9
**stand** [2] - 5:6, 122:5
**standard** [5] - 9:4, 9:12, 25:10, 25:11, 28:18
**standards** [2] - 9:13, 133:1
**standpoint** [1] - 5:2
**start** [15] - 4:6, 4:10, 9:2, 20:6, 23:5, 34:14, 34:17, 36:17, 38:14, 43:4, 94:6, 132:25, 144:2, 153:3, 154:11
**started** [11] - 7:18, 19:3, 27:8, 30:3, 31:9, 43:2, 72:1, 72:10, 84:11, 132:24, 132:25
**starting** [1] - 132:18
**starts** [2] - 137:12, 149:9
**startup** [1] - 7:20
**state** [8] - 15:12, 24:15, 134:21, 137:3, 146:19,

146:20, 151:8, 151:11
**statement** [7] - 55:23, 55:25, 62:12, 86:1, 102:25, 109:24, 152:23
**States** [1] - 4:2
**STATES** [2] - 1:1, 1:16
**states** [27] - 27:11, 105:5, 105:6, 110:21, 110:25, 126:7, 127:9, 127:12, 128:9, 132:11, 138:3, 139:18, 140:10, 141:16, 141:21, 142:21, 142:22, 143:1, 143:24, 146:21, 150:17, 150:20, 152:2, 152:14
**status** [4] - 20:3, 21:3, 84:2, 84:4
**statute** [1] - 24:22
**stay** [2] - 11:18, 59:14
**stayed** [1] - 42:21
**steer** [1] - 93:1
**stenography** [1] - 1:23
**step** [2] - 9:7, 153:16
**STEPHANIE** [1] - 2:3
**Steve** [3] - 45:9, 45:12, 45:14
**sticker** [2] - 108:3, 108:5
**still** [8] - 39:18, 44:2, 50:19, 51:9, 100:20, 100:21, 102:17, 156:11
**stipulate** [1] - 63:9
**stop** [7] - 80:8, 109:11, 117:3, 119:4, 121:20, 121:24, 154:9
**stopped** [5] - 7:7, 8:22, 18:24, 19:1, 154:9
**stopping** [1] - 118:12
**stops** [1] - 87:19
**story** [2] - 6:13, 77:15
**straight** [1] - 148:25
**strange** [1] - 144:5
**strategy** [2] - 108:17, 129:22
**Street** [3] - 1:12, 1:19, 2:4
**Streets** [1] - 53:1
**stretch** [1] - 122:5
**stricken** [3] - 76:21, 80:19, 80:20

**strike** [1] - 76:23
**struggle** [1] - 149:18
**student** [4] - 125:9,
134:12, 134:13,
134:19
**students** [5] - 48:12,
53:3, 125:13, 134:7,
134:9
**stuff** [3] - 41:7,
118:18, 153:9
**style** [3] - 143:10,
143:17, 143:22
**subject** [5] - 5:13, 6:2,
84:22, 85:6, 135:4
**subjected** [1] - 8:6
**subjective** [1] - 73:7
**submit** [2] - 9:4, 9:5
**submitted** [6] - 9:5,
50:7, 78:22, 78:23,
78:24, 80:6
**submitting** [1] -
148:19
**subpoena** [3] - 5:13,
5:19, 6:3
**subtle** [1] - 142:3
**successful** [1] - 7:20
**suffer** [2] - 59:8
**suffered** [3] - 58:18,
58:19, 59:6
**suffering** [2] - 46:4,
134:25
**suggested** [2] - 25:10,
32:10
**suggesting** [2] -
24:11, 134:14
**suggestions** [2] -
24:24, 52:13
**Suite** [2] - 1:19, 2:4
**summarize** [1] -
110:14
**sun** [1] - 42:21
**Sun** [3] - 42:23,
109:18, 109:25
**supervisor** [2] - 10:7,
119:21
**support** [3] - 49:22,
49:23, 148:17
**supported** [1] - 52:11
**supporting** [1] -
148:24
**supposed** [2] - 26:8,
113:20
**Supreme** [7] - 20:1,
20:3, 20:22, 21:18,
22:3, 22:6, 24:12
**surely** [1] - 140:23
**suspected** [1] - 63:13
**sustained** [6] - 19:6,
23:16, 23:21, 24:1,
45:16, 67:23

