```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF PENNSYLVANIA
 2

 3  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

    CARL WILLIAMS,                    CIVIL ACTION NUMBER:
 4
         Plaintiff,                   2:22-CV-01618-JDW
 5
         v.                           JURY TRIAL
 6                                    DAY 4
    LINODE LIMITED LIABILITY
 7  COMPANY, d/b/a LINODE, LLC,
    LINODIAN, LLC, d/b/a LINODE,
 8  LLC, DANIEL SPATARO, and
    THOMAS ASARO
 9
         Defendants.
10  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11
         U.S. District Court, Eastern District of PA
12       James A. Byrne U.S. Courthouse
         601 Market Street
13       Philadelphia, Pennsylvania 19106
         January 26, 2024
14       Commencing at 9:11 a.m.

15
    B E F O R E:            THE HONORABLE JOSHUA D. WOLSON
16                          UNITED STATES DISTRICT JUDGE

17
    A P P E A R A N C E S:
18
         DEREK SMITH LAW GROUP, PLLC
19       BY:  SETH D. CARSON  ESQUIRE
         1835 Market Street, Suite 2950
20       Philadelphia, PA 19103
         For the Plaintiff
21

22           Maureen McHugh, Official Court Reporter
                 maureen_mchugh@paed.uscourts.gov
23
      Proceedings recorded by mechanical stenography; transcript
24          produced by computer-aided transcription.

25
```

**UNITED STATES DISTRICT COURT**

1   **A P P E A R A N C E S:**(Cont'd)

2

3       JACKSON LEWIS, P.C.
        BY:  STEPHANIE JILL PEET, ESQUIRE
4            JONATHAN CAVALIER, ESQUIRE
             TIMOTHY MCCARTHY, ESQUIRE
5            1601 Cherry Street, Suite 1350
             Philadelphia, PA 19102
6            For the Defendant

7

8

9

10

11  **ALSO PRESENT:**

12          Melissa Meyer, Paralegal

13          Laura Buenzle Roberts, Courtroom Deputy

14

15

16

17

18

19

20

21

22

23

24

25

**U**NITED  **S**TATES  **D**ISTRICT  **C**OURT

```
 1                        I N D E X

 2
    EXAMINATIONS                                      PAGE
 3
      CARL WILLIAMS
 4    CROSS-EXAMINATION BY MR. CAVALIER:              10
      REDIRECT EXAMINATION BY MR. CARSON:            111
 5    RECROSS-EXAMINATION BY MR. CAVALIER:           129

 6    VINCENT PALOCHKO
      DIRECT EXAMINATION BY MR. CARSON:              131
 7

 8                      E X H I B I T S

 9
    DEFENDANT EXHIBIT 145 WAS RECEIVED IN EVIDENCE    70
10  PLAINTIFF EXHIBIT 32 WAS RECEIVED IN EVIDENCE    137
    PLAINTIFF EXHIBIT 31 WAS RECEIVED IN EVIDENCE    138
11  PLAINTIFF EXHIBIT 30 WAS RECEIVED IN EVIDENCE    138
    PLAINTIFF EXHIBIT 92 WAS RECEIVED IN EVIDENCE    172
12  PLAINTIFF EXHIBIT 61 WAS RECEIVED IN EVIDENCE    197
    PLAINTIFF EXHIBIT 20 WAS RECEIVED IN EVIDENCE    208
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (PROCEEDINGS held in open court before The Honorable

2    JOSHUA D. WOLSON, United States District Judge, at 9:11 a.m.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Good morning, everybody.  Have a seat,

5    please.  All right.  So before we bring the jury in, I got the

6    two letters last night, and let me pose a question to

7    Mr. Carson.

8              I read your letter.  I read the response I got.  The

9    defense makes the argument that they are entitled to explore

10   Mr. Musbach's conviction with Mr. Williams on cross as an

11   alternative source of emotional distress.  What's your response

12   to that?

13             MR. CARSON:  They made that argument at the pretrial

14   conference and you said that -- you ruled on that argument, and

15   you said that you weren't going to allow that to happen because

16   it was too tangential.  It doesn't even make sense.  They were

17   talking about -- you said they can explore the issue of

18   emotional distress without telling them he was convicted.  I

19   think that issue has been -- that argument has already been

20   made and ruled on.

21             THE COURT:  I don't think that's what I said.  I did

22   rule that certain documents couldn't come in.  We weren't going

23   to get into, for example, the charging documents from New

24   Jersey and things like that.

25             MR. CARSON:  We went through all the exhibits.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  We did go through the exhibits.

2          MR. CARSON:  Right.  And the exhibits for the

3  transcript and the exhibits for the plea agreement, that's the

4  argument they made, to keep it in, and you agreed.

5          THE COURT:  I said the documents were tangential and

6  that we didn't need to get into that.  I agree with that.

7          But the concept, I never excluded the concept.  I do

8  think that it's appropriate fodder for examination,

9  particularly given the testimony that I heard from

10  Mr. Williams, I guess, yesterday with respect to emotional

11  distress.

12          And given that context especially, I think it's

13  appropriate to permit the defense to explore alternative

14  sources of emotional distress, including the fact that he was

15  in a relationship with someone who was charged and ultimately

16  convicted of fairly serious charges in Federal Court of New

17  Jersey.

18          MR. CARSON:  He wasn't in a relationship when he was

19  convicted.  The guy went to jail.  Like, two years later he was

20  convicted and he was in jail --

21          THE COURT:  Mr. Carson, I'm not going to argue the

22  facts with you.  Okay?  They are entitled to cross examine on

23  this and to present it.

24          MR. CARSON:  They can cross examine on that issue

25  without telling the jury the guy did it.

**UNITED  STATES  DISTRICT  COURT**

 1          THE COURT:  I don't know what the testimony will be,
 2   but I am going to permit them to explore this assuming --
 3   again, it will depend on the testimony and the foundation, but
 4   I'm not going to exclude it.
 5          MR. CARSON:  Can I make another request, then?
 6          THE COURT:  I'm sorry?  No, hold on.  I'm not done.
 7   As far as the exhibit goes, I'm certainly not going to exclude
 8   the article, Exhibit 24.  I mean, that clearly is something
 9   that is the subject of the company's argument as to why it
10   terminated Mr. Williams.
11          Now, I'll go back to where we were at the final
12   pretrial.  Mr. Palochko, Mr. Asaro, Mr. Spataro, et cetera,
13   should not be testifying about anything other than what they
14   knew at the time of termination.  Right?  They are not a source
15   of information about the outcome of criminal proceedings
16   against Mr. Musbach, you know, but I do think it's fair game
17   for cross.
18          And then, you know, we can talk about, as we get to
19   the final jury charge, whether, you know, to put something in
20   that says something along the lines of, you know, the jury
21   should, in deciding what the reason was and whether the reason
22   for Mr. Williams' termination was discriminatory, the jury can
23   only consider the knowledge that the company had at the time of
24   the termination decision.  I mean, something like that may be
25   appropriate in the final charge.

**UNITED STATES DISTRICT COURT**

1        MR. CARSON:  That's not enough, Your Honor.  The jury

2   needs to be told that the article was introduced not for the

3   truth of the matter asserted but only to show the effect on the

4   readers, and that at the time of the termination, the knowledge

5   related to whether or not he did it or not was not something

6   that was even considered because those things hadn't even

7   happened yet.

8        And so the only way that they can consider that he did

9   it is with regard to his claim for emotional discharge.

10       THE COURT:  Well, Mr. Carson, I'm not having a charge

11  conference now, and I'm not ruling on what's going to be in the

12  charge.

13       MR. CARSON:  Okay.

14       THE COURT:  Okay?  So if you want to argue for that

15  when we get to the charge, you can.  And by that point, I'll

16  have heard a lot more of the testimony and I'll have the

17  context and I can make a decision about what, if anything, I

18  want to put into the final charge about this.

19       But that's not something we need to tackle now, and

20  it's not something I can resolve now.  Okay?

21       MR. CARSON:  Yep.

22       THE COURT:  Okay.  Anything else before I bring the

23  jury in?

24       MR. CARSON:  What about the comments that were made in

25  the opening statement that he already had done it and --

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Again, I'm not going to go back and strike

2    things.  You asked me about that.  You objected during the

3    opening statement.  I overruled it.  I'm not going to go back

4    and revisit that now.  Again, there were things that came in in

5    the opening statements.

6          First of all, this is closer to what's permitted.

7    Whether it is or isn't, again, I don't know yet.  It will

8    depend on testimony.  I can see it potentially coming into

9    evidence.  I didn't interrupt your opening when you went into

10   stuff that I expressly excluded.

11         MR. CARSON:  I understand.

12         THE COURT:  I'm not going to go back now, and,

13   frankly, I don't know that it would make any sense to start

14   calling the jury's attention back to what happened several days

15   ago and try to give them the instructions about it.

16         MR. CARSON:  Okay.  So just one last request, then.

17         THE COURT:  Yes.

18         MR. CARSON:  Can you please issue an instruction

19   regarding this idea that Carl Williams was terminated to

20   protect people's children?  That's totally inappropriate.  The

21   argument has nothing to do with Carl Williams --

22         THE COURT:  I'm not aware of what that argument is.

23         MR. CARSON:  So Dan Spataro plans to say that the

24   reason why he wanted Carl gone is because he thought of his

25   kids and he thought of Carl with his kids, and that was the

**UNITED STATES DISTRICT COURT**

1  problem.  And that's not their argument.  Their argument is

2  that it had to do with the company's reputation.

3          THE COURT:  I'm not going to constrain testimony.  I

4  don't know what Mr. Spataro is going to say.  I haven't seen --

5  I don't have a transcript in front of me from a deposition.  I

6  don't know what he's going to say.  So I'm not going to

7  instruct him to testify a certain way.

8          If he wants to testify that certain things were in his

9  head and motivated him, you know, I don't know what that's

10  going to be.  But to the extent it deviates from the reason the

11  company is giving now, then maybe that's good for you.  I don't

12  know.  But I'm not going to issue instructions about what

13  people can and cannot say in their testimony.

14          MR. CARSON:  Isn't that the same as your instruction

15  regarding Vincent Palochko not saying that he remembered any

16  money that --

17          THE COURT:  It's not the same.  What I'm saying now is

18  they have to limit themselves because that's factually -- in

19  other words, they're not going to then get into "and then what

20  else happened," right?  They can't, obviously, have known what

21  happened in the future at the time of termination.  No one is

22  saying otherwise.

23          What I'm saying is they can't then sponsor additional

24  testimony even if they know what happened to Mr. Musbach later,

25  right?  They can't be the sponsors of that testimony.

**UNITED STATES DISTRICT COURT**

1          But what I'm not going to say is that for subject

2    matters that are relevant and are proper for them to testify

3    about, such as what the company was thinking at the time of the

4    termination, I'm not going to tell them what they can and

5    cannot say.

6          MR. CARSON:  You did issue an instruction that Vincent

7    Palochko can't say that he thought of these checks and he

8    thought that Carl might be helping them pay for the killing.

9          THE COURT:  You know, again, there are certain

10   prejudice rules I've issued.  Beyond that, I am not going

11   there, Mr. Carson.

12         MR. CARSON:  Okay.

13         THE COURT:  So that's it.  All right?

14         All right.  So let's go ahead and bring the jury in.

15         THE COURTROOM DEPUTY:  All rise.

16         (Jury enters the courtroom at 9:20 a.m.)

17         THE COURT:  You can all have a seat.  Good morning,

18   everybody.  Again, compliments.  I know it's not always easy to

19   get here first thing.  Everybody is prompt and on time and

20   ready to go, and I appreciate that.

21         We're going to continue with Mr. Williams'

22   cross-examination right now.

23         So, Mr. Cavalier, come on up and we'll proceed.

24         MR. CAVALIER:  Thank you, Your Honor.

25                          CROSS-EXAMINATION

**UNITED STATES DISTRICT COURT**

1  BY MR. CAVALIER:

2  Q.  Good morning, Mr. Williams.  When we left off yesterday,

3  we had just finished talking about that long message thread

4  that you had between 2017 and 2020 with Mr. Palochko.

5      I'd like to go through, much more briefly, another message

6  thread with you first thing this morning.

7          MR. CAVALIER:  Can you pull up 138?

8  BY MR. CAVALIER:

9  Q.  So my first question to you, Mr. Williams, is do you

10  recognize this document?

11          THE COURT:  Did we publish this?  I'm sorry.

12          MR. CAVALIER:  Not yet.  I'm sorry.  I don't know that

13  that was admitted.

14          THE COURT:  I don't have it in yet, and I'm not sure

15  we're publishing until we deal with admission.

16          Okay.  Go ahead.

17  BY MR. CAVALIER:

18  Q.  Can you see the document, Mr. Williams?

19  A.  I see the judge on my screen.

20          THE COURT:  Sorry.  Did you say 138?

21          MR. CAVALIER:  138.

22          THE COURT:  Okay.  This is in evidence already.

23          MR. CAVALIER:  Okay.

24          THE COURTROOM DEPUTY:  So we can publish it?

25          THE COURT:  Yes, we can publish it.

**UNITED STATES DISTRICT COURT**

1          MR. CAVALIER:  Thanks.

2    BY MR. CAVALIER:

3    Q.  It's already been admitted, Mr. Williams.  Let us know if

4    you recognize the document.

5    A.  Yes, I do.

6    Q.  What is it?

7    A.  Thread text between Chris Aker and myself.

8    Q.  Remind us who Chris Aker is?

9    A.  The owner of Linode and CEO.

10   Q.  Okay.  So let's just briefly go through this document.

11   We're not going to take as much time with it as we did with the

12   one yesterday.  It's also shorter.  But it begins with a

13   message from you to Mr. Aker on March 1st, 2018, correct?

14   A.  March.  It appears to say that.  I don't remember this

15   exactly, but yeah.

16          MR. CAVALIER:  Tim, can you drop that a little so he

17   can see the date stamp?

18   BY MR. CAVALIER:

19   Q.  March 1, 2018, yes?

20   A.  Yes.

21   Q.  Okay.  And it appears that you're sending Mr. Aker a

22   picture of what looks like a Japanese seafood display at some

23   restaurant in Philadelphia, correct?

24   A.  I don't know.  I don't remember the picture.

25   Q.  Okay.  Do you agree with me that that seems like that's

**UNITED  STATES  DISTRICT  COURT**

1  what that is?

2  A.   I just don't know.  I can't remember that.

3  Q.   Okay.  Below the picture, you say, "Out with my Japanese

4  friend having raw fish.  Outstanding Philly cuisine," right?

5  A.   I don't remember saying that.

6  Q.   Okay.  But you agree with me it seems like you're sharing,

7  with Mr. Aker, a picture of a dinner that you had with a

8  Japanese friend at some point in March of 2018?

9  A.   It appears that way.

10  Q.   So I ask that, to ask you this follow-up question, it's:

11  Do you agree with me that, based on this -- and if you don't,

12  we can go through a little further -- but do you agree with me

13  that you had, at least as of March of 2018, a familiar enough

14  relationship with Mr. Aker that you could have these kinds of

15  casual conversations with him about dinner?

16  A.   Through a text message.  Not in person but through a text

17  message.

18  Q.   Right.  So you were at least familiar enough with

19  Mr. Aker, the owner of the company, the founder of the company,

20  that you could send him casual pictures about meals you were

21  having, correct?

22  A.   He was -- both of us were kind of foodies, yes.

23  Q.   Okay.  And he responds, "Looking delicious," right?

24  A.   Right.

25  Q.   All right.  And if we roll through this document, you,

1  here again on May 2nd, 2018, at 7 o'clock, you send him a

2  picture of the founder of OpenForge?

3  A.   Yes.

4  Q.   And it looks like a couple other pictures from that event.

5  If you look at the top of the next page, looks like you were at

6  a happy hour that Linode put on?

7  A.   At the Philly -- Philadelphia Tech week, I was giving --

8  sending back Chris Aker information, real time, about what was

9  going on at the Philadelphia Tech week in the Linode's sponsor

10 caveat.

11 Q.   Okay.  So you were keeping him updated about the

12 happenings at the conference or the happy hour, correct?

13 A.   Yes.

14 Q.   Okay.  And if we scroll down a little further to May 17,

15 2018, it looks like you're sending him a photo of some kind of

16 a meeting?

17 A.   That is the meeting I arranged for the NextGen to get

18 information.  The vendor showed up, as you can see in the

19 background, Cumulus, and I brought them into Philadelphia to

20 involve them in the strategy for meeting with many of the

21 different teams.  And so that's what that picture is.

22 Q.   Okay.  You were just updating Mr. Aker on what you had

23 done that day, correct?

24 A.   Yes.  He said that my activities have a positive

25 contagious effect on Linode and Linode's culture and to

**UNITED STATES DISTRICT COURT**

1  continue to do those.

2  Q.   So he was fond of you and what you were doing at that

3  point in time, correct?

4  A.   I mean, Chris Aker told me, "I don't know how anyone can

5  not like you."

6       But he also has, you know, the Dr. Hyde/Dr. Jekyll side,

7  which everybody knows, where, you know.

8       But putting that aside, I ignored that part, even though

9  there were many things there, and focused on getting -- helping

10 him with the business.

11 Q.   Let's go through this and see if we see any of the

12 Mr. Hyde in this thread.

13 A.   No.  You won't see that.  You'll see that in other emails

14 that were public.

15 Q.   But that aren't in evidence yet?

16 A.   I do not have them.

17 Q.   Okay.  Let's continue with the document here.  Later in

18 May, that same month, looks like you're sending him pictures

19 from a gathering at a local bar?

20 A.   This is a Linode sponsored event.  Because the CEO came

21 and visited our office and were discussing using Linode for --

22 and they were up the street from Linode.

23 Q.   Okay.  Then we roll through to September 19, 2018, and it

24 looks like you reach out to him to ask him if he's coming to a

25 dinner at Stella Pizza down in Old City, a net op's dinner?

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  A.   Yes.  This was a dinner I arranged and invited Chris.

2  Q.   Okay.  And if we scroll to the next page, he responds to

3  you, right?  He says, "Very nice, Carl.  Thanks for the invite

4  but not able to make it.  Have a great time.  Celebrate the

5  accomplishment and great job."

6  A.   Yes.

7  Q.   Okay.  If we continue rolling through, there are texts

8  from you to him in October of 2018.  Looks like you're sending

9  him some information?

10  A.   This is the -- the -- that has to do with that picture

11  above.  This is the...

12  Q.   If you don't know what it is, you don't need to tell us.

13  I just need you to tell me if you agree it looks like you're

14  sending him some information of some type?

15  A.   I can't say what the bottom is that I'm sending him, but

16  our promotional peering of -- to hand out as a sticker that

17  people put on the back of their laptop regarding

18  interconnection and peering that I actually designed.  But I

19  have a graphic artwork person do it, but I lay it out.  So he

20  loved that one.

21  Q.   Okay.  And if we could scroll down to 565, October 17,

22  2018, looks like you're sending him some pictures of a peering

23  display?

24  A.   This was at the -- the graphics place that I already

25  testified down in Old City, where I also got an $800 frame that

UNITED STATES DISTRICT COURT

1   had Linode's executives including Dan, Chris, Rich, and -- Dan,

2   Chris, Rich, and Chris, and I'm spending his money.  So I am

3   showing the product of that spending of his money, and he's

4   saying looking good.

5   Q.   Right.  Okay.  And then later on, as we scroll through,

6   you send him a picture of yourself, it looks like, at a

7   conference of some kind?

8   A.   This is at our interconnection event, which I had Linode

9   sponsor.  If you pull it up you can -- no need to zoom in.

10  It's not probably that important, but you'll see the Linode

11  logo in the back of our sponsorship.  And -- oh, this was in

12  Hong Kong, I can tell.  This one I went to by myself.  And

13  Chris, at that time, wanted to focus on the Chinese market.

14  And it's expensive to do transit traffic to inside and outside

15  of Chinese because there's not so much bandwidth.  They limit

16  the bandwidth.

17       And so we thought by going to Hong Kong, we could look at

18  getting very inexpensive transit from Taiwan or Hong Kong

19  because it's attached to domestic China.  And this is what that

20  is.

21  Q.   Okay.  And if we scroll down a little further to 568, it's

22  11/27/2018, November 7, 2018, it looks like you're sending him

23  a picture of some oysters.  It says, "Oyster Wednesday."

24  A.   Oh, he loves oysters.

25  Q.   And it doesn't look like on that day he had oysters,

**UNITED STATES DISTRICT COURT**

1   right?  Because he responds, "I had wings."

2   A.   I know.  Because he's jealous because he loves oysters.

3   Q.   Right.  And then below that, on that same page, you send

4   him a picture.  It looks like a fish?

5   A.   That's Branzino.

6   Q.   That's what the fish is?

7   A.   That's a Branzino.

8   Q.   Okay.  I'm just --

9   A.   The Birdy's Cafe in Cherry Hill.

10  Q.   Okay.  As we scroll through into 2019, we don't have to

11  stop on each one, but it looks like you're sending him updates

12  about things that are going on.  One of the photos is in

13  Pittsburgh?

14  A.   That Pittsburgh cell tower is we were looking at 5G edge

15  computing and investigating the Pittsburgh 5G project that was

16  hosted by Carnegie Mellon and looking to have a POC with

17  Pittsburgh -- and with Pittsburgh and 5G and putting our

18  servers right near the aggregation points for edge computing

19  from your 5G device that could do artifical intelligence

20  machine learning very quickly, locally, and then send, to the

21  back end to the cloud, data that's more static and doesn't need

22  to be processed in that real time.

23       So it's getting him excited about this by showing him the

24  actual tower they used.

25  Q.   Got you.  So if we roll through the next couple pages, all

**UNITED STATES DISTRICT COURT**

1  the way down through 578, it looks like a series of messages

2  from you, largely involving food and some travel, it looks

3  like, that you were doing on behalf of Linode?

4  A.  No.  You skipped a few.

5  Q.  Yeah.  We're not going to go through each and every text,

6  but just generally?

7  A.  Generally, there's a lot of technical work that I'm

8  showing him there, as you can see.  You skipped a lot of

9  things, but that's okay.

10  Q.  All right.  And if we roll down to 579, I think you

11  mentioned this during your testimony yesterday, that on that

12  day, February 25, 2019, Mr. Aker is sending you what looks like

13  a screenshot from a video meeting with Scott McNealy, where he

14  says, "We had a fantastic call.  Thank you very much for

15  setting this up.  He was very helpful and willing to help more.

16  It was a thrill, Carl.  Highlight of my career.  Thank you."

17  A.  Yes.

18  Q.  And that, I think you told us yesterday, was a meeting

19  that you arranged for Mr. Aker with Mr. McNealy, who was a

20  former executive at Sun Microsystems?

21  A.  Yes.  He's a well-known pioneer in the industry.

22  Q.  Okay.  And Mr. Aker is sending you his gratitude for

23  setting that up?

24  A.  Yes.  And we had follow-up calls with Scott on a private

25  equity discussion, financial things with myself, Chris, Scott,

1  and John, who was VP of partnerships.

2  Q.   Okay.  And if we continue down through this thread, we get

3  into March of 2019, on 581.  And, you know, again, we don't

4  have to delve too deeply into it, but you're sending him

5  today's Google Doodle on March 9th, another picture of food in

6  Haddonfield?

7  A.   Fish.

8  Q.   Uh-huh.  And if we continue to roll down into March, on

9  583, it looks like you're sending him some work-related

10 information about an edge computing meet up?

11 A.   Yes.  That was 3/15/2019, shortly after my title change.

12 Q.   Understood.  And so we roll here into March 21st of 2019,

13 and it looks like you're sending him a picture of a Starbucks

14 Doodle that day?

15 A.   A 5G.  Oh, they had a cloud stuff and so --

16 Q.   Right.

17 A.   Chris and I would do that.  There was more of that on

18 Slack.

19 Q.   Sure.  If we continue down through March, there's some

20 more discussion.  It looks like you're sending him a couple

21 texts or screenshots of text messages you had.

22       And then on 3/29, again, it looks like you're sending him

23 another capture about --

24 A.   That's my presentation that I was giving, Peering Access

25 Edge Building a More Distributed Internet, with the green

**UNITED STATES DISTRICT COURT**

1  represents Linode and us.  This is kind of a visionary approach
2  of how we can move from centralized cloud to edge cloud, which
3  is what eventually led to Akamai wanting to buy Linode, to
4  perform cloud computing.  And we actually worked with Akamai
5  and Comcast to do that 5G cloud computing on the meetings with
6  them.
7  Q.  You thought Mr. Aker would be interested in that, right?
8  A.  Yeah.
9  Q.  Okay.  And if we scroll further down, it looks like you
10  set up a booth at Temple at one point and sent Mr. Aker some
11  pictures?
12  A.  Yes.  Yes -- oh, I was asked to sponsor the job fair in
13  the Owl House, where the students all get together on a
14  Saturday.  I got up very early and gave a presentation at 8:00
15  and they work coding.  And then they come over and give resumes
16  at a booth and they get some swag.
17      And I gave the resumes to Vincent, and he said that we
18  can't hire, they're too junior, but we paid anyways,
19  regardless.
20  Q.  Okay.  And then on April 2, 2019, it looks like you're
21  sending him a photo of Dan Spataro and somebody named Joe?
22  A.  This is Dan Spataro and this is Chris Aker's girlfriend's
23  uncle-in-law, and he happened to be at an interconnection
24  meeting.
25      I met Chris Aker.  He didn't even know that I was from

**UNITED STATES DISTRICT COURT**

1  Linode, and he says, "Oh, well, I know Chris."

2      And I said why.  And I called Dan over to meet him.  I

3  don't like to take pictures of myself with people.  I like to

4  give the attention to others.  So I took a picture of Dan and

5  Chris Aker's uncle-in-law, and sent it to Chris, who was quite

6  surprised.  "Joe says hello."  I was trying to shock Chris that

7  Joe is here.

8  Q.  Right.  And he responds.  It looks like you sent him

9  another picture from either the same event or a different event

10  from around that same time period below, also with Dan in this

11  picture?

12  A.  Can we see it?

13  Q.  Sure.  A little further down.

14  A.  Yes.  That is that gentleman over here at Depix, and I was

15  on their advisory board and still am.  And they are a vendor of

16  Linode, and they still have me on their website as their

17  customer -- I mean, as part of their technical advisory board

18  although I've removed Linode from my job description.

19      But they, Ed there, sent me a text six months after I was

20  terminated and was shocked and said, "You were such an

21  outstanding ambassador for Linode," and went on about that.

22  And we do have that text but there we are.

23  Q.  Okay.  If we scroll down to the bottom of 0591, it looks

24  like you're sending him a clip of a text message and then

25  asking him about -- or telling him, I guess I should say, that

**UNITED STATES DISTRICT COURT**

1  you've done due diligence and think we should sign this $86,000

2  vapor agreement soon and let me accept responsibility to get

3  the peering worked out.  Do you see that?

4  A.  Yes.

5  Q.  Okay.  And if we bounce down to the next page, we don't

6  have to really get into it, but he says, "Please communicate

7  with Dan and Tom on getting answers to the edge pop

8  connectivity questions.  I will not proceed without that

9  information.  Thanks."

10 A.  Yes.

11 Q.  So you're talking about some work that you were

12 recommending to him, and he was telling you to talk to Dan and

13 Tom about it, yes?

14 A.  Yeah.  Because I initially proposed it to Chris and my --

15 Chris committed to doing the project in February, and I was

16 part of a press release.  And someone said, "Whose name should

17 be quoted?"

18      Chris says, quote, "Carl's name."

19      And Dan said, "If your name is quoted and then Chris

20 doesn't fulfill the promise, then it's going to be on you and

21 your credibility."

22 Q.  So they were protecting your reputation in the industry?

23 A.  No, they weren't.

24 Q.  Okay.

25 A.  But continue.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  Q.   All right.  Let's go down to 595.  This is April 13, 2019,

2  and you're sending Mr. Aker a photo of yourself, what looks

3  like a restaurant in Cherry Hill, New Jersey, correct?

4  A.   Yes.  The one before was from SoftBank in Japan, and I

5  went to SoftBank to talk to the individual who was one below

6  the CTO, who I had worked for -- worked with doing patents and

7  publications.

8       And since SoftBank is always interested in investing, I

9  met with them about Linode and wrote up a Word doc, several

10  pages.  And Chris Aker was very intensively reading the

11  financial information and background with SoftBank.  SoftBank

12  is the largest or second largest after Docomo now.

13      So there is the peering person, but I knew the top guy and

14  my friend, but he came with us.  And he was asked to take me

15  out to dinner because the CTO person that I know couldn't join

16  us for dinner.  So they took me out.

17  Q.   Okay.  Let's look -- let's jump ahead to May 2nd, 2019.

18  A.   Uh-huh.

19  Q.   And it begins with some texts and then there's some

20  photos.  Why don't you briefly tell us what's going on here.

21  You say, "You have time to meet Rogers?"

22      He says, "I do.  I'm at the hotel bar having a seltzer.  I

23  meet here -- I can meet him in 10 minutes."

24      And then later that day, it looks like you're sending him

25  a series of photographs of people, including Mr. Aker?

**UNITED STATES DISTRICT COURT**

1   A.   Yeah.  Chris came to the event because he wanted to see
2   the brand new opening of Toronto data center.  We were
3   happening to be having our business analyst meeting regarding
4   infrastructure and going from centralized computing to more of
5   an edge -- distributed edge computing.
6        And Chris came along to -- I wanted him to meet people,
7   but his primary objective was to go to the data center Equinix,
8   where we host these servers.  And the four of them, they wanted
9   a picture taken.  I didn't want to be in the picture.  And that
10  is the picture, and we discussed it being framed, because they
11  were sending it to their wives.  And Chris was sending it to
12  his mother, his sister.  He was, like, so interested in this
13  photo.
14       Yes.  So this is photos that he asked me to send because I
15  had just taken them in real-time.  So that 5/2/19 was 8:33 p.m.
16  at night and that's when we were at the data center and in
17  real-time I was sending him the photos at his request.
18  Q.   Since you mentioned it, let's talk about it briefly now.
19  You did something more with this photo, correct?
20  A.   Yes.  As you seen in both Vincent Palochko's thread, yeah.
21  Q.   This is the photo that we were talking about in that
22  thread, right?
23  A.   No, you never talked about it, but I seen it.
24  Q.   You saw the thread?
25  A.   Yeah.

**UNITED STATES DISTRICT COURT**

1  Q.   Okay.  Just briefly, can you explain what you did with the

2  photo and why?

3  A.   What I did was is I proposed putting the photos and

4  framing it, like we have done with many other kinds of photos

5  all over to Linode buildings.  So I discussed with other people

6  that we're going to surprise, like we did before, Chris Aker,

7  with the actual -- because he was very into it.

8       And have everybody -- as we did before, have everybody's

9  name.  But at this time on it -- there's actually an exhibit on

10 that frame.  And so I needed to have all the names of every

11 employee so that Vision Graphics, which those other things came

12 from, would take the photo, make it much -- do work to the

13 photo because you can't -- that just can't be placed in, put it

14 at 8 1/2 by 10, put padding in the back, have a person take all

15 the names of the employees.  I asked Vincent, as you will see

16 in his thread, do you want to send the invoicing directly to

17 their Vision Graphics because perhaps I shouldn't have

18 everybody's name, or do you want to send them to me?

19      And I also talked to Vincent verbally before that, and he

20 says, I love your project, I always love all your projects.  So

21 then we have a follow-up and he sent me an email list with all

22 the names of the employees as well in a Slack message, a

23 spreadsheet.

24      And the cost already was known to be $800.  Chris Aker

25 would routinely tell me there is no budget.  He would even tell

**UNITED STATES DISTRICT COURT**

1  me that when I wanted to purchase transit, but always told me
2  it cannot be spend as much as you want with transit because we
3  would never be able to scale.  So you have to get the price
4  down and share that transit bandwidth or scalability.
5  Otherwise, it's a roadblock, you cannot scale.  It would be too
6  economically roadblock.
7       So yes, I had taken -- talked to a number of people and
8  put the $800 mark to Vincent Palochko.  Previously I see in the
9  document that I had approval from Rich Ford for that exact
10  amount.  And number three, it wasn't my credit card that I used
11  because I didn't have a corporate credit card at the time.  It
12  was either Dan's corporate credit card or Brett Kaplan's.  They
13  were the two managers to which I would go to and ask for
14  permission to use their credit card to go over and purchase
15  these frames.  We've had many of them.  So that's the process,
16  yes.
17  Q.  Let me ask you, did Mr. Aker like the product, the
18  photograph that you got?
19  A.  Yes.  He hung it up right outside of his office.
20  Q.  Okay.  Did he thank you for doing that?
21  A.  Yes.
22  Q.  All right.  Let's jump ahead a little bit here and work
23  our way to the end of this.  Let's go to 0619.  This is
24  December 7th of '19.
25       So it looks like this starts with you -- I'm going to

 1   actually do two different days, but we'll do them both.

 2       December 7th, you send him a picture of the Star Wars Rise

 3   of Skywalker, it looks like one of those displays that you see

 4   at a movie theater?

 5   A.   I don't know.

 6   Q.   There we go.

 7   A.   Two -- yeah.  He is a Star Wars fan and that's why he

 8   liked Jedi.  The CEO of OpenForge, his name is Jedi.  And he

 9   says anybody with the name Jedi he's going to love.

10   Q.   Okay.  Then if we jump down to the next one on

11   December 17, 2019, who is in that photo?

12   A.   That is Chris -- that is Tom Asaro and Andrew Dampf --

13   excuse me, Dan Spataro in the back, he's right over there, and

14   Tom Asaro on December 17th, 2019, at a vendor meeting that we

15   have with vendors.

16   Q.   Okay.  And let's jump a little further down to the next

17   page on June 10, 2020.

18       Looks like you're sending him a photo and --

19   A.   He loves fish.

20   Q.   Next one.  We've seen enough fish photos.  There we go.

21       So here it looks like you're sending him a picture of a

22   very large tree across a few cars and you're asking him, "Do

23   you know a Haddonfield attorney?  The apartment does not remove

24   the tree and my insurance is waiting.  Apartment said they

25   asked maintenance people to do it, who refused."

**UNITED STATES DISTRICT COURT**

1       Right?

2   A.   Yeah.  That destroyed my car.

3   Q.   And he's responding, "Hey, I don't, but you should talk to

4   Peter at Linode.  He may have ideas."

5       Peter, as we talked about yesterday, was in-house counsel

6   for Linode at that time, correct?

7   A.   I assume he still is.

8   Q.   Okay.  And then if we roll forward, there's a few more

9   Linode-related photos, and we get to the end of the chain in

10  June of 2020?

11  A.   Yeah.  These are design photos that I had of our transit,

12  if you want me to go over them.

13  Q.   No, it's okay.  The upshot of this whole thing is this.

14  It looks like you had a really good relationship with Chris

15  Aker.

16  A.   At points the -- in Galloway, there were -- as I said,

17  there's a Dr. Jekyll and a Dr. Hyde.  Everybody knows about it.

18  He was listening to Andrew Dampf and Alex Forrester, and they

19  sent out -- because I got these IP address slash by slash, 16

20  up to that point, and he's -- Alex Forrester sent out to the

21  company line that the policy that I had put in place of --

22  instead of us running at 10 percent capacity or at 90 percent

23  capacity, we only have 10 percent left, which means we only

24  have 2,000 Linode per data center we can create --

25  Q.   Mr. Williams, I'm sorry to interrupt you, but the question

**UNITED STATES DISTRICT COURT**

1  was, you and Mr. Aker appear to have a friendly relationship,

2  correct?

3  A.   Not at certain points.  I mean, not due to me, but --

4  Q.   We didn't see any of those points in the text message

5  thread that we just went through, right?

6  A.   Those were -- and everyone at linode.com emails -- I'm not

7  bringing that up here, but I just -- since you brought it up,

8  I'm responding.  But in this, these email message -- this text

9  messages, no.  I've made initiative to be who I am.

10 Q.   And who you are in these text threads is somebody who is

11 engaging with the founder of the company in friendly and

12 diversified manner, sending him all kinds of snippets of your

13 life and receiving snippets of his life over the course of two

14 and a half years, correct?

15 A.   Yes.

16 Q.   Right.  And so I'll ask you the same question I asked you

17 about the document yesterday.

18      Regardless of anything else that you've testified to, at

19 least as to this thread, there was never a point over those two

20 and a half years where -- you know, in between the restaurant

21 photos and photos of conferences or the photos about Star Wars

22 or photos about a tree falling on your car in the apartment

23 complex or all the references to Linode events, there's nothing

24 in that thread where you mentioned to him anything like, hey,

25 Chris, I really got to talk to you, Dan made a really crude

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  comment about my age and I'm bothered by it and I know we have
2  this kind of relationship so I thought we could talk?
3  A.   In this thread, no.
4  Q.   Okay.  All right.  Let's move on to the questionnaire, as
5  I call it, or the charge as you call it, that we talked about
6  yesterday.
7       This is -- let's just take a quick look at Exhibit 34,
8  previously admitted, so we can refresh our recollections.
9       So this is the document that we discussed or you discussed
10 with your counsel yesterday, and then you and I discussed
11 briefly, correct?
12 A.   Yes.
13 Q.   And again, we don't have to belabor the point, but I think
14 you'll remember that I was insisting it was a questionnaire and
15 you were referring to it as a charge?
16 A.   It is a charge.
17 Q.   Well, let's read what it's called at the top of the
18 document, right?
19      So it's a questionnaire.  Yes?
20 A.   It says the word "questionnaire."
21 Q.   All right.  And just again briefly, since we've already
22 mentioned this, if we look down in the document -- by the way,
23 this document has redactions on it.  Did you make those
24 redactions or did the commission?
25 A.   Erica made those redactions, the attorney.

**UNITED STATES DISTRICT COURT**

1  Q.   Okay.  Do you know whose name you listed under name,

2  address, and phone number of the person who does not live with

3  you and would know how to contact you?

4  A.   That is my niece.

5  Q.   Okay.  Let's go down to the substance of this.

6       So number 7, it says that -- it asks you to state the

7  reasons the employer gave you for the actions that harmed you,

8  right?

9  A.   Right.

10 Q.   And you say, "Linode never informed me or gave me a reason

11 for not promoting me to the open position of network manager.

12 I asked to apply for the position, but I was never

13 interviewed."  Okay?

14 A.   Correct.

15 Q.   And this was that Tim Kaufman promotion we talked about

16 yesterday, right?

17 A.   Yes.

18 Q.   And so it's fair to say that the thrust of this

19 questionnaire that you were submitting was that you believed

20 you deserved to be interviewed for that position that Tim

21 Kaufman ultimately got, right?

22 A.   Not questionnaire, but yes on the others.

23 Q.   Okay.  And is it fair to say also, that at least as to the

24 contents of this document, that was all you were complaining

25 about in November of 2018 to the PHRC?

**UNITED STATES DISTRICT COURT**

1  A.   Right.  Yes.

2  Q.   So again, as I asked you yesterday -- and if I'm wrong,

3  you can tell me where to point it out in the document, but

4  there's nothing in here, at least as of November 9, 2018 --

5  well, first of all, there's nothing at all about sexual

6  orientation in this document, right?

7          MR. CARSON:  Objection.  Asked and answered.  We did

8  all this yesterday, Your Honor.

9          THE COURT:  The objection is overruled.

10          THE WITNESS:  There was nothing about sexual

11  orientation here, but all of the background regarding what I

12  testified to, as I pointed out yesterday in my testimony,

13  converges to the point where my ability to interview for a

14  position which Tom Asaro said, yes, you can interview, talk to

15  Dan, came to that convergence.  At that point I was never told

16  that Tim Kaufman was going to get promoted that morning.

17  Within hours of receiving Tim Kaufman's announcement that gave

18  the reason for his promotion is that he created new practices

19  in the network engineering team as a basis, a main basis for

20  the reason of the promotion.

21          And so I know about Tim Kaufman and I have put

22  together so many practices.  And if that's the reason -- and

23  the fact that I was not interviewed was the -- and told.  So --

24  BY MR. CARSON:

25  Q.   Right, you were --

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  A.   -- that's what I'm explaining here.

2  Q.   You were upset that you weren't interviewed for the

3  position, correct?

4  A.   I was not given the opportunity to apply for the position.

5  Q.   Okay.  And for whatever convergences we're referring to

6  there, you didn't say any of that in this document, right?

7  A.   It's implied in this document because I say call me --

8  there has to be a background.  You just can't say I wasn't

9  promoted because of my age.  They have to have all of the

10  reasons.  So they are going to investigate, they are going to

11  assign a private -- I mean, the Pennsylvania Human Relations

12  Committee investigator, which I stated, again, that I went back

13  -- because I was concerned about going into work every day and

14  not knowing what to expect and having this anxiety, I went back

15  on my way to work because it's near Linode, the office, and

16  said -- I think it was the Tuesday after I filed this -- has

17  the investigator been assigned.

18  Q.   Right.  We're going to talk about that in a second.  But

19  for now, again, the question is, you didn't say anything about

20  those other things in this document, right?

21       I understand that you thought that somebody was going to

22  call you and you're testifying now that you can tell them

23  whatever you wanted to tell them.  But at least as to this

24  initial document, which I call a questionnaire and you call

25  charge, you didn't say anything about your sexual orientation,

1 any harassment in that regard, or any age-related harassment

2 that you now testify was going on at that time, right?

3      Your complaint here is just limited to the fact that you

4 weren't interviewed for this position, according to you,

5 because of your age?

6 A.  The document speaks for itself.

7 Q.  Okay.  We agree on that.  And I want to ask you what you

8 said yesterday.  I want to be very clear on it before we move

9 on from this document.

10      Was it your testimony yesterday that you went to the EEOC

11 or the PHRC, filed this charge, and as a direct result of this

12 you had meetings that led to your promotion?

13      In other words, is it your testimony that this document

14 that you filed with the PHRC led directly to you being promoted

15 in late 2019?

16 A.  The -- my filing of the charge, my discussions with Dan

17 Spataro and Tom Asaro, Chris Aker, did not show up at the

18 meeting, led, as I explained in more detail, to that promotion

19 as director of network strategy and innovation.

20 Q.  And you're saying that prior to you filing this PHRC

21 charge, as you call it -- again, I call it a questionnaire --

22 nobody at Linode had any intention of promoting you in that

23 respect?

24 A.  To director of network strategy and innovation, no.  And I

25 must point out that I did bring with me Tim Kaufman's thing,

1  but I didn't give it to him because he said during our

2  discussion -- they said they were going to have a private

3  investigator to get all those documents.

4  Q.  Okay.  So let's put that aside a second and I want to pull

5  up Exhibit 15.

6          MR. CAVALIER:  I believe this has already been

7  previously admitted yesterday.

8          MR. MCCARTHY:  Yes.

9          MR. CAVALIER:  So we can publish that right off the

10  bat.  We can publish that right off the bat.

11  BY MR. CAVALIER:

12  Q.  All right.  This is a little small, so if you need a paper

13  copy or if you need Tim to blow up any response, we're going to

14  go through this.  All right?

15  A.  Sure.

16  Q.  First off, the date of that questionnaire/charge was

17  November 9, 2018, correct?

18  A.  Correct.

19  Q.  What's the date of this document?

20  A.  September 7, 2018.

21  Q.  Okay.  So this is about two months before that

22  questionnaire was filed, correct?

23  A.  Yes.

24  Q.  Let's read through this, okay, step through it with me.

25  A.  Yes.

1  Q.   So this is Dan Spataro writing to you.  And he's saying,

2  "Hi, Carl.  In regards to our conversation the other day about

3  manager of interconnection and IP strategy versus principal

4  engineer versus network operations manager, here are my

5  thoughts."

6       He says, "To me, a principal network engineer at Linode is

7  someone that can architect, deploy, and maintain many complex

8  network solutions and environments.  Some of the current and

9  past examples of these network architecture tasks include" --

10 and then he goes on to say -- to list eight bullet points that

11 are absolutely Greek to me, but they appear to be tasks related

12 to network engineering, I guess I'll say.

13      Am I in the ballpark on that?

14 A.   Well, Kubernetes is a platform, a software platform

15 developed by Google and is an open source.  That isn't

16 specifically network, but one has to have an understanding of

17 containerized -- this is an orchestration platform of virtual

18 containers.  And the networking between those containers, that

19 aspect is you have to have networking background.

20 Q.   Okay.

21 A.   And I teach that at Temple, by the way.

22 Q.   So that's a yes to the question that these eight things

23 are things that network engineers would be doing?

24 A.   Not at that time we would not have had Kubernetes.  Dan

25 didn't even -- he asked me, what is a container?  He, himself,

**UNITED STATES DISTRICT COURT**

1  did not know.  I had to explain it to him.

2  Q.   So do we at least agree that those are technical aspects

3  of network engineering?

4  A.   Yes.

5  Q.   Okay.  So let's look at the next.

6  A.   Some of them.

7  Q.   Let's look at the next piece.

8       It says, "I consider the network operations manager

9  basically a principal network engineer with folks reporting to

10 them."

11      So what he's telling you there is that he sees this

12 network operations manager position as essentially a network

13 engineer with other network engineers reporting to them.  In

14 other words, he's saying he sees the network operations manager

15 as a technical position, correct?

16 A.   I don't know what he was talking about because I had just

17 complained to him.

18 Q.   Okay.

19 A.   And I assumed I would be interviewed because I told -- I

20 was waiting to be interviewed during this entire period of

21 time.  And the man's here in his office glass, and I'm sitting

22 here.  Why is he sending this to me when we had already

23 conversations?

24 Q.   The question was, he's essentially telling you that

25 network operations manager position, as he sees it, is

**UNITED STATES DISTRICT COURT**

1  essentially a technical role, correct?

2  A.   I don't know what he was thinking of that.  I don't

3  necessarily agree with that.

4  Q.   That's fair.  Let's move on to the next piece.

5  A.   You have to ask Dan.

6  Q.   We will do that.

7       Here he says, "That being said, I think your strengths are

8  best served on the interconnection and network strategy side of

9  things.  I can see that evolving into the data center space

10  also.  This means continuing what you were currently doing at a

11  high level, as we plan to add many more DCs" -- that's data

12  centers -- "you will continue to be busy."

13      This is interconnection and network strategy functions,

14  and then he lists off, again, it looks like eight tasks that he

15  views as being relevant to a position related to

16  interconnection and network strategy, correct?

17  A.   I was doing those functions as a network engineer.

18  Q.   All right.  And he was praising you for that, right?  He's

19  saying these are your strengths in this area?

20  A.   I was doing other of those functions that you just put up

21  at the top as well.

22  Q.   Okay.  But at least as far as Dan Spataro is concerned,

23  he's telling you in his view he sees these eight areas at the

24  bottom as things that you're strong in.  That's what he's

25  telling you, right?

**UNITED STATES DISTRICT COURT**

1  A.   I don't know -- he's trying to convey something here and

2  he seemed to be conveying that.

3  Q.   Okay.

4  A.   Based on my previous discussion that I testified.  And

5  he's trying to convey something here in a written-up text

6  message.

7  Q.   Right.  And what he's trying to convey, at least according

8  to the document, is that he thinks you're strong in these eight

9  areas?

10 A.   There's many things he seems to be trying to convey here

11 but...

12 Q.   Okay.  He then says, "I never want to put people in a box.

13 We are still a small team, so you are in no way limited to

14 those functions.  But as we grow, I can see strategy,

15 interconnection, and capacity planning taking up more of your

16 time.  I came up with some examples of folks I consider your

17 peers (strategy people who are also technical.)"

18      And then he lists Martin Levy, Martin Hannigan, Adan

19 Davenport, and Christian Koch.  And presumably, you know who

20 all four of those people are, correct?

21 A.   Just one moment.  I know of Adan Davenport.  Martin Levy

22 I'm good friend with.  He's retired.  And Christian Koch, yeah.

23 Q.   So do you agree with me that what Mr. Spataro is saying to

24 you here is that he sees your strengths in strategy,

25 interconnection, and capacity planning as being areas of growth

1  and giving you comparers at other companies that he could see

2  you adopting a role similar to?

3  A.   I've been doing those things already, so that's not a

4  promotion, but okay.

5  Q.   Well, I mean, it's a promotion if you get paid more,

6  right?  You get a new title, you get a new business card?

7  A.   What title am I getting?

8  Q.   Well, it looks like he's -- well, you tell me, but it

9  looks like --

10 A.   Go up to the top.

11 Q.   -- it's a very lengthy document, he's trying to sketch out

12 the role, the promoted role he sees for you as a comparer to

13 these four people that he's listing in other companies.  Don't

14 you agree with that?

15 A.   Can you go back up to the top where he lays that title

16 out?  It's right at the top.  "Hi, Carl."

17 Q.   Right.  So in that first line he's saying to you, look, we

18 had a conversation the other day about manager of

19 interconnection and IP strategy?

20 A.   We did not.

21 Q.   Okay.  So that's -- you're saying that's not true, what

22 he's saying there?

23 A.   That is not true.

24 Q.   Okay.  Well, then let's do a quick check then at the

25 bottom of that and see where you told him that was not true.

**UNITED STATES DISTRICT COURT**

1  A.  Can we go over the title?

2  Q.  Sure.

3  A.  So because I have to -- a strategy is not network

4  strategy.  A strategy is IP address strategy that he's relating

5  to.  I know for an attorney, someone hears the word "IP," they

6  think intellectual property.

7  Q.  Clearly that's internet protocol, yes?

8  A.  No.  It's IP strategy.  The context is I have been doing

9  IP address strategy for all those years, so that's the strategy

10  that he's talking about, not network strategy.

11  Q.  Right.  He's saying to you that -- he's saying to you that

12  we had a conversation the other day where he laid out to you

13  his thoughts about three different roles, the manager of

14  interconnection and IP strategy, principal engineer, and then

15  network operations manager, right?  That's what he's

16  referencing?

17      And then he proceeds to describe at some considerable

18  length how he sees those things interrelating and why he sees

19  one as a good fit for you over the others, right?

20  A.  He's trying to convey something.  I don't know -- I

21  would -- the IP address strategy had already been completed and

22  I'm just monitoring and ensuring the maintenance of its

23  operation and its deployment.

24      This is not network strategy.  This is no strategy at all.

25  What Dan is talking about was what I had been doing with

**UNITED STATES DISTRICT COURT**

1  getting IP addresses.  That is in no way a promotion of any
2  sort.
3  Q.   Let's be clear on what Dan is talking about.  Dan is
4  talking about building Linode's interconnection strategy
5  globally.  He's talking about building ASN63949, he's talking
6  about carrier relations, he's talking about contract
7  procurement and negotiations, he's talking about peering
8  relations, he's talking about managing our peering strategy
9  globally, he's talking about capacity planning, and he's
10  talking about managing capacity on our internet, Edge, and
11  backup.
12      That's what Dan is talking about, right?
13  A.   I've been doing that since day one.
14  Q.   All right.  But that's what he's saying is a growth area
15  for the company, right?  And at least in Dan's view, he sees
16  that as a promotion for you, correct?
17  A.   I wouldn't consider it a promotion when I'm doing that.
18  Q.   I'm asking you, that's what Dan sees it as, correct?
19  Whether you agree or not, Dan is saying in this very long
20  descriptive email to you, he said in his view this is where he
21  sees your strengths are and this is where he sees a role for
22  you as a promotion to a director level, this is where he sees
23  that, right?
24  A.   Does it say director?
25  Q.   It says manager of interconnection and IP strategy, right?

**UNITED STATES DISTRICT COURT**

1  I mean, we're talking about that versus network operations

2  manager, which is what you wanted to interview for, right?

3  A.   So the context of manager is -- there were so many

4  managers and they just -- they need to -- they want to pull

5  them out of the group and just give them that title, and like a

6  year or two later they are gone because it's no growth.  That's

7  not a manager.

8  Q.   Right.  Now, so today, what you're saying is --

9  A.   I was already managing these things.

10 Q.   So you're saying that Dan is lying about the fact that you

11 had a conversation the other day before this message, and he's

12 sending this long thought-out email, these Slack messages.

13 He's painstakingly, I think, laying out what he sees as the

14 path for your career was -- just didn't happen, in your view.

15 This is fabricated?

16 A.   If -- I agree.  There's something that he wants to convey

17 here, but it's not -- he's not -- based on our conversations,

18 there's no addressing any concerns that I had in those

19 conversations.

20 Q.   All right.

21 A.   He's put this out, I'm sitting here and he's in his

22 office.  And I'm, like, in disbelief over that whole thing, and

23 I didn't want to get into those things that we talked about in

24 Slack because they're personnel issues.  So I told him that.

25 Q.   So let's see, after all of that, how you voiced your

**UNITED STATES DISTRICT COURT**

1  response to Dan about this document down at the bottom.  All

2  right?

3       So he goes through the trouble of putting this thing

4  together for you, and your answer to him is, "Hi, Dan.

5  Personnel issues should never be put in Slack like this.

6  That's my knee-jerk reaction to this protractive write up."

7       First off, you didn't tell him that the conversation that

8  he referenced in the first line never happened, right?

9  A.   Correct.

10 Q.   Okay.  Second --

11 A.   I don't discuss those personnel issues in a Slack

12 document.  I was shocked that the man's in his room.

13 Q.   Well, let me ask you:  Did you stand up and walk into his

14 room and say, hey, Dan, let's discuss this in person?

15 A.   I already had that discussion with him, and I'm waiting

16 for my interview.

17 Q.   I thought the discussion that he's talking about in the

18 slack message didn't happen.  What discussion did you have with

19 him?

20 A.   Can you repeat that?

21 Q.   Sure.  You said that this -- he mentions at the top of

22 this page in regard to our conversation the other day.  You

23 said that never happened?

24 A.   That topic of discussion never happened.

25 Q.   Right.  But now you're saying you had a conversation with

1  him already and I want --

2  A.   I didn't, no.  I've been testifying to that, my meetings

3  all along.

4  Q.   So after you tell Dan the personnel issue should never be

5  put in a Slack like this, he responds, "Okay," with some dots

6  after it.

7      So is it fair to say that Dan is writing back to you that

8  he's a little befuddled as to why you would react this way to

9  what he put together, correct?

10 A.   I'm more than befuddled that I received this.

11 Q.   Okay.  You didn't say that in your response.  You didn't

12 explain why you were befuddled.

13 A.   He knows.  I told him about personnel issues.  I don't

14 know what he's trying to convey here.  This is a job of IP

15 addresses that I've been doing since day one.

16 Q.   Again, I'm wondering why you didn't say that to him.

17 A.   That has been said many times.

18 Q.   Why don't we say it one more time?

19 A.   Where?

20 Q.   Why didn't you say that to him in response to this?

21 Simply because you don't discus personnel issues in Slack

22 messages?

23 A.   I come from a history where things get misinterpreted

24 putting -- when you're discussing those things in writing.

25      So no.  I had that meeting.  I was upset and now getting

**UNITED STATES DISTRICT COURT**

1  this, and then I expected something more.  Carl, at least.

2  Q.  So from September 7, 2018, through November, when you

3  filed the PHRC questionnaire?

4  A.  November 9th.

5  Q.  You never once, during those two months, walked into Dan's

6  office, grabbed him in the hallway, asked him out to lunch,

7  took him to dinner, sat down with him and said, hey, listen.

8  Let's talk about your message.  Let's talk about what you laid

9  out as to what you see for my future at the company, and here's

10  why I'm feeling the way I'm feeling about it, correct?  That

11  never happened during those two months?

12  A.  I had made my feelings known, and I was told that I could

13  apply for the network engineering position.

14  Q.  Right.  And they told you that you didn't have the

15  technical chops for it, right?  That's what they said?

16  A.  No.  They said that in relationship to age a number of

17  times, John.

18  Q.  All right.  Let's look at your reviews and see what they

19  were saying about your technical chops.  Okay?

20      All right.  We can move on from that document.

21      MR. CAVALIER:  Tim, can you pull up Document 49 for

22  us?  That's previously admitted, I believe.

23  BY MR. CAVALIER:

24  Q.  All right.  As we discussed yesterday, and I think you

25  identified this document, this is a compilation of your

**UNITED STATES DISTRICT COURT**

1 performance reviews at Linode from 2015 through the 2020

2 mid-year review, correct?

3 A.  No.  If you remember, I had objected to one of the reviews

4 when this was being entered into evidence, and I said directly

5 to go to the midterm review when we started talking.

6     But putting that aside, there are a number reviews here

7 that are mine.  But when we get to that one, which I'm sure

8 you're going to go over, we can discuss it.

9 Q.  Sure.  And just briefly, and you can correct me if I'm

10 wrong on this as well, one of the things you testified about

11 yesterday is that you were upset that Dan Spataro hadn't done

12 your 2020 mid-year review, right?

13 A.  A written 2020 midterm review.

14 Q.  Okay.  And you said that you tried to ping him a couple

15 times.  You tried to ping Tom about it, right?

16 A.  Dan Spataro is the one that I was talking about, yes.

17 Q.  And you were complaining that he hadn't submitted a

18 mid-year review, right, in 2020?

19 A.  Yeah.  He did not, a written one.

20 Q.  But then I noticed that on the phone call or the meeting

21 recording that we listened to yesterday, one of the things that

22 you were saying in that meeting or the termination meeting was

23 that you didn't know why you were being terminated when you had

24 just gotten a glowing 2020 mid-year review from Dan Spataro,

25 correct?

**UNITED STATES DISTRICT COURT**

1  A.   I wouldn't use the word "glowing," but that was a verbal
2  review that I had to take Dan out to dinner a week before my
3  termination to get.
4       So there's a difference between the testimony of written
5  review, which he never did, and me requesting now that we go
6  out to lunch.  And when I made that request, he then posts on a
7  Slack -- a private messaging between myself, him, and two
8  vendors suggesting that the vendors come to my performance
9  review for lunch.  And this is a week and a half before my
10 thing.
11      And I said, "No, we're going.  Sorry.  Lud's not coming,
12 and he's not going to pay for lunch."
13      That's how that lunch meeting went, and I asked him and
14 the topic was performance review.  And he said I had nothing to
15 worry about.
16 Q.   Right.
17 A.   He stated to me that I am doing my job and that he does
18 have one other person that he's worried about.  He asked me to
19 use the -- my corporate credit card to charge him and myself
20 and his wife's food for his wife to take home.
21      He also told me about Steve Shawl's exit interview, in
22 which he said that Steve Shawl stated that he was -- the reason
23 he left was he didn't think that Tim Kaufmann was interested in
24 managing a group.
25      He also stated to me that another director had been let

**UNITED STATES DISTRICT COURT**

1  go, the director of engineering department, and Dan wanted to

2  take him out now that he's gone and get him drunk and wanted to

3  know his salary.  He wanted to get him drunk so that he could

4  manipulate him to get his salary.

5  Q.   The question was:  Did you get a mid-year review in 2020?

6  A.   Not the standard written review that he gave for everybody

7  else in May of 2019.  I was the only person he did not do.

8  Q.   All right.  All right.  And he's having this dinner with

9  you or this lunch with you or this meal with you that you're

10  describing at some length, and he's talking to you about exit

11  interviews and other people's performance reviews and so on,

12  correct?

13  A.   Yes.

14  Q.   Right.  Does it seem to you that that's a conversation

15  that two upper-level executives at a company would normally

16  have?

17  A.   I missed that.  I'm sorry.

18  Q.   I was just observing that that sounds like the exact type

19  of conversation that we would expect two director level

20  employees of a company to be having about other people who

21  worked there, what their exit interview said, what their

22  performance was like.  Don't you agree?

23  A.   Yeah.  I -- if he wants to share Steve Shawl's exit review

24  with me.

25  Q.   Or with another director at the company?

**UNITED STATES DISTRICT COURT**

1  A.   No.  He was a senior network engineer.

2  Q.   No.  You're another director at the company?

3  A.   He shares with everybody, but I'm entitled at that point.

4  Q.   Right, as a director.  He knows that?

5  A.   My title was director.

6  Q.   All right.  Let's look at some reviews.  So we'll start in

7  2015.  Okay?  And it looks like the first piece of this, on

8  0160, is your self review, right?

9  A.   What -- there's no dates on here.

10  Q.   Well, if we look at the first page, we see that the 2015

11  review is Page 1 to 3 or 4.  So as we step through that, we'll

12  be able to tell which year they are, correct?

13      As a matter of fact, at the bottom of 1259, where the 2015

14  review starts, it says it's the 2015 annual performance?

15  A.   I don't know who wrote that.  That's not the form that

16  reviews were done.  This was created by somebody.  I don't know

17  who it was created by, and they seemed to have put things in

18  the Word doc.  These are not the forms, the standard forms that

19  you would see as an employee.

20  Q.   I'll tell you what, if you think that these are not

21  accurate or you think they are wrong --

22  A.   I'm saying that it's in a Word doc.  Someone's just

23  taking --

24  Q.   Has compiled the reviews?

25  A.   It's not the form that is in a personnel folder.  When

**UNITED STATES DISTRICT COURT**

1  people turn over their personnel folder, you would see

2  signatures and so forth and dates.  This is a chaotic

3  present -- view of my long work in terms of my performance

4  reviews at Linode.

5  Q.   All right.  We don't like the format, but if you have any

6  issues with the substance, let me know.

7  A.   Okay.

8  Q.   So again, this document begins with the 2015 self review,

9  correct?

10  A.   This part of the document has some content that I do

11  remember writing in my self review.  Unfortunately, as I said,

12  it would have the date.

13  Q.   Okay.  I mean, we at least know, if we, again, scroll back

14  up from the bottom of 159, that the review itself was created

15  on November 3, 2015, at 7:21, right?

16  A.   That -- the annual performance -- I don't know what that

17  means.  This is not part of the -- as the look and feel of the

18  way that I see those things.

19  Q.   All right.  Again, if you see any inaccuracies with the

20  substance in the document, let us know and we'll deal with it.

21  But for now, we'll try to overcome the formatting problems.

22      If we go down to 161 --

23  A.   We're missing data and lots of things here.

24  Q.   If you see anything missing, let us know.

25      So again, scroll down to the middle of 161.  There's a

**UNITED STATES DISTRICT COURT**

1    section for you to note what can you be doing better, right?

2    A.    I guess at that time.

3    Q.    All right.

4    A.    At the end of 2015.

5    Q.    All right.  And so you're looking to, among other things,

6    improve your ability to provide technical advice, assistance,

7    and instruction in layman's terms to upper management, right?

8    A.    Yes.

9    Q.    Okay.  And if we move down a little bit, there's a peer

10   review, and this splits over two pages.  So we can take a look

11   at it.

12        My first question is going to be:  Do you know who

13   submitted your peer review in 2015?

14   A.    I never seen peer reviews.  I never got to see content of

15   a peer review.

16   Q.    Okay.

17   A.    They are anonymous.

18   Q.    All right.  So --

19   A.    If a manager wants to show them to you, you can see them.

20   Q.    All right.  We're going to look at some manager reviews,

21   too.  But if you go down to the next page, where it says what

22   areas can this person improve, this is from the peer review in

23   2015.  It says, "Carl needs to improve his technical ability.

24   A large portion of his time is spent doing research and not

25   enough time is spent doing actual engineering.  He seems to be

**UNITED STATES DISTRICT COURT**

1  okay with this, but it's frustrating when other team members

2  shoulder the majority of the technical work.  Other ops members

3  are aware that he isn't technical.  So they never bother

4  approaching him with questions, which results in him

5  approaching other network team members and them being

6  interrupted from their work to do the necessary tasks asked of

7  them by their ops manager."

8       And then it says, "Major network outages happen on or off

9  hours that are handled by other network team members.  Carl

10  shows no sense of urgency when there are network problems

11  affecting entire data centers and instead defers to other team

12  members without even attempting to investigate the issue."

13      All right.  So one of your peers, at least anonymously in

14  2015, was noting here that, in their opinion, you needed to

15  improve your technical ability, correct?

16  A.   I haven't seen this peer review.  The only two peers that

17  I had at that time was Andrew Dampf and Alex Forrester.

18  Q.   All right.  It says here, also, "Carl needs to improve or

19  Carl can also improve his communication skills."

20      And we don't need to belabor the point, but, essentially,

21  you agree with me that somebody, one of your peers anonymously,

22  was suggesting to you in 2015 that you need to improve your

23  technical ability and your communication skills?

24  A.   I can't -- I don't -- never seen the peer reviews, but I

25  do know that Andrew Dampf and Alex Forrester were the two

**UNITED STATES DISTRICT COURT**

1  engineers to provide me peer reviews.

2  Q.  All right.  If we roll down a little bit to 2016, this is

3  a manager review.  So this is Dan Spataro reviewing you in

4  2016, right?

5  A.  I don't see where it says Dan Spataro.

6  Q.  He was your manager in 2016, right?

7  A.  Beginning of 2016, it was Tom Asaro.  So that's why I'm --

8  I'm -- if you can print that whole thing out?

9          MR. CARSON:  I have a printed copy, Your Honor, I can

10  give him.

11          MR. CAVALIER:  No objection.

12          THE COURT:  Okay.  Go ahead and approach.

13  BY MR. CAVALIER:

14  Q.  All right.  So hopefully, the paper copy will help us.

15  But I do want to ask, you went through this document with your

16  employee -- or with your lawyer yesterday, right?  That's how

17  it got admitted into evidence?

18  A.  With that caveat that I told you about.

19  Q.  Right.  But yesterday, you acknowledged that these were

20  your performance reviews?

21  A.  No, I actually...

22  Q.  I know you had an issue with one thing in it.

23  A.  I acknowledged the two thousand -- I said specifically to

24  go down to 2020 self -- self review, and that's the one we were

25  talking about.

UNITED STATES DISTRICT COURT

1  Q.   All right.  Well, we'll get there.

2  A.   We stipulated to put all of them in.

3  Q.   So the question that's pending, whenever you get through

4  that -- take your time if you need it.

5  A.   May I get --

6  Q.   The question is --

7  A.   Because the fake performance review of 2015 may not be in

8  this set of docs.  I'm just looking for that.  I know that it

9  was turned over in discovery much later.  And, in fact --

10        THE COURT:  Wait, Mr. Williams.  I want to be clear.

11  When you say "this set of documents," what you are looking at?

12  What Mr. Carson handed you is this exhibit, correct?

13        THE WITNESS:  Yes.

14        THE COURT:  Okay.  So whatever we looked at on the

15  screen is in the paper copy you have?

16        MR. CARSON:  Yes, Your Honor.

17        THE WITNESS:  Yes.

18        THE COURT:  Okay.

19        THE WITNESS:  Okay.  So I am -- I thought that that

20  one document was part of here, and it's not so continue.

21  Continue, John.

22  BY MR. CAVALIER:

23  Q.   All right.  The question was:  Your manager gave you an

24  annual review in 2016, correct?  It's 0162.

25  A.   Yes.  Yes, I do see that.

**UNITED STATES DISTRICT COURT**

1  Q.  And your manager, at that time in 2016, was Mr. Spataro?

2  A.  Yes.

3  Q.  All right.  Let's see.  Can we agree that in the first 1,

4  2, 3, 4, 5, 6, 7 lines on 0162 and the next line on 0163,

5  Mr. Spataro is praising your accomplishments in the 2016 year?

6  A.  I cannot say who wrote this, whether it was Tom or --

7  Q.  Somebody masquerading as your manager in 2016 --

8       MR. CARSON:  Objection, Your Honor.

9  BY MR. CAVALIER:

10  Q.  -- praised your accomplishments, correct?

11       THE COURT:  Objection is sustained.

12       MR. CAVALIER:  Fair.

13  BY MR. CAVALIER:

14  Q.  Your manager in 2016, whoever they may have been, was

15  complimenting your performance in 2016 in these first 8 bullets

16  of your review, correct?

17  A.  This 2016 review, in fact, I did not receive nor was it

18  part of my --

19  Q.  Okay.

20  A.  That's the one right here.

21  Q.  That's not the question.

22  A.  Yes.

23  Q.  The question is:  According to this document that

24  was admitted into evidence by your attorney, in 2016, someone

25  under the header of manager review was praising your

**UNITED STATES DISTRICT COURT**

1  performance in 2016 in these first 8 paragraphs or bullets of

2  this review.  Can we agree on that?

3  A.   This could not have been Dan Spataro.

4  Q.   That's not the question.  The question is:  Someone under

5  the heading of manager gave you a review in 2016, wherein they

6  praised you and your accomplishments of 2016 in these first 8

7  lines?

8  A.   No.  I am -- I am stating to you from 2016 annual review

9  until the end of the paragraph, "While not part of this review,

10  I would just like to note that Carl has been unfortunate to

11  need his entire PTO" --

12  Q.   Where are you reading from?

13  A.   Reference Defendant's 0163.

14  Q.   We're looking at the first 8 lines, 7 of which are on 0162

15  to 0163.

16  A.   I just --

17  Q.   And the question is:  Was your manager in 2016, whoever

18  that was, praising your accomplishments in 2016?

19  A.   This is the issue that I have.

20  Q.   I'm not asking what the issue is.  I'm asking you a very

21  simple question.

22  A.   No.  This document does not represent a 2016 review,

23  period.  These are not 2016 things.  They are 2015 things.

24  Q.   Okay.  But in 2016, when this review was delivered,

25  somebody was praising your accomplishments over the past year.

**UNITED STATES DISTRICT COURT**

1   Can we agree on that?

2   A.   I never read this review.   It was never provided to me.

3   This -- I've never seen this.

4   Q.   All right.   Let's go through it paragraph by paragraph.

5   Maybe we can break it down that way.

6        THE COURT:   Hold on.   Let's use that as a point for

7   our morning break and come back and do that.   Let's take

8   10 minutes and step out.

9        Again, not a time to talk about the case, including

10  the testimony you're hearing now.   Think about something else,

11  talk about something else, and we'll see you back here in

12  10 minutes.   Okay.

13       THE COURTROOM DEPUTY:   Please rise.

14       (Jury exits the courtroom at 10:44 a.m.)

15       THE COURT:   Okay.   Take 10 minutes and come back.

16       (Brief recess from 10:44 a.m. to 11:04 a.m.)

17       THE COURTROOM DEPUTY:   All rise.

18       THE COURT:   All right.   Let's bring the jury in.

19       THE COURTROOM DEPUTY:   All rise.

20       (Jury enters the courtroom at 11:05 a.m.)

21       THE COURT:   Have a seat, everybody.

22       Mr. Williams, come on up.

23       MR. CAVALIER:   May I, Your Honor?

24       THE COURT:   Go ahead.

25       MR. CAVALIER:   Thanks.   Let's put Exhibit 49 back up.

1  BY MR. CAVALIER:

2  Q.   Mr. Williams, again, this document was entered into

3  evidence by your attorney yesterday after you acknowledged that

4  it was a compilation of your performance reviews?

5       MR. MCCARTHY:  I think we're on the wrong.

6  BY MR. CAVALIER:

7  Q.   I'm going to ask you some very specific questions about it

8  in some very specific ways so that we can try to get through

9  this a little quicker.  Okay?  So I'm going to ask you to

10 listen to my question as best you can and answer that question.

11 Okay?

12 A.   Yes.

13 Q.   All right.  So if we move down to 163, in the second

14 paragraph, the document states, "I would like to see Carl

15 improve his technical abilities.  A significant amount of time

16 is spent on research.  While this is important, there is room

17 to scale back and contribute on the technical side.  Carl has

18 started down this path very recently by approaching and

19 configuring peers at each of these exchanges.  I would like to

20 see Carl expand his hands-on abilities."

21      Did I read that correctly?

22 A.   You read that correctly.

23 Q.   Okay.  He goes on, your manager, to say, "There have been

24 a few major network outages, both on and off hours, where Carl

25 was not seen present.  I would like Carl to stay in tune with

**UNITED STATES DISTRICT COURT**

 1   these events with a sense of urgency and learn how to pitch in

 2   during such an event."

 3       Did I read that correctly?

 4   A.   Yes, you did.

 5   Q.   Okay.  If we continue down to the 2019 year-end review on

 6   164.  All right?  Now this is another manager review, correct?

 7   A.   164.

 8   Q.   The bottom of 164?

 9   A.   Two thousand -- it suggests 2019 year-end review.

10   Q.   Right.  So this is the year-end review 2019.  And if we

11   look down below, there's a manager review.  It says, "Daniel

12   Spataro manager."

13   A.   Yes, that is correct.

14   Q.   So we agree this is a year-end review that your manager,

15   Mr. Spataro, gave to you?

16   A.   Absolutely.

17   Q.   All right.  And he says, "Carl was promoted to the

18   director of network strategy and innovation at the beginning of

19   this year and has really hit the ground running."

20   A.   Yes.

21   Q.   It says, "Carl continues to build the best internet

22   possible at Linode."

23   A.   Yes.

24   Q.   "Carl has worked to make our peering more robust while

25   lowering costs."

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   So without getting into too much detail on the rest of

3  that, he's praising your performance, correct?

4  A.   Yes.

5  Q.   All right.  A couple other things he says here, "Carl and

6  I met with Cloudflare in Panama.  We get better pricing than

7  them, even though they do not move much more volume," right?

8       I'm sorry, "They do much, much more volume," that says,

9  right?

10  A.   Yeah.  Cloudflare is bigger than Akamai.

11  Q.   Okay.  If we look down here a little further, I think it's

12  fifth from the bottom, there's a paragraph where Mr. Spataro,

13  your manager, says to you, "Carl has made me a better employee

14  by running with innovation and forcing me out of my comfort

15  zone," right?

16  A.   Yes.

17  Q.   So he's praising your work in this new role, this director

18  of innovation role, correct?

19  A.   Yes.

20  Q.   And he's also praising your networking skills just below

21  that.  "Carl has introduced Linode to industry folks that we

22  would never have known if it was not for Carl," right?

23  A.   Yes.

24  Q.   All right.  He says, "Carl is the King of diligence and

25  always take a pragmatic approach to new technology and never

**UNITED STATES DISTRICT COURT**

1  takes anything for granted."

2  A.  Yes.

3  Q.  "I'm always impressed with the level of detail and effort

4  Carl puts into his projects.  Carl is a tireless worker, always

5  thinking of new ways to advance Linode."

6      Did I read that correctly?

7  A.  Yes, you did.

8  Q.  All right.  And if we roll down to the top of 166,

9  Mr. Spataro is praising you again here, where he says, "Carl

10  continuously grows with his strategy and innovation role.  When

11  Carl has Step 1 of the plan, he already has Step 5 planned

12  out."

13      So again, he's praising you since this promotion as to

14  your performance in that new role, correct?

15  A.  Yes.

16  Q.  And even praises your technical knowledge growth, right?

17  He says here, "Carl has really grown his technical knowledge

18  around 5G edge.  He has researched and talked to key

19  contributors of that space," right?

20  A.  Yes.

21  Q.  So that's pretty positive stuff we just went through,

22  right?

23  A.  He did write that.  I remember reading it.

24  Q.  Okay.  And here, where he's asked what development advice

25  would you give this employee based on what you know about them

**UNITED STATES DISTRICT COURT**

1  and where they are in their career, he gently suggests, I would

2  say, but what he says is, "Carl needs to get better at written

3  and verbal communication.  Many times, Carl's communication has

4  no context and it's very hard to discern what he is saying.

5  I've also been in many meetings where Carl is not getting his

6  point across clearly and tends to drag on for long periods of

7  time.  Carl can do a better job staying on message and making

8  sure he gets all his points across clearly when presenting to

9  the execs."

10       So he's giving you constructive criticism there, yes?

11  A.   Yes.

12  Q.   If we roll down a little further on the bottom of 166,

13  there's another peer review.  And like we said earlier, these

14  are anonymous, right, so we don't know who submitted these?

15  A.   That is correct.

16  Q.   Somebody is saying that you're an interconnection expert

17  and that you're well connected with peering managers across the

18  globe and has negotiated many peering agreements that I

19  provision this year.  Vodafone was a big one.

20       Did I read that correctly?

21  A.   You did.

22  Q.   Since this person is saying that they provision these

23  peering agreements, does that give you any idea as to who

24  submitted this peer review?

25  A.   Could be Job Kitonga, I'm just guessing.  I know that he

**UNITED STATES DISTRICT COURT**

1  did -- I think it may be Job, but I'm not sure.

2  Q.  All right.  That's fair.  If we roll down a little further

3  on that page.

4  A.  Yes.

5  Q.  And right there in the middle, whoever this is, is saying,

6  "I think Carl does a great job.  He should keep doing what he

7  does."

8      Right?  Right there in the middle of 167.

9  A.  167, nothing.

10 Q.  Sort of towards the top.

11 A.  Four from the top?

12 Q.  Sort of toward the top, yeah.

13 A.  "I think Carl does a great job.  He should keep doing what

14 he does," yes.

15 Q.  All right.  And a little further down, just below the half

16 way line, the person is asked, "In your observations, what are

17 the things this employee does well?"

18     And the document says, "Carl is an amazing human and super

19 smart.  He's always looking for ways to make Linode better and

20 more competitive.  I'm constantly impressed with Carl's

21 connections and insight throughout the cloud and IT world."

22 And then it goes on to provide more praise, yes?

23 A.  Yes.

24 Q.  All right.  So this is a very positive review both from

25 Dan Spataro and this peer of yours, correct?

**UNITED STATES DISTRICT COURT**

1  A.   Someone at Linode provided that peer review.  I don't know

2  who.

3  Q.   Right.  But overall, between Mr. Spataro and this peer

4  review from 2019, it's very positive, correct?

5  A.   Exactly.

6  Q.   All right.  And now we have a self-review section.  It's a

7  self-review on the bottom of 167.

8  A.   Yeah.

9  Q.   And it looks like you provided you own self-review, right?

10 A.   Yes.

11 Q.   And there's a section here where you list your main

12 accomplishments.  You say, Chris Aker called me a visionary

13 after your March 29th presentation.  There's a section there

14 where it says how you've grown professionally during the review

15 period, you mention the courses you taught at Temple.

16      And now I want to ask you about this section here where it

17 says, "What challenges have you faced and what have you learned

18 from them?"

19      Do you see that?

20 A.   Yes.

21 Q.   And you say, "I am dynamic and flexible and don't have a

22 specific iron in the fire toward a specific solution and will

23 adapt to ever-changing history and technical market and

24 company's goals and objectives."

25      Did I read that correctly?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   You say, "I do both long-term strategy with focus on

3  short-term execution.  So past successes or failures in the

4  company have always influenced decisions that I am responsible

5  for, but I also try to highlight them to larger

6  decision-makers."

7       Correct?

8  A.   Correct.

9  Q.   So the company is asking you here what challenges have you

10 faced in your work, and you're giving them a couple examples,

11 right?

12 A.   Yes.

13 Q.   Just to be clear, there's nothing in this document that

14 suggests that any challenges you faced during this year had to

15 do with your age or sexual orientation in the company, correct?

16 A.   Again, I don't --

17      (Court reporter interruption.)

18 A.   No, you're correct.  You're correct, John.

19 Q.   And just to be clear, I understand that you're saying that

20 I wouldn't write "I am being discriminated against due to my

21 age" in a self-review, right?  But there's nothing in here that

22 says I have found it challenging to truly participate in my --

23 in the company because I feel like people are treating me

24 differently because of my age in relation to the other members

25 of my team or anything like that, right?

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  A.    There is no comments to that effect in here.

2  Q.    And just briefly to finish off the document, we can go

3  down to 169.  There's a self-review at the bottom of that page

4  from 2020.  It's a fairly extensive self-review, right?

5        And we can page through it for you, if you'd like.  I

6  think you still have the paper document.  But it runs from 0169

7  through the middle of 0172.

8  A.    It runs through 1 paragraph at 169, the whole page of 170,

9  up until three-fourths of the page on 171, yes.

10  Q.    All right.  And we can take a look at it, if you'd like,

11  but the question I want to ask you is, again, at least as of

12  2020 in your self-review, there's nothing in here about facing

13  challenges related to your age, your sexual orientation or

14  anything even referencing those issues, correct?

15  A.    No.

16  Q.    Okay.  No, there's not; or no, I'm correct?

17  A.    Oh, that's correct.

18  Q.    All right.  And then, again, you have a peer review here

19  at the bottom.

20        And again, just to kind of short circuit it, the review is

21  largely positive, correct?

22  A.    At the bottom where?

23  Q.    Underneath the self-review we just talked about.

24  A.    171?

25  Q.    Yeah.  It looks like there's a peer review there.  You see

1  that?

2  A.   Oh, where it says "peer reviews," yes, 172.

3  Q.   Right.  So somebody is giving you a peer review here.  And

4  again, just to speed things along, this is another positive

5  peer review that you received in 2020?

6  A.   Yes.

7  Q.   All right.  We can put that one aside.

8       MR. CAVALIER:  I want to briefly just ask you about a

9  couple exhibits that I don't think we've seen yet.  So let's

10  take a look at -- let's pull up for the witness only,

11  Number 145.

12  BY MR. CAVALIER:

13  Q.   And once the document is up, I'm going to ask you if you

14  can identify it.

15  A.   It's -- it is text messages that were on my phone between

16  Dan Spataro; Dan's friend, James G; and myself.

17  Q.   All right.  And do you know what this group text thread is

18  in reference to generally?

19  A.   October we were in Panama.

20  Q.   Okay.  So this is the Panama -- the three of you went on

21  that Panama trip we've referenced, right?

22  A.   Excuse me.  Yes.

23  Q.   If I recall your testimony yesterday, this is one of the

24  trips where you felt like you were excluded by Mr. Spataro due

25  to your age or orientation?

**UNITED STATES DISTRICT COURT**

1  A.  Yes.

2  Q.  All right.  So let's look through this text from Panama

3  briefly.

4         THE COURT:  Hold on.  Are we moving to admit?

5         MR. CAVALIER:  I'm sorry.  Yes, Your Honor, I'd like

6  to admit and publish.

7         MR. CARSON:  No objection.

8         THE COURT:  No objection.  So 145 will be received

9  into evidence.

10         MR. CAVALIER:  Thanks, Your Honor.

11         (DEFENDANT EXHIBIT 145 WAS RECEIVED IN EVIDENCE.)

12  BY MR. CAVALIER:

13  Q.  This is not a very long thread, so we're going to go

14  through it fairly quickly, but ultimately it looks like Dan is

15  the first one who sets up a Jimmy, Carl, Dan text list so you

16  can all talk during the trip, right?

17  A.  Yes.  We were scheduled to go to the Panama Canal.

18  Q.  So if we scroll briefly through 640 into 641, it looks

19  like you were having some conversation and some photos about

20  the hotel that you were staying at, Dan had some trouble

21  getting into his room, right?

22  A.  That's what it states.

23  Q.  Okay.  And then it looks like James G here is asking about

24  what the plan is and saying that he's leaving in five minutes,

25  he'll meet you guys wherever.  And you're all essentially

**UNITED STATES DISTRICT COURT**

1  planning out where to meet up, right?

2  A.   Yeah.  I had arranged to go to the Panama Canal.

3  Q.   Okay.  And then on October 6, 2019, James again says,

4  "Just getting up.  What are you guys up to?"  He sends a

5  picture.

6        Dan says, "Anyone getting lunch?"

7        James G says, "Come here for brunch.  It looks

8  ridiculous."

9        Dan says, "Okay."  Talk about the floor.

10       And then you throw in comments about Eagles versus Jets,

11  right?

12  A.   Dan is a Jets fan.

13  Q.   Okay.  And then if we roll down, there's some more

14  conversation -- you're in blue, by the way, in this thread,

15  right?

16  A.   Yes.

17  Q.   So you're talking about where they can watch the games.

18       Little further down, Dan says, "Any breakfast food?"

19       James G says, "Great spread here."

20       You send a menu, right?

21       And then at the top of 644, you send what appears to me to

22  be a link to, I guess, a way that you guys can visit the Panama

23  Canal, right?

24  A.   I don't know if it's a link, but it's about visiting the

25  Panama Canal.

**UNITED STATES DISTRICT COURT**

1  Q.   Right.  You're suggesting to the group, hey, let's go

2  visit the Panama Canal?

3  A.   No.  I had already arranged that.  I'm getting people

4  excited.

5  Q.   All right.  And Dan says, "Let's do it."  Right?

6  A.   Yes.

7  Q.   And then you talk about some of the details.  Dan says,

8  "I'll be out front at like 2:00."

9  A.   Yes.

10 Q.   And then you have some more discussion, right?

11 A.   Right.

12 Q.   And then on October 6th, if we go down to 645, there are

13 some photos -- it looks like you took the first two photos.

14      Is that Dan and James G there?

15 A.   That is Dan and James G, exactly.

16 Q.   Okay.  And if we roll through we can see some more

17 pictures of the Panama Canal, picture of Dan, some more canal

18 pictures, right?  Rolling all the way through, there's a lot of

19 pictures.  We don't have to spend any time on them, but

20 essentially you're sending the group a bunch of pictures,

21 right?

22 A.   Yes.  Every time I took a photo, I sent it to them.

23 Q.   Okay.  And if we look down here, we start with the text

24 again on October 6, 2019, 7:49 p.m.  It looks like you guys are

25 trying to arrange a dinner, right?

**UNITED STATES DISTRICT COURT**

1  A.  Yes.

2  Q.  Okay.  And it looks there -- a little later on in the

3  night, it looks like Dan shares that he took a $60 hit in

4  Blackjack in eight hands?

5  A.  I didn't go with him.

6  Q.  Right.  But he's sharing with the group that he must have

7  lost 60 bucks at Blackjack?

8  A.  Yes.

9  Q.  Okay.  And then on October 30th, you send him a message

10  about working class Hong Kong neighborhood protests, right?

11  A.  Yes.

12  Q.  And there's some more discussion later in the month and

13  then in November of same thread, but nothing really of note,

14  right?

15  A.  I don't see any of note.

16  Q.  Okay.  And again, given that this is the thread that had

17  the three of you talking in Panama, there's nothing that we see

18  in here where you were being excluded from activities or told

19  not to come somewhere or anything of that nature, correct?

20  A.  In this thread?

21  Q.  In this thread?

22  A.  No.

23  Q.  Okay.  We can put that one away.

24      By the way, just briefly before we go to the final piece

25  of our discussion.  Do you remember mentioning Owen Conway

**UNITED STATES DISTRICT COURT**

1  yesterday?

2  A.  Yes.

3  Q.  All right.  I think you said that at one point in time you

4  took issue with the fact that Owen Conway was promoted?

5  A.  I took issue that an individual was promoted and I was not

6  told about it nor considered for the position.

7  Q.  Okay.  And I think you were upset about that because Owen

8  Conway is a younger guy than you, right?

9  A.  I was upset about it because I was not considered.  It so

10 happened to be that he was younger than me, yes.  I mean, that

11 was a pattern.

12 Q.  Okay.  Do you know how old Owen Conway is?

13 A.  At the time, in Galloway, I believe he stated his age as

14 40, 41.

15 Q.  Right.  And at that time you were in your mid 50s,

16 correct?

17 A.  Yes.

18 Q.  And today Owen Conway would be about 50, right?

19 A.  Today?

20 Q.  Yeah.  You're 59 today, today Owen Conway is about 50,

21 right?

22 A.  Today -- if you add the time and you're right, then that

23 would be what it is.

24 Q.  I guess my question is, 50 is not that much younger than

25 59, is it?

**UNITED STATES DISTRICT COURT**

1          MR. CARSON:  Objection Your Honor.

2          THE COURT:  Sustained.

3   BY MR. CAVALIER:

4   Q.   He's also gay, correct?

5   A.   He is.

6   Q.   By the way, prior to 2014 when Mr. Musbach, who we're

7   going to talk about in a moment, worked at Linode, he was

8   promoted too, right?

9   A.   He was.

10  Q.   And he was a gay man?

11  A.   He was.  Not openly gay, but he was.

12  Q.   All right.  So let's talk about your termination from the

13  company, okay?  So we're moving ahead now to the summer of

14  2020, right?

15       So to lay the framework, you're coming off a series of

16  positive reviews in the company, right?

17  A.   I didn't get my midterm review written a week before my

18  termination.

19  Q.   Right.  But as we heard in that phone call --

20  A.   It was a verbal --

21  Q.   Right.  Dan gave you a review that I think you described

22  as being very positive, correct?

23  A.   Those statements I made, yes, very brief.

24  Q.   All right.

25  A.   You're doing great, and that was it.

**UNITED STATES DISTRICT COURT**

1  Q.   Okay.  So then on -- well, let's lay the groundwork here

2  since we've kind of been edging around it the entire trial, but

3  let's just get into it.

4      Who is John Musbach?

5  A.   John Musbach was an employee at Linode when I arrived

6  there on November 17, 2014.

7  Q.   And how did you meet him?

8  A.   How did I meet him?  John Musbach sent a company-wide

9  email out saying that his roommate left and the lease was in

10  that roommate's name.  He worked also at Linode, Ruben Parson,

11  and that he needed another room.  My landlord asked me to find

12  someone just like me at Linode.  And I mentioned to John, who I

13  did not know, just through the IRC channel that we used to use

14  as a collaboration tool, that the owner of the house leases out

15  rooms.  And that was about a day or two later and John responds

16  he's going to -- he's already found a room with his manager at

17  Linode, senior customer support manager, so he went to move in

18  with that person.

19  Q.   All right.  And at this point in time, were you both

20  working at Linode?

21  A.   Yes.

22  Q.   All right.  And so you took a room in that same house --

23  just to be clear for the jury, this is a big five bedroom house

24  where each tenant had their own room at the time, yes?

25  A.   At this time John nor that senior customer support are in

**UNITED STATES DISTRICT COURT**

1  my house.  Are you suggesting that?

2      (Court reporter interruption.)

3  A.  Not my house, but the house -- a room that I was renting

4  in the house that I was living in.

5      I was offering John, through my landlord who also lived

6  there, because he was looking for one.  But he declined after

7  -- you know, he declined to take the room because he, John,

8  already talked to his manager and they are going to room

9  together at his manager's apartment with his manager's

10 girlfriend.

11 Q.  Okay.

12 A.  That's what he said to me.

13 Q.  Did there ever come a time where John did move into one of

14 the rooms in the house that you were just referencing?

15 A.  He did -- he did.  Because then that situation needed

16 another one.

17 Q.  Okay.  Just to put a time stamp on this, where are we?

18 Are we in 2014, 2015, 2016?

19 A.  When John moved into the house I was living in?

20 Q.  Right.

21 A.  My mother died in September 2015.  Probably November --

22 end of November of 2015 he moved into that house.

23 Q.  Okay.  And at that point in time, he was still working at

24 Linode, right?

25 A.  Yes.

**UNITED STATES DISTRICT COURT**

1  Q.   And you two were simply co-workers, correct?

2  A.   He worked at Linode as an employee; I worked at Linode at

3  a different department and a different room as an employee.

4  Q.   You didn't have any relationship at that point in time,

5  correct?

6  A.   No.

7  Q.   And then in 2016, Mr. Musbach got into some trouble,

8  correct?

9  A.   I know nothing about any trouble that Mr. Musbach got

10 into.

11 Q.   Well, I understand that you weren't involved in any of it,

12 but you certainly know that he got into some trouble in 2016,

13 right?

14          MR. CARSON:  Objection.

15          THE COURT:  Overruled.

16          MR. CARSON:  Is he asking what he knew then or --

17          THE COURT:  Objection is overruled.

18 BY MR. CAVALIER:

19 Q.   Right?  I mean --

20 A.   At some point John got into, I guess you'd say, trouble.

21 Whatever it was -- I mean, I don't know those details at that

22 point.

23 Q.   Well, at some point law enforcement showed up at the

24 house, right?

25 A.   I was not present and cannot speak to that.

**UNITED STATES DISTRICT COURT**

1  Q.   Well, sitting here today, you know that there was a point
2  that law enforcement showed up at that house, correct?
3  A.   From my landlord.
4  Q.   Right.  And then later in the day, you came home, correct?
5  A.   Yes.
6  Q.   And the authorities had searched all the rooms in the
7  house, correct?
8  A.   I do not know.
9  Q.   Well, at that point did you ask your landlord or anyone
10 else what's going on in here?
11 A.   No.  My landlord and I had talked.  When -- he happened to
12 be an attorney, also worked in the New Jersey District
13 Attorney's northern office, and he told me about the situation.
14 And I had responded, could you -- I requested -- because there
15 were many people living in the house in different rooms, as
16 well as my landlord and his wife.  I requested that the Comcast
17 service do complete parental controls and no kind of rated R or
18 pornography, all the strictest parental controls be made in the
19 house.  That's what I remember.
20 Q.   All right.  But prior to all of that -- let me just ask
21 the question.  When did you learn that John Musbach had been
22 charged with sexual abuse of a child?
23 A.   I don't know what he was charged with.  I know that there
24 was a charge.
25 Q.   Okay.  Do you know when you learned that?

**UNITED STATES DISTRICT COURT**

1  A.   I don't recall.

2  Q.   And the details of that charge was that he was sending

3  photographs of his genitalia and receiving photographs of the

4  genitalia of a boy at the time who was 13, correct?

5  A.   I learned that later.

6  Q.   Okay.  Do you remember when you learned it?

7  A.   I don't -- I don't remember when I learned that.

8  Q.   Well, let's try to put a time stamp on it.  Was it the

9  same year that the events happened?

10  A.   Those words were not something -- I was told that there

11  was text messaging going back and forth, from my landlord, and

12  there was inappropriate content.  And that -- so that's all I

13  know.

14  Q.   Well --

15  A.   I never asked John anything and I have no knowledge.

16  Q.   Let's be clear.  You know, sitting here today, that he was

17  exchanging pornographic images with a 13-year-old boy, correct?

18  A.   He was exchanging -- him and the 14-year-old exchanged

19  text messages with pictures of themselves, yeah.

20  Q.   Right.  Sexual pictures?

21  A.   Of their genitalia from what I understand.  From my

22  landlord I got that.

23  Q.   Did the police take Mr. Musbach's laptop at that point

24  when he was arrested?

25  A.   I have no idea.

**UNITED STATES DISTRICT COURT**

1   Q.   Do you know sitting here today whether the police took

2   Mr. Musbach's laptop when he was arrested?

3   A.   I heard that in the deposition.

4   Q.   Well, Linode fired Mr. Musbach around this time, right?

5   A.   Yes.

6   Q.   Do you know why they fired him?

7   A.   They fired him because he did not report his laptop

8   missing in a reasonable period of time.

9   Q.   All right.  So again, Mr. Musbach is charged with these

10  crimes, he's fired from Linode.

11       Is he still living in the room in the house that was your

12  residence at the time?

13  A.   Yes.

14  Q.   And now, eventually you two formed a relationship,

15  correct?

16  A.   Yes.

17  Q.   How did that come about?

18  A.   July of 2016.

19  Q.   And again, just so the jury knows the time frame here,

20  when was the arrest?

21  A.   That, I don't remember.

22  Q.   It was a littler earlier in 2016, correct, same year?

23  A.   Much earlier than -- July, yes.

24  Q.   So July of 2016.  I'm sorry.  I didn't mean to interrupt.

25  A.   There was a special priest from Villanova who was giving

**UNITED STATES DISTRICT COURT**

1  lunch retreats, topics at Our Lady of Perpetual Help in

2  Galloway at lunchtime, and I was going to those.  And John, who

3  I was not talking with, asked me if he could come along, and

4  that's how that happened.  He came along and slowly he -- did I

5  answer your question?

6  Q.   I think you were in the process of answering it.

7  A.   Okay.  Slowly -- John was isolated, and isolated in the

8  sense that he didn't have any friends.  And he wanted to -- I'm

9  an approachable person and he wanted to be present where I was.

10 That's what I recall.

11 Q.   All right.  And soon thereafter, the two of you struck up

12 a romantic relationship, correct?

13 A.   At some point.

14 Q.   Some point in 2016?

15 A.   Yes.

16 Q.   And at some point during this time frame, Mr. Musbach pled

17 guilty to those original charges, correct?

18 A.   He -- I mean, I was not -- I was working at Linode so I --

19 this part of his life of dealing with the charges, since my

20 landlord was an attorney, was helping him.  I allowed -- I

21 wasn't involved in any of that, so I don't know -- never seen

22 any legal documents or know anything about that because any

23 information I got was from his attorney who was dealing with

24 that.

25 Q.   Did you ever talk to him about the charges?

**UNITED STATES DISTRICT COURT**

1  A.   No.

2  Q.   Did you --

3  A.   His attorney told me what had -- I remember his attorney

4  saying that they liked John, the authorities.  I mean, when I

5  say "liked John," is that -- apparently as soon as he was

6  arrested, he sat down at the table and admitted to everything.

7  They just booked him, according to my attorney, and even took

8  him home.

9       And my landlord told me that they even -- he forgot his

10  phone and they brought -- they left and got his phone and

11  brought him back to his house.  I wasn't there at the time.

12  That's all what the landlord of my house said.

13  Q.   Well, as you guys were establishing this new relationship,

14  did you find it difficult that he was going through what I have

15  to imagine was a stressful period in his life?

16  A.   He never -- it is my view that is why he needed somebody.

17  He had no one.

18  Q.   Okay.  And so you were there for him, correct?

19  A.   It was a struggle.  I remember not wanting to be -- I have

20  not been in a relationship for -- since 2001.  My mother is the

21  person I focused on.  So I had struggled with not wanting to --

22  because John wanted -- John needed somebody and John needed me,

23  so that's how it happened.

24  Q.   I understand.  And so eventually his charges are resolved

25  and he got probation for those, right, or some kind of

**UNITED STATES DISTRICT COURT**

1   supervised release?

2       He never went to prison for that, right?

3   A.   Exactly.

4   Q.   And so over the course of the next four years, with those

5   charges seemingly behind him, the two of you do what two people

6   will do and your relationship grows, correct?

7   A.   We're companions.

8   Q.   Partners?

9   A.   Partners.  I always like to say companions.  I mean, I

10  can't say where or when, but it probably happened in

11  Haddonfield because I had to move to Haddonfield for work.  And

12  I was going and John didn't have anybody, and so he came with

13  me.

14      I mean, there wasn't always this constant -- a constant.

15  I had my work to do and John had his job.  We lived in the same

16  house, two different rooms, in Galloway.  So it was probably in

17  Haddonfield that we were more together.

18  Q.   Okay.  And so while all the events at Linode that we were

19  talking about throughout the course of this trial so far were

20  going on in 2016, 2017, 2018, 2019, and 2020, the two of you

21  were living a normal life in a relationship, correct?

22  A.   In Haddonfield, it was he had a probation officer and

23  would come over once a week, and I just did my job at Linode.

24  Q.   Okay.

25  A.   And...

**UNITED STATES DISTRICT COURT**

1  Q.  All right.  So let's jump ahead to the summer of 2020.

2  Tell us when you first found out that John was in trouble

3  again?

4  A.  Summer of 2020.

5  Q.  Okay.  And how did you find that out?

6  A.  You mean in August of 2020?

7  Q.  Or whenever you found out.  How did you find out in 2020

8  that John was going to be facing more trouble?

9  A.  I don't know.  I mean, what happened -- first time I knew

10 of any issue is his parole officer and others had came to the

11 house.  And I was asleep and awoken, and they were going to

12 take John away.  And I said why, and they wouldn't tell me.

13 But it was his parole officer.  So...

14 Q.  Okay.  So he was arrested at that point in time, correct?

15 A.  I assume it was an arrest, but, I mean, I didn't get to

16 see that part because it already happened, and I was awakened.

17 Q.  You were awakened by the commotion?

18 A.  No.  I think his parole officer knows me.  He woke me

19 because it was early morning.

20 Q.  Did his parole officer tell you anything about the nature

21 of this new trouble that he was in?

22 A.  No.  I asked.

23 Q.  What did he say?

24 A.  Her.

25 Q.  What did she say?

1  A.   No.  They couldn't tell me.

2  Q.   Okay.  Did there come a point where you did learn the

3  nature of these new charges?

4  A.   In -- I learned in the -- later that day, when I was asked

5  to call into -- several times I was called because I declined

6  the first time -- to come -- to Zoom into a meeting and I could

7  learn what happened at the meeting, the Zoom court hearing.

8       So the court had called me and that's -- I was asked to

9  call.  Why?  I don't have that background and knowledge.

10 Q.   All right.  And that court hearing was the pretrial

11 detention hearing for Mr. Musbach?

12 A.   Yes.

13 Q.   All right.  And at that -- with your presence at that

14 court hearing, you then learned the nature of the new charges

15 against Mr. Musbach?

16 A.   Yes.

17 Q.   And what were the charges this time?

18 A.   It was murder for hire.

19 Q.   Okay.  And to be clear --

20 A.   Was the topic.  I don't know what the exact charge is.

21 Q.   All right.  The allegations were that when he was

22 originally charged with having inappropriate sexual

23 communications with the child back in 2016 and was facing

24 criminal prosecution, he used the dark web to attempt to

25 procure a hit man, correct?

**UNITED STATES DISTRICT COURT**

1  A.   No.  That's not what I learned.

2  Q.   What did you learn?

3  A.   I just learned that it was murder for hire, and it was

4  about a transaction on the dark web to a -- to this 14-year-old

5  person that he did have inappropriate relations with -- I mean

6  communications with.

7       This is, of course, before -- this was, of course, before

8  we were together, and it's now four years later that this

9  happened.

10  Q.   Right.  And to be very clear and very fair to you, this

11  conduct that was underlying these charges happened before you

12  formed a relationship with Mr. Musbach, right?

13  A.   Before he moved into the house --

14  Q.   Right.

15  A.   -- and before he formed a relation.

16  Q.   Okay.  You were at the court hearing that day in an effort

17  to persuade the court that you could be a third-party custodian

18  for Mr. Musbach, correct?

19  A.   No.  I was there to learn and I was asked questions.

20  Q.   Okay.

21  A.   I was willing to -- I was there to ask -- to ask -- answer

22  questions about myself so that they could release John on bail.

23  Q.   To you?

24  A.   To me and his parents.

25  Q.   Well, you would serve as the primary custodian of John if

1  he was released, right?

2  A.   It was going to be -- John's parents were going to be

3  moving to New Jersey, and our apartment complex was the

4  proposal and that we would take turns being present for John

5  because we thought he needed psychological help.

6  Q.   Okay.  And so ultimately, in addition to asking questions

7  that day, your goal, in effect, was to convince the court to

8  allow John to stay at home under your supervision until such

9  time as his charges played out rather than incarcerate him,

10  right?

11  A.   I was there to answer questions.  If they -- so I was --

12  actually, my goal was to learn what was going on.

13  Q.   Okay.

14  A.   It was -- if -- I thought it was a very serious charge,

15  which I stated to the judge.  I thought that if it's true, it's

16  outrageous.

17  Q.   Okay.  And the judge asked you a series of questions about

18  whether you would be a proper and capable custodian for John

19  during that window between if he were released and --

20          MR. CARSON:  Your Honor, objection.

21          THE COURT:  The objection is overruled.

22          THE WITNESS:  Yes.

23  BY MR. CAVALIER:

24  Q.   Okay.  And you had a conversation with the judge that day

25  about what you would have to do if the court agreed to release

**UNITED STATES DISTRICT COURT**

1  him to your custody, correct?

2  A.   I mean, I don't remember those details.

3  Q.   All right.  But, essentially, what you were telling the

4  court was that, in your view, you had the capability and the

5  ability to make sure he wasn't getting into anymore trouble if

6  he was released until his charges could be resolved, correct?

7  A.   What I told the court was is that the allegations at that

8  time happened way before me, and for four years he lived as a

9  most outstanding citizen.  I'm just, like, in shock if it's

10 true.  And if he was able to do that for four years, then I

11 could be present for him while he was -- whatever court hearing

12 he needed.

13      The context of that is that nothing -- you have to

14 remember the time period -- nothing was known about anything.

15 Q.   Okay.  Ultimately, though, the court disagreed and

16 remanded him to be incarcerated until his charges were

17 resolved, correct?

18 A.   I wasn't at that meeting.

19 Q.   I didn't ask you if you were at that meeting.  I asked you

20 if, ultimately, he was incarcerated until the charges were

21 resolved?

22 A.   That's my understanding.

23 Q.   Okay.  And you would know that because he wasn't around

24 and you were in a relationship, right?

25 A.   Yeah.

**UNITED STATES DISTRICT COURT**

1  Q.   Ultimately, your participation in this hearing was picked
2  up by a newspaper, correct?
3  A.   I was not aware of that.
4  Q.   I understand you were not aware of it at the time, but
5  you're aware of it now, right?
6  A.   Through this court case.  There was one document that was
7  showed to me during this court case.
8  Q.   So your testimony is that at the time of your termination
9  from Linode, you did not know that your relationship with
10 Mr. Musbach had been published in the Philadelphia Inquirer,
11 correct?
12 A.   No.  I was told by his parents that they put something out
13 on the internet, but I never -- I never went to look and Google
14 anything about John.  It's -- it's negative information that I
15 can't consume.  So...
16 Q.   This was your part --
17 A.   To this day -- to this day, I've never Googled John's
18 name.  Even if I would go into an attorney's office and they
19 want to Google it, I go like this.  I don't know what's true in
20 there and what's not.
21      I did Google my own name, and my name is not associated
22 with John and never has.  If I Google my name and Linode,
23 nothing comes up to John Musbach's case.  And --
24 Q.   Let me just correct you there.  We know that in at least
25 one place, your name is associated with John Musbach, right?

**UNITED STATES DISTRICT COURT**

1  A.   From the document that you produced.

2  Q.   Right.  Which was published in the Inquirer in 2020,

3  correct?

4       MR. CARSON:  Objection.

5       THE COURT:  Sustained.

6  BY MR. CAVALIER:

7  Q.   All right, let me ask you a different question.  Why

8  wouldn't you ever seek out information about Mr. Musbach, who

9  was your partner?

10  A.   Well, as I said, I can't deal with negative information.

11  I don't even know if it's true or not.  It's just going to

12  upset me.  His parents were upset.  So I said I'm not going to

13  look and I never have.

14  Q.   Right.

15  A.   Now during this case, I looked and Googled Carl Williams.

16  There's many Carl Williams.  And in no way, when you Google my

17  name, does that case come up or my relationship with John

18  Musbach.

19       And when I Google Carl Williams and Linode, it takes me

20  back to -- at this day, all the Linode social networking that

21  have my pictures and all of my presentations are on the Linode

22  site, still today, and that's all that comes up.

23  Q.   Are you happy that in your Google searches you were not

24  able to find anything associating your name with John Musbach?

25  A.   I did it only in response to that lawsuit.

**UNITED STATES DISTRICT COURT**

1  Q.   I'm asking you a different question.  Were you happy that

2  you were unable to find any association between your name and

3  Mr. Musbach's during your Google searches?

4  A.   I really -- if it came -- if something would come up, it

5  would be, I would assume --

6  Q.   It would be bad, right?

7  A.   I would assume it would be that one article.

8  Q.   Right.  But if information came up linking you to

9  Mr. Musbach, that would be negative in your opinion, right?

10 A.   No.  Because I feel that I am doing the right thing by

11 remaining present to an individual who has and never did have

12 anybody.  And that is the reason today that I remain present.

13 Q.   I understand.  The question wasn't about you remaining

14 present.  The question was whether you were pleased that when

15 you conducted these Google searches you couldn't find any

16 association between you and John Musbach from the internet?

17         MR. CARSON:  Objection.  Asked and answered.

18         THE COURT:  The objection is overruled.

19         THE WITNESS:  I didn't care.  The reason I did it was

20 because of some kind of statement that somehow Linode is

21 connected to John Musbach.

22 BY MR. CAVALIER:

23 Q.   All right.  Let me ask this question, then.  You testified

24 just a few minutes ago that you didn't want to look for any

25 information out there about Mr. Musbach or his charges because

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  I think you said, you have an emotional reaction to bad news?

2  A.   Bad and fake news and all kinds of -- you know how things

3  go.

4  Q.   Sure.

5  A.   I mean, it's like Vincent Palochko, when they started

6  publishing things about discrimination.

7              MR. CAVALIER:  Object.

8              THE COURT:  I'll order that part of the answer

9  stricken.

10             MR. CAVALIER:  Thank you.

11  BY MR. CAVALIER:

12  Q.   So again, you didn't want to look for anything about

13  Mr. Musbach.  But now, all of a sudden, you're looking and

14  you're checking the internet to see whether you're connected

15  with him?

16  A.   From this lawsuit.

17  Q.   Okay.  Fair enough.  All right.  So ultimately, a few days

18  after you participate in this hearing and, unbeknownst to

19  you -- well, I'll leave that out since it's not in evidence

20  quite yet.  You get called into a meeting at Linode, right?

21  A.   We heard it.

22  Q.   You heard it?

23  A.   Oh, I get called into a meeting at Linode?

24  Q.   Yeah.  You were called into a meeting at Linode shortly

25  after that hearing?

**UNITED STATES DISTRICT COURT**

1  A.   No.

2  Q.   Okay.  Shortly after that hearing, did you have a meeting

3  with people at Linode?

4  A.   I had a scheduled meeting -- a scheduled one-on-one

5  meeting already with Dan, and that's what I dialed into.

6  Q.   And that was ultimately, though, the meeting with Dan, as

7  you call him, Mr. Spataro, and Mr. Palochko, correct?

8  A.   Vincent and Mr. Spataro were present on the Zoom meeting.

9  Q.   And ultimately, the contents of that meeting were

10 memorialized by you in a recording that you made that was

11 played here in court yesterday, correct?

12 A.   Missing the first little piece, but yes.

13 Q.   All right.  And as we learned, certainly, through that

14 call, you were ultimately terminated at that meeting, correct?

15 A.   I was asked to resign.  When I didn't resign, I was

16 terminated.

17 Q.   All right.  And you agree with me, correct, that during

18 that meeting, you believed that you were being terminated due

19 to your affiliation with John Musbach, correct?

20 A.   No.

21 Q.   That's not correct?

22 A.   I -- I thought it was bullshit.  But if they were going to

23 say that I was terminated because of John Musbach, that would

24 be some serious stuff based on the fact that it was very clear

25 that I was going to be terminated regardless.

**UNITED STATES DISTRICT COURT**

1  Q.   Despite the fact that you had just received glowingly

2  positive reviews from Mr. Spataro that we talked about earlier?

3  A.   I had to pull -- he never gave me my 2020 review.  I had

4  to pull him into a meeting.  And in the Philippines, he said I

5  wasn't going to be back.  I seen previous testimony.

6  Q.   Well, let me ask the question a different way.  We heard

7  you in the phone call say repeatedly -- as a matter of fact,

8  your lawyer stipulated to the idea that you said it a lot.  We

9  heard you say repeatedly during that call, "Tell me, am I being

10 terminated because of what happened with John Musbach last

11 week."  We can agree on that, right?

12 A.   Yes.

13 Q.   So is it --

14 A.   I wanted to -- because --

15 Q.   You thought there might be a possibility that Linode found

16 out about what happened with John's new charges and was firing

17 you because of that.  Correct?

18 A.   No.

19 Q.   No, that's not true?

20 A.   No, it's not.

21 Q.   Okay.  But ultimately, you were terminated, correct?

22 A.   Yes.

23 Q.   All right.  And that was about six days after we

24 ultimately found out that this article was published, correct?

25 And I know you didn't know it at the time, but as you know now,

**UNITED STATES DISTRICT COURT**

1  your termination was about six days after this Inquirer article

2  we've mentioned was published, correct?

3  A.  I don't know the date of this article.  I'm aware there

4  was press because his mother told me.

5  Q.  And you were terminated shortly after that press dropped,

6  correct?

7  A.  Yes.

8  Q.  All right.  So this is a simple question for you, and I'm

9  trying to understand your beliefs here.  Are you testifying

10  here today that, in your view, Mr. Spataro was just looking for

11  an excuse to get rid of you over all of these years that you

12  worked together?  And then this article came out and provided

13  with the perfect excuse to cover up his real motives to fire

14  you because you were gay or old?

15  A.  They were going to terminate me anyways.  They have a

16  termination-at-will policy, and they're out there trying to

17  seek some justification.

18  Q.  So this article just happened to come along at the perfect

19  time to give Dan Spataro the reason he needed to get rid of

20  you?

21  A.  I don't know anything with regards to Dan Spataro and that

22  article.  What I know is what Dan Spataro stated to me, the way

23  he behaved for that entire period of time.

24  Q.  I'm asking you very simply.  Is it your belief, sitting

25  here today, that Dan Spataro was gunning for you because you

**UNITED STATES DISTRICT COURT**

1  were old and gay and this article provided him with the excuse
2  that he needed?  Is that your testimony here?
3  A.   Gunning for me, I don't know.
4  Q.   Gunning to get rid of you, to fire you, to find some
5  reason to paper up the file?
6  A.   I don't know what they were doing.
7  Q.   Okay.
8  A.   You know, it was just all false.
9  Q.   Right.  And they told you during the meeting you were
10  being fired for policy violations, correct?
11  A.   They said there was an investigation.
12  Q.   Right.  And that they found policy violations and you were
13  being terminated for conduct in opposition to Linode policy,
14  correct?  That's what they told you?
15  A.   And they told me to report it to the unemployment office.
16  Q.   Right.  They wanted to make sure that you could collect
17  unemployment, right?
18  A.   I would not be able to collect unemployment if I was
19  terminated for policy violations, as Vincent stated in the
20  call.  So I mean, I went to a federal agency --
21  Q.   Well, hold up.  We're getting there.
22  A.   -- told them what Linode stated as a reason.
23  Q.   We'll get to that.  But for now, we all agree here that
24  you were not actually terminated for policy violations,
25  correct?

**UNITED STATES DISTRICT COURT**

1  A.   I was terminated --

2  Q.   Yes or no?

3  A.   -- because I was discriminated against.

4  Q.   I know that that's your contention here.  But my question

5  is simple.  We can all agree that you were not terminated for

6  policy violations, correct?

7  A.   I was not terminated for any of the many different ever

8  changing, even during this lawsuit, including way different

9  information you guys submitted to EEOC --

10        MR. CAVALIER:  I'm going to ask that be stricken.

11        THE COURT:  The reference to EEOC will be stricken.

12  The jury will disregard it.

13        Mr. Williams, you have to answer the questions you're

14  being asked.

15        THE WITNESS:  Okay.  Okay.  Can you ask me the

16  question again?

17  BY MR. CAVALIER:

18  Q.   I'll tell you what.  We're satisfied.  I will move on to

19  the next piece.

20    Just briefly, though, whatever reason you were given, you

21  agree that you reacted -- I know you don't agree -- you reacted

22  with anger during that meeting we heard recorded.  But

23  certainly, you can understand that someone perceived you to

24  have reacted angrily to your termination news in that meeting,

25  correct?

**UNITED STATES DISTRICT COURT**

1  A.   I was upset and I panicked.

2  Q.   That's fair.

3  A.   And because I was being terminated after six years.  My

4  heart was beating fast.

5  Q.   You were upset?

6  A.   My fingers were -- my father had Parkinson's.  It started

7  looking like this.

8  Q.   You were upset?

9  A.   And my heart is beating fast and I was in a panic.  That

10  was the beginning of further panic attacks thereafter.

11  Q.   I understand.

12  A.   I panicked because I am losing everything that I am

13  invested in.

14  Q.   The question was:  Were you upset during the meeting?

15  A.   I was upset and panicked.

16  Q.   Okay.  And ultimately, as we heard in the recording,

17  Mr. Palochko eventually finished the meeting, which ended your

18  termination, correct?

19  A.   They just hung up on me.

20  Q.   Okay.  After 27 minutes?

21  A.   However long the tape recording is.

22  Q.   Okay.  All right.  So now, for our last -- the last piece

23  of this before I let you go, I want to talk to you about the

24  damages that you're claiming in this case.

25       It's your understanding, is it not, that you are seeking

**UNITED STATES DISTRICT COURT**

1  damages relating to your alleged emotional distress resulting

2  from things that happened to you at Linode and, ultimately,

3  your termination, correct?

4  A.  Yes.

5  Q.  Right.  So you're seeking money damages to compensate you

6  for those emotional harms that you've alleged?

7  A.  Yes.

8  Q.  Right.  So do you understand that one of the things you're

9  asking the jury to do as a result of that is to parse through

10  all of the potential causes of emotional distress in your life

11  and to identify causes related to discrimination at Linode?

12  A.  Yes.

13  Q.  Okay.  And you would agree that any emotional distress

14  that you suffered during this period of time that was not

15  caused by unlawful discrimination at Linode, it's not Linode's

16  responsibility to compensate you for that, correct?

17  A.  That is correct.

18  Q.  All right.  And so you know that because your emotional

19  state and condition has been put at issue in this case by you,

20  we have the right to explore those other sources, the right and

21  the obligation, frankly, to explore those other sources so that

22  the jury has the information needed to make that determination

23  that we just talked about, right?

24  A.  I did not have emotional distress.

25  Q.  You're saying that you didn't have any sources of

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  emotional distress between 2014 and today other than the

2  emotional distress caused by Linode?

3  A.   2014?

4  Q.   Yeah.  At the beginning of your employment.

5  A.   My mother died in September of 2014.

6  Q.   Okay.  Other than the passing of your mother -- and I'm

7  sorry about that -- in 2015 --

8  A.   I was grieving.

9  Q.   You're telling the jury that you've had no other sources

10  of emotional distress in your life during that period?

11  A.   Emotional distress.  I did not, not the emotional distress

12  that is -- that I characterize as emotional distress.  There

13  are stresses in people's lives.  I did grieve my mother in

14  September when she had passed, in September of 2014 --

15  September 2015.  There are normal stresses in one's life.

16  Q.   Okay.  We're going to talk about some of those normal

17  stresses, I guess.  And I was going to ask you whether -- I was

18  going to tell you that you might find some of these questions

19  difficult.  But I guess if you haven't experienced any other

20  emotional distress, we'll proceed to the first one.

21      By the way, before I ask you, who was the person at Linode

22  who helped you most with the death of your mother and coping

23  with that?  It was Dan Spataro, right?

24  A.   Dan Spataro?

25  Q.   Yeah.

**UNITED STATES DISTRICT COURT**

1  A.   I don't remember talking to Dan about my mother.

2  Q.   Okay.  You missed about three months of work when she

3  passed?

4  A.   Dan was not there.

5  Q.   You missed about three months of work when she passed?

6  A.   No.  No, I did not.  You want me to go into that?

7  Q.   No.  That's fine.  So in August of 2020, you learned, as

8  we talked about earlier, that Mr. Musbach was arrested for

9  conduct that, I believe, you described as outrageous, correct?

10 A.   If true, it's outrageous.  And today, it's outrageous, but

11 not the John that I knew for those four years.

12 Q.   Okay.  And at the point in time where these charges arose,

13 you had been in a relationship with him for about four years,

14 correct?

15 A.   Yes.

16 Q.   You'd been living together?

17 A.   Yes.

18 Q.   And we talked earlier, I used the word "partners," you

19 used the word "companions"?

20 A.   Because that was the nature of our relationship.

21 Q.   You were a couple?

22 A.   We were, yes, but I'd like to -- I'm not -- it's different

23 than, for example, when I was in college and I had a first

24 love.

25 Q.   Sure.  We all mature.

**UNITED STATES DISTRICT COURT**

1  A.   I was not seeking anything and we -- the basis of John and

2  my relationship was a common -- a common need.  He needed -- he

3  had nobody.  And I had later found out that he's on the

4  autistic scale.  So I'm an approachable person.  So I never --

5  I never seen that.  So we both were able to come together, I

6  think, because --

7  Q.   The point is you care for him very deeply?

8  A.   I care about him, yes.

9  Q.   Right.  And in 2020, you cared for him very deeply,

10  correct?

11  A.   Two thousand when?

12  Q.   2020?

13  A.   I mean, I care about what happens to him.

14  Q.   Okay.  And what happened to him in 2020 was he was charged

15  with this horrible crime.  Did that cause you any emotional

16  distress?

17  A.   It was shocking to me.

18  Q.   I can see that, but the question is:  Did it cause you

19  emotional distress?

20  A.   It caused me a great concern.

21  Q.   Okay.  But did it cause you emotional distress?

22  A.   No.

23  Q.   No emotional distress from that?

24  A.   No.

25  Q.   By the way, you found out about these new charges at

**UNITED STATES DISTRICT COURT**

1  essentially the same time you got terminated from Linode,

2  right?  We talked about that earlier?

3  A.  Yes.

4  Q.  Okay.  Did you suffer any emotional distress when you

5  found out that the Court was not going to release Mr. Musbach

6  to your custody pending his trial?

7  A.  No.

8  Q.  Did it cause you any emotional distress knowing that your

9  partner was incarcerated for a period of time?

10  A.  No.

11  Q.  Ultimately Mr. Musbach pled guilty to the crime he was

12  charged with, trying to hire a hitman to kill this 13- or-

13  14-year-old boy.

14      Did it cause you any emotional distress when your partner

15  or companion admitted to the conduct that you described as

16  outrageous?

17  A.  I remember that I thought it was outrageous.  He and his

18  mother and I talked and I had -- we both had great concern that

19  he needed mental help.

20  Q.  Did it cause you emotional distress when he admitted to

21  the crime?

22  A.  It caused me great concern.

23  Q.  Did it cause you emotional distress when he admitted to

24  the crime?

25  A.  No.  I'm trying to tell you --

**UNITED STATES DISTRICT COURT**

1    Q.   Well, you just answered the question.

2         By the way, yesterday, on that note, if you remember,

3    there was some testimony about the show Westworld.  Do you

4    remember that?

5    A.   Yes.

6    Q.   And you said that you suggested to Mr. Spataro that he

7    watch the show and he said, "I don't like watching anything

8    sexual."

9    A.   Sexuality.

10   Q.   Right.  And you testified that it was a show about AI,

11   right?

12   A.   AI robots, yes.

13   Q.   AI robots.  And just to be clear for the jury, part of the

14   show with these AI robots is that customers can hire the AI

15   robots and use them for their pleasure?

16   A.   Yes.

17   Q.   So Mr. Spataro told you that he didn't want to watch

18   anything like that.  And you told the jury, if you remember, I

19   think -- and correct me if I'm wrong -- that you were so upset

20   by that that you went home and cried for three days?

21        MR. CARSON:  Objection.

22        THE COURT:  Was that an objection?  Objection is

23   overruled.

24   BY MR. CAVALIER:

25   Q.   You told the jury that that emotionally upset you when he

1  told you he wasn't going to watch --

2  A.   I did.  He's attacking me -- up to this point, there was a

3  man who was holding hands with a woman and another man up to

4  this point in the show so --

5  Q.   He didn't know any of that, right, because he didn't watch

6  it?

7  A.   Well, if he did, this was not the premise of that show.

8  Q.   So you felt like Dan telling you he wasn't going to watch

9  Westworld was --

10  A.   He was needling me because we had many other

11  conversations.  You need to put that in context.  That's --

12  Q.   That caused you emotional distress?

13  A.   If that was the only thing that Dan did --

14  Q.   That -- I'm just -- I want you to be clear on your

15  testimony yesterday because I thought what you testified to was

16  that that interaction with Dan Spataro caused you emotional

17  distress that you're seeking compensation here for by this

18  jury; am I correct?

19  A.   Yes.

20  Q.   Okay.  At the same time --

21  A.   I mean, in totality with the comments.  With that comment

22  and the totality of everything else.

23  Q.   Okay.  Ultimately Mr. Musbach was sentenced to a period of

24  incarceration as a result of his admission of guilt to the

25  attempt to murder the child, correct?

**UNITED STATES DISTRICT COURT**

1  A.   He what?

2  Q.   He was sentenced to a period of incarceration?

3  A.   He was incarcerated.

4  Q.   He is incarcerated today?

5  A.   Yes.

6  Q.   How long was the sentence he received?

7  A.   Is it six years?  Somewhere around six years, and then

8  they let him out before that.

9  Q.   When is he scheduled for release?

10  A.   I think in a year, year and a half.

11  Q.   And to this day you remain in a relationship with

12  Mr. Musbach, correct?

13  A.   I remain present to John and told him that if he needs

14  someone to talk to, I will always be present.  And if you ever

15  having any anxiety, come to me because I don't think you can

16  deal with that on your own.  Come to me and talk to me.

17  Q.   And you speak with him frequently, correct?

18  A.   Unfortunately, I don't.

19  Q.   Do you chat?

20  A.   No, not any longer.  There was when he was first in.

21  Q.   Okay.

22  A.   We had that little chat thing.

23  Q.   That's not available anymore?

24  A.   No.

25  Q.   Do you visit him?

1  A.  No.

2  Q.  Do you put money on his food account?

3  A.  I do give him food, yes, and vitamins and Tylenol.

4  Q.  All right.  My last question to you was going to be that

5  it must be emotionally difficult having your partner or

6  significant other locked away in prison for several years, but

7  I think you've already testified that nothing having anything

8  to do with Mr. Musbach's situation has caused you any emotional

9  distress at all?

10  A.  John, it's not about me.  It's about John and John needing

11  somebody.

12  Q.  And so --

13  A.  So I am just being present and remain present to John.

14  Now --

15  Q.  Your partner was convicted of trying to murder a child and

16  you're telling this jury that that caused you no emotional

17  distress?

18  A.  It did not because --

19  Q.  I don't need a "because."  I'm asking you if it caused you

20  any emotional distress?

21  A.  It caused me great concern.

22  Q.  Did it cause you emotional distress?

23  A.  It caused me great concern.

24  Q.  I'm going to ask the Judge to make you answer the question

25  if you don't answer it this time.

**UNITED STATES DISTRICT COURT**

1          Did it cause you emotional distress?

2               MR. CARSON:  Objection.

3               THE COURT:  Objection overruled.

4               THE WITNESS:  No.  It caused me great concern.

5               MR. CAVALIER:  That's all I have.

6               THE COURT:  Okay.  All right.  Mr. Carson, I assume

7  you have more than about 10 minutes on redirect; is that fair?

8               MR. CARSON:  I do.

9               THE COURT:  Okay.  So why don't we use that as a time

10  to take that lunch break.  Take a lunch break, we'll plan to

11  take about an hour, so come back 25 after 1:00 and get started

12  then with Mr. Williams' redirect.

13          Again, not to talk about the case or evidence amongst

14  yourselves, with anyone through chat with others.  Keep the

15  patter down and clear your heads.  Thanks, everybody.

16               THE COURTROOM DEPUTY:  All rise.

17          (Jury exits the courtroom at 12:22 p.m.)

18               THE COURT:  All right.  You can be seated.

19          Mr. Williams, you can step down.

20          How long do you think you have, Mr. Carson,

21  realistically, not with the statements I've been getting in

22  this case?

23               MR. CARSON:  An hour.

24               THE COURT:  An hour.  All right.  I mean, I don't know

25  how much is left.  I know I've heard various estimates of

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1    times.  Just -- I still don't think it's a problem yet, but for

2    your planning purposes, I have a fairly substantial Daubert

3    hearing in a patent case scheduled next Thursday here.  You

4    know what, if you like Tonka toys, it's about road pavers.  I

5    can't move that.  The trial is 10 days after that I've got to

6    do.

7              MR. CAVALIER:  It would shock me if it ran to that

8    time.

9              THE COURT:  Deliberations are not a problem.  They can

10   be back deliberating while I'm doing my hearing.  That's fine.

11             Let's plan to come back -- you know, be ready to go 25

12   after and hopefully get started then.  Thanks, everybody.

13             THE COURTROOM DEPUTY:  All rise.

14             (Luncheon recess taken from 12:23 p.m. to 1:35 p.m.)

15             THE COURTROOM DEPUTY:  All rise.

16             THE COURT:  Have a seat everybody.  We can bring the

17   jury in.

18             THE COURTROOM DEPUTY:  All rise.

19             (Jury enters the courtroom at 1:37 p.m.)

20             THE COURT:  Have a seat everybody.  All right.  We're

21   going to pick up now, Mr. Williams is going to testify on

22   redirect.  His lawyer gets to ask some additional questions as

23   well.

24             Mr. Williams, come on up.

25             And, Mr. Carson proceed.

**UNITED STATES DISTRICT COURT**

1                        REDIRECT EXAMINATION

2    BY MR. CARSON:

3    Q.   Back again.  All right.  So on Mr. Cavalier's questions on

4    cross-examination, you guys discussed your technical abilities,

5    so I just wanted to try to make that issue as clear as we can

6    for the jury.

7    A.   Can you get closer to the microphone, Mr. Carson.

8    Q.   Sure.  So I have want to make that issue as clear as we

9    can for the jury.

10       So my question is this:  Are you a technically proficient

11   network engineer?

12   A.   Yes.

13   Q.   And how do you know that?  How do you know that you don't

14   just think you are and maybe you are not as good as you think

15   you are?

16   A.   Today I don't do conferences, do the setting up

17   relationships, and the last year and a half to two -- I think

18   it's been two, two and a half years, I sit at my desk, I work

19   at Comcast doing the exact technical work that a senior network

20   engineer or somewhere between a senior network engineer and a

21   principal engineer does every day and have been promoted and

22   moving over to the 5G group at Comcast doing those daily

23   things.  And I'm sitting at my desk working on routers,

24   building and designing their 5G network, which has a 5G core to

25   it that is even beyond the scope that Linode does.

**UNITED STATES DISTRICT COURT**

1    We do all of the cloud-based technology things, but we are

2    also adding in the type of access, which is a cellular.  A

3    cellular network -- and I'm working with the top people in the

4    industry.  When Comcast decided to move to 5G, they brought

5    people from all over the United States, brought them in with

6    20, 30 years of experience -- don't wish to say anything, but

7    we have a group that is seasoned because of their deep

8    background and experience.

9    We do not have that much room for, you know,

10   unfortunately, people who are right out of school or, you know,

11   at a novice level.  We've hit hard.  And all of my tasks each

12   and every day are sitting at my desk working on routers,

13   working -- configuring at 5G network.  We have -- I'm in charge

14   of even the RAM that's sitting in the Comcast office right

15   outside.  We have it attenuated down low.  So we designed that

16   network as part of production here in Philadelphia.  Part of

17   the production network is on the 22nd floor.  And --

18   Q.  Carl, let me jump in real quick and just ask you this:  Do

19   you have any personal knowledge as to the way that the people

20   at Comcast who are your supervisors feel about your technical

21   abilities?

22        MR. CAVALIER:  Objection.

23        THE COURT:  Sustained.

24   BY MR. CARSON:

25   Q.  I don't want to know anything that anyone said.  I'm

**UNITED STATES DISTRICT COURT**

1  saying has anything ever happened at Comcast that indicated to

2  you that -- the way they thought about your technical

3  abilities?

4          MR. CAVALIER:  Objection.

5          THE COURT:  Sustained.

6  BY MR. CAVALIER:

7  Q.  How is your career at Comcast going?

8          MR. CAVALIER:  Objection.

9          THE COURT:  Sustained.

10 BY MR. CARSON:

11 Q.  How long have you been employed with Comcast?

12 A.  For the last three years.

13 Q.  And --

14 A.  Two to three years.

15 Q.  How did that employment with Comcast begin?

16         MR. CAVALIER:  Objection.  Relevance.

17         THE COURT:  Sustained.

18         MR. CARSON:  It's relevant to his past --

19         THE COURT:  Don't argue with me.  Mr. Carson, don't

20 argue with me.

21         MR. CARSON:  Well, it is relevant.

22         THE COURT:  Mr. Carson, if you want to approach, you

23 can ask the question.

24         MR. CARSON:  I would like to ask the question.

25         THE COURT:  What?

**UNITED STATES DISTRICT COURT**

1          MR. CARSON:  I would like to ask a quick question.

2          THE COURT:  Okay.  Come to sidebar.

3          (Sidebar as follows:)

4          THE COURT:  Mr. Carson, this isn't Law and Order.  You

5    don't argue with me in open court about an objection.  Okay?

6    Don't ever do that again.

7          MR. CARSON:  Okay.

8          THE COURT:  All right.  Go ahead.

9          MR. CARSON:  All right.  So his current position is

10   relevant for a host of reasons, including his past wage loss

11   claim, it's relevant in terms of the argument that he wasn't

12   technically sound.

13         THE COURT:  Okay.  I'm going to stop you.  The wage

14   loss claim is relevant to the extent it's about how much money

15   he's making or to the extent -- I haven't heard a mitigation

16   defense.  Okay?

17         So it's not really relevant unless there's a failure

18   to mitigate defense.  In terms of his proficiency, his

19   proficiency now and how Comcast people perceive him has nothing

20   to do with what was happening at Linode in 2020 or before.

21         MR. CARSON:  Okay.  Okay.  I understand.

22         THE COURT:  Okay.

23         (Sidebar concluded.)

24   BY MR. CARSON:

25   Q.  So, Mr. Williams, while you were employed with Linode, did

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  the issue of your technical abilities at Linode ever come up in

2  a positive way?

3      Did anyone ever tell you how proficient you are

4  technically in terms of your employment at Linode?

5  A.   Yes.

6  Q.   And the work you did at Linode, was it difficult work for

7  you?

8  A.   Yes, it was.

9  Q.   Technically, was it challenging?

10  A.   There's always challenges, but I was proficient at my job,

11  went beyond my expectations set for me on a technical level.

12  And also I must say that I had won an industry award during

13  this period of time where I was inducted into the -- as an IPv6

14  expert into the IPv6 internet hall of fame.  And the people on

15  those committees included the co-founder.  And it was for my

16  work for 1994, started on IPv6, all the way through any Linode

17  experience.

18  Q.   When did you receive that award?

19  A.   A month after I was fired from Linode.

20  Q.   And when the issues of your technical abilities at Linode

21  came up, what was the context?

22  A.   The context was my age, that I did not have the technical

23  chops to do technical things because of my age.  These were the

24  comments that were made, they were made numerous times, and I

25  do not have a career at Linode as a manager because of my age.

1  Q.  Did anyone ever suggest that your performance was an issue

2  at Linode in terms of like a performance improvement plan,

3  anything like that?

4  A.  No one did.

5  Q.  And your termination, whether it had to do with

6  discrimination or policy violations or whatever else that

7  defendants are going to claim it had to do with, did the issues

8  of your abilities technically ever come up?

9  A.  Only in the context of my age.

10 Q.  And you know, we saw a performance review where, you know,

11 it says something about your technical abilities in there but

12 it doesn't say anything about your age in there.  So how would

13 you explain that?

14 A.  These reviews do not state the word "age," but Tom Asaro

15 and Dan Asaro(Sic) both were involved in all of the decisions

16 relating to my advancement.  And within making those decisions,

17 Dan Spataro told me numerous occasions that it was because of

18 my age, and I explained the very detailed examples of those

19 comments.

20 Q.  Were those comments made constructively, like, hey, look,

21 you're getting older --

22 A.  No.  They were made in a demeaning, ridicule manner,

23 disrespectful.

24 Q.  I understand.  I understand.  So questions about your

25 relationship with Chris Aker also came up on the

**UNITED STATES DISTRICT COURT**

1  cross-examination?

2  A.  Yes.

3  Q.  And I was a little confused because I didn't realize that

4  you had made any claims against Chris Aker.

5      Had you made any claims against Chris Aker?

6  A.  No.

7  Q.  Had you ever accused Chris Aker of discrimination before?

8  A.  No.

9  Q.  You said something on cross about Dr. Jekyll or Mr. Hyde.

10  What did you mean by that?

11  A.  Chris said that when he drinks more than one cup of

12  coffee -- he only drinks one cup of coffee because if he drinks

13  many cups he turns into a, you know, Dr. Jekyll, Dr. Hyde,

14  where he's then making some statements, and that's just him

15  being in charge of a company --

16  Q.  When you are saying that he's like -- you know, I guess

17  Mr. Hyde is the nice one, Dr. Jekyll is the --

18  A.  Yeah.

19  Q.  When you're saying he's a Dr. Jekyll, were you accusing

20  him in any way of discrimination?

21  A.  No.  I tend to have my history of things.  And when

22  someone asks me a question, some of that comes out.  And the

23  man is -- he told me constant.  He went like this.  I asked him

24  does he have any free time.  And I said, "Are you always busy?"

25  And he says, "Constant," and would go like this.  With him it's

**UNITED STATES DISTRICT COURT**

1  always constant.

2  Q.   So the other relationship that came up on

3  cross-examination was your relationship with Vince Palochko,

4  who is the HR manager?

5  A.   Yes.

6  Q.   Before Vincent Palochko participated in the issues that

7  led to termination, did you ever accuse him of discrimination?

8  A.   No.

9  Q.   Did he tell you that he didn't want to work with you

10  because you were old?

11  A.   No.

12  Q.   Did you accuse him of saying anything like that?

13  A.   Never.

14  Q.   So just generally, let's do this briefly because we've all

15  been here and we want to keep things moving.

16       Just briefly, what did you think about Vincent Palochko

17  while you were employed there up until, you know, the last

18  six months of your employment?

19  A.   Vincent Palochko, as I stated, he and I had a very

20  friendly, very great rapport.  I explained that.  During what I

21  experienced during my termination and thereafter, up to today,

22  that my -- I cannot -- unfortunately, I cannot have those

23  positive feelings from my heart that I had at one time for him.

24  Q.   There was also some discussion during your termination

25  about -- so I don't need to put it up if you remember it.

**UNITED STATES DISTRICT COURT**

1    Do you remember that there was some sort of electronic

2    message that Dan Spataro sent to you around September 7th or

3    8th of 2018, and that was -- it listed out like some different

4    job requirements for a couple different positions?  Do you

5    recall that?

6    A.    Yes, I do.

7    Q.    Good.  So there was a question about whether or not you

8    had changed your testimony in some way because you suggested

9    that you -- that there was a conversation that you had with him

10   before that and there was something that Dan Spataro references

11   about a conversation having before.

12       So just to be clear, what were the -- you know, was there

13   a conversation before that and just kind of lay out that

14   timeline of events.  Let's start with why that meeting

15   happened.

16       Who was the first person that you spoke to that

17   precipitated events that led to the meeting and the email?

18   A.    I went to Tom Asaro --

19   Q.    Okay.  And --

20   A.    -- and asked him about applying for the network manager

21   position.

22   Q.    And what did he say to you?

23   A.    He said yes.

24   Q.    And what --

25       MR. CAVALIER:  Objection.  Asked and answered.

UNITED STATES DISTRICT COURT

```
 1            THE COURT:  It's overruled.

 2            THE WITNESS:  He said yes.

 3  BY MR. CARSON:

 4  Q.   What else did he say?

 5  A.   He said Dan will make that decision and see Dan.

 6  Q.   And you went and spoke to Dan next?

 7  A.   Yes.

 8  Q.   And after that is when the email came out, right?

 9  A.   Right after that.

10  Q.   And that's what you said on direct examination?

11  A.   Yes.

12            MR. CARSON:  I'm just going to skip a couple things.

13  BY MR. CARSON:

14  Q.   I guess a question came up about Owen Conway's age.  At

15  the time that these things happened, nine years ago, how old

16  was he?

17  A.   Approximately 40, 41.

18  Q.   And you were in your?

19  A.   50s.

20  Q.   And he wasn't 50 when these things happened, correct?

21  A.   No.

22  Q.   I just wanted to make sure that was clear.  So I guess --

23  I would just kind of skip down.

24            What do you think of John Musbach?

25  A.   John --
```

**UNITED STATES DISTRICT COURT**

1  Q.   I want to be more specific because I don't want to make
2  you say something -- what do you think about his crimes, the
3  things that he did that Mr. Cavalier and his clients are
4  suggesting led to your termination?
5  A.   His crimes are reprehensible.
6  Q.   Tell it like you would tell me on the street.  Like, how
7  do you really feel about his crimes?  Like, don't even tell the
8  jury that is here, tell me.  What do you really think?
9  A.   I am disgusted by him.  I refused to even acknowledge him.
10 After he got fired, when I would come into the house, ignored
11 him.
12 Q.   Did you know about any of the issues related to the things
13 he was arrested for in 2020?  Did you know about those things
14 before the arrest?
15 A.   No.
16 Q.   Did you know that he had gone on the internet and sent
17 Bitcoin to some crazy website and ask that this kid get killed?
18 A.   No.  If I had known about those crimes, I would have
19 separated from the house that we were in together, even if we
20 weren't in a relationship.
21 Q.   And has he ever -- since the day you found about those
22 crimes, has he ever stepped foot in your house again?
23 A.   No.  He's in jail.  I am -- I was always very happy.  I
24 sensed a relief when he was not granted bail.
25 Q.   Let's talk about that for a second since you brought it

**UNITED STATES DISTRICT COURT**

1  up.  So he had a bail hearing on the 13th of August; is that

2  right?

3  A.  He did.

4  Q.  And at that bail hearing it was suggested that you sponsor

5  him, or something like that.

6      Did you sponsor him?

7  A.  I did not.

8  Q.  Did you even know that you had to attend the bail hearing

9  when you woke up that morning?

10  A.  No.

11  Q.  Who told you you had to log into --

12  A.  I was asked to call by a woman who called me in the court.

13  Q.  Who did she say she was from?  Where did she say she was

14  from?

15  A.  The court in -- I didn't --

16  Q.  Was it like John Musbach's attorney or his paralegal?

17  A.  No, it was not John Musbach's attorney.

18  Q.  Who was it?

19  A.  It was someone from that federal court.

20  Q.  And did you leave your house to do that?

21  A.  No.

22  Q.  Did you leave your desk to do that?

23  A.  No, I did not.

24  Q.  And so -- all right.  So what did you do?  You logged into

25  something?

**UNITED STATES DISTRICT COURT**

1  A.   I logged into the Zoom meeting that I had her text me.

2  Q.   And John Musbach had -- that's when you discovered that he

3  had applied for bail?

4  A.   During the Zoom meeting, yes.

5  Q.   All right.

6  A.   The Zoom meeting went in -- I'm on my laptop working and

7  doing that and was focused when -- I forget the name of the

8  judge.

9  Q.   And at that time what was the address where John Musbach

10  lived?

11  A.   My address, 274 Kings Highway East.

12  Q.   Did the judge ask you to do anything, if he was going to

13  decide -- if she was going to decide to release John on bail,

14  did she ask you to do anything for the court?

15  A.   Yes.

16  Q.   What did she ask you to do?

17  A.   She told me would I report John if he violated any of the

18  conditions that she has yet to determine of the bail, and I

19  said I would not hesitate to report him.  I told --

20  Q.   Did she tell you what reporting him would lead to, if you

21  did report?

22  A.   That he would go into incarceration.

23  Q.   And you were okay with that?

24  A.   Yes.

25  Q.   Was his bail application approved?

**UNITED STATES DISTRICT COURT**

1  A.   No.

2  Q.   Let me go back in time a little bit to 2016.  So this

3  would be before your relationship with John started and when

4  John was just first living at that home and rented a room from

5  that person at the place he lived, and now you guys are living

6  together.

7       And when you first found out that John had these issues

8  with the charges and the pictures of the kid, what did you do?

9  A.   When the owner of the house told me --

10 Q.   We're just -- I don't care what the owner said.  Just,

11 what did you do?  Did you suggest anything to John Musbach?

12 A.   I actually yelled at John Musbach, even though I did not

13 know him, and I ignored John Musbach from that point on.

14 Q.   Did you go anywhere with him?

15 A.   No.  I did not want to be in the house.

16 Q.   Did you suggest that he kind of -- something that would

17 try to help with his problem?

18 A.   He, based on me -- yeah.  I guess I'm ignoring him when he

19 tried to talk to me -- seen that I was going out, and I

20 responded that I'm going to Our Lady of Perpetual Help there in

21 Galloway.

22 Q.   What's that?  Is that church?

23 A.   Yes.  I'm a devout Catholic.

24 Q.   What did that have to do with John Musbach?

25 A.   I took him with me.

**UNITED STATES DISTRICT COURT**

1  Q.   Why?

2  A.   Because he initiated the conversation, and if it was to go

3  out for dinner, I would have said no.

4       But this was during lunch hour, where I was in

5  Villanova --

6  Q.   Why did you take him to church?

7  A.   To help him.

8  Q.   Why?  Why do you think your church can help him?

9  A.   That's my spirituality.  The crime was not a

10  murder-for-hire.  It was --

11  Q.   He was sending pictures to a little kid.  Terrible.  What

12  did you do to help him?

13  A.   He was sending pictures to little kids -- to take him to

14  church and find God.  That's the way I viewed it.

15  Q.   And that was after the conduct that led -- that led him to

16  send the Bitcoin?  That all happened already, correct?

17  A.   That already happened.  Had I known --

18  Q.   And you took him to church, right?

19  A.   I didn't even know about that.  Otherwise, I wouldn't have

20  took him to church.  I would have just --

21  Q.   But you did.  You took him to church?

22  A.   Yeah.  I took him to church based on the other issue, the

23  exchange of messages.  And we continued to go each and every

24  day during that retreat.

25  Q.   And at the hearing, four years later, did the judge

**UNITED STATES DISTRICT COURT**

1  comment on John Musbach's history in those last four years

2  since he met you and since you started taking him to church?

3  A.  Yes.

4  Q.  What did he say?

5        MR. MCCARTHY:  Objection.

6        THE COURT:  Sustained.

7  BY MR. CARSON:

8  Q.  What was John Musbach's history after you started taking

9  him to church?

10  A.  He was an outstanding citizen.

11  Q.  I think that's debatable, right?  Because can you ever be

12  an outstanding citizen again?  Did he ever do anything like

13  that again?

14  A.  No.  He never did anything like that again, and we

15  continued to go to church.

16  Q.  Was he ever a danger to the public after that?

17  A.  Never.

18  Q.  From 2016, when you got that house in Haddonfield, I think

19  you said in your testimony that the reason you moved there is

20  because Linode moved; is that correct?

21  A.  Yes.

22  Q.  So that was, I think, in 2017, September 2017?

23  A.  September of 2017.

24  Q.  That was when you moved?  Okay.

25  A.  Yes.

**UNITED STATES DISTRICT COURT**

1  Q.  All right.  And did you and John Musbach go out and look

2  for a place together?

3  A.  No.  I looked for the place together.  I looked for the

4  place.  He wanted to get together.

5  Q.  Did you find a place to live?

6  A.  I did.

7  Q.  Was that John Musbach's house?

8  A.  No.

9  Q.  So how did he end up there?  Did you invite him?  Did

10  he -- how did that happen?

11  A.  He and I aren't in that strong relationship.

12  Q.  I don't care about your relationship.  How did it happen

13  that he ended up in the house?

14  A.  He asked to move with me.

15  Q.  Why did you let him?

16  A.  To continue to help him and see where our companionship

17  would proceed.  We routinely went to church all over the -- I

18  mean, here and in Pennsylvania, northern New Jersey.  I took

19  him to --

20  Q.  So now it's 2017.  You guys are living together.  You're

21  working at Linode.  You're living with a guy who used to work

22  at Linode.  Linode introduced you to the guy.  Do they know

23  that you guys are living together?

24          MR. CAVALIER:  Object to that characterization.

25          THE COURT:  Objection is sustained.

**UNITED STATES DISTRICT COURT**

1  BY MR. CARSON:

2  Q.   You met John Musbach through Linode; is that right?

3  A.   Yes.

4  Q.   Because he was an employee there for years, right?

5  A.   Yes.

6  Q.   And now you're living in a house together.  Did the people

7  at Linode know that you guys lived together?

8  A.   Yes.

9  Q.   Did Dan Spataro know?

10  A.   Yes.

11  Q.   How do you know he knew?  Did he ever say anything to you

12  that indicated he knew?

13          MR. CAVALIER:  Objection.  It's beyond the scope.

14          THE COURT:  Sustained.

15          THE WITNESS:  He --

16          THE COURT:  Can't answer that.  Sustained.

17          THE WITNESS:  Sorry.  I didn't hear sustained.  I'm

18  sorry.

19  BY MR. CARSON:

20  Q.   You were asked a bunch of questions during your

21  cross-examination about the termination.  Do you recall that?

22  A.   Yes.

23  Q.   Have you ever suggested in this case that your theory of

24  liability is that they wanted to fire you for five years and

25  then, all of a sudden, this thing happened out of the blue and

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1    then they terminate -- they were just lucky enough now, they

2    had an excuse to terminate you.  Is that your argument in this

3    case?

4    A.   No, it's not.

5    Q.   Are you even arguing that that's the reason they

6    terminated you?

7    A.   No.

8    Q.   Did they tell you at the employment --

9    A.   Termination.

10   Q.   -- weekly meeting that turned into the termination, did

11   they tell you that that's the reason why they terminated you?

12   A.   No.

13   Q.   And we all heard the recording.  So I don't need to go

14   into that.  Do you have any doubt, in your mind, whether John

15   Musbach did these things that he was accused of?

16   A.   I have no doubt based on his plead of guilty.

17   Q.   Right.  He admitted to it, right?

18   A.   Yes.

19        MR. CARSON:  I don't have anymore questions.  Thank

20   you, Carl.

21        MR. CAVALIER:  One briefly for clarification.

22        THE COURT:  Yes.  Let Mr. Carson clear it up.

23        MR. CARSON:  I'll get that afterwards.

24                    RECROSS-EXAMINATION

25   BY MR. CAVALIER:

**UNITED STATES DISTRICT COURT**

1  Q.   Just to be clear, Mr. Williams, the reason that

2  Mr. Musbach hasn't stepped foot in your house since the day he

3  was arrested and the reason he's not a danger to the public

4  since then is because he's in prison, right?

5  A.   He is not a danger because he's in prison.  He deserves to

6  complete his sentence that the judge had imposed on him.

7  Q.   Right.  But my point is, you know, you said he's not a

8  danger to society.  He's not in society right now.  He's in

9  prison, correct?

10 A.   He's in prison.

11          MR. CAVALIER:  That's all I have.

12          THE COURT:  Okay.  Step down.  We're done,

13 Mr. Williams.  You can step down.

14          Mr. Carson, what's next?

15          MR. CARSON:  I call Vincent Palochko.

16          THE COURT:  Is he outside?

17          MR. CAVALIER:  May I go find the witness?

18          THE COURT:  Yeah.  Go ahead.

19          MR. CAVALIER:  Thank you.

20          THE COURT:  Up here and stay standing.  Okay?

21          THE WITNESS:  Sure.

22          THE COURTROOM DEPUTY:  Please raise your right hand.

23          (**VINCENT PALOCHKO**, HAVING BEEN DULY SWORN OR DULY

24 AFFIRMED, TESTIFIED AS FOLLOWS:)

25          THE COURTROOM DEPUTY:  Please state your full name and

**UNITED STATES DISTRICT COURT**

1    spell your name for the record.

2           THE WITNESS:  Vincent Palochko.  V-I-N-C-E-N-T,

3    P-A-L-O-C-H-K-O.

4           THE COURT:  Go ahead and have a seat.

5           THE WITNESS:  Thanks.

6           MR. CAVALIER:  This witness is being called as of

7    cross.

8           THE JUROR:  Could we have the monitor slid just a

9    little bit so we can see his face?

10          THE COURT:  Great.  Thanks.

11          THE JUROR:  Thank you.

12                   DIRECT EXAMINATION

13   BY MR. CARSON:

14   Q.  Can you please state your full name for the record?

15   A.  Full name is Vincent Palochko.

16   Q.  And, Mr. Palochko, where do you currently work?

17   A.  I currently work at Akamai Technologies.

18   Q.  And until 2022, Akamai Technologies -- strike that.  In

19   2022, you were employed with Linode; is that correct?

20   A.  That's correct.

21   Q.  And the reason you work for Akamai Technologies today is

22   because they purchased Linode, right?

23   A.  That's correct.

24   Q.  And through that purchase, the employees that worked at

25   Linode became Akamai employees, correct?

**UNITED STATES DISTRICT COURT**

1  A.  Yes.

2  Q.  Including the network engineering department?

3  A.  Yes.

4  Q.  And your position with Linode is some sort of human

5  resource position; is that right?

6  A.  Yes.  My job title is director of people operations.

7  Q.  You said director of people operations?

8  A.  Yes.

9  Q.  That was the first title you ever held there?

10  A.  It was not.

11  Q.  What was the first title?

12  A.  Human resources manager.

13  Q.  And over the years, the human resource department grew; is

14  that right?

15  A.  Yes.

16  Q.  Grew a number of people?

17  A.  Number of people and scope of work, yes.

18  Q.  Because the company grew?

19  A.  Yes.

20  Q.  Significantly?

21  A.  Correct.

22  Q.  And part of your job responsibilities as the -- I'll start

23  with this.  Was there anyone who was assigned or worked in the

24  human resources department that had a position that was higher

25  than yours?

**UNITED STATES DISTRICT COURT**

1  A.   No.

2  Q.   And that was throughout the entire time the company was in

3  existence, right?

4  A.   That's correct.

5  Q.   And when did you start with the company?

6  A.   In 2012.

7  Q.   And during that entire time period, you were responsible

8  for issues -- human resources issues that included, for

9  example, directing the employee handbook?

10  A.   Yes.

11  Q.   And you did, in fact, direct Linode's employee handbook,

12  right?

13  A.   Yes.

14  Q.   You wrote it, right?

15  A.   In collaboration with others, yes.

16  Q.   Who did you collaborate with?

17  A.   Various sources online, my own independent research as

18  well as outside counsel.

19  Q.   And that was the -- when was the first time you wrote an

20  employee handbook at Linode?

21  A.   In 2012.

22  Q.   And over the years, Linode issued new employee handbooks

23  or updated employee handbooks, right?

24  A.   Yes.

25  Q.   And you were responsible for the revisions and changes

**UNITED STATES DISTRICT COURT**

1  that were going to be made in issuing those updates; is that

2  right?

3  A.   That's correct.

4  Q.   And when is the first time that any kind of policy

5  regarding discrimination appeared in the employee handbook?

6  A.   It was included in my original issue in 2012.

7  Q.   And then it was included again in 2014?

8  A.   Yes.

9  Q.   Did it change at all between the 2012 version and the 2014

10  version?

11  A.   To my recollection, it expanded to be a little bit more

12  clear, to add a little bit more clarity and a little bit more

13  procedural.  It never changed in terms of the company's view on

14  discrimination.

15  Q.   Did it get longer?  More words in it?

16  A.   Yes, there were more words.

17  Q.   Do you know off the top of your head what section the

18  discrimination policy is for the Linode employee handbook?

19  A.   What section?  No.  I don't recall.

20  Q.   Okay.  So I'm going to show you an exhibit that was

21  already admitted into evidence.

22        MR. CARSON:  Can we please show the witness exhibit --

23  let's start with 31.  Do you know what?  Let's start with 33

24  and kind of go in reverse chronological order.

25  BY MR. CARSON:

**UNITED STATES DISTRICT COURT**

1  Q.  Can you see the document just placed in front of you?  I
2  can give you a paper copy.
3  A.  No.  This is fine.
4  Q.  So is this the -- can you see the date on that document?
5  A.  Yes.
6  Q.  And so what version is this?  Is it the first?  The
7  second?  The third?
8  A.  I couldn't tell you based on that.  It was a living
9  document.  So the revision date is not the original issuance
10  date.  So offhand, I can't tell you if this is the original
11  copy that was drafted in 2012.  It was a copy that was accurate
12  and updated as of January -- October 1, 2014.
13  Q.  Right.  Yeah.  So 2012 was the first one, right?
14  A.  Yes.
15  Q.  And then was this the second one?
16  A.  As I said, it was a living document.  So any time that
17  there was a modification, we issued a new version with a last
18  revised date.  I can't tell you how many revisions there were
19  between 2012 and October 1, 2014.
20  Q.  Do you know if there was any?
21  A.  There was at least one, yes.
22  Q.  Okay.  So this is like the second or third or fourth?
23  Somewhere in there?
24  A.  Like I said, I can't tell you how many revisions there
25  were.  It was a living document.  At any time we made a

**UNITED STATES DISTRICT COURT**

1  revision, we updated the date stamp there.

2  Q.  All right.  Let's just scroll down to -- but this is the

3  version that was in effect by November of 2014, when Carl

4  Williams was first hired, right?  One month before?

5  A.  I think that's a reasonable assumption, yes.

6  Q.  Well, do you know if it was issued in that month?

7  A.  I can't tell you that for sure.

8  Q.  Have you issued so many employee handbooks since you've

9  been there that you forget how many there were?

10 A.  Depending on the timing of the change, you know, I really

11 can't tell you definitively if there was one that was -- if we

12 made a revision between October 1st and November.

13 Q.  When you say "the change," are you talking about to

14 Akamai?

15 A.  No.  To the handbook.

16 Q.  So just in general, do you know how many about?  Like, was

17 it less than ten?  More than ten?

18 A.  Like I said, anytime there was a revision, which was

19 typically a procedural thing within the handbook, anytime we

20 did something differently procedural within the company, that

21 was typically what we issued a revision for.

22      Anytime we did that, we would change the wording, you

23 know, whether it was a company policy or procedure or we had to

24 update something.  And we would issue a revised copy of the

25 handbook with an updated time stamp on the handbook.

**UNITED STATES DISTRICT COURT**

1  Q.  Okay.  So I'll do this, then.  You're looking at

2  Exhibit 33.  That is the version from October 1st, 2014, right?

3  A.  Are you asking me?

4  Q.  Yes.

5  A.  Yes, that's correct.

6       MR. CARSON:  Can we show him, Mr. Palochko,

7  Exhibit 32.

8  BY MR. CARSON:

9  Q.  That's the version from August 11, 2015?

10 A.  Yes.

11       MR. CARSON:  And is 32 in evidence already?  I think

12 it is.

13       MR. CAVALIER:  It is not.

14       MR. CARSON:  All right.

15 BY MR. CARSON:

16 Q.  And this is the employee handbook that you wrote that

17 applied to Linode employees as of August 11, 2015?

18 A.  Yes, sir.

19       MR. CARSON:  I move to admit.

20       MR. CAVALIER:  No objection.

21       THE COURT:  Okay.  Exhibit 32 will come in.

22       (PLAINTIFF EXHIBIT 32 WAS RECEIVED IN EVIDENCE.)

23       MR. CARSON:  Can we please show the witness

24 Exhibit 31.

25 BY MR. CARSON:

**UNITED STATES DISTRICT COURT**

1  Q.  Do you see 31?

2  A.  Yes.

3  Q.  Do you have it in front of you?  Okay.  That's the version

4  that was released effective December 15, 2016?

5  A.  Yes.

6  Q.  And that's the employee handbook that you authored that

7  was released and applied to all Linode employees at that time?

8  A.  Yes.

9          MR. CARSON:  Move to admit Exhibit 31.

10          MR. CAVALIER:  No objection.

11          THE COURT:  Exhibit 31 will be received.

12          (PLAINTIFF EXHIBIT 31 WAS RECEIVED IN EVIDENCE.)

13          MR. CARSON:  And then Exhibit 30.

14  BY MR. CARSON:

15  Q.  And this was the version that was effective August 24,

16  2017?

17  A.  That's correct.

18  Q.  That you wrote and you authored and applied to Linode

19  employees at that time?

20  A.  Yes.

21          MR. CARSON:  Move to admit.

22          MR. CAVALIER:  No objection.

23          THE COURT:  It will come in.

24          (PLAINTIFF EXHIBIT 30 WAS RECEIVED IN EVIDENCE.)

25  BY MR. CARSON:

**UNITED STATES DISTRICT COURT**

1  Q.  So these are all the versions that we received.  Are you

2  saying that there's a bunch more versions or is this all of

3  them?

4        MR. CAVALIER:  Objection.

5        THE COURT:  Overruled.

6        THE WITNESS:  There -- I can't tell you for certain.

7  As I mentioned before, there were several revisions and it

8  was -- could have been something as small as a telephone

9  extension that was referred to in the handbook.

10 BY MR. CARSON:

11 Q.  So if a telephone extension changed, you would redate and

12 issue an entire new one?

13 A.  Yes.

14 Q.  And you don't know, sitting here right now, if there's

15 four or a hundred?  You can't tell me?

16 A.  No.

17 Q.  Okay.

18        MR. CARSON:  All right.  So let's go back to

19 Exhibit 33, and let's scroll down the page to Defendant 248.

20 BY MR. CARSON:

21 Q.  Do you see that document in front of you?

22 A.  Yes.

23 Q.  And that's Linode's antidiscrimination policy as of

24 October 2014, when this version was authored and released,

25 correct?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   And that's the entirety of Linode's antidiscrimination

3  policy.  It's right there, right?

4  A.   Yes.

5  Q.   Those four sentences?  Count it if you want.

6  A.   Yes.  This is the entirety of it.

7  Q.   Okay.  And is the reason why this policy exists because

8  Linode recognized that discrimination in the workplace is

9  against the law?

10  A.   Yes.

11  Q.   And so Linode was trying to prevent discrimination.  Is

12  that the reason for this policy?

13  A.   Yes.

14  Q.   So the first sentence in the second paragraph says,

15  "Employees with questions or concerns about discrimination in

16  the workplace are encouraged to bring these issues to the

17  attention of the management team and/or human resource."

18       Do you see that?

19  A.   Yes.

20  Q.   So it's not mandatory to report discrimination in the

21  workplace if you see it.  It's just a suggestion?

22  A.   According to this sentence, yes.

23  Q.   Did that sentence ever change?

24  A.   I don't know off the top of my head.  I couldn't tell you.

25  Q.   Was there anyone at Linode, other than you, who would have

1  been responsible for authoring and releasing employee

2  handbooks?

3  A.  No.

4  Q.  So there was nothing wrong with, according to Linode

5  policy at least, with an employee who just decides not to

6  report anything, because it's not mandatory to report anything.

7  It's just encouraged, right?

8  A.  I would disagree with that statement.  But in the handbook

9  here -- I know what you're getting at.  Because it does state

10  that they were encouraged to bring the issues.

11  Q.  Is there an anti-retaliation section in this policy?

12  A.  In this policy?  No.

13  Q.  Do you know what retaliation is?

14  A.  Yes.

15  Q.  So why not have a policy that prevents retaliation in the

16  workplace in addition to discrimination?  Did Linode condone

17  retaliation?

18  A.  We did not, no.

19  Q.  But employees wouldn't know that because there's no policy

20  on it, right?

21  A.  You said within this policy.  No, there's no mention of

22  that within this policy.  I'm not sure in the entirety of the

23  handbook.  It might be mentioned elsewhere.

24  Q.  So I don't want to waste time.  Let's just skip to the

25  most recent one that was turned over, Exhibit 30.

**UNITED STATES DISTRICT COURT**

1          MR. CARSON:  Can we please show the witness 30 again

2    or just scroll down to the policy.  I think it's 3.1.  Did I

3    pass it?  So 3.1 is on page 11.

4          THE COURTROOM DEPUTY:  11?

5          MR. CARSON:  Yep.

6    BY MR. CARSON:

7    Q.   So by 2017, is this the policy change?  It looks like this

8    now?

9    A.   Yes.

10   Q.   So I would direct your attention to the second -- or the

11   last paragraph besides "more information may be found."  Do you

12   see the first sentence there?  It says it's encouraged, right?

13   A.   Where are you pointing to?

14   Q.   Last paragraph at the end of the policy.

15   A.   Yes.

16   Q.   See that?  It says, "Employees with questions or concerns

17   about discrimination in the workplace are encouraged to bring

18   these issues to the attention of the management team and/or

19   human resources."

20        All right.  So between 2014 and 2017, the policy changed

21   several times.  You say you don't have any idea how many times.

22   We know it's at least one, two, three -- at least three times.

23   And in those three years and those three different versions of

24   the policy, there still was no policy that actually prevented

25   discrimination and harassment in the workplace by requiring

**UNITED STATES DISTRICT COURT**

1  that all discrimination be reported, correct?

2  A.   The second part of that statement is true.  There was a

3  policy in place preventing discrimination.  The policy states

4  that it is encouraged to bring it up.  So the second part of

5  the state --

6  Q.   Yeah.  It's an optional policy, right?

7  A.   No, it's not.

8  Q.   It's an option.  If they feel like it, if not, whatever?

9  A.   There are certain laws that take precedence here.  So it's

10 not an optional policy, sir.

11 Q.   What law?

12 A.   Any nondiscrimination laws.

13 Q.   Can you name one?

14        MR. CAVALIER:  Objection.

15        THE COURT:  Sustained.

16 BY MR. CARSON:

17 Q.   Do you know what any of the laws are that caused you to

18 write this policy, to author this policy?

19        MR. CAVALIER:  Objection.

20        THE COURT:  It's sustained.

21 BY MR. CARSON:

22 Q.   So there's also -- am I right that there's still no

23 retaliatory policy or policy for any retaliation by 2017?  You

24 can look if you want.

25 A.   That's only one small bit of the handbook.  I believe

1  there's something elsewhere in the handbook, if I'm not

2  mistaken, but I can't tell you yes or no without looking

3  through the handbook and pointing you in the direction.

4  Q.  Is there someone employed at Linode who knows the employee

5  handbook better than you?

6       MR. CAVALIER:  Objection.  Speculation.

7       THE COURT:  Sustained.

8  BY MR. CARSON:

9  Q.  Is there someone who is employed at Linode whose

10 responsibility is to know the employee handbook more than you?

11 A.  Responsibility to know to handbook more than me?

12 Q.  Yes.  I'll try to help you.

13      One of your job responsibilities is to author employee

14 handbooks, correct?

15 A.  Yes, that was one of my responsibilities.

16 Q.  Yeah.  So every one of my questions -- I'm probably going

17 to ask you in the present tense a lot today.  So every single

18 one of my question, unless I state otherwise, is regarding the

19 time period between November 2014 and August 2020, just to make

20 it easy.

21      So during that time period, one of your job

22 responsibilities was to author the employee handbook, right?

23 A.  Yes.

24 Q.  That wasn't optional, that was something you were required

25 to do because you were receiving a paycheck and benefits from

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1  Linode, right?

2  A.    Yes.

3  Q.    So is there any person employed at Linode whose position

4  and job responsibilities required them to do more work with the

5  employee handbook than you?

6  A.    No.

7  Q.    And you have no idea whether or not there's another policy

8  in the employee handbook, other than the one we're looking at,

9  that prevents retaliation, is that what you're saying?

10  A.    I didn't say that, no.

11  Q.    Well, do you know?

12  A.    I said that I'd like to reference a handbook because this

13  is many years old and I'd like to thumb through it if you're

14  asking me to --

15  Q.    Yeah, I can hand --

16  A.    To answer your question.  I can see about two-thirds of a

17  page here.

18  Q.    Would you like me to get you a paper copy?

19  A.    Sure.  I can look this up for you.

20  Q.    I can get you paper copies for everything.  It might be

21  easier.  So Exhibit 30.

22        MR. CARSON:  Your Honor, may I approach?

23        THE COURT:  Go ahead.

24  BY MR. CARSON:

25  Q.    This is Exhibit 30, same exact exhibit you got on the

**UNITED STATES DISTRICT COURT**

1  screen.

2  A.   Do you have the ability to search text within this instead

3  of me thumbing through 65 pages?

4  Q.   Well, just sitting here today -- and you're welcome to

5  look if it helps.  But sitting here today, do you know if there

6  even is another section in this book regarding retaliation?

7  A.   I would have to look.  Off the top of my head, I don't

8  recall.

9  Q.   Okay.  I'll move on.  So before you worked at Linode, you

10 didn't have any prior experience in human resources, correct?

11 A.   Not in a purely human resources role.  I had relevant

12 responsibilities and duties at prior positions.

13 Q.   Did you ever work in a human resources department before

14 Linode?

15 A.   No.

16 Q.   And your degree from school, is it in human resources or

17 people relations or anything like that?

18 A.   No.

19 Q.   And Linode is a tech company; is that right?

20 A.   Yes.

21 Q.   And I think Linode uses electronic communications for a

22 lot of what they do, right?

23 A.   Yes.

24 Q.   Almost all of what they do, right?

25 A.   A lot of what they do, yes.

1  Q.   For instance, Linode has a Slack account, right?

2  A.   Yes.

3  Q.   And all the employees at Linode have a Slack, like, user

4  name and password they could use to send messages on this Slack

5  account?

6  A.   Yes, that's correct.

7  Q.   And if an employee has an issue or problem, they can send

8  you a Slack message?

9  A.   That's correct.

10 Q.   And are they encouraged to do that --

11 A.   Yes.

12 Q.   -- if they have a problem?

13      And they also -- the employees also have email addresses;

14 is that right?

15 A.   That's correct, yeah.

16 Q.   And they all have your email address?

17 A.   Yes.

18 Q.   And if there's an issue or a problem, they are encouraged

19 to send emails and ask you about it?

20 A.   Yes.  Slack, email, come to my office, any -- I made

21 myself very available.

22 Q.   And was there some other resource that Linode used to help

23 employees communicate other than the Slack and the emails that

24 you know of?

25 A.   In terms of --

**UNITED STATES DISTRICT COURT**

1  Q.   You know, a --

2  A.   -- physical tools?

3  Q.   -- messaging system or chat system?

4  A.   No.   Primarily it was Slack and email.

5  Q.   Okay.

6  A.   That's how we used written communication.

7  Q.   And it's your contention in this case that the reason my

8  client was terminated is because you guys secretly had an issue

9  with his appearing at -- his name appearing in an article that

10 you read online; is that right?   Is that fair to say?

11 A.   I wouldn't -- not in its entirety.   I mean, that plays a

12 part in it, yes, absolutely.

13 Q.   How much of a part did it play?

14 A.   That was the catalyst that drove the decision.   I think on

15 its surface, the way that you stated it, it's a little bit

16 deeper than that, but that was the catalyst that drove us to

17 make a decision based on, you know, what the article actually

18 said and what actually happened.

19 Q.   So can we sum -- so all the different reasons that are

20 related to that article, his relationship with John Musbach,

21 appearing in the article, issues related to publicity, can we

22 just call that the John Musbach issue from now on?   All of it,

23 every single issue that we could possibly imagine related to

24 John Musbach from publicity, public relations, to the article,

25 to his relationship, to people allegedly saying that they

1  weren't -- they don't want to work with him anymore.  All those

2  issue, that's the John Musbach issue.

3  A.   That's fair.

4  Q.   That's why he was fired?

5  A.   Yes.

6  Q.   And there was no other reason why he was fired but that,

7  correct?

8  A.   That's correct.

9  Q.   Is there a single message anywhere, even one, that

10 suggests that he was fired for that reason that you can tell me

11 about?

12 A.   There is not.

13 Q.   All the Slack conversations, right, all of them, no one

14 ever said it by Slack, right?

15 A.   Not that I'm aware of.

16 Q.   And all the emails, no one ever said it by email?

17 A.   Not that I'm aware of.

18 Q.   You are not alleging that it was like one or two people

19 involved.  Like, Carl has a discrimination claim, he's the only

20 one involved in those.  This is like 30, 40 people allegedly

21 involved in the decision to terminate, no?

22       MR. CAVALIER:  Objection.

23       THE COURT:  Objection is overruled.  If you can

24 answer, you can.

25       MR. CARSON:  I'll withdraw it.

**UNITED STATES DISTRICT COURT**

1  BY MR. CARSON:

2  Q.   So how many people -- the decision to terminate Carl

3  Williams for the John Musbach issue, you were involved in that

4  decision, correct?

5  A.   Yes.

6  Q.   And you're alleging that Dan Spataro was involved in that

7  decision?

8  A.   No.

9  Q.   You're not?

10  A.   Sorry, Dan was.

11  Q.   Dan Spataro?

12  A.   Yeah.

13  Q.   Yeah.  You're the one -- you guys are going to say it was

14  either him or me, right?

15  A.   Yes.

16  Q.   Tom Asaro, he was involved in the decision?

17  A.   Yes.

18  Q.   Rich Ford?

19  A.   No, he was not involved in the decision.

20  Q.   Not at all, not in any way?

21  A.   In the decision to terminate, no.

22  Q.   Well, let's use the decision as broadly as we're going to

23  use the John Musbach issue.

24       So by the decision, I mean like anything that even

25  contributed to the people who made the decision.  So for

**UNITED STATES DISTRICT COURT**

1  example, in his opening statement, Mr. Cavalier made a promise

2  to the jury --

3          THE COURT:  No, no.  Mr. Carson, we're not getting

4  into what happened in openings.

5          MR. CARSON:  Okay.  Well, let's just do this then.

6  BY MR. CARSON:

7  Q.  So isn't it your contention that --

8  A.  What I can tell you is --

9  Q.  There's no question pending right now.

10          Isn't it your contention that there were employees,

11  including Mr. Spataro, who do not want to work with Carl

12  anymore?

13  A.  Yes.

14  Q.  Employees, plural, right?

15  A.  Yes.

16  Q.  So there was Dan Spataro and how many other people?

17  A.  I don't know how many other people.  I knew of two.  I've

18  heard there were plenty more.

19  Q.  You've heard of two you said?

20  A.  Yes.

21  Q.  Heard of two.  Okay.

22          What are their names?

23  A.  Andrew Dampf and Dan Spataro.

24  Q.  I said other than -- so other than Dan Spataro, how many

25  other people were there?

**UNITED STATES DISTRICT COURT**

1   A.   Excuse me?

2   Q.   Other than Dan Spataro, how many people do you allege said

3   that they did not want to work with --

4   A.   By hearsay, there were more than two.  I knew of two

5   firsthand.

6   Q.   So I won't object to hearsay.  So like someone else told

7   you that there was more people than that?

8   A.   Yes.

9   Q.   Who told you there was more people than that?

10  A.   I don't know.

11  Q.   So the only ones that you could name that said anything

12  about, A, because I read this article I don't want to work with

13  Carl anymore, only people you're giving me right now are Andrew

14  Dampf and Dan Spataro?

15  A.   Those are the only ones that I can name now, yes.

16  Q.   Okay.

17  A.   That's the only ones I had firsthand encounters with

18  personally.

19  Q.   So I guess we can add Andrew Dampf's name to the list.

20       So out of all those people, Andrew Dampf, Dan Spataro, Tom

21  Asaro, you, anybody, not one person wrote one thing down

22  related to this idea that they just didn't want to work with

23  Carl anymore because of the John Musbach issue, correct?

24  A.   To me, no.

25  Q.   You cannot identify in front of this jury or for this jury

**UNITED STATES DISTRICT COURT**

1  a single document where this was written down, right?

2  A.   To me, that I'm in possession of, no.  That's correct.

3  Q.   I mean, there are documents that suggest he was terminated

4  for other reasons that you know of, right?

5  A.   Yes.

6  Q.   Those other reasons are what?

7  A.   They are a varying degree of policy violations.

8  Q.   That's not the real reasons, right?

9  A.   That's correct.

10 Q.   Those are the reasons that you used to hide the real

11 reason?

12         MR. CAVALIER:  Objection.

13         THE COURT:  Sustained.

14 BY MR. CARSON:

15 Q.   Why did you use those reasons?

16 A.   Why did we use those reasons?

17 Q.   Yeah.

18 A.   There's a couple different things to talk about there.

19 Q.   I'll let you say all of them but --

20 A.   Sure.

21 Q.   And your lawyer can cross-examine you and ask you, but

22 I'll give you the opportunity.  But just generally why, what

23 was the reason?

24 A.   The reason was we were -- I mean, like I said, there's a

25 couple different things I pointed to.  You know, we were aware

**UNITED STATES DISTRICT COURT**

1   of prior litigation that Carl had.  We wanted to make this

2   termination meeting as the least bit risky as we possibly

3   could.  We wanted to also make sure that we were able to

4   provide something objective and not get into any speculation.

5   By nature, a lot of interactions with Mr. Williams, when it

6   came to giving him feedback or questioning certain decisions,

7   came with a sense of volatility.  And he would --

8   Q.  I think you misunderstood my question.

9        THE COURT:  Mr. Carson.

10        THE WITNESS:  He would often rebut feedback that was

11  coming to him and become very defensive.  And we went into that

12  conversation knowing that Mr. Williams would become very

13  defensive and very volatile, as I think that, you know, was

14  proven in the colloquy that we heard that here.

15        So our mission in that call was to remove him from the

16  company in the quickest, most efficient way possible without

17  compromising, you know, company's safety, reputation, anything

18  of that sort.  So we -- essentially, we wanted to make it as

19  smoothly as possible.  And yes, that did involve lying about

20  the reason, and that was to protect ourselves.

21  Q.  "Lying," that's the word that you used, right?

22  A.  Sure.

23  Q.  So you lied to my client, correct?

24  A.  Yes.

25  Q.  And you lied about the issue of his termination and the

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  reason for it, right?

2  A.  Yes.

3  Q.  That's the thing you lied about.  So are you lying again

4  by saying it's John Musbach?

5  A.  No, I'm not.

6  Q.  Now you are telling the truth?

7  A.  Yes.

8  Q.  So I think you misunderstood my question before.  Like I

9  said, I'll be happy to go over the things you just said about

10  why you lied, but generally speaking, isn't it true that this

11  lie that you told about these policy violations was told

12  because you didn't want to tell him what you are saying now is

13  the actual reason, right?

14  A.  Yes.

15  Q.  So when you decided -- I'm sorry.  Who was the first

16  person who said "I don't want to work with Carl anymore"

17  according to your testimony?

18  A.  I don't remember the chronological order of folks who

19  mentioned that.

20  Q.  Well, if you had to say who was the primary decisionmaker

21  in Carl's termination, isn't it true it would be Dan Spataro?

22  A.  Those are two different questions.  The primary --

23  Q.  Just answer the second one.

24  A.  It was a collaborative decision.  We really didn't make

25  the kind of determination on employment decisions that didn't

1  involve multiple people at the company.  This was a

2  collaborative decision between myself, Tom Asaro, and Dan

3  Spataro.

4  Q.  The three of you guys worked together to do this, right?

5  A.  To make a decision?

6  Q.  Yes.

7  A.  Yes.

8  Q.  To terminate my client.

9      You, Tom Asaro, and Dan Spataro worked together to

10 terminate my client, right?

11 A.  Yes.

12 Q.  And you worked together to come up with this lie too,

13 correct?

14 A.  No.

15 Q.  Were the --

16 A.  I'm sorry.  The reason?  Yes.

17 Q.  Yeah.  It's a lie.  You said it was a lie?

18 A.  Yes.

19 Q.  So you guys worked together to come up with this lie,

20 right?

21 A.  Yes.

22 Q.  Okay.  So when you guys worked together to come up with

23 this lie, you said one of the reasons why was because of the

24 risk?  Is that what you said, because of the riskiness?

25 A.  Yes.

1  Q.   What was the risk that caused you to have to lie about his

2  termination?

3  A.   Like I said, it was --

4  Q.   The risk, what was the risk?

5  A.   There were a few different things at play.

6  Q.   What was one of them?  What was the risk?

7         MR. CAVALIER:  Your Honor, I'm going to ask if the

8  witness be allowed to answer the --

9         THE COURT:  That doesn't mean you can cut him off, but

10  I mean -- you've asked him what the risk is, he's trying to

11  answer.  Let him answer what the risk is.

12         THE WITNESS:  My answer is going to be tremendously

13  different from before.  Carl, like I said, he had a certain

14  level of volatility when it came to delivering feedback.  We

15  approached -- you know, how we planned to have this

16  conversation go knowing that there would be an unfavorable

17  reaction from Mr. Williams.  And part of that risk was employee

18  safety, part of that risk was being aware of prior litigation

19  with prior employers, part of that risk was just making a very

20  uncomfortable situation much worse.

21  BY MR. CARSON:

22  Q.   Did you say employee safety?

23  A.   Yes.

24  Q.   Where was -- so employee safety in terms of what, like

25  when you actually told him he was terminated?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   So he was home when you told him that, right?

3  A.   Yes.  Well, I don't know where he was.  I was --

4  Q.   He wasn't with you or Dan, you guys were on a computer

5  screen somewhere?

6  A.   That's correct.

7  Q.   Where were you?  Were you at home?

8  A.   I was in my home office, yes.

9  Q.   Where did you live at that time?

10 A.   Where did I live at that time?

11 Q.   What state?  I don't need the address, but what state?

12 A.   In New Jersey.

13 Q.   So you were in New Jersey.  And does Dan Spataro live in

14 New Jersey too?  What state does he live in?

15 A.   As far as I know, he lives in New Jersey.

16 Q.   Okay.  So you guys were in New Jersey at your homes,

17 right?

18 A.   Yes.  I don't know where Dan was.

19 Q.   He wasn't --

20 A.   I'm assuming --

21 Q.   -- with you?

22 A.   I was at my house, yes.

23 Q.   He was somewhere else other than where you were?

24 A.   Yes.

25 Q.   He was in one place, you were in another place, and Carl

**UNITED STATES DISTRICT COURT**

1  was in some other place?

2  A.   We were all remotely connected via video conference.

3  Q.   And you were concerned about employee safety?

4  A.   Yes.

5  Q.   And you were so concerned about employee safety, yet you

6  came up with a lie about the reason you were going to terminate

7  him?

8  A.   That was part of it, yes.

9  Q.   Prior litigation, did you say?

10  A.   Yes.

11  Q.   What prior litigation was there that you were worried

12  about?

13  A.   I don't have enough information to comment on that.

14  Q.   People --

15  A.   Exactly, I know that it exists and that it happened.  I

16  don't have enough information to describe it to you.

17  Q.   Okay.  Well, okay.  So how did you find out that Carl --

18  you're going to say that you found out about this article.  So

19  how did you find out about the article?

20  A.   It was brought to my attention.  I don't recall

21  specifically where it came from in terms of who sent it to me,

22  but it was sent to me I believe via Slack, and it was brought

23  up to my attention, as it was also to Tom and Dan, as far as I

24  know.

25  Q.   By Slack okay.  So there's a Slack message where someone

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  sent you the article, is that your testimony?

2  A.  I'd have to verify.  I believe so.

3  Q.  Yeah, there's no Slack message, right?  It doesn't exist?

4  A.  Excuse me?

5  Q.  There's no Slack message --

6        MR. CAVALIER:  Objection.  Argumentative.

7        THE COURT:  It's overruled.  He can answer.

8        THE WITNESS:  Are you telling me --

9  BY MR. CARSON:

10  Q.  Yeah, again, there's not --

11        THE COURT:  He doesn't get to tell you anything.  He's

12  asking you a question.

13        THE WITNESS:  As I said, I'm pretty sure that's how my

14  memory goes.  This was several years ago.  I would have to

15  verify before answering --

16  BY MR. CARSON:

17  Q.  Who sent you this Slack message, if you can't remember --

18  A.  I just said I don't recall where it came from.

19  Q.  Do you know what day it is?

20  A.  What day it is?

21  Q.  That it was sent?

22  A.  No.

23  Q.  So there's a Slack message that --

24        (Court reporter interruption.)

25  Q.  So you're saying that there's a Slack message that you

**UNITED STATES DISTRICT COURT**

1  don't know who sent it, you don't know what day it was sent,

2  but that's how you found out about this article, that's your

3  testimony?

4  A.   That's correct.

5  Q.   And --

6  A.   If I had a recollection of every message that was sent and

7  a date and time stamp of every message that was sent, that

8  would be impressive.

9  Q.   Yeah, we don't want you to remember every one, sir.  We

10  just want you to remember the ones that you say that caused my

11  client's termination.

12  A.   Understood.  Yeah.

13  Q.   So isn't it true that you told my client that there was an

14  anonymous report about him missing time from work?

15  A.   Yes.

16  Q.   That was part of the lie, right?

17  A.   Yes.

18  Q.   That was not true?

19  A.   I never verified one way or another.  I didn't receive a

20  complaint myself, I can tell you that much.

21  Q.   And you're the human resource director at that time,

22  right?

23  A.   Yes.

24  Q.   So if there were complaints, if there are human resource

25  issues, you are the person that they would be directed toward,

**UNITED STATES DISTRICT COURT**

1  right?

2  A.   Yes.

3  Q.   And so you don't even know if someone actually did

4  complain about my client in this article, right?

5  A.   Right.

6  Q.   Maybe there was no complaint, right?

7  A.   Right.

8  Q.   What we know for sure, all we really know is that you

9  promised him on the day -- you said with a hundred percent

10 certainty it had nothing to do with John Musbach, the

11 termination had nothing to do with John Musbach.

12      That's what you said that day, right?

13 A.   That's correct.

14 Q.   And you wrote that down that day too.  Do you remember

15 that?

16 A.   Where did I write that down?

17      MR. CARSON:  Can we please show the witness.  So can

18 we please show Mr. Palochko Exhibit -- I think it's 49.  49 has

19 already been admitted into evidence.

20 BY MR. CARSON:

21 Q.   So you recognize what this document is, right,

22 Mr. Palochko?

23 A.   Yeah, this is a document that I created summarizing any

24 kind of performance reviews, performance evaluation, personnel

25 notes and any other written documentation about Mr. Williams'

1  performance.

2  Q.   Yeah.   These were his performance reviews, right?   What

3  we're looking at right now?

4  A.   It's exactly what I just said.   It's more than just

5  performance reviews.

6  Q.   Yeah.   I was trying to help the jury understand what this

7  is.

8       These are his performance reviews, right?

9  A.   They are performance reviews, personnel notes, any other

10  information that were documented about Mr. Williams' employment

11  or performance, yes.

12  Q.   And if we scroll all the way down to the bottom, after his

13  2020 mid-year review -- down, down, down -- we can see there's

14  a section that says "personnel notes," right?

15  A.   Yes.

16  Q.   It's page -- it's Defendant Exhibit 174.   And the first

17  time a personnel note shows up in Mr. Williams' employee file,

18  according to this document, was the day after he was

19  terminated, correct?

20  A.   August 20th, 2020, yes.

21  Q.   Yeah.   I believe -- please correct me if I'm wrong -- that

22  the phone call occurred on August 19, 2020, where you guys told

23  him it was something that it wasn't.

24  A.   Yes.

25  Q.   And so you are part of this thread here that we're looking

1  at, correct?

2  A.   Yes.

3  Q.   And you actually are the first person who put something

4  down on paper?

5  A.   Correct.

6  Q.   And it was the day after his termination, it was

7  3:11 p.m., and you wrote:  "Sending a letter detailing post

8  termination logistics via US mail since we have not been able

9  to confirm email address for Carl.  A copy of the letter is in

10  the document/employee file section of Bamboo."

11       Did you ever actually send that letter?

12  A.   Yes.

13  Q.   You sure?  You really remember sending it?

14  A.   I do.

15  Q.   Okay.  So the next thing you write is you say, "On the

16  morning of 8/20, I coordinated with Lisa Brown to arrange with

17  her to pick up Carl's laptop.  Full dialogue is captured

18  within.  A shared Google drive folder, myself and Peter Fu, the

19  link."  And then there's a link probably to the thing you just

20  referenced, right?  That's what it looks like?

21  A.   That's correct.

22  Q.   And Lisa was someone, I think you had asked her to stop by

23  Carl's house to pick up some things since he had been fired the

24  day before; is that right?

25  A.   Lisa was our office manager and she arranged for a courier

UNITED STATES DISTRICT COURT

1  to pick up Carl's equipment.

2  Q.  And Lisa said some things about the logistics of that

3  situation.

4      And then we can go down to the very next section.  And it

5  says August 20, 10:08 a.m. -- Sorry.  It says August 20th,

6  10:08 a.m., Vincent Palochko again.  Right?  Do you see that?

7  Do you see that?

8  A.  Yes.

9  Q.  And Tom Asaro put this note in there that you read back

10  then, correct?

11  A.  Yes.

12  Q.  And Tom Asaro says, "There is a court date tomorrow,

13  2020/8/20."  And it says, "That Carl was scheduled to be at.

14  As of the time of his termination, he had not requested PTO to

15  attend.  Carl has 39 unpaid free Linodes under his Linode

16  account.  Unclear on what they are for, if they're personal and

17  it way exceeds that benefit.  If they are work related, I

18  believe they are supposed to be under a net ops account with

19  notes detailing what they are for at the note detail.  If this

20  is correct, we are having someone disable, slash, preserve

21  these for the interim."

22      Do you see that?

23  A.  I see that, yes.

24  Q.  So that court date is the thing with John Musbach, right?

25  A.  I'm not sure what that -- I don't have any proper context

1  to tell you what that was about.

2  Q.   Okay.  Well, so I'll represent to you that Carl went to a

3  court date on August 13, 2020, and that was in the article that

4  you're saying precipitated his termination.  Do you recall

5  that?

6  A.   Yes.

7  Q.   And there were a second date scheduled a week later,

8  August 20th.  Did you know that?

9  A.   Like I said, I know there was a court date based on what

10  you are showing me.  I don't have the proper context to tell

11  you what that court date was regarding.

12  Q.   Right.  But the issue that is written down in those

13  notes -- and by the way, these are notes between you and Dan

14  Spataro and Tom Asaro, correct?

15  A.   Yes.

16  Q.   Carl is not on these notes, right?

17  A.   No.

18  Q.   Carl had been fired?

19  A.   Well, they are in a confidential repository as well.

20  Q.   Yeah.  Only management can see them.

21  A.   Direct management, human resources, company executives.

22  Q.   So even if Carl was there, he wouldn't be able to see

23  them.

24  A.   That is correct.

25  Q.   But he was not there because he was fired after six years'

**UNITED STATES DISTRICT COURT**

1  employment, right?

2  A.  That's correct.

3  Q.  All right.  So you don't have to lie in this document,

4  right?  There's no safety concerns or issues with litigation.

5  There's no issue with telling the truth in this document, is

6  there?

7  A.  I don't see any reason.  Right.

8  Q.  Right.  So when you're talking about the court date

9  related to John Musbach, the problem that is identified is that

10 he didn't request PTO off.  It has nothing to do with publicity

11 or reputation or all these things that you're trying to tell

12 the jury in this case, right?  So why are you lying in this

13 document, sir?

14        MR. CAVALIER:  Objection.  It's not his statement.

15 BY MR. CARSON:

16 Q.  Do you know why Tom Asaro is lying in this document, sir?

17 A.  No.

18 Q.  But you and Tom Asaro and Dan Spataro did work together to

19 come up with a lie, and this is part of that lie that we're

20 seeing here, right?

21 A.  We collaborated on the reason for termination and -- yes.

22 Q.  So why are you guys lying to each other, too?  Does that

23 make any sense?

24 A.  No.

25 Q.  It doesn't.  Doesn't say anywhere -- doesn't even say John

**UNITED STATES DISTRICT COURT**

1  Musbach in there, does it?

2  A.  It doesn't.

3  Q.  But he took time to identify policy violations that are

4  being violated in this document, right?

5  A.  Yes.

6  Q.  And I think he even says can you add this to the file.

7  Take a look.  "There's a court date that Carl is scheduled to

8  be at as of the time of his termination.  He has not requested

9  PTO to attend.  Carl has 39 free Linodes under his Linode

10  account." (Inaudible.)

11        THE COURT:  Mr. Carson, I don't know if you're trying

12  to read into the record.

13        MR. CARSON:  Sorry.  I'm just reading it to myself.

14        THE COURT:  But you can't read to yourself out loud.

15  We're on the record.

16        MR. CARSON:  I apologize.

17  BY MR. CARSON:

18  Q.  So the next thing that we see on this document, this

19  internal document that had nothing -- that Carl had no access

20  to, it says, "I had Lisa to help me get a courier to retrieve

21  Carl's equipment," and it's one about logistics.

22        Lisa Brown, "He said he is busy and hung up on me."  I

23  guess she's referencing Carl.  "I messaged him the following:

24  'Carl, it's Lisa at Linode.  I have FedEx...'"

25        That related to the issues she talked about before where

1  she was trying to retrieve some equipment?

2  A.   Yes.

3  Q.   And then it says at -- on August 19th, 2020, it says,

4  "Dan, Carl and I had a call at 3:00 p.m. today to discuss his

5  employment termination.  Dan and I delivered the initial

6  message and stated that we received an anonymous complaint

7  during a day last week where Carl was out of the office but did

8  not work and was not on PTO.  That complaint led us to an

9  investigation, which uncovered several occurrences of behaviors

10  or conduct which was not consistent with Linode policy."

11      Did I read that right?

12  A.   I believe so, yes.

13  Q.   And so there, that's the lie that you testified about,

14  right?

15  A.   That's correct.

16  Q.   It doesn't say this is the story that we're going to tell

17  Carl and the real story is something completely different,

18  right?

19  A.   No.  This is a summary of what we talked about on the

20  phone.

21  Q.   So, sir, didn't -- isn't it true that you thought at the

22  time that Carl Williams was building a lawsuit?

23  A.   Just a little bit speculative but --

24  Q.   Well, it's not, actually.  I'm asking you is it true at

25  that time that you believed Carl Williams was trying to build a

1  lawsuit?

2  A.  That he was trying to build a lawsuit?

3  Q.  Yeah.

4  A.  It crossed my mind but there was no evidence of such.

5  Q.  Well, it didn't just cross your mind.  You talked about

6  the fact that he was trying to build a lawsuit, right?

7  A.  When did I talk about that?

8  Q.  You tell me.  Did you talk about it?

9  A.  No.

10  Q.  Did anyone say that to you, some upper level management

11  person say to you that he was trying to build a lawsuit?

12  A.  Not that I'm aware of.

13      MR. CARSON:  Okay.  Let's show the witness another

14  exhibit.  So the exhibit I would like to show Mr. Palochko next

15  is Exhibit 92, please.

16  BY MR. CARSON:

17  Q.  Mr. Palochko, if you could, please, let me know when the

18  exhibit is on the screen in front of you, and I'll just ask you

19  a few questions.

20  A.  Yes.  The exhibit is on the screen.

21  Q.  So what we're looking at here, I think these are those

22  Slack messages that you testified about earlier, correct?

23  A.  Yes.

24  Q.  And so you and Dan Spataro had a personal Slack thread

25  that was just between the two of you, right?

**UNITED STATES DISTRICT COURT**

1  A.  Yes.

2  Q.  And no one else was on that thread?

3  A.  Correct.

4  Q.  And you and Tom Asaro had a thread as well?

5  A.  That's correct.

6  Q.  And you and Tom Asaro and Vince Palochko had a thread,

7  too?

8  A.  Tom Asaro, you mean?

9  Q.  Sorry.  You and Tom Asaro -- sorry.  I did that wrong.

10  Tom Asaro, Dan Spataro, and you also had a thread?

11  A.  Yes.

12  Q.  And the only person at the company higher than you guys

13  would be the owner, Chris Aker; is that true?

14  A.  Yes.

15  Q.  So you weren't worried about people reading the thread or

16  what you would say on the thread because there's no one to

17  discipline you other than the owner, right?

18  A.  It's a speculative statement, I wouldn't agree with that,

19  no.

20  Q.  Did you ever worry about what you said in the Slack

21  message when it was just you and Dan talking?

22  A.  I didn't have to worry.

23  Q.  Did you feel like you could be honest in those messages?

24  A.  Yes.  Absolutely.

25  Q.  So I'm going to scroll down -- so this has already been

1    admitted -- no.  It hasn't.  Sorry.  Let me lay a foundation.

2        So this is a thread this exists between you and Dan

3    Spataro during your employment at Linode, correct?

4    A.  Yes.

5            MR. CARSON:  Your Honor, I would move to have Exhibit

6    92 admitted.

7            MR. CAVALIER:  No objection.

8            THE COURT:  All right.  92 will come in.

9            (PLAINTIFF EXHIBIT 92 WAS RECEIVED IN EVIDENCE.)

10   BY MR. CARSON:

11   Q.  I'll go over this thread in more detail with you later,

12   but since it came up, let's just take a look at it.

13       So this is not your whole thread with Dan Spataro, right?

14   A.  No.

15   Q.  You guys only took a piece out of it and sent --

16           MR. CAVALIER:  Objection.

17   BY MR. CARSON:

18   Q.  -- it, right?  This isn't the whole thing?

19           THE COURT:  Hold on, Mr. Carson.  There's an

20   objection.  The objection is sustained.

21   BY MR. CARSON:

22   Q.  Did you and Dan Spataro send more messages to each other

23   than just the last week that Carl was terminated?

24   A.  Yeah.  We've worked together for many, many years.

25   Q.  And you started using Slack with Dan in 2016?

**UNITED STATES DISTRICT COURT**

1  A.   It's definitely more than what we're looking at right now.

2  Q.   Okay.  It would be years of messages, correct?

3  A.   Yes.

4  Q.   And so the ones that we're looking at here, I believe, you

5  guys were -- so while we're listening to that recording, you

6  guys were sending messages to each other, right?

7  A.   Yes.

8  Q.   And that's what we have in front of us, right?

9  A.   Yes.

10 Q.   And so if we scroll down here to 875, at the top, the

11 first message says, "Do we just end this call?"

12      Do you see that?

13 A.   Yes.

14 Q.   And if you go -- if you look a little -- the page right

15 above, that's you that sent that message, right?

16 A.   Yes.

17 Q.   And then the next one says, Dan Spataro says, "Yes, right.

18 We have to."

19      You see that?

20 A.   Yes.

21 Q.   And what did he say next?

22 A.   "He's building a case."

23 Q.   And "he" was Carl, right?

24 A.   Yes.

25 Q.   Because you guys were on the phone with Carl at that time,

 1  right?

 2  A.   Yes.

 3  Q.   Terminating him at that time, right?

 4  A.   That's correct.

 5  Q.   And by "case," you guys meant lawsuit, right?

 6  A.   Yes.

 7  Q.   And so because he's building a case, Dan Spataro's next

 8  comment is, "Don't answer anything," right?

 9  A.   Yes.

10  Q.   Is there anywhere in this document where it says I'm

11  glad -- I can't believe he just realized that we're really

12  doing it because of John Musbach.  How did he guess that?  Is

13  that in this document?

14  A.   Not that I'm aware of.

15  Q.   Is the word John Musbach in this document?

16  A.   No.

17  Q.   It's your testimony that at this time, you're on the phone

18  with Carl Williams and you're texting with Carl Williams -- I'm

19  sorry -- you're terminating Carl Williams and you're texting

20  with Dan Spataro in real time, and you and Dan Spataro both

21  knew that you were lying to Carl Williams, right?  That's your

22  testimony?

23  A.   Yes.

24  Q.   And you didn't even mention anything about that in this

25  text thread, right?

**UNITED STATES DISTRICT COURT**

1   A.   In this text thread, no.

2   Q.   Nothing?

3   A.   No.

4   Q.   Did you ever listen to the whole recording?

5   A.   I didn't hear the recording nor was I aware that there was

6   a recording.  That's a little bit inappropriate, but I was on

7   the call.  So I'm familiar with the context.

8   Q.   Well, let's go to Page 874.  Do you see that?  Do you see

9   what you said to Dan Spataro at 3:21?

10  A.   "He is recording this, dude?  For sure?"

11  Q.   You said that, right?

12  A.   Yes.

13  Q.   And that was while it was happening in August of 2020,

14  years ago, right?  Correct?

15  A.   Can you repeat that question?

16  Q.   When you texted that he is recording it, you said that in

17  August of 2020 while you were texting Dan Spataro, while you

18  were terminating Carl Williams in August 2020?

19  A.   Yes.

20  Q.   So my question is:  Did you ever hear the end of the

21  recording?

22  A.   Did I hear the end?  I just said I didn't hear the

23  recording.  No.

24  Q.   Okay.  You didn't hear any of it?

25  A.   No.

**UNITED STATES DISTRICT COURT**

1  Q.  How did it end?  Do you remember?

2  A.  The recording that I didn't hear?

3  Q.  No.  How -- so you were on the call?

4  A.  I didn't hear the recording, sir.

5  Q.  But you were on the call, correct?

6  A.  Yes.

7  Q.  So do you remember how the call ended?

8  A.  No.

9  Q.  Did you guys say, hey, Carl, we'll see you later or I'll

10 talk soon?

11 A.  No.  That's not how the call went.

12 Q.  Did you say let's keep in touch?

13 A.  No.

14 Q.  Did you guys hang up on him?

15 A.  I think we might have, yes.  I don't remember

16 definitively, but that's how we had to end it because otherwise

17 it was not going to end.

18 Q.  What did you do afterward?

19 A.  After I hung up from the call?

20 Q.  Yeah.  So we all heard the recording.  So while Carl is

21 sitting there still asking questions in a panicked voice,

22 asking about his termination, what were you and Dan doing?

23 A.  Sorry.  Are you talking about after the call?

24 Q.  Yeah.  What did you and Dan --

25 A.  I don't remember specifically.

**UNITED STATES DISTRICT COURT**

1  Q.  Did you guys celebrate at all?

2  A.  Did we celebrate?

3  Q.  Yeah.

4  A.  No, sir.

5  Q.  You sure?  Let's go down to -- let's go to 876.  It says,

6  3:28, Vincent Palochko, "Holy shit, man."

7      And at 3:52, which would have been after you guys hung

8  up --

9  A.  If there's -- I mean, earlier in the document, too, while

10  we were on the call --

11  Q.  What did you and Dan Spataro do?

12  A.  Excuse me?

13  Q.  What did you and Dan Spataro do?

14  A.  That's an expression.  I don't think I've ever had a drink

15  alongside Dan Spataro.

16  Q.  I'm talking about this?

17  A.  Fist bump?

18  Q.  Yeah.  You guys fist bumped each other, right?

19  A.  Sure.

20  Q.  What's the fist bump mean?

21  A.  It's like a handshake.

22  Q.  Does it have any kind of context other than like a

23  handshake?  Isn't it like congratulatory?

24  A.  It's like a handshake.

25  Q.  Do you remember which GIF you guys used?  Was it like the

1  one from *The Office*?  Was it funny?  Did you guys laugh?

2  A.    No.

3  Q.    Did you laugh when you sent that?

4  A.    No.  I didn't laugh.  It was a sigh of relief, sir.  If

5  you scroll up a couple pages, Dan said he was scared while he

6  was on that call.  It was a very hostile call, and we were

7  relieved when the call was over, hence the fist bumps because

8  we supported each other through that hostile call.  It wasn't a

9  celebratory thing.  We didn't congratulate each other for

10 losing an employee.

11 Q.    There's no question right now, sir.

12 A.    It's fair.

13 Q.    And then you guys kept talking about issues relating to

14 Carl's termination, correct?

15 A.    Are we referencing this --

16 Q.    Yeah.  So let's go down to the bottom of 876.

17 A.    What's the question?

18 Q.    You and Mr. Spataro, after the call, in a private Slack,

19 continued discussing Carl Williams's termination and issues

20 related to it, correct?

21 A.    Carl was referencing --

22 Q.    It's yes or no.

23 A.    Carl was referencing a specific policy during that call.

24 So this is the content from the policy that he was referring

25 to.

**UNITED STATES DISTRICT COURT**

1  Q.   So I'll ask the question again.  Did you guys continue a

2  discussion about issues relating to Carl Williams' termination

3  after the call?

4  A.   Issues related to the termination?  This is this policy he

5  referenced.

6  Q.   Is it related to Carl Williams and the termination?

7  A.   Yes.

8  Q.   The call you guys just did, right?

9  A.   Yes.

10 Q.   And the lie that you told, according to your own testimony

11 here today, is that there was a policy -- a series of policy

12 violations implicating Linode's progressive disciplinary

13 policy, right?

14 A.   Yes.

15 Q.   And here you texted to Dan Spataro the progressive

16 disciplinary part of the disciplinary policy, correct?

17 A.   That's correct.

18 Q.   Yeah.  It says, "Verbal warnings, written warning, final

19 warning, final disciplinary action."

20      The final disciplinary action, what is that?  Is that

21 termination?

22 A.   Typically, termination.  It could have been termination,

23 suspension, or other action.  But typically, it would have been

24 termination.

25 Q.   But in Carl's context it was termination, right?

**UNITED STATES DISTRICT COURT**

1  A.   That's correct.

2  Q.   So this is the second written thing that you said amongst

3  the high level management staff at Linode that supports the lie

4  that you told, correct?

5  A.   Yes.

6  Q.   And so my question is, sir, if the reason you told the lie

7  is related to safety and you just didn't want to deal with Carl

8  blowing up because he's just so volatile, why are you guys

9  lying to each other in private about the same thing?  Can you

10  explain that to the jury?

11  A.   No.  We had a plan for the call and the conduct of the

12  call.  We're not lying to each other.  I think we were all very

13  clearly on same page here.

14  Q.   Was it method acting?  You guys are all just so into the

15  parts?

16        MR. CAVALIER:  Objection.

17        THE COURT:  Objection sustained.

18  BY MR. CARSON:

19  Q.   So why were you continuing the charade when Carl wasn't

20  there anymore?

21  A.   Because we didn't treat it as a charade, sir.

22  Q.   Don't you think it makes more sense that you weren't lying

23  when you said policy violations, that there is written

24  evidence, multiple examples of written evidence, that

25  demonstrate that the reason you fired Carl Williams that day

**UNITED STATES DISTRICT COURT**

1  were policy violations?  Doesn't that make a lot more sense

2  considering this evidence?

3  A.   I'm not sure I understand the question.  Was that a

4  question?

5  Q.   I can ask it again, though.  Let me see if I can make it

6  easier to understand.

7       So we've now seen two written communications between

8  high-level employees at Linode that reference that the reason

9  Carl was terminated was due to policy violations, correct?

10 We've seen two examples now?

11 A.   Yes.

12 Q.   And you told Carl Williams he was terminated for policy

13 violations, correct?

14 A.   That's correct.

15 Q.   And the reason you said you lied, that reason doesn't make

16 sense for the communications, right?

17 A.   What communications?  I'm not sure, when you say it

18 doesn't make sense for the communications --

19 Q.   Well, it doesn't make sense for you to lie to each other

20 about it.  It doesn't make sense for you to talk -- Carl is not

21 around and you are not terminating him.  It doesn't make sense

22 for you guys to tell each other that it's policy violations

23 when he's telling that you all knew that this was a thing that

24 you cooked up.

25 A.   We were all on the same page.  That's why.  We had a

**UNITED STATES DISTRICT COURT**

1  specific plan with how we wanted the conversation to go.  We

2  were on the same page.  It wasn't that we were lying to each

3  other.  It was that we were following through with a specific

4  plan that we had agreed upon and that we'd follow through with.

5  Q.  And you're certain, 100 percent certain, that that plan

6  was enacted.  The motive behind that plan to tell Carl a false

7  reason for the termination was solely and 100 percent only

8  because you were concerned about Carl Williams and the way he

9  would respond and safety issues and those types of things

10  related to Carl's behavior?

11  A.  Yes.

12  Q.  That's the only reason?

13  A.  There was more than that for the actual call itself.  Yes.

14  Are you talking about the general reason for termination?

15  Q.  No.  I'm talking about the general reason for coming up

16  with a false story for him.  Because --

17  A.  That's correct, then.

18  Q.  -- here's the thing.  When someone lies to you, sir,

19  right, and then they admit to you that they lied and say, hey,

20  I lied to you but this is the real story, isn't the first thing

21  you want to know is why they lied?  Isn't that the first thing

22  you want to know from them?

23  A.  It's a bit of a subjective question, but I guess so.

24  Q.  And if they lie about the reason, doesn't that affect

25  their credibility?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   Because now they've lied to you twice, right?  That's

3  right, correct?

4  A.   Yes.

5  Q.   All right.  So my question to you is:  I'm trying to

6  understand the reason why you lied and I want to know if it had

7  anything else -- I would like the jury to know because it's

8  important in their deliberations -- why you lied.  Does it have

9  anything to do with, anything other than what you're telling me

10 right now, that it was these issues related to his behavior or

11 issues related to things that would happen that day of the

12 termination and that's all?  Nothing else?

13 A.   It's the same answer that I gave you why there was a lie.

14 I don't have any more to it than I already explained.  It was

15 exactly as I stated before.

16 Q.   But this might be the single most important issue in the

17 case, sir.  So I have to get an answer to this question.

18 A.   I did answer the question.

19 Q.   Yes or no, sir.  If there is something else, please tell

20 us.  You have the opportunity now to tell us.  And you're under

21 oath, right?  Now is the time to come clean.

22 A.   I am, yes.

23 Q.   Right.  So is the reason why you lied 100 percent related

24 to Carl Williams' behavior that day and the issues that you

25 said, like the way he would react to this personal sensitive

**UNITED STATES DISTRICT COURT**

1  information and the way that he's a little volatile and safety

2  and because of these other litigation issues?  That's the only

3  reason and there's no other reason why you lied besides those

4  things?

5  A.   Correct.

6  Q.   Nothing?

7  A.   Correct.

8  Q.   So there would be no reason for that lie to continue like,

9  say, a year later, correct?

10  A.   Correct.

11  Q.   And if we can show that that lie continued a year later,

12  sir, does that prove that you're lying again?

13  A.   I don't believe so.

14  Q.   Because you're not lying now, right?  Now is the time that

15  you're telling the truth, correct, sir?

16  A.   That's correct.

17        THE COURT:  Okay.  Let's use that for our afternoon

18  break.

19        MR. CARSON:  Okay.

20        THE COURT:  All right.  Take 10, 15 minutes, clear our

21  heads, and try to come back 25 after 3:00, okay?

22        THE COURTROOM DEPUTY:  All rise.

23        (Jury exits the courtroom at 3:13 p.m.)

24        THE COURT:  Okay.  Be ready to go in 10 minutes.  All

25  right.

**UNITED STATES DISTRICT COURT**

1          (Brief recess from 3:13 p.m. to 3:26 p.m. )

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  All right.  You can have a seat.  We'll

4   get the jury in.

5          How much longer do you have, Mr. Carson?

6          MR. CARSON:  I'm going to try to wrap it up the next

7   half hour, 45 minutes.

8          THE COURT:  Okay.

9          MR. CARSON:  I'm going to try.

10         THE COURTROOM DEPUTY:  All rise.

11         (Jury enters the courtroom at 3:27 p.m.)

12         THE COURT:  All right.  You can all have a seat.

13         Mr. Carson, continue.  Thank you.

14         MR. CARSON:  Thank you.

15  BY MR. CARSON:

16  Q.   So when we took a break, we were just talking about the

17  reason why you and Tom Asaro and Dan Spataro engaged in this

18  group decision to lie about the actual reason for Carl

19  Williams' termination, and I asked if there was any other

20  reason for this decision to lie other than what you've already

21  testified to.  And I just want to give you one more opportunity

22  to think about it and tell the jury if there was any other

23  reasons --

24         MR. CAVALIER:  Objection.  Asked and answered.

25         THE COURT:  Objection is overruled.

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1          THE WITNESS:  It's exactly what I already stated.  It

2    was an unprecedented situation.  We were scared.  We know that

3    we had to make a certain decision and have the end result be a

4    certain way.  And you know, what I've already given you is the

5    reason that we conducted this meeting in the certain way that

6    we did, which was --

7    BY MR. CARSON:

8    Q.   So that's a no, there is no other reason than what you've

9    already said?

10   A.   That's correct.

11   Q.   And now I'd like to ask you if you recall that you

12   appeared in this case as a corporate designee for Linode at one

13   point, do you recall that?

14   A.   Yes.

15   Q.   And you did that more than once, right?  You did that at a

16   deposition?

17   A.   I did that at a deposition.  That was the only time.

18   Q.   Were you also -- do you recall that you also verified

19   interrogatories that were sent to you during this discovery

20   period?  Do you recall that?

21   A.   What was that?

22   Q.   The questions that were sent.  Both sides sent questions

23   to the other, and both sides answered those questions, and you

24   were the person who signed the verification on behalf of

25   Linode, do you recall that?

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  A.   I'm sorry, I don't recall what you are talking about.  I

2  might have it mixed up but...

3  Q.   I'm going to show you a document.

4        MR. CARSON:  Can we please show the witness Exhibit 6.

5  And this isn't for the jury, this is just for the witness right

6  now.  And can you just scroll all the way to the bottom.  All

7  right.  So hang on a second.  So let me do this.

8  BY MR. CARSON:

9  Q.   Do you see the document in front of you?

10  A.   I do.

11  Q.   Scroll back up to the top.  These are the questions that

12  you verified.

13        Do you recall verifying these questions?  You signed a

14  statement that said that the answers to these questions are

15  true and accurate and correct to the best of your knowledge,

16  information, and belief.  Do you recall that?

17  A.   I don't recall it, honestly.  I'm not doubting it.  I

18  don't recall specifically.

19        MR. CARSON:  Show the witness -- I'm going to direct

20  you where to go.  So you are going to go up to discovery

21  folder, then go to --

22        (Discussion held off the record.)

23        MR. CARSON:  What's happening to my computer?  All

24  right.  So you can see what I'm doing.  All right.

25  BY MR. CARSON:

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  Q.  So do you see the document in front of you, sir?

2  A.  That's me, yep.

3  Q.  That's your signature, correct?

4  A.  Yes.

5  Q.  And that document is dated November 9, 2022, correct?

6  A.  Yes.

7  Q.  And this document is actually -- it's a verification which

8  means it's signed under penalty of perjury.  Did you know that

9  when you signed it?

10  A.  Understood, yes.

11  Q.  So what you are saying in this document is that you

12  reviewed the interrogatories that were sent to you and you

13  verified the information is true, right?

14  A.  Yes.

15  Q.  And that's in connection with this court case, right?

16  A.  Yes.

17  Q.  Okay.  So let's just take a look for a moment.

18      So one of the questions, sir -- do you recall that one of

19  the questions that was asked to you was for you to explain why

20  plaintiff was terminated and include in your response all

21  individuals who were involved in that termination?  Do you

22  recall that?

23      MR. CAVALIER:  Your Honor, I'm going to object.  And I

24  might need a very, very brief sidebar.

25      THE COURT:  Yeah, come on up.

**UNITED STATES DISTRICT COURT**

1          (Sidebar as follows:)

2          THE COURT:  Go ahead, Mr. Cavalier.

3          MR. CAVALIER:  Sure.  A couple things.  For one, the

4   exhibit we're now looking at doesn't have a verification, so I

5   don't know whether the verification he was asking about was

6   part of this or some other documents, number one.

7          Number two, because Mr. Asaro and Mr. Spataro were

8   named defendants at the time, he obviously acted in the

9   capacity as a corporate designee.  I think it's prejudicially

10  confusing to the jury to suggest the actions he took in his

11  function as the corporate designee are attributable to him

12  personally for purposes of impeachment.

13         THE COURT:  Well, I'm not aware -- I mean, these are

14  interrogatories, and I'm not aware of anything in the rules

15  that says that interrogatories are verified by a corporate

16  designee akin to Rule 30(b)(6).  They are just verified.

17         And so it's not clear to me that he was necessarily

18  acting as a corporate representative, as opposed to just the

19  person who verified them -- obviously Linode as the defendant

20  could only act through a corporate -- act through an

21  individual.

22         MR. CAVALIER:  Right.

23         THE COURT:  But he signed it and so --

24         MR. CAVALIER:  I don't know that we know that.

25         THE COURT:  Well, I thought he just owned it in --

**UNITED STATES DISTRICT COURT**

1       MR. CARSON:  He also produced at the same time.

2       THE COURT:  That's not in the record.  But he did just

3  own the idea that these were the signatures to that document.

4  I mean, do you have a good faith basis to say it was not the

5  same verification?  I mean, what's the date on them?

6       MR. CAVALIER:  I don't know.  I don't have it.

7       THE COURT:  You don't have what, the verification?

8       MR. CAVALIER:  The verification.  I don't see it.  I

9  didn't know what verification he was showing at the time.

10       MR. CARSON:  What's the date on the interrogatories?

11       MR. CAVALIER:  I'm not doubting that it is, I just

12  need to know that the verification is attached to these

13  interrogatories.  Based on what I have, I don't have that.

14       THE COURT:  Or was sent later and -- it's not uncommon

15  in discovery for a verification to come later and to say, I'm

16  verifying these interrogatories.  I mean, again, I let this go

17  even though it's not an exhibit because it's akin to in some

18  respects showing him a deposition and saying this is -- you

19  know, you swore under oath and it's impeachment.

20       If you've got a basis to tell me that he didn't verify

21  these interrogatories, I can hear that, but it certainly looked

22  like, as I looked at it, the verification.  If there's things

23  beyond that that you want to bring out in term of the process,

24  he can certainly resist to the extent he's inclined to when

25  Mr. Carson asks him questions.  And you might find more

1  resistance than you're hoping for, Mr. Carson, or maybe you

2  won't, and you can deal with it on cross.

3        MR. CAVALIER:  By the way, I didn't mean to imply

4  anything.  Do you know that that verification is for these

5  interrogatories?

6        MR. CARSON:  Yes.

7        MR. CAVALIER:  Okay.

8        THE COURT:  To the extent there's an objection, I'll

9  overrule it.

10       MR. CAVALIER:  That's fair.  I'll withdraw.

11       (Sidebar concluded.)

12       THE COURT:  Go ahead, Mr. Carson.

13 BY MR. CARSON:

14 Q.  So before we stopped, you had confirmed -- you recall

15 signing that verification now that you see it, correct?

16 A.  I don't have a very strong recollection of the documents.

17 Q.  But that is your signature?

18 A.  That is my signature, yes.

19 Q.  And the document in front of you on page 6, question 10,

20 which asks why plaintiff was terminated in August -- I'm going

21 to start on the 1, 2, 3 -- the 4th line down it says, "Linode

22 terminated plaintiff's employment after it discovered he had

23 repeatedly violated the company's policies relating to time off

24 and use of company resources.  Specifically on August 14th,

25 2020, Linode received an anonymous complaint accusing plaintiff

**UNITED STATES DISTRICT COURT**

1    of taking time off from work on August 13, 2020, to testify in
2    a criminal proceeding involving a former employee of Linode.
3    Linode investigated this complaint and confirmed plaintiff did,
4    in fact, attend a court proceeding during the workday and did
5    not notify his supervisor of his need to take time off.
6    Moreover, Linode confirmed that plaintiff misrepresented the
7    number of hours he worked on August 13th and failed to utilize
8    his allotted vacation and/or other paid time off for the hours
9    he missed.  Plaintiff's conduct directly violated Section 3.7
10   of Linode's employee handbook which provides that any employee
11   who is observed not following their schedule without reporting
12   their time appropriately can and will be subject to
13   disciplinary action up and including termination."
14        And it continues and says, "Plaintiff's violation of 3.7
15   prompted Linode's human resources department to investigate
16   whether plaintiff previously engaged in similar conduct to
17   understand whether plaintiff's conduct on August 13th was an
18   isolated incident or part of a more extensive history of
19   violative behavior.  To Linode's dismay, the investigation
20   uncovered an egregious matter of plaintiff's delinquent
21   recordkeeping and improper use of company funds and resources.
22   Relative to the latter, Linode discovered plaintiff has been
23   using his corporate credit card to make large purchases without
24   prior authorization of a picture frame costing $800 and
25   baseball tickets costing a total of $1,480.  Additionally, the

**U**NITED  **S**TATES  **D**ISTRICT  **C**OURT

1  investigation revealed at least one instance to which plaintiff

2  made unwanted sexual advances toward a junior engineer.  For

3  these reasons only, and after consulting with Linode's human

4  resources department, Mr. Spataro made the decision to

5  terminate plaintiff's employment effective August 19th, 2020."

6      Sir, did I read that correctly?

7  A.  Yes.

8  Q.  That's the same lie that you told Carl --

9  A.  That's consistent with -- nothing in there is untrue, but

10 that is consistent with the lie at the termination meeting

11 which was not the communicated reason for termination.

12 Q.  Well, we can talk about whether those things are true or

13 not, but those are not the reasons he was terminated that you

14 testified to today, correct?

15 A.  Exactly.

16 Q.  You testified that the anonymous call that came through,

17 that was part of the lie, correct?

18 A.  Yes.

19 Q.  So in this verified under penalty of perjury statement in

20 this case, you continued to tell the same story that we've now

21 seen that you told to him at the termination, that then you

22 wrote down in a private document at work later that same day,

23 that you texted Dan Spataro about while you were terminating

24 him, and that you continued to go with the same story more than

25 a year later, right?  You've seen that?

**UNITED STATES DISTRICT COURT**

1  A.   That's accurate, yes.

2  Q.   So what is that about?  Why are you still lying in this

3  case?

4  A.   I don't have a great answer for you.  That's what we

5  decided on as the communicated reason for termination.  That's

6  consistent with what was done in the termination.  I think

7  we've already made it clear that that wasn't the entirety of

8  the truth behind the termination reason.

9  Q.   Sir, I'm going to ask you --

10         MR. CARSON:  Can we please also show the witness

11  another exhibit.  This is just in the witness -- I don't think

12  it's been admitted yet.  And so this exhibit is -- I think it's

13  61.

14         MR. CAVALIER:  To the extent this is for refreshing

15  recollection, I'm going to object to it.  It's an excluded

16  exhibit.

17         MR. CARSON:  I'm going to admit it right now.  It's

18  excluded and --

19         THE COURT:  Hold on.  Come up to sidebar.

20         (Sidebar as follows:)

21         THE COURT:  So let me start with this.  You haven't

22  identified the exhibit.  What exhibit number?

23         MR. CARSON:  I'm sorry.  61.  I thought I did.

24         THE COURT:  All right.  And so just to go back, there

25  was an objection to this exhibit.  I excluded it at the final

**UNITED STATES DISTRICT COURT**

1  pretrial conference, right?

2          MR. CAVALIER:  On his motion.

3          MR. CARSON:  It was my objection.

4          THE COURT:  It was your objection.  And just looking

5  back at the list, what were the grounds?

6          MR. CARSON:  So I said that it should not be able to

7  be used as an affirmative reason.  They are saying that none of

8  these things had to do with termination, but this is actually

9  the list of fake policy violations that they generated that

10  week.  And so I think I can lay a foundation for it and get

11  it admitted.  And I think I said that that was a reason I might

12  do it, and you said that you'll leave the door open to me doing

13  that.

14          THE COURT:  Well, no.  I think I said if a witness

15  opened the door.  I didn't say I would leave the door open.

16  Right?

17          So you could have objected to the exhibit.  I think

18  with respect to exhibits I said obviously all of my decisions

19  were subject to the --

20          MR. CARSON:  I mean, this is -- so the thing that he

21  just testified about over and over again, all these fake policy

22  violations that didn't really have to do with his termination,

23  this is the list that they made that week.  So it's certainly

24  relevant.  And if he lays a foundation and confirms he

25  recognizes it, then I think I should be allowed to admit it so

**UNITED STATES DISTRICT COURT**

1  the jury can see what they did.  And this goes directly

2  correctly to pretext.

3          THE COURT:  Okay.  Yeah, I'll allow it.

4          MR. CARSON:  Thank you.

5          MR. CAVALIER:  Okay.

6          (Sidebar concluded.)

7          MR. CARSON:  May I proceed, Your Honor?

8          THE COURT:  Yeah.  And just for the record, you're

9  showing the witness Exhibit 61.

10          MR. CARSON:  61 for the record, and it's not admitted

11  yet.

12          THE COURT:  All right.  Okay.

13  BY MR. CARSON:

14  Q.  So can you just please look at the exhibit.  So this is

15  the list of policy violations that was drafted the week of Carl

16  Williams' termination, correct?

17  A.  Yes.

18  Q.  And this was drafted in connection to Dan Spataro, Tom

19  Asaro and your plan to use this list instead of telling him the

20  real reason which you are saying today?

21  A.  Correct.

22          MR. CARSON:  Your Honor, I move to admit 61.

23          MR. CAVALIER:  Subject to prior, no objection.

24          THE COURT:  I'm going to admit it.  And 61 will

25  be admitted.

**UNITED STATES DISTRICT COURT**

1           (PLAINTIFF EXHIBIT 61 WAS RECEIVED IN EVIDENCE.)

2    BY MR. CARSON:

3    Q.   And so this list -- so you didn't -- so let me just

4    explain what it is first.

5         So this is a list that --

6           THE COURT:  Hold on, Mr. Carson.  You can't testify.

7    You can ask him a question, but you can't explain things.

8           MR. CARSON:  I'll explain through the questions, Your

9    Honor.  Sorry.  Let me ask questions to help the jury

10   understand what this is.

11   BY MR. CARSON:

12   Q.   So this list was generated the week of Carl Williams'

13   termination; is that correct?

14   A.   Yes.

15   Q.   And this is -- when you were saying there's a list of

16   policy violations that is the  found during the phone call, you

17   were referring to this list, right?

18   A.   That's correct.

19   Q.   And none of the things on this list are the real reason

20   why he was terminated, right?

21   A.   That's correct.

22   Q.   And so you didn't use this list on the phone call, right?

23   A.   That's correct.

24   Q.   You didn't even tell Carl whether this list existed,

25   right?

**UNITED STATES DISTRICT COURT**

1  A.   That's correct.

2  Q.   And so you could have -- you know, if the reason why you

3  -- you know, I'm using the word you used, "lie."

4       If the reason why you guys all lied is what you said it is

5  today, this list would not be necessary at all, right?

6  A.   Uhm --

7  Q.   I mean, like all the issues with safety of the employees

8  and Carl Williams' temper and volatility, none of those things

9  were an issue.  You could have not created this list and still

10 accounted for those reasons, right?

11 A.   Sure.

12 Q.   But you didn't.  Instead, the list was created.  And it's

13 an extensive list too, right?

14 A.   It is.

15 Q.   And I think that there was information provided to the

16 jury that suggested that when you decided that you didn't want

17 to tell Carl Williams about the John Musbach issue, you just

18 came up with like the most basic reason for terminating that

19 you could think of, and that was policy violations, right?

20 A.   I think a list this extensive wouldn't be the most basic

21 reason I could think of.

22 Q.   The --

23 A.   Those are all legitimate policy --

24      (Court reporter interruption.)

25 A.   This is not a basic reading.  This is an extensive list

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1  that's legitimate policy violations, which are consistent with

2  other terminations at the company.  So I wouldn't call this a

3  basic reason but I --

4  Q.  Yeah, this is a pretty extensive list, right?

5  A.  It is, yes.

6  Q.  But, you know, almost -- so the list has -- do you know

7  how many are on this list?

8  A.  No.

9  Q.  Four, five, six --

10       THE COURT:  Mr. Carson, we're on the record, so I'm

11  going to ask you not to do that out loud.

12       MR. CARSON:  Sorry.  I'll keep it in my head.

13  BY MR. CARSON:

14  Q.  So I'll represent to you, sir, that there are 16 alleged

15  violation on this list.  Does that seem right to you?

16  A.  I'll take your word for it, sure.

17  Q.  And eight of them didn't even happen in 2020.  Do you see

18  that?

19  A.  Yes.

20  Q.  And all but the last two of them didn't happen within, you

21  know, two months of the termination, right?

22  A.  That's correct.

23  Q.  And none of these led to any kind of formal disciplinary

24  write-up or anything like that, right?

25  A.  That's correct.

**UNITED STATES DISTRICT COURT**

1  Q.   And Linode does, according to at least the policy, have a

2  disciplinary policy in effect, right?

3  A.   Is the  do, yeah.

4  Q.   And it's purported to be a progressive disciplinary

5  policy; is that right?

6  A.   Yeah.  That goes to prove that Linode gave Carl a

7  tremendous amount of leeway in how he operated.

8  Q.   So under that progressive disciplinary policy, there are

9  verbal warnings; is that right?  That's one of the steps?

10 A.   That's one of the items that's in that policy, yes.

11 Q.   And there are written warnings too, right?

12 A.   That's also, yes.

13 Q.   And there are write-ups?

14 A.   That's the same thing as a written warning.

15 Q.   So in Carl's six years of employment, he had never been

16 written up for discipline even once, right?

17 A.   Correct.

18 Q.   And even though verbal warnings are called "verbal,"

19 there's usually some documentation that there has been a

20 warning made in someone's employee file; do you agree?

21 A.   Yes.

22 Q.   And so there's also no verbal warnings in the employee

23 file throughout his six years of employment, correct?

24 A.   Yes.

25 Q.   So in Carl's six years of employment, he had not been

**UNITED STATES DISTRICT COURT**

1  subjected to Linode's disciplinary policy even once, right?

2  A.  Aside from the termination, that's accurate.

3  Q.  Right.  Until the day he was terminated, right?

4  A.  Correct.

5  Q.  And some of these things on here are really -- you know,

6  there's things that aren't true in this document as well,

7  right?

8  A.  No.

9  Q.  Well, this was -- I'm not going to do all of them.  I

10 don't think I need to.  But the one, two, three, four, fifth.

11 The fifth one says that he purchased a picture frame in the

12 amount of $800 without prior approval?

13 A.  That's accurate.

14 Q.  Where is that picture frame right now?

15 A.  Where is the picture frame right now?

16 Q.  Yes.  Do you know?

17 A.  I haven't lived in the state in a few years.  I couldn't

18 tell you the location of the picture frame right now.

19 Q.  Were you --

20 A.  Last I knew, it was hanging up in a Linode office.

21 Q.  Whose office?

22 A.  The building I should say, in the Linode building.

23 Q.  Where was it hanging up?

24 A.  In a hallway.

25 Q.  Was it near someone's office?

**UNITED STATES DISTRICT COURT**

1  A.   I think the closest offices it was near were mine and
2  Chris Aker's.
3  Q.   And who was the picture purchased for?
4  A.   I don't know.  It was purchased, that's as much as I know.
5  I don't know who it was for.
6  Q.   Well, Carl told you that he was going to purchase it and
7  spent $800, right?
8  A.   He also told me he cleared it with finance.
9  Q.   So do you know what I'm talking about when I say Carl told
10  you it was purchased?
11  A.   Yes.
12  Q.   He sent you a Slack message, right?
13  A.   I know exactly what you are talking about.
14  Q.   Yeah.  He sent you a Slack message?
15  A.   Yes.  I said as long as it goes through the proper
16  approval process, which he stated that it did.
17  Q.   So he did tell the director of human resources before
18  spending the money that he was going to spend the money?
19  A.   It wasn't in my capacity to approve company expenses.
20       (Inaudible crosstalk.)
21  A.   That was a completely different department that handled
22  company expenses.  That was not my position.
23  Q.   Can is the  just agree that that happened, though?
24  A.   That I approved it?  No, I can't agree that that happened.
25  He told me he was going to purchase it, to which I relayed the

**UNITED STATES DISTRICT COURT**

1  policy to him that he has to get it approved through proper

2  procedure.  I can't tell you that I approved it, no.

3  Q.  I didn't ask you that question.  I just said, did he send

4  you a message before he bought it and let you know he was going

5  to buy it for $800?

6  A.  Yes.

7  Q.  Did he tell you the amount, $800?

8  A.  I don't recall if he told me the amount.  I believe he

9  did.  I don't remember specifically if he did or not.

10 Q.  Okay.

11      MR. CARSON:  Can is the  please just put Exhibit 22 on

12 the screen for a minute?  So please, can is the  show the

13 witness page 706.

14 BY MR. CARSON:

15 Q.  So this is what we're talking about, right?  You said to

16 him what you testified just now.  You said, "If there are

17 purchases required,  just make sure it's clear with Dan and/or

18 finance."

19      And Carl says --

20 A.  Where are you?  I'm sorry to interrupt.  I'm not seeing

21 what you're reading.

22 Q.  So on this --

23 A.  Okay.  Yes.

24 Q.  All right.  Yeah.  So it says -- you know, you said, "If

25 there are purchases required, I just make sure it's clear with

**UNITED STATES DISTRICT COURT**

1  Dan and/or finance."

2      Carl says, "Yes, that was cleared with Richard Ford.  I

3  told him today when we were in the lobby $800."

4      Do you see that?

5  A.  Yes.

6  Q.  And there's other things in there that -- well --

7      MR. CARSON:  Can is the  please put 61 back up,

8  please.

9  BY MR. CARSON:

10  Q.  So that $800 one was June 28, 2019.  Do you see that?

11  A.  Yes.

12  Q.  So there was no one who made any kind of issue about that

13  expenditure between June 28, 2019, and over a year and

14  two months later when you wanted to terminate Carl Williams,

15  right?

16  A.  Richard Ford did.

17  Q.  Is there an email or text or something or Slack message

18  you can show?

19  A.  That I have access to, no, but I know that it wasn't

20  approved to purchase.

21  Q.  How do you know?

22  A.  Richard Ford did not approve an $800 picture frame.

23  Q.  How do you know?

24  A.  Because he told me.

25  Q.  He told you?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   Is that a lie or is that the truth?

3  A.   That's the truth.

4  Q.   So the document that's a lie, you're telling the truth

5  about, right?  That's what your testimony --

6  A.   Excuse me?

7  Q.   All this stuff in here is a lie, none of these things had

8  to do with his termination, but your testimony about --

9  A.   I'm sorry.  Are you saying this whole document is a lie?

10 I don't understand where you are going here.

11 Q.   Well, you used this document to terminate -- it says tell

12 Carl Williams that these are the reasons why he was terminated,

13 right?

14 A.   Yes.

15 Q.   So this document, none of these are the reasons why he was

16 terminated, right?

17 A.   That doesn't make the document a lie; that makes the

18 communicated reason for termination a lie.  Everything in this

19 document is accurate.

20 Q.   You made this document because you wanted to tell Carl

21 Williams something that was false about his termination?

22 A.   Yes, because we were afraid going into that meeting to

23 tell him what we really thought --

24 Q.   I didn't ask you that.

25 A.   That's fair.  It doesn't make the document a lie, it makes

UNITED STATES DISTRICT COURT

1  the verbal reason why is the  terminated him a lie.

2  Q.   So when did Richard Ford tell you that?

3  A.   After the purchase of the picture frame.

4  Q.   Okay.  So Richard Ford told you that around June 2019.

5  A.   After the purchase of the picture frame.

6  Q.   Yeah.  And that, obviously, was back when you're saying

7  the thing happened, right?

8  A.   Yes.

9  Q.   So Richard Ford told you that a year and two months before

10 this document was created?

11 A.   I don't know.  I can't say it's a year and two months.  I

12 don't know when is the  spoke about it, but it was prior to the

13 termination.  It was after the purchase of the picture frame.

14 Q.   It was back when it happened, when you're saying it

15 happened, June 28th, 2019, right?

16 A.   Sure.  Yes.

17 Q.   All right.  So Richard Ford told you something, and you're

18 saying it was some sort of disciplinary issue and you didn't do

19 anything about it for a year and two months, and then that's

20 when you decided it became an issue?

21 A.   The picture frame itself or the pattern of policy

22 violations.

23 Q.   If that's the answer you want to give, I'll let the record

24 speak for itself.

25 A.   Sure.

**UNITED STATES DISTRICT COURT**

1  Q.  And the next one -- and you called that theft of

2  professional ethics?  That's what you call that, theft?

3  A.  That was the label of the violation, yes.

4  Q.  So when Carl Williams tells you in advance he's going to

5  spend $800 and then spends $800 for a picture frame that's hung

6  near the owner of the place's office, that's an example of

7  theft according to you?

8  A.  I wasn't authorized to give financial approval of the

9  company.  So by him telling me he was going to purchase

10 something, that doesn't give him authorization to purchase

11 something.  If someone's using company funds on a purchase,

12 whether or not it's going to live in the office or live in

13 their house, yes, absolutely.

14 Q.  So he stole from Linode when he did that?

15 A.  If he was using unauthorized company funds, I would

16 consider that a form of theft.  Sure.

17 Q.  Okay.  So is your definition of harassment that broad as

18 well?  You said in this document that -- so let's see.

19 A.  I'm sorry.  Do you want all encompassing definitions of

20 theft, how to draw that to harassment?

21 Q.  You can interpret that however way you want to.

22 A.  Sure.

23 Q.  So January 9, 2020, this one you're calling harassment.

24 You see that?  It's from the bottom one, two, three, four,

25 five, it's the seventh from the bottom.

**UNITED STATES DISTRICT COURT**

1   A.   Can you point to me where that says harassment?

2   Q.   Yes.  It says embarrassing and/or harassment?

3   A.   Okay.  Sure.

4   Q.   All right.  So this one we're going to see harassment.  So

5   let's take a look.

6        MR. CARSON:  So can is the  please show the witness

7   Exhibit 20.  So this is -- sorry.  When you're ready -- I don't

8   know.  Is 20 admitted yet?

9        THE COURTROOM DEPUTY:  No.

10       MR. CAVALIER:  I don't think so.

11  BY MR. CARSON:

12  Q.   So this is a Slack thread between you and Carl Williams

13  that occurred in connection with that issue of harassment

14  during yours and Carl's employment at Linode, correct?

15  A.   Yes.

16       MR. CARSON:  I move to admit Exhibit 20.

17       THE COURT:  Mr. Cavalier?

18       MR. CAVALIER:  I'm sorry, Your Honor?

19       THE COURT:  He moved to admit.  He offered it.

20       MR. CAVALIER:  I have no objection.

21       THE COURT:  Okay.  It will come in.

22       (PLAINTIFF EXHIBIT 20 WAS RECEIVED IN EVIDENCE.)

23  BY MR. CARSON:

24  Q.   So you guys are discussing the harassment, right, in this

25  text thread, correct?

**UNITED STATES DISTRICT COURT**

1  A.   If -- the issue that he pointed to on the spreadsheet,

2  yes, that's what we're looking at.  That's the communication

3  about that Linode.

4  Q.   And here you say, "Hi, Carl.  I've addressed this issue.

5  Can you please let me know if this persists."

6        And he says, "Yes, thanks."

7        And you say, "Cool.  There's something else I wanted to

8  mention.  Can you stop by if you have a chance?  Otherwise,

9  maybe we can talk tomorrow."

10        And he said, "Yeah.  I can stop by tomorrow.  Is there

11  anything wrong?"

12        You say, "No.  I don't think so.  Feel free to stop by

13  tomorrow if you'd like.  Maybe not necessary.  I don't want to

14  make a really big deal of this, but I did get some feedback a

15  couple days ago when you shared a photo of Alyssa and staff.

16  What I got was that the photo was unprovoked and out of

17  context.  And because of that, made Alyssa uncomfortable and

18  others a bit uncomfortable for her."

19        This is the issue, right?

20  A.   Yes.

21  Q.   And, you know, I'll let -- the jury can look at it at

22  their leisure.  But it closed, and the last thing you said is,

23  "No problem, Carl.  Thanks for understanding.  Let me know if

24  you have anything else and that other topic you brought up with

25  me, please."

**UNITED STATES DISTRICT COURT**

1       And Carl said, "Sure, Vincent."

2       So here you're discussing what you're calling harassment,

3   correct?

4   A.   I never used that word.

5   Q.   That's the word you guys used in the document?

6   A.   Embarrassment and/or harassment.

7   Q.   Harassment.  You used harassment, right?  It says that in

8   the document?

9   A.   Embarrassment and/or harassment.  Sure.  Form of

10  harassment.

11  Q.   The photo that he shared, where did he get that photo?  Do

12  you remember?

13  A.   I think it was an extended profile picture, if I remember

14  correctly.  The nature of Slack, it shows a head shot of the

15  coworker, and you can click on it and it will show the entire

16  picture, not just the cropped portion.

17      So I believe it took a few steps to get the picture, but

18  it was an expanded version of the Slack profile picture, which,

19  in Slack, is just a head shot.  The extended version, you know,

20  I believe was a full body image of Alyssa on vacation.

21  Q.   Well, where did he get a different picture from?

22  A.   I just explained where the picture came from.  And the

23  picture was shared in a company-wide chat channel in front of

24  the entire company, and it caused quite a bit of embarrassment.

25      Upon speaking with Alyssa and addressing how she wanted

**UNITED STATES DISTRICT COURT**

1  this situation to go, she didn't want to pursue it as an

2  official harassment complaint.  But it certainly made her

3  uncomfortable and embarrassed.

4  Q.  She said that?

5  A.  Yes.  To have her picture shared in a company-wide chat

6  channel, which was of her private vacation, which was

7  unsolicited and there was no communication directly to her,

8  yes, she was absolutely embarrassed.

9  Q.  Wasn't the picture just her profile picture?  It's the

10  exact picture she had up?  It was just a little larger?  It

11  wasn't a different picture.  It wasn't a full-body shot --

12  A.  I just explained what the picture was.  It was a full-body

13  picture.  It was a standard picture of the --

14  Q.  Are you sure she told you that?

15  A.  I saw it.

16  Q.  Did you ask Alyssa what it was and did she tell you?

17  A.  I saw it.

18  Q.  I'm asking if the person who you are saying this happened

19  to told you that or if she told you what it was?

20  A.  I don't think it was necessary for her to tell me what it

21  was because I saw it firsthand.

22        MR. CARSON:  Can is the  show the witness Exhibit 81,

23  please.

24  BY MR. CARSON:

25  Q.  So this is the conversation that you had with Alyssa about

UNITED STATES DISTRICT COURT

1  this issue?

2  A.    That's not -- that's not the same person.

3  Q.    It's not?

4  A.    This is a person named Amber.  We're talking about a

5  person named Alyssa.

6  Q.    Okay.  I know.

7          MR. CARSON:  Sorry.  I pulled up the wrong exhibit.

8  My fault.

9          THE COURT:  Let's approach.  Get counsel up here.

10          (Sidebar as follows:)

11          THE COURT:  So I've given you a ton of leeway,

12  Mr. Carson, but I think we've gotten too far afield.  This

13  document wasn't shown to Mr. Williams, and it acknowledged that

14  it's not the basis on which they terminated Mr. Williams.  So

15  arguing about the veracity of the items in the list which

16  wasn't shown to Mr. Williams is getting into very collateral

17  matters.  And this case is crawling -- crawling along.  Okay?

18  We are on our second witness.  So it needs to be done, and I

19  think on this exhibit, you need to wrap.  Okay?

20          MR. CARSON:  So there's a text thread between her and

21  the girl, and the girl says, "Don't worry.  It's no big deal."

22          THE COURT:  But all of this is ancillary to the issues

23  in the case.

24          MR. CARSON:  I think it shows that they're lying in

25  the document --

**UNITED STATES DISTRICT COURT**

1          THE COURT:  But the document itself wasn't shown to
2   Mr. Williams, and they've acknowledged that it wasn't what they
3   used to decide to terminate him on.  So what we're doing now is
4   arguing about whether they were truthful in their own internal
5   discussion that led them to say something that they've
6   acknowledged is a lie.  It's collateral and is a waste of time.
7   And under Rule 403, we're too far afield.  This case is going
8   nowhere and we need to wrap it up.
9          MR. CARSON:  I think it's relevant, but I'm going to
10  do what you tell me to do.
11         THE COURT:  All right.  So wrap it up.
12         (Sidebar concluded.)
13  BY MR. CARSON:
14  Q.   All right.  Because of the timing issues, I'm going to
15  keep things moving.  There's a couple other things I want to
16  talk to you about or ask you questions about before is the
17  finish up.  And here's the first thing.
18       So you are the person at Linode who's responsible for the
19  issues related to the benefits employees receive, correct?
20  A.   Correct.
21  Q.   And some of the benefits the employees receive include
22  profit sharing and a 401K, not matching, and a 401K
23  distribution, right?
24  A.   That's correct.
25  Q.   And a 401K contribution they receive whether they -- it's

**UNITED STATES DISTRICT COURT**

1    not a matching.  They receive it no matter what, right?

2    A.    Yeah.  It was a 3 percent contribution.

3    Q.    And the profit sharing is something they also received no

4    matter what, correct?

5    A.    That's correct.

6    Q.    And the way it works is that there's an administrator that

7    Linode uses that will provide the names and the amounts that

8    each employee is supposed to receive under the profit sharing

9    every year, right?

10    A.    That's correct.

11    Q.    And at the end of the year, December 31st, information is

12    provided to that administrator.  The administrator works up the

13    number and then provides the information back upon which the

14    checks or the money is given to the employees, right?

15    A.    Yeah.  If -- the money was deposited into the 401K

16    accounts.  It's another avenue of a 401K contribution, but

17    that's correct.

18    Q.    So the money -- the benefit for profit sharing that

19    employees received for, let's say, 2017, they received in the

20    first six months in 2018, right?

21    A.    Yeah.  It's typically about halfway through the following

22    year of employment.

23    Q.    And the money that they received for 2018 would be, like,

24    they received it in 2019?

25    A.    Correct.

**UNITED STATES DISTRICT COURT**

1  Q.  And the year that the issue in this case relates to is

2  2020, because Carl Williams did not receive the profit sharing

3  for 2020 year, correct?

4  A.  That's correct.

5  Q.  And he was supposed to receive that under the terms of the

6  plan, correct?

7  A.  That's not correct.

8  Q.  Why not?

9  A.  It was -- under the plan, it was standard practice that

10  terminated employees who are not highly-compensated employees

11  would receive a profit sharing contribution for their final

12  year of employment.

13      Employees who were highly-compensated employees -- highly

14  compensated is a federal definition of a highly-compensated

15  employee.  Employees who were considered highly compensated did

16  not receive a profit sharing contribution if they were

17  terminated in the calendar year.

18  Q.  But you told Mr. Williams that it didn't matter whether he

19  worked there.  He should have received the money, correct?

20  A.  Not in these words, no.  I said all the -- all eligible

21  employees would receive a contribution.  He was not considered

22  an eligible employee.

23  Q.  Well, let's look at...

24      MR. CARSON:  Can is the  please show the witness 174.

25  BY MR. CARSON:

**UNITED STATES DISTRICT COURT**

1  Q.   And this has already been admitted.  So this is an email

2  from you, right?

3  A.   Can you scroll up?  Yes.

4  Q.   You sent this email, and Carl Williams is copied.  And it

5  says -- we're looking at the last sentence in the second

6  paragraph.  Says, "They are then paid out for the entirety of

7  the eligibility period where the eligible employee was active

8  with Linode regardless of their employment status at that

9  time."

10       Did I read that right?

11 A.   You did.

12 Q.   So employment status at the time is not a condition of the

13 profit sharing, correct?

14 A.   That's correct.

15 Q.   And so employees who are no longer employed at Linode but

16 worked a certain number of hours for the year, for the plan

17 year, should still receive the profit sharing, right?

18 A.   That's -- as long as they're not highly-compensated

19 employees, that is accurate.

20 Q.   Well, does it say that in the email?

21 A.   The key word here is "eligible employees."  Because

22 Mr. Williams was a highly-compensated employee, he was not

23 considered an eligible employee under this part of the plan.  I

24 think that's the key word we're not talking about here.

25 Q.   It doesn't say eligible employees.  It says, "They are

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  then paid out for the entirety of the eligibility period."

2  A.   "Where the eligible employee was active" --

3  Q.   Right.  So by eligible employee there, you were referring

4  to a certain amount of hours you have to work in order to

5  qualify for profit sharing, right?

6  A.   I didn't say that, no.

7  Q.   But that's what's true, right?  The only condition for

8  getting the profit sharing is that you have to work a certain

9  amount of hours?

10  A.   That's not accurate.

11  Q.   You sure?

12  A.   Yes.

13  Q.   Do you remember when I asked you questions about profit

14  sharing during a deposition?

15  A.   Yes.

16  Q.   And that deposition was June of last year?

17  A.   Sure.

18  Q.   And do you remember that you were under oath when you gave

19  answers to those questions?

20  A.   Yes.

21  Q.   Sorry.  It was August 2, 2023.  And on August 2, 2023, you

22  said -- on August 2, 2023, you said:

23       "QUESTION:  Okay."

24            MR. CAVALIER:  Page?

25            MR. CARSON:  34.  Sorry.  Line 20.  I can give you a

UNITED STATES DISTRICT COURT

1  copy of the transcript.

2        MR. CAVALIER:  No, I got one.

3  BY MR. CARSON:

4  Q.  So it says:

5        "QUESTION:  Okay."

6        Then here, in the last sentence of Paragraph 2, it says

7  that they are paid out for the entirety -- sorry.  I can't

8  talk.  It says, "They are then paid out for the entirety of the

9  eligibility period where the eligible employee was active with

10  Linode regardless of their employment status at the time.

11        "Is that your understanding if that's accurate?"

12        And you said, "Yes."

13        And then I said, "And so it doesn't matter whether they're

14  employed at the time.  What is the eligibility requirement that

15  determines whether they're paid out for the year?"

16        And you said, "So this is what I mentioned before.  The

17  eligibility requirement is that employee would have to serve

18  one year of employment, and then they're entered into the plan.

19  So they were enrolled into the plan the first of the quarter

20  following one year of employment.  That's when their

21  eligibility period would have started."

22        So you didn't mention anything about highly-compensated

23  employees there, correct?

24  A.  It sounds like I mentioned who was eligible for the plan

25  itself.  I might not have understood the question properly

**UNITED STATES DISTRICT COURT**

1    there.

2        But, no, I didn't mention anything about

3    highly-compensated employees there.  But the statement you read

4    still says eligible employees, which, by the plan definitions

5    and everything, Mr. Williams wouldn't have been a highly

6    compensated -- wouldn't have been eligible -- excuse me.

7    Q.   So then I asked you, "So do you know whether Mr. Williams

8    received his profit sharing in 2020?"

9        Answer, "I don't recall specifically, no."

10       And I asked a question, "In order to find that out, is

11   there a document we can look at?"

12       He says, "I don't have the records of the specific

13   contributions of the profit sharing.  That was all maintained

14   through our retirement portal, which I don't have access to any

15   longer since the acquisition of Akamai."

16       And I said, "But generally speaking, so I think that the

17   Milberg Consulting company provided" --

18            MR. CAVALIER:  How is this impeachment?

19            THE COURT:  I mean, I don't have it.  I don't know if

20   the witness has it.  So I don't know if it's impeachment

21   because I don't know if he said anything contrary to his

22   current testimony.

23            MR. CAVALIER:  I think we are in the same boat here,

24   Your Honor.

25            MR. CARSON:  I can set it up if you need me to a

UNITED STATES DISTRICT COURT

1  little better.

2       THE COURT:  It's not a question of setting it up.

3  It's a question of being able to identify.  I mean there are

4  two fairly lengthy questions and answers now without having

5  heard anything directly contrary.

6       MR. CARSON:  Okay.  I'll get to the point.  Sorry.

7  Just a moment, Your Honor.

8  BY MR. CARSON:

9  Q.  There's several things on Page 41.  It says, "Everyone in

10  the company who is eligible for the same benefits packages,

11  there was no difference in benefit package by employee

12  classification.  Outside there was some limited rules that

13  wouldn't apply to, you know, this specific situation that had

14  to do full-time versus part-time employees."

15       And I said, "So that list of benefits that is the  named,

16  which is health division, the profit sharing?"

17       You said, "Yes.  That's the benefit package that Linode

18  paid to its employees."

19       You said, "Yes."

20       So there you said that there was no difference, correct?

21  A.  This is out of context.  That was referring to our

22  specific benefits package and who was eligible for the benefit

23  packages.  Carl had the same eligibility requirements for those

24  benefits package.

25       That does not refer to how the mechanics of the plans

**UNITED STATES DISTRICT COURT**

1  themselves work and what is included and what is excluded from

2  those plans.  So this is very out of context.  I'm a little bit

3  uncomfortable with where we're going here.

4          THE COURT:  So two things.  One is that I think you

5  need to have something specific that is contrary if you want to

6  show him something that you think is contrary.

7          The other thing is I think you need to give the

8  witness the transcript at this point.  It seems clear to me

9  that he's going to have questions about the context of the

10  questions and answers that you're citing.  And he needs to look

11  at the relevant portions of the transcript to tell you if it

12  really is impeachment.

13          MR. CARSON:  I'd be happy to give him a copy of the

14  transcript.

15          MR. CAVALIER:  Your Honor, can I have a 30-second

16  sidebar?

17          THE COURT:  Yes.

18          MR. CAVALIER:  Thank you.

19          (Sidebar as follows:)

20          THE COURT:  Mr. Carson, we're waiting.

21          MR. CARSON:  Sorry.  Yes.

22          MR. CAVALIER:  He explains the entire thing right here

23  on Page 30.

24          MR. CARSON:  Yeah.  He also says that Carl was owed

25  the money that year, from the same deposition.

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1          MR. CAVALIER:  The whole thing with the eligible
2     employee, it's -- I'll stipulate to whatever he's trying to get
3     out of this.  I'm trying to get this guy on a plane today.
4          THE COURT:  Testimony here is that highly-compensated
5     employees are not eligible to receive the 3 percent
6     contribution.
7          MR. CARSON:  That's not what we're talking about,
8     though.  That's the 401K.  We're talking about the 5 percent.
9          MR. CAVALIER:  I will stipulate that if he prevails on
10    liability claim, he will receive that money.
11          MR. CARSON:  No.  No.  No.  His liability claim is
12    that money.
13          THE COURT:  Meaning, you're saying, because the
14    liability claim is that they denied him the profit sharing in
15    some discriminatory way?
16          MR. CARSON:  Yes.  That it was owed without respect to
17    whether he worked there or not.  And I just need -- I made a
18    note of it.  I don't know why I can't find it.  I just need a
19    minute to find it.
20          THE COURT:  See, that's the problem.  You just can't
21    find it.  You need to come in here ready to go.  This case is
22    going nowhere, Mr. Carson.  What is your -- we're dragging
23    along.  What is your plan to get this case finished?
24          MR. CARSON:  Finish questioning this witness about a
25    couple things and move on.

**UNITED STATES DISTRICT COURT**

```
 1            THE COURT:  You keep saying that, a couple things, an
 2    hour.  Everything stretches --
 3            MR. CARSON:  I'm almost done --
 4            THE COURT:  -- double and triple --
 5            MR. CARSON:  Okay.  I'm almost done.
 6            THE COURT:  Okay.  But I've heard almost done before,
 7    and you're not almost done.  You need to wrap it up.  Okay?
 8            MR. CARSON:  I just need a minute because there's one
 9    thing I'm going to ask him about.  Then I'm going to wrap it
10    up.
11            (Sidebar concluded.)
12            MR. CARSON:  So here is the transcript, and so I --
13    I'll tell you where to go.  So can you please turn to Page 68.
14            MR. CAVALIER:  Are is the  in a different deposition
15    now?
16            MR. CARSON:  Yeah.  That was the issue.
17    BY MR. CARSON:
18    Q.  All right.  So this would be Vincent Palochko's deposition
19    from June 26, 2023.
20    A.  Okay.
21    Q.  And can you please turn to Page 37.
22    A.  Page 37?
23    Q.  Yes.
24    A.  Okay.
25    Q.  So on 37, I say, "I would look at updates as is the  said
```

*United States District Court*

1  before."

2       And you said -- sorry strike that.

3       "Okay.  Do you have an update that occurred just to this

4  policy, if any, between October 2014 and August 2020?"

5       You said, "I don't have an answer to that."

6       "Do you know if an update occurred?"  Sorry --

7  A.   What -- which line are is the  on here?  Can you tell me

8  which line we're on here?

9            THE COURTROOM DEPUTY:  No, Page 37, Line 24.

10           MR. CARSON:  Thank you, Melissa.

11 BY MR. CARSON:

12 Q.   Page 37, Line 24.

13 A.   Sure.

14           MR. CAVALIER:  Your Honor.

15           MR. CARSON:  I just need one more --

16           THE COURT:  Mr. Carson, you keep saying you just need

17 one minute and it's always one more minute.  Do it now or move

18 on.

19 BY MR. CARSON:

20 Q.   Okay.  So if you please turn to Page 67?

21 A.   We're at 67 now.

22 Q.   Thank you.  Question, "What?  Didn't he work like almost

23 nine months that year, eight and a half months?"

24       You said, "I'm sorry.  I'd like to back up.  If you don't

25 mind, I'd like to double check."

1    "Yes.  All right.  That's fine."

2    Answer, "Yeah.  If his termination was in August, off the

3    top of my head, he should have worked the required amount of

4    hours.  I'd have to double check, though, the exact, you know,

5    if there was a distribution.  I don't see a reason why there

6    wouldn't have been, but I don't recall specifically."

7    Is that what you said?

8    A.  That's right.

9    Q.  You didn't say anything about highly-compensated employees

10   getting paid differently?

11   A.  I did double check, just as I said I would in this

12   transcript.  I said right here, "Off the top of my head."

13   You know, this was a high-pressure deposition.  Is the

14   had three different retirement plans.  It would be impossible

15   for me to memorize every single regulation in three different

16   retirement plans.  I'm not a retirement plan administrator.

17   I'm not an actuary.  So that's why I said off the top of my

18   head and I'd have to double check.

19   I did double check with our retirement plan administrator.

20   And that's why I'm here telling you that he was a

21   highly-compensated employee.  So that's why he didn't qualify

22   for the contribution.

23   Q.  Didn't you have another way of paying highly-compensated

24   employees that was like an IRS rule or something that you

25   couldn't pay --

**UNITED STATES DISTRICT COURT**

1   A.   Yeah.   They weren't eligible for our 3 percent Safe Harbor

2   401K contribution.   So they were given, as a company courtesy,

3   is the  didn't want to exclude highly-compensated employees

4   from that benefit.   So they were given that 3 percent

5   contribution as -- it was labeled as profit sharing.   And that

6   was --

7   Q.   They all got it, right?

8   A.   They all got it, yes.

9   Q.   And Carl got it every year that he was working at

10  Linode --

11  A.   There's two different things here that we're looking at.

12  The profit-sharing plan had a little bit of discretion to it.

13  So that three percent contribution to the profit-sharing plan

14  were done on a paycheck basis and it behaved the same way as a

15  three percent match or a three percent contribution to a 401K

16  plan.

17       The other portion of the profit-sharing plan, which was

18  the entire company, including non-highly-compensated employees,

19  was a lump sum contribution.   And it was discretionary amount,

20  it was typically about five percent of the eligible earnings

21  for a year.   But those are two different things we're talking

22  about.   So he would have received the three percent

23  profit-sharing during the course of the employment on a per

24  payroll basis.

25  Q.   Did you just say it was discretionary?

**UNITED STATES DISTRICT COURT**

1  A.  Excuse me?

2  Q.  Did you just say it was discretionary?

3  A.  The amount is discretionary, yes.

4  Q.  But not the --

5  A.  The rules within the plan are not discretionary.  It's

6  governed very closely.  The exact amounts that is the

7  contribute to that plan was a discretionary portion of that

8  plan.  It has nothing to do with who is not eligible for the

9  plan.

10  Q.  So if I show you the 401K profit-sharing plan contract

11  with the employees, would you be able to show me where it says

12  in there that --

13  A.  If you want me to read a 30-page document, I'm not --

14      (Inaudible crosstalk.)

15  A.  I can't tell you that.  If you want me to go through a

16  30-page document, I think we have to -- you know, I might have

17  to spend some time with that.  But I'm not a plan

18  administrator, I'm not familiar with the ins and outs of the

19  rules.

20      Like I said here in this transcript, I did double check

21  with our plan administrator about specific rules, which I said

22  here off the top of my head I'm not familiar with.  And I have

23  gotten a response which is what I'm telling you today.

24  Q.  Does it matter what the person that you're saying -- I

25  mean, we don't know if --

UNITED STATES DISTRICT COURT

1          MR. CAVALIER:  Asked and answered.

2    BY MR. CARSON:

3    Q.   Is that another lie or is that the truth that you asked

4    him?

5          MR. CAVALIER:  Objection.

6          THE COURT:  The objection is overruled.  You can

7    answer the question.

8          THE WITNESS:  It's the truth.  I emailed Jack Sherman,

9    who is our retirement plan administrator from Milberg

10   Consulting following this deposition to double check the rules

11   because I wasn't sure myself and it was an educational

12   opportunity for me.

13   BY MR. CARSON:

14   Q.   So is that written into the actual contract or is that

15   some sort of --

16   A.   Like I said, if you want me to go through the entire

17   contract, I don't know if everyone here is going to be happy,

18   but I'd be happy to read through a 30-plus-page document to

19   tell you.

20   Q.   But you told Carl that -- Carl received the profit-sharing

21   every year of his employment; is that correct?

22   A.   No.

23   Q.   He didn't?

24   A.   No.

25   Q.   After his eligibility period, after the first-year

**UNITED STATES DISTRICT COURT**

1  eligibility period ended, he received it every year thereafter?

2  A.  No, he did not.

3  Q.  He didn't?  Which year didn't he get it for?

4  A.  The year that he was terminated he didn't receive it.

5  Q.  And that's the crux of the case.  So isn't it true --

6  A.  Because he wasn't eligible.  He received it every year

7  that he was eligible for it, yes.

8  Q.  But under the plan, sir, he was eligible because the plan

9  says it's not with respect to whether you worked there or not,

10 and it says that --

11        MR. CAVALIER:  Objection.

12        THE COURT:  Mr. Carson, you're now just testifying.

13 If there's a document that you want to show him, you can show

14 it to him, okay, and he can cross-examine on it, but I'm not

15 going to have you representing what's in and not in the

16 documents.

17        MR. CARSON:  Can you show the witness Exhibit 172,

18 please.

19        MR. CAVALIER:  Objection.  This exhibit was not

20 disclosed to us per the Court's orders.

21        MR. CARSON:  It's already admitted.

22        MR. CAVALIER:  For today's witness.

23        THE COURT:  I'm going to allow it.  I think it's being

24 offered for impeachment purposes.

25        But, you know, Mr. Carson, if you are going to show it

**UNITED STATES DISTRICT COURT**

1  to him, you need to have something very specific to show him.

2  We're not just going to page through the whole document.

3           MR. CARSON:  I'm just asking him to show me where it

4  says that highly-compensated employees --

5           THE COURT:  Give him a whole copy of the document.

6  But you know what, we're not -- Mr. Carson, if that's what you

7  want to do, you are going to have to table that.  I'm not going

8  to sit here at 4:35 on a Friday afternoon while he flips

9  through the whole document.

10          MR. CARSON:  Okay.  I'm fine with Table 1.

11          THE COURT:  I'm also not giving him homework over the

12  weekend.  So we're going to do it against your time and I may

13  put you on a clock.

14          MR. CARSON:  I don't know what that means.

15          THE COURT:  Means you are going to have a limited

16  amount of time left for your case.

17          MR. CARSON:  I still don't know what that means.

18          THE COURT:  Well, we'll talk about it later.

19          MR. CARSON:  Okay.

20          MR. CAVALIER:  Your Honor, this delay is starting to

21  seem intentional.

22          THE COURT:  I don't think it's intentional.  We're

23  going to end at a certain time today no matter what, okay.

24  It's going to have to wrap up.

25          If you're not ready for another line of questioning,

**UNITED STATES DISTRICT COURT**

1    Mr. Carson --

2           MR. CARSON:  I'm ready.

3           THE COURT:  It doesn't seem like it.  So if you're

4    ready, then ask.

5           MR. CARSON:  My last line of questioning will be on...

6    BY MR. CARSON:

7    Q.   So when you -- in your position as the director of human

8    resources, part of your job is also receiving charges of

9    discrimination, correct?

10   A.   Yes.

11   Q.   And so you know what a charge of discrimination is, right?

12   A.   Yes.

13   Q.   And my client filed a charge alleging that Linode engaged

14   in discriminatory conduct which led to his termination after he

15   was terminated, right?

16   A.   After the termination, yes.

17   Q.   And because you are also the director of human resources,

18   you understand that the response to a charge of discrimination

19   is that the employer writes a position statement, right?

20   A.   Yes.

21   Q.   And Linode responded to my client's charge of

22   discrimination, correct?

23   A.   I'm not aware of the response.  I know that there was a

24   charge filed.  I don't have -- I didn't draft a response

25   personally.  Typically that would be handled by legal.  But go

**UNITED STATES DISTRICT COURT**

1  ahead.

2  Q.   So isn't it true that the same information that's in the

3  interrogatories and the same information that you told Carl the

4  day he was terminated and the same information that's in the

5  list on the Excel spreadsheet and that's in your communication

6  with Dan Spataro is also in that position statement?

7  A.   The position statement I didn't draft and I'm not familiar

8  with.

9           MR. CAVALIER:  Objection.  Lack of foundation.

10          THE COURT:  Sustained.

11          MR. CARSON:  Can I show the witness the document?

12          THE COURT:  No.  You have no foundation to do so.

13          MR. CARSON:  Sidebar please.

14          (Sidebar as follows:)

15          MR. CARSON:  Under Rule 801, these -- a position

16  statement is a -- is not hearsay.

17          THE COURT:  I'm not saying it's hearsay, Mr. Carson.

18  I'm saying you don't have any foundation.  He just said he's

19  not familiar with it.

20          MR. CARSON:  Right.  But it can still be admitted and

21  used to impeach, and admissions by attorneys are admissible as

22  party admissions under their clients --

23          THE COURT:  Mr. Carson, you're quoting a hearsay rule.

24  You have to show a foundation to use the document.  He said

25  he's not familiar with it.  He can't look at the document and

1    tell you what's in it for the first time here.

2          If you can establish his familiarity with it, that's

3    something different, but he said he wasn't involved in drafting

4    it and he hasn't seen it.  So yes, it's not hearsay.  It's a

5    party admission.  Yes, you can use it to impeach.  But it's

6    not --

7          MR. CARSON:  No, it actually -- supposed to be -- it

8    comes in, I think, I can show it to the jury and ask questions

9    about it.

10         THE COURT:  Yes, with a witness who has a foundation

11   to sponsor it.  It's not self-authenticating and you don't have

12   a witness who has any foundation for it right now.  Those are

13   different rules of evidence, Mr. Carson.

14         MR. CARSON:  I think that it says that a party's

15   position statement for EEOC is admissible as evidence

16   determining that the contents of an email from the defendant's

17   attorney regarding subject of litigation constituting a party

18   admission under Rule 801 --

19         THE COURT:  Mr. Carson, do you understand the

20   difference between foundation and hearsay?

21         MR. CARSON:  Yeah, I do.

22         THE COURT:  Well, you don't seem like you do because

23   you keep quoting hearsay, and I'm saying foundation is the

24   problem here.  I understand it is admissible.  It is admissible

25   if you lay a foundation.  Every document that comes in needs to

**UNITED STATES DISTRICT COURT**

1    have foundation.

2          You cannot just pick a random document that a witness

3    has never seen and show it to them if it doesn't impeach, and

4    this document is not even in evidence.

5          MR. CARSON:  He was the corporate designee of --

6          THE COURT:  But he just said he hasn't seen it.

7          MR. CARSON:  I think I can still use it to impeach,

8    though.

9          THE COURT:  No, you can't, because there's nothing to

10   impeach.  He didn't offer testimony about what was in the

11   statement.  He said he doesn't know because he hasn't seen it.

12         MR. CAVALIER:  It also wasn't disclosed.

13         MR. CARSON:  I mean, so, what, I'm going to have to

14   call their lawyer to the stand then in order to get it in?

15         THE COURT:  I'm not telling you how to get it in, I'm

16   not offering you legal advice.  I'm telling you that without a

17   foundation from this witness that he has seen it, then you

18   can't get it in.  You need a foundation.  That's how evidence

19   works, Mr. Carson.

20         MR. CARSON:  Okay.  All right.  I'll go in and I'll

21   just ask -- I'll finish up my questions then.

22         THE COURT:  Okay.

23         (Sidebar concluded.)

24   BY MR. CARSON:

25   Q.  How many other ways did you lie about this case other than

**UNITED STATES DISTRICT COURT**

1  the ones that you already admitted to?

2        MR. CAVALIER:  Objection.

3        THE COURT:  It's overruled.

4        THE WITNESS:  I already admitted to what was lied

5  about.

6  BY MR. CARSON:

7  Q.  Do you know how many lies you told?

8  A.  No.  The reason for the termination.

9  Q.  So how long did those lies last?  Do you know when you

10  decided to stop lying?

11  A.  No.

12  Q.  Can is the  agree you didn't decide to stop lying while

13  the charge was at the EEOC?

14        MR. CAVALIER:  Objection.

15        THE COURT:  Objection is sustained.

16  BY MR. CARSON:

17  Q.  Well, can is the  agree that as far as, you know, November

18  of 2022, you were still going with that same lie, correct?

19        MR. CAVALIER:  Objection.

20        THE COURT:  That's overruled.

21        THE WITNESS:  I don't know, sir.

22  BY MR. CARSON:

23  Q.  Well, you saw the interrogatories, right, that were dated

24  November 2022, right?

25  A.  Okay.  Yes.

**UNITED STATES DISTRICT COURT**

1  Q.   So from at least the week before the termination until
2  November of 2022, you lied about the reason for the termination
3  and said it was -- according to your testimony, you lied about
4  the reason for the termination and said it was policy
5  violations, correct?  For that entire period of time, correct?
6  A.   Yes.
7  Q.   So when was the decision made to stop lying and tell the
8  truth, what you are saying is the truth?
9  A.   I already said I don't know.
10 Q.   Did you ever make a decision to stop lying, come clean?
11 A.   Didn't I admit to lying and coming clean?  Yes.  There was
12 a decision, it's here in court under oath.  Absolutely.
13 Q.   Well, when did you make that decision?
14 A.   I said I don't know twice already.  This is the third
15 time, I don't know.
16 Q.   Why did you make that decision?
17 A.   I don't have a great answer for you there.
18 Q.   Do you have any answer?
19 A.   No.
20 Q.   One day you were saying it was policy violations -- I'm
21 sorry, not one day.  For August 2020 through August 2021 until
22 August 2022.  So for two years and three months you told the
23 same -- well, I mean, according to you it was a lie.  You told
24 the same story consistently every single time you filed
25 anything, every single time you said anything, even in your

1  private communications with the people you're saying you lied

2  with, and then all of a sudden one day you just stopped lying

3  and started telling this other story?

4  A.  It's a very all-encompassing statement.  I believe is the

5  seen the interrogatory and some conversation immediately

6  following  the termination.  If you are saying every single

7  time I've ever talked about this ever to anyone in any form,

8  that's a little bit too much.

9  Q.  Well, is there -- so let's just pretend for a minute that

10  you stopped --

11  A.  I'm not going to pretend.  That's not why I'm here, to

12  pretend, no.

13  Q.  Let's assume for a minute you stopped lying the day after

14  you filed these interrogatories.  Right?

15      So did you have a discussion with Dan Spataro and Tom

16  Asaro and say, yo, is the  got to come clean on this --

17  A.  Are we pretending?

18          MR. CAVALIER:  Objection.

19          THE COURT:  Objection is sustained.  Rephrase the

20  question, Mr. Carson.

21  BY MR. CARSON:

22  Q.  Was there a conversation with Tom Asaro and Dan Spataro

23  where you talked about changing their story from policy

24  violations to John Musbach?

25  A.  Was there ever a conversation?  Yes.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  Q.  When?

2  A.  I don't know.

3  Q.  I'm assuming this conversation was not done

4  electronically, so there's no proof of it?

5       MR. CAVALIER:  Objection.

6       THE COURT:  It's overruled.

7  BY MR. CARSON:

8  Q.  Was it done electronically?

9  A.  I don't know.

10 Q.  If it was, it would certainly help your case, so you would

11 tell us, right?

12 A.  I don't know.

13 Q.  Let me ask you this.  Isn't it true that the reason why

14 you changed your story was when you realized you couldn't prove

15 any of those policy violation and you realized that that wasn't

16 going to work, you couldn't win this case with it, so then you

17 had to think of another reason and that's when you came up with

18 the John Musbach thing?

19 A.  No, it has nothing to do with the case.  We could

20 certainly prove the policy violations.  They were 100 percent

21 legitimate.

22 Q.  None of them led to any disciplinary action, so how were

23 they legitimate?

24 A.  Because we were that nice to Carl during his employment.

25 Is the  cared about him and is the  gave him the benefit of the

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  doubt during these things.  We were a really nice company and

2  treated our people well.  Is the  looked the other way for a

3  lot of these things.

4       He had a great experience in this company.  And that shows

5  because he had a list of policy violations and he delivered

6  some level of value to the company, so we looked the other way.

7  If anything, it's because we were good to him.

8  Q.  Why isn't there any proof?

9  A.  That we've submitted or any in existence?

10  Q.  Why isn't there anything in existence that suggests that

11  between August of 2020 --

12  A.  Do you want us to dig through folders and show you

13  receipts --

14  Q.  Yeah.  That's called discovery, sir.

15  A.  But that's not the reason for this termination.

16  Q.  That's what this court case is all about.  Is the  want

17  you to dig through your folders or your files and --

18          MR. CAVALIER:  Objection.

19          THE COURT:  Objection is sustained.

20  BY MR. CARSON:

21  Q.  Can you answer the question of why there is -- in a tech

22  company when everything is sent through electronic means, why

23  isn't there one shred of evidence between August of 2020 and

24  November of 2022, almost two and a half years later, why isn't

25  there one shred of evidence that your real reason was something

**UNITED STATES DISTRICT COURT**

1  related to John Musbach?

2  A.   I don't know.

3  Q.   You agree there's not though, correct?

4  A.   I didn't say that.  I said I don't know.

5  Q.   Is there?  Is there evidence?  Can you tell us about it if

6  there is?

7  A.   About the reason for termination?

8  Q.   About the evidence, sir?

9  A.   The evidence for the reason of termination?

10  Q.   No, the evidence that it was related to John Musbach,

11  where is it?

12  A.   It was a collective decision.  I'm here under oath in

13  court telling you the reason for termination.

14  Q.   But, sir, you were under oath when you signed those

15  interrogatories, right?

16  A.   Yes.

17  Q.   So you're willing to lie under oath?

18        MR. CAVALIER:  Objection.

19        THE COURT:  Objection is overruled.

20  BY MR. CARSON:

21  Q.   Why does it matter that you're under oath?  That doesn't

22  matter to you, right?

23  A.   Are you asking me?

24  Q.   Yeah.

25  A.   It does.

**UNITED STATES DISTRICT COURT**

1  Q.  So it matters today, but not back then when you lied the

2  last time?

3  A.  I didn't say that.

4  Q.  So my last question, sir, is with regard to the Akamai

5  purchase, and then I'll wrap it up.

6      So the employees who continued to work at Linode when

7  Akamai was purchased, if Carl was there, he would have received

8  a bonus like everyone else, correct?

9          MR. CAVALIER:  Objection.  Lack of foundation.

10         THE COURT:  Objection is sustained.

11 BY MR. CARSON:

12 Q.  So isn't it true that employees, other than Carl, who

13 remained at Linode received a bonus when Akamai purchased

14 Linode?  Isn't that true?

15 A.  Did any employees receive a bonus?

16 Q.  Yes.

17 A.  Yes.

18 Q.  And the network engineers received a bonus, right?

19 A.  Yes.

20 Q.  Adam Dampf received a bonus, correct?

21 A.  I don't know specific people and amounts or anything of

22 that sort.  Generally speaking, yes, there were bonuses.

23 Q.  So do you know who Andrew Dampf is?

24 A.  Yes.

25 Q.  He was a network engineer who worked with Carl, correct?

**UNITED STATES DISTRICT COURT**

1  A.   He worked along side Carl, yes.

2  Q.   And he got hired one month before Carl, like September --

3  I'm sorry, September --

4  A.   I don't have the dates, but it sounds about right.

5  Q.   Okay.  Well, do you remember that when Carl started in

6  November 2014, there was two other network engineers who worked

7  there at that time?

8  A.   I think it was Andrew Dampf and one other one, yes.

9  Q.   Alex Forrester?

10 A.   Yes.

11 Q.   And Alex Forrester started first, right?

12 A.   I don't know.

13 Q.   And Andrew Dampf started September 29, 2014, does that

14 sound about right?

15 A.   I don't know.  This is eight years ago.  I can't tell you

16 a date when someone was hired eight years ago.  Is the  hire

17 hundreds of people.

18 Q.   Well, on August -- do you remember when you appeared for a

19 deposition in August of 2023?  I already asked you that once

20 today.

21 A.   Do I remember the deposition, yes.

22 Q.   Do you remember I asked you the question about the date

23 that Andrew Dampf started?

24 A.   No.

25 Q.   You said it was September 2014?

**UNITED STATES DISTRICT COURT**

1          MR. CAVALIER:  This is not impeachment.  Objection.

2          THE COURT:  Objection is overruled.  If you remember

3  the date, that's fine.  If you don't -- you know, you have a

4  reason to doubt what's in the deposition, you can tell him.

5          THE WITNESS:  I believe we're talking about the

6  corporate designee deposition where I had reference material

7  with information that was requested.  You had submitted a list

8  of questions that you were going to be asking.  So I had

9  reference material at that point.  It's not that I remembered

10  something then and I don't remember it now.  It's that I had

11  reference material then.

12  BY MR. CARSON:

13  Q.  At the deposition you said September 29th, 2014.  Do you

14  have any reason to think that's not true?

15  A.  If I said that in the deposition, that's what it is.

16  Q.  Okay.  And he was promoted to a senior network engineer

17  position at some point, correct?

18  A.  Yes.

19  Q.  And so he was the person who worked almost the exact same

20  amount of time as Carl.  It was only two months difference

21  between the amount of time he worked and the amount of time

22  Carl would have worked had he been at Linode when Akamai

23  purchased Linode; is that right?

24  A.  Yes.

25  Q.  And he was in the same department doing the same kind of

1   job almost at the same level.  He was a senior network

2   engineer, correct?

3   A.   He was the same job description for some time, yes.

4   Q.   And when Akamai purchased Linode, Andrew Dampf received a

5   $934,000 bonus; isn't that true?

6            MR. CAVALIER:  Objection.

7            THE COURT:  The objection is overruled.  If you know,

8   you can answer.

9            THE WITNESS:  I don't know.

10  BY MR. CARSON:

11  Q.   And Tim Kaufman received a $329,811 bonus, correct?

12           MR. CAVALIER:  Objection.

13           THE COURT:  Again, the objection is overruled.  If he

14  knows, he can answer.  If he doesn't know --

15           THE WITNESS:  I don't have knowledge of specific

16  amounts or who received a bonus, as I said before.

17  BY MR. CARSON:

18  Q.   And Adam Rambo received a $217,895 bonus.  Do you recall

19  that?

20  A.   I --

21  Q.   You recall they all received bonuses, right?

22  A.   I don't recall who received, who didn't receive a bonus,

23  or the amount of the bonus.

24  Q.   Well, you recall that Tim Kaufman, Adam Rambo, Tom Duff,

25  Andrew --

**UNITED STATES DISTRICT COURT**

1          (Court reporter interruption.)

2          THE COURT:  Mr. Carson, I think is the 've established

3    he doesn't know who did and did not get a bonus.

4          MR. CARSON:  Well, can I show him his deposition to

5    refresh his recollection as the corporate designee?

6          THE COURT:  Again, you can show anything you want to

7    refresh his recollection.  It's also 10 of 5:00 on a Friday.

8    So if he doesn't know here, he doesn't know.  I mean, if

9    showing him his deposition is actually going to refresh his

10   recollection that he knows, that's fine.  It's not going to be

11   to have him just refresh his recollection of what the testimony

12   was and have him parrot it because that's a little different.

13   BY MR. CARSON:

14   Q.   Did you receive a bonus?

15         MR. CAVALIER:  Objection.  Relevance.

16         THE COURT:  Yeah, that objection is sustained.

17   BY MR. CARSON:

18   Q.   Aren't you the same level as -- you were a director and

19   Carl was a director, right?

20         MR. CAVALIER:  Same objection.

21         THE COURT:  You can answer that question, but I'm not

22   going to get into that type of evidence.

23         THE WITNESS:  I'm not going to answer the question.

24   BY MR. CARSON:

25   Q.   You're not going to answer whether you were a director?

**UNITED STATES DISTRICT COURT**

1          THE COURT:  You can answer whether you were at the

2    same corporate level as Mr. --

3          THE WITNESS:  Yes, I was a director level.

4    BY MR. CARSON:

5    Q.  Do you recall during the corporate designee deposition

6    that is the  discussed bonuses of employees?

7    A.  Yes.

8    Q.  And do you recall telling me what the bonuses were for

9    certain employees?

10   A.  No.

11   Q.  You don't recall disclosing the numbers of any of them?

12   A.  I don't recall specifically the amounts and names, no.

13         MR. CARSON:  No more questions.

14         THE COURT:  Okay.  All right.  Mr. Palochko, you can

15   step down.  We'll resume on Monday.  We'll break for the

16   weekend.  Break for the weekend.  Obviously, you're away from

17   here for a bit of time, but it's important that you bear in

18   mind the same cautions that I've been giving all of you.

19   Right?

20         There's still more evidence to come.  Often times what

21   you hear late in the case can be just as significant as what

22   you hear early in the case, if not more so.

23         So you should not be talking about the case with

24   friends, family, co-workers, anyone else you may talk to over

25   the weekend.  You shouldn't be looking things up, shouldn't be

1    talking amongst yourselves.

2            And the last thing -- and, you know, I think this is

3    sort of implicit of what I've been saying along the way, but

4    particularly with some time away there's a temptation to kind

5    of mull over the evidence in your mind and start to form some

6    opinions, and I'm going to caution you against doing that.  As

7    more evidence comes, it's important that you keep an open mind

8    and not start to form those opinions at this point with more

9    evidence to come, what you think the outcome will be in the

10   case.  Okay?

11           So just kind of check out for the weekend, try not to

12   think about the case at all.  Enjoy your weekend.  And we'll

13   see everyone back here -- I do have another matter in here that

14   I have to deal with Monday morning, so we'll start at 10:00.

15           So I'll see everybody Monday morning.

16           THE COURTROOM DEPUTY:  All rise.

17           (Jury exits the courtroom at 4:54 p.m.)

18           THE COURT:  All right.  You can step down, sir.  You

19   can all be seated.

20           I want to get a handle on where we are here.  We have

21   Mr. Palochko's sort of cross/direct on Monday to do.

22           Do you have a sense of how long that is, Mr. Cavalier?

23           MR. CAVALIER:  I got to have another conversation with

24   my client.  I got to tell you, Your Honor, I'm a little livid

25   right now.  We've been saying for days -- this man has a child

**UNITED STATES DISTRICT COURT**

1  at home who has mental health issues, he's been away from him

2  for a week waiting to testify here.  And I've been very clear

3  all week long that he needed to be out of here and on a plane.

4       At every turn from Mr. Carson I've heard that's going

5  to happen, that what we're going to do, we'll shorten it up and

6  it won't be tight.  And I just saw the most blatant example of

7  stretching an examination to send the jury home at the end of

8  the day after cross, and now I got to pull in this poor man

9  either away from his son for a weekend or drag him back from

10 Salt Lake City on Monday to continue testimony.

11      THE COURT:  I appreciate the frustration.  Right now

12 what I need to do is get a sense of how long everything is

13 going to be because, frankly, this case is not moving.

14      MR. CAVALIER:  I would agree with you.

15      THE COURT:  And I accepted all of your -- and the

16 good-faith representations, and I think largely came from the

17 plaintiff that the case would be done by Friday.  That's what

18 you told me at the final pretrial, Mr. Carson.  You looked

19 right at me and said, I think the jury will have this case by

20 Friday.  And you're not even close, you're not even close.

21      So it was my mistake for accepting that.  But from

22 here on out, we're going on a chess clock.  Okay?  That's how

23 we're doing the rest of this case.  So we are going to wrap it

24 up.  So I do need some estimates for everyone about what they

25 have to do so I can put that clock in place.

**UNITED STATES DISTRICT COURT**

1          MR. CAVALIER:  And my apologies, Your Honor.  On that

2    note, I was planning on doing Mr. Palochko's direct and cross

3    in a half hour to get him on a plane.  Now that that no longer

4    is a possibility, it seems like 45 minutes.

5          THE COURT:  Okay.

6          MR. CARSON:  It would be easier if the defendants

7    stipulated to two things.

8          MR. CAVALIER:  I've been trying to stipulate to things

9    throughout this entire process.

10         THE COURT:  Mr. Carson, I'm not getting into that at

11   this point.  Okay?  I've heard offers for stipulations in

12   various respects.  I don't know where that all stands, but, you

13   know, I need to put some limits on this case at this point.

14         So who are you calling after Mr. Palochko, Mr. Carson?

15         MR. CARSON:  Do defendants have an opinion about that

16   or --

17         MR. CAVALIER:  Thomas Asaro must testify on Monday.

18   He is not available on Tuesday.  He is out of state, outside

19   the hundred-mile radius and entirely unavailable.

20         THE COURT:  It seems like we are going to get done

21   with Mr. Palochko in enough time.  Again I have sort of said

22   Mr. Asaro wasn't subject to a subpoena, given the status in the

23   case.  So the hundred mile thing is less important.

24         MR. CAVALIER:  He'll be here.

25         THE COURT:  But I think he'll be here.  How long do

**UNITED STATES DISTRICT COURT**

 1  you need with him, Mr. Carson?

 2          MR. CARSON:  How long did the one I just do take?

 3          THE COURT:  I'm sorry?  Are you asking me how long

 4  Mr. Palochko just took?

 5          MR. CARSON:  I'm trying to use that as a guide.

 6          THE COURT:  Three hours.

 7          MR. CARSON:  So I'm going to do it faster than that.

 8  Two hours.

 9          THE COURT:  I think you can go faster than that.  I

10  don't want to be repeating a lot.

11          Mr. Cavalier, how long do you need?

12          MR. CAVALIER:  However much time is left in the day on

13  Monday because I can't go into Tuesday.

14          THE COURT:  Right.  But in your --

15          MR. CAVALIER:  An hour, 45 minutes.

16          THE COURT:  All right.  Who else are you calling, if

17  anyone, Mr. Carson?

18          MR. CARSON:  Dan Spataro, Mr. Ford.

19          THE COURT:  Mr. Spataro, Mr. Ford.

20          MR. CAVALIER:  Mr. Ford is not a party.

21          THE COURT:  Has he been subpoenaed?

22          MR. CARSON:  He accepted service.

23          MR. CAVALIER:  He accepted service.  Is the  didn't

24  get service, but is the  will produce him.

25          THE COURT:  All right.  You guys resolve that issue as

**UNITED STATES DISTRICT COURT**

1  far as -- I haven't dealt with it.

2          How long are you going to need with Mr. Spataro,

3  Mr. Carson?

4          MR. CARSON:  Same amount of time.

5          THE COURT:  Okay.  Mr. Cavalier?

6          MR. CAVALIER:  Maybe a little longer for Mr. Spataro.

7          THE COURT:  Mr. Cavalier.

8          MR. CAVALIER:  An hour and a half, maybe.  He's the

9  accused.

10          THE COURT:  Okay.  How long are you going to need with

11  Mr. Ford, Mr. Carson?

12          MR. CARSON:  Less time.

13          THE COURT:  How much?

14          MR. CARSON:  Two hours.

15          THE COURT:  That's more than anyone else you just

16  said.

17          MR. CARSON:  No.  I just need enough.

18          THE COURT:  You just said less time.

19          MR. CARSON:  I know.

20          THE COURT:  So which is it?

21          MR. CARSON:  I just said what was suggested to me.

22          THE COURT:  Mr. Carson, do you actually have an

23  estimate of how long these things are going to be or are you

24  just shooting off the top of your head?

25          MR. CARSON:  I'm not shooting --

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1        THE COURT:  You've not worked through this at all and

2   given any thought to how long these examinations are going to

3   be.

4        MR. CARSON:  I do.  I'll try to get done everything.

5   So yeah.  I'll say an hour and a half, maybe.

6        MR. CAVALIER:  If that's the case, I would ask for

7   proffer.  I cannot fathom what information Richard Ford has

8   about this case that would take an hour and a half to testify

9   about.

10       MR. CARSON:  Well, he did testify that they all worked

11  together and that -- I mean, he testified that he was just as

12  involved as everyone else.

13       MR. CAVALIER:  In what?

14       MR. CARSON:  In everything, in the termination, in the

15  disciplinary stuff.

16       THE COURT:  Okay.  All right.  That's -- Mr. Cavalier,

17  how long do you think you're going to need Mr. Ford?

18       MR. CAVALIER:  15 minutes, depending on, obviously,

19  whatever the substance is.  I mean, if he goes 3 hours on him.

20       THE COURT:  Right.  Who else are you calling,

21  Mr. Carson, if anyone?

22       MR. CARSON:  Because of the issues with the position

23  statement and what just happened with the bonuses, I guess,

24  maybe, like a corporate designee.

25       THE COURT:  You can't call a corporate designee at

**UNITED STATES DISTRICT COURT**

1   trial.  That's not how it works.

2          MR. CARSON:  Well, then, who can I call to --

3          THE COURT:  I don't know the answer to that.  I'm not

4   involved in this case like that, Mr. Carson.  I'm not a

5   litigator at this point.

6          MR. CARSON:  Stephanie Peet or whoever signed the

7   position statement.

8          MR. CAVALIER:  Well, is the  would, obviously, object

9   to that.

10          THE COURT:  We're not calling Ms. Peet.

11          MR. CARSON:  So then there's a piece of evidence

12   that's admissible as to the federal rules, but you're saying

13   there's no way to get it in all of --

14          THE COURT:  I'm not saying that.  I don't --

15          MR. CARSON:  They all have the discretion to say they

16   don't remember doing it.

17          THE COURT:  Okay.  I don't know.  Is there anyone else

18   that you plan to call at this point?

19          MR. CARSON:  Besides the three people I just said?

20          THE COURT:  Yes.

21          MR. CARSON:  No.

22          THE COURT:  And, Mr. Cavalier, you're still thinking

23   about calling the doctor?

24          MR. CAVALIER:  I mean, at this point in time, I can't

25   imagine doing that.  I would represent to the court that it's

**UNITED STATES DISTRICT COURT**

1  probably 98 percent likely that is the  will not call the

2  doctor.  Is the  may have an impeachment, slash, rebuttal

3  witness, who will be very short.

4          MR. CARSON:  Who is the rebuttal witness?

5          THE COURT:  They don't have to tell you that,

6  Mr. Carson.

7          MR. CAVALIER:  I don't have to tell you that.

8          MR. CARSON:  I know.  I'm just asking.  I'm allowed to

9  ask, aren't I?

10          By the way, Your Honor, the bonuses, you made an order

11  that they have to provide those bonuses to me in verified

12  statements, and I don't think I received the verification.  So

13  I guess what I'm asking is to have him verify it.  They sent me

14  the letter.  They never sent the verification.

15          MR. CAVALIER:  Your Honor, you ruled that the bonuses

16  for non-similarly situated people were out.

17          Number two, if he can lay a foundation with somebody

18  who knows what the bonuses are, he can have them.  Call Adam

19  Dampf if he's on your witness list.  Ask him how much he got.

20          MR. CARSON:  You weren't here for it, John, because

21  you came to the case at the end.  But is the  already had

22  arguments about it, and Judge Wolson ruled that the defendants

23  had to provide me a list of the amounts of benefit to similarly

24  situated employees and it had to be verified.  And I got --

25          MR. CAVALIER:  It's the fourth day of trial and you're

**UNITED STATES DISTRICT COURT**

1   raising a discovery issue.  I don't know what to say in

2   response to that.

3          THE COURT:  I'm not going to tackle this right now.

4   Okay?  It is a discovery issue.  If you didn't follow up,

5   Mr. Carson, you can come back and tell me what happened and

6   whether you followed up on that.  You're right.  I issued an

7   order.

8          MR. CARSON:  I actually did follow up with that order.

9          THE COURT:  That's what I'm not going to resolve right

10  now.  I don't have to.  I'm not going to do this.  At this

11  point, based on he said, he said stuff, I don't know what

12  happened.  Okay?  It's 5 o'clock on Friday and, frankly, a lot

13  of this day has been unnecessarily drawn out.

14         So let me see.  I'm just looking at these estimates.

15  My initial inclination was to say that the defense needs a

16  little more time because they still have to do Mr. Palochko,

17  and Mr. Carson has done it already.

18         I'm hearing these estimates and, in some respects --

19  well, Mr. Carson, obviously, he has the burden and so he gets a

20  little longer.  I'm just going to level it out.  I'm going to

21  give everybody four and a half hours.  That's what you have

22  left to finish this case.

23         And if you're on the clock, standing there quiet,

24  whatever it is, the time is running when you're doing any type

25  of examination.

**UNITED STATES DISTRICT COURT**

1        MR. CARSON:  I didn't know what you meant when you

2  said a clock.

3        THE COURT:  I'm sorry?

4        MR. CARSON:  I didn't know what you meant when you

5  said a clock.

6        THE COURT:  Right.  Well, that's what I mean.  I

7  should have done it from the start.  I regret that I didn't.

8  It will be probably the last time in this court that I don't.

9        And -- and just to be clear about this, if there are

10  sidebars during an examination, loser pays.  That means whoever

11  loses the ruling at sidebar, that time comes off of your clock

12  for trial.  Okay?

13        So we'll start tracking that on Monday.  We'll do it

14  here.  You all should keep track yourselves, and you can check

15  in with us to make sure your totals align.  But what that puts

16  us on is a pace to wrap this up Tuesday.  Maybe it will go a

17  little faster.  That would be my hope.

18        I have a criminal matter in here at 9:00 a.m. on

19  Monday, and I also have one over lunch on Monday.  So for the

20  9:00 a.m. one, I need you to make little space at counsel table

21  so the government and the defense have some --

22        MR. CARSON:  Should we do that now before is the

23  leave, I guess?

24        THE COURT:  Oh, okay.  Yeah.  So I'm going to need

25  defense.  That's all got to move because the guy is in custody.

**UNITED STATES DISTRICT COURT**

1    So he can't have any access to any of that.  So is the  may

2    have to do that -- well, he's not in custody for the 12:30 one.

3    Because -- right.  Okay.  But yeah.  So for at least the

4    morning, I'll need that table cleared off.

5            Okay.  And then I think that should be it.  I don't

6    think I have any significant conflicts on Tuesday to get

7    through.  We'll have to figure out what to do about the charge

8    conference on Tuesday.  So I have to do a charge conference.  I

9    have to work on a draft of the charge to get to all of you.  My

10   gut is you'll get it early in the day Monday.  It's possible it

11   will come out over the weekend.  Either way, I would then do

12   the conference -- depending on how the testimony breaks, we can

13   do it late in the day Monday.  I'm a little reluctant to do a

14   late start Tuesday.  But again, I need to see where the

15   testimony is.  The other option is we can do it over lunch on

16   Tuesday.  But I want to be in a position to do it and knock it

17   out because, again, as I told you, I charge the jury before you

18   close.  So it needs to get wrapped.

19           All right.  I think that's everything.  Any other

20   housekeeping is the  need to deal with before is the  break for

21   the weekend?

22           MR. CAVALIER:  Not from me, Your Honor.  I apologize

23   for my tone earlier.

24           THE COURT:  Okay.  Everybody have a good weekend.

25   I'll see you here Monday.

**UNITED STATES DISTRICT COURT**

1          (Matter adjourned at 5:08 p.m.)

2          - - - - - - - - - - - - - - - -

3

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     /S/ Maureen McHugh, RPR
      Official Court Reporter

8

9     January 26, 2024
            Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$1,480** [1] - 192:25
**$217,895** [1] - 244:18
**$329,811** [1] - 244:11
**$60** [1] - 73:3
**$800** [13] - 16:25, 26:24, 27:8, 192:24, 201:12, 202:7, 203:5, 203:7, 204:3, 204:10, 204:22, 207:5
**$86,000** [1] - 23:1
**$934,000** [1] - 244:5

## '

**'19** [1] - 27:24
**'Carl** [1] - 168:24
**'ve** [1] - 245:2

## /

**/S** [1] - 258:7

## 0

**0160** [1] - 51:8
**0162** [3] - 56:24, 57:4, 58:14
**0163** [3] - 57:4, 58:13, 58:15
**0169** [1] - 68:6
**0172** [1] - 68:7
**0591** [1] - 22:23
**0619** [1] - 27:23

## 1

**1** [9] - 12:19, 51:11, 57:3, 63:11, 68:8, 135:12, 135:19, 191:21, 230:10
**1/2** [1] - 26:14
**10** [15] - 3:4, 24:23, 26:14, 28:17, 29:22, 29:23, 59:8, 59:12, 59:15, 109:7, 110:5, 184:20, 184:24, 191:19, 245:7
**100** [4] - 182:5, 182:7, 183:23, 238:20
**10:00** [1] - 247:14
**10:08** [2] - 165:5, 165:6
**10:44** [2] - 59:14, 59:16
**11** [4] - 137:9, 137:17, 142:3, 142:4
**11/27/2018** [1] - 17:22
**111** [1] - 3:4

**11:04** [1] - 59:16
**11:05** [1] - 59:20
**1259** [1] - 51:13
**129** [1] - 3:5
**12:22** [1] - 109:17
**12:23** [1] - 110:14
**12:30** [1] - 257:2
**13** [5] - 24:1, 80:4, 104:12, 166:3, 192:1
**13-year-old** [1] - 80:17
**131** [1] - 3:6
**1350** [1] - 2:4
**137** [1] - 3:10
**138** [5] - 3:10, 3:11, 11:7, 11:20, 11:21
**13th** [3] - 122:1, 192:7, 192:17
**14-year-old** [3] - 80:18, 87:4, 104:13
**145** [4] - 3:9, 69:11, 70:8, 70:11
**14th** [1] - 191:24
**15** [4] - 36:5, 138:4, 184:20, 252:18
**159** [1] - 52:14
**16** [2] - 29:19, 199:14
**1601** [1] - 2:4
**161** [2] - 52:22, 52:25
**163** [1] - 60:13
**164** [3] - 61:6, 61:7, 61:8
**166** [2] - 63:8, 64:12
**167** [3] - 65:8, 65:9, 66:7
**169** [2] - 68:3, 68:8
**17** [4] - 14:14, 16:21, 28:11, 76:6
**170** [1] - 68:8
**171** [2] - 68:9, 68:24
**172** [3] - 3:11, 69:2, 229:17
**174** [2] - 163:16, 215:24
**17th** [1] - 28:14
**1835** [1] - 1:19
**19** [2] - 15:23, 163:22
**19102** [1] - 2:5
**19103** [1] - 1:20
**19106** [1] - 1:13
**197** [1] - 3:12
**1994** [1] - 115:16
**19th** [2] - 169:3, 193:5
**1:00** [1] - 109:11
**1:35** [1] - 110:14
**1:37** [1] - 110:19
**1st** [3] - 12:13, 136:12, 137:2

## 2

**2** [7] - 21:20, 57:4, 191:21, 217:21, 217:22, 218:6
**2,000** [1] - 29:24
**20** [8] - 3:12, 112:6, 165:5, 208:7, 208:8, 208:16, 208:22, 217:25
**2001** [1] - 83:20
**2012** [7] - 133:6, 133:21, 134:6, 134:9, 135:11, 135:13, 135:19
**2014** [21] - 75:6, 76:6, 77:18, 101:1, 101:3, 101:5, 101:14, 134:7, 134:9, 135:12, 135:19, 136:3, 137:2, 139:24, 142:20, 144:19, 224:4, 242:6, 242:13, 242:25, 243:13
**2015** [21] - 48:1, 51:7, 51:10, 51:13, 51:14, 52:8, 52:15, 53:4, 53:13, 53:23, 54:14, 54:22, 56:7, 58:23, 77:18, 77:21, 77:22, 101:7, 101:15, 137:9, 137:17
**2016** [34] - 55:2, 55:4, 55:6, 55:7, 56:24, 57:1, 57:5, 57:7, 57:14, 57:15, 57:17, 57:24, 58:1, 58:5, 58:6, 58:8, 58:17, 58:18, 58:22, 58:23, 58:24, 77:18, 78:7, 78:12, 81:18, 81:22, 81:24, 82:14, 84:20, 86:23, 124:2, 126:18, 138:4, 172:25
**2017** [11] - 11:4, 84:20, 126:22, 126:23, 127:20, 138:16, 142:7, 142:20, 143:23, 214:19
**2018** [19] - 12:13, 12:19, 13:8, 13:13, 14:1, 14:15, 15:23, 16:8, 16:22, 17:22, 32:25, 33:4, 36:17, 36:20, 47:2, 84:20, 119:3, 214:20, 214:23
**2019** [23] - 28:10,

**19:12, 20:3, 20:12, 21:20, 24:1, 24:17, 28:11, 28:14, 35:15, 50:7, 61:5, 61:9, 61:10, 66:4, 71:3, 72:24, 84:20, 204:10, 204:13, 206:4, 206:15, 214:24**
**2020** [48] - 11:4, 28:17, 29:10, 48:1, 48:12, 48:13, 48:18, 48:24, 50:5, 55:24, 68:4, 68:12, 69:5, 75:14, 84:20, 85:1, 85:4, 85:6, 85:7, 91:2, 95:3, 102:7, 103:9, 103:12, 103:14, 114:20, 121:13, 144:19, 163:13, 163:20, 163:22, 166:3, 169:3, 175:13, 175:17, 175:18, 191:25, 192:1, 193:5, 199:17, 207:23, 215:2, 215:3, 219:8, 224:4, 236:21, 239:11, 239:23
**2020/8/20** [1] - 165:13
**2021** [1] - 236:21
**2022** [8] - 131:18, 131:19, 188:5, 235:18, 235:24, 236:2, 236:22, 239:24
**2023** [5] - 217:21, 217:22, 223:19, 242:19
**2024** [2] - 1:13, 258:9
**208** [1] - 3:12
**20th** [3] - 163:20, 165:5, 166:8
**21st** [1] - 20:12
**22** [1] - 203:11
**22nd** [1] - 112:17
**24** [4] - 6:8, 138:15, 224:9, 224:12
**248** [1] - 139:19
**25** [4] - 19:12, 109:11, 110:11, 184:21
**26** [3] - 1:13, 223:19, 258:9
**27** [1] - 99:20
**274** [1] - 123:11
**28** [2] - 204:10, 204:13
**28th** [1] - 206:15
**29** [1] - 242:13
**2950** [1] - 1:19
**29th** [2] - 66:13,

**243:13
**2:00** [1] - 72:8
**2:22-CV-01618-JDW** [1] - 1:4
**2nd** [2] - 14:1, 24:17

## 3

**3** [9] - 51:11, 52:15, 57:4, 191:21, 214:2, 222:5, 226:1, 226:4, 252:19
**3.1** [2] - 142:2, 142:3
**3.7** [2] - 192:9, 192:14
**3/15/2019** [1] - 20:11
**3/29** [1] - 20:22
**30** [10] - 3:11, 112:6, 138:13, 138:24, 141:25, 142:1, 145:21, 145:25, 149:20, 221:23
**30(b)(6)** [1] - 189:16
**30-page** [2] - 227:13, 227:16
**30-plus-page** [1] - 228:18
**30-second** [1] - 221:15
**30th** [1] - 73:9
**31** [7] - 3:10, 134:23, 137:24, 138:1, 138:9, 138:11, 138:12
**31st** [1] - 214:11
**32** [5] - 3:10, 137:7, 137:11, 137:21, 137:22
**33** [3] - 134:23, 137:2, 139:19
**34** [2] - 31:7, 217:25
**37** [5] - 223:21, 223:22, 223:25, 224:9, 224:12
**39** [2] - 165:15, 168:9
**3:00** [2] - 169:4, 184:21
**3:11** [1] - 164:7
**3:13** [2] - 184:23, 185:1
**3:21** [1] - 175:9
**3:26** [1] - 185:1
**3:27** [1] - 185:11
**3:28** [1] - 177:6
**3:52** [1] - 177:7

## 4

**4** [3] - 1:6, 51:11, 57:4
**40** [3] - 74:14, 120:17, 149:20

**401K** [9] - 213:22, 213:25, 214:15, 214:16, 222:8, 226:2, 226:15, 227:10
**403** [1] - 213:7
**41** [3] - 74:14, 120:17, 220:9
**45** [3] - 185:7, 249:4, 250:15
**49** [4] - 47:21, 59:25, 162:18
**4:35** [1] - 230:8
**4:54** [1] - 247:17
**4th** [1] - 191:21

**5**

**5** [4] - 57:4, 63:11, 222:8, 255:12
**5/2/19** [1] - 25:15
**50** [4] - 74:18, 74:20, 74:24, 120:20
**50s** [2] - 74:15, 120:19
**565** [1] - 16:21
**568** [1] - 17:21
**578** [1] - 19:1
**579** [1] - 19:10
**581** [1] - 20:3
**583** [1] - 20:9
**59** [2] - 74:20, 74:25
**595** [1] - 24:1
**5:00** [1] - 245:7
**5:08** [1] - 258:1
**5G** [12] - 18:14, 18:15, 18:17, 18:19, 20:15, 21:5, 63:18, 111:22, 111:24, 112:4, 112:13

**6**

**6** [5] - 57:4, 71:3, 72:24, 187:4, 191:19
**60** [1] - 73:7
**601** [1] - 1:12
**61** [9] - 3:12, 194:13, 194:23, 196:9, 196:10, 196:22, 196:24, 197:1, 204:7
**640** [1] - 70:18
**641** [1] - 70:18
**644** [1] - 71:21
**645** [1] - 72:12
**65** [1] - 146:3
**67** [2] - 224:20, 224:21
**68** [1] - 223:13
**6th** [1] - 72:12

**7**

**7** [7] - 14:1, 17:22, 32:6, 36:20, 47:2, 57:4, 58:14
**70** [1] - 3:9
**706** [1] - 203:13
**7:21** [1] - 52:15
**7:49** [1] - 72:24
**7th** [3] - 27:24, 28:2, 119:2

**8**

**8** [5] - 26:14, 57:15, 58:1, 58:6, 58:14
**8/20** [1] - 164:16
**801** [2] - 232:15, 233:18
**81** [1] - 211:22
**874** [1] - 175:8
**875** [1] - 173:10
**876** [2] - 177:5, 178:16
**8:00** [1] - 21:14
**8:33** [1] - 25:15
**8th** [1] - 119:3

**9**

**9** [4] - 33:4, 36:17, 188:5, 207:23
**90** [1] - 29:22
**92** [5] - 3:11, 170:15, 172:6, 172:8, 172:9
**98** [1] - 254:1
**9:00** [2] - 256:18, 256:20
**9:11** [2] - 1:14, 4:2
**9:20** [1] - 10:16
**9th** [2] - 20:5, 47:4

**A**

**a.m** [11] - 1:14, 4:2, 10:16, 59:14, 59:16, 59:20, 165:5, 165:6, 256:18, 256:20
**abilities** [9] - 60:15, 60:20, 111:4, 112:21, 113:3, 115:1, 115:20, 116:8, 116:11
**ability** [7] - 33:13, 53:6, 53:23, 54:15, 54:23, 89:5, 146:2
**able** [13] - 16:4, 27:3, 51:12, 89:10, 91:24, 97:18, 103:5, 154:3, 164:8, 166:22, 195:6, 220:3, 227:11

**above-entitled** [1] - 258:5
**absolutely** [7] - 37:11, 61:16, 148:12, 171:24, 207:13, 211:8, 236:12
**abuse** [1] - 79:22
**accept** [1] - 23:2
**accepted** [3] - 248:15, 250:22, 250:23
**accepting** [1] - 248:21
**Access** [1] - 20:24
**access** [5] - 112:2, 168:19, 204:19, 219:14, 257:1
**accomplishment** [1] - 16:5
**accomplishments** [6] - 57:5, 57:10, 58:6, 58:18, 58:25, 66:12
**according** [13] - 35:4, 40:7, 57:23, 83:7, 140:22, 141:4, 155:17, 163:18, 179:10, 200:1, 207:7, 236:3, 236:23
**account** [6] - 108:2, 147:1, 147:5, 165:16, 165:18, 168:10
**accounted** [1] - 198:10
**accounts** [1] - 214:16
**accurate** [10] - 51:21, 135:11, 187:15, 194:1, 201:2, 201:13, 205:19, 216:19, 217:10, 218:11
**accuse** [2] - 118:7, 118:12
**accused** [3] - 117:7, 129:15, 251:9
**accusing** [2] - 117:19, 191:25
**acknowledge** [1] - 121:9
**acknowledged** [6] - 55:19, 55:23, 60:3, 212:13, 213:2, 213:6
**acquisition** [1] - 219:15
**act** [2] - 189:20
**acted** [1] - 189:8
**acting** [2] - 180:14, 189:18
**ACTION** [1] - 1:3
**action** [5] - 179:19, 179:20, 179:23, 192:13, 238:22

**actions** [2] - 32:7, 189:10
**active** [3] - 216:7, 217:2, 218:9
**activities** [2] - 14:24, 73:18
**actual** [7] - 18:24, 26:7, 53:25, 155:13, 182:13, 185:18, 228:14
**actually..** [1] - 55:21
**actuary** [1] - 225:17
**Adam** [3] - 42:20, 244:18, 244:24, 254:18
**Adan** [2] - 40:18, 40:21
**adapt** [1] - 66:23
**add** [6] - 39:11, 74:22, 134:12, 152:19, 168:6
**adding** [1] - 112:2
**addition** [2] - 88:6, 141:16
**additional** [2] - 9:23, 110:22
**Additionally** [1] - 192:25
**address** [10] - 29:19, 32:2, 42:4, 42:9, 42:21, 123:9, 123:11, 147:16, 158:11, 164:9
**addressed** [1] - 209:4
**addresses** [3] - 43:1, 46:15, 147:13
**addressing** [2] - 44:18, 210:25
**adjourned** [1] - 258:1
**administrator** [8] - 214:6, 214:12, 225:16, 225:19, 227:18, 227:21, 228:9
**admissible** [5] - 232:21, 233:15, 233:24, 253:12
**admission** [4] - 11:15, 106:24, 233:5, 233:18
**admissions** [2] - 232:21, 232:22
**admit** [13] - 70:4, 70:6, 137:19, 138:9, 138:21, 182:19, 194:17, 195:25, 196:22, 196:24, 208:16, 208:19, 236:11
**admitted** [26] - 11:13,

12:3, 31:8, 36:7, 47:22, 55:17, 57:24, 83:6, 104:15, 104:20, 104:23, 129:17, 134:21, 162:19, 172:1, 172:6, 194:12, 195:11, 196:10, 196:25, 208:8, 216:1, 229:21, 232:20, 235:1, 235:4
**adopting** [1] - 41:2
**advance** [2] - 63:5, 207:4
**advancement** [1] - 116:16
**advances** [1] - 193:2
**advice** [3] - 53:6, 63:24, 234:16
**advisory** [2] - 22:15, 22:17
**affect** [1] - 182:24
**affecting** [1] - 54:11
**affiliation** [1] - 94:19
**AFFIRMED** [1] - 130:24
**afield** [2] - 212:12, 213:7
**afraid** [1] - 205:22
**afternoon** [2] - 184:17, 230:8
**afterwards** [1] - 129:23
**age** [19] - 31:1, 34:9, 35:1, 35:5, 47:16, 67:15, 67:21, 67:24, 68:13, 69:25, 74:13, 115:22, 115:23, 115:25, 116:9, 116:12, 116:14, 116:18, 120:14
**age-related** [1] - 35:1
**agency** [1] - 97:20
**aggregation** [1] - 18:18
**ago** [8] - 8:15, 92:24, 120:15, 160:14, 175:14, 209:15, 242:15, 242:16
**agree** [34] - 5:6, 12:25, 13:6, 13:11, 13:12, 16:13, 35:7, 38:2, 39:3, 40:23, 41:14, 43:19, 44:16, 50:22, 54:21, 57:3, 58:2, 59:1, 61:14, 94:17, 95:11, 97:23, 98:5, 98:21, 100:13, 171:18, 200:20, 202:23, 202:24,

235:12, 235:17,
240:3, 248:14
**agreed** [3] - 5:4,
88:25, 182:4
**agreement** [2] - 5:3,
23:2
**agreements** [2] -
64:18, 64:23
**ahead** [15] - 10:14,
11:16, 24:17, 27:22,
55:12, 59:24, 75:13,
85:1, 114:8, 130:18,
131:4, 145:23,
189:2, 191:12, 232:1
**AI** [4] - 105:10,
105:12, 105:14
**al** [1] - 105:13
**aided** [1] - 1:24
**Akamai** [14] - 21:3,
21:4, 62:10, 131:17,
131:18, 131:21,
131:25, 136:14,
219:15, 241:4,
241:7, 241:13,
243:22, 244:4
**Aker** [27] - 12:7, 12:8,
12:21, 13:7, 13:14,
13:19, 14:8, 15:4,
19:12, 19:19, 19:22,
21:7, 21:10, 21:25,
24:2, 24:10, 26:6,
26:24, 29:15, 30:1,
35:17, 66:12,
116:25, 117:4,
117:5, 117:7, 171:13
**aker** [4] - 12:13, 14:22,
24:25, 27:17
**Aker's** [3] - 21:22,
22:5, 202:2
**akin** [2] - 189:16,
190:17
**Alex** [6] - 29:18,
29:20, 54:17, 54:25,
242:9, 242:11
**align** [1] - 256:15
**all-encompassing** [1]
- 237:4
**allegations** [2] -
86:21, 89:7
**allege** [1] - 152:2
**alleged** [3] - 100:1,
100:6, 199:14
**allegedly** [2] - 148:25,
149:20
**alleging** [3] - 149:18,
150:6, 231:13
**allotted** [1] - 192:8
**allow** [4] - 4:15, 88:8,
196:3, 229:23
**allowed** [4] - 82:20,

157:8, 195:25, 254:8
**almost** [10] - 146:24,
199:6, 223:3, 223:5,
223:6, 223:7,
224:22, 239:24,
243:19, 244:1
**alongside** [1] - 177:15
**ALSO** [1] - 2:10
**alternative** [2] - 4:11,
5:13
**Alyssa** [7] - 209:15,
209:17, 210:20,
210:25, 211:16,
211:25, 212:5
**amazing** [1] - 65:18
**ambassador** [1] -
22:21
**Amber** [1] - 212:4
**amount** [17] - 27:10,
60:15, 200:7,
201:12, 203:7,
203:8, 217:4, 217:9,
225:3, 226:19,
227:3, 230:16,
243:20, 243:21,
244:23, 251:4
**amounts** [6] - 214:7,
227:6, 241:21,
244:16, 246:12,
254:23
**analyst** [1] - 25:3
**ancillary** [1] - 212:22
**and..** [1] - 84:25
**Andrew** [14] - 28:12,
29:18, 54:17, 54:25,
151:23, 152:13,
152:19, 152:20,
241:23, 242:8,
242:13, 242:23,
244:4, 244:25
**anger** [1] - 98:22
**angrily** [1] - 98:24
**announcement** [1] -
33:17
**annual** [4] - 51:14,
52:16, 56:24, 58:8
**anonymous** [6] -
53:17, 64:14,
161:14, 169:6,
191:25, 193:16
**anonymously** [2] -
54:13, 54:21
**answer** [38] - 45:4,
60:10, 82:5, 87:21,
88:11, 93:8, 98:13,
108:24, 108:25,
128:16, 145:16,
149:24, 155:23,
157:8, 157:11,
157:12, 160:7,

174:8, 183:13,
183:17, 183:18,
194:4, 206:23,
219:9, 224:5, 225:2,
228:7, 236:17,
236:18, 239:21,
244:8, 244:14,
245:21, 245:23,
245:25, 246:1, 253:3
**answered** [7] - 33:7,
92:17, 105:1,
119:25, 185:24,
186:23, 228:1
**answering** [2] - 82:6,
160:15
**answers** [5] - 23:7,
187:14, 217:19,
220:4, 221:10
**anti** [1] - 141:11
**anti-retaliation** [1] -
141:11
**antidiscrimination** [2]
- 139:23, 140:2
**anxiety** [2] - 34:14,
107:15
**anytime** [3] - 136:18,
136:19, 136:22
**anyways** [2] - 21:18,
96:15
**apartment** [4] - 28:23,
30:22, 77:9, 88:3
**Apartment** [1] - 28:24
**apologies** [1] - 249:1
**apologize** [2] -
168:16, 257:22
**appear** [2] - 30:1,
37:11
**appeared** [3] - 134:5,
186:12, 242:18
**appearing** [3] - 148:9,
148:21
**application** [1] -
123:25
**applied** [4] - 123:3,
137:17, 138:7,
138:18
**apply** [4] - 32:12, 34:4,
47:13, 220:13
**applying** [1] - 119:20
**appreciate** [2] - 10:20,
248:11
**approach** [6] - 21:1,
55:12, 62:25,
113:22, 145:22,
212:9
**approachable** [2] -
82:9, 103:4
**approached** [1] -
157:15
**approaching** [3] -

54:4, 54:5, 60:18
**appropriate** [3] - 5:8,
5:13, 6:25
**appropriately** [1] -
192:12
**approval** [4] - 27:9,
201:12, 202:16,
207:8
**approve** [2] - 202:19,
204:22
**approved** [5] - 123:25,
202:24, 203:1,
203:2, 204:20
**April** [2] - 21:20, 24:1
**architect** [1] - 37:7
**architecture** [1] - 37:9
**area** [2] - 39:19, 43:14
**areas** [4] - 39:23, 40:9,
40:25, 53:22
**argue** [5] - 5:21, 7:14,
113:19, 113:20,
114:5
**arguing** [3] - 129:5,
212:15, 213:4
**argument** [12] - 4:9,
4:13, 4:14, 4:19, 5:4,
6:9, 8:21, 8:22, 9:1,
114:11, 129:2
**Argumentative** [1] -
160:6
**arguments** [1] -
254:22
**arose** [1] - 102:12
**arrange** [2] - 72:25,
164:16
**arranged** [6] - 14:17,
16:1, 19:19, 71:2,
72:3, 164:25
**arrest** [3] - 81:20,
85:15, 121:14
**arrested** [7] - 80:24,
81:2, 83:6, 85:14,
102:8, 121:13, 130:3
**arrived** [1] - 76:5
**article** [12] - 6:8, 7:2,
92:7, 95:24, 96:1,
96:3, 96:12, 96:18,
96:22, 97:1, 148:9,
148:17, 148:20,
148:21, 148:24,
152:12, 159:18,
159:19, 160:1,
161:2, 162:4, 166:3
**artifical** [1] - 18:19
**artwork** [1] - 16:19
**AS** [1] - 130:24
**Asaro** [29] - 6:12,
28:12, 28:14, 33:14,
35:17, 55:7, 116:14,
119:18, 150:16,

152:21, 156:2,
156:9, 165:9,
165:12, 166:14,
167:16, 167:18,
171:4, 171:6, 171:8,
171:9, 171:10,
185:17, 189:7,
196:19, 237:16,
237:22, 249:17,
249:22
**ASARO** [1] - 1:8
**Asaro(sic** [1] - 116:15
**aside** [5] - 15:8, 36:4,
48:6, 69:7, 201:2
**asleep** [1] - 85:11
**ASN63949** [1] - 43:5
**aspect** [1] - 37:19
**aspects** [1] - 38:2
**asserted** [1] - 7:3
**assign** [1] - 34:11
**assigned** [2] - 34:17,
132:23
**assistance** [1] - 53:6
**associated** [2] -
90:21, 90:25
**associating** [1] -
91:24
**association** [2] - 92:2,
92:16
**assume** [6] - 29:7,
85:15, 92:5, 92:7,
109:6, 237:13
**assumed** [1] - 38:19
**assuming** [3] - 6:2,
158:20, 238:3
**assumption** [1] -
136:5
**at..** [1] - 215:23
**attached** [2] - 17:19,
190:12
**attacking** [1] - 106:2
**attacks** [1] - 99:10
**attempt** [2] - 86:24,
106:25
**attempting** [1] - 54:12
**attend** [4] - 122:8,
165:15, 168:9, 192:4
**attention** [7] - 8:14,
22:4, 140:17,
142:10, 142:18,
159:20, 159:23
**attenuated** [1] -
112:15
**attorney** [14] - 28:23,
31:25, 42:5, 57:24,
60:3, 79:12, 82:20,
82:23, 83:3, 83:7,
122:16, 122:17,
233:17
**Attorney's** [1] - 79:13

**attorney's** [1] - 90:18
**attorneys** [1] - 232:21
**attributable** [1] - 189:11
**August** [35] - 85:6, 102:7, 122:1, 137:9, 137:17, 138:15, 144:19, 163:20, 163:22, 165:5, 166:3, 166:8, 169:3, 175:13, 175:17, 175:18, 191:20, 191:24, 192:1, 192:7, 192:17, 193:5, 217:21, 217:22, 224:4, 225:2, 236:21, 236:22, 239:11, 239:23, 242:18, 242:19
**authenticating** [1] - 233:11
**author** [3] - 143:18, 144:13, 144:22
**authored** [3] - 138:6, 138:18, 139:24
**authoring** [1] - 141:1
**authorities** [2] - 79:6, 83:4
**authorization** [2] - 192:24, 207:10
**authorized** [1] - 207:8
**autistic** [1] - 103:4
**available** [3] - 107:23, 147:21, 249:18
**avenue** [1] - 214:16
**awakened** [2] - 85:16, 85:17
**award** [2] - 115:12, 115:18
**aware** [16] - 8:22, 54:3, 90:3, 90:4, 90:5, 96:3, 149:15, 149:17, 153:25, 157:18, 170:12, 174:14, 175:5, 189:13, 189:14, 231:23
**awoken** [1] - 85:11

**B**

**background** [7] - 14:19, 24:11, 33:11, 34:8, 37:19, 86:9, 112:8
**backup** [1] - 43:11
**bad** [3] - 92:6, 93:1, 93:2
**bail** [9] - 87:22,

121:24, 122:1, 122:4, 122:8, 123:3, 123:13, 123:18, 123:25
**ballpark** [1] - 37:13
**Bamboo** [1] - 164:10
**bandwidth** [3] - 17:15, 17:16, 27:4
**bar** [2] - 15:19, 24:22
**baseball** [1] - 192:25
**based** [14] - 13:11, 40:4, 44:17, 63:25, 94:24, 112:1, 124:18, 125:22, 129:16, 135:8, 148:17, 166:9, 190:13, 255:11
**basic** [4] - 198:18, 198:20, 198:25, 199:3
**basis** [8] - 33:19, 103:1, 190:4, 190:20, 212:14, 226:14, 226:24
**bat** [2] - 36:10
**bear** [1] - 246:17
**beating** [2] - 99:4, 99:9
**became** [2] - 131:25, 206:20
**become** [2] - 154:11, 154:12
**bedroom** [1] - 76:23
**BEEN** [1] - 130:23
**befuddled** [3] - 46:8, 46:10, 46:12
**begin** [1] - 113:15
**beginning** [4] - 55:7, 61:18, 99:10, 101:4
**begins** [3] - 12:12, 24:19, 52:8
**behalf** [2] - 19:3, 186:24
**behaved** [2] - 96:23, 226:14
**behavior** [4] - 182:10, 183:10, 183:24, 192:19
**behaviors** [1] - 169:9
**behind** [3] - 84:5, 182:6, 194:8
**belabor** [2] - 31:13, 54:20
**belief** [2] - 96:24, 187:16
**beliefs** [1] - 96:9
**Below** [1] - 13:3
**below** [6] - 18:3, 22:10, 24:5, 61:11, 62:20, 65:15

**benefit** [8] - 165:17, 214:18, 220:11, 220:17, 220:22, 226:4, 238:25, 254:23
**benefits** [7] - 144:25, 213:19, 213:21, 220:10, 220:15, 220:22, 220:24
**best** [4] - 39:8, 60:10, 61:21, 187:15
**better** [8] - 53:1, 62:6, 62:13, 64:2, 64:7, 65:19, 144:5, 220:1
**between** [31] - 11:4, 12:7, 30:20, 37:18, 49:4, 49:7, 66:3, 69:15, 88:19, 92:2, 92:16, 101:1, 111:20, 134:9, 135:19, 136:12, 142:20, 144:19, 156:2, 166:13, 170:25, 172:2, 181:7, 204:13, 208:12, 212:20, 224:4, 233:20, 239:11, 239:23, 243:21
**beyond** [4] - 111:25, 115:11, 128:13, 190:23
**Beyond** [1] - 10:10
**big** [4] - 64:19, 76:23, 209:14, 212:21
**bigger** [1] - 62:10
**Birdy's** [1] - 18:9
**bit** [20] - 27:22, 53:9, 55:2, 124:2, 131:9, 134:11, 134:12, 143:25, 148:15, 154:2, 169:23, 175:6, 182:23, 209:18, 210:24, 221:2, 226:12, 237:8, 246:17
**Bitcoin** [2] - 121:17, 125:16
**Blackjack** [2] - 73:4, 73:7
**blatant** [1] - 248:6
**blow** [1] - 36:13
**blowing** [1] - 180:8
**blue** [2] - 71:14, 128:25
**board** [2] - 22:15, 22:17
**boat** [1] - 219:23
**body** [3] - 210:20, 211:11, 211:12

**bonus** [13] - 241:8, 241:13, 241:15, 241:18, 241:20, 244:5, 244:11, 244:16, 244:18, 244:22, 244:23, 245:3, 245:14
**bonuses** [9] - 241:22, 244:21, 246:6, 246:8, 252:23, 254:10, 254:11, 254:15, 254:18
**book** [1] - 146:6
**booked** [1] - 83:7
**booth** [2] - 21:10, 21:16
**bother** [1] - 54:3
**bothered** [1] - 31:1
**bottom** [19] - 16:15, 22:23, 39:24, 41:25, 45:1, 51:13, 52:14, 61:8, 62:12, 64:12, 66:7, 68:3, 68:19, 68:22, 163:12, 178:16, 187:6, 207:24, 207:25
**bought** [1] - 203:4
**bounce** [1] - 23:5
**box** [1] - 40:12
**boy** [2] - 80:4, 80:17, 104:13
**brand** [1] - 25:2
**Branzino** [2] - 18:5, 18:7
**break** [6] - 59:5, 59:7, 109:10, 184:18, 185:16, 246:15, 246:16, 257:20
**breakfast** [1] - 71:18
**breaks** [1] - 257:12
**Brett** [1] - 27:12
**Brief** [2] - 59:16, 185:1
**brief** [2] - 75:23, 188:24
**briefly** [17] - 11:5, 12:10, 24:20, 25:18, 26:1, 31:11, 31:21, 48:9, 68:2, 69:8, 70:3, 70:18, 73:24, 98:20, 118:14, 118:16, 129:21
**bring** [11] - 4:5, 7:22, 10:14, 35:25, 59:18, 110:16, 140:16, 141:10, 142:17, 143:4, 190:23
**bringing** [1] - 30:7
**broad** [1] - 207:17
**broadly** [1] - 150:22
**brought** [10] - 14:19,

30:7, 83:10, 83:11, 112:4, 112:5, 121:25, 159:20, 159:22, 209:24
**Brown** [2] - 164:16, 168:22
**brunch** [1] - 71:7
**bucks** [1] - 73:7
**budget** [1] - 26:25
**Buenzle** [1] - 2:12
**build** [6] - 61:21, 169:25, 170:2, 170:6, 170:11
**building** [8] - 43:4, 43:5, 111:24, 169:22, 173:22, 174:7, 201:22
**Building** [1] - 20:25
**buildings** [1] - 26:5
**bullet** [1] - 37:10
**bullets** [2] - 57:15, 58:1
**bullshit** [1] - 94:22
**bump** [2] - 177:17, 177:20
**bumped** [1] - 177:18
**bumps** [1] - 178:7
**bunch** [3] - 72:20, 128:20, 139:2
**burden** [1] - 255:19
**business** [3] - 15:10, 25:3, 41:6
**busy** [3] - 39:12, 117:24, 168:22
**but..** [2] - 40:11, 187:2
**buy** [2] - 21:3, 203:5
**BY** [109] - 1:19, 2:3, 3:4, 3:4, 3:5, 3:6, 11:1, 11:8, 11:17, 12:2, 12:18, 33:24, 36:11, 47:23, 55:13, 56:22, 57:9, 57:13, 60:1, 60:6, 69:12, 70:12, 75:3, 78:18, 88:23, 91:6, 92:22, 93:11, 98:17, 105:24, 111:2, 112:24, 113:6, 113:10, 114:24, 120:3, 120:13, 126:7, 128:1, 128:19, 129:25, 131:13, 134:25, 137:8, 137:15, 137:25, 138:14, 138:25, 139:10, 139:20, 142:6, 143:16, 143:21, 144:8, 145:24, 150:1, 151:6,

153:14, 157:21, 160:9, 160:16, 162:20, 167:15, 168:17, 170:16, 172:10, 172:17, 172:21, 180:18, 185:15, 186:7, 187:8, 187:25, 191:13, 196:13, 197:2, 197:11, 199:13, 203:14, 204:9, 208:11, 208:23, 211:24, 213:13, 215:25, 218:3, 220:8, 223:17, 224:11, 224:19, 228:2, 228:13, 231:6, 234:24, 235:6, 235:16, 235:22, 237:21, 238:7, 239:20, 240:20, 241:11, 243:12, 244:10, 244:17, 245:13, 245:17, 245:24, 246:4

**Byrne** [1] - 1:12

## C

**Cafe** [1] - 18:9
**calendar** [1] - 215:17
**canal** [1] - 72:17
**Canal** [6] - 70:17, 71:2, 71:23, 71:25, 72:2, 72:17
**cannot** [11] - 9:13, 10:5, 27:2, 27:5, 57:6, 78:25, 118:22, 152:25, 234:2, 252:7
**capability** [1] - 89:4
**capable** [1] - 88:18
**capacity** [8] - 29:22, 29:23, 40:15, 40:25, 43:9, 43:10, 189:9, 202:19
**capture** [1] - 20:23
**captured** [1] - 164:17
**car** [2] - 29:2, 30:22
**card** [7] - 27:10, 27:11, 27:12, 27:14, 41:6, 49:19, 192:23
**care** [6] - 92:19, 103:7, 103:8, 103:13, 124:10, 127:12
**cared** [2] - 103:9, 238:25
**career** [5] - 19:16, 44:14, 64:1, 113:7, 115:25

**CARL** [2] - 1:3, 3:3
**Carl** [132] - 8:19, 8:21, 8:24, 8:25, 10:8, 16:3, 19:16, 37:2, 41:16, 47:1, 53:23, 54:9, 54:18, 54:19, 58:10, 60:14, 60:17, 60:20, 60:24, 60:25, 61:17, 61:21, 61:24, 62:5, 62:13, 62:21, 62:22, 62:24, 63:4, 63:9, 63:11, 63:17, 64:2, 64:5, 64:7, 65:6, 65:13, 65:18, 70:15, 91:15, 91:16, 91:19, 112:18, 129:20, 136:3, 149:19, 150:2, 151:11, 152:13, 152:23, 154:1, 155:16, 157:13, 158:25, 159:17, 164:9, 165:13, 165:15, 166:2, 166:16, 166:18, 166:22, 168:7, 168:9, 168:19, 168:23, 169:4, 169:7, 169:17, 169:22, 169:25, 172:23, 173:23, 173:25, 174:18, 174:19, 174:21, 175:18, 176:9, 176:20, 178:19, 178:21, 179:2, 179:6, 180:7, 180:19, 180:25, 181:9, 181:12, 181:20, 182:6, 182:8, 183:24, 185:18, 193:8, 196:15, 197:12, 197:24, 198:8, 198:17, 200:6, 202:6, 202:9, 203:19, 204:2, 204:14, 205:12, 205:20, 207:4, 208:12, 209:4, 209:23, 210:1, 215:2, 216:4, 220:23, 221:24, 226:9, 228:20, 232:3, 238:24, 241:7, 241:12, 241:25, 242:1, 242:2, 242:5, 243:20, 243:22, 245:19
**carl** [2] - 63:4, 178:23

**Carl's** [14] - 23:18, 64:3, 65:20, 155:21, 164:17, 164:23, 165:1, 168:21, 178:14, 179:25, 182:10, 200:15, 200:25, 208:14
**Carnegie** [1] - 18:16
**carrier** [1] - 43:6
**cars** [1] - 28:22
**carson** [1] - 190:25
**CARSON** [246] - 1:19, 3:4, 3:6, 4:13, 4:25, 5:2, 5:18, 5:24, 6:5, 7:1, 7:13, 7:21, 7:24, 8:11, 8:16, 8:18, 8:23, 9:14, 10:6, 10:12, 33:7, 33:24, 55:9, 56:16, 57:8, 70:7, 75:1, 78:14, 78:16, 88:20, 91:4, 92:17, 105:21, 109:2, 109:8, 109:23, 111:2, 112:24, 113:10, 113:18, 113:21, 113:24, 114:1, 114:7, 114:9, 114:21, 114:24, 120:3, 120:12, 120:13, 126:7, 128:1, 128:19, 129:19, 129:23, 130:15, 131:13, 134:22, 134:25, 137:6, 137:8, 137:11, 137:14, 137:15, 137:19, 137:23, 137:25, 138:9, 138:13, 138:14, 138:21, 138:25, 139:10, 139:18, 139:20, 142:1, 142:5, 142:6, 143:16, 143:21, 144:8, 145:22, 145:24, 149:25, 150:1, 151:5, 151:6, 153:14, 157:21, 160:9, 160:16, 162:17, 162:20, 167:15, 168:13, 168:16, 168:17, 170:13, 170:16, 172:5, 172:10, 172:17, 172:21, 180:18, 184:19, 185:6, 185:9, 185:14, 185:15, 186:7, 187:4, 187:8, 187:19, 187:23,

187:25, 190:1, 190:10, 191:6, 191:13, 194:10, 194:17, 194:23, 195:3, 195:6, 195:20, 196:4, 196:7, 196:10, 196:13, 196:22, 197:2, 197:8, 197:11, 199:12, 199:13, 203:11, 203:14, 204:7, 204:9, 208:6, 208:11, 208:16, 208:23, 211:22, 211:24, 212:7, 212:20, 212:24, 213:9, 213:13, 215:24, 215:25, 217:25, 218:3, 219:25, 220:6, 220:8, 221:13, 221:21, 221:24, 222:7, 222:11, 222:16, 222:24, 223:3, 223:5, 223:8, 223:12, 223:16, 223:17, 224:10, 224:11, 224:15, 224:19, 228:2, 228:13, 229:17, 229:21, 230:3, 230:10, 230:14, 230:17, 230:19, 231:2, 231:5, 231:6, 232:11, 232:13, 232:15, 232:20, 233:7, 233:14, 233:21, 234:5, 234:7, 234:13, 234:20, 234:24, 235:6, 235:16, 235:22, 237:21, 238:7, 239:20, 240:20, 241:11, 243:12, 244:10, 244:17, 245:4, 245:13, 245:17, 245:24, 246:4, 246:13, 249:6, 249:15, 250:2, 250:5, 250:7, 250:18, 250:22, 251:4, 251:12, 251:14, 251:17, 251:19, 251:21, 251:25, 252:4, 252:10, 252:14, 252:22, 253:2, 253:6, 253:11, 253:15, 253:19,

253:21, 254:4, 254:8, 254:20, 255:8, 256:1, 256:4, 256:22
**Carson** [54] - 4:7, 5:21, 7:10, 10:11, 56:12, 109:6, 109:20, 110:25, 111:7, 113:19, 113:22, 114:4, 129:22, 130:14, 151:3, 154:9, 168:11, 172:19, 185:5, 185:13, 191:1, 191:12, 197:6, 199:10, 212:12, 221:20, 222:22, 224:16, 229:12, 229:25, 230:6, 231:1, 232:17, 232:23, 233:13, 233:19, 234:19, 237:20, 245:2, 248:4, 248:18, 249:10, 249:14, 250:1, 250:17, 251:3, 251:11, 251:22, 252:21, 253:4, 254:6, 255:5, 255:17, 255:19
**case** [52] - 59:9, 90:6, 90:7, 90:23, 91:15, 91:17, 99:24, 100:19, 109:13, 109:22, 110:3, 128:23, 129:3, 148:7, 167:12, 173:22, 174:5, 174:7, 183:17, 186:12, 188:15, 193:20, 194:3, 212:17, 212:23, 213:7, 215:1, 222:21, 222:23, 229:5, 230:16, 234:25, 238:10, 238:16, 238:19, 239:16, 246:21, 246:22, 246:23, 247:10, 247:12, 248:13, 248:17, 248:19, 248:23, 249:13, 249:23, 252:6, 252:8, 253:4, 254:21, 255:22
**casual** [2] - 13:15, 13:20
**catalyst** [2] - 148:14, 148:16
**Catholic** [1] - 124:23

**caused** [16] - 100:15, 101:2, 103:20, 104:22, 106:12, 106:16, 108:8, 108:16, 108:19, 108:21, 108:23, 109:4, 143:17, 157:1, 161:10, 210:24
**causes** [2] - 100:10, 100:11
**caution** [1] - 247:6
**cautions** [1] - 246:18
**Cavalier** [9] - 10:23, 121:3, 151:1, 189:2, 208:17, 247:22, 250:11, 251:7, 253:22
**cavalier** [2] - 251:5, 252:16
**CAVALIER** [149] - 2:3, 3:4, 3:5, 10:24, 11:1, 11:7, 11:8, 11:12, 11:17, 11:21, 11:23, 12:1, 12:2, 12:16, 12:18, 36:6, 36:9, 36:11, 47:21, 47:23, 55:11, 55:13, 56:22, 57:9, 57:12, 57:13, 59:23, 59:25, 60:1, 60:6, 69:8, 69:12, 70:5, 70:10, 70:12, 75:3, 78:18, 88:23, 91:6, 92:22, 93:7, 93:10, 93:11, 98:10, 98:17, 105:24, 109:5, 110:7, 112:22, 113:4, 113:6, 113:8, 113:16, 119:25, 127:24, 128:13, 129:21, 129:25, 130:11, 130:17, 130:19, 131:6, 137:13, 137:20, 138:10, 138:22, 139:4, 143:14, 143:19, 144:6, 149:22, 153:12, 157:7, 160:6, 167:14, 172:7, 172:16, 180:16, 185:24, 188:23, 189:3, 189:22, 189:24, 190:6, 190:8, 190:11, 191:3, 191:7, 191:10, 194:14, 195:2, 196:5, 196:23, 208:10, 208:18, 208:20,

217:24, 218:2, 219:18, 219:23, 221:15, 221:18, 221:22, 222:1, 222:9, 223:14, 224:14, 228:1, 228:5, 229:11, 229:19, 229:22, 230:20, 232:9, 234:12, 235:2, 235:14, 235:19, 237:18, 238:5, 239:18, 240:18, 241:9, 243:1, 244:6, 244:12, 245:15, 245:20, 247:23, 248:14, 249:1, 249:8, 249:17, 249:24, 250:12, 250:15, 250:20, 250:23, 251:6, 251:8, 252:6, 252:13, 252:18, 253:8, 253:24, 254:7, 254:15, 254:25, 257:22
**Cavalier's** [1] - 111:3
**caveat** [2] - 14:10, 55:18
**celebrate** [3] - 16:4, 177:1, 177:2
**celebratory** [1] - 178:9
**cell** [1] - 18:14
**cellular** [2] - 112:2, 112:3
**center** [5] - 25:2, 25:7, 25:16, 29:24, 39:9
**centers** [2] - 39:12, 54:11
**centralized** [2] - 21:2, 25:4
**CEO** [3] - 12:9, 15:20, 28:8
**certain** [19] - 4:22, 9:7, 9:8, 10:9, 30:3, 139:6, 143:9, 154:6, 157:13, 182:5, 186:3, 186:4, 186:5, 216:16, 217:4, 217:8, 230:23, 246:9
**certainly** [10] - 6:7, 78:12, 94:13, 98:23, 190:21, 190:24, 195:23, 211:2, 238:10, 238:20
**certainty** [1] - 162:10
**certify** [1] - 258:4
**cetera** [1] - 6:12
**chain** [1] - 29:9
**challenges** [5] -

66:17, 67:9, 67:14, 68:13, 115:10
**challenging** [2] - 67:22, 115:9
**chance** [1] - 209:8
**change** [7] - 20:11, 134:9, 136:10, 136:13, 136:22, 140:23, 142:7
**changed** [5] - 119:8, 134:13, 139:11, 142:20, 238:14
**changes** [1] - 133:25
**changing** [3] - 66:23, 98:8, 237:23
**channel** [3] - 76:13, 210:23, 211:6
**chaotic** [1] - 52:2
**characterization** [1] - 127:24
**characterize** [1] - 101:12
**charade** [2] - 180:19, 180:21
**charge** [30] - 6:19, 6:25, 7:10, 7:12, 7:15, 7:18, 31:5, 31:15, 31:16, 34:25, 35:11, 35:16, 35:21, 49:19, 79:24, 80:2, 86:20, 88:14, 112:13, 117:15, 231:11, 231:13, 231:18, 231:21, 231:24, 235:13, 257:7, 257:8, 257:9, 257:17
**charged** [7] - 5:15, 79:22, 79:23, 81:9, 86:22, 103:14, 104:12
**charges** [20] - 5:16, 82:17, 82:19, 82:25, 83:24, 84:5, 86:3, 86:14, 86:17, 87:11, 88:9, 89:6, 89:16, 89:20, 92:25, 95:16, 102:12, 103:25, 124:8, 231:8
**charging** [1] - 4:23
**chat** [6] - 107:19, 107:22, 109:14, 148:3, 210:23, 211:5
**check** [10] - 41:24, 224:25, 225:4, 225:11, 225:18, 225:19, 227:20, 228:10, 247:11, 256:14
**checking** [1] - 93:14

**checks** [2] - 10:7, 214:14
**Cherry** [3] - 2:4, 18:9, 24:3
**chess** [1] - 248:22
**child** [5] - 79:22, 86:23, 106:25, 108:15, 247:25
**children** [1] - 8:20
**China** [1] - 17:19
**Chinese** [2] - 17:13, 17:15
**chops** [3] - 47:15, 47:19, 115:23
**Chris** [39] - 12:7, 12:8, 14:8, 15:4, 16:1, 17:1, 17:2, 17:13, 19:25, 20:17, 21:22, 21:25, 22:1, 22:5, 22:6, 23:14, 23:15, 23:18, 23:19, 24:10, 25:1, 25:6, 25:11, 26:6, 26:24, 28:12, 29:14, 30:25, 35:17, 66:12, 116:25, 117:4, 117:5, 117:7, 117:11, 171:13, 202:2
**Christian** [2] - 40:19, 40:22
**chronological** [2] - 134:24, 155:18
**church** [12] - 124:22, 125:6, 125:8, 125:14, 125:18, 125:20, 125:21, 125:22, 126:2, 126:9, 126:15, 127:17
**circuit** [1] - 68:20
**citing** [1] - 221:10
**citizen** [3] - 89:9, 126:10, 126:12
**City** [3] - 15:25, 16:25, 248:10
**CIVIL** [1] - 1:3
**claim** [8] - 7:9, 114:11, 114:14, 116:7, 149:19, 222:10, 222:11, 222:14
**claiming** [1] - 99:24
**claims** [2] - 117:4, 117:5
**clarification** [1] - 129:21
**clarity** [1] - 134:12
**class** [1] - 73:10
**classification** [1] - 220:12
**clean** [4] - 183:21,

236:10, 236:11, 237:16
**clear** [28] - 35:8, 43:3, 56:10, 67:13, 67:19, 76:23, 80:16, 86:19, 87:10, 94:24, 105:13, 106:14, 109:15, 111:5, 111:8, 119:12, 120:22, 129:22, 130:1, 134:12, 184:20, 189:17, 194:7, 203:17, 203:25, 221:8, 248:2, 256:9
**cleared** [2] - 202:8, 204:2, 257:4
**clearly** [5] - 6:8, 42:7, 64:6, 64:8, 180:13
**click** [1] - 210:15
**client** [8] - 148:8, 154:23, 156:8, 156:10, 161:13, 162:4, 231:13, 247:24
**client's** [2] - 161:11, 231:21
**clients** [2] - 121:3, 232:22
**clip** [1] - 22:24
**clock** [7] - 230:13, 248:22, 248:25, 255:23, 256:2, 256:5, 256:11
**close** [2] - 248:20, 257:18
**closed** [1] - 209:22
**closely** [1] - 227:6
**closer** [2] - 8:6, 111:7
**closest** [1] - 202:1
**cloud** [8] - 18:21, 20:15, 21:2, 21:4, 21:5, 65:21, 112:1
**cloud-based** [1] - 112:1
**Cloudflare** [1] - 62:6
**cloudflare** [1] - 62:10
**co** [3] - 78:1, 115:15, 246:24
**co-founder** [1] - 115:15
**co-workers** [2] - 78:1, 246:24
**coding** [1] - 21:15
**coffee** [2] - 117:12
**collaborate** [1] - 133:16
**collaborated** [1] - 167:21
**collaboration** [2] -

76:14, 133:15
**collaborative** [2] -
155:24, 156:2
**collateral** [2] - 212:16,
213:6
**collect** [2] - 97:16,
97:18
**collective** [1] - 240:12
**college** [1] - 102:23
**colloquy** [1] - 154:14
**Comcast** [12] - 21:5,
79:16, 111:19,
111:22, 112:4,
112:14, 112:20,
113:1, 113:7,
113:11, 113:15,
114:19
**comfort** [1] - 62:14
**coming** [7] - 8:8,
15:24, 49:11, 75:15,
154:11, 182:15,
236:11
**Commencing** [1] -
1:14
**comment** [5] - 31:1,
106:21, 126:1,
159:13, 174:8
**comments** [7] - 7:24,
68:1, 71:10, 106:21,
115:24, 116:19,
116:20
**commission** [1] -
31:24
**committed** [1] - 23:15
**Committee** [1] - 34:12
**committees** [1] -
115:15
**common** [2] - 103:2
**commotion** [1] - 85:17
**communicate** [2] -
23:6, 147:23
**communicated** [3] -
193:11, 194:5,
205:18
**communication** [8] -
54:19, 54:23, 64:3,
148:6, 209:2, 211:7,
232:5
**communications** [8] -
86:23, 87:6, 146:21,
181:7, 181:16,
181:17, 181:18,
237:1
**companies** [2] - 41:1,
41:13
**companion** [1] -
104:15
**companions** [3] -
84:7, 84:9, 102:19
**companionship** [1] -

127:16
**company** [50] - 6:23,
9:11, 10:3, 13:19,
29:21, 30:11, 43:15,
47:9, 50:15, 50:20,
50:25, 51:2, 67:4,
67:9, 67:15, 67:23,
75:13, 75:16, 76:8,
117:15, 132:18,
133:2, 133:5,
136:20, 136:23,
146:19, 154:16,
156:1, 166:21,
171:12, 191:24,
192:21, 199:2,
202:19, 202:22,
207:9, 207:11,
207:15, 210:23,
210:24, 211:5,
219:17, 220:10,
226:2, 226:18,
239:1, 239:4, 239:6,
239:22
**COMPANY** [1] - 1:7
**company's** [6] - 6:9,
9:2, 66:24, 134:13,
154:17, 191:23
**company-wide** [3] -
76:8, 210:23, 211:5
**comparer** [1] - 41:12
**comparers** [1] - 41:1
**compensate** [2] -
100:5, 100:16
**compensated** [17] -
215:10, 215:13,
215:14, 215:15,
216:18, 216:22,
218:22, 219:3,
219:6, 222:4, 225:9,
225:21, 225:23,
226:3, 226:18, 230:4
**compensation** [1] -
106:17
**competitive** [1] -
65:20
**compilation** [2] -
47:25, 60:4
**compiled** [1] - 51:24
**complain** [1] - 162:4
**complained** [1] -
38:17
**complaining** [2] -
32:24, 48:17
**complaint** [8] - 35:3,
161:20, 162:6,
169:6, 169:8,
191:25, 192:3, 211:2
**complaints** [1] -
161:24
**complete** [2] - 79:17,

130:6
**completed** [1] - 42:21
**completely** [2] -
169:17, 202:21
**complex** [3] - 30:23,
37:7, 88:3
**complimenting** [1] -
57:15
**compliments** [1] -
10:18
**compromising** [1] -
154:17
**computer** [3] - 1:24,
158:4, 187:23
**computer-aided** [1] -
1:24
**computing** [7] - 18:15,
18:18, 20:10, 21:4,
21:5, 25:4, 25:5
**concept** [2] - 5:7
**concern** [6] - 103:20,
104:18, 104:22,
108:21, 108:23,
109:4
**concerned** [5] - 34:13,
39:22, 159:3, 159:5,
182:8
**concerns** [4] - 44:18,
140:15, 142:16,
167:4
**concluded** [6] -
114:23, 191:11,
196:6, 213:12,
223:11, 234:23
**condition** [3] - 100:19,
216:12, 217:7
**conditions** [1] -
123:18
**condone** [1] - 141:16
**conduct** [11] - 87:11,
97:13, 102:9,
104:15, 125:15,
169:10, 180:11,
192:9, 192:16,
192:17, 231:14
**conducted** [2] - 92:15,
186:5
**conference** [9] - 4:14,
7:11, 14:12, 17:7,
159:2, 195:1, 257:8,
257:12
**conferences** [2] -
30:21, 111:16
**confidential** [1] -
166:19
**configuring** [2] -
60:19, 112:13
**confirm** [1] - 164:9
**confirmed** [3] -
191:14, 192:3, 192:6

**confirms** [1] - 195:24
**conflicts** [1] - 257:6
**confused** [1] - 117:3
**confusing** [1] - 189:10
**congratulate** [1] -
178:9
**congratulatory** [1] -
177:23
**connected** [4] - 64:17,
92:21, 93:14, 159:2
**connection** [3] -
188:15, 196:18,
208:13
**connections** [1] -
65:21
**connectivity** [1] - 23:8
**consider** [6] - 6:23,
7:8, 38:8, 40:16,
43:17, 207:16
**considerable** [1] -
42:17
**considered** [6] - 7:6,
74:6, 74:9, 215:15,
215:21, 216:23
**considering** [1] -
181:2
**consistent** [5] -
169:10, 193:9,
193:10, 194:6, 199:1
**consistently** [1] -
236:24
**Constant** [1] - 117:25
**constant** [4] - 84:14,
117:23, 118:1
**constantly** [1] - 65:20
**constituting** [1] -
233:17
**constrain** [1] - 9:3
**constructive** [1] -
64:10
**constructively** [1] -
116:20
**Consulting** [2] -
219:17, 228:10
**consulting** [1] - 193:3
**consume** [1] - 90:15
**contact** [1] - 32:3
**contagious** [1] - 14:25
**container** [1] - 37:25
**containerized** [1] -
37:17
**containers** [2] - 37:18
**content** [4] - 52:10,
53:14, 80:12, 178:24
**contention** [4] - 98:4,
148:7, 151:7, 151:10
**contents** [3] - 32:24,
94:9, 233:16
**context** [19] - 5:12,
7:17, 42:8, 44:3,

64:4, 89:13, 106:11,
115:21, 115:22,
116:9, 165:25,
166:10, 175:7,
177:22, 179:25,
209:17, 220:21,
221:2, 221:9
**continue** [17] - 10:21,
15:1, 15:17, 16:7,
20:2, 20:8, 20:19,
23:25, 39:12, 56:20,
56:21, 61:5, 127:16,
179:1, 184:8,
185:13, 248:10
**continued** [7] -
125:23, 126:15,
178:19, 184:11,
193:20, 193:24,
241:6
**continues** [2] - 61:21,
192:14
**continuing** [2] - 39:10,
180:19
**continuously** [1] -
63:10
**contract** [4] - 43:6,
227:10, 228:14,
228:17
**contrary** [4] - 219:21,
220:5, 221:5, 221:6
**contribute** [2] - 60:17,
227:7
**contributed** [1] -
150:25
**contribution** [13] -
213:25, 214:2,
214:16, 215:11,
215:16, 215:21,
222:6, 225:22,
226:2, 226:5,
226:13, 226:15,
226:19
**contributions** [1] -
219:13
**contributors** [1] -
63:19
**controls** [2] - 79:17,
79:18
**convergence** [1] -
33:15
**convergences** [1] -
34:5
**converges** [1] - 33:13
**conversation** [25] -
37:2, 41:18, 42:12,
44:11, 45:7, 45:22,
45:25, 50:14, 50:19,
70:19, 71:14, 88:24,
119:9, 119:11,
119:13, 125:2,

154:12, 157:16,
182:1, 211:25,
237:5, 237:22,
237:25, 238:3,
247:23
**conversations** [6] -
13:15, 38:23, 44:17,
44:19, 106:11,
149:13
**convey** [7] - 40:1,
40:5, 40:7, 40:10,
42:20, 44:16, 46:14
**conveying** [1] - 40:2
**convicted** [5] - 4:18,
5:16, 5:19, 5:20,
108:15
**conviction** [1] - 4:10
**convince** [1] - 88:7
**Conway** [6] - 73:25,
74:4, 74:8, 74:12,
74:18, 74:20
**Conway's** [1] - 120:14
**cooked** [1] - 181:24
**Cool** [1] - 209:7
**coordinated** [1] -
164:16
**copied** [1] - 216:4
**copies** [1] - 145:20
**coping** [1] - 101:22
**copy** [13] - 36:13,
55:9, 55:14, 56:15,
135:2, 135:11,
136:24, 145:18,
164:9, 218:1,
221:13, 230:5
**core** [1] - 111:24
**corporate** [17] - 27:11,
27:12, 49:19,
186:12, 189:9,
189:11, 189:15,
189:18, 189:20,
192:23, 234:5,
243:6, 245:5, 246:2,
246:5, 252:24,
252:25
**correct** [231] - 12:13,
12:23, 13:21, 14:12,
14:23, 15:3, 24:3,
25:19, 29:6, 30:2,
30:14, 31:11, 32:14,
34:3, 36:17, 36:18,
36:22, 38:15, 39:1,
39:16, 40:20, 43:16,
43:18, 45:9, 46:9,
47:10, 48:2, 48:9,
48:25, 50:12, 51:12,
52:9, 54:15, 56:12,
56:24, 57:10, 57:16,
61:6, 61:13, 62:3,
62:18, 63:14, 64:15,

65:25, 66:4, 67:7,
67:8, 67:15, 67:18,
68:14, 68:16, 68:17,
68:21, 73:19, 74:16,
75:4, 75:22, 78:1,
78:5, 78:8, 79:2,
79:4, 79:7, 80:4,
80:17, 81:15, 81:22,
82:12, 82:17, 83:18,
84:6, 84:21, 85:14,
86:25, 87:18, 89:1,
89:6, 89:17, 90:2,
90:11, 90:24, 91:3,
94:7, 94:11, 94:14,
94:17, 94:19, 94:21,
95:17, 95:21, 95:24,
96:2, 96:6, 97:10,
97:14, 97:25, 98:6,
98:25, 99:18, 100:3,
100:16, 100:17,
102:9, 102:14,
103:10, 105:19,
106:18, 106:25,
107:12, 107:17,
120:20, 125:16,
126:20, 130:9,
131:19, 131:20,
131:23, 131:25,
132:21, 133:4,
134:3, 137:5,
138:17, 139:25,
143:1, 144:14,
146:10, 147:6,
147:9, 147:15,
149:7, 149:8, 150:4,
152:23, 153:2,
153:9, 154:23,
156:13, 158:6,
161:4, 162:13,
163:19, 163:21,
164:1, 164:5,
164:21, 165:10,
165:20, 166:14,
166:24, 167:2,
169:15, 170:22,
171:3, 171:5, 172:3,
173:2, 174:4,
175:14, 176:5,
178:14, 178:20,
179:16, 179:17,
180:1, 180:4, 181:9,
181:13, 181:14,
182:17, 183:3,
184:5, 184:7, 184:9,
184:10, 184:15,
184:16, 186:10,
187:15, 188:3,
188:5, 191:15,
193:14, 193:17,
196:16, 196:21,
197:13, 197:18,

197:21, 197:23,
198:1, 199:22,
199:25, 200:17,
200:23, 201:4,
208:14, 208:25,
210:3, 213:19,
213:20, 213:24,
214:4, 214:5,
214:10, 214:17,
214:25, 215:3,
215:4, 215:6, 215:7,
215:19, 216:13,
216:14, 218:23,
220:20, 228:21,
231:9, 231:22,
235:18, 236:5,
240:3, 241:8,
241:20, 241:25,
243:17, 244:2,
244:11, 258:4
**correctly** [9] - 60:21,
60:22, 61:3, 63:6,
64:20, 66:25, 193:6,
196:2, 210:14
**cost** [1] - 26:24
**costing** [2] - 192:24,
192:25
**costs** [1] - 61:25
**counsel** [5] - 29:5,
31:10, 133:18,
212:9, 256:20
**count** [1] - 140:5
**couple** [18] - 14:4,
18:25, 20:20, 48:14,
62:5, 67:10, 69:9,
102:21, 119:4,
120:12, 153:18,
153:25, 178:5,
189:3, 209:15,
213:15, 222:25,
223:1
**courier** [2] - 164:25,
168:20
**course** [6] - 30:13,
84:4, 84:19, 87:7,
226:23
**courses** [1] - 66:15
**court** [35] - 4:1, 86:7,
86:8, 86:10, 86:14,
87:16, 87:17, 88:7,
88:25, 89:4, 89:7,
89:11, 89:15, 90:6,
90:7, 94:11, 114:5,
122:12, 122:15,
122:19, 123:14,
165:12, 165:24,
166:3, 166:9,
166:11, 167:8,
168:7, 188:15,
192:4, 236:12,

239:16, 240:13,
253:25, 256:8
**COURT** [224] - 1:1,
4:4, 4:21, 5:1, 5:5,
5:21, 6:1, 6:6, 7:10,
7:14, 7:22, 8:1, 8:12,
8:17, 8:22, 9:3, 9:17,
10:9, 10:13, 10:17,
11:11, 11:14, 11:20,
11:22, 11:25, 33:9,
55:12, 56:10, 56:14,
56:18, 57:11, 59:6,
59:15, 59:18, 59:21,
59:24, 70:4, 70:8,
75:2, 78:15, 78:17,
88:21, 91:5, 92:18,
93:8, 98:11, 105:22,
109:3, 109:6, 109:9,
109:18, 109:24,
110:9, 110:16,
110:20, 112:23,
113:5, 113:9,
113:17, 113:19,
113:22, 113:25,
114:2, 114:4, 114:8,
114:13, 114:22,
120:1, 126:6,
127:25, 128:14,
128:16, 129:22,
130:12, 130:16,
130:18, 130:20,
131:4, 131:10,
137:21, 138:11,
138:23, 139:5,
143:15, 143:20,
144:7, 145:23,
149:23, 151:3,
153:13, 154:9,
157:9, 160:7,
160:11, 168:11,
168:14, 172:8,
172:19, 180:17,
184:17, 184:20,
184:24, 185:3,
185:8, 185:12,
185:25, 188:25,
189:2, 189:13,
189:23, 189:25,
190:2, 190:7,
190:14, 191:8,
191:12, 194:19,
194:21, 194:24,
195:4, 195:14,
196:3, 196:8,
196:12, 196:24,
197:6, 199:10,
208:17, 208:19,
208:21, 212:9,
212:11, 212:22,
213:1, 213:11,
219:19, 220:2,

221:4, 221:17,
221:20, 222:4,
222:13, 222:20,
223:1, 223:4, 223:6,
224:16, 228:6,
229:12, 229:23,
230:5, 230:11,
230:15, 230:18,
230:22, 231:3,
232:10, 232:12,
232:17, 232:23,
233:10, 233:19,
233:22, 234:6,
234:9, 234:15,
234:22, 235:3,
235:15, 235:20,
237:19, 238:6,
239:19, 240:19,
241:10, 243:2,
244:7, 244:13,
245:2, 245:6,
245:16, 245:21,
246:1, 246:14,
247:18, 248:11,
248:15, 249:5,
249:10, 249:20,
249:25, 250:3,
250:6, 250:9,
250:14, 250:16,
250:19, 250:21,
250:25, 251:5,
251:7, 251:10,
251:13, 251:15,
251:18, 251:20,
251:22, 252:1,
252:16, 252:20,
252:25, 253:3,
253:10, 253:14,
253:17, 253:20,
253:22, 254:5,
255:3, 255:9, 256:3,
256:6, 256:24,
257:24
**Court** [10] - 1:11, 1:22,
5:16, 67:17, 77:2,
104:5, 160:24,
198:24, 245:1, 258:7
**Court's** [1] - 229:20
**courtesy** [1] - 226:2
**Courthouse** [1] - 1:12
**COURTROOM** [19] -
4:3, 10:15, 11:24,
59:13, 59:17, 59:19,
109:16, 110:13,
110:15, 110:18,
130:22, 130:25,
142:4, 184:22,
185:2, 185:10,
208:9, 224:9, 247:16
**Courtroom** [1] - 2:12
**courtroom** [8] - 10:16,

59:14, 59:20,
109:17, 110:19,
184:23, 185:11,
247:17
**cover** [1] - 96:13
**coworker** [1] - 210:15
**crawling** [2] - 212:17
**crazy** [1] - 121:17
**create** [1] - 29:24
**created** [8] - 33:18,
51:16, 51:17, 52:14,
162:23, 198:9,
198:12, 206:10
**credibility** [2] - 23:21,
182:25
**credit** [6] - 27:10,
27:11, 27:12, 27:14,
49:19, 192:23
**cried** [1] - 105:20
**crime** [5] - 103:15,
104:11, 104:21,
104:24, 125:9
**crimes** [6] - 81:10,
121:2, 121:5, 121:7,
121:18, 121:22
**criminal** [4] - 6:15,
86:24, 192:2, 256:18
**criticism** [1] - 64:10
**cropped** [1] - 210:16
**cross** [17] - 4:10, 5:22,
5:24, 6:17, 10:22,
111:4, 117:1, 117:9,
118:3, 128:21,
131:7, 153:21,
170:5, 191:2,
229:14, 248:8, 249:2
**CROSS** [2] - 3:4,
10:25
**cross-examination** [5]
- 10:22, 111:4,
117:1, 118:3, 128:21
**CROSS-**
**EXAMINATION** [2] -
3:4, 10:25
**cross-examine** [2] -
153:21, 229:14
**cross/direct** [1] -
247:21
**crossed** [1] - 170:4
**crosstalk** [2] - 202:20,
227:14
**crude** [1] - 30:25
**crux** [1] - 229:5
**CTO** [2] - 24:6, 24:15
**cuisine** [1] - 13:4
**culture** [1] - 14:25
**Cumulus** [1] - 14:19
**cup** [2] - 117:11,
117:12
**cups** [1] - 117:13

**current** [3] - 37:8,
114:9, 219:22
**custodian** [3] - 87:17,
87:25, 88:18
**custody** [4] - 89:1,
104:6, 256:25, 257:2
**customer** [3] - 22:17,
76:17, 76:25
**customers** [1] -
105:14
**cut** [1] - 157:9

## D

**d/b/a** [2] - 1:7, 1:7
**daily** [1] - 111:22
**damages** [3] - 99:24,
100:1, 100:5
**Dampf** [14] - 28:12,
29:18, 54:17, 54:25,
151:23, 152:14,
152:20, 241:20,
241:23, 242:8,
242:13, 242:23,
244:4, 254:19
**Dampf's** [1] - 152:19
**dan** [1] - 169:5
**Dan** [124] - 8:23, 17:1,
21:21, 21:22, 22:2,
22:4, 22:10, 23:7,
23:12, 23:19, 28:13,
30:25, 33:15, 35:16,
37:1, 37:24, 39:5,
39:22, 42:25, 43:3,
43:12, 43:18, 43:19,
44:10, 45:1, 45:4,
45:14, 46:4, 46:7,
48:11, 48:16, 48:24,
49:2, 50:1, 55:3,
55:5, 58:3, 65:25,
69:16, 70:14, 70:15,
70:20, 71:6, 71:9,
71:12, 71:18, 72:5,
72:7, 72:14, 72:15,
72:17, 73:3, 75:21,
94:5, 94:6, 96:19,
96:21, 96:22, 96:25,
101:23, 101:24,
102:1, 102:4, 106:8,
106:13, 106:16,
116:15, 116:17,
119:2, 119:10,
120:5, 120:6, 128:9,
150:6, 150:10,
150:11, 151:16,
151:23, 151:24,
152:2, 152:14,
152:20, 155:21,
156:2, 156:9, 158:4,
158:13, 158:18,
159:23, 166:13,

167:18, 169:4,
170:24, 171:10,
171:21, 172:2,
172:13, 172:22,
172:25, 173:17,
174:7, 174:20,
175:9, 175:17,
176:22, 176:24,
177:11, 177:13,
177:15, 178:5,
179:15, 185:17,
193:23, 196:18,
203:17, 204:1,
232:6, 237:15,
237:22, 250:18
**Dan's** [4] - 27:12,
43:15, 47:5, 69:16
**danger** [4] - 126:16,
130:3, 130:5, 130:8
**DANIEL** [1] - 1:8
**Daniel** [2] - 61:11
**dark** [2] - 86:24, 87:4
**data** [9] - 18:21, 25:2,
25:7, 25:16, 29:24,
39:9, 39:11, 52:23,
54:11
**date** [24] - 12:17,
36:16, 36:19, 52:12,
96:3, 135:4, 135:9,
135:10, 135:18,
136:1, 161:7,
165:12, 165:24,
166:3, 166:7, 166:9,
166:11, 167:8,
168:7, 190:5,
190:10, 242:16,
242:22, 243:3
**Date** [1] - 258:9
**dated** [2] - 188:5,
235:23
**dates** [3] - 51:9, 52:2,
242:4
**Daubert** [1] - 110:2
**Davenport** [2] - 40:19,
40:21
**DAY** [1] - 1:6
**days** [9] - 8:14, 28:1,
93:17, 95:23, 96:1,
105:20, 110:5,
209:15, 247:25
**DCs** [1] - 39:11
**deal** [10] - 11:15,
52:20, 91:10,
107:16, 180:7,
191:2, 209:14,
212:21, 247:14,
257:20
**dealing** [2] - 82:19,
82:23
**dealt** [1] - 251:1

**death** [1] - 101:22
**debatable** [1] - 126:11
**December** [6] - 27:24,
28:2, 28:11, 28:14,
138:4, 214:11
**decide** [4] - 123:13,
213:3, 235:12
**decided** [6] - 112:4,
155:15, 194:5,
198:16, 206:20,
235:10
**decides** [1] - 141:5
**deciding** [1] - 6:21
**decision** [29] - 6:24,
7:17, 67:6, 120:5,
148:14, 148:17,
149:21, 150:2,
150:4, 150:7,
150:16, 150:19,
150:21, 150:22,
150:24, 150:25,
155:24, 156:2,
156:5, 185:18,
185:20, 186:3,
193:4, 236:7,
236:10, 236:12,
236:13, 236:16,
240:12
**decision-makers** [1] -
67:6
**decisionmaker** [1] -
155:20
**decisions** [6] - 67:4,
116:15, 116:16,
154:6, 155:25,
195:18
**declined** [3] - 77:6,
77:7, 86:5
**deep** [1] - 112:7
**deeper** [1] - 148:16
**deeply** [3] - 20:4,
103:7, 103:9
**defendant** [1] - 189:19
**Defendant** [3] - 2:5,
139:19, 163:16
**DEFENDANT** [2] - 3:9,
70:11
**defendant's** [1] -
233:16
**Defendant's** [1] -
58:13
**Defendants** [1] - 1:9
**defendants** [5] -
116:7, 189:8, 249:6,
249:15, 254:22
**defense** [7] - 4:9,
5:13, 114:16,
114:18, 255:15,
256:21, 256:25
**defensive** [2] -

154:11, 154:13
**defers** [1] - 54:11
**definitely** [1] - 173:1
**definition** [2] - 207:17,
215:14
**definitions** [2] -
207:19, 219:4
**definitively** [2] -
136:11, 176:16
**degree** [2] - 146:16,
153:7
**delay** [1] - 230:20
**deliberating** [1] -
110:10
**deliberations** [2] -
110:9, 183:8
**delicious** [1] - 13:23
**delinquent** [1] -
192:20
**delivered** [3] - 58:24,
169:5, 239:5
**delivering** [1] - 157:14
**delve** [1] - 20:4
**demeaning** [1] -
116:22
**demonstrate** [1] -
180:25
**denied** [2] - 222:14
**department** [10] -
50:1, 78:3, 132:2,
132:13, 132:24,
146:13, 192:15,
193:4, 202:21,
243:25
**Depix** [1] - 22:14
**deploy** [1] - 37:7
**deployment** [1] -
42:23
**deposited** [1] - 214:15
**deposition** [21] - 9:5,
81:3, 186:16,
186:17, 190:18,
217:14, 217:16,
221:25, 223:14,
223:18, 225:13,
228:10, 242:19,
242:21, 243:4,
243:6, 243:13,
243:15, 245:4,
245:9, 246:5
**Deputy** [1] - 2:12
**DEPUTY** [19] - 4:3,
10:15, 11:24, 59:13,
59:17, 59:19,
109:16, 110:13,
110:15, 110:18,
130:22, 130:25,
142:4, 184:22,
185:2, 185:10,
208:9, 224:9, 247:16

**DEREK** [1] - 1:18
**describe** [2] - 42:17, 159:16
**described** [3] - 75:21, 102:9, 104:15
**describing** [1] - 50:10
**description** [2] - 22:18, 244:3
**descriptive** [1] - 43:20
**deserved** [1] - 32:20
**deserves** [1] - 130:5
**design** [1] - 29:11
**designed** [2] - 16:18, 112:15
**designee** [10] - 186:12, 189:9, 189:11, 189:16, 234:5, 243:6, 245:5, 246:5, 252:24, 252:25
**designing** [1] - 111:24
**desk** [4] - 111:18, 111:23, 112:12, 122:22
**despite** [1] - 95:1
**destroyed** [1] - 29:2
**detail** [5] - 35:18, 62:2, 63:3, 165:19, 172:11
**detailed** [1] - 116:18
**detailing** [2] - 164:7, 165:19
**details** [4] - 72:7, 78:21, 80:2, 89:2
**detention** [1] - 86:11
**determination** [2] - 100:22, 155:25
**determine** [1] - 123:18
**determines** [1] - 218:15
**determining** [1] - 233:16
**developed** [1] - 37:15
**development** [1] - 63:24
**deviates** [1] - 9:10
**device** [1] - 18:19
**devout** [1] - 124:23
**dialed** [1] - 94:5
**dialogue** [1] - 164:17
**died** [2] - 77:21, 101:5
**difference** [5] - 49:4, 220:11, 220:20, 233:20, 243:20
**different** [35] - 14:21, 22:9, 28:1, 42:13, 78:3, 79:15, 84:16, 91:7, 92:1, 95:6, 98:7, 98:8, 102:22, 119:3, 119:4, 142:23, 148:19,

153:18, 153:25, 155:22, 157:5, 157:13, 169:17, 202:21, 210:21, 211:11, 223:14, 225:14, 225:15, 226:11, 226:21, 233:3, 233:13, 245:12
**differently** [3] - 67:24, 136:20, 225:10
**difficult** [4] - 83:14, 101:19, 108:5, 115:6
**dig** [2] - 239:12, 239:17
**diligence** [2] - 23:1, 62:24
**dinner** [12] - 13:7, 13:15, 15:25, 16:1, 24:15, 24:16, 47:7, 49:2, 50:8, 72:25, 125:3
**direct** [7] - 35:11, 120:10, 133:11, 142:10, 166:21, 187:19, 249:2
**DIRECT** [2] - 3:6, 131:12
**directed** [1] - 161:25
**directing** [1] - 133:9
**direction** [1] - 144:3
**directly** [7] - 26:16, 35:14, 48:4, 192:9, 196:1, 211:7, 220:5
**director** [23] - 35:19, 35:24, 43:22, 43:24, 49:25, 50:1, 50:19, 50:25, 51:2, 51:4, 51:5, 61:18, 62:17, 132:6, 132:7, 161:21, 202:17, 231:7, 231:17, 245:18, 245:19, 245:25, 246:3
**disable** [1] - 165:20
**disagree** [1] - 141:8
**disagreed** [1] - 89:15
**disbelief** [1] - 44:22
**discern** [1] - 64:4
**discharge** [1] - 7:9
**disciplinary** [14] - 179:12, 179:16, 179:19, 179:20, 192:13, 199:23, 200:2, 200:4, 200:8, 201:1, 206:18, 238:22, 252:15
**discipline** [2] - 171:17, 200:16
**disclosed** [2] -

229:20, 234:12
**disclosing** [1] - 246:11
**discovered** [3] - 123:2, 191:22, 192:22
**discovery** [7] - 56:9, 186:19, 187:20, 190:15, 239:14, 255:1, 255:4
**discretion** [2] - 226:12, 253:15
**discretionary** [6] - 226:19, 226:25, 227:2, 227:3, 227:5, 227:7
**discriminated** [2] - 67:20, 98:3
**discrimination** [24] - 93:6, 100:11, 100:15, 116:6, 117:7, 117:20, 118:7, 134:5, 134:14, 134:18, 140:8, 140:11, 140:15, 140:20, 141:16, 142:17, 142:25, 143:1, 143:3, 149:19, 231:9, 231:11, 231:18, 231:22
**discriminatory** [3] - 6:22, 222:15, 231:14
**discus** [1] - 46:21
**discuss** [4] - 45:11, 45:14, 48:8, 169:4
**discussed** [8] - 25:10, 26:5, 31:9, 31:10, 47:24, 111:4, 246:6
**discussing** [5] - 15:21, 46:24, 178:19, 208:24, 210:2
**discussion** [15] - 19:25, 20:20, 36:2, 40:4, 45:15, 45:17, 45:18, 45:24, 72:10, 73:12, 73:25, 118:24, 179:2, 213:5, 237:15
**Discussion** [1] - 187:22
**discussions** [1] - 35:16
**disgusted** [1] - 121:9
**dismay** [1] - 192:19
**display** [2] - 12:22, 16:23
**displays** [1] - 28:3
**disregard** [1] - 98:12

**disrespectful** [1] - 116:23
**distress** [31] - 4:11, 4:18, 5:11, 5:14, 100:1, 100:10, 100:13, 100:24, 101:1, 101:2, 101:10, 101:11, 101:12, 101:20, 103:16, 103:19, 103:21, 103:23, 104:4, 104:8, 104:14, 104:20, 104:23, 106:12, 106:17, 108:9, 108:17, 108:20, 108:22, 109:1
**distributed** [1] - 25:5
**Distributed** [1] - 20:25
**distribution** [2] - 213:23, 225:5
**DISTRICT** [3] - 1:1, 1:1, 1:16
**District** [4] - 1:11, 4:2, 79:12
**diversified** [1] - 30:12
**division** [1] - 220:16
**doc** [3] - 24:9, 51:18, 51:22
**Docomo** [1] - 24:12
**docs** [1] - 56:8
**doctor** [2] - 253:23, 254:2
**Document** [1] - 47:21
**document** [105] - 11:10, 11:18, 12:4, 12:10, 13:25, 15:17, 27:9, 30:17, 31:9, 31:18, 31:22, 31:23, 32:24, 33:3, 33:6, 34:6, 34:7, 34:20, 34:24, 35:6, 35:9, 35:13, 36:19, 40:8, 41:11, 45:1, 45:12, 47:20, 47:25, 52:8, 52:10, 52:20, 55:15, 56:20, 57:23, 58:22, 60:2, 60:14, 65:18, 67:13, 68:2, 68:6, 69:13, 90:6, 91:1, 135:1, 135:4, 135:9, 135:16, 135:25, 139:21, 153:1, 162:21, 162:23, 163:18, 167:3, 167:5, 167:13, 167:16, 168:4, 168:18, 168:19, 174:10, 174:13, 174:15, 177:9,

187:3, 187:9, 188:1, 188:5, 188:7, 188:11, 190:3, 191:19, 193:22, 201:6, 205:4, 205:9, 205:11, 205:15, 205:17, 205:19, 205:20, 205:25, 206:10, 207:18, 210:5, 210:8, 212:13, 212:25, 213:1, 219:11, 227:13, 227:16, 228:18, 229:13, 230:2, 230:5, 230:9, 232:11, 232:24, 232:25, 233:25, 234:2, 234:4
**document/employee** [1] - 164:10
**documentation** [2] - 162:25, 200:19
**documented** [1] - 163:10
**documents** [10] - 4:22, 4:23, 5:5, 36:3, 56:11, 82:22, 153:3, 189:6, 191:16, 229:16
**domestic** [1] - 17:19
**done** [22] - 6:6, 7:25, 14:23, 23:1, 26:4, 48:11, 51:16, 130:12, 194:6, 212:18, 223:3, 223:5, 223:6, 223:7, 226:14, 238:3, 238:8, 248:17, 249:20, 252:4, 255:17, 256:7
**Doodle** [2] - 20:5, 20:14
**door** [3] - 195:12, 195:15
**dots** [1] - 46:5
**double** [8] - 223:4, 224:25, 225:4, 225:11, 225:18, 225:19, 227:20, 228:10
**doubt** [4] - 129:14, 129:16, 239:1, 243:4
**doubting** [2] - 187:17, 190:11
**down** [72] - 14:14, 15:25, 16:21, 16:25, 17:21, 19:1, 19:10, 20:2, 20:8, 20:19, 21:9, 22:13, 22:23, 23:5, 24:1, 27:4,

**U**NITED **S**TATES **D**ISTRICT **C**OURT

28:10, 28:16, 31:22,
32:5, 45:1, 47:7,
52:22, 52:25, 53:9,
53:21, 55:2, 55:24,
59:5, 60:13, 60:18,
61:5, 61:11, 62:11,
63:8, 64:12, 65:2,
65:15, 68:3, 71:13,
71:18, 72:12, 72:23,
83:6, 109:15,
109:19, 112:15,
120:23, 130:12,
130:13, 136:2,
139:19, 142:2,
152:21, 153:1,
162:14, 162:16,
163:12, 163:13,
164:4, 165:4,
166:12, 171:25,
173:10, 177:5,
178:16, 191:21,
193:22, 246:15,
247:18
**Dr** [8] - 15:6, 29:17,
117:9, 117:13,
117:17, 117:19
**draft** [3] - 231:24,
232:7, 257:9
**drafted** [3] - 135:11,
196:15, 196:18
**drafting** [1] - 233:3
**drag** [2] - 64:6, 248:9
**dragging** [1] - 222:22
**draw** [1] - 207:20
**drawn** [1] - 255:13
**drink** [1] - 177:14
**drinks** [3] - 117:11,
117:12
**drive** [1] - 164:18
**drop** [1] - 12:16
**dropped** [1] - 96:5
**drove** [2] - 148:14,
148:16
**drunk** [2] - 50:2, 50:3
**dude** [1] - 175:10
**due** [6] - 23:1, 30:3,
67:20, 69:24, 94:18,
181:9
**Duff** [1] - 244:24
**DULY** [2] - 130:23
**during** [46] - 8:2,
19:11, 36:1, 38:20,
47:5, 47:11, 61:2,
66:14, 67:14, 70:16,
82:16, 88:19, 90:7,
91:15, 92:3, 94:17,
95:9, 97:9, 98:8,
98:22, 99:14,
100:14, 101:10,
115:12, 118:20,

118:21, 118:24,
123:4, 125:4,
125:24, 128:20,
133:7, 144:21,
169:7, 172:3,
178:23, 186:19,
192:4, 197:16,
208:14, 217:14,
226:23, 238:24,
239:1, 246:5, 256:10
**duties** [1] - 146:12
**dynamic** [1] - 66:21

### E

**Eagles** [1] - 71:10
**early** [4] - 21:14,
85:19, 246:22,
257:10
**earnings** [1] - 226:20
**easier** [3] - 145:21,
181:6, 249:6
**East** [1] - 123:11
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:11
**easy** [2] - 10:18,
144:20
**economically** [1] -
27:6
**Ed** [1] - 22:19
**Edge** [2] - 20:25,
43:10
**edge** [8] - 18:14,
18:18, 20:10, 21:2,
23:7, 25:5, 63:18
**edging** [1] - 76:2
**educational** [1] -
228:11
**EEOC** [5] - 35:10,
98:9, 98:11, 233:15,
235:13
**effect** [6] - 7:3, 14:25,
68:1, 88:7, 136:3,
200:2
**effective** [3] - 138:4,
138:15, 193:5
**efficient** [1] - 154:16
**effort** [2] - 63:3, 87:16
**egregious** [1] - 192:20
**eight** [10] - 37:10,
37:22, 39:14, 39:23,
40:8, 73:4, 199:17,
224:23, 242:15,
242:16
**either** [5] - 22:9,
27:12, 150:14,
248:9, 257:11
**electronic** [3] - 119:1,
146:21, 239:22
**electronically** [2] -

238:4, 238:8
**eligibility** [9] - 216:7,
217:1, 218:9,
218:14, 218:17,
218:21, 220:23,
228:25, 229:1
**eligible** [22] - 215:20,
215:22, 216:7,
216:21, 216:23,
216:25, 217:2,
217:3, 218:9,
218:24, 219:4,
219:6, 220:10,
220:22, 222:1,
222:5, 226:1,
226:20, 227:8,
229:6, 229:7, 229:8
**elsewhere** [2] -
141:23, 144:1
**email** [18] - 26:21,
30:8, 43:20, 44:12,
76:9, 119:17, 120:8,
147:13, 147:16,
147:20, 148:4,
149:16, 164:9,
204:17, 216:1,
216:4, 216:20,
233:16
**emailed** [1] - 228:8
**emails** [5] - 15:13,
30:6, 147:19,
147:23, 149:16
**embarrassed** [2] -
211:3, 211:8
**embarrassing** [1] -
208:2
**embarrassment** [3] -
210:6, 210:9, 210:24
**emotional** [35] - 4:11,
4:18, 5:10, 5:14, 7:9,
93:1, 100:1, 100:6,
100:10, 100:13,
100:18, 100:24,
101:1, 101:2,
101:10, 101:11,
101:12, 101:20,
103:15, 103:19,
103:21, 103:23,
104:4, 104:8,
104:14, 104:20,
104:23, 106:12,
106:16, 108:8,
108:16, 108:20,
108:22, 109:1
**emotionally** [2] -
105:25, 108:5
**employed** [9] -
113:11, 114:25,
118:17, 131:19,
144:4, 144:9, 145:3,

216:15, 218:14
**employee** [54] - 26:11,
51:19, 55:16, 62:13,
63:25, 65:17, 76:5,
78:2, 78:3, 128:4,
133:9, 133:11,
133:20, 133:22,
133:23, 134:5,
134:18, 136:8,
137:16, 138:6,
141:1, 141:5, 144:4,
144:10, 144:13,
144:22, 145:5,
145:8, 147:7,
157:17, 157:22,
157:24, 159:3,
159:5, 163:17,
178:10, 192:2,
192:10, 200:20,
200:22, 214:8,
215:15, 215:22,
216:7, 216:22,
216:23, 217:2,
217:3, 218:9,
218:17, 220:11,
222:2, 225:21
**Employees** [2] -
140:15, 142:16
**employees** [48] -
26:15, 26:22, 50:20,
131:24, 131:25,
137:17, 138:7,
138:19, 141:19,
147:3, 147:13,
147:23, 151:10,
151:14, 181:8,
198:7, 213:19,
213:21, 214:14,
214:19, 215:10,
215:13, 215:15,
215:21, 216:15,
216:19, 216:21,
216:25, 218:23,
219:3, 219:4,
220:14, 220:18,
222:5, 225:9,
225:24, 226:3,
226:18, 227:11,
230:4, 241:6,
241:12, 241:15,
246:6, 246:9, 254:24
**employer** [2] - 32:7,
231:19
**employers** [1] -
157:19
**employment** [26] -
101:4, 113:15,
115:4, 118:18,
129:8, 155:25,
163:10, 167:1,
169:5, 172:3,

216:15, 218:14
**enacted** [1] - 182:6
**encompassing** [2] -
207:19, 237:4
**encounters** [1] -
152:17
**encouraged** [8] -
140:16, 141:7,
141:10, 142:12,
142:17, 143:4,
147:10, 147:18
**end** [23] - 18:21,
27:23, 29:9, 53:4,
58:9, 61:5, 61:9,
61:10, 61:14, 77:22,
127:9, 142:14,
173:11, 175:20,
175:22, 176:1,
176:16, 176:17,
186:3, 214:11,
230:23, 248:7,
254:21
**ended** [4] - 99:17,
127:13, 176:7, 229:1
**enforcement** [2] -
78:23, 79:2
**engaged** [3] - 185:17,
192:16, 231:13
**engaging** [1] - 30:11
**engineer** [15] - 37:4,
37:6, 38:9, 38:13,
39:17, 42:14, 51:1,
111:11, 111:20,
111:21, 193:2,
241:25, 243:16,
244:2
**engineering** [7] -
33:19, 37:12, 38:3,
47:13, 50:1, 53:25,
132:2
**engineers** [5] - 37:23,
38:13, 55:1, 241:18,
242:6
**enjoy** [1] - 247:12
**enrolled** [1] - 218:19
**ensuring** [1] - 42:22
**entered** [3] - 48:4,
60:2, 218:18
**enters** [4] - 10:16,
59:20, 110:19,
185:11
**entire** [15] - 38:20,
54:11, 58:11, 76:2,

96:23, 133:2, 133:7,
139:12, 210:15,
210:24, 221:22,
226:18, 228:16,
236:5, 249:9
**entirely** [1] - 249:19
**entirety** [9] - 140:2,
140:6, 141:22,
148:11, 194:7,
216:6, 217:1, 218:7,
218:8
**entitled** [4] - 4:9, 5:22,
51:3, 258:5
**environments** [1] -
37:8
**Equinix** [1] - 25:7
**equipment** [3] - 165:1,
168:21, 169:1
**equity** [1] - 19:25
**Erica** [1] - 31:25
**especially** [1] - 5:12
**ESQUIRE** [4] - 1:19,
2:3, 2:3, 2:4
**essentially** [9] - 38:12,
38:24, 39:1, 54:20,
70:25, 72:20, 89:3,
104:1, 154:18
**establish** [1] - 233:2
**established** [1] -
245:2
**establishing** [1] -
83:13
**estimate** [1] - 251:23
**estimates** [4] - 109:25,
248:24, 255:14,
255:18
**et** [1] - 6:12
**ethics** [1] - 207:2
**evaluation** [1] -
162:24
**event** [7] - 14:4, 15:20,
17:8, 22:9, 25:1,
61:2
**events** [6] - 30:23,
61:1, 80:9, 84:18,
119:14, 119:17
**eventually** [4] - 21:3,
81:14, 83:24, 99:17
**ever-changing** [1] -
66:23
**evidence** [33] - 8:9,
11:22, 15:15, 48:4,
55:17, 57:24, 60:3,
70:9, 93:19, 109:13,
134:21, 137:11,
162:19, 170:4,
180:24, 181:2,
233:13, 233:15,
234:4, 234:18,
239:23, 239:25,

240:5, 240:8, 240:9,
240:10, 245:22,
246:20, 247:5,
247:7, 247:9, 253:11
**EVIDENCE** [14] - 3:9,
3:10, 3:10, 3:11,
3:11, 3:12, 3:12,
70:11, 137:22,
138:12, 138:24,
172:9, 197:1, 208:22
**evolving** [1] - 39:9
**exact** [9] - 27:9, 50:18,
86:20, 111:19,
145:25, 211:10,
225:4, 227:6, 243:19
**exactly** [10] - 12:15,
66:5, 72:15, 84:3,
159:15, 163:4,
183:15, 186:1,
193:15, 202:13
**examination** [10] - 5:8,
10:22, 111:4, 117:1,
118:3, 120:10,
128:21, 248:7,
255:25, 256:10
**EXAMINATION** [8] -
3:4, 3:4, 3:5, 3:6,
10:25, 111:1,
129:24, 131:12
**examinations** [1] -
252:2
**EXAMINATIONS** [1] -
3:2
**examine** [4] - 5:22,
5:24, 153:21, 229:14
**example** [6] - 4:23,
102:23, 133:9,
151:1, 207:6, 248:6
**examples** [6] - 37:9,
40:16, 67:10,
116:18, 180:24,
181:10
**exceeds** [1] - 165:17
**Excel** [1] - 232:5
**exchange** [1] - 125:23
**exchanged** [1] - 80:18
**exchanges** [1] - 60:19
**exchanging** [2] -
80:17, 80:18
**excited** [2] - 18:23,
72:4
**exclude** [3] - 6:4, 6:7,
226:3
**excluded** [8] - 5:7,
8:10, 69:24, 73:18,
194:15, 194:18,
194:25, 221:1
**Excuse** [1] - 205:6
**excuse** [11] - 28:13,
69:22, 96:11, 96:13,

97:1, 129:2, 152:1,
160:4, 177:12,
219:6, 227:1
**execs** [1] - 64:9
**execution** [1] - 67:3
**executive** [1] - 19:20
**executives** [3] - 17:1,
50:15, 166:21
**exhibit** [23] - 6:7, 26:9,
56:12, 134:20,
134:22, 145:25,
170:14, 170:18,
170:20, 189:4,
190:17, 194:11,
194:12, 194:16,
194:22, 194:25,
195:17, 196:14,
212:7, 212:19,
229:19
**EXHIBIT** [14] - 3:9,
3:10, 3:10, 3:11,
3:11, 3:12, 3:12,
70:11, 137:22,
138:12, 138:24,
172:9, 197:1, 208:22
**Exhibit** [26] - 6:8,
31:7, 36:5, 59:25,
137:2, 137:7,
137:21, 137:24,
138:9, 138:11,
138:13, 139:19,
141:25, 145:21,
145:25, 162:18,
163:16, 170:15,
172:5, 187:4, 196:9,
203:11, 208:7,
208:16, 211:22,
229:19
**exhibits** [6] - 4:25,
5:1, 5:2, 5:3, 69:9,
195:18
**exist** [1] - 160:3
**existed** [1] - 197:24
**existence** [3] - 133:3,
239:9, 239:10
**exists** [3] - 140:7,
159:15, 172:2
**exit** [4] - 49:21, 50:10,
50:21, 50:23
**exits** [4] - 59:14,
109:17, 184:23,
247:17
**expand** [1] - 60:20
**expanded** [2] -
134:11, 210:18
**expect** [2] - 34:14,
50:19
**expectations** [1] -
115:11
**expected** [1] - 47:1

**expenditure** [1] -
204:13
**expenses** [2] - 202:19,
202:22
**expensive** [1] - 17:14
**experience** [5] -
112:6, 112:8,
115:17, 146:10,
239:4
**experienced** [2] -
101:19, 118:21
**expert** [2] - 64:16,
115:14
**explain** [9] - 26:1,
38:1, 46:12, 116:13,
180:10, 188:19,
197:4, 197:7, 197:8
**explained** [6] - 35:18,
116:18, 118:20,
183:14, 210:22,
211:12
**explaining** [1] - 34:1
**explains** [1] - 221:22
**explore** [6] - 4:9, 4:17,
5:13, 6:2, 100:20,
100:21
**expression** [1] -
177:14
**expressly** [1] - 8:10
**extended** [2] - 210:13,
210:19
**extension** [2] - 139:9,
139:11
**extensive** [6] - 68:4,
192:18, 198:13,
198:20, 198:25,
199:4
**extent** [6] - 9:10,
114:14, 114:15,
190:24, 191:8,
194:14

## F

**fabricated** [1] - 44:15
**face** [1] - 131:9
**faced** [3] - 66:17,
67:10, 67:14
**facing** [3] - 68:12,
85:8, 86:23
**fact** [14] - 5:14, 33:23,
35:3, 44:10, 51:13,
56:9, 57:17, 74:4,
94:24, 95:1, 95:7,
133:11, 170:6, 192:4
**facts** [1] - 5:22
**factually** [1] - 9:18
**failed** [1] - 192:7
**failure** [1] - 114:17
**failures** [1] - 67:3

**fair** [17] - 6:16, 21:12,
32:18, 32:23, 39:4,
46:7, 57:12, 65:2,
87:10, 93:17, 99:2,
109:7, 148:10,
149:3, 178:12,
191:10, 205:25
**fairly** [5] - 5:16, 68:4,
70:14, 110:2, 220:4
**faith** [2] - 190:4,
248:16
**fake** [4] - 56:7, 93:2,
195:9, 195:21
**falling** [1] - 30:22
**false** [4] - 97:8, 182:6,
182:16, 205:21
**fame** [1] - 115:14
**familiar** [8] - 13:13,
13:18, 175:7,
227:18, 227:22,
232:7, 232:19,
232:25
**familiarity** [1] - 233:2
**family** [1] - 246:24
**fan** [2] - 28:7, 71:12
**fantastic** [1] - 19:14
**far** [9] - 6:7, 39:22,
84:19, 158:15,
159:23, 212:12,
213:7, 235:17, 251:1
**fast** [2] - 99:4, 99:9
**faster** [3] - 250:7,
250:9, 256:17
**father** [1] - 99:6
**fathom** [1] - 252:7
**fault** [1] - 212:8
**February** [2] - 19:12,
23:15
**Federal** [1] - 5:16
**federal** [4] - 97:20,
122:19, 215:14,
253:12
**FedEx..** [1] - 168:24
**feedback** [4] - 154:6,
154:10, 157:14,
209:14
**feelings** [2] - 47:12,
118:23
**felt** [2] - 69:24, 106:8
**few** [10] - 19:4, 28:22,
29:8, 60:24, 92:24,
93:17, 157:5,
170:19, 201:17,
210:17
**fifth** [3] - 62:12,
201:10, 201:11
**figure** [1] - 257:7
**file** [6] - 97:5, 163:17,
164:10, 168:6,
200:20, 200:23

**filed** *[9]* - 34:16, 35:11, 35:14, 36:22, 47:3, 231:13, 231:24, 236:24, 237:14
**files** *[1]* - 239:17
**filing** *[2]* - 35:16, 35:20
**final** *[11]* - 6:11, 6:19, 6:25, 7:18, 73:24, 179:18, 179:19, 179:20, 194:25, 215:11, 248:18
**finance** *[2]* - 202:8, 203:18, 204:1
**financial** *[3]* - 19:25, 24:11, 207:8
**fine** *[7]* - 102:7, 110:10, 135:3, 225:1, 230:10, 243:3, 245:10
**fingers** *[1]* - 99:6
**finish** *[5]* - 68:2, 213:17, 222:24, 234:21, 255:22
**finished** *[3]* - 11:3, 99:17, 222:23
**fire** *[4]* - 66:22, 96:13, 97:4, 128:24
**fired** *[14]* - 81:4, 81:6, 81:7, 81:10, 97:10, 115:19, 121:10, 149:4, 149:6, 149:10, 164:23, 166:18, 166:25, 180:25
**firing** *[1]* - 95:16
**first** *[51]* - 8:6, 10:19, 11:6, 11:9, 33:5, 36:16, 41:17, 45:7, 45:8, 51:7, 51:10, 53:12, 57:3, 57:15, 58:1, 58:6, 58:14, 70:15, 72:13, 85:2, 85:9, 86:6, 94:12, 101:20, 102:23, 107:20, 119:16, 124:4, 124:7, 132:9, 132:11, 133:19, 134:4, 135:6, 135:13, 136:4, 140:14, 142:12, 155:15, 163:16, 164:3, 173:11, 182:20, 182:21, 197:4, 213:17, 214:20, 218:19, 228:25, 233:1, 242:11
**first-year** *[1]* - 228:25
**firsthand** *[3]* - 152:5,

152:17, 211:21
**fish** *[6]* - 13:4, 18:4, 18:6, 20:7, 28:19, 28:20
**fist** *[4]* - 177:17, 177:18, 177:20, 178:7
**fit** *[1]* - 42:19
**five** *[6]* - 70:24, 76:23, 128:24, 199:9, 207:25, 226:20
**flexible** *[1]* - 66:21
**flips** *[1]* - 230:8
**floor** *[2]* - 71:9, 112:17
**focus** *[2]* - 17:13, 67:2
**focused** *[2]* - 15:9, 83:21, 123:7
**fodder** *[1]* - 5:8
**folder** *[4]* - 51:25, 52:1, 164:18, 187:21
**folders** *[2]* - 239:12, 239:17
**folks** *[4]* - 38:9, 40:16, 62:21, 155:18
**follow** *[6]* - 13:10, 19:24, 26:21, 182:4, 255:4, 255:8
**follow-up** *[3]* - 13:10, 19:24, 26:21
**followed** *[1]* - 255:6
**following** *[7]* - 168:23, 182:3, 192:11, 214:21, 218:20, 228:10, 237:6
**FOLLOWS** *[1]* - 130:24
**follows** *[6]* - 114:3, 189:1, 194:20, 212:10, 221:19, 232:14
**fond** *[1]* - 15:2
**food** *[6]* - 19:2, 20:5, 49:20, 71:18, 108:2, 108:3
**foodies** *[1]* - 13:22
**foot** *[2]* - 121:22, 130:2
**forcing** *[1]* - 62:14
**Ford** *[15]* - 27:9, 150:18, 204:2, 204:16, 204:22, 206:2, 206:4, 206:9, 206:17, 250:18, 250:19, 250:20, 251:11, 252:7, 252:17
**foregoing** *[1]* - 258:4
**forget** *[2]* - 123:7, 136:9
**forgot** *[1]* - 83:9

**form** *[7]* - 51:15, 51:25, 207:16, 210:9, 237:7, 247:5, 247:8
**formal** *[1]* - 199:23
**format** *[1]* - 52:5
**formatting** *[1]* - 52:21
**formed** *[3]* - 81:14, 87:12, 87:15
**former** *[2]* - 19:20, 192:2
**forms** *[2]* - 51:18
**Forrester** *[6]* - 29:18, 29:20, 54:17, 54:25, 242:9, 242:11
**forth** *[2]* - 52:2, 80:11
**forward** *[1]* - 29:8
**foundation** *[18]* - 6:3, 172:1, 195:10, 195:24, 232:9, 232:12, 232:18, 232:24, 233:10, 233:12, 233:20, 233:23, 233:25, 234:1, 234:17, 234:18, 241:9, 254:17
**founder** *[4]* - 13:19, 14:2, 30:11, 115:15
**four** *[18]* - 25:8, 40:20, 41:13, 65:11, 84:4, 87:8, 89:8, 89:10, 102:11, 102:13, 125:25, 126:1, 139:15, 140:5, 199:9, 201:10, 207:24, 255:21
**fourth** *[2]* - 135:22, 254:25
**fourths** *[1]* - 68:9
**frame** *[15]* - 16:25, 26:10, 81:19, 82:16, 192:24, 201:11, 201:14, 201:15, 201:18, 204:22, 206:3, 206:5, 206:13, 206:21, 207:5
**framed** *[1]* - 25:10
**frames** *[1]* - 27:15
**framework** *[1]* - 75:15
**framing** *[1]* - 26:4
**frankly** *[4]* - 8:13, 100:21, 248:13, 255:12
**free** *[4]* - 117:24, 165:15, 168:9, 209:12
**frequently** *[1]* - 107:17
**Friday** *[5]* - 230:8,

245:7, 248:17, 248:20, 255:12
**friend** *[5]* - 13:4, 13:8, 24:14, 40:22, 69:16
**friendly** *[3]* - 30:1, 30:11, 118:20
**friends** *[2]* - 82:8, 246:24
**front** *[7]* - 9:5, 72:8, 135:1, 138:3, 139:21, 152:25, 170:18, 173:8, 187:9, 188:1, 191:19, 210:23
**frustrating** *[1]* - 54:1
**frustration** *[1]* - 248:11
**Fu** *[1]* - 164:18
**fulfill** *[1]* - 23:20
**full** *[8]* - 130:25, 131:14, 131:15, 164:17, 210:20, 211:11, 211:12, 220:14
**full-body** *[2]* - 211:11, 211:12
**full-time** *[1]* - 220:14
**function** *[1]* - 189:11
**functions** *[4]* - 39:13, 39:17, 39:20, 40:14
**funds** *[2]* - 192:21, 207:11, 207:15
**funny** *[1]* - 178:1
**future** *[2]* - 9:21, 47:9

**G**

**Galloway** *[5]* - 29:16, 74:13, 82:2, 84:16, 124:21
**game** *[1]* - 6:16
**games** *[1]* - 71:17
**gathering** *[1]* - 15:19
**gay** *[5]* - 75:4, 75:10, 75:11, 96:14, 97:1
**general** *[3]* - 136:16, 182:14, 182:15
**generally** *[8]* - 19:6, 19:7, 69:18, 118:14, 153:22, 155:10, 219:16, 241:22
**generated** *[2]* - 195:9, 197:12
**genitalia** *[3]* - 80:3, 80:4, 80:21
**gentleman** *[1]* - 22:14
**gently** *[1]* - 64:1
**GIF** *[1]* - 177:25
**girl** *[2]* - 212:21
**girlfriend** *[1]* - 77:10

**girlfriend's** *[1]* - 21:22
**given** *[12]* - 5:9, 5:12, 34:4, 73:16, 98:20, 186:4, 212:11, 214:14, 226:2, 226:4, 249:22, 252:2
**glad** *[1]* - 174:11
**glass** *[1]* - 38:21
**globally** *[2]* - 43:5, 43:9
**globe** *[1]* - 64:18
**glowing** *[2]* - 48:24, 49:1
**glowingly** *[1]* - 95:1
**goal** *[2]* - 88:7, 88:12
**goals** *[1]* - 66:24
**God** *[1]* - 125:14
**good-faith** *[1]* - 248:16
**Google** *[12]* - 20:5, 37:15, 90:13, 90:19, 90:21, 90:22, 91:16, 91:19, 91:23, 92:3, 92:15, 164:18
**Googled** *[2]* - 90:17, 91:15
**governed** *[1]* - 227:6
**government** *[1]* - 256:21
**grabbed** *[1]* - 47:6
**granted** *[2]* - 63:1, 121:24
**graphic** *[1]* - 16:19
**Graphics** *[2]* - 26:11, 26:17
**graphics** *[1]* - 16:24
**gratitude** *[1]* - 19:22
**Great** *[1]* - 71:19
**great** *[16]* - 16:4, 16:5, 65:6, 65:13, 75:25, 103:20, 104:18, 104:22, 108:21, 108:23, 109:4, 118:20, 131:10, 194:4, 236:17, 239:4
**Greek** *[1]* - 37:11
**green** *[1]* - 20:25
**grew** *[3]* - 132:13, 132:16, 132:18
**grieve** *[1]* - 101:13
**grieving** *[1]* - 101:8
**ground** *[1]* - 61:19
**grounds** *[1]* - 195:5
**groundwork** *[1]* - 76:1
**GROUP** *[1]* - 1:18
**group** *[9]* - 44:5, 49:24, 69:17, 72:1, 72:20, 73:6, 111:22, 112:7, 185:18
**grow** *[1]* - 40:14

**grown** [2] - 63:17, 66:14
**grows** [2] - 63:10, 84:6
**growth** [4] - 40:25, 43:14, 44:6, 63:16
**guess** [20] - 5:10, 22:25, 37:12, 53:2, 71:22, 74:24, 78:20, 101:17, 101:19, 117:16, 120:14, 120:22, 124:18, 152:19, 168:23, 174:12, 182:23, 252:23, 254:13, 256:23
**guessing** [1] - 64:25
**guide** [1] - 250:5
**guilt** [1] - 106:24
**guilty** [3] - 82:17, 104:11, 129:16
**gunning** [3] - 96:25, 97:3, 97:4
**gut** [1] - 257:10
**guy** [8] - 5:19, 5:25, 24:13, 74:8, 127:21, 127:22, 222:3, 256:25
**guys** [43] - 70:25, 71:4, 71:22, 72:24, 83:13, 98:9, 111:4, 124:5, 127:20, 127:23, 128:7, 148:8, 150:13, 156:4, 156:19, 156:22, 158:4, 158:16, 163:22, 167:22, 171:12, 172:15, 173:5, 173:6, 173:25, 174:5, 176:9, 176:14, 177:1, 177:7, 177:18, 177:25, 178:1, 178:13, 179:1, 179:8, 180:8, 180:14, 181:22, 198:4, 208:24, 210:5, 250:25

**H**

**Haddonfield** [7] - 20:6, 28:23, 84:11, 84:17, 84:22, 126:18
**half** [15] - 30:14, 30:20, 49:9, 65:15, 107:10, 111:17, 111:18, 185:7, 224:23, 239:24, 249:3, 251:8, 252:5,

252:8, 255:21
**halfway** [1] - 214:21
**hall** [1] - 115:14
**hallway** [2] - 47:6, 201:24
**hand** [3] - 16:16, 130:22, 145:15
**handbook** [25] - 133:9, 133:11, 133:20, 134:5, 134:18, 136:15, 136:19, 136:25, 137:16, 138:6, 139:9, 141:8, 141:23, 143:25, 144:1, 144:3, 144:5, 144:10, 144:11, 144:22, 145:5, 145:8, 145:12, 192:10
**handbooks** [5] - 133:22, 133:23, 136:8, 141:2, 144:14
**handed** [1] - 56:12
**handle** [1] - 247:20
**handled** [3] - 54:9, 202:21, 231:25
**hands** [3] - 60:20, 73:4, 106:3
**hands-on** [1] - 60:20
**handshake** [3] - 177:21, 177:23, 177:24
**hang** [2] - 176:14, 187:7
**hanging** [2] - 201:20, 201:23
**Hannigan** [1] - 40:18
**happenings** [1] - 14:12
**happy** [9] - 14:6, 14:12, 91:23, 92:1, 121:23, 155:9, 221:13, 228:17, 228:18
**harassment** [18] - 35:1, 142:25, 207:17, 207:20, 207:23, 208:1, 208:2, 208:4, 208:13, 208:24, 210:2, 210:6, 210:7, 210:9, 210:10, 211:2
**Harbor** [1] - 226:1
**hard** [2] - 64:4, 112:11
**harmed** [1] - 32:7
**harms** [1] - 100:6
**HAVING** [1] - 130:23
**head** [12] - 9:9, 134:17, 140:24,

146:7, 199:12, 210:14, 210:19, 225:3, 225:12, 225:18, 227:22, 251:24
**header** [1] - 57:25
**heading** [1] - 58:5
**heads** [2] - 109:15, 184:21
**health** [2] - 220:16, 248:1
**hear** [11] - 128:17, 175:5, 175:20, 175:22, 175:24, 176:2, 176:4, 190:21, 246:21, 246:22
**heard** [22] - 5:9, 7:16, 75:19, 81:3, 93:21, 93:22, 95:6, 95:9, 98:22, 99:16, 109:25, 114:15, 129:13, 151:18, 151:19, 151:21, 154:14, 176:20, 220:5, 223:6, 248:4, 249:11
**hearing** [18] - 59:10, 86:7, 86:10, 86:11, 86:14, 87:16, 89:11, 90:1, 93:18, 93:25, 94:2, 110:3, 110:10, 122:1, 122:4, 122:8, 125:25, 255:18
**hears** [1] - 42:5
**hearsay** [8] - 152:4, 152:6, 232:16, 232:17, 232:23, 233:4, 233:20, 233:23
**heart** [3] - 99:4, 99:9, 118:23
**held** [3] - 4:1, 132:9, 187:22
**hello** [1] - 22:6
**Help** [2] - 82:1, 124:20
**help** [15] - 19:15, 55:14, 88:5, 104:19, 124:17, 125:7, 125:8, 125:12, 127:16, 144:12, 147:22, 163:6, 168:20, 197:9, 238:10
**helped** [1] - 101:22
**helpful** [1] - 19:15
**helping** [3] - 10:8, 15:9, 82:20
**helps** [1] - 146:5
**hence** [1] - 178:7

**hesitate** [1] - 123:19
**Hi** [4] - 37:2, 41:16, 45:4, 209:4
**hide** [1] - 153:10
**high** [4] - 39:11, 180:3, 181:8, 225:13
**high-level** [1] - 181:8
**high-pressure** [1] - 225:13
**higher** [2] - 132:24, 171:12
**highlight** [2] - 19:16, 67:5
**highly** [17] - 215:10, 215:13, 215:14, 215:15, 216:18, 216:22, 218:22, 219:3, 219:5, 222:4, 225:9, 225:21, 225:23, 226:3, 226:18, 230:4
**highly-compensated** [13] - 215:10, 215:13, 215:14, 216:18, 216:22, 218:22, 219:3, 222:4, 225:9, 225:21, 225:23, 226:3, 230:4
**Highway** [1] - 123:11
**Hill** [2] - 18:9, 24:3
**himself** [1] - 37:25
**hire** [7] - 21:18, 86:18, 87:3, 104:12, 105:14, 125:10, 242:16
**hired** [3] - 136:4, 242:2, 242:16
**history** [6] - 46:23, 66:23, 117:21, 126:1, 126:8, 192:18
**hit** [4] - 61:19, 73:3, 86:25, 112:11
**hitman** [1] - 104:12
**hold** [7] - 6:6, 59:6, 70:4, 97:21, 172:19, 194:19, 197:6
**holding** [1] - 106:3
**Holy** [1] - 177:6
**home** [11] - 49:20, 79:4, 83:8, 88:8, 105:20, 124:4, 158:2, 158:7, 158:8, 248:1, 248:7
**homes** [1] - 158:16
**homework** [1] - 230:11
**honest** [1] - 171:23
**honestly** [1] - 187:17
**Hong** [4] - 17:12, 17:17, 17:18, 73:10

**Honor** [29] - 7:1, 10:24, 33:8, 55:9, 56:16, 57:8, 59:23, 70:5, 70:10, 75:1, 88:20, 145:22, 157:7, 172:5, 188:23, 196:7, 196:22, 197:9, 208:18, 219:24, 220:7, 221:15, 224:14, 230:20, 247:24, 249:1, 254:10, 254:15, 257:22
**Honorable** [1] - 4:1
**HONORABLE** [1] - 1:15
**hope** [1] - 256:17
**hopefully** [1] - 55:14, 110:12
**hoping** [1] - 191:1
**horrible** [1] - 103:15
**host** [2] - 25:8, 114:10
**hosted** [1] - 18:16
**hostile** [2] - 178:6, 178:8
**hotel** [2] - 24:22, 70:20
**hour** [13] - 14:6, 14:12, 109:11, 109:23, 109:24, 125:4, 185:7, 223:2, 249:3, 250:15, 251:8, 252:5, 252:8
**hours** [14] - 33:17, 54:9, 60:24, 192:7, 192:8, 216:16, 217:4, 217:9, 225:4, 250:6, 250:8, 251:14, 252:19, 255:21
**house** [36] - 29:5, 76:14, 76:22, 76:23, 77:1, 77:3, 77:4, 77:14, 77:19, 77:22, 78:24, 79:2, 79:7, 79:15, 79:19, 81:11, 83:11, 83:12, 84:16, 85:11, 87:13, 121:10, 121:19, 121:22, 122:20, 124:9, 124:15, 126:18, 127:7, 127:13, 128:6, 130:2, 158:22, 164:23, 207:13
**House** [1] - 21:13
**housekeeping** [1] - 257:20
**HR** [1] - 118:4

**Human** [1] - 34:11
**human** [20] - 65:18, 132:4, 132:12, 132:13, 132:24, 133:8, 140:17, 142:19, 146:10, 146:11, 146:13, 146:16, 161:21, 161:24, 166:21, 192:15, 193:3, 202:17, 231:7, 231:17
**hundred** [4] - 139:15, 162:9, 249:19, 249:23
**hundred-mile** [1] - 249:19
**hundreds** [1] - 242:17
**hung** [6] - 27:19, 99:19, 168:22, 176:19, 177:7, 207:5
**Hyde** [4] - 15:12, 29:17, 117:13, 117:17
**hyde** [1] - 117:9
**Hyde/Dr** [1] - 15:6

**I**

**idea** [8] - 8:19, 64:23, 80:25, 95:8, 142:21, 145:7, 152:22, 190:3
**ideas** [1] - 29:4
**identified** [3] - 47:25, 167:9, 194:22
**identify** [5] - 69:14, 100:11, 152:25, 168:3, 220:3
**ignored** [3] - 15:8, 121:10, 124:13
**ignoring** [1] - 124:18
**image** [1] - 210:20
**images** [1] - 80:17
**imagine** [3] - 83:15, 148:23, 253:25
**immediately** [1] - 237:5
**impeach** [5] - 232:21, 233:5, 234:3, 234:7, 234:10
**impeachment** [8] - 189:12, 190:19, 219:18, 219:20, 221:12, 229:24, 243:1, 254:2
**implicating** [1] - 179:12
**implicit** [1] - 247:3
**implied** [1] - 34:7
**imply** [1] - 191:3

**important** [7] - 17:10, 60:16, 183:8, 183:16, 246:17, 247:7, 249:23
**imposed** [1] - 130:6
**impossible** [1] - 225:14
**impressed** [2] - 63:3, 65:20
**impressive** [1] - 161:8
**improper** [1] - 192:21
**improve** [8] - 53:6, 53:22, 53:23, 54:15, 54:18, 54:19, 54:22, 60:15
**improvement** [1] - 116:2
**IN** [1] - 3:9, 3:10, 3:10, 3:11, 3:11, 3:12, 3:12, 70:11, 137:22, 138:12, 138:24, 172:9, 197:1, 208:22
**in-house** [1] - 29:5
**inaccuracies** [1] - 52:19
**inappropriate** [5] - 8:20, 80:12, 86:22, 87:5, 175:6
**Inaudible** [3] - 168:10, 202:20, 227:14
**incarcerate** [1] - 88:9
**incarcerated** [5] - 89:16, 89:20, 104:9, 107:3, 107:4
**incarceration** [3] - 106:24, 107:2, 123:22
**incident** [1] - 192:18
**inclination** [1] - 255:15
**inclined** [1] - 190:24
**include** [3] - 37:9, 188:20, 213:21
**included** [5] - 115:15, 133:8, 134:6, 134:7, 221:1
**including** [10] - 5:14, 17:1, 24:25, 59:9, 98:8, 114:10, 132:2, 151:11, 192:13, 226:18
**independent** [1] - 133:17
**indicated** [2] - 113:1, 128:12
**individual** [4] - 24:5, 74:5, 92:11, 189:21
**individuals** [1] - 188:21

**inducted** [1] - 115:13
**industry** [5] - 19:21, 23:22, 62:21, 112:4, 115:12
**inexpensive** [1] - 17:18
**influenced** [1] - 67:4
**information** [31] - 6:15, 14:8, 14:18, 16:9, 16:14, 20:10, 23:9, 24:11, 82:23, 90:14, 91:8, 91:10, 92:8, 92:25, 98:9, 100:22, 142:11, 159:13, 159:16, 163:10, 184:1, 187:16, 188:13, 198:15, 214:11, 214:13, 232:2, 232:3, 232:4, 243:7, 252:7
**informed** [1] - 32:10
**infrastructure** [1] - 25:4
**initial** [3] - 34:24, 169:5, 255:15
**initiated** [1] - 125:2
**initiative** [1] - 30:9
**innovation** [6] - 35:19, 35:24, 61:18, 62:14, 62:18, 63:10
**Inquirer** [3] - 90:10, 91:2, 96:1
**inside** [1] - 17:14
**insight** [1] - 65:21
**insisting** [1] - 31:14
**instance** [2] - 147:1, 193:1
**instead** [5] - 29:22, 54:11, 146:2, 196:19, 198:12
**instruct** [1] - 9:7
**instruction** [4] - 8:18, 9:14, 10:6, 53:7
**instructions** [2] - 8:15, 9:12
**insurance** [1] - 28:24
**intellectual** [1] - 42:6
**intelligence** [1] - 18:19
**intensively** [1] - 24:10
**intention** [1] - 35:22
**intentional** [2] - 230:21, 230:22
**interaction** [1] - 106:16
**interactions** [1] - 154:5
**interconnection** [14] - 16:18, 17:8, 21:23,

37:3, 39:8, 39:13, 39:16, 40:15, 40:25, 41:19, 42:14, 43:4, 43:25, 64:16
**interested** [4] - 21:7, 24:8, 25:12, 49:23
**interim** [1] - 165:21
**internal** [2] - 168:19, 213:4
**internet** [8] - 42:7, 43:10, 61:21, 90:13, 92:16, 93:14, 115:14, 121:16
**Internet** [1] - 20:25
**interpret** [1] - 207:21
**interrelating** [1] - 42:18
**interrogatories** [13] - 186:19, 188:12, 189:14, 189:15, 190:10, 190:13, 190:16, 190:21, 191:5, 232:3, 235:23, 237:14, 240:15
**interrogatory** [1] - 237:5
**interrupt** [4] - 8:9, 29:25, 81:24, 203:20
**interrupted** [1] - 54:6
**interruption** [5] - 67:17, 77:2, 160:24, 198:24, 245:1
**interview** [6] - 33:13, 33:14, 44:2, 45:16, 49:21, 50:21
**interviewed** [7] - 32:13, 32:20, 33:23, 34:2, 35:4, 38:19, 38:20
**interviews** [1] - 50:11
**introduced** [3] - 7:2, 62:21, 127:22
**invested** [1] - 99:13
**investigate** [3] - 34:10, 54:12, 192:15
**investigated** [1] - 192:3
**investigating** [1] - 18:15
**investigation** [4] - 97:11, 169:9, 192:19, 193:1
**investigator** [3] - 34:12, 34:17, 36:3
**investing** [1] - 24:8
**invite** [2] - 16:3, 127:9
**invited** [1] - 16:1
**invoicing** [1] - 26:16
**involve** [3] - 14:20,

154:19, 156:1
**involved** [14] - 78:11, 82:21, 116:15, 149:19, 149:20, 149:21, 150:3, 150:6, 150:16, 150:19, 188:21, 233:3, 252:12, 253:4
**involving** [1] - 19:2, 192:2
**IP** [12] - 29:19, 37:3, 41:19, 42:4, 42:5, 42:8, 42:9, 42:14, 42:21, 43:1, 43:25, 46:14
**IPv6** [3] - 115:13, 115:14, 115:16
**IRC** [1] - 76:13
**iron** [1] - 66:22
**IRS** [1] - 225:24
**isolated** [2] - 82:7, 192:18
**issuance** [1] - 135:9
**issue** [52] - 4:17, 4:19, 5:24, 8:18, 9:12, 10:6, 46:4, 54:12, 55:22, 58:19, 58:20, 74:4, 74:5, 85:10, 100:19, 111:5, 111:8, 115:1, 116:1, 125:22, 134:6, 136:24, 139:12, 147:7, 147:18, 148:8, 148:22, 148:23, 149:2, 150:3, 150:23, 152:23, 154:25, 166:12, 167:5, 183:16, 198:9, 198:17, 204:12, 206:18, 206:20, 208:13, 209:1, 209:4, 209:19, 212:1, 215:1, 223:16, 250:25, 255:1, 255:4
**issued** [7] - 10:10, 133:22, 135:17, 136:6, 136:8, 136:21, 255:6
**issues** [36] - 44:24, 45:5, 45:11, 46:13, 46:21, 52:6, 68:14, 115:20, 116:7, 118:6, 121:12, 124:7, 133:8, 140:16, 141:10, 142:18, 148:21, 161:25, 167:4, 168:25, 178:13,

178:19, 179:2,
179:4, 182:9,
183:10, 183:11,
183:24, 184:2,
198:7, 212:22,
213:14, 213:19,
248:1, 252:22
**issuing** [1] - 134:1
**IT** [1] - 65:21
**items** [2] - 200:10,
212:15
**itself** [7] - 35:6, 52:14,
182:13, 206:21,
206:24, 213:1,
218:25

## J

**Jack** [1] - 228:8
**JACKSON** [1] - 2:2
**jail** [3] - 5:19, 5:20,
121:23
**James** [8] - 1:12,
69:16, 70:23, 71:3,
71:7, 71:19, 72:14,
72:15
**January** [4] - 1:13,
135:12, 207:23,
258:9
**Japan** [1] - 24:4
**Japanese** [3] - 12:22,
13:3, 13:8
**jealous** [1] - 18:2
**Jedi** [3] - 28:8, 28:9
**Jekyll** [6] - 15:6,
29:17, 117:9,
117:13, 117:17,
117:19
**jerk** [1] - 45:6
**Jersey** [11] - 4:24,
5:17, 24:3, 79:12,
88:3, 127:18,
158:12, 158:13,
158:14, 158:15,
158:16
**Jets** [2] - 71:10, 71:12
**JILL** [1] - 2:3
**Jimmy** [1] - 70:15
**Job** [2] - 64:25, 65:1
**job** [20] - 16:5, 21:12,
22:18, 46:14, 49:17,
64:7, 65:6, 65:13,
84:15, 84:23,
115:10, 119:4,
132:6, 132:22,
144:13, 144:21,
145:4, 231:8, 244:1,
244:3
**Joe** [3] - 21:21, 22:6,
22:7

**John** [94] - 20:1,
47:17, 56:21, 67:18,
76:4, 76:5, 76:8,
76:12, 76:15, 76:25,
77:5, 77:7, 77:13,
77:19, 78:20, 79:21,
80:15, 82:2, 82:7,
83:4, 83:5, 83:22,
84:12, 84:15, 85:2,
85:8, 85:12, 87:22,
87:25, 88:4, 88:8,
88:18, 90:14, 90:22,
90:23, 90:25, 91:17,
91:24, 92:16, 92:21,
94:19, 94:23, 95:10,
102:11, 103:1,
107:13, 108:10,
108:13, 120:24,
120:25, 122:16,
122:17, 123:2,
123:9, 123:13,
123:17, 124:3,
124:4, 124:7,
124:11, 124:12,
124:13, 124:24,
126:1, 126:8, 127:1,
127:7, 128:2,
129:14, 148:20,
148:22, 148:24,
149:2, 150:3,
150:23, 152:23,
155:4, 162:10,
162:11, 165:24,
167:9, 167:25,
174:12, 174:15,
198:17, 237:24,
238:18, 240:1,
240:10, 254:20
**John's** [3] - 88:2,
90:17, 95:16
**join** [1] - 24:15
**JONATHAN** [1] - 2:3
**JOSHUA** [2] - 1:15,
4:2
**Judge** [3] - 4:2,
108:24, 254:22
**JUDGE** [1] - 1:16
**judge** [8] - 11:19,
88:15, 88:17, 88:24,
123:8, 123:12,
125:25, 130:6
**July** [3] - 81:18, 81:23,
81:24
**jump** [6] - 24:17,
27:22, 28:10, 28:16,
85:1, 112:18
**June** [8] - 28:17,
29:10, 204:10,
204:13, 206:4,
206:15, 217:16,

223:19
**junior** [2] - 21:18,
193:2
**JUROR** [2] - 131:8,
131:11
**Jury** [8] - 10:16,
59:14, 59:20,
109:17, 110:19,
184:23, 185:11,
247:17
**jury** [43] - 4:5, 5:25,
6:19, 6:20, 6:22, 7:1,
7:23, 10:14, 59:18,
76:23, 81:19, 98:12,
100:9, 100:22,
101:9, 105:13,
105:18, 105:25,
106:18, 108:16,
110:17, 111:6,
111:9, 121:8, 151:2,
152:25, 163:6,
167:12, 180:10,
183:7, 185:4,
185:22, 187:5,
189:10, 196:1,
197:9, 198:16,
209:21, 233:8,
248:7, 248:19,
257:17
**JURY** [1] - 1:5
**jury's** [1] - 8:14
**justification** [1] -
96:17

## K

**Kaplan's** [1] - 27:12
**Kaufman** [4] - 32:15,
32:21, 33:16, 33:21,
244:11, 244:24
**Kaufman's** [2] - 33:17,
35:25
**Kaufmann** [1] - 49:23
**keep** [12] - 5:4, 65:6,
65:13, 118:15,
176:12, 199:12,
213:15, 223:1,
224:16, 233:23,
247:7, 256:14
**Keep** [1] - 109:14
**keeping** [1] - 14:11
**kept** [1] - 178:13
**key** [3] - 63:18,
216:21, 216:24
**kid** [3] - 121:17, 124:8,
125:11
**kids** [3] - 8:25, 125:13
**kill** [1] - 104:12
**killed** [1] - 121:17
**killing** [1] - 10:8

**kind** [23] - 13:22,
14:15, 17:7, 21:1,
31:2, 68:20, 76:2,
79:17, 83:25, 92:20,
119:13, 120:23,
124:16, 134:4,
134:24, 155:25,
162:24, 177:22,
199:23, 204:12,
243:25, 247:4,
247:11
**kinds** [4] - 13:14, 26:4,
30:12, 93:2
**King** [1] - 62:24
**Kings** [1] - 123:11
**Kitonga** [1] - 64:25
**knee** [1] - 45:6
**knee-jerk** [1] - 45:6
**knock** [1] - 257:16
**knowing** [4] - 34:14,
104:8, 154:12,
157:16
**knowledge** [6] - 6:23,
7:4, 63:16, 63:17,
80:15, 86:9, 112:19,
187:15, 244:15
**known** [8] - 9:20,
19:21, 26:24, 47:12,
62:22, 89:14,
121:18, 125:17
**knows** [10] - 15:7,
29:17, 46:13, 51:4,
81:19, 85:18, 144:4,
244:14, 245:10,
254:18
**Koch** [2] - 40:19,
40:22
**Kong** [4] - 17:12,
17:17, 17:18, 73:10
**Kubernetes** [2] -
37:14, 37:24

## L

**label** [1] - 207:3
**labeled** [1] - 226:5
**lack** [2] - 232:9, 241:9
**Lady** [2] - 82:1, 124:20
**laid** [2] - 42:12, 47:8
**Lake** [1] - 248:10
**landlord** [11] - 76:11,
77:5, 79:3, 79:9,
79:11, 79:16, 80:11,
80:22, 82:20, 83:9,
83:12
**laptop** [6] - 16:17,
80:23, 81:2, 81:7,
123:6, 164:17
**large** [3] - 28:22,
53:24, 192:23

**largely** [3] - 19:2,
68:21, 248:16
**larger** [2] - 67:5,
211:10
**largest** [2] - 24:12
**last** [27] - 4:6, 8:16,
95:10, 99:22, 108:4,
111:17, 113:12,
118:17, 126:1,
135:17, 142:11,
142:14, 169:7,
172:23, 199:20,
201:20, 209:22,
216:5, 217:16,
218:6, 231:5, 235:9,
241:2, 241:4, 247:2,
256:8
**late** [4] - 35:15,
246:21, 257:13,
257:14
**latter** [1] - 192:22
**laugh** [3] - 178:1,
178:3, 178:4
**Laura** [1] - 2:12
**LAW** [1] - 1:18
**law** [6] - 21:23, 22:5,
78:23, 79:2, 140:9,
143:11
**Law** [1] - 114:4
**laws** [3] - 143:9,
143:12, 143:17
**lawsuit** [9] - 91:25,
93:16, 98:8, 169:22,
170:1, 170:2, 170:6,
170:11, 174:5
**lawyer** [5] - 55:16,
95:8, 110:22,
153:21, 234:14
**lay** [8] - 16:19, 75:15,
76:1, 119:13, 172:1,
195:10, 233:25,
254:17
**laying** [1] - 44:13
**layman's** [1] - 53:7
**lays** [2] - 41:15,
195:24
**lead** [1] - 123:20
**learn** [7] - 61:1, 79:21,
86:2, 86:7, 87:2,
87:19, 88:12
**learned** [11] - 66:17,
79:25, 80:5, 80:6,
80:7, 86:4, 86:14,
87:1, 87:3, 94:13,
102:7
**learning** [1] - 18:20
**lease** [1] - 76:9
**leases** [1] - 76:14
**least** [24] - 13:13,
13:18, 30:19, 32:23,

*33:4, 34:23, 38:2, 39:22, 40:7, 43:15, 47:1, 52:13, 54:13, 68:11, 90:24, 135:21, 141:5, 142:22, 154:2, 193:1, 200:1, 236:1, 257:3*

**leave** [6] - 93:19, 122:20, 122:22, 195:12, 195:15, 256:23

**leaving** [1] - 70:24

**led** [14] - 21:3, 35:12, 35:14, 35:18, 118:7, 119:17, 121:4, 125:15, 169:8, 199:23, 213:5, 231:14, 238:22

**leeway** [2] - 200:7, 212:11

**left** [9] - 11:2, 29:23, 49:23, 76:9, 83:10, 109:25, 230:16, 250:12, 255:22

**legal** [3] - 82:22, 231:25, 234:16

**legitimate** [4] - 198:23, 199:1, 238:21, 238:23

**leisure** [1] - 209:22

**length** [2] - 42:18, 50:10

**lengthy** [2] - 41:11, 220:4

**less** [4] - 136:17, 249:23, 251:12, 251:18

**letter** [5] - 4:8, 164:7, 164:9, 164:11, 254:14

**letters** [1] - 4:6

**level** [17] - 39:11, 43:22, 50:15, 50:19, 63:3, 112:11, 115:11, 157:14, 170:10, 180:3, 181:8, 239:6, 244:1, 245:18, 246:2, 246:3, 255:20

**Levy** [2] - 40:18, 40:21

**LEWIS** [1] - 2:2

**liability** [4] - 128:24, 222:10, 222:11, 222:14

**LIABILITY** [1] - 1:6

**lie** [41] - 155:11, 156:12, 156:17, 156:19, 156:23, 157:1, 159:6,

*161:16, 167:3, 167:19, 169:13, 179:10, 180:3, 180:6, 181:19, 182:24, 183:13, 184:8, 184:11, 185:18, 185:20, 193:8, 193:10, 193:17, 198:3, 205:2, 205:4, 205:7, 205:9, 205:17, 205:18, 205:25, 206:1, 213:6, 228:3, 234:25, 235:18, 236:23, 240:17*

**lied** [19] - 154:23, 154:25, 155:3, 155:10, 181:15, 182:19, 182:20, 182:21, 183:2, 183:6, 183:8, 183:23, 184:3, 198:4, 235:4, 236:2, 236:3, 237:1, 241:1

**lies** [3] - 182:18, 235:7, 235:9

**life** [8] - 30:13, 82:19, 83:15, 84:21, 100:10, 101:10, 101:15

**likely** [1] - 254:1

**limit** [2] - 9:18, 17:15

**LIMITED** [1] - 1:6

**limited** [4] - 35:3, 40:13, 220:12, 230:15

**limits** [1] - 249:13

**Line** [2] - 224:9, 224:12

**line** [11] - 29:21, 41:17, 45:8, 57:4, 65:16, 191:21, 217:25, 224:7, 224:8, 230:25, 231:5

**lines** [4] - 6:20, 57:4, 58:7, 58:14

**link** [4] - 71:22, 71:24, 164:19

**linking** [1] - 92:8

**Linode** [147] - 12:9, 14:6, 14:25, 15:20, 15:21, 15:22, 17:8, 17:10, 19:3, 21:1, 21:3, 22:1, 22:16, 22:18, 22:21, 24:9, 26:5, 29:4, 29:6, 29:9, 29:24, 30:23, 32:10, 34:15, 35:22, 37:6, 48:1, 52:4, 61:22, 62:21, 63:5,

*65:19, 66:1, 75:7, 76:5, 76:10, 76:12, 76:17, 76:20, 77:24, 78:2, 81:4, 81:10, 82:18, 84:18, 84:23, 90:9, 90:22, 91:19, 91:20, 91:21, 92:20, 93:20, 93:23, 93:24, 94:3, 95:15, 97:13, 97:22, 100:2, 100:11, 100:15, 101:2, 101:21, 104:1, 111:25, 114:20, 114:25, 115:1, 115:4, 115:6, 115:16, 115:19, 115:20, 115:25, 116:2, 126:20, 127:21, 127:22, 128:2, 128:7, 131:19, 131:22, 131:25, 132:4, 133:20, 133:22, 134:18, 137:17, 138:7, 138:18, 140:8, 140:11, 140:25, 141:4, 141:16, 144:4, 144:9, 145:1, 145:3, 146:9, 146:14, 146:19, 146:21, 147:1, 147:3, 147:22, 165:15, 168:9, 168:24, 169:10, 172:3, 180:3, 181:8, 186:12, 186:25, 189:19, 191:21, 191:25, 192:2, 192:3, 192:6, 192:22, 200:1, 200:6, 201:20, 201:22, 207:14, 208:14, 209:3, 213:18, 214:7, 216:8, 216:15, 218:10, 220:17, 226:10, 231:13, 231:21, 241:6, 241:13, 241:14, 243:22, 243:23, 244:4*

**LINODE** [3] - 1:6, 1:7, 1:7

**Linode's** [14] - 14:9, 14:25, 17:1, 43:4, 100:15, 133:11, 139:23, 140:2, 179:12, 192:10, 192:15, 192:19, 193:3, 201:1

**Linode-related** [1] - 29:9

**linode.com** [1] - 30:6

**Linodes** [2] - 165:15, 168:9

**LINODIAN** [1] - 1:7

**Lisa** [7] - 164:16, 164:22, 164:25, 165:2, 168:20, 168:22, 168:24

**list** [35] - 26:21, 37:10, 66:11, 70:15, 152:19, 195:5, 195:9, 195:23, 196:15, 196:19, 197:3, 197:5, 197:12, 197:15, 197:17, 197:19, 197:22, 197:24, 198:5, 198:9, 198:12, 198:13, 198:20, 198:25, 199:4, 199:6, 199:7, 199:15, 212:15, 220:15, 232:5, 239:5, 243:7, 254:19, 254:23

**listed** [2] - 32:1, 119:3

**listen** [3] - 47:7, 60:10, 175:4

**listened** [1] - 48:21

**listening** [2] - 29:18, 173:5

**listing** [1] - 41:13

**lists** [2] - 39:14, 40:18

**litigation** [7] - 154:1, 157:18, 159:9, 159:11, 167:4, 184:2, 233:17

**litigator** [1] - 253:5

**littler** [1] - 81:22

**live** [8] - 32:2, 127:5, 158:9, 158:10, 158:13, 158:14, 207:12

**lived** [7] - 77:5, 84:15, 89:8, 123:10, 124:5, 128:7, 201:17

**lives** [2] - 101:13, 158:15

**livid** [1] - 247:24

**living** [15] - 77:4, 77:19, 79:15, 81:11, 84:21, 102:16, 124:4, 124:5, 127:20, 127:21, 127:23, 128:6, 135:8, 135:16, 135:25

**LLC** [3] - 1:7, 1:7, 1:8

**lobby** [1] - 204:3

**local** [1] - 15:19

**locally** [1] - 18:20

**location** [1] - 201:18

**locked** [1] - 108:6

**log** [1] - 122:11

**logged** [2] - 122:24, 123:1

**logistics** [3] - 164:8, 165:2, 168:21

**logo** [1] - 17:11

**long-term** [1] - 67:2

**look** [43] - 14:5, 17:17, 17:25, 24:17, 31:7, 31:22, 38:5, 38:7, 41:17, 47:18, 51:6, 51:10, 52:17, 53:10, 53:20, 61:11, 62:11, 68:10, 69:10, 70:2, 72:23, 90:13, 91:13, 92:24, 93:12, 116:20, 127:1, 143:24, 145:19, 146:5, 146:7, 168:7, 172:12, 173:14, 188:17, 196:14, 208:5, 209:21, 215:23, 219:11, 221:10, 223:25, 232:25

**looked** [9] - 56:14, 91:15, 127:3, 190:21, 190:22, 239:2, 239:6, 248:18

**looking** [27] - 17:4, 18:14, 18:16, 53:5, 56:8, 56:11, 58:14, 65:19, 77:6, 93:13, 96:10, 99:7, 137:1, 144:2, 145:8, 163:3, 163:25, 170:21, 173:1, 173:4, 189:4, 195:4, 209:2, 216:5, 226:11, 246:25, 255:14

**Looking** [1] - 13:23

**looks** [47] - 12:22, 14:4, 14:5, 14:15, 15:18, 15:24, 16:8, 16:13, 16:22, 17:6, 17:22, 18:4, 18:11, 19:1, 19:2, 19:12, 20:9, 20:13, 20:20, 20:22, 21:9, 21:20, 22:8, 22:23, 24:2, 24:24, 27:25, 28:3, 28:18, 28:21, 29:14, 39:14, 41:8, 41:9, 51:7, 66:9, 68:25, 70:14, 70:18, 70:23,

71:7, 72:13, 72:24, 73:2, 73:3, 142:7, 164:20
**loser** [1] - 256:10
**loses** [1] - 256:11
**losing** [2] - 99:12, 178:10
**loss** [2] - 114:10, 114:14
**lost** [1] - 73:7
**loud** [2] - 168:14, 199:11
**love** [4] - 26:20, 28:9, 102:24
**loved** [1] - 16:20
**loves** [3] - 17:24, 18:2, 28:19
**low** [1] - 112:15
**lowering** [1] - 61:25
**lucky** [1] - 129:1
**lud's** [1] - 49:11
**lump** [1] - 226:19
**lunch** [13] - 47:6, 49:6, 49:9, 49:12, 49:13, 50:9, 71:6, 82:1, 109:10, 125:4, 256:19, 257:15
**Luncheon** [1] - 110:14
**lunchtime** [1] - 82:2
**lying** [23] - 44:10, 154:19, 154:21, 155:3, 167:12, 167:16, 167:22, 174:21, 180:9, 180:12, 180:22, 182:2, 184:12, 184:14, 194:2, 212:24, 235:10, 235:12, 236:7, 236:10, 236:11, 237:2, 237:13

**M**

**machine** [1] - 18:20
**mail** [1] - 164:8
**main** [2] - 33:19, 66:11
**maintain** [1] - 37:7
**maintained** [1] - 219:13
**maintenance** [2] - 28:25, 42:22
**Major** [1] - 54:8
**major** [1] - 60:24
**majority** [1] - 54:2
**makers** [1] - 67:6
**man** [8] - 75:10, 86:25, 106:3, 117:23, 177:6, 247:25, 248:8
**man's** [2] - 38:21,

45:12
**management** [7] - 53:7, 140:17, 142:18, 166:20, 166:21, 170:10, 180:3
**manager** [40] - 32:11, 37:3, 37:4, 38:8, 38:12, 38:14, 38:25, 41:18, 42:13, 42:15, 43:25, 44:2, 44:3, 44:7, 53:19, 53:20, 54:7, 55:3, 55:6, 56:23, 57:1, 57:7, 57:14, 57:25, 58:5, 58:17, 60:23, 61:6, 61:11, 61:12, 61:14, 62:13, 76:16, 76:17, 77:8, 115:25, 118:4, 119:20, 132:12, 164:25
**manager's** [2] - 77:9
**managers** [2] - 27:13, 44:4, 64:17
**managing** [4] - 43:8, 43:10, 44:9, 49:24
**mandatory** [2] - 140:20, 141:6
**manipulate** [1] - 50:4
**manner** [2] - 30:12, 116:22
**March** [11] - 12:13, 12:14, 12:19, 13:8, 13:13, 20:3, 20:5, 20:8, 20:12, 20:19, 66:13
**mark** [1] - 27:8
**Market** [2] - 1:12, 1:19
**market** [2] - 17:13, 66:23
**Martin** [3] - 40:18, 40:21
**masquerading** [1] - 57:7
**match** [1] - 226:15
**matching** [2] - 213:22, 214:1
**material** [3] - 243:6, 243:9, 243:11
**Matter** [1] - 258:1
**matter** [15] - 7:3, 51:13, 95:7, 192:20, 214:1, 214:4, 215:18, 218:13, 227:24, 230:23, 240:21, 240:22, 247:13, 256:18, 258:5
**matters** [3] - 10:2, 212:17, 241:1

**mature** [1] - 102:25
**maureen** [1] - 1:22
**Maureen** [2] - 258:7
**maureen.mchugh@ paed.uscourts.gov** [1] - 1:22
**MCCARTHY** [4] - 2:4, 36:8, 60:5, 126:5
**McHugh** [2] - 1:22, 258:7
**McNealy** [2] - 19:13, 19:19
**meal** [1] - 50:9
**meals** [1] - 13:20
**mean** [55] - 6:8, 6:24, 15:4, 22:17, 30:3, 34:11, 41:5, 44:1, 52:13, 74:10, 78:19, 78:21, 81:24, 82:18, 83:4, 84:9, 84:14, 85:6, 85:9, 85:15, 87:5, 89:2, 93:5, 97:20, 103:13, 106:21, 109:24, 117:10, 127:18, 148:11, 150:24, 153:3, 153:24, 157:9, 157:10, 171:8, 177:9, 177:20, 189:13, 190:4, 190:5, 190:16, 191:3, 195:20, 198:7, 219:19, 220:3, 227:25, 234:13, 236:23, 245:8, 252:11, 252:19, 253:24, 256:6
**meaning** [1] - 222:13
**means** [9] - 29:23, 39:10, 52:17, 188:8, 230:14, 230:15, 230:17, 239:22, 256:10
**meant** [3] - 174:5, 256:1, 256:4
**mechanical** [1] - 1:23
**mechanics** [1] - 220:25
**meet** [10] - 20:10, 22:2, 24:21, 24:23, 25:6, 70:25, 71:1, 76:7, 76:8
**meeting** [45] - 14:16, 14:17, 14:20, 19:13, 19:18, 21:24, 25:3, 28:14, 35:18, 46:25, 48:20, 48:22, 49:13, 86:6, 86:7, 89:18, 89:19, 93:20, 93:23,

93:24, 94:2, 94:4, 94:5, 94:6, 94:8, 94:9, 94:14, 94:18, 95:4, 97:9, 98:22, 98:24, 99:14, 99:17, 119:14, 119:17, 123:1, 123:4, 123:6, 129:10, 154:2, 186:5, 193:10, 205:22
**meetings** [4] - 21:5, 35:12, 46:2, 64:5
**Melissa** [2] - 2:11, 224:10
**Mellon** [1] - 18:16
**members** [6] - 54:1, 54:2, 54:5, 54:9, 54:12, 67:24
**memorialized** [1] - 94:10
**memorize** [1] - 225:15
**memory** [1] - 160:14
**mental** [2] - 104:19, 248:1
**mention** [6] - 66:15, 141:21, 174:24, 209:8, 218:22, 219:2
**mentioned** [11] - 19:11, 25:18, 30:24, 31:22, 76:12, 96:2, 139:7, 141:23, 155:19, 218:16, 218:24
**mentioning** [1] - 73:25
**mentions** [1] - 45:21
**menu** [1] - 71:20
**message** [34] - 11:3, 11:5, 12:13, 13:16, 13:17, 22:24, 26:22, 30:4, 30:8, 40:6, 44:11, 45:18, 47:8, 64:7, 73:9, 119:2, 147:8, 149:9, 159:25, 160:3, 160:5, 160:17, 160:23, 160:25, 161:6, 161:7, 169:6, 171:21, 173:11, 173:15, 202:12, 202:14, 203:4, 204:17
**messaged** [1] - 168:23
**messages** [14] - 19:1, 20:21, 30:9, 44:12, 46:22, 69:15, 80:19, 125:23, 147:4, 170:22, 171:23, 172:22, 173:2, 173:6
**messaging** [3] - 49:7, 80:11, 148:3

**met** [5] - 21:25, 24:9, 62:6, 126:2, 128:2
**method** [1] - 180:14
**Meyer** [1] - 2:11
**microphone** [1] - 111:7
**Microsystems** [1] - 19:20
**mid** [7] - 48:2, 48:12, 48:18, 48:24, 50:5, 74:15, 163:13
**mid-year** [6] - 48:2, 48:12, 48:18, 48:24, 50:5, 163:13
**middle** [4] - 52:25, 65:5, 65:8, 68:7
**midterm** [3] - 48:5, 48:13, 75:17
**might** [13] - 10:8, 95:15, 101:18, 141:23, 145:20, 176:15, 183:16, 187:2, 188:24, 190:25, 195:11, 218:25, 227:16
**Milberg** [2] - 219:17, 228:9
**mile** [2] - 249:19, 249:23
**mind** [7] - 129:14, 170:4, 170:5, 224:25, 246:18, 247:5, 247:7
**mine** [2] - 48:7, 202:1
**minute** [7] - 203:12, 222:19, 223:8, 224:17, 237:9, 237:13
**minutes** [14] - 24:23, 59:8, 59:12, 59:15, 70:24, 92:24, 99:20, 109:7, 184:20, 184:24, 185:7, 249:4, 250:15, 252:18
**misinterpreted** [1] - 46:23
**misrepresented** [1] - 192:6
**missed** [4] - 50:17, 102:2, 102:5, 192:9
**missing** [5] - 52:23, 52:24, 81:8, 94:12, 161:14
**mission** [1] - 154:15
**mistake** [1] - 248:21
**mistaken** [1] - 144:2
**misunderstood** [2] - 154:8, 155:8
**mitigate** [1] - 114:18

**mitigation** [1] - 114:15
**mixed** [1] - 187:2
**modification** [1] - 135:17
**moment** [4] - 40:21, 75:7, 188:17, 220:7
**Monday** [13] - 246:15, 247:14, 247:15, 247:21, 248:10, 249:17, 250:13, 256:13, 256:19, 257:10, 257:13, 257:25
**money** [16] - 9:16, 17:2, 17:3, 100:5, 108:2, 114:14, 202:18, 214:14, 214:15, 214:18, 214:23, 215:19, 221:25, 222:10, 222:12
**monitor** [1] - 131:8
**monitoring** [1] - 42:22
**month** [6] - 15:18, 73:12, 115:19, 136:4, 136:6, 242:2
**months** [17] - 22:19, 36:21, 47:5, 47:11, 102:2, 102:5, 118:18, 199:21, 204:14, 206:9, 206:11, 206:19, 214:20, 224:23, 236:22, 243:20
**moreover** [1] - 192:6
**morning** [12] - 4:4, 10:17, 11:2, 11:6, 33:16, 59:7, 85:19, 122:9, 164:16, 247:14, 247:15, 257:4
**most** [8] - 89:9, 101:22, 141:25, 154:16, 183:16, 198:18, 198:20, 248:6
**mother** [10] - 25:12, 77:21, 83:20, 96:4, 101:5, 101:6, 101:13, 101:22, 102:1, 104:18
**motion** [1] - 195:2
**motivated** [1] - 9:9
**motive** [1] - 182:6
**motives** [1] - 96:13
**move** [25] - 21:2, 31:4, 35:8, 39:4, 47:20, 53:9, 60:13, 62:7, 76:17, 77:13, 84:11, 98:18, 110:5, 112:4,

127:14, 137:19, 138:9, 138:21, 146:9, 172:5, 196:22, 208:16, 222:25, 224:17, 256:25
**moved** [7] - 77:19, 77:22, 87:13, 126:19, 126:20, 126:24, 208:19
**movie** [1] - 28:4
**moving** [7] - 70:4, 75:13, 88:3, 111:22, 118:15, 213:15, 248:13
**MR** [396] - 3:4, 3:4, 3:5, 3:6, 4:13, 4:25, 5:2, 5:18, 5:24, 6:5, 7:1, 7:13, 7:21, 7:24, 8:11, 8:16, 8:18, 8:23, 9:14, 10:6, 10:12, 10:24, 11:1, 11:7, 11:8, 11:12, 11:17, 11:21, 11:23, 12:1, 12:2, 12:16, 12:18, 33:7, 33:24, 36:6, 36:8, 36:9, 36:11, 47:21, 47:23, 55:9, 55:11, 55:13, 56:16, 56:22, 57:8, 57:9, 57:12, 57:13, 59:23, 59:25, 60:1, 60:5, 60:6, 69:8, 69:12, 70:5, 70:7, 70:10, 70:12, 75:1, 75:3, 78:14, 78:16, 78:18, 88:20, 88:23, 91:4, 91:6, 92:17, 92:22, 93:7, 93:10, 93:11, 98:10, 98:17, 105:21, 105:24, 109:2, 109:5, 109:8, 109:23, 110:7, 111:2, 112:22, 112:24, 113:4, 113:6, 113:8, 113:10, 113:16, 113:18, 113:21, 113:24, 114:1, 114:7, 114:9, 114:21, 114:24, 119:25, 120:3, 120:12, 120:13, 126:5, 126:7, 127:24, 128:1, 128:13, 128:19, 129:19, 129:21, 129:23, 129:25, 130:11, 130:15, 130:17, 130:19, 131:6, 131:13,

134:22, 134:25, 137:6, 137:8, 137:11, 137:13, 137:14, 137:15, 137:19, 137:20, 137:23, 137:25, 138:9, 138:10, 138:13, 138:14, 138:21, 138:22, 138:25, 139:4, 139:10, 139:18, 139:20, 142:1, 142:5, 142:6, 143:14, 143:16, 143:19, 143:21, 144:6, 144:8, 145:22, 145:24, 149:22, 149:25, 150:1, 151:5, 151:6, 153:12, 153:14, 157:7, 157:21, 160:6, 160:9, 160:16, 162:17, 162:20, 167:14, 167:15, 168:13, 168:16, 168:17, 170:13, 170:16, 172:5, 172:7, 172:10, 172:16, 172:17, 172:21, 180:16, 180:18, 184:19, 185:6, 185:9, 185:14, 185:15, 185:24, 186:7, 187:4, 187:8, 187:19, 187:23, 187:25, 188:23, 189:3, 189:22, 189:24, 190:1, 190:6, 190:8, 190:10, 190:11, 191:3, 191:6, 191:7, 191:10, 191:13, 194:10, 194:14, 194:17, 194:23, 195:2, 195:3, 195:6, 195:20, 196:4, 196:5, 196:7, 196:10, 196:13, 196:22, 196:23, 197:2, 197:8, 197:11, 199:12, 199:13, 203:11, 203:14, 204:7, 204:9, 208:6, 208:10, 208:11, 208:16, 208:18, 208:20, 208:23, 211:22, 211:24, 212:7, 212:20, 212:24, 213:9,

213:13, 215:24, 215:25, 217:24, 217:25, 218:2, 218:3, 219:18, 219:23, 219:25, 220:6, 220:8, 221:13, 221:15, 221:18, 221:21, 221:22, 221:24, 222:1, 222:7, 222:9, 222:11, 222:16, 222:24, 223:3, 223:5, 223:8, 223:12, 223:14, 223:16, 223:17, 224:10, 224:11, 224:14, 224:15, 224:19, 228:1, 228:2, 228:5, 228:13, 229:11, 229:17, 229:19, 229:21, 229:22, 230:3, 230:10, 230:14, 230:17, 230:19, 230:20, 231:2, 231:5, 231:6, 232:9, 232:11, 232:13, 232:15, 232:20, 233:7, 233:14, 233:21, 234:5, 234:7, 234:12, 234:13, 234:20, 234:24, 235:2, 235:6, 235:14, 235:16, 235:19, 235:22, 237:18, 237:21, 238:5, 238:7, 239:18, 239:20, 240:18, 240:20, 241:9, 241:11, 243:1, 243:12, 244:6, 244:10, 244:12, 244:17, 245:4, 245:13, 245:15, 245:17, 245:20, 245:24, 246:4, 246:13, 247:23, 248:14, 249:1, 249:6, 249:8, 249:15, 249:17, 249:24, 250:2, 250:5, 250:7, 250:12, 250:15, 250:18, 250:20, 250:22, 250:23, 251:4, 251:6, 251:8, 251:12, 251:14, 251:17, 251:19, 251:21, 251:25, 252:4, 252:6,

252:10, 252:13, 252:14, 252:18, 252:22, 253:2, 253:6, 253:8, 253:11, 253:15, 253:19, 253:21, 253:24, 254:4, 254:7, 254:8, 254:15, 254:20, 254:25, 255:8, 256:1, 256:4, 256:22, 257:22
**mull** [1] - 247:5
**multiple** [2] - 156:1, 180:24
**murder** [5] - 86:18, 87:3, 106:25, 108:15, 125:10
**murder-for-hire** [1] - 125:10
**Musbach** [65] - 6:16, 9:24, 75:6, 76:4, 76:5, 76:8, 78:7, 78:9, 79:21, 81:4, 81:9, 82:16, 86:11, 86:15, 87:12, 87:18, 90:10, 90:25, 91:8, 91:18, 91:24, 92:9, 92:16, 92:21, 92:25, 93:13, 94:19, 94:23, 95:10, 102:8, 104:5, 104:11, 106:23, 107:12, 120:24, 123:2, 123:9, 124:11, 124:12, 124:13, 124:24, 127:1, 128:2, 129:15, 130:2, 148:20, 148:22, 148:24, 149:2, 150:3, 150:23, 152:23, 155:4, 162:10, 162:11, 165:24, 167:9, 168:1, 174:12, 174:15, 198:17, 237:24, 238:18, 240:1, 240:10
**Musbach's** [1] - 4:10, 80:23, 81:2, 90:23, 92:3, 108:8, 122:16, 122:17, 126:1, 126:8, 127:7
**must** [5] - 35:25, 73:6, 108:5, 115:12, 249:17

**N**

**name** [29] - 23:16, 23:18, 23:19, 26:9,

26:18, 28:8, 28:9, 32:1, 76:10, 90:18, 90:21, 90:22, 90:25, 91:17, 91:24, 92:2, 123:7, 130:25, 131:1, 131:14, 131:15, 143:13, 147:4, 148:9, 152:11, 152:15, 152:19

**named** [5] - 21:21, 189:8, 212:4, 212:5, 220:15

**names** [6] - 26:10, 26:15, 26:22, 151:22, 214:7, 246:12

**nature** [1] - 73:19, 85:20, 86:3, 86:14, 102:20, 154:5, 210:14

**near** [5] - 18:18, 34:15, 201:25, 202:1, 207:6

**necessarily** [2] - 39:3, 189:17

**necessary** [4] - 54:6, 198:5, 209:13, 211:20

**need** [51] - 5:6, 7:19, 16:12, 16:13, 17:9, 18:21, 36:12, 36:13, 44:4, 54:20, 54:22, 56:4, 58:11, 103:2, 106:11, 108:19, 118:25, 129:13, 158:11, 188:24, 190:12, 192:5, 201:10, 212:19, 213:8, 219:25, 221:5, 221:7, 222:17, 222:18, 222:21, 223:7, 223:8, 224:15, 224:16, 230:1, 234:18, 248:12, 248:24, 249:13, 250:1, 250:11, 251:2, 251:10, 251:17, 252:17, 256:20, 256:24, 257:4, 257:14, 257:20

**needed** [15] - 26:10, 54:14, 76:11, 77:15, 83:16, 83:22, 88:5, 89:12, 96:19, 97:2, 100:22, 103:2, 104:19, 248:3

**needing** [1] - 108:10

**needling** [1] - 106:10

**needs** [10] - 7:2, 53:23, 54:18, 64:2, 107:13, 212:18, 221:10, 233:25, 255:15, 257:18

**negative** [3] - 90:14, 91:10, 92:9

**negotiated** [1] - 64:18

**negotiations** [1] - 43:7

**neighborhood** [1] - 73:10

**net** [2] - 15:25, 165:18

**network** [51] - 32:11, 33:19, 35:19, 35:24, 37:4, 37:6, 37:8, 37:9, 37:12, 37:16, 37:23, 38:3, 38:8, 38:9, 38:12, 38:13, 38:14, 38:25, 39:8, 39:13, 39:16, 39:17, 42:3, 42:10, 42:15, 42:24, 44:1, 47:13, 51:1, 54:5, 54:8, 54:9, 54:10, 60:24, 61:18, 111:11, 111:19, 111:20, 111:24, 112:3, 112:13, 112:16, 112:17, 119:20, 132:2, 241:18, 241:25, 242:6, 243:16, 244:1

**networking** [4] - 37:18, 37:19, 62:20, 91:20

**never** [47] - 5:7, 25:23, 27:3, 30:19, 32:10, 32:12, 33:15, 40:12, 45:5, 45:8, 45:23, 45:24, 46:4, 47:5, 47:11, 49:5, 53:14, 54:3, 54:24, 59:2, 59:3, 62:22, 62:25, 80:15, 82:21, 83:16, 84:2, 90:13, 90:17, 90:22, 91:13, 92:11, 95:3, 103:4, 103:5, 118:13, 126:14, 126:17, 134:13, 161:19, 200:15, 210:4, 234:3, 254:14

**new** [17] - 25:2, 33:18, 41:6, 62:17, 62:25, 63:5, 63:14, 83:13, 85:21, 86:3, 86:14, 95:16, 103:25, 133:22, 135:17, 139:12

**New** [11] - 4:23, 5:16,

24:3, 79:12, 88:3, 127:18, 158:12, 158:13, 158:14, 158:15, 158:16

**news** [3] - 93:1, 93:2, 98:24

**newspaper** [1] - 90:2

**next** [26] - 14:5, 16:2, 18:25, 23:5, 28:10, 28:16, 28:20, 38:5, 38:7, 39:4, 53:21, 57:4, 84:4, 98:19, 110:3, 120:6, 130:14, 164:15, 165:4, 168:18, 170:14, 173:17, 173:21, 174:7, 185:6, 207:1

**NextGen** [1] - 14:17

**nice** [4] - 16:3, 117:17, 238:24, 239:1

**niece** [1] - 32:4

**night** [3] - 4:6, 25:16, 73:3

**nine** [2] - 120:15, 224:23

**nobody** [2] - 35:22, 103:3

**non** [2] - 226:18, 254:16

**non-highly-compensated** [1] - 226:18

**non-similarly** [1] - 254:16

**nondiscrimination** [1] - 143:12

**none** [2] - 195:7, 197:19, 198:8, 199:23, 205:7, 205:15, 238:22

**normal** [3] - 84:21, 101:15, 101:16

**normally** [1] - 50:15

**northern** [2] - 79:13, 127:18

**note** [10] - 53:1, 58:10, 73:13, 73:15, 105:2, 163:17, 165:9, 165:19, 222:18, 249:2

**notes** [7] - 162:25, 163:9, 163:14, 165:19, 166:13, 166:16

**nothing** [30] - 8:21, 30:23, 33:4, 33:5, 33:10, 49:14, 65:9, 67:13, 67:21, 68:12, 73:13, 73:17, 78:9,

89:13, 89:14, 90:23, 108:7, 114:19, 141:4, 162:10, 162:11, 167:10, 168:19, 175:2, 183:12, 184:6, 193:9, 227:8, 234:9, 238:19

**noticed** [1] - 48:20

**notify** [1] - 192:5

**noting** [1] - 54:14

**November** [20] - 17:22, 32:25, 33:4, 36:17, 47:2, 47:4, 52:15, 73:13, 76:6, 77:21, 77:22, 136:3, 136:12, 144:19, 188:5, 235:17, 235:24, 236:2, 239:24, 242:6

**novice** [1] - 112:11

**nowhere** [2] - 213:8, 222:22

**number** [14] - 27:7, 27:10, 32:2, 32:6, 47:16, 48:6, 132:16, 132:17, 189:6, 192:7, 194:22, 214:13, 216:16, 254:17

**Number** [2] - 69:11, 189:7

**NUMBER** [1] - 1:3

**numbers** [1] - 246:11

**numerous** [2] - 115:24, 116:17

## O

**o'clock** [2] - 14:1, 255:12

**oath** [8] - 183:21, 190:19, 217:18, 236:12, 240:12, 240:14, 240:17, 240:21

**object** [6] - 93:7, 127:24, 152:6, 188:23, 194:15, 253:8

**objected** [3] - 8:2, 48:3, 195:17

**objection** [79] - 33:7, 33:9, 55:11, 57:11, 70:7, 70:8, 75:1, 78:14, 78:17, 88:20, 88:21, 91:4, 92:17, 92:18, 105:21, 105:22, 109:2, 109:3, 112:22, 113:4, 113:8,

113:16, 114:5, 119:25, 126:5, 127:25, 128:13, 137:20, 138:10, 138:22, 139:4, 143:14, 143:19, 144:6, 149:22, 149:23, 153:12, 160:6, 167:14, 172:7, 172:16, 172:20, 180:16, 180:17, 185:24, 185:25, 191:8, 194:25, 195:3, 195:4, 196:23, 208:20, 228:6, 229:19, 232:9, 235:2, 235:14, 235:15, 235:19, 237:18, 237:19, 238:5, 239:18, 239:19, 240:18, 240:19, 241:9, 241:10, 243:1, 243:2, 244:6, 244:7, 244:12, 244:13, 245:15, 245:16, 245:20

**Objection** [3] - 57:8, 228:5, 229:11

**objective** [2] - 25:7, 154:4

**objectives** [1] - 66:24

**obligation** [1] - 100:21

**observations** [1] - 65:16

**observed** [1] - 192:11

**observing** [1] - 50:18

**obviously** [9] - 9:20, 189:8, 189:19, 195:18, 206:6, 246:16, 252:18, 253:8, 255:19

**occasions** [1] - 116:17

**occurred** [4] - 163:22, 208:13, 224:3, 224:6

**occurrences** [1] - 169:9

**October** [13] - 16:8, 16:21, 69:19, 71:3, 72:12, 72:24, 73:9, 135:12, 135:19, 136:12, 137:2, 139:24, 224:4

**OF** [1] - 1:1

**offer** [1] - 234:10

**offered** [2] - 208:19, 229:24

**offering** [2] - 77:5,

234:16
**offers** [1] - 249:11
**offhand** [1] - 135:10
**office** [19] - 15:21, 27:19, 34:15, 38:21, 44:22, 47:6, 79:13, 90:18, 97:15, 112:14, 147:20, 158:8, 164:25, 169:7, 201:20, 201:21, 201:25, 207:6, 207:12
**Office** [1] - 178:1
**officer** [5] - 84:22, 85:10, 85:13, 85:18, 85:20
**offices** [1] - 202:1
**official** [1] - 211:2
**Official** [2] - 1:22, 258:7
**often** [2] - 154:10, 246:20
**Old** [2] - 15:25, 16:25
**old** [6] - 74:12, 96:14, 97:1, 118:10, 120:15, 145:13
**older** [1] - 116:21
**on..** [1] - 231:5
**once** [7] - 47:5, 69:13, 84:23, 186:15, 200:16, 201:1, 242:19
**one** [126] - 8:16, 9:21, 12:12, 16:20, 17:12, 18:11, 18:12, 21:10, 24:4, 24:5, 28:3, 28:10, 28:20, 37:16, 40:21, 42:19, 43:13, 46:15, 46:18, 48:3, 48:7, 48:10, 48:16, 48:19, 48:21, 49:18, 54:13, 54:21, 55:22, 55:24, 56:20, 57:20, 64:19, 69:7, 69:23, 70:15, 73:23, 74:3, 77:6, 77:13, 77:16, 83:17, 90:6, 90:25, 92:7, 94:4, 100:8, 101:20, 116:4, 117:11, 117:12, 117:17, 118:23, 129:21, 135:13, 135:15, 135:21, 136:4, 136:11, 139:12, 141:25, 142:22, 143:13, 143:25, 144:13, 144:15, 144:16, 144:18, 144:21, 145:8, 149:9,

149:13, 149:16, 149:18, 149:20, 150:13, 152:21, 155:23, 156:23, 157:6, 158:25, 161:9, 161:19, 168:21, 171:2, 171:16, 173:17, 178:1, 185:21, 186:12, 188:18, 189:3, 189:6, 193:1, 200:9, 200:10, 201:10, 201:11, 204:10, 204:12, 207:1, 207:23, 207:24, 208:4, 218:2, 218:18, 218:20, 221:4, 223:8, 224:15, 224:17, 236:21, 237:2, 239:23, 239:25, 242:2, 242:8, 250:2, 256:19, 256:20, 257:2
**One** [1] - 236:20
**one's** [1] - 101:15
**one-on-one** [1] - 94:4
**ones** [6] - 152:11, 152:15, 152:17, 161:10, 173:4, 235:1
**online** [2] - 133:17, 148:10
**op's** [1] - 15:25
**open** [7] - 4:1, 32:11, 37:15, 114:5, 195:12, 195:15, 247:7
**opened** [1] - 195:15
**OpenForge** [2] - 14:2, 28:8
**opening** [6] - 7:25, 8:3, 8:5, 8:9, 25:2, 151:1
**openings** [1] - 151:4
**openly** [1] - 75:11
**operated** [1] - 200:7
**operation** [1] - 42:23
**operations** [9] - 37:4, 38:8, 38:12, 38:14, 38:25, 42:15, 44:1, 132:6, 132:7
**opinion** [3] - 54:14, 92:9, 249:15
**opinions** [2] - 247:6, 247:8
**opportunity** [5] - 34:4, 153:22, 183:20, 185:21, 228:12
**opposed** [1] - 189:18

**opposition** [1] - 97:13
**ops** [3] - 54:2, 54:7, 165:18
**option** [2] - 143:8, 257:15
**optional** [3] - 143:6, 143:10, 144:24
**OR** [1] - 130:23
**orchestration** [1] - 37:17
**Order** [1] - 114:4
**order** [9] - 93:8, 134:24, 155:18, 217:4, 219:10, 234:14, 254:10, 255:7, 255:8
**orders** [1] - 229:20
**orientation** [6] - 33:6, 33:11, 34:25, 67:15, 68:13, 69:25
**original** [4] - 82:17, 134:6, 135:9, 135:10
**originally** [1] - 86:22
**otherwise** [5] - 9:22, 125:19, 144:18, 176:16, 209:8
**Otherwise** [1] - 27:5
**ourselves** [1] - 154:20
**outages** [2] - 54:8, 60:24
**outcome** [2] - 6:15, 247:9
**outrageous** [6] - 88:16, 102:9, 102:10, 104:16, 104:17
**outs** [1] - 227:18
**outside** [7] - 17:14, 27:19, 112:15, 130:16, 133:18, 220:12, 249:18
**outstanding** [5] - 13:4, 22:21, 89:9, 126:10, 126:12
**overall** [1] - 66:3
**overcome** [1] - 52:21
**overrule** [1] - 191:9
**overruled** [21] - 8:3, 33:9, 78:15, 78:17, 88:21, 92:18, 105:23, 109:3, 120:1, 139:5, 149:23, 160:7, 185:25, 228:6, 235:3, 235:20, 238:6, 240:19, 243:2, 244:7, 244:13
**owed** [2] - 221:24, 222:16
**Owen** [1] - 73:25,

74:4, 74:7, 74:12, 74:18, 74:20, 120:14
**Owl** [1] - 21:13
**own** [8] - 66:9, 76:24, 90:21, 107:16, 133:17, 179:10, 190:3, 213:4
**owned** [1] - 189:25
**owner** [8] - 12:9, 13:19, 76:14, 124:9, 124:10, 171:13, 171:17, 207:6
**Oyster** [1] - 17:23
**oysters** [4] - 17:23, 17:24, 17:25, 18:2

## P

**P-A-L-O-C-H-K-O** [1] - 131:3
**P.C** [1] - 2:2
**p.m** [14] - 25:15, 72:24, 109:17, 110:14, 110:19, 164:7, 169:4, 184:23, 185:1, 185:11, 247:17, 258:1
**PA** [3] - 1:11, 1:20, 2:5
**pace** [1] - 256:16
**package** [4] - 220:11, 220:17, 220:22, 220:24
**packages** [2] - 220:10, 220:23
**padding** [1] - 26:14
**Page** [8] - 51:11, 175:8, 220:9, 221:23, 223:13, 223:21, 224:9, 224:20
**page** [27] - 14:5, 16:2, 18:3, 23:5, 28:17, 45:22, 51:10, 53:21, 65:3, 68:3, 68:5, 68:8, 68:9, 139:19, 142:3, 145:17, 163:16, 173:14, 180:13, 181:25, 182:2, 191:19, 203:13, 217:24, 223:22, 224:12, 230:2
**PAGE** [1] - 3:2
**pages** [5] - 18:25, 24:10, 53:10, 146:3, 178:5
**paid** [10] - 21:18, 41:5, 192:8, 216:6, 217:1, 218:7, 218:8,

218:15, 220:18, 225:10
**painstakingly** [1] - 44:13
**PALOCHKO** [2] - 3:6, 130:23
**Palochko** [29] - 6:12, 9:15, 10:7, 11:4, 27:8, 93:5, 94:7, 99:17, 118:3, 118:6, 118:16, 118:19, 130:15, 131:2, 131:15, 131:16, 137:6, 162:18, 162:22, 165:6, 170:14, 170:17, 171:6, 177:6, 246:14, 249:14, 249:21, 250:4, 255:16
**Palochko's** [4] - 25:20, 223:18, 247:21, 249:2
**Panama** [12] - 62:6, 69:19, 69:20, 69:21, 70:2, 70:17, 71:2, 71:22, 71:25, 72:2, 72:17, 73:17
**panic** [2] - 99:9, 99:10
**panicked** [4] - 99:1, 99:12, 99:15, 176:21
**paper** [9] - 36:12, 55:14, 56:15, 68:6, 97:5, 135:2, 145:18, 145:20, 164:4
**paragraph** [10] - 58:9, 59:4, 60:14, 62:12, 68:8, 140:14, 142:11, 142:14, 216:6
**Paragraph** [1] - 218:6
**paragraphs** [1] - 58:1
**paralegal** [1] - 122:16
**Paralegal** [1] - 2:11
**parental** [2] - 79:17, 79:18
**parents** [4] - 87:24, 88:2, 90:12, 91:12
**Parkinson's** [1] - 99:6
**parole** [4] - 85:10, 85:13, 85:18, 85:20
**parrot** [1] - 245:12
**parse** [1] - 100:9
**Parson** [1] - 76:10
**part** [34] - 15:8, 22:17, 23:16, 52:10, 52:17, 56:20, 57:18, 58:9, 82:19, 85:16, 90:16, 93:8, 105:13, 112:16, 132:22,

143:2, 143:4,
148:12, 148:13,
157:17, 157:18,
157:19, 159:8,
161:16, 163:25,
167:19, 179:16,
189:6, 192:18,
193:17, 216:23,
220:14, 231:8
**part-time** [1] - 220:14
**participate** [2] - 67:22,
93:18
**participated** [1] -
118:6
**participation** [1] -
90:1
**particularly** [2] - 5:9,
247:4
**partner** [5] - 91:9,
104:9, 104:14,
108:5, 108:15
**partners** [3] - 84:8,
84:9, 102:18
**partnerships** [1] -
20:1
**parts** [1] - 180:15
**party** [5] - 87:17,
232:22, 233:5,
233:17, 250:20
**party's** [1] - 233:14
**pass** [1] - 142:3
**passed** [3] - 101:14,
102:3, 102:5
**passing** [1] - 101:6
**password** [1] - 147:4
**past** [5] - 37:9, 58:25,
67:3, 113:18, 114:10
**patent** [1] - 110:3
**patents** [1] - 24:6
**path** [2] - 44:14, 60:18
**patter** [1] - 109:15
**pattern** [2] - 74:11,
206:21
**pavers** [1] - 110:4
**pay** [3] - 10:8, 49:12,
225:25
**paycheck** [2] - 144:25,
226:14
**paying** [1] - 225:23
**payroll** [1] - 226:24
**pays** [1] - 256:10
**peer** [18] - 53:9, 53:13,
53:14, 53:15, 53:22,
54:16, 54:24, 55:1,
64:13, 64:24, 65:25,
66:1, 66:3, 68:18,
68:25, 69:2, 69:3,
69:5
**peering** [11] - 16:16,
16:18, 16:22, 23:3,

24:13, 43:7, 43:8,
61:24, 64:17, 64:18,
64:23
**Peering** [1] - 20:24
**peers** [5] - 40:17,
54:13, 54:16, 54:21,
60:19
**PEET** [1] - 2:3
**Peet** [2] - 253:6,
253:10
**penalty** [2] - 188:8,
193:19
**pending** [1] - 56:3,
104:6, 151:9
**PENNSYLVANIA** [1] -
1:1
**Pennsylvania** [3] -
1:13, 34:11, 127:18
**people** [52] - 9:13,
16:17, 22:3, 24:25,
25:6, 26:5, 27:7,
28:25, 40:12, 40:17,
40:20, 41:13, 50:20,
52:1, 67:23, 72:3,
79:15, 84:5, 94:3,
112:3, 112:5,
112:10, 112:19,
114:19, 115:14,
128:6, 132:6, 132:7,
132:16, 132:17,
146:17, 148:25,
149:18, 149:20,
150:2, 150:25,
151:16, 151:17,
151:25, 152:2,
152:7, 152:9,
152:13, 152:20,
156:1, 171:15,
237:1, 239:2,
241:21, 242:17,
253:19, 254:16
**People** [1] - 159:14
**people's** [3] - 8:20,
50:11, 101:13
**per** [3] - 29:24,
226:23, 229:20
**perceive** [1] - 114:19
**perceived** [1] - 98:23
**percent** [19] - 29:22,
29:23, 162:9, 182:5,
182:7, 183:23,
214:2, 222:5, 222:8,
226:1, 226:4,
226:13, 226:15,
226:20, 226:22,
238:20, 254:1
**perfect** [2] - 96:13,
96:18
**perform** [1] - 21:4
**performance** [26] -

48:1, 49:8, 49:14,
50:11, 50:22, 51:14,
52:3, 52:16, 55:20,
56:7, 57:15, 58:1,
60:4, 62:3, 63:14,
116:1, 116:2,
116:10, 162:24,
163:1, 163:2, 163:5,
163:8, 163:9, 163:11
**perhaps** [1] - 26:17
**period** [25] - 22:10,
38:20, 58:23, 66:15,
81:8, 83:15, 89:14,
96:23, 100:14,
101:10, 104:9,
106:23, 107:2,
115:13, 133:7,
144:19, 144:21,
186:20, 216:7,
217:1, 218:9,
218:21, 228:25,
229:1, 236:5
**periods** [1] - 64:6
**perjury** [2] - 188:8,
193:19
**permission** [1] - 27:14
**permit** [2] - 5:13, 6:2
**permitted** [1] - 8:6
**Perpetual** [2] - 82:1,
124:20
**persists** [1] - 209:5
**person** [36] - 13:16,
16:19, 24:13, 24:15,
26:14, 32:2, 45:14,
49:18, 50:7, 53:22,
64:22, 65:16, 76:18,
82:9, 83:21, 87:5,
101:21, 103:4,
119:16, 124:5,
145:3, 152:21,
155:16, 161:25,
164:3, 170:11,
171:12, 186:24,
189:19, 211:18,
212:2, 212:4, 212:5,
213:18, 227:24,
243:19
**personal** [4] - 112:19,
165:16, 170:24,
183:25
**personally** [3] -
152:18, 189:12,
231:25
**personnel** [12] -
44:24, 45:5, 45:11,
46:4, 46:13, 46:21,
51:25, 52:1, 162:24,
163:9, 163:14,
163:17
**persuade** [1] - 87:17

**Peter** [3] - 29:4, 29:5,
164:18
**Philadelphia** [9] -
1:13, 1:20, 2:5,
12:23, 14:7, 14:9,
14:19, 90:10, 112:16
**Philippines** [1] - 95:4
**Philly** [2] - 13:4, 14:7
**phone** [13] - 32:2,
48:20, 69:15, 75:19,
83:10, 95:7, 163:22,
169:20, 173:25,
174:17, 197:16,
197:22
**photo** [16] - 14:15,
21:21, 24:2, 25:13,
25:19, 25:21, 26:2,
26:12, 26:13, 28:11,
28:18, 72:22,
209:15, 209:16,
210:11
**photograph** [1] -
27:18
**photographs** [3] -
24:25, 80:3
**photos** [16] - 18:12,
24:20, 25:14, 25:17,
26:3, 26:4, 28:20,
29:9, 29:11, 30:21,
30:22, 70:19, 72:13
**PHRC** [5] - 32:25,
35:11, 35:14, 35:20,
47:3
**physical** [1] - 148:2
**pick** [5] - 110:21,
164:17, 164:23,
165:1, 234:2
**picked** [1] - 90:1
**picture** [49] - 12:22,
12:24, 13:3, 13:7,
14:2, 14:21, 16:10,
17:6, 17:23, 18:4,
20:5, 20:13, 22:4,
22:9, 22:11, 25:9,
25:10, 28:2, 28:21,
71:5, 72:17, 192:24,
201:11, 201:14,
201:15, 201:18,
202:3, 204:22,
206:3, 206:5,
206:13, 206:21,
207:5, 210:13,
210:16, 210:17,
210:18, 210:21,
210:22, 210:23,
211:5, 211:9,
211:10, 211:11,
211:12, 211:13
**pictures** [16] - 13:20,
14:4, 15:18, 16:22,

21:11, 22:3, 72:17,
72:18, 72:19, 72:20,
80:19, 80:20, 91:21,
124:8, 125:11,
125:13
**piece** [9] - 38:7, 39:4,
51:7, 73:24, 94:12,
98:19, 99:22,
172:15, 253:11
**ping** [2] - 48:14, 48:15
**pioneer** [1] - 19:21
**pitch** [1] - 61:1
**Pittsburgh** [5] - 18:13,
18:14, 18:15, 18:17
**Pizza** [1] - 15:25
**place** [13] - 16:24,
29:21, 90:25, 124:5,
127:2, 127:3, 127:4,
127:5, 143:3,
158:25, 159:1,
248:25
**place's** [1] - 207:6
**placed** [2] - 26:13,
135:1
**PLAINTIFF** [12] - 3:10,
3:10, 3:11, 3:11,
3:12, 3:12, 137:22,
138:12, 138:24,
172:9, 197:1, 208:22
**Plaintiff** [2] - 1:4, 1:20
**plaintiff** [9] - 188:20,
191:20, 191:25,
192:3, 192:6,
192:16, 192:22,
193:1, 248:17
**plaintiff's** [5] - 191:22,
192:9, 192:17,
192:20, 193:5
**Plaintiff's** [1] - 192:14
**plan** [38] - 39:11,
63:11, 70:24,
109:10, 110:11,
116:2, 180:11,
182:1, 182:4, 182:5,
182:6, 196:19,
215:6, 215:9,
216:16, 216:23,
218:18, 218:19,
218:24, 219:4,
222:23, 225:16,
225:19, 226:12,
226:13, 226:16,
226:17, 227:5,
227:7, 227:8, 227:9,
227:10, 227:17,
227:21, 228:9,
229:8, 253:18
**plane** [3] - 222:3,
248:3, 249:3
**planned** [2] - 63:11,

*157*:15
**planning** *[6]* - 40:15, 40:25, 43:9, 71:1, 110:2, 249:2
**plans** *[5]* - 8:23, 220:25, 221:2, 225:14, 225:16
**platform** *[3]* - 37:14, 37:17
**play** *[2]* - 148:13, 157:5
**played** *[2]* - 88:9, 94:11
**plays** *[1]* - 148:11
**plea** *[1]* - 5:3
**plead** *[1]* - 129:16
**pleased** *[1]* - 92:14
**pleasure** *[1]* - 105:15
**pled** *[2]* - 82:16, 104:11
**plenty** *[1]* - 151:18
**PLLC** *[1]* - 1:18
**plural** *[1]* - 151:14
**POC** *[1]* - 18:16
**point** *[49]* - 7:15, 13:8, 15:3, 21:10, 29:20, 30:19, 31:13, 33:3, 33:13, 33:15, 35:25, 51:3, 54:20, 59:6, 64:6, 74:3, 76:19, 77:23, 78:4, 78:20, 78:22, 78:23, 79:1, 79:9, 80:23, 82:13, 82:14, 82:16, 85:14, 86:2, 102:12, 103:7, 106:2, 106:4, 124:13, 130:7, 186:13, 208:1, 220:6, 221:8, 243:9, 243:17, 247:8, 249:11, 249:13, 253:5, 253:18, 253:24, 255:11
**pointed** *[3]* - 33:12, 153:25, 209:1
**pointing** *[2]* - 142:13, 144:3
**points** *[6]* - 18:18, 29:16, 30:3, 30:4, 37:10, 64:8
**police** *[2]* - 80:23, 81:1
**policies** *[1]* - 191:23
**policy** *[76]* - 29:21, 96:16, 97:10, 97:12, 97:13, 97:19, 97:24, 98:6, 116:6, 134:4, 134:18, 136:23, 139:23, 140:3, 140:7, 140:12, 141:5, 141:11,

141:12, 141:15, 141:19, 141:21, 141:22, 142:2, 142:7, 142:14, 142:20, 142:24, 143:3, 143:6, 143:10, 143:18, 143:23, 145:7, 153:7, 155:11, 168:3, 169:10, 178:23, 178:24, 179:4, 179:11, 179:13, 179:16, 180:23, 181:1, 181:9, 181:12, 181:22, 195:9, 195:21, 196:15, 197:16, 198:19, 198:23, 199:1, 200:1, 200:2, 200:5, 200:8, 200:10, 201:1, 203:1, 206:21, 224:4, 236:4, 236:20, 237:23, 238:15, 238:20, 239:5
**poor** *[1]* - 248:8
**pop** *[1]* - 23:7
**pornographic** *[1]* - 80:17
**pornography** *[1]* - 79:18
**portal** *[1]* - 219:14
**portion** *[4]* - 53:24, 210:16, 226:17, 227:7
**portions** *[1]* - 221:11
**pose** *[1]* - 4:6
**position** *[30]* - 32:11, 32:12, 32:20, 33:14, 34:3, 34:4, 35:4, 38:12, 38:15, 38:25, 39:15, 47:13, 74:6, 114:9, 119:21, 132:4, 132:5, 132:24, 145:3, 202:22, 231:7, 231:19, 232:6, 232:7, 232:15, 233:15, 243:17, 252:22, 253:7, 257:16
**positions** *[2]* - 119:4, 146:12
**positive** *[11]* - 14:24, 63:21, 65:24, 66:4, 68:21, 69:4, 75:16, 75:22, 95:2, 115:2, 118:23
**possession** *[1]* -

153:2
**possibility** *[2]* - 95:15, 249:4
**possible** *[4]* - 61:22, 154:16, 154:19, 257:10
**possibly** *[2]* - 148:23, 154:2
**post** *[1]* - 164:7
**posts** *[1]* - 49:6
**potential** *[1]* - 100:10
**potentially** *[1]* - 8:8
**practice** *[1]* - 215:9
**practices** *[2]* - 33:18, 33:22
**pragmatic** *[1]* - 62:25
**praise** *[1]* - 65:22
**praised** *[2]* - 57:10, 58:6
**praises** *[1]* - 63:16
**praising** *[10]* - 39:18, 57:5, 57:25, 58:18, 58:25, 62:3, 62:17, 62:20, 63:9, 63:13
**precedence** *[1]* - 143:9
**precipitated** *[2]* - 119:17, 166:4
**prejudice** *[1]* - 10:10
**prejudicially** *[1]* - 189:9
**premise** *[1]* - 106:7
**presence** *[1]* - 86:13
**present** *[16]* - 5:23, 52:3, 60:25, 78:25, 82:9, 88:4, 89:11, 92:11, 92:12, 92:14, 94:8, 107:13, 107:14, 108:13, 144:17
**PRESENT** *[1]* - 2:10
**presentation** *[3]* - 20:24, 21:14, 66:13
**presentations** *[1]* - 91:21
**presenting** *[1]* - 64:8
**preserve** *[1]* - 165:20
**press** *[3]* - 23:16, 96:4, 96:5
**pressure** *[1]* - 225:13
**presumably** *[1]* - 40:19
**pretend** *[3]* - 237:9, 237:11, 237:12
**pretending** *[1]* - 237:17
**pretext** *[1]* - 196:2
**pretrial** *[5]* - 4:13, 6:12, 86:10, 195:1, 248:18

**pretty** *[3]* - 63:21, 160:13, 199:4
**prevails** *[1]* - 222:9
**prevent** *[1]* - 140:11
**prevented** *[1]* - 142:24
**preventing** *[1]* - 143:3
**prevents** *[1]* - 141:15, 145:9
**previous** *[1]* - 40:4, 95:5
**previously** *[5]* - 27:8, 31:8, 36:7, 47:22, 192:16
**price** *[1]* - 27:3
**pricing** *[1]* - 62:6
**priest** *[1]* - 81:25
**primarily** *[1]* - 148:4
**primary** *[4]* - 25:7, 87:25, 155:20, 155:22
**principal** *[5]* - 37:3, 37:6, 38:9, 42:14, 111:21
**print** *[1]* - 55:8
**printed** *[1]* - 55:9
**prison** *[6]* - 84:2, 108:6, 130:4, 130:5, 130:9, 130:10
**private** *[9]* - 19:24, 34:11, 36:2, 49:7, 178:18, 180:9, 193:22, 211:6, 237:1
**probation** *[2]* - 83:25, 84:22
**problem** *[11]* - 9:1, 110:1, 110:9, 124:17, 147:7, 147:12, 147:18, 167:9, 209:23, 222:20, 233:24
**problems** *[2]* - 52:21, 54:10
**procedural** *[3]* - 134:13, 136:19, 136:20
**procedure** *[2]* - 136:23, 203:2
**proceed** *[6]* - 10:23, 23:8, 101:20, 110:25, 127:17, 196:7
**proceeding** *[2]* - 192:2, 192:4
**PROCEEDINGS** *[1]* - 4:1
**Proceedings** *[1]* - 1:23
**proceedings** *[2]* - 6:15, 258:5
**proceeds** *[1]* - 42:17

**process** *[5]* - 27:15, 82:6, 190:23, 202:16, 249:9
**processed** *[1]* - 18:22
**procure** *[1]* - 86:25
**procurement** *[1]* - 43:7
**produce** *[1]* - 250:24
**produced** *[3]* - 1:24, 91:1, 190:1
**product** *[2]* - 17:3, 27:17
**production** *[2]* - 112:16, 112:17
**professional** *[1]* - 207:2
**professionally** *[1]* - 66:14
**proffer** *[1]* - 252:7
**proficiency** *[2]* - 114:18, 114:19
**proficient** *[3]* - 111:10, 115:3, 115:10
**profile** *[3]* - 210:13, 210:18, 211:9
**profit** *[23]* - 213:22, 214:3, 214:8, 214:18, 215:2, 215:11, 215:16, 216:13, 216:17, 217:5, 217:8, 217:13, 219:8, 219:13, 220:16, 222:14, 226:5, 226:12, 226:13, 226:17, 226:23, 227:10, 228:20
**profit-sharing** *[6]* - 226:12, 226:13, 226:17, 226:23, 227:10, 228:20
**progressive** *[4]* - 179:12, 179:15, 200:4, 200:8
**project** *[3]* - 18:15, 23:15, 26:20
**projects** *[2]* - 26:20, 63:4
**promise** *[2]* - 23:20, 151:1
**promised** *[1]* - 162:9
**promoted** *[10]* - 33:16, 34:9, 35:14, 41:12, 61:17, 74:4, 74:5, 75:8, 111:21, 243:16
**promoting** *[2]* - 32:11, 35:22
**promotion** *[12]* - 32:15, 33:18, 33:20, 35:12, 35:18, 41:4,

**UNITED STATES DISTRICT COURT**

*41:5, 43:1, 43:16,
43:17, 43:22, 63:13*
**promotional** *[1] -
16:16*
**prompt** *[1] - 10:19*
**prompted** *[1] - 192:15*
**proof** *[2] - 238:4,
239:8*
**proper** *[6] - 10:2,
88:18, 165:25,
166:10, 202:15,
203:1*
**properly** *[1] - 218:25*
**property** *[1] - 42:6*
**proposal** *[1] - 88:4*
**proposed** *[2] - 23:14,
26:3*
**prosecution** *[1] -
86:24*
**protect** *[2] - 8:20,
154:20*
**protecting** *[1] - 23:22*
**protests** *[1] - 73:10*
**protocol** *[1] - 42:7*
**protractive** *[1] - 45:6*
**prove** *[4] - 184:12,
200:6, 238:14,
238:20*
**proven** *[1] - 154:14*
**provide** *[7] - 53:6,
55:1, 65:22, 154:4,
214:7, 254:11,
254:23*
**provided** *[8] - 59:2,
66:1, 66:9, 96:12,
97:1, 198:15,
214:12, 219:17*
**provides** *[2] - 192:10,
214:13*
**provision** *[2] - 64:19,
64:22*
**psychological** *[1] -
88:5*
**PTO** *[5] - 58:11,
165:14, 167:10,
168:9, 169:8*
**public** *[4] - 15:14,
126:16, 130:3,
148:24*
**publications** *[1] - 24:7*
**publicity** *[3] - 148:21,
148:24, 167:10*
**publish** *[6] - 11:11,
11:24, 11:25, 36:9,
36:10, 70:6*
**published** *[4] - 90:10,
91:2, 95:24, 96:2*
**publishing** *[2] - 11:15,
93:6*
**pull** *[9] - 11:7, 17:9,*

*36:4, 44:4, 47:21,
69:10, 95:3, 95:4,
248:8*
**pulled** *[1] - 212:7*
**purchase** *[13] - 27:1,
27:14, 131:24,
202:6, 202:25,
204:20, 206:3,
206:5, 206:13,
207:9, 207:10,
207:11, 241:5*
**purchased** *[9] -
131:22, 201:11,
202:3, 202:4,
202:10, 241:7,
241:13, 243:23,
244:4*
**purchases** *[3] -
192:23, 203:17,
203:25*
**purely** *[1] - 146:11*
**purported** *[1] - 200:4*
**purposes** *[3] - 110:2,
189:12, 229:24*
**pursue** *[1] - 211:1*
**put** *[35] - 6:19, 7:18,
14:6, 16:17, 26:13,
26:14, 27:8, 29:21,
33:21, 36:4, 39:20,
40:12, 44:21, 45:5,
46:5, 46:9, 51:17,
56:2, 59:25, 69:7,
73:23, 77:17, 80:8,
90:12, 100:19,
106:11, 108:2,
118:25, 164:3,
165:9, 203:11,
204:7, 230:13,
248:25, 249:13*
**puts** *[2] - 63:4, 256:15*
**putting** *[6] - 15:8,
18:17, 26:3, 45:3,
46:24, 48:6*

## Q

**qualify** *[2] - 217:5,
225:21*
**quarter** *[1] - 218:19*
**QUESTION** *[2] -
217:23, 218:5*
**questioning** *[4] -
154:6, 222:24,
230:25, 231:5*
**questionnaire** *[10] -
31:4, 31:14, 31:19,
31:20, 32:19, 32:22,
34:24, 35:21, 36:22,
47:3*
**questionnaire/**

*charge* *[1] - 36:16*
**questions** *[42] - 23:8,
54:4, 60:7, 87:19,
87:22, 88:6, 88:11,
88:17, 98:13,
101:18, 110:22,
111:3, 116:24,
128:20, 129:19,
140:15, 142:16,
144:16, 155:22,
170:19, 176:21,
186:22, 186:23,
187:11, 187:13,
187:14, 188:18,
188:19, 190:25,
197:8, 197:9,
213:16, 217:13,
217:19, 220:4,
221:9, 221:10,
233:8, 234:21,
243:8, 246:13*
**quick** *[4] - 31:7, 41:24,
112:18, 114:1*
**quicker** *[1] - 60:9*
**quickest** *[1] - 154:16*
**quickly** *[2] - 18:20,
70:14*
**quiet** *[1] - 255:23*
**quite** *[3] - 22:5, 93:20,
210:24*
**quote** *[1] - 23:18*
**quoted** *[2] - 23:17,
23:19*
**quoting** *[2] - 232:23,
233:23*

## R

**radius** *[1] - 249:19*
**raise** *[1] - 130:22*
**raising** *[1] - 255:1*
**RAM** *[1] - 112:14*
**Rambo** *[2] - 244:18,
244:24*
**ran** *[1] - 110:7*
**random** *[1] - 234:2*
**rapport** *[1] - 118:20*
**rated** *[1] - 79:17*
**rather** *[1] - 88:9*
**raw** *[1] - 13:4*
**reach** *[1] - 15:24*
**react** *[2] - 46:8, 183:25*
**reacted** *[3] - 98:21,
98:24*
**reaction** *[3] - 45:6,
93:1, 157:17*
**read** *[22] - 4:8, 31:17,
36:24, 59:2, 60:21,
60:22, 61:3, 63:6,
64:20, 66:25,*

*148:10, 152:12,
165:9, 168:12,
168:14, 169:11,
193:6, 216:10,
219:3, 227:13,
228:18*
**readers** *[1] - 7:4*
**reading** *[7] - 24:10,
58:12, 63:23,
168:13, 171:15,
198:25, 203:21*
**ready** *[8] - 10:20,
110:11, 184:24,
208:7, 222:21,
230:25, 231:2, 231:4*
**real** *[14] - 14:8, 18:22,
25:15, 25:17, 96:13,
112:18, 153:8,
153:10, 169:17,
174:20, 182:20,
196:20, 197:19,
239:25*
**real-time** *[2] - 25:15,
25:17*
**realistically** *[1] -
109:21*
**realize** *[1] - 117:3*
**realized** *[3] - 174:11,
238:14, 238:15*
**really** *[22] - 23:6,
29:14, 30:25, 61:19,
63:17, 73:13, 92:4,
114:17, 121:7,
121:8, 136:10,
155:24, 162:8,
164:13, 174:11,
195:22, 201:5,
205:23, 209:14,
221:12, 239:1*
**reason** *[83] - 6:21,
8:24, 9:10, 32:10,
33:18, 33:20, 33:22,
49:22, 92:12, 92:19,
96:19, 97:5, 97:22,
98:20, 126:19,
129:5, 129:11,
130:1, 130:3,
131:21, 140:7,
140:12, 148:7,
149:6, 149:10,
153:11, 153:23,
153:24, 154:20,
155:1, 155:13,
156:16, 159:6,
167:7, 167:21,
180:6, 180:25,
181:8, 181:15,
182:7, 182:12,
182:14, 182:15,
182:24, 183:6,*

*183:23, 184:3,
184:8, 185:17,
185:18, 185:20,
186:5, 186:8,
193:11, 194:5,
194:8, 195:7,
195:11, 196:20,
197:19, 198:2,
198:4, 198:18,
198:21, 199:3,
205:18, 206:1,
225:5, 235:8, 236:2,
236:4, 238:13,
238:17, 239:15,
239:25, 240:7,
240:9, 240:13,
243:4, 243:14*
**reasonable** *[2] - 81:8,
136:5*
**reasons** *[17] - 32:7,
34:10, 114:10,
148:19, 153:4,
153:6, 153:8,
153:10, 153:15,
153:16, 156:23,
185:23, 193:3,
193:13, 198:10,
205:12, 205:15*
**rebut** *[1] - 154:10*
**rebuttal** *[2] - 254:2,
254:4*
**receipts** *[1] - 239:13*
**receive** *[20] - 57:17,
115:18, 161:19,
213:19, 213:21,
213:25, 214:1,
214:8, 215:2, 215:5,
215:11, 215:16,
215:21, 216:17,
222:5, 222:10,
229:4, 241:15,
244:22, 245:14*
**RECEIVED** *[14] - 3:9,
3:10, 3:10, 3:11,
3:11, 3:12, 3:12,
70:11, 137:22,
138:12, 138:24,
172:9, 197:1, 208:22*
**received** *[31] - 46:10,
69:5, 70:8, 95:1,
107:6, 138:11,
139:1, 169:6,
191:25, 214:3,
214:19, 214:23,
214:24, 215:19,
219:8, 226:22,
228:20, 229:1,
229:6, 241:7,
241:13, 241:18,
241:20, 244:4,
244:11, 244:16,*

244:18, 244:21, 244:22, 254:12
**receiving** [5] - 30:13, 33:17, 80:3, 144:25, 231:8
**recent** [1] - 141:25
**recently** [1] - 60:18
**recess** [3] - 59:16, 110:14, 185:1
**recognize** [3] - 11:10, 12:4, 162:21
**recognized** [1] - 140:8
**recognizes** [1] - 195:25
**recollection** [8] - 134:11, 161:6, 191:16, 194:15, 245:5, 245:7, 245:10, 245:11
**recollections** [1] - 31:8
**recommending** [1] - 23:12
**record** [11] - 131:1, 131:14, 168:12, 168:15, 187:22, 190:2, 196:8, 196:10, 199:10, 206:23, 258:5
**recorded** [2] - 1:23, 98:22
**recording** [16] - 48:21, 94:10, 99:16, 99:21, 129:13, 173:5, 175:4, 175:5, 175:6, 175:10, 175:16, 175:21, 175:23, 176:2, 176:4, 176:20
**recordkeeping** [1] - 192:21
**records** [1] - 219:12
**RECROSS** [2] - 3:5, 129:24
**RECROSS-**
**EXAMINATION** [2] - 3:5, 129:24
**redactions** [3] - 31:23, 31:24, 31:25
**redate** [1] - 139:11
**redirect** [3] - 109:7, 109:12, 110:22
**REDIRECT** [2] - 3:4, 111:1
**refer** [1] - 220:25
**reference** [8] - 58:13, 69:18, 98:11, 145:12, 181:8, 243:6, 243:9, 243:11
**referenced** [4] - 45:8, 69:21, 164:20, 179:5

**references** [2] - 30:23, 119:10
**referencing** [7] - 42:16, 68:14, 77:14, 168:23, 178:15, 178:21, 178:23
**referred** [1] - 139:9
**referring** [6] - 31:15, 34:5, 178:24, 197:17, 217:3, 220:21
**refresh** [5] - 31:8, 245:5, 245:7, 245:9, 245:11
**refreshing** [1] - 194:14
**refused** [2] - 28:25, 121:9
**regard** [4] - 7:9, 35:1, 45:22, 241:4
**regarding** [10] - 8:19, 9:15, 16:17, 25:3, 33:11, 134:5, 144:18, 146:6, 166:11, 233:17
**regardless** [5] - 21:19, 30:18, 94:25, 216:8, 218:10
**regards** [2] - 37:2, 96:21
**regret** [1] - 256:7
**regulation** [1] - 225:15
**related** [27] - 7:5, 20:9, 29:9, 35:1, 37:11, 39:15, 68:13, 100:11, 121:12, 148:20, 148:21, 148:23, 152:22, 165:17, 167:9, 168:25, 178:20, 179:4, 179:6, 180:7, 182:10, 183:10, 183:11, 183:23, 213:19, 240:1, 240:10
**relates** [1] - 215:1
**relating** [6] - 42:4, 100:1, 116:16, 178:13, 179:2, 191:23
**relation** [2] - 67:24, 87:15
**Relations** [1] - 34:11
**relations** [5] - 43:6, 43:8, 87:5, 146:17, 148:24
**relationship** [31] - 5:15, 5:18, 13:14, 29:14, 30:1, 31:2, 47:16, 78:4, 81:14, 82:12, 83:13, 83:20,

84:6, 84:21, 87:12, 89:24, 90:9, 91:17, 102:13, 102:20, 103:2, 107:11, 116:25, 118:2, 118:3, 121:20, 124:3, 127:11, 127:12, 148:20, 148:25
**relationships** [1] - 111:17
**relative** [1] - 192:22
**relayed** [1] - 202:25
**release** [7] - 23:16, 84:1, 87:22, 88:25, 104:5, 107:9, 123:13
**released** [6] - 88:1, 88:19, 89:6, 138:4, 138:7, 139:24
**releasing** [1] - 141:1
**relevance** [2] - 113:16, 245:15
**relevant** [12] - 10:2, 39:15, 113:18, 113:21, 114:10, 114:11, 114:14, 114:17, 146:11, 195:24, 213:9, 221:11
**relief** [2] - 121:24, 178:4
**relieved** [1] - 178:7
**reluctant** [1] - 257:13
**remain** [4] - 92:12, 107:11, 107:13, 108:13
**remained** [1] - 241:13
**remaining** [2] - 92:11, 92:13
**remanded** [1] - 89:16
**remember** [47] - 12:14, 12:24, 13:2, 13:5, 31:14, 48:3, 52:11, 63:23, 73:25, 79:19, 80:6, 80:7, 81:21, 83:3, 83:19, 89:2, 89:14, 102:1, 104:17, 105:2, 105:4, 105:18, 118:25, 119:1, 155:18, 160:17, 161:9, 161:10, 162:14, 164:13, 176:1, 176:7, 176:15, 176:25, 177:25, 203:9, 210:12, 210:13, 217:13, 217:18, 242:5, 242:18, 242:21, 242:22,

243:2, 243:10, 253:16
**remembered** [2] - 9:15, 243:9
**remind** [1] - 12:8
**remotely** [1] - 159:2
**remove** [2] - 28:23, 154:15
**removed** [1] - 22:18
**rented** [1] - 124:4
**renting** [1] - 77:3
**repeat** [2] - 45:20, 175:15
**repeatedly** [3] - 95:7, 95:9, 191:23
**repeating** [1] - 250:10
**rephrase** [1] - 237:19
**report** [9] - 81:7, 97:15, 123:17, 123:19, 123:21, 140:20, 141:6, 161:14
**reported** [1] - 143:1
**Reporter** [2] - 1:22, 258:7
**reporter** [5] - 67:17, 77:2, 160:24, 198:24, 245:1
**reporting** [4] - 38:9, 38:13, 123:20, 192:11
**repository** [1] - 166:19
**reprehensible** [1] - 121:5
**represent** [4] - 58:22, 166:2, 199:14, 253:25
**representations** [1] - 248:16
**representative** [1] - 189:18
**representing** [1] - 229:15
**represents** [1] - 21:1
**reputation** [4] - 9:2, 23:22, 154:17, 167:11
**request** [5] - 6:5, 8:16, 25:17, 49:6, 167:10
**requested** [5] - 79:14, 79:16, 165:14, 168:8, 243:7
**requesting** [1] - 49:5
**required** [5] - 144:24, 145:4, 203:17, 203:25, 225:3
**requirement** [2] - 218:14, 218:17
**requirements** [2] - 119:4, 220:23

**requiring** [1] - 142:25
**research** [3] - 53:24, 60:16, 133:17
**researched** [1] - 63:18
**residence** [1] - 81:12
**resign** [2] - 94:15
**resist** [1] - 190:24
**resistance** [1] - 191:1
**resolve** [3] - 7:20, 250:25, 255:9
**resolved** [4] - 83:24, 89:6, 89:17, 89:21
**resource** [6] - 132:5, 132:13, 140:17, 147:22, 161:21, 161:24
**resources** [16] - 132:12, 132:24, 133:8, 142:19, 146:10, 146:11, 146:13, 146:16, 166:21, 191:24, 192:15, 192:21, 193:4, 202:17, 231:8, 231:17
**respect** [5] - 5:10, 35:23, 195:18, 222:16, 229:9
**respects** [3] - 190:18, 249:12, 255:18
**respond** [1] - 182:9
**responded** [3] - 79:14, 124:20, 231:21
**responding** [2] - 29:3, 30:8
**responds** [6] - 13:23, 16:2, 18:1, 22:8, 46:5, 76:15
**response** [13] - 4:8, 4:11, 36:13, 45:1, 46:11, 46:20, 91:25, 188:20, 227:23, 231:18, 231:23, 231:24, 255:2
**responsibilities** [6] - 132:22, 144:13, 144:15, 144:22, 145:4, 146:12
**responsibility** [4] - 23:2, 100:16, 144:10, 144:11
**responsible** [5] - 67:4, 133:7, 133:25, 141:1, 213:18
**rest** [2] - 62:2, 248:23
**restaurant** [3] - 12:23, 24:3, 30:20
**result** [4] - 35:11, 100:9, 106:24, 186:3
**resulting** [1] - 100:1

**UNITED STATES DISTRICT COURT**

**results** [1] - 54:4
**resume** [1] - 246:15
**resumes** [2] - 21:15, 21:17
**retaliation** [7] - 141:11, 141:13, 141:15, 141:17, 143:23, 145:9, 146:6
**retaliatory** [1] - 143:23
**retired** [1] - 40:22
**retirement** [6] - 219:14, 225:14, 225:16, 225:19, 228:9
**retreat** [1] - 125:24
**retreats** [1] - 82:1
**retrieve** [2] - 168:20, 169:1
**revealed** [1] - 193:1
**reverse** [1] - 134:24
**review** [68] - 48:2, 48:5, 48:12, 48:13, 48:18, 48:24, 49:2, 49:5, 49:9, 49:14, 50:5, 50:6, 50:23, 51:8, 51:11, 51:14, 52:8, 52:11, 52:14, 53:10, 53:13, 53:15, 53:22, 54:16, 55:3, 55:24, 56:7, 56:24, 57:16, 57:17, 57:25, 58:2, 58:5, 58:8, 58:9, 58:22, 58:24, 59:2, 61:5, 61:6, 61:9, 61:10, 61:11, 61:14, 64:13, 64:24, 65:24, 66:1, 66:4, 66:6, 66:7, 66:9, 66:14, 67:21, 68:3, 68:4, 68:12, 68:18, 68:20, 68:23, 68:25, 69:3, 69:5, 75:17, 75:21, 95:3, 116:10, 163:13
**reviewed** [1] - 188:12
**reviewing** [1] - 55:3
**reviews** [24] - 47:18, 48:1, 48:3, 48:6, 50:11, 51:6, 51:16, 51:24, 52:4, 53:14, 53:20, 54:24, 55:1, 55:20, 60:4, 69:2, 75:16, 95:2, 116:14, 162:24, 163:2, 163:5, 163:8, 163:9
**revised** [2] - 135:18, 136:24
**revision** [5] - 135:9, 136:1, 136:12, 136:18, 136:21

**revisions** [4] - 133:25, 135:18, 135:24, 139:7
**revisit** [1] - 8:4
**Rich** [3] - 17:1, 17:2, 27:9
**rich** [1] - 150:18
**Richard** [7] - 204:2, 204:16, 206:2, 206:4, 206:9, 206:17, 252:7
**richard** [1] - 204:22
**rid** [3] - 96:11, 96:19, 97:4
**ridicule** [1] - 116:22
**ridiculous** [1] - 71:8
**rise** [13] - 4:3, 10:15, 59:13, 59:17, 59:19, 109:16, 110:13, 110:15, 110:18, 184:22, 185:2, 185:10, 247:16
**Rise** [1] - 28:2
**risk** [10] - 156:24, 157:1, 157:4, 157:6, 157:10, 157:11, 157:17, 157:18, 157:19
**riskiness** [1] - 156:24
**risky** [1] - 154:2
**road** [1] - 110:4
**roadblock** [2] - 27:5, 27:6
**Roberts** [1] - 2:12
**robots** [4] - 105:12, 105:13, 105:14, 105:15
**robust** [1] - 61:24
**Rogers** [1] - 24:21
**role** [10] - 39:1, 41:2, 41:12, 43:21, 62:17, 62:18, 63:10, 63:14, 146:11
**roles** [1] - 42:13
**roll** [13] - 13:25, 15:23, 18:25, 19:10, 20:8, 20:12, 29:8, 55:2, 63:8, 64:12, 65:2, 71:13, 72:16
**rolling** [2] - 16:7, 72:18
**romantic** [1] - 82:12
**room** [15] - 45:12, 45:14, 60:16, 70:21, 76:11, 76:16, 76:22, 76:24, 77:3, 77:7, 77:8, 78:3, 81:11, 112:9, 124:4
**roommate** [1] - 76:9
**roommate's** [1] -

76:10
**rooms** [5] - 76:15, 77:14, 79:6, 79:15, 84:16
**routers** [2] - 111:23, 112:12
**routinely** [2] - 26:25, 127:17
**RPR** [1] - 258:7
**Ruben** [1] - 76:10
**rule** [3] - 4:22, 225:24, 232:23
**Rule** [4] - 189:16, 213:7, 232:15, 233:18
**ruled** [4] - 4:14, 4:20, 254:15, 254:22
**rules** [9] - 10:10, 189:14, 220:12, 227:5, 227:19, 227:21, 228:10, 233:13, 253:12
**ruling** [2] - 7:11, 256:11
**running** [4] - 29:22, 61:19, 62:14, 255:24
**runs** [2] - 68:6, 68:8

## S

**S:(Cont'd** [1] - 2:1
**Safe** [1] - 226:1
**safety** [11] - 157:17, 157:18, 157:22, 157:24, 159:3, 159:5, 167:4, 180:7, 182:9, 184:1, 198:7
**salary** [2] - 50:3, 50:4
**Salt** [1] - 248:10
**sat** [2] - 47:7, 83:6
**satisfied** [1] - 98:18
**Saturday** [1] - 21:14
**saw** [7] - 25:24, 116:10, 211:15, 211:17, 211:21, 235:23, 248:6
**scalability** [1] - 27:4
**scale** [4] - 27:3, 27:5, 60:17, 103:4
**scared** [2] - 178:5, 186:2
**schedule** [1] - 192:11
**scheduled** [8] - 70:17, 94:4, 107:9, 110:3, 165:13, 166:7, 168:7
**school** [2] - 112:10, 146:16
**scope** [3] - 111:25, 128:13, 132:17
**Scott** [3] - 19:13,

19:24, 19:25
**screen** [7] - 11:19, 56:15, 146:1, 158:5, 170:18, 170:20, 203:12
**screenshot** [1] - 19:13
**screenshots** [1] - 20:21
**scroll** [21] - 14:14, 16:2, 16:21, 17:5, 17:21, 18:10, 21:9, 22:23, 52:13, 52:25, 70:18, 136:2, 139:19, 142:2, 163:12, 171:25, 173:10, 178:5, 187:6, 187:11, 216:3
**seafood** [1] - 12:22
**search** [1] - 146:2
**searched** [1] - 79:6
**searches** [3] - 91:23, 92:3, 92:15
**seasoned** [1] - 112:7
**seat** [8] - 4:4, 10:17, 59:21, 110:16, 110:20, 131:4, 185:3, 185:12
**seated** [2] - 109:18, 247:19
**second** [19] - 24:12, 34:18, 36:4, 45:10, 60:13, 121:25, 135:7, 135:15, 135:22, 140:14, 142:10, 143:2, 143:4, 155:23, 166:7, 180:2, 187:7, 212:18, 216:5
**secretly** [1] - 148:8
**section** [12] - 53:1, 66:6, 66:11, 66:13, 66:16, 134:17, 134:19, 141:11, 146:6, 163:14, 164:10, 165:4
**Section** [1] - 192:9
**see** [93] - 8:8, 11:18, 11:19, 12:17, 14:18, 15:11, 15:13, 17:10, 19:8, 22:12, 23:3, 25:1, 26:15, 27:8, 28:3, 30:4, 39:9, 40:14, 41:1, 41:25, 44:25, 47:9, 47:18, 51:10, 51:19, 52:1, 52:18, 52:19, 52:24, 53:14, 53:19, 55:5, 56:25, 57:3, 59:11, 60:14, 60:20, 66:19, 68:25, 72:16, 73:15,

73:17, 85:16, 93:14, 103:18, 120:5, 127:16, 131:9, 135:1, 135:4, 138:1, 139:21, 140:18, 140:21, 142:12, 142:16, 145:16, 163:13, 165:6, 165:7, 165:22, 165:23, 166:20, 166:22, 167:7, 168:18, 173:12, 173:19, 175:8, 176:9, 181:5, 187:9, 187:24, 188:1, 190:8, 191:15, 196:1, 199:17, 204:4, 204:10, 207:18, 207:24, 208:4, 222:20, 225:5, 247:13, 247:15, 255:14, 257:14, 257:25
**seeing** [2] - 167:20, 203:20
**seek** [2] - 91:8, 96:17
**seeking** [4] - 99:25, 100:5, 103:1, 106:17
**seem** [5] - 50:14, 199:15, 230:21, 231:3, 233:22
**seemingly** [1] - 84:5
**sees** [14] - 38:11, 38:14, 38:25, 39:23, 40:24, 41:12, 42:18, 43:15, 43:18, 43:21, 43:22, 44:13
**self** [14] - 51:8, 52:8, 52:11, 55:24, 66:6, 66:7, 66:9, 67:21, 68:3, 68:4, 68:12, 68:23, 233:11
**self-authenticating** [1] - 233:11
**self-review** [8] - 66:6, 66:7, 66:9, 67:21, 68:3, 68:4, 68:12, 68:23
**seltzer** [1] - 24:22
**send** [20] - 13:20, 14:1, 17:6, 18:3, 18:20, 25:14, 26:16, 26:18, 28:2, 71:20, 71:21, 73:9, 125:16, 147:4, 147:7, 147:19, 164:11, 172:22, 203:3, 248:7
**sending** [36] - 12:21, 14:8, 14:15, 15:18, 16:8, 16:14, 16:15,

UNITED STATES DISTRICT COURT

*16*:22, 17:22, 18:11,
19:12, 19:22, 20:4,
20:9, 20:13, 20:20,
20:22, 21:21, 22:24,
24:2, 24:24, 25:11,
25:17, 28:18, 28:21,
30:12, 38:22, 44:12,
72:20, 80:2, 125:11,
125:13, 164:7,
164:13, 173:6
**sends** [1] - 71:4
**senior** [7] - 51:1,
76:17, 76:25,
111:19, 111:20,
243:16, 244:1
**sense** [16] - 4:16,
8:13, 54:10, 61:1,
82:8, 154:7, 167:23,
180:22, 181:1,
181:16, 181:18,
181:19, 181:20,
181:21, 247:22,
248:12
**sensed** [1] - 121:24
**sensitive** [1] - 183:25
**sent** [34] - 21:10, 22:5,
22:8, 22:19, 26:21,
29:19, 29:20, 72:22,
76:8, 119:2, 121:16,
159:21, 159:22,
160:1, 160:17,
160:21, 161:1,
161:6, 161:7,
172:15, 173:15,
178:3, 186:19,
186:22, 188:12,
190:14, 202:12,
202:14, 216:4,
239:22, 254:13,
254:14
**sentence** [8] - 107:6,
130:6, 140:14,
140:22, 140:23,
142:12, 216:5, 218:6
**sentenced** [2] -
106:23, 107:2
**sentences** [1] - 140:5
**separated** [1] - 121:19
**September** [16] -
15:23, 36:20, 47:2,
77:21, 101:5,
101:14, 101:15,
119:2, 126:22,
126:23, 242:2,
242:3, 242:13,
242:25, 243:13
**series** [5] - 19:1,
24:25, 75:15, 88:17,
179:11
**serious** [3] - 5:16,

88:14, 94:24
**serve** [2] - 87:25,
218:17
**served** [1] - 39:8
**servers** [2] - 18:18,
25:8
**service** [4] - 79:17,
250:22, 250:23,
250:24
**set** [5] - 21:10, 56:8,
56:11, 115:11,
219:25
**SETH** [1] - 1:19
**sets** [1] - 70:15
**setting** [4] - 19:15,
19:23, 111:16, 220:2
**seventh** [1] - 207:25
**several** [9] - 8:14,
24:9, 86:5, 108:6,
139:7, 142:21,
160:14, 169:9, 220:9
**sexual** [10] - 33:5,
33:10, 34:25, 67:15,
68:13, 79:22, 80:20,
86:22, 105:8, 193:2
**sexuality** [1] - 105:9
**share** [2] - 27:4, 50:23
**shared** [5] - 164:18,
209:15, 210:11,
210:23, 211:5
**shares** [2] - 51:3, 73:3
**sharing** [25] - 13:6,
73:6, 213:22, 214:3,
214:8, 214:18,
215:2, 215:11,
215:16, 216:13,
216:17, 217:5,
217:8, 217:14,
219:8, 219:13,
220:16, 222:14,
226:5, 226:12,
226:13, 226:17,
226:23, 227:10,
228:20
**Shawl** [1] - 49:22
**Shawl's** [2] - 49:21,
50:23
**Sherman** [1] - 228:8
**shit** [1] - 177:6
**shock** [2] - 22:6, 89:9,
110:7
**shocked** [2] - 22:20,
45:12
**shocking** [1] - 103:17
**shooting** [2] - 251:24,
251:25
**short** [3] - 67:3, 68:20,
254:3
**short-term** [1] - 67:3
**shorten** [1] - 248:5

**shorter** [1] - 12:12
**shortly** [4] - 20:11,
93:24, 94:2, 96:5
**shot** [3] - 210:14,
210:19, 211:11
**shoulder** [1] - 54:2
**show** [45] - 7:3, 35:17,
53:19, 105:3, 105:7,
105:10, 105:14,
106:4, 106:7,
134:20, 134:22,
137:6, 137:23,
142:1, 162:17,
162:18, 170:13,
170:14, 184:11,
187:3, 187:4,
187:19, 194:10,
203:12, 204:18,
208:6, 210:15,
211:22, 215:24,
221:6, 227:10,
227:11, 229:13,
229:17, 229:25,
230:1, 230:3,
232:11, 232:24,
233:8, 234:3,
239:12, 245:4, 245:6
**showed** [4] - 14:18,
78:23, 79:2, 90:7
**showing** [8] - 17:3,
18:23, 19:8, 166:10,
190:9, 190:18,
196:9, 245:9
**shown** [3] - 212:13,
212:16, 213:1
**shows** [5] - 54:10,
163:17, 210:14,
212:24, 239:4
**shred** [2] - 239:23,
239:25
**side** [4] - 15:6, 39:8,
60:17, 242:1
**sidebar** [6] - 114:2,
188:24, 194:19,
221:16, 232:13,
256:11
**Sidebar** [12] - 114:3,
114:23, 189:1,
191:11, 194:20,
196:6, 212:10,
213:12, 221:19,
223:11, 232:14,
234:23
**sidebars** [1] - 256:10
**sides** [2] - 186:22,
186:23
**sigh** [1] - 178:4
**sign** [1] - 23:1
**signature** [3] - 188:3,
191:17, 191:18

**signatures** [2] - 52:2,
190:3
**signed** [7] - 186:24,
187:13, 188:8,
188:9, 189:23,
240:14, 253:6
**significant** [4] - 60:15,
108:6, 246:21, 257:6
**significantly** [1] -
132:20
**signing** [1] - 191:15
**similar** [2] - 41:2,
192:16
**similarly** [2] - 254:16,
254:23
**simple** [3] - 58:21,
96:8, 98:5
**simply** [3] - 46:21,
78:1, 96:24
**single** [9] - 144:17,
148:23, 149:9,
153:1, 183:16,
225:15, 236:24,
236:25, 237:6
**sister** [1] - 25:12
**sit** [2] - 111:18, 230:8
**site** [1] - 91:22
**sitting** [13] - 38:21,
44:21, 79:1, 80:16,
81:1, 96:24, 111:23,
112:12, 112:14,
139:14, 146:4,
146:5, 176:21
**situated** [2] - 254:16,
254:24
**situation** [8] - 77:15,
79:13, 108:8,
157:20, 165:3,
186:2, 211:1, 220:13
**six** [13] - 22:19, 95:23,
96:1, 99:3, 107:7,
118:18, 166:25,
199:9, 200:15,
200:23, 200:25,
214:20
**sketch** [1] - 41:11
**skills** [3] - 54:19,
54:23, 62:20
**skip** [3] - 120:12,
120:23, 141:24
**skipped** [2] - 19:4,
19:8
**Skywalker** [1] - 28:3
**Slack** [38] - 20:18,
26:22, 44:12, 44:24,
45:5, 45:11, 46:5,
46:21, 49:7, 147:1,
147:3, 147:4, 147:8,
147:20, 147:23,
148:4, 149:13,

149:14, 159:22,
159:25, 160:3,
160:5, 160:17,
160:23, 160:25,
170:22, 170:24,
171:20, 172:25,
178:18, 202:12,
202:14, 204:17,
208:12, 210:14,
210:18, 210:19
**slack** [1] - 45:18
**slash** [4] - 29:19,
165:20, 254:2
**slid** [1] - 131:8
**slowly** [2] - 82:4, 82:7
**small** [4] - 36:12,
40:13, 139:8, 143:25
**smart** [1] - 65:19
**SMITH** [1] - 1:18
**smoothly** [1] - 154:19
**snippets** [2] - 30:12,
30:13
**so..** [2] - 85:13, 90:15
**social** [1] - 91:20
**society** [2] - 130:8
**SoftBank** [4] - 24:4,
24:5, 24:8, 24:11
**softBank** [1] - 24:11
**software** [1] - 37:14
**solely** [1] - 182:7
**solution** [1] - 66:22
**solutions** [1] - 37:8
**someone** [21] - 5:15,
23:16, 37:7, 42:5,
57:24, 58:4, 66:1,
76:12, 98:23,
107:14, 117:22,
122:19, 144:4,
144:9, 152:6,
159:25, 162:3,
164:22, 165:20,
182:18, 242:16
**somewhere** [6] -
73:19, 107:7,
111:20, 135:23,
158:5, 158:23
**son** [1] - 248:9
**soon** [4] - 23:2, 82:11,
83:5, 176:10
**sorry** [43] - 6:6, 11:11,
11:12, 11:20, 29:25,
49:11, 50:17, 62:8,
70:5, 81:24, 101:7,
128:17, 128:18,
150:10, 155:15,
156:16, 168:13,
171:9, 172:1,
174:19, 176:23,
187:1, 194:23,
197:9, 203:20,

*205*:9, *207*:19, *208*:7, *208*:18, *212*:7, *217*:21, *217*:25, *218*:7, *220*:6, *221*:21, *224*:2, *224*:6, *224*:24, *236*:21, *242*:3, *250*:3, *256*:3
**Sorry** [2] - *165*:5, *199*:12
**sort** [12] - *43*:2, *65*:10, *65*:12, *119*:1, *132*:4, *154*:18, *206*:18, *228*:15, *241*:22, *247*:3, *247*:21, *249*:21
**sound** [2] - *114*:12, *242*:14
**sounds** [3] - *50*:18, *218*:24, *242*:4
**source** [3] - *4*:11, *6*:14, *37*:15
**sources** [6] - *5*:14, *100*:20, *100*:21, *100*:25, *101*:9, *133*:17
**space** [3] - *39*:9, *63*:19, *256*:20
**SPATARO** [1] - *1*:8
**Spataro** [85] - *6*:12, *8*:23, *9*:4, *21*:21, *21*:22, *28*:13, *35*:17, *37*:1, *39*:22, *40*:23, *48*:11, *48*:16, *48*:24, *55*:3, *55*:5, *57*:1, *57*:5, *58*:3, *61*:12, *61*:15, *62*:12, *63*:9, *65*:25, *66*:3, *69*:16, *69*:24, *94*:7, *94*:8, *95*:2, *96*:10, *96*:19, *96*:21, *96*:22, *96*:25, *101*:23, *101*:24, *105*:6, *105*:17, *106*:16, *116*:17, *119*:2, *119*:10, *128*:9, *150*:6, *150*:11, *151*:11, *151*:16, *151*:23, *151*:24, *152*:2, *152*:14, *152*:20, *155*:21, *156*:3, *156*:9, *158*:13, *166*:14, *167*:18, *170*:24, *171*:10, *172*:3, *172*:13, *172*:22, *173*:17, *174*:20, *175*:9, *175*:17, *177*:11, *177*:13, *177*:15, *178*:18, *179*:15, *185*:17, *189*:7,

*193*:4, *193*:23, *196*:18, *232*:6, *237*:15, *237*:22, *250*:18, *250*:19, *251*:2, *251*:6
**Spataro's** [1] - *174*:7
**speaking** [4] - *155*:10, *210*:25, *219*:16, *241*:22
**speaks** [1] - *35*:6
**special** [1] - *81*:25
**specific** [16] - *60*:7, *60*:8, *66*:22, *121*:1, *178*:23, *182*:1, *182*:3, *219*:12, *220*:13, *220*:22, *221*:5, *227*:21, *230*:1, *241*:21, *244*:15
**specifically** [10] - *37*:16, *55*:23, *159*:21, *176*:25, *187*:18, *191*:24, *203*:9, *219*:9, *225*:6, *246*:12
**Speculation** [1] - *144*:6
**speculation** [1] - *154*:4
**speculative** [2] - *169*:23, *171*:18
**speed** [1] - *69*:4
**spell** [1] - *131*:1
**spend** [5] - *27*:2, *72*:19, *202*:18, *207*:5, *227*:17
**spending** [3] - *17*:2, *17*:3, *202*:18
**spends** [1] - *207*:5
**spent** [4] - *53*:24, *53*:25, *60*:16, *202*:7
**spirituality** [1] - *125*:9
**splits** [1] - *53*:10
**sponsor** [7] - *9*:23, *14*:9, *17*:9, *21*:12, *122*:4, *122*:6, *233*:11
**sponsored** [1] - *15*:20
**sponsors** [1] - *9*:25
**sponsorship** [1] - *17*:11
**spread** [1] - *71*:19
**spreadsheet** [3] - *26*:23, *209*:1, *232*:5
**staff** [2] - *180*:3, *209*:15
**stamp** [6] - *12*:17, *77*:17, *80*:8, *136*:1, *136*:25, *161*:7
**stand** [2] - *45*:13, *234*:14

**standard** [4] - *50*:6, *51*:18, *211*:13, *215*:9
**standing** [2] - *130*:20, *255*:23
**stands** [1] - *249*:12
**Star** [3] - *28*:2, *28*:7, *30*:21
**Starbucks** [1] - *20*:13
**start** [16] - *8*:13, *51*:6, *72*:23, *119*:14, *132*:22, *133*:5, *134*:23, *191*:21, *194*:21, *247*:5, *247*:8, *247*:14, *256*:7, *256*:13, *257*:14
**started** [17] - *48*:5, *60*:18, *93*:5, *99*:6, *109*:11, *110*:12, *115*:16, *124*:3, *126*:2, *126*:8, *172*:25, *218*:21, *237*:3, *242*:5, *242*:11, *242*:13, *242*:23
**starting** [1] - *230*:20
**starts** [2] - *27*:25, *51*:14
**state** [13] - *32*:6, *100*:19, *116*:14, *130*:25, *131*:14, *141*:9, *143*:5, *144*:18, *158*:11, *158*:14, *201*:17, *249*:18
**statement** [20] - *7*:25, *8*:3, *92*:20, *141*:8, *143*:2, *151*:1, *167*:14, *171*:18, *187*:14, *193*:19, *219*:3, *231*:19, *232*:6, *232*:7, *232*:16, *233*:15, *234*:11, *237*:4, *252*:23, *253*:7
**statements** [5] - *8*:5, *75*:23, *109*:21, *117*:14, *254*:12
**STATES** [2] - *1*:1, *1*:16
**states** [3] - *60*:14, *70*:22, *143*:3
**States** [2] - *4*:2, *112*:5
**static** [1] - *18*:21
**stating** [1] - *58*:8
**status** [4] - *216*:8, *216*:12, *218*:10, *249*:22
**stay** [3] - *60*:25, *88*:8, *130*:20
**staying** [2] - *64*:7,

*70*:20
**Stella** [1] - *15*:25
**stenography** [1] - *1*:23
**step** [8] - *36*:24, *51*:11, *59*:8, *109*:19, *130*:12, *130*:13, *246*:15, *247*:18
**Step** [2] - *63*:11
**Stephanie** [1] - *253*:6
**STEPHANIE** [1] - *2*:3
**stepped** [2] - *121*:22, *130*:2
**steps** [2] - *200*:9, *210*:17
**Steve** [3] - *49*:21, *49*:22, *50*:23
**sticker** [1] - *16*:16
**still** [23] - *22*:15, *22*:16, *29*:7, *40*:13, *68*:6, *77*:23, *81*:11, *91*:22, *110*:1, *142*:24, *143*:22, *176*:21, *194*:2, *198*:9, *216*:17, *219*:4, *230*:17, *232*:20, *234*:7, *235*:18, *246*:20, *253*:22, *255*:16
**stipulate** [3] - *222*:2, *222*:9, *249*:8
**stipulated** [3] - *56*:2, *95*:8, *249*:7
**stipulations** [1] - *249*:11
**stole** [1] - *207*:14
**stop** [10] - *18*:11, *114*:13, *164*:22, *209*:8, *209*:10, *209*:12, *235*:10, *235*:12, *236*:7, *236*:10
**stopped** [4] - *191*:14, *237*:2, *237*:10, *237*:13
**story** [10] - *169*:16, *169*:17, *182*:16, *182*:20, *193*:20, *193*:24, *236*:24, *237*:3, *237*:23, *238*:14
**strategy** [29] - *14*:20, *35*:19, *35*:24, *37*:3, *39*:8, *39*:13, *39*:16, *40*:14, *40*:17, *40*:24, *41*:19, *42*:3, *42*:4, *42*:8, *42*:9, *42*:10, *42*:14, *42*:21, *42*:24, *43*:4, *43*:8, *43*:25, *61*:18, *63*:10, *67*:2

**street** [2] - *15*:22, *121*:6
**Street** [3] - *1*:12, *1*:19, *2*:4
**strengths** [4] - *39*:7, *39*:19, *40*:24, *43*:21
**stresses** [3] - *101*:13, *101*:15, *101*:17
**stressful** [1] - *83*:15
**stretches** [1] - *223*:2
**stretching** [1] - *248*:7
**stricken** [3] - *93*:9, *98*:10, *98*:11
**strictest** [1] - *79*:18
**strike** [3] - *8*:1, *131*:18, *224*:2
**strong** [4] - *39*:24, *40*:8, *127*:11, *191*:16
**struck** [1] - *82*:11
**struggle** [1] - *83*:19
**struggled** [1] - *83*:21
**students** [1] - *21*:13
**stuff** [7] - *8*:10, *20*:15, *63*:21, *94*:24, *205*:7, *252*:15, *255*:11
**subject** [7] - *6*:9, *10*:1, *192*:12, *195*:19, *196*:23, *233*:17, *249*:22
**subjected** [1] - *201*:1
**subjective** [1] - *182*:23
**submitted** [7] - *48*:17, *53*:13, *64*:14, *64*:24, *98*:9, *239*:9, *243*:7
**submitting** [1] - *32*:19
**subpoena** [1] - *249*:22
**subpoenaed** [1] - *250*:21
**substance** [4] - *32*:5, *52*:6, *52*:20, *252*:19
**substantial** [1] - *110*:2
**successes** [1] - *67*:3
**sudden** [3] - *93*:13, *128*:25, *237*:2
**suffer** [1] - *104*:4
**suffered** [1] - *100*:14
**suggest** [5] - *116*:1, *124*:11, *124*:16, *153*:3, *189*:10
**suggested** [6] - *105*:6, *119*:8, *122*:4, *128*:23, *198*:16, *251*:21
**suggesting** [5] - *49*:8, *54*:22, *72*:1, *77*:1, *121*:4
**suggestion** [1] - *140*:21
**suggests** [5] - *61*:9,

64:1, 67:14, 149:10,
239:10
**Suite** [2] - 1:19, 2:4
**sum** [2] - 148:19,
226:19
**summarizing** [1] -
162:23
**summary** [1] - 169:19
**summer** [3] - 75:13,
85:1, 85:4
**Sun** [1] - 19:20
**super** [1] - 65:18
**supervised** [1] - 84:1
**supervision** [1] - 88:8
**supervisor** [1] - 192:5
**supervisors** [1] -
112:20
**support** [2] - 76:17,
76:25
**supported** [1] - 178:8
**supports** [1] - 180:3
**supposed** [4] -
165:18, 214:8,
215:5, 233:7
**surface** [1] - 148:15
**surprise** [1] - 26:6
**surprised** [1] - 22:6
**suspension** [1] -
179:23
**sustained** [24] - 57:11,
75:2, 91:5, 112:23,
113:5, 113:9,
113:17, 126:6,
127:25, 128:14,
128:16, 128:17,
143:15, 143:20,
144:7, 153:13,
172:20, 180:17,
232:10, 235:15,
237:19, 239:19,
241:10, 245:16
**swag** [1] - 21:16
**swore** [1] - 190:19
**SWORN** [1] - 130:23
**system** [2] - 148:3

**T**

**Table** [1] - 230:10
**table** [4] - 83:6, 230:7,
256:20, 257:4
**tackle** [2] - 7:19, 255:3
**Taiwan** [1] - 17:18
**tangential** [2] - 4:16,
5:5
**tape** [1] - 99:21
**tasks** [5] - 37:9, 37:11,
39:14, 54:6, 112:11
**taught** [1] - 66:15
**teach** [1] - 37:21

**team** [9] - 33:19,
40:13, 54:1, 54:5,
54:9, 54:11, 67:25,
140:17, 142:18
**teams** [1] - 14:21
**tech** [2] - 146:19,
239:21
**Tech** [2] - 14:7, 14:9
**technical** [29] - 19:7,
22:17, 38:2, 38:15,
39:1, 40:17, 47:15,
47:19, 53:6, 53:23,
54:2, 54:3, 54:15,
54:23, 60:15, 60:17,
63:16, 63:17, 66:23,
111:4, 111:19,
112:20, 113:2,
115:1, 115:11,
115:20, 115:22,
115:23, 116:11
**technically** [5] -
111:10, 114:12,
115:4, 115:9, 116:8
**Technologies** [3] -
131:17, 131:18,
131:21
**technology** [2] -
62:25, 112:1
**telephone** [2] - 139:8,
139:11
**temper** [1] - 198:8
**Temple** [3] - 21:10,
37:21, 66:15
**temptation** [1] - 247:4
**ten** [2] - 136:17
**tenant** [1] - 76:24
**tend** [1] - 117:21
**tends** [1] - 64:6
**tense** [1] - 144:17
**term** [3] - 67:2, 67:3,
190:23
**terminate** [13] - 96:15,
129:1, 129:2,
149:21, 150:2,
150:21, 156:8,
156:10, 159:6,
193:5, 204:14,
205:11, 213:3
**terminated** [44] - 6:10,
8:19, 22:20, 48:23,
94:14, 94:16, 94:18,
94:23, 94:25, 95:10,
95:21, 96:5, 97:13,
97:19, 97:24, 98:1,
98:5, 98:7, 99:3,
104:1, 129:6,
129:11, 148:8,
153:3, 157:25,
163:19, 172:23,
181:9, 181:12,

188:20, 191:20,
191:22, 193:13,
197:20, 201:3,
205:12, 205:16,
206:1, 212:14,
215:10, 215:17,
229:4, 231:15, 232:4
**terminating** [6] -
174:3, 174:19,
175:18, 181:21,
193:23, 198:18
**termination** [83] -
6:14, 6:22, 6:24, 7:4,
9:21, 10:4, 48:22,
49:3, 75:12, 75:18,
90:8, 96:1, 96:16,
98:24, 99:18, 100:3,
116:5, 118:7,
118:21, 118:24,
121:4, 128:21,
129:9, 129:10,
154:2, 154:25,
155:21, 157:2,
161:11, 162:11,
164:6, 164:8,
165:14, 166:4,
167:21, 168:8,
169:5, 176:22,
178:14, 178:19,
179:2, 179:4, 179:6,
179:21, 179:22,
179:24, 179:25,
182:7, 182:14,
183:12, 185:19,
188:21, 192:13,
193:10, 193:11,
193:21, 194:5,
194:6, 194:8, 195:8,
195:22, 196:16,
197:13, 199:21,
201:2, 205:8,
205:18, 205:21,
206:13, 225:2,
231:14, 231:16,
235:8, 236:1, 236:2,
236:4, 237:6,
239:15, 240:7,
240:9, 240:13,
252:14
**termination-at-will** [1]
- 96:16
**terminations** [1] -
199:2
**terms** [11] - 52:3, 53:7,
114:11, 114:18,
115:4, 116:2,
134:13, 147:25,
157:24, 159:21,
215:5
**terrible** [1] - 125:11
**TESTIFIED** [1] -

130:24
**testified** [17] - 16:25,
30:18, 33:12, 40:4,
48:10, 92:23,
105:10, 106:15,
108:7, 169:13,
170:22, 185:21,
193:14, 193:16,
195:21, 203:16,
252:11
**testify** [1] - 9:7, 9:8,
10:2, 35:2, 110:21,
192:1, 197:6, 248:2,
249:17, 252:8,
252:10
**testifying** [5] - 6:13,
34:22, 46:2, 96:9,
229:12
**testimony** [39] - 5:9,
6:1, 6:3, 7:16, 8:8,
9:3, 9:13, 9:24, 9:25,
19:11, 33:12, 35:10,
35:13, 49:4, 59:10,
69:23, 90:8, 95:5,
97:2, 105:3, 106:15,
119:8, 126:19,
155:17, 160:1,
161:3, 174:17,
174:22, 179:10,
205:5, 205:8,
219:22, 222:4,
234:10, 236:3,
245:11, 248:10,
257:12, 257:15
**text** [26] - 12:7, 13:16,
19:5, 20:21, 22:19,
22:22, 22:24, 30:4,
30:8, 30:10, 40:5,
69:15, 69:17, 70:2,
70:15, 72:23, 80:11,
80:19, 123:1, 146:2,
174:25, 175:1,
204:17, 208:25,
212:20
**texted** [3] - 175:16,
179:15, 193:23
**texting** [3] - 174:18,
174:19, 175:17
**texts** [3] - 16:7, 20:21,
24:19
**THE** [273] - 1:15, 4:3,
4:4, 4:21, 5:1, 5:5,
5:21, 6:1, 6:6, 7:10,
7:14, 7:22, 8:1, 8:12,
8:17, 8:22, 9:3, 9:17,
10:9, 10:13, 10:15,
10:17, 11:11, 11:14,
11:20, 11:22, 11:24,
11:25, 33:9, 33:10,
55:12, 56:10, 56:13,
56:14, 56:17, 56:18,

56:19, 57:11, 59:6,
59:13, 59:15, 59:17,
59:18, 59:19, 59:21,
59:24, 70:4, 70:8,
75:2, 78:15, 78:17,
88:21, 88:22, 91:5,
92:18, 92:19, 93:8,
98:11, 98:15,
105:22, 109:3,
109:4, 109:6, 109:9,
109:16, 109:18,
109:24, 110:9,
110:13, 110:15,
110:16, 110:18,
110:20, 112:23,
113:5, 113:9,
113:17, 113:19,
113:22, 113:25,
114:2, 114:4, 114:8,
114:13, 114:22,
120:1, 120:2, 126:6,
127:25, 128:14,
128:15, 128:16,
128:17, 129:22,
130:12, 130:16,
130:18, 130:20,
130:21, 130:22,
130:25, 131:2,
131:4, 131:5, 131:8,
131:10, 131:11,
137:21, 138:11,
138:23, 139:5,
139:6, 142:4,
143:15, 143:20,
144:7, 145:23,
149:23, 151:3,
153:13, 154:9,
154:10, 157:9,
157:12, 160:7,
160:8, 160:11,
160:13, 168:11,
168:14, 172:8,
172:19, 180:17,
184:17, 184:20,
184:22, 184:24,
185:2, 185:3, 185:8,
185:10, 185:12,
185:25, 186:1,
188:25, 189:2,
189:13, 189:23,
189:25, 190:2,
190:7, 190:14,
191:8, 191:12,
194:19, 194:21,
194:24, 195:4,
195:14, 196:3,
196:8, 196:12,
196:24, 197:6,
199:10, 208:9,
208:17, 208:19,
208:21, 212:9,

212:11, 212:22,
213:1, 213:11,
219:19, 220:2,
221:4, 221:17,
221:20, 222:4,
222:13, 222:20,
223:1, 223:4, 223:6,
224:9, 224:16,
228:6, 228:8,
229:12, 229:23,
230:5, 230:11,
230:15, 230:18,
230:22, 231:3,
232:10, 232:12,
232:17, 232:23,
233:10, 233:19,
233:22, 234:6,
234:9, 234:15,
234:22, 235:3,
235:4, 235:15,
235:20, 235:21,
237:19, 238:6,
239:19, 240:19,
241:10, 243:2,
243:5, 244:7, 244:9,
244:13, 244:15,
245:2, 245:6,
245:16, 245:21,
245:23, 246:1,
246:3, 246:14,
247:16, 247:18,
248:11, 248:15,
249:5, 249:10,
249:20, 249:25,
250:3, 250:6, 250:9,
250:14, 250:16,
250:19, 250:21,
250:25, 251:5,
251:7, 251:10,
251:13, 251:15,
251:18, 251:20,
251:22, 252:1,
252:16, 252:20,
252:25, 253:3,
253:10, 253:14,
253:17, 253:20,
253:22, 254:5,
255:3, 255:9, 256:3,
256:6, 256:24,
257:24
**the..** [1] - 16:11
**theater** [1] - 28:4
**theft** [5] - 207:1,
207:2, 207:7,
207:16, 207:20
**themselves** [3] - 9:18,
80:19, 221:1
**theory** [1] - 128:23
**thereafter** [4] - 82:11,
99:10, 118:21, 229:1
**they've** [3] - 183:2,

213:2, 213:5
**thinking** [4] - 10:3,
39:2, 63:5, 253:22
**thinks** [1] - 40:8
**third** [4] - 87:17,
135:7, 135:22,
236:14
**third-party** [1] - 87:17
**thirds** [1] - 145:16
**THOMAS** [1] - 1:8
**Thomas** [1] - 249:17
**thought-out** [1] -
44:12
**thoughts** [2] - 37:5,
42:13
**thousand** [3] - 55:23,
61:9, 103:11
**thread** [36] - 11:3,
11:6, 12:7, 15:12,
20:2, 25:20, 25:22,
25:24, 26:16, 30:5,
30:19, 30:24, 31:3,
69:17, 70:13, 71:14,
73:13, 73:16, 73:20,
73:21, 163:25,
170:24, 171:2,
171:4, 171:6,
171:10, 171:15,
171:16, 172:2,
172:11, 172:13,
174:25, 175:1,
208:12, 208:25,
212:20
**threads** [1] - 30:10
**three** [26] - 27:10,
42:13, 68:9, 69:20,
73:17, 102:2, 102:5,
105:20, 113:12,
113:14, 142:22,
142:23, 156:4,
201:10, 207:24,
225:14, 225:15,
226:13, 226:15,
226:22, 236:22,
250:6, 253:19
**three-fourths** [1] -
68:9
**thrill** [1] - 19:16
**throughout** [5] -
65:21, 84:19, 133:2,
200:23, 249:9
**throw** [1] - 71:10
**thrust** [1] - 32:18
**thumb** [1] - 145:13
**thumbing** [1] - 146:3
**Thursday** [1] - 110:3
**tickets** [1] - 192:25
**tight** [1] - 248:6
**Tim** [12] - 12:16,
32:15, 32:20, 33:16,

33:17, 33:21, 35:25,
36:13, 47:21, 49:23,
244:11, 244:24
**timeline** [1] - 119:14
**timing** [2] - 136:10,
213:14
**TIMOTHY** [1] - 2:4
**tireless** [1] - 63:4
**title** [10] - 20:11, 41:6,
41:7, 41:15, 42:1,
44:5, 51:5, 132:6,
132:9, 132:11
**today** [33] - 44:8,
74:18, 74:19, 74:20,
74:22, 79:1, 80:16,
81:1, 91:22, 92:12,
96:10, 96:25, 101:1,
102:10, 107:4,
111:16, 118:21,
131:21, 144:17,
146:4, 146:5, 169:4,
179:11, 193:14,
196:20, 198:5,
204:3, 222:3,
227:23, 230:23,
241:1, 242:20
**today's** [2] - 20:5,
229:22
**together** [27] - 21:13,
33:22, 45:4, 46:9,
77:9, 84:17, 87:8,
96:12, 102:16,
103:5, 121:19,
124:6, 127:2, 127:3,
127:4, 127:20,
127:23, 128:6,
128:7, 156:4, 156:9,
156:12, 156:19,
156:22, 167:18,
172:24, 252:11
**Tom** [31] - 23:7, 23:13,
28:12, 28:14, 33:14,
35:17, 48:15, 55:7,
57:6, 116:14,
119:18, 150:16,
152:20, 156:2,
156:9, 159:23,
165:9, 165:12,
166:14, 167:16,
167:18, 171:4,
171:6, 171:8, 171:9,
171:10, 185:17,
196:18, 237:15,
237:22, 244:24
**tomorrow** [4] -
165:12, 209:9,
209:10, 209:13
**ton** [1] - 212:11
**tone** [1] - 257:23
**Tonka** [1] - 110:4

**took** [23] - 22:4, 24:16,
47:7, 72:13, 72:22,
73:3, 74:4, 74:5,
76:22, 81:1, 83:7,
124:25, 125:18,
125:20, 125:21,
125:22, 127:18,
168:3, 172:15,
185:16, 189:10,
210:17, 250:4
**tool** [1] - 76:14
**tools** [1] - 148:2
**top** [24] - 14:5, 24:13,
31:17, 39:21, 41:10,
41:15, 41:16, 45:21,
63:8, 65:10, 65:11,
65:12, 71:21, 112:3,
134:17, 140:24,
146:7, 173:10,
187:11, 225:3,
225:12, 225:17,
227:22, 251:24
**topic** [4] - 45:24,
49:14, 86:20, 209:24
**topics** [1] - 82:1
**Toronto** [1] - 25:2
**total** [1] - 192:25
**totality** [2] - 106:21,
106:22
**totally** [1] - 8:20
**totals** [1] - 256:15
**touch** [1] - 176:12
**toward** [4] - 65:12,
66:22, 161:25, 193:2
**towards** [1] - 65:10
**tower** [2] - 18:14,
18:24
**toys** [1] - 110:4
**track** [1] - 256:14
**tracking** [1] - 256:13
**traffic** [1] - 17:14
**transaction** [1] - 87:4
**transcript** [11] - 1:23,
5:3, 9:5, 218:1,
221:8, 221:11,
221:14, 223:12,
225:12, 227:20,
258:4
**transcription** [1] -
1:24
**transit** [6] - 17:14,
17:18, 27:1, 27:2,
27:4, 29:11
**travel** [1] - 19:2
**treat** [1] - 180:21
**treated** [1] - 239:2
**treating** [1] - 67:23
**tree** [3] - 28:22, 28:24,
30:22
**tremendous** [1] -

200:7
**tremendously** [1] -
157:12
**trial** [7] - 76:2, 84:19,
104:6, 110:5, 253:1,
254:25, 256:12
**TRIAL** [1] - 1:5
**tried** [3] - 48:14,
48:15, 124:19
**trip** [2] - 69:21, 70:16
**triple** [1] - 223:4
**trips** [1] - 69:24
**trouble** [10] - 45:3,
70:20, 78:7, 78:9,
78:12, 78:20, 85:2,
85:8, 85:21, 89:5
**true** [29] - 41:21,
41:23, 41:25, 88:15,
89:10, 90:19, 91:11,
95:19, 102:10,
143:2, 155:10,
155:21, 161:13,
161:18, 169:21,
169:24, 171:13,
187:15, 188:13,
193:12, 201:6,
217:7, 229:5, 232:2,
238:13, 241:12,
241:14, 243:14,
244:5
**truly** [1] - 67:22
**truth** [12] - 7:3, 155:6,
167:5, 184:15,
194:8, 205:2, 205:3,
205:4, 228:3, 228:8,
236:8
**truthful** [1] - 213:4
**try** [13] - 8:15, 52:21,
60:8, 67:5, 80:8,
111:5, 124:17,
144:12, 184:21,
185:6, 185:9,
247:11, 252:4
**trying** [29] - 22:6, 40:1,
40:5, 40:7, 40:10,
41:11, 42:20, 46:14,
72:25, 96:9, 96:16,
104:12, 104:25,
108:15, 140:11,
157:10, 163:6,
167:11, 168:11,
169:1, 169:25,
170:2, 170:6,
170:11, 183:5,
222:2, 222:3, 249:8,
250:5
**Tuesday** [8] - 34:16,
249:18, 250:13,
256:16, 257:6,
257:8, 257:14,

*257*:16
**tune** *[1]* - 60:25
**turn** *[5]* - 52:1, 223:13, 223:21, 224:20, 248:4
**turned** *[3]* - 56:9, 129:10, 141:25
**turns** *[2]* - 88:4, 117:13
**twice** *[2]* - 183:2, 236:14
**two** *[66]* - 4:6, 5:19, 27:13, 28:1, 28:7, 30:13, 30:19, 36:21, 44:6, 47:5, 47:11, 49:7, 50:15, 50:19, 53:10, 54:16, 54:25, 55:23, 61:9, 72:13, 76:15, 78:1, 81:14, 82:11, 84:5, 84:16, 84:20, 103:11, 111:17, 111:18, 113:14, 142:22, 145:16, 149:18, 151:17, 151:19, 151:21, 152:4, 155:22, 170:25, 181:7, 181:10, 189:7, 199:20, 199:21, 201:10, 204:14, 206:9, 206:11, 206:19, 207:24, 220:4, 221:4, 226:11, 226:21, 236:22, 239:24, 242:6, 243:20, 249:7, 250:8, 251:14, 254:17
**two-thirds** *[1]* - 145:16
**Tylenol** *[1]* - 108:3
**type** *[5]* - 16:14, 50:18, 112:2, 245:22, 255:24
**types** *[1]* - 182:9
**typically** *[7]* - 136:19, 136:21, 179:22, 179:23, 214:21, 226:20, 231:25

### U

**U.S** *[2]* - 1:11, 1:12
**ultimately** *[17]* - 5:15, 32:21, 70:14, 88:6, 89:15, 89:20, 90:1, 93:17, 94:6, 94:9, 94:14, 95:21, 95:24, 99:16, 100:2, 104:11, 106:23
**unable** *[1]* - 92:2

**unauthorized** *[1]* - 207:15
**unavailable** *[1]* - 249:19
**unbeknownst** *[1]* - 93:18
**uncle** *[2]* - 21:23, 22:5
**uncle-in-law** *[2]* - 21:23, 22:5
**unclear** *[1]* - 165:16
**uncomfortable** *[5]* - 157:20, 209:17, 209:18, 211:3, 221:3
**uncommon** *[1]* - 190:14
**uncovered** *[2]* - 169:9, 192:20
**under** *[27]* - 32:1, 57:25, 58:4, 88:8, 165:15, 165:18, 168:9, 183:20, 188:8, 190:19, 193:19, 200:8, 213:7, 214:8, 215:5, 215:9, 216:23, 217:18, 229:8, 232:15, 232:22, 233:18, 236:12, 240:12, 240:14, 240:17, 240:21
**underlying** *[1]* - 87:11
**underneath** *[1]* - 68:23
**understood** *[4]* - 20:12, 161:12, 188:10, 218:25
**unemployment** *[3]* - 97:15, 97:17, 97:18
**unfavorable** *[1]* - 157:16
**unfortunate** *[1]* - 58:10
**unfortunately** *[4]* - 52:11, 107:18, 112:10, 118:22
**United** *[2]* - 4:2, 112:5
**UNITED** *[2]* - 1:1, 1:16
**unlawful** *[1]* - 100:15
**unless** *[2]* - 114:17, 144:18
**unnecessarily** *[1]* - 255:13
**unpaid** *[1]* - 165:15
**unprecedented** *[1]* - 186:2
**unprovoked** *[1]* - 209:16
**unsolicited** *[1]* - 211:7
**untrue** *[1]* - 193:9
**unwanted** *[1]* - 193:2

**up** *[132]* - 10:23, 11:7, 13:10, 14:18, 15:22, 17:9, 19:15, 19:23, 19:24, 20:10, 21:10, 21:14, 24:9, 26:21, 27:19, 29:20, 30:7, 35:17, 36:5, 36:13, 39:20, 40:5, 40:15, 40:16, 41:10, 41:15, 45:6, 45:13, 47:21, 52:14, 59:22, 59:25, 68:9, 69:10, 69:13, 70:15, 71:1, 71:4, 78:23, 79:2, 82:11, 90:2, 90:23, 91:17, 91:22, 92:4, 92:8, 96:13, 97:5, 97:21, 99:19, 106:2, 106:3, 110:21, 110:24, 111:16, 115:1, 115:21, 116:8, 116:25, 118:2, 118:17, 118:21, 118:25, 120:14, 122:1, 122:9, 127:9, 127:13, 129:22, 130:20, 143:4, 145:19, 156:12, 156:19, 156:22, 159:6, 159:23, 163:17, 164:17, 164:23, 165:1, 167:19, 168:22, 172:12, 176:14, 176:19, 177:8, 178:5, 180:8, 181:24, 182:15, 185:6, 187:2, 187:11, 187:20, 188:25, 192:13, 194:19, 198:18, 199:24, 200:16, 201:20, 201:23, 204:7, 209:24, 211:10, 212:7, 212:9, 213:8, 213:11, 213:17, 214:12, 216:3, 219:25, 220:2, 223:7, 223:10, 224:24, 230:24, 234:21, 238:17, 241:5, 246:25, 248:5, 248:24, 255:4, 255:6, 255:8, 256:16
**update** *[3]* - 136:24, 224:3, 224:6
**updated** *[5]* - 14:11, 133:23, 135:12, 136:1, 136:25

**updates** *[3]* - 18:11, 134:1, 223:25
**updating** *[1]* - 14:22
**upper** *[3]* - 50:15, 53:7, 170:10
**upper-level** *[1]* - 50:15
**ups** *[1]* - 200:13
**upset** *[14]* - 34:2, 46:25, 48:11, 74:7, 74:9, 91:12, 99:1, 99:5, 99:8, 99:14, 99:15, 105:19, 105:25
**upshot** *[1]* - 29:13
**urgency** *[1]* - 54:10, 61:1
**US** *[1]* - 164:8
**user** *[1]* - 147:3
**uses** *[2]* - 146:21, 214:7
**utilize** *[1]* - 192:7

### V

**vacation** *[2]* - 192:8, 210:20, 211:6
**value** *[1]* - 239:6
**vapor** *[1]* - 23:2
**various** *[3]* - 109:25, 133:17, 249:12
**varying** *[1]* - 153:7
**vendor** *[3]* - 14:18, 22:15, 28:14
**vendors** *[3]* - 28:15, 49:8
**veracity** *[1]* - 212:15
**verbal** *[8]* - 49:1, 64:3, 75:20, 200:9, 200:18, 200:22, 206:1
**Verbal** *[1]* - 179:18
**verbally** *[1]* - 26:19
**verification** *[15]* - 186:24, 188:7, 189:4, 189:5, 190:5, 190:7, 190:8, 190:9, 190:12, 190:15, 190:22, 191:4, 191:15, 254:12, 254:14
**verified** *[10]* - 161:19, 186:18, 187:12, 188:13, 189:15, 189:16, 189:19, 193:19, 254:11, 254:24
**verify** *[4]* - 160:2, 160:15, 190:20, 254:13
**verifying** *[2]* - 187:13,

*190*:16
**version** *[12]* - 134:9, 134:10, 135:6, 135:17, 136:3, 137:2, 137:9, 138:3, 138:15, 139:24, 210:18, 210:19
**versions** *[3]* - 139:1, 139:2, 142:23
**versus** *[5]* - 37:3, 37:4, 44:1, 71:10, 220:14
**via** *[3]* - 159:2, 159:22, 164:8
**video** *[2]* - 19:13, 159:2
**view** *[9]* - 39:23, 43:15, 43:20, 44:14, 52:3, 83:16, 89:4, 96:10, 134:13
**viewed** *[1]* - 125:14
**views** *[1]* - 39:15
**Villanova** *[2]* - 81:25, 125:5
**Vince** *[2]* - 118:3, 171:6
**Vincent** *[20]* - 9:15, 10:6, 21:17, 25:20, 26:15, 26:19, 27:8, 93:5, 94:8, 97:19, 118:6, 118:16, 118:19, 130:15, 131:2, 131:15, 165:6, 177:6, 210:1, 223:18
**VINCENT** *[3]* - 3:6, 130:23, 131:2
**violated** *[4]* - 123:17, 168:4, 191:23, 192:9
**violation** *[4]* - 192:14, 199:15, 207:3, 238:15
**violations** *[27]* - 97:10, 97:12, 97:19, 97:24, 98:6, 116:6, 153:7, 155:11, 168:3, 179:12, 180:23, 181:1, 181:9, 181:13, 181:22, 195:9, 195:22, 196:15, 197:16, 198:19, 199:1, 206:22, 236:5, 236:20, 237:24, 238:20, 239:5
**violative** *[1]* - 192:19
**virtual** *[1]* - 37:17
**Vision** *[2]* - 26:11, 26:17
**visionary** *[2]* - 21:1,

66:12

**visit** [3] - 71:22, 72:2, 107:25
**visited** [1] - 15:21
**visiting** [1] - 71:24
**vitamins** [1] - 108:3
**Vodafone** [1] - 64:19
**voice** [1] - 176:21
**voiced** [1] - 44:25
**volatile** [3] - 154:13, 180:8, 184:1
**volatility** [3] - 154:7, 157:14, 198:8
**volume** [2] - 62:7, 62:8
**VP** [1] - 20:1

## W

**wage** [2] - 114:10, 114:13
**wait** [1] - 56:10
**waiting** [5] - 28:24, 38:20, 45:15, 221:20, 248:2
**walk** [1] - 45:13
**walked** [1] - 47:5
**wants** [4] - 9:8, 44:16, 50:23, 53:19
**warning** [4] - 179:18, 179:19, 200:14, 200:20
**warnings** [5] - 179:18, 200:9, 200:11, 200:18, 200:22
**Wars** [3] - 28:2, 28:7, 30:21
**WAS** [14] - 3:9, 3:10, 3:10, 3:11, 3:11, 3:12, 3:12, 70:11, 137:22, 138:12, 138:24, 172:9, 197:1, 208:22
**waste** [2] - 141:24, 213:6
**watch** [6] - 71:17, 105:7, 105:17, 106:1, 106:5, 106:8
**watching** [1] - 105:7
**ways** [4] - 60:8, 63:5, 65:19, 234:25
**web** [2] - 86:24, 87:4
**website** [2] - 22:16, 121:17
**Wednesday** [1] - 17:23
**week** [17] - 14:7, 14:9, 49:2, 49:9, 75:17, 84:23, 95:11, 166:7, 169:7, 172:23,

195:10, 195:23, 196:15, 197:12, 236:1, 248:2, 248:3
**weekend** [10] - 230:12, 246:16, 246:25, 247:11, 247:12, 248:9, 257:11, 257:21, 257:24
**weekly** [1] - 129:10
**welcome** [1] - 146:4
**well-known** [1] - 19:21
**Westworld** [2] - 105:3, 106:9
**wherein** [1] - 58:5
**whole** [12] - 29:13, 44:22, 55:8, 68:8, 172:13, 172:18, 175:4, 205:9, 222:1, 230:2, 230:5, 230:9
**wide** [3] - 76:8, 210:23, 211:5
**wife** [2] - 49:20, 79:16
**wife's** [1] - 49:20
**Williams** [55] - 4:10, 5:10, 6:10, 8:19, 8:21, 11:2, 11:9, 11:18, 12:3, 29:25, 56:10, 59:22, 60:2, 91:15, 91:16, 91:19, 98:13, 109:19, 110:21, 110:24, 114:25, 130:1, 130:13, 136:4, 150:3, 154:5, 154:12, 157:17, 169:22, 169:25, 174:18, 174:19, 174:21, 175:18, 179:6, 180:25, 181:12, 182:8, 198:17, 204:14, 205:12, 205:21, 207:4, 208:12, 212:13, 212:14, 212:16, 213:2, 215:2, 215:18, 216:4, 216:22, 219:5, 219:7
**WILLIAMS** [2] - 1:3, 3:3
**Williams'** [12] - 6:22, 10:21, 109:12, 162:25, 163:10, 163:17, 179:2, 183:24, 185:19, 196:16, 197:12, 198:8
**Williams's** [1] - 178:19
**willing** [3] - 19:15,

87:21, 240:17
**win** [1] - 238:16
**window** [1] - 88:19
**wings** [1] - 18:1
**wish** [1] - 112:6
**withdraw** [2] - 149:25, 191:10
**WITNESS** [28] - 33:10, 56:13, 56:17, 56:19, 88:22, 92:19, 98:15, 109:4, 120:2, 128:15, 128:17, 130:21, 131:2, 131:5, 139:6, 154:10, 157:12, 160:8, 160:13, 186:1, 228:8, 235:4, 235:21, 243:5, 244:9, 244:15, 245:23, 246:3
**witness** [34] - 69:10, 130:17, 131:6, 134:22, 137:23, 142:1, 157:8, 162:17, 170:13, 187:4, 187:5, 187:19, 194:10, 194:11, 195:14, 196:9, 203:13, 208:6, 211:22, 212:18, 215:24, 219:20, 221:8, 222:24, 229:17, 229:22, 232:11, 233:10, 233:12, 234:2, 234:17, 254:3, 254:4, 254:19
**wives** [1] - 25:11
**woke** [2] - 85:18, 122:9
**Wolson** [1] - 254:22
**WOLSON** [2] - 1:15, 4:2
**woman** [2] - 106:3, 122:12
**won** [1] - 115:12
**wondering** [1] - 46:16
**word** [14] - 31:20, 42:5, 49:1, 102:18, 102:19, 116:14, 154:21, 174:15, 198:3, 199:16, 210:4, 210:5, 216:21, 216:24
**Word** [2] - 24:9, 51:18, 51:22
**wording** [1] - 136:22
**words** [7] - 9:19, 35:13, 38:14, 80:10, 134:15, 134:16,

215:20

**work-related** [1] - 20:9
**workday** [1] - 192:4
**worker** [1] - 63:4
**workers** [2] - 78:1, 246:24
**workplace** [6] - 140:8, 140:16, 140:21, 141:16, 142:17, 142:25
**works** [4] - 214:6, 214:12, 234:19, 253:1
**world** [1] - 65:21
**worried** [3] - 49:18, 159:11, 171:15
**worry** [4] - 49:15, 171:20, 171:22, 212:21
**worse** [1] - 157:20
**wrap** [10] - 185:6, 212:19, 213:8, 213:11, 223:7, 223:9, 230:24, 241:5, 248:23, 256:16
**wrapped** [1] - 257:18
**write** [8] - 45:6, 63:23, 67:20, 143:18, 162:16, 164:15, 199:24, 200:13
**write-up** [1] - 199:24
**write-ups** [1] - 200:13
**writes** [1] - 231:19
**writing** [4] - 37:1, 46:7, 46:24, 52:11
**written** [20] - 40:5, 48:13, 48:19, 49:4, 50:6, 64:2, 75:17, 148:6, 153:1, 162:25, 166:12, 179:18, 180:2, 180:23, 180:24, 181:7, 200:11, 200:14, 200:16, 228:14
**written-up** [1] - 40:5
**wrote** [11] - 24:9, 51:15, 57:6, 133:14, 133:19, 137:16, 138:18, 152:21, 162:14, 164:7, 193:22

## Y

**year** [52] - 44:6, 48:2, 48:12, 48:18, 48:24, 50:5, 51:12, 57:5, 58:25, 61:5, 61:9,

61:10, 61:14, 61:19, 64:19, 67:14, 80:9, 81:22, 107:10, 111:17, 163:13, 184:9, 184:11, 193:25, 204:13, 206:9, 206:11, 206:19, 214:9, 214:11, 214:22, 215:1, 215:3, 215:12, 215:17, 216:16, 216:17, 217:16, 218:15, 218:18, 218:20, 221:25, 224:23, 226:9, 226:21, 228:21, 228:25, 229:1, 229:3, 229:4, 229:6
**year-end** [4] - 61:5, 61:9, 61:10, 61:14
**years** [40] - 5:19, 30:14, 30:20, 42:9, 84:4, 87:8, 89:8, 89:10, 96:11, 99:3, 102:11, 102:13, 107:7, 108:6, 111:18, 112:6, 113:12, 113:14, 120:15, 125:25, 126:1, 128:4, 128:24, 132:13, 133:22, 142:23, 145:13, 160:14, 172:24, 173:2, 175:14, 200:15, 200:23, 200:25, 201:17, 236:22, 239:24, 242:15, 242:16
**years'** [1] - 166:25
**yelled** [1] - 124:12
**yesterday** [27] - 5:10, 11:2, 12:12, 19:11, 19:18, 29:5, 30:17, 31:6, 31:10, 32:16, 33:2, 33:8, 33:12, 35:8, 35:10, 36:7, 47:24, 48:11, 48:21, 55:16, 55:19, 60:3, 69:23, 74:1, 94:11, 105:2, 106:15
**yo** [1] - 237:16
**younger** [3] - 74:8, 74:10, 74:24
**yourself** [3] - 17:6, 24:2, 168:14
**yourselves** [3] - 109:14, 247:1, 256:14

## Z

**zone** [1] - 62:15
**Zoom** [6] - 86:6, 86:7, 94:8, 123:1, 123:4, 123:6
**zoom** [1] - 17:9

UNITED STATES DISTRICT COURT