```
 1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA
 2

 3    ━━━━━━━━━━━━━━━━━━━━━━━━━━

      CARL WILLIAMS,                    CIVIL ACTION NUMBER:
 4
          Plaintiff,                    2:22-CV-01618-JDW
 5
          v.                            JURY TRIAL
 6                                      DAY 5
      LINODE LIMITED LIABILITY
 7    COMPANY, d/b/a LINODE, LLC,
      LINODIAN, LLC, d/b/a LINODE,
 8    LLC, DANIEL SPATARO, and
      THOMAS ASARO
 9
          Defendants.
10    ━━━━━━━━━━━━━━━━━━━━━━━━━━

11
          U.S. District Court, Eastern District of PA
12        James A. Byrne U.S. Courthouse
          601 Market Street
13        Philadelphia, Pennsylvania 19106
          January 29, 2024
14        Commencing at 10:10 a.m.

15

16    B E F O R E:          THE HONORABLE JOSHUA D. WOLSON
                            UNITED STATES DISTRICT JUDGE
17

18    A P P E A R A N C E S:

19        DEREK SMITH LAW GROUP, PLLC
          BY:  SETH D. CARSON  ESQUIRE
20        1835 Market Street, Suite 2950
          Philadelphia, PA 19103
21        For the Plaintiff

22            Maureen McHugh, Official Court Reporter
                  maureen_mchugh@paed.uscourts.gov
23
      Proceedings recorded by mechanical stenography; transcript
24        produced by computer-aided transcription.

25
```

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1    **A P P E A R A N C E S:**(Cont'd)

2

3       JACKSON LEWIS, P.C.
        BY:   STEPHANIE JILL PEET, ESQUIRE
              JONATHAN CAVALIER, ESQUIRE
4             TIMOTHY MCCARTHY, ESQUIRE
              1601 Cherry Street, Suite 1350
5             Philadelphia, PA 19102
              For the Defendant

6

7

8

9

10

       **ALSO PRESENT:**

11

12                    Melissa Meyer, Paralegal

13                    Laura Buenzle Roberts, Courtroom Deputy

14

15

16

17

18

19

20

21

22

23

24

25

**U**NITED **S**TATES **D**ISTRICT **C**OURT

I N D E X

EXAMINATIONS                                                    PAGE

  **VINCENT PALOCHKO** (Continued)
CROSS-EXAMINATION BY MR. CAVALIER:                              18
REDIRECT EXAMINATION BY MR. CARSON:                            56
RECROSS-EXAMINATION BY MR. CAVALIER:                           81
REDIRECT EXAMINATION BY MR. CARSON:                            87

**THOMAS VINCENT ASARO**
DIRECT EXAMINATION BY MR. CARSON:                             103
CROSS-EXAMINATION BY MR. CAVALIER:                            173
RECROSS-EXAMINATION BY MR. CARSON:                            206


                      E X H I B I T S

DEFENDANT EXHIBIT 24 WAS RECEIVED IN EVIDENCE                  41

```
 1              (PROCEEDINGS held in open court before The Honorable
 2    JOSHUA D. WOLSON, United States District Judge, at 10:10 a.m.)
 3              THE COURTROOM DEPUTY:  All rise.
 4              THE COURT:  Good morning.  Everybody have a seat,
 5    please.  All right.
 6              Anything we need to tackle -- I didn't see anything --
 7    before we bring the jury in yet?  Mr. Cavalier?
 8              MR. CAVALIER:  Just a couple very brief issues.  With
 9    respect to your clock on Friday -- and I understand that you
10    intend to impose that, and on our side we're certainly in favor
11    of that -- I'd be remiss if I didn't at least note that --
12    first, that Mr. Carson has already examined Mr. Palochko, so it
13    seems to me that my clock should start after my examination of
14    him.  I'm okay if the Court disagrees, but I wanted to note
15    that.
16              MR. CARSON:  No objection.
17              THE COURT:  I will just say, as I sat there Friday, I
18    baked in -- I listened to what you all said you needed for your
19    respective examinations, I baked in some time for Mr. Carson's
20    redirect, recross, whatever we're calling it, with these
21    witnesses, but it was all triggered off of what you told me you
22    needed.  So although it's equal, I did account for the fact
23    that you had that.
24              MR. CAVALIER:  Understood.  Secondly, will the clock
25    include closings?
```

**UNITED STATES DISTRICT COURT**

```
 1          THE COURT:  No.  We'll see where we are.  If I need to
 2    put a separate clock on closings, I will, but this is for
 3    evidence.
 4          MR. CAVALIER:  Okay.  And the last point on that is
 5    that we just wanted to confirm with the Court that this clock
 6    is a hard line.
 7          THE COURT:  Hard line.  When your time is up, you're
 8    done.
 9          MR. CAVALIER:  Okay.  Secondarily, our intended
10    impeachment witness, who will be very short now as this trial
11    has bled into the second week, he is unavailable to testify in
12    person.  He is a non-party, he is not affiliated with Linode,
13    and he is far outside the 100-mile subpoena radius.  So I would
14    move the Court for permission under those circumstances to put
15    his testimony on by video.  We would certainly bear any
16    problems with the technology or any issues with that our on
17    end.  If it doesn't work, it doesn't work.  But it is the only
18    way that we're going to be able to get his very brief testimony
19    in.
20          THE COURT:  Meaning you want to have his testimony by
21    Zoom, not by video deposition?
22          MR. CAVALIER:  Right.  Correct.
23          THE COURT:  Let's tackle that -- I mean, you're not
24    planning to call him for a couple of days at least, right?  Or
25    at least not now?
```

**UNITED STATES DISTRICT COURT**

 1          MR. CAVALIER:  Presumably it would be tomorrow.
 2          THE COURT:  Tomorrow.  Okay.  Let's tackle that -- I
 3   have the jury waiting, so let's tackle it maybe at the end of
 4   the day.  I don't know that I'm initially opposed to it, I
 5   don't know if you talked to Mr. Carson about who the witness is
 6   or --
 7          MR. CAVALIER:  This just came up essentially.
 8          THE COURT:  So talk to him too and see if there's
 9   going to be an objection.
10          MR. CAVALIER:  Okay.  Thank you, Your Honor.
11          MR. CARSON:  Your Honor, can I just raise one really
12   quick issue?
13          So the defendants' defense in this case is -- you
14   know, numerous times we've heard all the documents and all the
15   evidence that you'd expect to see in a case like this is just
16   missing.  And because that's their defense in the case and
17   because they opened the door, I think that I should be able to
18   examine why some of this stuff is missing and, therefore, talk
19   about some of the things that happened in discovery.  It's not
20   missing because we didn't ask for it, it's missing because it
21   wasn't turned over, even in violation of your court order, Your
22   Honor.
23          I looked up this issue, and in the Third Circuit it
24   certainly appears to be fair game, and so I just wanted to say
25   that because I felt like some of the objections -- I mean, I

**UNITED  STATES  DISTRICT  COURT**

1  don't know why they are getting sustained a hundred percent

2  every time, but I assume that you do, obviously.  But I felt

3  like some of them were getting sustained because I was going

4  toward that issue, and I just wanted to put that on the record

5  and say I think that's fair for me to explore that issue that

6  the door was opened by --

7          THE COURT:  Well, I'm not sure I've heard the other

8  side really open the door in the sense that -- I mean, they've

9  asked about specifics of what's in these documents.

10          MR. CARSON:  Your Honor, can I just -- so I have the

11  transcript from his opening statement.  His opening statement

12  was --

13          THE COURT:  I'm less worried about the opening

14  statements, Mr. Carson, than I am about the actual testimony.

15          MR. CARSON:  It's what the jury heard.

16          THE COURT:  I understand that, but it's a testimonial

17  thing from my perspective more than it is the openings.

18          MR. CARSON:  The quote was, "All the evidence you'd

19  expect to see in this case is missing.  You'll see tons and

20  tons of documents.  You're going to even see a 100-page report

21  from Vince Palochko" -- who, by the way, is someone who my

22  client never, ever suggested he had a problem with.  And you're

23  going to see all this stuff, and because you're not going to

24  see anything in there, it means that my client's case is not

25  valid.

**UNITED STATES DISTRICT COURT**

1       THE COURT:  Well, let me ask a question, Mr. Carson.

2  The things that you say they didn't turn over, were they

3  subject to discovery motions practice?

4       MR. CARSON:  Yes.

5       THE COURT:  What was it?  Point me to the motions on

6  the docket.

7       MR. CARSON:  Sure.  So the -- so your order was 35 and

8  the motion was, I think -- I think the response was 34.  That

9  was the origin -- sorry.  Your order was --

10      THE COURT:  38?

11      MR. CARSON:  38, yes.  No, that's not.

12      THE COURT:  Okay.

13      MR. CARSON:  Sorry.  It was 45, Your Honor.  Sorry

14  about that.  There's a few motions here.

15      The order was 35, the motion to compel was 42, and the

16  response was 43.  And then your order, it says that the reason

17  why the documents were denied, as moot in light of defendant's

18  commitments --

19      THE COURT:  Wait.  Which order are you looking at?

20      MR. CARSON:  It's 45, Your Honor.  And so this

21  order --

22      THE COURT:  Which paragraph are you reading from?

23      MR. CARSON:  Paragraph 3.  And the last sentence is,

24  "Defendants shall produce" -- I'm sorry, the second to last

25  sentence, "The defendants shall produce outstanding ESI using

**UNITED STATES DISTRICT COURT**

1    agreed-upon search criteria or an agreed-upon comparative data,

2    any outstanding documents by June 23, 2023."

3         I sent over a list of key words prior to that, it was

4    ignored; I sent over two deficiency letters prior to that, it

5    was ignored.  And then the things in the deficiency letters

6    that we specifically asked for were the communications that my

7    client testified about where he reported discrimination.  So

8    text threads between him and Dan Spataro, text threads between

9    him and Tom Asaro, text threads between him and Peter Fu.  I

10   understand he's house counsel, but his communications with my

11   client are certainly not privileged.  None of that was turned

12   over.  It just wasn't -- I mean, they turned over the entire

13   thread, hundreds of pages, for the one guy that they could find

14   in there that they can use to make this argument.

15        THE COURT:  I'm going to stop you, Mr. Carson.

16        I'm going to ask Mr. Cavalier, was this turned over in

17   discovery?

18        MR. CAVALIER:  Your Honor, to my knowledge, we turned

19   over everything that was asked for.

20        THE COURT:  Did you run the ESI search terms that --

21        MR. CAVALIER:  I would need to check on that.  That's

22   before my time in this case.  But my understanding is that it

23   was run.

24        And beyond that, I would say that to extent this was

25   an issue, the proper way to deal with it is to file a motion

**UNITED STATES DISTRICT COURT**

1    for sanctions and adverse inference.  I'm certainly entitled to

2    rely in my crafting of case strategy and in my statements to

3    the jury on the exhibits that are proffered by the parties at

4    pretrial.

5           To the extent -- we believe that the documents in this

6    case paint a full picture.  If there are documents that were

7    not produced or that Mr. Williams believes existed or believes

8    we have, the proper way to deal with that was months ago --

9           MR. CARSON:  Your Honor --

10          MR. CAVALIER:  -- not half way through, on day five of

11   trial.

12          MR. CARSON:  -- I'm not saying it's a discovery issue.

13   I'm saying now it's a trial issue because they are making the

14   argument that like --

15          THE COURT:  Well, but hold on.  Okay.

16          So the issue with it being a trial issue, Mr. Carson,

17   is typically when this comes up, it comes up in the context of

18   either -- you know, some sort of spoliation ruling or an

19   adverse inference ruling or something like that.  Right now

20   what I'm left with is -- first of all, I don't know how you can

21   ask witnesses about discovery because they don't run

22   discovery --

23          MR. CARSON:  Right, but --

24          THE COURT:  -- right?

25          MR. CARSON:  I'm sorry.  Go ahead.

1          THE COURT:  But what I'm saying is, so if you ask a

2   witness what happened in discovery, they would be like, I don't

3   know.  Right?

4          MR. CARSON:  I understand.

5          THE COURT:  So the second problem is it opens up the

6   need for the collateral discussion about what happened during

7   discovery practice.  Right?  It's not as simple as, well,

8   didn't we ask for this and it wasn't turned over, because I am

9   confident then that Linode is going to want to get up and

10  explain their side of the discovery story as well, and none of

11  that is something that the jury should be considering.  They

12  shouldn't be considering discovery practice.

13         MR. CARSON:  Can I suggest maybe a way to handle it?

14         THE COURT:  Yeah.

15         MR. CARSON:  How about I don't ask any questions about

16  discovery, but I can ask questions about documents that exist

17  that we don't have.  Like -- which I think I've been doing this

18  the whole time, and you've been allowing me to do it, which is,

19  Mr. Asaro, isn't it true that you and my client also had Slack

20  threads with each other?  And then --

21         THE COURT:  You can ask that question and you can ask

22  questions like, did you ever see a document that, you know, has

23  whatever information in it?  You're welcome to ask those

24  questions as far as I'm concerned.  Okay?

25         MR. CARSON:  And then let the jury know, these are the

**U̲N̲I̲T̲E̲D̲  S̲T̲A̲T̲E̲S̲  D̲I̲S̲T̲R̲I̲C̲T̲  C̲O̲U̲R̲T̲**

1    things that we don't have.

2         THE COURT:  No, no, no, no, no.  That's a different

3    thing.  You can ask them, are you aware of this?  Do you know

4    what happened?  Have you ever seen this?  Right?  You can ask

5    that question.

6         But what I'm not going to then do is get into -- you

7    can't testify to the jury that you didn't get it because you're

8    not a witness --

9         MR. CARSON:  Well, in my closing statement I can

10   mention it.

11        THE COURT:  No.  It's not a fact.

12        MR. CARSON:  What's not a fact?  They are not here,

13   that's a fact.

14        THE COURT:  You cannot say to the jury in closings

15   stuff about what happened in discovery.  You cannot say to the

16   jury in closing -- you can say we don't have it, okay?

17        MR. CARSON:  Right.

18        THE COURT:  But what are you going to do if the

19   witness says, no, I don't remember that?

20        MR. CARSON:  Understood.

21        THE COURT:  Then you're stuck with it.

22        MR. CARSON:  Then I'll deal with it.

23        THE COURT:  Okay.  Look, if a witness says, sure, I

24   remember that, okay, that's a different story, and we'll deal

25   with that.  If a witness says, yes, I remember that there were

𝓤𝓷𝓲𝓽𝓮𝓭 𝓢𝓽𝓪𝓽𝓮𝓼 𝓓𝓲𝓼𝓽𝓻𝓲𝓬𝓽 𝓒𝓸𝓾𝓻𝓽

1  these email, texts, whatever, right, and those conversations

2  happened and -- you know, then you can get up and say, I know

3  we don't have them, but the witness acknowledged it happened.

4  Fine.  Okay?  And we'll deal with that eventuality if it

5  arises.

6          But what I'm not going to have you do is, either with

7  the witnesses or in front of the jury, get up and represent

8  things about what happened in discovery.

9          MR. CARSON:  I think I can do it without making those

10  representations about discovery.  I think I can do it with just

11  focusing on the evidence.

12          THE COURT:  Again, that's fine.  But if the witnesses

13  say "I don't remember" or "I don't know" or anything like that,

14  you can't introduce new information in closings --

15          MR. CARSON:  I understand that.

16          THE COURT:  -- that goes beyond what the witnesses

17  have said in terms of your representations about what happened

18  in discovery.

19          MR. CARSON:  And for the record, the ESI protocol was

20  never run.

21          THE COURT:  But I do think that Mr. Cavalier -- look,

22  I can't resolve that right now.  You're saying one thing, he's

23  saying something else.  I am here, I have no way of resolving

24  that.  Right?

25          The time to resolve it is not in the middle of a

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1    trial.  If you think I gave you an order -- right, I gave you

2    the benefit of an order, if you felt like they weren't

3    complying with it, it was your obligation to follow up with a

4    sanctions motion or a contempt motion or something like that to

5    enforce my order.

6          MR. CARSON:  Well, Your Honor, they were -- up until

7    the very last day of discovery, I was receiving documents.  I

8    was even receiving documents after the close of discovery.

9    Documents, for example -- I mean, the discovery in its faith is

10   so bad.

11         THE COURT:  Mr. Carson, Mr. Carson --

12         MR. CARSON:  Yes.

13         THE COURT:  -- I'm not resolving discovery.

14         MR. CARSON:  I understand.

15         THE COURT:  My point is this:  First of all, at some

16   point you've got to decide that you can't wait any longer, even

17   though they are continuing to produce.  And there was plenty of

18   time post discovery, before this trial, where you again could

19   have come back to me and said I never got what you told them to

20   give me, but you didn't.  So I have no way now of resolving

21   that even if it's true or not.

22         MR. CARSON:  Your Honor, the elements in the Third

23   Circuit don't mention any of these things that you are

24   suggesting I need to do today.  The elements in the Third

25   Circuit are if I can show that the documents are in the care,

**UNITED STATES DISTRICT COURT**

1   custody, and control of the defendants and if I can show that

2   they were not turned over, then I can use that in my case as

3   evidence.

4          THE COURT:  Show me your case.  What's the case that

5   says that?

6          And again, I want to make the point, okay.  This is

7   the last time I'm doing this.  This is the kind of thing that

8   you were supposed to raise in an email to me, not on the fly at

9   10:30 while the jury is sitting back there.

10         MR. CARSON:  Your Honor, if we're waiting for the

11  jury, I can just -- I think I understand what your ruling is, I

12  think I can --

13         THE COURT:  Well, but if you are telling me that my

14  ruling is contrary to the Third Circuit guidance, then I want

15  do see the Third Circuit guidance, Mr. Carson, but you should

16  have sent it to me last night.

17         MR. CARSON:  So the guidance that I was referring to

18  is -- so one of the cases that I was reading was Gumbs v.

19  International Harvester, where it says the court --

20         THE COURT:  Can you give me a citation?

21         MR. CARSON:  Sure.  718 F.2d 88 (3d Cir. 1983).

22         THE COURT:  So you are looking at page 98 of this

23  Gumbs case, G-U-M-B-S.

24         MR. CARSON:  Yes, Your Honor.  There's just two

25  elements where the evidence is within the parties' control and

**UNITED STATES DISTRICT COURT**

1    appearance, there has been actual suppression -- those are the

2    only two elements that I saw.

3           THE COURT:  But this isn't a spoliation issue,

4    Mr. Carson.  I mean, I'm looking at this case now.  This is

5    there's a piece of evidence, it wasn't preserved, and is the

6    question whether you are going to give the jury an adverse

7    inference instruction.  I don't have that fact pattern in front

8    of me.

9           MR. CARSON:  Okay.

10           THE COURT:  Okay, so I don't think --

11           MR. CARSON:  I don't want to take up more time if the

12    jury is waiting.  I understand what your ruling is.  I'll work

13    within it.  I just wanted to put that on the record as

14    something I thought I should be allowed to do.

15           THE COURT:  Okay.  Let's bring the jury in.

16           MR. CARSON:  Thank you.

17           THE COURTROOM DEPUTY:  Please rise.

18           (Jury enters the courtroom at 10:27 a.m.)

19           THE COURT:  You can all have a seat.  Good morning

20    everybody.  Everybody have a good weekend?  Anybody too

21    invested in the Lions yesterday?

22           I just wanted to mention two things to you, harkening

23    back to the initial instructions I gave you at the beginning of

24    the case.  One is, I told you -- sort of talking about the

25    order of the case, right?  So the plaintiff presents his case

**UNITED STATES DISTRICT COURT**

1    and then Linode presents its case.

2            One of the thing you're going to see, and you are

3    going to see it starting really this morning, is -- we're still

4    in the plaintiff's case.  This plaintiff hasn't rested his

5    case.  But as a matter of efficiency, we're not going to have

6    witnesses who are testifying now leave and come back in the

7    defendant's case and testify.  Right?

8            So we're just going to have, for instance,

9    Mr. Palochko today and Mr. Spataro and Mr. Asaro when they

10   testify.  We're going to let the defendant just kind of put on

11   its narrative with them one time.  So I just wanted to explain

12   that to you while you're hearing it go beyond what the

13   plaintiff did.  We're just doing it once, okay?

14           The other piece -- and this kind of ties into it -- is

15   part of my job here is to try to keep the trains running on

16   time, and that means when we did voir dire, when we were

17   picking the jury, I made some representations to you about how

18   long I thought the case would go.  I'm trying to honor that and

19   keep things moving along.

20           So you've seen a little bit of that in open court,

21   I've done other parts of it without you here.  But I just want

22   to reiterate something I said at the beginning, which is,

23   nothing I do is intended to convey my view of the merits of the

24   case.  Right?  And so trying to move the case along faster

25   doesn't mean I think it's strong or weak or anything else.  You

1  can go to a restaurant and think the restaurant is really good

2  but the service is a little slow, right?  And so this is

3  potentially something similar, me wanting the case to move

4  faster and to honor the commitments we made to you in terms of

5  timing is not a representation of my views of the merits of the

6  case, and I just wanted to make sure you all understand that.

7  Okay?

8        So what we're going to do now is continue with

9  Mr. Palochko and let the defendants do their examination.

10  Okay?

11        Come on up, Mr. Palochko.

12        THE COURT:  Go ahead.

13        MR. CAVALIER:  Thank you.

14                    CROSS-EXAMINATION

15  BY MR. CAVALIER:

16  Q.  Good morning, Mr. Palochko.

17  A.  Good morning.

18  Q.  Is this your first time testifying in court?

19  A.  Yes.

20  Q.  Before we move into some substance, I wanted to address

21  some of the things that went on at the end of the day on

22  Friday.

23        Were you frustrated on the stand on Friday?

24        MR. CARSON:  Objection, Your Honor.

25        THE COURT:  The objection is sustained.

**UNITED STATES DISTRICT COURT**

1 BY MR. CAVALIER:

2 Q.  All right.  Let me move into this.  Why don't you tell me

3 and the jury about your background.

4 A.  Sure.  My name is Vincent Palochko.  I grew up in

5 Piscataway, New Jersey with my parents and older brother.  I

6 attended and graduated from Piscataway High School.  Following

7 high school, I want to Hofstra --

8          MR. CARSON:  Objection, relevance.

9          THE COURT:  No, it's overruled.

10          THE WITNESS:  Following high school, I went to Hofstra

11 University for about a year, and then I transferred and

12 completed my college education in Stockton University in New

13 Jersey.  I graduated with a bachelor of science in business

14 management.

15          Following college, I worked for about a year as a food

16 and beverage operations manager at a high-volume Italian

17 restaurant and catering facility.  My next position was at

18 Paychex where I worked in payroll with numerous small

19 businesses, processing payroll, advising on labor law and the

20 such for about five years.  And then following Paychex is when

21 I joined Linode, where I've been for ten years prior to the

22 acquisition from Akamai.

23 BY MR. CAVALIER:

24 Q.  What made you want to join Linode?

25 A.  Linode was actually one of my clients at Paychex where I

**UNITED STATES DISTRICT COURT**

1  was processing payroll for.  It was a small business that

2  was -- you know, I knew little about, but I saw them hiring

3  tons of new employees, I saw a lot of growth, I saw a lot of

4  excitement.  And every other week I spoke to Mr. Asaro, who was

5  my contact with the company, and he had nothing but great

6  things to say about the company, about its growth and --

7          MR. CARSON:  Objection.  Hearsay.

8          THE COURT:  It's overruled.

9          THE WITNESS:  It was an appealing place.  And, you

10  know, my position was somewhat relevant to the needs of the

11  company at the time, so Mr. Asaro and I built a little bit of a

12  working relationship.  And, you know, when I was ready to move

13  on to the next stage of my career, we had a conversation about

14  what I can offer Linode and how I can help with its growth.

15  And one thing led to another and that's where I landed.

16  BY MR. CAVALIER:

17  Q.  Do you remember what year that was?

18  A.  That was in 2012, is when I joined Linode.

19  Q.  Okay.  When you joined Linode in 2012, did it have a human

20  resources department?

21  A.  It did not.

22  Q.  Were you responsible for essentially becoming the human

23  resources department at Linode?

24  A.  Yes.

25  Q.  What was your title when you were hired?

**UNITED STATES DISTRICT COURT**

1  A.  Human resources manager.

2  Q.  Did you have any employees who were reporting to you at

3  the beginning?

4  A.  I did not, no.

5  Q.  Can you just generally describe to the jury what some of

6  your duties as human resources manager were in those early

7  days?

8  A.  Sure.  In the early days, the company -- I joined the

9  company about just less than 30 employees, so it was very much

10  of a start-up environment.  Everyone does a little bit of

11  everything.

12      So among many things, my duties revolved around just

13  keeping the business running and keeping the operations going.

14  I was doing the day-to-day bookkeeping, I was distributing mail

15  and documents, I was doing a lot of operational tasks, even,

16  you know, interfacing with customer, but at the same time

17  laying the groundwork for a human resources practice and

18  building structure in the company.

19      And that included things like building up the first-ever

20  formal handbook at the company, building out structure among

21  and implementing software for our recordkeeping purposes,

22  performance reviews, how we collected applicant information for

23  jobs and things of that sort.  So it was a lot of building the

24  foundation for the company to grow upon and building out

25  structure that we can rely on for the next several, you know,

**UNITED STATES DISTRICT COURT**

1  several years.

2  Q.   Did that involve formalizing processes that were already

3  in place?

4  A.   It did, yes.  We had a lot of unspoken processes that were

5  acted upon, but we didn't really have any structure behind it

6  or any policy or documentation behind it.  So a lot of that had

7  to do with formalizing things.  So we had -- you know,

8  something a little more objective to lean back on and how we

9  conduct ourselves as a business.

10 Q.   Okay.  I think you just testified that you were

11 responsible for creating the first formal handbook at Linode?

12 A.   That's correct.

13 Q.   And we looked at some of those on Friday, correct?

14 A.   Yes.

15 Q.   I just want to bring a couple of those up with you briefly

16 now to ask you a couple questions, if that's all right.

17 A.   Sure.

18      MR. CAVALIER:  Tim, can you pull up Exhibit 30 first,

19 the 2017 handbook.  Actually, do it in order.  Pull up 33.  All

20 right.  That's the one.

21 BY MR. CAVALIER:

22 Q.   Can you see that on the screen?  This is already admitted,

23 by the way.

24 A.   Yes.

25 Q.   So why don't you tell the jury what this is.

**UNITED STATES DISTRICT COURT**

1  A.   It's a version of the handbook that was effective -- it

2  was updated as of October 1, 2014.

3  Q.   At least as far as you know, is this the -- well, I'll ask

4  the question.

5       Is this the earliest form of the handbook?  Can you tell

6  from looking at this?

7  A.   The earliest form of the handbook was issued in about

8  2012, probably later in the year, halfway through the year or

9  so.

10 Q.   So pretty soon after?

11 A.   This is the iteration of that.

12 Q.   Okay.  And you testified, I remember on Friday, that each

13 time the handbook was updated, it was republished with the new

14 date stamp?

15 A.   That's correct.

16 Q.   How are employees able to access the handbook at Linode?

17 A.   They were able to access it digitally through our HRS or

18 human resources information system.  So we had a copy that was

19 available to them on kind of an intranet type of a portal that

20 they were able to access the latest version on demand.

21 Q.   Okay.  So each time the new handbook was created, the

22 company didn't print out copies for every employee and leave it

23 on their desk?

24 A.   Correct.

25 Q.   Were the employees notified when a new handbook revision

1  was made?

2  A.   For any significant changes that affected policy or

3  anything that was material, yes.  A lot of the changes were,

4  you know, relatively minor.  If we had to update a phone

5  extension for where employees call out, for example, you know,

6  something like that would not be blasted out to the entire

7  company.  But if we had a policy shift or a procedure shift,

8  that would certainly be emailed out to employees to make sure

9  that they are aware of a change.

10 Q.   Okay.  Were the employees required to acknowledge receipt

11 of the handbook when their employment started?

12 A.   Yes.

13 Q.   And I should ask, were you involved in the hiring process

14 at Linode in the 2012 to, say, 2014 time frame?

15 A.   I was, yes.

16 Q.   During your time -- well, let me ask, did you -- what were

17 your hiring practices at that point in time?  And by that, I

18 mean yours personally as an employee of Linode?

19 A.   Sure.  So Linode as a start-up was very much driven by

20 technology.  We were in our infancy as a company, so it was

21 imperative that we were able to attract and hire people who had

22 the technical skills to do the job.  We didn't have a

23 tremendous amount of in-house training and development, we

24 didn't have a ton of resources to be able to grow people, so a

25 lot of what we were looking for was the technical skills behind

**UNITED STATES DISTRICT COURT**

1    the -- you know, what we needed for the position.

2        My personal practice is we're always finding the best

3    qualified person for the position to make sure that the most

4    efficient people that can kind of, at that stage of the

5    company, go out of bounds from their position a little bit.  We

6    were, you know, all hands on deck at that time.  We needed

7    people to have a pretty broad skillset and understand their

8    position.  But there wasn't a whole lot of specialization at

9    the company at the time, so having a broad set of technical

10   knowledge was imperative.

11   Q.   Did you care how old the perspective employees were at the

12   time of their hire?

13   A.   No.

14   Q.   Let me ask you just briefly about this exhibit here.

15       MR. CAVALIER:  Tim, if you could, just flip to 0248.

16   BY MR. CAVALIER:

17   Q.   You were asked about this on Friday, so I just want to

18   clarify a couple points.

19       MR. CAVALIER:  Can you pull up the second paragraph

20   under 3.1.

21   BY MR. CAVALIER:

22   Q.   Do you remember on Friday when Mr. Carson was asking you

23   questions about whether the handbooks contained

24   anti-retaliation policy?

25   A.   Yes.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  Q.   Tell the jury really quick what an anti-retaliation policy

2  is.

3  A.   So it's, you know, if an employee brings up a -- a

4  challenge that they have at work, that would be a policy that

5  prevents the person who they brought this up with retaliating

6  against them or acting adversely against them for the issue

7  that they brought up.

8  Q.   Okay.  And if you would, read the last two sentences in

9  the paragraph that Tim has kindly highlighted us for?

10 A.   "Employees can raise concerns and make reports without

11 fear of reprisal.  Anyone found to be engaging in unlawful

12 discrimination will be subject to disciplinary action up to and

13 including termination of employment."

14 Q.   So at least as of the 2014 iteration of the handbook, is

15 that an anti-retaliation policy, in your view?

16 A.   I would say so.

17         MR. CAVALIER:  Let's pull up Exhibit 30, then, and

18 jump to the last one.  Tim, this is 8089, I believe.  808.

19 Sorry.  It's 808 to 809.

20 BY MR. CAVALIER:

21 Q.   So this is the 2017 handbook that Mr. Carson asked you

22 about, and he specifically asked you whether this particular

23 handbook contained an anti-retaliation policy.

24         And I want to draw your attention specifically to the top

25 of page 0809 and ask you to read that.

**UNITED STATES DISTRICT COURT**

1  A.  Starting with --

2  Q.  Sorry.  The last paragraph starting with "Employees with

3  questions."

4  A.  Sure.  "Employees with questions or concerns about

5  discrimination in the workplace are encouraged to bring these

6  issues to the attention of the management team and/or human

7  resources.  Employees can raise concerns and make reports

8  without fear of reprisal.  Anyone found to be engaging in

9  unlawful discrimination will be subject to disciplinary action

10 up to and including termination of employment."

11 Q.  So at least through -- from 2014 through this handbook in

12 2017, the Linode handbooks contain that same anti-retaliation

13 language, correct?

14 A.  Yes.

15 Q.  And, in fact, in this handbook, if you read the paragraph

16 before that, you specifically call out the prohibition on

17 retaliation, correct?

18 A.  Correct.

19 Q.  What does that paragraph say?

20 A.  "Discriminatory harassing or retaliatory behavior is

21 prohibited from coworkers, supervisors, managers, owners, and

22 third parties including clientele.  The company takes

23 allegations of discrimination, intimidation, harassment, and

24 retaliation very seriously and will promptly conduct an

25 investigation when warranted."

UNITED STATES DISTRICT COURT

1  Q.  So in this paragraph, you actually use the word

2  "retaliation" twice, correct?

3  A.  Yes.

4  Q.  And is this an example of how -- and you testified on

5  Friday that this policy handbook was a living document.  Is

6  this an example of that?

7          MR. CARSON:  Objection.  Leading, Your Honor.

8          THE COURT:  It is.  Rephrase it.

9  BY MR. CAVALIER:

10  Q.  Is this an example of the type of living document that you

11  described this handbook as?

12  A.  Absolutely.

13          MR. CARSON:  Objection.

14          THE COURT:  Objection is overruled.  Go ahead.

15          THE WITNESS:  As a smaller company, most of our

16  policies were simple and interpreted as we grew in size and

17  scope as a company.  As we attracted, you know, a much more

18  specialized and diverse workforce, we had a need for more

19  specific policy that were -- that spelled a lot of things out

20  that were sort of implied in our earlier days.  So absolutely.

21  BY MR. CAVALIER:

22  Q.  Okay.  Let me bring you forward now.  I want to talk to

23  you about Mr. Williams' hire in particular.  Were you involved

24  in that hiring?

25  A.  I was, yes.

**UNITED STATES DISTRICT COURT**

1   Q.   Can you explain to the jury what your involvement was?

2   A.   Sure.  So I was the -- it was in 2014, and I was still a

3   human resources department of one.  So any talent acquisition

4   responsibilities fell directly under me.  And that had, you

5   know, everything from head hunting and searching for the right

6   type of talent to reviewing resumes to scheduling and actually

7   conducting interviews with candidates.

8   Q.   Did you interview Mr. Williams?

9   A.   Yes.

10  Q.   In person?

11  A.   It was -- I believe so, yes.

12  Q.   Okay.  Before I get into the substance there, do you

13  remember how Mr. Williams came to your attention or the

14  attention of Linode?

15  A.   Sure.  Mr. Williams applied to a position at Linode.  We

16  had a posted position for a network engineer that Mr. Williams

17  applied to.

18  Q.   Okay.  Do you remember, did he send a resume?

19  A.   He sent a resume, yes.

20  Q.   Did you review that resume?

21  A.   Yes.

22  Q.   Do you remember what your reaction to his resume was?

23  A.   Yeah.  I remember it being very exciting.  You know, as I

24  kind of alluded to you before, as a small tech company in a

25  shore town in New Jersey, it wasn't very common for us to get

**UNITED  STATES  DISTRICT  COURT**

1  very skilled technical people.  The populations didn't offer

2  that type of candidates.

3      So when we saw Mr. Williams' resume, you know, he had some

4  very impressive positions and very impressive companies that he

5  worked for.  And he had a tremendous amount of experience.  So

6  he was, you know, it was a resume that we hadn't really seen

7  that type of person before, and he came across extremely

8  exciting.

9      And our initial reaction was this is someone that we have

10  to talk to, someone that we are very interested in hiring

11  before even really getting to know him.

12  Q.  And ultimately, you were able to talk to him, correct?

13  A.  Yes.

14  Q.  Did you know how old he was at the time of his hire?

15  A.  No.

16  Q.  Did you care how old he was at a time of his hire?

17  A.  Didn't matter, no.

18  Q.  So, explain how the hiring process goes, at least with

19  respect to Mr. Williams?

20  A.  Sure.  So we typically conduct a few different rounds of

21  interviews.  It generally started with a phone screen to go

22  over the basic qualifications of the position to make sure that

23  the candidates have the technical skills and the know-how to do

24  the job.

25      The following steps are generally a phone interview, which

**UNITED STATES DISTRICT COURT**

1   is a little bit more in depth on the person's motives for

2   wanting to join the company or what their skillset looks like

3   or what they can contribute longer term.

4       And then an in-person interview, which is a, you know,

5   continuation of the phone interview and, you know, technical

6   assessment.  But also, we put a little focus on the in-person

7   interviews and just judging the character of the person, to

8   make sure that it's someone that would be a good contributor to

9   the company.

10  Q.   So ultimately, the decision was made to make an offer to

11  Mr. Williams, correct?

12  A.   That's correct, yes.

13          MR. CARSON:  Objection.  Leading.

14          THE COURT:  Overruled.

15  BY MR. CAVALIER:

16  Q.   Can you explain the process, to the extent you haven't

17  already, that was in your mind when the offer was made?  Just

18  as far as it goes beyond what you already said, if anything?

19  A.   Sure.  That's generally about it.  We had a pretty

20  successful interview with Mr. Williams.  I think he offered a

21  lot to the company that we didn't already have a lot of in

22  terms of his skillset and know-how.

23      So when we made an offer to him, it was pretty cut and

24  dry.  We sent him an offer letter via email, and, you know,

25  Mr. Williams was responsive and excited to join.

**UNITED STATES DISTRICT COURT**

1  Q.   How did you decide how much money to offer him?

2  A.   My memory is a little bit fuzzy from that long ago, but I

3  believe it was largely based upon his needs as a candidate and

4  where he needed to be to meet a satisfactorily level of

5  compensation based on his prior roles and know-how.

6  Q.   And with respect to -- let's strike that.  Was he offered

7  a significant sum of money for a Linode employee?

8  A.   Upon his hire, he was, I believe, the highest paid person

9  at the company and remained the highest paid person at the

10  company for a few years.  At the very least, after a couple

11  years, he was one of the top few earners at the company.

12  Q.   All right.  And so did Mr. Williams ultimately accept that

13  offer of employment?

14  A.   He did, yes.

15  Q.   All right.  How did Mr. Williams perform after he was

16  hired in the early days?

17  A.   So his experience was very -- he had a lot of experience.

18  Upon hiring, we did, you know, stipulate to him that a lot of

19  what he's capable of might be more than we need as a company at

20  the time.  And I remember sending him a specific email with

21  some of the requirements of the position, which were more

22  engineering and technical focused.  He had a strong pedigree in

23  networking, and he would be brought into Linode to do some

24  pretty basic tasks, some basic troubleshooting and technical

25  tasks.

**UNITED STATES DISTRICT COURT**

 1    So we sent him a bullet list of things he'd be responsible

 2 for because he -- one of our risks in bringing him on was he

 3 looked a little overqualified for what we needed at the time,

 4 and we were worried that he wouldn't be excited about the

 5 position and it wouldn't be stimulating for him and it wouldn't

 6 offer him too much growth.  Because he was going to be doing

 7 some very kind of ground level networking where he wasn't going

 8 to be continuing his career, which was a little bit more high

 9 level, at least initially.

10 Q.   Okay.  Were there issues with Mr. Williams' technical

11 performance early on?

12 A.   I was somewhat distant from that, so I can't comment

13 specifically.  But I do remember peers in his position, they

14 were stronger technically than Mr. Williams.  I think some of

15 the -- the basic technical hands-on tasks, Mr. Williams wasn't

16 as strong as his peers.

17 Q.   Okay.  Did you have frequent discussions with Mr. Williams

18 about work-related topics?

19 A.   Yes.

20 Q.   Did Mr. Williams complain to you about certain things that

21 were happening at work?

22 A.   He did.

23 Q.   Did you have Slack communications with Mr. Williams?

24 A.   Yes.

25      MR. CAVALIER:  Tim, could you pull up Exhibit 22.

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1  Previously admitted.  14.

2  BY MR. CAVALIER:

3  Q.  So do you recognize the documents on your screen?

4  A.  It looks like it's a transcript of a Slack thread between

5  myself and Mr. Williams.

6  Q.  Okay.  So you're aware, this exhibit has already been

7  discussed.  I know you weren't in court for that.

8      But does this document contain communications between

9  yourself and Mr. Williams from 2017 through 2020?

10  A.  Yes.

11  Q.  All right.  I don't want to go through this whole document

12  with you.  We spent a lot of time on it with Mr. Williams.

13      But I will ask you, if you know, in this document that

14  spans a hundred pages in four years, did Mr. Williams ever once

15  complain to you via this Slack channel about any harassment or

16  discrimination?

17  A.  He did not.  I remember a lot of complaints.  They were

18  relatively small, you know, things that bothered him, which we

19  were able -- or I was able to address pretty quickly and to his

20  satisfaction.  I think it's quite the contrary.  I never heard

21  any complains about harassment, discrimination, or anything of

22  that sort.

23      But I do recall having a good working relationship with

24  Mr. Williams.  He was someone that we -- I interfaced with

25  regularly.  And quite a few times in that thread, he did share

**UNITED STATES DISTRICT COURT**

1  his praise for myself and for the company and how we were

2  handling diversity-related issues.

3  Q.  And we looked at some of those, but I do just want to draw

4  your attention to one specifically.

5        MR. CAVALIER:  Tim, 0729 and 0730 in that same

6  document.

7  BY MR. CAVALIER:

8  Q.  I don't know if you can see that, but if you go down to

9  0730, is this one of those examples that you were just

10 referring to?  And I direct your attention to the top of 0730.

11 A.  Yes.  I believe that was one of those -- this is just a

12 general, you know, expression of my working relationship with

13 Carl.

14     We often talked about diversity-related issues but, I

15 think, in a positive light.  It was more chatting about things

16 that we're doing well and talking about some of the issues

17 outside of Linode.

18 Q.  And just to be clear, we talked about this document.  But

19 did Mr. Williams ever raise any concerns about treatment

20 relating to age or sexual orientation at Linode verbally to

21 you?

22 A.  No.

23 Q.  Did he ever raise any considerations or issues with

24 treatment over age or sexual orientation in any other media or

25 form with you?

**UNITED STATES DISTRICT COURT**

1  A.  No.

2  Q.  Okay.  Did he ever raise any considerations with you about

3  any treatment at all for -- any negative treatment at all for

4  any reason by Dan Spataro?

5  A.  No.

6  Q.  Let me skip a head a little bit and ask you, did

7  Mr. Williams, at least as far as you know, ever have any, we'll

8  call them, issues with respect to his work at Linode?  And by

9  that, I mean policy violations or the like?

10  A.  There were policy violations, yes.  I think we talked a

11  little bit about that on Friday.

12  Q.  Of everybody at Linode, who was the person during

13  Mr. Williams' employment who was most concerned about these

14  policy violations?

15  A.  I would say our VP of finance, Richard Ford.

16         MR. CARSON:  Objection.  Speculation.

17         THE COURT:  Do you know or are you just guessing?

18         THE WITNESS:  I know.

19         THE COURT:  So you can answer but then explain how you

20  know.

21         THE WITNESS:  Okay.  I've heard it firsthand.  Richard

22  Ford is our Vice President of finance.  And he used to --

23         MR. CARSON:  Objection.  Hearsay.

24         THE COURT:  Objection is sustained.

25  BY MR. CAVALIER:

**UNITED STATES DISTRICT COURT**

1  Q.  Did Richard Ford ever make it clear to you that he had

2  issues with Mr. Williams' performance or adherence to policy at

3  Linode?

4          MR. CARSON:  Objection.  Hearsay.

5          THE COURT:  Overruled.

6          THE WITNESS:  Adherence to policy, yes.

7  BY MR. CAVALIER:

8  Q.  Okay.  And from those -- what was your belief at the time

9  as a result of that indication from Mr. Ford as to

10 Mr. Williams' issues with policy compliance?

11 A.  Sure.  So my belief at the time was Richard Ford was

12 dealing what the company finances, and he saw things through a

13 very black and white lens.  I think the reporting hierarchy

14 that Mr. Williams was in saw them as relatively minor

15 infractions.

16      A lot of the times, it was a misuse of company funds, you

17 know, expensing something that shouldn't have been expensed or

18 maybe purchasing alcohol when he was out to a dinner with

19 vendors or something of that sort.  It was never gross

20 misconduct.  It was always relatively minor when put together.

21      But I think that the reason there was leniency there was

22 Mr. Williams was delivering value to the company, and the

23 company was very gracious in giving him some space to be able

24 to do what he needed to do to operate.  Sort of step back and

25 let him run his own position there and just gave him freedom

**UNITED STATES DISTRICT COURT**

1   and gave him leeway and made sure that he was able to operate

2   as efficiently as possible because he was delivering value.  He

3   saved the company a lot of money.  He brought a lot of

4   knowledge into the company, whether it was by himself or making

5   connection.  So it was relatively easy within his immediate

6   chain to look the other way with some of these infractions.

7   Q.   Did Mr. Ford ever indicate to you that he wanted

8   Mr. Williams to be disciplined for some of these infractions?

9           MR. CARSON:  Objection.  Hearsay.

10          THE COURT:  Sustained.

11          MR. CAVALIER:  We can ask Mr. Ford directly.

12  BY MR. CAVALIER:

13  Q.   Was Mr. Williams ever disciplined for any of these

14  infractions?

15  A.   He was not.

16  Q.   Are you able to tell the jury succinctly who Mr. Williams

17  reported to at Linode and describe that reporting structure?

18  A.   Sure.  So Mr. Williams reported today Tom Asaro when he

19  was hired.  A few years after, when Dan Spataro was hired, I

20  think in 2017, I'm not certain on the date, Mr. Williams

21  reported to Dan Spataro.  And he continued to report to Dan

22  Spataro for the remainder of his employment.

23  Q.   Were you involved in the hiring of Mr. Spataro?

24  A.   I was, yes.

25  Q.   Can you describe to the jury your involvement in that

**UNITED STATES DISTRICT COURT**

1  process?

2  A.   Sure.  At the time of Mr. Spataro's involvement, I took a

3  step back from a lot of the recruitment responsibilities that I

4  had.  So most of my responsibilities there were organizing

5  interviews, reviewing resumes, and, you know, if interviews

6  were successful, issues of an offer and determining

7  compensation.

8  Q.   Was Mr. Spataro hired to be, among other things,

9  Mr. Williams' supervisor or boss?

10 A.   Yes.

11 Q.   Did Mr. Williams ever indicate to you that he had any

12 concerns about that arrangement?

13 A.   He did not.

14 Q.   Do you remember when Mr. Spataro was hired?

15 A.   I don't remember the exact date.  I think it was around

16 2017, but I don't recall specifically.

17 Q.   All right.  So Mr. Spataro is hired.  Do you recall

18 whether there were any other issues with Mr. Williams'

19 employment between the hiring of Mr. Spataro and, we'll say,

20 the events leading up to his eventual termination?

21 A.   Issues?  No.

22 Q.   Okay.  Any complaints from him during that time period?

23 A.   No.

24 Q.   Any human resources issues with respect to age or sex

25 discrimination raised at all with you during that period?

**UNITED STATES DISTRICT COURT**

1  A.    No.

2  Q.    Any issue with respect to age or sexist or discriminatory

3  sexual orientation comments regarding other employees separate

4  and apart from Mr. Williams that he brought to your attention?

5  A.    No.

6  Q.    All right.  So let's move ahead, then, to what brings us

7  here today, Mr. Williams' termination.

8       Why don't you, in your own words, explain to the jury the

9  events that lead to Linode terminating Mr. Williams'

10 employment?

11 A.    Sure.  So we were made aware of the issues outside of the

12 workplace with Mr. Williams' affiliation with --

13         MR. CARSON:  Objection.  Hearsay.

14         THE COURT:  It's overruled.

15         THE WITNESS:  With John Musbach, and a decision was

16 made to remove --

17 BY MR. CAVALIER:

18 Q.    Let me back you up real quick.  How were you made aware of

19 that?

20         MR. CARSON:  Objection.  Hearsay.

21         THE COURT:  It's overruled.

22         THE WITNESS:  Through an article that was published

23 that stated Mr. Williams was testifying on behalf of

24 Mr. Musbach in court and was aware of his past issues with

25 child pornography.

**UNITED STATES DISTRICT COURT**

1  BY MR. CAVALIER:

2  Q.  Did you see that article?

3  A.  I did.  I saw a copy of it.

4       MR. CAVALIER:  All right.  We're going to bring up,

5  just for the witness, Exhibit 24.

6       MR. CARSON:  Your Honor, for the record, I would like

7  to put another objection.

8       THE COURT:  They haven't moved to the admission yet.

9  So you are a little premature.

10      MR. CARSON:  Sorry.

11 BY MR. CAVALIER:

12 Q.  Can you see that document on your screen?

13 A.  Yes.

14 Q.  Is this the article you are referring to?

15 A.  I believe so, yes.

16      MR. CAVALIER:  Move to admit and publish.

17      MR. CARSON:  Objection.

18      THE COURT:  Objection overruled.  Exhibit 24 will be

19 received into evidence.

20      (DEFENDANT EXHIBIT 24 WAS RECEIVED IN EVIDENCE.)

21 BY MR. CAVALIER:

22 Q.  So as I think you just testified, you were aware of this

23 article in the period leading up to Mr. Williams' termination.

24 Do you remember how you were made aware of this article?

25 A.  I don't remember who brought it to my attention, but it

**UNITED STATES DISTRICT COURT**

1   was sent over to me electronically.

2   Q.   Okay.  Did you discuss this article with anyone else at

3   Linode?

4   A.   I talked about it with Tom Asaro and Dan Spataro and how

5   to best handle that, how to best handle what was going on.

6   Q.   What was your reaction to the article?

7   A.   I was disgusted.  I was kind of -- I was shocked.  I was

8   taken aback by it.  I was a bit surprised by it.

9   Q.   Were you concerned about the potential effects of this

10  article on Linode's business?

11  A.   Yes.

12  Q.   Why?

13  A.   Well, we, you know, the days following the article, we did

14  have a couple employees who discussed ultimatums --

15           MR. CARSON:  Objection.  Hearsay.

16           THE COURT:  Overruled.

17           THE WITNESS:  The employees were uncomfortable working

18  with someone like Mr. Williams, who might support this type of

19  behavior.  And they gave a him-or-me type of ultimatum where

20  they said they would be --

21           MR. CARSON:  Objection.  Hearsay.

22           THE COURT:  Overruled, Mr. Carson.

23           THE WITNESS:  They would leave the company if

24  Mr. Williams stayed at the company.

25           But beyond that, in the public eye, Mr. Williams was a

**UNITED STATES DISTRICT COURT**

1    spokesperson on behalf of the company.  He was directly

2    involved in hundreds of thousands of dollars, if not millions

3    of dollars, contracts with vendors.  He was going across the

4    world, attending trade shows and conferences, speaking on

5    behalf of the company.  He was very much a public figure for

6    the company.

7            So the reputational risk of the company that existed

8    if this spread and vendors or potential customers or even

9    future employees saw that the company was appearing to support

10   a person like this, there was pretty severe risk involved in

11   keeping him at the company, in my eyes.

12   BY MR. CAVALIER:

13   Q.   Okay.  And did you discuss that with Mr. Spataro and

14   Mr. Asaro?

15   A.   Yes.

16   Q.   And did you ultimately come to a decision with respect to

17   Mr. Williams' employment?

18   A.   We did, yes.

19   Q.   And what was that decision?

20   A.   The decision was to remove him from the company.

21   Q.   Okay.  Can you tell the jury about how long it took from

22   your awareness of this article to the time when you decided

23   that Mr. Williams would be terminated?

24   A.   Sure.  It was just a matter of a few days.

25   Q.   Okay.  Had you ever dealt with a situation like this in

**UNITED STATES DISTRICT COURT**

1  your role as human resources manager?

2  A.   No.   This was absolutely unprecedented.

3  Q.   Did it require urgent attention from the company?

4  A.   It did, yes.

5  Q.   In your discussions with Mr. Spataro and Mr. Asaro, was

6  there unanimity with respect to the decision to terminate

7  Mr. Williams?

8  A.   Yes.

9  Q.   So as we've heard a lot about this week and we heard on a

10  recording of that meeting, you told Mr. Williams that he was

11  being terminated for policy violations, correct?

12  A.   That's correct, yes.

13  Q.   Can you explain to the jury all of the factors that played

14  into your decision -- and by your decision, I mean the

15  company's decision -- to do that?

16  A.   Sure.   So as mentioned, it was an unprecedented chain of

17  events that happened.   We knew that we had to remove him from

18  the company.   And quite frankly, we were scared.   It was a very

19  different type of occurrence than we've ever seen before.   We

20  had to act with urgency.   We were scared and unprepared for

21  this.

22      And we were aware of the pattern of policy violations that

23  already existed over the past several years with Mr. Williams,

24  so we collected them and, you know, we did use that as a

25  communicated reason for the termination because we saw that at

**UNITED STATES DISTRICT COURT**

1  the time as the cleanest way to present the termination to him.

2  Because the policy violations were legitimate, they happened,

3  they were consistent with other terminations within the

4  company, and we viewed that as the least risky method for us to

5  terminate Mr. Williams without going into any kind of

6  speculation, any kind of subjective facts, any kind of things

7  that happened outside the workplace that might provoke him to

8  react adversely to the conversation.

9  Q.   Did you have safety concerns?

10  A.   We did, yes.

11  Q.   Can you describe them?

12  A.   His partner, who's published, threatened to kill a child

13  and hired a hitman to kill a child, so we knew that we were

14  dealing with --

15          MR. CARSON:  Objection, Your Honor.

16          THE COURT:  Well, the objection is sustained.  You

17  know -- objection is sustained.

18  BY MR. CAVALIER:

19  Q.   Let me ask you a question.  Did the circumstances of the

20  facts as you saw them in the article that is on your screen

21  right now give you a safety concern with respect to the

22  termination of Mr. Williams?

23  A.   It did, yes.

24  Q.   Okay.  And to the extent you can, without talking about

25  things that you know from the future just what's in your mind

1  at the time, can you describe those safety concerns that you

2  had in that moment to the jury?

3  A.  Sure.  So it was - we knew that Mr. Williams had a bit of

4  a history, not being violent or disruptive by any means, but he

5  did have a little bit of an unpredictable personality when it

6  came to reacting to feedback that he was given.  I would

7  describe his personality as potentially volatile.  And there

8  was just an unknown that existed there when it came to

9  providing feedback.

10      So we were going into this with urgency and we genuinely

11  didn't know how he would react or didn't know what would come

12  of his termination conversation.

13  Q.  All right.  So again, the decision was made to tell him

14  that he was terminated for policy violations.

15      How did you decide who would communicate that message to

16  Mr. Williams?

17  A.  So it was typical with any termination that I would be the

18  primary communicator for a termination as my position with

19  human resources in the company, and then we always had a third

20  person in the room or in the conversation when we did

21  terminations.  And that person was -- 99 percent of the time it

22  was a direct manager, once in a while it was a different

23  designee if the manager wasn't available.  But almost every

24  single time it was myself as human resources who would

25  communicate the termination, along with any applicable reasons

**UNITED STATES DISTRICT COURT**

1   or information, along with the manager to be kind of a witness

2   to the conversation and mostly in a supportive role in that

3   conversation.

4   Q.   So in this instance, who was involved in the termination

5   meeting to Mr. Williams?

6   A.   From Linode it was myself and Dan Spataro.

7   Q.   All right.  And I know, again, as a witness you weren't

8   permitted to be in court for this week, but we heard a

9   recording of that termination meeting in court here last week.

10      At the time that you were in that meeting, did you know

11  that Mr. Williams was recording the meeting?

12  A.   I had no idea, no.

13  Q.   Let me ask you to take a look at Exhibit 92, which was

14  previously admitted.

15      Can you describe to the jury what this document is, if you

16  recognize it?

17  A.   Sure.  Looks like this is a conversation in Slack between

18  myself and Dan Spataro.  I believe this was us coordinating

19  together right before the call actually happened, the

20  termination call.

21  Q.   Was it common practice for you and Mr. Spataro to

22  communicate like this with respect to a termination meeting?

23  A.   Yes.

24  Q.   And what was the reasoning behind that?

25  A.   So at this time, Slack was our primary communication tool

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1   at the company.  So this was common between myself and any

2   manager that we had handled business with as this was our

3   primary method of communication.

4   Q.   Had you ever had a contemporaneous communication with a

5   manager at Linode during a termination meeting like this one?

6   A.   Yes.

7   Q.   Okay.  If I can direct your attention to -- and again, we

8   saw this with you on Friday, so I don't want to go over it in

9   detail, but I want to ask you a few quick questions about it.

10  All right?

11       MR. CAVALIER:  Let me ask you to page down, Tim, if

12  you would, to 876?

13  BY MR. CAVALIER:

14  Q.   Do you see that section there Mr. Palochko?

15  A.   Yes.

16  Q.   All right.  You were asked a bit about this on Friday, up

17  at the top there where you say -- it looks like immediately

18  after the call was over, you say, "Holy shit, man," and then

19  there was a fist bump, either a GIF or an emoji, or something

20  like that.

21       Do you see that there?

22  A.   Yes.

23  Q.   Can you describe to the jury what emotions you were

24  feeling when you put those things in the Slack channel?

25  A.   Sure.  It was a huge sigh of relief that the call had

1  ended at that point, and I felt relieved and I felt glad that

2  Dan and I were able to support each other through the

3  conversation.

4  Q.  How did you feel during the call?

5  A.  It was -- it was scary, it was uncomfortable, it was --

6  quite frankly, it was a bit unexpected.

7  Q.  Unexpected how?

8  A.  Mr. Williams became, you know, I would say pretty angry

9  during the call.  He --

10          MR. CARSON:  Objection.

11          THE COURT:  It's overruled.

12          THE WITNESS:  He immediately started to defend himself

13  and get very argumentative during the call.  He started to

14  question, you know, my own credibility and started to question

15  different company policies and generally, you know, made the

16  call very uncomfortable with his emotions.

17  BY MR. CAVALIER:

18  Q.  Did you have, at the time to have termination meeting --

19  and I can't remember if you mentioned this earlier -- did you

20  have knowledge as to whether Mr. Williams had any litigation

21  history?

22  A.  I did, yes.

23  Q.  Can you describe that to the jury?

24  A.  I'm just --

25          MR. CARSON:  Objection, Your Honor.  Hearsay.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  It's overruled.

2          THE WITNESS:  I'm just generally aware that he did

3    have litigation history --

4          MR. CARSON:  Objection.  Relevance.

5          THE COURT:  It's overruled.

6          THE WITNESS:  -- with a prior employer before his time

7    at Linode.

8    BY MR. CAVALIER:

9    Q.  Did that factor into your decision as to the communication

10   of Mr. Williams that he was terminated for policy violations?

11   A.  It was a consideration, absolutely.

12   Q.  Okay.

13   A.  We were looking for the cleanest way to terminate him with

14   the least amount of risk to the company.  And when I say

15   "risk," litigation is one of the elements of that risk.

16   Q.  Okay.  Did you believe during your meeting with

17   Mr. Williams at which he was terminated that he was either

18   planning or formulating an intention to sue the company?

19   A.  So the meeting was conducted via a video call through our

20   software, I think it was Google Meet at the time.  And, you

21   know, the very first thing that I saw Mr. Williams do on that

22   call was grab a note pad and a pen, so it was my assumption

23   that he was taking copious notes and was preparing to act upon

24   the meeting.

25   Q.  Do you remember Mr. Williams asking you whether he was

**UNITED STATES DISTRICT COURT**

1  being terminated because of what happened with Mr. Musbach the

2  prior week?

3  A.   Yeah.  Multiple times on that call, yes.

4  Q.   Okay.  Did you have any thought as to, at that point in

5  time, as to why he was asking that question?

6       Let me strike that question and ask a better one.  Did you

7  know whether Mr. Williams had seen the article?

8            MR. CARSON:  Objection.  Hearsay.  I mean, objection.

9  Speculation.

10           THE COURT:  The question is whether he knew so if

11  you --

12           THE WITNESS:  I didn't have any knowledge of whether

13  or not he saw the article.

14           MR. CAVALIER:  Okay.  Let me ask you, Tim, if you

15  would, to page down in this document to the August 20th, 2020,

16  entry.  There.  It's Defendant's 877.

17  BY MR. CAVALIER:

18  Q.   So this is the day after Mr. Williams' termination,

19  correct?

20  A.   August 20th.  Yes, that's correct.

21  Q.   And it appears to me that you are reaching out to

22  Mr. Spataro?

23           MR. CARSON:  Objection.  Leading.

24           THE COURT:  Overruled.

25  BY MR. CAVALIER:

**UNITED STATES DISTRICT COURT**

1  Q.   Can you explain to the jury what you're doing here?

2  A.   Sure.  It was just a wellbeing check, as it's a common

3  practice with me.  If I saw someone at the company having a bad

4  time with anything, it would be my instinct to reach out to see

5  how they are doing, to check in on them to make sure they are

6  okay.  And that's exactly this, because it was a very emotional

7  day for myself and Mr. Spataro, so I want to ensure that he was

8  in a good space.

9  Q.   And in fact, he asks you whether you had nightmares.

10       What did you take that to mean?

11  A.   It was a scary experience, I think, for both of us.  It

12  was unexpected and it was very emotional.  It was frightening.

13  Q.   Just before we move off this document, I want to direct

14  your attention to Mr. Spataro's last message in this thread.

15  Do you see that there, it spans 877 to 878?

16  A.   "Having to do negative stuff weighs you down.  It's not

17  good for the soul."  Yes.

18  Q.   What did you take that to mean?

19            MR. CARSON:  Objection.  Speculation.

20            THE COURT:  It's overruled.

21            THE WITNESS:  In my conversations leading up to and

22  after the termination, Mr. Spataro was -- he was devastated.

23  He valued --

24            MR. CARSON:  Objection, Your Honor.

25            THE COURT:  That's sustained.  Whatever you understood

**UNITED STATES DISTRICT COURT**

1   this to mean, you can testify about.  Okay?

2         THE WITNESS:  He was sad that he had to --

3         MR. CARSON:  Objection.

4         THE WITNESS:  -- terminate Mr. Williams.

5         THE COURT:  Objection is overruled.

6   BY MR. CAVALIER:

7   Q.  He was sad that he had to terminate Mr. Williams?

8   A.  Yes.

9   Q.  All right.  We can move on from this document.

10        Let me just ask you flat out.  Did Mr. Williams'

11  termination have anything to do with his age?

12  A.  No.

13  Q.  Did his termination have anything to do with the fact that

14  he was a gay man?

15  A.  No.

16  Q.  Did it have anything to do with the fact that he was an

17  older, gay man?

18  A.  No.

19  Q.  Did your explanation that you provided to Mr. Williams,

20  that he was being terminated for policy violations, was that

21  intended to serve as a cover for some reason for termination

22  related to his age or sex?

23  A.  No, absolutely not.

24  Q.  Okay.  Did he say anything, to your recollection, in the

25  meeting that evinced a belief on his part that he thought his

1  termination was because of his age or sexual orientation?

2  A.  No.

3  Q.  Again, had he ever said anything to raise a concern in

4  that area to you during his employment?

5  A.  No.

6  Q.  Before I let you go, I want to ask you one last question.

7      How do you feel to be testifying here today?

8          MR. CARSON:  Objection, Your Honor.

9          THE COURT:  The objection is overruled.

10         THE WITNESS:  It's a little bit surprising, it's a

11 little bit frustrating.  It's not something I would have

12 expected to be doing, especially with Mr. Williams on the other

13 side of the table there.

14 BY MR. CAVALIER:

15 Q.  Why?

16 A.  He -- you know, to my knowledge, I worked with him for

17 several years, for six years we worked together, he always had

18 a great experience at Linode.

19         MR. CARSON:  Objection, Your Honor.

20         THE COURT:  That objection is sustained.

21         THE WITNESS:  From my observation --

22         MR. CARSON:  Objection, Your Honor.

23         THE COURT:  The objection is sustained, I just

24 sustained it, Mr. Carson.

25         MR. CARSON:  We --

1           THE COURT:  You can testify to what you know.

2           MR. CAVALIER:  I think we're fine on that.

3    BY MR. CAVALIER:

4    Q.  Let me ask you this, do you feel like your reputation is

5    at issue here?

6    A.  I think so, yes.

7    Q.  Can you explain to the jury --

8           MR. CARSON:  Objection, Your Honor.  I think so?

9           THE COURT:  No, it's overruled.

10          THE WITNESS:  So I spent all of my efforts in my

11   10 years at Linode to make it the best place possible for any

12   employee to work.  And part of those efforts were a lot of

13   structure in spaces of diversity, inclusion, and equity to make

14   sure that every employee who came into the door, no matter who

15   they were, what background they were, what they looked like,

16   what they believed, had the same experiences, had the same

17   opportunities, had the same treatment.  And part of that was

18   training leadership, part of that was putting programs in place

19   for employees, part of that was changing how we hire employees

20   to make sure we have a diverse work force.

21          And I put tons of effort into educating myself, into

22   implementing different policies, collecting feedback on those

23   policies and programs to make Linode the absolute best place

24   possible to work for everybody and for everyone to be

25   comfortable and to be happy and successful there.

**UNITED STATES DISTRICT COURT**

1        So for someone to come across and say that wasn't the

2   case, when I've seen the counter, it's, quite frankly, a little

3   bit shocking to me.  It's a little surprising.

4        MR. CAVALIER:  That's all I have, Your Honor.

5        THE COURT:  Okay.  Thank you, Mr. Palochko.

6        THE WITNESS:  Thank you.

7        THE COURT:  Mr. Carson?

8                        REDIRECT EXAMINATION

9   BY MR. CARSON:

10  Q.   Did you say that you had an issue with Carl Williams

11  questioning your credibility during that phone call just now?

12  A.   That was part of it, yes.

13  Q.   Yeah.  So how could you possibly have an issue when

14  someone is questioning your credibility and you're lying to

15  them in real-time, sir?

16  A.   He was referencing a specific policy that was not being

17  followed when, in fact, it was being followed, and that's how I

18  interpreted that.

19  Q.   Sir, you were -- how many lies did you tell him on that

20  call?

21  A.   One lie.

22  Q.   No, sir, you told him many lies.  Didn't you testify to

23  that on Friday?

24  A.   I think the reason for the termination, as we communicated

25  it, was the lie that we're...

**UNITED STATES DISTRICT COURT**

1  Q.  Let's just go through -- so you lied about having an

2  anonymous phone call, right?  You testified to that on Friday?

3  That was one lie, correct?

4         MR. CAVALIER:  Objection.  Asked and answered.

5         THE COURT:  Overruled.

6         THE WITNESS:  That's what I was told.

7  BY MR. CARSON:

8  Q.  Yeah.  So you made up a phone call that never happened and

9  then told Carl Williams about that phone call during that

10 conversation with Carl Williams, right?

11 A.  I was informed about a phone call.  It wasn't anything

12 that I said that I had a phone call with someone.

13 Q.  Sir, you testified on Friday that that phone call was part

14 of this lie that you, Dan Spataro, and Tom Asaro cooked up,

15 correct?

16 A.  Yes.

17 Q.  And you lied about when he asked you does it have to do

18 with this thing about John Musbach, you lied about that, right?

19 A.  Yes.

20 Q.  And you lied about the policy violations, correct?

21 A.  They were legitimate, but that was not the reason for

22 termination.

23 Q.  Right, so you lied about the policy violations, correct?

24 A.  Sure.

25 Q.  So you were telling him multiple -- the entire

1  conversation -- everything that came out of your mouth was a

2  lie, right?

3  A.  It was one big lie, yes.

4  Q.  Right, one big lie.  And he was questioning your

5  credibility, and you sat here in front of this jury in this

6  room today and said you have a problem with that?  Do you still

7  have a problem with that?

8  A.  At the time I did, yes.

9  Q.  Do you anymore -- don't you understand that when you are

10  lying and people are questioning your credibility, they're the

11  ones who are right and you were the one who was wrong?

12       MR. CAVALIER:  Objection.

13  BY MR. CARSON:

14  Q.  Do you understand that, sir?

15       THE COURT:  Objection is overruled.

16       THE WITNESS:  I understand.

17  BY MR. CARSON:

18  Q.  You said that you had a lot of time that you needed to

19  educate yourself, right?  As a human resource director during

20  your employment, right?

21  A.  Yes.

22  Q.  Yeah, you needed to educate.  Isn't that because you had

23  no experience whatsoever when Tom Asaro hand-selected you to

24  run the entire company's human resources department?

25  A.  I had several years of professional experience.  And in

**UNITED STATES DISTRICT COURT**

1  practicing any profession, I think continuing education is

2  pretty normal conduct.

3  Q.   Sir, when he decided that you were going to be the person

4  who was going to start Linode's entire human resources

5  department in 2012, you had never worked in a human resources

6  department, correct?

7  A.   That's accurate.

8  Q.   You had no experience in human resources, correct?

9  A.   That's false.

10  Q.   You went to school for human resources?

11  A.   I went to school for business management.  Part of that is

12  education in human resources.  It wasn't my primary study, but

13  there were several courses in human resources throughout

14  college.

15  Q.   Do you remember the name of one of those courses right

16  now?

17  A.   Not off the top of my head.  That was --

18  Q.   The professor who taught you something about human

19  resources, do you remember their name?

20  A.   No.

21  Q.   Can you tell us something you learned in school about

22  human resources?

23  A.   No.

24  Q.   I'll withdraw that.

25       So according to your testimony, when Carl Williams first

**UNITED STATES DISTRICT COURT**

1  started at this company, there was less than 30 employees

2  there, correct?

3  A.   When Carl Williams started at the company?

4  Q.   Yeah.

5  A.   No, that's inaccurate.

6  Q.   So how many employees were there when Carl Williams

7  started?

8  A.   Off the top of my head, I don't recall, but there was more

9  than 30.

10  Q.   More than 40?

11  A.   I just said I don't recall the number.  If I had to give

12  you a number, it's going to be speculation.

13  Q.   But aren't you the person who's in charge of human

14  resources?  Aren't you the one person who should know that

15  better than anyone?

16  A.   Yes.  And at the time, I did.  But at this point, you

17  know, this is eight years ago, I don't remember the exact head

18  count on the exact date from eight years ago.

19  Q.   How about just an approximate head count on a year?

20  A.   That's speculation.

21  Q.   Let's just figure out -- so how about in like 2016, do you

22  know the approximate head count during the entire year of 2016

23  at Linode?

24  A.   During 2016?

25  Q.   Yeah.

**UNITED STATES DISTRICT COURT**

1  A.  I don't know.

2  Q.  2017, do you know?

3  A.  No.

4  Q.  Do you know for 2018 or '19 or '20?

5  A.  It's going to be speculation if I had to guess.  Larger

6  than 30, but smaller than 200.

7  Q.  And so Tom Asaro, did you tell Tom Asaro that you never

8  worked in a human resources department before he decided that

9  you were going to be the person who was going to start the

10  human resource department for Linode?

11  A.  I applied for the role, I expressed my interest and

12  offered what I can do.  I presented with Mr. Asaro a resume

13  which showed my background and qualifications.  We had, you

14  know --

15  Q.  The question was, did you tell him that you had no

16  experience?

17  A.  Did I tell him I had no experience?  No.

18  Q.  And you had no experience writing an employee handbook,

19  correct?

20  A.  I've never written one prior to Linode.

21  Q.  Have you ever thought about writing one prior to Linode?

22  A.  I never had to, correct.

23  Q.  So we heard you say that there were never any reports of

24  discrimination by Carl Williams or reports about his age or

25  reports about sexual orientation, but, sir, are you telling the

1  truth when you say that or is that another one of these lies?

2  A.  No, I never heard a report of discrimination from

3  Mr. Williams.

4  Q.  He could have reported things to Tom Asaro and Dan Spataro

5  and you don't know about them, correct?

6  A.  They would have come to me.  I would have been aware.

7  Q.  How do you know they would have come to you if they didn't

8  come to you?

9  A.  Because I was in human resources at the company, so if --

10  something like that would have come across me.

11  Q.  So if there was a conversation about age with Tom Asaro or

12  Dan Spataro, they should have come to you, is that your

13  testimony?

14  A.  Yes.

15  Q.  And they should have told you about it because then you

16  could have done something about it, correct?

17  A.  Absolutely, yes.

18  Q.  If they didn't come to you, then they did something wrong,

19  didn't they?

20  A.  Yes.

21  Q.  And you testified on your examination with Mr. Cavalier

22  that Carl Williams brought a significant amount of value to

23  Linode, didn't he?

24  A.  He did, yes.

25  Q.  And he helped grow the company, didn't he?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   And he helped make the company more valuable in terms of

3  dollars and cents, didn't he?

4  A.   Yes.

5  Q.   Sir, you testified about my client's technical abilities,

6  did you?

7  A.   Yes.

8  Q.   Can you just tell us about your background in network

9  engineering?

10  A.   I don't have a background in network engineering.

11  Q.   Well, just tell us about how you learned about it on your

12  own?

13  A.   Sure.  As someone who was responsible for recruiting in

14  the company, I was aware of the basic retirements of the

15  position, very, very basic high-level concept in such so that I

16  would be able to effectivity screen whether an employee would

17  be a good fit for an interview or not a good fit for an

18  interview.

19  Q.   So that's the extent of you technical knowledge, isn't it?

20  A.   Yes.

21  Q.   You know almost nothing about network engineering,

22  correct?

23  A.   It's not my expertise, that's correct.

24  Q.   So then why are you sitting here in this courtroom, sir,

25  testifying about my client's technical abilities in network

1  engineering?  Why would you do that when you have no knowledge

2  about whether those things are true or not?

3  A.   Network engineering, no, but I was responsible for working

4  with leadership in the company, with managing the performance

5  review process.  I had many conversations to coach leadership

6  in the company.  And part of that was conversations about how

7  employees were doing.

8  Q.   So you're just sitting here in front of the jury and

9  you're just saying things that other people told you and you're

10  putting it out there like you have knowledge of those things,

11  right?

12  A.   Yes.

13  Q.   Yeah.  These are just things that other people said to

14  you, right?

15  A.   Yes.

16  Q.   And you don't know whether they are true or not true, do

17  you?

18  A.   I trust the people that I work with.

19  Q.   Right.  And you don't --

20      (Inaudible crosstalk.)

21      THE COURT:  Mr. Carson, you've got to let him finish

22  his answer, sir.

23      THE WITNESS:  Just professionally, I trust the people

24  I work with.  And generally, you know, I don't think that

25  leadership is lying to me when they come to me with issues and

1  how to develop employees or how employees are doing or lying in
2  performance reviews or things of that sort.
3  BY MR. CARSON:
4  Q.   This is a basic question, sir.  Do you have any personal
5  knowledge of whether or not my client has any issues with his
6  technical skills?
7  A.   Personal, no.
8  Q.   Yeah.  He could be the best technically, most proficient
9  network engineer on the planet, and you have no clue whether
10  that's true or not true, right?
11  A.   If I were to judge his work, no, but by hearsay, sure.
12  Q.   Well, you mean you judged his work in network engineering?
13  A.   I just said no.
14  Q.   I'll move on.  You talked about a job posting on the
15  examination with Mr. Cavalier.  When -- I think it was in the
16  context of when my client was first hired.
17       So you said there was something posted.  What does that
18  mean?
19  A.   It means that the job description was publicly available
20  to collect applications for candidates for the position, a job
21  board or some other format.
22  Q.   Yeah.  And so you sent it electronically somewhere and
23  ended up like on the internet; is that right?
24  A.   Yes.
25  Q.   So if we wanted to, we could probably find that job

**UNITED STATES DISTRICT COURT**

1  posting and confirm that it actually was posted through some

2  sort of metadata or something, I'm sure?

3          MR. CAVALIER:  Objection.

4          THE COURT:  Sustained.

5  BY MR. CARSON:

6  Q.  Do you know how it was sent to this job posting?

7  A.  How it was sent?

8  Q.  Like, are you the one who sent it?

9  A.  Typically, we would post jobs through -- we had a software

10 called Applicant Tracking System, and we would post jobs within

11 the software.  And that software would distribute the job

12 postings to the career site Linode.com/careers.  But it would

13 also send out the job posting to other free job searches, such

14 as Indeed.com.

15 Q.  For the record, I believe you.  I think this job was

16 posted.  And so what I'm saying is you're certain this job was

17 actually posted on a website electronically somewhere; is that

18 right?

19 A.  Yes.

20 Q.  Okay.  Because that's how Carl -- that was what Carl

21 responded to when he sent in his application, right?

22 A.  Yes.

23 Q.  So you testified that there was never any time ever when

24 Carl Williams reported anything to do with discrimination,

25 right?

**UNITED STATES DISTRICT COURT**

1   A.   That I'm aware of.  That's correct.

2   Q.   But if someone does report discrimination, isn't it true

3   that it's your position and it's your job to do the

4   investigation?

5   A.   Yes.

6   Q.   And you have to investigate every single time someone

7   reports anything to do with discrimination, correct?

8   A.   That's correct.

9   Q.   And you can't pick and choose the ones you respond to.

10  You have to do them all, right?

11  A.   That's correct.

12  Q.   And even if the person doesn't work at the company

13  anymore, for example, and reported discrimination, that's still

14  something you need to investigate, right?

15  A.   Yes.

16  Q.   Because you got to make sure that there's not

17  discrimination in the workplace, right?

18  A.   Right.

19  Q.   And you've never in your career, one time, engaged in any

20  investigation during your employment with Linode, correct?

21  A.   That's not correct.  As far as discrimination, you're --

22  Q.   Yes.

23  A.   No, I have not.

24  Q.   As far as reports of discriminatory issues in the

25  workplace goes, you've never had to investigate anything,

1  right?

2  A.  Correct.

3  Q.  But isn't it true that it was reported to you that there

4  was an abusive and toxic work environment at Linode?

5  A.  No.

6  Q.  Do you know who Tara Taylor is?

7  A.  Yes.

8  Q.  She never said that?

9  A.  They never came up to me with a formal complaint, no.

10 Q.  Well, does it have to be a formal complaint?  What does

11 that mean?

12 A.  If someone comes to me with a complaint about something

13 that happened to them.

14 Q.  What do you mean "formal complaint"?  So you pick and

15 choose what complaints you respond to?  Oh, that's the formal

16 one.  This one I don't have to respond to?

17 A.  No.  I never received a complaint of discrimination from

18 this person.

19 Q.  So is there any magic words or magic way that people have

20 to complain in order for you to respond to them?

21 A.  No.

22 Q.  You are supposed to respond to every single time that you

23 hear anything that suggests that there might be discrimination

24 in the workplace, correct?

25 A.  Correct.

1   Q.   And that doesn't matter, the medium how you receive that

2   information.  You respond to it because it's your job to root

3   that stuff out and get rid of it?

4   A.   That's correct.

5   Q.   Didn't Tara Taylor write a public article --

6        MR. CAVALIER:  Objection.

7        THE COURT:  Objection sustained.

8   BY MR. CARSON:

9   Q.   Didn't you know that Tara Taylor said that there was abuse

10  and toxicity in the workplace?

11       MR. CAVALIER:  Objection.

12       THE COURT:  Objection is overruled.  If she complained

13  to you about it, go ahead.  You can answer.

14       THE WITNESS:  There was an opinionated blog post

15  following her employment, yes.

16  BY MR. CARSON:

17  Q.   Unhealthy cultural conditions?

18       MR. CAVALIER:  Objection.

19       THE COURT:  Objection is overruled.

20  BY MR. CARSON:

21  Q.   Do you know about that?

22  A.   I'm aware of it, yes.

23  Q.   Toxic work environment, that's what Tara Taylor said?

24  A.   Yes.  I'm aware of that blog post.

25  Q.   Did you respond to any of those reports?

1  A.   No.   Tara Taylor was already -- had departed the company

2  at the time that that blog post was published.

3  Q.   I thought you just said it didn't matter if they worked

4  for the company still?

5  A.   You just asked if I responded to it.  I thought you meant

6  to Tara Taylor.

7  Q.   Did you investigate any of that stuff?

8  A.   I spoke with various leadership about the article.  I

9  reviewed notes regarding their employment at the company.  So I

10  would consider that an investigation, yes.

11  Q.   So now you did investigate discrimination.  Are you

12  changing your testimony?

13  A.   I'm not changing testimony.

14  Q.   Well, are you saying now, sir, that you did investigate

15  reports of discrimination?

16  A.   It wasn't a discrimination complaint.

17  Q.   When someone says that there's a white guy problem at

18  Linode, that's not indicative of a discriminatory complaint?

19  A.   In this case?  No.

20  Q.   So you look at what the people are saying, who are

21  reporting stuff, and you pick and choose whether or not you

22  think it's discrimination.  And then you only respond to those

23  things that you think are discrimination.  Isn't that your

24  practice, sir?

25  A.   No.

**UNITED STATES DISTRICT COURT**

1  Q.  So we don't know whether Carl actually reported

2  discrimination.  He might have done it 50 times and you just

3  didn't think what he said was enough to raise the level of

4  deserving of your time to investigate, correct?

5  A.  I never got a complaint of discrimination from

6  Mr. Williams.

7  Q.  A formal complaint?

8  A.  I said I never received a complaint from Mr. Williams

9  about discrimination.

10  Q.  Rich Ford, you testified about him.  For the record, he's

11  the person who handles all Linode's finances, correct?

12  A.  Yes.

13  Q.  Money coming in, money going out?

14  A.  Yes.

15  Q.  So he would basically be Linode's accountant?

16  A.  VP of finance is the title.

17  Q.  But he did accounting for Linode?

18  A.  At one point in time, yes.

19  Q.  So you testified about these policy violations that you

20  are saying are legitimate but had nothing to do with the

21  termination.

22      But I'm going to ask you about your testimony where you're

23  talking about leniency.  And I think the word, sir, you used

24  when Mr. Cavalier was asking you questions were "leniency" and

25  "freedom" and "leeway."  Do you remember using those words?

1   A.   Yes.

2   Q.   Those are the things that Carl Williams received in

3   connection with those things on that list, right?  All those

4   supposed policy violations, right?

5   A.   Yes.

6   Q.   Sir, if you give an employee leeway and you give them

7   freedom and you give them leniency -- for years, right?  For

8   years you did that, right?

9   A.   Yes.

10  Q.   And if you do that for years, can you then turn around and

11  say when you want to fire the guy that those things are

12  legitimate policy violations?  You allowed them to happen, sir,

13  right?

14  A.   Yes, correct.

15  Q.   So how can you possibly sit there and say that those

16  things were things that he did wrong when you're sitting here,

17  on the other hand, saying you allowed them to happen?

18  A.   Unfortunately, it was the best defense that we had at that

19  point in time.

20  Q.   Well, wasn't it the best defense you had until you changed

21  your story to the one you are telling the jury here, right?

22  That's a better defense, isn't it?

23  A.   It was the legitimate reason, yes.

24  Q.   When you realized, sir, that that list of policy

25  violations wasn't going to get you through this case, that's

**UNITED STATES DISTRICT COURT**

1   when your story changed; isn't that true, sir?

2   A.   No.

3   Q.   Well, it did change after the case was filed, right?  You

4   changed your story after this lawsuit was filed correct?

5   A.   I don't know the date that this lawsuit was filed.

6   Q.   We saw the interrogatories that you signed, right?  And

7   you verified under penalty of perjury, right?

8   A.   Yes.

9   Q.   And those have the same lies that you told Carl back then,

10  right?

11  A.   Sure.  Yes.

12  Q.   So your story changed after this lawsuit was filed,

13  correct?

14  A.   Correct.

15  Q.   And your story changed after you retained counsel,

16  correct?

17  A.   Again, I don't know the exact dates.  I don't have the

18  timeline of when this story changed, but yes --

19  Q.   When was counsel retained?  Do you know that?

20  A.   I don't know.

21  Q.   Was it while the charge was still going on in the EEOC?

22  A.   I don't know.

23  Q.   You don't know that?  You don't know when you retained

24  counsel in this case sir?

25  A.   Are you asking for a specific date?

**UNITED STATES DISTRICT COURT**

1    Q.   Yeah.  I'm asking for the year, even?

2         MR. CAVALIER:  Objection.  He's not a party.  He's a

3    witness.

4         THE COURT:  The question is whether he knows when

5    Linode retained --

6         MR. CAVALIER:  That wasn't the question.

7         THE COURT:  I think that's how "you" is being used.

8    BY MR. CARSON:

9    Q.   You as the representative of Linode?

10   A.   No --

11        THE COURT:  Wait.  Wait.  Wait.  He's not the

12   representative of Linode.  He's not testifying as a corporate

13   representative.  Okay?

14        The question is whether he individually knows when

15   Linode hired counsel.  That's what he can testify to.

16        THE WITNESS:  I don't know.

17   BY MR. CARSON:

18   Q.   But you do know that Linode was represented during the

19   process at the EEOC when this charge was filed, right?

20   A.   You said during?  I don't know the time frame here.

21   Q.   But you know what the charge of discrimination is, sir.

22   It's part of your job to know those things, right?

23   A.   Yes.

24   Q.   And so you know that my client did start this entire

25   process at an administrative level by filing a charge of

**UNITED STATES DISTRICT COURT**

1  discrimination at the EEOC, right?

2  A.   Yes, I'm aware of that.

3  Q.   And you do know that Linode was represented during that

4  process, right?

5  A.   Like I said, I don't know the time frame, but, yes, it's a

6  safe assumption.

7  Q.   Yeah.  And it's also a safe assumption that the document

8  that's signed by attorneys, that you verified under penalty of

9  perjury, that Linode was represented when that document came

10  out, correct?

11  A.   Yes.

12  Q.   So you already had counsel when you changed the story to

13  something completely different that no one ever heard before

14  for two and a half years, right?

15        MR. CARSON:  Same objection.

16        THE COURT:  Overruled.

17        THE WITNESS:  Yes.

18  BY MR. CARSON:

19  Q.   Right.  And so isn't it true, sir, that the reason why is

20  because you realized that you were going to claim that someone

21  was terminated subject to progressive disciplinary policy and

22  they had not one time been subjected to progressive discipline;

23  isn't that true, sir?

24  A.   Didn't have anything to do with progressive discipline,

25  no.

**UNITED STATES DISTRICT COURT**

1  Q.  Right.  So you can't win a case in court if you're going

2  to claim someone was terminated for progressive discipline and

3  they were never subjected to progressive discipline, correct?

4  A.  No.

5  Q.  So you can't win the case with the old story, which is why

6  you had to change it to this story that we're hearing in court

7  now; isn't that true, sir?

8  A.  No.

9  Q.  And you're telling the truth now?

10 A.  Yes.

11 Q.  You don't even remember the year that Dan Spataro started?

12 A.  No, I don't remember the exact year.

13 Q.  It was February of 2016, wasn't it?

14 A.  I just said I don't remember the exact year.

15 Q.  Is there someone at Linode who's supposed to remember

16 those types of things better than you?

17        MR. CAVALIER:  Objection.

18        THE WITNESS:  That's supposed to remember them better

19 than me?

20 BY MR. CARSON:

21 Q.  Yeah.  That is supposed to know about when people came,

22 when people left, especially high-level management?  You are

23 the people person there.  You run the human resources

24 department, right?

25 A.  If I was able to reference documentation, sure, I have all

**UNITED STATES DISTRICT COURT**

1  those records.  It's not my practice nor is it my expectation

2  to remember hire dates of every employee at the company.

3  Q.   How about -- I'll withdraw.  Let's talk about termination

4  for a minute, then I'll wrap it up.

5      You testified that you were -- disgusted is, I think, the

6  word you used, right?

7  A.   Yes.

8  Q.   My client has never broken the law, correct?  You don't

9  have any knowledge whether he's ever done anything wrong,

10  correct?

11  A.   That's too vague for me to answer.

12  Q.   Well, do you have any knowledge -- can you tell us about a

13  crime that my client has committed?

14  A.   No, I cannot.

15  Q.   Can you tell us about one thing that my client ever did

16  wrong?  A speeding ticket?  Anything?

17  A.   Me personally, no.

18  Q.   Yes.  Do you have any knowledge of that?

19  A.   No.

20  Q.   And we saw that article, right?  There's nothing in that

21  article, sir, that suggested that my client was supporting him,

22  is there?

23  A.   He was testifying on another party's behalf.

24  Q.   It doesn't say that in the article, sir, does it?

25  A.   I think it's -- I don't remember the exact wording.

1  Q.  Let's just be fair.  There's nothing else that you saw,

2  nothing else that you knew.  The only thing you had access to

3  at the time of the termination was that article, correct?

4  A.  Correct.

5  Q.  So the entire basis for the termination, if what you're

6  saying is true this time, then, is that article, right?

7  A.  Correct.

8  Q.  And so I guess we'll just show it to you quickly.

9       MR. CARSON:  Can we please put the article up.  I

10  believe it's Exhibit 24.  Just need to show it to the witness.

11  I guess it's published already.  So just scroll down to the

12  bottom.  I'll just pull it up myself.

13  BY MR. CARSON:

14  Q.  Can you see it?

15  A.  Yes.

16  Q.  So there's nothing in this article about my client until

17  the very last couple of sentences, right?

18  A.  I believe it's just the one line, yes.

19  Q.  Right.  Okay.

20       MR. CARSON:  And can we scroll down so we can see that

21  line, please?

22  BY MR. CARSON:

23  Q.  Do you see the line?

24       MR. CARSON:  Right there.  You have it.

25  BY MR. CARSON:

**UNITED STATES DISTRICT COURT**

1  Q.   This is the line right here, sir, "'It's very serious,'
2  Mr. Williams said.  'There are no other times that I've heard
3  anything like this behavior that I've heard in court today.'"
4      Right?
5  A.   Right.
6  Q.   Can you show me here where it says he testified on
7  Mr. Musbach's behalf?
8  A.   I think it's the paragraph before that where it says he
9  was testifying there.  I think it's implied.
10 Q.   It says he testified, right?
11 A.   Yes.
12 Q.   Doesn't say who he testified for, right?
13 A.   No.
14 Q.   For all you knew, he could have been testifying to get
15 this guy in jail that day, right?
16 A.   He could have.
17 Q.   You didn't know, right?
18 A.   I knew what was in the article.
19 Q.   You didn't know whether he was there to testify to keep
20 him in jail or whether he was there to testify to promise the
21 judge that he was going to send him back to jail if he ever did
22 something wrong or if he's there to testify that he thought
23 that pedophilia was the greatest thing in the world?  You
24 didn't know, right?
25 A.   Again, it was pretty --

**UNITED STATES DISTRICT COURT**

1  Q.  Sir, you didn't know, right?

2  A.  Right.

3  Q.  And you didn't even bother to try to find out, correct?

4  A.  Right.

5  Q.  You never once even went to my client and say, hey, we saw

6  this article.  Are these things true?  Is this even a real --

7  is this a scam article or is this a real article?  You didn't

8  do that, right?

9  A.  That's correct.

10  Q.  You didn't think that you had to ask him a single

11  question, did you?

12  A.  That's correct.

13  Q.  Because you didn't care, did you?

14  A.  I wouldn't say I didn't care.

15  Q.  You didn't care whether the article was true or not.  All

16  you cared about was getting him out of the company; isn't that

17  correct?

18  A.  The second part is true, yes.  We cared about getting him

19  out of the company.  I wouldn't say we didn't care.

20  Q.  Didn't you just tell the jury that you were contemplating

21  a legal issue?

22  A.  Excuse me?

23  Q.  You told this jury in court twice now, on Friday and

24  today, that when you terminated my client you were

25  contemplating a lawsuit, right?

**UNITED STATES DISTRICT COURT**

1  A.  That was part of the -- yes.

2  Q.  Sir, when you are contemplating a lawsuit, if that's true,

3  and you're contemplating a lawsuit, isn't that the time to dot

4  your Is and cross your Ts and make sure that you're solid?

5  A.  Yes.

6  Q.  And you didn't even do that, either?

7  A.  Correct.

8  Q.  You didn't write down one place, hey, we're going to tell

9  him this story but this is the true story, right?

10  A.  Right.

11  Q.  And you didn't go up to him and say, hey, Carl, we saw the

12  article.  Is any of this stuff true?

13  A.  Right.

14  Q.  You didn't ask anyone else if it was true.  You did

15  nothing, right?  Nothing.  You just -- you sat down with Dan

16  Spataro, you sat down with Tom Asaro, you cooked up a lie, you

17  told it to him, and you got him out of there.  That's what you

18  did, right?

19  A.  Yes.

20        MR. CARSON:  No more questions.

21        MR. CAVALIER:  I guess it's redirect.

22        THE COURT:  Whatever you call it, you do.

23                    RECROSS-EXAMINATION

24  BY MR. CAVALIER:

25  Q.  Mr. Palochko, did you have reason to believe in 2020, at

**UNITED STATES DISTRICT COURT**

1  the time that Mr. Williams' termination was being contemplated,

2  that he had a relationship with Mr. Musbach?

3          MR. CARSON:  Objection.

4          THE COURT:  Overruled.

5          THE WITNESS:  I did have reason to believe based on

6  human resources' records, which were available to me but not

7  public to the company.  I was aware that Mr. Musbach and

8  Mr. Williams shared a common address for several years prior to

9  termination.

10 Q.  Did they also share common finances?

11         MR. CARSON:  Objection, Your Honor.

12         THE COURT:  If you know.

13         THE WITNESS:  I know on at least one occurrence, yes.

14 BY MR. CAVALIER:

15 Q.  Tell the jury.

16         MR. CARSON:  Objection, Your Honor.

17         THE COURT:  Approach.

18         (Sidebar as follows:)

19         THE COURT:  If this question is designed to elicit

20 anything about him giving financial support to Mr. Musbach in

21 connection with the criminal activity, I think I've already

22 said we're not going there.

23         MR. CAVALIER:  Let me say that I think this door was

24 just blown wide open on that cross where he was thundering away

25 about his beliefs at the time.  He didn't know whether he was

**UNITED STATES DISTRICT COURT**

1  being -- he was testifying in support or against.  He didn't

2  know if he was saying the guy should go to jail.

3          MR. CARSON:  He talks too loud.

4          MR. CAVALIER:  I think he's entitled to explain why he

5  didn't need any additional information beyond what was in the

6  article to formulate the belief that Williams was testifying in

7  support.

8          MR. CARSON:  So if he does this, you got to let me

9  recross because he testified in his deposition that the first

10 time he saw those checks was at the deposition, that the first

11 time he realized they were living together was at the

12 deposition.

13         MR. CAVALIER:  I'm not going bring up the checks.

14         MR. CARSON:  He didn't see the checks.  He didn't see

15 them.  At his deposition, he said the first time he ever saw

16 them was at his deposition.

17         THE COURT:  When you are asking the question about

18 common finances, what is it you are expecting he's going to

19 say?

20         MR. CAVALIER:  I want him to be able to say to the

21 jury that he knew that they were in a relationship --

22         THE COURT:  He just said that.

23         MR. CAVALIER:  And that he had a basis for his belief

24 at the time that Mr. Carson just crushed him on.

25         THE COURT:  Hold on, Mr. Cavalier.  You just asked and

**UNITED STATES DISTRICT COURT**

1    he responded that he had a basis to think they were in a

2    relationship, and he had a basis to know that they were sharing

3    an address.  Okay?  What is it that you think he's going to say

4    about the common finances that he knew at the time of the

5    termination?  What is it he's going to say?

6            MR. CAVALIER:  To be perfectly honest with you, I

7    don't know what he's going to say.

8            THE COURT:  My concern is that you are going to blur

9    the lines in this temporal distinction that we've drawn, right?

10   So there's a distinction between what he knew at the time and

11   what he knows now, and I think that would be pretty prejudicial

12   if we go there.  Okay?

13           So I want to be very cautious that the questions

14   you're asking him are questions that you know are intended to

15   elicit information about what he knew at the time of the

16   termination.  If he knew something at the time of termination,

17   then that's fine.  If you want me to go clarify that with him,

18   I can.

19           MR. CAVALIER:  I'd like you to clarify because I

20   believe he did know at the time of the termination.

21           MR. CARSON:  He --

22           THE COURT:  I don't care what he testified to at

23   deposition because you can recross him about that and impeach

24   him.

25           MR. CARSON:  Thank you.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  That's fine.  But if he's going to say he

2     actually knew something, I'm not going to say you can't say

3     that.

4          MR. CARSON:  I just want an opportunity to --

5          THE COURT:  I will.  You're going to get one last

6     chance given the nature of what we're doing here.  Normally, I

7     end with recross and effectively direct.  Do a cross, a

8     redirect, you're going to get one more shot.

9          MR. CARSON:  Thank you, Your Honor.

10         THE COURT:  Okay?  All right.

11         (Sidebar concluded)

12         THE COURT:  So let me just clarify for you, sir.  The

13    questions that Mr. Cavalier is asking now, your answer should

14    be about what you knew at the time that you terminated

15    Mr. Williams, right?

16         THE WITNESS:  Uh-huh.

17         THE COURT:  If you've learned stuff since then about

18    this case or anything else, that's not what you should be

19    talking about.  Okay?

20         THE WITNESS:  Okay.

21         THE COURT:  Go ahead, Mr. Cavalier.

22    BY MR. CAVALIER:

23    Q.  So with that clarification from the judge, did you have

24    reason to believe that Mr. Williams and Mr. Musbach were

25    intermingling finances at the time that Mr. Williams was

**UNITED STATES DISTRICT COURT**

1  terminated?  Did you have that knowledge?

2  A.   Yes.  As I said before, at least in one occurrence, it was

3  relatively common for Mr. Williams to have an outstanding 401K

4  loan, which is common practice in the company.  A lot of

5  employees took advantage of 401K loans.

6        In my observations at the time of his employment, it

7  was -- a few times, Mr. Williams would pay off the balance of

8  one of his 401K loans and then take out a larger 401K loan once

9  he had his balance paid off.

10       In at least one occurrence, I was the recipient of the

11  payments for these 401K loans.  In my position, I administered

12  the retirement plans.  I did receive a payment.  It was a money

13  order that was purchased by Mr. Musbach to pay off the 401K

14  loan that was taken out by Mr. Williams.

15  Q.   When you saw this article in 2020, did you have any reason

16  whatsoever to think that -- Mr. Carson was up here thundering

17  away at you about what you didn't know.

18       Did you have any reason to believe that this was anything

19  other than what it appeared to be on its face to you, which was

20  that Mr. Williams was testifying in support of someone and

21  acknowledging his prior awareness of his paramour's child

22  pornography issues?

23  A.   With the information that I had, I think it was a

24  reasonable assumption --

25            MR. CARSON:  Objection, Your Honor.

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1          THE COURT:  It's overruled.

2   BY MR. CAVALIER:

3   Q.  You can answer.

4   A.  With the information that I had, I think it was a

5   reasonable assumption, yes.

6          MR. CAVALIER:  Nothing further.

7                    REDIRECT EXAMINATION

8   BY MR. CARSON:

9   Q.  Sir, those checks that you just testified, what year were

10  they from?

11  A.  What year were they from?

12  Q.  Yes.

13  A.  It was during Mr. Williams' employment.

14  Q.  What year were they from, sir?

15  A.  I don't remember the exact date.

16  Q.  It was 2019, wasn't it?

17  A.  I don't remember the exact date.

18  Q.  So it's your testimony that because you saw a 401K check

19  that may or may not have had John Musbach's name on it, that

20  that meant that when you read that article, he was testifying

21  for him?  That's what you're saying to this jury?

22  A.  I think it had to do with the assumption that there was a

23  relationship.  It had nothing to do with whether he was

24  testifying for or against.

25  Q.  Sir, didn't you say that you didn't know that they were in

**UNITED STATES DISTRICT COURT**

1  a relationship until that?

2  A.   I just said to Mr. Cavalier, I think it was a safe

3  assumption.  I didn't have any objective information that would

4  indicate one way or another, but I think with the information

5  that I had, it would have been a safe assumption.

6  Q.   Sir, isn't it true that in 2016, 2017, 2018, that you knew

7  that Carl Williams was in a relationship with John Musbach?

8  A.   I did not know.  I knew they had the same address because

9  of HR records.  I didn't know anything about relationship

10  status.

11  Q.   You didn't know that they had the same address then,

12  right?  Correct?

13  A.   I think -- I managed HR records and I believe they did

14  have the same address at that point.

15  Q.   Sir, did you know then whether they had the same address

16  or are you just saying that here now as another lie?

17  A.   Excuse me?

18  Q.   Are you just saying that now to try to --

19       (Inaudible crosstalk.)

20       THE COURT:  You can't talk at the same time.

21       MR. CARSON:  I would like to finish my question.

22  Thank you.

23  BY MR. CARSON:

24  Q.   So the question here -- I want to try to make this very

25  clear -- is that I just showed in this case a few minutes ago,

**UNITED STATES DISTRICT COURT**

1 correct, that you did not even know whether Carl Williams was

2 testifying in that case against John Musbach to keep him in

3 jail or for him, correct?  You didn't know?

4 A.  Right.

5 Q.  And so to try to suggest that you had some sort of

6 indication, you went and talked about these checks, right?

7 That's what you did, correct?

8 A.  Right.

9 Q.  And so in order for that to be a valid story, you would

10 have had to have known that then, correct?

11 A.  Known what then?

12 Q.  About the checks then, sir.

13 A.  I did know about the checks then, yes.

14 Q.  Right.  Let me finish.  If you didn't know about the

15 checks then, then what you just said in this courtroom to try

16 to account for your lack of knowledge is another invalid, false

17 story, correct?

18 A.  If I didn't know about the checks?

19 Q.  Yeah.

20 A.  I'm not sure I understand your question here.

21 Q.  If you didn't know then, if -- obviously we all saw the

22 evidence now, you've been working on it for three years since

23 then, right?  So we all know what the evidence is today.  But

24 back then on real-time, you didn't know about those checks,

25 correct?

**UNITED STATES DISTRICT COURT**

1  A.   I did know about the checks.

2  Q.   Okay.  And did you know whether they were living together

3  at that time?

4  A.   They had the same address in HR information systems.

5  Q.   Right.  And are you testifying here in court today that

6  you knew that then that they had the same address?

7  A.   Yes.

8  Q.   Do you recall at your deposition that I took on June, I

9  believe it was 23rd -- I'm going to try not to do anything on

10 Friday, okay, if you will please bear with me -- June 26, 2023.

11 You recall that, correct?

12 A.   Yes.

13 Q.   And at that deposition, I asked you questions, right?

14 A.   Yes.

15 Q.   And you responded to those questions, correct?

16 A.   Yes.

17 Q.   And you responded under oath, correct?  You swore to tell

18 the truth?

19 A.   Yes.

20 Q.   And that's the same exact oath that you took before you

21 got on that stand in this case in this trial, correct?

22 A.   Yes.

23 Q.   To tell the truth?

24 A.   That's correct.

25 Q.   And those events that you testified about at the

1  deposition, those events, we were much closer in time to when

2  these events happened when you testified at that deposition

3  right, than we are now?

4  A.  Yes, we were closer.

5  Q.  Yeah.  All right.  So at that deposition --

6          MR. CAVALIER:  Does the witness have a copy of this

7  deposition?

8          MR. CARSON:  I can give him a copy.

9          THE COURT:  Yeah, please give him a copy.

10  BY MR. CARSON:

11  Q.  So this is the deposition --

12          THE COURT:  Give him a copy and then go back to the

13  podium and ask him the question.

14          MR. CARSON:  Page 94.

15  BY MR. CARSON:

16  Q.  Just let me know when you are ready.

17  A.  I have it.  I'm just not sure what I'm supposed to be

18  looking for but...

19  Q.  Can you just please turn to page 94.

20  A.  Sure.

21  Q.  Okay.  So I'm going to read.  I'm going to start at

22  line 21.  So this is the questions and answers.

23      "QUESTION:  And at that time, John Musbach and Carl

24  Williams were roommates, right?

25      "ANSWER:  I don't know.

**UNITED STATES DISTRICT COURT**

1    "QUESTION:  Well, you did know that Carl Williams and John

2    Musbach were roommates, right?

3        "ANSWER:  I don't know.

4        "QUESTION:  Doesn't that mean that you knew that Carl

5    Williams and John Musbach were roommates in 2016, in 2017, in

6    2018, and 2019, isn't that what that means?

7        "ANSWER:  I said I didn't know that they were roommates at

8    that time.

9        "QUESTION:  Did you have Carl --

10        "ANSWER:  If they were roommates at that time.

11        "QUESTION:  Did you have Carl Williams' address on file?

12        "ANSWER:  Yes.

13        "QUESTION:  Did you have John Musbach's address on file?

14        "ANSWER:  Yes.

15        "QUESTION:  So if it was the same address, then you had

16    records that demonstrated that they were roommates, correct?

17        "ANSWER:  I can't confirm that.  If I look back at it,

18    possibly, but I didn't -- I never compared employees' records

19    with one another.

20        "QUESTION:  Where would you like to look back to confirm?

21        "ANSWER:  Excuse me?"

22        Sir, that's what you testified to at your deposition,

23    correct?

24    A.    That's correct.

25    Q.    So isn't it true that the idea that they had the same

**U**NITED  **S**TATES  **D**ISTRICT  **C**OURT

1  address and that you looked at employee record, that was my

2  idea, sir, that I suggested to you at your deposition?

3  A.  What's the question?

4  Q.  Sir, I'm the one who suggested to you that you should know

5  they lived together because they had the same address and you

6  had their employee records.  That was me who suggested that to

7  you and you denied it at your deposition, right?

8  A.  I didn't deny that they lived together, no.

9  Q.  Sir, did you hear what I just heard?

10 A.  I think in context you're -- you know, if we read a couple

11 lines up, we were talking about the time that Mr. Musbach's

12 company laptop was confiscated.  At that time, I didn't -- I

13 still don't know.  I didn't know where he resided.

14 Q.  Sir, you said that you didn't check the employee records

15 to see whether they had the same address.  You said, I didn't

16 compare the record.  That's what you said, right?

17 A.  Yes.

18 Q.  So are you lying now or were you lying then?  Can you just

19 tell us which lie --

20 A.  They did share a common address.  I said I didn't know

21 during that deposition.

22 Q.  Right.  And so -- and didn't you just testify that in

23 order for that to be a valid argument that you're trying to

24 make in this courtroom today, that you would have had to know

25 then?

**UNITED STATES DISTRICT COURT**

1  A.   No.

2  Q.   And you didn't know then, correct?

3  A.   Correct.

4  Q.   Right.  And do I need to do the same thing for the checks?

5  Will you admit that you didn't know about the checks either

6  then?

7  A.   I did know about the check.

8  Q.   Then, you knew about the checks then?

9  A.   Yes.

10  Q.   Okay.  All right.  Can you please turn to page 107 of the

11  same deposition.  When you are there, let me know and I'll ask

12  the question.

13  A.   I'm here.

14  Q.   Okay.  I'm not there yet.

15       So I'll do the same thing.  I'll just start on 106 to kind

16  of give you a tiny bit of a context.  Actually, no, I'll start

17  on line 1 of 107.  Sorry.

18       "This one of 235 says that the remitter is John Musbach."

19  Do you see that?  Do you agree we're talking about the checks

20  there, right?

21  A.   Yes.

22  Q.   "I see that, yes."  That's your answer.

23       "ANSWER:  I see that, yes.

24       "QUESTION:  And this is dated in 2000 -- January 2019,

25  correct?

**UNITED STATES DISTRICT COURT**

1      "ANSWER:  Correct.

2      "So this is another document that you had in your file

3   that would have indicated that my client was in a relationship

4   with John Musbach; is that correct?

5      "ANSWER:  I can't make that inference from this.

6      "QUESTION:  Why not?

7      "ANSWER:  Anyone can write a check on behalf of anyone

8   else or purchase a money order on behalf of anyone else.  I

9   can't make an inference about a specific relationship based on

10  what looks to be a cashier's check.

11     "QUESTION:  But you were aware of John Musbach's legal

12  troubles in 2019?

13     "ANSWER:  Yes:

14     "QUESTION:  So how -- what was your understanding of how

15  Linode found out about Carl being in a relationship with John

16  Musbach before his termination?

17     "ANSWER:  It was through the newspaper."

18     So, sir, isn't it true that the inference that you just

19  suggested the jury should maybe, that you had knowledge about

20  whether he was testifying for or against, that you denied you

21  could make that inference in your testimony?

22  A.   I said it was an assumption.

23  Q.   Right.  But you said to me under oath that you couldn't

24  draw any inferences from seeing a check, correct?

25  A.   Correct.

**UNITED STATES DISTRICT COURT**

1  Q.   And you didn't say I've seen these before, I saw these
2  back then, right?
3  A.   What was that?
4  Q.   You didn't say to me, I've seen these checks before, I saw
5  these back then, yeah, I know about these.
6       You didn't say that, did you?  Take your time.
7  A.   You showed them to me on the screen.  I don't think I had
8  to say that I knew about them at the time.
9  Q.   Uh-huh.  I would direct your attention to -- I'm just
10 going to keep reading at the bottom to have 107.
11      So the answer:  "It was through the newspaper article.  It
12 mentioned that Carl was testifying for John Musbach up in New
13 York."
14      So again, the article does not say that, correct?  Doesn't
15 say he was testifying for anyone, correct?
16 A.   Right.
17 Q.   "I think prior to then there was no knowledge that the
18 article specifically mentioned that Carl's partner, John
19 Musbach, and prior to that I had no indication that there was
20 any kind of a relationship more than a co-living situation of
21 anything.
22      "QUESTION:  And how did you find out about that?  And by
23 you, I mean you and Linode, if you want to differentiate.
24 Like, how did you find out that the newspaper article existed?
25      "ANSWER" -- I'll stop there.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Well, no, if you state the question, read
2    the answer.
3          MR. CARSON:  Well, it's something he said about a
4    lawyer.  I'm sorry.
5    BY MR. CARSON:
6    Q.  "ANSWER:  It was sent to me, I believe it was Peter Fu,
7    who pointed out to me.  Someone raised it to him.  I don't know
8    who that was."
9          So back then, you said that you knew who sent it to you,
10   right?
11   A.  I didn't know the originating party, I knew who sent it to
12   me.
13   Q.  Right.  Well, in court today you said you didn't remember
14   who sent it to you, right?
15   A.  If that was misinterpreted, I apologize.  I know who sent
16   it to me.  I don't know who sent it originally.
17   Q.  Sir, do you want to apologize for everything, all the
18   lies?
19          MR. CAVALIER:  Objection.
20          THE COURT:  Sustained.
21          MR. CARSON:  No more questions.
22          THE COURT:  All right.  You can step down,
23   Mr. Palochko.
24          (Witness excused.)
25          THE COURT:  All right.  Well, so it's noon, we've gone

**UNITED STATES DISTRICT COURT**

1  for about an hour and a half.  We'll use that as an opportunity

2  for a lunch break rather than start a new witness now.  Let's

3  plan to take an hour, come back around 1:00 and get started.

4  Okay?

5          And again, not a chance to start talking about what

6  you've heard.  There's more testimony to come.  Just clear your

7  heads and go to lunch, okay?  Thanks, everybody.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits the courtroom at 12:00 p.m.)

10          THE COURT:  Okay.  You can all be seated.  I just want

11  to -- two things.  I want to, one, just game out where we stand

12  now.  So we have to -- is Mr. Spataro next?

13          MR. CAVALIER:  Mr. Asaro.

14          THE COURT:  Sorry?

15          MR. CAVALIER:  Mr. Asaro is next.

16          THE COURT:  Okay.  And then Mr. Spataro is after him?

17          MR. CARSON:  Yes, Your Honor.

18          THE COURT:  Okay.  I assume we're not going to get

19  through both of them this afternoon; is that right?

20          MR. CAVALIER:  I defer.

21          MR. CARSON:  I mean, we're definitely going fast

22  because of the clock.  I think it might be possible to get to

23  some of Mr. Asaro, but I don't think we're going to finish

24  today.

25          THE COURT:  Okay.  Then after Mr. Spataro, are you

1  calling Mr. Ford?

2          MR. CARSON:  Yes, Your Honor, and then I also sent

3  some marked portions of the corporate designee transcript that

4  I'd like to read in.

5          THE COURT:  Okay.  So I don't know where that stands.

6          MR. CAVALIER:  It came in at 4:30 this morning.  I

7  haven't had a chance to look at it.

8          MR. CARSON:  I think a lot of the things we can

9  stipulate to.  I expect an argument about some of it, and I

10  think -- I would probably make the same argument.  But I think

11  we can stipulate to like 90 percent of it, and then the rest

12  we'll ask you to make a ruling on.

13          THE COURT:  Okay.  You're going to read it in or is it

14  a video?

15          MR. CARSON:  I was just going to read it in.

16          THE COURT:  So you'll have to have someone on the

17  stand then.  Just make sure --

18          MR. CARSON:  What, do a question-and-answer thing?

19          THE COURT:  Yeah.  I'm not going to let you stand

20  there and do a monologue of the questions and --

21          MR. CARSON:  No, that's fine.  I think we did that in

22  Judge Sanchez's trial last year.

23          THE COURT:  Okay.  So then really what I'm trying to

24  get at is what we're going to do about a charge conference.  We

25  sent you all the instructions, and I know you haven't had a

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  chance to look at them yet probably, but we'll have to do

2  those.

3      And is Mr. Ford it for you Mr. Carson, just to

4  reiterate?

5      MR. CARSON:  That was my plan, Your Honor.  That was

6  my plan.  But maybe if we can make an agreement on corporate

7  designee stuff --

8      THE COURT:  I meant in terms of live witnesses.

9      MR. CARSON:  Let's plan on him.

10     THE COURT:  Okay.  That's fine.

11     So -- well, let's see how the afternoon goes, see

12  where we break.  I may want to do the charge conference at the

13  end of the day today, I may want to do it early tomorrow, but

14  need to get it in.  And I want to try to do it not at the

15  expense of time with the jury because I want to get -- we need

16  to get this case to the jury.  So -- okay.

17     MR. CARSON:  I think both of our goals is that this is

18  going to get to the jury tomorrow for sure.

19     THE COURT:  That's all well and good, but you're still

20  talking about testimony tomorrow for at least two, maybe a

21  third witness by Zoom.  And by the way, I have to see -- I

22  don't know what Zoom capabilities we have right there now.

23     MR. CAVALIER:  If we need to bring it in, we will.

24     THE COURT:  Okay.  So we have, you know -- but you're

25  saying get to the jury tomorrow.  I mean, between testimony and

**UNITED STATES DISTRICT COURT**

1  reading the charge and closings, that's a good chunk of the

2  day.

3          MR. CARSON:  Yeah, you're right.

4          THE COURT:  So it may be that they are done, they may

5  not really be able to deliberate much, I don't know.  Ideally,

6  I would like to be able to get it to them tomorrow.  Again, as

7  I told you, I charge them first with the exception of that very

8  last charge.

9          So we just need to allocate time for all of that.

10  We'll see how the afternoon goes and then we'll see whether

11  it's going to be a 4:30 or quarter of 5:00 charge conference

12  today or whether it's going to be something like 8:15 tomorrow

13  morning.  But it's probably going to be one of those.

14          That works for you?

15          THE COURT REPORTER:  Yes.

16          THE COURT:  All right.  I do have a guilty plea to

17  take at 12:15, so I need some space at counsel table for

18  everybody.  So it's not -- it doesn't have to be totally moved.

19  The person is not in custody.  I mean, the one this morning was

20  going to be someone in custody, but today's is going to be --

21  or this afternoon should be less of a big deal, but I still

22  just -- you know, defense counsel needs somewhere to set up.

23  Okay, same with the government counsel.

24          So I'll see everyone back here at 1:00, and we'll

25  resume then with Mr. Asaro.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

```
1                MR. CARSON:  Thank you, Your Honor.

2                THE COURT:  All right.  Thanks.

3                THE COURTROOM DEPUTY:  All rise.

4                (Luncheon recess taken from 12:05 p.m. to 1:09 p.m.)

5                THE COURTROOM DEPUTY:  All rise.

6                THE COURT:  All right.  Have a seat, everybody.  Go

7    ahead and bring the jury in.

8                THE COURTROOM DEPUTY:  All rise.

9                (Jury enters the courtroom at 1:10 p.m.)

10               THE COURT:  You can have a seat.

11               Mr. Carson, call your next witness.

12               MR. CARSON:  Your Honor, I call Tom Asaro.

13               THE COURT:  All right.  Is he outside?

14               MR. CAVALIER:  Yes.

15               THE COURT:  Just stay standing, if you would.

16               THE WITNESS:  Yes.

17               THE COURT:  Please raise your right hand.

18               (**THOMAS VINCENT ASARO**, HAVING BEEN DULY SWORN OR DULY

19   AFFIRMED, TESTIFIED AS FOLLOWS:)

20               THE COURTROOM DEPUTY:  Please state your full name and

21   spell your name for the record.

22               THE WITNESS:  Thomas Vincent Asaro, T-H-O-M-A-S,

23   V-I-N-C-E-N-T, A-S-A-R-O.

24               THE COURT:  Go ahead and have a seat.

25               THE WITNESS:  Thank you.
```

*UNITED STATES DISTRICT COURT*

 1                    DIRECT EXAMINATION

 2  BY MR. CARSON:

 3  Q.   Good afternoon, Mr. Asaro.

 4  A.   Good afternoon.

 5  Q.   Can you please state your full name again just for the

 6  record?

 7  A.   Thomas Asaro.

 8  Q.   And, Mr. Asaro, where do you currently work?

 9  A.   I'm currently retired.

10  Q.   What year did you retire?

11  A.   2023.

12  Q.   2023.  Was that -- that was the year after Akamai acquired

13  Linode; is that correct?

14  A.   Correct.

15  Q.   At the time that Akamai acquired Linode, you were the

16  number two person in the company?

17  A.   I was the chief operating officer.

18  Q.   Is that number two?

19  A.   I guess, underneath Christopher Aker, the founder and CEO.

20  Q.   What do you mean you guess?  Do you know whether you were

21  number two, or three, or four?

22  A.   I don't know if there's a numerical order to those

23  positions but...

24  Q.   Who did you report to?

25  A.   Christopher Aker.

**UNITED  STATES  DISTRICT  COURT**

1  Q.   Did you report to anybody else?

2  A.   No.

3  Q.   Is there anybody who reported to you during your

4  employment at Linode?

5  A.   Yes.

6  Q.   And the people who reported to you, they would be the

7  directors; is that correct?

8  A.   Not all of them.

9  Q.   Well, let's go through some of them.

10      Dan Spataro, was he a director at any time during his

11  employment at Linode?

12  A.   Yes.

13  Q.   And he reported to you?

14  A.   Yes.

15  Q.   And Rich Ford was a director during his employment at

16  Linode?

17  A.   I believe he was vice president.  I can't remember his

18  exact title.

19  Q.   You don't remember the title of Rich Ford?

20  A.   No.

21  Q.   Is that a no?

22  A.   No.

23  Q.   You got to articulate.

24      But Rich Ford reported to you?

25  A.   Yes.

1  Q.   And Vince Palochko was a director at Linode during his

2  employment?

3  A.   Yes.

4  Q.   And he reported to you?

5  A.   Yes.

6  Q.   And did any other directors report to you besides those

7  three?

8  A.   Richard Meyers.

9  Q.   What was his position?

10 A.   He was the director of customer support.

11 Q.   And when did you first start at Linode?

12 A.   November 2006.

13 Q.   And you first started at Linode in November of 2006

14 because your friend Chris Aker recruited you; is that correct?

15 A.   Correct.

16 Q.   He came to you and asked you to help him out with his

17 business, right?

18 A.   Yes.

19 Q.   And at that time it was a pretty small business, it was

20 much smaller than it was in 2020 when my client's employment

21 ended, correct?

22 A.   Yes.

23 Q.   And from 2006, when you started, until 2014, when my

24 client started, the business grew a bit, right?

25 A.   Yeah, I would say that was probably the fastest period of

**UNITED STATES DISTRICT COURT**

1  our growth.

2  Q.   Okay.  Well, let's think about that for a minute.

3       So how many employees were there in 2006 when you first

4  started?

5  A.   Three.

6  Q.   Okay.  And how many employees were there in 2014 when my

7  client started?

8  A.   I do not recall.

9  Q.   No idea?

10 A.   No.

11 Q.   You don't have the slightest clue the number of employees

12 that the company you were chief operating officer for?  You

13 don't have the slightest clue?

14 A.   I mean, I can give you a guesstimated range but --

15 Q.   How about approximation?  An approximated range?

16 A.   35.

17 Q.   And do you recall that I asked you questions already, a

18 little less than a year ago?  Do you recall that?

19 A.   Yes.

20 Q.   And you were under oath when I asked you those questions

21 before?

22 A.   Yes.

23 Q.   That was a deposition, right?

24 A.   Yes.

25 Q.   And that deposition was certainly closer in time to when

**United States District Court**

1  these things actually happened than we are today, right?

2  A.   Yes.

3  Q.   Do you recall the number of employees that you said were

4  at the company during that time period, during that deposition?

5  A.   No, I do not recall.

6  Q.   Are you sure it wasn't 35?

7  A.   I said I don't remember how many I said during the

8  deposition.

9  Q.   Okay.  Is it possible it was less than 35?

10 A.   It's quite possible it was less than 35.

11 Q.   Is it possible it was less than 30?

12 A.   It's possible.

13 Q.   All right.  So I'll just continue.  I don't want to take

14 too much time.

15      So when Carl started, let's just say there was

16 approximately somewhere between something in the 20s and 30s

17 employees in 2014; is that right?

18 A.   I said I don't recall how many employees.

19 Q.   Approximately somewhere between 20 and 40?

20 A.   Well, when you asked me to approximate earlier, I said 35.

21 Q.   Isn't 35 between 25 and 40?

22 A.   It's between 25 and 40, but you said 25.

23 Q.   Are you okay with that statement between -- in 2014, when

24 my client started, it was between 20 and 40 employees?

25 A.   I don't recall.

**UNITED STATES DISTRICT COURT**

1  Q.   Okay.  You don't recall.  How many employees were there

2  when my client was terminated in August 2020?

3  A.   I don't recall the exact number.

4  Q.   Did you forget it at some point?

5  A.   No.  I didn't memorize it as we hired and terminated

6  employees.

7  Q.   But didn't you -- didn't you recall it last time I asked

8  you that question, about a year ago?

9  A.   I don't remember.

10  Q.   Well, was it hundreds?  It was hundreds, right?  There

11  were hundreds of people there when my client's employment

12  ended?

13  A.   Yes.

14  Q.   So you think the fastest growth was between 3 employees

15  and -- we'll go with your number.  We'll go with 40.  How about

16  that?  Between 3 and 40 versus 40 and hundreds, the fastest

17  growth was in those early years?

18  A.   Yes, according to revenue.

19  Q.   What about data centers?  How many data centers were there

20  at the time my client started his employment?

21  A.   2014?

22  Q.   Uh-huh?

23  A.   Six.

24  Q.   And how many were there when his employment ended in 2020?

25  A.   Ten.

**UNITED STATES DISTRICT COURT**

1  Q.  So during the time period that my client was employed at

2  Linode, Linode grew pretty significantly; is that correct?

3  A.  Could you verify significant?

4  Q.  Yeah.  Sure.  It grew in the number of employees, yes?

5  A.  Yes.

6  Q.  It more than, like, quadrupled?

7  A.  Yes, in the number of employees.

8  Q.  And it grew in terms of its value, correct?

9  A.  Yes.

10  Q.  And it grew in terms of its -- the number of customers

11  that it had?

12  A.  Yes.

13  Q.  And it grew in terms of the number of countries it did

14  business in?

15  A.  I'm not sure.

16  Q.  Well, you didn't add data centers in different countries?

17  You're the chief operating officer.  Wasn't it your job to kind

18  of run this part of the business?

19  A.  Yeah.  I'm sure we had customers in every possible country

20  before Carl started.

21  Q.  You did?  In every possible country?  So in order to have

22  customers in a country, do you need to have data centers in

23  that country?

24  A.  No.

25  Q.  In order to have customers in a country, do you need to do

**UNITED STATES DISTRICT COURT**

1  anything at all to kind of set things up in that country?

2  A.  No.

3  Q.  Okay.  So how -- what do you mean no?  You say you don't

4  have to do anything?  You just open a business and, boom,

5  you're in every country on the planet?

6  A.  Every country that has internet access, yes.

7  Q.  How many countries on this planet have internet access?

8      MR. CAVALIER:  Objection.

9      THE COURT:  Yeah.  The objection is sustained.

10 BY MR. CARSON:

11 Q.  Do you know how many countries there are on planet earth?

12     MR. CAVALIER:  Objection.

13     THE COURT:  Sustained.

14 BY MR. CARSON:

15 Q.  How many countries did Linode do business in?

16 A.  175 plus.

17 Q.  And did Linode open data centers in Frankfurt in 2016?

18 A.  We opened a data center in Frankfurt.  I don't recall what

19 year it was.

20 Q.  Did Linode open a data center in Singapore in 2015?

21 A.  We opened a data center in Singapore, but I don't recall

22 what year it opened.

23 Q.  Do you recall if it was between 2014 and 2020?  Can you

24 get within 6 years?

25 A.  It was after 2014, yes.

**UNITED STATES DISTRICT COURT**

1  Q.  Okay.  And what about Mumbai?  Sydney?  Data centers

2  there, too, right?

3  A.  Correct.

4  Q.  And Tokyo, there, too, right?

5  A.  Yes.  Tokyo was --

6  Q.  Both before and after 2014, right?

7  A.  It was previous to 2014.

8  Q.  And after, right?  There was additional work that was done

9  in Tokyo after 2014; isn't that correct?

10  A.  Once we open a data center, there's always additional

11  work.

12  Q.  Okay.  And who's responsible for managing the data

13  centers?  What department is that for managing information

14  between the data centers and within the data centers?

15  A.  Could you be clear with the question?

16  Q.  Sure.  Like, so do you know what a network engineer does?

17  A.  Yes.

18  Q.  What does a network engineer do?

19  A.  A network engineer would configure our connectivity around

20  the globe, both between data centers and with member carriers.

21  Q.  Within the data centers and between the data centers,

22  right?

23  A.  Within the data centers, between the data centers, and

24  with our network carrier providers, which have nothing to do

25  with our data centers.

**UNITED STATES DISTRICT COURT**

1  Q.   Okay.  So part of growing the business, you do that

2  through the network engineering department, right?

3  A.   That is one aspect of the business, yes.

4  Q.   And Carl was part of the network engineering department

5  while Linode grew significantly, correct?

6  A.   Yes.

7  Q.   And he significantly contributed to Linode's growth; isn't

8  that true?

9  A.   Define significantly.

10  Q.   How about you just define it however you want to interpret

11  the question.  Did he contribute significantly?

12  A.   He contributed.

13  Q.   You don't want to say he contributed significantly?

14  A.   Not without a definition, no.

15  Q.   Okay.  Did he help Linode secure a large number of IP

16  addresses?

17  A.   Yes.  That was one of his responsibilities.

18  Q.   And your position as chief operating officer, why don't

19  you just give us a brief description?

20  A.   Sure.  I started pretty early, as you mentioned already.

21  So in the beginning, I was responsible for setting up new

22  departments.  I mean, everybody kind of did everything at that

23  point.

24       But my first action was learning how to build servers,

25  getting them distributed to the data centers, set up a

1  purchasing department, set up a customer support department,

2  payroll.  I mean, everything kind of -- that was non-technical

3  kind of fell on me in the beginning.

4  Q.  Day-to-day operations.  Is that fair to say?

5  A.  Yeah.  Day-to-day operations.  Towards the end, I was more

6  focused on the hardware and data centers.

7  Q.  And one of the objectives in growing Linode was to look

8  towards some sort of exit strategy; is that correct?

9  A.  No.  I think that's why we were so successful, is we

10  didn't think about that until the end.

11  Q.  So according to your testimony, it was never discussed to

12  grow the company big enough that you could sell it to one of

13  the big guys?

14  A.  Towards the end it was, but not...

15  Q.  Let me ask you this question.  After Linode was purchased

16  by Akamai, you continued to work for Linode; is that correct?

17  A.  Continued to work for Akamai.

18  Q.  Akamai, yes.  And all the Linode employees that were there

19  kind of transitioned over to Akamai; is that right?

20  A.  Yes.

21  Q.  And Linode employees became Akamai employees, right?

22  A.  Yes.

23  Q.  And they received all the benefits and all the incomes and

24  salaries that Akamai paid to its employees, right?

25  A.  Yes.

UNITED STATES DISTRICT COURT

1  Q.   And they received bonuses, too?

2  A.   Yeah.  I think that was part of the compensation package.

3  Q.   Yep.  And then there was specific bonuses paid out to

4  employees who weren't fired before the purchase by -- through

5  the Akamai purchase; is that right?

6  A.   Yes.

7  Q.   And the network engineers received those bonuses, right?

8  A.   Network engineers received those bonuses, yes.

9  Q.   And then after you worked at Akamai for about a year, you

10  retired?

11  A.   Yes.

12  Q.   So let's go back in time a little bit, then I'll -- kind

13  of start in 2014, and I'll try to walk through this just as

14  quickly as we can.

15       Before I do, though, I wanted to ask you a question about

16  my client's claim.  So you're aware that my client is in court

17  today because of his claim of discrimination in the workplace,

18  correct?

19  A.   Yes.

20  Q.   And he alleged discrimination in terms of his employment

21  at Linode in connection with, among other things, his pay and

22  his benefits and his termination.  Do you understand that?

23  A.   No.

24  Q.   You don't understand that one of my client's claims is

25  that he was wrongfully terminated and the reason for the

**UNITED STATES DISTRICT COURT**

1  termination was discrimination?

2  A.  Yes, I understand that.

3  Q.  And my client started this claim by filing some documents

4  at the Equal Employment Opportunity Commission, correct?

5  A.  I don't know.

6  Q.  You don't know how this process started?

7  A.  No.

8  Q.  Weren't you identified in those documents filed at the

9  EEOC though?

10  A.  I don't know.

11  Q.  You don't know whether you were named in a filing at the

12  EEOC?

13  A.  No.

14  Q.  Did you ever know that?

15  A.  I don't know.

16  Q.  And so do you know what a charge of discrimination is,

17  sir?

18  A.  Yes.

19  Q.  What is it?

20  A.  Being accused of treating a protected class

21  inappropriately.

22  Q.  And it's a document that's filed in an administrative

23  agency, correct?

24  A.  Yes.

25  Q.  And you were named in the document by my client that was

1  filed in an administrative agency in 2021; isn't that right?

2          MR. CAVALIER:  Objection.  Asked and answered.

3          THE COURT:  Overruled.

4          THE WITNESS:  I don't know if I was named.

5  BY MR. CARSON:

6  Q.  Well, do you remember ever hiring a lawyer to help you

7  with those claims?

8          MR. CAVALIER:  I'm going to object again.  Are we

9  talking about the company or the individual witness?

10          THE COURT:  I understand the question to be about him

11  individually.  So if you hired a lawyer, you can answer.

12          THE WITNESS:  I hired a lawyer through our insurance

13  company.

14  BY MR. CARSON:

15  Q.  And that lawyer represented you; is that right?

16  A.  Yes.

17  Q.  And that lawyer, acting on your behalf, responded to my

18  client's claims; is that correct?

19  A.  Yes.

20  Q.  And we'll circle back to that.

21      So before Dan Spataro began his employment at Linode in

22  February of 2016, you were the supervisor of the network

23  engineering department?

24  A.  Yes.

25  Q.  So you were plaintiff's, Carl Williams', supervisor?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   And do you remember the names of the other -- well, how

3  many other people worked in the network engineering department

4  at that time?

5  A.   When Dan was hired?  What time are you speaking of?

6  Q.   When Carl was first hired in November of 2014?

7  A.   There were two.

8  Q.   Andrew Dampf and Alex Forrester, correct?

9  A.   Yes.

10 Q.   And Alex Forrester was hired before Andrew Dampf, right?

11 A.   I think so.

12 Q.   And all three of them were hired in 2014?

13 A.   I don't recall their exact hire dates, but before 2014,

14 yes.

15 Q.   And in 2014, I said.  All three were hired in 2014?

16 A.   I'm not sure of their exact hire dates, but they were

17 hired before Carl.

18 Q.   I have Andrew Dampf was hired September 29th and Carl was

19 hired like November 14th.  Does that sound right, 2014?

20 A.   I would need to see the HR documents but...

21 Q.   And so after all three of their hires in 2014, those three

22 people with you supervising them, that was the network

23 engineering department, correct?

24 A.   Yes.

25 Q.   And as you worked in the network engineering department,

1  Linode did business with vendors including a vendor called Net

2  Access; is that correct?

3  A.  Yes.

4  Q.  And Net Access had a data center, helped you -- helped

5  Linode set up a data center in their new work location in

6  Newark, New Jersey; is that right?

7  A.  Net Access was the colocation provider that we used in New

8  Jersey, yes, the data center.

9  Q.  And Dan Spataro, before his employment at Linode, worked

10  for Net Access, right?

11  A.  Yes.

12  Q.  And there was times when you traveled to that Newark data

13  center with Carl Williams and the other network engineers; is

14  that right?

15  A.  I don't know if I -- yeah.  I think I went with Carl once.

16  Q.  And Andrew Dampf and Alex Forrester were present?

17  A.  Yeah.  I think there was -- yes, yes.

18  Q.  Did you hear the comment when Andrew Dampf said to Carl

19  Williams you just sit there and keep your mouth shut and you

20  listen?

21       MR. CAVALIER:  Objection.

22       THE COURT:  Objection is overruled.

23  BY MR. CARSON:

24  Q.  You didn't hear that?

25  A.  No.

**UNITED STATES DISTRICT COURT**

1  Q.   And for a while there, while you're their supervisor, it

2  was just the three of you.  And then after that, the department

3  grew in size in terms of the number of employees, right?

4  A.   Yes.

5  Q.   Some new network engineers were hired, I believe.  Dan

6  Spataro was hired in 2016, beginning of 2016; is that right?

7  A.   Yes.

8  Q.   And who -- was it Owen Conway who was also hired around

9  that time period?

10 A.   Yes.

11 Q.   And so after that, the network engineering department

12 would have been Alex Forrester, Andrew Dampf, Carl Williams,

13 Owen Conway, with Dan Spataro managing them?

14 A.   Yes.

15 Q.   And when Dan Spataro became the manager of them, the

16 network engineers reported to Dan Spataro, and Dan Spataro

17 reported to you, right?

18 A.   Yes.

19 Q.   And so we're still in the Galloway office.  Do you

20 remember when the network engineering department moved to that

21 big room in the Galloway office?

22 A.   Yes.

23 Q.   And that was the same time period when, I think, your

24 administrative assistant was Lisa Brown.  Do you recall that?

25 A.   Lisa Brown was the office manager.

**UNITED STATES DISTRICT COURT**

1   Q.   And she was at that Galloway office in that big room

2   around that time period?

3   A.   No.  She was on the original side of the building.

4   Q.   But she -- there were times where she would walk into that

5   big room to do things, correct?

6   A.   Yes.  It was part of the office.

7   Q.   Yes.  It was part of the office.  And so did you hear when

8   Lisa Brown announced to the whole room how old Carl was and

9   said he was the oldest person in the company?  Did you hear her

10  say that?

11          MR. CAVALIER:  Objection.  Assumes facts not in

12  evidence.

13          THE COURT:  It's overruled.

14          So again, if you heard these statements, you can

15  acknowledge them.  If you didn't, just tell him.  Okay?

16          THE WITNESS:  All right.

17  BY MR. CARSON:

18  Q.   And so now we're still in that network engineering

19  department in the big room in Galloway, New Jersey, and do you

20  recall, by the way, how old Alex Forrester was back then?

21  A.   I do not.

22  Q.   In his 20s, though, right?

23  A.   Late 20s, early 30s.  I don't know.

24  Q.   Andrew Dampf was in his low 30s, right?

25  A.   I don't know for sure.

**UNITED STATES DISTRICT COURT**

1  Q.   You know Carl Williams was in his 50s, though, correct?

2  A.   I didn't know his exact age, but yeah.

3  Q.   So -- and Vince Palochko was there this entire time; is

4  that right?

5  A.   Employed?

6  Q.   Yeah.  Employed at Linode?

7  A.   Yes.

8  Q.   And Vince Palochko's job would have been to do everything

9  in the human resources department that needed to be done,

10  right?  He was the primary human resource employee?

11  A.   Yes.

12  Q.   And that's because you decided to hire him to that

13  position back around 2012?

14  A.   Yes.

15  Q.   Did you know he had no training when you hired him?

16  A.   Yes.

17  Q.   Did Linode spend money to get him training?

18  A.   Yes.

19  Q.   They did?

20  A.   Yes.

21  Q.   What -- how did they do that?

22  A.   He went out and got his PHR certification and -- I can't

23  recall his other education or certifications, but he continued

24  over the course of his employment to better himself.

25  Q.   When did he get the PHR certification?

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  A.   I don't recall.

2  Q.   Several years, like 10 years after he started, right?

3  A.   I don't remember.

4  Q.   2018, 2017, somewhere in there?

5  A.   I remember it being in the Galloway office, but I can't

6  remember the year.

7  Q.   Well, you were in the Galloway office in 2017, correct?

8  You moved to Haddonfield in September of 2017, right?

9  A.   Yes.  Yes.

10  Q.   And so how about in the first two years of his employment?

11  Did -- was there anything done to help him learn how to be a

12  human resource manager at that time?

13  A.   I don't recall.

14  Q.   So now we are -- let's -- I guess we'll talk about -- so

15  Rich Ford, you said, was -- worked in finance, right?

16  A.   Yes.

17  Q.   So he was the person who did Linode's accounting; is that

18  right?

19  A.   Yes.

20  Q.   Money coming in, money going out.  He managed all that

21  stuff?

22  A.   Yes.

23  Q.   Ones and zeroes, doing the books?  Yeah?

24  A.   Accounting, yes.

25  Q.   And during this entire time period, Linode maintained

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  electronic communication systems; is that right?

2  A.   Could you be more specific?

3  Q.   Sure.  Yeah.  They had different chat programs, software,

4  so that employees could communicate with each other

5  electronically, right?

6  A.   Yes.

7  Q.   And ultimately, Slack became the primary way that

8  employees communicated at Linode; is that right?

9  A.   One of the primary, yes.

10  Q.   And emails.  Emails were another way that employees

11  communicated?

12  A.   Emails, in-person meetings.

13  Q.   And before Slack, there was another chat tool that was

14  used, correct?

15  A.   Yes.

16  Q.   It was like ICF or something like that?

17  A.   IRC.

18  Q.   IRC.  And so using Slack, you could start threads that

19  would maintain communications between people at Linode, right?

20  A.   Yes.

21  Q.   And you could create groups that would maintain

22  communications for people at Linode; is that right?

23  A.   Yes.

24  Q.   So, for instance, there was like a sales channel, right?

25  A.   Yes.

1  Q.  And there was even a channel for you and Carl to

2  communicate with each other, right?  You guys had a Slack

3  thread?

4  A.  I'm sure we did.

5  Q.  Yeah.  And that's how you guys communicated for his

6  six years' of employment, through that Slack thread, right?

7  A.  I don't know if we used Slack for all six years.  I don't

8  think we used it when he started.

9  Q.  Yeah, that's a good point.  So let's just say from the

10 time you started using Slack, that's when you and Carl

11 maintained those Slack conversations, correct?

12 A.  Yes.

13 Q.  So that would have been like what, around -- do you

14 remember when you guys started using Slack?

15 A.  I do not.

16 Q.  2017, does that sound right to you?

17 A.  I don't know.

18 Q.  Whenever it was, there was a Slack channel for you and

19 Carl, right?

20 A.  Yes.

21 Q.  And we'll call it a thread.  And there was also a Slack

22 thread for you and Carl and Dan Spataro, right?

23 A.  Yes.

24 Q.  And there was also a Slack thread for you and Dan Spataro

25 and Carl and some other people too, right?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.  It worked just like text messages, whoever we

2  decided to add.

3  Q.   And Slack is a cloud system, right?

4  A.   Yes.

5  Q.   And you know what that is because you guys did cloud

6  computing at Linode, right?

7  A.   Yes.

8  Q.   So you probably know better than most people what cloud

9  computing is, correct?

10 A.   Yes.

11 Q.   And cloud computing means that the information is stored

12 in a server at a data center, correct?

13 A.   Yes.

14 Q.   And so the Slack threads for you and Carl, you and Dan and

15 Carl, those things would be on Slack's servers, correct?

16          MR. CAVALIER:  I'm going to object.

17          THE COURT:  Objection is sustained.

18 BY MR. CARSON:

19 Q.   Do you know where they would be?  Do you know how Slack

20 works?

21          MR. CAVALIER:  Same objection.

22          THE COURT:  The question is, does he know?  So he can

23 answer if he knows.

24          THE WITNESS:  No.

25 BY MR. CARSON:

**UNITED STATES DISTRICT COURT**

1  Q.   You don't know how Slack works at all?

2  A.   I don't know how it works technically behind the scenes.

3  Q.   Okay.  So do you know whether or not you have access to

4  those messages?

5  A.   Could you be more specific?

6  Q.   Sure.  Like if you wanted to see what you sent to Carl,

7  you know, the month before he was terminated, you can go look,

8  right?

9         MR. CAVALIER:  I'm going to object again.

10        THE COURT:  The objection is overruled.  I mean, you

11  can answer.

12        THE WITNESS:  Yes, I can look.

13  BY MR. CARSON:

14  Q.   Yeah, you can look.

15       So the next thing I want to ask you about is Dan Spataro.

16  So Dan Spataro became the manager of the network engineering

17  department, right?

18  A.   Yes.

19  Q.   And then at some point he became the director in the

20  network engineering department, right?

21  A.   Yes.

22  Q.   At some point Carl Williams became a director in the

23  network engineering department; is that correct?

24  A.   Yes.

25  Q.   And Carl Williams worked in the network engineering

**UNITED STATES DISTRICT COURT**

1  department throughout his entire employment at Linode; is that

2  right?

3  A.  Yes.

4  Q.  And Dan Spataro worked with the network engineering

5  department throughout his entire employment while still at

6  Linode, right?

7  A.  Yes.

8  Q.  And Carl started about two years before Dan Spataro; is

9  that correct?

10  A.  Yes.

11  Q.  And then at some point the network engineering department

12  continued to grow, and Tim Kaufman was added to the department;

13  is that right?

14  A.  Yes.

15  Q.  And he was actually added as a senior network engineer,

16  correct?

17  A.  Yes.

18  Q.  And then he was promoted to a manager of the network

19  engineers, right?

20  A.  Yes.

21  Q.  And when he was promoted to the manager, the corporate

22  hierarchy would have been the network engineers and then Tim

23  Kaufman and then Dan Spataro and then you and then Chris Aker,

24  right?

25  A.  Yes.

1  Q.  I guess I'll just -- so Adam Rambo -- it's true that the

2  department continued to even grow after that, correct?  In

3  terms of the number of people.

4  A.  Can you be more specific?  After what?

5  Q.  After Tim Kaufman became the manager?

6  A.  I don't remember.

7  Q.  I'll name some people.  Is this a list of network

8  engineers at Linode:  Adam Rambo, Andrew Dampf, Tim Kaufman,

9  Tom Duff, Alex Forrester, Job Kitonga, Steve Shaw, Ben Ritchey,

10 Owen Conway, all network engineers, right?

11 A.  Yes.

12 Q.  And they all were added at various times over the years,

13 all of them were added after Carl Williams except for Andrew

14 Dampf and Alex Forrester, right?

15 A.  Yes.

16 Q.  And then Linode moved from the Galloway office to

17 Haddonfield office, and eventually Linode settled at their

18 Philadelphia headquarters over in Old City, right?

19 A.  Yes.

20 Q.  Not too far from here, actually, right?

21 A.  Yes.

22 Q.  And according to your testimony -- strike that.  Sorry.

23      And so, again, over that time the network engineering

24 department was responsible for helping to set up new data

25 centers right?

**UNITED STATES DISTRICT COURT**

1  A.   Sorry.  Could you repeat that question?

2  Q.   Sure.  The network engineering department was responsible

3  for helping and assisting in setting up and monitoring new data

4  centers, correct?

5  A.   Yes, from the network perspective.

6  Q.   And Carl Williams was responsible for helping Linode grow,

7  right?  He did like public relations and things like that once

8  he became a director, right?

9  A.   I don't recall any public relations.

10 Q.   He would like travel and go to shows and make

11 introductions and do networking of people, not data centers; is

12 that right?

13 A.   Yes.

14 Q.   Do you remember how long Tim Kaufman was there before his

15 promotion?

16 A.   No, I don't.

17 Q.   It wasn't that long, though, right?  It was less than a

18 year?

19 A.   I don't recall.

20 Q.   Do you recall when Tim Kaufman was promoted that the

21 position was not opened up at all to anyone who had been there

22 longer than Tim Kaufman?

23 A.   The position was not posted publicly.

24 Q.   It was not posted publicly, correct?

25 A.   Correct.

**UNITED STATES DISTRICT COURT**

1  Q.   It was not posted in any way, correct?

2  A.   I don't recall if it was posted internally, but it wasn't

3  posted publicly.

4  Q.   And Tim Kaufman was just basically told that he was going

5  to be the new manager, right?

6  A.   I don't know.  I wasn't involved in the selection process.

7  Q.   Yeah.  You turned that entirely over to Dan Spataro to do,

8  right?

9  A.   Yes.

10  Q.   And you gave him blanket authority to basically hire,

11  promote, fire anyone he wanted?

12  A.   Yes.

13  Q.   And you did that without any -- there was no policy in

14  place to make sure that promotions and hirings and terminations

15  were not done in any kind of way that could implicate

16  discriminatory motives, correct?

17  A.   Could you restate, please?

18  Q.   Sure.  There was no policy in place that Dan Spataro could

19  go look at to say, here's -- if I want to do a promotion, here

20  are the steps I have to follow because we want to make sure

21  that Linode stays above board and that we can't be accused of

22  favoritism or discrimination or those kinds of things, right?

23  A.   He would have worked with the HR department.

24  Q.   My question is a little more specific, though.  There was

25  no policy in place for how a manager like Dan Spataro was

**UNITED STATES DISTRICT COURT**

1  supposed to do, you know, promotional stuff?  Like no policy,

2  no protocol in place, no list of requirements, correct?

3  A.   I'm not sure.

4  Q.   You can't think of any right now, correct?

5  A.   I'm not sure if one existed.  That would be Vinny and HR.

6  Q.   You turned that over to Vincent Palochko, the HR guy,

7  right?

8  A.   Yes.

9  Q.   Was that before or after he took his first class in human

10  resources, do you know?

11  A.   Was what before or after?

12  Q.   When you allowed him to be completely in charge of making

13  sure that there wasn't discriminatory promotions or hirings?

14  A.   Yeah, I'm not sure when he took those classes.  He was in

15  charge.

16  Q.   And so in terms of these promotions and hirings, Dan

17  Spataro with blanket authority just selected -- Dan Spataro

18  kind of -- sorry, Dan Spataro just selected Tim Kaufman as a

19  person that he wanted in that position, correct?

20  A.   Yes.  He was most familiar with his team, so he chose the

21  person who was most qualified.

22  Q.   Isn't it true, though, that Carl Williams came to you

23  about that position before that selection was made?

24  A.   Carl came to my office unscheduled once and mentioned that

25  he was going to talk to Dan and apply for the position.

**UNITED STATES DISTRICT COURT**

1  Q.  He told you he was interested in a manager position,

2  right?

3  A.  He told me he was interested in the position that Dan was

4  putting somebody into, yes.

5  Q.  And what did you tell him?

6  A.  I told him to talk to Dan.

7  Q.  And do you know if Carl Williams did that?

8  A.  I'm assuming -- no, I don't know.

9  Q.  That was around what, like September 2018?

10  A.  I don't recall the date.

11  Q.  It was absolutely before Tim Kaufman was announced in that

12  position, right?

13  A.  Yes.

14  Q.  It had to have been before, right?

15  A.  Yes.

16  Q.  So Tim Kaufman was announced in that position in November

17  of 2018, right?

18  A.  Again, I don't recall the date.

19  Q.  Well, do you recall the conversation in December of 2018

20  when Carl and you and Dan Spataro had that talk in one of your

21  offices?

22  A.  I recall -- I recall a talk in my office, yes.

23  Q.  And so that conversation had to do with Carl Williams

24  being kind of upset that he wasn't promoted into that Tim --

25  the position that Tim Kaufmann had, right?

UNITED STATES DISTRICT COURT

1  A.   That's not the meeting I recall.

2  Q.   Well, you certainly spoke about a job that Carl Williams

3  could do during that meeting, right?

4  A.   The way I recall it, he had already been promoted or given

5  the opportunity to take a different job, yes.

6  Q.   What do you mean he had already been promoted?  What does

7  that mean?

8  A.   The meeting that I recall in my office, Carl had been

9  given the manager of -- I think it was interconnection and

10  innovation title, and the meeting was Carl saying that the

11  manager position wouldn't suffice because when he would be

12  making calls, the other party wouldn't respect the title or

13  call him back, and so he requested that it be changed from

14  manager to director.

15  Q.   And that meeting was in your office with -- it was you and

16  Carl and Dan Spataro in that meeting, correct?

17  A.   Yes.

18  Q.   And it's your testimony, sitting here today, that the

19  reason for that meeting was because Carl Williams had already

20  been promoted to a manager position?

21  A.   Yes.

22  Q.   And Carl -- what Carl Williams was concerned about is that

23  he wasn't happy with the manager promotion and he wanted to

24  be -- he wanted a director promotion?

25  A.   I don't know if he was necessarily unhappy, but it was

**UNITED STATES DISTRICT COURT**

1  explained when he was calling on the people that he needed to

2  call on, he would be more likely to receive a callback or

3  appointment if it's a director instead of manager.

4  Q.   What did you say to that?

5  A.   I consulted with Dan and thought it was appropriate if he

6  was going to get more callbacks to change it from manager to

7  director.

8  Q.   Well, that decision that he was going to get this title

9  changed to director, that occurred during the meeting, right?

10 Carl was told that in that meeting, right?

11 A.   In a meeting in my office.  I don't know if we're talking

12 about the same meeting.

13 Q.   It was like December of 2018?

14 A.   I don't recall.

15 Q.   Well, do you recall when Carl was -- when it was announced

16 that Carl was going to now have this title of director?

17 A.   I recall it being announced.  I don't recall the date.

18 Q.   You can't pin it down within like a six-month period of

19 time even?

20 A.   I would say somewhere between December and February.

21 Q.   December 2018 and February 2019, is that your testimony?

22 A.   Could you remind me when Tim Kaufman was promoted?

23 Q.   I can just show it to you.

24 A.   Yeah.

25 Q.   So the January exhibit is Exhibit 21.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1     MR. CARSON:  Could we please put Exhibit 21 -- and I

2 think this has already been admitted, so we can publish it to

3 the jury as well.

4     THE WITNESS:  So if this happened in January, I'm

5 going to say the meeting happened within six weeks of that.

6 BY MR. CARSON:

7 Q.  In -- well, you mean six weeks before?

8 A.  Yeah.

9 Q.  So four weeks before January 25th would be around

10 December 25th, and two weeks before that would be, what,

11 14 days so 25 goes to 15, minus 4, goes to 11.

12     So what, December 11th-ish?  Does that sound right?

13 A.  I don't know the exact date.

14 Q.  Well, six weeks before that would be December 11th, right?

15 A.  Yeah.

16 Q.  Yeah?

17 A.  Yes.

18 Q.  Okay.  So this here is the announcement for when Carl,

19 after he was promoted to manager, was then given a title change

20 to director, that's what we're looking at?

21 A.  No.  This looks like the announcement to the entire

22 company that Carl is now director of network strategy and

23 innovation.

24 Q.  But I thought you said he was already promoted to manager

25 before that, before the meeting you said, right?

**UNITED STATES DISTRICT COURT**

1  A.   Between Dan and Carl, yes, not announced to the entire

2  company.

3  Q.   Okay.  So it was a secret promotion?

4  A.   No.  It was a conversation between the two of them.

5  Q.   Any electronic communications that we can just go look at

6  to confirm this?

7  A.   Electronic communications?

8  Q.   Sure.  Any Slack messages or emails or anything that we

9  could use to confirm that he was promoted to manager and then

10 not happy with the manager title, so he was promoted again to

11 director?

12           MR. CAVALIER:  Objection.

13           THE COURT:  It's overruled.

14           THE WITNESS:  I don't know of any.

15 BY MR. CARSON:

16 Q.   So if Linode promotes somebody to one position, like say

17 they promote someone to a director, and then like a month later

18 the director comes back and says, hey, I'm not happy with

19 director title, I want to be vice president, Linode is just

20 like, you're a vice president now?  That's how they roll?

21 A.   No.

22 Q.   But that's what you're saying happened to Carl?

23 A.   No.

24 Q.   So we can obviously see in this email that it says,

25 "Hello.  I'm happy to announce that Carl Williams is now

**UNITED STATES DISTRICT COURT**

1  director of network strategy and innovation.  During his time

2  at Linode, Carl has been instrumental with building Linode

3  global peering strategy, which has led to our customers having

4  the best network possible."

5       Do you agree with that?

6  A.   Yes.

7  Q.   And Carl was instrumental in helping Linode grow and

8  regarding its global peering strategy, correct?  Instrumental?

9  A.   Carl was responsible for global peering strategy.

10  Q.   And he was instrumental too, right?

11  A.   No.

12  Q.   So you don't agree with that?

13  A.   No.

14  Q.   Okay.  "Carl has also dramatically lowered Linode's

15  operational expenses."

16       You agree with that, right?  That's obviously a fact,

17  right?

18  A.   Yes.

19  Q.   "And allowed Linode to have a robust and valuable

20  network."

21       So Carl was responsible for helping Linode and allowed

22  Linode to have a robust and valuable network, correct?

23  A.   Yes.

24  Q.   "And as director of network strategy and innovation, Carl

25  will be leveraging his vast industry connections to explore

**UNITED STATES DISTRICT COURT**

1  business development opportunities."

2      Do you agree with that?

3  A.  Yes.

4  Q.  So it doesn't say anywhere in here that this is going to

5  be the second promotion, right, because the other one was the

6  one that only Carl and Dan knew about, you're saying, right?

7  A.  Yeah.  I believe Dan and Carl worked together to create a

8  new position for him, and at first it was going to be called

9  manager.  And before it was announced to the entire company,

10  before the responsibilities were fleshed out, is when the

11  meeting I referred to happened.

12  Q.  Did you congratulate Carl after -- you know, respond and

13  congratulate him since you were the number two chief operating

14  officer at the time?

15  A.  I don't remember.  But if I would have, it would have been

16  verbally.

17  Q.  We wouldn't see any evidence of that, right?

18  A.  Unless somebody recorded me, no.

19  Q.  So over the years of Carl Williams' employment, between

20  2014 and 2020, Linode promoted several network engineers to

21  senior network engineers, correct?

22  A.  Could you define "several"?

23  Q.  Yeah.  It was four altogether, right?

24  A.  I don't know the exact number but...

25  Q.  Well, let's go through them.  Was it -- Tim Kaufman was

**UNITED STATES DISTRICT COURT**

1  one, right?  He was hired as a senior network engineer,

2  correct?

3  A.   I don't remember what his starting title was.

4  Q.   And Owen Conway was promoted to a senior network engineer

5  position?

6  A.   I don't remember what his starting position was either.

7  Q.   And Andrew Dampf was promoted to a senior network engineer

8  position, correct?

9  A.   Yes.

10  Q.   And that's the same Andrew Dampf who started within

11  one month of when Carl started, right?

12  A.   Yes.

13  Q.   Do you remember the name of anyone else who was promoted

14  to a senior network engineer position?

15  A.   No.

16  Q.   Was it Tom Duff?

17  A.   I don't know.

18  Q.   So over the years, these senior network engineering

19  positions became available, those also were like the Tim

20  Kaufman position where Dan --

21      (Court reporter interruption.)

22      MR. CARSON:  I'm sorry.

23  BY MR. CARSON:

24  Q.   So over the years as these senior network engineering

25  positions became available or these promotions occurred, Dan

1  Spataro was given blanket authority for those decisions as

2  well, correct?

3  A.  Yes.

4  Q.  And you were the person who actually gave Dan Spataro that

5  blanket authority, right?

6  A.  Yes.

7  Q.  And at any time during any of the years, was there ever a

8  policy that Dan Spataro was required to follow in making these

9  promotion and hiring decisions?

10 A.  No.

11 Q.  Okay.  So -- and you also acknowledged that none of these

12 positions were ever posted anywhere, correct?

13 A.  Which positions?

14 Q.  Any.  So any of them.  So any of the senior network

15 engineering positions, any of Carl's positions, the first

16 secret one to the manager position and the one that we saw that

17 was just announced or Tim Kaufman's, none of them were posted

18 anywhere, right?

19 A.  No, that's wrong.

20 Q.  Which one was posted?

21 A.  If we were looking to grow the team, we would post

22 positions.

23 Q.  How would you post positions?

24 A.  The recruiting team would take care of that.  I don't know

25 if they post them on Indeed or in the company chats.  You know,

1    to recruiting Slack channel and whatnot.

2    Q.   Do you know where they were posted?

3    A.   I don't know exactly.  It wasn't my responsibility.

4    Q.   Did you ever see one posted?

5    A.   Yes.

6    Q.   Where did you see it posted?

7    A.   Indeed, LinkedIn.

8    Q.   You saw a position on Indeed between 2014 and, say, 2019

9    for a senior network engineer position?

10   A.   I don't know.

11   Q.   Did you see one on Indeed for a director of

12   interconnection or strategy position?

13   A.   No.  That was an internal one.

14   Q.   Did you see one for a manager of the network engineers on

15   Indeed?

16   A.   No.  That was an internal.

17   Q.   None of those were ever posted on Indeed, right?

18   A.   Correct.

19   Q.   Or posted at all, correct?

20   A.   Correct.

21   Q.   Going faster than I thought.  Scroll down just a moment.

22   A.   Is this water?

23   Q.   Yeah.  Okay.

24        Do you remember when Carl Williams came to you because

25   there was some -- he felt that there was some emojis that were

1  being put out on the Slack channel that he felt were

2  disrespectful to him?  Do you remember that?

3  A.  Yes.

4  Q.  And do you remember when Carl Williams -- before Carl

5  Williams and you and Dan had this meeting in December of 2018,

6  that Charles Williams filed a document at the Pennsylvania

7  Human Relations Commission?  Do you remember that?

8  A.  No.

9  Q.  I'll show you the document, maybe it will refresh your

10  recollection.  So the document is --

11       MR. CARSON:  If you can find it faster than me, you're

12  welcome to --

13       MR. CAVALIER:  96.

14       MR. CARSON:  Can we put 96 up?  Thank you, John.

15  BY MR. CARSON:

16  Q.  Does that refresh your recollection?

17  A.  I don't know if this is a document -- I don't know if this

18  is the same document, but I've only seen one complaint document

19  that was after Carl was terminated.

20       MR. CARSON:  So let's put it to the top so he can take

21  his time looking at it.

22  BY MR. CARSON:

23  Q.  So I don't want you to get confused.  Let's get it

24  straight.

25       So you can see the stamp on this one was while he was

**UNITED STATES DISTRICT COURT**

1  employed there in 2018, November?

2  A.   Yes.

3  Q.   So this would not be the document you're talking about,

4  correct?

5  A.   I don't know if this is the document I'm talking about.

6  Q.   So I'll represent to you that it's my client's position

7  that he filed this charge at the Pennsylvania Human Relations

8  Commission and that the meeting you had with Dan Spataro and

9  him in your office in 2018, in December, was because of this.

10 So do you agree with that, sir?

11 A.   No.

12 Q.   But you do agree that it was right after that meeting that

13 Carl Williams' promotion was announced, correct?  Right after

14 the December meeting?

15 A.   Yeah.  The email you displayed earlier was two months

16 after this.

17 Q.   And you do agree that you never, ever had to hear from the

18 Pennsylvania Human Relations Commission while Carl Williams was

19 employed at Linode after that, correct?

20 A.   I never heard from them, no.

21 Q.   And at some point -- so do you agree that as a director of

22 the network -- as a director assigned to the network

23 engineering department, that Carl's position was above a senior

24 network engineering?

25 A.   I don't know if I would put it in a hierarchy like that.

**UNITED STATES DISTRICT COURT**

1  Q.  Do you agree that his position was above manager of the

2  network engineers?

3  A.  I feel like his position was kind of lateral, but I'm not

4  -- you know, I wouldn't put it in the ladder with network

5  engineers.

6  Q.  When Carl Williams received this director title, he no

7  longer reported to Tim Kaufman, right?

8  A.  I believe he always reported to Dan.

9  Q.  Well, before this director position, when he was a network

10  engineer, Tim Kaufman was his supervisor, right?

11  A.  I don't remember.  There might have been a small period of

12  time when he was.

13  Q.  And do you remember whether Carl ever received any kind of

14  an income -- income increasement or raise to his salary after

15  he was afforded this network or director of network engineering

16  title?

17  A.  I don't know, but I would assume there would be one.

18  Q.  And do you know how much money Carl earned at the time,

19  before the title change?

20  A.  No.

21  Q.  Do you know whether or not -- so isn't it true, though,

22  that employees at Linode receive annual increases to their

23  income as part of Linode's, you know, salary and benefits

24  package?

25  A.  Discretionary, yeah, by their manager.

**UNITED STATES DISTRICT COURT**

1  Q.  And those annual increases are -- sometimes they are the

2  same for everyone in the department, like everyone will get a

3  3 percent bump, and other times it can be different for

4  different people, right?

5  A.  I don't recall if there was ever a time when everybody got

6  the same.

7  Q.  Do you recall -- so in around 2020, all the network

8  engineers got a 3 percent bump in that department?

9  A.  No, I don't recall.

10  Q.  So isn't the right person to compare, if you were going to

11  try to compare Carl to another person in his department,

12  wouldn't the closest person to compare him to be Dan Spataro

13  since they both have the same director and they're both in the

14  same department?

15  A.  No.

16  Q.  Who would be the closest person to compare Carl to?

17  A.  Carl had a unique position.  I don't think there was

18  anybody there to compare him to.

19  Q.  If you had to compare him to somebody, you wouldn't

20  compare him to someone who was still a network engineer because

21  that's several levels below, correct?

22  A.  Like I said, I wouldn't put his position in the same

23  hierarchy as the network engineers.  He was in the network

24  department but...

25  Q.  Let me hand you --

**UNITED STATES DISTRICT COURT**

1          MR. CARSON:  Your Honor, can I approach and hand him

2    the deposition transcript?

3          THE COURT:  Yes.

4    BY MR. CARSON:

5    Q.  I'm actually going to hand you two.  I don't know if you

6    remember, but the court reporter had to leave, so there was two

7    different transcripts.  That's No. 1 and this is the follow-up

8    one.

9          So let me direct your attention to -- okay.  So you agree

10   we already kind of went through this once already.  We'll just

11   do it again.  So you agree that you were under oath the last

12   time I asked you questions during your deposition, a little

13   less than a year ago, correct?

14   A.  Yes.

15   Q.  And again, that was closer in time to these events,

16   correct?

17   A.  Yes.

18   Q.  So let me direct your attention to Page 102, Line 18 to

19   24.  I'm going to go there as well?

20   A.  Page 102 --

21   Q.  In the bigger one, by the way.  Page 102 and then Lines 18

22   to 24.  I'm going to get there as well.  So --

23          MR. CAVALIER:  Are we refreshing or impeaching?

24          MR. CARSON:  I am refreshing right now, I guess.

25          Actually, no.  Impeaching.  You said no.  Impeaching.

**UNITED STATES DISTRICT COURT**

1  BY MR. CARSON:

2  Q.  So again, you said that there's no one that you can

3  compare Carl to, right?  That was your testimony?

4       THE COURT:  If you're reading testimony, read the

5  questions and the answers to the --

6       MR. CARSON:  No, I'm not.

7       THE COURT:  So you're talking to -- I apologize.

8  Okay.

9  BY MR. CARSON:

10  Q.  So your testimony here today was that there's no one we

11  can compare Carl to, right?

12  A.  His position was unique, yes.  There wasn't a pool of

13  people doing the same thing as Carl.

14  Q.  So I'll read to you from that deposition transcript that

15  you provided under oath.

16       So I said, "Well, who do we -- when Carl Williams received

17  the position of director, who do we compare him to to see if

18  his salary is appropriate of the director."

19       Answer from the witness, "I don't know if that's -- if

20  there's another director of, you know, some networking or, you

21  know, more technical group that would demand a higher salary.

22  I don't know if you can necessarily compare him to you, the

23  director of customer support, for example."

24       Question "Who do we compare him to?"

25       Answer, "I don't think you can compare him to -- I don't

UNITED STATES DISTRICT COURT

1  think you compare them to an individual."

2      Question, "Positions -- what positions do we compare him

3  to?"

4      "I mean, I don't know."

5      Question "You don't know.  Okay.  So how much money did

6  the director of human resources earn?"

7           THE COURT:  Wait.  Wait.  Wait a minute.  I haven't

8  heard anything that this actually impeaches him.

9           MR. CARSON:  Yeah.  So I had a note in my thing.

10  Sorry about that.

11  BY MR. CARSON:

12  Q.  So let me ask you this, then, regarding performance

13  reviews.  Okay?  Are performance reviews an important part of

14  the annual raise process?

15  A.  Yes.

16  Q.  And in order for people to get raises, they need to get

17  their performance reviews; is that correct?

18  A.  Not necessarily.

19  Q.  But you do agree that getting a good performance review or

20  even getting a performance review is beneficial for that

21  process of receiving an increase in your salary, right?

22  A.  Not necessarily.

23  Q.  Well, who's -- what was the rules?  Did the managers have

24  to do performance reviews every year?

25  A.  Yeah.  They were suggested as a tool.  I don't think it

**UNITED STATES DISTRICT COURT**

1   was enforced that it had to be completed, but it worked both

2   ways.  The tool had a place for the manager to review the

3   employee and the employee to submit a self review.

4   Q.   And the manager who's doing those reviews of the employees

5   was something that was considered as part of whether or not the

6   employee would receive a raise, correct?

7   A.   Not necessarily.  There were raises given without

8   performance reviews.

9   Q.   Do you remember whether or not you ever did a performance

10  review of Carl Williams when he was employed there?

11  A.   I don't remember.

12  Q.   Did you ever give him good performance reviews?

13  A.   I don't remember if I gave him a performance review.

14  Q.   Do you know if Dan Spataro was giving him performance

15  reviews?

16  A.   I don't know if Dan gave him a performance review.

17  Q.   Do you know if anyone ever gave Carl Williams performance

18  reviews while he was employed there?

19  A.   I don't know.

20  Q.   Do you know why Carl Williams was fired?

21  A.   Yes.

22  Q.   Do you remember that?

23  A.   Yes.

24  Q.   You don't remember the performance review process, right?

25  A.   I'm sorry.

**UNITED STATES DISTRICT COURT**

1  Q.  You don't remember the performance review process, do you?

2  A.  I do remember the performance review process.

3  Q.  All right.  So did you follow it?

4  A.  Did I use the tool?

5  Q.  Did you follow the policy for performance reviews at

6  Linode?

7  A.  There wasn't a policy.

8  Q.  So it doesn't matter if anyone does performance reviews at

9  Linode?  Is that your testimony?

10  A.  There was a tool that managers chose to use.

11  Q.  And you don't know whether you ever used it?

12  A.  I know I used it.

13  Q.  Did you ever use it with Carl?

14  A.  I don't remember.

15  Q.  You don't know if Dan used it with Carl?

16  A.  I don't know.

17  Q.  But you remember why Carl was fired, right?

18  A.  Yes.

19  Q.  Why?

20  A.  Carl was fired because of his public support of someone,

21  an ex-employee, that was in trouble for being a pedophile and

22  accused of attempting murder of a 13-year-old.

23  Q.  What's a pedophile?

24  A.  He was found with child porn on his work laptop.

25  Q.  My question, sir, is what's a pedophile?

**UNITED STATES DISTRICT COURT**

1  A.   Somebody that --

2  Q.   Has sex with kids, right?  That's what a pedophile is,

3  correct?

4  A.   A pedophile is somebody who gets off sexually with kids,

5  but it doesn't need to be sex.

6  Q.   To be a pedophile, do you have to actually engage in some

7  kind of act or can it just be something that happens in your

8  mind?

9  A.   I think you need to engage in an act.  I don't know.

10  Q.   Why are you using that word here, sir?  There's no

11  allegations against John Musbach for pedophilia.  What he did

12  is bad enough.  Why do you need to exaggerate it in front of

13  this jury, sir?  It's terrible what he did.  You just said he

14  sent pornographic pictures to a 13-year-old.  That's pretty

15  bad, right?

16  A.   That's pretty bad.

17  Q.   Right.  But you want to use the word "pedophile," right?

18  Even though that's not what happened.  Why?

19  A.   That is what happened.

20  Q.   Tell me about the time when John Musbach touched a kid.

21  It never happened, sir.  He was a terrible person who did

22  terrible things, terrible, terrible ideas, terrible decisions.

23  He's exactly where he belongs, in jail.

24       But he wasn't a pedophile, and you want to use that word

25  here, don't you, sir?  Why?  Why exaggerate about something you

1 don't have to exaggerate about?

2 A.   I am not exaggerating about that.

3 Q.   So tell me about the time when he did something to touch a

4 kid.  Tell me about it.

5 A.   He was found with child porn on his laptop.  To me, that's

6 a pedophile.

7 Q.   Okay.  And you said that my client was fired for

8 supporting that?

9 A.   Yes.

10 Q.   At the time, back in 2020, take your mind back to August

11 of 2020.  What information did you have about this issue?  It

12 was the newspaper article, correct?

13 A.   Specific to John Musbach?  Or could you be more specific?

14 Q.   Yeah.  Sir, it's about the issue that we're talking about

15 right now.  What do you mean be more specific?  How much more

16 specific do you want me to be?

17      It was an article on the internet, right?  That's what you

18 had access to at that point, right?  It was an internet

19 article, correct?

20 A.   It was a newspaper article.

21 Q.   It wasn't in the newspaper, though.  It was on the

22 internet, right?

23 A.   It was the Philadelphia Inquirer on the internet.

24 Q.   It was on the internet, sir.  It wasn't in the paper,

25 correct?

**UNITED STATES DISTRICT COURT**

1  A.   Yes.

2  Q.   You agree with that distinction?

3  A.   Yes.

4  Q.   I mean, there is a distinction between internet and a

5  paper, right?  That's an easy one, right?  Right?

6  A.   Yes.

7  Q.   And so the only information that you had when you are

8  saying these decisions were made was that article, right?

9  Correct?

10  A.   No.

11  Q.   What other information did you have?

12  A.   Tried to reach out to Carl that day before I knew --

13  before I saw --

14  Q.   Did you talk to him?

15  A.   I tried to.  He was unavailable --

16  Q.   Did you talk to him, sir --

17       MR. CAVALIER:  Can he finish his answer, please?

18       THE COURT:  You need to let him finish his answer,

19  Mr. Carson.

20  BY MR. CARSON:

21  Q.   Question was, sir, did you talk to him?

22  A.   No.  He was unavailable.

23  Q.   So you didn't get information from Carl, then, right?

24  A.   Correct.

25  Q.   All right.  You didn't have any other information, right?

**UNITED STATES DISTRICT COURT**

1  It was just -- the decision to fire Carl was based upon this

2  thing you read on the internet, right?

3  A.  Yes.

4  Q.  100 percent, right?

5  A.  Yes.

6  Q.  Okay.

7        MR. CARSON:  Can we please show the witness the

8  article.  I think it's 22.  I'll tell you in a second.

9        THE COURT:  It's 24, Mr. Carson.

10        MR. CARSON:  Thank you, Your Honor.

11 BY MR. CARSON:

12 Q.  Do you have the article now in front of you?

13 A.  Yes.

14 Q.  That's what you're talking about?

15 A.  Can you scroll down?

16        MR. CARSON:  Wait.  Wait.  Wait before you scroll

17 down.

18 BY MR. CARSON:

19 Q.  Can I ask you a question about the top?  Do you recognize

20 this?

21 A.  Yes.

22 Q.  Is this what you are talking about?

23 A.  I'm not sure without reading the rest of it.  It's been a

24 couple years.

25 Q.  Okay?

**UNITED STATES DISTRICT COURT**

1          MR. CARSON:  You can scroll down.

2  BY MR. CARSON:

3  Q.   Do you recognize it yet?

4  A.   Can you continue scrolling, please?

5  Q.   Let us know when you do.

6  A.   Continue please.  Continue please.  Continue.

7  Q.   You don't recognize it yet?

8  A.   There were several articles.  I'm trying --

9  Q.   There was only one, sir.  You just said 100 percent it was

10  based on one article.  Is this it?

11  A.   I don't know.  Continue.  Yes, this is it.

12  Q.   Do you agree that we don't have to search through it?

13  There's only one sentence in this whole article that has to do

14  with where Carl's name is mentioned.  Do you agree with that?

15  A.   There was more than one sentence --

16  Q.   Oh, a little section at the bottom --

17          MR. CAVALIER:  Object again.  He's trying --

18          THE COURT:  Again, I don't know that he's done with

19  his answer, Mr. Carson.

20          MR. CARSON:  Well, it was a yes-or-no question.

21          THE COURT:  Well, no.  It may not be.  So let him

22  answer the question.

23          THE WITNESS:  Could you repeat the question, please?

24  BY MR. CARSON:

25  Q.   Sure.  There's one section at the bottom, there's a little

UNITED STATES DISTRICT COURT

1  section at the bottom where Carl's mentioned, correct?

2  A.  Yes.

3  Q.  Okay.

4      MR. CARSON:  So can we show him that section now?

5  BY MR. CARSON:

6  Q.  Look at the screen, sir.  Do you see it?

7  A.  Yes.

8  Q.  Can you point out the part where it says that Carl

9  supports any of this behavior?  I can read it to you, if you

10  want.

11     "The allegations came as a surprise to his partner, Carl

12  Williams, who testified Thursday that, while Musbach had been

13  open about his past problems with child porn, he had not

14  mentioned trying to have someone killed.  'It's very serious,'

15  Williams said.  'There are no other times that I've heard

16  anything like this behavior that I've heard about today.'"

17     So that's what you're dealing with.  So can you just point

18  out there where it says that my client supported this guy?

19  A.  Client --

20  Q.  Just where?  Just show us.  Just tell us.

21  A.  It's not in the article.

22  Q.  Right.  And since this article was 100 percent of what you

23  based the decision on, this whole idea that my client supported

24  Carl Williams(Sic) is another lie that you're telling this

25  jury, correct?

**UNITED STATES DISTRICT COURT**

1   A.   No.

2   Q.   Well, we do know that you've lied in the case already,

3   right?  You agree with that?

4   A.   I'm sorry?

5   Q.   You have lied in this case already, correct, sir?

6   A.   I have not lied in this case.

7   Q.   You haven't?  Not once?

8   A.   No.

9   Q.   Did you and Vince Palochko and Dan Spataro work together

10  to come up with a false story for the reason my client was

11  terminated?

12  A.   No.

13  Q.   You didn't do that?

14  A.   The policy violations that we told Carl about at his

15  termination were true; however, we chose not to bring this

16  story up in his termination and used policy violations instead.

17  Q.   He wasn't fired because of anything to do with a single

18  policy violation, correct?

19  A.   Correct.

20  Q.   So, I mean, we have them, right?  I'm happy to do it.  I

21  really don't care.  You know.  Let's just do it.  So --

22       MR. CARSON:  What is it?  61?  The list of policy

23  violations.

24  BY MR. CARSON:

25  Q.   So this has already been admitted into evidence.  So this

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  is what you're talking about, right?  This was the list that

2  was generated in order to try to excuse Linode's behavior in

3  firing my client, right?

4  A.   This is a list of policy violations, yes.

5  Q.   Right.  Correct.  And so the first one says, "Violations

6  of theft and professional ethics."

7       He wasn't fired for that reason, correct?

8  A.   Correct.

9  Q.   The second one says, "Professional ethics."

10      He's not fired for that either, right?

11 A.   Correct.

12 Q.   Third one says, "Theft and professional ethics."

13      He's not fired for that, correct?

14 A.   Correct.

15 Q.   The fourth one says, "Theft and professional ethics."

16      He's not fired for that either?

17 A.   Correct.

18 Q.   5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th,

19 15th, 16th, wasn't fired for any of these reasons, right?

20 A.   Right.

21 Q.   This is a list of things that did not contribute to his

22 termination, right?

23 A.   They contributed to his termination, but the ultimate

24 reason was the affiliation with John Musbach.

25 Q.   Sir, he wasn't fired for any of these reasons, right?  You

**UNITED STATES DISTRICT COURT**

1  testified that way already, right?

2  A.   Right.

3  Q.   Right.  So you're saying 100 percent of the reason he was

4  fired was because of that article, right?  That's what you

5  said?

6  A.   Because of his affiliation with John Musbach.  Right.

7  Q.   Affiliation with John Musbach, right?  That's what you

8  said, right?

9  A.   Yes.

10  Q.   Okay.  So according to your testimony, when you decided

11  you wanted to terminate my client, the first thing that was

12  done is you sat down and you generated a list of reasons why he

13  wasn't terminated, right?

14  A.   I did not generate a list.

15  Q.   Did you assist in this list?

16  A.   No.

17  Q.   Okay.  So let's go back to --

18         MR. CARSON:  Can we please show the witness -- it's

19  going to be the performance review document.  You're welcome to

20  try to find it faster than me.  I think it's 47.  Hang on.  49.

21  Can you please show him 49?

22  BY MR. CARSON:

23  Q.   Sir, do you recognize this?

24  A.   I don't see anything.

25         MR. CARSON:  Go to the top, Melissa, please.

**UNITED STATES DISTRICT COURT**

1          THE COURTROOM DEPUTY:  Top.

2          MR. CARSON:  It's a blank screen in front of him.

3    BY MR. CARSON:

4    Q.   Do you see it now?

5    A.   Yes.

6    Q.   It's a document that was made by copying and pasting a

7    bunch of stuff into a Word doc, right?

8    A.   I don't know how it was created.

9    Q.   You don't know how -- but it looks to you like it's copied

10   and pasted, right?

11   A.   Yes or exported or --

12   Q.   Copy and pasted is something different than exporting.  It

13   looks to you like it's copied and pasted, right?

14   A.   I can't tell if it was copied and pasted.

15   Q.   So if you want to turn to Page 108 of your deposition, I

16   can go through it all with you.

17        "But," question, "I think, like, the last three pages are

18   about termination.  So I mean, you can read it, but I'll give

19   you an opportunity to look at those page us when I get to

20   that."

21        Answer, "Okay.  All right.  What's the next question?"

22        "All right.  So I want to go back to Page 159, kind of

23   start at the beginning and walk through it.  Do you recognize

24   the document."

25        "Yeah.  It looks like it was, you know, copied and pasted,

**U̲ɴɪᴛᴇᴅ  S̲ᴛᴀᴛᴇs  D̲ɪsᴛʀɪᴄᴛ  C̲ᴏᴜʀᴛ**

1  but yeah."

2      Question, "Yeah.  This isn't in this format that you see

3  it here, correct?"

4      "Correct."

5      "This is copied and pasted out of that info, this Word

6  document, correct?"

7      Answer, "Yes."

8      So last time I asked you about, it looked like it was

9  copied and pasted, right?

10 A.  Yes.

11      MR. CARSON:  And scroll all the way to the bottom,

12 please.  I'll tell you what page.  So we're going to stop at

13 Page 175.  At the top it says August 20th at 10:08 p.m.  Let me

14 know when you are there.  Are you there?

15 BY MR. CARSON:

16 Q.  Can you see that, sir?

17 A.  Yes.  This looks like it was copied and pasted.

18 Q.  Can you see what you said there?

19 A.  Yes.

20 Q.  It says what?  Tom Asaro, can you please add to the file,

21 right?

22 A.  Yes.

23 Q.  You were making a file of policy violations in connection

24 with Carl Williams' termination, right?

25 A.  I was asking Vinny to add an unreported day of PTO to

**UNITED STATES DISTRICT COURT**

1    Carl's HR file, not a list of policy violations.

2    Q.    Well, let's just see what you added to the file.  It says,

3    "There is a court date tomorrow, 2020, August 20th, that Carl

4    is scheduled to be at.  As of the time of his termination, he

5    had not requested PTO to attend.  Carl has 39 unpaid Linodes

6    under his Linode account.  Unclear what they are for.  If they

7    are personal, it way exceeds that benefit.  If they are work

8    related, I believe they may -- they are supposed to be under a

9    net ops account with notes detailing what they are.  We are

10    having someone disable, slash, preserve these for the new

11    term."

12          You wrote that, correct, sir?

13    A.    Yes.

14    Q.    So you are referencing even the very thing that you're

15    saying, you know, was 100 percent of the reason why he was

16    terminated.  You were referencing that very thing, and you

17    didn't mention that as a problem, right?  You mentioned that

18    the problem was violation of a policy, right?

19    A.    Is there a question?

20    Q.    Yeah.  That's what you did, correct?

21    A.    I'm referencing Carl's HR file and I'm referencing Linodes

22    that may either be personal, which exceeds a fringe benefit

23    that we offered employees.

24    Q.    That's the policy violation?

25    A.    Or -- that is.  But also, employees would put Linodes

**UNITED STATES DISTRICT COURT**

1   under their account to do work on specific projects.  So I

2   didn't know if these were specific to Carl's work at Linode and

3   needed to be reviewed and placed underneath the correct

4   department or team lead to continue with that work.

5   Q.    Yeah.  And so the day of his termination, you were sending

6   messages to the human resource department to add things to

7   Carl's file in connection with what?  Policy violations, right?

8   A.    Correct.

9   Q.    Right.  And you don't mention John Musbach once, right?

10  A.    Not in this copy and paste, no.

11  Q.    Nowhere, actually, on the planet earth, in the history of

12  the human race did you ever mention John Musbach in the

13  electronic communication, right, sir?

14          MR. CAVALIER:  Objection.

15          THE COURT:  That's overruled.

16          THE WITNESS:  Not that I can recall.

17  BY MR. CARSON:

18  Q.    Yeah.  And you don't ever recall seeing anyone talk about

19  John Musbach in any kind of electronic communication, correct?

20  A.    Seeing?

21  Q.    You?  Vincent Palochko?  Dan Spataro?  Texting each other?

22  Emailing each other?  Slacking each other?  IPF'ing each other?

23  Nothing?  Zero, right?

24  A.    There was certainly a conversation.  Yeah.  This was a

25  crazy, chaotic time.

**UNITED STATES DISTRICT COURT**

 1  Q.  Sir, I'm asking you about electronic communications.  You

 2  don't remember even one, do you?

 3  A.  No.  No.

 4  Q.  All right.  And so -- and so the reason that you guys

 5  decided to tell Carl was the reason for the termination, it was

 6  not the reason for the termination, right?

 7  A.  Correct.

 8  Q.  And you admitted that you lied to do that, correct?

 9  A.  Yes.

10  Q.  Several times, right?

11  A.  Several times.

12  Q.  Do you remember I played the recording for you at your

13  deposition and every time I stopped it, you said that was a

14  lie.  Do you remember that?

15          MR. CAVALIER:  I'm going to object to that.

16          THE COURT:  That's sustained.

17  BY MR. CARSON:

18  Q.  Sir, did you say you lied in connection with my client's

19  termination?

20  A.  Yes.

21  Q.  Multiple times, right?

22  A.  I'm unclear if you're asking me if I lied multiple times

23  or if I said I lied multiple times.

24  Q.  You said you lied multiple times, right?

25  A.  Okay.  Yeah.  Every time you asked, I answered yes.

**UNITED STATES DISTRICT COURT**

1  Q.  And in order to tell this lie, you had to come up with

2  other lies, right?  Isn't that true?

3  A.  No.

4  Q.  Well, I mean, one of the things on this list of so-called

5  policy violations is there's a bunch of things about his

6  purchasing alcohol and asking for reimbursements, right?

7  A.  I don't know.

8  Q.  Well, look at it.  Show it to me.  This is very quickly,

9  right?

10       So the first one, the second one.  The first one it says

11  that there's ten instances --

12            MR. CAVALIER:  He doesn't have the document.

13            MS. MEYER:  Yeah, what's the document?

14            MR. CAVALIER:  It's 60-61.

15            MR. CARSON:  Do you got it?

16  BY MR. CARSON:

17  Q.  Do you see it?  The first one, ten times you said, ten

18  times, ten instances.  Do you see that?

19  A.  I see it.

20  Q.  Asking for reimbursement.  Do you see that?

21  A.  Yes.

22  Q.  When someone asks for reimbursement, it's means they spent

23  their own money, correct?

24  A.  Typically, yes.

25  Q.  Right.  They spent their own money, they think that what

**UNITED  STATES  DISTRICT  COURT**

1  they did should be reimbursed because it was something for the

2  company, so they request from the company a reimbursement,

3  correct?

4  A.  Yes.

5  Q.  The act of requesting reimbursement doesn't violate any

6  policy at Linode, does it?

7      It's just a request, right?  Linode can say, yes, sure,

8  we'll get you it back, or no, we're not going to do this one,

9  right?

10  A.  Yes.

11  Q.  Do you remember when John Musbach worked at Linode?

12  A.  Yes.

13  Q.  Couple years, right?

14  A.  Yes.

15  Q.  And when he was fired, he was fired for what, like losing

16  a laptop or something like that?

17  A.  The story I remember is the FBI confiscated his laptop.

18  Q.  But he was fired because he asked for a new laptop, right?

19  That was the reason?

20  A.  Yeah.  And he told us the story when we asked him what

21  happened to his original laptop.

22  Q.  Why did you guys lie again?  What was the reason for the

23  lie?

24  A.  Why did we...

25  Q.  Yeah.  Why did you decide to lie to Carl about the most

**UNITED STATES DISTRICT COURT**

1  important issue in this case, the termination?

2  A.   It was a pretty chaotic and scary time.  It was

3  unprecedented.  We had an ex employee that was accused of some

4  pretty heinous things, we had a current employee that was

5  supporting him.

6  Q.   Well, didn't you just already admit that there's no

7  evidence he supported him?

8  A.   No.

9  Q.   Well, what's the evidence he supported him, sir?

10 A.   He was in court supporting him.

11 Q.   When someone goes to court, sir, can't they testify

12 against a person?

13 A.   They could.

14 Q.   Right.  You don't know which one he did, do you?  You have

15 no clue.  You certainly didn't know then, right?

16 A.   I don't know.

17 Q.   Right.  And you didn't bother to just talk to him about it

18 first, right?  There wasn't a single person that went up to

19 Carl Williams and was like, hey, Carl, what's up?  This is

20 pretty bad, dude.

21      No one did that, right?

22 A.   No.

23 Q.   Not a single person.  Because you didn't care, did you?

24 A.   We did care.

25 Q.   You cared so much that you just figured you were just

1  going to get rid of him?  Let's get rid of him, who cares.

2  It's all good.

3      Does that sound like you cared so much?  Do you really

4  want to say to this jury that you cared, sir?

5  A.  Yes.

6  Q.  No evidence that you cared, though, correct?

7  A.  Plenty of evidence that we cared.

8  Q.  You cared so much that you gave him the respect of lying

9  to him about everything?  Right, that's how much you cared?

10 A.  Yes.

11 Q.  Did you ever come clean to him?  Did someone call Carl the

12 next day and be like, yo, man, you got to understand.  We just

13 can't be associated, man.  We're a growing company, dog.

14     Did you ever do that?

15 A.  No.

16 Q.  Did anyone ever call him and say, hey, man, we're really

17 sorry this happened.  You know, we understand that you worked

18 all year and you did enough hours for the profit-sharing, we're

19 going to get you that profit-sharing check next year and we

20 wish you the best of luck?

21     Did you do that?

22 A.  No.

23 Q.  Did you ever call even him once to see how he was doing

24 afterwards?

25 A.  No.

**UNITED STATES DISTRICT COURT**

1  Q.  Did anyone?

2  A.  I don't know.

3  Q.  Anyone tell you that they did?

4  A.  No.

5  Q.  And you didn't read anything else about Carl Williams

6  before the termination, right?  Just that article?  We already

7  did that, correct?

8  A.  Correct.

9  Q.  The only time the FBI - you know, you mentioned the FBI

10 and I don't want to confuse anyone.

11     When the FBI communicated with Linode, it was because John

12 Musbach was employed there back in '16 when some of these

13 things may or may not have happened or did happen, I guess,

14 right?

15 A.  Yes.

16 Q.  It had nothing to do with anything that happened in '17 or

17 '18 or '19 or '20, right?  It was about the things that

18 happened when John was there, correct?

19 A.  I'm not sure.

20 Q.  And no one has ever contacted Linode about my client,

21 correct, not once?

22 A.  I'm not sure.  Not me.

23 Q.  My client has never committed a crime in his life.  Do you

24 have any knowledge to suggest otherwise?

25 A.  No.

**UNITED STATES DISTRICT COURT**

1   Q.   And you've never heard a single employee say it's either

2   him or me, right?  Not one in connection with that article,

3   correct?

4   A.   I did hear somebody say that.

5   Q.   Who?

6   A.   Dan Spataro.

7   Q.   Anyone else?

8   A.   No.

9   Q.   You have no knowledge of whether one other employee even

10  saw that article, do you?  Before the termination, sir.

11  A.   Yeah.  I mean, other execs.

12  Q.   Yeah, people you guys shared it with, according to your

13  testimony at least, right?

14  A.   Yeah.

15  Q.   But no employees came to Linode, no one sent any Slack

16  messages, guys, is this true about Carl?  What's going on with

17  Carl?

18       None of that ever happened, right?

19  A.   Not to me.

20  Q.   Yeah, not to you.

21       Vince Palochko never told you those things happened,

22  right?

23  A.   He told -- I think people came to him.

24  Q.   Do you know any of their names?

25  A.   I don't know.

1  Q.  You can't remember what he said?

2  A.  No.

3  Q.  So you don't have any real reason to say that that

4  happened, right?  It's just you think?

5     Certainly never saw any evidence that someone came to him,

6  correct?

7  A.  No evidence other than employees telling me.

8  Q.  What employees?

9  A.  Dan and Vinny.

10  Q.  The two people that you worked with to come up with this

11  fake reason for the termination, right?

12  A.  Yes.

13  Q.  And there was like a lot that went into this fake reason,

14  right?  You guys like made up a whole anonymous call.  Hey, we

15  got an anonymous call about the hours that you worked, right?

16  That was all part of the lie?

17  A.  I never heard about an anonymous call.

18  Q.  Yeah.  There wasn't an anonymous call, right?  It didn't

19  happen, right?

20  A.  I don't recall an anonymous call.

21  Q.  So you didn't hear about any complaints, right?  No one?

22  Just the three of you guys working together, right?  Correct?

23  A.  I didn't receive any complaints other than from Dan and

24  Vinny.

25  Q.  And what you know for sure, no matter what the reason was,

1  Dan didn't want Carl to work there anymore, correct?

2  A.   Sorry.  Could you restate?

3  Q.   I said what you know for sure, putting aside whatever the

4  reason was, you know for certain that Dan didn't want to work

5  with Carl any longer, don't you?

6  A.   Yes.

7  Q.   Tom -- Carl never punched a clock in his employment,

8  right?  There was never set hours he was supposed to work,

9  right?  He was a salary employee, correct?

10 A.   We had core hours we expected people to be there, and it

11 floated a couple hours in each direction.

12 Q.   Yeah.  But there was no time clock, no hour-keeping

13 system, nothing like that, right?

14 A.   There was no time clock, if that's what you're asking.

15        MR. CARSON:  I don't have any more questions.

16        THE COURT:  Okay.  Let's use that as a moment for a

17 mid afternoon break.  So we'll take ten -- we'll take about

18 15 minutes and we'll come back.  Let's be ready to go promptly

19 at 3:00.  All right?  Okay.  Thank you.

20        THE COURTROOM DEPUTY:  All rise.

21        (Jury exits the courtroom at 2:44 p.m.)

22        THE COURT:  Okay.  We'll come back and do cross then.

23 Okay.  Thanks.

24        MR. CAVALIER:  Your Honor, how late do you intend to

25 go today?  I just want to make sure we finish with this

**UNITED STATES DISTRICT COURT**

1  witness.

2          THE COURT:  I mean, my expectation was to go to about

3  4:30.

4          MR. CAVALIER:  As long as I know I'm good to go.

5  Thanks.

6          THE COURT:  Yep.

7          (Brief recess from 2:44 p.m. to 3:01 p.m.)

8          THE COURTROOM DEPUTY:  All rise.

9          THE COURT:  All right.  Have a seat everybody.  Get

10  the jury.

11          THE COURTROOM DEPUTY:  All rise.

12          (Jury enters the courtroom at 3:02 p.m.)

13          THE COURT:  All right.  Have a seat, everybody.

14          Mr. Asaro, come on back up.

15          MR. CAVALIER:  May I, Your Honor.

16          THE COURT:  Go ahead, Mr. Cavalier.

17                          CROSS-EXAMINATION

18  BY MR. CAVALIER:

19  Q.   Welcome back, Mr. Asaro.

20  A.   Thank you.

21  Q.   Why don't you tell the jury a little bit about yourself,

22  like the speed dating version, background, education, and so

23  forth.

24  A.   Sure.  Tom Asaro, I'm married, I have three boys at home.

25  Two of them are in college, one just started high school.  I

**UNITED STATES DISTRICT COURT**

1  went to high school in Southern New Jersey, went to Rutgers a

2  year for engineering, then to Stockton and ended up with a

3  psychology degree.

4      First job was at a construction company as a purchasing

5  manager.  And then I had a knack for computers, so I was a

6  purchasing manager, slash, IT.  I worked there for eight years

7  before moving on to Linode.  And you know, I'm sure I'll tell

8  the rest of that story later but...

9  Q.  On that note, let me ask you, how did you meet Christopher

10 Aker?

11 A.  Chris and I, he lived three doors down from me when my

12 family moved to South Jersey I was 11.  So I was in fifth

13 grade.  So we met somewhere around fifth or sixth grade.  We've

14 been best friends for 35-plus years.

15 Q.  Why don't you tell the jury how the story of how Linode

16 began.

17 A.  Okay.  So I'm going to go to my senior year in college.

18 This is December of 1997.  It's Christmas break, holiday break.

19 The day after Christmas, Chris and I decided we were going to

20 take a cross-country or round-country road trip.

21     We didn't have much of a budget.  I was still in school

22 and Chris had just gotten out of school, but we were going to

23 take his car, we were going to drive the southern route to

24 California, to San Francisco, and then the northern route back

25 to New Jersey.

**UNITED STATES DISTRICT COURT**

1          And we had something like 16 or 17 days to do this.  It
2     was a pretty quick trip.  I think we did like 9,000 miles.
3     Point being, though, along the way, we tried to stay with
4     friends or relatives as much as possible, and one of those
5     stops was in Flagstaff, Arizona.  We stayed with one of Chris's
6     mentors from Full Sail University, where he got two degrees
7     there and then he taught there for a year.  So this was one of
8     the professors that both taught him and that he worked with.
9          We were in Flagstaff, and he worked at a local university
10    and on the side he helped a local dial-up ISP run.  And he
11    brought us to that facility to give us a tour, and we were --
12    you know, we were geeks at heart, so it was a pretty cool
13    experience to see all the banks of modems and the people
14    dialing up just to get internet access back then.
15         We left that place with two things.  One, on the side they
16    were burning Linux DVDs or CDs, so he gave us our first copy of
17    Linux, and we were going to go back to New Jersey and start a
18    dial-up ISP.
19    Q.   What is Linux, briefly?
20    A.   Linux is the operating system similar to Windows or Mac
21    OS, except it's the operating system that runs the internet
22    basically.
23    Q.   Okay.
24    A.   So we were going to come back to New Jersey and start a
25    dial-up ISP.  Along the rest of the trip, in San Francisco we

**UNITED STATES DISTRICT COURT**

1    went to a Fry's for the first time in our life, this was an

2    electronics store that's kind of ran like a flea market.  So we

3    found a used, really small monitor, put that in his trunk.  And

4    then in Washington State, we stayed at another friend's house

5    that had just gotten a new PC, so he sold us his old PC, so we

6    put that in the car.

7        And on our way home, we got a flat tire in a snowstorm and

8    had to hole up in a hotel for a day and a half while that got

9    repaired and the snow passed.  So we pulled the power cord off

10   of one of the lamps in the hotel, plugged the computer in,

11   installed Linux for the first time, and that's kind of what

12   started the whole thing.

13       We got back to New Jersey, started writing business plans,

14   starting looking at office space, what it would take to open up

15   a dial-up ISP, but regular life got in the way.  I finished

16   school, he found a job in Tennessee, and we never really

17   pursued that other than we came up with a name, Shore Network

18   Technologies, we came up with a logo, and we kind of halted

19   there.  And I'm kind of really glad we didn't start a dial-up

20   ISP in 1998.  That would have been a disaster.

21       So Chris went off to this job in Tennessee where -- it was

22   a start-up.  It was a health care educational, online -- you

23   know, doctors and nurses would use this service to keep up with

24   their credits that they had to maintain every year.  So we got

25   a little bit of a taste for this online service, education

**UNITED STATES DISTRICT COURT**

1  recurring subscription-based service.

2      And off on the side he did continue with the Shore Network

3  Technologies project, just not as a dial-up ISP.  He created

4  what's called a shared hosting service.  It's shared because

5  you take one computer and you can put a whole bunch of

6  customers on it.  But it's shared in a way that they all share

7  the same software.  So it's usually very slow and not a very

8  good customer experience, but it's acceptable for things like

9  email or a website that doesn't get a lot of traffic.

10      So he would sign up friends, co-workers, family members,

11  the place that I got a job at signed up for a service.  And he

12  had enough of a customer base to bring in $2,000 a month,

13  something like that.  It paid for his rent, paid for his car

14  payment.

15      And after a couple years working at this medical start-up

16  online company, he wanted to fulfill his dream of working for

17  himself.  So he had a year of savings saved up in the bank, he

18  had this project off on the side that was kind of paying his

19  rent and whatnot, and he gave himself a year to come up with

20  the idea.

21      He quit his job, he came up with the idea to do Linode,

22  and he kind of locked himself in his apartment for six months.

23  Nobody really heard from him.  You had to kind of like -- he

24  didn't reach out to anybody, you had to reach out to him.

25      But at the other end, all by himself he created Linode.

**UNITED STATES DISTRICT COURT**

1  He wrote the website, he programmed everything.  He bought used

2  hardware on EBay and put the software on it and shipped it off

3  to the data centers.  And he really worked his butt off on this

4  thing.

5      On June 16, 2003, he was going to launch -- funny enough,

6  June 15th, the day before, somebody found the website and

7  signed up.  It was the first customer.  But he had to call this

8  customer up and say that he was going to delete the data base

9  the next morning and launch for real, so the customer came back

10  the next day.

11      And from that day until I was employed there, every single

12  day there was at least one new customer.  And you know, in the

13  fast growing years, dozens or hundreds per day.  So it's a real

14  -- he came up with a unicorn, a real hit.

15      He did that by himself for about a year and a half and

16  couldn't keep up.  Because he was the technical person, he was

17  fixing bugs, he was answering customer support tickets, he was

18  looking for new hardware, shipping it to data centers,

19  everything by himself.  So he hired one of his early employees

20  as his number one employee.  And they did that for about a

21  year.

22      And at about that time, I was ready to move on from the

23  job that I was working at at the construction company, and he

24  felt that the Linode business was stable enough to invite me

25  on.  I had already been married, two kids, stable job, and here

**UNITED STATES DISTRICT COURT**

1   was this start-up opportunity that was pretty scary, but I'm

2   glad I took the leap.

3       So I came over in 2006, and I just started soaking it all

4   in.  He trained me.  He came from Tennessee to New Jersey,

5   stayed at my house for two weeks.  We built servers together,

6   we shipped them, he started teaching me Linux, a little bit of

7   SQL, and we were off to the races.  It was a little difficult

8   in the beginning because I would get up in this morning with

9   the kids or whatever, and all these customer support tickets

10  were there to be answered.  And you know, when I was new, I

11  didn't know how to respond to them.  And they were on the

12  typical programmer, wake up at 1:00 in the afternoon, get on

13  the computer at 2:00, and I would have to wait for them.  But

14  eventually we kind of all got synced up.

15      About a year or two working remotely, all three of us,

16  Chris decided to move back to New Jersey and we opened up our

17  first office; it was in Absecon.  And the three of us being in

18  the same building for mostly the same hours, things really took

19  off after that.  We could go out to lunch together and talk

20  about ideas, and we could actively help each other with

21  customer support issues or technical problems instead of, you

22  know, almost like leaving a voicemail and waiting for the other

23  person to wake up.  So it was a big catalyst being in the same

24  building.

25      I would continue to build out most of the non-technical

**UNITED STATES DISTRICT COURT**

1    pieces of the company.  I would build servers, I would ship the
2    servers, look for new data center locations.  I built a
3    customer service department that eventually became 24/7 so the
4    customers didn't have to wait to get an answer.  You know,
5    introduced benefits when I joined.  Part of the reason it was
6    scary leaving the stable job, there were no benefits, no health
7    plan, no retirement plan.  So I introduced all of those things,
8    paid time off.  And we continued to grow.
9        But it was difficult because we would take every dollar
10   that was in savings and buy as many servers as we could to meet
11   the demand of the next month.  And if we could only buy more
12   servers than we had money for, we could grow that much faster.
13   We went to the bank to get a loan, and they only gave us a
14   small one to only buy a couple servers with it.  We were buying
15   mostly on cash.  We would place an order, and the vendors would
16   force us to place a wire transfer before they would accept the
17   order and ship everything to my house.
18       Eventually, we decided we needed to kind of leapfrog and
19   couldn't get a loan and we didn't want to take any outside
20   investment.  We didn't have any VC firms.  They would call, but
21   we just didn't want to answer to somebody else.  So I got a
22   second mortgage on my house, and that was the catalyst for us
23   to buy instead of five servers a month, five servers one month,
24   we were able to get 50, and we filled them up.  And that was
25   the catalyst to spur the growth that we saw.  Linode was able

**UNITED STATES DISTRICT COURT**

1    to pay my second mortgage back in less than a year.

2         So continuing to grow, we opened a second office in

3    Galloway.  We started with 25 percent.  It was like a shared

4    office building.  There was an orthodontist across the way and

5    a lawyer upstairs, and we took a little piece of the building,

6    25 percent.

7         And by the time we moved out of that office, we had about

8    80 percent of it.  As tenants would leave, we would tell the

9    landlord that we wanted the space, and we just continued to

10   grow there.

11        It was difficult recruiting, though, because we were in

12   Galloway.  We needed technical help.  And it was difficult

13   convincing people around the country to relocate to kind of a

14   sleepy shore town, especially in the winter, so the decision

15   was made to eventually relocate to Philadelphia metropolitan

16   area where we could attract a lot of talent.  And the plan was

17   to hire like crazy, which we did.

18        I'm kind of fast-forwarding through some of the stuff

19   at the end there.  But, you know, after almost 20 years, it

20   felt like we couldn't help our employees grow anymore.  You

21   know, we did as much we could as entrepreneurs to grow this

22   thing, take care of our employees, and we wanted to kind of

23   pass the torch to somebody who had been doing this for much

24   longer.  We were very strict with the requirements when we were

25   looking for these companies.  We wanted them to have the same

**UNITED STATES DISTRICT COURT**

1  values, the same kind of community, kind of like the same way

2  we brought -- we were brought up internally.  So luckily we

3  found a company that was like that, and one of the pioneers of

4  the internet, Akamai, and then we moved on.  We just needed a

5  break.

6  Q.  Let me just ask you briefly, from the founding of the

7  company to the sale of the company to Akamai, did anyone other

8  than Christopher Aker own any piece of the company?

9  A.  No.  Christopher Aker owned one hundred percent of the

10  company.

11  Q.  And I want to ask you this briefly because I realize we're

12  on day five of this trial and I don't think anyone in the

13  courtroom knows at this point, but can you explain to the jury

14  briefly what a Linode is and what the company does?

15  A.  Sure.  So I mentioned earlier, Chris created this shared

16  hosting company where there's a computer and all the software

17  is shared and it's pretty slow and not a great customer

18  experience.  One of the alternatives to that is what's called

19  dedicated hosting where you go out and buy your own computer,

20  which is expensive, you put your own software on there or hire

21  someone to put it on there, and then you bring it to a data

22  center and pay them what's called a rent for electricity,

23  cooling, security so nobody else can touch it, and then

24  connectivity to the internet.  And then you are the only

25  customer on it.

**UNITED STATES DISTRICT COURT**

1    And that's kind of opposite of shared hosts.  It's very
2    performant, but it's super expensive.  So Chris's idea was
3    somewhere in the middle.  There's open-source software, which
4    is free for anyone to download, where we could take that -- we
5    still had to buy the big, expensive computer, but we could
6    install this software and it kind of minimized the hardware.
7    So it was a bunch of small servers, small dedicated servers
8    that you weren't sharing with anybody else as far as the
9    software goes.  So you got the performance, but you also got
10   the sharing costs of putting this expensive computer online so
11   that we could offer this product at a much more competitive
12   rate than if you went out and bought your own and would have
13   hosted on your own.
14   Q.  So what us normal folk termed "cloud computing," your
15   definition of that or your product in the cloud is a Linode?
16   A.  Yes.
17   Q.  All right.  Let me move you to some substance, and some of
18   this you already responded to questions from Mr. Carson on.
19        But since you are the earliest employee that the jury is
20   going to hear from at Linode, I want to take you through some
21   of the hires, people that we've heard about.
22   A.  Okay.
23   Q.  Did you hire Vincent Palochko?
24   A.  Yes.
25   Q.  Can you tell the jury about that hire?

**UNITED STATES DISTRICT COURT**

1  A.   Yeah.  Vincent was our payroll specialist at Paychex, so I

2  communicated with him often, and he was great.  He was kind of

3  everything that Linode aspired to be in our customer service

4  department.  He was quick to respond, he was courteous, he had

5  the right answers on the first try.  You didn't have to keep

6  calling him back.  And the opportunity presented itself for him

7  to -- we got talking one day, he wanted to move on, and I

8  suggested that he come on over and lead our HR department.

9  Q.   Was he the lead HR person at Linode throughout his

10 employment with the company?

11 A.   Yes.

12 Q.   Do you remember the dates of his employment with Linode?

13 A.   I don't recall exactly.

14 Q.   Okay.  Does 2012 for a hire date sound correct to you?

15 A.   Yes.

16 Q.   Was Vinny in his role as the head HR person at Linode, all

17 the way through the, what we'll call the end of the company or

18 the acquisition of the company by Akamai?

19 A.   Yes.

20 Q.   And that occurred when, in 2022?

21 A.   2022, yes.

22 Q.   Okay.  So about 10 years of employment?

23 A.   Yes.

24 Q.   During that 10-year window, did Vincent Palochko ever give

25 you, as chief operating officer, a reason to doubt his

**UNITED STATES DISTRICT COURT**

1  competence as HR manager?

2        MR. CARSON:  Objection.  Leading.

3        THE COURT:  Overruled.

4  BY MR. CAVALIER:

5  Q.   You can answer.

6  A.   No.

7  Q.   So let's step forward, then, to the next hire in the

8  chronological chain of this case, which is the hire of Mr. Carl

9  Williams.  Were you involved at all in the decision to hire

10 Mr. Williams?

11 A.   Yes.

12 Q.   Can you tell the jury about that involvement?

13 A.   Yeah.  As I was responsible for most things non-technical,

14 one of those things was recruiting.  Even though Vinny had

15 joined the team and was kind of taking that over for me, I

16 would participate in almost every interview up until a certain

17 point.  So I was definitely involved in Carl's interview.

18 Q.   Do you have a recollection, sitting here today, about the

19 specifics of that interview or how it went?

20 A.   Not -- not very well.  Not -- I don't recall it very well.

21 That was a long time ago.

22      But yeah.  Carl's resume was very impressive.  He had some

23 big names on there, and we were struggling to hire people in

24 the Galloway area.  So it looked like we were going to have a

25 good fit.

**UNITED STATES DISTRICT COURT**

1  Q.  Did you meet with Mr. Williams in person prior to his
2  hire?
3  A.  Yes.
4  Q.  So you were able to observe him personally, correct?
5  A.  Yes.
6  Q.  Did you have an opinion or idea on how old he was at the
7  time of hire?
8  A.  No.
9  Q.  Did you care how old he was at the time of hire?
10 A.  No.
11 Q.  So next up, I believe, in the hiring chain of the names
12 the jury has heard about is Dan Spataro.  Were you involved in
13 the hire of Dan Spataro?
14 A.  Yes.
15 Q.  Can you tell the jury about that involvement?
16 A.  Dan worked at our data center in New Jersey.  We called it
17 our Newark data center, but it was actually in Cedar Knolls, I
18 think it was called.  But putting Cedar Knolls on a worldwide
19 company website, I don't think anybody would have heard of
20 that.  So we used Newark.
21      So he was the lead network tech there that ran the entire
22 data center, including our very complicated setup there.
23 Q.  What was Dan hired to do?
24 A.  Dan was hired for two main reasons, in my opinion.  One,
25 we were growing and needed a true manager for the department.

**UNITED STATES DISTRICT COURT**

1  You know, not me.  I'm not very technical.  I was more of a

2  people leader than a technical leader.  So he was brought in to

3  lead the network engineering department.

4      But we were also experiencing internet attacks against our

5  service that were degrading service for our customers.  Our

6  network, up until that point, had been designed by Chris Aker,

7  and it wasn't holding up very well to some of these attacks.

8  And Dan was brought in to redesign our entire network and bring

9  it up to data center grade.

10  Q.  And did he do that?

11  A.  Yes.

12  Q.  Okay.  At the time of his hire, was Mr. Williams, then,

13  going to be reporting to Mr. Spataro?

14  A.  Yes.

15  Q.  Do you remember who else at that point in time would be

16  reporting to Mr. Spataro?

17  A.  It was Andrew Dampf, Alex Forrester, and right about at

18  the same time, I was interviewing Owen Conway, who I felt was a

19  great fit for the team.  But I had already committed to hiring

20  Dan as the manager and wanted his blessing before we hired him.

21  So we reached out to each other, and he gave me the blessing.

22  Q.  So you're saying that even prior to Dan's hire, you spoke

23  to him about potentially hiring Mr. Conway?

24  A.  Yes.

25  Q.  All right.  As a matter of fact, he's the next name on my

**UNITED STATES DISTRICT COURT**

1  list.  Can you tell me about how that hire went down?

2  A.   Yeah.  Owen interviewed -- I can't remember if he was in

3  person or if it was a Zoom call or -- but he was a great fit.

4  He worked at one of the internet exchanges, which there's only

5  a few in the world.  So he worked at one of the places where

6  all of the information on the internet meets and then is, you

7  know, redirected to its final destination.

8      I thought this was a perfect fit for what we do and for

9  our company, and I recommended that we hire him.  I just wanted

10  to get Dan's blessing before I did.

11  Q.   Did you, in fact, hire Owen Conway?

12  A.   Yes.

13  Q.   Do you remember the position he was hired into?

14  A.   I don't recall exactly, but it was, at a minimum, network

15  engineer if not senior network engineer.

16  Q.   Okay.  At the time you hired him, did you know Mr. Conway

17  was gay?

18  A.   Not -- not at the time I hired him.

19  Q.   Did you come to find out he was?

20  A.   Yes.

21  Q.   How?

22  A.   He would talk about it openly.

23  Q.   Just to close the loop there, Mr. Conway eventually left

24  Linode, correct?

25  A.   Correct.

**UNITED STATES DISTRICT COURT**

1  Q.  Do you know when that occurred?

2  A.  I don't know exactly.  Maybe a year and a half, two years

3  in.

4  Q.  Okay.  Did -- at least to your knowledge, did Mr. Conway

5  ever complain about any treatment that he received at Linode

6  due to his age or his sexual orientation?

7  A.  Never.

8  Q.  Let me take you back, then.  We have the hire dates now.

9  We've set the path.  Let me talk to you about Mr. Williams'

10  employment with the company.  Okay?

11      Was there any point early in Mr. Williams' employment

12  where you had reason to be concerned about his technical

13  abilities?

14  A.  Yes.

15  Q.  Can you explain that to the jury?

16  A.  Carl had this great resume.  And being a short-handed,

17  especially on the network, engineering staff, kind of start up

18  atmosphere, we needed people to jump in and do whatever was

19  necessary to help keep the company running.

20      Not long after Carl started, he wouldn't participate in

21  some of the more technical things that we needed to do.  There

22  was an on-call rotation, you know, during some of these

23  attacks.

24      Especially, there was a large attack against us for

25  two weeks straight during the holiday season.  I think it was

**UNITED STATES DISTRICT COURT**

1  2015 to '16, right before we hired Dan.  Our Atlanta data

2  center was knocked offline.  All the customers there didn't

3  have access to the Linode, and their customers didn't have

4  access to the Linode.  And this was because these folks on the

5  internet had decided to attack us and knock the data center

6  out.

7       For two weeks straight, Andrew Dampf, Alex Forrester, and

8  I were on calls with the data center, trying to resolve this,

9  talking with other network engineers, talking to Dan and his

10 team, trying to figure out how to get our data center back

11 online.  But Carl wasn't participating in that emergency

12 scenario.

13 Q.  Did that cause frustration amongst the employees?

14 A.  It was never expressed to me that it did, but I could see

15 that it would.

16 Q.  Did you think it was problematic that he wasn't

17 participating?

18 A.  Yes.

19 Q.  But you didn't terminate his employment, correct?

20 A.  No.

21 Q.  Let me ask you a little bit -- and I know this isn't your

22 area, but you were asked about it on direct.  Do you remember

23 being asked by Mr. Carson about whether there were any policies

24 in place governing the way Mr. Spataro handled the promotion of

25 Tim Kaufman?

**UNITED STATES DISTRICT COURT**

1  A.  Yes.

2  Q.  Okay.

3        MR. CAVALIER:  Could you to me a favor and bring up

4  Exhibit 33?  Previously admitted.

5  BY MR. CAVALIER:

6  Q.  So, Mr. Asaro, do you recognize this as a Linode handbook?

7  A.  Yes.

8        MR. CAVALIER:  Tim, if you could, please flip forward

9  to the Bates stamp 0248.

10 BY MR. CAVALIER:

11 Q.  So, Mr. Asaro, are you familiar with the policy that Tim's

12 helpfully called out here for you?

13 A.  Not exactly.

14 Q.  Okay.  You didn't write this policy, correct?

15 A.  No.

16 Q.  All right.  Is it your understanding, as chief operating

17 officer of Linode, that all employees are required to follow

18 the employment policies set forth in the handbook?

19 A.  Yes.

20 Q.  So is it your understanding, as chief operations officer,

21 that Mr. Spataro and all his activities on behalf of Linode

22 would be required to comply with this non-discrimination

23 policy?

24 A.  Yes.

25 Q.  Including in the area of promoting acting Linode

**UNITED STATES DISTRICT COURT**

1  employees?

2  A.   Yes.

3  Q.   Okay.  Do you have any reason to doubt that Mr. Spataro

4  complied with this policy?

5  A.   No.

6  Q.   All right.  When Mr. Spataro -- and I recognize we're

7  going to hear from him directly, so I'm only asking about what

8  you know or observed at the time -- was responsibility for

9  Mr. Williams' employment effectively handed off to Mr. Spataro?

10  A.   Yes.

11  Q.   Okay.  And so at that point, there was yet another level

12  of employment separation, we'll call it, between you and Carl?

13  A.   Correct.

14  Q.   Okay.  Did Mr. Spataro ever discuss with you issues that

15  he was having with Mr. Williams' employment?

16  A.   No.

17  Q.   Okay.  Did you ever have an opportunity between the point

18  where Mr. Spataro took over as the director of network

19  operations and Mr. Williams' employment to directly manage or

20  otherwise observe Mr. Williams' employment?

21  A.   Sorry.  Could you repeat?

22  Q.   Yeah.  It was a little convoluted.  Sorry about that.  I

23  think I was just asking you to confirm that once Mr. Spataro

24  took over to the point that -- from that point to the point

25  that Mr. Williams was no longer employed, did you have direct

1  involvement in the oversight of Mr. Williams' employment?

2  A.  No.

3  Q.  Okay.  By the way, just to cover something that I think

4  we've heard here this week, since you mentioned it earlier, I

5  wanted to ask you.  I think we heard some testimony -- and I

6  recognize you haven't been in the courtroom -- but we've heard

7  some testimony this week about Mr. Williams' involvement in the

8  process that led to Linode's sale to Akamai.  Do you have any

9  thoughts at all for the jury on whether Mr. Williams

10 participated in that process?

11           MR. CARSON:  Objection.  Leading.

12           THE COURT:  It's overruled.

13           THE WITNESS:  I can answer?

14           MR. CAVALIER:  Yes, you can answer.

15           THE COURT:  Go ahead.

16           THE WITNESS:  Carl wouldn't have been involved with

17 any discussions to sell the company.

18 BY MR. CAVALIER:

19 Q.  To your knowledge, did Carl introduce you to anyone

20 relevant to the ultimate sale of the company?

21 A.  No.

22 Q.  Do you know whether he introduced Mr. Aker to anybody who

23 was relevant in the sale of the company?

24 A.  No.

25 Q.  To your knowledge, did he play any role whatsoever in the

**UNITED STATES DISTRICT COURT**

1  sale of the company to Akamai?

2  A.  No.

3  Q.  So let's jump forward, then, to the termination event.

4  When did the issue that ultimately led to Mr. Williams'

5  termination first come to your attention and how?

6  A.  I mean, do you want me to go back to 2015 or whenever?

7  Q.  We're going to talk about the policy violations.  But with

8  respect to the article -- well, actually, you know what?  Let's

9  do it in the order you prefer.

10     Starting in 2015, did you have the opportunity to observe

11  or be involved with any policy violations brought to your

12  attention with respect to Mr. Williams?

13  A.  I can't remember the years in which or, you know, the time

14  stamps at which violations would occur.

15  Q.  Did policy violations come to your attention during

16  Mr. Williams' employment?

17  A.  Yes.  Yes.

18  Q.  How?

19  A.  There would be complaints from, usually, Rich Ford.

20        MR. CARSON:  Objection.  Hearsay.

21        THE COURT:  Overruled.

22  BY MR. CAVALIER:

23  Q.  You can continue.

24  A.  Complaints from Rich Ford because he would see the credit

25  card receipts, which employees, you know, were trusted to use

1  for business reasons, and there would be questionable charges

2  on them.

3  Q.  Was it your impression that Richard Ford wanted to discuss

4  the termination of plaintiff's employment as a result of those

5  violations --

6        MR. CARSON:  Objection.  Leading.

7        THE COURT:  It's overruled.

8        THE WITNESS:  He certainly wanted to discuss the

9  violations on him.  He never approached as far as termination,

10  but he definitely wanted to document and pursue them.

11  BY MR. CAVALIER:

12  Q.  Okay.  And yet they were not documented or pursued,

13  correct?

14  A.  Correct.

15  Q.  Why not?

16  A.  Well, early on, after Carl was hired, Christopher Aker

17  sent me a link to an article where Carl Williams had sued his

18  previous employer, Sun Microsystems.

19        MR. CARSON:  Objection.  Hearsay.

20        THE COURT:  Overruled.

21        THE WITNESS:  So we were cognizant of this during his

22  entire employment.  We didn't want to -- you know, we kind of

23  treated him with kid gloves.  We didn't want to cause any

24  action that would result in a lawsuit.

25  BY MR. CAVALIER:

**UNITED STATES DISTRICT COURT**

1  Q.   Okay.  So with that background, let's move ahead to the

2  termination.  And I'll refer to Exhibit 24, which you were

3  shown on your examination from Mr. Carson.  But I want the jury

4  to hear in your own words how you first heard of, what I'll

5  call, the issue with Mr. Williams and Mr. Musbach in 2020.

6  A.   In 2020?

7  Q.   Yes.  How did that come to your attention that there was

8  an issue?

9  A.   Yeah.  I believe it was from Dan in that -- somehow it

10 came to Dan's attention.  I don't know if it was from another

11 employee.  He sent it to my attention and then appeared in my

12 office and was visually upset.  And that's how I learned about

13 it.

14 Q.   What did Mr. Spataro say to you?

15 A.   He was -- he was distraught.  I mean, he had worked with

16 Carl for many years.  He wanted to see Carl succeed --

17        MR. CARSON:  Objection, Your Honor.

18        THE COURT:  It's overruled.

19 BY MR. CAVALIER:

20 Q.   Continue.

21 A.   He helped craft a position just for Carl.  He was trying

22 to do good by Carl.  And after hearing about this article and,

23 you know, the things that Musbach had done, he was scared to

24 work next to him and --

25        MR. CARSON:  Objection, Your Honor.

**UNITED STATES DISTRICT COURT**

1        THE COURT:  Overruled.

2        THE WITNESS:  Said to me that either Carl Williams --

3        MR. CARSON:  Objection.

4        THE COURT:  Overruled.

5        MR. CARSON:  Said it to me?

6        THE WITNESS:  Either Carl goes or I go.

7   BY MR. CAVALIER:

8   Q.   How did you react to that information?

9   A.   Very much in the same way that Dan did.  I mean, even

10  though he wasn't the technical employee that we wanted him to

11  be, I felt like we found a place for him, thought he was, you

12  know, doing good work for Linode, wanted him to succeed, but,

13  you know, you think about your kids and your employees.

14        MR. CARSON:  Objection, Your Honor.

15        THE COURT:  Overruled.

16  BY MR. CAVALIER:

17  Q.   You can continue.

18  A.   You think about your kids and your employees and being in

19  proximity to anything near, you know, the story that we read

20  about, and you just don't want to risk that.  You don't want to

21  risk your family.  You don't want to risk your employees.  You

22  don't want to risk your --

23        MR. CARSON:  Objection.

24        THE WITNESS:  -- business reputation.

25        THE COURT:  It's overruled.

**UNITED STATES DISTRICT COURT**

1  BY MR. CAVALIER:

2  Q.  You bought up your business reputation.  Let me ask you

3  about that.  What was the concern there?

4  A.  Well, I mean, if employees were already finding this

5  article and, you know, feeling -- having feelings about it, I

6  could see customers potentially or vendors.  And I didn't know

7  what the results of that would be.

8  Q.  Was a key part of the value that Mr. Williams was

9  providing to Linode at this point --

10        MR. CARSON:  Objection.  Leading.

11        THE COURT:  He hasn't asked the question yet.  So let

12  him finish the question.

13  BY MR. CAVALIER:

14  Q.  Was a key part of the value that Mr. Williams was

15  providing to Linode at this point a result of his relationships

16  in the industry?

17        MR. CARSON:  Objection.  Leading.

18        THE COURT:  It is leading, Mr. Cavalier.

19        MR. CAVALIER:  I can re-ask.

20  BY MR. CAVALIER:

21  Q.  What was one of the key measures of the value that

22  Mr. Williams was providing at this point in time?

23  A.  He was measuring the network performance between certain

24  points on the internet and communicating with the transit --

25  member transit providers and the sales reps that represented

1 them in order to give us better performance for our customers.

2 Q.  Were you concerned about the impact that this published

3 article would have on his ability to perform those tasks?

4        MR. CARSON:  Objection.  Leading.

5        THE COURT:  Overruled.

6 BY MR. CAVALIER:

7 Q.  You can answer.

8 A.  Yes.

9 Q.  All right.  So what happened after Mr. Spataro came to

10 your office with respect to Mr. Williams' employment?  Can you

11 tell the jury?

12 A.  You know, it was a shock at first.  And then Dan and Vinny

13 and I decided that Carl should be terminated and we should try

14 to head this off before it got bigger than it already was, and

15 that's how we proceeded.

16 Q.  And I think you just said this, but I want to confirm.  At

17 this point, Vincent Palochko was brought into the discussion?

18 A.  Yes.

19 Q.  Okay.  Explain to the jury, in your own words, why

20 Mr. Williams was not told that his termination was due to this

21 article and his affiliation with Mr. Musbach?

22 A.  Part of it was the known history, you know, suing his

23 previous employer.  Part of it was fear of retaliation.  You

24 know, if -- I don't know what his exact relationship with

25 Musbach was, but if this guy was able to hire an assassin for a

**UNITED STATES DISTRICT COURT**

1    13-year-old --

2          MR. CARSON:  Objection, Your Honor.

3          THE COURT:  The objection is sustained.

4    BY MR. CAVALIER:

5    Q.   Okay.  Other reasons -- were there other reasons at the

6    time?

7    A.   The -- I'm sorry.  Can you restate the question now?

8    Q.   Sure.  I was just asking you why Mr. Williams was

9    ultimately told -- I should say Mr. Williams was ultimately not

10   told that his termination was due to the publication of this

11   article and affiliation with Mr. Musbach?

12   A.   Safety for the company, knowing the history, and, you

13   know, the -- just wanted to protect the business.

14   Q.   Okay.  Was it also because Linode didn't want to lose

15   Mr. Spataro?

16         MR. CARSON:  Objection.  Leading.

17         THE COURT:  Sustained.  Can you rephrase it?

18         MR. CAVALIER:  Sure.

19   BY MR. CAVALIER:

20   Q.   Were you concerned that if you didn't fire Mr. Williams,

21   Mr. Spataro would leave?

22   A.   Yes.

23         MR. CARSON:  Objection.  Leading.

24         THE COURT:  If you are going to object, Mr. Carson,

25   you got to make it so that we can hear it.  I'm not always sure

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1    when you're objecting.

2          MR. CAVALIER:  Your Honor, frankly, I can't tell the

3    difference between the objections and the muttering that I'm

4    getting.

5          MR. CARSON:  There is no muttering.  It's all

6    objections.

7          THE COURT:  Well, then, speak up so we know.  Because

8    they are not coming up on the transcript, Mr. Carson.

9    BY MR. CAVALIER:

10   Q.   Why didn't you want to lose Mr. Spataro?

11   A.   Dan was a key employee from the moment we hired him.  He,

12   you know, he corrected our network issues.  He designed, you

13   know, a top-tier global network for our company, and I think

14   there's only -- I'm not going to guess how many people -- but

15   there's a finite number of people that can do what Dan can do.

16   Q.   You said earlier, I think, when you were responding to

17   Mr. Carson's questions that when you found out about this

18   article, you attempted to reach out to Mr. Williams; is that

19   true?

20   A.   I actually attempted to reach out to him earlier in the

21   day before I saw the article.

22   Q.   Had you heard from Mr. Spataro at that point?

23   A.   No.

24   Q.   Okay.  What were you trying to reach out to him about?

25   A.   I can't remember the exact -- it was something work

**UNITED STATES DISTRICT COURT**

1  related, but I can't remember the exact topic, you know, the

2  question that I needed an answer to.

3  Q.  Okay.  Did you ever try to reach out to him after you

4  spoke to Mr. Spataro to ask him questions about what was in the

5  article?

6  A.  No.

7  Q.  Why not?

8  A.  I didn't think that was my place.  That would have been,

9  you know.

10  Q.  Okay.  Let's talk about the list of violations that we've

11  seen.  Ultimately, as I think you're aware as chief executive

12  officer, ultimately, Mr. Williams was told that he was

13  terminated due to policy violations.  We agree on that, yes?

14  A.  Yes.

15  Q.  All right.  Have you heard the recorded call or the

16  recorded meeting in which he was terminated?

17  A.  Yes, I have heard it.

18  Q.  Okay.  What was the -- what was the genesis of these

19  violations?  I mean, I guess the question is, did everybody

20  just make these violations up from whole cloth?

21  A.  No.  They actually happened.

22  Q.  Okay.  And so what was the purpose in documenting them at

23  the time of Mr. Williams' termination and providing those

24  reasons to him?

25  A.  They hadn't been documented previously.  So we wanted to

**UNITED STATES DISTRICT COURT**

1  make sure that they were recorded, and that was the reason we

2  wanted to provide for his termination.  We didn't want to, you

3  know, open up a can of worms and mention the Musbach stuff.

4  Q.  For the reasons you explained to the jury earlier?

5  A.  Correct.

6  Q.  Okay.  I asked Mr. Palochko the same questions.  I'll ask

7  you them now.  Did Mr. Williams' termination have anything at

8  all to do with his age?

9  A.  No.

10  Q.  Did it have anything at all to do with the fact that he

11  was gay?

12  A.  No.

13  Q.  Did it have anything to do with the fact that he had

14  previously complained about discrimination or harassment in the

15  workplace?

16  A.  No.

17  Q.  To your knowledge, had he ever done so at that point?

18  A.  There was one incident.

19  Q.  Why don't you tell the jury about that incident?

20  A.  Yeah.  It was an unscheduled meeting.  I guess he was

21  walking by my office or seeing if I was in my office, and he

22  popped in.  And he mentioned that in a chat, in a Slack chat,

23  that one of our -- his coworkers used the old man emoji.  I

24  don't believe that I was in this thread, in this chat.  So I

25  couldn't sit down and make an evaluation myself.

**UNITED STATES DISTRICT COURT**

1      But I told him to go speak to Vinny, whose office was

2   three feet across the hall, like directly across the hall from

3   me, and that if he had a formal complaint that he should lodge

4   it with Vinny.

5   Q.   Do you know if he ever did so?

6   A.   I don't know if he ever did.

7   Q.   Did you ever hear about this use of an emoji again?

8   A.   No.

9   Q.   Okay.  You were asked on --

10        MR. CAVALIER:  Could you pull up Exhibit 34,

11   previously admitted?

12   BY MR. CAVALIER:

13   Q.   I wanted to ask you about this also.  So this is the PHRC

14   questionnaire that Mr. Carson asked you about.

15        Do you see that?

16   A.   Yes.

17   Q.   Did you see this document -- well, let me back up.

18        Did Mr. Williams ever give you a copy of this document?

19   A.   No.

20   Q.   Did anyone give you a copy of this document in 2018 or

21   2019?

22   A.   No.

23   Q.   Did you ever see this document anywhere during that time?

24   A.   No.

25   Q.   Was it discussed at the meeting that was held in

1  December 2018 with you, Mr. Spataro, and Mr. Williams?

2  A.   No.

3  Q.   Was it leveraged against you as a reason for Mr. Williams

4  to be promoted to this director of innovation and --

5        MR. CARSON:  Objection, Your Honor.

6        THE COURT:  That's overruled.

7  BY MR. CAVALIER:

8  Q.   Was it used by Mr. Williams as a bargaining chip or as

9  leverage against you to force you to promote him to director

10  role?

11  A.   No.

12  Q.   Did you even know it existed at that point?

13  A.   No.

14  Q.   Ultimately -- and ultimately Mr. Williams was terminated,

15  correct?

16  A.   Yes.

17  Q.   Was it hard to terminate him?

18  A.   I mean, we don't like terminating anyone.

19  Q.   Okay.  Was he providing some measure of value to the

20  company at that point?

21  A.   Yes.

22  Q.   Is it difficult for you to terminate people in your role

23  as chief operations officer?

24  A.   Yes.

25  Q.   How does it feel, sitting here today, to be accused of

**UNITED STATES DISTRICT COURT**

1  discriminating against someone because they are gay?

2  A.   It feels terrible.  You know, you create something, you

3  start a company, you hire people, you create almost like a

4  family that you work to achieve a common goal, and that's not

5  what we were built on.  We purposely didn't take any outside

6  money, we purposely didn't run ourselves like a big mega corp.

7  Nobody was a number at Linode.  Everybody -- you know,

8  everybody was important.  And it feels, it feels horrible to

9  not only have the company accused of it, but I personally was

10  accused of it.

11         MR. CAVALIER:  That's all I have.

12         THE COURT:  Okay.

13         Mr. Carson?

14         MR. CARSON:  Yes.

15                    RECROSS-EXAMINATION

16  BY MR. CARSON:

17  Q.   So Mr. Cavalier asked you why you told this lie to Carl

18  Williams.

19       Do you recall that?

20  A.   Yes.

21  Q.   And you gave a list of reasons having to do with things

22  that were happening in connection with the actual termination,

23  correct?

24  A.   Sorry.  Can you be more specific?

25  Q.   Yeah, sure.  Nothing on the list that you gave as an

1  excuse for lying, none of those things had anything to do with

2  things that would happen years after, right?

3  A.    I still don't understand the question.

4  Q.    So let's go through the reasons then real quick.

5       You said safety, right?  Is there a safety issue involved?

6  That was your testimony, safety?

7  A.    Yeah.  Yeah.

8  Q.    Had Carl ever done anything his entire career to suggest

9  that there was some issue with safety in connection with his

10  employment?

11  A.    No.

12  Q.    There was zero safety issues involved in the termination,

13  correct?

14  A.    There was safety concerns due to the article that I read

15  about.

16  Q.    When you say "safety concerns," are you talking about the

17  behavior of John Musbach?

18  A.    Yes.

19  Q.    Are you honestly sitting on that stand under oath and

20  suggesting to the jury that the behavior of John Musbach is

21  somehow attributable to Carl Williams?  Is that what you're

22  doing up there, sir?

23  A.    Yes.

24  Q.    That's what you said, yes?

25  A.    Yes.

**UNITED STATES DISTRICT COURT**

1   Q.   That's why you're using this as the reason, right?  That's

2   why.  That's why you're up here with the absurd reason for

3   terminating Carl Williams is because you want the jury to think

4   that Carl did what John did, correct?

5   A.   No.

6   Q.   Then why did you just say that, sir?

7   A.   Because they are associated with each other, so there's a

8   connection.

9   Q.   Really?  You didn't know that at the time, sir, right?

10  A.   I did know that at the time.

11  Q.   No, you didn't.  You said the only thing you knew was the

12  article.

13       Did you know they were together at the time?

14  A.   I knew that they lived together.

15  Q.   Did you?  At the time?  You sure about that?  Did you know

16  at the time that they lived together?

17  A.   No.

18  Q.   Right.  So all you knew is that some guy that worked for

19  you for six years, never had a safety problem, never broke the

20  law, no connection to anything -- he's a quiet, calm, relaxed

21  -- he's a quiet dude.  All you know at the time is you saw this

22  thing in the paper and you saw him quoting and saying that his

23  conduct was horrible.  You didn't know whether he was there to

24  testify for him, you didn't know if he was there to testify

25  against him, right?

1          MR. CAVALIER:  I'm going to object.  This is compound

2  and argumentative.

3          THE COURT:  Well, the question is compound.  You need

4  to break it up into questions, Mr. Carson.

5  BY MR. CARSON:

6  Q.  Sir, at the time, you didn't know anything about what

7  actually happened, right?

8  A.  I knew that John -- what John Musbach was accused of.

9  Q.  Correct.  And that's all you knew, right?

10  A.  I knew that he was associated with Carl Williams.

11  Q.  Did you know whether Carl Williams was there to testify

12  against him?  I already did that.  We don't have to do it

13  again.  You didn't know that, sir.

14          So why are you suggesting to the jury that the jury should

15  consider Carl to be someone who attempted to murder somebody or

16  someone who attempted to send pornographic pictures to a kid?

17  That's what you're asking the jury to do, right, is to take the

18  behavior, the terrible, horrible behavior of John Musbach and

19  flip it on to Carl because hopefully that's enough to win this

20  case, right?  That's what you want?

21  A.  No.

22  Q.  A total prejudicial excuse, right?  Nothing based on

23  anything real, correct?

24  A.  No.

25  Q.  What?

**UNITED STATES DISTRICT COURT**

1  A.   That's not correct.

2  Q.   Well, how is it not correct, sir?  You just said it a

3  minute ago.

4       You said that you attribute the behavior of John Musbach

5  to Carl Williams.  Did you not just say that?  Do you want to

6  change your testimony, sir?

7  A.   Attributing the association of Carl Williams with John

8  Musbach as a public -- it's a safety concern for the employees,

9  and it's a --

10  Q.   What's the safety concern, sir?

11  A.   John Musbach tried to have a 13-year-old killed.

12  Q.   Right.  I understand the safety concern for the

13  13-year-old.  I mean, it wasn't a real concern because he went

14  to a fake website, right?  He got scammed, thank God.  Right?

15  That's what happened.  You read that in the article too?

16  A.   Yes.

17  Q.   So what was the safety concern, sir, regarding Carl

18  Williams?  Nothing, zero, correct?

19       THE COURT:  Mr. Carson, you don't get to ask and

20  answer.  Ask him a question.

21  BY MR. CARSON:

22  Q.   Wasn't it true that the safety concern was zero?

23  A.   No.

24  Q.   Well, then what was it?

25       MR. CAVALIER:  Asked and answered.

**UNITED STATES DISTRICT COURT**

1          MR. CARSON:  No, it wasn't answered.

2          THE COURT:  Don't argue.  The objection is overruled.

3    BY MR. CARSON:

4    Q.  What was it?  Tell us what it was.  Articulate a

5    reasonable safety concern implicated by Carl Williams'

6    employment at Linode.

7    A.  Carl Williams was associated with a person who was accused

8    of attempted murder.

9    Q.  We understood that part.  It's not true, but we understood

10   it.

11        But the point is, I asked you a different question and you

12   can't answer it, can you, sir?  What was that safety concern?

13         MR. CAVALIER:  Asked and answered.

14         THE COURT:  Overruled.

15         THE WITNESS:  That John Musbach might do something

16   against Linode.

17   BY MR. CARSON:

18   Q.  That was your safety concern?  Where was he when you read

19   the article?  Where did the article say he was?  What did the

20   article say, sir, do you remember?

21        Was he walking around the streets?  What do we do in this

22   country when people are accused of attempted murder?  Where do

23   we put them?

24   A.  Jail.

25   Q.  And that's where John Musbach was, right?  That's what you

**UNITED STATES DISTRICT COURT**

1  knew at the time, if the article was true, right?

2  A.  Yes.

3  Q.  Yeah.  And you never talked to Carl Williams about it

4  either, did you?

5  A.  No.

6  Q.  And that safety concern, that didn't exist anymore two and

7  a half years later after we filed this lawsuit, did it?

8  A.  I don't understand.

9  Q.  So this all happened in August of 2020, didn't it, sir?

10  A.  Yes.

11  Q.  So August of 2021, August of 2022, August, September,

12  October, November -- by November of 2022, you could now tell

13  the truth, couldn't you, if your story is true?

14  A.  I'm not following.

15  Q.  How don't you follow?

16      Sir, when did you decide that you were going to come clean

17  and say, oh, we lied then, this is the reason we lied, here is

18  the truth and this is why we did it?  When did you decide to do

19  that?

20  A.  Are you asking when?

21  Q.  When did you decide to come clean?  When did you decide to

22  admit that you lied then but it was for these, you know, safety

23  concerns and come clean?  When?  When did that happen?

24  A.  When I was deposed.

25  Q.  When you were deposed, that's the first time?

**UNITED STATES DISTRICT COURT**

 1      So you're saying the first time that you decided to change
 2  your story was in June of 2023?  So what's that, August to --
 3  A.   There was no story to tell in between.
 4  Q.   Okay.  There wasn't?
 5      I mean, didn't your lawyers propound responses to
 6  interrogatories --
 7          MR. CAVALIER:  Objection.
 8  BY MR. CARSON:
 9  Q.   -- on behalf of you?
10          THE COURT:  Objection is sustained.
11  BY MR. CARSON:
12  Q.   It's not?
13          MR. CARSON:  Okay.  I'll show him the document then.
14          Can we please put No. 6 on the board, on the screen,
15  just for the witness, please?
16  BY MR. CARSON:
17  Q.   Do you see that document, sir?
18  A.   Yes.
19  Q.   And do you see what it says there?
20          THE COURT:  Well, hold on.  Are you -- you're showing
21  it only to the witness?
22          MR. CARSON:  Right.
23          THE COURT:  Are you laying a foundation to introduce
24  it?  What are you doing?  Or are you refreshing recollection?
25          MR. CARSON:  No, Your Honor, I'm not doing it -- I'm

1   using it to impeach.

2           MR. CAVALIER:  There's no foundation for impeachment.

3           MR. CARSON:  It's his statement, sir.

4           THE COURT:  Wait, wait, wait.  You don't get to make

5   representations, okay.

6           If you're using it to impeach, then you still need to

7   lay the appropriate foundation.

8           MR. CARSON:  Okay.

9   BY MR. CARSON:

10  Q.   So, sir -- sorry.  Let me just take a minute.  These

11  are -- this document here, do you see it in front of you?

12  A.   I see it.

13  Q.   Okay.  Do you see the first sentence there, sir?  This was

14  filed on your behalf, right?

15  A.   I don't know what this is.

16  Q.   Was it filed on your behalf, sir?

17  A.   I don't know.  Was it?  I don't know what it is.

18  Q.   I'm asking you to take a look at it and tell me if you see

19  your name on there.

20          MR. CAVALIER:  I'm going to object.  There's clearly

21  no foundation.

22          THE COURT:  The objection is sustained.

23  BY MR. CARSON:

24  Q.   Sir, do you know what this document is, sir?

25          MR. CAVALIER:  Same objection.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

 1          THE COURT:  Well, no.  He can answer if he knows what

 2    the document is.

 3          THE WITNESS:  I don't know what this document is.

 4    BY MR. CARSON:

 5    Q.   Do you see your name on the document?

 6    A.   Yes, I see my name on the document.

 7    Q.   Okay.  Can I show you the date?  Can you go all the way

 8    down to the bottom and look at the date?

 9          THE COURT:  Hold on, Mr. Carson.  Again, establish the

10    foundation.  The date is not the foundation of it, the date is

11    the impeachment you're trying to get to.

12          MR. CARSON:  No, I would like to establish that this

13    is --

14          THE COURT:  Come up to sidebar.

15          (Sidebar as follows:)

16          THE COURT:  Okay.  I know you know what this document

17    is, okay, but if the witness doesn't know what it is -- when

18    you impeach with the deposition, you say, you were deposed,

19    right?  You remember that deposition, right?  You took the

20    oath, right?

21          You lay the foundation to establish the knowledge of

22    the prior statement.  In this case --

23          MR. CARSON:  Right.  And if he said, no, I don't

24    remember doing any of that stuff, I would still be allowed to

25    do it.  It's the same thing, Your Honor.  It is his statement,

**UNITED STATES DISTRICT COURT**

1  Your Honor.

2          THE COURT:  Mr. Carson, he doesn't know what it is.

3          MR. CARSON:  It's still his statement.

4          THE COURT:  I don't know it's his statement.

5          MR. CARSON:  His name is on it.  It says filed on

6  behalf of --

7          THE COURT:  I know his name is on it.  You have to

8  establish some knowledge of it.

9          MR. CARSON:  No, I don't, because the statement of the

10  lawyer is attributable to him.  And under the Third Circuit,

11  this situation right here, when it goes directly to pretext and

12  when it goes directly to contradict the position of the

13  defendant, you do not have to --

14          THE COURT:  He's not a defendant.

15          MR. CARSON:  He's not a defendant, but he's on the

16  stand as the CEO of Linode.  He's the number two guy for the

17  company.  The company is the defendant.

18          THE COURT:  But he's not a defendant.

19          MR. CARSON:  He was at the time that this statement

20  was made.

21          THE COURT:  I understand that, but you still need to

22  establish some foundation.

23          MR. CARSON:  Your Honor, he can't just slither out of

24  providing a completely contradictory story by just saying he

25  doesn't remember.

UNITED STATES DISTRICT COURT

1          THE COURT:  Mr. Carson, you know and I know that

2    interrogatory responses frequently go out without review by

3    every person involved.  And so, again, it's different than a

4    deposition where he's there.

5          And so you need to establish some degree of

6    foundation.  That's my ruling.  I understand you don't like it,

7    okay, and at some point if you want to take it up --

8          MR. CARSON:  It's also a reversible error, I believe,

9    Your Honor.

10          THE COURT:  Then take it up to the Court of Appeals,

11    okay.

12          Now, here's the second thing I'm going to tell you

13    since we're at sidebar.  Today is two strikes.  You argued with

14    me in court, okay.  I overruled your objection, and your

15    response was to point out the language of the testimony that

16    you think generated the basis for the hearsay objection, and

17    it's on the docket.  Okay?

18          MR. CARSON:  I know.

19          THE COURT:  Do not argue with me in court.  The next

20    time you do it will be contempt.  Do you understand that?

21          MR. CARSON:  Yeah, I guess so, but I --

22          THE COURT:  I warned you about it Friday.  You are not

23    allowed to do it.  You may not argue with me in open court in

24    front of the jury.

25          If you make an objection, make the objection.  And

**UNITED STATES DISTRICT COURT**

1  especially after I've ruled and overruled your objection, the

2  last thing I need is your commentary in front of the jury.

3        MR. CARSON:  Your Honor, first of all -- right, I

4  understand.  But this situation right now, this statement right

5  here is absolutely relevant to the case, it directly goes to

6  the --

7        THE COURT:  Mr. Carson, I've already ruled on this.  I

8  don't need to hear more argument.  I've ruled.

9        MR. CARSON:  I think you should listen to more

10 argument.

11       THE COURT:  I'm not going to listen to an argument

12 because I have ruled, Mr. Carson.

13       MR. CARSON:  Then I should be allowed to ask questions

14 to try to show that this statement was filed on his behalf,

15 these were his words at the time, and that --

16       THE COURT:  You can do that.  That's laying a

17 foundation.  Show me the signature block, ask him if he's

18 familiar with what the lawyers did for him.  You can do all

19 that.  That would be the foundation.

20       MR. CARSON:  All right.  Well, that's what I was

21 trying to do.

22       THE COURT:  No, you're showing him the substance.  The

23 date of the thing, for example, goes to when the statement was

24 made and to your question about the --

25       MR. CARSON:  My question was going to be, as of that

**UNITED STATES DISTRICT COURT**

 1  date, you were represented by these people.

 2          THE COURT:  Okay.  So show him the signature block,

 3  not the date, and focus him on what was going on in the case,

 4  whether he knew he had lawyers, whether these were his lawyers,

 5  whether he knew they were making statements on his behalf.

 6  That's a foundation to then show it to him.

 7          MR. CARSON:  Okay.

 8          THE COURT:  Okay?

 9          MR. CARSON:  All right.

10          (Sidebar concluded.)

11          MR. CARSON:  Scroll all the way to the bottom, please.

12  BY MR. CARSON:

13  Q.  Do you see that signature block, Mr. Asaro?

14  A.  Yes.

15  Q.  Do you recognize those people's name, Stephanie Peet, Tim

16  McCarthy?

17  A.  Yes.

18  Q.  At the time, they were your attorneys?

19  A.  Yes.

20  Q.  And they were representing you in connection with my

21  client's claims of discrimination?

22  A.  Yes.

23  Q.  And you're aware that my client filed a lawsuit, right?

24  A.  Yes.

25  Q.  And you're aware that there was a process called

**UNITED STATES DISTRICT COURT**

1  discovery, right?

2  A.  Yes.

3  Q.  And you're aware that during that discovery process, there

4  was documents that were exchanged?

5  A.  Yes.

6  Q.  And you were aware that during that discovery process the

7  parties were allowed to ask each other questions, right?

8  A.  Yes.

9  Q.  And are you aware of whether or not the people who were

10  responding on your behalf to those questions were indeed

11  Stephanie Peet and Tim McCarthy at that time?

12  A.  Yes.

13        MR. CARSON:  Your Honor, I would submit that I laid a

14  proper foundation.

15        MR. CAVALIER:  Same objection.

16        THE COURT:  No, objection is overruled.

17  BY MR. CARSON:

18  Q.  And so, Mr. Asaro --

19        MR. CAVALIER:  Objection to the admission of the

20  document for this witness.

21        THE COURT:  Well, I don't know he's moved for its

22  admission.  I thought it was just for impeachment.

23        MR. CARSON:  I have not.

24        MR. CAVALIER:  I thought he did.

25        MR. CARSON:  I have not moved for admission.

**UNITED STATES DISTRICT COURT**

1          So can we scroll up?

2    BY MR. CARSON:

3    Q.   Do you see that in front of you, the Question Number 10?

4    A.   Yes.

5    Q.   And it asks the question:  "Please explain why plaintiff

6    was terminated in August of 2020."

7          Do you see that?

8    A.   Yes.

9    Q.   And the answer that you provided was that --

10          MR. CAVALIER:  Objection.

11          THE COURT:  No, the objection is overruled.

12    BY MR. CARSON:

13    Q.   Was that, "Linode terminated plaintiff's employment after

14    it discovered he had repeatedly violated the company's policies

15    related to time off, misuse of company resources" -- and, you

16    know, you listed all the policies and I'll just skip to the

17    end.  And the last thing you said in this statement was -- and

18    it's now the second paragraph, and again, you listed a bunch of

19    more policy violations.

20          And it says, "For these reasons only and after consulting

21    with Linode's human resources department, Mr. Spataro made the

22    decision to terminate plaintiff's employment August 19, 2020."

23          Did you see that?

24    A.   Yes.

25    Q.   And so as of November of 2022, almost two and a half years

**UNITED STATES DISTRICT COURT**

1  later, you were still using the same, what you call is a lie,

2  what I call is your pretext, you were still using the same

3  story to explain why Carl Williams was terminated?

4      Do you see that?

5  A.  I've never seen this document before.

6  Q.  But you see that that's what was filed on your behalf by

7  your attorneys, right?

8  A.  Yes.

9  Q.  So why -- how could that still be happening if what you

10 are telling me in this courtroom today and what you are telling

11 the jury in this courtroom today is the truth?

12 A.  I don't know.

13 Q.  It doesn't make any sense, though, does it?

14 A.  I don't know.

15 Q.  Your reason for the lie doesn't really hold up when you

16 consider this document, does it?

17 A.  I've never seen this document before.

18 Q.  But do you agree, sir, that the reasons that you said that

19 you lied and the reasons that you said Dan Spataro and Vince

20 Palochko all lied along with you don't make any sense if you

21 are telling the same lie two and a half years later, right?

22 A.  Why doesn't it make sense?

23 Q.  Sir, I don't want to know what you said to your lawyers,

24 but why would you be lying to your own lawyers?

25      MR. CAVALIER:  I'm going to object to that.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1          THE COURT:  Yeah, the objection is sustained.  And you

2    should not get into any communications you've had with your

3    lawyers, okay.

4          MR. CARSON:  I don't want you to.  But I certainly

5    don't understand and I don't know the document --

6          THE COURT:  Is that a question or are you -- we don't

7    want comments, so we're going to strike that from the record.

8          And if you have a question, ask a question.

9          MR. CARSON:  I was just trying to formulate a

10   question.

11   BY MR. CARSON:

12   Q.   All right.  Do you know if you filed any other documents

13   with any other agencies where you told the same lie again years

14   later?

15   A.   I didn't file any documents.

16   Q.   Well, did your lawyers file on your behalf, sir, any

17   documents?

18   A.   Not that I know of.

19   Q.   Was a position statement filed?

20         MR. CAVALIER:  Objection.

21         THE COURT:  Overruled.  If he knows, he can answer.

22   BY MR. CARSON:

23   Q.   Do you know if a position statement was filed on your

24   behalf at the Equal Employment Opportunity Commission?

25   A.   I don't know.

1  Q.  And do you know if that position statement parrots the

2  same story?

3  A.  I don't know.

4           MR. CARSON:  I don't have any more questions.

5           THE COURT:  Okay.  Mr. Cavalier?

6           MR. CAVALIER:  Nothing further, Your Honor.

7           THE COURT:  All right.  Mr. Asaro, you can step down.

8  You're excused.

9           THE WITNESS:  Thank you.

10          (Witness excused.)

11          THE COURT:  All right.  Let me see counsel for just a

12  moment.

13          (Sidebar as follows:)

14          THE COURT:  Okay.  So from a scheduling standpoint, I

15  don't know whether you want to start in on Mr. Spataro now and

16  do -- we can do 30 minutes of his testimony now?

17          MR. CARSON:  If it's a choice, I would say can I start

18  him in the morning?

19          MR. CAVALIER:  I don't have any objection to that.

20          THE COURT:  That's fine.

21          MR. CARSON:  As long as we get done tomorrow.

22          THE COURT:  What do you have?  Mr. Spataro and

23  Mr. Ford?

24          MR. CARSON:  Yeah.  And I think that Mr. Ford will be

25  super fast.  And again, I think I'll be done tomorrow.  Yeah.

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1          THE COURT:  Okay.  So Mr. Spataro and Mr. Ford

2  tomorrow.  You might have your witness by video.

3          MR. CAVALIER:  Yes, if permitted.  It will be very

4  short, obviously.

5          THE COURT:  So let's do this.  I'm going to send the

6  jury home.  Let's do our charge conference now.  Okay?  Knock

7  it out so that we're in a position tomorrow as soon as you're

8  done with the evidence to try to charge.

9          MR. CAVALIER:  Charge and close.

10          THE COURT:  Charge and close.  So you guys got to be

11  prepared to close tomorrow.

12          MR. CARSON:  When you say "done with the evidence," do

13  you mean putting on the evidence for the jury?

14          THE COURT:  The presentation of the evidence.  When

15  the evidence presentation is done and you guys have rested,

16  then I'm going to hopefully be in a position to charge pretty

17  quickly.  And you guys will close when I'm done charging.

18  Okay?  So that we're going to get this thing to the jury maybe

19  by the middle of the afternoon tomorrow or something like that.

20          MR. CAVALIER:  Okay.

21          MR. CARSON:  Okay.

22          THE COURT:  Let's do it that way.

23          MR. CAVALIER:  Do you have a general plan or

24  preference as to the point in the day we would get to where you

25  would decide it's too late in the day to, at least, close or

**UNITED STATES DISTRICT COURT**

1  allow them to start deliberating?

2       I mean, if we get them the case -- if Seth finishes

3  rebuttal closing at 4:15, are we letting them deliberate for a

4  while?

5       THE COURT:  I'll probably ask them what they want to

6  do.  Okay?  Because I have some flexibility tomorrow afternoon.

7  And so if I got them the case at 4:00, 4:15 and they said,

8  well, we want to take a couple hours and see if we can be done,

9  I'd probably let them do that.

10      But if they just say, no, we're going to want to start

11 fresh or we think it will take more than that to sort through

12 everything we've heard over five days, I would probably defer

13 to them as well.

14      MR. CAVALIER:  Okay.

15      THE COURT:  All right.

16      (Sidebar concluded.)

17      THE COURT:  Okay.  We're going to break for the day.

18 Okay?  Because I -- I don't love the idea of starting someone

19 new now, interrupting 20, 25 minutes to say go home and resume

20 tomorrow.

21      I'm telling you that only because one of the reasons I

22 was consulting with the lawyers was to make sure that won't

23 extend us an extra day beyond what I thought it would.  I don't

24 think it will.

25      So let's plan to start tomorrow at 9:00.  Okay?  I'm

**UNITED STATES DISTRICT COURT**

1  going to make a push to try and get all the evidence to you

2  tomorrow.

3          But I want to remind you there is more evidence to

4  come.  All right?  So it's important that you not start

5  thinking about the case and forming opinions.  We haven't heard

6  from some witnesses, including some important ones.

7          You also haven't heard the law, which makes it hard to

8  form an opinion because you don't actually know what the

9  standard is.

10          And you haven't heard the lawyers' closing arguments,

11  and the lawyers' closing arguments are important because

12  they're going to take the evidence and weave it together how

13  they want you to think about it.

14          So keep an open mind, head home now.  We'll see you

15  tomorrow.  My hope for tomorrow is that we are going to be able

16  to finish the presentation of evidence, give you the law, and

17  do closing arguments.  Okay?  So my hope is that by sometime

18  tomorrow, the case will be yours to begin deliberating.  Okay?

19          So with that, I'll see everybody tomorrow, and have a

20  good evening.

21          THE COURTROOM DEPUTY:  All rise.

22          (Jury exits the courtroom at 4:16 p.m.)

23          THE COURT:  You can all have a seat.  Does anybody

24  need a short break before we start doing the charge conference?

25          So we sent you the instructions this morning.  I'm

**UNITED STATES DISTRICT COURT**

1  going to pull my copy up.

2          Okay.  So as you guys pull it up, just generally two

3  things.  One is a reminder that I do send a written copy of my

4  charge back to the jury.  So what that means is -- I don't know

5  how carefully you've had a chance to go through these -- but if

6  there are things that you see, like, you know, typos, line

7  edits, things like that, flag them for me.  We're going to give

8  them a scrub as well, certainly, before we send them to the

9  jury.  And, frankly, the best scrub they get is when I sit and

10  read them out loud.  But in the meantime, just flag it.

11          Other thing is the way I generally do this is I just

12  kind of mark through the instructions one by one and ask for

13  any comments on each instruction.  And then as I wrap up each

14  section, I'll ask you if you have comments for things that I

15  haven't included that you want me to include, and then we'll do

16  that again at the end.  Okay?

17          So I'm going to start with the early section, and I'm

18  going to hope that I can go through it fairly quickly.  We'll

19  just start with 1(a), which is burden of proof.  Anybody have

20  any comments on burden of proof?  You all have it?

21          MR. CARSON:  None from me, Your Honor.

22          THE COURT:  Okay.

23          MR. CAVALIER:  None from defense.

24          THE COURT:  All right.  So on to 1(b), types of

25  evidence.  Anybody have a comment there?

**UNITED STATES DISTRICT COURT**

1          Okay.  All right.  How about 1(c), direct and

2    circumstantial evidence?  Any comments?

3          MR. CAVALIER:  One of these days some brilliant judge

4    is going to come up with a better analogy than a raincoat, but

5    no objection.

6          THE COURT:  I can play with it, but I don't get any

7    bang for the buck.

8          All right 1(d), credibility?  No?

9          Okay.  1(e), number of witnesses?

10         Okay.  1(f), opinion testimony?  Okay.

11         MR. CAVALIER:  I think I might suggest just adding

12    that -- I was going to suggest that we add in -- he's a damages

13    expert only, but I don't think that's necessary.  That's fine.

14         THE COURT:  They heard what they heard.  Okay.

15         All right.  So let's go to the substantive claims.

16    Anything else in the preliminary instructions anybody thinks I

17    need to include?

18         MR. CARSON:  False in one, false in all?  They've

19    heard a lot about lies.  I think they should know what to do

20    with that information.

21         THE COURT:  Any problem with including that,

22    Mr. Cavalier?

23         MR. CAVALIER:  I'd need to see it.

24         THE COURT:  Is the Third Circuit pattern instruction

25    you're proposing, Mr. Carson?

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1          MR. CARSON:  Hang on.

2          MR. CAVALIER:  I think credibility of witnesses

3   captures the idea that he's getting at.

4          MR. CARSON:  Do you guys want to keep going?  Because

5   I wasn't really ready to do a charging conference this second,

6   so I didn't have a lot in my notes here.  But if you want to

7   keep going, I can circle back to see what I suggested.

8          THE COURT:  Well, I mean, I guess you're saying false

9   in one, false in all.  Is there something specific that you

10  have in mind as a charge?

11         MR. CARSON:  Yes.

12         MR. CAVALIER:  I think credibility of witnesses covers

13  this notion, would be my position, Your Honor.  And just for

14  the record, I'm not familiar with any Third Circuit model on

15  the issue Mr. Carson is suggesting nor am I aware of any cases

16  or have any prior experience with that kind of instruction

17  being added to EPA instruction.

18         MR. CARSON:  So here's the instruction that the Third

19  Circuit model, Jury Instruction 4.26 --

20         THE COURT:  Mr. Carson, you've got to speak up.  I

21  can't hear you.

22         MR. CARSON:  I have a very bad toothache right now.

23  So I apologize.

24         So the one I was looking at was Third Circuit model,

25  4.26.  It is a -- under the criminal one, it's a list.  But I

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  just think it will help the jury to understand how they can

2  use -- because they've heard a lot about credibility and lies.

3  And I think they should know that they can have a little

4  guidance on how to use that information, you know, whether it

5  applies to just what they're saying or whether it can apply to

6  other things and everything.

7            MR. CAVALIER:  I think that's exactly what the model

8  of civil instruction on credibility of witnesses is.

9            MR. CARSON:  I'll look at the credibility again.  John

10  might be right.  Let me just look again.  I'm sorry.

11            I mean, it sort of says it, but not really, right?  It

12  doesn't say how to use that information or how they're supposed

13  to judge that information.

14            MR. CAVALIER:  I don't think we're supposed to tell

15  them how to use that information and make those determines.

16            MR. CARSON:  This is a jury instruction.

17            THE COURT:  Well, the jury instructions in a criminal

18  context with the burdens are different.  I think this

19  probably -- I mean, if you can show me cases tomorrow morning,

20  Mr. Carson, that say that instruction's been documented in

21  civil cases like this, I'm open to inserting it at the end or

22  in the middle.  But otherwise, I do think it's covered by

23  what's in the credibility.

24            MR. CARSON:  Thank you, Your Honor.

25            THE COURT:  Let's go to substantive claim 2(a),

**UNITED STATES DISTRICT COURT**

1    introduction to the law.  Does anybody have comments on that

2    one?

3            MR. CAVALIER:  So, Your Honor, at the bottom of

4    Page 12.

5            THE COURT:  Yeah.

6            MR. CAVALIER:  Where you say suffered any

7    discrimination at Linode, I think we probably want to add

8    retaliation into that.

9            THE COURT:  Yeah.  Okay.

10           MR. CAVALIER:  Just to make sure all are covered.

11           THE COURT:  Right.

12           MR. CARSON:  So the first part looks good to me on

13   2(a).  What was the suggestion there?

14           THE COURT:  It's in the second paragraph, where it

15   says, "Linode denies that it violated either statute or that

16   Mr. Williams suffered any discrimination."  And they want me to

17   add or retaliation at Linode.

18           MR. CARSON:  That sounds good.

19           THE COURT:  Okay.  2(b).  This is for treatment

20   claims.  Comments here?

21           MR. CAVALIER:  One note, Your Honor, on the beginning

22   of the section on age discrimination, to prevail on his claim

23   of age-based discrimination.

24           THE COURT:  Yes.

25           MR. CAVALIER:  I will be frank with the Court.  I do

1   not know whether this is my defense counsel bias or an actual

2   memory, but I seem to remember that age has to be the

3   determinative factor in Linode's decision.

4            MR. CARSON:  I know it's but for.

5            MR. CAVALIER:  It's a but for standard.

6            MR. CARSON:  Where does that say that again?

7            THE COURT:  Very bottom of Page 13, Mr. Carson, "To

8   prevail on his claim of age-based discrimination."

9            MR. CARSON:  (Reading to self.)

10           THE COURT:  If it's a but for causation, there can be

11  multiple but for causes of something.

12           MR. CAVALIER:  That's true.

13           THE COURT:  Right?  If it were proximate cause, it

14  would definitely be the, but if it's but for.

15           MR. CAVALIER:  Take me way back to said pro.

16           THE COURT:  I'd probably take you back to torts.  But

17  let me just -- yeah.  I mean, I think the model instructions is

18  the Article A.

19           MR. CAVALIER:  If the model instructions use the

20  Article A, I would defer to the model instructions.

21           THE COURT:  Okay.

22           MR. CAVALIER:  I also think you're right, but in the

23  general context, you can actually have more than one.

24           THE COURT:  The instruction seems to be the 8.1.1.

25           MR. CARSON:  What is that?  That's the baseball

**UNITED STATES DISTRICT COURT**

1   holding from Judge Scalia?

2          THE COURT:  I'm sorry.  What?

3          MR. CARSON:  Judge Scalia did a thing about baseball,

4   how the reason that you one is because of the run in the first

5   inning or the run in the last inning.

6          THE COURT:  Correct.  They are all but for causes of

7   your victory.

8          Yeah, so let me just look at 1.1 here.

9          Yeah.  A determinative factor.  That's the Third

10  Circuit's pattern of instruction.  Okay.  So I'll stick with

11  that.

12         Okay.  Anything else on 2(b)?

13         Now I want to move to 2(c).

14         MR. CAVALIER:  None from the defense, Your Honor.

15         THE COURT:  Okay.  So 2(c)(i) is the hostile work

16  environment claim.  The first title of (c)(i), it should be

17  elements of claims.  This is just moving headings around.  It's

18  not the definition of hostile here.

19         But other than that, it'll change.  It will be

20  elements plural, claims plural.  Anybody have any comments on

21  2(c)(i)?

22         MR. CAVALIER:  No.  And, of course, subject to Rule 50

23  motions.

24         THE COURT:  Yeah.  We'll have to edit these if and

25  when there are motions, if and when they are granted.  I don't

**UNITED STATES DISTRICT COURT**

1  know there will be.

2        MR. CAVALIER:  Other than that, no, Your Honor.

3        THE COURT:  Yeah.  Okay.  And I just want to be clear.

4  I did not include -- there is a sixth element in the pattern

5  instructions that really is there for situations where there's

6  an (inaudible) defense -- I don't think you're asserting that

7  here.  So I don't think it's appropriate here.

8        MR. CAVALIER:  I can confirm that.  I don't want to

9  give you the answer right now, but let me think on that.

10        THE COURT:  All right.  Okay.  Anything else on

11  2(b)(i)?  Nope.

12        2(c)(ii), definition of hostile?

13        MR. CAVALIER:  Nothing from the defense.

14        THE COURT:  Okay.  Good.  Okay.  2(d) is retaliation

15  claims.  And right now, I'm just focusing on the 2(d) before I

16  get to the subheadings.  Anything there?

17        MR. CAVALIER:  Not on the face, Your Honor.

18        MR. CARSON:  I'm good.

19        THE COURT:  Okay.  So 2(d)(i) is the engaging in

20  protected activity.

21        MR. CAVALIER:  No issue.

22        THE COURT:  Okay.

23        MR. CARSON:  Yes, Your Honor.

24        THE COURT:  All right.  Okay.  2(d)(ii), then, is the

25  materially adverse action.

**UNITED STATES DISTRICT COURT**

 1          MR. CAVALIER:  Good here.

 2          THE COURT:  You okay?

 3          MR. CARSON:  Orajel.  It's gross.  Sorry.  What are we

 4  doing?  2(d)(i)?

 5          THE COURT:  Well, I thought we just did 2(d)(i).  I

 6  think we're on 2(d)(ii), which is the materially adverse

 7  action.  Okay?

 8          MR. CARSON:  Good.

 9          THE COURT:  Okay.  2(d)(iii) is the causal connection.

10          MR. CAVALIER:  No issue.

11          MR. CARSON:  I'm good, too.

12          THE COURT:  Okay.  And then 2(e) is independent

13  claims.

14          MR. CAVALIER:  Actually, my colleague raises a good

15  point in here, and I offer this for discussion, not as a

16  suggestion.  But in the last sentence on determinative effect,

17  you use the word harassed, terminated, or denied profit

18  sharing.

19          I'm not sure that harassment or harassed is as

20  accurate to the facts as discriminated against would be since

21  that's largely how it's couched in the other instructions.

22          MR. CARSON:  He would not be subjected to

23  discrimination?

24          MR. CAVALIER:  He would not have been discriminated

25  against, terminated, or denied profit sharing.

**UNITED STATES DISTRICT COURT**

1          MR. CARSON:  I'm good with that.

2          THE COURT:  So subjected -- what do we say?

3    Discriminated against.

4          MR. CAVALIER:  Yes.

5          THE COURT:  Okay.  Fine.  All right.  And then I've

6    got two 2(e) as independent claims.

7          MR. CARSON:  Good.

8          THE COURT:  I think that will track with the

9    instructions on the verdict sheet.  Great.

10         Okay.  Now we get to damages, which is 3.  So let me

11   just start with the part under Roman 3 on Page 28.  Anybody

12   have a comment there?

13         MR. CAVALIER:  No.

14         MR. CARSON:  This is fine.

15         THE COURT:  Okay.  And then so 3(a) is damages

16   available under Title VII, 3(a)(i) being compensatory damages.

17   Anyone have a comment on compensatory damage instructions?

18         MR. CAVALIER:  I guess I should raise the issue since

19   normally -- I know that we don't have any standing to object,

20   but we know that we want nominal damages in the instruction on

21   the sheet.

22         THE COURT:  I think there is nominal damages in the

23   instruction, isn't there?

24         MR. CAVALIER:  Yes.  You can get nominal damages, but

25   it's typically sort of either at the plaintiff's preference

**UNITED STATES DISTRICT COURT**

1  or --

2          THE COURT:  Let's get there and see what Mr. Carson

3  thinks.  Okay?  Let's see.  Anything on compensatory,

4  Mr. Carson?

5          MR. CARSON:  No.

6          THE COURT:  No?  Okay.  So that's 3(a)(i).

7          3(a)(ii) is punitives.

8          MR. CARSON:  Looks good to me.

9          THE COURT:  Okay.  Good.  And then we're on to 3(b),

10  which is the damages under the ADEA, and 3(b)(i) is backpay.

11  We have a comment there.

12          MR. CAVALIER:  Where the that?  Your Honor, one point,

13  if you don't mind, looking backwards -- and I apologize.  My

14  pagination is different here, I guess, because of my device.

15  Looking to the punitive damages piece.

16          THE COURT:  Yes.

17          MR. CAVALIER:  Where it says that in this case you

18  will first decide if punitive damages are appropriate, can I

19  make a suggestion that we add that to say in this case, if you

20  find Linode liable, you will then decide if punitive damages

21  are appropriate or something to that effect?

22          MR. CARSON:  Where are we?

23          THE COURT:  It's on the draft I sent you, Mr. Carson.

24  It's on Page 34, the start of the last paragraph.

25          MR. CARSON:  What's the suggestion?

**U**NITED **S**TATES **D**ISTRICT **C**OURT

1          THE COURT:  I think the suggestion was to say if you
2    find Linode liable, you will then first -- you will then decide
3    whether punitive damages are appropriate.
4          MR. CARSON:  The language --
5          THE COURT:  It says, "In this case, you will first
6    decide if punitive damages are appropriate.  If so, then after
7    you return your verdict..."
8          So they're suggesting in this case if you find Linode
9    liable, then you will first decide if punitive damages are
10   appropriate.  And then if you --
11         MR. CARSON:  I think that's more confusing.  I can see
12   why it's -- you know, first means, like, they are deciding that
13   first.
14         I think in this case, you will decide if punitive
15   damages are appropriate.  I'd take the word "first" out.
16         THE COURT:  Well, the point is I wanted to sequence it
17   to tell them that there's going to be a separate proceeding.
18         MR. CARSON:  Yeah.
19         THE COURT:  I think first does matter in that sense.
20   If there's another word you prefer, I'm open to that.
21         Again, don't forget -- and I haven't sent it to you
22   yet.  I want to play with it a little bit -- but this will be
23   paired with the verdict form.  Right?  And the verdict form
24   will have instructions on it that say if you find, for
25   instance, they'll say if you find any liability on any of these

**UNITED STATES DISTRICT COURT**

1  counts, go to damages.

2        One of the reasons I haven't sent it to you, frankly,

3  is I'm debating from a flow standpoint, given that the damages

4  are slightly different under Title VII and ADEA, whether to

5  have the Title VII liability questions and the Title VII

6  compensatory damages questions and then the ADEA liability

7  questions and the ADEA compensatory damages questions and then

8  punitive damages question.

9        There's some logic to that because I don't think

10 there's overlap, but I need to see it.  And I haven't had a

11 chance to look at it and make sure it makes sense.

12       MR. CARSON:  Also, doesn't there have to be a question

13 for liquidated under the ADEA versus --

14       THE COURT:  Yes.  That's what I'm saying.  The damages

15 are different.  And so normally, when I do a verdict sheet, it

16 says liability, liability, liability.  If you answer anything

17 yes, go to damages, damages, damages, damages.

18       But in some respects, if I'm harkening back, if you

19 answered 4, 5, and 6 yes, answer these damages questions.  And

20 if you answered 1, 2, and 3 yes, you have to answer these

21 damages questions.  It feels like I just sort of collapse it

22 all up, just like I did with these instructions, to avoid the

23 repetition of, you know, what these things are.

24       So that's what I'm playing with the verdict sheet.  My

25 point being -- I know you haven't seen it yet -- I do think the

**U N I T E D   S T A T E S   D I S T R I C T   C O U R T**

1  concern that both of you are articulating with respect to this

2  sentence in the instructions will be mitigated and probably

3  covered by what I'm going to put in the verdict sheet itself.

4  Because there's big bold letters that say, you know, if you

5  don't find liability, don't do this.  Don't do punitives,

6  right?  And I think that will, frankly, be easier than needling

7  over this, unless someone feels very strongly over this.

8        MR. CAVALIER:  No.  We love agonizing over every word

9  you say.

10        THE COURT:  Okay.  We're then on to 3(b)(i), which is

11  the backpay instruction under the ADEA.

12        MR. CAVALIER:  I have a suggestion on that point.  I

13  don't think there's conflicting testimony on the amount of

14  backpay in this case.  I could be wrong about that.  Maybe my

15  colleague disagrees, but I don't know that the jury really

16  needs to answer this question.

17        I mean, if there's liability, we owe the guy backpay,

18  and the backpay is essentially the amount that the expert

19  testified to, and that's the economics in the case.

20        THE COURT:  Well, I mean, if you want to

21  stipulate that -- and I know there was some discussion about

22  stipulation before -- if you want to stipulate that

23  Mr. Staller's calculation of backpay is the amount of backpay

24  that is owed, then I can tell the jury that and just direct

25  them.  You know, what I would do then is backpay available

**UNITED STATES DISTRICT COURT**

1  under the ADEA, and if you find that the defendant is liable,
2  then I instruct you that the amount of backpay is X, and that
3  that's the amount you should award.
4       And if you want it, Mr. Carson, just so that I'm
5  completely faunced(PH) by that, I can say I instruct you on the
6  amount that Staller calculated, which is X, is the amount that
7  you should award.
8       MR. CARSON:  I think the bonus is in there too.
9  That's not part of what Mr. Staller --
10      THE COURT:  I mean, that's fair.  The Akamai retention
11  bonus.
12      MR. CAVALIER:  Obviously, we don't stipulate to that.
13      THE COURT:  You're not stipulating to that?
14      MR. CARSON:  I would agree to something where we
15  stipulated that like -- you know, if they find liability, you
16  know, Mr. Staller's is that, and then they have to figure out
17  whether they think he should get a bonus or whether he was paid
18  unfairly, or something like that.
19      THE COURT:  In other words, you wouldn't do a
20  stipulation if there's reference to a bonus?
21      MR. CAVALIER:  I certainly don't want to call out the
22  bonus in the instructions.
23      THE COURT:  All right.  Well, then -- I mean, you guys
24  can talk more, and if you come up with a stipulation, you let
25  me know.  But otherwise, we're going to go with this.

**UNITED STATES DISTRICT COURT**

```
 1              MR. CAVALIER:  I agree.

 2              THE COURT:  Okay.

 3              MR. CAVALIER:  No issues.

 4              THE COURT:  All right.  So do you have anything on

 5  3(b)(i), Mr. Carson?

 6              MR. CARSON:  I don't think so.

 7              THE COURT:  Mr. Cavalier, you're good too?

 8              MR. CAVALIER:  Good.

 9              THE COURT:  3(b)(ii) is liquidated damages.  Anything

10  there?

11              MR. CARSON:  Good.

12              MR. CAVALIER:  Good.

13              THE COURT:  All right.  3(c) is the nominal damages.

14  Mr. Carson, do you want that instruction?

15              MR. CARSON:  I mean, I would object to it.

16              THE COURT:  I mean, if you don't want it, I don't

17  think the defense wants it.

18              Do you care, Mr. Cavalier?

19              MR. CAVALIER:  I want it out.

20              THE COURT:  You want it out.

21              You want it out, Mr. Carson?

22              MR. CARSON:  I'd like to talk to my client about that.

23  I guess right now I'm just going to --

24              THE COURT:  Well, let's do this.  Does anybody --  and

25  just so you understand process wise, okay, the instruction that
```

**UNITED STATES DISTRICT COURT**

1  is under 4 is the instruction that I would give after closings.
2  So I'll give everything through whatever we wind up, 3(b) or
3  3(c), before closings.  I would do 4 after closings, which is
4  basically how do you go back and be a juror.
5         Does anybody have anything on 4, which I think is a
6  standard Third Circuit instruction on this?
7         MR. CAVALIER:  No issues.
8         MR. CARSON:  And you said 4 is what you would do after
9  the closing?
10         THE COURT:  Correct.  No, you're good?
11         MR. CARSON:  I'm good.
12         THE COURT:  And then -- so let's just look quickly.  I
13  also sent you the instruction on the punitives, if we get
14  there.  That's what I would give the jury if they come back,
15  say punitives are appropriate, and hear a little bit of
16  additional evidence.  Again I think that largely tracks the
17  Circuit's instruction, but does anybody have any comments on
18  that?
19         MR. CARSON:  What page?
20         THE COURT:  It's a new -- it's a separate file that
21  was attached.
22         Right, that was included?
23         MS. MEYER:  Yes.
24         MR. CAVALIER:  And that's the standard model.
25         THE COURT:  Yes, it's my understanding it is.

**UNITED STATES DISTRICT COURT**

1          MR. CAVALIER:  Looks like it to me.

2          THE COURT:  Yeah.

3          MR. CARSON:  Looks like -- I'm okay with that.

4          THE COURT:  All right.  So why don't we -- Mr. Carson,

5    I'd like to get these as close to put to bed as I can, so why

6    don't you take a couple minutes and talk to Mr. Williams and

7    let me know what you want to do with respect to the nominal

8    damages instruction.

9          MR. CARSON:  There's -- I don't know if it's a

10   comment, but it's in the Third Circuit jury instructions,

11   something that says something about -- something like this,

12   that I would ask for it to be included:  If you find that you

13   disbelieve defendant's (inaudible) reason for the termination,

14   you may but you do not have to find that --

15         THE COURT:  I think that's in here.  I think if you go

16   back and look -- I'll find it for you, Mr. Carson, but it is

17   under the pretext instruction.

18         MR. CARSON:  I think I found it.  Yep.  All right.

19   Sorry.

20         THE COURT:  So it's in there.  Okay.  So -- well, what

21   do you think about nominal damages?  Do you want to talk to

22   Mr. Williams for a couple minutes now?

23         MR. CARSON:  Yeah, can I just get a minute?

24         THE COURT:  Sure.

25         (Brief pause.)

**UNITED STATES DISTRICT COURT**

 1          MR. CARSON:  Your Honor, we agree with Mr. Cavalier,

 2   we can take it out.

 3          THE COURT:  All right.  So take out the 3(c), which is

 4   nominal damages.  Okay.  Great.

 5          MR. CAVALIER:  Couple references also, Your Honor.  I

 6   think if you just search for "nominal," you'll find it.

 7          THE COURT:  Okay.  Oh, I see it.  Yep.  Okay.

 8          So I think I've got these, subject -- I guess we'll

 9   see what happens on the Rule 50 tomorrow, I'll hear you guys on

10   that when we get there.

11          One thing -- well, two things.  Let's just kind of try

12   to wrap these things up now.  One, you all ought to talk about

13   how you're sending evidence to the jury.  You've been

14   presenting everything electronically.  There's really two

15   options.  I think I talked about this at the final pretrial.

16   Option one is an air gap computer with a memory stick.

17   Option two is a binder.  It's really your call.

18          MR. CARSON:  I unnecessarily made like binders for

19   everybody, so I have extra papers for everyone if you want to

20   do that.

21          MR. CAVALIER:  We have specific loose copies for the

22   jurors, so we can coordinate, collate and --

23          THE COURT:  That's fine.  In that case then, the only

24   thing that poses a challenge is the recording.  If you are

25   sending them hard copies, we're obviously not sending them the

1  recording.  So if they want to hear it again, they'll have to

2  send a note back and we'll bring them out here and play it for

3  them.

4          MR. CARSON:  That works.

5          THE COURT:  Let's try and seen if we can't -- I don't

6  know if you've had a chance to talk to Mr. Carson about this

7  witness that you want to testify remotely tomorrow.

8          MR. CAVALIER:  We haven't.

9          THE COURT:  You haven't yet?  Well, who is it?

10          MR. CAVALIER:  It's Owen Conway.

11          THE COURT:  And where is he?

12          MR. CAVALIER:  He's on the West Coast.  Palm Springs.

13          THE COURT:  Okay.  And he doesn't still work for

14  Linode or Akamai or wherever?

15          MR. CAVALIER:  Nope.

16          MR. CARSON:  And he's -- obviously, he's a rebuttal

17  witness, so he's only going to appear to rebut something that

18  Mr. Williams said, right?

19          THE COURT:  That's my understanding.

20          MR. CAVALIER:  That's my understanding as well.

21          THE COURT:  I mean, you know what you're putting him

22  on for.

23          MR. CAVALIER:  I want to be clear so that there's --

24  you know, the range of rebuttal here based on the testimony is

25  wide, in our opinion.  I think he can testify to rebut certain

1    --

2          THE COURT:  I want to be clear, okay.  We're not in a

3    rebuttal case.  When Mr. Carson rests, you can put on witnesses

4    to mount a defense.  So that's what I'm trying to -- so it has

5    to be --

6          MR. CARSON:  He wasn't on their witness list.

7          THE COURT:  Well, that's my question --

8          MR. CAVALIER:  He's on their witness list.

9          THE COURT:  Is he in the pretrial memo as a witness?

10          MR. CARSON:  I put him on mine, but I never got in

11    touch with him, I've never spoken to him.

12          THE COURT:  Well, I'm not sure that matters.  Doesn't

13    that mean that you have notice of his potential participation

14    in the case?

15          MR. CARSON:  No, I don't think it does.  Defendants

16    never gave us those.  He gave us, you know, five people on the

17    witness list.

18          THE COURT:  But you listed him.

19          MR. CARSON:  Yeah, one of like 30 people that we were

20    just trying to get in touch with.

21          THE COURT:  Hold on.  When you put people on a witness

22    list, you're telling defendants these people might show up at

23    trial.

24          MR. CARSON:  Right.

25          THE COURT:  Right.  They are entitled to rely on that,

**UNITED STATES DISTRICT COURT**

1    aren't they.

2          MR. CARSON:  I don't think that -- if they didn't give

3    us notice that he's going to show up in trial and testify on

4    behalf of them, I don't think that it's -- I mean, look, he

5    wasn't listed in any of their documents in discovery either, I

6    don't believe, so -- I don't think he's listed --

7          THE COURT:  Well, that -- I mean that's a question

8    too.  I guess maybe I'll have to answer that in the morning.

9    Because if you're -- I don't know that he's purely a rebuttal

10   witness at this point when you're calling him as part of your

11   defense case in chief.

12         MR. CAVALIER:  He is our only witness in our case in

13   chief.

14         THE COURT:  Understood.  Did you disclose him in your

15   Rule 26 disclosures?

16         MR. CAVALIER:  I would have to look at that, Your

17   Honor.  But, quite frankly, we didn't necessarily expect him to

18   be relevant coming in, but his name come up far more than we

19   expected.  He was on plaintiff's list.  He can rebut specific

20   things that have been offered in testimony by certain people

21   here, which we think is directly relevant.  And ultimately the

22   plaintiff is asking us if we would accept a subpoena on behalf

23   of the guy.  I mean, they definitely were aware that this

24   person was a potential witness at this trial.

25         MR. CARSON:  And the answer was, no, we can't get in

UNITED STATES DISTRICT COURT

1  touch with him.

2        THE COURT:  Okay.  So I'm going to put a pin in that.

3  You guys can talk.  If there's an argument that he has not been

4  properly disclosed tomorrow, I'm going to -- both know what the

5  disclosures were.  Right, you'll have to hand them up to me.

6        And if there are cases you think are applicable, I

7  will want to know that too.  I'm going to do some looking

8  myself, but I'm not going to do that on the fly right now.

9        So there's two paths from that discussion tomorrow.

10  There's the path where he does and the path where he doesn't

11  testify.

12        MR. CAVALIER:  Well, so I don't think there can be any

13  legitimate dispute that he's eligible to testify as an

14  impeachment witness.  So at the very least, he's going to

15  testify as to those matters.

16        THE COURT:  When you say "impeachment," what do you

17  mean?

18        MR. CAVALIER:  He's going to impeach testimony offered

19  about him and about his employment at Linode, about the

20  environment at Linode, to the extent he can rebut specific

21  testimony offered by the plaintiff.

22        THE COURT:  Well, again, I'm going to --

23        MR. CARSON:  My client didn't testify to the

24  environment, he testified about what happened to him.

25        THE COURT:  Well, I'm going to pause on that.  Again,

**UNITED STATES DISTRICT COURT**

1  because I, frankly, need to think about this at least a little

2  bit.  I mean, I know that you've put on a lot of your case.

3          MR. CARSON:  He was not in the 26(a) disclosures.

4  There were two sets and he's not in either set.

5          THE COURT:  Okay.  But I just said, I'm putting a pin

6  in that.  So let's wait until tomorrow and deal with that then.

7  If it is rebuttal testimony, then maybe he doesn't have to be

8  disclosed, but I'll have to think about that and look at the

9  case law on it.

10          Let's go down the path where he does testify for a

11  second and just game that out.  There's a path where he might

12  not.  If he does, then the question is raised of, can he

13  testify by Zoom?

14          So he's on the West Coast and he's not within your

15  control, I take it, is what you are saying?

16          MR. CAVALIER:  Correct.

17          THE COURT:  Right?  Is there anything else that you

18  would offer as a reason for him to testify remotely?

19          MR. CAVALIER:  He's also sick.

20          THE COURT:  When you say "sick," what does that mean?

21  Like a cold or he has cancer or --

22          MR. CAVALIER:  No, no.  More like the former, right.

23  I'm sorry.  I didn't mean to leave the improper impression.

24  But sick to the point where it would inhibit travel, but not

25  bedridden.

**UNITED STATES DISTRICT COURT**

```
 1          THE COURT:  Meaning like -- when you say "sick to
 2  inhibit travel," flu, COVID, something of that ilk?  That's
 3  what we're talking about?
 4          MR. CAVALIER:  Yes.
 5          THE COURT:  Again, Mr. Carson, I want you to game this
 6  out.  I'm not overruling any objections you're making on the
 7  disclosure issues, okay.
 8          If I let him testify or if I say the testimony is
 9  proper given the disclosures, what's your view on him
10  testifying by Zoom?
11          MR. CARSON:  We object to it.  Just -- you know, I
12  haven't had the opportunity to -- this is the first I'm hearing
13  of it, the last day -- the day before the last day of the
14  trial.
15          THE COURT:  Again, I want to try to separate out the
16  disclosure questions, right, which go to whether he can testify
17  -- you know, whether there's been some violation that prevents
18  him from testifying.
19          From the question of -- let's say I overrule his
20  objections.  And, again, don't take this as preview I will.
21  I'm truly putting a pin in it because I need to go think about
22  it.  I'm hearing it for the first time now.
23          But I do want to try and also understand what the
24  arguments are.  If I need to hear from him tomorrow, I can
25  first thing.  There's a rule that governs this, right?
```

**UNITED STATES DISTRICT COURT**

```
 1          MR. CARSON:  I was about to say, I think there's a
 2   rule, and I'm not sure that the elements are satisfied.
 3          THE COURT:  There is a rule.  And the rules, it's not
 4   really elements, it's pretty nebulous, okay, is the problem.
 5   And the cases are kind of all over the map on this.
 6          So I'm going -- I guess what I'm going to do then is
 7   I'm just going to put a pin in both of these things.  You all
 8   can talk.  If you can't resolve it, I'll resolve it in the
 9   morning.  Again, on both issues, whether he can testify,
10   whether disclosure has been proper, whether the scope of his
11   testimony is such that it would excuse a disclosure failure if
12   there has been one.  All of these are things that I'm going to
13   want to hear argument on in the morning.  Okay?
14          That -- I'm concerned that that argument might not be
15   real fast.  I hope it will be.  So I wanted -- I told the jury
16   to be here at 9:00.  I really want to get this case to them
17   tomorrow.  So what that means is I'm going to ask you all to be
18   here at 8:30.
19          Does that work for you, Maureen?
20          THE COURT REPORTER:  Yes.
21          THE COURT:  Laura?
22          THE COURTROOM DEPUTY:  Yes.
23          THE COURT:  So we'll be here 8:30.  Unless you come in
24   and tell me you've reached an agreement on it, I'm going to
25   hear from you then.  Come with whatever you got, okay.  And
```

**UNITED STATES DISTRICT COURT**

1   we'll take a quick look at it here, but I'm not going to do all

2   your work for all of you on this.

3           MR. CARSON:  Yes.  Can we get a time check on the --

4           THE COURT:  I'm going to step off and you can check

5   with my folks up here, yes.

6           Anything else besides the time we need to take up?

7           Mr. Cavalier is saying no.

8           Mr. Carson?

9           MR. CARSON:  No, Your Honor.

10          THE COURT:  Okay.  I'll see everyone tomorrow.  Feel

11  better, Mr. Carson.

12          MR. CARSON:  Thanks, Your Honor.

13          THE COURTROOM DEPUTY:  All rise.

14          (Matter adjourned at 5:06 p.m.)

15

16          - - - - - - - - - - - - - - - -

17

18          I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20

21  */S/ Maureen McHugh, RPR*
    *Official Court Reporter*

22

23  *January 29, 2024*
        *Date*

24

25


**UNITED STATES DISTRICT COURT**

**$**

**$2,000** [1] - 177:12

**'**

**'16** [2] - 169:12, 190:1
**'17** [1] - 169:16
**'18** [1] - 169:17
**'19** [2] - 61:4, 169:17
**'20** [2] - 61:4, 169:17
**'It's** [1] - 79:1
**'there** [2] - 79:2, 156:15

**/**

**/S** [1] - 254:21

**0**

**0248** [2] - 25:15, 191:9
**0729** [1] - 35:5
**0730** [3] - 35:5, 35:9, 35:10
**0809** [1] - 26:25

**1**

**1** [4] - 23:2, 94:17, 146:7, 240:20
**1(a** [1] - 228:19
**1(b** [1] - 228:24
**1(c** [1] - 229:1
**1(d** [1] - 229:8
**1(e** [1] - 229:9
**1(f** [1] - 229:10
**1.1** [1] - 234:8
**10** [4] - 55:11, 122:2, 184:22, 221:3
**10-year** [1] - 184:24
**100** [5] - 154:4, 155:9, 156:22, 159:3, 162:15
**100-mile** [1] - 5:13
**100-page** [1] - 7:20
**102** [3] - 146:18, 146:20, 146:21
**103** [1] - 3:7
**106** [1] - 94:15
**107** [3] - 94:10, 94:17, 96:10
**108** [1] - 160:15
**10:08** [1] - 161:13
**10:10** [2] - 1:14, 4:2
**10:27** [1] - 16:18
**10:30** [1] - 15:9
**10th** [1] - 158:18
**11** [2] - 135:11, 174:12
**11th** [3] - 135:12,

135:14, 158:18
**11th-ish** [1] - 135:12
**12** [1] - 232:4
**12:00** [1] - 98:9
**12:05** [1] - 102:4
**12:15** [1] - 101:17
**12th** [1] - 158:18
**13** [1] - 233:7
**13-year-old** [5] - 150:22, 151:14, 200:1, 210:11, 210:13
**1350** [1] - 2:4
**13th** [1] - 158:18
**14** [2] - 34:1, 135:11
**14th** [2] - 117:19, 158:18
**15** [2] - 135:11, 172:18
**159** [1] - 160:22
**15th** [2] - 158:19, 178:6
**16** [2] - 175:1, 178:5
**1601** [1] - 2:4
**16th** [1] - 158:19
**17** [1] - 175:1
**173** [1] - 3:7
**175** [2] - 110:16, 161:13
**18** [3] - 3:4, 146:18, 146:21
**1835** [1] - 1:19
**19** [1] - 221:22
**19102** [1] - 2:5
**19103** [1] - 1:20
**19106** [1] - 1:13
**1983** [1] - 15:21
**1997** [1] - 174:18
**1998** [1] - 176:20
**1:00** [3] - 98:3, 101:24, 179:12
**1:09** [1] - 102:4
**1:10** [1] - 102:9

**2**

**2** [1] - 240:20
**2(a** [1] - 231:25
**2(a)** [1] - 232:13
**2(b** [1] - 234:12
**2(b)** [1] - 232:19
**2(b)(i** [1] - 235:11
**2(c** [1] - 234:13
**2(c)(i** [2] - 234:15, 234:21
**2(c)(ii** [1] - 235:12
**2(d** [2] - 235:14, 235:15
**2(d)(i** [2] - 235:19, 236:4
**2(d)(i)** [1] - 236:5

**2(d)(ii** [2] - 235:24, 236:6
**2(d)(iii** [1] - 236:9
**2(e** [2] - 236:12, 237:6
**20** [4] - 107:19, 107:24, 181:19, 226:19
**200** [1] - 61:6
**2000** [1] - 94:24
**2003** [1] - 178:5
**2006** [5] - 105:12, 105:13, 105:23, 106:3, 179:3
**2012** [7] - 20:18, 20:19, 23:8, 24:14, 59:5, 121:13, 184:14
**2014** [25] - 23:2, 24:14, 26:14, 27:11, 29:2, 105:23, 106:6, 107:17, 107:23, 108:21, 110:23, 110:25, 111:6, 111:7, 111:9, 114:13, 117:6, 117:12, 117:13, 117:15, 117:19, 117:21, 138:20, 141:8
**2015** [4] - 110:20, 190:1, 194:6, 194:10
**2016** [10] - 60:21, 60:22, 60:24, 76:13, 88:6, 92:5, 110:17, 116:22, 119:6
**2017** [13] - 22:19, 26:21, 27:12, 34:9, 38:20, 39:16, 61:2, 88:6, 92:5, 122:4, 122:7, 122:8, 124:16
**2018** [14] - 61:4, 88:6, 92:6, 122:4, 132:9, 132:17, 132:19, 134:13, 134:21, 142:5, 143:1, 143:9, 204:20, 205:1
**2019** [7] - 87:16, 92:6, 94:24, 95:12, 134:21, 141:8, 204:21
**2020** [18] - 34:9, 51:15, 81:25, 86:15, 105:20, 108:2, 108:24, 110:23, 138:20, 145:7, 152:10, 152:11, 162:3, 196:5, 196:6, 212:9, 221:6, 221:22
**2021** [2] - 116:1, 212:11
**2022** [5] - 184:20,

**184:21**, 212:11, 212:12, 221:25
**2023** [5] - 9:2, 90:10, 103:11, 103:12, 213:2
**2024** [2] - 1:13, 254:23
**206** [1] - 3:8
**20s** [3] - 107:16, 120:22, 120:23
**20th** [4] - 51:15, 51:20, 161:13, 162:3
**21** [3] - 91:22, 134:25, 135:1
**22** [2] - 33:25, 154:8
**23** [1] - 9:2
**235** [1] - 94:18
**23rd** [1] - 90:9
**24** [9] - 3:10, 41:5, 41:18, 41:20, 78:10, 146:19, 146:22, 154:9, 196:2
**24/7** [1] - 180:3
**25** [7] - 107:21, 107:22, 135:11, 181:3, 181:6, 226:19
**25th** [2] - 135:9, 135:10
**26** [2] - 90:10, 249:15
**26(a** [1] - 251:3
**28** [1] - 237:11
**29** [2] - 1:13, 254:23
**2950** [1] - 1:19
**29th** [1] - 117:18
**2:00** [1] - 179:13
**2:22-CV-01618-JDW** [1] - 1:4
**2:44** [2] - 172:21, 173:7

**3**

**3** [8] - 8:23, 108:14, 108:16, 145:3, 145:8, 237:10, 237:11, 240:20
**3(a** [1] - 237:15
**3(a)(i** [1] - 237:16
**3(a)(i)** [1] - 238:6
**3(a)(ii** [1] - 238:7
**3(b** [2] - 238:9, 244:2
**3(b)(i** [3] - 238:10, 241:10, 243:5
**3(b)(ii** [1] - 243:9
**3(c** [3] - 243:13, 244:3, 246:3
**3.1** [1] - 25:20
**30** [9] - 21:9, 22:18, 26:17, 60:1, 60:9, 61:6, 107:11, 224:16, 248:19

**30s** [3] - 107:16, 120:23, 120:24
**33** [2] - 22:19, 191:4
**34** [3] - 8:8, 204:10, 238:24
**35** [8] - 8:7, 8:15, 106:16, 107:6, 107:9, 107:10, 107:20, 107:21
**35-plus** [1] - 174:14
**38** [2] - 8:10, 8:11
**39** [1] - 162:5
**3:00** [1] - 172:19
**3:01** [1] - 173:7
**3:02** [1] - 173:12
**3d** [1] - 15:21

**4**

**4** [6] - 135:11, 240:19, 244:1, 244:3, 244:5, 244:8
**4.26** [2] - 230:19, 230:25
**40** [8] - 60:10, 107:19, 107:21, 107:22, 107:24, 108:15, 108:16
**401K** [7] - 86:3, 86:5, 86:8, 86:11, 86:13, 87:18
**41** [1] - 3:10
**42** [1] - 8:15
**43** [1] - 8:16
**45** [2] - 8:13, 8:20
**47** [1] - 159:20
**49** [2] - 159:20, 159:21
**4:00** [1] - 226:7
**4:15** [2] - 226:3, 226:7
**4:16** [1] - 227:22
**4:30** [3] - 99:6, 101:11, 173:3

**5**

**5** [2] - 1:6, 240:19
**50** [4] - 71:2, 180:24, 234:22, 246:9
**50s** [1] - 121:1
**56** [1] - 3:4
**5:00** [1] - 101:11
**5:06** [1] - 254:14
**5th** [1] - 158:18

**6**

**6** [3] - 110:24, 213:14, 240:19
**60-61** [1] - 165:14
**601** [1] - 1:12

UNITED STATES DISTRICT COURT

**61** [1] - 157:22
**6th** [1] - 158:18

**7**

**718** [1] - 15:21
**7th** [1] - 158:18

**8**

**8.1.1** [1] - 233:24
**80** [1] - 181:8
**808** [2] - 26:18, 26:19
**8089** [1] - 26:18
**809** [1] - 26:19
**81** [1] - 3:5
**87** [1] - 3:5
**876** [1] - 48:12
**877** [2] - 51:16, 52:15
**878** [1] - 52:15
**88** [1] - 15:21
**8:15** [1] - 101:12
**8:30** [2] - 253:18, 253:23
**8th** [1] - 158:18

**9**

**9,000** [1] - 175:2
**90** [1] - 99:11
**92** [1] - 47:13
**94** [2] - 91:14, 91:19
**96** [2] - 142:13, 142:14
**98** [1] - 15:22
**99** [1] - 46:21
**9:00** [2] - 226:25, 253:16
**9th** [1] - 158:18

**A**

**A-S-A-R-O** [1] - 102:23
**a.m** [3] - 1:14, 4:2, 16:18
**aback** [1] - 42:8
**abilities** [3] - 63:5, 63:25, 189:13
**ability** [1] - 199:3
**able** [24] - 5:18, 6:17, 23:16, 23:17, 23:20, 24:21, 24:24, 30:12, 34:19, 37:23, 38:1, 38:16, 49:2, 63:16, 76:25, 83:20, 101:5, 101:6, 180:24, 180:25, 186:4, 199:25, 227:15
**above-entitled** [1] - 254:19
**Absecon** [1] - 179:17

**absolute** [1] - 55:23
**absolutely** [8] - 28:12, 28:20, 44:2, 50:11, 53:23, 62:17, 132:11, 218:5
**absurd** [1] - 208:2
**abuse** [1] - 69:9
**abusive** [1] - 68:4
**accept** [3] - 32:12, 180:16, 249:22
**acceptable** [1] - 177:8
**Access** [4] - 118:2, 118:4, 118:7, 118:10
**access** [11] - 23:16, 23:17, 23:20, 78:2, 110:6, 110:7, 126:3, 152:18, 175:14, 190:3, 190:4
**according** [6] - 59:25, 108:18, 113:11, 128:22, 159:10, 170:12
**account** [5] - 4:22, 89:16, 162:6, 162:9, 163:1
**accountant** [1] - 71:15
**accounting** [3] - 71:17, 122:17, 122:24
**accurate** [2] - 59:7, 236:20
**accused** [10] - 115:20, 130:21, 150:22, 167:3, 205:25, 206:9, 206:10, 209:8, 211:7, 211:22
**achieve** [1] - 206:4
**acknowledge** [2] - 24:10, 120:15
**acknowledged** [2] - 13:3, 140:11
**acknowledging** [1] - 86:21
**acquired** [2] - 103:12, 103:15
**acquisition** [3] - 19:22, 29:3, 184:18
**act** [5] - 44:20, 50:23, 151:7, 151:9, 166:5
**acted** [1] - 22:5
**acting** [3] - 26:6, 116:17, 191:25
**ACTION** - 1:3
**action** [6] - 26:12, 27:9, 112:24, 195:24, 235:25, 236:7
**actively** [1] - 179:20
**activities** [1] - 191:21
**activity** [2] - 82:21,

235:20
**actual** [4] - 7:14, 16:1, 206:22, 233:1
**Adam** [2] - 128:1, 128:8
**add** [9] - 109:16, 125:2, 161:20, 161:25, 163:6, 229:12, 232:7, 232:17, 238:19
**added** [6] - 127:12, 127:15, 128:12, 128:13, 162:2, 230:17
**adding** [1] - 229:11
**additional** [4] - 83:5, 111:8, 111:10, 244:16
**address** [17] - 18:20, 34:19, 82:8, 84:3, 88:8, 88:11, 88:14, 88:15, 90:4, 90:6, 92:11, 92:13, 92:15, 93:1, 93:5, 93:15, 93:20
**addresses** [1] - 112:16
**ADEA** [7] - 238:10, 240:4, 240:6, 240:7, 240:13, 241:11, 242:1
**adherence** [2] - 37:2, 37:6
**adjourned** [1] - 254:14
**administered** [1] - 86:11
**administrative** [4] - 74:25, 115:22, 116:1, 119:24
**admission** [4] - 41:8, 220:19, 220:22, 220:25
**admit** [4] - 41:16, 94:5, 167:6, 212:22
**admitted** [8] - 22:22, 34:1, 47:14, 135:2, 157:25, 164:8, 191:4, 204:11
**advantage** [1] - 86:5
**adverse** [5] - 10:1, 10:19, 16:6, 235:25, 236:6
**adversely** [2] - 26:6, 45:8
**advising** [1] - 19:19
**affected** [1] - 24:2
**affiliated** [1] - 5:12
**affiliation** [5] - 40:12, 158:24, 159:6, 159:7, 199:21,

200:11
**AFFIRMED** [1] - 102:19
**afforded** [1] - 144:15
**afternoon** [10] - 98:19, 100:11, 101:10, 101:21, 103:3, 103:4, 172:17, 179:12, 225:19, 226:6
**afterwards** [1] - 168:24
**age** [16] - 35:20, 35:24, 39:24, 40:2, 53:11, 53:22, 54:1, 61:24, 62:11, 121:2, 189:6, 203:8, 232:22, 232:23, 233:2, 233:8
**age-based** [2] - 232:23, 233:8
**agencies** [1] - 223:13
**agency** [2] - 115:23, 116:1
**ago** [10] - 10:8, 32:2, 60:17, 60:18, 88:25, 106:18, 108:8, 146:13, 185:21, 210:3
**agonizing** [1] - 241:8
**agree** [22] - 94:19, 137:5, 137:12, 137:16, 138:2, 143:10, 143:12, 143:17, 143:21, 144:1, 146:9, 146:11, 148:19, 153:2, 155:12, 155:14, 157:3, 202:13, 222:18, 242:14, 243:1, 246:1
**agreed** [2] - 9:1
**agreed-upon** [2] - 9:1
**agreement** [2] - 100:6, 253:24
**ahead** [11] - 10:25, 18:12, 28:14, 40:6, 69:13, 85:21, 102:7, 102:24, 173:16, 193:15, 196:1
**aided** [1] - 1:24
**air** [1] - 246:16
**Akamai** [18] - 19:22, 103:12, 103:15, 113:16, 113:17, 113:18, 113:19, 113:21, 113:24, 114:5, 114:9, 182:4, 182:7, 184:18, 193:8, 194:1,

242:10, 247:14
**Aker** [10] - 103:19, 103:25, 105:14, 127:23, 174:10, 182:8, 182:9, 187:6, 193:22, 195:16
**alcohol** [2] - 37:18, 165:6
**Alex** [9] - 117:8, 117:10, 118:16, 119:12, 120:20, 128:9, 128:14, 187:17, 190:7
**allegations** [3] - 27:23, 151:11, 156:11
**alleged** [1] - 114:20
**allocate** [1] - 101:9
**allow** [1] - 226:1
**allowed** [10] - 16:14, 72:12, 72:17, 131:12, 137:19, 137:21, 215:24, 217:23, 218:13, 220:7
**allowing** [1] - 11:18
**alluded** [1] - 29:24
**almost** [7] - 46:23, 63:21, 179:22, 181:19, 185:16, 206:3, 221:25
**ALSO** [1] - 2:10
**alternatives** [1] - 182:18
**altogether** [1] - 138:23
**amount** [11] - 24:23, 30:5, 50:14, 62:22, 241:13, 241:18, 241:23, 242:2, 242:3, 242:6
**analogy** [1] - 229:4
**Andrew** [13] - 117:8, 117:10, 117:18, 118:16, 118:18, 119:12, 120:24, 128:8, 128:13, 139:7, 139:10, 187:17, 190:7
**angry** [1] - 49:8
**announce** [1] - 136:25
**announced** [9] - 120:8, 132:11, 132:16, 134:15, 134:17, 136:1, 138:9, 140:17, 143:13
**announcement** [1] - 135:18, 135:21
**annual** [3] - 144:22, 145:1, 148:14

**anonymous** [6] - 57:2, 171:14, 171:15, 171:17, 171:18, 171:20
**answer** [40] - 36:19, 64:22, 69:13, 77:11, 85:13, 87:3, 94:22, 96:11, 97:2, 99:18, 116:11, 125:23, 126:11, 147:19, 147:25, 153:17, 153:18, 155:19, 155:22, 160:21, 161:7, 180:4, 180:21, 185:5, 193:13, 193:14, 199:7, 202:2, 210:20, 211:12, 215:1, 221:9, 223:21, 235:9, 240:16, 240:19, 240:20, 241:16, 249:8, 249:25
**ANSWER** [16] - 91:25, 92:3, 92:7, 92:10, 92:12, 92:14, 92:17, 92:21, 94:23, 95:1, 95:5, 95:7, 95:13, 95:17, 96:25, 97:6
**answered** [9] - 57:4, 116:2, 164:25, 179:10, 210:25, 211:1, 211:13, 240:19, 240:20
**answering** [1] - 178:17
**answers** [3] - 91:22, 147:5, 184:5
**anti** [5] - 25:24, 26:1, 26:15, 26:23, 27:12
**anti-retaliation** [5] - 25:24, 26:1, 26:15, 26:23, 27:12
**apart** [1] - 40:4
**apartment** [1] - 177:22
**apologize** [5] - 97:15, 97:17, 147:7, 230:23, 238:13
**appealing** [1] - 20:9
**Appeals** [1] - 217:10
**appear** [1] - 247:17
**appearance** [1] - 16:1
**appeared** [2] - 86:19, 196:11
**appearing** [1] - 43:9
**applicable** [2] - 46:25, 250:6
**Applicant** [1] - 66:10
**applicant** [1] - 21:22
**application** [1] - 66:21

**applications** [1] - 65:20
**applied** [3] - 29:15, 29:17, 61:11
**applies** [1] - 231:5
**apply** [2] - 131:25, 231:5
**appointment** [1] - 134:3
**approach** [2] - 82:17, 146:1
**approached** [1] - 195:9
**appropriate** [11] - 134:5, 147:18, 214:7, 235:7, 238:18, 238:21, 239:3, 239:6, 239:10, 239:15, 244:15
**approximate** [3] - 60:19, 60:22, 107:20
**approximated** [1] - 106:15
**approximation** [1] - 106:15
**area** [5] - 54:4, 181:16, 185:24, 190:22, 191:25
**argue** [3] - 211:2, 217:19, 217:23
**argued** [1] - 217:13
**argument** [11] - 9:14, 10:14, 93:23, 99:9, 99:10, 218:8, 218:10, 218:11, 250:3, 253:13, 253:14
**argumentative** [2] - 49:13, 209:2
**arguments** [4] - 227:10, 227:11, 227:17, 252:24
**arises** [1] - 13:5
**Arizona** [1] - 175:5
**arrangement** [1] - 39:12
**article** [67] - 40:22, 41:2, 41:14, 41:23, 41:24, 42:2, 42:6, 42:10, 42:13, 43:22, 45:20, 51:7, 51:13, 69:5, 70:8, 77:20, 77:21, 77:24, 78:3, 78:6, 78:9, 78:16, 79:18, 80:6, 80:7, 80:15, 81:12, 83:6, 86:15, 87:20, 96:11, 96:14, 96:18, 96:24, 152:12, 152:17,

152:19, 152:20, 153:8, 154:8, 154:12, 155:10, 155:13, 156:21, 156:22, 159:4, 169:6, 170:2, 170:10, 194:8, 195:17, 196:22, 198:5, 199:3, 199:21, 200:11, 201:18, 201:21, 202:5, 207:14, 208:12, 210:15, 211:19, 211:20, 212:1
**Article** [2] - 233:18, 233:20
**articles** [1] - 155:8
**articulate** [2] - 104:23, 211:4
**articulating** [1] - 241:1
**AS** [1] - 102:19
**ASARO** [3] - 1:8, 3:6, 102:18
**Asaro** [33] - 9:9, 11:19, 17:9, 20:4, 20:11, 38:18, 42:4, 43:14, 57:14, 58:23, 61:7, 61:12, 62:4, 62:11, 81:16, 98:13, 98:15, 98:23, 101:25, 102:12, 102:22, 103:3, 103:7, 103:8, 161:20, 173:14, 173:24, 191:6, 191:11, 219:13, 220:18, 224:7
**asaro** [2] - 44:5, 173:19
**aside** [1] - 172:3
**aspect** [1] - 112:3
**aspired** [1] - 184:3
**assassin** [1] - 199:25
**asserting** [1] - 235:6
**assessment** [1] - 31:6
**assigned** [1] - 143:22
**assist** [1] - 159:15
**assistant** [1] - 119:24
**assisting** [1] - 129:3
**associated** [4] - 168:13, 208:7, 209:10, 211:7
**association** [1] - 210:7
**assume** [3] - 7:2, 98:18, 144:17
**assumes** [1] - 120:11
**assuming** [1] - 132:8
**assumption** [9] -

50:22, 75:6, 75:7, 86:24, 87:5, 87:22, 88:3, 88:5, 95:22
**Atlanta** [1] - 190:1
**atmosphere** [1] - 189:18
**attached** [1] - 244:21
**attack** [2] - 189:24, 190:5
**attacks** [3] - 187:4, 187:7, 189:23
**attempted** [6] - 201:18, 201:20, 209:15, 209:16, 211:8, 211:22
**attempting** [1] - 150:22
**attend** [1] - 162:5
**attended** [1] - 19:6
**attending** [1] - 43:4
**attention** [20] - 26:24, 27:6, 29:13, 29:14, 35:4, 35:10, 40:4, 41:25, 44:3, 48:7, 52:14, 96:9, 146:9, 146:18, 194:5, 194:12, 194:15, 196:7, 196:10, 196:11
**attorneys** [3] - 75:8, 219:18, 222:7
**attract** [2] - 24:21, 181:16
**attracted** [1] - 28:17
**attributable** [2] - 207:21, 216:10
**attribute** [1] - 210:4
**attributing** [1] - 210:7
**August** [13] - 51:15, 51:20, 108:2, 152:10, 161:13, 162:3, 212:9, 212:11, 213:2, 221:6, 221:22
**authority** [4] - 130:10, 131:17, 140:1, 140:5
**available** [8] - 23:19, 46:23, 65:19, 82:6, 139:19, 139:25, 237:16, 241:25
**avoid** [1] - 240:22
**award** [2] - 242:3, 242:7
**aware** [27] - 12:3, 24:9, 34:6, 40:11, 40:18, 40:24, 41:22, 41:24, 44:22, 50:2, 62:6, 63:14, 67:1, 69:22, 69:24, 75:2, 82:7, 95:11, 114:16,

202:11, 219:23, 219:25, 220:3, 220:6, 220:9, 230:15, 249:23
**awareness** [2] - 43:22, 86:21

**_B_**

**bachelor** [1] - 19:13
**background** [7] - 19:3, 55:15, 61:13, 63:8, 63:10, 173:22, 196:1
**backpay** [9] - 238:10, 241:11, 241:14, 241:17, 241:18, 241:23, 241:25, 242:2
**backwards** [1] - 238:13
**bad** [7] - 14:10, 52:3, 151:12, 151:15, 151:16, 167:20, 230:22
**baked** [2] - 4:18, 4:19
**balance** [2] - 86:7, 86:9
**bang** [1] - 229:7
**bank** [2] - 177:17, 180:13
**banks** [1] - 175:13
**bargaining** [1] - 205:8
**base** [2] - 177:12, 178:8
**baseball** [2] - 233:25, 234:3
**based** [12] - 32:3, 32:5, 82:5, 95:9, 154:1, 155:10, 156:23, 177:1, 209:22, 232:23, 233:8, 247:24
**basic** [7] - 30:22, 32:24, 33:15, 63:14, 63:15, 65:4
**basis** [5] - 78:5, 83:23, 84:1, 84:2, 217:16
**Bates** [1] - 191:9
**bear** [2] - 5:15, 90:10
**became** [12] - 49:8, 113:21, 119:15, 123:7, 126:16, 126:19, 126:22, 128:5, 129:8, 139:19, 139:25, 180:3
**becoming** [1] - 20:22
**bed** [1] - 245:5
**bedridden** [1] - 251:25

**BEEN** [1] - 102:18
**began** [2] - 116:21, 174:16
**begin** [1] - 227:18
**beginning** [9] - 16:23, 17:22, 21:3, 112:21, 113:3, 119:6, 160:23, 179:8, 232:21
**behalf** [21] - 40:23, 43:1, 43:5, 77:23, 79:7, 95:7, 95:8, 116:17, 191:21, 213:9, 214:14, 214:16, 216:6, 218:14, 219:5, 220:10, 222:6, 223:16, 223:24, 249:4, 249:22
**behavior** [11] - 27:20, 42:19, 79:3, 156:9, 156:16, 158:2, 207:17, 207:20, 209:18, 210:4
**behind** [5] - 22:5, 22:6, 24:25, 47:24, 126:2
**belief** [5] - 37:8, 37:11, 53:25, 83:6, 83:23
**beliefs** [1] - 82:25
**believes** [2] - 10:7
**belongs** [1] - 151:23
**below** [1] - 145:21
**Ben** [1] - 128:9
**beneficial** [1] - 148:20
**benefit** [3] - 14:2, 162:7, 162:22
**benefits** [5] - 113:23, 114:22, 144:23, 180:5, 180:6
**best** [12] - 25:2, 42:5, 55:11, 55:23, 65:8, 72:18, 72:20, 137:4, 168:20, 174:14, 228:9
**better** [10] - 51:6, 60:15, 72:22, 76:16, 76:18, 121:24, 125:8, 199:1, 229:4, 254:11
**between** [35] - 9:8, 9:9, 34:4, 34:8, 39:19, 47:17, 48:1, 84:10, 100:25, 107:16, 107:19, 107:21, 107:22, 107:23, 107:24, 108:14, 108:16, 110:23, 111:14, 111:20, 111:21,

111:23, 123:19, 134:20, 136:1, 136:4, 138:19, 141:8, 153:4, 192:12, 192:17, 198:23, 201:3, 213:3
**beverage** [1] - 19:16
**beyond** [7] - 9:24, 13:16, 17:12, 31:18, 42:25, 83:5, 226:23
**bias** [1] - 233:1
**big** [14] - 58:3, 58:4, 101:21, 113:12, 113:13, 119:21, 120:1, 120:5, 120:19, 179:23, 183:5, 185:23, 206:6, 241:4
**bigger** [2] - 146:21, 199:14
**binder** [1] - 246:17
**binders** [1] - 246:18
**bit** [27] - 17:20, 20:11, 21:10, 25:5, 31:1, 32:2, 33:8, 36:6, 36:11, 42:8, 46:3, 46:5, 48:16, 49:6, 54:10, 54:11, 56:3, 94:16, 105:24, 114:12, 173:21, 176:25, 179:6, 190:21, 239:22, 244:15, 251:2
**black** [1] - 37:13
**blank** [1] - 160:2
**blanket** [4] - 130:10, 131:17, 140:1, 140:5
**blasted** [1] - 24:6
**bled** [1] - 5:11
**blessing** [3] - 187:20, 187:21, 188:10
**block** [3] - 218:17, 219:2, 219:13
**blog** [3] - 69:14, 69:24, 70:2
**blown** [1] - 82:24
**blur** [1] - 84:8
**board** [3] - 65:21, 130:21, 213:14
**bold** [1] - 241:4
**bonus** [5] - 242:8, 242:11, 242:17, 242:20, 242:22
**bonuses** [4] - 114:1, 114:3, 114:7, 114:8
**bookkeeping** [1] - 21:14
**books** [1] - 122:23
**boom** [1] - 110:4
**boss** [1] - 39:9

**bother** [2] - 80:3, 167:17
**bothered** [1] - 34:18
**bottom** [10] - 78:12, 96:10, 155:16, 155:25, 156:1, 161:11, 215:8, 219:11, 232:3, 233:7
**bought** [3] - 178:1, 183:12, 198:2
**bounds** [1] - 25:5
**boys** [1] - 173:24
**break** [9] - 98:2, 100:12, 172:17, 174:18, 182:5, 209:4, 226:17, 227:24
**brief** [3] - 4:8, 5:18, 112:19
**Brief** [2] - 173:7, 245:25
**briefly** [6] - 22:15, 25:14, 175:19, 182:6, 182:11, 182:14
**brilliant** [1] - 229:3
**bring** [15] - 4:7, 16:15, 22:15, 27:5, 28:22, 41:4, 83:13, 100:23, 102:7, 157:15, 177:12, 182:21, 187:8, 191:3, 247:2
**bringing** [1] - 33:2
**brings** [2] - 26:3, 40:6
**broad** [2] - 25:7, 25:9
**broke** [1] - 208:19
**broken** [1] - 77:8
**brother** [1] - 19:5
**brought** [14] - 26:5, 26:7, 32:23, 38:3, 40:4, 41:25, 62:22, 175:11, 182:2, 187:2, 187:8, 194:11, 199:17
**Brown** [3] - 119:24, 119:25, 120:8
**buck** [1] - 229:7
**budget** [1] - 174:21
**Buenzle** [1] - 2:13
**bugs** [1] - 178:17
**build** [3] - 112:24, 179:25, 180:1
**building** [11] - 21:18, 21:19, 21:20, 21:23, 21:24, 120:3, 137:2, 179:18, 179:24, 181:4, 181:5
**built** [4] - 20:11, 179:5, 180:2, 206:5
**bullet** [1] - 33:1

**bump** [3] - 48:19, 145:3, 145:8
**bunch** [5] - 160:7, 165:5, 177:5, 183:7, 221:18
**burden** [2] - 228:19, 228:20
**burdens** [1] - 231:18
**burning** [1] - 175:16
**business** [24] - 19:13, 20:1, 21:13, 22:9, 42:10, 48:2, 59:11, 105:17, 105:19, 105:24, 109:14, 109:18, 110:4, 110:15, 112:1, 112:3, 118:1, 138:1, 176:13, 178:24, 195:1, 197:24, 198:2, 200:13
**businesses** [1] - 19:19
**but..** [6] - 91:18, 103:23, 117:20, 138:24, 145:24, 174:8
**butt** [1] - 178:3
**buy** [6] - 180:10, 180:11, 180:14, 180:23, 182:19, 183:5
**buying** [1] - 180:14
**BY** [133] - 1:19, 2:3, 3:4, 3:4, 3:5, 3:5, 3:7, 3:7, 3:8, 18:15, 19:1, 19:23, 20:16, 22:21, 25:16, 25:21, 26:20, 28:9, 28:21, 31:15, 34:2, 35:7, 36:25, 37:7, 38:12, 40:17, 41:1, 41:11, 41:21, 43:12, 45:18, 48:13, 49:17, 50:8, 51:17, 51:25, 53:6, 54:14, 55:3, 56:9, 57:7, 58:13, 58:17, 65:3, 66:5, 69:8, 69:16, 69:20, 74:8, 74:17, 75:18, 76:20, 78:13, 78:22, 78:25, 81:24, 82:14, 85:22, 87:2, 87:8, 88:23, 91:10, 91:15, 97:5, 103:2, 110:10, 110:14, 116:5, 116:14, 118:23, 120:17, 125:18, 125:25, 126:13, 135:6, 136:15, 139:23, 142:15,

142:22, 146:4, 147:1, 147:9, 148:11, 153:20, 154:11, 154:18, 155:2, 155:24, 156:5, 157:24, 159:22, 160:3, 161:15, 163:17, 164:17, 165:16, 173:18, 185:4, 191:5, 191:10, 193:18, 194:22, 195:11, 195:25, 196:19, 197:7, 197:16, 198:1, 198:13, 198:20, 199:6, 200:4, 200:19, 201:9, 204:12, 205:7, 206:16, 209:5, 210:21, 211:3, 211:17, 213:8, 213:11, 213:16, 214:9, 214:23, 215:4, 219:12, 220:17, 221:2, 221:12, 223:11, 223:22
**Byrne** [1] - 1:12

---

## C

**c)(i** [1] - 234:16
**calculated** [1] - 242:6
**calculation** [1] - 241:23
**California** [1] - 174:24
**callback** [1] - 134:2
**callbacks** [1] - 134:6
**calm** [1] - 208:20
**cancer** [1] - 251:21
**candidate** [1] - 32:3
**candidates** [4] - 29:7, 30:2, 30:23, 65:20
**cannot** [3] - 12:14, 12:15, 77:14
**capabilities** [1] - 100:22
**capable** [1] - 32:19
**captures** [1] - 230:3
**car** [3] - 174:23, 176:6, 177:13
**card** [1] - 194:25
**care** [16] - 14:25, 25:11, 30:16, 80:13, 80:14, 80:15, 80:19, 84:22, 140:24, 157:21, 167:23, 167:24, 176:22, 181:22, 186:9,

243:18
**cared** [9] - 80:16,
80:18, 167:25,
168:3, 168:4, 168:6,
168:7, 168:8, 168:9
**career** [5] - 20:13,
33:8, 66:12, 67:19,
207:8
**carefully** [1] - 228:5
**cares** [1] - 168:1
**Carl** [158] - 35:13,
56:10, 57:9, 57:10,
59:25, 60:3, 60:6,
61:24, 62:22, 66:20,
66:24, 71:1, 72:2,
73:9, 81:11, 88:7,
89:1, 91:23, 92:1,
92:4, 92:9, 92:11,
95:15, 96:12,
107:15, 109:20,
112:4, 116:25,
117:6, 117:17,
117:18, 118:13,
118:15, 118:18,
119:12, 120:8,
121:1, 124:1,
124:10, 124:19,
124:22, 124:25,
125:14, 125:15,
126:6, 126:22,
126:25, 127:8,
128:13, 129:6,
131:22, 131:24,
132:7, 132:20,
132:23, 133:2,
133:8, 133:10,
133:16, 133:19,
133:22, 134:10,
134:15, 134:16,
135:18, 135:22,
136:1, 136:22,
136:25, 137:2,
137:7, 137:9,
137:14, 137:21,
137:24, 138:6,
138:7, 138:12,
138:19, 139:11,
141:24, 142:4,
142:19, 143:13,
143:18, 144:6,
144:13, 144:18,
145:11, 145:16,
145:17, 147:3,
147:11, 147:13,
147:16, 149:10,
149:17, 149:20,
150:13, 150:15,
150:17, 150:20,
153:12, 153:23,
154:1, 156:8,
156:11, 156:24,

157:14, 161:24,
162:3, 162:5, 164:5,
166:25, 167:19,
168:11, 169:5,
170:16, 170:17,
172:1, 172:5, 172:7,
185:8, 189:16,
189:20, 190:11,
192:12, 193:16,
193:19, 195:16,
195:17, 196:16,
196:21, 196:22,
197:2, 197:6,
199:13, 206:17,
207:8, 207:21,
208:3, 208:4,
209:10, 209:11,
209:15, 209:19,
210:5, 210:7,
210:17, 211:5,
211:7, 212:3, 222:3
**CARL** [1] - 1:3
**Carl's** [11] - 96:18,
140:15, 143:23,
155:14, 156:1,
162:1, 162:21,
163:2, 163:7,
185:17, 185:22
**carrier** [1] - 111:24
**carriers** [1] - 111:20
**carson** [1] - 25:22
**CARSON** [321] - 1:19,
3:4, 3:5, 3:7, 3:8,
4:16, 6:11, 7:10,
7:15, 7:18, 8:4, 8:7,
8:11, 8:13, 8:20,
8:23, 10:9, 10:12,
10:23, 10:25, 11:4,
11:13, 11:15, 11:25,
12:9, 12:12, 12:17,
12:20, 12:22, 13:9,
13:15, 13:19, 14:6,
14:12, 14:14, 14:22,
15:10, 15:17, 15:21,
15:24, 16:9, 16:11,
16:16, 18:24, 19:8,
20:7, 28:7, 28:13,
31:13, 36:16, 36:23,
37:4, 38:9, 40:13,
40:20, 41:6, 41:10,
41:17, 42:15, 42:21,
45:15, 49:10, 49:25,
50:4, 51:8, 51:23,
52:19, 52:24, 53:3,
54:8, 54:19, 54:22,
54:25, 55:8, 56:9,
57:7, 58:13, 58:17,
65:3, 66:5, 69:8,
69:16, 69:20, 74:8,
74:17, 75:15, 75:18,
76:20, 78:9, 78:13,

78:20, 78:22, 78:24,
78:25, 81:20, 82:3,
82:11, 82:16, 83:3,
83:8, 83:14, 84:21,
84:25, 85:4, 85:9,
86:25, 87:8, 88:21,
88:23, 91:8, 91:10,
91:14, 91:15, 97:3,
97:5, 97:21, 98:17,
98:21, 99:2, 99:8,
99:15, 99:18, 99:21,
100:5, 100:9,
100:17, 101:3,
102:1, 102:12,
103:2, 110:10,
110:14, 116:5,
116:14, 118:23,
120:17, 125:18,
125:25, 126:13,
135:1, 135:6,
136:15, 139:22,
139:23, 142:11,
142:14, 142:15,
142:20, 142:22,
146:1, 146:4,
146:24, 147:1,
147:6, 147:9, 148:9,
148:11, 153:20,
154:7, 154:10,
154:11, 154:16,
154:18, 155:1,
155:2, 155:20,
155:24, 156:4,
156:5, 157:22,
157:24, 159:18,
159:22, 159:25,
160:2, 160:3,
161:11, 161:15,
163:17, 164:17,
165:15, 165:16,
172:15, 185:2,
193:11, 194:20,
195:6, 195:19,
196:17, 196:25,
197:3, 197:5,
197:14, 197:23,
198:10, 198:17,
199:4, 200:2,
200:16, 200:23,
201:5, 205:5,
206:14, 206:16,
209:5, 210:21,
211:1, 211:3,
211:17, 213:8,
213:11, 213:13,
213:16, 213:22,
213:25, 214:3,
214:8, 214:9,
214:23, 215:4,
215:12, 215:23,
216:3, 216:5, 216:9,

216:15, 216:19,
216:23, 217:8,
217:18, 217:21,
218:3, 218:9,
218:13, 218:20,
218:25, 219:7,
219:9, 219:11,
219:12, 220:13,
220:17, 220:23,
220:25, 221:2,
221:12, 223:4,
223:9, 223:11,
223:22, 224:4,
224:17, 224:21,
224:24, 225:12,
225:21, 228:21,
229:18, 230:1,
230:4, 230:11,
230:18, 230:22,
231:9, 231:16,
231:24, 232:12,
232:18, 233:4,
233:6, 233:9,
233:25, 234:3,
235:18, 235:23,
236:3, 236:8,
236:11, 236:22,
237:1, 237:7,
237:14, 238:5,
238:8, 238:22,
238:25, 239:4,
239:11, 239:18,
240:12, 242:8,
242:14, 243:6,
243:11, 243:15,
243:22, 244:8,
244:11, 244:19,
245:3, 245:9,
245:18, 245:23,
246:1, 246:18,
247:4, 247:16,
248:6, 248:10,
248:15, 248:19,
248:24, 249:2,
249:25, 250:23,
251:3, 252:11,
253:1, 254:3, 254:9,
254:12
**Carson** [55] - 4:12,
6:5, 7:14, 8:1, 9:15,
10:16, 14:11, 15:15,
16:4, 26:21, 42:22,
54:24, 56:7, 64:21,
83:24, 86:16, 100:3,
102:11, 153:19,
154:9, 155:19,
183:18, 190:23,
196:3, 200:24,
201:8, 204:14,
206:13, 209:4,
210:19, 215:9,

216:2, 217:1, 218:7,
218:12, 229:25,
230:15, 230:20,
231:20, 233:7,
238:2, 238:4,
238:23, 242:4,
243:5, 243:14,
243:21, 245:4,
245:16, 247:6,
248:3, 252:5, 254:8,
254:11
**Carson's** [2] - 4:19,
201:17
**case** [65] - 6:13, 6:15,
6:16, 7:19, 7:24,
9:22, 10:2, 10:6,
15:2, 15:4, 15:23,
16:4, 16:24, 16:25,
17:1, 17:4, 17:5,
17:7, 17:18, 17:24,
18:3, 18:6, 56:2,
70:19, 72:25, 73:3,
73:24, 76:1, 76:5,
85:18, 88:25, 89:2,
90:21, 100:16,
157:2, 157:5, 157:6,
167:1, 185:8,
209:20, 215:22,
218:5, 219:3, 226:2,
226:7, 227:5,
227:18, 238:17,
238:19, 239:5,
239:8, 239:14,
241:14, 241:19,
246:23, 248:3,
248:14, 249:11,
249:12, 251:2,
251:9, 253:16
**cases** [6] - 15:18,
230:15, 231:19,
231:21, 250:6, 253:5
**cash** [1] - 180:15
**cashier's** [1] - 95:10
**catalyst** [3] - 179:23,
180:22, 180:25
**catering** [1] - 19:17
**causal** [1] - 236:9
**causation** [1] - 233:10
**causes** [2] - 233:11,
234:6
**cautious** [1] - 84:13
**Cavalier** [19] - 4:7,
9:16, 13:21, 62:21,
65:15, 71:24, 83:25,
85:13, 85:21, 88:2,
173:16, 198:18,
206:17, 224:5,
229:22, 243:7,
243:18, 246:1, 254:7
**CAVALIER** [222] - 2:3,

3:4, 3:5, 3:7, 4:8, 4:24, 5:4, 5:9, 5:22, 6:1, 6:7, 6:10, 9:18, 9:21, 10:10, 18:13, 18:15, 19:1, 19:23, 20:16, 22:18, 22:21, 25:15, 25:16, 25:19, 25:21, 26:17, 26:20, 28:9, 28:21, 31:15, 33:25, 34:2, 35:5, 35:7, 36:25, 37:7, 38:11, 38:12, 40:17, 41:1, 41:4, 41:11, 41:16, 41:21, 43:12, 45:18, 48:11, 48:13, 49:17, 50:8, 51:14, 51:17, 51:25, 53:6, 54:14, 55:2, 55:3, 56:4, 57:4, 58:12, 66:3, 69:6, 69:11, 69:18, 74:2, 74:6, 76:17, 81:21, 81:24, 82:14, 82:23, 83:4, 83:13, 83:20, 83:23, 84:6, 84:19, 85:22, 87:2, 87:6, 91:6, 97:19, 98:13, 98:15, 98:20, 99:6, 100:23, 102:14, 110:8, 110:12, 116:2, 116:8, 118:21, 120:11, 125:16, 125:21, 126:9, 136:12, 142:13, 146:23, 153:17, 155:17, 163:14, 164:15, 165:12, 165:14, 172:24, 173:4, 173:15, 173:18, 185:4, 191:3, 191:5, 191:8, 191:10, 193:14, 193:18, 194:22, 195:11, 195:25, 196:19, 197:7, 197:16, 198:1, 198:13, 198:19, 198:20, 199:6, 200:4, 200:18, 200:19, 201:2, 201:9, 204:10, 204:12, 205:7, 206:11, 209:1, 210:25, 211:13, 213:7, 214:2, 214:20, 214:25, 220:15, 220:19, 220:24, 221:10, 222:25, 223:20, 224:6, 224:19, 225:3, 225:9,

225:20, 225:23, 226:14, 228:23, 229:3, 229:11, 229:23, 230:2, 230:12, 231:7, 231:14, 232:3, 232:6, 232:10, 232:21, 232:25, 233:5, 233:12, 233:15, 233:19, 233:22, 234:14, 234:22, 235:2, 235:8, 235:13, 235:17, 235:21, 236:1, 236:10, 236:14, 236:24, 237:4, 237:13, 237:18, 237:24, 238:12, 238:17, 241:8, 241:12, 242:12, 242:21, 243:1, 243:3, 243:8, 243:12, 243:19, 244:7, 244:24, 245:1, 246:5, 246:21, 247:8, 247:10, 247:12, 247:15, 247:20, 247:23, 248:8, 249:12, 249:16, 250:12, 250:18, 251:16, 251:19, 251:22, 252:4
**CDs** [1] - 175:16
**Cedar** [2] - 186:17, 186:18
**center** [19] - 110:18, 110:20, 110:21, 111:10, 118:4, 118:5, 118:8, 118:13, 125:12, 180:2, 182:22, 186:16, 186:17, 186:22, 187:9, 190:2, 190:5, 190:8, 190:10
**centers** [22] - 108:19, 109:16, 109:22, 110:17, 111:1, 111:13, 111:14, 111:20, 111:21, 111:23, 111:25, 112:25, 113:6, 128:25, 129:4, 129:11, 178:3, 178:18
**cents** [1] - 63:3
**CEO** [2] - 103:19, 216:16
**certain** [8] - 33:20, 38:20, 66:16, 172:4,

185:16, 198:23, 247:25, 249:20
**certainly** [15] - 4:10, 5:15, 6:24, 9:11, 10:1, 24:8, 106:25, 133:2, 163:24, 167:15, 171:5, 195:8, 223:4, 228:8, 242:21
**certification** [2] - 121:22, 121:25
**certifications** [1] - 121:23
**certify** [1] - 254:18
**chain** [4] - 38:6, 44:16, 185:8, 186:11
**challenge** [2] - 26:4, 246:24
**chance** [7] - 85:6, 98:5, 99:7, 100:1, 228:5, 240:11, 247:6
**change** [9] - 24:9, 73:3, 76:6, 134:6, 135:19, 144:19, 210:6, 213:1, 234:19
**changed** [9] - 72:20, 73:1, 73:4, 73:12, 73:15, 73:18, 75:12, 133:13, 134:9
**changes** [2] - 24:2, 24:3
**changing** [3] - 55:19, 70:12, 70:13
**channel** [7] - 34:15, 48:24, 123:24, 124:1, 124:18, 141:1, 142:1
**chaotic** [2] - 163:25, 167:2
**character** [1] - 31:7
**charge** [23] - 60:13, 73:21, 74:19, 74:21, 74:25, 99:24, 100:12, 101:1, 101:7, 101:8, 101:11, 115:16, 131:12, 131:15, 143:7, 225:6, 225:8, 225:9, 225:10, 225:16, 227:24, 228:4, 230:10
**charges** [1] - 195:1
**charging** [2] - 225:17, 230:5
**Charles** [1] - 142:6
**chat** [5] - 123:3, 123:13, 203:22, 203:24
**chats** [1] - 140:25
**chatting** [1] - 35:15

**check** [12] - 9:21, 52:2, 52:5, 87:18, 93:14, 94:7, 95:7, 95:10, 95:24, 168:19, 254:3, 254:4
**checks** [16] - 83:10, 83:13, 83:14, 87:9, 89:6, 89:12, 89:13, 89:15, 89:18, 89:24, 90:1, 94:4, 94:5, 94:8, 94:19, 96:4
**Cherry** [1] - 2:4
**chief** [12] - 103:17, 106:12, 109:17, 112:18, 138:13, 184:25, 191:16, 191:20, 202:11, 205:23, 249:11, 249:13
**child** [7] - 40:25, 45:12, 45:13, 86:21, 150:24, 152:5, 156:13
**chip** [1] - 205:8
**choice** [1] - 224:17
**choose** [3] - 67:9, 68:15, 70:21
**chose** [3] - 131:20, 150:10, 157:15
**Chris** [9] - 105:14, 127:23, 174:11, 174:19, 174:22, 176:21, 179:16, 182:15, 187:6
**Chris's** [2] - 175:5, 183:2
**Christmas** [2] - 174:18, 174:19
**Christopher** [6] - 103:19, 103:25, 174:9, 182:8, 182:9, 195:16
**chronological** [1] - 185:8
**chunk** [1] - 101:1
**Cir** [1] - 15:21
**circle** [2] - 116:20, 230:7
**Circuit** [12] - 6:23, 14:23, 14:25, 15:14, 15:15, 216:10, 229:24, 230:14, 230:19, 230:24, 244:6, 245:10
**Circuit's** [2] - 234:10, 244:17
**circumstances** [2] - 5:14, 45:19
**circumstantial** [1] - 229:2

**citation** [1] - 15:20
**City** [1] - 128:18
**civil** [2] - 231:8, 231:21
**CIVIL** [1] - 1:3
**claim** [9] - 75:20, 76:2, 114:16, 114:17, 115:3, 231:25, 232:22, 233:8, 234:16
**claims** [11] - 114:24, 116:7, 116:18, 219:21, 229:15, 232:20, 234:17, 234:20, 235:15, 236:13, 237:6
**clarification** [1] - 85:23
**clarify** [4] - 25:18, 84:17, 84:19, 85:12
**class** [2] - 115:20, 131:9
**classes** [1] - 131:14
**clean** [4] - 168:11, 212:16, 212:21, 212:23
**cleanest** [2] - 45:1, 50:13
**clear** [8] - 35:18, 37:1, 88:25, 98:6, 111:15, 235:3, 247:23, 248:2
**clearly** [1] - 214:20
**client** [36] - 7:22, 9:7, 9:11, 11:19, 65:5, 65:16, 74:24, 77:8, 77:13, 77:15, 77:21, 78:16, 80:5, 80:24, 95:3, 105:24, 106:7, 107:24, 108:2, 108:20, 109:1, 114:16, 115:3, 115:25, 152:7, 156:18, 156:19, 156:23, 157:10, 158:3, 159:11, 169:20, 169:23, 219:23, 243:22, 250:23
**client's** [11] - 7:24, 63:5, 63:25, 105:20, 108:11, 114:16, 114:24, 116:18, 143:6, 164:18, 219:21
**clientele** [1] - 27:22
**clients** [1] - 19:25
**clock** [9] - 4:9, 4:13, 4:24, 5:2, 5:5, 98:22, 172:7, 172:12, 172:14

**close** [8] - 14:8, 188:23, 225:9, 225:10, 225:11, 225:17, 225:25, 245:5

**closer** [4] - 91:1, 91:4, 106:25, 146:15

**closest** [2] - 145:12, 145:16

**closing** [7] - 12:9, 12:16, 226:3, 227:10, 227:11, 227:17, 244:9

**closings** [8] - 4:25, 5:2, 12:14, 13:14, 101:1, 244:1, 244:3

**cloth** [1] - 202:20

**cloud** [6] - 125:3, 125:5, 125:8, 125:11, 183:14, 183:15

**clue** [4] - 65:9, 106:11, 106:13, 167:15

**co** [2] - 96:20, 177:10

**co-living** [1] - 96:20

**co-workers** [1] - 177:10

**coach** [1] - 64:5

**Coast** [2] - 247:12, 251:14

**cognizant** [1] - 195:21

**cold** [1] - 251:21

**collapse** [1] - 240:21

**collate** [1] - 246:22

**collateral** [1] - 11:6

**colleague** [2] - 236:14, 241:15

**collect** [1] - 65:20

**collected** [2] - 21:22, 44:24

**collecting** [1] - 55:22

**college** [5] - 19:12, 19:15, 59:14, 173:25, 174:17

**colocation** [1] - 118:7

**comfortable** [1] - 55:25

**coming** [4] - 71:13, 122:20, 201:8, 249:18

**Commencing** [1] - 1:14

**comment** [7] - 33:12, 118:18, 228:25, 237:12, 237:17, 238:11, 245:10

**commentary** [1] - 218:2

**comments** [10] - 40:3, 223:7, 228:13,

228:14, 228:20, 229:2, 232:1, 232:20, 234:20, 244:17

**Commission** [5] - 115:4, 142:7, 143:8, 143:18, 223:24

**commitments** [2] - 8:18, 18:4

**committed** [3] - 77:13, 169:23, 187:19

**common** [12] - 29:25, 47:21, 48:1, 52:2, 82:8, 82:10, 83:18, 84:4, 86:3, 86:4, 93:20, 206:4

**communicate** [5] - 46:15, 46:25, 47:22, 123:4, 124:2

**communicated** [7] - 44:25, 56:24, 123:8, 123:11, 124:5, 169:11, 184:2

**communicating** [1] - 198:24

**communication** [7] - 47:25, 48:3, 48:4, 50:9, 123:1, 163:13, 163:19

**communications** [10] - 9:6, 9:10, 33:23, 34:8, 123:19, 123:22, 136:5, 136:7, 164:1, 223:2

**communicator** [1] - 46:18

**community** [1] - 182:1

**companies** [2] - 30:4, 181:25

**company** [111] - 20:5, 20:6, 20:11, 21:8, 21:9, 21:18, 21:20, 21:24, 23:22, 24:7, 24:20, 25:5, 25:9, 27:22, 28:15, 28:17, 29:24, 31:2, 31:9, 31:21, 32:9, 32:10, 32:11, 32:19, 35:1, 37:12, 37:16, 37:22, 37:23, 38:3, 38:4, 42:23, 42:24, 43:1, 43:5, 43:6, 43:7, 43:9, 43:11, 43:20, 44:3, 44:18, 45:4, 46:19, 48:1, 49:15, 50:14, 50:18, 52:3, 60:1, 60:3, 62:9, 62:25, 63:2, 63:14, 64:4, 64:6, 67:12, 70:1, 70:4, 70:9,

77:2, 80:16, 80:19, 82:7, 86:4, 93:12, 103:16, 106:12, 107:4, 113:12, 116:9, 116:13, 120:9, 135:22, 136:2, 138:9, 140:25, 166:2, 168:13, 174:4, 177:16, 178:23, 180:1, 182:3, 182:7, 182:8, 182:10, 182:14, 182:16, 184:10, 184:17, 184:18, 186:19, 188:9, 189:10, 189:19, 193:17, 193:20, 193:23, 194:1, 200:12, 201:13, 205:20, 206:3, 206:9, 216:17, 221:15

**COMPANY** [1] - 1:7

**company's** [3] - 44:15, 58:24, 221:14

**comparative** [1] - 9:1

**compare** [16] - 93:16, 145:10, 145:11, 145:12, 145:16, 145:18, 145:19, 145:20, 147:3, 147:11, 147:17, 147:22, 147:24, 147:25, 148:1, 148:2

**compared** [1] - 92:18

**compel** [1] - 8:15

**compensation** [3] - 32:5, 39:7, 114:2

**compensatory** [5] - 237:16, 237:17, 238:3, 240:6, 240:7

**competence** [1] - 185:1

**competitive** [1] - 183:11

**complain** [4] - 33:20, 34:15, 68:20, 189:5

**complained** [2] - 69:12, 203:14

**complains** [1] - 34:21

**complaint** [12] - 68:9, 68:10, 68:12, 68:14, 68:17, 70:16, 70:18, 71:5, 71:7, 71:8, 142:18, 204:3

**complaints** [7] - 34:17, 39:22, 68:15, 171:21, 171:23, 194:19, 194:24

**completed** [2] - 19:12,

149:1

**completely** [4] - 75:13, 131:12, 216:24, 242:5

**compliance** [1] - 37:10

**complicated** [1] - 186:22

**complied** [1] - 192:4

**comply** [1] - 191:22

**complying** [1] - 14:3

**compound** [2] - 209:1, 209:3

**computer** [9] - 1:24, 176:10, 177:5, 179:13, 182:16, 182:19, 183:5, 183:10, 246:16

**computer-aided** [1] - 1:24

**computers** [1] - 174:5

**computing** [4] - 125:6, 125:9, 125:11, 183:14

**concept** [1] - 63:15

**concern** [15] - 45:21, 54:3, 84:8, 198:3, 210:8, 210:10, 210:12, 210:13, 210:17, 210:22, 211:5, 211:12, 211:18, 212:6, 241:1

**concerned** [8] - 11:24, 36:13, 42:9, 133:22, 189:12, 199:2, 200:20, 253:14

**concerns** [10] - 26:10, 27:4, 27:7, 35:19, 39:12, 45:9, 46:1, 207:14, 207:16, 212:23

**concluded** [3] - 85:11, 219:10, 226:16

**conditions** [1] - 69:17

**conduct** [5] - 22:9, 27:24, 30:20, 59:2, 208:23

**conducted** [1] - 50:19

**conducting** [1] - 29:7

**conference** [6] - 99:24, 100:12, 101:11, 225:6, 227:24, 230:5

**conferences** [1] - 43:4

**confident** [1] - 11:9

**configure** [1] - 111:19

**confirm** [5] - 5:5, 66:1, 92:17, 92:20, 136:6, 136:9, 192:23, 199:16, 235:8

**confiscated** [2] - 93:12, 166:17

**conflicting** [1] - 241:13

**confuse** [1] - 169:10

**confused** [1] - 142:23

**confusing** [1] - 239:11

**congratulate** [2] - 138:12, 138:13

**connection** [14] - 38:5, 72:3, 82:21, 114:21, 161:23, 163:7, 164:18, 170:2, 206:22, 207:9, 208:8, 208:20, 219:20, 236:9

**connections** [1] - 137:25

**connectivity** [2] - 111:19, 182:24

**consider** [3] - 70:10, 209:15, 222:16

**consideration** [1] - 50:11

**considerations** [2] - 35:23, 36:2

**considered** [1] - 149:5

**considering** [2] - 11:11, 11:12

**consistent** [1] - 45:3

**construction** [2] - 174:4, 178:23

**consulted** [1] - 134:5

**consulting** [2] - 221:20, 226:22

**contact** [1] - 20:5

**contacted** [1] - 169:20

**contain** [2] - 27:12, 34:8

**contained** [2] - 25:23, 26:23

**contemplated** [1] - 82:1

**contemplating** [4] - 80:20, 80:25, 81:2, 81:3

**contemporaneous** [1] - 48:4

**contempt** [2] - 14:4, 217:20

**context** [6] - 10:17, 65:16, 93:10, 94:16, 231:18, 233:23

**continuation** [1] - 31:5

**continue** [13] - 18:8, 107:13, 155:4, 155:6, 155:11, 163:4, 177:2,

179:25, 194:23, 196:20, 197:17
**Continued** [1] - 3:3
**continued** [8] - 38:21, 113:16, 113:17, 121:23, 127:12, 128:2, 180:8, 181:9
**continuing** [4] - 14:17, 33:8, 59:1, 181:2
**contracts** [1] - 43:3
**contradict** [1] - 216:12
**contradictory** [1] - 216:24
**contrary** [2] - 15:14, 34:20
**contribute** [3] - 31:3, 112:11, 158:21
**contributed** [4] - 112:7, 112:12, 112:13, 158:23
**contributor** [1] - 31:8
**control** [3] - 15:1, 15:25, 251:15
**conversation** [15] - 20:13, 45:8, 46:12, 46:20, 47:2, 47:3, 47:17, 49:3, 57:10, 58:1, 62:11, 132:19, 132:23, 136:4, 163:24
**conversations** [5] - 13:1, 52:21, 64:5, 64:6, 124:11
**convey** [1] - 17:23
**convincing** [1] - 181:13
**convoluted** [1] - 192:22
**Conway** [11] - 119:8, 119:13, 128:10, 139:4, 187:18, 187:23, 188:11, 188:16, 188:23, 189:4, 247:10
**cooked** [2] - 57:14, 81:16
**cool** [1] - 175:12
**cooling** [1] - 182:23
**coordinate** [1] - 246:22
**coordinating** [1] - 47:18
**copied** [7] - 160:9, 160:13, 160:14, 160:25, 161:5, 161:9, 161:17
**copies** [3] - 23:22, 246:21, 246:25
**copious** [1] - 50:23
**copy** [13] - 23:18,

41:3, 91:6, 91:8, 91:9, 91:12, 160:12, 163:10, 175:16, 204:18, 204:20, 228:1, 228:3
**copying** [1] - 160:6
**cord** [1] - 176:9
**core** [1] - 172:10
**corp** [1] - 206:6
**corporate** [4] - 74:12, 99:3, 100:6, 127:21
**Correct** [2] - 5:22, 141:18
**correct** [202] - 22:12, 22:13, 23:15, 23:24, 27:13, 27:17, 27:18, 28:2, 30:12, 31:11, 31:12, 44:11, 44:12, 51:19, 51:20, 57:3, 57:15, 57:20, 57:23, 59:6, 59:8, 60:2, 61:19, 61:22, 62:5, 62:16, 63:22, 63:23, 67:1, 67:7, 67:8, 67:11, 67:20, 67:21, 68:2, 68:24, 68:25, 69:4, 71:4, 71:11, 72:14, 73:4, 73:13, 73:14, 73:16, 75:10, 76:3, 77:8, 77:10, 78:3, 78:4, 78:7, 80:3, 80:9, 80:12, 80:17, 81:7, 88:12, 89:1, 89:3, 89:7, 89:10, 89:17, 89:25, 90:11, 90:15, 90:17, 90:21, 90:24, 92:16, 92:23, 92:24, 94:2, 94:3, 94:25, 95:1, 95:4, 95:24, 95:25, 96:14, 96:15, 103:13, 103:14, 104:7, 105:14, 105:15, 105:21, 109:2, 109:8, 111:3, 111:9, 112:5, 113:8, 113:16, 114:18, 115:4, 115:23, 116:18, 117:8, 117:23, 118:2, 120:5, 121:1, 122:7, 123:14, 124:11, 125:9, 125:12, 125:15, 126:23, 127:9, 127:16, 128:2, 129:4, 129:24, 129:25, 130:1, 130:16, 131:2, 131:4, 131:19, 133:16, 137:8, 137:22,

138:21, 139:2, 139:8, 140:2, 140:12, 141:19, 141:20, 143:4, 143:13, 143:19, 145:21, 146:13, 146:16, 148:17, 149:6, 151:3, 152:12, 152:19, 152:25, 153:9, 153:24, 156:1, 156:25, 157:5, 157:18, 157:19, 158:5, 158:7, 158:8, 158:11, 158:13, 158:14, 158:17, 161:3, 161:4, 161:6, 162:12, 162:20, 163:3, 163:8, 163:19, 164:7, 164:8, 165:23, 166:3, 168:6, 169:7, 169:8, 169:18, 169:21, 170:3, 171:6, 171:22, 172:1, 172:9, 184:14, 186:4, 188:24, 188:25, 190:19, 191:14, 192:13, 195:13, 195:14, 203:5, 205:15, 206:23, 207:13, 208:4, 209:9, 209:23, 210:1, 210:2, 210:18, 234:6, 244:10, 251:16, 254:18
**corrected** [1] - 201:12
**costs** [1] - 183:10
**couched** [1] - 236:21
**counsel** [1] - 9:10, 73:15, 73:19, 73:24, 74:15, 75:12, 101:17, 101:22, 101:23, 224:11, 233:1
**count** [3] - 60:18, 60:19, 60:22
**counter** [1] - 56:2
**countries** [5] - 109:13, 109:16, 110:7, 110:11, 110:15
**country** [12] - 109:19, 109:21, 109:22, 109:23, 109:25, 110:1, 110:5, 110:6, 174:20, 181:13, 211:22
**counts** [1] - 240:1

**couple** [18] - 4:8, 5:24, 22:15, 22:16, 25:18, 32:10, 42:14, 78:17, 93:10, 154:24, 166:13, 172:11, 177:15, 180:14, 226:8, 245:6, 245:22, 246:5
**course** [2] - 121:24, 234:22
**courses** [2] - 59:13, 59:15
**COURT** [344] - 1:1, 4:4, 4:17, 5:1, 5:7, 5:20, 5:23, 6:2, 6:8, 7:7, 7:13, 7:16, 8:1, 8:5, 8:10, 8:12, 8:19, 8:22, 9:15, 9:20, 10:15, 10:24, 11:1, 11:5, 11:14, 11:21, 12:2, 12:11, 12:14, 12:18, 12:21, 12:23, 13:12, 13:16, 13:21, 14:11, 14:13, 14:15, 15:4, 15:13, 15:20, 15:22, 16:3, 16:10, 16:15, 16:19, 18:12, 18:25, 19:9, 20:8, 28:8, 28:14, 31:14, 36:17, 36:19, 36:24, 37:5, 38:10, 40:14, 40:21, 41:8, 41:18, 42:16, 42:22, 45:16, 49:11, 50:1, 50:5, 51:10, 51:24, 52:20, 52:25, 53:5, 54:9, 54:20, 54:23, 55:1, 55:9, 56:5, 56:7, 57:5, 58:15, 64:21, 66:4, 69:7, 69:12, 69:19, 74:4, 74:7, 74:11, 75:16, 81:22, 82:4, 82:12, 82:17, 82:19, 83:17, 83:22, 83:25, 84:8, 84:22, 85:1, 85:5, 85:10, 85:12, 85:17, 85:21, 87:1, 88:20, 91:9, 91:12, 97:1, 97:20, 97:22, 97:25, 98:10, 98:14, 98:16, 98:18, 98:25, 99:5, 99:13, 99:16, 99:19, 99:23, 100:8, 100:10, 100:19, 100:24, 101:4, 101:15, 101:16, 102:2, 102:6, 102:10, 102:13, 102:15, 102:17, 102:24, 110:9, 110:13,

116:3, 116:10, 118:22, 120:13, 125:17, 125:22, 126:10, 136:13, 146:3, 147:4, 147:7, 148:7, 153:18, 154:9, 155:18, 155:21, 163:15, 164:16, 172:16, 172:22, 173:2, 173:6, 173:9, 173:13, 173:16, 185:3, 193:12, 193:15, 194:21, 195:7, 195:20, 196:18, 197:1, 197:4, 197:15, 197:25, 198:11, 198:18, 199:5, 200:3, 200:17, 200:24, 201:7, 205:6, 206:12, 209:3, 210:19, 211:2, 211:14, 213:10, 213:20, 213:23, 214:4, 214:22, 215:1, 215:9, 215:14, 215:16, 216:2, 216:4, 216:7, 216:14, 216:18, 216:21, 217:1, 217:10, 217:19, 217:22, 218:7, 218:11, 218:16, 218:22, 219:2, 219:8, 220:16, 220:21, 221:11, 223:1, 223:6, 223:21, 224:5, 224:7, 224:11, 224:14, 224:20, 224:22, 225:1, 225:5, 225:10, 225:14, 225:22, 226:5, 226:15, 226:17, 227:23, 228:22, 228:24, 229:6, 229:14, 229:21, 229:24, 230:8, 230:20, 231:17, 231:25, 232:5, 232:9, 232:11, 232:14, 232:19, 232:24, 233:7, 233:10, 233:13, 233:16, 233:21, 233:24, 234:2, 234:6, 234:15, 234:24, 235:3, 235:10,

235:14, 235:19,
235:22, 235:24,
236:2, 236:5, 236:9,
236:12, 237:2,
237:5, 237:8,
237:15, 237:22,
238:2, 238:6, 238:9,
238:16, 238:23,
239:1, 239:5,
239:16, 239:19,
240:14, 241:10,
241:20, 242:10,
242:13, 242:19,
242:23, 243:2,
243:4, 243:7, 243:9,
243:13, 243:16,
243:20, 243:24,
244:10, 244:12,
244:20, 244:25,
245:2, 245:4,
245:15, 245:20,
245:24, 246:3,
246:7, 246:23,
247:5, 247:9,
247:11, 247:13,
247:19, 247:21,
248:2, 248:7, 248:9,
248:12, 248:18,
248:21, 248:25,
249:7, 249:14,
250:2, 250:16,
250:22, 250:25,
251:5, 251:17,
251:20, 252:1,
252:5, 252:15,
253:3, 253:20,
253:21, 253:23,
254:4, 254:10
**court** [23] - 4:1, 6:21,
15:19, 17:20, 18:18,
34:7, 40:24, 47:8,
47:9, 76:1, 76:6,
79:3, 80:23, 90:5,
97:13, 114:16,
146:6, 162:3,
167:10, 167:11,
217:14, 217:19,
217:23
**Court** [9] - 1:11, 1:22,
4:14, 5:5, 5:14,
139:21, 217:10,
232:25, 254:21
**courteous** [1] - 184:4
**Courthouse** [1] - 1:12
**Courtroom** [1] - 2:13
**COURTROOM** [14] -
4:3, 16:17, 98:8,
102:3, 102:5, 102:8,
102:20, 160:1,
172:20, 173:8,
173:11, 227:21,

253:22, 254:13
**courtroom** [13] -
16:18, 63:24, 89:15,
93:24, 98:9, 102:9,
172:21, 173:12,
182:13, 193:6,
222:10, 222:11,
227:22
**cover** [2] - 53:21,
193:3
**covered** [3] - 231:22,
232:10, 241:3
**covers** [1] - 230:12
**COVID** [1] - 252:2
**coworkers** [2] - 27:21,
203:23
**craft** [1] - 196:21
**crafting** [1] - 10:2
**crazy** [2] - 163:25,
181:17
**create** [4] - 123:21,
138:7, 206:2, 206:3
**created** [5] - 23:21,
160:8, 177:3,
177:25, 182:15
**creating** [1] - 22:11
**credibility** [12] - 49:14,
56:11, 56:14, 58:5,
58:10, 229:8, 230:2,
230:12, 231:2,
231:8, 231:9, 231:23
**credit** [1] - 194:24
**credits** [1] - 176:24
**crime** [2] - 77:13,
169:23
**criminal** [3] - 82:21,
230:25, 231:17
**criteria** [1] - 9:1
**cross** [5] - 81:4,
82:24, 85:7, 172:22,
174:20
**CROSS** [4] - 3:4, 3:7,
18:14, 173:17
**cross-country** [1] -
174:20
**CROSS-
EXAMINATION** [4] -
3:4, 3:7, 18:14,
173:17
**crosstalk** [2] - 64:20,
88:19
**crushed** [1] - 83:24
**cultural** [1] - 69:17
**current** [1] - 167:4
**custody** [3] - 15:1,
101:19, 101:20
**customer** [17] - 21:16,
105:10, 113:1,
147:23, 177:8,
177:12, 178:7,

178:8, 178:9,
178:12, 178:17,
179:9, 179:21,
180:3, 182:17,
182:25, 184:3
**customers** [13] - 43:8,
109:10, 109:19,
109:22, 109:25,
137:3, 177:6, 180:4,
187:5, 190:2, 190:3,
198:6, 199:1
**cut** [1] - 31:23

## D

**d/b/a** [2] - 1:7, 1:7
**damage** [1] - 237:17
**damages** [32] -
229:12, 237:10,
237:15, 237:16,
237:20, 237:22,
237:24, 238:10,
238:15, 238:18,
238:20, 239:3,
239:6, 239:9,
239:15, 240:1,
240:3, 240:6, 240:7,
240:8, 240:14,
240:17, 240:19,
240:21, 243:9,
243:13, 245:8,
245:21, 246:4
**Dampf** [13] - 117:8,
117:10, 117:18,
118:16, 118:18,
119:12, 120:24,
128:8, 128:14,
139:7, 139:10,
187:17, 190:7
**Dan** [79] - 9:8, 36:4,
38:19, 38:21, 42:4,
47:6, 47:18, 49:2,
57:14, 62:4, 62:12,
76:11, 81:15,
104:10, 116:21,
117:5, 118:9, 119:5,
119:13, 119:15,
119:16, 124:22,
124:24, 125:14,
126:15, 126:16,
127:4, 127:8,
127:23, 130:7,
130:18, 130:25,
131:16, 131:17,
131:18, 131:25,
132:3, 132:6,
132:20, 133:16,
134:5, 136:1, 138:6,
138:7, 139:20,
139:25, 140:4,
140:8, 142:5, 143:8,

144:8, 145:12,
149:14, 149:16,
150:15, 157:9,
163:21, 170:6,
171:9, 171:23,
172:1, 172:4,
186:12, 186:13,
186:16, 186:23,
186:24, 187:8,
187:20, 190:1,
190:9, 196:9, 197:9,
199:12, 201:11,
201:15, 222:19
**Dan's** [3] - 187:22,
188:10, 196:10
**DANIEL** [1] - 1:8
**data** [43] - 9:1, 108:19,
109:16, 109:22,
110:17, 110:18,
110:20, 110:21,
111:1, 111:10,
111:12, 111:14,
111:20, 111:21,
111:23, 111:25,
112:25, 113:6,
118:4, 118:5, 118:8,
118:12, 125:12,
128:24, 129:3,
129:11, 178:3,
178:8, 178:18,
180:2, 182:21,
186:16, 186:17,
186:22, 187:9,
190:1, 190:5, 190:8,
190:10
**Date** [1] - 254:23
**date** [21] - 23:14,
38:20, 39:15, 60:18,
73:5, 73:25, 87:15,
87:17, 132:10,
132:18, 134:17,
135:13, 162:3,
184:14, 215:7,
215:8, 215:10,
218:23, 219:1, 219:3
**dated** [1] - 94:24
**dates** [6] - 73:17, 77:2,
117:13, 117:16,
184:12, 189:8
**dating** [1] - 173:22
**DAY** [1] - 1:6
**day-to-day** [3] - 21:14,
113:4, 113:5
**days** [11] - 5:24, 21:7,
21:8, 28:20, 32:16,
42:13, 43:24,
135:11, 175:1,
226:12, 229:3
**deal** [7] - 9:25, 10:8,
12:22, 12:24, 13:4,

101:21, 251:6
**dealing** [3] - 37:12,
45:14, 156:17
**dealt** [1] - 43:25
**debating** [1] - 240:3
**December** [12] -
132:19, 134:13,
134:20, 134:21,
135:10, 135:12,
135:14, 142:5,
143:9, 143:14,
174:18, 205:1
**decide** [15] - 14:16,
32:1, 46:15, 166:25,
212:16, 212:18,
212:21, 225:25,
238:18, 238:20,
239:2, 239:6, 239:9,
239:14
**decided** [13] - 43:22,
59:3, 61:8, 121:12,
125:2, 159:10,
164:5, 174:19,
179:16, 180:18,
190:5, 199:13, 213:1
**deciding** [1] - 239:12
**decision** [18] - 31:10,
40:15, 43:16, 43:19,
43:20, 44:6, 44:14,
44:15, 46:13, 50:9,
134:8, 154:1,
156:23, 181:14,
185:9, 221:22, 233:3
**decisions** [4] - 140:1,
140:9, 151:22, 153:8
**deck** [1] - 25:6
**dedicated** [2] -
182:19, 183:7
**defend** [1] - 49:12
**Defendant** [1] - 2:5
**DEFENDANT** [2] -
3:10, 41:20
**defendant** [7] - 17:10,
216:13, 216:14,
216:15, 216:17,
216:18, 242:1
**defendant's** [3] - 8:17,
17:7, 245:13
**Defendant's** [1] -
51:16
**defendants** [5] - 8:25,
15:1, 18:9, 248:15,
248:22
**Defendants** [2] - 1:9,
8:24
**defendants'** [1] - 6:13
**defense** [14] - 6:13,
6:16, 72:18, 72:20,
72:22, 101:22,
228:23, 233:1,

234:14, 235:6,
235:13, 243:17,
248:4, 249:11
**defer** [3] - 98:20,
226:12, 233:20
**deficiency** [2] - 9:4,
9:5
**define** [3] - 112:9,
112:10, 138:22
**definitely** [5] - 98:21,
185:17, 195:10,
233:14, 249:23
**definition** [4] - 112:14,
183:15, 234:18,
235:12
**degrading** [1] - 187:5
**degree** [2] - 174:3,
217:5
**degrees** [1] - 175:6
**delete** [1] - 178:8
**deliberate** [2] - 101:5,
226:3
**deliberating** [2] -
226:1, 227:18
**delivering** [2] - 37:22,
38:2
**demand** [3] - 23:20,
147:21, 180:11
**demonstrated** [1] -
92:16
**denied** [5] - 8:17,
93:7, 95:20, 236:17,
236:25
**denies** [1] - 232:15
**deny** [1] - 93:8
**departed** [1] - 70:1
**department** [48] -
20:20, 20:23, 29:3,
58:24, 59:5, 59:6,
61:8, 61:10, 76:24,
111:13, 112:2,
112:4, 113:1,
116:23, 117:3,
117:23, 117:25,
119:2, 119:11,
119:20, 120:19,
121:9, 126:17,
126:20, 126:23,
127:1, 127:5,
127:11, 127:12,
128:2, 128:24,
129:2, 130:23,
143:23, 145:2,
145:8, 145:11,
145:14, 145:24,
163:4, 163:6, 180:3,
184:4, 184:8,
186:25, 187:3,
221:21
**departments** [1] -

112:22
**deposed** [3] - 212:24,
212:25, 215:18
**deposition** [31] - 5:21,
83:9, 83:10, 83:12,
83:15, 83:16, 84:23,
90:8, 90:13, 91:1,
91:2, 91:5, 91:7,
91:11, 92:22, 93:2,
93:7, 93:21, 94:11,
106:23, 106:25,
107:4, 107:8, 146:2,
146:12, 147:14,
160:15, 164:13,
215:18, 215:19,
217:4
**depth** [1] - 31:1
**Deputy** [1] - 2:13
**DEPUTY** [14] - 4:3,
16:17, 98:8, 102:3,
102:5, 102:8,
102:20, 160:1,
172:20, 173:8,
173:11, 227:21,
253:22, 254:13
**DEREK** [1] - 1:18
**describe** [9] - 21:5,
38:17, 38:25, 45:11,
46:1, 46:7, 47:15,
48:23, 49:23
**described** [1] - 28:11
**description** [2] -
65:19, 112:19
**deserving** [1] - 71:4
**designed** [3] - 82:19,
187:6, 201:12
**designee** [3] - 46:23,
99:3, 100:7
**desk** [1] - 23:23
**destination** [1] - 188:7
**detail** [1] - 48:9
**detailing** [1] - 162:9
**determinative** [3] -
233:3, 234:9, 236:16
**determines** [1] -
231:15
**determining** [1] - 39:6
**devastated** [1] - 52:22
**develop** [1] - 65:1
**development** [2] -
24:23, 138:1
**device** [1] - 238:14
**dial** [6] - 175:10,
175:18, 175:25,
176:15, 176:19,
177:3
**dial-up** [6] - 175:10,
175:18, 175:25,
176:15, 176:19,
177:3

**dialing** [1] - 175:14
**difference** [1] - 201:3
**different** [21] - 12:2,
12:24, 30:20, 44:19,
46:22, 49:15, 55:22,
75:13, 109:16,
123:3, 133:5, 145:3,
145:4, 146:7,
160:12, 211:11,
217:3, 231:18,
238:14, 240:4,
240:15
**differentiate** [1] -
96:23
**difficult** [5] - 179:7,
180:9, 181:11,
181:12, 205:22
**digitally** [1] - 23:17
**dinner** [1] - 37:18
**dire** [1] - 17:16
**DIRECT** [2] - 3:7,
103:1
**direct** [12] - 35:10,
46:22, 48:7, 52:13,
85:7, 96:9, 146:9,
146:18, 190:22,
192:25, 229:1,
241:24
**direction** [1] - 172:11
**directly** [10] - 29:4,
38:11, 43:1, 192:7,
192:19, 204:2,
216:11, 216:12,
218:5, 249:21
**director** [37] - 58:19,
104:10, 104:15,
105:1, 105:10,
126:19, 126:22,
129:8, 133:14,
133:24, 134:3,
134:7, 134:9,
134:16, 135:20,
135:22, 136:11,
136:17, 136:18,
136:19, 137:1,
137:24, 141:11,
143:21, 143:22,
144:6, 144:9,
144:15, 145:13,
147:17, 147:18,
147:20, 147:23,
148:6, 192:18,
205:4, 205:9
**directors** [2] - 104:7,
105:6
**disable** [1] - 162:10
**disagrees** [2] - 4:14,
241:15
**disaster** [1] - 176:20
**disbelieve** [1] - 245:13

**disciplinary** [3] -
26:12, 27:9, 75:21
**discipline** [4] - 75:22,
75:24, 76:2, 76:3
**disciplined** [2] - 38:8,
38:13
**disclose** [1] - 249:14
**disclosed** [2] - 250:4,
251:8
**disclosure** [4] - 252:7,
252:16, 253:10,
253:11
**disclosures** [4] -
249:15, 250:5,
251:3, 252:9
**discovered** [1] -
221:14
**discovery** [24] - 6:19,
8:3, 9:17, 10:12,
10:21, 10:22, 11:2,
11:7, 11:10, 11:12,
11:16, 12:15, 13:8,
13:10, 13:18, 14:7,
14:8, 14:9, 14:13,
14:18, 220:1, 220:3,
220:6, 249:5
**discretionary** [1] -
144:25
**discriminated** [3] -
236:20, 236:24,
237:3
**discriminating** [1] -
206:1
**discrimination** [42] -
9:7, 26:12, 27:5,
27:9, 27:23, 34:16,
34:21, 39:25, 61:24,
62:2, 66:24, 67:2,
67:7, 67:13, 67:17,
67:21, 68:17, 68:23,
70:11, 70:15, 70:16,
70:22, 70:23, 71:2,
71:5, 71:9, 74:21,
75:1, 114:17,
114:20, 115:1,
115:16, 130:22,
191:22, 203:14,
219:21, 232:7,
232:16, 232:22,
232:23, 233:8,
236:23
**discriminatory** [6] -
27:20, 40:2, 67:24,
70:18, 130:16,
131:13
**discuss** [5] - 42:2,
43:13, 192:14,
195:3, 195:8
**discussed** [4] - 34:7,
42:14, 113:11,

204:25
**discussion** [5] - 11:6,
199:17, 236:15,
241:21, 250:9
**discussions** [3] -
33:17, 44:5, 193:17
**disgusted** [2] - 42:7,
77:5
**displayed** [1] - 143:15
**dispute** [1] - 250:13
**disrespectful** [1] -
142:2
**disruptive** [1] - 46:4
**distant** [1] - 33:12
**distinction** [4] - 84:9,
84:10, 153:2, 153:4
**distraught** [1] -
196:15
**distribute** [1] - 66:11
**distributed** [1] -
112:25
**distributing** [1] -
21:14
**DISTRICT** [3] - 1:1,
1:1, 1:16
**District** [3] - 1:11, 4:2
**diverse** [2] - 28:18,
55:20
**diversity** [3] - 35:2,
35:14, 55:13
**diversity-related** [2] -
35:2, 35:14
**doc** [1] - 160:7
**docket** [2] - 8:6,
217:17
**doctors** [1] - 176:23
**document** [51] -
11:22, 28:5, 28:10,
34:8, 34:11, 34:13,
35:6, 35:18, 41:12,
47:15, 51:15, 52:13,
53:9, 75:7, 75:9,
95:2, 115:22,
115:25, 142:6,
142:9, 142:10,
142:17, 142:18,
143:3, 143:5,
159:19, 160:6,
160:24, 161:6,
165:12, 165:13,
195:10, 204:17,
204:18, 204:20,
204:23, 213:13,
213:17, 214:11,
214:24, 215:2,
215:3, 215:5, 215:6,
215:16, 220:20,
222:5, 222:16,
222:17, 223:5
**documentation** [2] -

22:6, 76:25
**documented** [3] - 195:12, 202:25, 231:20
**documenting** [1] - 202:22
**documents** [22] - 6:14, 7:9, 7:20, 8:17, 9:2, 10:5, 10:6, 11:16, 14:7, 14:8, 14:9, 14:25, 21:15, 34:3, 115:3, 115:8, 117:20, 220:4, 223:12, 223:15, 223:17, 249:5
**dog** [1] - 168:13
**dollar** [1] - 180:9
**dollars** [3] - 43:2, 43:3, 63:3
**done** [22] - 5:8, 17:21, 62:16, 71:2, 77:9, 101:4, 111:8, 121:9, 122:11, 130:15, 155:18, 159:12, 196:23, 203:17, 207:8, 224:21, 224:25, 225:8, 225:12, 225:15, 225:17, 226:8
**door** [5] - 6:17, 7:6, 7:8, 55:14, 82:23
**doors** [1] - 174:11
**dot** [1] - 81:3
**doubt** [2] - 184:25, 192:3
**down** [22] - 35:8, 48:11, 51:15, 52:16, 78:11, 78:20, 81:8, 81:15, 81:16, 97:22, 134:18, 141:21, 154:15, 154:17, 155:1, 159:12, 174:11, 188:1, 203:25, 215:8, 224:7, 251:10
**download** [1] - 183:4
**dozens** [1] - 178:13
**draft** [1] - 238:23
**dramatically** [1] - 137:14
**draw** [3] - 26:24, 35:3, 95:24
**drawn** [1] - 84:9
**dream** [1] - 177:16
**drive** [1] - 174:23
**driven** [1] - 24:19
**dry** [1] - 31:24
**dude** [2] - 167:20, 208:21
**due** [5] - 189:6,

199:20, 200:10, 202:13, 207:14
**Duff** [2] - 128:9, 139:16
**DULY** [2] - 102:18
**during** [44] - 11:6, 24:16, 36:12, 39:22, 39:25, 48:5, 49:4, 49:9, 49:13, 50:16, 54:4, 56:11, 57:9, 58:19, 60:22, 60:24, 67:20, 74:18, 74:20, 75:3, 87:13, 93:21, 104:3, 104:10, 104:15, 105:1, 107:4, 107:7, 109:1, 122:25, 133:3, 134:9, 137:1, 140:7, 146:12, 184:24, 189:22, 189:25, 194:15, 195:21, 204:23, 220:3, 220:6
**duties** [2] - 21:6, 21:12
**DVDs** [1] - 175:16

## E

**earliest** [3] - 23:5, 23:7, 183:19
**early** [12] - 21:6, 21:8, 32:16, 33:11, 100:13, 108:17, 112:20, 120:23, 178:19, 189:11, 195:16, 228:17
**earn** [1] - 148:6
**earned** [1] - 144:18
**earners** [1] - 32:11
**earth** [2] - 110:11, 163:11
**easier** [1] - 241:6
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:11
**easy** [2] - 38:5, 153:5
**EBay** [1] - 178:2
**economics** [1] - 241:19
**edit** [1] - 234:24
**edits** [1] - 228:7
**educate** [2] - 58:19, 58:22
**educating** [1] - 55:21
**education** [6] - 19:12, 59:1, 59:12, 121:23, 173:22, 176:25
**educational** [1] - 176:22
**EEOC** [5] - 73:21, 74:19, 75:1, 115:9,

115:12
**effect** [2] - 236:16, 238:21
**effective** [1] - 23:1
**effectively** [2] - 85:7, 192:9
**effectivity** [1] - 63:16
**effects** [1] - 42:9
**efficiency** [1] - 17:5
**efficient** [1] - 25:4
**efficiently** [1] - 38:2
**effort** [1] - 55:21
**efforts** [2] - 55:10, 55:12
**eight** [3] - 60:17, 60:18, 174:6
**either** [18] - 10:18, 13:6, 48:19, 50:17, 81:6, 94:5, 139:6, 158:10, 158:16, 162:22, 170:1, 197:2, 197:6, 212:4, 232:15, 237:25, 249:5, 251:4
**electricity** [1] - 182:22
**electronic** [6] - 123:1, 136:5, 136:7, 163:13, 163:19, 164:1
**electronically** [5] - 42:1, 65:22, 66:17, 123:5, 246:14
**electronics** [1] - 176:2
**element** [1] - 235:4
**elements** [9] - 14:22, 14:24, 15:25, 16:2, 50:15, 234:17, 234:20, 253:2, 253:4
**elicit** [2] - 82:19, 84:15
**eligible** [1] - 250:13
**email** [7] - 13:1, 15:8, 31:24, 32:20, 136:24, 143:15, 177:9
**emailed** [1] - 24:8
**emailing** [1] - 163:22
**emails** [4] - 123:10, 123:12, 136:8
**emergency** [1] - 190:11
**emoji** [3] - 48:19, 203:23, 204:7
**emojis** [1] - 141:25
**emotional** [2] - 52:6, 52:12
**emotions** [2] - 48:23, 49:16
**employed** [10] - 109:1, 121:5, 121:6, 143:1, 143:19, 149:10,

149:18, 169:12, 178:11, 192:25
**employee** [28] - 23:22, 24:18, 26:3, 32:7, 55:12, 55:14, 61:18, 63:16, 72:6, 77:2, 93:1, 93:6, 93:14, 121:10, 149:3, 149:6, 150:21, 167:3, 167:4, 170:1, 170:9, 172:9, 178:20, 183:19, 196:11, 197:10, 201:11
**Employees** [1] - 27:2
**employees** [64] - 20:3, 21:2, 21:9, 23:16, 23:25, 24:5, 24:8, 24:10, 25:11, 26:10, 27:4, 27:7, 40:3, 42:14, 42:17, 43:9, 55:19, 60:1, 60:6, 64:7, 65:1, 86:5, 106:3, 106:6, 106:11, 107:3, 107:17, 107:18, 107:24, 108:1, 108:6, 108:14, 109:4, 109:7, 113:18, 113:21, 113:24, 114:4, 119:3, 123:4, 123:8, 123:10, 144:22, 149:4, 162:23, 162:25, 170:15, 171:7, 171:8, 178:19, 181:20, 181:22, 190:13, 191:17, 192:1, 194:25, 197:13, 197:18, 197:21, 198:4, 210:8
**employees'** [1] - 92:18
**employer** [3] - 50:6, 195:18, 199:23
**Employment** [2] - 115:4, 223:24
**employment** [56] - 24:11, 26:13, 27:10, 32:13, 36:13, 38:22, 39:19, 40:10, 43:17, 54:4, 58:20, 67:20, 69:15, 70:9, 86:6, 87:13, 104:4, 104:11, 104:15, 105:2, 105:20, 108:11, 108:20, 108:24, 114:20, 116:21, 118:9, 121:24, 122:10, 124:6, 127:1, 127:5,

138:19, 172:7, 184:10, 184:12, 184:22, 189:10, 189:11, 190:19, 191:18, 192:9, 192:12, 192:15, 192:19, 192:20, 193:1, 194:16, 195:4, 195:22, 199:10, 207:10, 211:6, 221:13, 221:22, 250:19
**encouraged** [1] - 27:5
**end** [14] - 5:17, 6:3, 18:21, 85:7, 100:13, 113:5, 113:10, 113:14, 177:25, 181:19, 184:17, 221:17, 228:16, 231:21
**ended** [6] - 49:1, 65:23, 105:21, 108:12, 108:24, 174:2
**enforce** [1] - 14:5
**enforced** [1] - 149:1
**engage** [2] - 151:6, 151:9
**engaged** [1] - 67:19
**engaging** [3] - 26:11, 27:8, 235:19
**engineer** [15] - 29:16, 65:9, 111:16, 111:18, 111:19, 127:15, 139:1, 139:4, 139:7, 139:14, 141:9, 144:10, 145:20, 188:15
**engineering** [33] - 32:22, 63:9, 63:10, 63:21, 64:1, 64:3, 65:12, 112:2, 112:4, 116:23, 117:3, 117:23, 117:25, 119:11, 119:20, 120:18, 126:16, 126:20, 126:23, 126:25, 127:4, 127:11, 128:23, 129:2, 139:18, 139:24, 140:15, 143:23, 143:24, 144:15, 174:2, 187:3, 189:17
**engineers** [17] - 114:7, 114:8, 118:13, 119:5, 119:16, 127:19, 127:22, 128:8, 128:10,

138:20, 138:21, 141:14, 144:2, 144:5, 145:8, 145:23, 190:9
**ensure** [1] - 52:7
**enters** [3] - 16:18, 102:9, 173:12
**entire** [19] - 9:12, 24:6, 57:25, 58:24, 59:4, 60:22, 74:24, 78:5, 121:3, 122:25, 127:1, 127:5, 135:21, 136:1, 138:9, 186:21, 187:8, 195:22, 207:8
**entirely** [1] - 130:7
**entitled** [4] - 10:1, 83:4, 248:25, 254:19
**entrepreneurs** [1] - 181:21
**entry** [1] - 51:16
**environment** [6] - 21:10, 68:4, 69:23, 234:16, 250:20, 250:24
**EPA** [1] - 230:17
**equal** [1] - 4:22
**Equal** [2] - 115:4, 223:24
**equity** [1] - 55:13
**error** [1] - 217:8
**ESI** [3] - 8:25, 9:20, 13:19
**especially** [6] - 54:12, 76:22, 181:14, 189:17, 189:24, 218:1
**ESQUIRE** [4] - 1:19, 2:3, 2:3, 2:4
**essentially** [3] - 6:7, 20:22, 241:18
**establish** [6] - 215:9, 215:12, 215:21, 216:8, 216:22, 217:5
**ethics** [4] - 158:6, 158:9, 158:12, 158:15
**evaluation** [1] - 203:25
**evening** [1] - 227:20
**event** [1] - 194:3
**events** [7] - 39:20, 40:9, 44:17, 90:25, 91:1, 91:2, 146:15
**eventual** [1] - 39:20
**eventuality** [1] - 13:4
**eventually** [6] - 128:17, 179:14, 180:3, 180:18, 181:15, 188:23

**evidence** [32] - 5:3, 6:15, 7:18, 13:11, 15:3, 15:25, 16:5, 41:19, 89:22, 89:23, 120:12, 138:17, 157:25, 167:7, 167:9, 168:6, 168:7, 171:5, 171:7, 225:8, 225:12, 225:13, 225:14, 225:15, 227:1, 227:3, 227:12, 227:16, 228:25, 229:2, 244:16, 246:13
**EVIDENCE** [2] - 3:10, 41:20
**evinced** [1] - 53:25
**ex** [2] - 150:21, 167:3
**ex-employee** [1] - 150:21
**exact** [20] - 39:15, 60:17, 60:18, 73:17, 76:12, 76:14, 77:25, 87:15, 87:17, 90:20, 104:18, 108:3, 117:13, 117:16, 121:2, 135:13, 138:24, 199:24, 201:25, 202:1
**exactly** [8] - 52:6, 141:3, 151:23, 184:13, 188:14, 189:2, 191:13, 231:7
**exaggerate** [3] - 151:12, 151:25, 152:1
**exaggerating** [1] - 152:2
**examination** [5] - 4:13, 18:9, 62:21, 65:15, 196:3
**EXAMINATION** [14] - 3:4, 3:4, 3:5, 3:5, 3:7, 3:7, 3:8, 18:14, 56:8, 81:23, 87:7, 103:1, 173:17, 206:15
**examinations** [1] - 4:19
**EXAMINATIONS** [1] - 3:2
**examine** [1] - 6:18
**examined** [1] - 4:12
**example** [8] - 14:9, 24:5, 28:4, 28:6, 28:10, 67:13, 147:23, 218:23
**examples** [1] - 35:9
**exceeds** [2] - 162:7, 162:22

**except** [2] - 128:13, 175:21
**exception** [1] - 101:7
**exchanged** [1] - 220:4
**exchanges** [1] - 188:4
**excited** [2] - 31:25, 33:4
**excitement** [1] - 20:4
**exciting** [2] - 29:23, 30:8
**excuse** [7] - 80:22, 88:17, 92:21, 158:2, 207:1, 209:22, 253:11
**excused** [3] - 97:24, 224:8, 224:10
**execs** [1] - 170:11
**executive** [1] - 202:11
**exhibit** [3] - 25:14, 34:6, 134:25
**Exhibit** [12] - 22:18, 26:17, 33:25, 41:5, 41:18, 47:13, 78:10, 134:25, 135:1, 191:4, 196:2, 204:10
**EXHIBIT** [2] - 3:10, 41:20
**exhibits** [1] - 10:3
**exist** [2] - 11:16, 212:6
**existed** [7] - 10:7, 43:7, 44:23, 46:8, 96:24, 131:5, 205:12
**exit** [1] - 113:8
**exits** [3] - 98:9, 172:21, 227:22
**expect** [4] - 6:15, 7:19, 99:9, 249:17
**expectation** [2] - 77:1, 173:2
**expected** [3] - 54:12, 172:10, 249:19
**expecting** [1] - 83:18
**expense** [1] - 100:15
**expensed** [1] - 37:17
**expenses** [1] - 137:15
**expensing** [1] - 37:17
**expensive** [4] - 182:20, 183:2, 183:5, 183:10
**experience** [15] - 30:5, 32:17, 52:11, 54:18, 58:23, 58:25, 59:8, 61:16, 61:17, 61:18, 175:13, 177:8, 182:18, 230:16
**experiences** [1] - 55:16
**experiencing** [1] - 187:4
**expert** [2] - 229:13,

241:18
**expertise** [1] - 63:23
**explain** [16] - 11:10, 17:11, 29:1, 30:18, 31:16, 36:19, 40:8, 44:13, 52:1, 55:7, 83:4, 182:13, 189:15, 199:19, 221:5, 222:3
**explained** [2] - 134:1, 203:4
**explanation** [1] - 53:19
**explore** [2] - 7:5, 137:25
**exported** [1] - 160:11
**exporting** [1] - 160:12
**expressed** [2] - 61:11, 190:14
**expression** [1] - 35:12
**extend** [1] - 226:23
**extension** [1] - 24:5
**extent** [6] - 9:24, 10:5, 31:16, 45:24, 63:19, 250:20
**extra** [2] - 226:23, 246:19
**extremely** [1] - 30:7
**eye** [1] - 42:25
**eyes** [1] - 43:11

**F**

**F.2d** [1] - 15:21
**face** [2] - 86:19, 235:17
**facility** [2] - 19:17, 175:11
**fact** [15] - 4:22, 12:11, 12:12, 12:13, 16:7, 27:15, 52:9, 53:13, 53:16, 56:17, 137:16, 187:25, 188:11, 203:10, 203:13
**factor** [2] - 50:9, 233:3, 234:9
**factors** [1] - 44:13
**facts** [4] - 45:6, 45:20, 120:11, 236:20
**failure** [1] - 253:11
**fair** [5] - 6:24, 7:5, 78:1, 113:4, 242:10
**fairly** [1] - 228:18
**faith** [1] - 14:9
**fake** [3] - 171:11, 171:13, 210:14
**false** [7] - 59:9, 89:16, 157:10, 229:18, 230:8, 230:9

**familiar** [4] - 131:20, 191:11, 218:18, 230:14
**family** [4] - 174:12, 177:10, 197:21, 206:4
**far** [11] - 5:13, 11:24, 23:3, 31:18, 36:7, 67:21, 67:24, 128:20, 183:8, 195:9, 249:18
**fast** [5] - 98:21, 178:13, 181:18, 224:25, 253:15
**fast-forwarding** [1] - 181:18
**faster** [6] - 17:24, 18:4, 141:21, 142:11, 159:20, 180:12
**fastest** [3] - 105:25, 108:14, 108:16
**faunced(PH** [1] - 242:5
**favor** [2] - 4:10, 191:3
**favoritism** [1] - 130:22
**FBI** [4] - 166:17, 169:9, 169:11
**fear** [3] - 26:11, 27:8, 199:23
**February** [4] - 76:13, 116:22, 134:20, 134:21
**feedback** [3] - 46:6, 46:9, 55:22
**feelings** [1] - 198:5
**feet** [1] - 204:2
**fell** [2] - 29:4, 113:3
**felt** [11] - 6:25, 7:2, 14:2, 49:1, 141:25, 142:1, 178:24, 181:20, 187:18, 197:11
**few** [11] - 8:14, 30:20, 32:10, 32:11, 34:25, 38:19, 43:24, 48:9, 86:7, 88:25, 188:5
**fifth** [2] - 174:12, 174:13
**figure** [4] - 43:5, 60:21, 190:10, 242:16
**figured** [1] - 167:25
**file** [13] - 9:25, 92:11, 92:13, 95:2, 161:20, 161:23, 162:1, 162:2, 162:21, 163:7, 223:15, 223:16, 244:20
**filed** [20] - 73:3, 73:4,

73:5, 73:12, 74:19, 115:8, 115:22, 116:1, 142:6, 143:7, 212:7, 214:14, 214:16, 216:5, 218:14, 219:23, 222:6, 223:12, 223:19, 223:23

*filing* [3] - 74:25, 115:3, 115:11

*filled* [1] - 180:24

*final* [2] - 188:7, 246:15

*finance* [4] - 36:15, 36:22, 71:16, 122:15

*finances* [6] - 37:12, 71:11, 82:10, 83:18, 84:4, 85:25

*financial* [1] - 82:20

*fine* [12] - 13:4, 13:12, 55:2, 84:17, 85:1, 99:21, 100:10, 224:20, 229:13, 237:5, 237:14, 246:23

*finish* [9] - 64:21, 88:21, 89:14, 98:23, 153:17, 153:18, 172:25, 198:12, 227:16

*finished* [1] - 176:15

*finishes* [1] - 226:2

*finite* [1] - 201:15

*fire* [4] - 72:11, 130:11, 154:1, 200:20

*fired* [16] - 114:4, 149:20, 150:17, 150:20, 152:7, 157:17, 158:7, 158:10, 158:13, 158:16, 158:19, 158:25, 159:4, 166:15, 166:18

*firing* [1] - 158:3

*firms* [1] - 180:20

*first* [57] - 4:12, 10:20, 14:15, 18:18, 21:19, 22:11, 22:18, 50:21, 59:25, 65:16, 83:9, 83:10, 83:15, 101:7, 105:11, 105:13, 106:3, 112:24, 117:6, 122:10, 131:9, 138:8, 140:15, 158:5, 159:11, 165:10, 165:17, 167:18, 174:4, 175:16, 176:1, 176:11,

178:7, 179:17, 184:5, 194:5, 196:4, 199:12, 212:25, 213:1, 214:13, 218:3, 232:12, 234:4, 234:16, 238:18, 239:2, 239:5, 239:9, 239:12, 239:13, 239:15, 239:19, 252:12, 252:22, 252:25

*first-ever* [1] - 21:19

*firsthand* [1] - 36:21

*fist* [1] - 48:19

*fit* [6] - 63:17, 185:25, 187:19, 188:3, 188:8

*five* [7] - 10:10, 19:20, 180:23, 182:12, 226:12, 248:16

*fixing* [1] - 178:17

*flag* [2] - 228:7, 228:10

*Flagstaff* [2] - 175:5, 175:9

*flat* [2] - 53:10, 176:7

*flea* [1] - 176:2

*fleshed* [1] - 138:10

*flexibility* [1] - 226:6

*flip* [3] - 25:15, 191:8, 209:19

*floated* [1] - 172:11

*flow* [1] - 240:3

*flu* [1] - 252:2

*fly* [2] - 15:8, 250:8

*focus* [2] - 31:6, 219:3

*focused* [2] - 32:22, 113:6

*focusing* [2] - 13:11, 235:15

*folk* [1] - 183:14

*folks* [2] - 190:4, 254:5

*follow* [8] - 14:3, 130:20, 140:8, 146:7, 150:3, 150:5, 191:17, 212:15

*follow-up* [1] - 146:7

*followed* [2] - 56:17

*following* [8] - 19:6, 19:10, 19:15, 19:20, 30:25, 42:13, 69:15, 212:14

*FOLLOWS* [1] - 102:19

*follows* [3] - 82:18, 215:15, 224:13

*food* [1] - 19:15

*force* [3] - 55:20, 180:16, 205:9

*Ford* [20] - 36:15, 36:22, 37:1, 37:9,

37:11, 38:7, 38:11, 71:10, 99:1, 100:3, 104:15, 104:19, 104:24, 122:15, 194:19, 194:24, 195:3, 224:23, 224:24, 225:1

*foregoing* [1] - 254:18

*forget* [2] - 108:4, 239:21

*form* [6] - 23:5, 23:7, 35:25, 227:8, 239:23

*formal* [8] - 21:20, 22:11, 68:9, 68:10, 68:14, 68:15, 71:7, 204:3

*formalizing* [2] - 22:2, 22:7

*format* [2] - 65:21, 161:2

*former* [1] - 251:22

*forming* [1] - 227:5

*formulate* [2] - 83:6, 223:9

*formulating* [1] - 50:18

*Forrester* [9] - 117:8, 117:10, 118:16, 119:12, 120:20, 128:9, 128:14, 187:17, 190:7

*forth* [2] - 173:23, 191:18

*forward* [4] - 28:22, 185:7, 191:8, 194:3

*forwarding* [1] - 181:18

*foundation* [14] - 21:24, 213:23, 214:2, 214:7, 214:21, 215:10, 215:21, 216:22, 217:6, 218:17, 218:19, 219:6, 220:14

*founder* [1] - 103:19

*founding* [1] - 182:6

*four* [4] - 34:14, 103:21, 135:9, 138:23

*fourth* [1] - 158:15

*frame* [3] - 24:14, 74:20, 75:5

*Francisco* [2] - 174:24, 175:25

*frank* [1] - 232:25

*Frankfurt* [2] - 110:17, 110:18

*frankly* [9] - 44:18, 49:6, 56:2, 201:2,

228:9, 240:2, 241:6, 249:17, 251:1

*free* [2] - 66:13, 183:4

*freedom* [3] - 37:25, 71:25, 72:7

*frequent* [1] - 33:17

*frequently* [1] - 217:2

*fresh* [1] - 226:11

*Friday* [18] - 4:9, 4:17, 18:22, 18:23, 22:13, 23:12, 25:17, 25:22, 28:5, 36:11, 48:8, 48:16, 56:23, 57:2, 57:13, 80:23, 90:10, 217:22

*friend* [1] - 105:14

*friend's* [1] - 176:4

*friends* [3] - 174:14, 175:4, 177:10

*frightening* [1] - 52:12

*fringe* [1] - 162:22

*front* [11] - 13:7, 16:7, 58:5, 64:8, 151:12, 154:12, 160:2, 214:11, 217:24, 218:2, 221:3

*frustrated* [1] - 18:23

*frustrating* [1] - 54:11

*frustration* [1] - 190:13

*Fry's* [1] - 176:1

*Fu* [2] - 9:9, 97:6

*fulfill* [1] - 177:16

*full* [3] - 10:6, 102:20, 103:5

*Full* [1] - 175:6

*funds* [1] - 37:16

*funny* [1] - 178:5

*future* [2] - 43:9, 45:25

*fuzzy* [1] - 32:2

---

**G**

*G-U-M-B-S* [1] - 15:23

*Galloway* [10] - 119:19, 119:21, 120:1, 120:19, 122:5, 122:7, 128:16, 181:3, 181:12, 185:24

*game* [4] - 6:24, 98:11, 251:11, 252:5

*gap* [1] - 246:16

*gay* [5] - 53:14, 53:17, 188:17, 203:11, 206:1

*geeks* [1] - 175:12

*general* [3] - 35:12, 225:23, 233:23

*generally* [9] - 21:5,

30:21, 30:25, 31:19, 49:15, 50:2, 64:24, 228:2, 228:11

*generate* [1] - 159:14

*generated* [3] - 158:2, 159:12, 217:16

*genesis* [1] - 202:18

*genuinely* [1] - 46:10

*GIF* [1] - 48:19

*given* [9] - 46:6, 85:6, 133:4, 133:9, 135:19, 140:1, 149:7, 240:3, 252:9

*glad* [3] - 49:1, 176:19, 179:2

*global* [4] - 137:3, 137:8, 137:9, 201:13

*globe* [1] - 111:20

*gloves* [1] - 195:23

*goal* [1] - 206:4

*goals* [1] - 100:17

*God* [1] - 210:14

*Google* [1] - 50:20

*governing* [1] - 190:24

*government* [1] - 101:23

*governs* [1] - 252:25

*grab* [1] - 50:22

*gracious* [1] - 37:23

*grade* [3] - 174:13, 187:9

*graduated* [2] - 19:6, 19:13

*granted* [1] - 234:25

*great* [9] - 20:5, 54:18, 182:17, 184:2, 187:19, 188:3, 189:16, 237:9, 246:4

*greatest* [1] - 79:23

*grew* [10] - 19:4, 28:16, 105:24, 109:2, 109:4, 109:8, 109:10, 109:13, 112:5, 119:3

*gross* [2] - 37:19, 236:3

*ground* [1] - 33:7

*groundwork* [1] - 21:17

*group* [1] - 147:21

*GROUP* [1] - 1:18

*groups* [1] - 123:21

*grow* [15] - 21:24, 24:24, 62:25, 113:12, 127:12, 128:2, 129:6, 137:7, 140:21, 180:8, 180:12, 181:2, 181:10, 181:20, 181:21

**growing** [5] - 112:1, 113:7, 168:13, 178:13, 186:25
**growth** [9] - 20:3, 20:6, 20:14, 33:6, 106:1, 108:14, 108:17, 112:7, 180:25
**guess** [21] - 61:5, 78:8, 78:11, 81:21, 103:19, 103:20, 122:14, 128:1, 146:24, 169:13, 201:14, 202:19, 203:20, 217:21, 230:8, 237:18, 238:14, 243:23, 246:8, 249:8, 253:6
**guessing** [1] - 36:17
**guesstimated** [1] - 106:14
**guidance** [4] - 15:14, 15:15, 15:17, 231:4
**guilty** [1] - 101:16
**Gumbs** [2] - 15:18, 15:23
**guy** [12] - 9:13, 70:17, 72:11, 79:15, 83:2, 131:6, 156:18, 199:25, 208:18, 216:16, 241:17, 249:23
**guys** [19] - 113:13, 124:2, 124:5, 124:14, 125:5, 164:4, 166:22, 170:12, 170:16, 171:14, 171:22, 225:10, 225:15, 225:17, 228:2, 230:4, 242:23, 246:9, 250:3

## H

**Haddonfield** [2] - 122:8, 128:17
**half** [9] - 10:10, 75:14, 98:1, 176:8, 178:15, 189:2, 212:7, 221:25, 222:21
**halfway** [1] - 23:8
**hall** [2] - 204:2
**halted** [1] - 176:18
**hand** [7] - 58:23, 72:17, 102:17, 145:25, 146:1, 146:5, 250:5
**hand-selected** [1] - 58:23

**handbook** [21] - 21:20, 22:11, 22:19, 23:1, 23:5, 23:7, 23:13, 23:16, 23:21, 23:25, 24:11, 26:14, 26:21, 26:23, 27:11, 27:15, 28:5, 28:11, 61:18, 191:6, 191:18
**handbooks** [2] - 25:23, 27:12
**handed** [2] - 189:16, 192:9
**handle** [3] - 11:13, 42:5
**handled** [2] - 48:2, 190:24
**handles** [1] - 71:11
**handling** [1] - 35:2
**hands** [2] - 25:6, 33:15
**hands-on** [1] - 33:15
**hang** [2] - 159:20, 230:1
**happy** [6] - 55:25, 133:23, 136:10, 136:18, 136:25, 157:20
**harassed** [2] - 236:17, 236:19
**harassing** [1] - 27:20
**harassment** [5] - 27:23, 34:15, 34:21, 203:14, 236:19
**hard** [5] - 5:6, 5:7, 205:17, 227:7, 246:25
**hardware** [4] - 113:6, 178:2, 178:18, 183:6
**harkening** [2] - 16:22, 240:18
**Harvester** [1] - 15:19
**HAVING** [1] - 102:18
**head** [10] - 29:5, 36:6, 59:17, 60:8, 60:17, 60:19, 60:22, 184:16, 199:14, 227:14
**headings** [1] - 234:17
**headquarters** [1] - 128:18
**heads** [1] - 98:7
**health** [2] - 176:22, 180:6
**hear** [22] - 68:23, 93:9, 118:18, 118:24, 120:7, 120:9, 143:17, 170:4, 171:21, 183:20, 192:7, 196:4, 200:25, 204:7,

218:8, 230:21, 244:15, 246:9, 247:1, 252:24, 253:13, 253:25
**heard** [41] - 6:14, 7:7, 7:15, 34:20, 36:21, 44:9, 47:8, 61:23, 62:2, 75:13, 79:2, 79:3, 93:9, 98:6, 120:14, 143:20, 148:8, 156:15, 156:16, 170:1, 171:17, 177:23, 183:21, 186:12, 186:19, 193:4, 193:5, 193:6, 196:4, 201:22, 202:15, 202:17, 226:12, 227:5, 227:7, 227:10, 229:14, 229:19, 231:2
**hearing** [5] - 17:12, 76:6, 196:22, 252:12, 252:22
**hearsay** [14] - 20:7, 36:23, 37:4, 38:9, 40:13, 40:20, 42:15, 42:21, 49:25, 51:8, 65:11, 194:20, 195:19, 217:16
**heart** [1] - 175:12
**heinous** [1] - 167:4
**held** [2] - 4:1, 204:25
**Hello** [1] - 136:25
**help** [10] - 20:14, 105:16, 112:15, 116:6, 122:11, 179:20, 181:12, 181:20, 189:19, 231:1
**helped** [6] - 62:25, 63:2, 118:4, 175:10, 196:21
**helpfully** [1] - 191:12
**helping** [5] - 128:24, 129:3, 129:6, 137:7, 137:21
**hierarchy** [4] - 37:13, 127:22, 143:25, 145:23
**High** [1] - 19:6
**high** [8] - 19:7, 19:10, 19:16, 33:8, 63:15, 76:22, 173:25, 174:1
**high-level** [2] - 63:15, 76:22
**high-volume** [1] - 19:16
**higher** [1] - 147:21
**highest** [2] - 32:8,

32:9
**highlighted** [1] - 26:9
**him-or-me** [1] - 42:19
**himself** [5] - 38:4, 49:12, 121:24, 177:17, 177:19, 177:22, 177:25, 178:15, 178:19
**hire** [33] - 24:21, 25:12, 28:23, 30:14, 30:16, 32:8, 55:19, 77:2, 117:13, 117:16, 121:12, 130:10, 181:17, 182:20, 183:23, 183:25, 184:14, 185:7, 185:8, 185:9, 185:23, 186:2, 186:7, 186:9, 186:13, 187:12, 187:22, 188:1, 188:9, 188:11, 189:8, 199:25, 206:3
**hired** [36] - 20:25, 32:16, 38:19, 39:8, 39:14, 39:17, 45:13, 65:16, 74:15, 108:5, 116:11, 116:12, 117:5, 117:6, 117:10, 117:12, 117:15, 117:17, 117:18, 117:19, 119:5, 119:6, 119:8, 121:15, 139:1, 178:19, 186:23, 186:24, 187:20, 188:13, 188:16, 188:18, 190:1, 195:16, 201:11
**hires** [2] - 117:21, 183:21
**hiring** [14] - 20:2, 24:13, 24:17, 28:24, 30:10, 30:18, 32:18, 38:23, 39:19, 116:6, 140:9, 186:11, 187:19, 187:23
**hirings** [3] - 130:14, 131:13, 131:16
**history** [6] - 46:4, 49:21, 50:3, 163:11, 199:22, 200:12
**hit** [1] - 178:14
**hitman** [1] - 45:13
**Hofstra** [2] - 19:7, 19:10
**hold** [6] - 10:15, 83:25, 213:20, 215:9, 222:15, 248:21

**holding** [2] - 187:7, 234:1
**hole** [1] - 176:8
**holiday** [2] - 174:18, 189:25
**Holy** [1] - 48:18
**home** [5] - 173:24, 176:7, 225:6, 226:19, 227:14
**honest** [1] - 84:6
**honestly** [1] - 207:19
**Honor** [65] - 6:10, 6:11, 6:22, 7:10, 8:13, 8:20, 9:18, 10:9, 14:6, 14:22, 15:10, 15:14, 18:24, 28:7, 41:6, 45:15, 49:25, 52:24, 54:8, 54:19, 54:22, 55:8, 56:4, 82:11, 82:16, 85:9, 86:25, 98:17, 99:2, 100:5, 102:1, 102:12, 146:1, 154:10, 172:24, 173:15, 196:17, 196:25, 197:14, 200:2, 201:2, 205:5, 213:25, 215:25, 216:1, 216:23, 217:9, 218:3, 220:13, 224:6, 228:21, 230:13, 231:24, 232:3, 232:21, 234:14, 235:2, 235:17, 235:23, 238:12, 246:1, 246:5, 249:17, 254:9, 254:12
**honor** [2] - 17:18, 18:4
**Honorable** [1] - 4:1
**HONORABLE** [1] - 1:15
**hope** [4] - 227:15, 227:17, 228:18, 253:15
**hopefully** [2] - 209:19, 225:16
**horrible** [3] - 206:8, 208:23, 209:18
**hosted** [1] - 183:13
**hostile** [3] - 234:15, 234:18, 235:12
**hosting** [3] - 177:4, 182:16, 182:19
**hosts** [1] - 183:1
**hotel** [2] - 176:8, 176:10
**hour** [3] - 98:1, 98:3, 172:12

**hour-keeping** [1] - 172:12
**hours** [7] - 168:18, 171:15, 172:8, 172:10, 172:11, 179:18, 226:8
**house** [6] - 9:10, 24:23, 176:4, 179:5, 180:17, 180:22
**HR** [13] - 88:9, 88:13, 90:4, 117:20, 130:23, 131:5, 131:6, 162:1, 162:21, 184:8, 184:9, 184:16, 185:1
**HRS** [1] - 23:17
**huge** [1] - 48:25
**Human** [3] - 142:7, 143:7, 143:18
**human** [36] - 20:19, 20:22, 21:1, 21:6, 21:17, 23:18, 27:6, 29:3, 39:24, 44:1, 46:19, 46:24, 58:19, 58:24, 59:4, 59:5, 59:8, 59:10, 59:12, 59:13, 59:18, 59:22, 60:13, 61:8, 61:10, 62:9, 76:23, 82:6, 121:9, 121:10, 122:12, 131:9, 148:6, 163:6, 163:12, 221:21
**hundred** [3] - 7:1, 34:14, 182:9
**hundreds** [7] - 9:13, 43:2, 108:10, 108:11, 108:16, 178:13
**hunting** [1] - 29:5

**_I_**

**ICF** [1] - 123:16
**idea** [11] - 47:12, 92:25, 93:2, 106:9, 156:23, 177:20, 177:21, 183:2, 186:6, 226:18, 230:3
**ideally** [1] - 101:5
**ideas** [2] - 151:22, 179:20
**identified** [1] - 115:8
**ignored** [2] - 9:4, 9:5
**ilk** [1] - 252:2
**immediate** [1] - 38:5
**immediately** [2] - 48:17, 49:12
**impact** [1] - 199:2
**impeach** [5] - 84:23,

214:1, 214:6, 215:18, 250:18
**impeaches** [1] - 148:8
**impeaching** [3] - 146:23, 146:25
**impeachment** [6] - 5:10, 214:2, 215:11, 220:22, 250:14, 250:16
**imperative** [2] - 24:21, 25:10
**implementing** [2] - 21:21, 55:22
**implicate** [1] - 130:15
**implicated** [1] - 211:5
**implied** [2] - 28:20, 79:9
**important** [6] - 148:13, 167:1, 206:8, 227:4, 227:6, 227:11
**impose** [1] - 4:10
**impression** [2] - 195:3, 251:23
**impressive** [3] - 30:4, 185:22
**improper** [1] - 251:23
**IN** [2] - 3:10, 41:20
**in-house** [1] - 24:23
**in-person** [3] - 31:4, 31:6, 123:12
**inaccurate** [1] - 60:5
**inappropriately** [1] - 115:21
**inaudible** [2] - 235:6, 245:13
**Inaudible** [2] - 64:20, 88:19
**incident** [2] - 203:18, 203:19
**include** [4] - 4:25, 228:15, 229:17, 235:4
**included** [4] - 21:19, 228:15, 244:22, 245:12
**including** [8] - 26:13, 27:10, 27:22, 118:1, 186:22, 191:25, 227:6, 229:21
**inclusion** [1] - 55:13
**income** [3] - 144:14, 144:23
**incomes** [1] - 113:23
**increase** [1] - 148:21
**increasement** [1] - 144:14
**increases** [2] - 144:22, 145:1
**Indeed** [5] - 140:25,

141:8, 141:11, 141:15, 141:17
**indeed** [2] - 141:7, 220:10
**Indeed.com** [1] - 66:14
**independent** [2] - 236:12, 237:6
**indicate** [3] - 38:7, 39:11, 88:4
**indicated** [1] - 95:3
**indication** [3] - 37:9, 89:6, 96:19
**indicative** [1] - 70:18
**individual** [2] - 116:9, 148:1
**individually** [2] - 74:14, 116:11
**industry** [2] - 137:25, 198:16
**infancy** [1] - 24:20
**inference** [7] - 10:1, 10:19, 16:7, 95:5, 95:9, 95:18, 95:21
**inferences** [1] - 95:24
**info** [1] - 161:5
**information** [27] - 11:23, 13:14, 21:22, 23:18, 47:1, 69:2, 83:5, 84:15, 86:23, 87:4, 88:3, 88:4, 90:4, 111:13, 125:11, 152:11, 153:7, 153:11, 153:23, 153:25, 188:6, 197:8, 229:20, 231:4, 231:12, 231:13, 231:15
**informed** [1] - 57:11
**infractions** [4] - 37:15, 38:6, 38:8, 38:14
**inhibit** [2] - 251:24, 252:2
**initial** [2] - 16:23, 30:9
**inning** [2] - 234:5
**innovation** [5] - 133:10, 135:23, 137:1, 137:24, 205:4
**Inquirer** [1] - 152:23
**inserting** [1] - 231:21
**install** [1] - 183:6
**installed** [1] - 176:11
**instance** [4] - 17:8, 47:4, 123:24, 239:25
**instances** [2] - 165:11, 165:18
**instead** [4] - 134:3, 157:16, 179:21, 180:23

**instinct** [1] - 52:4
**instruct** [2] - 242:2, 242:5
**Instruction** [1] - 230:19
**instruction** [21] - 16:7, 228:13, 229:24, 230:16, 230:17, 230:18, 231:8, 231:16, 233:24, 234:10, 237:20, 237:23, 241:11, 243:14, 243:25, 244:1, 244:6, 244:13, 244:17, 245:8, 245:17
**instruction's** [1] - 231:20
**instructions** [18] - 16:23, 99:25, 227:25, 228:12, 229:16, 231:17, 233:17, 233:19, 233:20, 235:5, 236:21, 237:9, 237:17, 239:24, 240:22, 241:2, 242:22, 245:10
**instrumental** [4] - 137:2, 137:7, 137:8, 137:10
**insurance** [1] - 116:12
**intend** [2] - 4:10, 172:24
**intended** [4] - 5:9, 17:23, 53:21, 84:14
**intention** [1] - 50:18
**interconnection** [2] - 133:9, 141:12
**interest** [1] - 61:11
**interested** [3] - 30:10, 132:1, 132:3
**interfaced** [1] - 34:24
**interfacing** [1] - 21:16
**intermingling** [1] - 85:25
**internal** [2] - 141:13, 141:16
**internally** [2] - 130:2, 182:2
**International** [1] - 15:19
**internet** [19] - 65:23, 110:6, 110:7, 152:17, 152:18, 152:22, 152:23, 152:24, 153:4, 154:2, 175:14, 175:21, 182:4, 182:24, 187:4,

188:4, 188:6, 190:5, 198:24
**interpret** [1] - 112:10
**interpreted** [2] - 28:16, 56:18
**interrogatories** [2] - 73:6, 213:6
**interrogatory** [1] - 217:2
**interrupting** [1] - 226:19
**interruption** [1] - 139:21
**interview** [10] - 29:8, 30:25, 31:4, 31:5, 31:20, 63:17, 63:18, 185:16, 185:17, 185:19
**interviewed** [1] - 188:2
**interviewing** [1] - 187:18
**interviews** [5] - 29:7, 30:21, 31:7, 39:5
**intimidation** [1] - 27:23
**intranet** [1] - 23:19
**introduce** [3] - 13:14, 193:19, 213:23
**introduced** [3] - 180:5, 180:7, 193:22
**introduction** [1] - 232:1
**introductions** [1] - 129:11
**invalid** [1] - 89:16
**invested** [1] - 16:21
**investigate** [7] - 67:6, 67:14, 67:25, 70:7, 70:11, 70:14, 71:4
**investigation** [4] - 27:25, 67:4, 67:20, 70:10
**investment** [1] - 180:20
**invite** [1] - 178:24
**involve** [1] - 22:2
**involved** [15] - 24:13, 28:23, 38:23, 43:2, 43:10, 47:4, 130:6, 185:9, 185:17, 186:12, 193:16, 194:11, 207:5, 207:12, 217:3
**involvement** [7] - 29:1, 38:25, 39:2, 185:12, 186:15, 193:1, 193:7
**IP** [1] - 112:15
**IPF'ing** [1] - 163:22

**IRC** *[2]* - 123:17, 123:18
**ish** *[1]* - 135:12
**ISP** *[6]* - 175:10, 175:18, 175:25, 176:15, 176:20, 177:3
**issue** *[28]* - 6:12, 6:23, 7:4, 7:5, 9:25, 10:12, 10:13, 10:16, 16:3, 26:6, 40:2, 55:5, 56:10, 56:13, 80:21, 152:11, 152:14, 167:1, 194:4, 196:5, 196:8, 207:5, 207:9, 230:15, 235:21, 236:10, 237:18
**issued** *[1]* - 23:7
**issues** *[29]* - 4:8, 5:16, 27:6, 33:10, 35:2, 35:14, 35:16, 35:23, 36:8, 37:2, 37:10, 39:6, 39:18, 39:21, 39:24, 40:11, 40:24, 64:25, 65:5, 67:24, 86:22, 179:21, 192:14, 201:12, 207:12, 243:3, 244:7, 252:7, 253:9
**IT** *[1]* - 174:6
**it'll** *[1]* - 234:19
**Italian** *[1]* - 19:16
**iteration** *[2]* - 23:11, 26:14
**itself** *[2]* - 184:6, 241:3

### J

**JACKSON** *[1]* - 2:2
**jail** *[7]* - 79:15, 79:20, 79:21, 83:2, 89:3, 151:23, 211:24
**James** *[1]* - 1:12
**January** *[6]* - 1:13, 94:24, 134:25, 135:4, 135:9, 254:23
**Jersey** *[15]* - 19:5, 19:13, 29:25, 118:6, 118:8, 120:19, 174:1, 174:12, 174:25, 175:17, 175:24, 176:13, 179:4, 179:16, 186:16
**JILL** *[1]* - 2:3
**job** *[28]* - 17:15, 24:22, 30:24, 65:14, 65:19, 65:20, 65:25, 66:6, 66:11, 66:13, 66:15, 66:16, 67:3, 69:2,

74:22, 109:17, 121:8, 133:2, 133:5, 174:4, 176:16, 176:21, 177:11, 177:21, 178:23, 178:25, 180:6
**Job** *[1]* - 128:9
**jobs** *[3]* - 21:23, 66:9, 66:10
**John** *[40]* - 40:15, 57:18, 87:19, 88:7, 89:2, 91:23, 92:1, 92:5, 92:13, 94:18, 95:4, 95:11, 95:15, 96:12, 96:18, 142:14, 151:11, 151:20, 152:13, 158:24, 159:6, 159:7, 163:9, 163:12, 163:19, 166:11, 169:11, 169:18, 207:17, 207:20, 208:4, 209:8, 209:18, 210:4, 210:7, 210:11, 211:15, 211:25, 231:9
**join** *[3]* - 19:24, 31:2, 31:25
**joined** *[6]* - 19:21, 20:18, 20:19, 21:8, 180:5, 185:15
**JONATHAN** *[1]* - 2:3
**JOSHUA** *[2]* - 1:15, 4:2
**Judge** *[3]* - 4:2, 99:22, 234:1
**JUDGE** *[1]* - 1:16
**judge** *[6]* - 65:11, 79:21, 85:23, 229:3, 231:13, 234:3
**judged** *[1]* - 65:12
**judging** *[1]* - 31:7
**jump** *[3]* - 26:18, 189:18, 194:3
**June** *[6]* - 9:2, 90:8, 90:10, 178:5, 178:6, 213:2
**juror** *[1]* - 244:4
**jurors** *[1]* - 246:22
**Jury** *[7]* - 16:18, 98:9, 102:9, 172:21, 173:12, 227:22, 230:19
**jury** *[88]* - 4:7, 6:3, 7:15, 10:3, 11:11, 11:25, 12:7, 12:14, 12:16, 13:7, 15:9, 15:11, 16:6, 16:12, 16:15, 17:17, 19:3,

21:5, 22:25, 26:1, 29:1, 38:16, 38:25, 40:8, 43:21, 44:13, 46:2, 47:15, 48:23, 49:23, 52:1, 55:7, 58:5, 64:8, 72:21, 80:20, 80:23, 82:15, 83:21, 87:21, 95:19, 100:15, 100:16, 100:18, 100:25, 102:7, 135:3, 151:13, 156:25, 168:4, 173:10, 173:21, 174:15, 182:13, 183:19, 183:25, 185:12, 186:12, 186:15, 189:15, 193:9, 196:3, 199:11, 199:19, 203:4, 203:19, 207:20, 208:3, 209:14, 209:17, 217:24, 218:2, 222:11, 225:6, 225:13, 225:18, 228:4, 228:9, 231:1, 231:16, 231:17, 241:15, 241:24, 244:14, 245:10, 246:13, 253:15
**JURY** *[1]* - 1:5

### K

**Kaufman** *[17]* - 127:12, 127:23, 128:5, 128:8, 129:14, 129:20, 129:22, 130:4, 131:18, 132:11, 132:16, 134:22, 138:25, 139:20, 144:7, 144:10, 190:25
**Kaufman's** *[1]* - 140:17
**Kaufmann** *[1]* - 132:25
**keep** *[13]* - 17:15, 17:19, 79:19, 89:2, 96:10, 118:19, 176:23, 178:16, 184:5, 189:19, 227:14, 230:4, 230:7
**keeping** *[4]* - 21:13, 43:11, 172:12
**key** *[5]* - 9:3, 198:8, 198:14, 198:21, 201:11
**kid** *[4]* - 151:20, 152:4,

195:23, 209:16
**kids** *[6]* - 151:2, 151:4, 178:25, 179:9, 197:13, 197:18
**kill** *[2]* - 45:12, 45:13
**killed** *[2]* - 156:14, 210:11
**kind** *[54]* - 15:7, 17:10, 17:14, 23:19, 25:4, 29:24, 33:7, 42:7, 45:5, 45:6, 47:1, 94:15, 96:20, 109:17, 110:1, 112:22, 113:2, 113:3, 113:19, 114:12, 130:15, 131:18, 132:24, 144:3, 144:13, 146:10, 151:7, 160:22, 163:19, 176:2, 176:11, 176:18, 176:19, 177:18, 177:22, 177:23, 179:14, 180:18, 181:13, 181:18, 181:22, 182:1, 183:1, 183:6, 184:2, 185:15, 189:17, 195:22, 228:12, 230:16, 246:11, 253:5
**kindly** *[1]* - 26:9
**kinds** *[1]* - 130:22
**Kitonga** *[1]* - 128:9
**knack** *[1]* - 174:5
**knock** *[2]* - 190:5, 225:6
**knocked** *[1]* - 190:2
**Knolls** *[2]* - 186:17, 186:18
**know-how** *[3]* - 30:23, 31:22, 32:5
**knowing** *[1]* - 200:12
**knowledge** *[25]* - 9:18, 25:10, 38:4, 49:20, 51:12, 54:16, 63:19, 64:1, 64:10, 65:5, 77:9, 77:12, 77:18, 86:1, 89:16, 95:19, 96:17, 169:24, 170:9, 189:4, 193:19, 193:25, 203:17, 215:21, 216:8
**known** *[3]* - 89:10, 89:11, 199:22
**knows** *[7]* - 74:4, 74:14, 84:11, 125:23, 182:13, 215:1, 223:21

### L

**labor** *[1]* - 19:19
**lack** *[1]* - 89:16
**ladder** *[1]* - 144:4
**laid** *[1]* - 220:13
**lamps** *[1]* - 176:10
**landed** *[1]* - 20:15
**landlord** *[1]* - 181:9
**language** *[3]* - 27:13, 217:15, 239:4
**laptop** *[7]* - 93:12, 150:24, 152:5, 166:16, 166:17, 166:18, 166:21
**large** *[2]* - 112:15, 189:24
**largely** *[3]* - 32:3, 236:21, 244:16
**larger** *[2]* - 61:5, 86:8
**last** *[27]* - 5:4, 8:23, 8:24, 14:7, 15:7, 15:16, 26:8, 26:18, 27:2, 47:9, 52:14, 54:6, 78:17, 85:5, 99:22, 101:8, 108:7, 146:11, 160:17, 161:8, 218:2, 221:17, 234:5, 236:16, 238:24, 252:13
**late** *[3]* - 120:23, 172:24, 225:25
**lateral** *[1]* - 144:3
**latest** *[1]* - 23:20
**launch** *[2]* - 178:5, 178:9
**Laura** *[2]* - 2:13, 253:21
**law** *[7]* - 19:19, 77:8, 208:20, 227:7, 227:16, 232:1, 251:9
**LAW** *[1]* - 1:18
**lawsuit** *[9]* - 73:4, 73:5, 73:12, 80:25, 81:2, 81:3, 195:24, 212:7, 219:23
**lawyer** *[8]* - 97:4, 116:6, 116:11, 116:12, 116:15, 116:17, 181:5, 216:10
**lawyers** *[9]* - 213:5, 218:18, 219:4, 222:23, 222:24, 223:3, 223:16, 226:22
**lawyers'** *[2]* - 227:10, 227:11
**lay** *[1]* - 214:7, 215:21

**laying** [3] - 21:17, 213:23, 218:16
**lead** [6] - 40:9, 163:4, 184:8, 184:9, 186:21, 187:3
**leader** [2] - 187:2
**leadership** [5] - 55:18, 64:4, 64:5, 64:25, 70:8
**leading** [15] - 28:7, 31:13, 39:20, 41:23, 51:23, 52:21, 185:2, 193:11, 195:6, 198:10, 198:17, 198:18, 199:4, 200:16, 200:23
**lean** [1] - 22:8
**leap** [1] - 179:2
**leapfrog** [1] - 180:18
**learn** [1] - 122:11
**learned** [4] - 59:21, 63:11, 85:17, 196:12
**learning** [1] - 112:24
**least** [22] - 4:11, 5:24, 5:25, 23:3, 26:14, 27:11, 30:18, 32:10, 33:9, 36:7, 45:4, 50:14, 82:13, 86:2, 86:10, 100:20, 170:13, 178:12, 189:4, 225:25, 250:14, 251:1
**leave** [7] - 17:6, 23:22, 42:23, 146:6, 181:8, 200:21, 251:23
**leaving** [2] - 179:22, 180:6
**led** [4] - 20:15, 137:3, 193:8, 194:4
**leeway** [3] - 38:1, 71:25, 72:6
**left** [4] - 10:20, 76:22, 175:15, 188:23
**legal** [2] - 80:21, 95:11
**legitimate** [6] - 45:2, 57:21, 71:20, 72:12, 72:23, 250:13
**leniency** [4] - 37:21, 71:23, 71:24, 72:7
**lens** [1] - 37:13
**less** [11] - 7:13, 21:9, 60:1, 101:21, 106:18, 107:9, 107:10, 107:11, 129:17, 146:13, 181:1
**letter** [1] - 31:24
**letters** [3] - 9:4, 9:5, 241:4
**letting** [1] - 226:3

**level** [8] - 32:4, 33:7, 33:9, 63:15, 71:3, 74:25, 76:22, 192:11
**levels** [1] - 145:21
**leverage** [1] - 205:9
**leveraged** [1] - 205:3
**leveraging** [1] - 137:25
**LEWIS** [1] - 2:2
**liability** [9] - 239:25, 240:5, 240:6, 240:16, 241:5, 241:17, 242:15
**LIABILITY** [1] - 1:6
**liable** [4] - 238:20, 239:2, 239:9, 242:1
**lie** [22] - 56:21, 56:25, 57:3, 57:14, 58:2, 58:3, 58:4, 81:16, 88:16, 93:19, 156:24, 164:14, 165:1, 166:22, 166:23, 166:25, 171:16, 206:17, 222:1, 222:15, 222:21, 223:13
**lied** [18] - 57:1, 57:17, 57:18, 57:20, 57:23, 157:2, 157:5, 157:6, 164:8, 164:18, 164:22, 164:23, 164:24, 212:17, 212:22, 222:19, 222:20
**lies** [8] - 56:19, 56:22, 62:1, 73:9, 97:18, 165:2, 229:19, 231:2
**life** [3] - 169:23, 176:1, 176:15
**light** [2] - 8:17, 35:15
**likely** [1] - 134:2
**LIMITED** [1] - 1:6
**line** [9] - 5:6, 5:7, 78:18, 78:21, 78:23, 79:1, 91:22, 94:17, 228:6
**Line** [1] - 146:18
**lines** [2] - 84:9, 93:11
**Lines** [1] - 146:21
**link** [1] - 195:17
**LinkedIn** [1] - 141:7
**LINODE** [3] - 1:6, 1:7, 1:7
**Linode** [152] - 5:12, 11:9, 17:1, 19:21, 19:24, 19:25, 20:14, 20:18, 20:19, 20:23, 22:11, 23:16, 24:14, 24:18, 24:19, 27:12, 29:14, 29:15, 32:7,

32:23, 35:17, 35:20, 36:8, 36:12, 37:3, 38:17, 40:9, 42:3, 47:6, 48:5, 50:7, 54:18, 55:11, 55:23, 60:23, 61:10, 61:20, 61:21, 62:23, 67:20, 68:4, 70:18, 71:17, 74:5, 74:9, 74:12, 74:15, 74:18, 75:3, 75:9, 76:15, 95:15, 96:23, 103:13, 103:15, 104:4, 104:11, 104:16, 105:1, 105:11, 105:13, 109:2, 110:15, 110:17, 110:20, 112:5, 112:15, 113:7, 113:15, 113:16, 113:18, 113:21, 114:21, 116:21, 118:1, 118:5, 118:9, 121:6, 121:17, 122:25, 123:8, 123:19, 123:22, 125:6, 127:1, 127:6, 128:8, 128:16, 128:17, 129:6, 130:21, 136:16, 136:19, 137:2, 137:7, 137:19, 137:21, 137:22, 138:20, 143:19, 144:22, 150:6, 150:9, 162:6, 163:2, 166:6, 166:7, 166:11, 169:11, 169:20, 170:15, 174:7, 174:15, 177:21, 177:25, 178:24, 180:25, 182:14, 183:15, 183:20, 184:3, 184:9, 184:12, 184:16, 188:24, 189:5, 190:3, 190:4, 191:6, 191:17, 191:21, 191:25, 197:12, 198:9, 198:15, 200:14, 206:7, 211:6, 211:16, 216:16, 221:13, 232:7, 232:15, 232:17, 238:20, 239:2, 239:8, 247:14, 250:19, 250:20
**Linode's** [12] - 42:10, 59:4, 71:11, 71:15, 112:7, 122:17,

137:14, 144:23, 158:2, 193:8, 221:21, 233:3
**Linode.com/careers** [1] - 66:12
**Linodes** [3] - 162:5, 162:21, 162:25
**LINODIAN** [1] - 1:7
**Linux** [6] - 175:16, 175:17, 175:19, 175:20, 176:11, 179:6
**Lions** [1] - 16:21
**liquidated** [2] - 240:13, 243:9
**Lisa** [3] - 119:24, 119:25, 120:8
**list** [25] - 9:3, 33:1, 72:3, 72:24, 128:7, 131:2, 157:22, 158:1, 158:4, 158:21, 159:12, 159:14, 159:15, 162:1, 165:4, 188:1, 202:10, 206:21, 206:25, 230:25, 248:6, 248:8, 248:17, 248:22, 249:19
**listed** [5] - 221:16, 221:18, 248:18, 249:5, 249:6
**listen** [3] - 118:20, 218:9, 218:11
**listened** [1] - 4:18
**litigation** [3] - 49:20, 50:3, 50:15
**live** [1] - 100:8
**lived** [5] - 93:5, 93:8, 174:11, 208:14, 208:16
**living** [5] - 28:5, 28:10, 83:11, 90:2, 96:20
**LLC** [3] - 1:7, 1:7, 1:8
**loan** [5] - 86:4, 86:8, 86:14, 180:13, 180:19
**loans** [3] - 86:5, 86:8, 86:11
**local** [2] - 175:9, 175:10
**location** [1] - 118:5
**locations** [1] - 180:2
**locked** [1] - 177:22
**lodge** [1] - 204:3
**logic** [1] - 240:9
**logo** [1] - 176:18
**Look** [1] - 12:23
**look** [30] - 13:21, 38:6, 47:13, 70:20, 92:17,

92:20, 99:7, 100:1, 113:7, 126:7, 126:12, 126:14, 130:19, 136:5, 156:6, 160:19, 165:8, 180:2, 214:18, 215:8, 231:9, 231:10, 234:8, 240:11, 244:12, 245:16, 249:4, 249:16, 251:8, 254:1
**looked** [6] - 6:23, 22:13, 33:3, 35:3, 55:15, 93:1, 161:8, 185:24
**looking** [17] - 8:19, 15:22, 16:4, 23:6, 24:25, 50:13, 91:18, 135:20, 140:21, 142:21, 176:14, 178:18, 181:25, 230:24, 238:13, 238:15, 250:7
**looks** [14] - 31:2, 34:4, 47:17, 48:17, 95:10, 135:21, 160:9, 160:13, 160:25, 161:17, 232:12, 238:8, 245:1, 245:3
**loop** [1] - 188:23
**loose** [1] - 246:21
**lose** [2] - 200:14, 201:10
**losing** [1] - 166:15
**loud** [2] - 83:3, 228:10
**love** [2] - 226:18, 241:8
**low** [1] - 120:24
**lowered** [1] - 137:14
**luck** [1] - 168:20
**luckily** [1] - 182:2
**lunch** [3] - 98:2, 98:7, 179:19
**Luncheon** [1] - 102:4
**lying** [9] - 56:14, 58:10, 64:25, 65:1, 93:18, 168:8, 207:1, 222:24

---

**M**

**Mac** [1] - 175:20
**magic** [2] - 68:19
**mail** [1] - 21:14
**main** [1] - 186:24
**maintain** [3] - 123:19, 123:21, 176:24
**maintained** [2] - 122:25, 124:11

**man** [7] - 48:18, 53:14,
53:17, 168:12,
168:13, 168:16,
203:23
**manage** [1] - 192:19
**managed** [2] - 88:13,
122:20
**management** [4] -
19:14, 27:6, 59:11,
76:22
**manager** [42] - 19:16,
21:1, 21:6, 44:1,
46:22, 46:23, 47:1,
48:2, 48:5, 119:15,
119:25, 122:12,
126:16, 127:18,
127:21, 128:5,
130:5, 130:25,
132:1, 133:9,
133:11, 133:14,
133:20, 133:23,
134:3, 134:6,
135:19, 135:24,
136:9, 136:10,
138:9, 140:16,
141:14, 144:1,
144:25, 149:2,
149:4, 174:5, 174:6,
185:1, 186:25,
187:20
**managers** [3] - 27:21,
148:23, 150:10
**managing** [4] - 64:4,
111:12, 111:13,
119:13
**map** [1] - 253:5
**mark** [1] - 228:12
**marked** [1] - 99:3
**Market** [2] - 1:12, 1:19
**market** [1] - 176:2
**married** [2] - 173:24,
178:25
**material** [1] - 24:3
**materially** [2] -
235:25, 236:6
**matter** [11] - 17:5,
30:17, 43:24, 55:14,
69:1, 70:3, 150:8,
171:25, 187:25,
239:19, 254:19
**Matter** [1] - 254:14
**matters** [2] - 248:12,
250:15
**maureen** [1] - 1:22
**Maureen** [2] - 253:19,
254:21
**maureen.mchugh@
paed.uscourts.gov**
[1] - 1:22
**McCarthy** [2] - 219:16,

220:11
**MCCARTHY** [1] - 2:4
**McHugh** [2] - 1:22,
254:21
**mean** [69] - 5:23, 6:25,
7:8, 9:12, 14:9, 16:4,
17:25, 24:18, 36:9,
44:14, 51:8, 52:10,
52:18, 53:1, 65:12,
65:18, 68:11, 68:14,
92:4, 96:23, 98:21,
100:25, 101:19,
103:20, 106:14,
110:3, 112:22,
113:2, 126:10,
133:6, 133:7, 135:7,
148:4, 152:15,
153:4, 157:20,
160:18, 165:4,
170:11, 173:2,
194:6, 196:15,
197:9, 198:4,
202:19, 205:18,
210:13, 213:5,
225:13, 226:2,
230:8, 231:11,
231:19, 233:17,
241:17, 241:20,
242:10, 242:23,
243:15, 243:16,
247:21, 248:13,
249:4, 249:7,
249:23, 250:17,
251:2, 251:20,
251:23
**meaning** [2] - 5:20,
252:1
**means** [10] - 7:24,
17:16, 46:4, 65:19,
92:6, 125:11,
165:22, 228:4,
239:12, 253:17
**meant** [3] - 70:5,
87:20, 100:8
**meantime** [1] - 228:10
**measure** [1] - 205:19
**measures** [1] - 198:21
**measuring** [1] -
198:23
**mechanical** [1] - 1:23
**media** [1] - 35:24
**medical** [1] - 177:15
**medium** [1] - 69:1
**Meet** [1] - 50:20
**meet** [4] - 32:4, 174:9,
180:10, 186:1
**meeting** [33] - 44:10,
47:5, 47:9, 47:10,
47:11, 47:22, 48:5,
49:18, 50:16, 50:19,

50:24, 53:25, 133:1,
133:3, 133:8,
133:10, 133:15,
133:16, 133:19,
134:9, 134:10,
134:11, 134:12,
135:5, 135:25,
138:11, 142:5,
143:8, 143:12,
143:14, 202:16,
203:20, 204:25
**meetings** [1] - 123:12
**meets** [1] - 188:6
**mega** [1] - 206:6
**Melissa** [2] - 2:12,
159:25
**member** [2] - 111:20,
198:25
**members** [1] - 177:10
**memo** [1] - 248:9
**memorize** [1] - 108:5
**memory** [3] - 32:2,
233:2, 246:16
**mention** [7] - 12:10,
14:23, 16:22,
162:17, 163:9,
163:12, 203:3
**mentioned** [14] -
44:16, 49:19, 96:12,
96:18, 112:20,
131:24, 155:14,
156:1, 156:14,
162:17, 169:9,
182:15, 193:4,
203:22
**mentors** [1] - 175:6
**merits** [2] - 17:23,
18:5
**message** [2] - 46:15,
52:14
**messages** [5] - 125:1,
126:4, 136:8, 163:6,
170:16
**met** [1] - 174:13
**metadata** [1] - 66:2
**method** [2] - 45:4,
48:3
**metropolitan** [1] -
181:15
**MEYER** [2] - 165:13,
244:23
**Meyer** [1] - 2:12
**Meyers** [1] - 105:8
**Microsystems** [1] -
195:18
**mid** [1] - 172:17
**middle** [4] - 13:25,
183:3, 225:19,
231:22
**might** [14] - 32:19,

42:18, 45:7, 68:23,
71:2, 98:22, 144:11,
211:15, 225:2,
229:11, 231:10,
248:22, 251:11,
253:14
**miles** [1] - 175:2
**millions** [1] - 43:2
**mind** [7] - 31:17,
45:25, 151:8,
152:10, 227:14,
230:10, 238:13
**mine** [1] - 248:10
**minimized** [1] - 183:6
**minimum** [1] - 188:14
**minor** [3] - 24:4,
37:14, 37:20
**minus** [1] - 135:11
**minute** [6] - 77:4,
106:2, 148:7, 210:3,
214:10, 245:23
**minutes** [6] - 88:25,
172:18, 224:16,
226:19, 245:6,
245:22
**misconduct** [1] -
37:20
**misinterpreted** [1] -
97:15
**missing** [5] - 6:16,
6:18, 6:20, 7:19
**misuse** [2] - 37:16,
221:15
**mitigated** [1] - 241:2
**model** [8] - 230:14,
230:19, 230:24,
231:7, 233:17,
233:19, 233:20,
244:24
**modems** [1] - 175:13
**moment** [5] - 46:2,
141:21, 172:16,
201:11, 224:12
**money** [16] - 32:1,
32:7, 38:3, 71:13,
86:12, 95:8, 121:17,
122:20, 144:18,
148:5, 165:23,
165:25, 180:12,
206:6
**monitor** [1] - 176:3
**monitoring** [1] - 129:3
**monologue** [1] - 99:20
**month** [8] - 126:7,
134:18, 136:17,
139:11, 177:12,
180:11, 180:23
**months** [3] - 10:8,
143:15, 177:22
**moot** [1] - 8:17

**morning** [16] - 4:4,
16:19, 17:3, 18:16,
18:17, 99:6, 101:13,
101:19, 178:9,
179:8, 224:18,
227:25, 231:19,
249:8, 253:9, 253:13
**mortgage** [2] - 180:22,
181:1
**most** [11] - 25:3,
28:15, 36:13, 39:4,
65:8, 125:8, 131:20,
131:21, 166:25,
179:25, 185:13
**mostly** [3] - 47:2,
179:18, 180:15
**motion** [5] - 8:8, 8:15,
9:25, 14:4
**motions** [5] - 8:3, 8:5,
8:14, 234:23, 234:25
**motives** [2] - 31:1,
130:16
**mount** [1] - 248:4
**mouth** [2] - 58:1,
118:19
**move** [17] - 5:14,
17:24, 18:3, 18:20,
19:2, 20:12, 40:6,
41:16, 52:13, 53:9,
65:14, 178:22,
179:16, 183:17,
184:7, 196:1, 234:13
**moved** [10] - 41:8,
101:18, 119:20,
122:8, 128:16,
174:12, 181:7,
182:4, 220:21,
220:25
**moving** [3] - 17:19,
174:7, 234:17
**MR** [539] - 3:4, 3:4,
3:5, 3:5, 3:7, 3:7,
3:8, 4:8, 4:16, 4:24,
5:4, 5:9, 5:22, 6:1,
6:7, 6:10, 6:11, 7:10,
7:15, 7:18, 8:4, 8:7,
8:11, 8:13, 8:20,
8:23, 9:18, 9:21,
10:9, 10:10, 10:12,
10:23, 10:25, 11:13,
11:15, 11:25, 12:9,
12:12, 12:17, 12:20,
12:22, 13:9, 13:15,
13:19, 14:6, 14:12,
14:14, 14:22, 15:10,
15:17, 15:21, 15:24,
16:9, 16:11, 16:16,
18:15, 18:24, 19:1,
19:8, 19:23, 20:7,
20:16, 22:18, 22:21,

25:15, 25:16, 25:19, 25:21, 26:17, 26:20, 28:7, 28:9, 28:13, 28:21, 31:13, 31:15, 33:25, 34:2, 35:5, 35:7, 36:16, 36:23, 36:25, 37:4, 37:7, 38:9, 38:11, 38:12, 40:13, 40:17, 40:20, 41:1, 41:4, 41:6, 41:10, 41:11, 41:16, 41:17, 41:21, 42:15, 42:21, 43:12, 45:15, 45:18, 48:11, 48:13, 49:10, 49:17, 49:25, 50:4, 50:8, 51:8, 51:14, 51:17, 51:23, 51:25, 52:19, 52:24, 53:3, 53:6, 54:8, 54:14, 54:19, 54:22, 54:25, 55:2, 55:3, 55:8, 56:4, 56:9, 57:4, 57:7, 58:12, 58:13, 58:17, 65:3, 66:3, 66:5, 69:6, 69:8, 69:11, 69:16, 69:18, 69:20, 74:2, 74:6, 74:8, 74:17, 75:15, 75:18, 76:17, 76:20, 78:9, 78:13, 78:20, 78:22, 78:24, 78:25, 81:20, 81:21, 81:24, 82:3, 82:11, 82:14, 82:16, 82:23, 83:3, 83:4, 83:8, 83:13, 83:14, 83:20, 83:23, 84:6, 84:19, 84:21, 84:25, 85:4, 85:9, 85:22, 86:25, 87:2, 87:6, 87:8, 88:21, 88:23, 91:6, 91:8, 91:10, 91:14, 91:15, 97:3, 97:5, 97:19, 97:21, 98:13, 98:15, 98:17, 98:20, 98:21, 99:2, 99:6, 99:8, 99:15, 99:18, 99:21, 100:5, 100:9, 100:17, 100:23, 101:3, 102:1, 102:12, 102:14, 103:2, 110:8, 110:10, 110:12, 110:14, 116:22, 116:5, 116:8, 116:14, 118:21, 118:23, 120:11, 120:17, 125:16, 125:18, 125:21, 125:25, 126:9, 126:13, 135:1,

135:6, 136:12, 136:15, 139:22, 139:23, 142:11, 142:13, 142:14, 142:15, 142:20, 142:22, 146:1, 146:4, 146:23, 146:24, 147:1, 147:6, 147:9, 148:9, 148:11, 153:17, 153:20, 154:7, 154:10, 154:11, 154:16, 154:18, 155:1, 155:2, 155:17, 155:20, 155:24, 156:4, 156:5, 157:22, 157:24, 159:18, 159:22, 159:25, 160:2, 160:3, 161:11, 161:15, 163:14, 163:17, 164:15, 164:17, 165:12, 165:14, 165:15, 165:16, 172:15, 172:24, 173:4, 173:15, 173:18, 185:2, 185:4, 191:3, 191:5, 191:8, 191:10, 193:11, 193:14, 193:18, 194:20, 194:22, 195:6, 195:11, 195:19, 195:25, 196:17, 196:19, 196:25, 197:3, 197:5, 197:7, 197:14, 197:16, 197:23, 198:1, 198:10, 198:13, 198:17, 198:19, 198:20, 199:4, 199:6, 200:2, 200:4, 200:16, 200:18, 200:19, 200:23, 201:2, 201:5, 201:9, 204:10, 204:12, 205:5, 205:7, 206:11, 206:14, 206:16, 209:1, 209:5, 210:21, 210:25, 211:1, 211:3, 211:13, 211:17, 213:7, 213:8, 213:11, 213:13, 213:16, 213:22, 213:25, 214:2, 214:3, 214:8, 214:9, 214:20, 214:23, 214:25, 215:4, 215:12,

215:23, 216:3, 216:5, 216:9, 216:15, 216:19, 216:23, 217:8, 217:18, 217:21, 218:3, 218:9, 218:13, 218:20, 218:25, 219:7, 219:9, 219:11, 219:12, 220:13, 220:15, 220:17, 220:19, 220:23, 220:24, 220:25, 221:2, 221:10, 221:12, 222:25, 223:4, 223:9, 223:11, 223:20, 223:22, 224:4, 224:6, 224:17, 224:19, 224:21, 224:24, 225:3, 225:9, 225:12, 225:20, 225:21, 225:23, 226:14, 228:21, 228:23, 229:3, 229:11, 229:18, 229:23, 230:1, 230:2, 230:4, 230:11, 230:12, 230:18, 230:22, 231:7, 231:9, 231:14, 231:16, 231:24, 232:3, 232:6, 232:10, 232:12, 232:18, 232:21, 232:25, 233:4, 233:5, 233:6, 233:9, 233:12, 233:15, 233:19, 233:22, 233:25, 234:3, 234:14, 234:22, 235:2, 235:8, 235:13, 235:17, 235:18, 235:21, 235:23, 236:1, 236:3, 236:8, 236:10, 236:11, 236:14, 236:22, 236:24, 237:1, 237:4, 237:7, 237:13, 237:14, 237:18, 237:24, 238:5, 238:8, 238:12, 238:17, 238:22, 238:25, 239:4, 239:11, 239:18, 240:12, 241:8, 241:12, 242:14, 242:21, 243:1, 243:3, 243:6,

243:8, 243:11, 243:12, 243:15, 243:19, 243:22, 244:7, 244:8, 244:11, 244:19, 244:24, 245:1, 245:3, 245:9, 245:18, 245:23, 246:1, 246:5, 246:18, 246:21, 247:4, 247:8, 247:10, 247:12, 247:15, 247:16, 247:20, 247:23, 248:6, 248:8, 248:10, 248:15, 248:19, 248:24, 249:2, 249:12, 249:16, 249:25, 250:12, 250:18, 250:23, 251:3, 251:16, 251:19, 251:22, 252:4, 252:11, 253:1, 254:3, 254:9, 254:12
**MS** [2] - 165:13, 244:23
**multiple** [7] - 51:3, 57:25, 164:21, 164:22, 164:23, 164:24, 233:11
**Mumbai** [1] - 111:1
**murder** [4] - 150:22, 209:15, 211:8, 211:22
**Musbach** [46] - 40:15, 40:24, 51:1, 57:18, 82:2, 82:7, 82:20, 85:24, 86:13, 88:7, 89:2, 91:23, 92:2, 92:5, 94:18, 95:4, 95:16, 96:12, 96:19, 151:11, 151:20, 152:13, 156:12, 158:24, 159:6, 159:7, 163:9, 163:12, 163:19, 166:11, 169:12, 196:5, 196:23, 199:21, 199:25, 200:11, 203:3, 207:17, 207:20, 209:8, 209:18, 210:4, 210:8, 210:11, 211:15, 211:25
**Musbach's** [5] - 79:7, 87:19, 92:13, 93:11, 95:11
**muttering** [2] - 201:3, 201:5

**N**

**name** [19] - 19:4, 59:15, 59:19, 87:19, 102:20, 102:21, 103:5, 128:7, 139:13, 155:14, 176:17, 187:25, 214:19, 215:5, 215:6, 216:5, 216:7, 219:15, 249:18
**named** [3] - 115:11, 115:25, 116:4
**names** [4] - 117:2, 170:24, 185:23, 186:11
**narrative** [1] - 17:11
**nature** [1] - 85:6
**near** [1] - 197:19
**nebulous** [1] - 253:4
**necessarily** [6] - 133:25, 147:22, 148:18, 148:22, 149:7, 249:17
**necessary** [2] - 189:19, 229:13
**need** [38] - 4:6, 5:1, 9:21, 11:6, 14:24, 28:18, 32:19, 67:14, 78:10, 83:5, 94:4, 100:14, 100:15, 100:23, 101:9, 101:17, 109:22, 109:25, 117:20, 148:16, 151:5, 151:9, 151:12, 153:18, 209:3, 214:6, 216:21, 217:5, 218:2, 218:8, 227:24, 229:17, 229:23, 240:10, 251:1, 252:21, 252:24, 254:6
**needed** [19] - 4:18, 4:22, 25:1, 25:6, 32:4, 33:3, 37:24, 58:18, 58:22, 121:9, 134:1, 163:3, 180:18, 181:12, 182:4, 186:25, 189:18, 189:21, 202:2
**needling** [1] - 241:6
**needs** [4] - 20:10, 32:3, 101:22, 241:16
**negative** [2] - 36:3, 52:16
**Net** [3] - 118:1, 118:4, 118:10
**net** [2] - 118:7, 162:9

**network** [81] - 29:16, 63:8, 63:10, 63:21, 63:25, 64:3, 65:9, 65:12, 111:16, 111:18, 111:19, 111:24, 112:2, 112:4, 114:7, 114:8, 116:22, 117:3, 117:22, 117:25, 118:13, 119:5, 119:11, 119:16, 119:20, 120:18, 126:16, 126:20, 126:23, 126:25, 127:4, 127:11, 127:15, 127:18, 127:22, 128:7, 128:10, 128:23, 129:2, 129:5, 135:22, 137:1, 137:4, 137:20, 137:22, 137:24, 138:20, 138:21, 139:1, 139:4, 139:7, 139:14, 139:18, 139:24, 140:14, 141:9, 141:14, 143:22, 143:24, 144:2, 144:4, 144:9, 144:15, 145:7, 145:20, 145:23, 186:21, 187:3, 187:6, 187:8, 188:14, 188:15, 189:17, 190:9, 192:18, 198:23, 201:12, 201:13

**Network** [2] - 176:17, 177:2

**networking** [4] - 32:23, 33:7, 129:11, 147:20

**never** [47] - 7:22, 13:20, 14:19, 34:20, 37:19, 57:8, 59:5, 61:7, 61:20, 61:22, 61:23, 62:2, 66:23, 67:19, 67:25, 68:8, 68:9, 68:17, 71:5, 71:8, 76:3, 77:8, 80:5, 92:18, 113:11, 143:17, 143:20, 151:21, 169:23, 170:1, 170:21, 171:5, 171:17, 172:7, 172:8, 176:16, 189:7, 190:14, 195:9, 208:19, 212:3, 222:5, 222:17, 248:10, 248:11,
248:16

**new** [22] - 13:14, 20:3, 23:13, 23:21, 23:25, 98:2, 112:21, 118:5, 119:5, 128:24, 129:3, 130:5, 138:8, 162:10, 166:18, 176:5, 178:12, 178:18, 179:10, 180:2, 226:19, 244:20

**New** [15] - 19:5, 19:12, 29:25, 96:12, 118:6, 118:7, 120:19, 174:1, 174:25, 175:17, 175:24, 176:13, 179:4, 179:16, 186:16

**Newark** [4] - 118:6, 118:12, 186:17, 186:20

**newspaper** [6] - 95:17, 96:11, 96:24, 152:12, 152:20, 152:21

**next** [18] - 19:17, 20:13, 21:25, 98:12, 98:15, 102:11, 126:15, 160:21, 168:12, 168:19, 178:9, 178:10, 180:11, 185:7, 186:11, 187:25, 196:24, 217:19

**night** [1] - 15:16

**nightmares** [1] - 52:9

**nobody** [3] - 177:23, 182:23, 206:7

**nominal** [8] - 237:20, 237:22, 237:24, 243:13, 245:7, 245:21, 246:4, 246:6

**non** [5] - 5:12, 113:2, 179:25, 185:13, 191:22

**non-discrimination** [1] - 191:22

**non-party** [1] - 5:12

**non-technical** [3] - 113:2, 179:25, 185:13

**none** [10] - 9:11, 11:10, 140:11, 140:17, 141:17, 170:18, 207:1, 228:21, 228:23, 234:14

**noon** [1] - 97:25

**normal** [2] - 59:2, 183:14

**normally** [3] - 85:6, 237:19, 240:15

**northern** [1] - 174:24

**not..** [1] - 113:14

**note** [7] - 4:11, 4:14, 50:22, 148:9, 174:9, 232:21, 247:2

**notes** [4] - 50:23, 70:9, 162:9, 230:6

**nothing** [21] - 17:23, 20:5, 63:21, 71:20, 77:20, 78:1, 78:2, 78:16, 81:15, 87:6, 87:23, 111:24, 163:23, 169:16, 172:13, 206:25, 209:22, 210:18, 224:6, 235:13

**notice** [2] - 248:13, 249:3

**notified** [1] - 23:25

**notion** [1] - 230:13

**November** [9] - 105:12, 105:13, 117:6, 117:19, 132:16, 143:1, 212:12, 221:25

**nowhere** [1] - 163:11

**Number** [1] - 221:3

**number** [23] - 60:11, 60:12, 103:16, 103:18, 103:21, 106:11, 107:3, 108:3, 108:15, 109:4, 109:7, 109:10, 109:13, 112:15, 119:3, 128:3, 138:13, 138:24, 178:20, 201:15, 206:7, 216:16, 229:9

**NUMBER** [1] - 1:3

**numerical** [1] - 103:22

**numerous** [2] - 6:14, 19:18

**nurses** [1] - 176:23

---

## O

**oath** [8] - 90:17, 90:20, 95:23, 106:20, 146:11, 147:15, 207:19, 215:20

**object** [12] - 116:8, 125:16, 126:9, 155:17, 164:15, 200:24, 209:1, 214:20, 222:25, 237:19, 243:15,

252:11

**objecting** [1] - 201:1

**objection** [107] - 4:16, 6:9, 18:24, 18:25, 19:8, 20:7, 28:7, 28:13, 28:14, 31:13, 36:16, 36:23, 36:24, 37:4, 38:9, 40:13, 40:20, 41:7, 41:17, 41:18, 42:15, 42:21, 45:15, 45:16, 45:17, 49:10, 49:25, 50:4, 51:8, 51:23, 52:19, 52:24, 53:3, 53:5, 54:8, 54:9, 54:19, 54:20, 54:23, 57:4, 58:12, 58:15, 66:3, 69:6, 69:7, 69:11, 69:12, 69:18, 69:19, 74:2, 75:15, 76:17, 82:3, 82:11, 82:16, 86:25, 97:19, 110:8, 110:9, 110:12, 116:2, 118:21, 118:22, 120:11, 125:17, 125:21, 126:10, 136:12, 163:14, 185:2, 193:11, 194:20, 195:6, 195:19, 196:17, 196:25, 197:3, 197:14, 197:23, 198:10, 198:17, 199:4, 200:2, 200:3, 200:16, 200:23, 205:5, 211:2, 213:7, 213:10, 214:22, 214:25, 217:14, 217:16, 217:25, 218:1, 220:15, 220:16, 220:19, 221:10, 221:11, 223:1, 223:20, 224:19, 229:5

**Objection** [2] - 54:22, 55:8

**objections** [5] - 6:25, 201:3, 201:6, 252:6, 252:20

**objective** [2] - 22:8, 88:3

**objectives** [1] - 113:7

**obligation** [1] - 14:3

**observation** [1] - 54:21

**observations** [1] - 86:6

**observe** [3] - 186:4, 192:20, 194:10

**observed** [1] - 192:8

**obviously** [8] - 7:2, 89:21, 136:24, 137:16, 225:4, 242:12, 246:25, 247:16

**occur** [1] - 194:14

**occurred** [4] - 134:9, 139:25, 184:20, 189:1

**occurrence** [4] - 44:19, 82:13, 86:2, 86:10

**October** [2] - 23:2, 212:12

**OF** [1] - 1:1

**offer** [13] - 20:14, 30:1, 31:10, 31:17, 31:23, 31:24, 32:1, 32:13, 33:6, 39:6, 183:11, 236:15, 251:18

**offered** [7] - 31:20, 32:6, 61:12, 162:23, 249:20, 250:18, 250:21

**office** [26] - 119:19, 119:21, 119:25, 120:1, 120:6, 120:7, 122:5, 122:7, 128:16, 128:17, 131:24, 132:22, 133:8, 133:15, 134:11, 143:9, 176:14, 179:17, 181:2, 181:4, 181:7, 196:12, 199:10, 203:21, 204:1

**officer** [10] - 103:17, 106:12, 109:17, 112:18, 138:14, 184:25, 191:17, 191:20, 202:12, 205:23

**offices** [1] - 132:21

**Official** [1] - 1:22, 254:21

**offline** [1] - 190:2

**often** [2] - 35:14, 184:2

**Old** [1] - 128:18

**old** [10] - 25:11, 30:14, 30:16, 76:5, 120:8, 120:20, 176:5, 186:6, 186:9, 203:23

**older** [2] - 19:5, 53:17

**oldest** [1] - 120:9

**on-call** [1] - 189:22

**once** [15] - 17:13, 34:14, 46:22, 80:5, 86:8, 111:10,

118:15, 129:7, 131:24, 146:10, 157:7, 163:9, 168:23, 169:21, 192:23

**one** [146] - 6:11, 9:13, 13:22, 15:18, 16:24, 17:2, 17:11, 19:25, 20:15, 22:20, 26:18, 29:3, 32:11, 33:2, 35:4, 35:9, 35:11, 48:5, 50:15, 51:6, 54:6, 56:21, 57:3, 58:3, 58:4, 58:11, 59:15, 60:14, 61:20, 61:21, 62:1, 66:8, 67:19, 68:16, 71:18, 72:21, 75:13, 75:22, 77:15, 78:18, 81:8, 82:13, 85:5, 85:8, 86:2, 86:8, 86:10, 88:4, 92:19, 93:4, 94:18, 98:11, 101:13, 101:19, 112:3, 112:17, 113:7, 113:12, 114:24, 123:9, 131:5, 132:20, 136:16, 138:5, 138:6, 139:1, 139:11, 140:16, 140:20, 141:4, 141:11, 141:13, 141:14, 142:18, 142:25, 144:17, 146:8, 146:21, 147:2, 147:10, 153:5, 155:9, 155:10, 155:13, 155:15, 155:25, 158:5, 158:9, 158:12, 158:15, 164:2, 165:4, 165:10, 165:17, 166:8, 167:14, 167:21, 169:20, 170:2, 170:9, 170:15, 171:21, 173:25, 175:4, 175:5, 175:7, 175:15, 176:10, 177:5, 178:12, 178:19, 178:20, 180:14, 180:23, 182:3, 182:9, 184:7, 185:14, 186:24, 188:4, 188:5, 198:21, 203:18, 203:23, 226:21, 228:3, 228:12, 229:3, 229:18,

230:9, 230:24, 230:25, 232:2, 233:23, 234:4, 238:12, 240:2, 246:12, 246:16, 248:19, 253:12

**One** [3] - 182:18, 232:21, 246:11

**ones** [4] - 58:11, 67:9, 122:23, 227:6

**online** [5] - 176:22, 176:25, 177:16, 183:10, 190:11

**open** [16] - 4:1, 7:8, 17:20, 82:24, 110:4, 110:17, 110:20, 111:10, 156:13, 176:14, 183:3, 203:3, 217:23, 227:14, 231:21, 239:20

**open-source** [1] - 183:3

**opened** [8] - 6:17, 7:6, 110:18, 110:21, 110:22, 129:21, 179:16, 181:2

**opening** [3] - 7:11, 7:13

**openings** [1] - 7:17

**openly** [1] - 188:22

**opens** [1] - 11:5

**operate** [2] - 37:24, 38:1

**operating** [9] - 103:17, 106:12, 109:17, 112:18, 138:13, 175:20, 175:21, 184:25, 191:16

**operational** [2] - 21:15, 137:15

**operations** [7] - 19:16, 21:13, 113:4, 113:5, 191:20, 192:19, 205:23

**opinion** [5] - 186:6, 186:24, 227:8, 229:10, 247:25

**opinionated** [1] - 69:14

**opinions** [1] - 227:5

**opportunities** [2] - 55:17, 138:1

**Opportunity** [2] - 115:4, 223:24

**opportunity** [9] - 85:4, 98:1, 133:5, 160:19, 179:1, 184:6, 192:17, 194:10, 252:12

**opposed** [1] - 6:4

**opposite** [1] - 183:1

**ops** [1] - 162:9

**Option** [2] - 246:16, 246:17

**options** [1] - 246:15

**OR** [1] - 102:18

**Orajel** [1] - 236:3

**order** [27] - 6:21, 8:7, 8:9, 8:15, 8:16, 8:19, 8:21, 14:1, 14:2, 14:5, 16:25, 22:19, 68:20, 86:13, 89:9, 93:23, 95:8, 103:22, 109:21, 109:25, 148:16, 158:2, 165:1, 180:15, 180:17, 194:9, 199:1

**organizing** [1] - 39:4

**orientation** [6] - 35:20, 35:24, 40:3, 54:1, 61:25, 189:6

**origin** [1] - 8:9

**original** [2] - 120:3, 166:21

**originally** [1] - 97:16

**originating** [1] - 97:11

**orthodontist** [1] - 181:4

**OS** [1] - 175:21

**otherwise** [4] - 169:24, 192:20, 231:22, 242:25

**ought** [1] - 246:12

**ourselves** [2] - 22:9, 206:6

**outside** [7] - 5:13, 35:17, 40:11, 45:7, 102:13, 180:19, 206:5

**outstanding** [3] - 8:25, 9:2, 86:3

**overlap** [1] - 240:10

**overqualified** [1] - 33:3

**overrule** [1] - 252:19

**overruled** [50] - 19:9, 20:8, 28:14, 31:14, 37:5, 40:14, 40:21, 41:18, 42:16, 42:22, 49:11, 50:1, 50:5, 51:24, 52:20, 53:5, 54:9, 55:9, 57:5, 58:15, 69:12, 69:19, 75:16, 82:4, 87:1, 116:3, 118:22, 120:13, 126:10, 136:13, 163:15, 185:3, 193:12, 194:21, 195:7,

195:20, 196:18, 197:1, 197:4, 197:15, 197:25, 199:5, 205:6, 211:2, 211:14, 217:14, 218:1, 220:16, 221:11, 223:21

**overruling** [1] - 252:6

**oversight** [1] - 193:1

**owe** [1] - 241:17

**owed** [1] - 241:24

**Owen** [8] - 119:8, 119:13, 128:10, 139:4, 187:18, 188:2, 188:11, 247:10

**own** [14] - 37:25, 40:8, 49:14, 63:12, 165:23, 165:25, 182:8, 182:19, 182:20, 183:12, 183:13, 196:4, 199:19, 222:24

**owned** [1] - 182:9

**owners** [1] - 27:21

**P**

**P.C** [1] - 2:2

**p.m** [11] - 98:9, 102:4, 102:9, 161:13, 172:21, 173:7, 173:12, 227:22, 254:14

**PA** [3] - 1:11, 1:20, 2:5

**package** [2] - 114:2, 144:24

**pad** [1] - 50:22

**PAGE** [1] - 3:2

**page** [12] - 15:22, 26:25, 48:11, 51:15, 91:14, 91:19, 94:10, 146:20, 146:21, 160:19, 161:12, 244:19

**Page** [8] - 146:18, 160:15, 160:22, 161:13, 232:4, 233:7, 237:11, 238:24

**pages** [3] - 9:13, 34:14, 160:17

**pagination** [1] - 238:14

**paid** [9] - 32:8, 32:9, 86:9, 113:24, 114:3, 177:13, 180:8, 242:17

**paint** [1] - 10:6

**paired** [1] - 239:23

**palm** [1] - 247:12

**PALOCHKO** [1] - 3:3

**Palochko** [22] - 4:12, 7:21, 17:9, 18:9, 18:11, 18:16, 19:4, 48:14, 56:5, 81:25, 97:23, 105:1, 121:3, 131:6, 157:9, 163:21, 170:21, 183:23, 184:24, 199:17, 203:6, 222:20

**Palochko's** [1] - 121:8

**paper** [3] - 152:24, 153:5, 208:22

**papers** [1] - 246:19

**paragraph** [12] - 8:22, 8:23, 25:19, 26:9, 27:2, 27:15, 27:19, 28:1, 79:8, 221:18, 232:14, 238:24

**Paralegal** [1] - 2:12

**paramour's** [1] - 86:21

**parents** [1] - 19:5

**parrots** [1] - 224:1

**part** [34] - 17:15, 53:25, 55:12, 55:17, 55:18, 55:19, 56:12, 57:13, 59:11, 64:6, 74:22, 80:18, 81:1, 109:18, 112:1, 112:4, 114:2, 120:6, 120:7, 144:23, 148:13, 149:5, 156:8, 171:16, 180:5, 198:8, 198:14, 199:22, 199:23, 211:9, 232:12, 237:11, 242:9, 249:10

**participate** [2] - 185:16, 189:20

**participated** [1] - 193:10

**participating** [2] - 190:11, 190:17

**participation** [1] - 248:13

**particular** [2] - 26:22, 28:23

**parties** [3] - 10:3, 27:22, 220:7

**parties'** [1] - 15:25

**partner** [3] - 45:12, 96:18, 156:11

**parts** [1] - 17:21

**party** [4] - 5:12, 74:2, 97:11, 133:12

**party's** [1] - 77:23

**pass** [1] - 181:23

**passed** [1] - 176:9
**past** [3] - 40:24, 44:23, 156:13
**paste** [1] - 163:10
**pasted** [8] - 160:10, 160:12, 160:13, 160:14, 160:25, 161:5, 161:9, 161:17
**pasting** [1] - 160:6
**path** [5] - 189:9, 250:10, 251:10, 251:11
**paths** [1] - 250:9
**pattern** [5] - 16:7, 44:22, 229:24, 234:10, 235:4
**pause** [2] - 245:25, 250:25
**pay** [5] - 86:7, 86:13, 114:21, 181:1, 182:22
**Paychex** [4] - 19:18, 19:20, 19:25, 184:1
**paying** [1] - 177:18
**payment** [2] - 86:12, 177:14
**payments** [1] - 86:11
**payroll** [5] - 19:18, 19:19, 20:1, 113:2, 184:1
**PC** [2] - 176:5
**pedigree** [1] - 32:22
**pedophile** [9] - 150:21, 150:23, 150:25, 151:2, 151:4, 151:6, 151:17, 151:24, 152:6
**pedophilia** [2] - 79:23, 151:11
**peering** [3] - 137:3, 137:8, 137:9
**peers** [2] - 33:13, 33:16
**PEET** [1] - 2:3
**Peet** [2] - 219:15, 220:11
**pen** [1] - 50:22
**penalty** [2] - 73:7, 75:8
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania** [4] - 1:13, 142:6, 143:7, 143:18
**people** [52] - 24:21, 24:24, 25:4, 25:7, 30:1, 58:10, 64:9, 64:13, 64:18, 64:23, 68:19, 70:20, 76:21,

76:22, 76:23, 104:6, 108:11, 117:3, 117:22, 123:19, 123:22, 124:25, 125:8, 128:3, 128:7, 129:11, 134:1, 145:4, 147:13, 148:16, 170:12, 170:23, 171:10, 172:10, 175:13, 181:13, 183:21, 185:23, 187:2, 189:18, 201:14, 201:15, 205:22, 206:3, 211:22, 219:1, 220:9, 248:16, 248:19, 248:21, 248:22, 249:20
**people's** [1] - 219:15
**per** [1] - 178:13
**percent** [14] - 7:1, 46:21, 99:11, 145:3, 145:8, 154:4, 155:9, 156:22, 159:3, 162:15, 181:3, 181:6, 181:8, 182:9
**perfect** [1] - 188:8
**perfectly** [1] - 84:6
**perform** [2] - 32:15, 199:3
**performance** [27] - 21:22, 33:11, 37:2, 64:4, 65:2, 148:12, 148:13, 148:17, 148:19, 148:20, 148:24, 149:8, 149:9, 149:12, 149:13, 149:14, 149:16, 149:17, 149:24, 150:1, 150:2, 150:5, 150:8, 159:19, 183:9, 198:23, 199:1
**performant** [1] - 183:2
**period** [12] - 39:22, 39:25, 41:23, 105:25, 107:4, 109:1, 119:9, 119:23, 120:2, 122:25, 134:18, 144:11
**perjury** [2] - 73:7, 75:9
**permission** [1] - 5:14
**permitted** [2] - 47:8, 225:3
**person** [47] - 5:12, 25:3, 26:5, 29:10, 30:7, 31:4, 31:6, 31:7, 32:8, 32:9,

36:12, 43:10, 46:20, 46:21, 59:3, 60:13, 60:14, 61:9, 67:12, 68:18, 71:11, 76:23, 101:19, 103:16, 120:9, 122:17, 123:12, 131:19, 131:21, 140:4, 145:10, 145:11, 145:12, 145:16, 151:21, 167:12, 167:18, 167:23, 178:16, 179:23, 184:9, 184:16, 186:1, 188:3, 211:7, 217:3, 249:24
**person's** [1] - 31:1
**personal** [5] - 25:2, 65:4, 65:7, 162:7, 162:22
**personality** [2] - 46:5, 46:7
**personally** [4] - 24:18, 77:17, 186:4, 206:9
**perspective** [3] - 7:17, 25:11, 129:5
**Peter** [2] - 9:9, 97:6
**Philadelphia** [6] - 1:13, 1:20, 2:5, 128:18, 152:23, 181:15
**phone** [11] - 24:4, 30:21, 30:25, 31:5, 56:11, 57:2, 57:8, 57:9, 57:11, 57:12, 57:13
**PHR** [2] - 121:22, 121:25
**PHRC** [1] - 204:13
**pick** [3] - 67:9, 68:14, 70:21
**picking** [1] - 17:17
**picture** [1] - 10:6
**pictures** [2] - 151:14, 209:16
**piece** [5] - 16:5, 17:14, 181:5, 182:8, 238:15
**pieces** [1] - 180:1
**pin** [5] - 134:18, 250:2, 251:5, 252:21, 253:7
**pioneers** [1] - 182:3
**Piscataway** [2] - 19:5, 19:6
**place** [18] - 20:9, 22:3, 55:11, 55:18, 55:23, 81:8, 130:14, 130:18, 130:25, 131:2, 149:2, 175:15, 177:11, 180:15, 180:16,

190:24, 197:11, 202:8
**placed** [1] - 163:3
**places** [1] - 188:5
**plaintiff** [6] - 16:25, 17:4, 17:13, 221:5, 249:22, 250:21
**Plaintiff** [2] - 1:4, 1:20
**plaintiff's** [7] - 17:4, 116:25, 195:4, 221:13, 221:22, 237:25, 249:19
**plan** [9] - 98:3, 100:5, 100:6, 100:9, 180:7, 181:16, 225:23, 226:25
**planet** [5] - 65:9, 110:5, 110:7, 110:11, 163:11
**planning** [2] - 5:24, 50:18
**plans** [2] - 86:12, 176:13
**play** [4] - 193:25, 229:6, 239:22, 247:2
**played** [2] - 44:13, 164:12
**playing** [1] - 240:24
**plea** [1] - 101:16
**plenty** [2] - 14:17, 168:7
**PLLC** [1] - 1:18
**plugged** [1] - 176:10
**plural** [2] - 234:20
**plus** [1] - 110:16
**podium** [1] - 91:13
**point** [52] - 5:4, 8:5, 14:15, 14:16, 15:6, 24:17, 49:1, 51:4, 60:16, 71:18, 72:19, 88:14, 108:4, 112:23, 124:9, 126:19, 126:22, 127:11, 143:21, 152:18, 156:8, 156:17, 175:3, 182:13, 185:17, 187:6, 187:15, 189:11, 192:11, 192:17, 192:24, 198:9, 198:15, 198:22, 199:17, 201:22, 203:17, 205:12, 205:20, 211:11, 217:7, 217:15, 225:24, 236:15, 238:12, 239:16, 240:25, 241:12, 249:10, 251:24

**pointed** [1] - 97:7
**points** [2] - 25:18, 198:24
**policies** [8] - 28:16, 49:15, 55:22, 55:23, 190:23, 191:18, 221:14, 221:16
**policy** [58] - 22:6, 24:2, 24:7, 25:24, 26:1, 26:4, 26:15, 26:23, 28:5, 28:19, 36:9, 36:10, 36:14, 37:2, 37:6, 37:10, 44:11, 44:22, 45:2, 46:14, 50:10, 53:20, 56:16, 57:20, 57:23, 71:19, 72:4, 72:12, 72:24, 75:21, 130:13, 130:18, 130:25, 131:1, 140:8, 150:5, 150:7, 157:14, 157:16, 157:18, 157:22, 158:4, 161:23, 162:1, 162:18, 162:24, 163:7, 165:5, 166:6, 191:11, 191:14, 191:23, 192:4, 194:7, 194:11, 194:15, 202:13, 221:19
**pool** [1] - 147:12
**popped** [1] - 203:22
**populations** [1] - 30:1
**porn** [3] - 150:24, 152:5, 156:13
**pornographic** [2] - 151:14, 209:16
**pornography** [2] - 40:25, 86:22
**portal** [1] - 23:19
**portions** [1] - 99:3
**poses** [1] - 246:24
**position** [62] - 19:17, 20:10, 25:1, 25:3, 25:5, 25:8, 29:15, 29:16, 30:22, 32:21, 33:5, 33:13, 37:25, 46:18, 63:15, 65:20, 67:3, 86:11, 105:9, 112:18, 121:13, 129:21, 129:23, 131:19, 131:23, 131:25, 132:1, 132:3, 132:12, 132:16, 132:25, 133:11, 133:20, 136:16, 138:8, 139:5, 139:6, 139:8,

139:14, 139:20, 140:16, 141:8, 141:9, 141:12, 143:6, 143:23, 144:1, 144:3, 144:9, 145:17, 145:22, 147:12, 147:17, 188:13, 196:21, 216:12, 223:19, 223:23, 224:1, 225:7, 225:16, 230:13

**positions** [11] - 30:4, 103:23, 139:19, 139:25, 140:12, 140:13, 140:15, 140:22, 140:23, 148:2

**Positions** [1] - 148:2

**positive** [1] - 35:15

**possible** [12] - 38:2, 55:11, 55:24, 98:22, 107:9, 107:10, 107:11, 107:12, 109:19, 109:21, 137:4, 175:4

**possibly** [3] - 56:13, 72:15, 92:18

**post** [9] - 14:18, 66:9, 66:10, 69:14, 69:24, 70:2, 140:21, 140:23, 140:25

**posted** [18] - 29:16, 65:17, 66:1, 66:16, 66:17, 129:23, 129:24, 130:1, 130:2, 130:3, 140:12, 140:17, 140:20, 141:2, 141:4, 141:6, 141:17, 141:19

**posting** [4] - 65:14, 66:1, 66:6, 66:13

**postings** [1] - 66:12

**potential** [4] - 42:9, 43:8, 248:13, 249:24

**potentially** [4] - 18:3, 46:7, 187:23, 198:6

**power** [1] - 176:9

**practice** [10] - 8:3, 11:7, 11:12, 21:17, 25:2, 47:21, 52:3, 70:24, 77:1, 86:4

**practices** [1] - 24:17

**practicing** [1] - 59:1

**praise** [1] - 35:1

**prefer** [2] - 194:9, 239:20

**preference** [2] - 225:24, 237:25

**prejudicial** [2] - 84:11, 209:22

**preliminary** [1] - 229:16

**premature** [1] - 41:9

**prepared** [1] - 225:11

**preparing** [1] - 50:23

**PRESENT** [1] - 2:10

**present** [2] - 45:1, 118:16

**presentation** [3] - 225:14, 225:15, 227:16

**presented** [2] - 61:12, 184:6

**presenting** [1] - 246:14

**presents** [2] - 16:25, 17:1

**preserve** [1] - 162:10

**preserved** [1] - 16:5

**president** [3] - 104:17, 136:19, 136:20

**President** [1] - 36:22

**presumably** [1] - 6:1

**pretext** [3] - 216:11, 222:2, 245:17

**pretrial** [3] - 10:4, 246:15, 248:9

**pretty** [25] - 23:10, 25:7, 31:19, 31:23, 32:24, 34:19, 43:10, 49:8, 59:2, 79:25, 84:11, 105:19, 109:2, 112:20, 151:14, 151:16, 167:2, 167:4, 167:20, 175:2, 175:12, 179:1, 182:17, 225:16, 253:4

**prevail** [2] - 232:22, 233:8

**prevents** [1] - 26:5, 252:17

**preview** [1] - 252:20

**previous** [3] - 111:7, 195:18, 199:23

**previously** [6] - 34:1, 47:14, 191:4, 202:25, 203:14, 204:11

**primary** [7] - 46:18, 47:25, 48:3, 59:12, 121:10, 123:7, 123:9

**print** [1] - 23:22

**privileged** [1] - 9:11

**pro** [1] - 233:15

**problem** [10] - 7:22, 11:5, 58:6, 58:7,

70:17, 162:17, 162:18, 208:19, 229:21, 253:4

**problematic** [1] - 190:16

**problems** [3] - 5:16, 156:13, 179:21

**procedure** [1] - 24:7

**proceeded** [1] - 199:15

**proceeding** [1] - 239:17

**PROCEEDINGS** [1] - 4:1

**proceedings** [1] - 254:19

**Proceedings** [1] - 1:23

**process** [21] - 24:13, 30:18, 31:16, 39:1, 64:5, 74:19, 74:25, 75:4, 115:6, 130:6, 148:14, 148:21, 149:24, 150:1, 150:2, 193:8, 193:10, 219:25, 220:3, 220:6, 243:25

**processes** [2] - 22:2, 22:4

**processing** [2] - 19:19, 20:1

**produce** [3] - 8:24, 8:25, 14:17

**produced** [2] - 1:24, 10:7

**product** [2] - 183:11, 183:15

**profession** [1] - 59:1

**Professional** [1] - 158:9

**professional** [4] - 58:25, 158:6, 158:12, 158:15

**professionally** [1] - 64:23

**professor** [1] - 59:18

**professors** [1] - 175:8

**proffered** [1] - 10:3

**proficient** [1] - 65:8

**profit** [4] - 168:18, 168:19, 236:17, 236:25

**profit-sharing** [2] - 168:18, 168:19

**programmed** [1] - 178:1

**programmer** [1] - 179:12

**programs** [3] - 55:18, 55:23, 123:3

**progressive** [5] - 75:21, 75:22, 75:24, 76:2, 76:3

**prohibited** [1] - 27:21

**prohibition** [1] - 27:16

**project** [2] - 177:3, 177:18

**projects** [1] - 163:1

**promise** [1] - 79:20

**promote** [3] - 130:11, 136:17, 205:9

**promoted** [17] - 127:18, 127:21, 129:20, 132:24, 133:4, 133:6, 133:20, 134:22, 135:19, 135:24, 136:9, 136:10, 138:20, 139:4, 139:7, 139:13, 205:4

**promotes** [1] - 136:16

**promoting** [1] - 191:25

**promotion** [9] - 129:15, 130:19, 133:23, 133:24, 136:3, 138:5, 140:9, 143:13, 190:24

**promotional** [1] - 131:1

**promotions** [4] - 130:14, 131:13, 131:16, 139:25

**promptly** [1] - 27:24, 172:18

**proof** [2] - 228:19, 228:20

**proper** [5] - 9:25, 10:8, 220:14, 252:9, 253:10

**properly** [1] - 250:4

**proposing** [1] - 229:25

**propound** [1] - 213:5

**protect** [1] - 200:13

**protected** [2] - 115:20, 235:20

**protocol** [2] - 13:19, 131:2

**provide** [1] - 203:2

**provided** [3] - 53:19, 147:15, 221:9

**provider** [1] - 118:7

**providers** [2] - 111:24, 198:25

**providing** [7] - 46:9, 198:9, 198:15, 198:22, 202:23, 205:19, 216:24

**provoke** [1] - 45:7

**proximate** [1] - 233:13

**proximity** [1] - 197:19

**psychology** [1] - 174:3

**PTO** [2] - 161:25, 162:5

**public** [8] - 42:25, 43:5, 69:5, 82:7, 129:7, 129:9, 150:20, 210:8

**publication** [1] - 200:10

**publicly** [4] - 65:19, 129:23, 129:24, 130:3

**publish** [2] - 41:16, 135:2

**published** [5] - 40:22, 45:12, 70:2, 78:11, 199:2

**pull** [9] - 22:18, 22:19, 25:19, 26:17, 33:25, 78:12, 204:10, 228:1, 228:2

**pulled** [1] - 176:9

**punched** [1] - 172:7

**punitive** [8] - 238:15, 238:18, 238:20, 239:3, 239:6, 239:9, 239:14, 240:8

**punitives** [4] - 238:7, 241:5, 244:13, 244:15

**purchase** [3] - 95:8, 114:4, 114:5

**purchased** [2] - 86:13, 113:15

**purchasing** [5] - 37:18, 113:1, 165:6, 174:4, 174:6

**purely** [1] - 249:9

**purpose** [1] - 202:22

**purposely** [2] - 206:5, 206:6

**purposes** [1] - 21:21

**pursue** [1] - 195:10

**pursued** [2] - 176:17, 195:12

**push** [1] - 227:1

**put** [35] - 5:2, 5:14, 7:4, 16:13, 17:10, 31:6, 37:20, 41:7, 48:24, 55:21, 78:9, 135:1, 142:1, 142:14, 142:20, 143:25, 144:4, 145:22, 162:25, 176:3, 176:6, 177:5, 178:2, 182:20, 182:21, 211:23,

213:14, 241:3,
245:5, 248:3,
248:10, 248:21,
250:2, 251:2, 253:7
**putting** [10] - 55:18,
64:10, 132:4, 172:3,
183:10, 186:18,
225:13, 247:21,
251:5, 252:21

**Q**

**quadrupled** [1] -
109:6
**qualifications** [2] -
30:22, 61:13
**qualified** [2] - 25:3,
131:21
**quarter** [1] - 101:11
**QUESTION** [13] -
91:23, 92:1, 92:4,
92:9, 92:11, 92:13,
92:15, 92:20, 94:24,
95:6, 95:11, 95:14,
96:22
**question-and-**
**answer** [1] - 99:18
**questionable** [1] -
195:1
**questioning** [4] -
56:11, 56:14, 58:4,
58:10
**questionnaire** [1] -
204:14
**questions** [40] - 11:15,
11:16, 11:22, 11:24,
22:16, 25:23, 27:3,
27:4, 48:9, 71:24,
81:20, 84:13, 84:14,
85:13, 90:13, 90:15,
91:22, 97:21, 99:20,
106:17, 106:20,
146:12, 147:5,
172:15, 183:18,
201:17, 202:4,
203:6, 209:4,
218:13, 220:7,
220:10, 224:4,
240:5, 240:6, 240:7,
240:19, 240:21,
252:16
**quick** [8] - 6:12, 26:1,
40:18, 48:9, 175:2,
184:4, 207:4, 254:1
**quickly** [7] - 34:19,
78:8, 114:14, 165:8,
225:17, 228:18,
244:12
**quiet** [2] - 208:20,
208:21
**quit** [1] - 177:21

**quite** [7] - 34:20,
34:25, 44:18, 49:6,
56:2, 107:10, 249:17
**quote** [1] - 7:18
**quoting** [1] - 208:22

**R**

**race** [1] - 163:12
**races** [1] - 179:7
**radius** [1] - 5:13
**raincoat** [1] - 229:4
**raise** [14] - 6:11, 15:8,
26:10, 27:7, 35:19,
35:23, 36:2, 54:3,
71:3, 102:17,
144:14, 148:14,
149:6, 237:18
**raised** [3] - 39:25,
97:7, 251:12
**raises** [3] - 148:16,
149:7, 236:14
**Rambo** [2] - 128:1,
128:8
**ran** [2] - 176:2, 186:21
**range** [3] - 106:14,
106:15, 247:24
**rate** [1] - 183:12
**rather** [1] - 98:2
**re** [1] - 198:19
**re-ask** [1] - 198:19
**reach** [8] - 52:4,
153:12, 177:24,
201:18, 201:20,
201:24, 202:3
**reached** [2] - 187:21,
253:24
**reaching** [1] - 51:21
**react** [3] - 45:8, 46:11,
197:8
**reacting** [1] - 46:6
**reaction** [3] - 29:22,
30:9, 42:6
**read** [21] - 26:8, 26:25,
27:15, 87:20, 91:21,
93:10, 97:1, 99:4,
99:13, 99:15, 147:4,
147:14, 154:2,
156:9, 160:18,
169:5, 197:19,
207:14, 210:15,
211:18, 228:10
**reading** [7] - 8:22,
15:18, 96:10, 101:1,
147:4, 154:23, 233:9
**ready** [5] - 20:12,
91:16, 172:18,
178:22, 230:5
**real** [13] - 40:18,
56:15, 80:6, 80:7,

89:24, 171:3, 178:9,
178:13, 178:14,
207:4, 209:23,
210:13, 253:15
**real-time** [2] - 56:15,
89:24
**realize** [1] - 182:11
**realized** [3] - 72:24,
75:20, 83:11
**really** [29] - 6:11, 7:8,
17:3, 18:1, 22:5,
26:1, 30:6, 30:11,
99:23, 101:5,
157:21, 168:3,
168:16, 176:3,
176:16, 176:19,
177:23, 178:3,
179:18, 208:9,
222:15, 230:5,
231:11, 235:5,
241:15, 246:14,
246:17, 253:4,
253:16
**reason** [44] - 8:16,
36:4, 37:21, 44:25,
53:21, 56:24, 57:21,
72:23, 75:19, 81:25,
82:5, 85:24, 86:15,
86:18, 114:25,
133:19, 157:10,
158:7, 158:24,
159:3, 162:15,
164:4, 164:5, 164:6,
166:19, 166:22,
171:3, 171:11,
171:13, 171:25,
172:4, 180:5,
184:25, 189:12,
192:3, 203:1, 205:3,
208:1, 208:2,
212:17, 222:15,
234:4, 245:13,
251:18
**reasonable** [3] -
86:24, 87:5, 211:5
**reasoning** [1] - 47:24
**reasons** [17] - 46:25,
158:19, 158:25,
159:12, 186:24,
195:1, 200:5,
202:24, 203:4,
206:21, 207:4,
221:20, 222:18,
222:19, 226:21,
240:2
**rebut** [4] - 247:17,
247:25, 249:19,
250:20
**rebuttal** [6] - 226:3,
247:16, 247:24,

248:3, 249:9, 251:7
**receipt** [1] - 24:10
**receipts** [1] - 194:25
**receive** [6] - 69:1,
86:12, 134:2,
144:22, 149:6,
171:23
**received** [12] - 41:19,
68:17, 71:8, 72:2,
113:23, 114:1,
114:7, 114:8, 144:6,
144:13, 147:16,
189:5
**RECEIVED** [2] - 3:10,
41:20
**receiving** [3] - 14:7,
14:8, 148:21
**recess** [2] - 102:4,
173:7
**recipient** [1] - 86:10
**recognize** [11] - 34:3,
47:16, 154:19,
155:3, 155:7,
159:23, 160:23,
191:6, 192:6, 193:6,
219:15
**recollection** [5] -
53:24, 142:10,
142:16, 185:18,
213:24
**recommended** [1] -
188:9
**record** [13] - 7:4,
13:19, 16:13, 41:6,
66:15, 71:10, 93:1,
93:16, 102:21,
103:6, 223:7,
230:14, 254:19
**recorded** [5] - 1:23,
138:18, 202:15,
202:16, 203:1
**recording** [6] - 44:10,
47:9, 47:11, 164:12,
246:24, 247:1
**recordkeeping** [1] -
21:21
**records** [8] - 77:1,
82:6, 88:9, 88:13,
92:16, 92:18, 93:6,
93:14
**recross** [4] - 4:20,
83:9, 84:23, 85:7
**RECROSS** [4] - 3:5,
3:8, 81:23, 206:15
**RECROSS-**
**EXAMINATION** [4] -
3:5, 3:8, 81:23,
206:15
**recruited** [1] - 105:14
**recruiting** [5] - 63:13,

140:24, 141:1,
181:11, 185:14
**recruitment** [1] - 39:3
**recurring** [1] - 177:1
**redesign** [1] - 187:8
**REDIRECT** [4] - 3:4,
3:5, 56:8, 87:7
**redirect** [3] - 4:20,
81:21, 85:8
**redirected** [1] - 188:7
**refer** [1] - 196:2
**reference** [2] - 76:25,
242:20
**references** [1] - 246:5
**referencing** [5] -
56:16, 162:14,
162:16, 162:21
**referred** [1] - 138:11
**referring** [3] - 15:17,
35:10, 41:14
**refresh** [2] - 142:9,
142:16
**refreshing** [3] -
146:23, 146:24,
213:24
**regarding** [5] - 40:3,
70:9, 137:8, 148:12,
210:17
**regular** [1] - 176:15
**regularly** [1] - 34:25
**reimbursed** [1] - 166:1
**reimbursement** [4] -
165:20, 165:22,
166:2, 166:5
**reimbursements** [1] -
165:6
**reiterate** [2] - 17:22,
100:4
**related** [7] - 33:18,
35:2, 35:14, 53:22,
162:8, 202:1, 221:15
**relating** [1] - 35:20
**Relations** [3] - 142:7,
143:7, 143:18
**relations** [2] - 129:7,
129:9
**relationship** [15] -
20:12, 34:23, 35:12,
82:2, 83:21, 84:2,
87:23, 88:1, 88:7,
88:9, 95:3, 95:9,
95:15, 96:20, 199:24
**relationships** [1] -
198:15
**relatively** [6] - 24:4,
34:18, 37:14, 37:20,
38:5, 86:3
**relatives** [1] - 175:4
**relaxed** [1] - 208:20
**relevance** [2] - 19:8,

50:4
**relevant** [6] - 20:10, 193:20, 193:23, 218:5, 249:18, 249:21
**relief** [1] - 48:25
**relieved** [1] - 49:1
**relocate** [2] - 181:13, 181:15
**rely** [3] - 10:2, 21:25, 248:25
**remainder** [1] - 38:22
**remained** [1] - 32:9
**remember** [86] - 12:19, 12:24, 12:25, 13:13, 20:17, 23:12, 25:22, 29:13, 29:18, 29:22, 29:23, 32:20, 33:13, 34:17, 39:14, 39:15, 41:24, 41:25, 49:19, 50:25, 59:15, 59:19, 60:17, 71:25, 76:11, 76:12, 76:14, 76:15, 76:18, 77:2, 77:25, 87:15, 87:17, 97:13, 104:17, 104:19, 107:7, 108:9, 116:6, 117:2, 119:20, 122:3, 122:5, 122:6, 124:14, 128:6, 129:14, 138:15, 139:3, 139:6, 139:13, 141:24, 142:2, 142:4, 142:7, 144:11, 144:13, 146:6, 149:9, 149:11, 149:13, 149:22, 149:24, 150:1, 150:2, 150:14, 150:17, 164:2, 164:12, 164:14, 166:11, 166:17, 171:1, 184:12, 187:15, 188:2, 188:13, 190:22, 194:13, 201:25, 202:1, 211:20, 215:19, 215:24, 216:25, 233:2
**remind** [2] - 134:22, 227:3
**reminder** [1] - 228:3
**remiss** [1] - 4:11
**remitter** [1] - 94:18
**remotely** [3] - 179:15, 247:7, 251:18
**remove** [3] - 40:16, 43:20, 44:17

**rent** [3] - 177:13, 177:19, 182:22
**repaired** [1] - 176:9
**repeat** [3] - 129:1, 155:23, 192:21
**repeatedly** [1] - 221:14
**repetition** [1] - 240:23
**rephrase** [2] - 28:8, 200:17
**report** [7] - 7:20, 38:21, 62:2, 67:2, 103:24, 104:1, 105:6
**reported** [18] - 9:7, 38:17, 38:18, 38:21, 62:4, 66:24, 67:13, 68:3, 71:1, 104:3, 104:6, 104:13, 104:24, 105:4, 119:16, 119:17, 144:7, 144:8
**REPORTER** [2] - 101:15, 253:20
**Reporter** [2] - 1:22, 254:21
**reporter** [2] - 139:21, 146:6
**reporting** [6] - 21:2, 37:13, 38:17, 70:21, 187:13, 187:16
**reports** [9] - 26:10, 27:7, 61:23, 61:24, 61:25, 67:7, 67:24, 69:25, 70:15
**represent** [2] - 13:7, 143:6
**representation** [1] - 18:5
**representations** [4] - 13:10, 13:17, 17:17, 214:5
**representative** [3] - 74:9, 74:12, 74:13
**represented** [6] - 74:18, 75:3, 75:9, 116:15, 198:25, 219:1
**representing** [1] - 219:20
**reprisal** [2] - 26:11, 27:8
**reps** [1] - 198:25
**republished** [1] - 23:13
**reputation** [3] - 55:4, 197:24, 198:2
**reputational** [1] - 43:7
**request** [2] - 166:2, 166:7
**requested** [2] -

133:13, 162:5
**requesting** [1] - 166:5
**require** [1] - 44:3
**required** [4] - 24:10, 140:8, 191:17, 191:22
**requirements** [3] - 32:21, 131:2, 181:24
**resided** [1] - 93:13
**resolve** [5] - 13:22, 13:25, 190:8, 253:8
**resolving** [3] - 13:23, 14:13, 14:20
**resource** [5] - 58:19, 61:10, 121:10, 122:12, 163:6
**resources** [31] - 20:20, 20:23, 21:1, 21:6, 21:17, 23:18, 24:24, 27:7, 29:3, 39:24, 44:1, 46:19, 46:24, 58:24, 59:4, 59:5, 59:8, 59:10, 59:12, 59:13, 59:19, 59:22, 60:14, 61:8, 62:9, 76:23, 121:9, 131:10, 148:6, 221:15, 221:21
**resources'** [1] - 82:6
**respect** [17] - 4:9, 30:19, 32:6, 36:8, 39:24, 40:2, 43:16, 44:6, 45:21, 47:22, 133:12, 168:8, 194:8, 194:12, 199:10, 241:1, 245:7
**respective** [1] - 4:19
**respects** [1] - 240:18
**respond** [11] - 67:9, 68:15, 68:16, 68:20, 68:22, 69:2, 69:25, 70:22, 138:12, 179:11, 184:4
**responded** [7] - 66:21, 70:5, 84:1, 90:15, 90:17, 116:17, 183:18
**responding** [2] - 201:16, 220:10
**response** [3] - 8:8, 8:16, 217:15
**responses** [2] - 213:5, 217:2
**responsibilities** [5] - 29:4, 39:3, 39:4, 112:17, 138:10
**responsibility** [2] - 141:3, 192:8
**responsible** [13] - 20:22, 22:11, 33:1,

63:13, 64:3, 111:12, 112:21, 128:24, 129:2, 129:6, 137:9, 137:21, 185:13
**responsive** [1] - 31:25
**rest** [4] - 99:11, 154:23, 174:8, 175:25
**restate** [3] - 130:17, 172:2, 200:7
**restaurant** [3] - 18:1, 19:17
**rested** [2] - 17:4, 225:15
**rests** [1] - 248:3
**result** [4] - 37:9, 195:4, 195:24, 198:15
**results** [1] - 198:7
**resume** [11] - 29:18, 29:19, 29:20, 29:22, 30:3, 30:6, 61:12, 101:25, 185:22, 189:16, 226:19
**resumes** [2] - 29:6, 39:5
**retained** [4] - 73:15, 73:19, 73:23, 74:5
**retaliating** [1] - 26:5
**retaliation** [12] - 25:24, 26:1, 26:15, 26:23, 27:12, 27:17, 27:24, 28:2, 199:23, 232:8, 232:17, 235:14
**retaliatory** [1] - 27:20
**retention** [1] - 242:10
**retire** [1] - 103:10
**retired** [2] - 103:9, 114:10
**retirement** [2] - 86:12, 180:7
**retirements** [1] - 63:14
**return** [1] - 239:7
**revenue** [1] - 108:18
**reversible** [1] - 217:8
**review** [14] - 29:20, 64:5, 148:19, 148:20, 149:2, 149:3, 149:10, 149:13, 149:16, 149:24, 150:1, 150:2, 159:19, 217:2
**reviewed** [2] - 70:9, 163:3
**reviewing** [2] - 29:6, 39:5
**reviews** [13] - 21:22, 65:2, 148:13, 148:17, 148:24,

149:4, 149:8, 149:12, 149:15, 149:18, 150:5, 150:8
**revision** [1] - 23:25
**revolved** [1] - 21:12
**Rich** [7] - 71:10, 104:15, 104:19, 104:24, 122:15, 194:19, 194:24
**Richard** [6] - 36:15, 36:21, 37:1, 37:11, 105:8, 195:3
**rid** [3] - 69:3, 168:1
**rise** [11] - 4:3, 16:17, 98:8, 102:3, 102:5, 102:8, 172:20, 173:8, 173:11, 227:21, 254:13
**risk** [9] - 43:7, 43:10, 50:14, 50:15, 197:20, 197:21, 197:22
**risks** [1] - 33:2
**risky** [1] - 45:4
**Ritchey** [1] - 128:9
**road** [1] - 174:20
**Roberts** [1] - 2:13
**robust** [2] - 137:19, 137:22
**role** [7] - 44:1, 47:2, 61:11, 184:16, 193:25, 205:10, 205:22
**roles** [1] - 32:5
**roll** [1] - 136:20
**Roman** [1] - 237:11
**room** [7] - 46:20, 58:6, 119:21, 120:1, 120:5, 120:8, 120:19
**roommates** [6] - 91:24, 92:2, 92:5, 92:7, 92:10, 92:16
**root** [1] - 69:2
**rotation** [1] - 189:22
**round** [1] - 174:20
**round-country** [1] - 174:20
**rounds** [1] - 30:20
**route** [2] - 174:23, 174:24
**RPR** [1] - 254:21
**Rule** [3] - 234:22, 246:9, 249:15
**rule** [3] - 252:25, 253:2, 253:3
**ruled** [4] - 218:1, 218:7, 218:8, 218:12
**rules** [2] - 148:23, 253:3
**ruling** [7] - 10:18,

*10:19, 15:11, 15:14, 16:12, 99:12, 217:6*
**run** [12] - 9:20, 9:23, 10:21, 13:20, 37:25, 58:24, 76:23, 109:18, 175:10, 206:6, 234:4, 234:5
**running** [3] - 17:15, 21:13, 189:19
**runs** [1] - 175:21
**Rutgers** [1] - 174:1

## S

**S:(Cont'd** [1] - 2:1
**sad** [2] - 53:2, 53:7
**safe** [4] - 75:6, 75:7, 88:2, 88:5
**safety** [22] - 45:9, 45:21, 46:1, 200:12, 207:5, 207:6, 207:9, 207:12, 207:14, 207:16, 208:19, 210:8, 210:10, 210:12, 210:17, 210:22, 211:5, 211:12, 211:18, 212:6, 212:22
**Sail** [1] - 175:6
**salaries** [1] - 113:24
**salary** [6] - 144:14, 144:23, 147:18, 147:21, 148:21, 172:9
**sale** [5] - 182:7, 193:8, 193:20, 193:23, 194:1
**sales** [2] - 123:24, 198:25
**San** [2] - 174:24, 175:25
**Sanchez's** [1] - 99:22
**sanctions** [2] - 10:1, 14:4
**sat** [5] - 4:17, 58:5, 81:15, 81:16, 159:12
**satisfaction** [1] - 34:20
**satisfactorily** [1] - 32:4
**satisfied** [1] - 253:2
**saved** [2] - 38:3, 177:17
**savings** [2] - 177:17, 180:10
**saw** [36] - 16:2, 20:2, 20:3, 30:3, 37:12, 37:14, 41:3, 43:9, 44:25, 45:20, 48:8, 50:21, 51:13, 52:3,

*73:6, 77:20, 78:1, 80:5, 81:11, 83:10, 83:15, 86:15, 87:18, 89:21, 96:1, 96:4, 140:16, 141:8, 153:13, 170:10, 171:5, 180:25, 201:21, 208:21, 208:22*
**Scalia** [2] - 234:1, 234:3
**scam** [1] - 80:7
**scammed** [1] - 210:14
**scared** [3] - 44:18, 44:20, 196:23
**scary** [5] - 49:5, 52:11, 167:2, 179:1, 180:6
**scenario** [1] - 190:12
**scenes** [1] - 126:2
**scheduled** [1] - 162:4
**scheduling** [2] - 29:6, 224:14
**School** [1] - 19:6
**school** [10] - 19:7, 19:10, 59:10, 59:11, 59:21, 173:25, 174:1, 174:21, 174:22, 176:16
**science** [1] - 19:13
**scope** [2] - 28:17, 253:10
**screen** [10] - 22:22, 30:21, 34:3, 41:12, 45:20, 63:16, 96:7, 156:6, 160:2, 213:14
**scroll** [9] - 78:11, 78:20, 141:21, 154:15, 154:16, 155:1, 161:11, 219:11, 221:1
**scrolling** [1] - 155:4
**scrub** [2] - 228:8, 228:9
**search** [4] - 9:1, 9:20, 155:12, 246:6
**searches** [1] - 66:13
**searching** [1] - 29:5
**season** [1] - 189:25
**seat** [8] - 4:4, 16:19, 102:6, 102:10, 102:24, 173:9, 173:13, 227:23
**seated** [1] - 98:10
**second** [17] - 5:11, 8:24, 11:5, 25:19, 80:18, 138:5, 154:8, 158:9, 165:10, 180:22, 181:1, 181:2, 217:12, 221:18, 230:5,

*232:14, 251:11*
**secondarily** [1] - 5:9
**secondly** [1] - 4:24
**secret** [2] - 136:3, 140:16
**section** [8] - 48:14, 155:16, 155:25, 156:1, 156:4, 228:14, 228:17, 232:22
**secure** [1] - 112:15
**security** [1] - 182:23
**see** [94] - 4:6, 5:1, 6:8, 6:15, 7:19, 7:20, 7:23, 7:24, 11:22, 15:15, 17:2, 17:3, 22:22, 35:8, 41:2, 41:12, 48:14, 48:21, 52:4, 52:15, 78:14, 78:20, 78:23, 83:14, 93:15, 94:19, 94:22, 94:23, 100:11, 100:21, 101:10, 101:24, 117:20, 126:6, 136:24, 138:17, 141:4, 141:6, 141:11, 141:14, 142:25, 147:17, 156:6, 159:24, 160:4, 161:2, 161:16, 161:18, 162:2, 165:17, 165:18, 165:19, 165:20, 168:23, 175:13, 190:14, 194:24, 196:16, 198:6, 204:15, 204:17, 204:23, 213:17, 213:19, 214:11, 214:12, 214:13, 214:18, 215:5, 215:6, 219:13, 221:3, 221:7, 221:23, 222:4, 222:6, 224:11, 226:8, 227:14, 227:19, 228:6, 229:23, 230:7, 238:2, 238:3, 239:11, 240:10, 246:7, 246:9, 254:10*
**seeing** [4] - 95:24, 163:18, 163:20, 203:21
**seem** [1] - 233:2
**selected** [3] - 58:23, 131:17, 131:18
**selection** [2] - 130:6, 131:23

**self** [2] - 149:3, 233:9
**sell** [2] - 113:12, 193:17
**send** [8] - 29:18, 66:13, 79:21, 209:16, 225:5, 228:3, 228:8, 247:2
**sending** [5] - 32:20, 163:5, 246:13, 246:25
**senior** [13] - 127:15, 138:21, 139:1, 139:4, 139:7, 139:14, 139:18, 139:24, 140:14, 141:9, 143:23, 174:17, 188:15
**sense** [6] - 7:8, 222:13, 222:20, 222:22, 239:19, 240:11
**sent** [30] - 9:3, 9:4, 15:16, 29:19, 31:24, 33:1, 42:1, 65:22, 66:6, 66:7, 66:8, 66:21, 97:6, 97:9, 97:11, 97:14, 97:15, 97:16, 99:2, 99:25, 126:6, 151:14, 170:15, 195:17, 196:11, 227:25, 238:23, 239:21, 240:2, 244:13*
**sentence** [7] - 8:23, 8:25, 155:13, 155:15, 214:13, 236:16, 241:2
**sentences** [2] - 26:8, 78:17
**separate** [5] - 5:2, 40:3, 239:17, 244:20, 252:15
**separation** [1] - 192:12
**September** [4] - 117:18, 122:8, 132:9, 212:11
**sequence** [1] - 239:16
**serious** [2] - 79:1, 156:14
**seriously** [1] - 27:24
**serve** [1] - 53:21
**server** [1] - 125:12
**servers** [12] - 112:24, 125:15, 179:5, 180:1, 180:2, 180:10, 180:12, 180:14, 180:23, 183:7
**service** [10] - 18:2,

**self** [2] - 176:23, 176:25, 177:1, 177:4, 177:11, 180:3, 184:3, 187:5
**set** [11] - 25:9, 101:22, 110:1, 112:25, 113:1, 118:5, 128:24, 172:8, 189:9, 191:18, 251:4
**SETH** [1] - 1:19
**Seth** [1] - 226:2
**sets** [1] - 251:4
**setting** [2] - 112:21, 129:3
**settled** [1] - 128:17
**setup** [1] - 186:22
**several** [14] - 21:25, 22:1, 44:23, 54:17, 58:25, 59:13, 82:8, 122:2, 138:20, 138:22, 145:21, 155:8, 164:10, 164:11
**severe** [1] - 43:10
**sex** [4] - 39:24, 53:22, 151:2, 151:5
**sexist** [1] - 40:2
**sexual** [6] - 35:20, 35:24, 40:3, 54:1, 61:25, 189:6
**sexually** [1] - 151:4
**shall** [2] - 8:24, 8:25
**share** [4] - 34:25, 82:10, 93:20, 177:6
**shared** [9] - 82:8, 170:12, 177:4, 177:6, 181:3, 182:15, 182:17, 183:1
**sharing** [7] - 84:2, 168:18, 168:19, 183:8, 183:10, 236:18, 236:25
**Shaw** [1] - 128:9
**sheet** [5] - 237:9, 237:21, 240:15, 240:24, 241:3
**shift** [2] - 24:7
**ship** [2] - 180:1, 180:17
**shipped** [2] - 178:2, 179:6
**shipping** [1] - 178:18
**shit** [1] - 48:18
**shock** [1] - 199:12
**shocked** [1] - 42:7
**shocking** [1] - 56:3
**Shore** [2] - 176:17, 177:2
**shore** [2] - 29:25,

181:14
**short** [4] - 5:10, 189:16, 225:4, 227:24
**short-handed** [1] - 189:16
**shot** [1] - 85:8
**show** [23] - 14:25, 15:1, 15:4, 78:8, 78:10, 79:6, 134:23, 142:9, 154:7, 156:4, 156:20, 159:18, 159:21, 165:8, 213:13, 215:7, 218:14, 218:17, 219:2, 219:6, 231:19, 248:22, 249:3
**showed** [3] - 61:13, 88:25, 96:7
**showing** [2] - 213:20, 218:22
**shown** [1] - 196:3
**shows** [2] - 43:4, 129:10
**shut** [1] - 118:19
**sick** [4] - 251:19, 251:20, 251:24, 252:1
**side** [9] - 4:10, 7:8, 11:10, 54:13, 120:3, 175:10, 175:15, 177:2, 177:18
**Sidebar** [6] - 82:18, 85:11, 215:15, 219:10, 224:13, 226:16
**sidebar** [2] - 215:14, 217:13
**sigh** [1] - 48:25
**sign** [1] - 177:10
**signature** [3] - 218:17, 219:2, 219:13
**signed** [4] - 73:6, 75:8, 177:11, 178:7
**significant** [4] - 24:2, 32:7, 62:22, 109:3
**significantly** [6] - 109:2, 112:5, 112:7, 112:9, 112:11, 112:13
**similar** [2] - 18:3, 175:20
**simple** [2] - 11:7, 28:16
**Singapore** [2] - 110:20, 110:21
**single** [9] - 46:24, 67:6, 68:22, 80:10, 157:17, 167:18,

167:23, 170:1, 178:11
**sit** [4] - 72:15, 118:19, 203:25, 228:9
**site** [1] - 66:12
**sitting** [8] - 15:9, 63:24, 64:8, 72:16, 133:18, 185:18, 205:25, 207:19
**situation** [4] - 43:25, 96:20, 216:11, 218:4
**situations** [1] - 235:5
**six** [10] - 54:17, 108:23, 124:6, 124:7, 134:18, 135:5, 135:7, 135:14, 177:22, 208:19
**six-month** [1] - 134:18
**sixth** [2] - 174:13, 235:4
**size** [2] - 28:16, 119:3
**skilled** [1] - 30:1
**skills** [4] - 24:22, 24:25, 30:23, 65:6
**skillset** [3] - 25:7, 31:2, 31:22
**skip** [2] - 36:6, 221:16
**Slack** [28] - 11:19, 33:23, 34:4, 34:15, 47:17, 47:25, 48:24, 123:7, 123:13, 123:18, 124:2, 124:6, 124:7, 124:10, 124:11, 124:14, 124:18, 124:21, 124:24, 125:3, 125:14, 125:19, 126:1, 136:8, 141:1, 142:1, 170:15, 203:22
**Slack's** [1] - 125:15
**Slacking** [1] - 163:22
**slash** [2] - 162:10, 174:6
**sleepy** [1] - 181:14
**slightest** [2] - 106:11, 106:13
**slightly** [1] - 240:4
**slither** [1] - 216:23
**slow** [3] - 18:2, 177:7, 182:17
**small** [10] - 19:18, 20:1, 29:24, 34:18, 105:19, 144:11, 176:3, 180:14, 183:7
**smaller** [3] - 28:15, 61:6, 105:20
**SMITH** [1] - 1:18
**snow** [1] - 176:9

**snowstorm** [1] - 176:7
**so-called** [1] - 165:4
**soaking** [1] - 179:3
**software** [13] - 21:21, 50:20, 66:9, 66:11, 123:3, 177:7, 178:2, 182:16, 182:20, 183:3, 183:6, 183:9
**sold** [1] - 176:5
**solid** [1] - 81:4
**someone** [37] - 7:21, 30:9, 30:10, 31:8, 34:24, 42:18, 52:3, 56:1, 56:14, 57:12, 63:13, 67:2, 67:6, 68:12, 70:17, 75:20, 76:2, 76:15, 86:20, 97:7, 99:16, 101:20, 136:17, 145:20, 150:20, 156:14, 162:10, 165:22, 167:11, 168:11, 171:5, 182:21, 206:1, 209:15, 209:16, 226:18, 241:7
**sometime** [1] - 227:17
**sometimes** [1] - 145:1
**somewhat** [2] - 20:10, 33:12
**somewhere** [9] - 65:22, 66:17, 101:22, 107:16, 107:19, 122:4, 134:20, 174:13, 183:3
**soon** [2] - 23:10, 225:7
**sorry** [29] - 8:9, 8:13, 8:24, 10:25, 26:19, 27:2, 41:10, 94:17, 97:4, 98:14, 128:22, 129:1, 131:18, 139:22, 148:10, 149:25, 157:4, 168:17, 172:2, 192:21, 192:22, 200:7, 206:24, 214:10, 231:10, 234:2, 236:3, 245:19, 251:23
**Sorry** [1] - 8:13
**sort** [15] - 10:18, 16:24, 21:23, 28:20, 34:22, 37:19, 37:24, 65:2, 66:2, 89:5, 113:8, 226:11, 231:11, 237:25, 240:21
**soul** [1] - 52:17

**sound** [5] - 117:19, 124:16, 135:12, 168:3, 184:14
**sounds** [1] - 232:18
**source** [1] - 183:3
**South** [1] - 174:12
**Southern** [1] - 174:1
**southern** [1] - 174:23
**space** [5] - 37:23, 52:8, 101:17, 176:14, 181:9
**spaces** [1] - 55:13
**spans** [2] - 34:14, 52:15
**SPATARO** [1] - 1:8
**Spataro** [85] - 9:8, 17:9, 36:4, 38:19, 38:21, 38:22, 38:23, 39:8, 39:14, 39:17, 39:19, 42:4, 43:13, 44:5, 47:6, 47:18, 47:21, 51:22, 52:7, 52:22, 57:14, 62:4, 62:12, 76:11, 81:16, 98:12, 98:16, 98:25, 104:10, 116:21, 118:9, 119:6, 119:13, 119:15, 119:16, 124:22, 124:24, 126:15, 126:16, 127:4, 127:8, 127:23, 130:7, 130:18, 130:25, 131:17, 131:18, 132:20, 133:16, 140:1, 140:4, 140:8, 143:8, 145:12, 149:14, 157:9, 163:21, 170:6, 186:12, 186:13, 187:13, 187:16, 190:24, 191:21, 192:3, 192:6, 192:9, 192:14, 192:18, 192:23, 196:14, 199:9, 200:15, 200:21, 201:10, 201:22, 202:4, 205:1, 221:21, 222:19, 224:15, 224:22, 225:1
**Spataro's** [2] - 39:2, 52:14
**speaking** [2] - 43:4, 117:5
**specialist** [1] - 184:1
**specialization** [1] - 25:8
**specialized** [1] - 28:18

**specific** [21] - 28:19, 32:20, 56:16, 73:25, 95:9, 114:3, 123:2, 126:5, 128:4, 130:24, 152:13, 152:15, 152:16, 163:1, 163:2, 206:24, 230:9, 246:21, 249:19, 250:20
**specifically** [8] - 9:6, 26:22, 26:24, 27:16, 33:13, 35:4, 39:16, 96:18
**specifics** [2] - 7:9, 185:19
**Speculation** [1] - 52:19
**speculation** [6] - 36:16, 45:6, 51:9, 60:12, 60:20, 61:5
**speed** [1] - 173:22
**speeding** [1] - 77:16
**spell** [1] - 102:21
**spelled** [1] - 28:19
**spend** [1] - 121:17
**spent** [4] - 34:12, 55:10, 165:22, 165:25
**spoken** [1] - 248:11
**spokesperson** [1] - 43:1
**spoliation** [2] - 10:18, 16:3
**spread** [1] - 43:8
**Springs** [1] - 247:12
**spur** [1] - 180:25
**SQL** [1] - 179:7
**stable** [3] - 178:24, 178:25, 180:6
**staff** [1] - 189:17
**stage** [2] - 20:13, 25:4
**Staller** [2] - 242:6, 242:9
**Staller's** [2] - 241:23, 242:16
**stamp** [3] - 23:14, 142:25, 191:9
**stamps** [1] - 194:14
**stand** [7] - 18:23, 90:21, 98:11, 99:17, 99:19, 207:19, 216:16
**standard** [4] - 227:9, 233:5, 244:6, 244:24
**standing** [2] - 102:15, 237:19
**standpoint** [2] - 224:14, 240:3
**stands** [1] - 99:5

**start** [34] - 4:13, 21:10, 24:19, 59:4, 61:9, 74:24, 91:21, 94:15, 94:16, 98:2, 98:5, 105:11, 114:13, 123:18, 160:23, 175:17, 175:24, 176:19, 176:22, 177:15, 179:1, 189:17, 206:3, 224:15, 224:17, 226:1, 226:10, 226:25, 227:4, 227:24, 228:17, 228:19, 237:11, 238:24

**start-up** [5] - 21:10, 24:19, 176:22, 177:15, 179:1

**started** [36] - 24:11, 30:21, 49:12, 49:13, 49:14, 60:1, 60:3, 60:7, 76:11, 98:3, 105:13, 105:23, 105:24, 106:4, 106:7, 107:15, 107:24, 108:20, 109:20, 112:20, 115:3, 115:6, 122:2, 124:8, 124:10, 124:14, 127:8, 139:10, 139:11, 173:25, 176:12, 176:13, 179:3, 179:6, 181:3, 189:20

**starting** [8] - 17:3, 27:1, 27:2, 139:3, 139:6, 176:14, 194:10, 226:18

**state** [3] - 97:1, 102:20, 103:5

**State** [1] - 176:4

**statement** [18] - 7:11, 12:9, 107:23, 214:3, 215:22, 215:25, 216:3, 216:4, 216:9, 216:19, 218:4, 218:14, 218:23, 221:17, 223:19, 223:23, 224:1

**statements** [4] - 7:14, 10:2, 120:14, 219:5

**STATES** [2] - 1:1, 1:16

**States** [1] - 4:2

**status** [1] - 88:10

**statute** [1] - 232:15

**stay** [2] - 102:15, 175:3

**stayed** [4] - 42:24, 175:5, 176:4, 179:5

**stays** [1] - 130:21

**stenography** [1] - 1:23

**step** [6] - 37:24, 39:3, 97:22, 185:7, 224:7, 254:4

**Stephanie** [2] - 219:15, 220:11

**STEPHANIE** [1] - 2:3

**steps** [2] - 30:25, 130:20

**Steve** [1] - 128:9

**stick** [2] - 234:10, 246:16

**still** [24] - 17:3, 29:2, 58:6, 67:13, 70:4, 73:21, 93:13, 100:19, 101:21, 119:19, 120:18, 127:5, 145:20, 174:21, 183:5, 207:3, 214:6, 215:24, 216:3, 216:21, 222:1, 222:2, 222:9, 247:13

**stimulating** [1] - 33:5

**stipulate** [6] - 32:18, 99:9, 99:11, 241:21, 241:22, 242:12

**stipulated** [1] - 242:15

**stipulating** [1] - 242:13

**stipulation** [3] - 241:22, 242:20, 242:24

**Stockton** [2] - 19:12, 174:2

**stop** [3] - 9:15, 96:25, 161:12

**stopped** [1] - 164:13

**stops** [1] - 175:5

**store** [1] - 176:2

**stored** [1] - 125:11

**story** [28] - 11:10, 12:24, 72:21, 73:1, 73:4, 73:12, 73:15, 73:18, 75:12, 76:5, 76:6, 81:9, 89:9, 89:17, 157:10, 157:16, 166:17, 166:20, 174:8, 174:15, 197:19, 212:13, 213:2, 213:3, 216:24, 222:3, 224:2

**straight** [3] - 142:24, 189:25, 190:7

**strategy** [9] - 10:2, 113:8, 135:22, 137:1, 137:3, 137:8,

137:9, 137:24, 141:12

**Street** [3] - 1:12, 1:19, 2:4

**streets** [1] - 211:21

**strict** [1] - 181:24

**strike** [4] - 32:6, 51:6, 128:22, 223:7

**strikes** [1] - 217:13

**strong** [3] - 17:25, 32:22, 33:16

**stronger** [1] - 33:14

**strongly** [1] - 241:7

**structure** [6] - 21:18, 21:20, 21:25, 22:5, 38:17, 55:13

**struggling** [1] - 185:23

**stuck** [1] - 12:21

**study** [1] - 59:12

**stuff** [16] - 6:18, 7:23, 12:15, 52:16, 69:3, 70:7, 70:21, 81:12, 85:17, 100:7, 122:21, 131:1, 160:7, 181:18, 203:3, 215:24

**subheadings** [1] - 235:16

**subject** [6] - 8:3, 26:12, 27:9, 75:21, 234:22, 246:8

**subjected** [4] - 75:22, 76:3, 236:22, 237:2

**subjective** [1] - 45:6

**submit** [2] - 149:3, 220:13

**subpoena** [2] - 5:13, 249:22

**subscription** [1] - 177:1

**subscription-based** [1] - 177:1

**substance** [4] - 18:20, 29:12, 183:17, 218:22

**substantive** [2] - 229:15, 231:25

**succeed** [2] - 196:16, 197:12

**successful** [4] - 31:20, 39:6, 55:25, 113:9

**succinctly** [1] - 38:16

**sue** [1] - 50:18

**sued** [1] - 195:17

**suffered** [2] - 232:6, 232:16

**suffice** [1] - 133:11

**suggest** [6] - 11:13,

89:5, 169:24, 207:8, 229:11, 229:12

**suggested** [9] - 7:22, 77:21, 93:2, 93:4, 93:6, 95:19, 148:25, 184:8, 230:7

**suggesting** [5] - 14:24, 207:20, 209:14, 230:15, 239:8

**suggestion** [6] - 232:13, 236:16, 238:19, 238:25, 239:1, 241:12

**suggests** [1] - 68:23

**suing** [1] - 199:22

**Suite** [2] - 1:19, 2:4

**sum** [1] - 32:7

**Sun** [1] - 195:18

**super** [2] - 183:2, 224:25

**supervising** [1] - 117:22

**supervisor** [5] - 39:9, 116:22, 116:25, 119:1, 144:10

**supervisors** [1] - 27:21

**support** [14] - 42:18, 43:9, 49:2, 82:20, 83:1, 83:7, 86:20, 105:10, 113:1, 147:23, 150:20, 178:17, 179:9, 179:21

**supported** [4] - 156:18, 156:23, 167:7, 167:9

**supporting** [4] - 77:21, 152:8, 167:5, 167:10

**supportive** [1] - 47:2

**supports** [1] - 156:9

**supposed** [12] - 15:8, 68:22, 72:4, 76:15, 76:18, 76:21, 91:17, 131:1, 162:8, 172:8, 231:12, 231:14

**suppression** [1] - 16:1

**surprise** [1] - 156:11

**surprised** [1] - 42:8

**surprising** [2] - 54:10, 56:3

**Sustained** [1] - 97:20

**sustained** [22] - 7:1, 7:3, 18:25, 36:24, 38:10, 45:16, 45:17, 52:25, 54:20, 54:23, 54:24, 66:4, 69:7, 110:9, 110:13,

125:17, 164:16, 200:3, 200:17, 213:10, 214:22, 223:1

**swore** [1] - 90:17

**SWORN** [1] - 102:18

**Sydney** [1] - 111:1

**synced** [1] - 179:14

**system** [5] - 23:18, 125:3, 172:13, 175:20, 175:21

**System** [1] - 66:10

**systems** [2] - 90:4, 123:1

---

**T**

---

**table** [2] - 54:13, 101:17

**tackle** [4] - 4:6, 5:23, 6:2, 6:3

**talent** [3] - 29:3, 29:6, 181:16

**talks** [1] - 83:3

**Tara** [6] - 68:6, 69:5, 69:9, 69:23, 70:1, 70:6

**tasks** [5] - 21:15, 32:24, 32:25, 33:15, 199:3

**taste** [1] - 176:25

**taught** [3] - 59:18, 175:7, 175:8

**Taylor** [6] - 68:6, 69:5, 69:9, 69:23, 70:1, 70:6

**teaching** [1] - 179:6

**team** [8] - 27:6, 131:20, 140:21, 140:24, 163:4, 185:15, 187:19, 190:10

**tech** [2] - 29:24, 186:21

**technical** [26] - 24:22, 24:25, 25:9, 30:1, 30:23, 31:5, 32:22, 32:24, 33:10, 33:15, 63:5, 63:19, 63:25, 65:6, 113:2, 147:21, 178:16, 179:21, 179:25, 181:12, 185:13, 187:1, 187:2, 189:12, 189:21, 197:10

**technically** [3] - 33:14, 65:8, 126:2

**Technologies** [2] - 176:18, 177:3

**technology** [2] - 5:16,

24:20
**temporal** [1] - 84:9
**ten** [7] - 19:21, 108:25, 165:11, 165:17, 165:18, 172:17
**tenants** [1] - 181:8
**Tennessee** [3] - 176:16, 176:21, 179:4
**term** [2] - 31:3, 162:11
**termed** [1] - 183:14
**terminate** [10] - 44:6, 45:5, 50:13, 53:4, 53:7, 159:11, 190:19, 205:17, 205:22, 221:22
**terminated** [29] - 43:23, 44:11, 46:14, 50:10, 50:17, 51:1, 53:20, 75:21, 76:2, 80:24, 85:14, 86:1, 108:2, 108:5, 114:25, 126:7, 142:19, 157:11, 159:13, 162:16, 199:13, 202:13, 202:16, 205:14, 221:6, 221:13, 222:3, 236:17, 236:25
**terminating** [3] - 40:9, 205:18, 208:3
**termination** [67] - 26:13, 27:10, 39:20, 40:7, 41:23, 44:25, 45:1, 45:22, 46:12, 46:17, 46:18, 46:25, 47:4, 47:9, 47:20, 47:22, 48:5, 49:18, 51:18, 52:22, 53:11, 53:13, 53:21, 54:1, 56:24, 57:22, 71:21, 77:3, 78:3, 78:5, 82:1, 82:9, 84:5, 84:16, 84:20, 95:16, 114:22, 115:1, 157:15, 157:16, 158:22, 158:23, 160:18, 161:24, 162:4, 163:5, 164:5, 164:6, 164:19, 167:1, 169:6, 170:10, 171:11, 194:3, 194:5, 195:4, 195:9, 196:2, 199:20, 200:10, 202:23, 203:2, 203:7, 206:22, 207:12, 245:13
**terminations** [3] -

45:3, 46:21, 130:14
**terms** [13] - 9:20, 13:17, 18:4, 31:22, 63:2, 100:8, 109:8, 109:10, 109:13, 114:20, 119:3, 128:3, 131:16
**terrible** [8] - 151:13, 151:21, 151:22, 206:2, 209:18
**TESTIFIED** [1] - 102:19
**testified** [26] - 9:7, 22:10, 23:12, 28:4, 41:22, 57:2, 57:13, 62:21, 63:5, 66:23, 71:10, 71:19, 77:5, 79:6, 79:10, 79:12, 83:9, 84:22, 87:9, 90:25, 91:2, 92:22, 156:12, 159:1, 241:19, 250:24
**testify** [29] - 5:11, 12:7, 17:7, 17:10, 53:1, 55:1, 56:22, 74:15, 79:19, 79:20, 79:22, 93:22, 167:11, 208:24, 209:11, 247:7, 247:25, 249:3, 250:11, 250:13, 250:15, 250:23, 251:10, 251:13, 251:18, 252:8, 252:16, 253:9
**testifying** [21] - 17:6, 18:18, 40:23, 54:7, 63:25, 74:12, 77:23, 79:9, 79:14, 83:1, 83:6, 86:20, 87:20, 87:24, 89:2, 90:5, 95:20, 96:12, 96:15, 252:10, 252:18
**testimonial** [1] - 7:16
**testimony** [39] - 5:15, 5:18, 5:20, 7:14, 59:25, 62:13, 70:12, 70:13, 71:22, 87:18, 95:21, 98:6, 100:20, 100:25, 113:11, 128:22, 133:18, 134:21, 147:3, 147:4, 147:10, 150:9, 159:10, 170:13, 193:5, 193:7, 207:6, 210:6, 217:15, 224:16, 229:10, 241:13, 247:24, 249:20, 250:18, 250:21, 251:7, 252:8, 253:11

**text** [4] - 9:8, 9:9, 125:1
**texting** [1] - 163:21
**texts** [1] - 13:1
**THE** [412] - 1:15, 4:3, 4:4, 4:17, 5:1, 5:7, 5:20, 5:23, 6:2, 6:8, 7:7, 7:13, 7:16, 8:1, 8:5, 8:10, 8:12, 8:19, 8:22, 9:15, 9:20, 10:15, 10:24, 11:1, 11:5, 11:14, 11:21, 12:2, 12:11, 12:14, 12:18, 12:21, 12:23, 13:12, 13:16, 13:21, 14:11, 14:13, 14:15, 15:4, 15:13, 15:20, 15:22, 16:3, 16:10, 16:15, 16:17, 16:19, 18:12, 18:25, 19:9, 19:10, 20:8, 20:9, 28:8, 28:14, 28:15, 31:14, 36:17, 36:18, 36:19, 36:21, 36:24, 37:5, 37:6, 38:10, 40:14, 40:15, 40:21, 40:22, 41:8, 41:18, 42:16, 42:17, 42:22, 42:23, 45:16, 49:11, 49:12, 50:1, 50:2, 50:5, 50:6, 51:10, 51:12, 51:24, 52:20, 52:21, 52:25, 53:2, 53:4, 53:5, 54:9, 54:10, 54:20, 54:21, 54:23, 55:1, 55:9, 55:10, 56:5, 56:6, 56:7, 57:5, 57:6, 58:15, 58:16, 64:21, 64:23, 66:4, 69:7, 69:12, 69:14, 69:19, 74:4, 74:7, 74:11, 74:16, 75:16, 75:17, 76:18, 81:22, 82:4, 82:5, 82:12, 82:13, 82:17, 82:19, 83:17, 83:22, 83:25, 84:8, 84:22, 85:1, 85:5, 85:10, 85:12, 85:16, 85:17, 85:20, 85:21, 87:1, 88:20, 91:9, 91:12, 97:1, 97:20, 97:22, 97:25, 98:8, 98:10, 98:14, 98:16, 98:18, 98:25, 99:5, 99:13, 99:16, 99:19, 99:23, 100:8, 100:10, 100:19, 100:24, 101:4, 101:15, 101:16, 102:2, 102:3, 102:5,

102:6, 102:8, 102:10, 102:13, 102:15, 102:16, 102:17, 102:20, 102:22, 102:24, 102:25, 110:9, 110:13, 116:3, 116:4, 116:10, 116:12, 118:22, 120:13, 120:16, 125:17, 125:22, 125:24, 126:10, 126:12, 135:4, 136:13, 136:14, 146:3, 147:4, 147:7, 148:7, 153:18, 154:9, 155:18, 155:21, 155:23, 160:1, 163:15, 163:16, 164:16, 172:16, 172:20, 172:22, 173:2, 173:6, 173:8, 173:9, 173:11, 173:13, 173:16, 185:3, 193:12, 193:13, 193:15, 193:16, 194:21, 195:7, 195:8, 195:20, 195:21, 196:18, 197:1, 197:2, 197:4, 197:6, 197:15, 197:24, 197:25, 198:11, 198:18, 199:5, 200:3, 200:17, 200:24, 201:7, 205:6, 206:12, 209:3, 210:19, 211:2, 211:14, 211:15, 213:10, 213:20, 213:23, 214:4, 214:22, 215:1, 215:3, 215:9, 215:14, 215:16, 216:2, 216:4, 216:7, 216:14, 216:18, 216:21, 217:1, 217:10, 217:19, 217:22, 218:7, 218:11, 218:16, 218:22, 219:2, 219:8, 220:16, 220:21, 221:11, 223:1, 223:6, 223:21, 224:5, 224:7, 224:9, 224:11, 224:14, 224:20, 224:22, 225:1, 225:5, 225:10, 225:14,

225:22, 226:5, 226:15, 226:17, 227:21, 227:23, 228:22, 228:24, 229:6, 229:14, 229:21, 229:24, 230:8, 230:20, 231:17, 231:25, 232:5, 232:9, 232:11, 232:14, 232:19, 232:24, 233:7, 233:10, 233:13, 233:16, 233:21, 233:24, 234:2, 234:6, 234:15, 234:24, 235:3, 235:10, 235:14, 235:19, 235:22, 235:24, 236:2, 236:5, 236:9, 236:12, 237:2, 237:5, 237:8, 237:15, 237:22, 238:2, 238:6, 238:9, 238:16, 238:23, 239:1, 239:5, 239:16, 239:19, 240:14, 241:10, 241:20, 242:10, 242:13, 242:19, 242:23, 243:2, 243:4, 243:7, 243:9, 243:13, 243:16, 243:20, 243:24, 244:10, 244:12, 244:20, 244:25, 245:2, 245:4, 245:15, 245:20, 245:24, 246:3, 246:7, 246:23, 247:5, 247:9, 247:11, 247:13, 247:19, 247:21, 248:2, 248:7, 248:9, 248:12, 248:18, 248:21, 248:25, 249:7, 249:14, 250:2, 250:16, 250:22, 250:25, 251:5, 251:17, 251:20, 252:1, 252:5, 252:15, 253:3, 253:20, 253:21, 253:22, 253:23, 254:4, 254:10, 254:13
**theft** [1] - 158:6
**Theft** [2] - 158:12, 158:15
**therefore** [1] - 6:18
**they've** [3] - 7:8,

229:18, 231:2
**thinking** [1] - 227:5
**thinks** [2] - 229:16, 238:3
**third** [4] - 27:22, 46:19, 100:21, 158:12
**Third** [13] - 6:23, 14:22, 14:24, 15:14, 15:15, 216:10, 229:24, 230:14, 230:18, 230:24, 234:9, 244:6, 245:10
**Thomas** [2] - 102:22, 103:7
**THOMAS** [4] - 1:8, 3:6, 102:18, 102:22
**thoughts** [1] - 193:9
**thousands** [1] - 43:2
**thread** [10] - 9:13, 34:4, 34:25, 52:14, 124:3, 124:6, 124:21, 124:22, 124:24, 203:24
**threads** [6] - 9:8, 9:9, 11:20, 123:18, 125:14
**threatened** [1] - 45:12
**three** [16] - 89:22, 103:21, 105:7, 106:5, 117:12, 117:15, 117:21, 119:2, 160:17, 171:22, 173:24, 174:11, 179:15, 179:17, 204:2
**throughout** [4] - 59:13, 127:1, 127:5, 184:9
**thundering** [2] - 82:24, 86:16
**Thursday** [1] - 156:12
**ticket** [1] - 77:16
**tickets** [2] - 178:17, 179:9
**tier** [1] - 201:13
**ties** [1] - 17:14
**Tim** [31] - 22:18, 25:15, 26:9, 26:18, 33:25, 35:5, 48:11, 51:14, 127:12, 127:22, 128:5, 128:8, 129:14, 129:20, 129:22, 130:4, 131:18, 132:11, 132:16, 132:24, 132:25, 134:22, 138:25, 139:19, 140:17, 144:7, 144:10,

190:25, 191:8, 219:15, 220:11
**Tim's** [1] - 191:11
**timeline** [1] - 73:18
**timing** [1] - 18:5
**TIMOTHY** [1] - 2:4
**tiny** [1] - 94:16
**tire** [1] - 176:7
**title** [16] - 20:25, 71:16, 104:18, 104:19, 133:10, 133:12, 134:8, 134:16, 135:19, 136:10, 136:19, 139:3, 144:6, 144:16, 144:19, 234:16
**Title** [4] - 237:16, 240:4, 240:5
**today** [26] - 14:24, 17:9, 38:18, 40:7, 54:7, 58:6, 79:3, 80:24, 89:23, 90:5, 93:24, 97:13, 98:24, 100:13, 101:12, 107:1, 114:17, 133:18, 147:10, 156:16, 172:25, 185:18, 205:25, 217:13, 222:10, 222:11
**today's** [1] - 101:20
**together** [16] - 37:20, 47:19, 54:17, 83:11, 90:2, 93:5, 93:8, 138:7, 157:9, 171:22, 179:5, 179:19, 208:13, 208:14, 208:16, 227:12
**Tokyo** [3] - 111:4, 111:5, 111:9
**Tom** [16] - 9:9, 38:18, 42:4, 57:14, 58:23, 61:7, 62:4, 62:11, 81:16, 102:12, 128:9, 139:16, 161:20, 172:7, 173:24
**tomorrow** [31] - 6:1, 100:13, 100:18, 100:20, 100:25, 101:6, 101:12, 162:3, 224:21, 224:25, 225:2, 225:7, 225:11, 225:19, 226:6, 226:20, 226:25, 227:2, 227:15, 227:18, 227:19,

231:19, 246:9, 247:7, 250:4, 250:9, 251:6, 252:24, 253:17, 254:10
**Tomorrow** [1] - 6:2
**ton** [1] - 24:24
**tons** [4] - 7:19, 7:20, 20:3, 55:21
**took** [13] - 39:2, 43:21, 86:5, 90:8, 90:20, 131:9, 131:14, 179:2, 179:18, 181:5, 192:18, 192:24, 215:19
**tool** [6] - 47:25, 123:13, 148:25, 149:2, 150:4, 150:10
**toothache** [1] - 230:22
**top** [12] - 26:24, 32:11, 35:10, 48:17, 59:17, 60:8, 142:20, 154:19, 159:25, 160:1, 161:13, 201:13
**top-tier** [1] - 201:13
**topic** [1] - 202:1
**topics** [1] - 33:18
**torch** [1] - 181:23
**torts** [1] - 233:16
**total** [1] - 209:22
**totally** [1] - 101:18
**touch** [5] - 152:3, 182:23, 248:11, 248:20, 250:1
**touched** [1] - 151:20
**tour** [1] - 175:11
**toward** [1] - 7:4
**towards** [3] - 113:5, 113:8, 113:14
**town** [2] - 29:25, 181:14
**toxic** [2] - 68:4, 69:23
**toxicity** [1] - 69:10
**track** [1] - 237:8
**Tracking** [1] - 66:10
**tracks** [1] - 244:16
**trade** [1] - 43:4
**traffic** [1] - 177:9
**trained** [1] - 179:4
**training** [4] - 24:23, 55:18, 121:15, 121:17
**trains** [1] - 17:15
**transcript** [8] - 1:23, 7:11, 34:4, 99:3, 146:2, 147:14, 201:8, 254:18
**transcription** [1] - 1:24
**transcripts** [1] - 146:7

**transfer** [1] - 180:16
**transferred** [1] - 19:11
**transit** [2] - 198:24, 198:25
**transitioned** [1] - 113:19
**travel** [3] - 129:10, 251:24, 252:2
**traveled** [1] - 118:12
**treated** [1] - 195:23
**treating** [1] - 115:20
**treatment** [7] - 35:19, 35:24, 36:3, 55:17, 189:5, 232:19
**tremendous** [2] - 24:23, 30:5
**TRIAL** [1] - 1:5
**trial** [13] - 5:10, 10:11, 10:13, 10:16, 14:1, 14:18, 90:21, 99:22, 182:12, 248:23, 249:3, 249:24, 252:14
**tried** [4] - 153:12, 153:15, 175:3, 210:11
**triggered** [1] - 4:21
**trip** [3] - 174:20, 175:2, 175:25
**trouble** [1] - 150:21
**troubles** [1] - 95:12
**troubleshooting** [1] - 32:24
**true** [38] - 11:19, 14:21, 64:2, 64:16, 65:10, 67:2, 68:3, 73:1, 75:19, 75:23, 76:7, 78:6, 80:6, 80:15, 80:18, 81:2, 81:9, 81:12, 81:14, 88:6, 92:25, 95:18, 112:8, 128:1, 131:22, 144:21, 157:15, 165:2, 170:16, 186:25, 201:19, 210:22, 211:9, 212:1, 212:13, 233:12
**truly** [1] - 252:21
**trunk** [1] - 176:3
**trust** [2] - 64:18, 64:23
**trusted** [1] - 194:25
**truth** [7] - 62:1, 76:9, 90:18, 90:23, 212:13, 212:18, 222:11
**try** [22] - 17:15, 80:3, 88:18, 88:24, 89:5, 89:15, 90:9, 100:14, 114:13, 145:11,

158:2, 159:20, 184:5, 199:13, 202:3, 218:14, 225:8, 227:1, 246:11, 247:5, 252:15, 252:23
**trying** [16] - 17:18, 17:24, 93:23, 99:23, 155:8, 155:17, 156:14, 190:8, 190:10, 196:21, 201:24, 215:11, 218:21, 223:9, 248:4, 248:20
**Ts** [1] - 81:4
**turn** [5] - 8:2, 72:10, 91:19, 94:10, 160:15
**turned** [9] - 6:21, 9:11, 9:12, 9:16, 9:18, 11:8, 15:2, 130:7, 131:6
**twice** [2] - 28:2, 80:23
**two** [43] - 9:4, 15:24, 16:2, 16:22, 26:8, 75:14, 98:11, 100:20, 103:16, 103:18, 103:21, 117:7, 122:10, 127:8, 135:10, 136:4, 138:13, 143:15, 146:5, 146:6, 171:10, 173:25, 175:6, 175:15, 178:25, 179:5, 179:15, 186:24, 189:2, 189:25, 190:7, 212:6, 216:16, 217:13, 221:25, 222:21, 228:2, 237:6, 246:11, 246:14, 246:17, 250:9, 251:4
**type** [8] - 23:19, 28:10, 29:6, 30:2, 30:7, 42:18, 42:19, 44:19
**types** [2] - 76:16, 228:24
**typical** [2] - 46:17, 179:12
**typically** [5] - 10:17, 30:20, 66:9, 165:24, 237:25
**typos** [1] - 228:6

## U

**U.S** [2] - 1:11, 1:12
**ultimate** [2] - 158:23, 193:20
**ultimately** [13] - 30:12,

31:10, 32:12, 43:16,
123:7, 194:4, 200:9,
202:11, 202:12,
205:14, 249:21
**ultimatum** [1] - 42:19
**ultimatums** [1] - 42:14
**unanimity** [1] - 44:6
**unavailable** [3] - 5:11,
153:15, 153:22
**unclear** [2] - 162:6,
164:22
**uncomfortable** [3] -
42:17, 49:5, 49:16
**under** [25] - 5:14,
25:20, 29:4, 73:7,
75:8, 90:17, 95:23,
106:20, 146:11,
147:15, 162:6,
162:8, 163:1,
207:19, 216:10,
230:25, 237:11,
237:16, 238:10,
240:4, 240:13,
241:11, 242:1,
244:1, 245:17
**underneath** [2] -
103:19, 163:3
**understood** [6] - 4:24,
12:20, 52:25, 211:9,
249:14
**unexpected** [3] - 49:6,
49:7, 52:12
**unfairly** [1] - 242:18
**unfortunately** [1] -
72:18
**unhappy** [1] - 133:25
**unhealthy** [1] - 69:17
**unicorn** [1] - 178:14
**unique** [2] - 145:17,
147:12
**United** [1] - 4:2
**UNITED** [2] - 1:1, 1:16
**university** [1] - 175:9
**University** [3] - 19:11,
19:12, 175:6
**unknown** [1] - 46:8
**unlawful** [2] - 26:11,
27:9
**unless** [3] - 138:18,
241:7, 253:23
**unnecessarily** [1] -
246:18
**unpaid** [1] - 162:5
**unprecedented** [3] -
44:2, 44:16, 167:3
**unpredictable** [1] -
46:5
**unprepared** [1] -
44:20
**unreported** [1] -

161:25
**unscheduled** [2] -
131:24, 203:20
**unspoken** [1] - 22:4
**up** [135] - 5:7, 6:7,
6:23, 10:17, 11:5,
11:9, 13:2, 13:7,
14:3, 14:6, 16:11,
18:11, 19:4, 21:10,
21:19, 22:15, 22:18,
22:19, 24:19, 25:19,
26:3, 26:5, 26:7,
26:12, 26:17, 27:10,
33:25, 39:20, 40:18,
41:4, 41:23, 48:16,
52:21, 57:8, 57:14,
65:23, 68:9, 77:4,
78:9, 78:12, 81:11,
81:16, 83:13, 86:16,
93:11, 96:12,
101:22, 110:1,
112:21, 112:25,
113:1, 118:5,
128:24, 129:3,
129:21, 142:14,
146:7, 157:10,
157:16, 165:1,
167:18, 167:19,
171:10, 171:14,
173:14, 174:2,
175:10, 175:14,
175:18, 175:25,
176:8, 176:14,
176:15, 176:17,
176:18, 176:19,
176:22, 176:23,
177:3, 177:10,
177:11, 177:15,
177:17, 177:19,
177:21, 178:7,
178:8, 178:14,
178:16, 179:1,
179:8, 179:12,
179:14, 179:16,
179:23, 180:24,
182:2, 185:16,
186:11, 187:6,
187:7, 187:9,
189:17, 191:3,
198:2, 201:7, 201:8,
202:20, 203:3,
204:10, 204:17,
207:22, 208:2,
209:4, 215:14,
217:7, 217:10,
221:1, 222:15,
228:1, 228:2,
228:13, 229:4,
230:20, 240:22,
242:24, 244:2,
246:12, 248:22,

249:3, 249:18,
250:5, 254:5, 254:6
**update** [1] - 24:4
**updated** [2] - 23:2,
23:13
**upset** [2] - 132:24,
196:12
**upstairs** [1] - 181:5
**urgency** [2] - 44:20,
46:10
**urgent** [1] - 44:3

---

## V

**vague** [1] - 77:11
**valid** [3] - 7:25, 89:9,
93:23
**valuable** [3] - 63:2,
137:19, 137:22
**value** [8] - 37:22, 38:2,
62:22, 109:8, 198:8,
198:14, 198:21,
205:19
**valued** [1] - 52:23
**values** [1] - 182:1
**various** [2] - 70:8,
128:12
**vast** [1] - 137:25
**VC** [1] - 180:20
**vendor** [1] - 118:1
**vendors** [6] - 37:19,
43:3, 43:8, 118:1,
180:15, 198:6
**verbally** [2] - 35:20,
138:16
**verdict** [6] - 237:9,
239:23, 240:15,
240:24, 241:3
**verdict..** [1] - 239:7
**verified** [2] - 73:7,
75:8
**verify** [1] - 109:3
**version** [3] - 23:1,
23:20, 173:22
**versus** [2] - 108:16,
240:13
**via** [3] - 31:24, 34:15,
50:19
**Vice** [1] - 36:22
**vice** [3] - 104:17,
136:19, 136:20
**victory** [1] - 234:7
**video** [5] - 5:15, 5:21,
50:19, 99:14, 225:2
**view** [3] - 17:23,
26:15, 252:9
**viewed** [1] - 45:4
**views** [1] - 18:5
**VII** [4] - 237:16, 240:4,
240:5

**Vince** [7] - 7:21,
105:1, 121:3, 121:8,
157:9, 170:21,
222:19
**VINCENT** [4] - 3:3,
3:6, 102:18, 102:23
**Vincent** [8] - 19:4,
102:22, 131:6,
163:21, 183:23,
184:1, 184:24,
199:17
**Vinny** [9] - 131:5,
161:25, 171:9,
171:24, 184:16,
185:14, 199:12,
204:1, 204:4
**violate** [1] - 166:5
**violated** [2] - 221:14,
232:15
**violation** [5] - 6:21,
157:18, 162:18,
162:24, 252:17
**Violations** [1] - 158:5
**violations** [34] - 36:9,
36:10, 36:14, 44:11,
44:22, 45:2, 46:14,
50:10, 53:20, 57:20,
57:23, 71:19, 72:4,
72:12, 72:25,
157:14, 157:16,
157:23, 158:4,
161:23, 162:1,
163:7, 165:5, 194:7,
194:11, 194:14,
194:15, 195:5,
195:9, 202:10,
202:13, 202:19,
202:20, 221:19
**violent** [1] - 46:4
**visually** [1] - 196:12
**voicemail** [1] - 179:22
**voir** [1] - 17:16
**volatile** [1] - 46:7
**volume** [1] - 19:16
**VP** [2] - 36:15, 71:16

---

## W

**Wait** [1] - 8:19
**wait** [16] - 14:16,
74:11, 148:7,
154:16, 179:13,
180:4, 214:4, 251:6
**waiting** [4] - 6:3,
15:10, 16:12, 179:22
**wake** [2] - 179:12,
179:23
**walk** [3] - 114:13,
120:4, 160:23
**walking** [2] - 203:21,

211:21
**wants** [1] - 243:17
**warned** [1] - 217:22
**warranted** [1] - 27:25
**WAS** [2] - 3:10, 41:20
**Washington** [1] -
176:4
**water** [1] - 141:22
**ways** [1] - 149:2
**we're..** [1] - 56:25
**we..** [1] - 166:24
**weak** [1] - 17:25
**weave** [1] - 227:12
**website** [6] - 66:17,
177:9, 178:1, 178:6,
186:19, 210:14
**week** [8] - 5:11, 20:4,
44:9, 47:8, 47:9,
51:2, 193:4, 193:7
**weekend** [1] - 16:20
**weeks** [8] - 135:5,
135:7, 135:9,
135:10, 135:14,
179:5, 189:25, 190:7
**weighs** [1] - 52:16
**welcome** [4] - 11:23,
142:12, 159:19,
173:19
**wellbeing** [1] - 52:2
**West** [2] - 247:12,
251:14
**whatnot** [2] - 141:1,
177:19
**whatsoever** [3] -
58:23, 86:16, 193:25
**white** [2] - 37:13,
70:17
**whole** [10] - 11:18,
25:8, 34:11, 120:8,
155:13, 156:23,
171:14, 176:12,
177:5, 202:20
**wide** [2] - 82:24,
247:25
**WILLIAMS** [1] - 1:3
**Williams** [153] - 10:7,
29:8, 29:13, 29:15,
29:16, 30:19, 31:11,
31:20, 31:25, 32:12,
32:15, 33:14, 33:15,
33:17, 33:20, 33:23,
34:5, 34:9, 34:12,
34:14, 34:24, 35:19,
36:7, 37:14, 37:22,
38:8, 38:13, 38:16,
38:18, 38:20, 39:11,
40:4, 40:23, 42:18,
42:24, 42:25, 43:23,
44:7, 44:10, 44:23,
45:5, 45:22, 46:3,

46:16, 47:5, 47:11, 49:8, 49:20, 50:10, 50:17, 50:21, 50:25, 51:7, 53:4, 53:7, 53:19, 54:12, 56:10, 57:9, 57:10, 59:25, 60:3, 60:6, 61:24, 62:3, 62:22, 66:24, 71:6, 71:8, 72:2, 79:2, 82:8, 83:6, 85:15, 85:24, 85:25, 86:3, 86:7, 86:14, 86:20, 88:7, 89:1, 91:24, 92:1, 92:5, 118:13, 118:19, 119:12, 121:1, 126:22, 126:25, 128:13, 129:6, 131:22, 132:7, 132:23, 133:2, 133:19, 133:22, 136:25, 141:24, 142:4, 142:5, 142:6, 143:18, 144:6, 147:16, 149:10, 149:17, 149:20, 156:12, 156:15, 167:19, 169:5, 185:9, 185:10, 186:1, 187:12, 192:25, 193:9, 194:12, 195:17, 196:5, 197:2, 198:8, 198:14, 198:22, 199:20, 200:8, 200:9, 200:20, 201:18, 202:12, 204:18, 205:1, 205:3, 205:8, 205:14, 206:18, 207:21, 208:3, 209:10, 209:11, 210:5, 210:7, 210:18, 211:7, 212:3, 222:3, 232:16, 245:6, 245:22, 247:18
**Williams'** [36] - 28:23, 30:3, 33:10, 36:13, 37:2, 37:10, 39:9, 39:18, 40:7, 40:9, 40:12, 41:23, 43:17, 51:18, 53:10, 82:1, 87:13, 92:11, 116:25, 138:19, 143:13, 161:24, 189:9, 189:11, 192:9, 192:15, 192:19, 192:20, 193:1, 193:7, 194:4, 194:16, 199:10,

202:23, 203:7, 211:5
**Williams(Sic** [1] - 156:24
**win** [3] - 76:1, 76:5, 209:19
**wind** [1] - 244:2
**window** [1] - 184:24
**Windows** [1] - 175:20
**winter** [1] - 181:14
**wire** [1] - 180:16
**wise** [1] - 243:25
**wish** [1] - 168:20
**withdraw** [2] - 59:24, 77:3
**Witness** [2] - 97:24, 224:10
**WITNESS** [54] - 19:10, 20:9, 28:15, 36:18, 36:21, 37:6, 40:15, 40:22, 42:17, 42:23, 49:12, 50:2, 50:6, 51:12, 52:21, 53:2, 53:4, 54:10, 54:21, 55:10, 56:6, 57:6, 58:16, 64:23, 69:14, 74:16, 75:17, 76:18, 82:5, 82:13, 85:16, 85:20, 102:16, 102:22, 102:25, 116:4, 116:12, 120:16, 125:24, 126:12, 135:4, 136:14, 155:23, 163:16, 193:13, 193:16, 195:8, 195:21, 197:2, 197:6, 197:24, 211:15, 215:3, 224:9
**witness** [38] - 5:10, 6:5, 11:2, 12:8, 12:19, 12:23, 12:25, 13:3, 41:5, 47:1, 47:7, 74:3, 78:10, 91:6, 98:2, 100:21, 102:11, 116:9, 147:19, 154:7, 159:18, 173:1, 213:15, 213:21, 215:17, 220:20, 225:2, 247:7, 247:17, 248:6, 248:8, 248:9, 248:17, 248:21, 249:10, 249:12, 249:24, 250:14
**witnesses** [13] - 4:21, 10:21, 13:7, 13:12, 13:16, 17:6, 100:8, 227:6, 229:9, 230:2, 230:12, 231:8, 248:3

**WOLSON** [2] - 1:15, 4:2
**word** [10] - 28:1, 71:23, 77:6, 151:10, 151:17, 151:24, 236:17, 239:15, 239:20, 241:8
**Word** [2] - 160:7, 161:5
**wording** [1] - 77:25
**words** [8] - 9:3, 40:8, 68:19, 71:25, 196:4, 199:19, 218:15, 242:19
**work-related** [1] - 33:18
**workers** [1] - 177:10
**workforce** [1] - 28:18
**workplace** [9] - 27:5, 40:12, 45:7, 67:17, 67:25, 68:24, 69:10, 114:17, 203:15
**works** [5] - 101:14, 125:20, 126:1, 126:2, 247:4
**world** [3] - 43:4, 79:23, 188:5
**worldwide** [1] - 186:18
**worms** [1] - 203:3
**worried** [2] - 7:13, 33:4
**wrap** [2] - 77:4, 228:13, 246:12
**write** [4] - 69:5, 81:8, 95:7, 191:14
**writing** [3] - 61:18, 61:21, 176:13
**written** [2] - 61:20, 228:3
**wrongfully** [1] - 114:25
**wrote** [2] - 162:12, 178:1

**Y**

**year** [39] - 19:11, 19:15, 20:17, 23:8, 60:19, 60:22, 74:1, 76:11, 76:12, 76:14, 87:9, 87:11, 87:14, 99:22, 103:10, 103:12, 106:18, 108:8, 110:19, 110:22, 114:9, 122:6, 129:18, 146:13, 148:24, 168:18, 168:19, 174:2, 174:17,

175:7, 176:24, 177:17, 177:19, 178:15, 178:21, 179:15, 181:1, 189:2
**years** [49] - 19:20, 19:21, 22:1, 32:10, 32:11, 34:14, 38:19, 44:23, 54:17, 55:11, 58:25, 60:17, 60:18, 72:7, 72:8, 72:10, 75:14, 82:8, 89:22, 108:17, 110:24, 122:2, 122:10, 124:7, 127:8, 128:12, 138:19, 139:18, 139:24, 140:7, 154:24, 166:13, 174:6, 174:14, 177:15, 178:13, 181:19, 184:22, 189:2, 194:13, 196:16, 207:2, 208:19, 212:7, 221:25, 222:21, 223:13
**years'** [1] - 124:6
**yes-or-no** [1] - 155:20
**yesterday** [1] - 16:21
**yo** [1] - 168:12
**York** [1] - 96:13
**yourself** [3] - 34:9, 58:19, 173:21

**Z**

**zero** [4] - 163:23, 207:12, 210:18, 210:22
**zeroes** [1] - 122:23
**Zoom** [6] - 5:21, 100:21, 100:22, 188:3, 251:13, 252:10