**switch** [1] - 42:10
**switched** [1] - 130:22
**symptoms** [1] - 46:17
**system** [8] - 26:10,
31:6, 109:9, 126:22,
126:23, 136:25,
148:7, 149:4
**systems** [1] - 128:19

## T

**T-shirt** [1] - 96:12
**takeaway** [2] - 149:21,
150:5
**talent** [1] - 134:18
**Tara** [4] - 147:20,
147:22, 148:14,
149:1
**taught** [1] - 47:20
**taunts** [1] - 117:17
**Taylor** [3] - 147:20,
147:22, 148:14
**teach** [2] - 47:21, 48:3
**teaching** [3] - 42:6,
48:12, 125:10
**team** [8] - 51:12, 85:3,
85:12, 88:3, 120:17,
132:21, 137:16,
138:20
**tech** [3] - 7:20, 31:8,
48:24
**Technical** [1] - 52:23
**technical** [3] - 23:4,
95:1, 145:9
**technically** [1] -
143:11
**technologies** [1] -
48:1
**technology** [1] - 16:6
**temperature** [3] -
95:9, 96:5, 112:16
**Temple** [11] - 47:14,
47:17, 48:6, 48:14,
69:15, 69:16, 69:25,
79:24, 80:6, 125:10,
134:6
**ten** [3] - 38:18, 133:3,
133:5
**tentative** [1] - 5:22
**terminate** [2] - 63:23,
64:17, 65:24, 66:6
**terminated** [25] -
25:17, 27:12, 27:16,
30:7, 30:10, 32:20,
32:22, 32:25, 39:24,
47:7, 47:10, 62:21,
62:22, 63:14, 63:24,
64:5, 66:12, 66:22,
67:1, 68:8, 68:9,
75:21, 75:22, 76:7

**terminating** [4] -
64:13, 66:13, 66:20,
68:21
**termination** [26] -
19:16, 25:16, 34:6,
42:13, 42:18, 45:23,
46:12, 47:2, 47:10,
47:18, 48:17, 49:7,
52:5, 59:2, 63:4,
65:21, 66:20, 66:21,
68:2, 68:3, 75:13,
75:18, 75:25, 76:1,
76:10, 85:7
**terms** [7] - 47:6,
47:23, 48:16, 91:19,
108:19, 109:10,
130:9
**terrific** [1] - 16:8
**testified** [6] - 8:18,
14:21, 115:19,
116:3, 117:17, 130:5
**testifying** [1] - 156:8
**testimony** [13] - 4:22,
5:4, 5:24, 6:13, 7:1,
59:22, 64:3, 77:18,
77:24, 85:23,
121:16, 129:15,
155:20
**Texas** [2] - 155:8,
155:10
**text** [6] - 17:7, 20:3,
41:25, 80:1, 87:4,
149:11
**texted** [1] - 42:4
**Thanksgiving** [4] -
44:14, 116:22, 131:1
**that's..** [1] - 95:15
**that..** [1] - 35:11
**THE** [147] - 1:15, 4:3,
4:4, 4:8, 4:9, 5:6,
5:12, 5:15, 6:1, 6:5,
6:8, 6:16, 6:19, 6:21,
12:3, 12:16, 12:20,
14:2, 19:6, 23:16,
23:21, 24:1, 29:9,
34:14, 34:17, 34:21,
34:24, 35:6, 35:12,
35:16, 35:19, 35:20,
36:1, 36:8, 36:13,
36:15, 36:18, 36:21,
36:24, 37:13, 37:18,
37:20, 37:24, 38:2,
38:5, 38:8, 38:17,
38:19, 38:21, 38:22,
39:1, 39:4, 39:7,
39:9, 45:16, 48:9,
48:10, 54:22, 55:15,
57:21, 57:22, 59:12,
59:14, 59:15, 59:17,
63:10, 64:8, 64:9,

65:5, 65:6, 67:17,
67:18, 67:23, 69:23,
70:21, 70:22, 71:7,
71:8, 71:14, 72:2,
72:7, 72:18, 73:1,
73:12, 73:16, 73:19,
73:23, 74:4, 74:18,
74:20, 74:21, 74:25,
75:3, 75:5, 75:9,
76:23, 77:1, 78:17,
78:19, 80:20, 80:24,
81:2, 81:4, 81:8,
81:16, 82:24, 86:19,
88:21, 102:4, 102:5,
103:21, 104:2,
104:5, 104:11,
104:14, 110:8,
121:20, 122:4,
122:7, 122:9,
122:12, 122:13,
122:15, 122:17,
122:20, 123:7,
131:6, 133:9,
133:11, 133:12,
133:17, 153:2,
153:13, 153:15,
153:21, 153:24,
154:3, 154:8,
154:19, 154:22,
155:1, 155:4,
155:12, 155:17,
156:7, 157:2, 157:4
**themselves** [1] - 74:6
**thermometer** [1] -
96:1
**thermostat** [1] - 96:1
**they've** [2] - 4:19,
101:4
**thinking** [6] - 39:4,
71:18, 118:5, 118:6,
119:9, 121:18
**thinks** [1] - 118:20
**third** [3] - 56:14, 95:4,
104:20
**THOMAS** [1] - 1:8
**thorough** [1] - 15:20
**thousand** [1] - 43:5
**thread** [23] - 10:18,
10:19, 17:7, 17:22,
18:2, 18:3, 18:5,
18:6, 18:8, 18:9,
18:11, 18:12, 21:18,
23:6, 23:9, 23:11,
24:15, 79:21, 87:4,
87:6, 88:7, 100:12,
120:2
**threads** [1] - 18:14
**three** [15] - 7:18,
17:22, 17:24, 38:6,
45:6, 48:21, 77:8,

77:13, 77:24, 78:4,
78:12, 126:19,
137:18, 145:10,
156:8
**throughout** [5] - 29:4,
38:11, 43:19, 85:14,
86:4
**thrown** [1] - 39:16
**Thursday** [11] - 4:21,
27:15, 27:17, 30:11,
30:14, 32:11, 32:13,
33:6, 107:6, 155:12
**Tim** [30] - 17:21,
17:25, 18:8, 18:11,
41:19, 82:20, 83:1,
84:14, 86:9, 103:4,
103:19, 104:6,
111:22, 128:23,
128:25, 129:3,
129:9, 129:17,
130:17, 130:23,
131:18, 132:5,
134:2, 138:17,
139:1, 139:5,
139:24, 143:10,
144:10
**Tim's** [3] - 140:16,
143:17, 143:22
**timekeeping** [1] - 31:6
**timing** [2] - 68:5,
126:18
**TIMOTHY** [1] - 2:4
**tissues** [1] - 42:8
**title** [9] - 7:19, 20:17,
20:18, 51:11, 87:16,
127:21, 128:21,
131:20, 135:3
**titled** [2] - 97:7,
126:10
**today** [26] - 5:9, 7:12,
7:21, 23:3, 38:1,
39:3, 44:1, 51:9,
51:14, 51:21, 59:4,
64:3, 69:6, 70:24,
72:14, 81:13,
102:20, 104:21,
121:22, 128:22,
128:24, 129:15,
137:6, 140:5, 152:5,
153:1
**together** [4] - 41:25,
117:24, 120:8, 142:8
**toll** [1] - 59:6
**Tom** [35] - 17:20,
17:25, 18:5, 18:12,
44:12, 44:14, 79:20,
79:22, 82:9, 87:20,
87:22, 90:11, 97:17,
98:16, 113:18,
113:21, 116:14,

116:18, 116:20, 116:21, 116:25, 117:23, 118:22, 118:24, 118:25, 119:1, 120:11, 120:25, 121:12, 124:3, 130:20, 131:2, 140:16, 152:24
*tomorrow* [15] - 4:19, 4:23, 4:24, 5:5, 72:23, 89:5, 90:10, 153:3, 153:12, 153:25, 154:11, 154:15, 155:18, 156:16, 157:2
*ton* [1] - 5:15
*tonight* [1] - 47:21
*took* [9] - 19:9, 24:17, 27:3, 31:15, 98:9, 99:7, 100:9, 120:10, 146:17
*tool* [1] - 92:6
*top* [10] - 20:20, 87:22, 94:6, 99:12, 124:8, 133:3, 135:5, 138:13, 143:12, 150:2
*topic* [3] - 62:16, 101:11, 144:20
*topics* [1] - 152:12
*toward* [1] - 148:4
*towards* [3] - 7:14, 69:5, 154:12
*traffic* [3] - 109:2, 109:4, 109:5
*trained* [1] - 139:7
*transcript* [4] - 1:23, 35:13, 35:14, 157:8
*transcription* [1] - 1:24
*transferred* [1] - 51:9
*transgender* [1] - 22:4
*translating* [1] - 16:8
*travel* [2] - 4:19, 90:24
*traveled* [1] - 41:1
*traveling* [1] - 42:14
*treat* [3] - 43:8, 46:25, 47:2
*treated* [6] - 7:22, 8:3, 8:5, 43:10, 140:25, 152:20
*treating* [1] - 44:15
*treats* [1] - 46:17
*TRIAL* [1] - 1:5
*trial* [8] - 5:10, 38:10, 73:5, 78:4, 78:12, 80:22, 81:6, 131:8
*tried* [3] - 62:25, 77:17, 99:20

*tries* [1] - 93:1
*trip* [1] - 7:8
*true* [4] - 62:2, 118:4, 121:13, 130:22
*try* [19] - 12:6, 35:21, 35:23, 35:24, 38:24, 48:17, 72:8, 72:9, 72:17, 75:2, 110:23, 111:2, 119:13, 122:23, 131:11, 140:11, 153:20, 154:10, 154:11
*trying* [8] - 20:9, 50:5, 72:6, 88:10, 91:15, 96:6, 114:25, 143:6
*Tuesday* [5] - 90:11, 156:1, 156:2, 156:3, 156:13
*turn* [4] - 36:1, 37:25, 98:21, 153:25
*turned* [4] - 36:2, 70:16, 70:25, 98:4, 134:1
*turns* [1] - 149:19
*twice* [1] - 11:1
*twice-a-month* [1] - 11:1
*two* [21] - 20:5, 30:2, 43:4, 49:2, 49:5, 62:6, 75:1, 79:25, 86:16, 87:22, 88:13, 89:23, 115:4, 116:7, 117:15, 117:18, 119:12, 120:4, 121:22, 144:1, 148:19
*two-and-a-half-year* [1] - 117:15
*type* [3] - 13:5, 13:7, 115:1
*types* [4] - 40:24, 47:2, 50:5, 106:1
*typically* [1] - 155:13

### U

*U.S* [2] - 1:11, 1:12
*unaccepting* [1] - 148:4
*Unconventional* [1] - 97:7
*uncovered* [1] - 32:23
*under* [9] - 60:2, 60:12, 60:16, 61:16, 61:22, 67:12, 89:17, 104:11, 145:24
*underestimated* [1] - 38:12
*underneath* [1] - 144:21

*understood* [1] - 38:15
*unfair* [1] - 139:20
*Unfortunately* [1] - 107:7
*unhappy* [1] - 138:10
*UNITED* [2] - 1:1, 1:16
*United* [1] - 4:2
*University* [7] - 47:15, 47:17, 69:15, 69:16, 79:24, 125:10, 134:7
*unlawful* [2] - 85:5, 85:16
*unlikely* [1] - 156:1, 156:3
*unrelated* [1] - 105:16
*unwanted* [1] - 109:1
*up* [74] - 4:11, 5:7, 5:12, 6:11, 7:3, 7:13, 8:1, 8:4, 9:15, 12:13, 16:12, 17:2, 27:6, 27:10, 28:18, 28:19, 28:20, 28:24, 38:24, 39:10, 45:7, 47:4, 50:17, 51:8, 56:6, 59:20, 66:22, 70:12, 71:22, 75:6, 76:19, 82:21, 83:1, 84:14, 85:6, 85:17, 89:5, 93:15, 96:1, 97:20, 100:19, 101:6, 103:4, 104:4, 104:6, 111:3, 112:1, 116:6, 118:21, 120:3, 122:5, 122:18, 122:24, 123:5, 128:6, 130:12, 131:11, 131:17, 132:5, 132:7, 133:19, 134:5, 135:7, 137:6, 140:12, 144:15, 146:11, 152:3, 153:10, 155:20, 156:5
*updated* [2] - 127:21, 131:23
*upset* [7] - 19:19, 39:17, 68:12, 68:14, 68:18, 105:3, 105:21
*upsetting* [2] - 19:19, 45:6
*upward* [1] - 130:10
*upwardly* [1] - 129:9
*upwork* [1] - 107:3
*useful* [1] - 97:1
*user* [2] - 87:9, 145:7
*uses* [2] - 23:2, 26:11

### V

*vacation* [1] - 107:19
*value* [2] - 7:17, 110:3
*variety* [2] - 152:8, 152:12
*various* [2] - 48:24, 146:3
*vendor* [1] - 96:20
*verify* [2] - 11:5, 102:1
*version* [1] - 112:8
*versus* [1] - 103:16
*veteran* [1] - 84:3
*via* [1] - 110:23
*video* [5] - 26:10, 26:12, 26:17, 26:20, 29:23
*view* [2] - 110:4, 113:19
*viewed* [3] - 89:21, 89:22, 106:1
*viewing* [1] - 67:12
*viewpoints* [1] - 150:7
*views* [1] - 151:1
*Vince* [3] - 37:10, 96:14, 112:5
*Vincent* [120] - 26:17, 26:20, 27:11, 29:23, 30:5, 30:11, 32:12, 33:4, 33:5, 40:4, 40:8, 41:15, 61:4, 64:13, 79:17, 79:20, 79:25, 80:7, 80:9, 80:12, 87:9, 87:19, 88:5, 89:1, 90:4, 90:9, 91:21, 93:10, 93:18, 94:14, 95:4, 95:6, 95:8, 95:24, 96:4, 96:11, 97:16, 98:15, 98:20, 100:14, 100:20, 101:15, 101:19, 102:18, 105:24, 106:5, 106:14, 108:14, 112:23, 113:4, 113:7, 113:8, 113:20, 113:21, 114:25, 116:14, 116:19, 116:20, 116:21, 117:24, 118:6, 118:17, 118:23, 119:1, 119:2, 119:5, 119:10, 119:12, 119:20, 120:5, 120:11, 120:21, 121:1, 124:3, 124:19, 125:8, 125:16, 125:25, 126:4, 127:18,

127:24, 134:14, 137:22, 137:24, 138:6, 138:16, 138:21, 139:9, 140:2, 140:13, 140:18, 140:23, 140:25, 141:17, 141:24, 142:15, 143:9, 143:21, 144:18, 145:22, 146:4, 146:6, 147:8, 147:22, 148:1, 148:12, 148:13, 148:16, 148:17, 148:20, 149:16, 150:12, 151:9, 151:15, 151:22, 152:24
*Vincent's* [3] - 93:21, 116:9, 146:1
*Vinnie* [5] - 93:25, 101:12, 101:24, 118:16, 121:15
*Vinnie's* [1] - 102:10
*Vint* [1] - 48:19
*violated* [1] - 42:19
*violating* [1] - 37:6
*violation* [2] - 33:6, 86:5
*violations* [6] - 30:13, 32:23, 33:1, 33:8, 33:14, 75:23
*virtue* [2] - 55:6, 55:9
*visiting* [1] - 96:13
*volume* [1] - 36:2
*voluntarily* [1] - 5:2
*voters* [1] - 150:5

### W

*wage* [1] - 52:2
*wages* [1] - 58:25
*wait* [7] - 12:5, 22:12, 28:13, 90:15, 110:18, 124:11, 124:13
*walked* [1] - 45:4
*walking* [1] - 92:24
*wants* [3] - 109:5, 139:3
*warlock* [1] - 16:7
*warmer* [1] - 95:4
*WAS* [14] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 14:4, 29:10, 35:9, 54:23, 55:16, 88:22, 104:16
*waste* [1] - 53:15
*watch* [3] - 44:22, 45:12, 109:8

*United States District Court*

**ways** [2] - 70:15, 94:24
**weather** [1] - 6:23
**website** [9] - 20:4, 21:2, 21:16, 24:11, 25:2, 25:9, 65:7, 85:25
**Wednesday** [2] - 28:12, 94:9
**week** [22] - 5:19, 6:6, 11:1, 28:3, 33:7, 40:2, 63:24, 64:6, 64:16, 64:18, 64:21, 72:6, 74:8, 90:5, 90:11, 116:22, 117:1, 117:10, 136:1, 136:5, 142:2, 154:20
**weekly** [2] - 62:5, 62:8
**weeks** [3] - 26:4, 48:22, 79:25
**West** [2] - 44:23, 45:13
**whim** [1] - 5:16
**white** [1] - 150:4
**whole** [11] - 7:19, 34:15, 36:6, 48:14, 58:20, 58:23, 60:11, 86:16, 113:7, 116:3, 137:3
**Williams** [25] - 4:7, 5:7, 7:3, 7:6, 11:11, 30:25, 39:9, 39:12, 53:4, 55:3, 59:14, 72:11, 75:6, 75:12, 76:25, 80:21, 83:11, 84:19, 86:11, 93:12, 93:13, 122:18, 122:23, 134:5, 153:16
**WILLIAMS** [2] - 1:3, 3:3
**Williams'** [2] - 7:1, 75:7
**windows** [1] - 117:24
**winter** [1] - 95:5
**wish** [1] - 41:12
**withdrawn** [1] - 124:2
**withholdings** [1] - 95:18
**witness** [9] - 11:8, 11:9, 53:14, 61:13, 76:21, 86:18, 118:6, 156:5, 156:19
**WITNESS** [20] - 12:20, 48:10, 57:22, 59:15, 63:10, 64:9, 65:6, 67:18, 70:22, 71:8, 77:1, 78:19, 80:24, 81:2, 81:8, 102:5,

110:8, 123:7, 133:12, 133:17
**witnesses** [1] - 156:8
**WOLSON** [2] - 1:15, 4:2
**women** [1] - 91:19
**wonky** [1] - 144:3
**word** [4] - 23:8, 34:4, 105:5, 119:14
**words** [5] - 64:5, 77:6, 114:14, 114:15, 121:5
**worker** [2] - 68:24, 68:25
**workers** [1] - 153:8
**workplace** [4] - 8:12, 85:2, 85:17, 135:1
**works** [4] - 111:2, 117:23, 136:2, 136:25
**World** [2] - 44:23, 45:13
**world** [3] - 41:1, 66:25, 142:4
**worried** [3] - 67:8, 67:10, 69:10
**worry** [2] - 26:23, 67:13
**worse** [1] - 66:20
**wrap** [1] - 38:24
**write** [7] - 93:10, 95:3, 101:12, 105:11, 107:5, 125:8, 126:25
**writes** [9] - 95:6, 96:3, 96:14, 105:7, 106:5, 109:15, 110:22, 139:9, 149:16
**writing** [3] - 14:20, 104:21, 141:11
**written** [2] - 16:14, 85:24
**wrote** [3] - 15:22, 108:7, 110:17

## Y

**year** [40] - 7:8, 8:20, 8:25, 9:11, 10:6, 10:9, 11:24, 12:7, 12:20, 12:23, 13:16, 14:8, 14:12, 16:12, 18:22, 25:9, 48:21, 51:23, 51:24, 55:4, 55:19, 55:21, 55:24, 56:9, 56:16, 56:18, 56:22, 59:1, 60:4, 60:20, 61:18, 66:23, 89:20, 111:15, 117:15, 126:15, 132:16, 147:4

**year's** [1] - 124:25
**year-end** [2] - 12:20, 14:8
**years** [25] - 7:15, 14:10, 17:1, 22:23, 26:24, 39:14, 40:7, 40:10, 40:18, 42:1, 68:16, 104:24, 115:4, 116:7, 116:10, 120:4, 136:16, 145:10, 151:11, 151:22, 152:8, 152:18
**years'** [1] - 117:18
**yes-or-no** [3] - 66:3, 99:23, 131:9
**yesterday** [7] - 7:7, 73:2, 74:3, 103:10, 103:25, 132:1, 140:15
**younger** [3] - 80:3, 125:12
**yourself** [4] - 66:1, 106:18, 136:24, 150:9
**yourselves** [1] - 153:7