1        **UNITED STATES DISTRICT COURT**
          **EASTERN DISTRICT OF PENNSYLVANIA**

2

3 ───────────────────

  **CARL WILLIAMS,**              **CIVIL ACTION NUMBER:**
4

      **Plaintiff,**          **2:22-CV-01618-JDW**
5

      **v.**                **JURY TRIAL**
6                         **DAY 6**
  **LINODE LIMITED LIABILITY**
7  **COMPANY, d/b/a LINODE, LLC,**
  **LINODIAN, LLC, d/b/a LINODE,**
8  **LLC, DANIEL SPATARO, and**
  **THOMAS ASARO**
9

      **Defendants.**
10 ───────────────────

11

12      U.S. District Court, Eastern District of PA
      James A. Byrne U.S. Courthouse
      601 Market Street
13     Philadelphia, Pennsylvania 19106
      January 30, 2024
14     Commencing at 8:44 a.m.

15

**B E F O R E:**         **THE HONORABLE JOSHUA D. WOLSON**
16                 **UNITED STATES DISTRICT JUDGE**

17

**A P P E A R A N C E S:**
18

      DEREK SMITH LAW GROUP, PLLC
19     BY:  SETH D. CARSON  ESQUIRE
      1835 Market Street, Suite 2950
20     Philadelphia, PA 19103
      For the Plaintiff
21

22         Maureen McHugh, Official Court Reporter
            maureen_mchugh@paed.uscourts.gov
23

   Proceedings recorded by mechanical stenography; transcript
24       produced by computer-aided transcription.

25

*United States District Court*

1   **A P P E A R A N C E S:(Cont'd)**

2

        JACKSON LEWIS, P.C.
3       BY:  STEPHANIE JILL PEET, ESQUIRE
             JONATHAN CAVALIER, ESQUIRE
4            TIMOTHY MCCARTHY, ESQUIRE
             1601 Cherry Street, Suite 1350
5            Philadelphia, PA 19102
             For the Defendant
6

7

8

9

10

        **ALSO PRESENT:**

11

12          Melissa Meyer, Paralegal

13          Laura Buenzle Roberts, Courtroom Deputy

14          Catherine Lowry, Esquire

15

16

17

18

19

20

21

22

23

24

25


                        *United States District Court*

1                          I N D E X

2

EXAMINATIONS                                              PAGE

3

4    **DANIEL SPATARO**

     DIRECT EXAMINATION BY MR. CARSON:                     41
5    CROSS-EXAMINATION BY MR. CAVALIER:                   101
     REDIRECT EXAMINATION BY MR. CARSON:                  161
6    RECROSS-EXAMINATION BY MR. CAVALIER:                 175

7    **RICHARD FORD**

     DIRECT EXAMINATION BY MR. CARSON:                    178
8    CROSS-EXAMINATION BY MR. CAVALIER:                   181

9    **OWEN ANTHONY CONWAY (Via Zoom)**

     DIRECT EXAMINATION BY MR. CAVALIER:                  206
10   CROSS-EXAMINATION BY MR. CARSON:                     216
     REDIRECT EXAMINATION BY MR. CAVALIER:                219

11

12                       E X H I B I T S

13

DEFENDANT EXHIBIT 17 WAS RECEIVED IN EVIDENCE             144

14

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS held in open court before The Honorable

2   JOSHUA D. WOLSON, United States District Judge, at 8:44 a.m.)

3          THE COURTROOM DEPUTY:  All rise.

4          THE COURT:  Good morning, everybody.  Seems like we

5   have a few issues to tackle this morning before we get back to

6   the jury.  I'm going to tackle them in the order they came up

7   even though it's sort of inverse to the order in which they are

8   going to come up today.

9          So let me -- let me start with the issues concerning

10  Mr. Conway because that's where, I think, we left off

11  yesterday.  So I guess I'll start with the question, have you

12  all talked and where does that stand?

13          MR. CAVALIER:  Your Honor, as far as I know, plaintiff

14  still objects.

15          THE COURT:  Yes, Mr. Carson?

16          MR. CARSON:  Yes, Your Honor.

17          THE COURT:  Okay.  Well, so I guess, as I understand

18  the issue, the question is, first and foremost, whether --

19  let's start with the disclosure questions.

20          Is it correct, Mr. Cavalier, that Mr. Conway has not

21  been disclosed as in either 26(a)(1) or (a)(3) disclosures?

22          MR. CAVALIER:  Your Honor, Mr. Conway was not

23  disclosed in our initial disclosures in this case.  However, he

24  was disclosed by the plaintiff himself in deposition testimony,

25  and I can cite you some cases here that made clear that under

*United States District Court*

1    Rule 26 an individual's existence or knowledge can, quote,

2    "Otherwise be made known and thus be sufficiently disclosed for

3    Rule 26 purposes through deposition testimony."  That was

4    clearly done here.  I don't want to jump the gun, but I can

5    also explain to you the argument why.

6            Essentially, the touchstone here is unfair prejudicial

7    lack of notice, right?  I mean, that's ultimately the governing

8    concern.  And despite my best efforts, I couldn't find a single

9    case where a witness listed in the opposing party's pretrial

10   was such that that party could then later claim lack of notice

11   and lack of ability to prepare at trial for that witness.

12           If that were the case, if a plaintiff could get away

13   with that, it would incentivize essentially what happened in

14   this case, which is the plaintiff discloses 31 names as trial

15   witnesses in the pretrial memo with no proffers, requiring us

16   to do all the work preparing for those witnesses under the

17   assumption that they're all or mostly going to be called at

18   trial.

19           And then we tried to call one, after our prep reveals

20   and the testimony reveals they might have helpful information

21   to the jury, only to then disclaim notice and say that it's

22   unfair for that witness that they claimed they were going to

23   call to testify.

24           I think that -- that such a ruling would create

25   incentives for gamesmanship.  I think it would create

*United States District Court*

1    imbalances in the way pretrial memos were submitted to the

2    Court.  I think it's against the spirit of the rules.  And

3    again, in my experience and in my research, I couldn't find a

4    single case where a court disallowed a witness for Rule 26

5    purposes when that witness was disclosed on plaintiff's

6    pretrial memo as a trial witness.

7         THE COURT:  Are there cases that do the inverse, that

8    say, well, because the witness is on party A's pretrial list,

9    party B can call him even though party B didn't list them?

10        MR. CAVALIER:  I would say, first off, Your Honor,

11   that's a surprise to us that there isn't an enormous body of

12   case law on an issue like that.

13        But the cases that we found do indicate that, in such

14   a situation, under both Rule 36 and Rule 37, that when fair

15   notice is provided and there is a lack of prejudice that the

16   parties should be permitted to call the witness.  I can cite

17   these cases for you on the record or I could submit in a bench

18   brief.

19        THE COURT:  I'd rather take a look at least at one or

20   two now.  So, I mean, if you have others you want to put -- I

21   mean, I'd put them on the record.

22        MR. CAVALIER:  Sure.  So the first one is McCowan vs.

23   City of Philadelphia, 603 F. Supp. 3d 171 at 186.  The second

24   is Woodhouse vs. Spearman.

25        THE COURT:  Let me get through McCowan.  You said 186,

*United States District Court*

1   right?

2          MR. CAVALIER:  Yes, at 186.

3          THE COURT:  At 186.

4          MR. CARSON:  What was the first case again?  What was

5   the first case?

6          MR. CAVALIER:  It was McCowan vs. City of

7   Philadelphia.

8          MR. CARSON:  What was the case number two?

9          MR. CAVALIER:  I haven't said it yet.

10         THE COURT:  I haven't gotten to case number two yet,

11  Mr. Carson.

12         Okay.  I've read McCowan.  I've read sort of through

13  pages 186 and 187.  187 sort of -- Judge Marston's opinion

14  seems to invoke what amounts to some version of Pennypack

15  factors that gets you to Rule 37.  Go ahead.

16         MR. CAVALIER:  Number two is Holley vs. Port Authority

17  of New York.  This is a District of New Jersey case from 2018.

18  The cite is 2018 -- actually, I'll give you the Westlaw cite.

19  I know you prefer Westlaw, yes?

20         THE COURT:  Yes.

21         MR. CAVALIER:  It's 2018 WL 11413338.

22         THE COURT:  And you can -- the pin cite?

23         MR. CAVALIER:  I have the pin cite for the LEXIS

24  decision, but I can find you the Westlaw.

25         THE COURT:  Just give me a couple of words and I'll

*United States District Court*

1    search for it.  I have it.

2            MR. CAVALIER:  I was going to say it looks like it's

3    pin cite 20.

4            THE COURT:  Yes.  Okay.  Okay.  So I see that.  I see

5    what Holly says as well.  All right.  I see the cases are

6    similar.

7            MR. CAVALIER:  Essentially.

8            THE COURT:  Let me hear from Mr. Carson on this.

9            MR. CARSON:  So factually, the set of facts that

10   you're hearing is not what happened at all.  So yeah.  The

11   pretrial memo says what it says, but very early on, about a

12   month before the trial, John and I had email conversations.  He

13   said are you really calling all these people.  I said

14   absolutely not.

15           I gave him a list of people I intend to call.  It's

16   the people I did call in this case.  Owen Conway was not on

17   that list.  I let them know, basically, the list I provided was

18   a list given to me by my client.

19           And so, you know, I don't think that this idea that

20   they had to prepare for all 31 witnesses, it never happened.

21           And so, but more than that, at no time during

22   discovery has Owen Conway even been mentioned in the case by

23   defendants as someone they might call.

24           THE COURT:  Wait.  Wait.  Wait.  Okay.  So there's two

25   different things there.  Has his name been mentioned in

*United States District Court*

1   discovery, period?  Like, not as someone you're going to call.

2   Because we understand they've never said under 26(a)(1) or

3   (a)(3) that they might call him.

4          MR. CARSON:  Or in their discovery responses.

5          THE COURT:  I don't know what interrogatories you

6   asked.  Did you ask who they were going to call at trial?

7          MR. CARSON:  I don't think that question was posed

8   in --

9          THE COURT:  There's no reason to pose in

10   interrogatories because the rules are part of disclosure.  That

11   was sort of my approach when I was in practice.

12          MR. CARSON:  I understand that.  So his name didn't

13   appear under relevant information in those responses.

14          THE COURT:  Well, so, okay.  Mr. Cavalier said his

15   name came up in depositions; is that right?

16          MR. CARSON:  As he's one of the people who was started

17   as a network engineer and then was promoted to a senior network

18   engineer and then he left in 2017, you know, three years before

19   any of the events in this case took place.

20          But more than that, the fact pattern in this case is

21   that his name wasn't identified until the night before the last

22   day of the trial, and there is prejudice by this.  You know, at

23   least if they would have told me a week before the trial, I

24   could have scrambled to try to figure out how to handle this.

25          But I have no idea if anything this guy is going say

1  is true.  I have no way to test what he's going to say.  I've

2  never spoken to the guy.  It's my understanding that he's in

3  California beyond reach.  I think that there is prejudice in

4  this case.

5          If they want to call him as some sort of impeachment

6  witness, I guess that's fair game.  But I think calling him and

7  putting him on the stand as part of their defense in this case,

8  I just don't think it's fair to us or my client.

9          THE COURT:  Can you, Mr. Cavalier, either hand up or

10  read into the record where the disclosures are in the

11  depositions about him.

12          MR. CAVALIER:  Sure.  First of all, his name is

13  disclosed in plaintiff's complaint three different times.  So

14  right off the bat, his name is in the case.

15          I can give you cites or read deposition testimony from

16  Mr. Williams' own deposition testimony.  When asked about his

17  application to a position for senior network engineer, which

18  Mr. Williams, as you recall from testimony, was made a part of

19  this case.

20          He says, "I was not allowed to even provide when --

21  when -- when Owen Conway got promoted to senior network

22  engineer, I said why wasn't I made aware of the position?

23  Because I would have applied.  And that's when he" -- meaning

24  Dan -- "Starts yelling at me.  Because I'm telling him all

25  about age-related comments.  And he said at that meeting in

*United States District Court*

1  Galloway, outside in the parking lot, he was yelling at me and

2  saying -- and telling me it was because of my age and I'm being

3  dramatic."  And he goes on.

4          A few lines down:

5          "QUESTION:  You mentioned Owen Conway.  How old is

6  Owen Conway?  Do you know?

7          "ANSWER:  I don't.

8          "QUESTION:  Okay.  Do you know his sexual orientation?

9          "ANSWER:  Yes.

10          "QUESTION:  What is it based on, your knowledge?

11          "ANSWER:  He's in a relationship with another man."

12          And I'm looking down through this.  There's more

13  questions about Mr. Conway, questions about Mr. Conway and

14  Mr. Spataro, and so on and so forth.  That's in the first piece

15  of Mr. Williams' deposition.  I can tell you now if his name is

16  mentioned in the --

17          THE COURT:  When you say the first piece, can you just

18  give me a date and a page cite?

19          MR. CAVALIER:  Yes.  So for that one, this is the

20  June 2, 2023, deposition.  The page cites are essentially 140

21  through 142.

22          THE COURT:  Okay.

23          MR. CAVALIER:  Let me give you a quick check on the

24  other one.

25          MR. CARSON:  Your Honor, may I just add --

*United States District Court*

1          MR. CAVALIER:  He's actually mentioned on --

2          THE COURT:  Let me get the citation on the record,

3     Mr. Carson.

4          MR. CAVALIER:  So this is the June 5, 2023, piece of

5     Mr. Williams' deposition, and he's mentioned repeatedly through

6     pages 60 through 65.

7          THE COURT:  Okay.  All right.  Go ahead, Mr. Carson.

8          MR. CARSON:  So here's, I think, a very important

9     question.  So we've been hearing this entire time that

10    defendants had this impeachment witness.  I think if we look

11    back on the record, and I have it here, I certainly can point

12    it out.  Impeachment witness, impeach witness, impeachment

13    witness.

14         So did they start talking to Owen Conway at some point

15    a week or two ago and they just decided they were going to hold

16    it until the last second and then tell us they were going to do

17    this move?  If that's the case, that's trial by surprise,

18    right?  That's not fair either.

19         I think it suggests that there's some bad faith going

20    on.  Because why wouldn't they just -- the minute that they

21    thought they were going to call Owen Conway, why didn't they

22    let the Court know or let me know and amend their pretrial

23    memorandum or just send an email and say, hey, we want to add

24    this guy to the witness list.  Do you have any objection.

25         MR. CAVALIER:  I can answer that question.

*United States District Court*

1          THE COURT:  Go ahead.

2          MR. CAVALIER:  The answer to that question is simple.

3    We weren't talking to Mr. Conway until after Mr. Williams

4    testified and mentioned his name.  He was not our original

5    intended impeachment witness, and the first time I ever spoke

6    to the guy in my life was -- what? -- over the weekend.

7          MR. CARSON:  They waited until 5:30 last night to tell

8    us.

9          THE COURT:  All right.

10          MR. CAVALIER:  Again, Your Honor, I don't see how it

11    can be called unfair surprise when the plaintiff disclosed this

12    witness's name in their initial disclosures, testified about

13    him in his deposition, and then told us six weeks before trial

14    that he intended to call this witness.  What's the purpose of a

15    pretrial memo with witness disclosures if you can simply say,

16    well, I didn't really mean it.

17          MR. CARSON:  I told you I didn't really mean it in an

18    email.

19          MR. CAVALIER:  You told us that once, and then you

20    circled back, went to 16 names, then back to 31 names, and we

21    could never nail this down.

22          And, Your Honor, we put that issue before you before

23    the trial started.  You're familiar with that issue.

24          THE COURT:  Okay.  All right.  Julia?

25          (Discussion held off the record.)

*United States District Court*

1         THE COURT:  Okay.  All right.  So, you know, I think
2  we all are generally in agreement here that the test I need to
3  use here is the one that's set forth in the Nicholas vs. Penn
4  State University, it's 227 F.3d 133.  That's the case that was
5  relied on both in McCowan and in Holley, which sets out four
6  factors to decide whether to exclude a witness under Rule 37.

7         It's prejudice or surprise in the party against whom
8  the excluded evidence would have been admitted, the ability of
9  the party to cure that prejudice, the extent to which allowing
10 the evidence would disrupt orderly and efficient case or other
11 cases in the court, and bad faith or willfulness in failing to
12 comply with court order or discovery obligation.

13        With respect to prejudice or surprise, I think I agree
14 with the reasoning that I see in Holly and McCowan, which is
15 that if, you know, if a witness's name is both disclosed in
16 discovery, as it appears that Mr. Conway's name was, coupled
17 with the fact that he was on the plaintiff's witness list,
18 pretrial witness list, it, you know, it becomes difficult to
19 claim prejudice or surprise.  By Mr. Carson's admission, he was
20 on the witness list based on information supplied by
21 Mr. Williams.  So that information was in Mr. Williams' and,
22 therefore, Mr. Carson's custody.

23        I think the surprise here is that he's being called,
24 not that he's got relevant information.  And given that the
25 plaintiff had indicated an intent to call him, I think

*United States District Court*

1  that's -- that prejudice or surprise gets diminished.

2         I understand what Mr. Carson is saying, that he may

3  have walked this back, but, unfortunately, Mr. Carson, that's

4  not how these processes work.  You don't get to throw

5  everything against the kitchen sink or against the wall and see

6  what happens with the pretrial memo.  You got to list the

7  people you're going to call.  That's the purpose of disclosure.

8  And so I have to take that to some extent at face value.

9         Ability to cure the prejudice, again, at this point,

10 you get to cross-examine Mr. Conway.  You have the facts that

11 your client has supplied.  Certainly, he was known during

12 discovery and there was the ability to depose him during

13 discovery if people thought he was important.

14        It's not going to disrupt the orderly and efficient

15 trial of the case.  As I understand, you've made arrangements

16 for him today.  We're going to talk about that in a moment,

17 though.

18        Bad faith or willfulness and failure to comply with

19 discovery obligations, I'm not seeing bad faith if it's

20 Mr. Williams' trial testimony that elevates the significance of

21 it and then the defendant's pivoting response.  So I don't see

22 that as bad faith.  So I'm not going to preclude the testimony

23 based on the lack of disclosure.

24        The sort of second piece of this that, I guess, I need

25 to hear about is the question of Zoom testimony.  And, you

*United States District Court*

1  know, there is, as I said, a rule on this, I said yesterday.  I

2  think it's Federal Rules and Procedure 43.

3          MR. CAVALIER:  That's correct.

4          THE COURT:  So let me hear from you, Mr. Carson.

5  What's your view on permitting him to testify on Zoom?

6          MR. CARSON:  So we object to him appearing by Zoom.

7  It's just, you know, defendants had an opportunity if they

8  wanted to get Mr. Owen Conway here to -- there's a process

9  that's set up to subpoena him.

10          THE COURT:  Well, he's outside the subpoena power of

11  the Court if he's in California.

12          MR. CARSON:  Can't they subpoena him through the

13  California court?

14          THE COURT:  That's for depositions and discovery, not

15  for trial.  You can't call a witness to come to trial if

16  they're outside the hundred-mile bulge.

17          MR. CARSON:  Okay.  And so if he doesn't want to

18  travel here to testify, I think allowing him to sit at his

19  house, we don't know what's going on at his house.  We don't

20  know what's happening.  We don't know who's there.  We don't

21  know if notes are being passed.

22          We've already seen evidence in this case that when

23  people are on Zoom, they're secretly sending notes to each

24  other.  I think that 's evidence that that's going on in

25  depositions.  I mean, that was pretty clear to me that it was.

*United States District Court*

1          At one point, the witness -- at one point, Vince

2    Palochko testified and talked about something being exported.

3    And then the second time, when Tom Asaro testified --

4          THE COURT:  Mr. Carson, I'm not -- I mean, that's

5    not -- these are generalized concerns about Zoom, right?  It's

6    true in every time that someone testifies by Zoom that they are

7    not in the full control of the Court.  So I get that.

8          I don't know what happened in discovery.  I really

9    don't want to go down the path of trying to litigate this

10   because I'm sure Mr. Cavalier will have a different take than

11   you do.  And I don't want to resolve these collateral issues in

12   resolving the question of Zoom testimony.

13         So the test here is are there -- is there good cause

14   and compelling circumstances.  So talk to me about that

15   specifically here.

16         MR. CARSON:  Sorry, Your Honor.  Can you ask me that

17   question again, please?

18         THE COURT:  The test in the rule is good cause and

19   compelling circumstances and with appropriate safeguards.

20         MR. CARSON:  So first, I mean -- so first of all, I

21   don't think there is good cause.  You know, it's easy

22   financially to -- if Mr. Conway wanted to travel here to do the

23   testimony, he could do it.  Certainly, it's a case cost that

24   defendants could pay to get him here.  So obviously, it's not

25   important to him to travel here.  And I don't think that --

*United States District Court*

1    that's not a compelling reason to allow him to just do it his

2    way.

3           There's a reason why the primary and the preferred

4    method to have witnesses testify is in the courtroom.  And we

5    all know what those reasons are.  I don't know of any

6    safeguards that have been suggested to make sure that his

7    testimony is not, in any way, impacted by the video conference.

8           And so I don't think there's any good cause to have

9    him testify by video.  He not sick.  He's not incapacitated.

10   He, you know, if he has a cold, you know what I mean, that's

11   not good cause to allow him to avoid traveling.  It's within

12   the jurisdiction of the Court to testify in this case.

13          I also think it can be confusing for the jury to not

14   understand why this witness is going to show up at the last

15   minute and just appear on a video screen and talk.

16          So no safeguards, no good cause, and I think if he

17   wants to testify, he should travel to Pennsylvania and come

18   testify.

19          THE COURT:  Okay.  Mr. Cavalier, let me hear from you.

20   What are the circumstances that compel him not to testify in

21   person?

22          MR. CAVALIER:  Sure.  So number one, the primary good

23   cause factor here is the fact that he wasn't known as a

24   relevant trial witness until Mr. Williams testified, as you've

25   just found.  That required a pivot based on Mr. Williams'

1  testimony.

2         He is 3,000 miles away.  He is not an employee of

3  Linode or Akamai.  He's not under our control in any way in

4  that respect.

5         It's ironic that the cost of bringing a witness across

6  the country to testify is scoffed at by a party that has not

7  paid any of the witness fees that are due to our people in this

8  case.

9         And lastly, he is, in fact, sick, as it happens.  At

10  least as of 3:00 p.m. yesterday he was sick.

11         So this has become more common in the post COVID era.

12  And while I know it is not freely granted, and the standard is

13  good cause, given the testimony we've heard in the case, the

14  fact that his name has been mentioned, the fact that he has

15  valuable information to offer the jury, and the fact that this

16  is not 2017 where seeing the witness testifying on a video

17  screen is going to be some foreign concept to the jury, we

18  think he should be allowed to testify.  We think there's

19  adequate good cause.  We think he's important enough to

20  testify, and we think, under the circumstances, everything

21  falls as far as the balance goes in favor of allowing it.

22         THE COURT:  When did you first speak with him?

23         MR. CAVALIER:  I have to check, but it was, I think

24  the earliest, Friday after court.

25         THE COURT:  Okay.  Did you ask him to come?

*United States District Court*

1          MR. CAVALIER:  Sure.  I begged him to come.  He said

2    he couldn't do it.

3          THE COURT:  Did he give a reason why he couldn't do

4    it?

5          MR. CAVALIER:  I don't want to mix my reasons up, but

6    he has work commitments, for one, that don't allow him to miss

7    work this week.

8          And then I believe he told us on -- I can't remember

9    if it was Sunday or Monday for the first time that he was also

10   ill.

11         THE COURT:  And ill being -- I mean, again --

12         MR. CAVALIER:  He doesn't have cancer.

13         THE COURT:  No.  I know that.  We covered that

14   yesterday.  I mean, there's a difference between, you know, I

15   feel less than 100 percent and, you know, I'm having a hard

16   time getting out of bed today.

17         MR. CAVALIER:  Based on what the witness told us, it's

18   not cancer and it's not seasonal allergies or the sniffles.

19   It's somewhere in the realm of COVID-19 or flu or a severe

20   code.  He said he has a fever.

21         MR. CARSON:  Did he say he had COVID-19?

22         THE COURT:  I think he's giving me an order of

23   magnitude, Mr. Carson, not a diagnosis.

24         MR. CARSON:  If that was a week ago.

25         THE COURT:  No.  I think that was Sunday or Monday,

*United States District Court*

1    you say?  Like in the last 48 hours.

2            MR. CAVALIER:  Absolutely.  I just can't remember when

3    I spoke to him.  It starting to blur together with the trial,

4    Your Honor.  It was either yesterday or the evening prior.

5            THE COURT:  All right.  Well, I'm going to -- unless

6    you spoke with him during the break yesterday, I'm going to

7    assume it was prior.  Because you talked about it yesterday at

8    10 of 5:00.

9            MR. CAVALIER:  I think we talked to him briefly at

10   lunch yesterday, but I believe it was Sunday when we first

11   learned that he was ill.

12           THE COURT:  All right.  Well, you know, let me say

13   this.  I know that video conferencing has become far more

14   common post COVID.  It is still a suboptimal way of doing

15   things.

16           MR. CAVALIER:  We agree.

17           THE COURT:  It's not the same as having someone in

18   person to testify.

19           That said, the test here gives me a fair amount of

20   discretion.  I do think that it's satisfied here in terms of

21   the good cause and compelling circumstances.

22           The short turn around, in particular, does strike me

23   as significant.  This isn't a situation where the defendants

24   were dilatory and then at the last minute decided to contact

25   Mr. Conway.  They did so based on the testimony they heard at

*United States District Court*

1    trial.  They got in touch with him.  It's not surprising at

2    that point that a witness, who's fairly distant, might say,

3    it's -- that he's not able to come voluntarily even if he is

4    willing to testify voluntarily.

5           MR. CARSON:  Your Honor, there's a case -- here's a

6    case in Pennsylvania Federal Court that denies request for a

7    witness to testify remotely at trial.  Because of COVID-19, a

8    pandemic is no longer enough to establish good cause in

9    compelling circumstances.

10           THE COURT:  And I agree with that, Mr. Carson.  I

11   don't think that the COVID-19 pandemic itself is enough, and I

12   don't think that that's what this case is.  This situation is I

13   think there's more there.

14           So I did look at the cases on this yesterday.  They're

15   kind of arranged all over the place, both in this district and

16   elsewhere.  It's clear that they're very fact specific.  I've

17   not seen any sort of overarching guidance from the Third

18   Circuit on this.

19           I think that in this case, the specific facts are the

20   short turnaround, a third-party witness who says I can be

21   available for a window but not for days on that short

22   turnaround.  Coupled with the witness's, you know, an illness

23   makes travel far more challenging.

24           All of that does strike me as rising to the level of

25   good cause.  I think the testimony is, at least, significant

*United States District Court*

1    enough, given what I've heard at trial, to -- that weighs in

2    favor of allowing it as well.

3        Again, we try to resolve these cases on the merits to

4    the extent possible.  So I'll allow it.

5        That said, I'm going to want two things to happen

6    here.  One is, at some point, I need you to run a test with

7    him, and he's going to have to -- you need to ask him -- or

8    maybe I'll just ask him at the beginning of his testimony to

9    confirm that there's no one there with him and he's not in

10   digital communication with anyone.  And he's going to have to

11   attest to both of those things under oath as a safeguard for

12   this.

13       MR. CAVALIER:  Not a problem.

14       THE COURT:  Okay.  All right.  So that's where we are

15   with Mr. Conway.

16       I understand that we've made some arrangements through

17   the court to facilitate his testimony.  I see the white screen

18   here.  And my understanding, we're going to do a test run with

19   Mr. Conway at lunch.

20       MR. CAVALIER:  Perfect.  Thank you.  And thanks to

21   your staff.

22       THE COURT:  All right.  So let me -- I think the other

23   issues that we need to turn to are the objections that I got to

24   the exhibits for Mr. Spataro last night from Mr. Carson.

25       I know, Mr. Carson, you say you sent them sort of in

*United States District Court*

1  abundance of caution before you met and conferred.  Have you

2  conferred and any of these resolved?

3          MR. CARSON:  No.

4          MR. CAVALIER:  I can resolve a few of them for you.

5          THE COURT:  Okay.

6          MR. CAVALIER:  I don't think we care about any of the

7  objections with the exception of -- Tim, catch me here if I'm

8  wrong -- Exhibit 17, Exhibit 23, and Exhibit 42 -- is 42 -- no.

9  That's the recording.  So we're not going to play the recording

10 again.

11         THE COURT:  And 42 is in evidence.  And I thought,

12 frankly, what Mr. Carson suggested made sense.  But there are

13 excerpts of the recording you want to play?

14         MR. CAVALIER:  We're not playing.  That's fine.  So

15 the dispute is over Exhibit 17 and Exhibit 23.

16         And before I get into the merits of this, I have to

17 note again, Your Honor, and you'll recall, I think, that I've

18 raised the same issue in prior cases with Mr. Carson.  I take

19 issue with the fact that I'm now again being accused of faking

20 a document and apparently supporting perjury without basis.  So

21 that's my first issue here.  That's not the first time that's

22 happened.

23         THE COURT:  Well, hold on.  Let me just -- I hear what

24 you're saying, Mr. Cavalier, and I want to come back to it.  I

25 just want to make the record clear on this because this was

1    done by email and not on the record.

2          So you're not going to use Exhibit 18 with

3    Mr. Spataro.

4          MR. CAVALIER:  Correct.

5          THE COURT:  Okay.  You're not going to use -- I don't

6    know if Exhibit 66 is also the recording, but you're not going

7    to use Exhibit 66 with Mr. Spataro?

8          MR. CAVALIER:  What is Exhibit 66, Tim?

9          MR. MCCARTHY:  It's the evaluation.

10          MR. CARSON:  It's just a duplicate of the evaluation.

11          MR. CAVALIER:  Well, then that's not a duplicate of

12    42.  I think certainly if I choose to do so, I should be able

13    to take Mr. Spataro through the evaluations that support that.

14          THE COURT:  They are in evidence, right?

15          MR. CAVALIER:  In evidence.  Sorry.  Yes.

16          THE COURT:  I don't remember which exhibit they are

17    but -- I'm sorry?

18          MR. CAVALIER:  49 is the defense exhibit.

19          THE COURT:  49?  Okay.  Fine.

20          MR. CARSON:  All I was saying is it's a duplicate.

21          MR. CAVALIER:  Yeah, he was just noting it's a

22    duplicate.  We just had the wrong number.

23          THE COURT:  So 49 -- obviously, that's fine, 49 is in

24    evidence, assuming we can get a foundation.  And I think there

25    will be, and that's fine.

*United States District Court*

1              You're not going to use Exhibit 59 with Mr. Spataro.

2    And these pictures that are attached to Mr. Carson's email,

3    you're not using those?

4              MR. CAVALIER:  They are just demonstratives, they're

5    not exhibits.  We were just disclosing them to the extent we

6    want to use them in our closing argument.

7              THE COURT:  Well, we can tackle that then if there's

8    some issue in closing.  Okay.

9              So then let me circle back.  Exhibit 17 -- you know,

10   Mr. Carson, you said, "See attached."  There's nothing attached

11   that relates to Exhibit 17.

12             MR. CARSON:  Sorry.  I attached it to the email I sent

13   to Mr. Cavalier and I just didn't reattach it.  I just kind of

14   copy and pasted it.  Because it was almost 9 o'clock, I wanted

15   to get it to you before your deadline.

16             THE COURT:  But so --

17             MR. CARSON:  But what was attached the day that they

18   were -- so this was produced after the close of discovery, not

19   --

20             THE COURT:  When after the close of discovery?

21             MR. CARSON:  I think it was -- I can look in the

22   email.  I think it was a week.

23             THE COURT:  A week after the close of discovery?

24             MR. CARSON:  Yes.  September 30th.  And I think

25   discovery ended September 23rdrd.

*United States District Court*

1             THE COURT:  Okay.

2             MR. CARSON:  Am I saying the right date?  Hang on.  I

3    think it might be June 30th.

4             THE COURT:  I'm more concerned with the orders of

5    baggage.  It was days, not months, after the close of fact

6    discovery?

7             MR. CARSON:  It was not months.  It was a week after

8    the closing --

9             THE COURT:  A week after the close, fine.

10            MR. CARSON:  I mean, this document was actively

11   concealed.  Every single witness that I asked about in this

12   communication said they don't remember or it was anonymous

13   communication, so I had no idea that this person even existed

14   until --

15            THE COURT:  Well, let me ask you a question.  When you

16   got this a week after the close of discovery, what did you do

17   with it?

18            MR. CARSON:  I mean, Your Honor, we had already talked

19   to you about discovery.  We had some pretty firm conversations

20   with you where you said this is it, this is the last time, so I

21   just kind of accepted that this was what I was dealing with and

22   I didn't do anything.

23            THE COURT:  Look, let's be clear.  I told you I wasn't

24   going to extend discovery, right, it was time for you to bring

25   the case to a close.  But obviously if you get something after

*United States District Court*

1   the close of discovery that's new, your remedy is to seek

2   relief from me to take further discovery about it.

3        And so I think that's different than is the idea that

4   I'm not going to grant these sort of continuances of the

5   schedule in the case.  So the fact that it was produced after

6   the close of discovery and then you had several months in which

7   you could have asked me for relief to cure that issue doesn't

8   really impress me in terms of a basis to exclude the exhibit.

9        MR. CARSON:  Right.  So that -- it's kind of

10  everything together.  On top of that, they are absolutely

11  submitting it for the truth.  They want to prove that what this

12  said in the email is the truth of what actually happened.

13       It's not the complete document.  And you can even see

14  that there's cut-off information -- what the cut-off

15  information above is, hey, can you send me this email?  You

16  know, can you send this text message to me, or something like

17  that.  You know, we don't know what it is because it's a

18  snippet from a much larger conversation.  And it's hearsay

19  submitted for the truth, it should be excluded on that basis as

20  well.

21       And I think when you take everything into account, the

22  false statements made about this document during all three of

23  their depositions, the fact that it was produced after

24  discovery, the fact that it's a partial document, and the fact

25  that it's hearsay, I think those things altogether warrant

*United States District Court*

1    exclusion.

2            THE COURT:  All right.  Mr. Cavalier.

3            MR. CAVALIER:  First of all, it's not hearsay because

4    we're not offering it for the truth.  Part of the subject of

5    the testimony here has been the notice provided to Mr. Spataro

6    about the article.  There's, frankly, nothing in this document

7    and in the words on the document that would be hearsay.  I

8    mean, even if we were offering it for its truth, I don't see

9    why we would care.  The document is to show that an employee

10   sent this article to Mr. Spataro, and that's how he found out

11   about it.

12           I don't know if you want me to speak to discovery

13   issues.  I think you covered them there.  Certainly we would

14   have produced --  if Mr. Carson wanted to ask Mr. Spataro

15   additional questions about this document, he could have told

16   us, we would have produced him, he could have asked the

17   questions.

18           Finally, again, this goes back to sort of the fairness

19   here.  We disclosed this exhibit in our pretrial memo.  We had

20   a pretrial conference where all of the exhibits were discussed.

21   We talked about all of this.  There's an opportunity in Your

22   Honor's procedures to raise issues with exhibits like this.

23   This exhibit was not the subject of an objection from the

24   plaintiff.  And so I'm a little mind boggled as to why on the

25   eve of the sixth day of trial I get a communication from

1  plaintiff's counsel saying that this is part of an effort to
2  suborn perjury.
3        THE COURT:  All right.  So I'm going to allow
4  Exhibit 17.  There's a couple reasons why.  First, I don't
5  think it's hearsay.  I think it's offered for the fact that it
6  was said, not for the truth of it.
7        But secondly, you know, to Mr. Cavalier's point, there
8  were objections that were made to pretrial exhibits, and under
9  Rule 26(a)(3)(B), the rule says that "within 14 days of
10 receiving pretrial disclosures or at another time that the
11 court may set" -- and I set a different time -- "a party may
12 serve and promptly file a list of the following objections."
13 That includes "any objection together with the grounds for it
14 that may be made to the admissibility of materials identified
15 under Rule 26(a)(3)(A)(iii)" -- which is documents, disclosure
16 of documents.
17        And it says, "An objection not so made except for one
18 under rules Federal Rule of Evidence 402 or 403 is waived
19 unless excused by the court for good cause."
20        I don't see good cause here.  We spent a lot of time
21 going through the exhibits at the final pretrial conference.
22 So to the extent there were objections that could have been
23 made, I think they've been waived.  But in any event, even to
24 the extent I consider it, the hearsay objection would be
25 overruled.  So 17 can be used.

*United States District Court*

1          And then we have, 23 is the other one, Mr. Cavalier?

2          MR. CAVALIER:  Yes, Your Honor.

3          THE COURT:  All right.

4          MR. CAVALIER:  So this is the performance review from

5     Carl Williams to Dan Spataro.  A couple real quick easily

6     disposed of parts of this objection, this document plaintiff

7     takes issue with not that it was produced after discovery, but

8     that it was produced on the last day of discovery.

9          So I think Your Honor's decision on that argument as

10    to Exhibit 17 also controls here.  Again, this document was not

11    objected to during --

12         THE COURT:  I think it was, wasn't it?  I think it was

13    the subject of an objection.

14         MR. CAVALIER:  I see it as an objection reserved at

15    trial.  I'm sorry.

16         THE COURT:  I think there was an objection made, and I

17    think we discussed it at the final pretrial conference, and my

18    recollection is I think I overruled the objection at the final

19    pretrial conference.

20         MR. CAVALIER:  I think that's right.

21         Lastly, again, I'm being accused of offering the Court

22    a fake document, which I take issue with generally.  There's no

23    basis for that assertion.

24         MR. CARSON:  There is a basis.

25         MR. CAVALIER:  Mr. Williams was shown this document in

*United States District Court*

1  his deposition and didn't claim that it was a fake.  And beyond

2  that, it can certainly be offered as a party admission as an

3  exclusion to the hearsay rule.  So there's no hearsay objection

4  here.

5        And lastly, you know, it's -- there's nothing untoward

6  about having the person being reviewed by the plaintiff testify

7  about the impact that had on him and what it said about the

8  relationship and treatment of one another.

9        MR. CARSON:  Your Honor, he doesn't know if the

10  plaintiff even wrote it.  He can't lay a foundation through Dan

11  Spataro.  Dan Spataro wasn't there when this purportedly was

12  written.

13        Also, there's not a review process at Linode that

14  looks anything like this.  There is no Excel spreadsheet or --

15  this is information that was taken from somewhere else by

16  someone at Linode and then added to an Excel spreadsheet in

17  this format.  This is not the original format that any review

18  is done.  There's not a single date on this document.  We don't

19  even know when it was written.

20        Since Dan Spataro wasn't there when it was written, he

21  can't confirm the date when any of this stuff happened.  If

22  they wanted to introduce this document, the correct way to do

23  it would have been through Mr. Williams.  But the reason they

24  didn't do that is because it -- you know, exactly for the

25  things that I'm arguing, because they wouldn't have been able

*United States District Court*

1    to lay a foundation for it.

2              So now they are going to try to do it through

3    Mr. Spataro, who has no basis and fact and no personal

4    knowledge that anything in this document was even written by my

5    client.

6              MR. CAVALIER:  We don't know that.  And I think it

7    would be subject to my ability to lay a foundation with

8    Mr. Spataro.  And I think all of the other things that

9    plaintiff said go to weight, not admissibility.

10             THE COURT:  Well, I was going to ask.  I mean, you're

11   going to lay a foundation with Mr. Spataro, who's going to say

12   he knows what this document is and how it was generated?

13             MR. CAVALIER:  I believe so, yes.

14             THE COURT:  Okay.  So, you know, if he can do that,

15   then I think it's potentially admissible.  You know I need to

16   hear that testimony.

17             MR. CAVALIER:  Sure.

18             THE COURT:  And if there's -- I guess if you have an

19   objection to the foundation that's laid, Mr. Carson, you can

20   make it, okay, but I'm not going to go on the words of counsel

21   on this.  So let's just do it when you get to it.  Okay.

22             So I think that's it, right, in terms of the issues we

23   need to take up?  Yes?  Anything else from --

24             MR. CAVALIER:  That's fine, yes.

25             THE COURT:  -- your perspective, Mr. Carson?

*United States District Court*

```
 1              MR. CARSON:  No, Your Honor.

 2              THE COURT:  Okay, all right.  So I think the jury is

 3    ready.  Why don't we bring them in and we'll get started.

 4              MR. CAVALIER:  Your Honor, I don't mean to be petty,

 5    but I do need to ask again, given the scheduling this morning

 6    that we're now at 9:30, is there a deduction for plaintiff's

 7    time here?

 8              THE COURT:  I'm not taking -- I mean, these are

 9    pretrial issues.

10              MR. CAVALIER:  Right.  But we started at 8:50 instead

11    of 8:30.

12              THE COURT:  Yeah.  I mean, Mr. Carson was late.  I

13    know he was late.  I'm not going to deduct his trial time based

14    on that.

15              MR. CAVALIER:  Fair enough.

16              THE COURT:  I know we need to get this case done and

17    we're going to.

18              MR. CAVALIER:  Thank you.

19              MR. CARSON:  Also, my next witness is Dan Spataro.

20              THE COURT:  I understood that.

21              MR. CAVALIER:  He told me Ford.

22              MR. CARSON:  I did not say that.

23              THE COURT:  Okay.

24              MR. CAVALIER:  Ford is here.

25              THE COURT:  I don't know what was said between you and
```

*United States District Court*

1   -- I can't.

2           MR. CAVALIER:  I can tell you.  It's in text messages.

3           MR. CARSON:  It's not in text messages.

4           MR. CAVALIER:  Beyond that, before we get to the

5   exhibits, I'll also note that we haven't been given any

6   disclosures as to documents or exhibits for this witness.

7           THE COURT:  Yeah, go stop Laura.  Tell her not to

8   bring them in.

9           MR. CAVALIER:  My apologies for raising it now.

10          THE COURT:  Okay.  So, Mr. Carson, did you send a

11  disclosure to the defense about the exhibits you were going to

12  use with Mr. Spataro?

13          MR. CARSON:  Yes.  I took the pretrial list of

14  exhibits, the joint list, I marked them up, and I said these

15  are the ones for all three defendants.

16          THE COURT:  Wait.  I'm confused.  Did you -- have you

17  made like the day-before disclosures?

18          MR. CARSON:  Yeah.  I did it more than a day before.

19  So I took the document and I put an X next to each exhibit, and

20  I said these are the exhibits I intend to use for Mr. Spataro,

21  for Mr. Asaro, and for Vince Palochko.

22          THE COURT:  Meaning separately or meaning just this is

23  the universe of documents I'm going to use with all three?

24          MR. CARSON:  No.  I marked only the ones -- I didn't

25  say -- yeah, I said these are the ones I'll use for all three.

*United States District Court*

1  It's all the same exhibits, so I'll use for all three of them.

2          THE COURT:  Is that what happened?

3          MR. CAVALIER:  I don't recall that, but I'll take him

4  at his word for Mr. Spataro.  But I was mainly speaking about

5  Mr. Ford.

6          THE COURT:  Okay.  So then --

7          MR. CARSON:  That's true.  I did not provide any

8  exhibits.  I don't think Mr. Ford can authenticate a single

9  exhibit in this case.

10          THE COURT:  So you're not going to show him any

11  exhibits?

12          MR. CARSON:  I mean, I didn't say that.  I just didn't

13  say I agree --

14          THE COURT:  Wait a minute.  It can't be "I don't think

15  he can."

16          Are you going to use exhibits with Mr. Ford?

17          MR. CARSON:  I think I can ask him questions about

18  policies and things like that.

19          THE COURT:  You can ask him questions about things

20  that are -- you can ask him general questions about policies.

21  My order said disclose the exhibits you're going to use with

22  witnesses.

23          MR. CARSON:  Okay.

24          THE COURT:  Did you do that?

25          MR. CARSON:  I did not put a list of exhibits together

*United States District Court*

1    for Rich Ford.

2            THE COURT:  Why not?

3            MR. CARSON:  I just didn't get to it, Your Honor.

4            THE COURT:  I'm sorry?

5            MR. CARSON:  I just didn't get to it, Your Honor.  I

6    had 18 things to do for this trial and I'm doing it by myself.

7    I don't have a team of people working with me ultimately.

8            THE COURT:  Well, there's prejudice to the fact that

9    you don't get to it.  And there's a court order.  You don't

10   just get to disregard the court order because you're busy.

11           MR. CARSON:  I didn't just disregard it because I was

12   busy.

13           THE COURT:  Well, "I didn't get to it" is disregarding

14   it.

15           MR. CARSON:  I know.  I've been working nonstop from

16   the time we left the trial until now, so it wasn't that I

17   disregarded it.  It's just something that -- the way it

18   happened.

19           THE COURT:  All right.  Did you tell Mr. Cavalier that

20   Mr. Ford was going first today?

21           MR. CARSON:  No.  I absolutely know --

22           MR. CAVALIER:  I can read the latest --

23           THE COURT:  What does the text message say?

24           MR. CAVALIER:  So this is yesterday at 7:14 from Seth,

25   after I asked him -- I said, "Let me know if" -- this is 5:26

1  p.m. yesterday.  First, I said, "I hope your tooth feels

2  better.  Let me know in you are calling Ford next.  I need to

3  know if I should have him there first thing."

4          Seth says, "Either him or Dan.  I will let you know

5  tonight.  I think unless Ford, like, has some sort of

6  scheduling issue, I was thinking of calling Dan next."

7          "Can you send me the exhibits planned to use for Dan?

8  And I don't know if you're going to do some stuff with Ford,

9  but I was thinking maybe leaving them out.  I don't know.  I'm

10  using voice text right now.  I'm just kind of stream of

11  consciousness."

12          MR. CARSON:  Okay.

13          MR. CAVALIER:  I write back and I said, "I can get

14  Ford there first if that's who you want.  Just let me know your

15  preference and I'll make it work on my end."

16          And then I followed up later and I said, "I just need

17  to know when you want Ford since Dan will be there anyway.  As

18  it stands, I have Ford arriving at nine."

19          MR. CARSON:  So I didn't say that Ford was going

20  first ever.  I specifically said Dan.

21          THE COURT:  Where did you say Dan?

22          MR. CARSON:  I said if I have a preference, I'm

23  choosing Dan.

24          THE COURT:  Is that what it says?

25          MR. CAVALIER:  That's not what I just read.

*United States District Court*

1          MR. CARSON:  It is what you just read.

2          MR. CAVALIER:  I don't see anywhere where you say "if

3    I have a preference, I'm going to call Dan."

4          I specifically asked you, and you told me you'd

5    disclose --

6          THE COURT:  Hold on.  You can't both talk, okay.

7          MR. CARSON:  So it says, "I was thinking of calling

8    Dan next.  Can you send an exhibit plan for him?  If you are

9    going to do something with Ford, I'm thinking of maybe leaving

10   him out."  I specifically said, "I'm thinking of calling Dan

11   next."

12         THE COURT:  And then follow that up with --

13         MR. CARSON:  That was the last thing I said.  There's

14   no other messages from me.

15         THE COURT:  All right, I'm not going to -- I mean, the

16   communication could and should have been better.  Again, this

17   is one of those things I guess you didn't get to, Mr. Carson,

18   is responding to those texts, and there's a certain degree of a

19   lack of professionalism there, but I'm not going to dictate the

20   order -- there's enough notice to suggest that Mr. Spataro can

21   go.

22         So I'm going to let Mr. Carson call Mr. Spataro next.

23   Okay?  All right.

24         MR. CARSON:  Can we sequester Mr. Ford?

25         THE COURT:  I'm sorry?

*United States District Court*

```
 1              MR. CARSON:  Mr. Ford needs to be sequestered?
 2              THE COURT:  Yes.
 3              MR. CARSON:  Your Honor, I can start preparing to --
 4              THE COURT:  Yes.
 5              THE COURTROOM DEPUTY:  All rise.
 6              (Jury enters the courtroom at 9:33 a.m.)
 7              THE COURT:  All right.  You can all have a seat.  Good
 8    morning, everybody.  Sorry to keep you waiting.  I try to do
 9    the most I can without subjecting you to white noise whenever I
10    can, so that's what we're doing back here.
11              We're going to proceed now.  Mr. Carson can call his
12    next witness.
13              MR. CARSON:  Your Honor, I call Dan Spataro.
14              THE COURT:  All right.  Mr. Spataro, come on up.
15              THE COURTROOM DEPUTY:  Okay.  Please raise your right
16    hand.
17              (DANIEL SPATARO, HAVING BEEN DULY SWORN OR DULY
18    AFFIRMED, TESTIFIED AS FOLLOWS:)
19              THE COURTROOM DEPUTY:  Please state your full name and
20    spell your name for the record.
21              THE WITNESS:  Daniel Spataro, D-A-N-I-E-L,
22    S-P-A-T-A-R-O.
23              THE COURT:  You can have a seat.
24              Go ahead, Mr. Carson.
25              MR. CARSON:  Sure.  Thank you, Your Honor.
```

*United States District Court*

1                         DIRECT EXAMINATION

2    BY MR. CARSON:

3    Q.   Can you please just state your full name for the record?

4    A.   Daniel Spataro.

5    Q.   And, Mr. Spataro, where do you currently work?

6    A.   At Akamai Technologies.

7    Q.   And the reason you work at Akamai Technologies is because

8    of the acquisition of Linode by Akamai; is that correct?

9    A.   Yes.

10   Q.   And when Linode acquired -- when Akamai acquired Linode,

11   all the employees that worked at Linode transferred over to

12   Akamai, correct?

13   A.   As far as I know, yes.

14   Q.   And that included -- that included you and the network

15   engineers who worked underneath you?

16   A.   Correct, all the teams that worked under me.

17   Q.   And bonuses were paid to the network engineers, correct?

18   A.   It's part of our usual compensation that everyone got --

19   well, not everyone, but based on merit, year-end bonuses.

20   Q.   So I'm talking about the bonuses that Akamai -- that

21   occurred through the Akamai purchase that the network engineers

22   received bonuses through the Akamai purchase as well, correct?

23   A.   I didn't have direct knowledge of that.

24   Q.   Well, you received a bonus, correct?

25   A.   Correct.

*United States District Court*

1  Q.   How much was your bonus?

2          MR. CAVALIER:  Objection.

3          THE COURT:  Objection sustained.

4  BY MR. CARSON:

5  Q.   You were a director in the network engineering department?

6  A.   At the time of acquisition, I was the vice president of

7  infrastructure operations.

8  Q.   But you were the director in the network engineering

9  department throughout your time period at Linode, correct?

10 A.   Correct.

11 Q.   And my client was a director in the network engineering

12 department throughout his employment at Linode, right?

13 A.   He progressed there, correct.

14 Q.   And my client worked in the network engineering department

15 longer than you?

16 A.   Correct.

17 Q.   So I guess I'll ask again then, since you are the person

18 similarly situated to him, how much -- what was the size of

19 your bonus during the Akamai purchase?

20          MR. CAVALIER:  Objection.

21          THE COURT:  No, I'll overrule the objection.

22 BY MR. CARSON:

23 Q.   How much was it?

24 A.   It was just shy of $3 million.

25 Q.   And other network engineers also received bonuses of that

*United States District Court*

1  size; is that correct?

2  A.    I don't have knowledge of their bonuses.

3  Q.    And I'll take you back to 2016.

4        2016 is when your employment at Linode first began; is

5  that correct?

6  A.    Correct.

7  Q.    And it was what, February of 2016?

8  A.    About that, correct.

9  Q.    And prior to that, you worked at a company called Net

10  Access?

11  A.    Net Access Corporation.

12  Q.    And Linode did business with Net Access before your

13  employment at Linode began?

14  A.    Linode was one of the biggest customers of Net Access.

15  Q.    And you worked in like a data center for Net Access,

16  correct?

17  A.    Yeah.  I ran engineering and architecture.  I focused

18  mainly on what we consider manage services for like the network

19  and cloud services.

20  Q.    Where did you go to college for all of that?

21  A.    I didn't go to college.

22  Q.    And when you first started your employment at Linode, it

23  was through Tom Asaro; is that right?

24  A.    Yeah.  Actually, Carl reached out to me.  We had a launch

25  in Zinburger, I believe, in Morris Plains, New Jersey.  He

1  brought up the idea of them possibly having a position that I

2  could fill there.

3  Q.   Is it your testimony that your -- that it was Carl's idea

4  to bring you to Linode first?

5  A.   I'm not sure whose idea, but Carl reached out to me first,

6  correct.

7  Q.   Do you know if at that time -- so -- and by at that time,

8  I mean from like, say, February 1st of 2016 through April 1st

9  of 2016.  So you worked at Linode between that time, correct?

10  A.   Yes.

11  Q.   And when you first started working at Linode, weren't the

12  network engineers, they were doing -- one of the jobs that they

13  were assigned was to kind of vet talent and do job interviews?

14  A.   Correct, yeah.

15  Q.   And you're saying that Carl was assigned to vet you before

16  your employment at Linode began?

17  A.   Jeez, I definitely -- I think I was interviewed.  I'm a

18  little bit cloudy on who the interview team was.  I don't know

19  either way.  I'm sorry.

20  Q.   Did Carl know you before that?

21  A.   Before I worked -- before he was a customer -- before I

22  worked at Linode, who was a customer at Net Access?

23  Q.   Yes.  Did he know you?

24  A.   No.

25  Q.   So the first time you ever met Carl was because you were a

*United States District Court*

1  customer of Linode's, right?

2  A.   Linode was a customer of Net Access.

3  Q.   Right.  I'm sorry.  Yes, Linode was a customer at Net

4  Access and that's how you met Carl?

5  A.   Correct.

6  Q.   So you guys, what, had a couple interactions here and

7  there before your employment began?

8  A.   Yeah.  I think what Carl said in his testimony, and a

9  group of folks came up to our offices to kind of talk about

10  some of the scaling issues they were having on their network.

11  And we were kind of providing advice and how we could work

12  together and partner the two companies to help solve those

13  problems.

14  Q.   So that part of Carl's testimony is true, right?  That

15  happened?

16  A.   That did happen.

17  Q.   And that was the first time you ever met Carl face to

18  face?

19  A.   I believe so.

20  Q.   And the second time you met Carl face to face was, you

21  said, he took you out at lunch during some sort of interview

22  process.

23  A.   Yes.  It was more like -- it was funny.  It was kind of

24  more, to me, set up as more help.  But then at the end of or,

25  like, the middle of lunch, he kind of said, hey, we could kind

*United States District Court*

1  of use you to help out.

2      And then I was like, okay, let me talk to whoever makes

3  the hiring decisions.  I already knew Tom, so I pretty much

4  reached out to Tom.

5  Q.  So after that is when your employment at Linode began,

6  yes?

7  A.  Yeah.  In February, around there.

8  Q.  And so do you know who the director of human resources is

9  at Linode at that time?

10  A.  Yeah.  Vinny.  I don't know if he was director at the

11  time, but it was Vinny.

12  Q.  Vinny is -- what's his last name?

13  A.  Oh, jeez.  I've heard it 7 million times.  Palochko.

14  Q.  Palochko.  Okay.  So that's Vince Palochko, the person who

15  testified in this case a couple days ago; is that right?

16  A.  Correct.

17  Q.  And I think you were asked this question before, but

18  did -- when you first started at Linode, were they in the

19  Galloway Road office?

20  A.  Correct.

21  Q.  Or the Galloway township office?

22  A.  Yes.  I commuted there from my house in Northwest New

23  Jersey.  So I remember that very well.  It's a long commute.

24  Q.  And eventually, they moved to the Haddonfield office and

25  then to the Philadelphia office, correct?

1  A.   Yes.  There was some progression in there.

2  Q.   And you were there for the move to Haddonfield and then

3  the move to Philadelphia?

4  A.   Correct.

5  Q.   And when you moved to the Haddonfield office you and Carl

6  had -- your desks were like if you were facing one way looking

7  at a wall and he would be facing the other way looking at that

8  wall; is that right?

9  A.   I don't remember.

10  Q.   You guys sat close to each other, though?

11  A.   Yeah.  We were pretty much packed in there like sardines

12  in that place, and I remember moving to a different building

13  down the street.  They were just grabbing up space on King's

14  Highway.

15  Q.   Because they were growing so fast during that time period?

16  A.   Correct.  Yeah.

17  Q.   And you heard Tom Asaro testify in this case that Linode,

18  from the very beginning, did business in all, like, every

19  country on the planet or something like that.  Do you agree

20  with that?

21  A.   I think he was referencing that we had customers.  As long

22  as you had a credit card, you could just sign up and get

23  service.  Not saying that we had presence in every country in

24  the world.  Obviously.

25  Q.   Because you did not have presence in every country of the

*United States District Court*

1  world from the very beginning, correct?

2  A.   Well, yeah.  We still don't, I don't think.

3  Q.   And that presence in the countries that Linode was in as

4  of August of 2020, when my client was separated from his

5  employment, that global presence was built through or during

6  the time period between, say, 2015 to 2020?

7  A.   If you're asking if we've opened up data centers and grew

8  during that time, yes, that's correct.

9  Q.   Grew and added data centers in, like, multiple other

10  countries?

11  A.   Yes.

12  Q.   Like Australia -- I don't think that's a country.  It's a

13  continent.  But Australia and Mumbai and in Germany, right?

14  A.   Yeah.  We focused more on cities.  So like Sydney and

15  Mumbai, Trompta(PH).

16  Q.   So the network engineering department was responsible for

17  growing that global infrastructure; is that correct?

18  A.   Not solely responsible, but for building out the network

19  portion of it, correct.

20  Q.   And that was one of the things that you were brought on to

21  help with, right?

22  A.   Yeah.  When I started, we were in like an existential

23  crisis.  We were under a widespread DDoS attack.  It was

24  definitely a trial by fire for me.

25  Q.   What was that?  So some kind of like hacker thing?

*United States District Court*

1  A.   Basically.  Yeah.  I think Carl testified to that.  People
2  try to overwhelm your platform or your network with lots of
3  erroneous traffic.
4  Q.   And your interactions with Carl throughout his employment,
5  they were mostly positive, correct?
6  A.   Yes.
7  Q.   And no one ever came to you once while Carl was employed
8  and asked you to, you know, escalate anything into some kind of
9  like official complaint or anything like that about Carl,
10  correct?
11  A.   Not really.  Nothing serious.
12  Q.   And regarding performance evaluations, we've heard some
13  things about these performance evaluations.  And I think you
14  were in the courtroom when Carl testified that in 2020, he did
15  not receive a performance evaluation, and he was kind of
16  challenged on that because of something we heard on the
17  recording.
18        But he was right, right?  He did not receive a performance
19  evaluation that year, correct?
20  A.   Performance evaluations typically happen at the end of the
21  year, and then we have those mid-year check-ins.  Those were
22  kind of more loosely followed.  I didn't always do the best job
23  of having mid-year check-ins with all of my reports because I
24  did a lot of one-on-ones, so at least every week or twice a
25  month.  I felt like I always had good communication.

*United States District Court*

1    So if I didn't feel like I needed to do a formal mid-year
2  check-in and I could save that time, I would take that, you
3  know, and just meet with the person.  And I think he said that
4  we had lunch or whatever went over his performance.
5  Q.  But you didn't agree with that, right?
6  A.  Agree with what part?
7  Q.  That you guys had lunch and went over his performance?
8  A.  I'm not sure what you mean.
9  Q.  Do you agree that you had lunch and went over his
10 performance?
11 A.  I agree we had lunch.  I remember getting tacos because it
12 was COVID time, pretty much.
13    But, I mean, we talked about -- we talked about a lot of
14 topics, and we could have touched on some of his performance.
15 Q.  Do you specifically remember touching on his performance?
16 A.  I don't really specifically remember a lot about that
17 meeting.
18 Q.  Do you know when that meeting occurred?  Like, in so --
19 maybe not the date, but since it was brought up during that --
20 we heard it during that back-and-forth on the recording.  We
21 heard Carl say that this lunch had just happened.  Do you agree
22 that lunch had just happened?
23 A.  Yeah.  It was sometime -- it was warm out, summertime.
24 Q.  And Carl said during that lunch that you told him he was
25 good and had nothing to worry about.  Did you tell him that?

*United States District Court*

1  A.   Probably.  Because that's how I felt at the time.  I don't

2  want to speculate.  So maybe I shouldn't.

3  Q.   You said probably, though, right?

4  A.   It sounds reasonable, but I don't know for sure.

5  Q.   Well, if Carl says it, you trust him, right?

6  A.   Sorry.  What was the question?

7  Q.   If Carl said it, you trust that he said it, right?  Since

8  you don't remember, he said it --

9  A.   No.

10  Q.   You're going to go with what he said, right?

11  A.   I would not go with what he said.

12  Q.   I'll move on.  So just to get the question straight before

13  we move on, Carl was right, there was no mid-year performance

14  review done for him that year, correct?

15  A.   Not on paper.

16  Q.   And do you ever remember doing any performance reviews for

17  Carl?

18  A.   Yes.

19  Q.   When did you get that memory?

20  A.   I just remember writing one, at least.

21  Q.   Just one?

22  A.   It's off the top of my head.

23  Q.   And is it possible that that didn't happen and that you

24  did none?

25  A.   No, I don't think so.

*United States District Court*

1    Q.   What was the performance review process?  So did -- so you

2    did -- you were supposed to do performance reviews for Carl,

3    right?

4    A.   Yeah.  Your direct manager.

5    Q.   During those -- that time period, while Carl was the

6    network engineer 2016, 2017, 2018, he was supposed to receive a

7    performance review on an annual basis from you?

8    A.   There was one point where he did not report to me.  I

9    don't remember the exact dates or if someone else did his

10   performance review.

11   Q.   Are you talking about after he received that director

12   title?

13   A.   No, before.  When Tim Kaufman was promoted to manager,

14   Carl reported to Tim Kaufman.

15   Q.   And Tim reported to you, right?

16   A.   Yeah.  So I would do Tim's performance review in that

17   situation, not Carl's.  It was your direct report.

18   Q.   And were there times when people that worked underneath

19   you did performance reviews for you?

20   A.   Yeah.  It was called upward feedback.

21   Q.   What was the process for that?

22   A.   I think it was -- well, we changed systems at least once.

23   So I think it was just part of the process flow of the

24   performance review system.

25   Q.   Did you ever do an upward feedback for Tom Asaro?

*United States District Court*

1  A.   Not that I can recall right here.

2  Q.   Had you ever done any upward feedback at all during your

3  entire employment there?

4  A.   I don't remember specifically.

5  Q.   Did you ever specifically see someone else doing upward

6  feedback?

7  A.   Yes.  Yeah.  I would read -- I just remember for Tim

8  specifically, I read some of his upward feedback.  Yeah.

9  Q.   When Tim did it, did you actually see him doing, like,

10 writing it down?

11 A.   Tim's employees did an upward feedback for Tim.

12 Q.   Did you say that you saw Tim's for you?

13 A.   No.

14 Q.   Okay.  I misunderstood you.  So have you ever seen an

15 employee -- so when the upward feedback is done, do they

16 receive an email or it's done on a computer?

17 A.   It's done through the performance software, which is a

18 software that has a service application on the web, through a

19 web browser.

20 Q.   So they'll get a link on the website and go do it?

21 A.   Pretty much, yeah.

22 Q.   And they can do it any time they want?

23 A.   Within the period that it's open.

24 Q.   And, you know, you won't know exactly when they did it.

25 You'll just see when it's done?

*United States District Court*

1  A.   Man, you're bringing me back here.  There might be some

2  reminders through email.  I don't know.

3  Q.   I guess my question is have you ever actually seen someone

4  doing one?

5  A.   Like writing it out over their shoulder?  No.

6  Q.   Yeah.

7  A.   No.

8  Q.   So you agree -- so some -- one of things I've said in the

9  case a few times, I think, or suggested, is that Carl was asked

10  to do not just networking of computers but the networking of

11  people, right?  Do you remember that?

12  A.   Well, there's a progression of our careers, and, you know,

13  what we needed at the time.  So I think he filled that

14  networking of people role, I'd say, more in towards the end of

15  his tenure at Linode, middle to the end, but not the beginning.

16  Q.   He was good at that, though, right?

17  A.   The networking of people?

18  Q.   Yes.

19  A.   Yeah.  He seemed to reach out to people and, you know,

20  collaborate with them outside of work.

21  Q.   What are those skills that it takes to be good at

22  networking of people?

23  A.   I'm not sure because I'm not good at it, honestly.

24  Q.   Good communication skills?

25  A.   Yes.

1  Q.  Be personable?

2  A.  Yeah.

3  Q.  And Carl was good at those things, right?

4  A.  In those situations, he was, correct.

5  Q.  When you first started at Linode, Andrew Dampf was already

6  there; is that correct?

7  A.  Correct.

8  Q.  And Alex Forrester was already there?

9  A.  Yes, correct.

10  Q.  And Carl was there?

11  A.  Correct.

12  Q.  And was Owen Conway there?

13  A.  That's fuzzy timeline because, I believe, he was being

14  interviewed.  And when Tom offered me the job, he said, hey, we

15  have this person we really like, Owen.  Do you care if we hire

16  him?  Do you want to meet him?

17      And I think I had a call with Owen, just to make sure I

18  was on board with it, but I'm not super, super positive.

19  Q.  Carl's performance, it was pretty good, right?

20  A.  In the beginning, I think we had some issues trying to get

21  Carl in a position where he was set up for success.  I think

22  there was some early friction there.  That's kind of the

23  message I got from Tom when I started.

24  Q.  Well, he had been at the company for about -- what? --

25  like November 14th, November 15th, so a year and a half before

*United States District Court*

1  you started, possibly?

2  A.   Yeah.

3  Q.   And he had received pretty positive performance reviews in

4  the time period, right?

5  A.   To my knowledge, there were some issues -- yes, I mean --

6  I don't -- he -- saying the word "network engineering" is like

7  saying you do insurance, right?  There's all different kind of

8  insurance, commercial insurance, residential insurance.  So

9  it's a very general topic.

10       So I think if you take network engineering, it's almost

11  impossible to be good at all of it.  I think he was strong in

12  some areas and not in others.

13       And the areas that he wasn't strong in were the crisis

14  that we were in, like kind of stepping up and being able to

15  fight that, those attacks.  And we had an architect to maintain

16  and deploy a network that could, in the future, mitigate those

17  attacks.

18  Q.   Isn't everybody strong in some areas and not strong in

19  other areas?

20  A.   Correct.

21  Q.   So what Carl was strong at, he was good at the strategy

22  side, right?

23  A.   Yes, eventually.  Uh-huh.

24  Q.   And he was good at what it took to build out global

25  networks?

*United States District Court*

1  A.   I think we're a team, but he did take the bull by the
2  horns with some of the needs that we had, and he ran with them.
3  Q.   And so with -- what Carl helped Linode do during those
4  years was help to advance the global network for Linode,
5  correct?
6  A.   Yes, I think that's fair to say.
7  Q.   And he was good at creating relationships with providers,
8  right?
9  A.   I think he was great at making relationships with
10  colleagues.  Providers, he would turn the screws on them
11  sometimes, and it could lead to some friction there.  But, I
12  mean, he would usually do well for the company.  Yeah.
13  Q.   And he was also good at that networking people side,
14  right?
15  A.   Building relationships with colleagues, yes, colleagues as
16  in the people outside of Linode, I would say.
17  Q.   And at some point in time, Carl came to you and was pretty
18  upset about being passed over for a promotion; is that correct?
19  A.   He did mention -- well, I would like to explain the
20  process was -- we had an opening for network engineering
21  manager.
22  Q.   Answer the question first, though.
23  A.   What was that?
24  Q.   He came to you and he was upset, correct?
25  A.   Yeah, he came to me.

*United States District Court*

1  Q.   Upset?

2  A.   I don't know how to judge upset.  He wasn't happy, I don't

3  think, with what he understood were the circumstances.

4  Q.   And he came to you and he was upset, and he said that he

5  wanted to be considered for advancement, right?

6  A.   He wanted to be considered for network engineering manager

7  job.

8  Q.   And we've seen this letter, this email that you sent.  And

9  I can bring it up if you don't remember it, but it was the

10 September 2018 email.

11      Do you remember the September 2018 email that we've kind

12 of seen a few times in this case?

13 A.   I don't remember an email.  So please bring it up.

14 Q.   Sure.  It was the one -- here I'll pull it up here.  You

15 got water there?  We can get you water.

16 A.   Yep.

17 Q.   Just a moment.

18         (Brief pause.)

19 BY MR. CARSON:

20 Q.   So I think it's in there twice, but let's just use 15.

21 A.   Oh, okay.  It's a Slack message, not an email.  That's why

22 I got confused.

23 Q.   Yeah.  So this was a Slack message between you and Carl,

24 right?

25 A.   Correct.

1  Q.   And Slack was the primary method of communication at
2  Linode; is that right?
3  A.   For me it was, yeah.
4  Q.   And there was a thread between you and Carl that you used
5  to communicate with him throughout his employment, right?
6  A.   Correct.
7  Q.   And I think there was also a thread between you and Carl
8  and Tom, right?  Tom Asaro?
9  A.   Kinds of works like text messaging.
10 Q.   So there was a thread between you and Carl and you and
11 Carl and Tom and you and Carl, Tom, and Vince and you and Carl
12 and Chris Aker and a bunch of threads like that, right?
13 A.   That's entirely possible.
14 Q.   And this is the -- from the thread between you -- just you
15 and Carl, right?
16 A.   Correct.
17 Q.   And so after he came to you and he was upset about the --
18 those issues related to being -- the advancement, you sent this
19 to him, right?
20 A.   Yeah.  After I explained to him that it was not an open
21 position, I sent this to him in the hopes that we could
22 collaborate on a position for him.
23 Q.   And so this would have been after that he came to you,
24 right?
25 A.   Probably.

*United States District Court*

1  Q.  Well, it makes sense --

2  A.  It does chronologically, but I just don't know for sure.

3  Q.  But this appears to be your response to that, correct?

4  A.  Probably.

5  Q.  Okay.  And when he said he was upset and you said he

6  wasn't happy, I think your words were "not happy," he didn't

7  tell you that the reason why he wasn't happy was because he

8  thought that his age was affecting his opportunities?

9  A.  No.  I think not at that time.  He may have mentioned it

10  in the following meeting we had in Tom's office, but it was

11  more of almost like a throwaway-type line, you know.  It

12  wasn't -- it didn't seem like it was a big deal to him.

13  Q.  So but you said -- what do you mean it wasn't a big deal?

14  You just said he was upset, wasn't happy, right?

15  A.  He was upset about not being considered for the network

16  manager role, correct.

17  Q.  And then you just testified to -- I was going to head

18  there, but since you mentioned it, I guess I'll just do it now.

19      You said there was another meeting that you had where it

20  was you and Carl and Tom, right?

21  A.  Yeah.  I think a couple months later.

22  Q.  And he was upset at that meeting, too, right?

23  A.  He was.  I mean, after I sent him this, you just could

24  tell he kind of pouted, and he would do that.  So I let him

25  kind of stew on things.  I knew I was making him a very

1  well-intentioned offer here.  And I thought once he thought

2  about it and cooled off a little bit that he would come to the

3  right conclusion.

4  Q.   Your goal in writing the email was to appear

5  well-intentioned; isn't that correct?

6  A.   Uh-huh.  I wanted to help him.

7  Q.   You designed that email for that reason, right?  So you

8  appeared well-intentioned; is that correct?

9  A.   I did have good intentions.  So yeah.  It appeared that

10  way, too.

11  Q.   And so then he comes to you again, and this time it's not

12  just you, but you and the chief operating officer of the

13  company, the No. 2 guy, and he's upset again, right?

14  A.   Yeah.  I think the sticking point there is Tom --

15  Q.   He was upset again, first?  You can answer but --

16  A.   Yeah.  I mean, he called the meeting.  I don't remember

17  the level of -- like, he wasn't yelling like he was at the

18  termination call.

19  Q.   Do you remember now that it was him who called the

20  meeting?

21  A.   He called me in there.  I mean, I would assume.

22  Q.   So he asked for a meeting.  He wanted the chief operating

23  officer to be there, and he was upset.  And he mentions his age

24  at that meeting, correct?

25  A.   I think he briefly mentioned his age.  Yeah.

*United States District Court*

1  Q.  What does that mean, briefly?

2  A.  It wasn't, like, the topic of the meeting.

3  Q.  So if someone mentions age, though, aren't you supposed to

4  let Vince Palochko know that?

5  A.  I don't know.  I have no idea.

6  Q.  You don't know because Linode didn't really have policies

7  to give you any guidance on that, correct?

8  A.  Didn't seem like a big deal to me because it wasn't

9  because of his age.  So I was...

10  Q.  So you've seen Linode's policy.  It didn't require you to

11  go talk to Vince Palochko.  You were just encouraged to go,

12  right?

13  A.  Sure.

14  Q.  And you chose not to go, right?

15  A.  I didn't choose anything.  I didn't even think about it.

16  Q.  You didn't even think about it.  And did Tom think about

17  it?  Tom Asaro?

18       MR. CAVALIER:  Objection.

19       THE COURT:  Sustained.

20  BY MR. CARSON:

21  Q.  Did Tom talk to you about thinking about it?

22  A.  No.  I mean, no.

23  Q.  So he's upset at the meeting with you and the No. 2 guy in

24  the company.  And it was during that meeting that it was first

25  suggested that Carl would receive this title to director of

*United States District Court*

1  network engineering and interconnection, correct?

2  A.   I don't remember the exact way it happened.  Again, I was

3  sending this message to him so we could start collaborating on

4  his feelings.  And, you know, it was kind of like a guiding

5  document that we would then collaborate on to shore up the

6  details, right?  And one of the details we changed was

7  director.

8  Q.   And he wasn't a manager before that, was he?

9  A.   No.

10 Q.   And he was a network engineer before that, right?

11 A.   That was his title, yeah.

12 Q.   And so after -- so it was decided at that meeting between

13 you and Tom Asaro and Carl Williams that that director title

14 would be assigned to him, right?

15 A.   I don't remember exactly what happened, but the outcome

16 was he was -- we gave him a director title.

17 Q.   Yeah.  The outcome was in January of 2019, it was

18 announced that he was going to -- that that director role had

19 been applied to him, right?

20 A.   Correct.  Yeah.

21 Q.   So since you're similarly situated to him, I guess we can

22 compare and see if he was paid like a director.  How much was

23 your salary at the time?

24         MR. CAVALIER:  Objection to the predicate.

25         THE COURT:  Objection is sustained.

*United States District Court*

1  BY MR. CARSON:

2  Q.   So what were you paid -- what was your -- not your

3  benefits or anything, just your base income level as the first

4  time you became a director at Linode.  What was it?

5        MR. CAVALIER:  Objection on relevance grounds, Your

6  Honor.

7        THE COURT:  Sustained.

8        MR. CARSON:  Your Honor, can I request a sidebar?

9        THE COURT:  Yeah.

10       (Sidebar as follows:)

11       MR. CARSON:  Your Honor, my client has a disparate

12  treatment claim for disparate income levels, and we have a

13  situation here where we have a person who was in the network

14  engineering department, started working after him, and during

15  his employment, he went from being a position lower than a

16  director to a director.

17       My client went from being something lower than a

18  director to a director.  My client received the -- the

19  defendants are going to try to say that that $7,000 increase in

20  his salary was because he was a director.  My client has said,

21  no, that was just some sort of cost of living thing, and it was

22  commensurate with normal raises at that time.

23       And now we have an opportunity to see if that's true

24  by learning what the increase was from -- what the salary level

25  was for Mr. Spataro when he first became a director.

*United States District Court*

1          THE COURT:  Okay.  Maybe I misheard it.  I thought he

2   was hired as a director.

3          MR. CARSON:  No.

4          THE COURT:  No.  All right.

5          MR. CAVALIER:  He was.  They never held the same

6   title.  He was always above Mr. Williams in the reporting

7   structure.

8          THE COURT:  Was he hired in as a director?

9          MR. CAVALIER:  Yes.

10          THE COURT:  When did he become a vice president?

11          MR. CAVALIER:  Before Tim Kaufman was promoted to

12   director, in the 2018 time frame.

13          THE COURT:  Okay.  Just hold on.  So the question is,

14   what was he paid essentially when he came into the company?

15          MR. CARSON:  I think that what Mr. Cavalier just said

16   is incorrect, but I'll ask questions.

17          So my question would be, what was he paid when he

18   first came into the company, if that was true.  But I think if

19   I asked the question when you first were hired, you were a

20   manager and then your next level up was director, I think he'll

21   say yes to both those questions.

22          THE COURT:  Okay.  So either way -- that's maybe why I

23   misheard it.

24          But either way, if the claim is disparate treatment in

25   pay --

*United States District Court*

1                    (Court reporter interruption.)

2          THE COURT:  That's okay.  So I guess, yes, if you can

3    establish the change in title coming with a disparate amount of

4    a raise, that would make it somewhat more likely than not that

5    there was disparate treatment.

6          That said, disparate treatment has some temporal

7    element to it, right?  So if it's just was his salary as a

8    director when he was hired different than the salary that Carl

9    got upon, you know, several years later becoming a director, I

10   think that's meaningfully different.

11         Does that make sense, Mr. Carson?  You see what I'm

12   saying?

13         MR. CARSON:  Sort of.  So I think that -- like if I

14   ask him the question -- like say he says, well, my first title

15   was director -- I don't think he's going to say that, but if he

16   does, then I think I can say, well, when you were a director,

17   what was your base salary?

18         THE COURT:  But so then you got this temporal

19   disparity.

20         MR. CARSON:  Which is what?

21         THE COURT:  In other words, he was a director when he

22   was hired some number of years earlier.

23         MR. CARSON:  I'm talking about 2016, and I think he

24   remained director until -- my client was also a director.  They

25   were both directors at the same time.  But I'll lay a

*United States District Court*

1  foundation for that.

2          THE COURT:  If you lay a foundation, that's fine.  I

3  mean, it goes to the claim you asserted.  I just want to be

4  clear about some of the --

5          MR. CARSON:  I'll do some back-up questions first.

6          THE COURT:  That's fine.

7          MR. CAVALIER:  Briefly, I want to note before we go

8  into this, that I believe it's undisputed that at all times --

9  they can't be comparators when at all times Mr. Spataro was his

10 boss.

11         THE COURT:  No, I agree.  I understand what you are

12 saying.  But again, for instance, if there's a move within the

13 company from manager's director even in, you know, 2017, and

14 then there's a move from manager to director in, you know,

15 2018, '19, whatever the time frame is, those are -- I mean,

16 it's not a decade apart.  They're sufficiently temporal and

17 proximate that -- you know, if the pay increase is different,

18 it would at least support the argument that there's disparate

19 treatment.  I understand it may not be proof on its own, but it

20 goes to the argument.

21         MR. CAVALIER:  I hear you.

22         THE COURT:  Okay.  All right.

23         (Sidebar concluded.)

24 BY MR. CARSON:

25 Q.  So when you first started at Linode, you were hired to

1  manage the network engineering department, correct?

2  A.   Correct.

3  Q.   And at some point in time while you were employed at

4  Linode, you became a director, correct?

5  A.   Correct.

6  Q.   And so when you first got that director title, what was

7  your base salary?

8  A.   I believe I became a director when I then also got

9  promoted to be a head of the data center engineering

10  department.

11  Q.   And what was the base salary?

12  A.   It was -- I'm going to have to ballpark it, but between

13  like 200 and 250, something like that.

14  Q.   And do you remember how big the increase was when you got

15  the manager to the director title?

16  A.   No.

17  Q.   It was more than 7,000?

18  A.   Yes.

19  Q.   Significantly more than 7,000?

20  A.   I have no idea.  I shouldn't have answered yes so quickly.

21  I don't know.

22  Q.   But sometimes your first instinct is the right one, sir,

23  don't you think?

24          MR. CAVALIER:  Objection.

25          THE COURT:  Objection is sustained.

*United States District Court*

1  BY MR. CARSON:

2  Q.   I'll move on.

3       And so you were the decisionmaker for staffing decisions

4  in the network engineering department while you were the

5  manager, director, and any other position you held there,

6  right?

7  A.   I did not control the purse strings.

8  Q.   But you controlled the decision whether to promote, not

9  promote, hire, things like that?

10 A.   That's what I'm trying to say, I couldn't coordinate a

11 promotion and not have a budget.  That wouldn't really fly.  So

12 I had to kind of coordinate that with the people in charge of

13 the money.

14 Q.   But you were the decisionmaker, correct?

15 A.   Again, I wouldn't -- I could say, hey, I want to promote

16 this person for these criteria, you know, is there any money to

17 promote them?

18 Q.   Sir, do you recall -- so I didn't actually conduct the

19 deposition.  It was someone named Erica who was at our firm at

20 that time conducted it.

21      Do you recall that, though, when she asked you some

22 questions at a deposition?

23 A.   Yeah.  Yes.

24 Q.   And do you recall the date of that deposition?

25 A.   No.

1  Q.  Does January 6, 2023, sound right?  It was over a year

2  ago, correct?

3  A.  Yeah.  It was a while ago.

4  Q.  And you were under oath when you answered those questions?

5  A.  Yes.

6  Q.  And that was closer in time to all these events than we

7  are now, right?

8  A.  Yeah.  Yep.

9        MR. CARSON:  I can give Mr. Spataro a copy of the

10  transcript.  I'm going to use this a few times.

11        Can we?

12        THE COURT:  Okay.

13        MR. CARSON:  1 and 2.  So just for the record, there

14  was two depositions.  The one that says Volume II is the one

15  that I conducted, and the other one is this.

16  BY MR. CARSON:

17  Q.  This is Volume I.  So I'll direct your attention to page

18  26.  And page 26, line 21, says -- the question was -- so 19 to

19  22 is what I'll read from.

20      So the question you were asked is:  "Okay.  With regard to

21  the decision to separate Mr. Williams from his employment, you

22  were the decisionmaker, yes?"

23        MR. CAVALIER:  Objection.  That's not the same

24  question.

25        MR. CARSON:  Hirings and firings I said.

*United States District Court*

 1          THE COURT:  Hold on.  No, no.  Okay.  So --
 2          MR. CARSON:  I can ask more questions if you want.
 3          THE COURT:  I'm going to sustain the objection.  I
 4   mean, it's not impeachment.
 5   BY MR. CARSON:
 6   Q.  Sir, you were the decisionmaker with respect to
 7   terminations as well, correct?
 8   A.  Yes.
 9   Q.  And it was your decision whether -- you were given blanket
10   authority by Tom Asaro to do whatever you wanted in that
11   department, as far as like promoting people, right?
12   A.  Again, I didn't control the purse strings.  So I had to do
13   some coordination and collaboration with others.
14   Q.  Sir, you were in the courtroom when you heard Tom Asaro
15   say he gave you blanket authority to do that.  Do you disagree
16   with him?
17   A.  I agree I could hire people if I had budget, and I could
18   fire people if there was cause, and promotions had to be
19   coordinated.  That's what I agree with.
20   Q.  Did you coordinate with anyone when you were making the
21   decision to hire, say --
22   A.  Absolutely.
23   Q.  What was the question?  You didn't let me ask you it.
24   A.  Sorry.
25   Q.  So there was two people who were promoted -- well, there

*United States District Court*

1  was more than two people, but there was two people who were

2  promoted around the same time at the end of 2018, beginning of

3  2019, correct?

4  A.   I have no idea.

5  Q.   Well, aren't you the one who promoted Tim Kaufman to the

6  manager of the network engineering department?

7  A.   I did.

8  Q.   You don't know when you did that?

9  A.   No.

10  Q.   Do you know if it was November of 2018 that it was

11  announced?

12  A.   I'll take your word for it if you have the document.

13  Q.   And that position wasn't opened up in any way to anyone,

14  correct?

15  A.   It was not.

16  Q.   There was no canvassing, there was no Indeed article

17  posted.  You just staffed it with him, correct?

18  A.   Correct.

19  Q.   You preselected him and staffed it with him, right?

20  A.   Correct.

21  Q.   You didn't tell anyone in the network engineering

22  department that you were hiring and they could apply, right?

23  A.   Not that they could apply, right.

24  Q.   And the same is true for, you know, all the senior network

25  engineer positions that were staffed while you were running the

*United States District Court*

1  department, correct?

2  A.   We considered all those as career progressions.  We didn't

3  create a new job and then move someone from network engineer to

4  senior.  We just gave them a career progression to senior.  And

5  I would say the same for Tim, honestly.

6  Q.   Carl reported that the prospect process was not a fair

7  process, correct?

8  A.   He wasn't happy with the process.

9  Q.   He specifically said that it was not a fair process,

10 right?

11 A.   I don't remember those words.

12 Q.   So the same deposition transcript, page 32, line 11

13 through 15.

14 A.   Sorry.  What was the question again?

15 Q.   Hang on a second.  So the same questions I asked before.

16 You were under oath when you testified at this deposition,

17 right?

18 A.   Correct.

19 Q.   And this is the same one that was done in January, over a

20 year ago?

21 A.   Correct.

22 Q.   "QUESTION:  When you say your boss's office, let me stop

23 you for a second.  Who specifically are you referring to?

24       "ANSWER:  Tom Asaro.

25       "QUESTION:  Okay.

*United States District Court*

1    "ANSWER:  I guess Carl was upset that he wasn't considered

2    for the role.  I explained to him it wasn't an open position.

3    I had already had someone in mind that I vetted, and, you know,

4    he did not like that.

5        "QUESTION:  And when you say he did not like that, can you

6    tell me what you recall of his remarks?

7        "ANSWER:  I remember him -- it's hard because he would

8    often sometimes go off on like tangents.  I don't remember

9    exactly what he was saying honestly.  It was something to the

10   effect that he didn't think it was a fair process, and my

11   rebuttal was that it was not a process."

12       Do you remember that?

13           MR. CAVALIER:  Same objection to that being

14   impeachment, Your Honor.

15           THE COURT:  I mean, it's close.  I'll allow it.

16   BY MR. CARSON:

17   Q.   Sir, you just testified that you don't recall him saying

18   it wasn't fair.  But he did say that, right?

19   A.   I wasn't quoting him, I was just saying what I thought his

20   perception was.

21   Q.   So your perception of him was that he didn't think the

22   hiring and promotion process was fair, correct?

23   A.   Correct.

24   Q.   And that was the same meeting when he mentioned age,

25   right?

*United States District Court*

1  A.   I don't think so.

2  Q.   What do you mean?

3  A.   That might have been the meeting before I sent that Slack

4  message where we met and talked about it, and then I presented

5  him, you know, some options that we can move forward with.

6  Q.   So he mentioned age at that meeting?

7  A.   No.  That the process, he wasn't happy with the process.

8  Q.   He mentioned age at this meeting, though, correct?  The

9  one with Tom Asaro and you in Tom Asaro's office?

10  A.   I do remember some mention of age.

11  Q.   By "some," you mean a lot?

12  A.   No.

13  Q.   And there was no formal process at Linode for promotions

14  or hiring, right?  All managers could just do what they wanted?

15  A.   Well, we really progressed throughout the years, like

16  Vincent testified.  We put a lot of -- a lot of the informal

17  stuff we formalized, and by the end we had, you know, defined

18  career ladders, different avenues for folks to progress.  I

19  don't remember when those were put in place and what dates.

20  But early on, yeah, it was not super formal there, no.

21  Q.   Sir, I mean, it was a simple yes-or-no question.

22       Was there a formal process in place or did Linode just

23  allow managers to do what they wanted in terms of the

24  promotions and hirings?

25  A.   At what point in time are you speaking of and then I can

*United States District Court*

1  answer?

2  Q.   The time -- 2016, when you started, until 2020 when my

3  client separated?

4  A.   Yeah, in 2020, there was process in place where we could

5  -- like I said, there was formal career ladders and --

6  Q.   When was that process put in place?

7  A.   I don't remember, but it was towards the 2020s.

8  Q.   Any emails that you could show us or employee handbook

9  changes or anything you can show us to show this new process

10  that was suddenly put in place?

11        MR. CAVALIER:  Objection.

12        THE COURT:  It's overruled.  If you know that there

13  are emails or --

14        THE WITNESS:  I don't know emails.  I mean, I know of

15  career ladders and --

16  BY MR. CARSON:

17  Q.   How do you know that there was a process put in place?

18  A.   Because I was part of it.

19  Q.   So what did you do to make sure employees knew about this

20  new process?  Did you use Slack to tell any of them?

21  A.   Maybe announced it in team meetings.  We had weekly team

22  meetings.

23  Q.   These would be verbal announcement that we can't verify?

24  A.   I'm not denying that there were written communications.  I

25  just don't remember.

*United States District Court*

1  Q.  And what year was this new process put in place?

2  A.  I have no idea.

3  Q.  It certainly wasn't in place in 2018 and 2019, correct?

4  A.  I don't know, honestly.

5  Q.  But you're the one who put it in place?

6  A.  Well, you know, HR would collaborate with the different,

7  you know, organizational leaders to implement the stuff.

8  Q.  There's nothing in the employee handbook that mentions or

9  dictates or guides how managers are supposed to behave when

10  hiring or firing, correct?

11  A.  I have no idea.

12  Q.  We saw that, you know, six-sentence discrimination policy,

13  but that policy doesn't mention promotions even one time, does

14  it?

15  A.  I have no idea.

16  Q.  All right.  Here.  I'll put the latest one up.

17        MR. CARSON:  So can we just put -- and then we can

18  publish this to the jury.  So how about we do the last one, the

19  Exhibit 30.

20  BY MR. CARSON:

21  Q.  Have you ever read this book before?

22  A.  When I first started.

23  Q.  Well, this didn't exist when you first started.  This one

24  is dated 8/24/17.

25  A.  Oh, this exact document, no, I don't think so.

1  Q.  So which one did you read?  The one when you first

2  started?

3       So that would be the closest one.  That would be

4  August 11, 2015.  The next one is December 16th.

5       So let's just put this, Exhibit 32 up.

6       This is the one you read before?  The date, by the way, on

7  the bottom of the first page says it was revised on August 11,

8  2015.  Do you see that?

9  A.  Which question are you asking me?

10 Q.  Just do you see the date?

11 A.  Yes.

12 Q.  Okay.  So let's scroll down.  Just follow me.

13      So here's the table of contents.  Can you show me the

14 table of contents that shows how managers are supposed to

15 behave when they want to promote somebody?

16 A.  Me?

17 Q.  Yeah.

18 A.  I don't -- I haven't -- I read this document many years

19 ago.  I cannot point you to --

20 Q.  Okay.  Well, I can show you -- let's see.  Let's go down

21 to 3.1 quickly.

22      So 3.1 says "Non-Discrimination."  Do you see that?

23           MR. CARSON:  Williams 20.  Do you have it?

24           MS. MEYER:  Yeah.

25 BY MR. CARSON:

*United States District Court*

1  Q.  Nothing in the discrimination policy that helps you in any
2  way with promotions, terminations, anything like that, right?
3  A.  Well, it says it will be based on merit, qualifications.
4  Q.  Anything else?  Is there anything that says here's the way
5  that you're supposed to do things if you want to promote
6  somebody, here's the way you're supposed to do things if you
7  want to fire someone, here's the steps you need to take, here's
8  the things you need to document?  Anything like that?
9  A.  No.
10  Q.  And did Linode have any management books that you could
11  follow or is this the only policy that Linode had at that time?
12  A.  At one point there was some kind of management career
13  ladder training.  I don't remember the system and the dates.
14  Q.  If there was one, you can't think of what it was, correct?
15  A.  No, not off the top of my head.
16  Q.  So Carl never slowed the team down?  His performance was
17  never an issue in that regard, correct?
18  A.  I'm trying to think of all the different variables there.
19  I mean, it's possible.
20  Q.  You can't recall any examples right now, correct?
21  A.  Not off the top of my head.
22  Q.  You don't ever recall his work product late or having to
23  return something to him and saying, this is just terrible, you
24  need to redo this?
25  A.  We were pretty collaborative.  Like definitely talking to

1  him when he was -- got promoted to director of strategy and

2  innovation, we collaborated closely.  And he would, you know,

3  bounce ideas off of me, I'd give him feedback, and we would

4  refine them together.

5  Q.  Do you ever recall any examples when his work product was

6  poor?

7  A.  Yeah, when I first started.  You know, we worked in an

8  operations department, which meant we had to respond to, you

9  know, various issues and incidents with the platform, and I

10  think that's where Carl wasn't set up for success.

11  Q.  How about between like, say, 2019 and August 2020, any

12  examples in there?

13  A.  He had -- I think some of the feedback I gave him was more

14  about communication.  He sent a lot of --

15  Q.  Questions about work product?

16  A.  Well, that is part of the product.

17  Q.  So you're saying there was poor work product in the -- you

18  know, 2020?

19  A.  Not that I can remember totally off the top of my head.

20  Q.  And was there upward mobility in network operations for

21  somebody like Carl?

22  A.  Once he hit director?  I think he had a lot of time to

23  grow within that role.  Any career advancement probably would

24  have been a longer -- a conversation we would have had longer

25  after he --

*United States District Court*

1  Q.   Sir, if you became a director --

2  A.   Yeah.

3  Q.   -- and you only received a $7,000 increase in money and

4  you were still getting paid like a network engineer, would you

5  consider that upward mobility?

6  A.   Yeah.

7  Q.   Okay.  Do you understand why my client didn't consider it

8  that?

9  A.   I didn't know he didn't consider that.

10 Q.   Well, wasn't he doing the same things he was already

11 doing, the same position?  You kind of just gave him a title to

12 go with what he was already doing?

13 A.   Not really.  Like all of the traveling and more of the --

14 kind of like more of the business development work, kind of

15 doing all those presentations, setting up the booths and all

16 that stuff.  He was not doing that as a network engineer title.

17 Q.   And you took that away from him in 2020; isn't that right?

18 A.   No.

19 Q.   Didn't you tell him during the Philippines trip that you

20 didn't want him going on these trips anymore?

21 A.   Never.

22 Q.   Didn't you tell him you were going to replace him with

23 Adam Rambo?

24 A.   No.

25 Q.   Do you remember that?

*United States District Court*

1   A.   I remember saying, hey, Carl, I can't always come on these

2   trips.  Why don't you bring someone else in the network

3   engineering department with you?  It's great contacts to have.

4   They can travel, they can meet people, you can mentor them.

5   That's what I suggested.  I did not say that.

6   Q.   Do you remember that specifically?

7   A.   Absolutely.  Because I remember his face kind of changed a

8   little bit and maybe he misinterpreted me.  I don't know.

9   Q.   So was that during the Philippines trip, this

10  conversation?

11  A.   I believe so.

12  Q.   That was at that dinner that my client testified about,

13  correct?

14  A.   At dinner?  I don't remember exactly when we had the

15  conversation.

16  Q.   Was it during a dinner at the Philippines trip?

17  A.   It could have been.

18  Q.   So Carl's promotion or change in job title, didn't you

19  call that a technical promotion because he was working on the

20  technical side at the time?

21  A.   It's possible.

22  Q.   And you were the key person who made the decision to fire

23  Carl, right?

24  A.   Yes.  Well, yeah.  I mean -- yeah.

25  Q.   And of course, you're going to say that you made this

*United States District Court*

1  decision because of the article that we've seen so many times

2  in this trial, right?

3         MR. CAVALIER:  Objection.  Argumentative.

4         THE COURT:  It's overruled.

5         You can answer.

6         THE WITNESS:  Yeah.  When I got a Slack message

7  pointing to that article and I read it, I made the decision

8  from that article and the contents of it that I just knew I was

9  done with working with Carl.

10 BY MR. CARSON:

11 Q.  You knew you were done, right?

12 A.  Yeah.

13 Q.  You read that article and you just knew you were done?

14 A.  Absolutely.

15 Q.  Did you check to make sure the article was real?

16 A.  It was in the Philadelphia Inquirer.

17 Q.  You never seen anything in the Philadelphia Inquirer that

18 wasn't real?

19 A.  Not that I can recall.

20 Q.  Don't newspapers, and especially on the internet, don't

21 they get things wrong all the time?

22 A.  That was not going through my head at the time.

23 Q.  Yeah.  What was going through your head was that you were

24 done working with Carl, right?

25 A.  After I read the contents of that article, that's exactly

1    what went through my head.

2    Q.    And only the contents of that article, right?  Nothing

3    else?

4    A.    Well, I had prior context and -- yeah.

5    Q.    What was your prior context?

6    A.    Well, I mean you have to understand, at the time when I

7    knew about John Musbach, I knew that he was someone that worked

8    at Linode, got caught with using the company laptop to have a

9    relationship or prey on a child.  You know, people at work

10   would say what a creepy pedophile he was.

11        So in my mind, he was like one of the worst people on

12   earth that I've heard of secondhand.  And once I read in that

13   article that Carl was -- the way I took it, he knew that he was

14   -- obviously, because he got arrested with the work laptop and

15   it was very public.  And Carl knew that and still decided to

16   have this relationship with John.  They were referred to as

17   partners, which I know, especially with same sex couples, that

18   the term "partner" means that they are involved romantically.

19   So he's choosing to spend his time with this person and it blew

20   my mind.  And I just knew from there that I could not carry on

21   the same relationship.

22   Q.    Did you know if any of those things were true?

23   A.    At the time, they were true.

24   Q.    Did you know if any of those things were true at the time?

25   A.    Yes.

1  Q.   How?

2  A.   Because I read them in text.  So I knew that they were

3  true.

4  Q.   You read them in text.  So you knew they were true.

5  A.   Yeah.

6  Q.   What did you read in the text that you knew was true, sir?

7  A.   The quote, the specific quote from Carl.

8  Q.   What was it?  Why don't you read it?

9  A.   He said, I knew about the child pornography -- I'm

10 paraphrasing -- but I didn't know about this murder stuff, this

11 terrible murder stuff.

12 Q.   Right.  So how did you know whether or not my client

13 wasn't there testifying against John Musbach to get him in

14 jail?

15 A.   I don't care.

16 Q.   I know you don't care.

17 A.   He carried on a relationship with the guy from work.

18 Q.   How do you know that?

19 A.   Because it said in the article that they were partners

20 and --

21 Q.   So you --

22       THE COURT:  Mr. Carson, you got to let him finish the

23 answer.

24       THE WITNESS:  When Carl and I went to lunch to get

25 tacos, he walked out to a car that wasn't his Buick, because he

*United States District Court*

1  got hit by the tree, and he said this is my roommate John's

2  car.  So I then put all that together that they were together.

3      I made my decision there, and I didn't know -- go

4  ahead.  Ask me questions.

5  BY MR. CARSON:

6  Q.  Sir, did you check to make sure any of that stuff really

7  happened?  Any of it?  Did you check?

8  A.  I read an article.

9  Q.  Did you check?  Simple as that.

10 A.  I don't know how I would check.

11 Q.  How about this.  Did you call Carl on the phone and say,

12 dude, I just saw this article.  What's going on with this?  You

13 didn't do that, right?

14 A.  No.  I didn't have a conversation.

15 Q.  You were done with him, right?

16 A.  Uh-huh.

17 Q.  And did you check to make sure that the article was real?

18 A.  I understand how the internet works.  It was --

19 Q.  Did you check?

20 A.  I don't know how I could verify if that's real.  I know --

21 do I know that he was convicted of preying on a child?  Yes.

22 Q.  Sir -- oh, you knew that at the time?

23 A.  Yes.

24 Q.  Really?  How?

25 A.  It says in the article.

*United States District Court*

1  Q.   Yeah.  So 100 percent of the information that you used to

2  make the decision was, according to you, in that article?

3  A.   Well, I knew that John Musbach worked at Linode and got

4  caught using his work laptop to have a relationship online with

5  a child.  So the fact that Carl then was in a relationship with

6  John, knowing that, was enough for me.

7  Q.   Do you know anything about that relationship at that time?

8  A.   With the child?

9  Q.   No.  Between what you're saying was happening to Carl and

10  John Musbach.  Did you know anything about it at the time?

11  A.   Well, I put together -- the article said they were

12  partners --

13  Q.   Yes --

14  A.   I knew they were partners from the article, and I knew

15  that Carl said his roommate was John.  He'd just told me that.

16  Q.   What's the most popular name on the planet?

17  A.   Mohammed.

18  Q.   Isn't it John?

19  A.   I don't think it is.

20  Q.   What about in this country, sir?  Is it John in this

21  country?  Probably John, right?

22  A.   I have no idea.

23  Q.   Maybe Mike?  Mike or John?  No idea?

24       So let me ask you this question:  Did you ask someone to

25  call Carl and check to see if it was real?

*United States District Court*

1  A.   No.

2  Q.   Did you care if it was real?

3  A.   Yes.

4  Q.   Then why didn't you check?

5  A.   Because at that time, I believed it was real.

6  Q.   You had worked with Carl for how many years by that point?

7  Four years?

8  A.   Four years.

9  Q.   Had he ever done anything to remotely make you think that

10  he would ever break the law?

11  A.   No.

12  Q.   Had he ever done anything to remotely make you think that

13  he would ever do anything that was not moral?

14  A.   Not moral?

15  Q.   Yeah.

16  A.   At that time?

17  Q.   At that time, sir?

18  A.   No.

19  Q.   Had he ever done anything at all but help Linode grow and

20  become a better company?

21  A.   My working relationship with Carl, I would say, was

22  decent.

23  Q.   Yeah.  All you knew at the time was that Carl was a good

24  guy with a good background who had never done anything wrong

25  and who had done nothing but help the company, correct?  That's

1  all you knew at the time?

2  A.   That's why this was shocking.  Yeah.

3  Q.   Uh-huh.  And you didn't bother to even check if you were

4  terminating him for a real reason.  Why?  Because you didn't

5  care, right?  You were done.

6        THE COURT:  Mr. Carson, you asked a question.  Let him

7  answer the first question.

8  BY MR. CARSON:

9  Q.   Please tell us why.  If you have an answer, I need to

10  hear.

11  A.   There were multiple days that passed between when I first

12  got the news --

13  Q.   Correct.

14  A.   -- and I told Tom that it was him or me.  And that when

15  Carl was fired -- and I think there was more --

16  Q.   We don't want to hear what you think, sir, just what you

17  know.

18        MR. CAVALIER:  I'm going to object to that.

19        THE COURT:  Just answer -- again, whatever -- he asked

20  you why.  So just answer the why.  Okay.

21        THE WITNESS:  Yeah.  The child -- John Musbach's

22  history was very known, very public in our company.  Carl said

23  he was his roommate.  The article said they were partners.

24  BY MR. CARSON:

25  Q.   You knew he was dating John Musbach before that, sir.

1  A.   Dating, I had no idea.

2  Q.   Right?  Because he told you; isn't that true?

3  A.   No.

4  Q.   Do you know whether or not -- are you married?

5  A.   Yes.

6  Q.   Did Carl know you were married?

7  A.   Yeah.  We went out to lunch with my wife.

8  Q.   Carl knew who your wife was, right?

9  A.   Uh-huh.

10 Q.   You knew who he was with, right?  That's the type of

11 relationship you had, sir.

12 A.   Never talked about that stuff.

13 Q.   Four years working together?

14 A.   Never talked about that stuff.

15 Q.   How many countries did you travel to with Carl?

16 A.   A lot.  We talked about his mother, his father, his niece.

17 Q.   All his family?

18 A.   Yeah.  Why would he bring up the creepy pedophile guy?

19 Q.   Because he's not a liar, sir.  He had nothing to hide at

20 the time, sir, right?

21 A.   Obviously, he did.

22 Q.   And you had no problem with it, right?

23 A.   With what?

24 Q.   Anything Carl ever did up until you wanted to get rid of

25 him.

*United States District Court*

1  A.   I had no problem with Carl until I read the article.  That

2  is true.  Well, you know, other than just normal work problems.

3  But yeah.

4  Q.   So if what you're saying is true, this is when the plan to

5  start the lie occurred, right?  What do you call it when three

6  people get together and hatch a plan to lie?  What's that

7  called?  What would you call that?

8  A.   Conspiracy to lie.

9  Q.   That's what I call it.  Is that what you did?  You

10  conspired to get rid of Carl?

11  A.   What I told Tom was it's him or me.  It's fine.  I'll

12  leave the company, but I'm not working with this situation.

13  Q.   Can you prove it?

14  A.   I think it was via video.

15  Q.   The primary method of communication you used at the time,

16  sir, was Slack, right?

17  A.   I said the primary method of communication to collaborate

18  that I've used at Linode, one of the primaries, was Slack, yes.

19  Q.   And you specifically put that little caveat in there, to

20  collaborate.  Is that what your testimony is?

21  A.   Well, it's a collaboration tool but...

22  Q.   So you didn't say prior to this that the primary method

23  used to communicate period was Slack, at that time

24  specifically?

25  A.   For collaboration.  Yeah.  We used Google Meet, we used

*United States District Court*

1  Slack, and we used Google Docs.

2  Q.   Yeah.  Tons of electronic communication tools where, if

3  something happens on those tools, you can confirm it happened,

4  right?  You used all these things?

5  A.   This was very shocking.  I wanted to talk to Tom in

6  person.

7  Q.   You never once sent a single message about any of this

8  stuff, right?

9  A.   It's entirely possible.  I don't know.

10  Q.   You sent message -- well, that's not necessarily true.

11  You did send messages about it, right?  But they just indicated

12  a totally different story, correct?

13  A.   I don't think so.  I mean...

14  Q.   Do you remember Exhibit 92?  Do you want me to show it to

15  you?

16  A.   Yeah, please.

17  Q.   Yeah.  Let's look at Exhibit 92.  This is you and Vince

18  Palochko discussing the termination, right?

19  A.   Yeah.  Because we were on video with Carl, and we were

20  talking about it or, at least, that situation, as it was

21  happening.  Or maybe after on Slack.  Yeah.

22  Q.   And in this communication, you didn't say anything about

23  secretly having a motive related to all this other stuff.  You

24  said it was policy violations in this, right?

25  A.   Yeah.  That was the task at hand.

*United States District Court*

 1  Q.  Carl wasn't on this thread?

 2  A.  No.

 3  Q.  He never saw this thread?

 4  A.  No.

 5  Q.  So when you are talking to Vince about it, the two of you

 6  are agreeing on policy violations?

 7  A.  Where do you see that?  We --

 8  Q.  Let's scroll down to the end.  Right there.  Isn't that

 9  the progressive disciplinary policy that you're referencing

10  right there?

11  A.  Yeah.  Because I think Carl was arguing with him on the

12  call about the semantics regarding the policy.

13  Q.  Sir, is that that progressive disciplinary policy right

14  there?

15  A.  You can't click on that.  I don't know what -- what does

16  it bring you to?

17  Q.  Is that the progressive disciplinary policy that's being

18  cited right there?

19  A.  Yes.

20  Q.  And isn't the fake reason or the reason you're saying --

21      THE COURT:  Mr. Carson, stay at the podium, please.

22  We can't hear you.

23      MR. CARSON:  Sorry.

24      THE COURT:  If you are walking that way, we just can't

25  hear you.


*United States District Court*

1  BY MR. CARSON:

2  Q.   Isn't the fake story progressive discipline?  Isn't it?

3  A.   When Carl was arguing with Vincent about the semantics

4  around, I guess, some of the technicalities around the policy

5  violations, I think Vincent was trying to prove that he was

6  right by pasting this in here to me.

7  Q.   And Vincent to you showed that he was right and that it

8  was policy violations, correct?

9  A.   I think he was trying to say that he was right about the

10  little point that him and Carl were disagreeing about or

11  something on the call.

12  Q.   So you heard Carl say on the call, how many times, is it

13  John Musbach?

14  A.   Yes.

15  Q.   And you guys were talking the whole time while he was

16  doing that, right?

17  A.   Yeah.

18  Q.   Show us the message in there where you guys talk, I can't

19  believe he's asking about John Musbach.  How does he know?

20       That's not in there, is it?

21  A.   No.

22  Q.   Do you have any excuse for that?

23  A.   We had a very -- we had an objective, right?  The outcome

24  was to fire Carl for policy violations.

25  Q.   That I know.

*United States District Court*

1  A.   And that, we did, and that's what we talked about there.

2  Q.   And why?  What's the excuse why you did this lie?

3  A.   I don't know.  That's what I was told.

4  Q.   You were told to do this lie?

5  A.   Yeah.

6  Q.   By who?

7  A.   I think Vincent.

8  Q.   So Vince said, I'm going to lie to Carl and you're going

9  to have to go along with it.  It's not your fault at all.  It

10 was just Vince's idea?

11 A.   He said, I guess, due to some other circumstances, which

12 the company was worried about, it would have been better to go

13 with the policy violations.

14 Q.   Did you argue with him and say why don't we just tell the

15 truth?

16 A.   I just wanted it done.

17 Q.   Isn't it your position in the case that the truth doesn't

18 hurt you at all?  The truth would have worked perfectly for

19 you?

20 A.   I agree.

21 Q.   So you're saying that the reason you lied was to cover up

22 nothing.  What's that about?

23 A.   That was above my pay grade.

24 Q.   All you knew is that you didn't want to work with him.  It

25 was your decision.  You were going to get him out of there.

*United States District Court*

1  They were going to support you and come up with whatever lie

2  you needed them to come up with to get him out, right?  That's

3  what you're testifying?

4  A.  They didn't have to support me.  They chose to and they

5  came up with the plan.

6  Q.  Yeah.  You said I don't want Carl here anymore.  Can you

7  guys figure out a way to get rid of him, and they came up with

8  a lie to get rid of him.  That's your testimony in court,

9  today?

10  A.  I would have left the company.  They decided to keep me.

11  Q.  You didn't answer that question.

12  A.  Sorry.  What was the question?

13  Q.  Is it your testimony to this jury that what happened is

14  you said you didn't want to work with Carl anymore.  You said

15  you wanted him out and that you needed them to get rid of him

16  for you.  And then they just cooked up this whole story to get

17  rid of him for you and get him out.  That's your testimony?

18  A.  Can you ask me just each part because I don't want to

19  agree to a large sentence like that.

20  Q.  No.  I'm going to ask the question I want to ask.  Is that

21  your testimony?

22  A.  No.

23  Q.  So then what is it?  What's your testimony, sir, for the

24  lie, the reason for the lie?

25  A.  The reason for the lie is I was told we're going to fire

1   Carl for these policy violations.  I said, okay, they look real

2   and they're true.  So I guess that's fine.  Let's do it.

3   Q.   Had you ever heard of anyone getting written up or

4   suggested as a policy violation to put in a request for a

5   reimbursement of money they spent?

6   A.   Those $1,500 Mets tickets I got asked about?

7   Q.   Who were those for?

8   A.   Supposedly for me.  I never saw him.

9   Q.   Does my client appear to be a baseball fan to you?

10  A.   No, but he knew I was.

11  Q.   And the Mets is your favorite time, right?

12  A.   Absolutely.

13  Q.   Do you have any explanation for why the lie continued for

14  years after?  You've been in the courtroom.  You've heard all

15  the evidence.

16  A.   I have no idea.

17  Q.   That doesn't make a lot of sense to you, does it?

18  A.   The first time I was asked under oath I told the truth.

19  Q.   Well, what about the document that we saw in this case,

20  the interrogatories?  That was signed under oath.

21  A.   I don't even know what interrogatory means.

22  Q.   Well, you were represented at that time, weren't you?  I'm

23  not going to do it all again.  We've all seen it.

24       But you were represented at that time, right?  Those

25  responses were filed on your behalf, correct, sir?

*United States District Court*

1  A.   They might have been, but I never saw the document,

2  participate in the creation of the document, sign off on the

3  document, whatever.

4  Q.   You're just innocent in all of this, right?  You don't

5  know what happened?

6  A.   I know exactly what happened.

7  Q.   Then what happened, sir?  Why are they telling the same

8  lie two and a half years later?  What happened?

9  A.   I know what happened in my context but I don't think --

10 Q.   You don't know exactly --

11        THE COURT:  Mr. Carson, you got to let him finish his

12 answer.

13        MR. CARSON:  Sorry, Your Honor.

14        THE WITNESS:  I think I was clear.

15 BY MR. CARSON:

16 Q.   Do you know what -- we're trying -- these aren't fake

17 questions.  I really want to know.  These are honest questions.

18 What happened?  Why could you still be telling this lie two and

19 a half years later?  If everything you're saying is correct,

20 that doesn't make sense.  Explain it.

21 A.   I have no idea what you're talking about.

22 Q.   Sir, on November of 2022, Carl was fired in August of

23 2020, right?

24 A.   Yes.

25 Q.   So August of 2021 would be a year later, correct?

*United States District Court*

1   A.   Correct.

2   Q.   August of 2022 would be two years later, correct?

3   A.   Sure.

4   Q.   August, September, October, November, so two years and

5   three months later the same lie is continuing.  If you tell the

6   same story for two years and three months, it's not a lie

7   anymore, sir.  It's just what happened; isn't that true?

8   A.   I guess from my perspective, I've never told that story

9   for two years.

10   Q.   You're just innocent?

11   A.   I sat down at deposition.  I was under oath.  I told the

12   truth.

13   Q.   Uh-huh.  You're telling the truth this time or telling the

14   truth on the phone call with Carl?  Which one is it?

15   A.   1000 percent.

16   Q.   Well, you weren't telling the truth on the phone call with

17   Carl, right?

18   A.   No.

19   Q.   We heard you say, Carl, you're being fired for a bunch of

20   policy violations, right?

21   A.   I don't believe so.

22   Q.   So that was a lie.  You don't believe you said that?

23   A.   Well, you said a recording --

24   Q.   Sir, I mean, you don't remember hearing --

25   A.   I'm not going to argue with you about that.  My full

*United States District Court*

1    intention was to fire Carl that day for policy violations.

2    Q.   Did you hear yourself on the video say the policy

3    violation thing?

4    A.   I kind of feel guilty about that call when I heard it

5    because I didn't really speak, and let, you know, Vinny kind of

6    fall on the sword.

7    Q.   Did you feel guilty for what you did to Carl?

8    A.   Because I didn't speak, I felt guilty towards Vinny

9    because he took the whole brunt of that meeting.

10   Q.   How about for Carl, sir?  Do you feel guilty for what

11   happened to Carl?

12   A.   No.

13   Q.   You've lied to him, sir, and you've been lying to him for

14   years.  I mean, as if we're supposed to believe anything you

15   said.  Why should we believe you, sir, if you've already

16   admitted to lying once?

17   A.   You can ask me the same question over and over.  I am

18   being very truthful.

19   Q.   I am asking the same question.  I'm just looking for an

20   answer.  Do you have one that makes sense?

21   A.   What was the question again?

22   Q.   Why are you telling the same lie for two years and three

23   months?

24   A.   Again, I wasn't telling a lie.  It was out of sight, out

25   of mind.

*United States District Court*

1            MR. CARSON:  No more questions.

2            THE COURT:  Okay.  Let's use that as our occasion for

3    morning break, then.  Let's take about 10 minutes.  Come back

4    around 11 o'clock, and we'll resume with Mr. Cavalier's

5    examination.

6            THE COURTROOM DEPUTY:  Okay.  Please rise.

7            (Jury exits the courtroom at 10:49 a.m.)

8            THE COURT:  Okay.  Come back in 10 minutes.  Thanks,

9    everybody.

10           THE WITNESS:  Do I need to stay here?

11           THE COURT:  No.  You can step down.

12           (Brief recess from 10:50 a.m. to 11:09 a.m. )

13           THE COURTROOM DEPUTY:  All rise.

14           THE COURT:  All right.  Have a seat.  We'll get the

15   jury in.

16           THE COURTROOM DEPUTY:  All rise.

17           (Jury enters the courtroom at 11:10 a.m.)

18           THE COURT:  All right.  Have a seat, everybody.

19           Mr. Cavalier, you can start your examination.

20           MR. CAVALIER:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. CAVALIER:

23   Q.  Good morning, Mr. Spataro.

24   A.  Good morning.

25   Q.  It's been a long week, yes?

*United States District Court*

1   A.   Yes.

2   Q.   I think the jury has been waiting to hear from you.  So

3   I'm going to ask you to tell them first, in your own words, who

4   you are.  Give them your background.

5   A.   Yeah.  So I -- obviously, my name is Dan Spataro.  I grew

6   up in northwest New Jersey in a township called Roxbury.

7   Basically started high school, but I have my mom and dad and

8   two sisters.

9        High school -- I didn't really take to school too well.

10  Actually, I was supposed to graduate in 1995.  Ended up

11  graduating in 1996 in night school.

12       At the time, I worked at Wendy's, and I really liked work.

13  And I knew that that was, like, my passion, was kind of working

14  and getting things done there.

15       And then after high school, I kind of felt like I had to

16  go to some kind of college.  I enrolled in the County College

17  of Morris, where, I think, I only went to one class.  It just

18  wasn't for me.  So I tried to find a career because, you know,

19  from my perception, like, Wendy's probably wasn't the best

20  place for me to be.

21       I then started a career working on cars, at like Sears

22  Automotive.  And there was, you know, a lot of gentleman there

23  that had families.  So I thought that maybe that was the path I

24  would take.

25       But then a couple of them were kind of like mentoring me,

*United States District Court*

1    and I saw through some conversations that, you know, like,

2    Sears was cutting back on a lot of the benefits and pay for

3    those folks, and they were having a hard time making ends meet.

4    So I knew I needed to find something else to do.

5         So I went to, quote, unquote, computer school.  I went to

6    Chub, I think, Technology Institute, it was called.  It was an

7    18-month program.  It was more school but, for some reason, I

8    just excelled at it, and really liked it.  I think I had the

9    highest grade in the class.

10        From there, I went to, like, a job at Johnson & Johnson

11   doing, like, data entry, which was kind of boring.

12        But during that time, I went to a house party.  And there

13   was a guy Eric sitting there, and Eric was telling me about

14   this job at the Net Access Corporation that he was doing, doing

15   dial-up tech support?  So I -- he said he could get me an

16   interview.

17        I interviewed there.  The manager of that department

18   actually went to high school with my sister.  So it worked out

19   and they hired me.

20        And from Net Access -- I worked there for 16 years -- I

21   progressed from dial-up tech support to, like, a tier-three

22   technician to doing network engineering to managing network

23   engineering and then to being, like, the director of all

24   engineering and architecture throughout that 16-year

25   progression.

*United States District Court*

1     And like we stated before, Linode was the biggest customer
2  of Net Access by revenue.  So I was pretty familiar with them.
3  I talked to Tom a few times.
4     And then Net Access got bought out by a much larger
5  company.  We kind of lost the family feel, and I was ready to
6  make a change.  So I went to Linode, and you already pretty
7  much know the story there.
8     But I progressed at Linode from network engineering
9  manager to the director of network engineering and data center
10  engineering, and then I took over systems engineering,
11  information technology.  And then at the end, we created, like,
12  a new 24/7 operation center full of operation engineers.
13     That's kind of like my progression throughout the years.
14  Q.   Thank you.  Are you married?
15  A.   Yeah.  I'm married with two kids.
16  Q.   Can you tell the jury -- I think you wanted to say a
17  little more on this subject, forgive me if I'm wrong -- but can
18  you tell the jury just a little bit more about the process by
19  which you went from net optics to Linode and how that came
20  about?
21  A.   Net Access to Linode?
22  Q.   Yes.
23  A.   Yeah.  So like I said, I was pretty familiar with their
24  setup.  Linode was having a lot of issues scaling because they
25  were growing so fast, so they kind of relied on the service

*United States District Court*

1  providers to help them scale.  So I was pretty familiar with

2  the setup.

3      And then, as I think Tom alluded to, there was -- in the

4  winter of 2015, the whole platform was being attacked by, you

5  know, hackers, you could say.  And I was able to keep Net

6  Access Linode at least -- well, it was never in our data center

7  up, you know, because I just kind of had the knowledge.  Like,

8  the different signatures the attacker were blocking, so I was

9  able to mitigate -- you know, keep them online.  And I think --

10  you know, I didn't really talk to Tom about it, but I think

11  that was kind of the catalyst for them to reach out to me

12  because I just had familiarity with what they were trying to

13  do, I already did it at my company, and I kind of had a

14  blueprint to apply for Net Access.

15      Like I said, Carl came up -- and I think he said we were

16  going to meet about more of their challenges, but at some point

17  during lunch -- or maybe it was dinner, I forget, but he kind

18  of mentioned that they were looking for someone to come in and

19  run the company or run the department.  So I told him that I

20  would reach out to Tom, and then that's kind of how I became

21  employed there.

22  Q.  What was your impression of Mr. Williams during that early

23  time?

24  A.  He seemed like a nice guy.  He seemed kind of quirky.  It

25  was kind of hard to follow exactly what he was trying to say.

*United States District Court*

1    I was trying to interpret it on the fly.  But overall, he

2    seemed like a well-intentioned person.

3    Q.   Any hesitation or issues on your part jumping over to

4    Linode and working with Mr. Williams?

5    A.   No, not working, no.  I had other hesitations because it

6    was so far and I had a good job and I was nervous because of my

7    family, and that was the only hesitation.

8    Q.   All right.  I think you testified earlier that you were --

9    again, in your own words, why don't you tell the jury what you

10   were hired to do at Linode and what your job title was at

11   first.

12   A.   So I was tired to run the network engineering department

13   and I took a manager of network engineering role, which was a

14   lower title than I had, but I knew that -- I knew titles didn't

15   really matter, especially at Linode too much, especially in the

16   beginning.  So I was fine with that because I knew the

17   challenge would be great.  And the challenge was to build a

18   global service provider, like, network, so this way we could

19   not have to rely on a lot of these middlemen to service our

20   customers.  We were going to actually build the infrastructure

21   to be a provider.  And that's kind of in a nutshell, at least

22   in the early days, what we did.

23   Q.   Okay.  And since you mentioned titles, just take the jury

24   briefly through each of the titles you held during your time at

25   Linode.

1  A.   Yes.  So I started out manager of network engineering.  I

2  believe my first promotion -- I don't remember if I got

3  promoted to director of just network engineering.  I think the

4  way it happened was I got promoted to take over the data center

5  engineering department, and then I got a director position from

6  that because I was sitting over two departments.  And they

7  already had a manager.

8       And then I went -- then I inherited systems engineering,

9  so I think then I became the director of infrastructure

10 operations.  And then once we had IT and we created this new

11 24/7 operations engineering department, I think that's when I

12 became the vice president of infrastructure.

13 Q.   At which point in time in your progression did your

14 responsibilities broaden out beyond just the network

15 engineering team?

16 A.   When I was promoted to director of network engineering and

17 data center engineering.

18 Q.   So at that point you were overseeing not only the network

19 engineering, but the data centers as well, correct?

20 A.   Yes.

21 Q.   Since we're talking about titles, I did want to ask you,

22 since I heard Mr. Carson refer to you as comparator of

23 Mr. Williams, was there ever a point in time during your

24 employment at Linode that Mr. Williams was not somewhere below

25 you in the hierarchy?

*United States District Court*

1  A.  I'm sorry.  Can you --

2  Q.  Let me ask you a better question.  Tell the jury the

3  period of time for which you were Mr. Williams' direct

4  supervisor?

5  A.  There was no period of time I was not -- that's a double

6  negative, but I was always his direct supervisor or above him

7  in some way.

8  Q.  Okay.  So let's talk about that distinction real quick.

9  You said "above him in some way."

10    Are you referring to the time period where Tim Kaufman was

11  his direct supervisor?

12  A.  Correct.

13  Q.  And what was your place in the hierarchy at that point?

14  A.  I was director then.

15  Q.  Meaning that you were supervising Mr. Kaufman?

16  A.  Correct, yes.

17  Q.  Was there ever a time in your employment at Linode that,

18  whether directly or indirectly, Mr. Williams didn't report up

19  to you?

20  A.  No.

21  Q.  Can you tell me a little bit about how salary decisions

22  were made at Linode during your early employment?

23  A.  That's a great question.  I think it was very ad hoc, you

24  know.  Basically instead of based on -- there were some

25  instances, I would say, where we skewed based on the need of

1  the employee versus -- you know, we didn't really have great
2  ways to, like, measure their worth and impact on --
3  Q.    Okay.  Was it hard to attract real talent to Southern New
4  Jersey?
5  A.    Almost impossible.
6  Q.    Not exactly the tech hub --
7  A.    Exactly, yeah.  Most of the people that were building
8  these large-scale service provider cloud networks were in New
9  York, San Francisco, stuff like that.
10 Q.    Okay.  Were you aware when you started at Linode of what
11 Mr. Williams' salary was?
12 A.    I don't remember.  I mean, I eventually knew.  I don't
13 know what you consider when I started.
14 Q.    Sure.  Did you know at any point in time in your early
15 employment at Linode how Mr. Williams' salary related to other
16 network engineers?
17 A.    Yeah, I'm sure I did.
18 Q.    Can you tell the jury about how they compared?
19 A.    Yeah.  I mean, I think when I -- he was over at least --
20 I'm trying to think percentages -- 30 percent or more probably
21 over the other network engineers.
22 Q.    Okay.  Was he the highest paid network engineer?
23 A.    Yes.
24 Q.    Was he one of the highest paid employees in the company as
25 far as you know?

*United States District Court*

1  A.   As far as -- I didn't know that probably back then.

2  Q.   I'd like you to tell the jury about your relationship with

3  Carl in the immediate time after you came over to Linode.

4  A.   Yeah.  I think when I first got there, I was in the

5  evaluation phase for all three employees.  And it was -- I'd

6  say my first initial impression of Carl was that I could tell

7  he was not comfortable with the work that we needed to be done.

8  He was kind of struggling -- you know, like, I think Tom

9  alluded to it.

10       We had to be on-call to fight these attacks or any kind of

11  problems, he was not -- that was not his strength.  So he was

12  not able to kind of save the day or jump on a call.  And, you

13  know, we expected a lot of people back then -- like, everyone

14  kind of had to do everything, so it might not have been totally

15  fair.  But he was not performing at the level that I would say

16  we expected at that time for that specific job role.

17  Q.   Did that make you want to get rid of him?

18  A.   I mean, you're constantly evaluating people all the time,

19  you know.  I didn't want to make a lot of waves in the

20  department.  I wanted to -- you know, I didn't want to be the

21  kind of person that cleans house, you know.  I wanted to work

22  with what we had and set people up for success the best we

23  could.  So I'd say no.  I mean, I always considered all

24  options, but I wasn't specifically trying to get rid of him,

25  no.

*United States District Court*

1  Q.  So what did you do in that respect with -- as far as

2  Mr. Williams goes?

3  A.  I think eventually once the dust started to settle from

4  all these -- you know, like the crisis that we were having,

5  that our business was so impacted by these attacks, I remember

6  trying to, you know, evaluate everyone's strengths and

7  weaknesses.

8      And Carl's strengths, you know, I think we testified that

9  he was able to obtain those millions of dollars in IP addresses

10  we needed from the governing body that manages those things,

11  that kind of policy work.  And some, you know, higher level, I

12  think, technical work is the best way to say it.  You know,

13  like maybe getting his hands dirty deep -- and especially some

14  of these operation things were not the best, but maybe some of

15  these higher level things that were also critical, he was kind

16  of strong at those.

17  Q.  Was it important for you to see Mr. Williams succeed at

18  Linode?

19  A.  Yes.

20  Q.  Why?

21  A.  I want everyone to succeed.  Like, I mean, if we have to

22  -- typically if we have to have a separation, you know, we bear

23  some of that responsibility.  You know, a lot of it, especially

24  if we hire the person and then we have to terminate them.  It's

25  really a horrible process.  I want everyone to succeed.  I want

*United States District Court*

1   to know that I put them in the right place, I want to know that

2   their passions are being fulfilled and, you know, they are

3   growing and they are enabled for success.  You know, that's all

4   I can do as a leader.

5   Q.   It's not fun to fire people, right?

6   A.   No.  It's horrible.

7   Q.   Can you tell the jury a bit about your personal

8   relationship with Mr. Williams within the working environment

9   during that time?

10  A.   Yeah.  I thought we had a good relationship.  We traveled

11  the world together, we had dinner, we had lunch.  We talked a

12  lot.  I mean, I would joke around that it's like my wife, my

13  kids, and Carl because he's -- you know, he's very chatty.  I

14  figured that, you know, maybe he was somewhat lonely and he

15  just wanted someone to talk to.  So I would always talk to him,

16  I would always respond to him.

17  Q.   Did you get along well?

18  A.   Yeah, I think we did, absolutely.

19  Q.   Did you enjoy working with him?

20  A.   Yeah.  I mean, he taught me a lot.  I mean, I didn't know

21  how to internationally travel.  He kind of took me under his

22  wing there, taught me stuff there.  He forced me out of my

23  comfort zone.  Like, this is excruciating for me to be up here.

24  He would force me to -- like, hey, Dan, you got to do this

25  presentation in front of these people.  And I'm like, I do?

*United States District Court*

1  You know, and I would kind of -- and I would do that stuff.

2  Q.   Was Mr. Williams' experience valuable to you?

3  A.   Yeah.

4  Q.   How so?

5  A.   He had that higher level experience and knowledge that

6  allowed him to figure out some of these strategy issues or,

7  like, some of these strategy problems that we had to solve for

8  the future.  Just having -- just being in the industry so long

9  and -- like, you gather a lot of context over the years that

10 when you have a new problem, you can quickly apply that context

11 to the new problem and solve it usually.

12 Q.   I heard you mention during the time that Mr. Carson was

13 asking you questions that Mr. Williams talked with you about

14 his family?

15 A.   Yeah.

16 Q.   Can you tell the jury a little bit about those

17 conversations?

18 A.   Yeah.  I mean, he really talked about his mom a lot.  I

19 mean, he obviously loved his mother incredibly.  He would talk

20 about their times -- specifically I remember -- I'm really into

21 like World War II and stuff, and I think he said that him and

22 his mom would travel to France and they saw some World War II

23 stuff.  And they're really into like churches, and they would

24 visit churches.

25        You know, usually when we were alone, like if we were

*United States District Court*

1  having dinner and a glass of wine or something like that,

2  that's what kind of -- we talked about home stuff.  That's what

3  he would talk about.  Like his mom, he told me about his dad in

4  Johnstown.  I think he used to, like, work in a pizzeria with

5  his dad or something.  And really the only family he talked

6  about currently, I think he would mention his niece and stuff

7  like that.

8  Q.  Did you ever have occasion to talk with Mr. Williams about

9  the unfortunate passing of his mother?

10 A.  Yes.  I know when we started, he was having -- his mom

11 just passed away.  I think this was his first job after that.

12 He seemed very -- like, I didn't know it until later when I

13 feel like he came out of it, but he seemed like he was -- you

14 know, I'm not an expert, but he seemed very sad, depressed.

15 And he told me that later.

16     And, you know, he wasn't really -- I think like I said,

17 enabled for success at work, so he had a lot of friction at

18 work.  And I think that, with his mom, he wasn't in a great

19 place.  But the first place we went to physically for this new

20 kind of role that we were kicking around was Hollywood,

21 California.  We went to a peering conference and we met all

22 these kind of people together.  I knew some of them.

23     But, like, we had this new problem to solve together and

24 we, like, met with people and kind of got - you know, I could

25 see the fire starting to burn in him, you know.  We had a new

1  problem to solve and a new directive and -- and he told me

2  later that -- you know, after that trip he really started to

3  come out of it. And, you know, from there on, he seemed pretty

4  happy overall.

5  Q.   Do you think that early time in that respect had a

6  positive impact on your relationship with Mr. Williams?

7  A.   Yeah, I think so. I think he saw that I believed in him

8  and, you know, I was on his side and trying to find a place for

9  him to be successful. And because you spend how much time at

10  work, right? It's like half your life. So you want it to be

11  somewhat fulfilling.

12  Q.   Well, on that point too, you testified earlier, if I

13  understood you, that you not only spend time at work in the

14  office, but also on the road together?

15  A.   Constantly. We traveled all over the world, places I've

16  never been with anybody, so it was all new, new frontiers.

17  Q.   During those trips -- and I'm sure you were in court, you

18  heard testimony about this earlier. During those trips, did

19  you have occasion to do non work-related things with

20  Mr. Williams?

21  A.   Yeah. We would go out to dinner, go out to lunch, we'd

22  walk around. We -- I'm just trying to think of different

23  trips. In Malaysia, we went to those two giant towers and

24  there was like a little park and we walked around. And one of

25  the nights we went down this street and had like a traditional

*United States District Court*

1   kind of meal.

2        In the Philippines, same thing.  We went to like this old

3   city and there was like these walls.  I don't know if it was a

4   fort-type thing or something, but there was like this whole

5   traditional dinner we had and there was people dancing and

6   singing.  It was so cool.  That was like pretty much everywhere

7   we went.

8        Then we went to Portugal, we went to like the old city and

9   we were walking around and seeing all the different

10  architecture.  And down by the water, like these giant statues

11  and -- yeah, it was cool.

12  Q.   Did you know Mr. Williams was gay when you worked with

13  him?

14  A.   He didn't like ever really come out and say it, you know.

15  Q.   Did you care one way or the other?

16  A.   No.

17  Q.   During these trips, did you ever exclude Mr. Williams from

18  any of these activities because he was a gay man, or at least

19  you suspected maybe he might have been a gay man?

20  A.   No.

21  Q.   Obviously, you knew when you met with Mr. Williams that he

22  was, generally speaking, with all due respect, an older

23  gentlemen, correct?

24  A.   Yeah, I knew he was older than me.

25  Q.   Did you ever exclude him because he was older than you

*United States District Court*

1  from these activities?

2  A.   No.

3  Q.   I want to show you a few exhibits.  We don't have to go

4  through them in depth.

5        MR. CAVALIER:  Tim, can you pull up 23?  This was

6  previously admitted.  All the way to the second.

7        (Discussion held off the record.)

8        MR. CAVALIER:  49.

9  BY MR. CAVALIER:

10  Q.   While Tim is playing with that document, let me ask you a

11  question.

12       Do you recall having occasion to give performance reviews

13  to Mr. Williams?

14  A.   Yes.

15  Q.   Can you explain to the jury the process of reviewing

16  Mr. Williams' performance over time, we'll say?

17  A.   I don't think I understand your question.  Over time --

18  Q.   Sure.  So essentially what I'm asking you to do is

19  describe to the jury the process by which you evaluated

20  Mr. Williams' performance over the years.  I don't want to know

21  about anything specific, I just want to generally -- what were

22  your responsibilities relating to reviewing his performance?

23  A.   Yeah.  So we would usually evaluate whatever -- like, you

24  know, the company had mission critical goals or top level

25  objectives, and we would kind of roll -- each employee would

1  roll up some objectives that they can control into those

2  mission critical goals.  And then based on those objectives, we

3  would then lay out criteria, and then most of the reviews

4  happened around their objectives.

5  Q.   Okay.  And so we have this document up now, and I want to

6  scroll you down to Defendant's 0162 to see if you recognize

7  something.

8       So do you see there at the -- where it says 2016 annual

9  review?

10 A.   Yep.

11 Q.   Do you know whether this was a review that you performed

12 for Mr. Williams?

13 A.   Okay.  I remember starting in early 2016.  Tom was his

14 manager.

15 Q.   Okay.

16 A.   I remember somewhat collaborating on this document.  So

17 this is a review in 2016 that was conducted, I believe, for the

18 2015 calendar year.  So it was Tom and I collaborating on it.

19 Q.   All right.  And if we could go down to the next page,

20 second paragraph.

21      I don't want to belabor this point because I think we've

22 heard plenty of testimony on it, but this paragraph, as you can

23 see, speaks to Carl's technical abilities.  I'd like you to

24 read that and tell me whether you agree with it.

25 A.   Yes.  I mean, that's kind of like -- yeah.

*United States District Court*

1  Q.   Okay.  And if you look at the next paragraph down, is this

2  referring to -- is this the same as your testimony earlier

3  referring to these emergency outages that require sort of all

4  hands?

5  A.   Yes.

6  Q.   And it seems to me like you're saying here -- or I'll just

7  ask you, is it true that you're telling Carl here that you'd

8  like a greater sense of intunement with these events and a

9  sense of urgency?

10 A.   It was Tom or I.  Like, I don't remember exactly writing

11 that.

12 Q.   Do you agree with the sentiment?

13 A.   I do.  I absolutely do.

14 Q.   And the next paragraph down, again, notes Carl's lack of

15 hands-on and emergency presence.

16      Do you see that paragraph?

17 A.   Yes.

18 Q.   Do you agree with the sentiment being conveyed to

19 Mr. Williams in that paragraph?

20 A.   Yes.

21 Q.   And then lastly, the following paragraph speaks to a

22 desire to see Mr. Williams improve his communication skills.

23      Do you see that there?

24 A.   Yes.

25 Q.   Is that a sentiment that you agree with?

*United States District Court*

1  A.   Yes.

2  Q.   Overall, though, Mr. Williams was generally reviewed

3  positively during his time at Linode, correct?

4  A.   Yes.

5  Q.   And you have no quarrel with the notion that he was

6  providing value to the company as an employee, correct?

7  A.   No.  Yes, that's correct.  Sorry.

8  Q.   It's okay.  Was there -- well, we'll get to that.  Let me

9  put that on pause for a second.

10      Between the period of your first day of work at Linode and

11  the issue with respect to the promotion that Mr. Williams

12  wanted to interview for that arose in September 2018, within

13  that time period, did Mr. Williams ever say anything to you

14  that would have led you to believe that he felt that he was

15  being discriminated against based on his age?

16  A.   No.

17  Q.   Did he ever say anything to you during that period of time

18  that would lead you to believe that he felt he was being

19  discriminated against based on his sexual orientation?

20  A.   No.

21  Q.   Did you ever observe anyone harassing or otherwise

22  treating Mr. Williams unfairly at Linode due to his age or

23  sexual orientation during that window?

24  A.   No.

25  Q.   Do you have any knowledge of any complaints that

1  Mr. Williams raised in that respect during that time period at
2  Linode based on his age or sexual orientation?
3  A.  No.
4  Q.  Did you ever treat him differently during that time period
5  based on his age or sexual orientation?
6  A.  No.  I don't -- I mean, being older is not a negative, and
7  neither is being gay.
8  Q.  Is the first time that Mr. Williams raised dissatisfaction
9  with you about his employment the September 2018 time frame
10 when the company was, I think at that point, considering
11 promoting Mr. Kaufman to the network manager role?
12 A.  I remember him, yeah, not being pleased with Tim getting
13 that position.
14 Q.  All right.  Was Tim Kaufman an employee at Linode at that
15 time?
16 A.  At what time?  Sorry.
17 Q.  At the time he was being considered for the promotion?
18 A.  Yes.
19 Q.  So this was not a new role that the company was looking to
20 fill from the outside, correct?
21         MR. CARSON:  Objection.  Leading.
22         THE COURT:  It's overruled.
23         MR. CAVALIER:  I can restate it.
24         THE COURT:  Go ahead and restate it.
25 BY MR. CAVALIER:

*United States District Court*

1  Q.   Was Mr. Kaufman -- strike that.

2       Was this a role that was being created that the company

3  was looking to fill from outside?

4  A.   No.

5  Q.   So was this just career progression for Mr. Kaufman?

6  A.   I think we're missing a little context here, if you don't

7  mind?

8  Q.   Not at all.

9  A.   I worked with Tim at Net Access Corporation.  He was my

10  employee there.  I was very familiar with him.  I knew he had a

11  skillset we desperately needed.  He went from Net Access, at

12  some point went to a startup where he gained even more

13  knowledge about the types of problems we needed to solve and

14  the environment we need to solve them, so I brought him over to

15  Linode because I knew that I was going to -- you know, at least

16  I thought that I would keep progressing at Linode because it

17  was a great place to progress for me, and I needed someone

18  there that I could eventually make that manager of network

19  engineering.  So I figure I will hire Tim, he will work with

20  the team.

21      And I think that's how Carl found out that I was going to

22  promote Tim was because in my one-on-ones with my reports and

23  network engineering department, I floated them the idea, hey,

24  you guys like working with Tim?  How is it?  You know, I wanted

25  to make sure that there was no show stoppers there.  I was

*United States District Court*

1  trying to introduce it to the team.

2  Q.   How did the team respond to the idea of working with Tim?

3  A.   Very favorable, except for Carl.

4  Q.   Did he, in voicing displeasure to you at that point in

5  time in working with Mr. Kaufman, did he raise any issues

6  related to his age or sexual orientation?

7  A.   At that time, no.

8  Q.   Yes.  Okay.

9       So was it your intention, at the time that you hired

10 Mr. Kaufman to work at Linode, that he would eventually assume

11 your role as manager of the department?

12 A.   Yes, exactly.

13 Q.   Were you familiar with Mr. Kaufman's technical abilities

14 during your work at Net Access?

15 A.   Oh, yeah, absolutely.

16 Q.   Can you tell me about them briefly?

17 A.   Yeah.  I mean, we worked on the same networks and solved

18 the same problems at Net Access, so I knew he had the ability

19 and the skillset that we needed for the team, the things that

20 we laid out here that maybe weren't Carl's strengths.

21      And I think it's important for the leader of the team to

22 be able to lead from the front and not from behind, so that was

23 important to me technically.  Tim was also someone that's, you

24 know, very easy -- I don't want to say easy to get along with,

25 but he's an easy person to follow as a leader.  And we also

1  kind of needed someone that could manage -- we didn't really

2  have a project management organization at the time.

3      And Tim, from my past working history with him, was able

4  to take projects, scope them, you know, task them out, and then

5  follow up with the tasks.  So I knew that he could kind of fit

6  and check off those boxes.

7  Q.  Did you give Tim Kaufman that promotion because he was

8  younger than Mr. Williams?

9  A.  No.

10  Q.  Did you give -- well, actually, I guess I should ask you.

11  Did you know whether Mr. Kaufman was straight or gay at the

12  point that you promoted him?

13  A.  Yeah.  I'm friends with him.

14  Q.  Okay.  Did you know -- did you promote him over

15  Mr. Williams because he was straight and Mr. Williams was gay?

16  A.  No.

17  Q.  How did Mr. Kaufman perform in the role?

18  A.  He did good.  Yeah.  I mean, he still works there, the

19  same job.

20  Q.  Okay.  I want to take you through, then.  So we've talked

21  about the first chunk of time here leading up to the Tim

22  Kaufman promotion.

23      So now I want to talk to you about that time frame which,

24  as I recall from prior testimony, spans from September 20th,

25  2018, through about January of 2019, agreed?

*United States District Court*

1  A.   Which piece of that?  Where Tim was --

2  Q.   Yeah.  The Tim Kaufman issue?

3  A.   Oh, through January.  Sorry.  Yeah.  I got it.

4  Q.   It's been a long week, like I said.  We looked at a Slack

5  message that I want to pull up for you.  It's Exhibit 15.  So I

6  know Mr. Carson asked you questions about how this document

7  came to be and what your intentions with it were.

8       But if you don't mind, I'd like you to just explain to the

9  jury how this came about, what you were trying to do, and what

10 your motivation was?

11 A.   Yeah.  I mean, I think this is kind of spawned by Carl's

12 displeasure with finding out that Tim was going to be network

13 engineering manager.

14 Q.   So he had voiced that to you at this point in time,

15 correct?

16 A.   I believe so.  Yeah.  Because I knew that.  So I was

17 trying to think of a way -- you know, we had a lot of problems

18 to solve.  I wasn't just creating a solution to those problems

19 out of thin air, but I was trying to group those problems that

20 Carl would be good at solving.  I knew in the future we were

21 going to grow a lot on the platform, and those problems were

22 going to become more.  So we needed to solve them now.

23      So I kind of laid out, in my mind, kind of what Tim's role

24 is, what a principal would be, and then what a potential role

25 for Carl could possibly be.  And then I knew that we kind of

*United States District Court*

1  each knew who some of these people were.  So I gave him some

2  analogies, like, who -- like, his career path could take the

3  same path as some of these folks that I knew he respected and

4  thought highly of or whatever.

5  Q.  Was this all just a sham to shut Mr. Williams up at this

6  point in time?

7  A.  No.  No.

8  Q.  What were you hoping would come of this after you sent it

9  to him?

10 A.  I was hoping that he would reply back -- well, in a

11 perfect world, he'd reply back great, Dan.  Sounds great.

12 Let's do it.

13     But I thought the process was going to be he'd reply back

14 and we would collaborate through this collaboration tool on a

15 solution to the problem.  You know, maybe he would say I want

16 the title of director here or something.  Or I don't want an

17 architect to deploy this or I don't want to do this or I

18 already do this.  And I was trying to -- I had a general set of

19 ideas that I wanted to collaborate on to make more specific

20 with him.

21 Q.  How did he respond to your effort to do that?

22 A.  He didn't seem happy from the message.  And then, like I

23 said before, that was kind of typical of our relationship,

24 where if I gave him constructive feedback or maybe gave him an

25 answer he didn't like, he would either respond negatively or he

1  would just kind of ghost me and pout in a way.  That's the best

2  way to explain it.

3      But usually, he would marinate on it, and then he would

4  understand that what I was doing was good, and he would come

5  back and we'd talk about it.

6  Q.  Did you have Mr. Williams' best interest at heart when you

7  sent him this document?

8          MR. CARSON:  Objection.  Leading.

9          THE COURT:  It's overruled.

10  BY MR. CAVALIER:

11  Q.  You can answer.

12  A.  Sorry.  I get confused.  Yes.

13  Q.  We heard testimony -- and you were in the courtroom for

14  it, so you heard the testimony too -- that, when Mr. Williams

15  was on the stand, that he was apparently upset that you sent

16  him this document via Slack rather than going to him in person

17  to talk about it.  What's your reaction, if any, to that

18  statement?

19  A.  I mean, I know we talked about it in person.  I wanted to

20  get this one in writing.  Because we would sit down and have a

21  discussion and sometimes we'd leave the room with two totally

22  different outcomes in our minds.

23      So I figured if we had it all written down in detail,

24  there'd be like no -- we wouldn't be able to cross our wires,

25  right?  Because it's all in the document that we could work on

*United States District Court*

1  together.  That's what I thought.

2      And I think this later became a Word document that we both

3  commented on and worked on together.

4  Q.  All right.  When is the next time that the subject of this

5  Slack message that you sent to Mr. Williams, when was the next

6  time it came to your attention?

7  A.  I don't know.  I mean, we could have talked about it a

8  couple times before.  I guess the next chronological thing is

9  maybe the meeting with Tom.  Like, I don't know.

10 Q.  All right.  And you mentioned the meeting with Tom, and

11 that's the next thing we're going to get to.  But again, I want

12 to be very specific about this.

13     Between the time period that you first discussed the

14 issues in this Slack communication with Mr. Williams and the

15 day prior to this meeting with Tom and Mr. Williams to discuss

16 this issue, did he ever once raise the issue of his age with

17 you with respect to this promotion?

18 A.  No.

19 Q.  Did he ever say to you, in any form, hey, I feel like I'm

20 getting passed over for promotion because Mr. Kaufman is

21 younger than me?

22 A.  No.

23 Q.  Did he ever say anything to you with respect to the idea

24 that he was not being considered for this promotion or

25 interviewed for this promotion because of his sexual

*United States District Court*

1  orientation?

2  A.   No.

3  Q.   And just to close the loop, did he ever say anything to

4  you that would have led you to believe that he thought at that

5  time that he was not being promoted because he was both on the

6  older side and gay?

7  A.   No.

8  Q.   Let's talk about that meeting, then.  Can you tell the

9  jury in your own words what you recall about that December 2018

10 meeting?

11 A.   Yeah.  I mean, it's kind of hazy-ish for me.  I remember

12 being in Tom's office, talking about this issue.  And I think

13 the crux of it was that Tom said I would be interviewing people

14 in the role deal.  And he told that to Carl -- the role of

15 network engineering manager, it would be an open role for

16 everyone to apply to within the company or externally or

17 whatever.  I'm not sure exactly what he promised to Carl, but

18 that's what he supposedly told Carl.

19      That was not my intention.  I was not going to open the

20 role.  I had Tim.  I picked him.  I brought him over to the

21 company, you know.  I let him meet the team, solve problems.  I

22 watched it all.  I was comfortable with Tim.  That was my plan.

23      So I think that was where we kind of had the friction

24 where Carl was saying, hey, the COO said this.  You're saying

25 this.  You have to listen to the COO.

*United States District Court*

1    I was like, no, this is the way I want to do it.  This is

2    the way it's going to happen.  I've thought this through.  I'm

3    making the best decision for the company and our customers.  I

4    talked to Tom, and he said it's your ball game, and that's what

5    we did.

6    Q.   Why didn't you give him a fake interview and tell him that

7    you'll consider him and then just hire Tim anyway?  You could

8    have done that, right?

9         MR. CARSON:  Objection.

10        THE COURT:  Overruled.

11        THE WITNESS:  It's not the right thing to do.  It's

12    going to waste people's time and it's going to give him a false

13    impression.

14   BY MR. CARSON:

15   Q.   Were you familiar at this point in time with Mr. Williams'

16   technical abilities?

17   A.   Oh, absolutely.

18   Q.   And were you familiar at this point in time with Tim

19   Kaufman's technical abilities?

20   A.   Absolutely.

21   Q.   Had Mr. Williams been granted an interview for the

22   position, would it have made any difference in your decision to

23   promote Tim kaufmann into the role?

24        MR. CARSON:  Objection.

25        THE COURT:  Sustained.

*United States District Court*

1  BY MR. CAVALIER:

2  Q.   You were here on -- I can't remember -- Tuesday,

3  Wednesday, Thursday, or Friday of last week when Mr. Williams

4  was on the stand, and he described this meeting as sort of a

5  negotiation session, where he -- where you guys had this

6  PHRC -- again, he calls it a charge; I call it a questionnaire.

7  And that as a result of that, you bargained with him in a way

8  that would have him withdraw that document.  Do you remember

9  that testimony?

10  A.   I remember that testimony.

11  Q.   Do you agree with that testimony?

12  A.   I never -- no.  I don't agree with it.  I never saw that

13  document until this -- the depositions and everything.

14  Q.   Did Mr. Williams ever give you this document near or about

15  in time to that December 2018 meeting?

16  A.   No.

17  Q.   Had you ever seen this document prior to the beginning of

18  this litigation?

19  A.   No.

20  Q.   Did this document have any impact whatsoever on your

21  decision to craft a new role for Mr. Williams and to promote

22  him into that role?

23  A.   I never saw it.  So it couldn't have an impact on my

24  decision, no.

25  Q.   All right.  So let's talk about, in your view, generally

1  speaking, what was discussed at that meeting and what was the

2  end result of it, to the best of your memory?

3  A.  I kind of just remember, you know, Carl upset that I

4  didn't follow Tom's -- what Tom told Carl, that it would be an

5  open position and he wanted to be able to interview for it.

6  Q.  All right.  You testified, when Mr. Carson was asking you

7  questions, that at this point, for the first time, Mr. Williams

8  mentioned something about his age?

9  A.  Yeah.

10 Q.  Can you tell the jury what he mentioned and how it came up

11 and was presented to you in that meeting?

12 A.  It was -- I don't want to diminish it, but it kind of felt

13 like a throwaway comment, like something about, you know, us

14 not considering maybe because of his age or something.  And I

15 was -- like, to me, it was so untrue and not even in my -- it's

16 not something I had ever thought of.  So I was just -- we just

17 never really -- just like, no, and we moved on with the

18 discussion.

19 Q.  Did he harp on the issue at all?

20 A.  No.

21 Q.  Did he ever bring it up with you between the point in time

22 of this meeting and ultimate point in time of his taking of the

23 director title?

24 A.  No.

25 Q.  Explain, then, what happened coming out of that meeting

*United States District Court*

1   with respect to this new role, if you would?

2   A.   I mean, again, it's hazy, but eventually, I think what

3   happened was we collaborated on a Word document, where we laid

4   out the roles and responsibilities of this new job.  And I

5   think once we had the job description nailed down and roles and

6   responsibilities, I sent out the email saying Carl was

7   promoted.

8   Q.   Can you tell the jury generally what this role was all

9   about?

10  A.   This role was -- since we were moving into all these new

11  cities, it's very important that you have the best connectivity

12  possible to the world and to the local population, right?

13       So if you're moving into this city, you want to be able to

14  say, okay, like, if customers are going to come to -- we

15  service customers of customers.

16       But like, if I'm going to have this website and I'm

17  selling this e-commerce stuff or I have video and you're in

18  Sydney, you want people in Sydney to have a good experience

19  when they're viewing that content, right?

20       So it's very important -- and there's a ton of detail on

21  this.  Like I said, it's like insurance, right?  If you narrow

22  down, there's a ton of detail to making sure that you are

23  connecting properly to the other networks out there.  So like,

24  you know, the Verizon of Sydney or the Comcast of Sydney or

25  whoever the eyeballs are.

*United States District Court*

1      It's also equally as important, to some of customers in

2   just content, they also connect to the content providers there,

3   like the Googles or the Akamais or the Facebooks.

4      So it's pretty detailed.  You have to understand how to

5   reach all the different customers you want through this

6   connectivity profile, and you want to weigh costs to

7   performance.  And, you know, it's like a whole career, really.

8   That's kind of what we do.

9   Q.  Did you think Mr. Williams would be well suited for the

10  role?

11  A.  I did.  I did.

12  Q.  Did you think the role was well matched with his talents?

13  A.  Yeah.  Absolutely.

14  Q.  Did you think Mr. Williams would be successful in this

15  role?

16  A.  Yeah.  I mean, it was a challenge, I felt like.  So I

17  didn't know, you know, but I wouldn't set him up for failure.

18  So I thought it was possible.

19  Q.  Was it your expectation that Mr. Williams, in this new

20  role, would provide value to the company?

21  A.  Yes.

22  Q.  What was Mr. Williams' title immediately prior to this

23  promotion?  Do you recall?

24  A.  It was network engineer, I think.

25  Q.  All right.  When he raised this issue, why didn't you

*United States District Court*

1  simply tell him, no, you're a network engineer and that's all

2  you're ever going to be?

3  A.   I think it was a confluence of things.  Like, I knew we

4  had these problems we had to solve.  I knew that he had a

5  skillset that could possibly be tuned and, if pointed in this

6  direction, could solve the problems.  I knew that he wanted

7  career progression.  Everyone does.  I understand that.  And

8  all three together kind of baked this cake of promotion.  Yeah.

9  Q.   Were you hopeful that Mr. Williams would be happy and

10  satisfied with this new role?

11  A.   Yeah.  I mean, I always say it's not our job to make

12  employees, like, happy, right?  But it's our job to create an

13  environment where they can thrive, which will then create

14  happiness.  So yeah.

15  Q.   Did you expect him to thrive?  Did you hope he would

16  thrive?

17  A.   Yeah.  I hoped so.

18  Q.   All right.  So briefly explain to the jury this

19  differential between Mr. Williams' promotion to the manager

20  position and then, ultimately, to obtaining the title of

21  director.  Can you explain to them how that came up?

22          MR. CARSON:  Objection.

23          THE COURT:  It's overruled.

24          THE WITNESS:  My recollection is when we were

25  getting -- like, my document was kind of like a starting point

*United States District Court*

1   in negotiations, right?  It said manager.

2          Someone brought up the point -- probably Carl -- that

3   a director title would be more fitting, especially since some

4   of those networks we had to connect to, you have to pay them

5   money.  You have to negotiate.

6          So when you get an email from someone who is a

7   manager, it doesn't carry as much weight as a director.

8   Because people know if you have a director title, you have

9   purchasing power.

10         And when you go to speak at these conferences, you're

11  a director, right?  It's a higher rung than manager and it, I

12  guess, it carries more clout.

13  Q.  When Mr. Williams asked for that title, did you push back

14  on it?

15  A.  I don't remember pushing back on it.

16  Q.  Did you have a problem with him assuming the director

17  title at that time?

18  A.  I'm not really big into titles.

19  Q.  Was this a real promotion for Mr. Williams, in your view?

20  A.  Absolutely.

21  Q.  Did he get a raise attended to the promotion?

22  A.  Yes.

23  Q.  In the immediate follow-up or the immediate time after the

24  promotion, did Mr. Williams voice any complaints to you of any

25  type whatsoever with respect to his work?

*United States District Court*

1  A.  No.

2  Q.  So at this point, again, we're going to move forward from

3  the date that Mr. Williams assumed the director title and,

4  we'll call it, the day before his termination.  Okay?

5      During that period of time, from January of 2019 to August

6  of 2020, did Mr. Williams ever complain to you that he was

7  being treated differently because of his age?

8  A.  No.

9  Q.  Did he ever complain to you that he was being treated

10  differently because of his sexual orientation?

11  A.  No.

12  Q.  Did he ever complain to you that you were treating him

13  differently for any of those reasons?

14  A.  No.

15  Q.  Did he ever make any complaints to you at all via any

16  mechanism regarding either of those two issues?

17  A.  No.

18  Q.  All right.  What was your relationship with Mr. Williams

19  like during that period of time after he had taken the director

20  title?

21  A.  I thought it was good.  We had our work stuff, right?

22  We're working together, and maybe we were pissing each other

23  off here and there.  I don't know.  I mean, it's entirely

24  possible.  But yeah.  I think you were talking about 2019,

25  right.

*United States District Court*

1  Q.  Right, 2019 to pre August 2020?

2  A.  I feel like we were rolling, you know.

3  Q.  Were you traveling together?

4  A.  Traveling together.

5  Q.  How was Mr. Williams doing with his new title?

6  A.  I thought he was doing well.

7  Q.  We've heard a lot about this summer of 2020 review that, I

8  think, you testified or Mr. Williams testified that you had in

9  the lunch meeting with him.

10      Did you ever have any occasion during the period of

11  January 2019 and August of 2020 to negatively comment on

12  Mr. Williams' performance?

13  A.  Did I have opportunity?

14  Q.  Yes?

15  A.  Absolutely.  We had one-on-ones.  We talked.

16  Q.  And what kind of issues were discussed in those

17  one-on-ones?

18  A.  We usually just, me and him, we usually talked about

19  whatever he was working on, you know.  If it was, you know, if

20  we're going to Mumbai, we need to figure out the connectivity

21  profile for Mumbai.  He would talk about it.  It was

22  complicated.

23  Q.  Okay.  During this period of time -- strike that for now.

24  Since we mentioned travel, you mentioned this on your

25  examination from Mr. Carson there.

*United States District Court*

 1       But tell the jury in your own words about the Panama trip,

 2  what you guys did and what message you were trying to convey to

 3  Carl about your travel at that point in time?

 4  A.    I think you're speaking of the Philippines trip.

 5  Q.    Sorry.  I may be -- like I said, it's been a long week.

 6  A.    Like I said before, I guess we were -- somehow we were

 7  talking.  And I said to him, you know, we're going.  You know,

 8  I've been traveling a lot.  I think it would be a good idea if

 9  maybe we brought someone more junior along so they can kind of

10  have the experience we're having, which is pretty cool.  You

11  learn a lot.  You meet people.  You get that context, the

12  understanding of kind of these conversations we're having with

13  these people that literally build the internet.  I thought it

14  would be a great experience for somebody.

15       I like to travel, but I can sacrifice my spot if we don't

16  have a budget or whatever.  I think it would be nice, and then

17  it would kind of be a bridge back to that team to maybe, you

18  know, mend any friction they had from the performance stuff,

19  you know.

20  Q.    Was it your impression during this time period that

21  Mr. Williams enjoyed traveling with you?

22  A.    Yes.

23  Q.    Do you have any reason to doubt that he enjoyed traveling

24  with you?

25  A.    I don't think so.  No.

*United States District Court*

1  Q.  Did he ever tell you that he was feeling excluded from any

2  of the activities on any of your trips?

3  A.  No.

4  Q.  Let me ask you about this issue of policy violations we've

5  heard a lot about this week.  And I think the jury has heard

6  plenty of testimony from all the witnesses about policy

7  violations.

8      Would you mind explaining to the jury, in your own view,

9  where Mr. Williams might have had issues complying with Linode

10  policy?

11          MR. CARSON:  Objection.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yeah.  I mean he took liberties with a

14  lot of different policies.  I mean, it's -- some of them were

15  trivial; some of them, to other people, weren't so trivial.  I

16  fielded complaints here and there, but nothing, in my mind, to

17  the level of an HR issue.

18          I definitely provided a lot of cover for him.  I

19  definitely got crap over the Mets tickets, over some dinners,

20  taking other employees out to dinner that was expensive.  You

21  know, that picture of Alyssa, Rich talked to me.

22          There's stuff, but I'd say, hey, I'll talk to him

23  about it.  And I probably didn't do the best job as a manager

24  cracking down on that.  Absolutely.

25  BY MR. CAVALIER:

*United States District Court*

1  Q.   When you say the Alyssa picture, can you explain to the

2  jury what you mean about that?

3  A.   Yeah.  I think it was somehow testified earlier --

4        MR. CARSON:  Objection, Your Honor.  Relevance.

5        THE COURT:  Overruled.

6        THE WITNESS:  That everyone has a profile picture in

7  Slack.  I guess Alyssa clanged her picture to be some vacation

8  photo that she was just on.  Your profile on Slack is super

9  small.

10        I guess somehow Carl maybe clicked on it and blew it

11  up and clicked it and then put it in the Slack channel, right?

12  Like, Alyssa looks great here or she's having a great time or

13  something to that effect.

14        It seemed innocent to me, enough, but I guess all the

15  attention to her made her feel embarrassed.  And that's my

16  knowledge of the situation.

17  BY MR. CAVALIER:

18  Q.   Who gave you crap about it?

19  A.   I remember Rich Ford reaching out to me about it.  I don't

20  know if it was a text, voice, passing him in the hall.  He said

21  something to me.

22  Q.   Was that -- well, did Rich Ford ever say anything else to

23  you about these policy violations with respect to Mr. Williams?

24        MR. CARSON:  Objection.

25        THE COURT:  It's overruled.

*United States District Court*

1          THE WITNESS:  Yeah.  I mean, he was on me about the

2    Mets tickets that I never got.  And I was like, if those were

3    purchased, I don't know anything about them.

4          So, you know, I told him to go to Vinny with it and

5    we'll deal with it together.

6    BY MR. CAVALIER:

7    Q.   Just real quick, what are these Mets tickets?

8    A.   I'm a big Mets fan.  Carl knows that.  I think he was

9    trying to maybe do something nice for me and buy me Mets

10   tickets, but I never saw them.

11        And I did confront Carl about them at work, and he just

12   said, "Dan, just forget about it.  Just forget about it."

13        I was like, "Carl, it's like a lot of money.  I'm being

14   asked about it."

15        And he was like, "Just forget about it, Dan."

16        And I was like, "Okay, man."

17        And that's why I was, like, if this is -- if we have a

18   system, we can deal with it.

19   Q.   All right.  Did you ever -- well, first of all, who's Rich

20   Ford?

21   A.   He's the VP of finance or CFO.

22   Q.   The money guy?

23   A.   Yeah.  The bean counter.

24   Q.   Did you ever discipline Carl for these policy violations

25   and complaints that Mr. Ford raised with you?

*United States District Court*

1  A.  Not discipline.  I mean, I probably mentioned a couple to

2  him.

3  Q.  Did you ever take any formal action against him for these

4  things?

5  A.  I did not.

6  Q.  Did you ever write him up for them?

7  A.  No.

8  Q.  Did you ever use them as a cover for discriminating

9  against Mr. Williams due to his age or sexual orientation?

10  A.  No.

11  Q.  In your view, were these policy violations really that big

12  of a deal?

13  A.  Not really.  I mean, some of them seemed a little trivial,

14  you know.  I wouldn't do them myself but -- not really.

15  Q.  Okay.  So let's fast forward, then, to the termination.

16  Okay?  And again, just to center everybody, this is the August

17  of 2020 time frame.

18      Why don't you just tell the jury, in your own words, how

19  you came to decide that your time working with Mr. Williams was

20  over?

21  A.  I was sitting at my desk, and an employee named Brittany

22  sent me a link to a website.  Paraphrasing as I don't have the

23  document in front of me, but she said something to the effect

24  of, hey, Dan, I think you should see this.  Not sure if Carl is

25  in trouble.

*United States District Court*

1    Q.   Real quick, before you go any further, let's look at that

2    document.

3    A.   Okay.

4    Q.   All right.

5         MR. CAVALIER:  Just Exhibit 17.  Not

6    previously admitted.  For the witness only.

7    BY MR. CAVALIER:

8    Q.   Is this the document that you were just referring to?

9    A.   Can you snip it?  I can't really see it.  Yes.  Yep.

10        MR. CAVALIER:  On that note, Your Honor, I move to

11   admit Exhibit 17.

12        MR. CARSON:  Objection, Your Honor.

13        THE COURT:  Okay.  The objection is overruled.

14        ( DEFENDANT EXHIBIT 17 WAS RECEIVED IN EVIDENCE.)

15   BY MR. CAVALIER:

16   Q.   So explain to the jury what this document is.

17   A.   This is the Slack conversation between Brittany Hanks and

18   myself.

19   Q.   All right.  And what's the subject matter of the

20   conversation?

21   A.   She is alerting me to the fact that Carl is in an article

22   with John Musbach and, very publicly, everyone knows who John

23   Musbach is because he got caught at work with child porn stuff.

24   Q.   Prior to August 13, 2020, did you know that Mr. Williams

25   was in a -- whatever we want to call it, a romantic

1 relationship or partnership, spousal arrangement with

2 Mr. Musbach?

3 A.  No.

4 Q.  Would you have a problem with it if you had found out that

5 that was the case?

6 A.  Yes.

7 Q.  Let's talk a little more about that in a bit, but first I

8 want to ask you, what did you do when you received these

9 messages from Brittany?

10 A.  I think I told her thanks, and then I immediately video

11 called Tom, I think.

12 Q.  Do you remember what you and Tom discussed?

13 A.  I think it was basically, hey, Tom, look at this article,

14 I do not, like, accept or take kindly to this type of these --

15 like these kid issues.  It's not something I can deal with,

16 pretty much.

17 Q.  Did you tell Tom that you were not going to work with

18 Mr. Williams anymore after this?

19 A.  Yes.  I said, Tom, it's him or me.

20 Q.  All right.  I'd like you, if you would, to explain to the

21 jury in your own words the reaction that this knowledge created

22 in you at this point in time.

23 A.  Like I said before, the context of me and John Musbach --

24 my knowledge of John Musbach at the time was that he was the

25 pedophile guy at work that got caught using his company laptop

*United States District Court*

1  to talk to a child online or to exchange pictures, pornography,

2  whatever it was.  You know, people would not speak kindly of

3  him in the office, that he was really weird and creepy.  You

4  know, he'd eat like a loaf of bread for lunch every day or

5  something.  My mind is like, wow, this guy is not someone we

6  want to be around or would choose to be around.

7       And then once I kind of saw -- I clicked on the link, I

8  read the article.  And then, like I said before, knowing the

9  fact that Carl and I were just at lunch and he talked about --

10 he said his roommate, John's car.  I was like, that must be

11 that John.

12      And then -- you know, just understanding the context that

13 Carl knew that this man was into this behavior with children,

14 and then he would then carry on a relationship with him after

15 that, keep him in his life -- yeah, that was just my point

16 where I knew I couldn't work with him.

17 Q.  So let me just ask you the question then.  Would it have

18 had any impact on your reaction to this knowledge if, instead

19 of being a male partner of Mr. Williams, the subject of this

20 article and these previous crimes was female?

21 A.  No, it wouldn't.  I mean, I have kids at home.  At that

22 time a 13-year-old the exact same age as the victim.  I have a

23 13-year-old at home now and at the time was -- -

24          MR. CARSON:  Objection.

25          THE COURT:  Objection is overruled.

1          Go ahead.

2          THE WITNESS:  I mean, I don't care who -- I mean, it's

3    just not something...

4    BY MR. CAVALIER:

5    Q.   Fair enough.  And just for the record, since you said you

6    don't care who, but if Mr. Williams had been a female employee

7    and his partner was a male employee in the situation as

8    Mr. Musbach, would that have made any difference in your views

9    about this or your reaction to it?

10         MR. CARSON:  Objection.

11         THE COURT:  I'm sorry.  Was that an objection?

12         MR. CARSON:  Yes, Your Honor.

13         THE COURT:  The objection is sustained.

14   BY MR. CAVALIER:

15   Q.   What happened -- well, first -- I'm sorry.  Let's do

16   Exhibit 42 because I just want you to verify something for me.

17   We've all seen it this week.  It's nothing surprising.

18         Is this the exhibit that Brittany sent you or is this the

19   article Brittany sent you?

20   A.   Yes.

21   Q.   And is this the article that you read before you went to

22   Tom and told him it's either Mr. Williams or me?

23   A.   Yes.

24   Q.   Did you have any reason in time to doubt the authenticity

25   of this Philadelphia Inquirer article?

*United States District Court*

1  A.  No.

2        MR. CARSON:  Objection.

3        THE COURT:  It's overruled.

4        THE WITNESS:  I already knew John Musbach was charged

5  with the child stuff.  I don't think that they would mess up

6  that Carl was quoted in here.  I mean, how would they even know

7  who that was?

8        Like -- yeah.  It's a paper record of Philadelphia.  I

9  did not question its authenticity.

10 BY MR. CAVALIER:

11 Q.  Did you believe at the time that you read the article that

12 its contents were accurate?

13 A.  A hundred percent.

14 Q.  So tell us what happened next in the process of

15 Mr. Williams' termination.

16 A.  Well, I had the conversation with Tom where I told him how

17 displeased I was, how I don't think I can continue with Carl.

18 I told him, you know, it's me or him.  And I felt really weird

19 making that kind of power move, or whatever, you know, and I

20 fully expected Tom could say, no, I thought about it -- he

21 could say, Dan, then you're out.  Who knows?

22       But once we decided on that, I went back to work.  You

23 know, obviously I thought about it and it was weighing on my

24 mind, but I remember, at least as far as the policy violations

25 thing, that was communicated to me that that was the route that

*United States District Court*

1  we were going to take to terminate Carl, and I accepted that.

2  Q.  Did you care what route the company took to terminate

3  Carl?

4  A.  No, I didn't care.

5  Q.  So long as it was done?

6  A.  It was done, yeah.

7  Q.  I think you mentioned that you felt some guilt when we

8  heard the recording of the termination meeting here in court

9  because you didn't do that much speaking.

10      Do you remember if you spoke at all during that call with

11  Mr. Williams?

12  A.  I did.  I think I spoke a little bit in the beginning and

13  said, hey, Carl, we're going to terminate you.  But then he

14  kind of turned his ire to Vinny, Vincent.  You know, he never

15  said my name really, so I didn't know what to do.  And I didn't

16  want to, like, trample on Vinny because I think, you know, as a

17  director of HR, he's been through many firings, I figured he

18  was the professional and I would kind of sit back.  I did feel

19  guilty that I didn't -- like, I didn't know what to do, you

20  know, type deal.

21  Q.  Sure.  And you had one goal at that point in time, right?

22  A.  Yes.  That was our task at the time to execute.

23  Q.  Let me ask you, because we heard a little bit of testimony

24  and the chunk of the recording was cut off in the beginning,

25  but do you recall Mr. Williams raising any issues related to

*United States District Court*

1  his sex in that 27-plus minute meeting about his termination?

2  A.  No.

3  Q.  Do you remember Mr. Williams raising any issues in the

4  27-plus minute meeting about his sexual orientation or any

5  other factors that were unique to him?

6  A.  No.

7  Q.  Okay.  Did your decision to go to Mr. Asaro and say either

8  Carl goes or I go have anything to do with the fact that Carl

9  is an older gentleman?

10  A.  No.

11  Q.  Did your decision to go to Mr. Asaro and say it's either

12  Mr. Williams or me have anything whatsoever to do with the fact

13  that Mr. Williams was a gay man?

14  A.  No.

15  Q.  All right.  So at that point, Mr. Williams' termination is

16  complete, correct?

17  A.  Yep.

18  Q.  From your perspective, when was the next time this issue

19  with Mr. Williams' saga came onto your radar screen?

20  A.  I think it's when we got a notice that we were going to be

21  sued, or that's what I remember at least.

22  Q.  All right.  Did you give it any thought in that period of

23  time in between his termination and when you found that out?

24  A.  I thought about the situation, yeah.  I mean, it was kind

25  of crazy.

*United States District Court*

1  Q.   Okay.  Did you ever talk to Mr. Williams during that time

2  period?

3  A.   No.  I didn't speak to him after that termination.

4  Q.   Did you participate in responding to interrogatories

5  during that time period?

6  A.   I didn't know what an interrogatory was until today.  No.

7  Q.   Okay.  Before I let you go, I want to ask you one last

8  thing here.

9       You've been here all week, correct?  You've heard all the

10 testimony in the case, you saw Mr. Williams testify for the

11 better part of four days.

12      You know you are the accused here, right?

13 A.   Yes.

14 Q.   How does it feel?

15 A.   It feels horrible.  I mean, I guess it didn't really hit

16 me as hard as I thought.  Like, I knew this was coming to this,

17 I knew it was going to be a bad experience for me.  I didn't

18 realize how personal it was until I heard the opening

19 statement, I heard Carl's testimony.  He insinuated that I

20 would cheat on my wife, like that I'm a monster.  That's what I

21 felt like.  And I kept hearing my name and it's personal.

22 Like, it's not good.  It's not a good experience.

23 Q.   You feel like your reputation is at issue?

24           MR. CARSON:  Objection.  Leading.

25           THE COURT:  Objection sustained.

*United States District Court*

1          Rephrase it.

2    BY MR. CAVALIER:

3    Q.   Do you feel like your reputation is at issue?

4          MR. CARSON:  Objection.  It's the same question.

5          THE COURT:  Yeah, it is the same question, so rephrase

6    it.

7    BY MR. CAVALIER:

8    Q.   Are there any other things you'd like to tell the jury

9    about why you're feeling the way you feeling this week in

10   court?

11   A.   Yeah.  It's not just about, like, Carl suing a nameless

12   company.  I am the face of the company.  My name is all over

13   this thing.  The complaints made against me are terrible.

14   Like, I'm not a bigot.  I don't discriminate against people.

15   Q.   Have you ever taken any action against anybody in your

16   life because of their sexual orientation or age?

17   A.   No.

18          MR. CAVALIER:  That's all I have.

19          THE COURT:  Okay.  Mr. Carson, how much do you have?

20          MR. CARSON:  Probably makes sense to do a lunch break

21   before I go, but I have a little bit.

22          THE COURT:  Okay.  All right.  So why don't we do

23   lunch now then.  We'll plan to come back by 1:15.  Okay?

24          We're getting close to the end, but not at the end

25   yet.  So again, clear your heads, don't talk about stuff or

*United States District Court*

1    look stuff up.  And we'll see you back here in an hour.

2         THE COURTROOM DEPUTY:  All rise.

3         (Jury exits the courtroom at 12:17 p.m.)

4         THE COURT:  All right.  You can all have a seat.

5         You can step down.

6         THE COURT:  Ballpark, how much time do you think you

7    need on redirect?

8         MR. CARSON:  Probably I'm going to do like -- I think

9    I have like, what, 45 minutes left?  So I think I'm going to

10   use like 30 minutes on redirect, possibly a little more, five

11   minutes for Rich Ford, and then the rest will be just reading

12   into the deposition transcript.

13        THE COURT:  How much deposition do you have to read

14   in?

15        MR. CARSON:  So we have a bunch marked, but I'm going

16   to try to tailor it down because some of it we can -- we don't

17   have to put in there.

18        THE COURT:  You conferred with --

19        MR. CARSON:  I sent all the designations over.

20        THE COURT:  So no objections I need to resolve?

21        MR. CAVALIER:  We don't have any objections to the

22   contents, but I'm a little unclear of this document that's

23   attached, and we would certainly object to the admission of a

24   document that's not an exhibit in this case into evidence as a

25   result of reading the deposition testimony in.

*United States District Court*

1          THE COURT:  Well, is the document attached that's an

2   exhibit, a deposition exhibit that's referenced in the

3   testimony, is that what you are saying?

4          MR. CAVALIER:  No, not to my knowledge.

5          MR. CARSON:  What happened, Your Honor, is during the

6   corporate designee deposition, we were going over the amounts

7   of things.  And we got on the phone with you, if you recall,

8   during it and we made an agreement that I wouldn't continue

9   asking questions about amounts of money, but instead, they

10  would send a letter with the amounts of money.  So that was

11  sent in connection with the corporate designee deposition, and

12  so I think --

13         THE COURT:  Was that document on the exhibit list for

14  trial?

15         MR. CARSON:  No.  It's the same as the corporate

16  designee deposition.  I don't want to admit it, I just want to

17  read the amounts on it, just like the corporate designee

18  transcript.  Just the amounts.

19         I mean, literally I was told to stop asking those

20  questions, and the defendant agreed instead of asking more

21  questions to the corporate designee, they would just send over

22  the amounts of --

23         THE COURT:  So my recollection of this, Mr. Carson,

24  was the problem -- and again, my recollection is not perfect,

25  but you can tell me if I'm wrong.  The problem was that the

*United States District Court*

1  corporate designee didn't know the numbers.

2        MR. CARSON:  I don't think that was it.  I think we

3  just decided that was the easier way to do it.  I mean, I

4  didn't ask a single question about numbers after that.  And we

5  were in the middle of going through them all when you called us

6  back.  And so instead, I just received the letter and the

7  letter just has six numbers, the numbers of the senior network

8  engineer amounts that they earned and the bonuses.  So I think

9  I should be allowed to read those in.

10        MR. CAVALIER:  To be clear, we don't have any problem

11  with Mr. Carson reading the testimony that he's highlighted in

12  it, but the attachment of a random document that's not

13  mentioned in the testimony is, at best, confusing.

14        THE COURT:  But let's be clear, okay.  When you say

15  "attachment," I mean, the jury is not getting the transcript.

16  That's why we're reading it in.

17        MR. CAVALIER:  Right.  So if the only thing that's

18  coming into evidence are the words on the page of the corporate

19  designee deposition, we don't have any objection.

20        THE COURT:  And that includes the words -- in other

21  words, what Mr. Carson is saying is he wants to read in the

22  substance of the letter as well.  He's not handing the letter

23  to the jury, he wants to read the substance of the letter in.

24        MR. CAVALIER:  That, we would object to.

25        MR. CARSON:  It's just six numbers.  It's not random.

*United States District Court*

1    It was sent in connection with the corporate designee

2    deposition by defendants.  And we said on the record we just

3    got off the phone with Your Honor, we made an agreement, so it

4    is referenced in the transcript.

5         THE COURT:  So again, my -- I mean, who was on that

6    call for -- I remember this call.  It was in July, right?  I

7    know it was in July because I know where I was when I took the

8    call.

9         Was that you, Mr. McCarthy?

10        MR. MCCARTHY:  It was me.

11        THE COURT:  Okay.  And so did the witness have the

12   numbers at hand or was it that he didn't have them?  What was

13   the issue?

14        MR. MCCARTHY:  He didn't have the numbers.

15        THE COURT:  That was my recollection too, he didn't

16   have the numbers.  And so rather than reconvene, get a bunch of

17   I don't knows and then reconvene, the idea was to provide the

18   numbers to Mr. Carson because it was just a determinable

19   amount.  Wasn't that what happened?

20        MR. MCCARTHY:  Yes, but I think there was some dispute

21   as to whether or not those numbers were within the scope of the

22   30(b)(6) categories.  But ultimately we ended up providing the

23   information so -- but, yes, you're correct.

24        MR. CARSON:  It's just --

25        MR. CAVALIER:  There are numbers in the transcript,

*United States District Court*

1    Your Honor.  It's just not as many numbers as on the document.

2         MR. CARSON:  The key numbers in the case are the

3    numbers on that letter.  And I gave up my client's right to

4    continue the corporate designee for the convenience and the

5    economics of all parties, and that letter was given to me in

6    lieu of that.  It's the six numbers.  It's the numbers for the

7    income level that the senior network engineer got.  I mean --

8         THE COURT:  When you say "income level," is it

9    salaries or bonuses?

10        MR. CARSON:  Yeah, no, the -- so it's the salary of

11   the three people who were promoted to senior network engineer

12   and it's the bonuses for the three people who were promoted to

13   the senior network engineer.  That's it.

14        THE COURT:  Again, I guess I want to drill down so I

15   want to understand how significant the testimony is.  Right?

16   So we know what Mr. Williams was making and would have lost

17   from the pay standpoint.

18        If this goes to promotions, does it have the delta,

19   Mr. Carson?

20        MR. CARSON:  So the evidence we heard in this case is

21   that the income level that my client received -- I'm sorry.

22   The position that my client held as a director was a higher

23   position than a senior network engineer.  And there are -- I

24   mean, the complaint has these into it, it was in our answers to

25   every interrogatory.

*United States District Court*

1          And so the letter basically just says that -- it
2   identifies the people who we agreed were similarly situated,
3   it's how much money they earned, and then it has the bonus for
4   those people, the Akamai bonus.
5          THE COURT:  The Akamai bonus that they earned, right?
6          MR. CARSON:  Yes.  That's it.
7          THE COURT:  So when for the -- so when you say -- I
8   just want to go back.
9          So on the salary side, it just says what their salary
10  was once they became network engineers?
11         MR. CARSON:  Yeah.  So for Andrew Dampf, it says
12  136,784, went to 142,254.
13         THE COURT:  So it tells me the amount that he got as a
14  raise when he was promoted?
15         MR. CARSON:  Yes.  So it has the amount of what they
16  received -- yeah.
17         So Andrew Dampf was promoted in 2019 to a senior
18  network engineering position, and so it has the amount he got
19  from that promotion to 136, and then he got another raise
20  one year later to 142.
21         Steven Shaw was promoted to the senior network
22  engineering around that same time and that's -- I'm sorry.  He
23  was hired to the senior network engineer, so his was 185 and it
24  went to 187.
25         And then Tim Kaufman's was 162, went to 168.

*United States District Court*

1          And since my client was at 129 and everyone is saying

2    that his position was higher than theirs, I think that's

3    evidence of disparate pay.  And then the other thing was just

4    the Akamai bonuses, Your Honor.

5          MR. CAVALIER:  Your Honor, I might be able to clear

6    this up.  To be perfectly honest with you, I don't understand,

7    yet again, why this was not an exhibit pretrial.  We worked

8    very hard on our pretrial memo to make sure it was accurate and

9    fulsome.  And here now we have another document that was not

10   one of the 150 exhibits listed on that document.

11         Setting that issue aside for a second, I don't have --

12   my belief is that at this point this kind of a document is --

13   the jury is just not going to care.  So if you want to let it

14   in, I'm not going to raise a stink over it.  I don't want to

15   create an issue, I don't want to keep you from your lunch.

16         THE COURT:  My inclination is to let Mr. Carson read

17   it in.  I do think that -- I mean, better practice would have

18   been to list it on the exhibit list, I agree with that.  It's

19   not actually testimony.  I understand we did something to

20   short-circuit the testimony.  It's not actually testimony.

21         But that said, it was done in lieu of prolonging or

22   reopening the deposition, and so there's an analogy there that

23   it is akin to deposition testimony.

24         So I'll let you read it in, Mr. Carson.  Again, I

25   don't know exactly what the letter says.  You need to -- I

*United States District Court*

1    don't want to get into objections as you are doing the reading,

2    so make sure you confer with Mr. Cavalier as to exactly what

3    you are going to say.  In other words, I don't need you to tell

4    me now.  I need you to talk to Mr. Cavalier and make sure you

5    guys are on the same page as to what verbiage you are going to

6    use because you are not reading lines from a deposition.

7            MR. CARSON:  Okay.  Understood.

8            THE COURT:  All right.  So let's take lunch and we'll

9    come back at 1:15 and hopefully wrap up the testimony.

10           MR. CAVALIER:  Thanks, Your Honor.

11           MR. CARSON:  Thank you, Your Honor.

12           THE COURT:  And, counsel, I need at least someone

13   around doing a test run of the Zoom now, so if someone can

14   stick around for that.  All right.  Thanks.

15           THE COURTROOM DEPUTY:  All rise.

16           (Lunch recess taken from 12:27 p.m. to 1:34 p.m.)

17           THE COURTROOM DEPUTY:  All rise.

18           THE COURT:  All right.  Have a seat, everybody.  You

19   can bring in the jury.

20           THE COURTROOM DEPUTY:  All rise.

21           (Jury enters the courtroom at 1:35 p.m.)

22           THE COURT:  All right.  Have a seat, everybody.

23   Mr. Spataro, come on up.

24           Mr. Carson, you're up.

25           MR. CARSON:  Thank you.

*United States District Court*

                        REDIRECT EXAMINATION

1
2  BY MR. CARSON:

3  Q.   Mr. Spataro, didn't you testify prior to this that you

4  found out about this article through some sort of anonymous

5  complaint?

6  A.   I do not remember -- oh, I think I remember.  And then I

7  was able to look it up and I refreshed my memory.

8  Q.   But you said it was an anonymous complaint, right?

9  A.   Yeah.  But I think after I answered that, like, I

10 remembered.

11 Q.   It wasn't an anonymous complain, was it?

12 A.   I received the article from Brittany.

13 Q.   Yeah.  And you were asked numerous times over the course

14 of this case how you found out about the article, and you

15 refused to provide any information about that, correct?

16         MR. CAVALIER:  Objection.

17         THE COURT:  Sustained.

18 BY MR. CARSON:

19 Q.   How come you didn't identify this person as the person who

20 sent you the article until today?

21 A.   I don't believe that was only today.  If that's the first

22 time you heard about it, then to you it is, yeah.

23 Q.   Well, sir, weren't you specifically asked -- didn't you

24 specifically say it was an anonymous complaint?

25 A.   That was wrong.  I corrected myself.

                    *United States District Court*

1  Q.  So do you remember the date that you were wrong?

2  A.  No.

3  Q.  Wasn't it in January of 2023?

4  A.  Possibly.

5  Q.  Much closer to the time when all these things happened to

6  today, right?

7  A.  Do you mind speaking up?  I'm sorry.

8  Q.  Yeah.  This was much closer in time than when all these

9  things happened than today?

10 A.  Yeah, in theory.

11 Q.  In theory?  No, it was a year and two months closer,

12 right?

13 A.  Yes.

14 Q.  Was that the only false information that you provided

15 throughout this case?

16 A.  Yes.

17 Q.  Didn't you also say that the article was just the

18 beginning of a reckoning against Carl?

19 A.  Yes.  I believe that when I reported what I knew to Tom

20 and they came up with these policy violations, at the time I

21 remember focusing that -- you know, we were kind of lenient

22 with Carl for a long period of time.  And once this article

23 hit, it kind of hit everyone like, you know -- like, the

24 totality of the issue is all encompassing of all of the

25 behavior.

*United States District Court*

1    Q.   Which one is it, sir?  Is the policy violations a lie or

2    is it all encompassing?  Because now you're changing your

3    story, aren't you?

4    A.   I think that all the policy violations are not lies.  They

5    did, in fact, happen.  Some of them are more trivial, some of

6    them are a little more serious.

7    Q.   Well, we've heard from other witnesses who already

8    testified in this case that those policy violations were cooked

9    up as part of a plan to lie to my client.

10           MR. CAVALIER:  Objection to misstatement of testimony.

11           THE COURT:  Yeah, that's sustained.

12   BY MR. CARSON:

13   Q.   Sir, you sat there, right there, right?

14   A.   Yes.

15   Q.   The word "lie" had been used repeatedly by Vince Palochko,

16   by Tom Asaro.  You heard that, right?

17   A.   Yeah.  The point of the lie was in the termination meeting

18   when we said, Carl, you are being terminated for policy

19   violation.  I'm paraphrasing.  We did not use the John Musbach

20   reasoning for that.

21   Q.   Yeah.  And you didn't use it two and a half years later

22   either, did you?

23           MR. CAVALIER:  Objection.  Lack of foundation.

24           THE COURT:  It's overruled.  If he knows, he can

25   answer.

*United States District Court*

1  BY MR. CARSON:

2  Q.   You sat right there and listened.  You saw it, right?  You

3  remember that yesterday?

4        THE COURT:  Wait, wait.  Mr. Carson, he's not going to

5  testify about what happened in court here.  He can testify

6  about what he knows.

7  BY MR. CARSON:

8  Q.   So you don't know about that, right?

9  A.   The first time I was asked under oath about why Carl was

10  terminated --

11  Q.   That wasn't my question.  I didn't ask you about the first

12  time you heard.  I said why continue to lie?

13  A.   Didn't feel like I did.

14  Q.   And today it seems like you've gained your memory about

15  what you did after this article -- after you read this article,

16  too, right?

17        MR. CAVALIER:  Objection.

18        THE COURT:  It's overruled.

19  BY MR. CARSON:

20  Q.   Last time you were asked, didn't you say you didn't

21  remember what you did?

22  A.   I don't remember.

23  Q.   You don't remember what you said last time or you don't

24  remember what you did after the article?

25  A.   Are you pointing to a deposition?

*United States District Court*

1  Q.  I'm asking what you did, sir?

2      THE COURT:  Wait.  Are you asking him what he did or

3  what he said?

4  BY MR. CARSON:

5  Q.  Sir, when did you get this memory back, that after you

6  read the article, you called Tom Asaro on a video call?  When

7  did that memory come back to you?

8  A.  I remember talking to Tom after...

9  Q.  Did you remember that a year and two months ago?

10 A.  I don't believe so.

11 Q.  So what helped to jog your memory?  Was it your attorneys?

12 You don't have to answer that.  What helped jog your memory?

13 A.  Just --

14 Q.  Just magically?

15 A.  I'm answering the questions as you are asking them.

16 Q.  Sir, you remember events better today than you did a year

17 and a half ago?

18 A.  Are you asking me in general?  I think that can happen.

19 Q.  You testified you're the face of the company.  What

20 company are you talking about?

21     MR. CAVALIER:  Objection.  Relevance.

22     THE COURT:  Overruled.

23 BY MR. CARSON:

24 Q.  You testified on direct examination from Mr. Cavalier that

25 you're the face of the company?

*United States District Court*

1      MR. CAVALIER:  Objection to the mischaracterization of

2  testimony.

3      THE COURT:  It's overruled.  Let him answer the

4  question.  I'm overruling it and then you're asking a different

5  question.  So if you want the answer to the question, you've

6  got to let him answer.

7      THE WITNESS:  I don't remember that.  Can you read it

8  back to me?

9  BY MR. CARSON:

10 Q.  Sure.  You don't remember what you said when Mr. Cavalier

11 was asking you questions just before lunch?

12 A.  I don't remember the context of when I was saying I was

13 the face of the company.  I guess I don't really remember the

14 context of saying that.

15 Q.  Your memory is a little fuzzy on that, too?

16     MR. CAVALIER:  Objection.

17     THE COURT:  Objection is overruled.

18 BY MR. CARSON:

19 Q.  You just said it, sir.

20 A.  Can you please read it back?

21 Q.  Do you know what company you were talking about?

22 A.  I assume Linode, if I said it.

23 Q.  Today you admitted that there was absolutely no

24 investigation into any of the issues related to John -- related

25 to this article about John Musbach, correct?

*United States District Court*

1  A.   I was not part of what I would consider an investigation.

2  Q.   Do you know anything about an investigation that was done?

3  A.   No.

4  Q.   So why did you say there was one last time in January of

5  2023?

6  A.   An investigation of the article itself.  You were asking

7  me how did I know before how the article was legitimate.  So I

8  thought you were asking me if I was investigating the

9  legitimacy of the article.

10 Q.   Sir, do you have any reason to believe that there was an

11 investigation done after you read this article?

12 A.   Investigation in what context?  I just want to make sure

13 I'm answering your question.

14 Q.   Any investigation by anyone at Linode?

15 A.   To see if the article was authentic?  Is that what you're

16 asking?

17 Q.   No.  Period.  Any -- do you know what an investigation is?

18 A.   Yeah.  It's a very general term.  If you are asking if

19 anyone at Linode ever looked into Carl's involvement with the

20 article or with John Musbach, I'm not totally sure.  I don't

21 know.

22 Q.   Okay.  So you saw the deposition transcript.  Please use

23 the first one, the thicker one.  Turn to Page 70.  I'll point

24 you to the lines of 19 through 21.

25       "QUESTION:  Are you aware of an investigation being

*United States District Court*

1  conducted?

2      "ANSWER:  There was one."

3         What were you talking about there?

4  A.   That could be for the policy violations.

5  Q.   You mean the real reason he was fired?

6  A.   That's probably what we're talking about, I think, but

7  that's not in the context from here.

8  Q.   So there was an investigation, and the reason why he was

9  fired was the policy violations, correct, sir?

10  A.   Well, I would think that people collaborated on that

11  document that you showed listing the policy violations.  So if

12  you consider that an investigation, I would maybe.

13  Q.   Well, why don't I just direct your attention a little

14  above to Line 15.  It says:

15      "QUESTION:  Following the dissemination of the article,

16  did you participate in any type of investigation of

17  Mr. Williams' work activities?

18      "ANSWER:  Not really.

19      "QUESTION:  Are you aware of an investigation being

20  conducted?

21      "ANSWER:  There was one."

22  A.   His investigation, Did Mr. Williams' work activities

23  around the policy violations, that's how I would interpret

24  that.

25  Q.   So in order to terminate my client, there was an

*United States District Court*

1  investigation into policy violations, right?

2  A.   They needed to be harvested.

3  Q.   Yeah.  They needed to be identified, right, by policy

4  violations?

5  A.   I would assume so, yes.

6  Q.   And the list of policy violations was made, right?

7  A.   I was not privy -- I was not part of that.

8  Q.   You saw the list, though, right?

9  A.   I did see the list.

10 Q.   And then you told him he was fired for policy violations,

11 correct?

12 A.   Yes.

13 Q.   And that story continued for years after, correct?

14 A.   The next time I was asked about it under oath, I told the

15 truth under oath.

16 Q.   Are you sure you remember that?

17 A.   Which part?

18 Q.   Any of it?

19 A.   Yes.

20 Q.   So you forget some parts.  Do you remember others?  How

21 does that work?  You don't know of a single other person who

22 worked at Linode who read that article, correct, sir?

23 A.   Brittany Hanks, you mean?  Other than the person that

24 shared it with me?

25 Q.   Did she anything bad about the article in that to you?

*United States District Court*

1  A.   No.

2  Q.   Nothing, right?

3  A.   Right.

4  Q.   Didn't complain in any way, correct?

5  A.   Not that I'm aware of, no.

6           (Inaudible crosstalk.)

7           THE COURT REPORTER:  I'm sorry, I didn't hear your

8  answer.

9  BY MR. CARSON:

10  Q.   You did not know of anyone who read it or complained about

11  it, correct?

12  A.   I didn't want to talk about it with anybody, so no.

13  Q.   And, you know, when Linode first advanced this tale about

14  my client's termination, the issue was that he missed work.  Do

15  you recall that?

16  A.   Yes.

17  Q.   And that's not really an issue, is it?

18  A.   No.

19  Q.   Because he didn't miss work, right?  That turned out to be

20  something you couldn't sustain, right?

21  A.   Well, I think he used work hours to -- I'm not sure if he

22  appeared or whatever statement he gave was during work time.

23  But again, in our type of business, we're a little looser

24  with -- as long as you work within those core hours, you're all

25  right.

*United States District Court*

1  Q.   Right.  And also ended up being a video call.  So you

2  couldn't use that anymore when you found that out, right?

3  A.   Yeah.  I didn't know that at the time.

4  Q.   So last time -- so if it didn't have anything to do with

5  it, then, why were you testifying under oath that it did?

6  A.   Because that was one of the list of the policy violations.

7  Q.   I thought you weren't involved in that part of it?

8  A.   I wasn't involved in curating the list, but I understood

9  what the policy violations were.

10  Q.   You helped facilitate the lie?  Is that what you're

11  saying?

12  A.   What do you mean by "facilitate"?

13  Q.   Well, didn't you say that had nothing to do with you?  You

14  just said you wanted him gone.  You take care of it.  They

15  cooked up the whole lie for you?  Isn't that what you said when

16  I asked you questions about this just a couple hours ago?

17  A.   The way I remember it is that the policy violations were

18  presented back to me, yes.

19  Q.   Why were you talking about the issue being that Carl

20  Williams skipped work to attend?

21  A.   I think that was the catalyst for the investigation.

22  Q.   Because you didn't know he didn't attend yet, right?  So

23  you thought you could get him on that, right?  Isn't that what

24  happened?

25  A.   I didn't know he didn't attend really until very late in

1  the whole thing.

2  Q.   You didn't find out until your deposition in real time

3  that it was a video call and he was at his desk the entire

4  time.  So you were trying to use something against him to

5  justify a false termination.  And when you find out that you

6  couldn't justify it, that just magically disappeared from the

7  case.  We haven't heard anything about that from you, right,

8  sir?

9  A.   The reason we fired Carl was because of the John Musbach

10 incident.

11 Q.   You're not going to answer that question I just asked?

12 A.   It was hard to follow that.

13 Q.   It was pretty easy for me to follow.  I think everyone

14 else heard me, too.  You didn't follow me?  I could ask it

15 again.

16 A.   Yeah.  Please.

17 Q.   So for years you went with the policy violations.  And

18 then when you changed your story, you decided you were going to

19 accuse my client of missing work because you read an article

20 and you thought that, oh, he must have went to this court

21 hearing.  Did he tell us he was going?  Did he use PTO?  And so

22 you thought you could get him there.

23      And then you found out in real time at your deposition

24 that he did not go, right?  That's what happened?

25 A.   That's flawed logic.  I mean, if I sleep on the couch all

1  day at work, just because I'm home --

2  Q.  Sir, did you find out at your deposition that it was a

3  video call?

4  A.  I don't remember --

5  Q.  Is that when you first found out?  You don't remember

6  that?  Why don't you turn to Page 74.  Try to refresh your

7  recollection.  74, Line 18.

8  A.  I'm not sure I'm saying anything different than this.

9  Q.  Sir, didn't you assume that he missed work to attend it,

10  sir?

11  A.  I did, but if you take the whole totality of the

12  statement --

13  Q.  We're just talking about the missing work issue --

14  A.  -- I was upset that he was appearing --

15  Q.  Sir, there's no question right now.

16          THE COURT:  Mr. Carson, stop the commentary.  Okay?

17          I don't want you to read the deposition into evidence.

18  Okay?  Mr. Carson didn't show it to you for that purpose.  He

19  showed it to you -- if you read the deposition and it makes a

20  light bulb go on over your head, you know, that cartoon image,

21  oh, I remember what he's telling me now, you can tell him that.

22  Otherwise, we'll move on.

23  BY MR. CARSON:

24  Q.  So now that you've read the deposition, do you remember

25  that when you attended this deposition you were still under the

*United States District Court*

1    impression he missed work to attend?

2    A.    Sure.

3    Q.    But we haven't heard any accusations like that in this

4    case because now you know that he didn't do that and the

5    allegation cannot be substantiated, correct?

6    A.    Again, I think your logic is flawed.  If you're --

7    Q.    Are you still accusing him of --

8         THE COURT:  Mr. Carson, you've got to let him finish

9    the answer.  You can't just cut him off.

10         THE WITNESS:  I think if you're accused of not being

11   at work on site or off site, not working, it's kind of the same

12   thing to me.  Again, we fired Carl for the John Musbach

13   umbrella of reasons.

14   BY MR. CARSON:

15   Q.    Too bad there's no evidence, right?

16   A.    Of which?

17   Q.    That you fired him for that reason.  There's no evidence

18   to support that.  Every single document in this case suggests

19   that you fired him for policy violations, correct?

20   A.    Everyone's testimony?

21   Q.    Can you point to a single document anywhere that suggests

22   that you're telling the truth?

23   A.    Not right, now.

24         MR. CARSON:  No more questions.

25         MR. CAVALIER:  Very briefly, Your Honor.

*United States District Court*

```
 1              THE COURT:  Go ahead.
 2              MR. CAVALIER:  Thank you.
 3                        RECROSS-EXAMINATION
 4   BY MR. CAVALIER:
 5   Q.   You've been here for this entire trial, correct?
 6   A.   Correct.
 7   Q.   Can you point to a single document in this entire case
 8   through which Carl Williams indicated to anyone at Linode any
 9   displeasure about his treatment over his age or sexual
10   orientation?
11              MR. CARSON:  Objection.
12              THE COURT:  Objection is overruled.
13              THE WITNESS:  No.
14   BY MR. CAVALIER:
15   Q.   Have you seen any such document presented into evidence
16   here during this trial?
17   A.   No.
18   Q.   My last question -- well, let me back up.  How soon after
19   this article dropped did you go to Mr. Asaro and say it's him
20   or me?
21   A.   I'm pretty sure it was very quick.  Like, I don't know.
22   Seconds, minutes, 10 minutes, like, it was the same time frame.
23   Q.   Okay.  And from that point, how long of a period of time
24   elapsed before you and Mr. Palochko had your termination
25   meeting with Mr. Williams?
```

*United States District Court*

1   A.   I think it was after the weekend.  A few days maybe.

2   Q.   Okay.  Same week maybe?

3   A.   Within the same calendar week, like a 7-day period.

4   Q.   All right.  The last thing I have for you is this.  Did

5   you -- when you told Tom Asaro that either Mr. Williams was

6   going or you were going, did you care whether he testified from

7   home or from the courtroom?

8           MR. CARSON:  Objection.

9           THE COURT:  Overruled.

10          THE WITNESS:  No.  It didn't have any bearing on my

11  thoughts.

12  BY MR. CAVALIER:

13  Q.   Did you care what the circumstances of that support that

14  Mr. Williams showed for Mr. Musbach --

15          MR. CARSON:  Objection.  Leading.

16  BY MR. CAVALIER:

17  Q.   At all?

18          THE COURT:  The objection is overruled.

19          THE WITNESS:  No.

20  BY MR. CAVALIER:

21  Q.   Did you care about the mechanism by which that support was

22  conveyed, either in the article itself or to the court that

23  Mr. Musbach was in that day?

24  A.   No.

25  Q.   What ultimately did you care about when you went to Tom

*United States District Court*

1  Asaro and told him it's either him or me?

2          MR. CARSON:  Objection.  Asked and answered.

3          THE COURT:  Objection is overruled.

4          THE WITNESS:  I mean, I cared that, again, that Carl

5  was openly supporting and with, involved with, living with, a

6  partner with, the person at Linode that got publicly busted for

7  using their company laptop for child pornography or preying on

8  a child, the reasons.  And it just, just really hit me hard.

9          I mean, again, I have children the same age.  I just

10  can't imagine accepting that.  I didn't know how we were ever

11  going to travel the world again.  And, like, the relationship

12  just couldn't continue the way it was, I mean.

13  Q.  For you, all else aside, that was the end of the story?

14  A.  That was it.

15          MR. CAVALIER:  Nothing further.

16          THE COURT:  Mr. Carson?

17          MR. CARSON:  Nothing.

18          THE COURT:  Okay.  Mr. Spataro, you can step down.

19          What's next, Mr. Carson?

20          MR. CARSON:  Oh, sorry.  Rich Ford, please.

21          THE COURT:  Okay.  Step up here.  Stay standing.

22          THE WITNESS:  Yep.

23          THE COURTROOM DEPUTY:  Please raise your right hand.

24          (**RICHARD FORD**, HAVING BEEN DULY SWORN OR DULY

25  AFFIRMED, TESTIFIED AS FOLLOWS:)

*United States District Court*

1          THE COURTROOM DEPUTY:  Please state your full name and

2    spell your name for the record.

3          THE WITNESS:  Richard Ford, F-O-R-D.

4          THE COURT:  Okay.  Have a seat.

5                         DIRECT EXAMINATION

6    BY MR. CARSON:

7    Q.   Good afternoon, Mr. Ford.  Can you just say -- you said

8    your name is Richard Ford, correct?

9    A.   Yes.

10   Q.   And just your position with Linode in between like 2014,

11   2020, please?

12   A.   I started in November of 2015 at the controller.  I was

13   promoted in 2016 approximately to the VP of finance.

14   Q.   Controller.  It's like an accounting type of gig?

15   A.   Head of accounting.  Yeah.  Ran the books.

16   Q.   And you knew that -- you knew my client, right?  Carl

17   Williams?

18   A.   I did.

19   Q.   And you knew he lived with John Musbach, correct?

20   A.   I knew that there was -- he lived there, I guess.  Yeah.

21   Not definitely.

22   Q.   You had heard that about Carl and John, that they lived

23   together, correct?

24   A.   I'd seen them in Haddonfield.  I lived not far from there.

25   Q.   And that was before the termination you knew they were

*United States District Court*

1  living together, right?

2  A.   Again, I don't know if they actually lived together.  I

3  don't think I ever asked.

4  Q.   Well, the last time I asked you that question -- do you

5  remember when I asked you that last time?

6  A.   I don't recall, but if I said I did, I did.

7  Q.   And you had known -- when you knew that they lived

8  together during my client's employment, you also were aware of

9  the charges against John Musbach regarding the pictures and of

10  the kid, right?

11  A.   Yes, to the pictures.

12  Q.   To the pictures.  Yeah?

13  A.   Yeah.  To the kid.

14  Q.   Are you saying that you didn't -- you didn't say that you

15  knew they lived together?

16  A.   I honestly don't recall knowing for a fact that they lived

17  together or not.

18  Q.   Let me refresh your recollection.

19       MR. CARSON:  Your Honor, may I approach?

20       THE COURT:  Yes.

21  BY MR. CARSON:

22  Q.   So if you could please turn to Page 13, Lines 3 through 7.

23  Take a look at that, and when you're done looking at it, just

24  let me now.  I'll ask you the question.

25  A.   What line was that, please?

*United States District Court*

1  Q.   Lines 3 through 13.  You can read 3 through 7 if you want.

2  A.   Uh-huh.

3  Q.   When you're done, look up and say I'm ready.

4  A.   I'm ready.

5  Q.   So does that refresh your recollection on whether you knew

6  they were living together?

7  A.   It says I didn't know at that point in time.

8  Q.   And can you also just turn to Page 14, Line 22, please,

9  just the next page.  Just read that.  And then just take it all

10  the way to -- just read that to 15, Line 4, and then I'll ask

11  you the question.  And you knew that they were living together

12  before Carl Williams' employment ended, correct?

13  A.   Yes.  I had -- obviously, I had an assumption that they

14  were living together.

15  Q.   And the reason that you believed that my client was

16  terminated was because of policy violations; is that correct?

17  A.   Yes, in addition to the Musbach case was part of it, but

18  we terminated due to policy violations.

19  Q.   That was the reason for the termination, correct, was

20  policy violations?

21  A.   We terminated at the point in time when we knew about the

22  Musbach case in the second phase, and we terminated for policy

23  violations.

24  Q.   And last time I asked you this question, I'm not sure you

25  knew.  So I just want to double check.

*United States District Court*

1   A.    Yep.

2   Q.    Do you know why he didn't receive his profit sharing

3   for -- so I think you know, like, you get your profit sharing

4   for, like, 2019, you'll get it sometime in 2020 and 2020

5   sometime in 2021?

6   A.    Yes.

7   Q.    Right?

8   A.    Yes.

9   Q.    So do you know why in 2021 he didn't get the profit share

10  for 2020?

11  A.    Again, I don't know if he got it or didn't get it.

12          MR. CARSON:  That's all the questions I have.  Thank

13  you.

14          THE COURT:  Mr. Cavalier?

15          MR. CAVALIER:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17  BY MR. CAVALIER:

18  Q.    Do you have any idea, sitting here today, whether

19  Mr. Spataro was aware at any point during Mr. Williams'

20  employment that he was living with Mr. Musbach?

21          MR. CARSON:  Objection.

22          THE COURT:  Sustained.

23  BY MR. CAVALIER:

24  Q.    Carl Williams was not in your chain of command, correct?

25  A.    Correct.

*United States District Court*

1  Q.  So did you care at all if he was living with Mr. Musbach?

2  A.  I did not.

3  Q.  He didn't report to you, right?

4  A.  He did not.

5  Q.  He didn't report to anybody in your department, correct?

6  A.  He did not.

7  Q.  Can you just briefly -- we've heard so much this week

8  about certain policy violations and whether they were real or

9  unreal.  Can you just give the jury a brief description of

10  these policy violations as you saw them from your point of

11  view?

12  A.  Yep.  As part of the head of finance, it was our job to

13  make sure it was fiscally responsible for spending the money,

14  to which certain employees had credit cards.  Carl Williams was

15  one that had a credit card, and frequently, I had questions

16  around the expenditures on Carl's account.  And I would go to

17  Dan, whether it was involving dinners, whether it was a picture

18  gift that was purchased, or Mets tickets that were purchased.

19  Q.  And what did you tell Dan?

20  A.  I got tired of going to Dan, quite frankly, and I told him

21  at this point in time that if there's any expenditures that

22  aren't authorized, it's on him.  I can't continue to monitor

23  it.

24  Q.  Did you think Mr. Spataro should discipline Mr. Williams

25  for these policy violations in real time?

*United States District Court*

1  A.   Yes.  And I so said that to Dan several times.

2  Q.   To your knowledge, did Mr. Spataro ever take any action

3  against Mr. Williams as a result of these policy violations as

4  they were happening?

5  A.   Not to my knowledge.

6           MR. CAVALIER:  That's all I have.

7           THE COURT:  Okay.

8           MR. CARSON:  No questions.

9           THE COURT:  Step down.  You're excused, Mr. Ford.

10          Mr. Carson?

11          MR. CARSON:  Your Honor, the plaintiff rests its case.

12          THE COURT:  Sorry?

13          MR. CARSON:  We're done calling witnesses.  We rest.

14          THE COURT:  You rest?

15          MR. CARSON:  Oh, sorry.  We -- I'm going to call

16  Catherine to the stand.  Thank you, Your Honor.

17          THE COURT:  Just to be clear, ladies and gentlemen,

18  what's going to happen now is you've heard some reference to

19  depositions.  Depositions, obviously -- I shouldn't say

20  obviously.  If you haven't figured it out yet, depositions are

21  statements taken under oath before trial as part of the

22  investigation in the case.  In some cases, they can be used in

23  court, and they're transcribed, just like you see the court

24  reporter here transcribing these proceedings.

25          What we're going to do now is Mr. Carson is going to

*United States District Court*

1    read into evidence portions of a deposition that was taken pre

2    trial.  He'll do it in sort of a call and response way with

3    someone.  It mimics the testimony that was given.

4            Having said that, remember this isn't the witness, and

5    so she's not necessarily capturing inflections, gestures,

6    mannerisms, things like that.  So you should pay attention to

7    the words that are read, but you should not draw conclusions

8    from her manner or whether you believe or disbelieve because

9    she's not the witness.  Okay?

10           Come on up.

11           You've given defense counsel the page and line cites?

12           MR. CARSON:  Yes, Your Honor.

13           THE COURT:  Go ahead.

14           MR. CARSON:  Okay.  Just one moment here.  All right.

15   So we're going to start on page 5 at the top.

16   BY MR. CARSON:

17   Q.   "Good afternoon.  Can you please state your full name for

18   the record?

19   A.   Vincent Palochko.

20   Q.   And today you are appearing as a corporate designee for

21   Linode; is that correct?

22   A.   That is correct, yes.

23   Q.   And can you just state your position at Linode?  I guess

24   for the record we can just kind of like keep the time when we

25   talk about questions to between 2014 and 2020.  So like for all

*United States District Court*

1  of my questions refer to those time periods.  So because I know

2  you know Linode has been purchased as another corporate entity,

3  so let's just stay within that time period from 2014 to 2020.

4  Is that fair?

5  A.  Yes.

6  Q.  All right.  So during that time period, what was your

7  position?

8  A.  So my most resent job title at Linode was director of

9  people operations.  My responsibilities were leading the human

10  resources function at Linode.

11  Q.  And as part of that function, you were involved in

12  payroll; is that correct?

13  A.  Yes."

14        MR. CARSON:  Skip down.  And you can continue.

15        THE WITNESS:  "So you understand" -- do you want me

16  to --

17        MR. CARSON:  That's me.

18  BY MR. CARSON:

19  Q.  "So you understand that you're here today to testify on

20  behalf of Linode; is that correct?

21  A.  Yes.

22  Q.  And there are specific subjects that we identified prior

23  to the deposition, and I'm just going to go over those with

24  you.  So number one says, 'Knowledge related to Carl Williams'

25  employment with Linode, including compensation and benefits

1  paid to Carl Williams from the first date of Carl Williams'

2  employment until the date when Carl Williams' employment ended.

3      And you are -- are you able to testify about that subject?

4  A.  Yes."

5      MR. CARSON:  Skipping down.

6  BY MR. CARSON:

7  Q.  "And when he first started his employment with Linode,

8  what was his starting pay?

9  A.  His starting pay was $120,000.14.

10 Q.  And that was an annual salary?

11 A.  It was.  It was an annual salary not inclusive of any

12 bonuses or anything of that sort, just the base pay."

13     MR CARSON:  Skipping down to top of page 9.

14 BY MR. CARSON:

15 Q.  "The first time that I have a base salary change was

16 June 16, 2017."

17     MR. CARSON:  Sorry.  That was you.  Sorry.

18     THE WITNESS:  "The first time that I have a base

19 salary was June 16, 2017."

20 BY MR. CARSON:

21 Q.  "And June 16, 2017, what was the increase?

22 A.  It was -- the new salary was $127,200.06.

23 Q.  What was the next date that his salary changed?

24 A.  Next date was January 11, 2019.

25 Q.  Okay.  What was the increase on that date?

*United States District Court*

1  A.   It was $127,585.90."

2        MR. CARSON:  Skipping down the page.

3  BY MR. CARSON:

4  Q.   "Okay.  So let's go by each one.  So after January of '19,

5  what was the next one?

6  A.   I have February 20, 2019, and the salary changed to

7  $135,000.06.  And then I have January 10th, 2020, and the

8  salary was adjusted to $139,725.30."

9        MR. CARSON:  Again to the middle of page 12.

10 BY MR. CARSON:

11 Q.   "So the one that we can't see, I'm assuming that one is

12 whatever his starting salary was.  Is that -- since you know

13 this document, can you --

14 A.   It should be.  It should be, yes.

15 Q.   And so that one probably says something like starting pay

16 you provided was $127,000.14?

17 A.   Yes."

18       MR. CARSON:  Skipping down, bottom of page 15.

19 BY MR. CARSON:

20 Q.   "In addition to his base salary, Mr. Williams was also

21 compensated through a benefits package; is that correct?

22 A.   Yes.  He was eligible for health insurance."

23       MR. CARSON:  Middle on page 18.

24 BY MR. CARSON:

25 Q.   "Okay.  Did Carl receive the health insurance benefit?

*United States District Court*

1   A.   He was eligible for it.

2   Q.   Do you know if Linode was actually paying it to him?

3   A.   As far as I know, yes.  I don't remember the specific

4   tier, but I know Carl did take advantage of our benefits

5   package.

6   Q.   Those are the tiers, okay.  In addition to health

7   insurance, I think there was also like vision and dental and

8   all of those; is that correct?

9   A.   Yes."

10          MR. CARSON:  Going down, page 20.

11  BY MR. CARSON:

12  Q.   "Did Linode pay a hundred percent of the dental plan?

13  A.   Yes."

14          MR. CARSON:  Next page.

15  BY MR. CARSON:

16  Q.   "There was life insurance benefits" --

17          MR. CARSON:  That's you.  Sorry.

18          THE WITNESS:  "There was life insurance benefits,

19  there was short-term disability benefits, and there was also a

20  retirement plan.  It was a group term policy if that's what

21  you're looking for, yeah."

22          MR. CARSON:  Going to page 23.

23  BY MR. CARSON:

24  Q.   "And so then I think there was also a -- I think you said

25  there was also a retirement benefit?

*United States District Court*

1  A.   That's correct, yes.

2  Q.   There was --

3  A.   There was.  There are generally two components of the

4  retirement benefit.  There was a standard 401K and there was a

5  profit-sharing portion.  So the way the 401K worked, it was a

6  safe harbor 401K plan.  The company provided a three percent

7  contribution to each employee's plan regardless of whether they

8  contributed or not.  The three percent was standard across the

9  board for any employees who were eligible for the plan, which

10  fell -- eligibility period was one year after your date of

11  hire.

12      This is confusing, so let me know if you don't understand.

13  The first quarter following an employee's one-year anniversary

14  is when they were entered into the 401K plan for the purpose of

15  their employer match or employer contribution.

16  Q.   Sure.  And so the minimum amount that Linode would

17  contribute would be the three percent?

18  A.   Yes, and that was flat.  It would be three percent flat.

19  There was no more, no less for any employees.

20  Q.   And that's three percent of the base salary?

21  A.   Yes.  It was actually not base salary, it was all

22  earnings.  So it would encompass things like base, overtime,

23  any earnings the employee had.

24  Q.   Carl Williams started to receive that benefit after his

25  eligibility period; is that right?

*United States District Court*

1  A.   So there's a little bit of an asterisk after that.  He did

2  receive the three percent because of the rules among -- on a

3  safe harbor plan, the highly compensated employees were not

4  eligible to receive the three percent contribution.  And that's

5  highly compensated employees defined by the IRS.

6       So this was a compliance issue for us.  They're not

7  eligible for a plan.  So what Linode did was, in lieu of the

8  three percent safe harbor contribution, Linode provided a

9  three percent profit-sharing contribution for each employee who

10 was defined as a highly compensated employee.  So that we

11 didn't miss out on any employees receiving that benefit, we

12 still contributed three percent on a per payroll basis, the

13 same as a safe harbor contribution, but it was just labeled as

14 a profit-sharing contribution.  The only mechanical difference

15 between these two items was that the vesting period for the

16 profit sharing was three years.  The safe harbor vesting, I

17 believe, was immediately vested.

18 Q.   Got it.  So Carl received that three percent but he

19 received it through his --

20 A.   Yeah, exactly.

21 Q.   And so like in addition to that three percent that he

22 received through the profit sharing, was there also a general

23 profit sharing?

24 A.   Yes, exactly.  That was kind of the other component of our

25 retirement plan was an annual profit-sharing allocation.  And

*United States District Court*

1   that was treated as a lump sum contribution.  The money went

2   right into the employee's same 401K account, it added to the

3   balance of that account, but it was a once-per-year

4   contribution as a lump sum.

5       Typically what that looked like, every year that Carl was

6   employed, that contribution was five percent of all earnings

7   for every employee.  It was proportionate to the employee's

8   specific earnings.  But every employee who was eligible for

9   that plan would receive the same percentage of their earnings.

10  That would be five percent of all earnings.  It would be base

11  salary, bonus, overtime, and any other earnings of the

12  employment.

13  Q.   How did you calculate that all earnings number?

14  A.   It would be pulled from our payroll records.  Our benefits

15  administrator or retirement plan administrator would collect an

16  annual census from us to do the calculations.  So we would

17  provide them with an annual census of each employee with their

18  hire and termination date, if applicable, as well as any kind

19  of earning that they had for that year.

20  Q.   And that was Milberg?

21  A.   Yes, exactly.

22  Q.   But generally speaking, the profit sharing for Carl would

23  have been the three percent through the 401K allocated through

24  the profit sharing, plus the five percent that was the profit

25  sharing?

*United States District Court*

1  A.  Yes."

2       MR. CARSON:  Skip ahead, page 31.

3  BY MR. CARSON:

4  Q.  "Year to date, 3,000?

5  A.  That would be the three percent profit sharing that would

6  be in place of a 401K contribution, the employer 401K

7  contribution."

8       MR. CARSON:  Skipping, skipping, 33.  Go ahead.

9  That's you.

10      THE WITNESS:  "Profit-sharing contributions, it would

11  be three percent on payroll basis, it would be a five percent

12  lump sum, so it would be both of those elements."

13  BY MR. CARSON:

14  Q.  "It's three percent plus five percent, right?

15  A.  Yeah.

16  Q.  So for the - so to when you talk about the retirement

17  plan, does that encompass both of those or does that refer to

18  one or the other?

19  A.  It's both of those.

20  Q.  Okay.  And here is the last sentence of paragraph 2, it

21  states that they're paid out for the entirety -- sorry, I can't

22  talk.  They are paid out for the entirety of the eligibility

23  period where the eligible employee was active with Linode

24  regardless of their employee status at the time.  Is that your

25  understanding of -- that's accurate?

*United States District Court*

1  A.   Yes.

2  Q.   And so then it doesn't -- if it doesn't matter whether

3  they are employed at the time, what is the eligibility

4  requirement that determines whether they are paid out for that

5  year?

6  A.   So this is what I mentioned before.  The eligibility

7  requirement is that an employee would have to serve one year of

8  employment and then they are entered into the plan.  So they

9  were enrolled into the plan the first of the quarter following

10  one year of employment, that's when their eligibility period

11  would have started.

12  Q.   Do you recognize this to be generally speaking -- what do

13  you recognize this to be, generally speaking?

14  A.   This is a summary plan description for the retirement

15  plan, which basically states all the guidelines and rules that

16  would govern that plan.

17  Q.   And I think that there is a section in this plan about

18  eligibility I'll ask you about.

19  A.   It might be closer to the beginning of the document, if I

20  remember correctly.

21  Q.   So I guess this section here where it says,

22  'profit-sharing contributions, the employee may, in sole

23  discretion, make a profit-sharing contribution to the plan on

24  your behalf.  You would be eligible to receive the allocation

25  if you have completed at least one hour of service during the

*United States District Court*

1  plan year.'

2      Is that -- is that -- what that does -- what does that

3  mean?

4  A.   Yeah, that's the eligibility period, yes, one year of

5  service at the company.

6  Q.   Okay.  So then for the year 2020, Mr. Williams was

7  eligible to receive profit sharing that year, correct?

8  A.   I have to double check the rules on a terminated employee.

9  Q.   But it does say in the email we looked at that it

10  doesn't -- that it's paid out not withstanding the employment

11  status at the time, right?

12  A.   I don't recall.  I think it said that -- I don't recall

13  specifically seeing that in the email.

14  Q.   Here, I'll show you.  This one here, I'll just highlight

15  it for you.

16  A.   Okay.  Yeah, I see that.

17  Q.   So do you know whether Mr. Williams received profit

18  sharing in 2020?

19  A.   I don't recall specifically, no.

20  Q.   But generally speaking, so I think that -- that the

21  Milberg company, they provide you with a list of the employees

22  that -- of the employees who were supposed to receive the

23  profit sharing that year?

24  A.   Yes.

25  Q.   And then they would provide that list to you to show what

*United States District Court*

1    the employee name and then the amount you owed to that

2    employee?

3    A.    Yeah.  We would provide them with a census, as I mentioned

4    before, and give them all the employee data, and they would run

5    all the calculations according to the plan, any kind of

6    compliance rules, any statutory requirements, and then they

7    would return to us with that, with what their contributions for

8    that year would be.

9    Q.    You would provide Milberg Consulting with that census, and

10   then based on that information, they would return to you a list

11   of the employees who are eligible to receive and the amount

12   they were supposed to receive; is that right?

13   A.    That's correct, yes.

14   Q.    When did that list come out?

15   A.    Generally speaking, towards to end of the first quarter,

16   early in the second quarter of each calendar year.  So I'd say

17   March or April time frame.

18       Let's say once we have everything in our hands, April or

19   May received the contribution in their retirement plan, and

20   then that contribution was based on prior year's wages.

21   Q.    So like for 2018, sometime in the middle of 2019 they get

22   their profit sharing?

23   A.    Right.

24   Q.    And 2020, sometime in 2021 they get their profit sharing?

25   A.    Right.

*United States District Court*

1  Q.   Is it true that everyone in the network engineering

2  department received the same benefits that you described Carl

3  received?

4  A.   Everyone would have received -- everyone in the company

5  was eligible for the same benefits package.  There was no

6  difference in benefits package by employee classification.

7  Q.   And so that list of benefits, that's the benefit package

8  that Linode paid to it employees; is that correct?

9  A.   Yes, yep.

10  Q.   And so the key difference between how much employees

11  receive would have been based on their base salary; is that

12  correct?

13  A.   For certain benefits, yes, that's correct.  The retirement

14  package was proportionate to the base salary, yes, that's

15  correct."

16        MR. CARSON:  The next one is you, at the top of 45.

17        THE WITNESS:  "Let me know -- I did take it down in

18  preparation.  I took down information of every employee that's

19  worked in the department during Carl's tenure.  Let me know

20  what information you're looking for.  So I have Nicholas,

21  N-I-C-H-O-L-A-S, Pegg, P-E-G-G."

22  BY MR. CARSON:

23  Q.   "Okay.

24  A.   Alex Forrester, F-O-R-S-T-E-R(Sic).

25  Q.   Are we doing titles too?

*United States District Court*

1  A.  I'm sorry, network engineer.

2  Q.  Okay.  Number two, Alex Forrester?

3  A.  F-O-R-S-T-E-R, network engineer.

4  Q.  Okay.

5  A.  I have Andrew Dampf, D-A-M-P-F.  I'll provide you with --

6  if there's a promotion or change in job title, I'll provide you

7  with any job title in their employment.  Andrew Dampf, last

8  name is D-A-M-P-F, network engineer and senior network

9  engineer.

10      I have Stephen, S-T-E-P-H-E-N, MacDavid, M-A-C-D-A-V-I-D,

11  network engineer.

12      I have Daniel Spataro, S-P-A-T-A-R-O, a few job titles,

13  network operations manager, director of network engineering,

14  director of data center and network operations, director of

15  infrastructure operations, and vice president of operations.

16      I have Owen, O-W-E-N, Conway, C-O-N-W-A-Y, network

17  engineer and senior network engineering.

18      Thomas Duff, D-U-F-F, network administrator, network

19  engineer.

20      Timothy Kaufman, K-A-U-F-M-A-N, senior network engineer,

21  network operations manager.

22  Q.  Number nine, Benjamin Ritchey, last name is R-I-T-C-H-E-Y,

23  job title is network engineer.

24      Next is Job Kitonga.  First name is J-O-B, last name is

25  K-I-T-O-N-G-A, network engineer job title.

*United States District Court*

1    Next Vincent Khamsao, last K-H-A-M-S-A-O, title, network
2  engineer.
3    And then I have James Paulk, P-A-U-L-K, job title, network
4  engineer.
5    Next is Tobias Paler.  T-O-B-I-A-S, last name is
6  P-A-L-E-R, title is principal network engineer.
7    And then I have Adam Rambo, R-A-M-B-O, job title is
8  network engineer.
9    And the last one I have was Steven Shaw, last name is
10 S-H-A-W, senior network engineer is the title."
11    MR. CARSON:  Skip down.  We can skip that part about
12 the -- we can skip page 50.
13    It was the call, Your Honor.  So we can go all the way
14 down to page 56.
15 BY MR. CARSON:
16 Q.  "So regarding category number 7, is it true that Linode
17 was purchased by Akamai, correct?
18 A.  Correct.
19 Q.  And when Akamai purchased Linode, Akamai paid employee
20 bonuses, right?  Or Linode paid the employee bonuses?  How do
21 you categorize that?
22 A.  There were some bonuses associated with this.  Not all
23 employees received bonuses.  And you know, so that's --
24 generally speaking, some employees did receive a bonus, yes.
25 Alex Forrester, 6/23/2014 to 8/28/2017."

*United States District Court*

 1          MR. CARSON:  And down, down, down, down.  The next

 2  page is page 70, and you go ahead.

 3          THE WITNESS:  "Let me pull up my notes here.  Andrew

 4  Dampf, hire date is 9/29/2014.  There's no termination date.

 5  BY MR. CARSON:

 6  Q.   "So he's active now?

 7  A.   Yes.

 8  Q.   Stephen MacDavid?

 9  A.   Hire date is June 8, 2015, to March 5, 2019.

10  Q.   Dan Spataro?

11  A.   Hire date is February 8, 2016.

12  Q.   Is he at Akamai now?

13  A.   Yes.

14  Q.   And Owen Conway?

15  A.   Hire date of February 29, 2016; termination date,

16  October 13, 2017.

17  Q.   And Thomas Duff?

18  A.   Hire date of August 8, 2016, and is still currently

19  employed with Akamai.  We can assume, if I don't have a

20  termination date, most of the rest are still employed.  So if I

21  don't mention termination date, they are still employed.

22  Q.   Okay.  Is Tim Kaufman, is he?

23  A.   Yeah.  Hire date is November 21, 2016.

24  Q.   He's at Akamai, I think?

25  A.   Yep.

1  Q.  And Benjamin Ritchey?

2  A.  Hire date of May 15, 2017.

3  Q.  And Job Kitonga?

4  A.  Hire date, January 15, 2018.

5  Q.  He's at Akamai?

6  A.  Uh-huh.

7  Q.  And Vincent Khamsao?

8  A.  Hire date, September 30, 2019.

9  Q.  James Paulk?

10 A.  Hire date of October 19, 2020, a termination date of

11 November 9, 2020.

12 Q.  And Adam Rambo?

13 A.  Hire date of March 22, 2021.

14 Q.  Didn't he -- wasn't Rambo the one who worked there and

15 then left and came back?  Does he have another hire date?

16 A.  I think he did.  I don't have those dates.  I only have

17 the original hire date here.  Actually, no, that wasn't the

18 original hire date.  That must have been the rehire date.

19 Q.  Steven Shaw?

20 A.  Yeah.  I have July 15, 2019, to August 3, 2020.

21 Q.  And there was a name that -- Bill Marantz?

22 A.  January 19, 2021.  It's through the HR records that I

23 maintained.  It was -- you know, I have a record of the

24 department that an individual worked in and then their job

25 titles.  We have a designation for which department employees

*United States District Court*

1  worked in.  So in this case, network operations would be that,

2  the name of the department in the HR records.

3  Q.  What were the other departments in network operations

4  besides network engineering?

5  A.  There weren't.  That's the only designation in the

6  department, network operations.

7      So I -- what I did was I captured similar situated

8  employees, which would be any employee with a job title as

9  network engineer as of the last day of each calendar year of

10  Carl's employment.

11      So for December 31, 2014, for the last day of employment

12  during that year, Nicholas pay, 85,000; Alex Forrester at

13  68,000; Andrew Dampf at 70,000; Carl Williams at 120,000."

14          MR. CARSON:  I think because of time, I think we can

15  just skip to the letter and we'll be done.

16          All right.  How about skip down to page 78 and start

17  with the answer.  Yeah, we were just looking.

18          THE WITNESS:  Line 8?

19          MR. CARSON:  Yes, please.

20          THE WITNESS:  "Yeah.  We were just looking at

21  employees who were -- could be compared to Carl Williams as a

22  network engineer.  Steve Shaw never held the job title of

23  network engineer."

24  BY MR. CARSON:

25  Q.  "He was a senior network engineer, right?

*United States District Court*

1  A.   He was hired as a senior network engineer, yes.

2  Q.   What was his -- when he was hired, what was his starting

3  salary?

4  A.   I don't have that information because I only have this

5  data for similar situated employees, which I classified as

6  network engineers who held the same job title."

7       THE WITNESS:  Do you want me to keep going?

8       MR. CARSON:  I want to see if we can skip a little

9  more.

10       So let's go down to page 80, and start on line 8.

11  BY MR. CARSON:

12  Q.   "So according to the testimony of Tim Kaufman and Adam

13  Rambo, Tim Kaufman received a bonus of 326,000 and -- I'm

14  sorry, Tim Kaufman received $326,000 and Adam Rambo received

15  217,000.

16       What were those bonuses called?

17  A.   What were they called?

18  Q.   Yes.

19  A.   Acquisition bonuses."

20       MR. CARSON:  I'll go down to the bottom of 82.

21  BY MR. CARSON:

22  Q.   "Is that the entirety of Linode's policy to prevent

23  discrimination and harassment in the workplace, is it a

24  handbook?

25  A.   Yes."

*United States District Court*

```
 1          MR. CARSON:  And then to 83.  Answer.  Go ahead.

 2          THE WITNESS:  "Yeah, it was one issue.  We never had

 3   to use the policy as it related to discrimination or anything

 4   outside sexual harassment."

 5          MR. CARSON:  I'm going to skip more.  All right.  So

 6   just the last thing is this.  That letter and -- Your Honor,

 7   may I approach?

 8          Just read this heading and those -- the same for that

 9   heading.  Thank you.

10          THE WITNESS:  "Acquisition bonuses.  Tim Kaufman,

11   $329,811.  Adam Rambo, $217,895.  Thomas Duff, $284,211.

12   Andrew Dampf, $947,349.  Benjamin Ritchey, $193,264.  Job

13   Kitonga, $75,790.  And Vincent Khamsao, $56,843.

14          And senior network engineer salaries:  Owen Conway

15   $126,500, 2017.  Andrew Dampf, $136,784 for 2019 and $142,254

16   for 2020.  Steven Shaw, $185,000 for 2019, $187,576 for 2020.

17   And Tim Kaufman, $162,493 for 2019, and $168,180 for 2020."

18          MR. CARSON:  Thank you.

19          THE COURT:  Step down.  Thank you.  I appreciate it.

20          MR. CARSON:  With that, Your Honor, the plaintiff

21   rests.

22          THE COURT:  Are we going to Mr. Conway?

23          MR. CAVALIER:  Defense has Rule 50 motions.

24          THE COURT:  Is Mr. Conway on?  Is he available now?

25   It's not a long --
```

*United States District Court*

 1          MR. CAVALIER:  No, not at all.

 2          THE COURT:  Let's put him on and we can deal with the

 3   motions later.

 4          So ladies and gentlemen, one last -- there are,

 5   unfortunately, circumstances these days where someone can't be

 6   here live, so we're going to allow a witness to testify by a

 7   Zoom connection.  It will be on a white screen over there for

 8   you to observe.

 9          You should not read anything into the fact that this

10   witness is testifying via Zoom, as opposed to live in person,

11   and you should make the same observations and use the same sort

12   of analysis that you would for someone who was sitting here

13   live in terms of assessing credibility and believability.

14   Okay?

15          Can you all see the screen?

16          THE JURY:  Yes.

17          THE COURT:  Okay.  You can't see him.

18          THE JUROR:  If I can stand, I can see fine.

19          THE COURT:  Do you mind sliding down?

20          THE JUROR:  Would it be okay if I stand?

21          THE COURT:  You can stand too.  As long as you are not

22   blocking the view of the person behind you, that's fine.

23          Yeah, call him.

24          MR. CAVALIER:  Defendant Linode calls our only

25   witness, Owen Conway.

*United States District Court*

```
 1          THE COURT:  All right.  Go head.  Why don't you swear
 2   him in, Ms. Roberts.
 3          THE COURTROOM DEPUTY:  Sir, can you please raise your
 4   right hand.
 5          (OWEN ANTHONY CONWAY, HAVING BEEN DULY SWORN OR DULY
 6   AFFIRMED, TESTIFIED AS FOLLOWS VIA ZOOM:)
 7          THE COURTROOM DEPUTY:  Please state your full name and
 8   spell your name for the record.
 9          THE WITNESS:  My name is Owen Anthony Conway.  First
10   name is O-W-E-N, middle name is A-N-T-H-O-N-Y, last name is
11   Conway, C-O-N-W-A-Y.
12          THE COURT:  All right.  Mr. Conway, good afternoon.
13   This is Judge Wolson.  Just two quick questions for you before
14   we get started.  I want to make sure there's no one there with
15   you.  Is that correct?
16          THE WITNESS:  I am on my own entirely within this
17   house.
18          THE COURT:  Are you in any kind of digital
19   communication with anyone by text, Slack, anything like that
20   right now?
21          THE WITNESS:  Only this.
22          THE COURT:  So just the Zoom and whatever chat that
23   might be enabled on the Zoom.  That's what you're saying,
24   right?
25          THE WITNESS:  Yes.
```

*United States District Court*

1           THE COURT:  Okay.  All right.

2           Mr. Cavalier, you can proceed.

3           MR. CAVALIER:  Thank you, Your Honor.

4                   DIRECT EXAMINATION

5    BY MR. CAVALIER:

6    Q.   Good afternoon, Mr. Conway.  Or it's good morning where

7    you are?

8    A.   It is still morning, yes.

9    Q.   Okay.  Why don't you tell the jury a little bit about

10   yourself and your background, if you don't mind?

11   A.   So as it pertains to Linode or just generally?

12   Q.   Your general professional and education history, just so

13   the jury has idea of who you are.

14   A.   Okay.  So I'm a degree-educated network engineer, slash,

15   network architect.  I've worked at several ISPs in the UK, and

16   I also worked for one of the largest internet games in the

17   world, as well as the London Internet Exchange as, initially,

18   their senior network engineer and then their network architect

19   for six years.

20       How I came to the U.S., I married an American who I've

21   been in a long-distance relationship with from 1997 to 2015.

22   We were married in 2014 in Philadelphia, and I moved over in

23   2015.

24       I started working for an organization called Sundial AS,

25   realized that they are completely clueless about the networking

*United States District Court*

1   that they're doing, and quit that job.  And then I started

2   working at Linode early 2016.

3   Q.   Thanks.  Can you explain how you came to be hired at

4   Linode?

5   A.   My resume was actually given by a friend.  His name is

6   Mark DeBrew.  He worked at the time, oh, for Salesforce, I

7   believe.  I believe he still does.  But the resume was passed

8   to several people, and I believe Dan and, I think, it's Vincent

9   Palochko was the head of HR at the time at Linode.  I don't

10  know if he still is, but they looked at my resume and actually

11  asked me to interview with them.

12  Q.   And ultimately, let me ask this.  Did you ever speak with

13  Mr. Dan Spataro before you were formally hired at Linode?

14  A.   He was on the phone during the interview, and then we

15  spoke again after.  But I didn't meet him until I'd actually

16  started because he started around the same time as me.  Well, I

17  think he started like a week before.

18       But -- because the interview process was at the beginning

19  of the month of February, and I started the job at the end of

20  the month in February.

21  Q.   Okay.

22  A.   So.

23  Q.   Let me ask you a couple of indelicate questions here.  I

24  don't want to jump right into it, but I also don't want to

25  waste your time.  You are, in fact, a gay man, correct?

*United States District Court*

1  A.   How could you tell?  Yes, I'm a gay man.

2  Q.   At the time you interviewed at Linode, were they aware

3  that you were a gay man?

4  A.   It was one of the first questions that came up, actually.

5  Because I cannot remember who it was.  It was either Andrew or

6  Alex during the interview asked me how I came to the U.S., and

7  I explained that I was married to my husband and I lived in

8  Philadelphia.  So they knew from the get-go.  I mean, there was

9  just no -- no secrets.  So...

10  Q.   And to ask it again, were you openly out during your time

11  at Linode?

12  A.   Yeah.  After about the third week.  Another colleague, who

13  worked on various shifts, I do not know their pronouns.  I

14  never asked them.  So I'm going to refer to them as they.  They

15  had complained very loudly in the office early one morning

16  about being the only queer person in the office, and I put up

17  my hand and said very loudly from the main office, "Gay man

18  reporting for duty."

19        So yeah.  I was pretty much out from day one.

20  Q.   Did the fact that you happen to be a gay man have any

21  impact on the hiring process at Linode for you?

22  A.   I do not believe so.

23  Q.   Okay.  And again, I apologize for the indelicate

24  questions, but how old of a man are you?

25  A.   I'm a youthful 51 years old, a good 10 years older than

*United States District Court*

1  most of the people at Linode.

2  Q.  And so when you interviewed there, how old would you have

3  been back then?

4  A.  46ish, 45ish, around that.

5  Q.  All right.  Did your age present any hurdle for you in the

6  hiring process at Linode?

7          MR. CARSON:  Objection.

8          THE COURT:  Objection is overruled.

9          THE WITNESS:  None that I'm aware of.

10  BY MR. CAVALIER:

11  Q.  Okay.  So what was your job at Linode?

12  A.  I was basically a senior network engineer.  So for the

13  first couple of months, I was basically learning how everything

14  worked.

15      And then I got into the rhythm of helping with escalations

16  and working on various projects, like the roll out of the

17  Juniper, which is -- as a replacement for the system routers,

18  the setting up of a few new data centers.

19      So we went to Shirakawa in Japan and basically built a

20  data center there.  And really, it was just sort of helping

21  maintain and keep the network growing.  So that was really our

22  job.

23  Q.  Who were the other network engineers in your group at the

24  time?

25  A.  It would have been Andrew Dampf, Alex Forrester, and Carl

1  Williams.

2  Q.   Okay.  During your time at Linode, were you able to

3  form -- strike that.  Did you have the opportunity to observe

4  Mr. Williams performing his job at Linode?

5  A.   Not directly, because we were in different offices.  So he

6  was in the Absecon office, which was in southern New Jersey,

7  and I was in the Haddonfield office, which is just a short

8  drive from Philadelphia.

9  Q.   Understood.  Did both you and Mr. Williams report to Dan

10  Spataro during your time at Linode?

11  A.   We definitely did.

12  Q.   All right.  Did you ever have any issue with Mr. Spataro's

13  treatment of you based on your age or sexual orientation?

14           MR. CARSON:  Objection.

15           THE COURT:  It's overruled.

16           THE WITNESS:  Do you want me to answer that question?

17  BY MR. CAVALIER:

18  Q.   Yes, please.

19  A.   I heard some sort of noise in the background there.

20  Q.   There was an objection.  It was overruled.

21  A.   I did not experience any discrimination.

22  Q.   Did you experience any discrimination on the basis of your

23  age?

24  A.   Not at all.

25  Q.   Did you ever observe Mr. Spataro make any negative

1  comments about Mr. Williams due to his sexual orientation?

2  A.   No.   He would have been slapped if he had because I don't

3  take that from anybody, and I wouldn't let anyone else get away

4  with it either.

5  Q.   Did you ever observe or hear Mr. Spataro make any

6  comments -- negative comments about Mr. Williams with respect

7  to his age?

8  A.   Not that I'm aware of.  I've never encountered that.

9  Q.   Okay.  Did Mr. Williams ever confide in you, at any point

10  during your time at Linode, that he was being discriminated

11  against on the basis of his age or sexual orientation?

12  A.   No.

13  Q.   Do you know whether Carl did, in fact, though, have some

14  issues with people in the office related to his performance?

15  A.   Yeah.  I think -- I think people were frustrated with Carl

16  at times.

17          MR. CARSON:  Objection.

18          THE COURT:  It's overruled.

19  BY MR. CAVALIER:

20  Q.   Why?

21  A.   So speaking from my own experience, because I don't like

22  speaking for other people, his on-call response was very

23  patchy.  And several incidents that had happened when he was on

24  call other people had to step in and resolve.

25  Q.   At least in your view, was that an effort issue or a

*United States District Court*

1  skills issue with Mr. Williams?

2         MR. CARSON:  Objection.

3         THE COURT:  It's overruled.

4         THE WITNESS:  It could -- I mean, I don't think that

5  Carl had the necessary skills for operations work.

6         MR. CARSON:  Objection.

7         THE WITNESS:  But you can make an effort to lift them.

8  BY MR. CAVALIER:

9  Q.  Did you ever hear Mr. Spataro, at any point in time, say

10  about Mr. Williams or anyone else at Linode anything to the

11  effect of they don't have the technical chops for this due to

12  their age?

13  A.  No.  Because that would imply that I wouldn't have the

14  technical chops due to my age.

15  Q.  You're no longer at Linode or Akamai, correct?

16  A.  Correct.  I --

17  Q.  Could you -- sorry, Mr. Conway.  I didn't mean to speak

18  over you.  Could you tell the jury how your employment at

19  Linode came to an end and when?

20  A.  So it came to an end in October 2017.  I got to a point

21  where I felt that the technology wasn't really that

22  interesting.  I had sort of issues with sort of reporting, saw

23  problems upstream, and I was getting tired of being the person

24  that everyone went to whenever there was a problem.  Most of

25  the support organization was in the Haddonfield office, not in

*United States District Court*

1    the Absecon office at the time.

2        And so I kind of reached a sort of critical point, and

3    then I was like, you know what?  There was one incident.

4    Again, it was an outage where other people had to step in and

5    assist and went on for several hours, and that kind of

6    crystallized my decision to leave.

7    Q.   Did part of that issue with respect to the outage have

8    anything to do with Mr. Williams?

9    A.   I believe he was on call at the time.  If anyone wanted to

10   correct me, I believe it was a Frankfurt outage where a router

11   failed.  That's my recollection.

12   Q.   Did you have any issue with Mr. Williams' performance

13   during that outage?

14   A.   He was on the call, as I recall, but not responding to

15   anything and certainly didn't take charge of the situation.

16   Other people did.

17   Q.   So did you voluntarily resign from Linode?

18   A.   Yes, I did.

19   Q.   Okay.  Where do you work -- where did you go from there?

20   A.   So I did a brief stint at Comcast.  And after that, I

21   worked at the American College -- sorry -- the Philadelphia

22   College of Physicians.  I keep calling it the American College

23   of Physicians.  Philadelphia College of Physicians in downtown

24   Philadelphia.

25       Then the pandemic hit, and I didn't work.  My husband was

*United States District Court*

1  an infectious diseases doctor.  We decided we didn't need two

2  of us risking going out all the time for work.  So I stayed in

3  for the pandemic.

4      When the pandemic was over, I started working at a company

5  called NRTC, which is the National Rural Telecommunications

6  Cooperative where I'm a network architect.  I've been there for

7  over 18 months now.

8  Q.  Are you aware that in the recent past Linode was sold to a

9  company called Akamai?

10 A.  Yeah.  I'm still a customer of Linode.  I see all of those

11 apparates(PH).  It's really infuriating.

12 Q.  Right.  Apologies for the seemingly obviousness to this

13 question, but did you get a retention bonus or acquisition

14 bonus --

15 A.  No.

16 Q.  -- when Akamai bought Linode?

17 A.  No.

18 Q.  Why not?

19 A.  I don't know.  Wait.  A retention bonus?

20 Q.  In 2022, when these bonuses were given, did you get any

21 kind of a bonus?

22          MR. CARSON:  Objection.

23          THE COURT:  Hold on.

24          MR. CARSON:  Objection, Your Honor.

25          THE COURT:  Hold on.  I think he's testified he didn't

*United States District Court*

1  get a bonus, right?

2         Just to be clear, you didn't get any kind of bonus in

3  2022, right?

4         THE WITNESS:  Correct.

5  BY MR. CAVALIER:

6  Q.  You weren't a Linode employee in 2022, correct?

7  A.  I was not a Linode employee in 2022.

8  Q.  Okay.  So I asked you about your hiring earlier, but

9  before I let you go, I just want to ask you a couple questions

10  that I want to be clear on.

11      Throughout the entirety of your employment with Linode,

12  did you ever experience anything ageist in the workplace?

13         MR. CARSON:  Objection.

14         THE COURT:  Overruled.

15         THE WITNESS:  From my perspective, no.

16  BY MR. CAVALIER:

17  Q.  Throughout your entire tenure with Linode, did you ever

18  experience any discrimination based on your sexual orientation?

19  A.  Again, from my experience, no.

20  Q.  Okay.  Did you ever see anyone at Linode experience any

21  kind of harassment or discrimination based on their age during

22  your time at Linode?

23  A.  I did not.

24  Q.  During your time at Linode did you ever see anyone at

25  Linode suffering any kind of discrimination or harassment

1  related to their sexual orientation?

2  A.  I did not.

3          MR. CAVALIER:  That's all I have.

4          THE COURT:  Okay.  Two minutes, Mr. Carson.

5          MR. CARSON:  Yes.  Four, I think.

6          THE COURT:  No, two.

7          MR. CARSON:  Is it two?

8          THE COURT:  Two.

9          MR. CARSON:  Two.  Here we go.  Two-minute

10  cross-examination.

11                          CROSS-EXAMINATION

12  BY MR. CARSON:

13  Q.  Sir, isn't it true that when you started at Linode, you

14  worked in the Galloway office for a very short period of time

15  and then you moved to the Haddonfield office?

16  A.  I was literally there for my induction for the --

17  Q.  Yeah.

18          THE COURT:  Mr. Carson, come to the podium and use the

19  microphone.  It's going to be easier with the Zoom.

20  BY MR. CARSON:

21  Q.  And Carl did not work in the Haddonfield office with you,

22  correct?

23  A.  That is correct.

24  Q.  You and Carl didn't work in the same office, even, right?

25  A.  That is correct.

*United States District Court*

1  Q.  You and Carl didn't even work in the same township,

2  correct?

3  A.  Correct.

4  Q.  So Carl could have been subjected to discrimination on a

5  daily basis and you would not have been there to observe it,

6  correct?

7  A.  Correct.

8  Q.  And the fact that you didn't see Carl be subjected

9  discrimination, that doesn't mean he wasn't subjected to

10  discrimination.  Don't you agree with that?

11  A.  That's a leading question.

12  Q.  Do you agree?  His experience could be different than your

13  experienced, right?

14  A.  It's possible.

15  Q.  It's possible that he was subjected to discrimination

16  quite a bit.  You just weren't there because you didn't work

17  with him, right?

18  A.  Because I wasn't there?

19  Q.  Because you didn't work with him?

20  A.  I can't prove a negative.

21  Q.  Isn't it possible that he was subjected to discrimination

22  during his employment and you just didn't observe it because

23  you didn't work in the same office as him?

24  A.  That is true.

25  Q.  Right.  And, sir, isn't it also true that the reason you

*United States District Court*

1  didn't receive a bonus, a retention bonus, is because you had

2  stopped working at Linode five years before the company was

3  sold?

4  A.   Yes, that is true.  I'm very puzzled as to why this is an

5  issue.

6  Q.   Trust me, it doesn't matter to you.

7  A.   Okay.

8  Q.   So did you ever hear anyone talk about there being a toxic

9  work environment at the Galloway office?

10  A.   No.

11  Q.   Did you ever hear -- did you ever read an article called

12  *Leaving Linode* or *Leaving Linode's Leaders*?

13  A.   Oh, this is the one by -- what was her name?  Tara Taylor.

14  Q.   Did you read the article?

15  A.   I read it last night.

16  Q.   Did that sound like the place that you had worked at in

17  Haddonfield?

18  A.   I will say that the Linode office was overwhelmingly white

19  and overwhelmingly male.

20  Q.   And young, too?  You said you were there in your mid 40s,

21  correct?

22  A.   Yes.  Definitely younger people.

23  Q.   And you were one of the oldest people there while you were

24  in your mid 40s, correct?

25         THE COURT:  Time, Mr. Carson.

*United States District Court*

1          THE WITNESS:  Yes.

2          MR. CARSON:  Thank you.

3          THE WITNESS:  No problem.

4          MR. CAVALIER:  Brief redirect.

5          THE COURT:  Go ahead.

6                    REDIRECT EXAMINATION

7    BY MR. CAVALIER:

8    Q.   Hi, Mr. Conway.  I just have one or two questions for you.

9    You were one of the oldest people at Linode during your time

10   there, correct?

11   A.   I wasn't that old.  Calm down.  Yeah.  I was one of the

12   oldest people.

13   Q.   Did that ever hinder you in any way in the company, in

14   your view?

15   A.   If it was, it wasn't to my knowledge.

16          MR. CAVALIER:  Okay.  That's all I have.

17          THE WITNESS:  Maybe in the Galloway office, where I

18   didn't experience it.

19   BY MR. CAVALIER:

20   Q.   You mean with Mr. Williams?

21   A.   Right.  That's what I'm saying.

22          MR. CAVALIER:  That's all I have.

23          THE COURT:  Okay.  Mr. Conway, thank you for your

24   time.  Appreciate it.  You can disconnect and you're excused.

25   Okay, sir.


                    *United States District Court*

1          THE WITNESS:  Thank you.

2          THE COURT:  Okay.

3          MR. CAVALIER:  Defense rests, Your Honor.

4          THE COURT:  Okay.  Any rebuttal, Mr. Carson?

5          MR. CARSON:  No, Your Honor.

6          THE COURT:  All right.  Let's use that as a moment for

7  our mid-afternoon break.

8          So when you hear "we rest," that means we're done with

9  the evidence, but we're not done.  So it's going to be a short

10  break.  It's going to be a break for about 15 or so, maybe

11  20 minutes, depending on -- I have a couple things to discuss

12  with the lawyers.

13          But it's not a time for you to start talking about the

14  case or the evidence yet because you haven't heard the law,

15  which I'm going to give you.  And you haven't heard the

16  summations from the lawyers, which are also going to be

17  important for you to understand the context of everything.

18          So a little bit longer.  I mean, keep an open mind,

19  hold off on deliberating until -- we'll get this case to you in

20  fairly short order.  Okay?  So see you back here in 15 minutes.

21          THE COURTROOM DEPUTY:  All rise.

22          MR. CARSON:  Your Honor, may I be excused?  I need to

23  use the restroom.

24          THE COURT:  Let them go.

25          (Jury exits the courtroom at 2:52 p.m.)

*United States District Court*

1          THE COURT:  All right.  We'll go off the record, and

2    then I want to hear the Rule 15 motions.

3          (Brief pause.)

4          MR. CAVALIER:  Your Honor, do you mind if I step out

5    for 30 seconds?

6          THE COURT:  Go ahead.

7          MR. CARSON:  Thank you, Your Honor.

8          THE COURT:  All right.  Let's get started here.

9          All right.  Mr. Cavalier, do you have Rule 50 motions?

10         MR. CAVALIER:  Yes, Your Honor.  And I guess from the

11   technical standpoint, I'm reviewing the Rule 50 motions that I

12   made at the end of plaintiff's case.

13         THE COURT:  It doesn't matter the way the rule reads.

14   It's once a party has been fully heard, you can make the motion

15   any time until the case is submitted to the jury.

16         MR. CAVALIER:  You know us.  We're always terrified to

17   waiver.

18         THE COURT:  Yes.

19         MR. CAVALIER:  And having said that, I don't want to

20   belabor these issues.  I understand the perspective in which

21   they are raised.  We would move formally for directed verdict

22   under Rule 50 on all of plaintiff's claims.  I am happy to

23   argue any of those points, if the court wishes to entertain

24   argument.

25         But for now, I would just say that specifically with

*United States District Court*

1    respect to both Title VII and the ADEA, there is insufficient

2    evidence in the record before the jury for them to render a

3    decision in favor of Mr. Williams on either the idea that

4    Mr. Williams was paid less than other employees in similar

5    situations.

6            I don't think there's any evidence on which the jury

7    could conclude that.  As a matter of fact, during the reading

8    of corporate designee deposition testimony at the end, that

9    only confirmed that everybody else who was a network engineer

10   with Mr. Williams made either less or only very slightly more

11   than he did at the time.

12           Same thing with respect to the profit sharing bonus.

13   I have been living this case for a month.  I sat here all week

14   and listened to the testimony, and standing here, I still have

15   absolutely no idea what the requirements of the profit sharing

16   bonus are, the amounts of the profit sharing bonus, how it's

17   calculated, who determines it, where the discretion is.

18           And so given that, I don't think there's any basis for

19   which a jury can come to a reasonable informed conclusion based

20   on the evidence in Mr. Williams' favor on that.

21           So I would at least argue to you, presuming you're

22   either going -- you're either going to hold off on ruling on

23   our Rule 50 motions until after a verdict is rendered or

24   whatever the Court's preference is, I would at least argue that

25   as to No. 1 and No. 3 under Title VII, I should say question

*United States District Court*

1  one under Title VII as to pay and as to the profit sharing

2  bonus as well as under the ADEA should all be out of the case

3  at this point and judgment rendered for defendant.

4       Lastly and specifically, we would submit to the Court

5  respectfully that there is no basis on which the jury could

6  come back here on a finding of punitive damages.  So we would

7  ask that judgment be entered for Linode on that point and that

8  question removed from the verdict sheet.

9       THE COURT:  Okay.  Let me do this.  Let me start and

10 just hear from Mr. Carson on those issues, and then I may have

11 a couple other questions for you.

12       But all right.  Just to do them seriatim, Mr. Carson,

13 on the evidence of the idea that Mr. Williams was paid less

14 than similarly situated employees, point me to evidence that

15 you would rely on.

16       MR. CARSON:  So I'm going to also move for a directed

17 verdict.

18       THE COURT:  Well, hold on.  I'm doing one at the time.

19       MR. CARSON:  So you want me to respond to their

20 motion?

21       THE COURT:  I want you to respond to their motion.

22       MR. CARSON:  Sure.  So we proved unequivocally that he

23 was paid less.  He was the oldest person there, right?  The

24 second oldest person there was in his mid 40s.  We just heard

25 from him.  He was 10 years older, according to his testimony.

*United States District Court*

1    That's their witness.  He was then the next oldest person.  And

2    every single person who was in a position lower than my client

3    received more money than my client.  My client was making

4    $127,000 a year for like 5 years, and he got bumped up to 135,

5    and then the entire department got bumped up to 139.

6            The senior network engineers and managers, all

7    positions lower than him, were 142, 187, 168, and then the only

8    person on his level was making 200 to 250,000, all of them

9    younger than him.

10           THE COURT:  Is there a temporal element there,

11   Mr. Carson, in terms of -- you say on his level.  For a chunk

12   of his time, he was a network engineer, right?  So when he's a

13   network engineer and he's making 120-something thousand dollars

14   a year, is there anyone who's making more than him who's a

15   network engineer?  Is there evidence of that?

16           MR. CARSON:  So our claim was based on his position as

17   a -- when he got his raise.  As far as him being a network

18   engineer, no, that wasn't --

19           THE COURT:  So just to be clear, so the claim is that

20   when he got his raise, which was, I think, roughly

21   contemporaneous with his ascension to the director position --

22           MR. CARSON:  It was announced in 2019, yes.

23           THE COURT:  I'm sorry?

24           MR. CARSON:  It was announced in January 2019.

25           THE COURT:  So starting in January of 2019, he was

*United States District Court*

1  paid less than people in lower or equivalent positions.  That's

2  the argument?

3          MR. CARSON:  Yes.  Yes.

4          THE COURT:  Okay.

5          MR. CARSON:  And the temporal proximity to the pays, I

6  mean, so in 2020, my client is receiving, as a director,

7  135,000 and 139,000.  Again, that bump-up had nothing do with

8  his position.  It was 3 percent across-the-board increase for

9  the whole department.

10          And the next, Andrew Dampf, is in two positions lower

11  than him, making $142,000 a year.

12          Steven Shaw is two positions lower than him making

13  $187,000 a year.

14          Tim Kaufmann is one position below him making $168,000

15  a year.

16          And Dan Spataro, who's at the same level as him, is

17  making -- Dan Spataro wouldn't say -- but between 200 and

18  $250,000 a year.

19          THE COURT:  Okay.  Mr. Cavalier?

20          MR. CAVALIER:  Just briefly, we would submit that

21  there is not evidence in the record sufficient to tie

22  Mr. Williams to those alleged comparators either on the basis

23  of temporal proximity or on the basis of job similarity.

24  Mr. Spataro testified very clear that even amongst similar

25  titles at Linode, the responsibilities can differ greatly, the

*United States District Court*

1    outreach of their hierarchal tree can vary greatly.  He

2    testified that this is a promotion into a one-off spot for

3    Mr. Williams, he wanted the title of director, they gave it to

4    him.  He wasn't supervising any employees, he wasn't running

5    any departments.

6           And so the idea that simply because someone else has a

7    title that in a different branch of the hierarchical tree might

8    be lower in name than Mr. Williams, there's no basis on which a

9    jury can come back and reasonably determine that those

10   comparators are sufficient to provide some kind of either

11   decision or indicia of pay discrimination based on the evidence

12   in the record.

13          THE COURT:  Okay.

14          MR. CARSON:  There's no evidence that they're in a

15   different tree.

16          THE COURT:  All right.  We're far enough into the

17   facts that I'm going to submit that issue to the jury.

18          MR. CAVALIER:  Sure.

19          THE COURT:  Okay.  Let's talk about the profit-sharing

20   bonus.  Mr. Carson, on that one, tell me the evidence that you

21   would point to to show an entitlement and -- I mean, I

22   understand the entitlement argument, I think, but what about

23   the discrimination piece of it, the discriminatory tie?

24          MR. CARSON:  So, Your Honor, we have proven in this

25   case as a matter of law, I would submit -- and I think that

*United States District Court*

1  plaintiff is entitled to directed verdict on this issue through

2  the testimony of the corporate designee that the eligibility

3  requirements were met, that it didn't matter that my client

4  wasn't working there.  The corporate designee stated that on

5  behalf -- you know, the corporate designee stated, which means

6  the corporation stated it.  And it was clear that he said that

7  the eligibility requirement was -- that it was one year of

8  employment, it was that he was receiving it.  And then I said,

9  does it matter if he's employed there?  And he says, no, it

10  doesn't matter if he's employed there.  So --

11          THE COURT:  Well, let me just -- if that's

12  cross-motion or if that's part of your cross-motion, I don't

13  agree that it's proved as a matter of law.  I mean, I think the

14  plan documents were put into evidence and the jury can look at

15  them, and they say what they say.  Right?

16          So regardless of what the corporate designee says, you

17  can't vary the terms of the plan by saying what he said at a

18  deposition.

19          MR. CARSON:  Right.  And that language is not in the

20  plan document.

21          THE COURT:  I don't know what's in the plan document.

22  I haven't read it.  So, I mean, you put it into evidence, but

23  -- you know.  So I'm not going to take that issue from the jury

24  on that basis.

25          So then what about the question about -- so I

*United States District Court*

1  understand the damages argument, right, on profit-sharing
2  bonus.  In other words, had he been employed, he would have
3  continued to get it, he would have gotten -- but I understand
4  all of that, how that might flow from the disparate treatment
5  for the termination.  But as an independent claim, what's the
6  evidence that the decision to deny him the profit-sharing bonus
7  when they were paid out by Linode in 2021 was discriminatory?
8       MR. CARSON:  Your Honor, they testify that there was a
9  list that was submitted by the Milberg Group to them.  It had
10  the names of the people who were supposed to get profit
11  sharing.  They admitted that Carl Williams' name should have
12  been on that list.  They admitted that the profit sharing was
13  withheld.

14       So there's only one reason that could have happened,
15  right?  Because, I mean, think about it.  They were told that
16  this happened, that the profit sharing wasn't paid to him, they
17  know that it wasn't paid to him, and they still haven't paid it
18  to him.  And so --

19       THE COURT:  That doesn't really answer my question,
20  Mr. Carson.

21       My question is, what is the evidence to which you
22  would point to to suggest that that decision -- it may have
23  violated the plan, right?

24       MR. CARSON:  Right.

25       THE COURT:  What is the evidence that the violation of

*United States District Court*

1  the plan was discriminatory?  Not that it flowed from a

2  discriminatory act.

3          In other words, if they terminated him for

4  discriminatory reasons, then this flows from it.  It's damages.

5  I get that, okay.  I get that that's your argument.

6          MR. CARSON:  Right.

7          THE COURT:  But what I'm saying is, as a separate act

8  post termination -- you know, how many months later.  So he was

9  fired in August of 2020, they sound like they were paid in

10 something like the second quarter of 2021.  Right?

11         MR. CARSON:  Right.  Yep.

12         THE COURT:  So in 2021, what evidence have you adduced

13 that you would point to that there was some discriminatory

14 motive at that time in the decision to deny the payment to

15 Mr. Williams?

16         MR. CARSON:  I think the very act of denying money

17 that you owe someone after they file a charge of discrimination

18 in and of itself is evidence of discriminatory motive, Your

19 Honor.

20         The charge -- the second quarter, you know, they all

21 said the list they received comes out April and May and they're

22 paid around June.  Well, what else happened in June?  In June,

23 they found out that the charge was filed.

24         THE COURT:  Is that in the records?

25         MR. CARSON:  Yes.

*United States District Court*

1          THE COURT:  Where?

2          MR. CARSON:  So the charge of discrimination was filed

3   on June 8, 2021, Your Honor.

4          THE COURT:  No.  I'm asking you whether that's in the

5   evidentiary record in this case.

6          MR. CARSON:  Yeah.  My client testified to it on

7   direct examination.  What did you do after you were fired?  He

8   actually said that, I filed a charge of discrimination.

9          THE COURT:  So he testified that he filed it, but you

10  just said they knew about it.

11         Do I have evidence in the record in front of me as to

12  when it was provided to Linode?

13         MR. CARSON:  Yes.

14         THE COURT:  Where?

15         MR. CARSON:  So they certainly both -- they certainly

16  didn't testify -- you know, they all had memory problems with

17  regard to that, but they certainly all testified that they knew

18  that the charge was filed.

19         THE COURT:  Wait.  Sitting here now, they all know the

20  charge was filed.

21         Is there evidence in the record that they knew in --

22  you know, I don't even know that the date has specifically been

23  established when the payments were made in 2021, but in the --

24  so you're saying, well, it post dates the filing of the charge.

25  I actually don't know that.  Right?

*United States District Court*

1            Is there evidence to establish that, that that's when

2  they were paid in 2021?

3            MR. CARSON:  Yes, that's what -- there is evidence.

4  That's when Carl said that they were received every year.

5            THE COURT:  I thought there were estimates that they

6  were paid in sort of June, July, second quarter.  Is that

7  right?

8            MR. CARSON:  Yes, that's after --

9            THE COURT:  Is it?  The charge was filed in June.

10  Were they paid on June 1?

11            MR. CARSON:  Your Honor, I think that there's

12  certainly sufficient evidence in this case for them to -- for a

13  jury to decide -- look, they are still not paying it to him

14  today, Your Honor.  As of January, when we did the depositions,

15  they admitted that the money was owed at the depositions.

16            THE COURT:  I hear what you are saying, Mr. Carson,

17  but I'm trying to parse the difference between -- okay.  First

18  of all, I don't know if they owe him the money or not.  Okay?

19  I don't know what the plan documents said.  All right.

20            They pointed some eligibility issues that they've

21  raised.  Whether they are right or not, I don't know.  It's

22  beyond my question right now.  This isn't an ERISA case, it's

23  not a benefits case.

24            MR. CARSON:  Right.

25            THE COURT:  So what I have to decide is whether

*United States District Court*

1   there's some evidence that that decision was discriminatory on

2   -- and to jump ahead because you're alluding to the charge,

3   whether it's retaliatory, and those are similar but not the

4   same.

5           MR. CARSON:  Yeah, and I think my client testified --

6   and I'd like to look at the transcript, but my client testified

7   that he contacted them and told them, hey, you owe me this

8   money and they still refused to pay it.

9           THE COURT:  How does that make it discriminatory?

10          MR. CARSON:  As soon as they know that they owe money

11  and they're not paying it, then I think it's fair to suggest

12  that the reason they're not paying it because they don't want

13  to pay a guy who they fired that -- you know, all of these

14  reasons they are saying.

15          THE COURT:  Do they have to take his word for it that

16  they owed it?

17          MR. CARSON:  No, Your Honor.  But they could have

18  easily just dispelled of this whole entire issue by putting the

19  chief operating officer -- the chief financial guy was on the

20  stand right there.  They could have handed him the document and

21  just said, hey, point out the place in the document where it

22  shows that there's this extra eligibility requirement.  They

23  didn't do that.

24          THE COURT:  I don't know that he handles that.  It

25  doesn't matter.  They didn't, right?  I don't know that the

*United States District Court*

1  witness --

2      MR. CARSON:  They didn't do that, and that's because

3  it's not in the document, Your Honor.  It doesn't exist.  The

4  money is owed.

5      THE COURT:  You keep saying that, okay, and I know you

6  keep saying that and I know you believe it.  It's not an

7  established fact.  I want to be clear with you, okay.  From my

8  perspective, it's not an established fact that it's owed.

9  Okay?  It's still a point of contention.  Okay?  And you're

10  going to have to accept that that's my point of view.

11      MR. CARSON:  I understand that.  I understand that.

12  But I think, Your Honor, that if it is a point of contention,

13  it's certainly a point of contention that the jury should be

14  permitted to consider with the --

15      THE COURT:  Here's the thing.  I don't disagree with

16  you.  There's no question that there's a factual dispute to

17  submit to the jury about whether he's owed the money under the

18  plan.  There's no question in my mind about that.

19      But your claim is that the non-payment of the money,

20  what didn't just violate the plan, but was discriminatory,

21  right, was an act of discrimination in its own right.

22      And that's what I'm asking you for, is the evidence

23  that it was an act of discrimination in its own right.

24      MR. CARSON:  I would submit that the timing of the

25  charge, the timing to when the payment was owed, the continued

*United States District Court*

1  refusal to submit the payment, not to mention all the direct

2  evidence of discrimination that my client testified to, the --

3  you know, not to mention the defendant's testimony in -- you

4  know, continually just admitting that they've lied.  You know,

5  they've lied in verified documents, they've lied on telephone

6  calls, they've lied --

7          THE COURT:  Mr. Carson, I'm not making credibility

8  determinations.  I can't on a Rule 50 motion.

9          MR. CARSON:  No.  So you said what is the evidence of

10  the failure -- that the refusal to pay was motivated by some

11  sort of discriminatory attempt.

12          I think when you look at the totality of the

13  circumstances and you consider all these factors, I think there

14  is enough there that you can conclude reasonably that the

15  withholding of the profit sharing is indeed motivated by

16  discriminatory evidence and certainly retaliatory.

17          THE COURT:  Okay.  All right.  Anything you want to

18  say on that, Mr. Cavalier?

19          MR. CAVALIER:  Only very briefly, Your Honor.

20          In our view, as I think you know, this is a damages

21  question.  As you remember at sidebar earlier in the case, this

22  is the issue that I tried to stipulate on, that it was part of

23  damages.  And if he prevailed on his termination, he would get

24  this money, whatever it might be.  And I think Mr. Carson

25  responded at that time that it was this independent claim.

*United States District Court*

1             Just to put it briefly, there's absolutely no evidence

2   in the record that Linode even decides whether he gets the

3   money, let alone was somehow motivated by discrimination or

4   retaliation related to it.  It's just not there.

5             MR. CARSON:  That's not true.  That's false.  The

6   testimony is that there's a list that Linode receives and that

7   Linode reviews that list, and based on that list, Linode sends

8   the checks out.  So Linode is the final decision-maker, as the

9   evidence suggested.

10            THE COURT:  Where is that evidence?  Who testified to

11  it?

12            MR. CARSON:  The corporate designee.

13            THE COURT:  So if -- the testimony I just heard that

14  was right in?

15            MR. CARSON:  Yeah.  So --

16            THE COURT:  Can you just hand up a copy of that

17  transcript and point me to page and lines, rather than my

18  trying to find it in the transcript?

19            MR. CARSON:  Can I get the one that's highlighted?

20            MR. CAVALIER:  Page 38.

21            THE COURT:  38 of the transcript.

22            MR. CARSON:  I can hand it up to Your Honor.  This one

23  is highlighted.  No?

24            MR. MCCARTHY:  38, line 1, Your Honor.

25            MR. CARSON:  Sorry, Your Honor.

*United States District Court*

```
 1              (Court reading.)

 2              THE COURT:  So the testimony is that Milberg

 3  Consulting Company would provide Linode with a list of the

 4  employees who were supposed to receive profit sharing, and then

 5  Linode would provide Milberg with a census of all employee

 6  data.  Milberg run the calculations according to the plan, any

 7  kind of compliance rules, any statutory requirement, and then

 8  they would return to us with what their contributions for that

 9  year would be.

10              MR. CARSON:  So the order is that they provide a

11  census to the Milberg group, and the Milberg group runs the

12  numbers and returns to Linode a list upon which -- and that

13  list is what's used to pay out the employees.

14              THE COURT:  Right.  I'm reading.  I see it.  I see

15  that.  Milberg came back with a list of the employees who were

16  eligible to receive and the amount they were supposed to

17  receive.

18              MR. CARSON:  The other thing, too, on Vincent

19  Palochko's examination, we went over this.  And that was Friday

20  when I was fumbling around a bit, but I think what I got out

21  was that he testified at that point in time that he did not

22  understand why the profit sharing wasn't paid, and then he

23  said, well --

24              THE COURT:  But again, I'm less interested in the

25  contractual plan dispute, Mr. Carson.  I understand that's a
```

*United States District Court*

1  fact question.  Right?  You've established that.  I'm focused

2  on the discriminatory part.

3       All right.  I'm going to put a pin in that one, I'm

4  going to think about that for a couple of minutes.

5       All right.  Let me hear you on punitives, Mr. Carson.

6       MR. CARSON:  So I think that the punitive damage claim

7  in this case has been very firmly established.  If the

8  plaintiff's theory of the case is credited by the jury, it

9  means that the defendants knowingly understood the law and

10  worked together -- the word that Daniel Spataro used was

11  "conspiracy," the word that Vincent Palochko used was "lie."

12  Thomas Asaro agreed with the "lie" word.  And that they worked

13  together to formulate a plan to avoid compliance with the law.

14       And if plaintiff's version of the facts is credited by

15  the jury, it means that that plan has been in effect since the

16  moment they decided they wanted to get rid of my client, and

17  that they continued with that plan up until and even after the

18  litigation started, that they filed answered to interrogatories

19  based on this false plan, and then their story completely

20  changes, a completely different story, there's no evidence of

21  this new story, and then their new story doesn't even make

22  sense.

23       I think if you look at the transcript of Vincent

24  Palochko, I mean, he testified there will be nothing -- there

25  will be no evidence to suggest that their excuse for lying is

*United States District Court*

1    anything but legitimate and that there's no reason for them to

2    continue lying two years later.  And then when I showed him

3    that they continued to lie two years later, in fact,

4    he actually admitted to perjury in this case.  And then I asked

5    him why, and his answer was, I don't have a good reason for

6    that.

7         And so the evidence in this case shows that there has

8    been a plan in effect from the very moment they wanted to get

9    rid of my client, the person who wanted to get rid of my client

10   -- and everyone agrees in this case, including my client,

11   including the defendants, that it was Dan Spataro, the guy who

12   subjected my client to non-stop discrimination in the workplace

13   based on his sexual orientation, based on his age.  And that

14   when he told them that he wanted to get rid of him, that they

15   worked together to formulate a false plan to avoid liability of

16   the law, and that this plan is still in effect right now and

17   they're trying -- and this is the last step of their plan.  If

18   they win this case, then their plan will be a success.

19        And what I hope is that the jury sees through it and

20   the jury awards my client the relief that he's requesting, the

21   relief that he's entitled to.  And I think that punitive

22   damages, you know, in this case are not just warranted but, you

23   know, absolutely deserving.

24        THE COURT:  Okay.  Mr. Cavalier, anything else on

25   that?

*United States District Court*

1          MR. CAVALIER:  Again, just very briefly.

2          The issue -- there's no law against lying to an

3   employee about the reason for his termination and there's no

4   requirement under the law or your instructions that have

5   anything to do with this case that require the employer to

6   deliver the full truth to an employee about the reasons for

7   their termination.

8          The legitimate non-discriminatory reason here is his

9   association with Mr. Musbach.  I don't think that's been

10  controverted.  I think Dan Spataro's testimony was undisputed.

11  And whatever other motivations may have been at play, it's

12  clear in the record -- and I think uncontroverted in the record

13  -- that that precipitated his termination.

14         Once you get beyond that question, there's just

15  nothing else in the record that shows that Linode as an entity

16  willfully or recklessly interfered with Mr. Williams' legally

17  protected rights.  To be honest with you, this is the genesis

18  of my argument for the underlying claims, I think it's valid,

19  but I know we're not going to discuss that here.

20         But once Mr. Spataro's uncontroverted testimony comes

21  in that he said it's him or me, and they said, okay, well, it's

22  him, after you get beyond that, there's no evidence of any

23  reckless indifference, there's no evidence of any willfulness.

24  And this lie about the reason he was terminated, I mean, that

25  might be evidence according to Mr. Carson of some other reason

*United States District Court*

1    or they were covering for something, but it's not evidence in

2    and of itself of reckless indifference to his protected rights.

3         THE COURT:  Yeah, I'm not sure I'm there.  I mean, it

4    is certainly evidence of pretext -- and to Mr. Carson's point,

5    if the jury accepts that, they don't have to decide if the

6    decision was then discriminatory, but they can.  And if they do

7    and they conclude that your client was lying throughout

8    administrative and legal proceedings about it, I think that

9    might be a basis for punitives.

10        Okay.  Let me -- the one other issue I want to ask

11   about, you moved on all the counts, all the claims, and I just

12   -- maybe I've missed it in the record, Mr. Carson, but what is

13   the protected conduct that underlies the sex-based retaliation

14   claim?  I know the age-based one, that's easy.  Right?  What's

15   the protected conduct for the sex-based one?

16        MR. CARSON:  Sure.  And because it wasn't in writing,

17   I understand the question, Your Honor.  So my client testified

18   that when this December 2018 discussion with Dan Spataro and

19   Tom Asaro occurred in the office of Tom Asaro, that the

20   discussion was not just about age, but that they were also

21   talking about his sexual orientation concerns, and that after

22   that meeting, that was a turning point in his career at Linode.

23   And it was after that meeting that just everything about his

24   employment changed.

25        You know, Dan Spataro, in his final year of

*United States District Court*

1  employment, just started just slowly just taking away my

2  client's ability to do his job.  You know, access to the -- you

3  know, the resources he needed to respond to requests, the

4  travel.  Started telling people that Carl won't be here much

5  longer, he started telling vendors that Carl won't be here next

6  year and that -- you know, stopped doing his performance

7  reviews.  There was like six or seven examples of how his

8  intention to get rid of Carl was made prior to the decision

9  being communicated to him.

10       And so we would submit that that 2018 meeting is

11  protected activity.  Not just that, but then all the times

12  after that were -- you know, where he's calling Carl a

13  troublemaker and he's calling Carl an activist because Carl is

14  trying to explain to him why -- you know, first instance -- you

15  know, there was testimony about a conversation between Carl and

16  Mr. Spataro where they -- where Carl was trying to explain to

17  him why employees who are in the LGBT community need to have,

18  you know, discriminatory free workplace and why they may engage

19  in kind of requests that Tara Taylor was making and he's trying

20  to educate Mr. Spataro on that.  And how Mr. Spataro's response

21  was that he's not interested in working with people like that,

22  you know, talking about people like that who are candidates and

23  how they were disqualified from consideration because of that.

24       So his protected activity would be those verbal

25  communications between Mr. Williams and Mr. Spataro, in

*United States District Court*

1   addition to that meeting in December 2018.

2          THE COURT:  Anything you want to add?

3          MR. CAVALIER:  Just briefly.  I don't think I recall

4   where any of that was in the actual record.  But even if it was

5   in the record, that might be evidence of a hostile work

6   environment, but that is not protected activity for the

7   purposes of the relevant statute.

8          THE COURT:  Well, I mean, again, if he said some of

9   what happened in his view with the promotion or lack of a

10  promotion was related to his sexual orientation, then that's

11  protected conduct.

12         MR. CAVALIER:  I don't recall any of that testimony.

13         THE COURT:  I'm not sure that I do either, but

14  frankly, I don't know that I can tell you that I remember every

15  piece of testimony in this case.

16         I have roughs of the transcripts.  I'm not sure that

17  I'm finding it quickly, but that doesn't mean that it's not

18  here.

19         MR. CARSON:  I can try to find it quickly.

20         (Discussion held off the record.)

21         MR. CAVALIER:  Your Honor, in the notes that we have

22  from the transcript, we have it that the testimony, according

23  to Mr. Williams from his own mouth when he was on the stand,

24  was that he repeated the word "ageism" three times, but he said

25  nothing in that meeting about his sexual orientation.

*United States District Court*

 1          THE COURT:  I appreciate those are your notes, but
 2   those are your notes.
 3          MR. CAVALIER:  We got a transcript page for you, too,
 4   Your Honor.
 5          THE COURT:  Okay.
 6          MR. CAVALIER:  What day is this?  Day 2, page 145.
 7          THE COURT:  145?
 8          You didn't do anything of substance on Day 1.  Day 1
 9   was jury selection and then you read the exhibits.
10          MR. CARSON:  Your Honor, can I sit down for a minute?
11          THE COURT:  Yeah.
12          145 doesn't really cover it.  It does say that others
13   talked about ageism.  It's not the actual testimony about the
14   meeting.
15          You know, look, I'm not going to take the issue from
16   the jury based on this.  I'll have a chance post-trial to parse
17   the transcript.  If there's not protected conduct, then there's
18   not protected conduct.  But ultimately, as the movant, you've
19   got the burden of persuasion and I just don't see it right now.
20   I know you're proving a negative, but I'm not seeing it right
21   now.
22          MR. CAVALIER:  Fair enough.
23          THE COURT:  Give me one second here.
24          (Discussion held off the record.)
25          THE COURT:  All right.  Okay.

*United States District Court*

1          So on the last issue that I hadn't sort of answered

2    was this issue on the profit sharing.  I'm going to let it go

3    to the jury.  I think the read is somewhat thin, but you know,

4    there is evidence that there was -- there's evidence that if

5    the jury were to believe it that there was some sort of

6    conspiracy against Mr. Williams and there was a list that was

7    provided and an opportunity to either add or remove, or

8    whatever, his name from that list, you know -- again, I can

9    look at all this more post-trial with the benefit of parsing

10   the transcript a little more closely, but as it stands now, I'm

11   going to let it go to jury.

12         So all right.  Mr. Carson, I talked to you briefly

13   about a motion.  Is there anything else you wanted to raise on

14   Rule 50?

15         MR. CARSON:  So I just thought that -- for the record,

16   I should move for a directed verdict as well based on the

17   testimony of perjury, based on the admissions by the corporate

18   -- or by the person who signed the verification.  That -- for

19   two and a half years, if you're saying policy violations and

20   every single piece of evidence says policy violations, I'm not

21   sure it's reasonable or any reasonable person can conclude that

22   when you flip your story over mid litigation, two and a half

23   years after the termination without a single shred of evidence

24   that supports the reasons for flipping the story, that you can

25   say that it's something else.  I don't think a reasonable jury

*United States District Court*

1    can conclude it's something else.

2           The only thing in the record is that he was fired for

3    policy violations.  And even the chief operating officer, the

4    vice president of the finance, got on the stand today and said

5    he was fired for policy violations.

6           THE COURT:  I'm going to deny that motion.  I do think

7    -- I mean, there's evidence the jury can certainly credit it

8    with respect to the idea of pretext, but there's also ample

9    evidence from which they can conclude either that that was the

10   real reason or, alternatively, that it wasn't, but they also

11   are going to be instructed that even if it wasn't, they still

12   don't have to find that it was discriminatory.

13          So I'm not going to find as a matter of law that it

14   was discriminatory and take that issue from the jury.

15          Okay.  So it's about 20 of 4:00 now.  I really want to

16   get this case moving.

17          How long are your respective closings?

18          MR. CARSON:  If you're going to ask me first, I would

19   say an hour.

20          THE COURT:  You're going to go -- I mean, I need you

21   to know because I need to know if I'm closing today.  And you

22   may be --

23          MR. CARSON:  So I think I would go for about an hour

24   at least.

25          THE COURT:  Well, an hour at least is a broad thing

*United States District Court*

1  because the next thing I know is you're going to up here more

2  than 90 minutes.  And you're going to say, well, I said an hour

3  at least, but I was just wrong, Judge.

4           So I need to know, Mr. Carson, have you run through

5  your closing?

6           MR. CARSON:  No, I haven't.  Not timing.  I haven't

7  timed myself yet.  Maybe John can answer the question first and

8  then let me look at my notes here.

9           THE COURT:  Do you have a sense, Mr. Cavalier, how

10  long your closing are?

11           MR. CAVALIER:  Sure.  30 minutes.  I prefer a clock on

12  them, frankly.

13           MR. CARSON:  If there's a way -- if there's an

14  opportunity to do them tomorrow morning, I would certainly ask

15  for that opportunity.

16           THE COURT:  Yeah, I understand that, but my preference

17  would be to do them this afternoon.  I'd like to get -- I mean,

18  the jury is anxious.  They've expressed their interest in

19  starting to deliberate a number of times.  It's 3:45 now.  I

20  can charge them in -- you know, the charge is ready, right?  So

21  I can bring them in now and charge them and have them charged

22  by about 4:10.

23           If it's okay with -- I think it's okay with Maureen.

24  Are we okay to go to 5:30?

25           THE COURT REPORTER:  Yes.


                        *United States District Court*

1          THE COURT:  So we can go to 5:30 today and do closings

2    if that will work.  I'm not trying to short-change you, but I

3    am trying to get the case going and to put the jury in the

4    position where they can deliberate in the morning.

5          MR. CARSON:  I'm just not sure that's enough time for

6    me, Your Honor.

7          THE COURT:  I'm struggling with this.  You've known

8    that we were coming to this and that I was going to want a time

9    estimate, right?

10         I mean, I can put you on a clock and say I think that

11   this can be done in 45 minutes.  I mean, I'm just -- I don't

12   want to waste a chunk of an afternoon when I know a jury is

13   here much longer than we've told them they were going to be.

14   They have lives, too, right?  And everything we do delays

15   things.

16         So, you know, I don't want to break up the closings.

17   I want to do the closings today if we're doing them, but I need

18   to have a sense from you, Mr. Carson, now to what you are going

19   to do in closing.

20         The alternative I can tell you, bring them in.  I can

21   charge them and assuming my charge is done by 4:15, I can say

22   you're going to close.  And I'm going to give you each 40,

23   45 minutes, and you got to be done.  I do think that's probably

24   enough time.

25         MR. CARSON:  But don't I have to go first and last?

*United States District Court*

1          THE COURT:  I mean you're -- you do get an opportunity

2   to rebut, yes.  And I can give you a time for rebuttal closing

3   as well.

4          But again, I don't want to tap dance around this.  I

5   feel like you're stringing me along in an effort to get this to

6   be tomorrow.

7          MR. CARSON:  I'm not stringing you along.  If I'm

8   going to give you a -- for a number, I would say an hour.  It's

9   a lot to do.

10          THE COURT:  Well, I'll tell you what I'll do,

11   Mr. Carson.  I think it can be tightened.  So I'll let you go

12   tomorrow morning, but you're going to be on a 45-minute clock.

13   Okay?

14          MR. CARSON:  Okay.

15          THE COURT:  So we'll do 45-minute closings tomorrow,

16   and I'm going to give you 10 minutes for rebuttal close.

17          MR. CARSON:  Yep.

18          THE COURT:  Okay.  45 minutes for you as well,

19   Mr. Cavalier.

20          MR. CAVALIER:  Hard clock.

21          THE COURT:  Hard clock.  At 45 minutes, the mic is

22   cutting off and you're done.

23          MR. CARSON:  The hard clock worked for me.

24          THE COURT:  Don't think you're going to do the FedEx

25   routine of talking fast and making Maureen take it down.

*United States District Court*

1          So then the question is do you want me to bring them

2     in and charge them now?

3          MR. CAVALIER:  I think so.

4          THE COURT:  So that we start with closings first thing

5     in the morning?

6          MR. CAVALIER:  I think that's our preference.

7          THE COURT:  That's kind of where I am.  Is that okay

8     with you, Mr. Carson?

9          MR. CARSON:  I have no objection.

10         THE COURT:  Okay.  And just real quickly, before I

11    bring them in, where are you -- you all got the verdict sheet.

12    You referenced it during your arguments.  Does anybody have any

13    objection to it?

14         MR. CAVALIER:  Subject to the Rule 50 motions, no.

15         MR. CARSON:  I looked at it and I -- just 30 seconds.

16         Your Honor, I don't have any objection.

17         THE COURT:  You don't have any objection.  Great.

18    We're going to bring the jury in, and I'll charge them now.

19         MR. CAVALIER:  Your Honor, approximate time for your

20    charge?

21         THE COURT:  For my charge, my guess is, I mean,

22    it's --

23         MR. CAVALIER:  It's not too long.

24         THE COURT:  No.  It's about 45 pages, and there's a

25    fair amount of white space.  So I'm thinking it's probably

*United States District Court*

```
 1   going to be 30 to 40 minutes.  I haven't read it out loud, but
 2   my guess is it's in that range based on past history.
 3             MR. CAVALIER:  Thank you.
 4             THE COURTROOM DEPUTY:  All rise.
 5             (Jury enters the courtroom at 3:48 p.m.)
 6             THE COURT:  All right.  Everybody have a seat, please.
 7   All right.  Thanks for your patience.  Here's what we're going
 8   to do.  As I think I just said to you, we're done with the
 9   presentation of evidence.  I'm going to charge you now on the
10   law of the case.  When I'm done, I'm going to release you for
11   the night.  The reason being, the attorneys have to do their
12   closing arguments.  I don't want them to be squeezed for time,
13   right?  It's important.  I don't want to -- if any of you
14   remember the old, like, FedEx commercials with the guy who
15   talked really fast?  I don't want it to be like that.
16             So we're going to break for the night, come back
17   fresh, you'll hear the closings.  At the end of the closings,
18   I'll give you one last instruction, which is the process of
19   deliberating, and then the case will be yours.  So you'll have
20   the case by the mid-morning break tomorrow.  I know you're
21   anxious to start deliberating.  And I apologize it's taken
22   longer than we initially anticipated.
23             As with the preliminary instructions, I'm going to
24   read these to you.  Okay?  Let me just say a word about that.
25             Certainly, this may be important for you in terms of
```

*United States District Court*

1  how to contextualize some of the evidence you've heard and some

2  of the closing arguments you're going to hear.  So to the

3  extent you want to make a brief note or two about my charge,

4  just like everything else in the case, you can.

5       That said, obviously it's really important that you

6  know what the law is.  I'm going to send you a written copy of

7  what I read to you.  Okay?  You will have that tomorrow.

8       So don't feel compelled to sit here and take a lot of

9  notes on what the law is because you'll be able to cross

10  reference it.  You'll have a table of contents.  It will all be

11  there for you.  But again, if you think it will help you as you

12  listen tomorrow to closings, feel free, okay?  It's up to you.

13  All right.

14       This is a civil case.  Plaintiff Carl Williams claims

15  that Linode, LLC, discriminated against him because of his

16  sexual orientation and age, subjected him to a hostile work

17  environment, and retaliated against him for raising concerns

18  about disparate treatment.  The disparate treatment alleged

19  relates to Mr. Williams' termination, pay, and the withholding

20  of a profit sharing bonus.

21       Linode denies these allegations and claims that it had

22  a legitimate reason for terminating Mr. Williams.

23       Mr. Williams has the burden of proving his case by

24  what is called a preponderance of the evidence.  That means he

25  must prove to you in light of all the evidence that what he

*United States District Court*

1  claims is more likely so than not so.

2           To say it differently, if you were to put the evidence

3  favorable to Mr. Williams and the evidence favorable to Linode

4  on opposite sides of a balance scale, Mr. Williams would have

5  to make the scales tip to his side, even a little.

6           If Mr. Williams fails to meet this burden, the verdict

7  must be for Linode.  If you find, after considering all the

8  evidence, that a claim or fact is more likely so than not so,

9  than the claim or fact has been proved by a preponderance of

10  the evidence.

11           In determining whether any fact has been proved by a

12  preponderance of evidence in the case, you may, unless I

13  instruct otherwise, consider the testimony of all witnesses

14  regardless of who may have called them and all exhibits

15  received in evidence regardless of who may have produced them.

16           You may have heard the term proof beyond a reasonable

17  doubt.  That is a standard that applies in criminal cases, not

18  civil cases like this one.  It does not apply here, and so you

19  should put it out of your mind.

20           The evidence from which you are to find the facts

21  consist of the following:  The testimony of the witnesses,

22  documents and other things received as exhibits, any facts that

23  are stipulated, that is, facts to which the parties formally

24  agreed, and any facts that are judiciously noticed.  That is

25  facts I say you must accept as true even without other

*United States District Court*

1  evidence.

2      The following things are not evidence:  Statements,

3  arguments, and questions of the lawyers for the parties in this

4  case, materials that a lawyer or witness referenced but that I

5  have not admitted into evidence, objections by lawyers, any

6  testimony I told you to disregard, and anything you may have

7  seen or heard about this case outside the courtroom.

8      You must make your decision based only on the evidence

9  that you saw and heard in court.  Do not let rumors,

10 suspicions, or anything else that you may have seen or heard

11 outside of court influence your decision in any way.

12     You should use your common sense in weighing the

13 evidence.  Consider it in light of your everyday experience

14 with people and events, and give it whatever weight you believe

15 it deserves.  If your experience tells you that certain

16 evidence reasonably leads to a conclusion, you are free to

17 reach that conclusion.

18     There are rules that control what can be received into

19 evidence.  When a lawyer asks a question or offers an exhibit

20 into evidence and a lawyer on the other side thinks that is not

21 permitted by the rules of evidence, that lawyer may object.

22 This simply means that the objecting lawyer is requesting that

23 I make a decision on a particular rule of evidence.  You should

24 not be influenced by the fact that an objection was made.

25 Objections to questions are not evidence.  Lawyers have an

*United States District Court*

1  obligation to their clients to make objections when they

2  believe that the evidence being offered is improper under the

3  rules of evidence.  You should not be influenced by the

4  objection or by my ruling on it.  If I sustained the objection,

5  ignore the question.  If I overruled it, treat the answer like

6  any other.  If I instructed you that some item of evidence is

7  received for a limited purpose only, you must follow that

8  instruction.

9         Also, I may have ordered certain testimony or other

10  evidence stricken from the record.  Do not consider any

11  testimony or other evidence that I struck or excluded.  Do not

12  speculate about what a witness might have said or what an

13  exhibit might have shown.

14         There are two types of evidence that you may use in

15  reaching your verdict.  One type of evidence is called direct

16  evidence.  An example of direct evidence is when a witness

17  testifies about something that the witness knows through his

18  own senses, something the witness has seen, felt, touched,

19  heard, or did.  If a witness testified that he saw it raining

20  outside and you believed him, that would be direct evidence

21  that it was raining.

22         The other type of evidence is circumstantial evidence.

23  Circumstantial evidence is proof of one or more facts from

24  which you could find another fact.  If someone walked into the

25  courtroom wearing a raincoat covered with drops of water and

*United States District Court*

1   carrying a wet umbrella, that would be circumstantial evidence

2   from which you can conclude that it was raining, even though

3   you didn't see it for yourself.

4        You should consider both kinds of evidence that are

5   presented to you.  The law makes distinction of the weight to

6   be given to either direct or circumstantial evidence.  You are

7   to decide how much weight to give any evidence.

8        In deciding what the facts are, you decide what

9   testimony you believe and what testimony you do not believe.

10  You are the sole judges of the credibility of the witnesses.

11       Credibility means whether a witness is worthy of

12  belief.  You may believe everything a witness says or only part

13  of it or none of it.  In deciding what to believe, you may

14  consider a number of factors, including the following:  The

15  opportunity and ability of the witness to see or hear or know

16  the things the witness testifies to, the quality of the

17  witness's understanding and memory, the witness's manner while

18  testifying, whether the witness has an interest in the outcome

19  of the case or any motive, bias, or prejudice, whether the

20  witness is contradicted by anything the witness said or wrote

21  before trial or by other evidence, how reasonable the witness's

22  testimony is when considered in the light of other evidence

23  that you believe, whether the witness has been convicted of

24  any crime, and any other factors that bear on believability.

25       The weight of the evidence to prove a fact does not

*United States District Court*

1  necessarily depend on the number of witnesses who testified.

2  What is more important is how believable the witnesses were and

3  how much weight you think their testimony deserves.

4       You've heard the testimony containing an opinion from

5  Chad Staller.  In weighing this opinion testimony, you may

6  consider his qualifications, the reasons for his opinions, and

7  the reliability of the information supporting those opinions,

8  as well as the factors I've previously mentioned for weighing

9  the testimony of any other witness.  This opinion should

10  receive whatever weight and credit, if any, you think

11  appropriate given all the other evidence in the case.  In

12  deciding whether to accept or rely upon Mr. Staller's opinion,

13  you may consider any bias that the witness may have.

14       Mr. Williams has made claims under two different laws,

15  Title VII and the Age Discrimination and Employment Act, or

16  ADEA.

17       Title VII prohibits an employer from discriminating

18  against an employee in the terms and conditions of employment

19  because of the employee's sex, among other things.  As a matter

20  of law, I instruct you that when an employer discriminates

21  against an employee based on that employee's sexual

22  orientation, the employer discriminates because of the

23  employee's sex.

24       The ADEA prohibits age discrimination against an

25  employee who is 40 years of age or older.

*United States District Court*

1          For his claims under both statutes, Mr. Williams

2     claims that he was subjected to, one, discrimination, two,

3     retaliation, and, three, a hostile work environment.

4          Linode denies that it violated either statute or that

5     Mr. Williams suffered any discrimination or retaliation at

6     Linode.

7          I will now instruct you more fully on the issues you

8     must address in this case.

9          Mr. Williams alleges that Linode paid him less than

10    other employees with similar positions, terminated his

11    employment, and withheld a profit sharing bonus that Linode

12    owed to him.  For Mr. Williams to recover on these claims that

13    Linode treated him differently, he must prove by a

14    preponderance of the evidence that Linode intentionally

15    discriminated against him on the basis of either his sex,

16    including his sexual orientation, or his age.

17         To prevail on his claim of sex-based discrimination,

18    Mr. Williams must prove both of the following by a

19    preponderance of the evidence:  First, Linode subjected

20    Mr. Williams to discriminatory pay, that Linode terminated

21    Mr. Williams, or that Linode discriminated against Mr. Williams

22    by withholding a profit sharing bonus from Mr. Williams.

23         And, second, Mr. Williams sex, including his sexual

24    orientation, was a determinative factor in Linode's decision.

25         To prevail on his claim of age-based discrimination,

*United States District Court*

1    Mr. Williams must prove two similar elements, each by a

2    preponderance of the evidence.  First, Linode subjected

3    Mr. Williams to discriminatory pay, that Linode terminated

4    Mr. Williams, or that Linode discriminated against Mr. Williams

5    by withholding a profit sharing bonus from Mr. Williams.

6         And, second, Mr. Williams' age was a determinative

7    factor in Linode's decision.

8         Although Mr. Williams must prove that Linode acted

9    with the intent to discriminate, either on the basis sex or on

10   the basis of age, Mr. Williams is not required to prove that

11   Linode acted with a particular intent to violate Mr. Williams'

12   federal civil rights.

13        Mr. Williams is also not required to produce direct

14   evidence of intent, such as statements admitting

15   discrimination.  You may infer intentional discrimination from

16   the existence of other facts.  You should weigh all the

17   evidence received in the case in deciding whether Linode

18   intentionally discriminated against Mr. Williams on the basis

19   of his sex, including sexual orientation, or on his age.

20        Linode has given a non-discriminatory reason for its

21   decisions regarding Mr. Williams' pay, termination, and profit

22   sharing.  Linode's non-discriminatory reason is Mr. Williams'

23   affiliation with John Musbach.

24        When evaluating Linode's non-discriminatory reason,

25   you must only consider what Linode knew about Mr. Musbach's

*United States District Court*

 1  criminal case at the time Linode acted.  For example, when

 2  Linode terminated Mr. Williams, it didn't have knowledge of

 3  subsequent developments in Mr. Musbach's criminal case.  So

 4  those developments are irrelevant to your assessment of

 5  Linode's stated reason.

 6        If you believe Linode's stated reason and if you find

 7  that the decisions regarding pay, termination, and profit

 8  sharing would have occurred because of Linode's stated reason,

 9  regardless of Mr. Williams' sexual orientation or age, then you

10  must find for Linode.

11        If you disbelieve Linode's stated reason for its

12  conduct, then you may, but need not, find that Mr. Williams has

13  proved intentional discrimination.

14        In determining whether Linode's stated reason for its

15  actions was a pretext or excuse for discrimination, you may not

16  question Linode's business judgment.  You cannot find

17  intentional discrimination simply because you disagree with the

18  business judgment of Linode or believe it is harsh or

19  unreasonable.

20        You are not to consider Linode's wisdom; however, you

21  may consider whether Mr. Williams has proven that Linode's

22  reason is merely a coverup for discrimination.  Ultimately, you

23  must decide whether Mr. Williams has proven that his sexual

24  orientation or his age was a determinative factor in Linode's

25  employment decisions.  Determinative factor means that if not

*United States District Court*

1  for Mr. Williams' sexual orientation or age, the termination,

2  unequal pay, and denial of profit sharing would not have

3  occurred.

4        Mr. Williams claims that Linode subjected him to a

5  hostile work environment that was motivated by Mr. Williams'

6  sexual orientation or his age.  For Mr. Williams' claim of a

7  hostile work environment based on sex, he must prove each of

8  the following elements by a preponderance of the evidence:

9        First, Mr. Williams was subjected to discriminatory

10  conduct on the basis of his sexual orientation by Linode's

11  employees.

12        Second, Mr. Williams did not welcome that conduct.

13        Third, Mr. Williams' sex, including his sexual

14  orientation, motivated the conduct in question.

15        Fourth, the conduct was so severe or pervasive that a

16  reasonable person in Mr. Williams' position would find

17  Mr. Williams' work environment to be hostile or abusive.  This

18  element requires you to look at the evidence from the point of

19  view of a reasonable member of Mr. Williams' protected class

20  and their reaction to Mr. Williams' work environment.

21        Fifth, Mr. Williams believed his work environment to

22  be hostile or abusive as a result of Linode's employees'

23  conduct.

24        For Mr. Williams' claim of a hostile work environment

25  based on age, he must prove the following similar elements by a

*United States District Court*

1  preponderance of the evidence:

2         First, Mr. Williams was subjected to discriminatory

3  conduct on the basis of his age by Linode's employees.

4         Second, Mr. Williams did not welcome that conduct.

5         Third, Mr. Williams' age motivated the conduct in

6  question.

7         Fourth, the conduct was so severe or pervasive that a

8  reasonable person in Mr. Williams' position would find

9  Mr. Williams' work environment to be hostile or abusive.  This

10 element requires you to look at the evidence from the point of

11 view from a reasonable member of Mr. Williams' protected class

12 and their reaction to Mr. Williams' work environment.

13        And, fifth, Mr. Williams believed his work environment

14 to be hostile or abusive as a result of Linode's employees'

15 conduct.

16        In determining whether a work environment is hostile,

17 you must look at all of the circumstances, which may include

18 the total physical environment of Mr. Williams' work area, the

19 degree and type of language and insult that filled the

20 environment before or after Mr. Williams arrived, the

21 reasonable expectations of Mr. Williams upon entering the

22 environment, the frequency of the offensive conduct, the

23 severity of the conduct, the effect of the working environment

24 on Mr. Williams' mental and emotional wellbeing, whether the

25 conduct was unwelcome, that is conduct Mr. Williams regarded as

*United States District Court*

1  unwanted or unpleasant, whether the conduct was pervasive,

2  whether the conduct was directed towards Mr. Williams, whether

3  the conduct was physically threatening or humiliating, whether

4  the conduct was merely a tasteless remark, and whether the

5  conduct unreasonably interfered with Mr. Williams' work

6  performance.

7           Conduct that amounts only to ordinary socializing in

8  the workplace, such as occasional horseplay, occasional use of

9  abusive language, tasteless jokes, and occasional teasing does

10  not constitute an abusive or hostile work environment.  A

11  hostile work environment can be found only if there is extreme

12  conduct amounting to a material change in the terms and

13  conditions of employment.

14           Moreover, isolated incidents, unless extremely

15  serious, will not amount to a hostile work environment.  It is

16  not enough that the work environment was generally harsh,

17  unfriendly, unpleasant, crude, or vulgar to all employees.  In

18  order to find a hostile work environment, you must find that

19  Mr. Williams was harassed because of his sexual orientation or

20  age.  The harassing conduct may, but need not, be sex based or

21  age based in nature.  Rather, it's defining characteristic is

22  that the harassment complained of was linked to Mr. Williams'

23  sexual orientation or age.  The key question was whether

24  Mr. Williams was subjected to harsh employment conditions to

25  which non-gay or younger employees were not.

*United States District Court*

1          It is important to understand that in determining
2   whether a hostile work environment existed at the employer's
3   workplace, you must consider the evidence from the perspective
4   of a reasonable person with Mr. Williams' sexual orientation or
5   age in the same position.  That is, you must determine whether
6   a reasonable person would have been offended or harmed by the
7   conduct in question.  You must evaluate the total circumstances
8   and determine whether the alleged harassing behavior could be
9   objectively classified as the kind of behavior that would
10  seriously affect the psychological or emotional wellbeing of a
11  reasonable individual with Mr. Williams' sexual orientation or
12  age.  The reasonable person is simply one of normal sensitivity
13  and emotional makeup.
14          Mr. Williams claims that Linode retaliated against him
15  because he engaged in protected activity by informing the
16  company that he was experiencing discrimination in his
17  employment on the basis of sex and on the basis of age.
18          To prevail on his claim of retaliation on the basis of
19  sex, Mr. Williams must prove each of the follow by a
20  preponderance of the evidence:
21          First, Mr. Williams engaged in protected activity by
22  complaining of sex-based discrimination, including
23  discrimination on the basis of sexual orientation.
24          Second, Mr. Williams was subjected to a materially
25  adverse action at the time or after the protected conduct took

*United States District Court*

1  place.

2         And, third, there was a causal connection between the

3  harassment, termination, or denial of profit sharing and

4  Mr. Williams' alleged complaint.

5         To prevail on his claim of retaliation on the basis of

6  age, Mr. Williams must prove each of the following by a

7  preponderance of the evidence:

8         First, Mr. Williams engaged in protected activity by

9  complaining of age-based discrimination.

10        Second, Mr. Williams was subjected to a materially

11  adverse action at the time or after the protected conduct took

12  place.

13        And, third, there was a causal connection between the

14  harassment, termination, or denial of profit sharing and

15  Mr. Williams' alleged complaint.

16        Concerning the first element, Mr. Williams need not

17  prove the merits of his protected conduct, but only that he was

18  acting under a reasonable, good faith belief that his or

19  someone else's right to be free from discrimination on the

20  basis of sex or age were violated.

21        Protected conduct under either Title VII or the ADEA

22  includes the following:

23        One, opposing any practice that the statute makes

24  unlawful, meaning sex-based discrimination in the case of

25  Title VII and age-based discrimination in the case of the ADEA.

*United States District Court*

1       Two, making a charge of employment discrimination.

2       Three, testifying, assisting, or participating in any

3 manner in an investigation proceeding or hearing under

4 Title VII or the ADEA.

5       Or, four, informal complaints and protests.

6       Concerning the second element, the term materially

7 adverse means that Mr. Williams must show that Linode's

8 response to the protected activity was serious enough that it

9 well might have discouraged a reasonable worker from making

10 complaints of discrimination.  The activity need not be related

11 to the workplace or to Mr. Williams' employment.

12       The third element is the causal connection between

13 Mr. Williams' protected activity and Linode's response, which

14 Mr. Williams may show in many ways.

15       For example, you may or may not find that there is a

16 sufficient connection through timing.  That is, Linode's

17 adverse action toward Mr. Williams followed shortly after

18 Linode became aware of Mr. Williams' protected conduct.

19       Causation is, however, not necessarily ruled out by a

20 more extended passage of time.  Causation may or may not be

21 proven by antagonism shown toward Mr. Williams or a change in

22 demeanor toward Mr. Williams.  Ultimately, you must decide

23 whether Mr. Williams' protected activity in complaining of

24 discrimination had a determinative effect on Linode's treatment

25 on Mr. Williams.

*United States District Court*

1        Determinative effect means that if not for
2   Mr. Williams' protected activity, he would not have been
3   discriminated against, terminated, or denied profit sharing.
4        As I've described for you, Mr. Williams brings six
5   total claims, claims of discrimination, retaliation, and
6   hostile work environment under Title VII and claims of
7   discrimination, retaliation, and hostile work environment under
8   the ADEA.  You should decide these claims independently of each
9   other.  That means regardless of your decision on Mr. Williams'
10  discrimination claims, you may, but need not, find that Linode
11  retaliated against Mr. Williams or subjected him to a hostile
12  work environment.
13       And regardless of your decision on Mr. Williams'
14  retaliation or hostile work environment claims, you may, but
15  need not, find that Linode discriminated against Mr. Williams.
16       I'm now going to instruct you on damages.  Just
17  because I'm instructing you on how to award damages does not
18  mean that I have any opinion on whether or not Linode should be
19  held liable.  The types of damage awards available to
20  prevailing plaintiffs under Title VII and the ADEA differ in
21  certain respects, specifically Title VII allows for, one,
22  compensatory damages and, two, punitive damages.  The ADEA
23  allows for, one, backpay and, two, liquidated damages.
24       I will first instruct you on the damages available
25  under Title VII and then those available under the ADEA.

*United States District Court*

1          If you find by a preponderance of the evidence that

2    Linode intentionally discriminated against Mr. Williams,

3    subjected Mr. Williams to a hostile work environment, or

4    retaliated against Mr. Williams because of his sex, including

5    his sexual orientation, you must consider the issue of

6    compensatory damages.  You must award Mr. Williams an amount

7    that will fairly compensate him for any injury he actually

8    sustained as a result of Linode's conduct.  The damages that

9    you award must be fair compensation, no more and no less.  The

10   award of compensatory damages is meant to put Mr. Williams in

11   the position he would have occupied if the discrimination had

12   not occurred.

13         Mr. Williams has the burden of proving damages by a

14   preponderance of the evidence.  Mr. Williams must show that the

15   injury would not have occurred without Linode's acts.

16   Mr. Williams must also show that Linode's acts played a

17   substantial part in bringing about the injury and that the

18   injury was either a direct result or a reasonably probable

19   consequence of Linode's acts.  This test, a substantial part in

20   bringing about the injury, is to be distinguished from the test

21   of employed in determining whether Linode's actions were

22   motivated by discrimination.

23         In other words, even assuming Linode was motivated by

24   discrimination, Mr. Williams is not entitled to damages for an

25   injury unless Linode's discriminatory actions actually played a

*United States District Court*

1  substantial part in bringing about that injury.  There can be

2  more than one cause of an injury.

3       To find that Linode's acts caused Mr. Williams'

4  injuries, you need not find that Linode's acts were the nearest

5  cause, either in time or space.

6       However, if Mr. Williams' injury was caused by a later

7  independent event that intervened between Linode's act and

8  Mr. Williams' injury, Linode is not liable unless the injury

9  was reasonably foreseeable by Linode.

10       In determining the amount of any damages that you

11  decide to award, you should be guided by common sense.  You

12  must use sound judgment in fixing an award of damages, drawing

13  reasonable inferences from the facts in evidence.  You may not

14  award damages based on sympathy, speculation, or guesswork.

15       You may award damages for any pain, suffering,

16  inconvenience, mental anguish, or loss of enjoyment of life

17  that Mr. Williams experienced as a consequence of Linode's

18  allegedly unlawful act.

19       No evidence of the monetary value of such intangible

20  things as pain and suffering has been or need be introduced

21  into evidence.  There's no exact standard for fixing the

22  compensation to be awarded for these elements of damage.  Any

23  award you make should be fair in light of the evidence

24  presented at the trial.

25       I instruct you that in awarding compensatory damages,

*United States District Court*

1    you are not to award damages for the amount of wages that

2    Mr. Williams would have earned, either in the past or in the

3    future, if he had continued in employment with Linode.  These

4    elements of recovery of wages that Mr. Williams could have

5    received from Linode are called backpay and front pay.  Under

6    Title VII, the determination of backpay and front pay is for

7    the Judge, not the jury.

8          You may award damages for monetary losses that

9    Mr. Williams might suffer in the future as a result of Linode's

10   acts.  For example, you may award damages for loss of earnings

11   resulting from any harm to Mr. Williams' reputation that was

12   suffered as a result of Linode's allegedly unlawful act.  Where

13   a victim of discrimination has been terminated by an employer

14   and has sued that employer for discrimination, he may find it

15   more difficult to be employed in the future or may have to take

16   a job that pays less that if the discrimination had not

17   occurred.  That element of damages is distinct from the amount

18   of wages Mr. Williams would have earned in the future from

19   Linode if he had retained a job.

20         As I instructed you previously, Mr. Williams has the

21   burden of proving damages by a preponderance of the evidence,

22   but the law does not require that Mr. Williams prove the amount

23   of his losses with mathematical precision.  It requires only as

24   much definiteness and accuracy as circumstances permit.

25         In assessing damages, you must not consider attorneys'

*United States District Court*

1    fees or the cost of litigating this case.  Attorneys' fees and

2    cost, if relevant at all, are for the Court and not the jury to

3    determine.  Therefore, attorney fees and costs should play no

4    part in your calculation of any damages.

5         Mr. Williams' claims Linode's acts were done with

6    malice or reckless indifference to Mr. Williams' federally

7    protected rights and that, as a result, there should be an

8    award of what are called punitive damages.

9         A jury may award punitive damages to punish a

10    defendant or to deter the defendant and others like the

11    defendant from committing such conduct in the future.  An award

12    of punitive damages is permissible in this case only if you

13    find by a preponderance of the evidence that a management

14    official of Linode personally acted with malice or reckless

15    indifference to Mr. Williams' federally protected rights.

16         An action is with malice if a person knows that it

17    violates the federal law prohibiting discrimination and does it

18    anyway.

19         An action is with reckless indifference is taken with

20    knowledge that it may violate the law.

21         But even if you make a finding that there has been an

22    act of discrimination with malice or reckless disregard of

23    Mr. Williams' federal rights, you cannot award punitive damages

24    if Linode proves by a preponderance of the evidence that it

25    made a good faith attempt to comply with the law by adopting

*United States District Court*

1 policies and procedures designed to prevent unlawful

2 discrimination, such as that suffered by Mr. Williams.

3        An award of punitive damages is discretionary.  That

4 is, if you find that the legal requirements for punitive

5 damages are satisfied and that Linode has not proved that it

6 made a good faith attempt to comply with the law, then you may

7 decide to award punitive damages or you may decide not to

8 award.

9        In this case, you will first decide if punitive

10 damages are appropriate.  If so, then after you return your

11 verdict, you will hear additional evidence and I will give you

12 additional instructions to permit you to decide the amount of

13 punitive damages.  That proceeding will be brief, and the need

14 for a short additional proceeding should not influence your

15 deliberations.

16        Under the ADEA, you must award as actual damages an

17 amount that reasonably compensates Mr. Williams for any lost

18 wages and benefits, taking into consideration any increases in

19 salary and benefits, including pension, that Mr. Williams would

20 have received from Linode had Mr. Williams not been the subject

21 of Linode's intentional discrimination.  Backpay damages, if

22 any, apply from the time Mr. Williams was terminated until the

23 date of your verdict.

24        If you award backpay, you are instructed to deduct

25 from the backpay figure whatever wages Mr. Williams has

*United States District Court*

1    obtained from other employment during this period.

2         However, please note that you should not deduct Social

3    Security benefits, unemployment compensation, and pension

4    benefits from an award of backpay.

5         In assessing damages, you must not consider attorney

6    fees or the cost of litigating this case.  Attorney fees and

7    costs, if relevant at all, are for the Court, and not the jury,

8    to determine.  Therefore, attorneys' fees and costs should play

9    no part in your calculation of any damages.

10        If you find that Mr. Williams is entitled to recover

11   damages for lost wages or benefits under the ADEA, then I would

12   also ask you to decide a further question, whether Linode's

13   conduct was willful.  For purposes of your answer to that

14   question, Mr. Williams has the burden of proving willfulness by

15   a preponderance of the evidence.

16        You must find Linode's violation of the ADEA to be

17   willful, if Linode knew or showed reckless disregard for

18   Mr. Williams' unequal pay, termination, or denial of the profit

19   sharing bonus was prohibited by the law.

20        To establish willfulness, it is not enough to show

21   that Linode acted negligently.  If you find that Linode did not

22   know or knew only that the law was potentially applicable and

23   did not act in reckless disregard as to whether its conduct was

24   prohibited by law, then Linode's conduct was not willful.

25        All right.  Those are my instructions for you on the

*United States District Court*

1    law.  As I said, I'll have one final instruction for you after

2    closings tomorrow on how you dispatch your duties as a juror

3    once I send you back.

4         But for now, we are going to break for the evening.

5    We'll come back in the morning fresh to hear closings.  I do

6    want to caution you.  Again, you've heard a lot but not all,

7    and those closings are really important to the lawyers and to

8    you to understand how the lawyers would take this law and have

9    you apply it, right?  And it's important to keep an open mind

10   until you hear that, because they may have a take on it that is

11   different than yours and that is going to impact your thinking.

12        So keep your head clear.  Don't talk about the case

13   quite yet.  You will be able to talk about it by mid-morning

14   tomorrow, I promise, but don't talk about it yet.  And again,

15   I've said this before, don't look stuff up.  It's not your

16   friend.  Just clear your heads, and I'll see you back here

17   tomorrow morning at 9:00 a.m.  Okay?  Thanks, everybody.

18        THE COURT:  All rise.

19        (Jury exits the courtroom at 4:19 p.m.)

20        THE COURT:  Okay.  You can all be seated.  Okay.  I

21   want to start promptly at 9:00 tomorrow.  Everybody be here

22   before that so that we can go as soon as the jury is ready to

23   go.

24        In terms of just logistics after that, we've taken the

25   jury's lunch order.  My gut is they are going to want to get

*United States District Court*

1  done tomorrow.  They're going to have a good chunk of the day

2  to deliberate.  But in the event that they don't, I do have a

3  6:00 p.m. commitment tomorrow.  So I'm not going to be able to

4  let them stay real late.  Okay?

5          You all should stick around once we get the case to

6  them.  I prefer not to have you -- I mean, you don't have to be

7  in here necessarily.  I don't think we have anything in here

8  tomorrow.  No, we don't.  We have some things -- we have a

9  hearing here Thursday morning, but hopefully we'll be clear by

10 then.

11         The other thing is assuming if -- if we do get a

12 verdict tomorrow, I'm going to want you all to take the

13 exhibits, all right?  We're not going to hang on to them,

14 right?

15         So, A, don't run out after the verdict and, B, talk

16 amongst yourselves about who's going to keep them and hang on

17 to them so that we can hand them back to them.  I know that

18 there is still, I think, one.  I think it was only one document

19 where there was an objection with respect to the punitives

20 proceeding, as I recall; is that right?

21         MR. CARSON:  I can't remember.

22         THE COURT:  I think there was a question -- or maybe

23 it was an in limine motion.  I don't remember which it was.  I

24 thought there was a question about using Akamai's finances.

25         MR. CAVALIER:  Certainly, our position is that that's

*United States District Court*

1    not relevant until and unless they find punitives.

2          THE COURT:  Well, it's not.  It hasn't gone in.  I

3    understand that.

4          The question is -- what I would like to do, just

5    refresh yourselves on it overnight.  When the jury goes out,

6    I'd like to resolve it, rather than scramble to resolve it if

7    they come back with a punitives finding and then we're going to

8    pivot to that proceeding, right?  I'd like to know the answer

9    to that and be ready to go.

10          MR. CARSON:  The question is talking about how much

11    money Akamai is worth, for the punitive question.

12          THE COURT:  Yes, I think I had tabled that question.

13    I don't remember off the top of my head, whether it was in

14    the -- at the final pretrial or whether it was in the in limine

15    motions, but I remember the issue coming up, and I remember my

16    kind of kicking the can down the road.  We wanted to see where

17    we stand.

18          But as I said, just refresh yourselves on it, and

19    let's get it resolved once the jury goes out and starts

20    deliberating so that if they come back and if they say yes to

21    punitives, we can just roll right into punitives.

22          MR. CARSON:  Okay.

23          THE COURT:  Okay?  Was there something else,

24    Mr. Carson?  You looked like you were about to pop up.

25          MR. CARSON:  No, Your Honor.  I was just thinking of

*United States District Court*

1    something.

2         THE COURT:  All right, anything else, Mr. Cavalier?

3         MR. CAVALIER:  No, Your Honor.

4         THE COURT:  All right.  So I'll see you guys here

5    tomorrow at 9:00 and we'll get started promptly.  Thank you,

6    everybody.  Have a good evening.

7         (Matter adjourned at 4:22 p.m.)

8         - - - - - - - - - - - - - - - - -

9

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   */S/ Maureen McHugh, RPR*
     *Official Court Reporter*

14

15   *January 30, 2024*
          *Date*

16

17

18

19

20

21

22

23

24

25

*United States District Court*

**$**

**$1,500** [1] - 97:6
**$120,000.14** [1] - 186:9
**$126,500** [1] - 203:15
**$127,000** [1] - 224:4
**$127,000.14** [1] - 187:16
**$127,200.06** [1] - 186:22
**$127,585.90** [1] - 187:1
**$135,000.06** [1] - 187:7
**$136,784** [1] - 203:15
**$139,725.30** [1] - 187:8
**$142,000** [1] - 225:11
**$142,254** [1] - 203:15
**$162,493** [1] - 203:17
**$168,000** [1] - 225:14
**$168,180** [1] - 203:17
**$185,000** [1] - 203:16
**$187,000** [1] - 225:13
**$187,576** [1] - 203:12
**$193,264** [1] - 203:12
**$217,895** [1] - 203:11
**$250,000** [1] - 225:18
**$284,211** [1] - 203:11
**$326,000** [1] - 202:14
**$329,811** [1] - 203:11
**$56,843** [1] - 203:13
**$7,000** [2] - 64:19, 81:3
**$75,790** [1] - 203:13
**$947,349** [1] - 203:12

**'**

**'19** [2] - 67:15, 187:4
**'Knowledge** [1] - 185:24
**'profit** [1] - 193:22
**'profit-sharing** [1] - 193:22

**/**

**/S** [1] - 276:13

**0**

**0162** [1] - 118:6

**1**

**1** [6] - 70:13, 222:25, 231:10, 235:24, 243:8

**10** [7] - 21:8, 101:3, 101:8, 175:22, 208:25, 223:25, 248:16
**100** [2] - 20:15, 87:1
**1000** [1] - 99:15
**101** [1] - 3:5
**10:49** [1] - 101:7
**10:50** [1] - 101:12
**10th** [1] - 187:7
**11** [5] - 73:12, 78:4, 78:7, 101:4, 186:24
**11413338** [1] - 7:21
**11:09** [1] - 101:12
**11:10** [1] - 101:17
**12** [1] - 187:9
**120,000** [1] - 201:13
**120-something** [1] - 224:13
**129** [1] - 159:1
**12:17** [1] - 153:3
**12:27** [1] - 160:16
**13** [4] - 144:24, 179:22, 180:1, 199:16
**13-year-old** [2] - 146:22, 146:23
**133** [1] - 14:4
**135** [1] - 224:4
**135,000** [1] - 225:7
**1350** [1] - 2:4
**136** [1] - 158:19
**136,784** [1] - 158:12
**139** [1] - 224:5
**139,000** [1] - 225:7
**14** [2] - 30:9, 180:8
**140** [1] - 11:20
**142** [3] - 11:21, 158:20, 224:7
**142,254** [1] - 158:12
**144** [1] - 3:13
**145** [3] - 243:6, 243:7, 243:12
**14th** [1] - 55:25
**15** [12] - 58:20, 73:13, 125:5, 168:14, 180:10, 187:18, 200:2, 200:4, 200:20, 220:10, 220:20, 221:2
**150** [1] - 159:10
**15th** [1] - 55:25
**16** [5] - 13:20, 103:20, 186:16, 186:19, 186:21
**16-year** [1] - 103:24
**1601** [1] - 2:4
**161** [1] - 3:5
**162** [1] - 158:25
**168** [2] - 158:25, 224:7

**16th** [1] - 78:4
**17** [11] - 3:13, 24:8, 24:15, 26:9, 26:11, 30:4, 30:25, 31:10, 144:5, 144:11, 144:14
**171** [1] - 6:23
**175** [1] - 3:6
**178** [1] - 3:7
**18** [5] - 25:2, 37:6, 173:7, 187:23, 214:7
**18-month** [1] - 103:7
**181** [1] - 3:8
**1835** [1] - 1:19
**185** [1] - 158:23
**186** [5] - 6:23, 6:25, 7:2, 7:3, 7:13
**187** [4] - 7:13, 158:24, 224:7
**19** [4] - 70:18, 167:24, 200:10, 200:22
**19102** [1] - 2:5
**19103** [1] - 1:20
**19106** [1] - 1:13
**1995** [1] - 102:10
**1996** [1] - 102:11
**1997** [1] - 206:21
**1:15** [2] - 152:23, 160:9
**1:34** [1] - 160:16
**1:35** [1] - 160:21
**1st** [2] - 44:8

**2**

**2** [6] - 11:20, 61:13, 62:23, 70:13, 192:20, 243:6
**20** [6] - 8:3, 78:23, 187:6, 188:10, 220:11, 245:15
**200** [3] - 68:13, 224:8, 225:17
**2014** [5] - 178:10, 184:25, 185:3, 201:11, 206:22
**2015** [9] - 48:6, 78:4, 78:8, 105:4, 118:18, 178:12, 199:9, 206:21, 206:23
**2016** [17] - 43:3, 43:4, 43:7, 44:8, 44:9, 52:6, 66:23, 76:2, 118:8, 118:13, 118:17, 118:13, 199:11, 199:15, 199:18, 199:23, 207:2
**2017** [11] - 9:18, 19:16, 52:6, 67:13, 186:16,

186:19, 186:21, 199:16, 200:2, 203:15, 212:20
**2018** [21] - 7:17, 7:18, 7:21, 52:6, 58:10, 58:11, 65:12, 67:15, 72:2, 72:10, 77:3, 120:12, 121:9, 124:25, 129:9, 131:15, 195:21, 200:4, 240:18, 241:10, 242:1
**2019** [23] - 63:17, 72:3, 77:3, 80:11, 124:25, 137:5, 137:24, 138:1, 138:11, 158:17, 181:4, 186:24, 187:6, 195:21, 199:9, 200:8, 200:20, 203:15, 203:16, 203:17, 224:22, 224:24, 224:25
**2020** [33] - 48:4, 48:6, 49:14, 76:2, 76:4, 80:11, 80:18, 81:17, 98:23, 137:6, 138:1, 138:7, 138:11, 143:17, 144:24, 178:11, 181:4, 181:10, 184:25, 185:3, 187:7, 194:6, 194:18, 195:24, 200:10, 200:11, 200:20, 203:16, 203:17, 225:6, 229:9
**2020s** [1] - 76:7
**2021** [12] - 98:25, 181:5, 181:9, 195:24, 200:13, 200:22, 228:7, 229:10, 229:12, 230:3, 230:23, 231:2
**2022** [6] - 98:22, 99:2, 214:20, 215:3, 215:6, 215:7
**2023** [5] - 11:20, 12:4, 70:1, 162:3, 167:5
**2024** [2] - 1:13, 276:15
**206** [1] - 3:9
**20th** [1] - 124:24
**21** [3] - 70:18, 167:24, 199:23
**216** [1] - 3:10
**217,000** [1] - 202:15
**219** [1] - 3:10
**22** [3] - 70:19, 180:8, 200:13
**227** [1] - 14:4
**23** [5] - 24:8, 24:15,

31:1, 117:5, 188:22
**23rdrd** [1] - 26:25
**24/7** [2] - 104:12, 107:11
**250** [1] - 68:13
**250,000** [1] - 224:8
**26** [5] - 5:1, 5:3, 6:4, 70:18
**26(a)(1** [2] - 4:21, 9:2
**26(a)(3)(A)(iii** [1] - 30:15
**26(a)(3)(B** [1] - 30:9
**27-plus** [2] - 150:1, 150:4
**29** [1] - 199:15
**2950** [1] - 1:19
**2:22-CV-01618-JDW** [1] - 1:4
**2:52** [1] - 220:25

**3**

**3** [7] - 42:24, 179:22, 180:1, 200:20, 222:25, 225:8
**3,000** [2] - 19:2, 192:4
**3.1** [2] - 78:21, 78:22
**30** [10] - 1:13, 77:19, 109:20, 153:10, 200:8, 221:5, 246:11, 249:15, 250:1, 276:15
**30(b)(6** [1] - 156:22
**30th** [2] - 26:24, 27:3
**31** [5] - 5:14, 8:20, 13:20, 192:2, 201:11
**32** [2] - 73:12, 78:5
**326,000** [1] - 202:13
**33** [1] - 192:8
**36** [1] - 6:14
**37** [3] - 6:14, 7:15, 14:6
**38** [3] - 235:20, 235:21, 235:24
**3:00** [1] - 19:10
**3:45** [1] - 246:19
**3:48** [1] - 250:5
**3d** [1] - 6:23

**4**

**4** [1] - 180:10
**40** [3] - 247:22, 250:1, 256:25
**401K** [8] - 189:4, 189:5, 189:6, 189:14, 191:2, 191:23, 192:6
**402** [1] - 30:18
**403** [1] - 30:18

**40s** [3] - 218:20, 218:24, 223:24
**41** [1] - 3:4
**42** [5] - 24:8, 24:11, 25:12, 147:16
**43** [1] - 16:2
**45** [7] - 153:9, 196:16, 247:11, 247:23, 248:18, 248:21, 249:24
**45-minute** [2] - 248:12, 248:15
**45ish** [1] - 209:4
**46ish** [1] - 209:4
**48** [1] - 21:1
**49** [5] - 25:18, 25:19, 25:23, 117:8
**4:00** [1] - 245:15
**4:10** [1] - 246:22
**4:15** [1] - 247:21
**4:19** [1] - 273:19
**4:22** [1] - 276:7

## 5

**5** [4] - 12:4, 184:15, 199:9, 224:4
**50** [9] - 198:12, 203:23, 221:9, 221:11, 221:22, 222:23, 234:8, 244:14, 249:14
**51** [1] - 208:25
**56** [1] - 198:14
**59** [1] - 26:1
**5:00** [1] - 21:8
**5:26** [1] - 37:25
**5:30** [2] - 13:7, 246:24, 247:1

## 6

**6** [2] - 1:6, 70:1
**6/23/2014** [1] - 198:25
**60** [1] - 12:6
**601** [1] - 1:12
**603** [1] - 6:23
**65** [1] - 12:6
**66** [3] - 25:6, 25:7, 25:8
**68,000** [1] - 201:13
**6:00** [1] - 274:3

## 7

**7** [4] - 46:13, 179:22, 180:1, 198:16
**7,000** [2] - 68:17, 68:19
**7-day** [1] - 176:3

**70** [2] - 167:23, 199:2
**70,000** [1] - 201:13
**74** [2] - 173:6, 173:7
**78** [1] - 201:16
**7:14** [1] - 37:24

## 8

**8** [6] - 199:9, 199:11, 199:18, 201:18, 202:10, 230:3
**8/24/17** [1] - 77:24
**8/28/2017** [1] - 198:25
**80** [1] - 202:10
**82** [1] - 202:20
**83** [1] - 203:1
**85,000** [1] - 201:12
**8:30** [1] - 34:11
**8:44** [2] - 1:14, 4:2
**8:50** [1] - 34:10

## 9

**9** [3] - 26:14, 186:13, 200:11
**9/29/2014** [1] - 199:4
**90** [1] - 246:2
**92** [2] - 92:14, 92:17
**9:00** [3] - 273:17, 273:21, 276:5
**9:30** [1] - 34:6
**9:33** [1] - 40:6

## A

**A's** [1] - 6:8
**a)(3** [2] - 4:21, 9:3
**a.m** [8] - 1:14, 4:2, 40:6, 101:7, 101:12, 101:17, 273:17
**abilities** [4] - 118:23, 123:13, 130:16, 130:19
**ability** [8] - 5:11, 14:8, 15:9, 15:12, 33:7, 123:18, 241:2, 255:15
**able** [20] - 22:3, 25:12, 32:25, 56:14, 105:5, 105:9, 110:12, 111:9, 123:22, 124:3, 127:24, 132:5, 133:13, 159:5, 161:7, 186:3, 210:2, 251:9, 273:13, 274:3
**above-entitled** [1] - 276:11
**Absecon** [2] - 210:6, 213:1
**absolutely** [21] - 8:14,

21:2, 28:10, 37:21, 71:22, 82:7, 83:14, 97:12, 112:18, 119:13, 123:15, 130:17, 130:20, 134:13, 136:20, 138:15, 140:24, 166:23, 222:15, 235:1, 238:23
**abundance** [1] - 24:1
**abusive** [6] - 260:17, 260:22, 261:9, 261:14, 262:9, 262:10
**accept** [4] - 145:14, 233:10, 252:25, 256:12
**accepted** [2] - 27:21, 149:1
**accepting** [1] - 177:10
**accepts** [1] - 240:5
**Access** [19] - 43:10, 43:11, 43:12, 43:14, 43:15, 44:22, 45:2, 45:4, 103:14, 103:20, 104:2, 104:4, 104:21, 105:6, 105:14, 122:9, 122:11, 123:14, 123:18
**access** [1] - 241:2
**according** [7] - 87:2, 195:5, 202:12, 223:25, 236:6, 239:25, 242:22
**account** [4] - 28:21, 182:16, 191:2, 191:3
**accounting** [2] - 178:14, 178:15
**accuracy** [1] - 269:24
**accurate** [3] - 148:12, 159:8, 192:25
**accusations** [1] - 174:3
**accuse** [1] - 172:19
**accused** [4] - 24:19, 31:21, 151:12, 174:10
**accusing** [1] - 174:7
**acquired** [2] - 41:10
**acquisition** [5] - 41:8, 42:6, 202:19, 203:10, 214:13
**across-the-board** [1] - 225:8
**Act** [1] - 256:15
**act** [10] - 229:2, 229:7, 229:16, 233:21, 233:23, 268:7, 268:18, 269:12,

270:22, 272:23
**acted** [5] - 258:8, 258:11, 259:1, 270:14, 272:21
**acting** [1] - 264:18
**ACTION** [1] - 1:3
**action** [8] - 143:3, 152:15, 183:2, 263:25, 264:11, 265:17, 270:16, 270:19
**actions** [3] - 259:15, 267:21, 267:25
**active** [2] - 192:23, 199:6
**actively** [1] - 27:10
**activist** [2] - 241:13
**activities** [5] - 116:18, 117:1, 140:2, 168:17, 168:22
**activity** [11] - 241:11, 241:24, 242:6, 263:15, 263:21, 264:8, 265:8, 265:10, 265:13, 265:23, 266:2
**acts** [7] - 267:15, 267:16, 267:19, 268:3, 268:4, 269:10, 270:5
**actual** [3] - 242:4, 243:13, 271:16
**ad** [1] - 108:23
**Adam** [6] - 81:23, 198:7, 200:12, 202:12, 202:14, 203:11
**add** [4] - 11:25, 12:23, 242:2, 244:7
**added** [3] - 32:16, 48:9, 191:2
**addition** [5] - 180:17, 187:20, 188:6, 190:21, 242:1
**additional** [4] - 29:15, 271:11, 271:12, 271:14
**address** [1] - 257:8
**addresses** [1] - 111:9
**adduced** [1] - 229:12
**ADEA** [14] - 222:1, 223:2, 256:16, 256:24, 264:21, 264:25, 265:4, 266:8, 266:20, 266:22, 266:25, 271:16, 272:11, 272:16
**adequate** [1] - 19:19
**adjourned** [1] - 276:7

**adjusted** [1] - 187:8
**administrative** [1] - 240:8
**administrator** [3] - 191:15, 197:18
**admissibility** [2] - 30:14, 33:9
**admissible** [1] - 33:15
**admission** [3] - 14:19, 32:2, 153:23
**admissions** [1] - 244:17
**admit** [2] - 144:11, 154:16
**admitted** [10] - 14:8, 100:16, 117:6, 144:6, 166:23, 228:11, 228:12, 231:15, 238:4, 253:5
**admitting** [2] - 234:4, 258:14
**adopting** [1] - 270:25
**advance** [1] - 57:4
**advanced** [1] - 170:13
**advancement** [3] - 58:5, 59:18, 80:23
**advantage** [1] - 188:4
**adverse** [4] - 263:25, 264:11, 265:7, 265:17
**advice** [1] - 45:11
**affect** [1] - 263:10
**affecting** [1] - 60:8
**affiliation** [1] - 258:23
**AFFIRMED** [3] - 40:18, 177:25, 205:6
**after..** [1] - 165:8
**afternoon** [7] - 178:7, 184:17, 205:12, 206:6, 220:7, 246:17, 247:12
**Age** [1] - 256:15
**age** [61] - 10:25, 11:2, 60:8, 61:23, 61:25, 62:3, 62:9, 74:24, 75:6, 75:8, 75:10, 120:15, 120:22, 121:2, 121:5, 123:6, 128:16, 132:8, 132:14, 137:7, 143:9, 146:22, 152:16, 175:9, 177:9, 209:5, 210:13, 210:23, 211:7, 211:11, 212:12, 212:14, 215:21, 238:13, 240:14, 240:20, 251:16, 256:24, 256:25, 257:16,

257:25, 258:6, 258:10, 258:19, 259:9, 259:24, 260:1, 260:6, 260:25, 261:3, 261:5, 262:20, 262:21, 262:23, 263:5, 263:12, 263:17, 264:6, 264:9, 264:20, 264:25

**age-based** [4] - 240:14, 257:25, 264:9, 264:25

**age-related** [1] - 10:25

**ageism** [2] - 242:24, 243:13

**ageist** [1] - 215:12

**ago** [10] - 12:15, 20:24, 46:15, 70:2, 70:3, 73:20, 78:19, 165:9, 165:17, 171:16

**agree** [26] - 14:13, 21:16, 22:10, 36:13, 47:19, 50:5, 50:6, 50:9, 50:11, 50:21, 54:8, 67:11, 71:17, 71:19, 95:20, 96:19, 118:24, 119:12, 119:18, 119:25, 131:11, 131:12, 159:18, 217:10, 217:12, 227:13

**agreed** [5] - 124:25, 154:20, 158:2, 237:12, 252:24

**agreeing** [1] - 93:6

**agreement** [3] - 14:2, 154:8, 156:3

**agrees** [1] - 238:10

**ahead** [16] - 7:15, 12:7, 13:1, 40:24, 86:4, 121:24, 147:1, 175:1, 184:13, 192:2, 192:8, 199:2, 203:1, 219:5, 221:6, 232:2

**aided** [1] - 1:24

**air** [1] - 125:19

**Akamai** [24] - 19:3, 41:6, 41:7, 41:8, 41:10, 41:12, 41:20, 41:21, 41:22, 42:19, 158:4, 158:5, 159:4, 198:17, 198:19, 199:12, 199:19, 199:24, 200:5, 212:15, 214:9, 214:16, 275:11

**Akamai's** [1] - 274:24

**Akamais** [1] - 134:3

**Aker** [1] - 59:12

**akin** [1] - 159:23

**alerting** [1] - 144:21

**Alex** [7] - 55:8, 196:24, 197:2, 198:25, 201:12, 208:6, 209:25

**allegation** [1] - 174:5

**allegations** [1] - 251:21

**alleged** [5] - 225:22, 251:18, 263:8, 264:4, 264:15

**allegedly** [2] - 268:18, 269:12

**alleges** [1] - 257:9

**allergies** [1] - 20:18

**allocated** [1] - 191:23

**allocation** [2] - 190:25, 193:24

**allow** [8] - 18:1, 18:11, 20:6, 23:4, 30:3, 74:15, 75:23, 204:6

**allowed** [4] - 10:20, 19:18, 113:6, 155:9

**allowing** [4] - 14:9, 16:18, 19:21, 23:2

**allows** [2] - 266:21, 266:23

**alluded** [2] - 105:3, 110:9

**alluding** [1] - 232:2

**almost** [4] - 26:14, 56:10, 60:11, 109:5

**alone** [2] - 113:25, 235:3

**ALSO** [1] - 2:10

**alternative** [1] - 247:20

**alternatively** [1] - 245:10

**altogether** [1] - 28:25

**Alyssa** [4] - 140:21, 141:1, 141:7, 141:12

**amend** [1] - 12:22

**American** [3] - 206:20, 213:21, 213:22

**amount** [19] - 21:19, 66:3, 156:19, 158:13, 158:15, 158:18, 189:16, 195:1, 195:11, 236:16, 249:25, 262:15, 267:6, 268:10, 269:1, 269:17, 269:22, 271:12, 271:17

**amounting** [1] -

262:12

**amounts** [10] - 7:14, 154:6, 154:9, 154:10, 154:17, 154:18, 154:22, 155:8, 222:16, 262:7

**ample** [1] - 245:8

**analogies** [1] - 126:2

**analogy** [1] - 159:22

**analysis** [1] - 204:12

**Andrew** [12] - 55:5, 158:11, 158:17, 197:5, 197:7, 199:3, 201:13, 203:12, 203:15, 208:5, 209:25, 225:10

**anguish** [1] - 268:16

**anniversary** [1] - 189:13

**announced** [5] - 63:18, 72:11, 76:21, 224:22, 224:24

**announcement** [1] - 76:23

**annual** [7] - 52:7, 118:8, 186:10, 186:11, 190:25, 191:16, 191:17

**anonymous** [5] - 27:12, 161:4, 161:8, 161:11, 161:24

**ANSWER** [9] - 11:7, 11:9, 11:11, 73:24, 74:1, 74:7, 168:2, 168:18, 168:21

**answer** [33] - 12:25, 13:2, 57:22, 61:15, 76:1, 83:5, 85:23, 89:7, 89:9, 89:19, 89:20, 96:11, 98:12, 100:20, 126:25, 127:11, 163:25, 165:12, 166:3, 166:5, 166:6, 170:8, 172:11, 174:9, 201:17, 203:1, 210:16, 228:19, 238:5, 246:7, 254:5, 272:13, 275:8

**answered** [6] - 68:20, 70:4, 161:9, 177:2, 237:18, 244:1

**answering** [2] - 165:15, 167:13

**answers** [1] - 157:24

**antagonism** [1] - 265:21

**ANTHONY** [3] - 3:9, 205:5, 205:10

**Anthony** [1] - 205:9

**anticipated** [1] - 250:22

**anxious** [2] - 246:18, 250:21

**anyway** [3] - 38:17, 130:7, 270:18

**apart** [1] - 67:16

**apologies** [2] - 35:9, 214:12

**apologize** [2] - 208:23, 250:21

**apparates(PH)** [1] - 214:11

**appear** [4] - 9:13, 18:15, 61:4, 97:9

**appeared** [3] - 61:8, 61:9, 170:22

**appearing** [3] - 16:6, 173:14, 184:20

**applicable** [2] - 191:18, 272:22

**application** [2] - 10:17, 53:18

**applied** [2] - 10:23, 63:19

**applies** [1] - 252:17

**apply** [8] - 72:22, 72:23, 105:14, 113:10, 129:16, 252:18, 271:22, 273:9

**appreciate** [3] - 203:19, 219:24, 243:1

**approach** [3] - 9:11, 179:19, 203:7

**appropriate** [3] - 17:19, 256:11, 271:10

**approximate** [1] - 249:19

**April** [4] - 44:8, 195:17, 195:18, 229:21

**architect** [5] - 56:15, 126:17, 206:15, 206:18, 214:6

**architecture** [3] - 43:17, 103:24, 116:10

**area** [1] - 261:18

**areas** [4] - 56:12, 56:13, 56:18, 56:19

**argue** [2] - 95:14, 99:25, 221:23, 222:21, 222:24

**arguing** [3] - 32:25, 93:11, 94:3

**argument** [11] - 5:5, 26:6, 31:9, 67:18,

67:20, 221:24, 225:2, 226:22, 228:1, 229:5, 239:18

**argumentative** [1] - 83:3

**arguments** [4] - 249:12, 250:12, 251:2, 253:3

**arose** [1] - 120:12

**arranged** [1] - 22:15

**arrangement** [1] - 145:1

**arrangements** [2] - 15:15, 23:16

**arrested** [1] - 84:14

**arrived** [1] - 261:20

**arriving** [1] - 38:18

**article** [54] - 29:6, 29:10, 72:16, 83:1, 83:7, 83:8, 83:13, 83:15, 83:25, 84:2, 84:13, 85:19, 86:8, 86:12, 86:17, 86:25, 87:2, 87:11, 87:14, 89:23, 91:1, 144:21, 145:13, 146:8, 146:20, 147:19, 147:21, 147:25, 148:11, 161:4, 161:12, 161:14, 161:20, 162:17, 162:22, 164:15, 164:24, 165:6, 166:25, 167:6, 167:7, 167:9, 167:11, 167:15, 167:20, 168:15, 169:22, 169:25, 172:19, 175:19, 176:22, 218:11, 218:14

**AS** [4] - 40:18, 177:25, 205:6, 206:24

**Asaro** [22] - 17:3, 35:21, 43:23, 47:17, 52:25, 59:8, 62:17, 63:13, 71:10, 71:14, 73:24, 75:9, 150:7, 150:11, 163:16, 165:6, 175:19, 176:5, 177:1, 237:12, 240:19

**ASARO** [1] - 1:8

**Asaro's** [1] - 75:9

**ascension** [1] - 224:21

**aside** [2] - 159:11, 177:13

**asserted** [1] - 67:3

**assertion** [1] - 31:23

**assessing** [3] - 204:13, 269:25, 272:5
**assessment** [1] - 259:4
**assigned** [3] - 44:13, 44:15, 63:14
**assist** [1] - 213:5
**assisting** [1] - 265:2
**associated** [1] - 198:22
**association** [1] - 239:9
**assume** [7] - 21:7, 61:21, 123:10, 166:22, 169:5, 173:9, 199:19
**assumed** [1] - 137:3
**assuming** [6] - 25:24, 136:16, 187:11, 247:21, 267:23, 274:11
**assumption** [2] - 5:17, 180:13
**asterisk** [1] - 190:1
**attached** [7] - 26:2, 26:10, 26:12, 26:17, 153:23, 154:1
**attachment** [2] - 155:12, 155:15
**attack** [1] - 48:23
**attacked** [1] - 105:4
**attacker** [1] - 105:8
**attacks** [4] - 56:15, 56:17, 110:10, 111:5
**attempt** [3] - 234:11, 270:25, 271:6
**attend** [5] - 171:20, 171:22, 171:25, 173:9, 174:1
**attended** [2] - 136:21, 173:25
**attention** [5] - 70:17, 128:6, 141:15, 168:13, 184:6
**attest** [1] - 23:11
**attorney** [3] - 270:3, 272:5, 272:6
**attorneys** [2] - 165:11, 250:11
**attorneys'** [3] - 269:25, 270:1, 272:8
**attract** [1] - 109:3
**August** [16] - 48:4, 78:4, 78:7, 80:11, 98:22, 98:25, 99:2, 99:4, 137:5, 138:1, 138:11, 143:16, 144:24, 199:18, 200:20, 229:9

**Australia** [2] - 48:12, 48:13
**authentic** [1] - 167:15
**authenticate** [1] - 36:8
**authenticity** [2] - 147:24, 148:9
**Authority** [1] - 7:16
**authority** [2] - 71:10, 71:15
**authorized** [1] - 182:22
**Automotive** [1] - 102:22
**available** [5] - 22:21, 203:24, 266:19, 266:24, 266:25
**avenues** [1] - 75:18
**avoid** [3] - 18:11, 237:13, 238:15
**award** [22] - 266:17, 267:6, 267:9, 267:10, 268:11, 268:12, 268:14, 268:15, 268:23, 269:1, 269:8, 269:10, 270:8, 270:9, 270:11, 270:23, 271:3, 271:7, 271:8, 271:16, 271:24, 272:4
**awarded** [1] - 268:22
**awarding** [1] - 268:25
**awards** [2] - 238:20, 266:19
**aware** [12] - 10:22, 109:10, 167:25, 168:19, 170:5, 179:8, 181:19, 208:2, 209:9, 211:8, 214:8, 265:18

---

## B

**back-and-forth** [1] - 50:20
**back-up** [1] - 67:5
**background** [4] - 88:24, 102:4, 206:10, 210:19
**backpay** [7] - 266:23, 269:5, 269:6, 271:21, 271:24, 271:25, 272:4
**bad** [8] - 12:19, 14:11, 15:18, 15:19, 15:22, 151:17, 169:25, 174:15
**baggage** [1] - 27:5
**baked** [1] - 135:8

**balance** [3] - 19:21, 191:3, 252:4
**ball** [1] - 130:4
**ballpark** [2] - 68:12, 153:6
**bargained** [1] - 131:7
**base** [14] - 64:3, 66:17, 68:7, 68:11, 186:12, 186:15, 186:18, 187:20, 189:20, 189:21, 189:22, 191:10, 196:11, 196:14
**baseball** [1] - 97:9
**based** [49] - 11:10, 14:20, 15:23, 18:25, 20:17, 21:25, 34:13, 41:19, 79:3, 108:24, 108:25, 118:2, 120:15, 120:19, 121:2, 121:5, 195:10, 195:20, 196:11, 210:13, 215:18, 215:21, 222:19, 224:16, 226:11, 235:7, 237:19, 238:13, 240:13, 240:14, 240:15, 243:16, 244:16, 244:17, 250:2, 253:8, 256:21, 257:17, 257:25, 260:7, 260:25, 262:20, 262:21, 263:22, 264:9, 264:24, 264:25, 268:14
**basis** [31] - 24:20, 28:8, 28:19, 31:23, 31:24, 33:3, 52:7, 190:12, 192:11, 210:22, 211:11, 217:5, 222:18, 223:5, 225:22, 225:23, 226:8, 227:24, 240:9, 257:15, 258:9, 258:10, 258:18, 260:10, 261:3, 263:17, 263:18, 263:23, 264:5, 264:20
**bat** [1] - 10:14
**bean** [1] - 142:23
**bear** [2] - 111:22, 255:24
**bearing** [1] - 176:10
**became** [11] - 64:4, 64:25, 68:4, 68:8, 81:1, 105:20, 107:9,

107:12, 128:2, 158:10, 265:18
**become** [5] - 19:11, 21:13, 65:10, 88:20, 125:22
**becomes** [1] - 14:18
**becoming** [1] - 66:9
**bed** [1] - 20:16
**BEEN** [3] - 40:17, 177:24, 205:5
**began** [5] - 43:4, 43:13, 44:16, 45:7, 46:5
**begged** [1] - 20:1
**beginning** [13] - 23:8, 47:18, 48:1, 54:15, 55:20, 72:2, 106:16, 131:17, 149:12, 149:24, 162:18, 193:19, 207:18
**behalf** [4] - 97:25, 185:20, 193:24, 227:5
**behave** [2] - 77:9, 78:15
**behavior** [4] - 146:13, 162:25, 263:8, 263:9
**behind** [2] - 123:22, 204:22
**belabor** [2] - 118:21, 221:20
**belief** [3] - 159:12, 255:12, 264:18
**believability** [2] - 204:13, 255:24
**believable** [1] - 256:2
**below** [2] - 107:24, 225:14
**bench** [1] - 6:17
**benefit** [7] - 187:25, 188:25, 189:4, 189:24, 190:11, 196:7, 244:9
**benefits** [20] - 64:3, 103:2, 185:25, 187:21, 188:4, 188:16, 188:18, 188:19, 191:14, 196:2, 196:5, 196:6, 196:7, 196:13, 231:23, 271:18, 271:19, 272:3, 272:4, 272:11
**Benjamin** [3] - 197:22, 200:1, 203:12
**best** [13] - 5:8, 49:22, 102:19, 110:22, 111:12, 111:14, 127:1, 127:6, 130:3, 132:2, 133:11,

140:23, 155:13
**better** [8] - 38:2, 39:16, 88:20, 95:12, 108:2, 151:11, 159:17, 165:16
**between** [32] - 20:14, 34:25, 44:9, 48:6, 58:23, 59:4, 59:7, 59:10, 59:14, 63:12, 68:12, 80:11, 87:9, 89:11, 120:10, 128:13, 132:21, 135:19, 144:17, 150:23, 178:10, 184:25, 190:15, 196:10, 225:17, 231:17, 241:15, 241:25, 264:2, 264:13, 265:12, 268:7
**beyond** [7] - 10:3, 32:1, 107:14, 231:22, 239:14, 239:22, 252:16
**Beyond** [1] - 35:4
**bias** [2] - 255:19, 256:13
**big** [7] - 60:12, 60:13, 62:8, 68:14, 136:18, 142:8, 143:11
**biggest** [2] - 43:14, 104:1
**bigot** [1] - 152:14
**Bill** [1] - 200:21
**bit** [16] - 44:18, 61:2, 82:8, 104:18, 108:21, 112:7, 113:16, 145:7, 149:12, 149:23, 152:21, 190:1, 206:9, 217:16, 220:18, 236:20
**blanket** [2] - 71:9, 71:15
**blew** [2] - 84:19, 141:10
**blocking** [2] - 105:8, 204:22
**blueprint** [1] - 105:14
**blur** [1] - 21:3
**board** [3] - 55:18, 189:9, 225:8
**body** [2] - 6:11, 111:10
**boggled** [1] - 29:24
**bonus** [29] - 41:24, 42:1, 42:19, 158:3, 158:4, 158:5, 191:11, 198:24, 202:13, 214:13,

214:14, 214:19, 214:21, 215:1, 215:2, 218:1, 222:12, 222:16, 223:2, 226:20, 228:2, 228:6, 251:20, 257:11, 257:22, 258:5, 272:19

**bonuses** [19] - 41:17, 41:19, 41:20, 41:22, 42:25, 43:2, 155:8, 157:9, 157:12, 159:4, 186:12, 198:20, 198:22, 198:23, 202:16, 202:19, 203:10, 214:20

**book** [1] - 77:21

**books** [2] - 79:10, 178:15

**booths** [1] - 81:15

**boring** [1] - 103:11

**boss** [1] - 67:10

**boss's** [1] - 73:22

**bother** [1] - 89:3

**bottom** [3] - 78:7, 187:18, 202:20

**bought** [2] - 104:4, 214:16

**bounce** [1] - 80:3

**boxes** [1] - 124:6

**branch** [1] - 226:7

**bread** [1] - 146:4

**break** [11] - 21:6, 88:10, 101:3, 152:20, 220:7, 220:10, 247:16, 250:16, 250:20, 273:4

**bridge** [1] - 139:17

**brief** [6] - 6:18, 182:9, 213:20, 219:4, 251:3, 271:13

**Brief** [3] - 58:18, 101:12, 221:3

**briefly** [15] - 21:9, 61:25, 62:1, 67:7, 106:24, 123:16, 135:18, 174:25, 182:7, 225:20, 234:19, 235:1, 239:1, 242:3, 244:12

**bring** [16] - 27:24, 34:3, 35:8, 44:4, 58:9, 58:13, 82:2, 90:18, 93:16, 132:21, 160:19, 246:21, 247:20, 249:1, 249:11,

249:18

**bringing** [5] - 19:5, 54:1, 267:17, 267:20, 268:1

**brings** [1] - 266:4

**Brittany** [7] - 143:21, 144:17, 145:9, 147:18, 147:19, 161:12, 169:23

**broad** [1] - 245:25

**broaden** [1] - 107:14

**brought** [7] - 44:1, 48:20, 50:19, 122:14, 129:20, 136:2, 139:9

**browser** [1] - 53:19

**brunt** [1] - 100:9

**budget** [3] - 69:11, 71:17, 139:16

**Buenzle** [1] - 2:13

**Buick** [1] - 85:25

**build** [4] - 56:24, 106:17, 106:20, 139:13

**building** [4] - 47:12, 48:18, 57:15, 109:7

**built** [2] - 48:5, 209:19

**bulb** [1] - 173:20

**bulge** [1] - 16:16

**bull** [1] - 57:1

**bump** [1] - 225:7

**bump-up** [1] - 225:7

**bumped** [2] - 224:4, 224:5

**bunch** [4] - 59:12, 99:19, 153:15, 156:16

**burden** [6] - 243:19, 251:23, 252:6, 267:13, 269:21, 272:14

**burn** [1] - 114:25

**business** [7] - 43:12, 47:18, 81:14, 111:5, 170:23, 259:16, 259:18

**busted** [1] - 177:6

**busy** [2] - 37:10, 37:12

**but..** [1] - 91:21

**buy** [1] - 142:9

**BY** [100] - 1:19, 2:3, 3:4, 3:5, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:10, 41:2, 42:4, 42:22, 58:19, 62:20, 64:1, 67:24, 69:1, 70:16, 71:5, 74:16, 76:16, 77:20, 78:25, 83:10, 86:5, 89:8, 89:24, 94:1, 98:15,

101:22, 117:9, 121:25, 127:10, 130:14, 131:1, 140:25, 141:17, 142:6, 144:7, 144:15, 147:4, 147:14, 148:10, 152:2, 152:7, 161:2, 161:18, 163:12, 164:1, 164:7, 164:19, 165:4, 165:23, 166:9, 166:18, 170:9, 173:23, 174:14, 175:4, 175:14, 176:12, 176:16, 176:20, 178:6, 179:21, 181:17, 181:23, 184:16, 185:18, 186:6, 186:14, 186:20, 187:3, 187:10, 187:19, 187:24, 188:11, 188:15, 188:23, 192:3, 192:13, 196:22, 198:15, 199:5, 201:24, 202:11, 202:21, 206:5, 209:10, 210:17, 211:19, 212:8, 215:5, 215:16, 216:12, 216:20, 219:7, 219:19

**Byrne** [1] - 1:12

## C

**C-O-N-W-A-Y** [1] - 205:11

**cake** [1] - 135:8

**calculate** [1] - 191:13

**calculated** [1] - 222:17

**calculation** [2] - 270:4, 272:9

**calculations** [3] - 191:16, 195:5, 236:6

**calendar** [4] - 118:18, 176:3, 195:16, 201:9

**California** [4] - 10:3, 16:11, 16:13, 114:21

**calm** [1] - 219:11

**cancer** [2] - 20:12, 20:18

**candidates** [1] - 241:22

**cannot** [5] - 78:19, 174:5, 208:5, 259:16, 270:23

**canvassing** [1] -

72:16

**captured** [1] - 201:7

**capturing** [1] - 184:5

**car** [3] - 85:25, 86:2, 146:10

**card** [2] - 47:22, 182:15

**cards** [1] - 182:14

**care** [19] - 24:6, 29:9, 55:15, 85:15, 85:16, 88:2, 89:5, 116:15, 147:2, 147:6, 149:2, 149:4, 159:13, 171:14, 176:6, 176:13, 176:21, 176:25, 182:1

**cared** [1] - 177:4

**career** [14] - 73:2, 73:4, 75:18, 76:5, 76:15, 79:12, 80:23, 102:18, 102:21, 122:5, 126:2, 134:7, 135:7, 240:22

**careers** [1] - 54:12

**Carl** [174] - 31:5, 43:24, 44:5, 44:15, 44:20, 44:25, 45:4, 45:8, 45:17, 45:20, 47:5, 49:1, 49:4, 49:7, 49:9, 49:14, 50:21, 50:24, 51:5, 51:7, 51:13, 51:17, 52:2, 52:5, 52:14, 54:9, 55:3, 55:10, 55:21, 56:21, 57:3, 57:17, 58:23, 59:4, 59:7, 59:10, 59:11, 59:15, 60:20, 62:25, 63:13, 66:8, 73:6, 74:1, 79:16, 80:10, 80:21, 82:1, 82:23, 83:9, 83:24, 84:13, 84:15, 85:7, 85:24, 86:11, 87:5, 87:9, 87:15, 87:25, 88:6, 88:21, 88:23, 89:15, 89:22, 90:6, 90:8, 90:15, 90:24, 91:1, 91:10, 92:19, 93:1, 93:11, 94:3, 94:10, 94:12, 94:24, 95:8, 96:6, 96:14, 97:1, 98:22, 99:14, 99:17, 99:19, 100:1, 100:7, 100:10, 100:11, 105:15, 110:3, 110:6, 112:13, 119:7, 122:21, 123:3, 125:20, 125:25, 129:14,

**CARL** [1] - 1:3

**Carl's** [15] - 44:3, 45:14, 52:17, 55:19, 82:18, 111:8, 118:23, 119:14, 123:20, 125:11, 151:19, 167:19, 182:16, 196:19, 201:10

**carried** [1] - 85:17

**carries** [1] - 136:12

**carry** [3] - 84:20, 136:7, 146:14

**carrying** [1] - 255:1

**cars** [1] - 102:21

**CARSON** [293] - 1:19, 3:4, 3:5, 3:7, 3:10, 4:16, 7:4, 7:8, 8:9, 9:4, 9:7, 9:12, 9:16, 11:25, 12:8, 13:7, 13:17, 16:6, 16:12, 16:17, 17:16, 17:20, 20:21, 20:24, 22:5, 24:3, 25:10, 25:20, 26:12, 26:17, 26:21, 26:24, 27:2, 27:7, 27:10, 27:18, 28:9,

129:17, 129:18, 129:24, 132:3, 132:4, 133:6, 136:2, 139:3, 141:10, 142:8, 142:11, 142:13, 142:24, 143:24, 144:21, 146:9, 146:13, 148:6, 148:17, 149:1, 149:3, 149:13, 150:8, 152:11, 162:18, 162:22, 163:18, 164:9, 171:19, 172:9, 174:12, 175:8, 177:4, 178:16, 178:22, 180:12, 181:24, 182:14, 185:24, 186:1, 186:2, 187:25, 188:4, 189:24, 190:18, 191:5, 191:22, 196:2, 201:13, 201:21, 209:25, 211:13, 211:15, 212:5, 216:21, 216:24, 217:1, 217:4, 217:8, 228:11, 231:4, 241:4, 241:5, 241:8, 241:12, 241:13, 241:15, 241:16, 251:14

31:24, 32:9, 34:1,
34:19, 34:22, 35:3,
35:13, 35:18, 35:24,
36:7, 36:12, 36:17,
36:23, 36:25, 37:3,
37:5, 37:11, 37:15,
37:21, 38:12, 38:19,
38:22, 39:1, 39:7,
39:13, 39:24, 40:1,
40:3, 40:13, 40:25,
41:2, 42:4, 42:22,
58:19, 62:20, 64:1,
64:8, 64:11, 65:3,
65:15, 66:13, 66:20,
66:23, 67:5, 67:24,
69:1, 70:9, 70:13,
70:16, 70:25, 71:2,
71:5, 74:16, 76:16,
77:17, 77:20, 78:23,
78:25, 83:10, 86:5,
89:8, 89:24, 93:23,
94:1, 98:13, 98:15,
101:1, 121:21,
127:8, 130:9,
130:14, 130:24,
135:22, 140:11,
141:4, 141:24,
144:12, 146:24,
147:10, 147:12,
148:2, 151:24,
152:4, 152:20,
153:8, 153:15,
153:19, 154:5,
154:15, 155:2,
155:25, 156:24,
157:2, 157:10,
157:20, 158:6,
158:11, 158:15,
160:7, 160:11,
160:25, 161:2,
161:18, 163:12,
164:1, 164:7,
164:19, 165:4,
165:23, 166:9,
166:18, 170:9,
173:23, 174:14,
174:24, 175:11,
176:8, 176:15,
177:2, 177:17,
177:20, 178:6,
179:19, 179:21,
181:12, 181:21,
183:8, 183:11,
183:13, 183:15,
184:12, 184:14,
184:16, 185:14,
185:17, 185:18,
186:5, 186:6,
186:13, 186:14,
186:17, 186:20,
187:2, 187:3, 187:9,

187:10, 187:18,
187:19, 187:23,
187:24, 188:10,
188:11, 188:14,
188:15, 188:17,
188:22, 188:23,
192:2, 192:3, 192:8,
192:13, 196:16,
196:22, 198:11,
198:15, 199:1,
199:5, 201:14,
201:19, 201:24,
202:8, 202:11,
202:20, 202:21,
203:1, 203:5,
203:18, 203:20,
209:7, 210:14,
211:17, 212:2,
212:6, 214:22,
214:24, 215:13,
216:5, 216:7, 216:9,
216:12, 216:20,
219:2, 220:5,
220:22, 221:7,
223:16, 223:19,
223:22, 224:16,
224:22, 224:24,
225:3, 225:5,
226:14, 226:24,
227:19, 228:8,
228:24, 229:6,
229:11, 229:16,
229:25, 230:2,
230:6, 230:13,
230:15, 231:3,
231:8, 231:11,
231:24, 232:5,
232:10, 232:17,
233:2, 233:11,
233:24, 234:9,
235:5, 235:12,
235:15, 235:19,
235:22, 235:25,
236:10, 236:18,
237:6, 240:16,
242:19, 243:10,
244:15, 245:18,
245:23, 246:6,
246:13, 247:5,
247:25, 248:7,
248:14, 248:17,
248:23, 249:9,
249:15, 274:21,
275:10, 275:22,
275:25
**Carson** [74] - 4:15,
7:11, 8:8, 12:3, 12:7,
15:2, 15:3, 16:4,
17:4, 20:23, 22:10,
23:24, 23:25, 24:12,
24:18, 26:10, 29:14,

33:19, 33:25, 34:12,
35:10, 39:17, 39:22,
40:11, 40:24, 66:11,
85:22, 89:6, 93:21,
98:11, 107:22,
113:12, 125:6,
132:6, 138:25,
152:19, 154:23,
155:11, 155:21,
156:18, 157:19,
159:16, 159:24,
160:24, 164:4,
173:16, 173:18,
174:8, 177:16,
177:19, 183:10,
183:25, 216:4,
216:18, 218:25,
220:4, 223:10,
223:12, 224:11,
226:20, 228:20,
231:16, 234:7,
234:24, 236:25,
237:5, 239:25,
240:12, 244:12,
246:4, 247:18,
248:11, 249:8,
275:24
**Carson's** [4] - 14:19,
14:22, 26:2, 240:4
**cartoon** [1] - 173:20
**case** [105] - 4:23, 5:9,
5:12, 5:14, 6:4, 6:12,
7:4, 7:5, 7:8, 7:10,
7:17, 8:16, 8:22,
9:19, 9:20, 10:4,
10:7, 10:14, 10:19,
12:17, 14:4, 14:10,
15:15, 16:22, 17:23,
18:12, 19:8, 19:13,
22:5, 22:6, 22:12,
22:19, 27:25, 28:5,
34:16, 36:9, 46:15,
47:17, 54:9, 58:12,
95:17, 97:19, 145:5,
151:10, 153:24,
157:2, 157:20,
161:14, 162:15,
163:8, 172:7, 174:4,
174:18, 175:7,
180:17, 180:22,
183:11, 183:22,
201:1, 220:14,
220:19, 221:12,
221:15, 222:13,
223:2, 226:25,
230:5, 231:12,
231:22, 231:23,
234:21, 237:7,
237:8, 238:4, 238:7,
238:10, 238:18,
238:22, 239:5,

242:15, 245:16,
247:3, 250:10,
250:19, 250:20,
251:4, 251:14,
251:23, 252:12,
253:4, 253:7,
255:19, 256:11,
257:8, 258:17,
259:1, 259:3,
264:24, 264:25,
270:1, 270:12,
271:9, 272:6,
273:12, 274:5
**cases** [12] - 4:25, 6:7,
6:13, 6:17, 8:5,
14:11, 22:14, 23:3,
24:18, 183:22,
252:17, 252:18
**catalyst** [2] - 105:11,
171:21
**catch** [1] - 24:7
**categories** [1] -
156:22
**categorize** [1] -
198:21
**category** [1] - 198:16
**Catherine** [2] - 2:14,
183:16
**caught** [4] - 84:8,
87:4, 144:23, 145:25
**causal** [3] - 264:2,
264:13, 265:12
**causation** [2] -
265:19, 265:20
**caused** [2] - 268:3,
268:6
**caution** [2] - 24:1,
273:6
**Cavalier** [24] - 4:20,
9:14, 10:9, 17:10,
18:19, 24:24, 26:13,
29:2, 31:1, 37:19,
65:15, 101:19,
160:2, 160:4,
166:10, 181:14,
206:2, 221:9,
225:19, 234:18,
238:24, 246:9,
248:19, 276:2
**CAVALIER** [182] - 2:3,
3:5, 3:6, 3:8, 3:9,
3:10, 4:13, 4:22,
6:10, 6:22, 7:2, 7:6,
7:9, 7:16, 7:21, 7:23,
8:2, 8:7, 10:12,
11:19, 11:23, 12:1,
12:4, 12:25, 13:2,
13:10, 13:19, 16:3,
18:22, 19:23, 20:1,
20:5, 20:12, 20:17,

21:2, 21:9, 21:16,
23:13, 23:20, 24:4,
24:6, 24:14, 25:4,
25:8, 25:11, 25:15,
25:18, 25:21, 26:4,
29:3, 31:2, 31:4,
31:14, 31:20, 31:25,
33:6, 33:13, 33:17,
33:24, 34:4, 34:10,
34:15, 34:18, 34:21,
34:24, 35:2, 35:4,
35:9, 36:3, 37:22,
37:24, 38:13, 38:25,
39:2, 42:2, 42:20,
62:18, 63:24, 64:5,
65:5, 65:9, 65:11,
67:7, 67:21, 68:24,
70:23, 74:13, 76:11,
83:3, 89:18, 101:20,
101:22, 117:5,
117:8, 117:9,
121:23, 121:25,
127:10, 131:1,
140:25, 141:17,
142:6, 144:5, 144:7,
144:10, 144:15,
147:4, 147:14,
148:10, 152:2,
152:7, 152:18,
153:21, 154:4,
155:10, 155:17,
155:24, 156:25,
159:5, 160:10,
161:16, 163:10,
163:23, 164:17,
165:21, 166:1,
166:16, 174:25,
175:2, 175:4,
175:14, 176:12,
176:16, 176:20,
177:15, 181:15,
181:17, 181:23,
183:6, 203:23,
204:1, 204:24,
206:3, 206:5,
209:10, 210:17,
211:19, 212:8,
215:5, 215:16,
216:3, 219:4, 219:7,
219:16, 219:19,
219:22, 220:3,
221:4, 221:10,
221:16, 221:19,
225:20, 226:18,
234:19, 235:20,
239:1, 242:3,
242:12, 242:21,
243:3, 243:6,
243:22, 246:11,
248:20, 249:3,
249:6, 249:14,

*249*:19, *249*:23, *250*:3, *274*:25, *276*:3
**cavalier** [1] - *165*:24
**Cavalier's** [2] - *30*:7, *101*:4
**caveat** [1] - *91*:19
**census** [6] - *191*:16, *191*:17, *195*:3, *195*:9, *236*:5, *236*:11
**center** [10] - *43*:15, *68*:9, *104*:9, *104*:12, *105*:6, *107*:4, *107*:17, *143*:16, *197*:14, *209*:20
**centers** [4] - *48*:7, *48*:9, *107*:19, *209*:18
**certain** [7] - *39*:18, *182*:8, *182*:14, *196*:13, *253*:15, *254*:9, *266*:21
**certainly** [20] - *12*:11, *15*:11, *17*:23, *25*:12, *29*:13, *32*:2, *77*:3, *153*:23, *213*:15, *230*:15, *230*:17, *231*:12, *233*:13, *234*:16, *240*:4, *245*:7, *246*:14, *250*:25, *274*:25
**certify** [1] - *276*:10
**CFO** [1] - *142*:21
**Chad** [1] - *256*:5
**chain** [1] - *181*:24
**challenge** [3] - *106*:17, *134*:16
**challenged** [1] - *49*:16
**challenges** [1] - *105*:16
**challenging** [1] - *22*:23
**chance** [1] - *243*:16
**change** [8] - *66*:3, *82*:18, *104*:6, *186*:15, *197*:6, *247*:2, *262*:12, *265*:21
**changed** [7] - *52*:22, *63*:6, *82*:7, *172*:18, *186*:23, *187*:6, *240*:24
**changes** [2] - *76*:9, *237*:20
**changing** [1] - *163*:2
**channel** [1] - *141*:11
**characteristic** [1] - *262*:21
**charge** [26] - *69*:12, *131*:6, *213*:15, *229*:17, *229*:20, *229*:23, *230*:2,

*230*:8, *230*:18, *230*:20, *230*:24, *231*:9, *232*:2, *233*:25, *246*:20, *246*:21, *247*:21, *249*:2, *249*:18, *249*:20, *249*:21, *250*:9, *251*:3, *265*:1
**charged** [2] - *148*:4, *246*:21
**charges** [1] - *179*:9
**chat** [1] - *205*:22
**chatty** [1] - *112*:13
**cheat** [1] - *151*:20
**check** [18] - *11*:23, *19*:23, *49*:21, *49*:23, *50*:2, *83*:15, *86*:6, *86*:7, *86*:9, *86*:10, *86*:17, *86*:19, *87*:25, *88*:4, *89*:3, *124*:6, *180*:25, *194*:8
**check-in** [1] - *50*:2
**check-ins** [2] - *49*:21, *49*:23
**checks** [1] - *235*:8
**Cherry** [1] - *2*:4
**chief** [5] - *61*:12, *61*:22, *232*:19, *245*:3
**child** [11] - *84*:9, *85*:9, *86*:21, *87*:5, *87*:8, *89*:21, *144*:23, *146*:1, *148*:5, *177*:7, *177*:8
**children** [2] - *146*:13, *177*:9
**choose** [2] - *25*:12, *62*:15, *146*:6
**choosing** [2] - *38*:23, *84*:19
**chops** [2] - *212*:11, *212*:14
**chose** [2] - *62*:14, *96*:4
**Chris** [1] - *59*:12
**chronological** [1] - *128*:8
**chronologically** [1] - *60*:2
**Chub** [1] - *103*:6
**chunk** [5] - *124*:21, *149*:24, *224*:11, *247*:12, *274*:1
**churches** [2] - *113*:23, *113*:24
**circle** [1] - *26*:9
**circled** [1] - *13*:20
**Circuit** [1] - *22*:18
**circuit** [1] - *159*:20
**circumstances** [14] - *17*:14, *17*:19, *18*:20, *19*:20, *21*:21, *22*:9,

*58*:3, *95*:11, *176*:13, *204*:5, *234*:13, *261*:17, *263*:7, *269*:24
**circumstantial** [4] - *254*:22, *254*:23, *255*:1, *255*:6
**citation** [1] - *12*:2
**cite** [8] - *4*:25, *6*:16, *7*:18, *7*:22, *7*:23, *8*:3, *11*:18
**cited** [1] - *93*:18
**cites** [3] - *10*:15, *11*:20, *184*:11
**cities** [2] - *48*:14, *133*:11
**city** [3] - *116*:3, *116*:8, *133*:13
**City** [2] - *6*:23, *7*:6
**civil** [3] - *251*:14, *252*:18, *258*:12
**CIVIL** [1] - *1*:3
**claim** [21] - *5*:10, *14*:19, *32*:1, *64*:12, *65*:24, *67*:3, *224*:16, *224*:19, *228*:5, *233*:19, *234*:25, *237*:6, *240*:14, *252*:8, *252*:9, *257*:17, *257*:25, *260*:6, *260*:24, *263*:18, *264*:5
**claimed** [1] - *5*:22
**claims** [19] - *221*:22, *239*:18, *240*:11, *251*:14, *251*:21, *252*:1, *256*:14, *257*:1, *257*:2, *257*:12, *260*:4, *263*:14, *266*:5, *266*:6, *266*:8, *266*:10, *266*:14, *270*:5
**clanged** [1] - *141*:7
**class** [4] - *102*:17, *103*:9, *260*:19, *261*:11
**classification** [1] - *196*:6
**classified** [2] - *202*:5, *263*:9
**cleans** [1] - *110*:21
**clear** [22] - *4*:25, *16*:25, *22*:16, *24*:25, *27*:23, *67*:4, *98*:14, *152*:25, *155*:10, *155*:14, *159*:5, *183*:17, *215*:2, *215*:10, *224*:19, *225*:24, *227*:6,

*233*:7, *239*:12, *273*:12, *273*:16, *274*:9
**clearly** [1] - *5*:4
**click** [1] - *93*:15
**clicked** [3] - *141*:10, *141*:11, *146*:7
**client** [42] - *8*:18, *10*:8, *15*:11, *33*:5, *42*:11, *42*:14, *48*:4, *64*:11, *64*:17, *64*:18, *64*:20, *66*:24, *76*:3, *81*:7, *82*:12, *85*:12, *97*:9, *157*:21, *157*:22, *159*:1, *163*:9, *168*:25, *172*:19, *178*:16, *180*:15, *224*:2, *224*:3, *225*:6, *227*:3, *230*:6, *232*:5, *232*:6, *234*:2, *237*:16, *238*:9, *238*:10, *238*:12, *238*:20, *240*:7, *240*:17
**client's** [4] - *157*:3, *170*:14, *179*:8, *241*:2
**clients** [1] - *254*:1
**clock** [6] - *246*:11, *247*:10, *248*:12, *248*:20, *248*:21, *248*:23
**close** [15] - *26*:18, *26*:20, *26*:23, *27*:5, *27*:9, *27*:16, *27*:25, *28*:1, *28*:6, *47*:10, *74*:15, *129*:3, *152*:24, *247*:22, *248*:16
**closely** [2] - *80*:2, *244*:10
**closer** [5] - *70*:6, *162*:5, *162*:8, *162*:11, *193*:19
**closest** [1] - *78*:3
**closing** [10] - *26*:6, *26*:8, *27*:8, *245*:21, *246*:5, *246*:10, *247*:19, *248*:2, *250*:12, *251*:2
**closings** [12] - *245*:17, *247*:1, *247*:16, *247*:17, *248*:15, *249*:4, *250*:17, *251*:12, *273*:2, *273*:5, *273*:7
**cloud** [2] - *43*:19, *109*:8
**cloudy** [1] - *44*:18
**clout** [1] - *136*:12
**clueless** [1] - *206*:25

**code** [1] - *20*:20
**cold** [1] - *18*:10
**collaborate** [8] - *54*:20, *59*:22, *63*:5, *77*:6, *91*:17, *91*:20, *126*:14, *126*:19
**collaborated** [3] - *80*:2, *133*:3, *168*:10
**collaborating** [3] - *63*:3, *118*:16, *118*:18
**collaboration** [4] - *71*:13, *91*:21, *91*:25, *126*:14
**collaborative** [1] - *79*:25
**collateral** [1] - *17*:11
**colleague** [1] - *208*:12
**colleagues** [3] - *57*:10, *57*:15
**collect** [1] - *191*:15
**college** [3] - *43*:20, *43*:21, *102*:16
**College** [5] - *102*:16, *213*:21, *213*:22, *213*:23
**Comcast** [2] - *133*:24, *213*:20
**comfort** [1] - *112*:23
**comfortable** [2] - *110*:7, *129*:22
**coming** [6] - *66*:3, *132*:25, *151*:16, *155*:18, *247*:8, *275*:15
**command** [1] - *181*:24
**Commencing** [1] - *1*:14
**commensurate** [1] - *64*:22
**comment** [2] - *132*:13, *138*:11
**commentary** [1] - *173*:16
**commented** [1] - *128*:3
**comments** [4] - *10*:25, *211*:1, *211*:6
**commerce** [1] - *133*:17
**commercial** [1] - *56*:8
**commercials** [1] - *250*:14
**commitment** [1] - *274*:3
**commitments** [1] - *20*:6
**committing** [1] - *270*:11
**common** [4] - *19*:11, *21*:14, *253*:12,

268:11
**communicate** [2] -
59:5, 91:23
**communicated** [2] -
148:25, 241:9
**communication** [16] -
23:10, 27:12, 27:13,
29:25, 39:16, 49:25,
54:24, 59:1, 80:14,
91:15, 91:17, 92:2,
92:22, 119:22,
128:14, 205:19
**communications** [2] -
76:24, 241:25
**community** [1] -
241:17
**commute** [1] - 46:23
**commuted** [1] - 46:22
**companies** [1] - 45:12
**company** [47] - 43:9,
55:24, 57:12, 61:13,
62:24, 65:14, 65:18,
67:13, 84:8, 88:20,
88:25, 89:22, 91:12,
95:12, 96:10, 104:5,
105:13, 105:19,
109:24, 117:24,
120:6, 121:10,
121:19, 122:2,
129:16, 129:21,
130:3, 134:20,
145:25, 149:2,
152:12, 165:19,
165:20, 165:25,
166:13, 166:21,
177:7, 189:6, 194:5,
194:21, 196:4,
214:4, 214:9, 218:2,
219:13, 263:16
**COMPANY** [1] - 1:7
**Company** [1] - 236:3
**comparator** [1] -
107:22
**comparators** [3] -
67:9, 225:22, 226:10
**compare** [1] - 63:22
**compared** [2] -
109:18, 201:21
**compel** [1] - 18:20
**compelled** [1] - 251:8
**compelling** [5] -
17:14, 17:19, 18:1,
21:21, 22:9
**compensate** [1] -
267:7
**compensated** [4] -
187:21, 190:3,
190:5, 190:10
**compensates** [1] -
271:17

**compensation** [5] -
41:18, 185:25,
267:9, 268:22, 272:3
**compensatory** [4] -
266:22, 267:6,
267:10, 268:25
**complain** [5] - 137:6,
137:9, 137:12,
161:11, 170:4
**complained** [3] -
170:10, 208:15,
262:22
**complaining** [3] -
263:22, 264:9,
265:23
**complaint** [8] - 10:13,
49:9, 157:24, 161:5,
161:8, 161:24,
264:4, 264:15
**complaints** [8] -
120:25, 136:24,
137:15, 140:16,
142:25, 152:13,
265:5, 265:10
**complete** [2] - 28:13,
150:16
**completed** [1] -
193:25
**completely** [3] -
206:25, 237:19,
237:20
**compliance** [4] -
190:6, 195:6, 236:7,
237:13
**complicated** [1] -
138:22
**comply** [4] - 14:12,
15:18, 270:25, 271:6
**complying** [1] - 140:9
**component** [1] -
190:24
**components** [1] -
189:3
**computer** [3] - 1:24,
53:16, 103:5
**computer-aided** [1] -
1:24
**computers** [1] - 54:10
**concealed** [1] - 27:11
**concept** [1] - 19:17
**concern** [1] - 5:8
**concerned** [1] - 27:4
**concerning** [3] - 4:9,
264:16, 265:6
**concerns** [3] - 17:5,
240:21, 251:17
**conclude** [7] - 222:7,
234:14, 240:7,
244:21, 245:1,
245:9, 255:2

**concluded** [1] - 67:23
**conclusion** [4] - 61:3,
222:19, 253:16,
253:17
**conclusions** [1] -
184:7
**conditions** [3] -
256:18, 262:13,
262:24
**conduct** [40] - 69:18,
240:13, 240:15,
242:11, 243:17,
243:18, 259:12,
260:10, 260:12,
260:14, 260:15,
260:23, 261:3,
261:4, 261:5, 261:7,
261:15, 261:22,
261:23, 261:25,
262:1, 262:2, 262:3,
262:4, 262:5, 262:7,
262:12, 262:20,
263:7, 263:25,
264:11, 264:17,
264:21, 265:18,
267:8, 270:11,
272:13, 272:23,
272:24
**conducted** [5] - 69:20,
70:15, 118:17,
168:1, 168:20
**confer** [1] - 160:2
**conference** [6] - 18:7,
29:20, 30:21, 31:17,
31:19, 114:21
**conferences** [1] -
136:10
**conferencing** [1] -
21:13
**conferred** [3] - 24:1,
24:2, 153:18
**confide** [1] - 211:9
**confirm** [3] - 23:9,
32:21, 92:3
**confirmed** [1] - 222:9
**confluence** [1] - 135:3
**confront** [1] - 142:11
**confused** [3] - 35:16,
58:22, 127:12
**confusing** [3] - 18:13,
155:13, 189:12
**connect** [2] - 134:2,
136:4
**connecting** [1] -
133:23
**connection** [7] -
154:11, 156:1,
204:7, 264:2,
264:13, 265:12,
265:16

**connectivity** [3] -
133:11, 134:6,
138:20
**consciousness** [1] -
38:11
**consequence** [2] -
267:19, 268:17
**consider** [25] - 30:24,
43:18, 81:5, 81:7,
81:9, 109:13, 130:7,
167:1, 168:12,
233:14, 234:13,
252:13, 253:13,
254:10, 255:4,
255:14, 256:6,
256:13, 258:25,
259:20, 259:21,
263:3, 267:5,
269:25, 272:5
**consideration** [2] -
241:23, 271:18
**considered** [9] - 58:5,
58:6, 60:15, 73:2,
74:1, 110:23,
121:17, 128:24,
255:22
**considering** [3] -
121:10, 132:14,
252:7
**consist** [1] - 252:21
**conspiracy** [3] - 91:8,
237:11, 244:6
**conspired** [1] - 91:10
**Constantly** [1] -
115:15
**constantly** [1] -
110:18
**constitute** [1] - 262:10
**constructive** [1] -
126:24
**Consulting** [2] -
195:9, 236:3
**contact** [1] - 21:24
**contacted** [1] - 232:7
**contacts** [1] - 82:3
**containing** [1] - 256:4
**contemporaneous** [1]
- 224:21
**content** [3] - 133:19,
134:2
**contention** [3] - 233:9,
233:12, 233:13
**contents** [8] - 78:13,
78:14, 83:8, 83:25,
84:2, 148:12,
153:22, 251:10
**context** [14] - 84:4,
84:5, 98:9, 113:9,
113:10, 122:6,
139:11, 145:23,

146:12, 166:12,
166:14, 167:12,
168:7, 220:17
**contextualize** [1] -
251:1
**continent** [1] - 48:13
**continually** [1] - 234:4
**continuances** [1] -
28:4
**continue** [8] - 148:17,
154:8, 157:4,
164:12, 177:12,
182:22, 185:14,
238:2
**continued** [7] - 97:13,
169:13, 228:3,
233:25, 237:17,
238:3, 269:3
**continuing** [1] - 99:5
**contractual** [1] -
236:25
**contradicted** [1] -
255:20
**contribute** [1] -
189:17
**contributed** [2] -
189:8, 190:12
**contribution** [15] -
189:7, 189:15,
190:4, 190:8, 190:9,
190:13, 190:14,
191:1, 191:4, 191:6,
192:6, 192:7,
193:23, 195:19,
195:20
**contributions** [4] -
192:10, 193:22,
195:7, 236:8
**control** [6] - 17:7,
19:3, 69:7, 71:12,
118:1, 253:18
**controlled** [1] - 69:8
**controller** [2] -
178:12, 178:14
**controls** [1] - 31:10
**controverted** [1] -
239:10
**convenience** [1] -
157:4
**conversation** [9] -
28:18, 80:24, 82:10,
82:15, 86:14,
144:17, 144:20,
148:16, 241:15
**conversations** [5] -
8:12, 27:19, 103:1,
113:17, 139:12
**convey** [1] - 139:2
**conveyed** [2] -
119:18, 176:22

**convicted** [2] - 86:21, 255:23
**CONWAY** [3] - 3:9, 197:16, 205:5
**conway** [1] - 203:24
**Conway** [32] - 4:10, 4:20, 4:22, 8:16, 8:22, 10:21, 11:5, 11:6, 11:13, 12:14, 12:21, 13:3, 15:10, 16:8, 17:22, 21:25, 23:15, 23:19, 55:12, 197:16, 199:14, 203:14, 203:22, 204:25, 205:9, 205:11, 205:12, 206:6, 212:17, 219:8, 219:23
**Conway's** [1] - 14:16
**COO** [2] - 129:24, 129:25
**cooked** [3] - 96:16, 163:8, 171:15
**cool** [3] - 116:6, 116:11, 139:10
**cooled** [1] - 61:2
**Cooperative** [1] - 214:6
**coordinate** [3] - 69:10, 69:12, 71:20
**coordinated** [1] - 71:19
**coordination** [1] - 71:13
**copy** [4] - 26:14, 70:9, 235:16, 251:6
**core** [1] - 170:24
**corporate** [18] - 154:6, 154:11, 154:15, 154:17, 154:21, 155:1, 155:18, 156:1, 157:4, 184:20, 185:2, 222:8, 227:2, 227:4, 227:5, 227:16, 235:12, 244:17
**Corporation** [3] - 43:11, 103:14, 122:9
**corporation** [1] - 227:6
**correct** [156] - 4:20, 16:3, 25:4, 32:22, 41:8, 41:12, 41:16, 41:17, 41:22, 41:24, 41:25, 42:9, 42:10, 42:13, 42:16, 43:1, 43:5, 43:6, 43:8, 43:16, 44:6, 44:9, 44:14, 45:5, 46:16, 46:20, 46:25, 47:4,

47:16, 48:1, 48:8, 48:17, 48:19, 49:5, 49:10, 49:19, 51:14, 55:4, 55:6, 55:7, 55:9, 55:11, 56:20, 57:5, 57:18, 57:24, 58:25, 59:6, 59:16, 60:3, 60:16, 61:5, 61:8, 61:24, 62:7, 63:1, 63:20, 68:1, 68:2, 68:4, 68:5, 69:14, 70:2, 71:7, 72:3, 72:14, 72:17, 72:18, 72:20, 73:1, 73:7, 73:18, 73:21, 74:22, 74:23, 75:8, 77:3, 77:10, 79:14, 79:17, 79:20, 82:13, 88:25, 89:13, 92:12, 94:8, 97:25, 98:19, 98:25, 99:1, 99:2, 107:19, 108:12, 116:23, 120:3, 120:6, 120:7, 121:20, 125:15, 150:16, 151:9, 156:23, 161:15, 166:25, 168:9, 169:11, 169:13, 169:22, 170:4, 170:11, 174:5, 174:19, 175:5, 175:6, 178:8, 178:19, 178:23, 180:12, 180:16, 180:19, 181:24, 181:25, 182:5, 184:21, 184:22, 185:12, 185:20, 187:21, 188:8, 189:1, 194:7, 195:13, 196:8, 196:12, 196:13, 196:15, 198:17, 198:18, 205:15, 207:25, 212:15, 212:16, 213:10, 215:4, 215:6, 216:22, 216:23, 216:25, 217:2, 217:3, 217:6, 217:7, 218:21, 218:24, 219:10, 276:10
**Correct** [1] - 108:16
**corrected** [1] - 161:25
**correctly** [1] - 193:20
**cost** [6] - 17:23, 19:5, 64:21, 270:1, 270:2, 272:6
**costs** [4] - 134:6, 270:3, 272:7, 272:8

**couch** [1] - 172:25
**counsel** [4] - 30:1, 33:20, 160:12, 184:11
**counter** [1] - 142:23
**countries** [3] - 48:3, 48:10, 90:15
**country** [7] - 19:6, 47:19, 47:23, 47:25, 48:12, 87:20, 87:21
**counts** [1] - 240:11
**County** [1] - 102:16
**couple** [16] - 7:25, 30:4, 31:5, 45:6, 46:15, 60:21, 102:25, 128:8, 143:1, 171:16, 207:23, 209:13, 215:9, 220:11, 223:11, 237:4
**coupled** [2] - 14:16, 22:22
**couples** [1] - 84:17
**course** [2] - 82:25, 161:13
**court** [24] - 4:1, 6:4, 14:11, 14:12, 16:13, 19:24, 23:17, 30:11, 30:19, 37:9, 37:10, 96:8, 115:17, 149:8, 152:10, 164:5, 172:20, 176:22, 183:23, 221:23, 236:1, 253:9, 253:11
**COURT** [331] - 1:1, 4:4, 4:15, 4:17, 6:7, 6:19, 6:25, 7:3, 7:10, 7:20, 7:22, 7:25, 8:4, 8:8, 8:24, 9:5, 9:9, 9:14, 10:9, 11:17, 11:22, 12:2, 12:7, 13:1, 13:9, 13:24, 14:1, 16:4, 16:10, 16:14, 17:4, 17:18, 18:19, 19:22, 19:25, 20:3, 20:11, 20:13, 20:22, 20:25, 21:5, 21:12, 21:17, 22:10, 23:14, 23:22, 24:5, 24:11, 24:23, 25:5, 25:14, 25:16, 25:19, 25:23, 26:7, 26:16, 26:20, 26:23, 27:1, 27:4, 27:9, 27:15, 27:23, 29:2, 30:3, 31:3, 31:12, 31:16, 33:10, 33:14, 33:18, 33:25, 34:2, 34:8, 34:12, 34:16, 34:20, 34:23, 34:25, 35:7,

35:10, 35:16, 35:22, 36:2, 36:6, 36:10, 36:14, 36:19, 36:24, 37:2, 37:4, 37:8, 37:13, 37:19, 37:23, 38:21, 38:24, 39:6, 39:12, 39:15, 39:25, 40:2, 40:4, 40:7, 40:14, 40:23, 42:3, 42:21, 62:19, 63:25, 64:7, 64:9, 65:1, 65:4, 65:8, 65:10, 65:13, 65:22, 66:2, 66:18, 66:21, 67:2, 67:6, 67:11, 67:22, 68:25, 70:12, 71:1, 71:3, 74:15, 76:12, 83:4, 85:22, 89:6, 89:19, 93:21, 93:24, 98:11, 101:2, 101:8, 101:11, 101:14, 101:18, 121:22, 121:24, 127:9, 130:10, 130:25, 135:23, 140:12, 141:5, 141:25, 144:13, 146:25, 147:11, 147:13, 148:3, 151:25, 152:5, 152:19, 152:22, 153:4, 153:6, 153:13, 153:18, 153:20, 154:1, 154:13, 154:23, 155:14, 155:20, 156:5, 156:11, 156:15, 157:8, 157:14, 158:5, 158:7, 158:13, 159:16, 160:8, 160:12, 160:18, 160:22, 161:17, 163:11, 163:24, 164:4, 164:18, 165:2, 165:22, 166:3, 166:17, 170:7, 173:16, 174:8, 175:1, 175:12, 176:9, 176:18, 177:3, 177:16, 177:18, 177:21, 178:4, 179:20, 181:14, 181:22, 183:7, 183:9, 183:12, 183:14, 183:17, 184:13, 203:19, 203:22, 203:24, 204:2, 204:17, 204:19, 204:21, 205:1,

205:12, 205:18, 205:22, 206:1, 209:8, 210:15, 211:18, 212:3, 214:23, 214:25, 215:14, 216:4, 216:6, 216:8, 216:18, 218:25, 219:5, 219:23, 220:2, 220:4, 220:6, 220:24, 221:1, 221:6, 221:8, 221:13, 221:18, 223:9, 223:18, 223:21, 224:10, 224:19, 224:23, 224:25, 225:4, 225:19, 226:13, 226:16, 226:19, 227:11, 227:21, 228:19, 228:25, 229:7, 229:12, 229:24, 230:1, 230:4, 230:9, 230:14, 230:19, 231:5, 231:9, 231:16, 231:25, 232:9, 232:15, 232:24, 233:5, 233:15, 234:7, 234:17, 235:10, 235:13, 235:16, 235:21, 236:2, 236:14, 236:24, 238:24, 240:3, 242:2, 242:8, 242:13, 243:1, 243:5, 243:7, 243:11, 243:23, 243:25, 245:6, 245:20, 245:25, 246:9, 246:16, 246:25, 247:1, 247:7, 248:1, 248:10, 248:15, 248:18, 248:21, 248:24, 249:4, 249:7, 249:10, 249:17, 249:21, 249:24, 250:6, 273:18, 273:20, 274:22, 275:2, 275:12, 275:23, 276:2, 276:4
**Court** [14] - 1:11, 1:22, 6:2, 12:22, 16:11, 17:7, 18:12, 22:6, 31:21, 66:1, 223:4, 270:2, 272:7, 276:13
**Court's** [1] - 222:24
**Courthouse** [1] - 1:12

*United States District Court*

**Courtroom** [1] - 2:13
**courtroom** [16] - 18:4, 40:6, 49:14, 71:14, 97:14, 101:7, 101:17, 127:13, 153:3, 160:21, 176:7, 220:25, 250:5, 253:7, 254:25, 273:19
**COURTROOM** [17] - 4:3, 40:5, 40:15, 40:19, 101:6, 101:13, 101:16, 153:2, 160:15, 160:17, 160:20, 177:23, 178:1, 205:3, 205:7, 220:21, 250:4
**cover** [4] - 95:21, 140:18, 143:8, 243:12
**covered** [3] - 20:13, 29:13, 254:25
**covering** [1] - 240:1
**coverup** [1] - 259:22
**COVID** [3] - 19:11, 21:14, 50:12
**COVID-19** [4] - 20:19, 20:21, 22:7, 22:11
**cracking** [1] - 140:24
**craft** [1] - 131:21
**crap** [2] - 140:19, 141:18
**crazy** [1] - 150:25
**create** [6] - 5:24, 5:25, 73:3, 135:12, 135:13, 159:15
**created** [4] - 104:11, 107:10, 122:2, 145:21
**creating** [2] - 57:7, 125:18
**creation** [1] - 98:2
**credibility** [4] - 204:13, 234:7, 255:10, 255:11
**credit** [5] - 47:22, 182:14, 182:15, 245:7, 256:10
**credited** [2] - 237:8, 237:14
**creepy** [3] - 84:10, 90:18, 146:3
**crime** [1] - 255:24
**crimes** [1] - 146:20
**criminal** [3] - 252:17, 259:1, 259:3
**crisis** [3] - 48:23, 56:13, 111:4
**criteria** [2] - 69:16,
118:3
**critical** [4] - 111:15, 117:24, 118:2, 213:2
**cross** [6] - 15:10, 127:24, 216:10, 227:12, 251:9
**CROSS** [6] - 3:5, 3:8, 3:10, 101:21, 181:16, 216:11
**cross-examination** [1] - 216:10
**CROSS-EXAMINATION** [6] - 3:5, 3:8, 3:10, 101:21, 181:16, 216:11
**cross-examine** [1] - 15:10
**cross-motion** [2] - 227:12
**crosstalk** [1] - 170:6
**crude** [1] - 262:17
**crux** [1] - 129:13
**crystallized** [1] - 213:6
**curating** [1] - 171:8
**cure** [3] - 14:9, 15:9, 28:7
**custody** [1] - 14:22
**customer** [7] - 44:21, 44:22, 45:1, 45:2, 45:3, 104:1, 214:10
**customers** [9] - 43:14, 47:21, 106:20, 130:3, 133:14, 133:15, 134:1, 134:5
**cut** [4] - 28:14, 149:24, 174:9
**cut-off** [2] - 28:14
**cutting** [2] - 103:2, 248:22

# D

**D-A-M-P-F** [1] - 197:5
**d/b/a** [2] - 1:7, 1:7
**dad** [3] - 102:7, 114:3, 114:5
**daily** [1] - 217:5
**damage** [3] - 237:6, 266:19, 268:22
**damages** [43] - 223:6, 228:1, 229:4, 234:20, 234:23, 238:22, 266:16, 266:17, 266:22, 266:23, 266:24, 267:6, 267:8, 267:10, 267:13, 267:24, 268:10,
268:12, 268:14, 268:15, 268:25, 269:1, 269:8, 269:10, 269:17, 269:21, 269:25, 270:4, 270:8, 270:9, 270:12, 270:23, 271:3, 271:5, 271:7, 271:10, 271:13, 271:16, 271:21, 272:5, 272:9, 272:11
**DAMPF** [1] - 197:8
**Dampf** [11] - 55:5, 158:11, 158:17, 197:5, 197:7, 199:4, 201:13, 203:12, 203:15, 209:25, 225:10
**Dan** [38] - 10:24, 31:5, 32:10, 32:11, 32:20, 34:19, 38:4, 38:6, 38:7, 38:17, 38:20, 38:21, 38:23, 39:3, 39:8, 39:10, 40:13, 102:5, 112:24, 126:11, 142:12, 142:15, 143:24, 148:21, 182:17, 182:19, 182:20, 183:1, 199:10, 207:8, 207:13, 210:9, 225:16, 225:17, 238:11, 239:10, 240:18, 240:25
**dance** [1] - 248:4
**dancing** [1] - 116:5
**DANIEL** [4] - 1:8, 3:4, 40:17, 40:21
**Daniel** [4] - 40:21, 41:4, 197:12, 237:10
**data** [16] - 43:15, 48:7, 48:9, 68:9, 103:11, 104:9, 105:6, 107:4, 107:17, 107:19, 195:4, 197:14, 202:5, 209:18, 209:20, 236:6
**date** [40] - 11:18, 27:2, 32:18, 32:21, 50:19, 69:24, 78:6, 78:10, 137:3, 162:1, 186:1, 186:2, 186:23, 186:24, 186:25, 189:10, 191:18, 192:4, 199:4, 199:9, 199:11, 199:15, 199:18, 199:20, 199:21, 199:23, 200:2, 200:4, 200:8, 200:10, 200:13,
200:15, 200:17, 200:18, 230:22, 271:23
**Date** [1] - 276:15
**dated** [1] - 77:24
**dates** [5] - 52:9, 75:19, 79:13, 200:16, 230:24
**dating** [2] - 89:25, 90:1
**DAY** [1] - 1:6
**day-before** [1] - 35:17
**days** [9] - 22:21, 27:5, 30:9, 46:15, 89:11, 106:22, 151:11, 176:1, 204:5
**DDoS** [1] - 48:23
**deadline** [1] - 26:15
**deal** [10] - 60:12, 60:13, 62:8, 129:14, 142:5, 142:18, 143:12, 145:15, 149:20, 204:2
**dealing** [1] - 27:21
**DeBrew** [1] - 207:6
**decade** [1] - 67:16
**December** [6] - 78:4, 129:9, 131:15, 201:11, 240:18, 242:1
**decent** [1] - 88:22
**decide** [16] - 14:6, 143:19, 231:13, 231:25, 240:5, 255:7, 255:8, 259:23, 265:22, 266:8, 268:11, 271:7, 271:9, 271:12, 272:12
**decided** [10] - 12:15, 21:24, 63:12, 84:15, 96:10, 148:22, 155:3, 172:18, 214:1, 237:16
**decides** [1] - 235:2
**deciding** [4] - 255:8, 255:13, 256:12, 258:17
**decision** [35] - 7:24, 31:9, 69:8, 70:21, 71:9, 71:21, 82:22, 83:1, 83:7, 86:3, 87:2, 95:25, 130:3, 130:22, 131:21, 131:24, 150:7, 150:11, 213:6, 222:3, 226:11, 228:6, 228:22, 229:14, 232:1, 235:8, 240:6, 241:8,
200:15, 200:17, 200:18, 230:22, 271:23
**decision-maker** [1] - 235:8
**decisionmaker** [4] - 69:3, 69:14, 70:22, 71:6
**decisions** [6] - 46:3, 69:3, 108:21, 258:21, 259:7, 259:25
**deduct** [3] - 34:13, 271:24, 272:2
**deduction** [1] - 34:6
**deep** [1] - 111:13
**DEFENDANT** [2] - 3:13, 144:14
**defendant** [6] - 154:20, 204:24, 223:3, 270:10, 270:11
**Defendant** [1] - 2:5
**Defendant's** [1] - 118:6
**defendant's** [2] - 15:21, 234:3
**Defendants** [1] - 1:9
**defendants** [10] - 8:23, 12:10, 16:7, 17:24, 21:23, 35:15, 64:19, 156:2, 237:9, 238:11
**defense** [6] - 10:7, 25:18, 35:11, 184:11, 203:23, 220:3
**defined** [3] - 75:17, 190:5, 190:10
**defining** [1] - 262:21
**definitely** [8] - 44:17, 48:24, 79:25, 140:18, 140:19, 178:21, 210:11, 218:22
**definiteness** [1] - 269:24
**degree** [3] - 39:18, 206:14, 261:19
**degree-educated** [1] - 206:14
**delays** [1] - 247:14
**deliberate** [3] - 246:19, 247:4, 274:2
**deliberating** [4] - 220:19, 250:19, 250:21, 275:20
**deliberations** [1] - 271:15
**deliver** [1] - 239:6

**delta** [1] - 157:18
**demeanor** [1] - 265:22
**demonstratives** [1] - 26:4
**denial** [4] - 260:2, 264:3, 264:14, 272:18
**denied** [1] - 266:3
**denies** [3] - 22:6, 251:21, 257:4
**dental** [2] - 188:7, 188:12
**deny** [3] - 228:6, 229:14, 245:6
**denying** [2] - 76:24, 229:16
**department** [32] - 42:5, 42:9, 42:12, 42:14, 48:16, 64:14, 68:1, 68:10, 69:4, 71:11, 72:6, 72:22, 73:1, 80:8, 82:3, 103:17, 105:19, 106:12, 107:5, 107:11, 110:20, 122:23, 123:11, 182:5, 196:2, 196:19, 200:24, 200:25, 201:2, 201:6, 224:5, 225:9
**departments** [3] - 107:6, 201:3, 226:5
**deploy** [2] - 56:16, 126:17
**depose** [1] - 15:12
**deposition** [40] - 4:24, 5:3, 10:15, 10:16, 11:15, 11:20, 12:5, 13:13, 32:1, 69:19, 69:22, 69:24, 73:12, 73:16, 99:11, 153:12, 153:13, 153:25, 154:2, 154:6, 154:11, 154:16, 155:19, 156:2, 159:22, 159:23, 160:6, 164:25, 167:22, 172:2, 172:23, 173:2, 173:17, 173:19, 173:24, 173:25, 184:1, 185:23, 222:8, 227:18
**depositions** [12] - 9:15, 10:11, 16:14, 16:25, 28:23, 70:14, 131:13, 183:19, 183:20, 231:14, 231:15

**depressed** [1] - 114:14
**depth** [1] - 117:4
**Deputy** [1] - 2:13
**DEPUTY** [17] - 4:3, 40:5, 40:15, 40:19, 101:6, 101:13, 101:16, 153:2, 160:15, 160:17, 160:20, 177:23, 178:1, 205:3, 205:7, 220:21, 250:4
**DEREK** [1] - 1:18
**describe** [1] - 117:19
**described** [3] - 131:4, 196:2, 266:4
**description** [3] - 133:5, 182:9, 193:14
**deserves** [2] - 253:15, 256:3
**deserving** [1] - 238:23
**designation** [2] - 200:25, 201:5
**designations** [1] - 153:19
**designed** [2] - 61:7, 271:1
**designee** [16] - 154:6, 154:11, 154:16, 154:17, 154:21, 155:1, 155:19, 156:1, 157:4, 184:20, 222:8, 227:2, 227:4, 227:5, 227:16, 235:12
**desire** [1] - 119:22
**desk** [2] - 143:21, 172:3
**desks** [1] - 47:6
**desperately** [1] - 122:11
**despite** [1] - 5:8
**detail** [3] - 127:23, 133:20, 133:22
**detailed** [1] - 134:4
**details** [2] - 63:6
**deter** [1] - 270:10
**determinable** [1] - 156:18
**determination** [1] - 269:6
**determinations** [1] - 234:8
**determinative** [6] - 257:24, 258:6, 259:24, 259:25, 265:24, 266:1
**determine** [5] - 226:9, 263:5, 263:8, 270:3, 272:8

**determines** [2] - 193:4, 222:17
**determining** [6] - 252:11, 259:14, 261:16, 263:1, 267:21, 268:10
**development** [1] - 81:14
**developments** [2] - 259:3, 259:4
**diagnosis** [1] - 20:23
**dial** [2] - 103:15, 103:21
**dial-up** [2] - 103:15, 103:21
**dictate** [1] - 39:19
**dictates** [1] - 77:9
**differ** [2] - 225:25, 266:20
**difference** [7] - 20:14, 130:22, 147:8, 190:14, 196:6, 196:10, 231:17
**different** [29] - 8:25, 10:13, 17:10, 28:3, 30:11, 47:12, 56:7, 66:8, 66:10, 67:17, 75:18, 77:6, 79:18, 92:12, 105:8, 115:22, 116:9, 127:22, 134:5, 140:14, 166:4, 173:8, 210:5, 217:12, 226:7, 226:15, 237:20, 256:14, 273:11
**differential** [1] - 135:19
**differently** [6] - 121:4, 137:7, 137:10, 137:13, 252:2, 257:13
**difficult** [2] - 14:18, 269:15
**digital** [2] - 23:10, 205:18
**dilatory** [1] - 21:24
**diminish** [1] - 132:12
**diminished** [1] - 15:1
**dinner** [9] - 82:12, 82:14, 82:16, 105:17, 112:11, 114:1, 115:21, 116:5, 140:20
**dinners** [2] - 140:19, 182:17
**DIRECT** [6] - 3:4, 3:7, 3:9, 41:1, 178:5, 206:4
**direct** [17] - 41:23,

52:4, 52:17, 70:17, 108:3, 108:6, 108:11, 165:24, 168:13, 230:7, 234:1, 254:15, 254:16, 254:20, 255:6, 258:13, 267:18
**directed** [5] - 221:21, 223:16, 227:1, 244:16, 262:2
**direction** [1] - 135:6
**directive** [1] - 115:1
**directly** [2] - 108:18, 210:5
**director** [66] - 42:5, 42:8, 42:11, 46:8, 46:10, 52:11, 62:25, 63:7, 63:13, 63:16, 63:18, 63:22, 64:4, 64:16, 64:18, 64:20, 64:25, 65:2, 65:8, 65:12, 65:20, 66:8, 66:9, 66:15, 66:16, 66:21, 66:24, 67:13, 67:14, 68:4, 68:6, 68:8, 68:15, 69:5, 80:1, 80:22, 81:1, 103:23, 104:9, 107:3, 107:5, 107:9, 107:16, 108:14, 126:16, 132:23, 135:21, 136:3, 136:7, 136:8, 136:11, 136:16, 137:3, 137:19, 149:17, 157:22, 185:8, 197:13, 197:14, 224:21, 225:6, 226:3
**directors** [1] - 66:25
**dirty** [1] - 111:13
**disability** [1] - 188:19
**disagree** [3] - 71:15, 233:15, 259:17
**disagreeing** [1] - 94:10
**disallowed** [1] - 6:4
**disappeared** [1] - 172:6
**disbelieve** [2] - 184:8, 259:11
**disciplinary** [3] - 93:9, 93:13, 93:17
**discipline** [4] - 94:2, 142:24, 143:1, 182:24
**disclaim** [1] - 5:21
**disclose** [2] - 36:21, 39:5

**disclosed** [9] - 4:21, 4:23, 4:24, 5:2, 6:5, 10:13, 13:11, 14:15, 29:19
**discloses** [1] - 5:14
**disclosing** [1] - 26:5
**disclosure** [6] - 4:19, 9:10, 15:7, 15:23, 30:15, 35:11
**disclosures** [8] - 4:21, 4:23, 10:10, 13:12, 13:15, 30:10, 35:6, 35:17
**disconnect** [1] - 219:24
**discouraged** [1] - 265:9
**discovery** [25] - 8:22, 9:1, 9:4, 14:12, 14:16, 15:12, 15:13, 15:19, 16:14, 17:8, 26:18, 26:20, 26:23, 26:25, 27:6, 27:16, 27:19, 27:24, 28:1, 28:2, 28:6, 28:24, 29:12, 31:7, 31:8
**discretion** [3] - 21:20, 193:23, 222:17
**discretionary** [1] - 271:3
**discriminate** [2] - 152:14, 258:9
**discriminated** [11] - 120:15, 120:19, 211:10, 251:15, 257:15, 257:21, 258:4, 258:18, 266:3, 266:15, 267:2
**discriminates** [2] - 256:20, 256:22
**discriminating** [2] - 143:8, 256:17
**discrimination** [58] - 77:12, 79:1, 202:23, 203:3, 210:21, 210:22, 215:18, 215:21, 215:25, 217:4, 217:9, 217:10, 217:15, 217:21, 226:11, 226:23, 229:17, 230:2, 230:8, 233:21, 233:23, 234:2, 235:3, 238:12, 256:24, 257:2, 257:5, 257:17, 257:25, 258:15, 259:13, 259:15, 259:17, 259:22, 263:16,

263:22, 263:23, 264:9, 264:19, 264:24, 264:25, 265:1, 265:10, 265:24, 266:5, 266:7, 266:10, 267:11, 267:22, 267:24, 269:13, 269:14, 269:16, 270:17, 270:22, 271:2, 271:21
**Discrimination** [2] - 78:22, 256:15
**discriminatory** [26] - 226:23, 228:7, 229:1, 229:2, 229:4, 229:13, 229:18, 232:1, 232:9, 233:20, 234:11, 234:16, 237:2, 239:8, 240:6, 241:18, 245:12, 245:14, 257:20, 258:3, 258:20, 258:22, 258:24, 260:9, 261:2, 267:25
**discuss** [3] - 128:15, 220:11, 239:19
**discussed** [6] - 29:20, 31:17, 128:13, 132:1, 138:16, 145:12
**discussing** [1] - 92:18
**discussion** [4] - 127:21, 132:18, 240:18, 240:20
**Discussion** [4] - 13:25, 117:7, 242:20, 243:24
**diseases** [1] - 214:1
**disparate** [11] - 64:11, 64:12, 65:24, 66:3, 66:5, 66:6, 67:18, 159:3, 228:4, 251:18
**disparity** [1] - 66:19
**dispatch** [1] - 273:2
**dispelled** [1] - 232:18
**displeased** [1] - 148:17
**displeasure** [3] - 123:4, 125:12, 175:9
**disposed** [1] - 31:6
**dispute** [4] - 24:15, 156:20, 233:16, 236:25
**disqualified** [1] - 241:23
**disregard** [6] - 37:10, 37:11, 253:6, 270:22, 272:17,

272:23
**disregarded** [1] - 37:17
**disregarding** [1] - 37:13
**disrupt** [2] - 14:10, 15:14
**dissatisfaction** [1] - 121:8
**dissemination** [1] - 168:15
**distance** [1] - 206:21
**distant** [1] - 22:2
**distinct** [1] - 269:17
**distinction** [2] - 108:8, 255:5
**distinguished** [1] - 267:20
**district** [1] - 22:15
**DISTRICT** [3] - 1:1, 1:1, 1:16
**District** [4] - 1:11, 4:2, 7:17
**Docs** [1] - 92:1
**doctor** [1] - 214:1
**document** [68] - 24:20, 27:10, 28:13, 28:22, 28:24, 29:6, 29:7, 29:9, 29:15, 31:6, 31:10, 31:22, 31:25, 32:18, 32:22, 33:4, 33:12, 35:19, 63:5, 72:12, 77:25, 78:18, 79:8, 97:19, 98:1, 98:2, 98:3, 117:10, 118:5, 118:16, 125:6, 127:7, 127:16, 127:25, 128:2, 131:8, 131:13, 131:14, 131:17, 131:20, 133:3, 135:25, 143:23, 144:2, 144:8, 144:16, 153:22, 153:24, 154:1, 154:13, 155:12, 157:1, 159:9, 159:10, 159:12, 168:11, 174:18, 174:21, 175:7, 175:15, 187:13, 193:19, 227:20, 227:21, 232:20, 232:21, 233:3, 274:18
**documents** [8] - 30:15, 30:16, 35:6, 35:23, 227:14, 231:19, 234:5,

252:22
**dollars** [2] - 111:9, 224:13
**done** [45] - 5:4, 25:1, 32:18, 34:16, 51:14, 53:2, 53:15, 53:16, 53:17, 53:25, 73:19, 83:9, 83:11, 83:13, 83:24, 86:15, 88:9, 88:12, 88:19, 88:24, 88:25, 89:5, 95:16, 102:14, 110:7, 130:8, 149:5, 149:6, 159:21, 167:2, 167:11, 179:23, 180:3, 183:13, 201:15, 220:8, 220:9, 247:11, 247:21, 247:23, 248:22, 250:8, 250:10, 270:5, 274:1
**double** [3] - 108:5, 180:25, 194:8
**doubt** [3] - 139:23, 147:24, 252:17
**down** [51] - 11:4, 11:12, 13:21, 17:9, 47:13, 53:10, 78:12, 78:20, 79:16, 93:8, 99:11, 101:11, 115:25, 116:10, 118:6, 118:19, 119:1, 119:14, 127:20, 127:23, 133:5, 133:22, 140:24, 153:5, 153:16, 157:14, 177:18, 183:9, 185:14, 186:5, 186:13, 187:2, 187:18, 188:10, 196:17, 196:18, 198:11, 198:14, 199:1, 201:16, 202:10, 202:20, 203:19, 204:19, 219:11, 243:10, 248:25, 275:16
**downtown** [1] - 213:23
**dramatic** [1] - 11:3
**draw** [1] - 184:7
**drawing** [1] - 268:12
**drill** [1] - 157:14
**drive** [1] - 210:8
**dropped** [1] - 175:19
**drops** [1] - 254:25
**dude** [1] - 86:12
**due** [9] - 19:7, 95:11, 116:22, 120:22,

143:9, 180:18, 211:1, 212:11, 212:14
**Duff** [3] - 197:18, 199:17, 203:11
**DUFF** [1] - 197:18
**DULY** [6] - 40:17, 177:24, 205:5
**duplicate** [4] - 25:10, 25:11, 25:20, 25:22
**during** [71] - 8:21, 15:11, 15:12, 21:6, 28:22, 31:11, 42:19, 45:21, 47:15, 48:5, 48:8, 50:19, 50:20, 50:24, 52:5, 53:2, 57:3, 62:24, 64:14, 81:19, 82:9, 82:16, 103:12, 105:17, 105:22, 106:24, 107:23, 108:22, 112:9, 113:12, 115:17, 115:18, 116:17, 120:3, 120:17, 120:23, 121:1, 121:4, 123:14, 137:5, 137:19, 138:10, 138:23, 139:20, 149:10, 151:1, 151:5, 154:5, 154:8, 170:22, 175:16, 179:8, 181:19, 185:6, 193:25, 196:19, 201:12, 207:14, 208:6, 208:10, 210:2, 210:10, 211:10, 213:13, 215:21, 215:24, 217:22, 219:9, 222:7, 249:12, 272:1
**dust** [1] - 111:3
**duties** [1] - 273:2
**duty** [1] - 208:18

**E**

**e-commerce** [1] - 133:17
**earliest** [1] - 19:24
**early** [12] - 8:11, 55:22, 75:20, 105:22, 106:22, 108:22, 109:14, 115:5, 118:13, 195:16, 207:2, 208:15
**earned** [5] - 155:8, 158:3, 158:5, 269:2, 269:18

**earning** [1] - 191:19
**earnings** [9] - 189:22, 189:23, 191:6, 191:8, 191:9, 191:10, 191:11, 191:13, 269:10
**earth** [1] - 84:12
**easier** [2] - 155:3, 216:19
**easily** [2] - 31:5, 232:18
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:11
**easy** [6] - 17:21, 123:24, 123:25, 172:13, 240:14
**eat** [1] - 146:4
**economics** [1] - 157:5
**educate** [1] - 241:20
**educated** [1] - 206:14
**education** [1] - 206:12
**effect** [10] - 74:10, 141:13, 143:23, 212:11, 237:15, 238:8, 238:16, 261:23, 265:24, 266:1
**efficient** [2] - 14:10, 15:14
**effort** [5] - 30:1, 126:21, 211:25, 212:7, 248:5
**efforts** [1] - 5:8
**either** [35] - 4:21, 10:9, 12:18, 21:4, 44:19, 65:22, 65:24, 126:25, 137:16, 147:22, 150:7, 150:11, 163:22, 176:5, 176:22, 177:1, 208:5, 211:4, 222:3, 222:10, 222:22, 225:22, 226:10, 242:13, 244:7, 245:9, 255:6, 257:4, 257:15, 258:9, 264:21, 267:18, 268:5, 269:2
**Either** [1] - 38:4
**elapsed** [1] - 175:24
**electronic** [1] - 92:2
**element** [8] - 66:7, 224:10, 260:18, 261:10, 264:16, 265:6, 265:12, 269:17
**elements** [6] - 192:12, 258:1, 260:8, 260:25, 268:22, 269:4

*United States District Court*

**elevates** [1] - 15:20
**eligibility** [12] - 189:10, 189:25, 192:22, 193:3, 193:6, 193:10, 193:18, 194:4, 227:2, 227:7, 231:20, 232:22
**eligible** [12] - 187:22, 188:1, 189:9, 190:4, 190:7, 191:8, 192:23, 193:24, 194:7, 195:11, 196:5, 236:16
**elsewhere** [1] - 22:16
**email** [22] - 8:12, 12:23, 13:18, 25:1, 26:2, 26:12, 26:22, 28:12, 28:15, 53:16, 54:2, 58:8, 58:10, 58:11, 58:13, 58:21, 61:4, 61:7, 133:6, 136:6, 194:9, 194:13
**emails** [3] - 76:8, 76:13, 76:14
**embarrassed** [1] - 141:15
**emergency** [2] - 119:3, 119:15
**emotional** [3] - 261:24, 263:10, 263:13
**employed** [13] - 49:7, 68:3, 105:21, 191:6, 193:3, 199:19, 199:20, 199:21, 227:9, 227:10, 228:2, 267:21, 269:15
**employee** [40] - 19:2, 29:9, 53:15, 76:8, 77:8, 109:1, 117:25, 120:6, 121:14, 122:10, 143:21, 147:6, 147:7, 189:23, 190:9, 190:10, 191:7, 191:8, 191:17, 192:23, 192:24, 193:7, 193:22, 194:8, 195:1, 195:2, 195:4, 196:6, 196:18, 198:19, 198:20, 201:8, 215:6, 215:7, 236:5, 239:3, 239:6, 256:18, 256:21, 256:25
**employee's** [7] - 189:7, 189:13,

191:2, 191:7, 256:19, 256:21, 256:23
**employees** [36] - 41:11, 53:11, 76:19, 109:24, 110:5, 135:12, 140:20, 182:14, 189:9, 189:19, 190:3, 190:5, 190:11, 194:21, 194:22, 195:11, 196:8, 196:10, 198:23, 198:24, 200:25, 201:8, 201:21, 202:5, 222:4, 223:14, 226:4, 236:4, 236:13, 236:15, 241:17, 257:10, 260:11, 261:3, 262:17, 262:25
**employees'** [2] - 260:22, 261:14
**employer** [9] - 189:15, 192:6, 239:5, 256:17, 256:20, 256:22, 269:13, 269:14
**employer's** [1] - 263:2
**employment** [48] - 42:12, 43:4, 43:13, 43:22, 44:16, 45:7, 46:5, 48:5, 49:4, 53:3, 59:5, 64:15, 70:21, 107:24, 108:17, 108:22, 109:15, 121:9, 179:8, 180:12, 181:20, 185:25, 186:2, 186:7, 191:12, 193:8, 193:10, 194:10, 197:7, 201:10, 201:11, 212:18, 215:11, 217:22, 227:8, 240:24, 241:1, 256:18, 257:11, 259:25, 262:13, 262:24, 263:17, 265:1, 265:11, 269:3, 272:1
**Employment** [1] - 256:15
**enabled** [3] - 112:3, 114:17, 205:23
**encompass** [2] - 189:22, 192:17
**encompassing** [2] - 162:24, 163:2

**encountered** [1] - 211:8
**encouraged** [1] - 62:11
**end** [21] - 38:15, 41:19, 45:24, 49:20, 54:14, 54:15, 72:2, 75:17, 93:8, 104:11, 132:2, 152:24, 177:13, 195:15, 207:19, 212:19, 212:20, 221:12, 222:8, 250:17
**ended** [6] - 26:25, 102:10, 156:22, 171:1, 180:12, 186:2
**ends** [1] - 103:3
**engage** [1] - 241:18
**engaged** [3] - 263:15, 263:21, 264:8
**engineer** [48] - 9:17, 9:18, 10:17, 10:22, 52:6, 63:10, 72:25, 73:3, 81:4, 81:16, 109:22, 134:24, 135:1, 155:8, 157:7, 157:11, 157:13, 157:23, 158:23, 197:1, 197:3, 197:8, 197:9, 197:11, 197:17, 197:19, 197:20, 197:23, 197:25, 198:2, 198:4, 198:6, 198:8, 198:10, 201:9, 201:22, 201:23, 201:25, 202:1, 203:14, 206:14, 206:18, 209:12, 222:9, 224:12, 224:13, 224:15, 224:18
**engineering** [46] - 42:5, 42:8, 42:11, 42:14, 43:17, 48:16, 56:6, 56:10, 57:20, 58:6, 63:1, 64:14, 68:1, 68:9, 69:4, 72:6, 72:21, 82:3, 103:22, 103:23, 103:24, 104:8, 104:9, 104:10, 106:12, 106:13, 107:1, 107:3, 107:5, 107:8, 107:11, 107:15, 107:16, 107:17, 107:19, 122:19, 122:23, 125:13, 129:15, 158:18, 158:22, 196:1, 197:13,

197:17, 201:4
**engineers** [12] - 41:15, 41:17, 41:21, 42:25, 44:12, 104:12, 109:16, 109:21, 158:10, 202:6, 209:23, 224:6
**enjoy** [1] - 112:19
**enjoyed** [2] - 139:21, 139:23
**enjoyment** [1] - 268:16
**enormous** [1] - 6:11
**enrolled** [2] - 102:16, 193:9
**entered** [3] - 189:14, 193:8, 223:7
**entering** [1] - 261:21
**enters** [4] - 40:6, 101:17, 160:21, 250:5
**entertain** [1] - 221:23
**entire** [8] - 12:9, 53:3, 172:3, 175:5, 175:7, 215:17, 224:5, 232:18
**entirely** [4] - 59:13, 92:9, 137:23, 205:16
**entirety** [4] - 192:21, 192:22, 202:22, 215:11
**entitled** [5] - 227:1, 238:21, 267:24, 272:10, 276:11
**entitlement** [2] - 226:21, 226:22
**entity** [2] - 185:2, 239:15
**entry** [1] - 103:11
**environment** [32] - 112:8, 122:14, 135:13, 218:9, 242:6, 251:17, 257:3, 260:5, 260:7, 260:17, 260:20, 260:21, 260:24, 261:9, 261:12, 261:13, 261:16, 261:18, 261:20, 261:22, 261:23, 262:10, 262:11, 262:15, 262:16, 262:18, 263:2, 266:6, 266:7, 266:12, 266:14, 267:3
**equally** [1] - 134:1
**equivalent** [1] - 225:1
**era** [1] - 19:11
**Eric** [2] - 103:13

**Erica** [1] - 69:19
**ERISA** [1] - 231:22
**erroneous** [1] - 49:3
**escalate** [1] - 49:8
**escalations** [1] - 209:15
**especially** [7] - 83:20, 84:17, 106:15, 111:13, 111:23, 136:3
**ESQUIRE** [4] - 1:19, 2:3, 2:3, 2:4
**Esquire** [1] - 2:14
**essentially** [6] - 5:6, 5:13, 8:7, 11:20, 65:14, 117:18
**establish** [4] - 22:8, 66:3, 231:1, 272:20
**established** [5] - 230:23, 233:7, 233:8, 237:1, 237:7
**estimate** [1] - 247:9
**estimates** [1] - 231:5
**evaluate** [3] - 111:6, 117:23, 263:7
**evaluated** [1] - 117:19
**evaluating** [2] - 110:18, 258:24
**evaluation** [5] - 25:9, 25:10, 49:15, 49:19, 110:5
**evaluations** [4] - 25:13, 49:12, 49:13, 49:20
**eve** [1] - 29:25
**evening** [3] - 21:4, 273:4, 276:6
**event** [3] - 30:23, 268:7, 274:2
**events** [5] - 9:19, 70:6, 119:8, 165:16, 253:14
**eventually** [7] - 46:24, 56:23, 109:12, 111:3, 122:18, 123:10, 133:2
**everyday** [1] - 253:13
**everywhere** [1] - 116:6
**evidence** [131] - 14:8, 14:10, 16:22, 16:24, 24:11, 25:14, 25:15, 25:24, 97:15, 153:24, 155:18, 157:20, 159:3, 173:17, 174:15, 174:17, 175:15, 184:1, 220:9, 220:14, 222:2, 222:6, 222:20,

223:13, 223:14, 224:15, 225:21, 226:11, 226:14, 226:20, 227:14, 227:22, 228:6, 228:21, 228:25, 229:12, 229:18, 230:11, 230:21, 231:1, 231:3, 231:12, 232:1, 233:22, 234:2, 234:9, 234:16, 235:1, 235:9, 235:10, 237:20, 237:25, 238:7, 239:22, 239:23, 239:25, 240:1, 240:4, 242:5, 244:4, 244:20, 244:23, 245:7, 245:9, 250:9, 251:1, 251:24, 251:25, 252:2, 252:3, 252:8, 252:10, 252:12, 252:15, 252:20, 253:1, 253:2, 253:5, 253:8, 253:13, 253:16, 253:19, 253:20, 253:21, 253:23, 253:25, 254:2, 254:3, 254:6, 254:10, 254:11, 254:14, 254:15, 254:16, 254:20, 254:22, 254:23, 255:1, 255:4, 255:6, 255:7, 255:21, 255:22, 255:25, 256:11, 257:14, 257:19, 258:2, 258:14, 258:17, 260:8, 260:18, 261:1, 261:10, 263:3, 263:20, 264:7, 267:1, 267:14, 268:13, 268:19, 268:21, 268:23, 269:21, 270:13, 270:24, 271:11, 272:15
**EVIDENCE** [2] - 3:13, 144:14
**Evidence** [1] - 30:18
**evidentiary** [1] - 230:5
**exact** [5] - 52:9, 63:2, 77:25, 146:22, 268:21
**exactly** [18] - 32:24, 53:24, 63:15, 74:9, 82:14, 83:25, 98:6, 98:10, 105:25,

109:6, 119:10, 123:12, 129:17, 159:25, 160:2, 190:20, 190:24, 191:21
**Exactly** [1] - 109:7
**examination** [7] - 101:5, 101:19, 138:25, 165:24, 216:10, 230:7, 236:19
**EXAMINATION** [18] - 3:4, 3:5, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:10, 41:1, 101:21, 161:1, 175:3, 178:5, 181:16, 206:4, 216:11, 219:6
**EXAMINATIONS** [1] - 3:2
**examine** [1] - 15:10
**example** [4] - 254:16, 259:1, 265:15, 269:10
**examples** [4] - 79:20, 80:5, 80:12, 241:7
**Excel** [2] - 32:14, 32:16
**excelled** [1] - 103:8
**except** [2] - 30:17, 123:3
**exception** [1] - 24:7
**excerpts** [1] - 24:13
**Exchange** [1] - 206:17
**exchange** [1] - 146:1
**exclude** [4] - 14:6, 28:8, 116:17, 116:25
**excluded** [4] - 14:8, 28:19, 140:1, 254:11
**exclusion** [2] - 29:1, 32:3
**excruciating** [1] - 112:23
**excuse** [4] - 94:22, 95:2, 237:25, 259:15
**excused** [4] - 30:19, 183:9, 219:24, 220:22
**execute** [1] - 149:22
**EXHIBIT** [2] - 3:13, 144:14
**Exhibit** [22] - 24:8, 24:15, 25:2, 25:6, 25:7, 25:8, 26:1, 26:9, 26:11, 30:4, 31:10, 77:19, 78:5, 92:14, 92:17, 125:5, 144:5, 144:11, 147:16
**exhibit** [17] - 25:16,

25:18, 28:8, 29:19, 29:23, 35:19, 36:9, 39:8, 147:18, 153:24, 154:2, 154:13, 159:7, 159:18, 253:19, 254:13
**exhibits** [24] - 23:24, 26:5, 29:20, 29:22, 30:8, 30:21, 35:5, 35:6, 35:11, 35:14, 35:20, 36:1, 36:8, 36:11, 36:16, 36:21, 36:25, 38:7, 117:3, 159:10, 243:9, 252:14, 252:22, 274:13
**exist** [2] - 77:23, 233:3
**existed** [2] - 27:13, 263:2
**existence** [2] - 5:1, 258:16
**existential** [1] - 48:22
**exits** [4] - 101:7, 153:3, 220:25, 273:19
**expect** [1] - 135:15
**expectation** [1] - 134:19
**expectations** [1] - 261:21
**expected** [3] - 110:13, 110:16, 148:20
**expenditures** [2] - 182:16, 182:21
**expensive** [1] - 140:20
**experience** [19] - 6:3, 113:2, 113:5, 133:18, 139:10, 139:14, 151:17, 151:22, 210:21, 210:22, 211:21, 215:12, 215:18, 215:19, 215:20, 217:12, 219:18, 253:13, 253:15
**experienced** [2] - 217:13, 268:17
**experiencing** [1] - 263:16
**expert** [1] - 114:14
**explain** [15] - 5:5, 57:19, 98:20, 117:15, 125:8, 127:2, 132:25, 135:18, 135:21, 141:1, 144:16, 145:20, 207:3, 241:14, 241:16
**explained** [3] - 59:20,

74:2, 208:7
**explaining** [1] - 140:8
**explanation** [1] - 97:13
**exported** [1] - 17:2
**expressed** [1] - 246:18
**extend** [1] - 27:24
**extended** [1] - 265:20
**extent** [7] - 14:9, 15:8, 23:4, 26:5, 30:22, 30:24, 251:3
**externally** [1] - 129:16
**extra** [1] - 232:22
**extreme** [1] - 262:11
**extremely** [1] - 262:14
**eyeballs** [1] - 133:25

## F

**F-O-R-D** [1] - 178:3
**F-O-R-S-T-E-R(Sic)** [1] - 196:24
**F.3d** [1] - 14:4
**face** [6] - 15:8, 45:17, 45:18, 45:20, 82:7, 152:12, 165:19, 165:25, 166:13
**Facebooks** [1] - 134:3
**facilitate** [3] - 23:17, 171:10, 171:12
**facing** [2] - 47:6, 47:7
**fact** [40] - 9:20, 14:17, 18:23, 19:9, 19:14, 19:15, 22:16, 24:19, 27:5, 28:5, 28:23, 28:24, 30:5, 33:3, 37:8, 87:5, 144:21, 146:9, 150:8, 150:12, 163:5, 179:16, 204:9, 207:25, 208:20, 211:13, 217:8, 222:7, 233:7, 233:8, 237:1, 238:3, 252:8, 252:9, 252:11, 253:24, 254:24, 255:25
**factor** [5] - 18:23, 257:24, 258:7, 259:24, 259:25
**factors** [7] - 7:15, 14:6, 150:5, 234:13, 255:14, 255:24, 256:8
**facts** [14] - 8:9, 15:10, 22:19, 226:17, 237:14, 252:20, 252:22, 252:23, 252:24, 252:25,

254:23, 255:8, 258:16, 268:13
**factual** [1] - 233:16
**factually** [1] - 8:9
**failed** [1] - 213:11
**failing** [1] - 14:11
**fails** [1] - 252:6
**failure** [3] - 15:18, 134:17, 234:10
**fair** [20] - 6:14, 10:6, 10:8, 12:18, 21:19, 34:15, 57:6, 73:6, 73:9, 74:10, 74:18, 74:22, 110:15, 147:5, 185:4, 232:11, 243:22, 249:25, 267:9, 268:23
**fairly** [3] - 22:2, 220:20, 267:7
**fairness** [1] - 29:18
**faith** [8] - 12:19, 14:11, 15:18, 15:19, 15:22, 264:18, 270:25, 271:6
**fake** [6] - 31:22, 32:1, 93:20, 94:2, 98:16, 130:6
**faking** [1] - 24:19
**fall** [1] - 100:6
**falls** [1] - 19:21
**false** [7] - 28:22, 130:12, 162:14, 172:5, 235:5, 237:19, 238:15
**familiar** [8] - 13:23, 104:2, 104:23, 105:1, 122:10, 123:13, 130:15, 130:18
**familiarity** [1] - 105:12
**families** [1] - 102:23
**family** [5] - 90:17, 104:5, 106:7, 113:14, 114:5
**fan** [2] - 97:9, 142:8
**far** [15] - 4:13, 19:21, 21:13, 22:23, 41:13, 71:11, 106:6, 109:25, 110:1, 111:1, 148:24, 178:24, 188:3, 224:17, 226:16
**fast** [5] - 47:15, 104:25, 143:15, 248:25, 250:15
**father** [1] - 90:16
**fault** [1] - 95:9
**favor** [4] - 19:21, 23:2, 222:3, 222:20

*favorable* [3] - 123:3, 252:3
*favorite* [1] - 97:11
*February* [8] - 43:7, 44:8, 46:7, 187:6, 199:11, 199:15, 207:19, 207:20
*Federal* [3] - 16:2, 22:6, 30:18
*federal* [3] - 258:12, 270:17, 270:23
*federally* [2] - 270:6, 270:15
*FedEx* [2] - 248:24, 250:14
*feedback* [10] - 52:20, 52:25, 53:2, 53:6, 53:8, 53:11, 53:15, 80:3, 80:13, 126:24
*feelings* [1] - 63:4
*fees* [7] - 19:7, 270:1, 270:3, 272:6, 272:8
*fell* [1] - 189:10
*felt* [13] - 49:25, 51:1, 100:8, 102:15, 120:14, 120:18, 132:12, 134:16, 148:18, 149:7, 151:21, 212:21, 254:18
*female* [2] - 146:20, 147:6
*fever* [1] - 20:20
*few* [11] - 4:5, 11:4, 24:4, 54:9, 58:12, 70:10, 104:3, 117:3, 176:1, 197:12, 209:18
*fielded* [1] - 140:16
*fifth* [2] - 260:21, 261:13
*fight* [2] - 56:15, 110:10
*figure* [6] - 9:24, 96:7, 113:6, 122:19, 138:20, 271:25
*figured* [4] - 112:14, 127:23, 149:17, 183:20
*file* [2] - 30:12, 229:17
*filed* [9] - 97:25, 229:23, 230:2, 230:8, 230:9, 230:18, 230:20, 231:9, 237:18
*filing* [1] - 230:24
*fill* [3] - 44:2, 121:20, 122:3
*filled* [2] - 54:13, 261:19

*final* [7] - 30:21, 31:17, 31:18, 235:8, 240:25, 273:1, 275:14
*finally* [1] - 29:18
*finance* [4] - 142:21, 178:13, 182:12, 245:4
*finances* [1] - 274:24
*financial* [1] - 232:19
*financially* [1] - 17:22
*fine* [13] - 24:14, 25:19, 25:23, 25:25, 27:9, 33:24, 67:2, 67:6, 91:11, 97:2, 106:16, 204:18, 204:22
*finish* [3] - 85:22, 98:11, 174:8
*fire* [9] - 48:24, 71:18, 79:7, 82:22, 94:24, 96:25, 100:1, 112:5, 114:25
*fired* [15] - 89:15, 98:22, 99:19, 168:5, 168:9, 169:10, 172:9, 174:12, 174:17, 174:19, 229:9, 230:7, 232:13, 245:2, 245:5
*firing* [1] - 77:10
*firings* [2] - 70:25, 149:17
*firm* [2] - 27:19, 69:19
*firmly* [1] - 237:7
*first* [98] - 4:18, 6:10, 6:22, 7:4, 7:5, 10:12, 11:14, 11:17, 13:5, 17:20, 19:22, 20:9, 21:10, 24:21, 29:3, 30:4, 37:20, 38:1, 38:3, 38:14, 38:20, 43:4, 43:22, 44:4, 44:5, 44:11, 44:25, 45:17, 46:18, 55:5, 57:22, 61:15, 62:24, 64:3, 64:25, 65:18, 65:19, 66:14, 67:5, 67:25, 68:6, 68:22, 77:22, 77:23, 78:1, 78:7, 80:7, 89:7, 89:11, 97:18, 102:3, 106:11, 107:2, 110:4, 110:6, 114:11, 114:19, 120:10, 121:8, 124:21, 128:13, 132:7, 142:19, 145:7, 147:15, 161:21, 164:9,

164:11, 167:23, 170:13, 173:5, 186:1, 186:7, 186:15, 186:18, 189:13, 193:9, 195:15, 205:9, 208:4, 209:13, 231:17, 241:14, 245:18, 246:7, 247:25, 249:4, 257:19, 258:2, 260:9, 261:2, 263:21, 264:8, 264:16, 266:24, 271:9
*First* [1] - 197:24
*fiscally* [1] - 182:13
*fit* [1] - 124:5
*fitting* [1] - 136:3
*five* [7] - 153:10, 191:6, 191:10, 191:24, 192:11, 192:14, 218:2
*fixing* [2] - 268:12, 268:21
*flat* [2] - 189:18
*flawed* [2] - 172:25, 174:6
*flip* [1] - 244:22
*flipping* [1] - 244:24
*floated* [1] - 122:23
*flow* [2] - 52:23, 228:4
*flowed* [1] - 229:1
*flows* [1] - 229:4
*flu* [1] - 20:19
*fly* [2] - 69:11, 106:1
*focused* [3] - 43:17, 48:14, 237:1
*focusing* [1] - 162:21
*folks* [4] - 45:9, 75:18, 103:3, 126:3
*follow* [13] - 39:12, 78:12, 79:11, 105:25, 123:25, 124:5, 132:4, 136:23, 172:12, 172:13, 172:14, 254:7, 263:19
*follow-up* [1] - 136:23
*followed* [3] - 38:16, 49:22, 265:17
*Following* [1] - 168:15
*following* [13] - 30:12, 60:10, 119:21, 189:13, 193:9, 252:21, 253:2, 255:14, 257:18, 260:8, 260:25, 264:6, 264:22
*follows* [1] - 64:10

*FOLLOWS* [3] - 40:18, 177:25, 205:6
*force* [1] - 112:24
*forced* [1] - 112:22
*Ford* [27] - 34:21, 34:24, 36:5, 36:8, 36:16, 37:1, 37:20, 38:2, 38:5, 38:8, 38:14, 38:17, 38:18, 38:19, 39:9, 39:24, 40:1, 141:19, 141:22, 142:20, 142:25, 153:11, 177:20, 178:3, 178:7, 178:8, 183:9
*FORD* [2] - 3:7, 177:24
*foregoing* [1] - 276:10
*foreign* [1] - 19:17
*foremost* [1] - 4:18
*foreseeable* [1] - 268:9
*forget* [5] - 105:17, 142:12, 142:15, 169:20
*forgive* [1] - 104:17
*form* [2] - 128:19, 210:3
*formal* [6] - 50:1, 75:13, 75:20, 75:22, 76:5, 143:3
*formalized* [1] - 75:17
*formally* [3] - 207:13, 221:21, 252:23
*format* [2] - 32:17
*formulate* [2] - 237:13, 238:15
*Forrester* [6] - 55:8, 196:24, 197:2, 198:25, 201:12, 209:25
*FORSTER* [1] - 197:3
*fort* [1] - 116:4
*fort-type* [1] - 116:4
*forth* [3] - 11:14, 14:3, 50:20
*forward* [3] - 75:5, 137:2, 143:15
*foundation* [9] - 25:24, 32:10, 33:1, 33:7, 33:11, 33:19, 67:1, 67:2, 163:23
*four* [7] - 14:5, 88:7, 88:8, 90:13, 151:11, 216:5, 265:5
*fourth* [2] - 260:15, 261:7
*frame* [7] - 65:12, 67:15, 121:9, 124:23, 143:17, 175:22, 195:17

*France* [1] - 113:22
*Francisco* [1] - 109:9
*Frankfurt* [1] - 213:10
*frankly* [5] - 24:12, 29:6, 182:20, 242:14, 246:12
*free* [4] - 241:18, 251:12, 253:16, 264:19
*freely* [1] - 19:12
*frequency* [1] - 261:22
*frequently* [1] - 182:15
*fresh* [2] - 250:17, 273:5
*friction* [5] - 55:22, 57:11, 114:17, 129:23, 139:18
*Friday* [3] - 19:24, 131:3, 236:19
*friend* [2] - 207:5, 273:16
*friends* [1] - 124:13
*front* [6] - 112:25, 123:22, 143:23, 230:11, 269:5, 269:6
*frontiers* [1] - 115:16
*frustrated* [1] - 211:15
*fulfilled* [1] - 112:2
*fulfilling* [1] - 115:11
*full* [9] - 17:7, 40:19, 41:3, 99:25, 104:12, 178:1, 184:17, 205:7, 239:6
*fully* [3] - 148:20, 221:14, 257:7
*fulsome* [1] - 159:9
*fumbling* [1] - 236:20
*fun* [1] - 112:5
*function* [2] - 185:10, 185:11
*funny* [1] - 45:23
*future* [8] - 56:16, 113:8, 125:20, 269:3, 269:9, 269:15, 269:18, 270:11
*fuzzy* [2] - 55:13, 166:15

## G

*gained* [2] - 122:12, 164:14
*Galloway* [6] - 11:1, 46:19, 46:21, 216:14, 218:9, 219:17
*game* [2] - 10:6, 130:4
*games* [1] - 206:16
*gamesmanship* [1] -

*5:25*
**gather** [1] - 113:9
**gay** [13] - 116:12, 116:18, 116:19, 121:7, 124:11, 124:15, 129:6, 150:13, 207:25, 208:1, 208:3, 208:20, 262:25
**Gay** [1] - 208:17
**general** [7] - 36:20, 56:9, 126:18, 165:18, 167:18, 190:22, 206:12
**generalized** [1] - 17:5
**generally** [16] - 14:2, 31:22, 116:22, 117:21, 120:2, 131:25, 133:8, 189:3, 191:22, 193:12, 193:13, 194:20, 195:15, 198:24, 206:11, 262:16
**generated** [1] - 33:12
**genesis** [1] - 239:17
**gentleman** [2] - 102:22, 150:9
**gentlemen** [3] - 116:23, 183:17, 204:4
**Germany** [1] - 48:13
**gestures** [1] - 184:5
**get-go** [1] - 208:8
**ghost** [1] - 127:1
**giant** [2] - 115:23, 116:10
**gift** [1] - 182:18
**gig** [1] - 178:14
**given** [6] - 8:18, 14:24, 19:13, 23:1, 34:5, 35:5, 71:9, 157:5, 184:3, 184:11, 207:5, 214:20, 222:18, 255:6, 256:11, 258:20
**glass** [1] - 114:1
**global** [5] - 48:5, 48:17, 56:24, 57:4, 106:18
**goal** [2] - 61:4, 149:21
**goals** [2] - 117:24, 118:2
**Google** [2] - 91:25, 92:1
**Googles** [1] - 134:3
**govern** [1] - 193:16
**governing** [2] - 5:7, 111:10

**grabbing** [1] - 47:13
**grade** [2] - 95:23, 103:9
**graduate** [1] - 102:10
**graduating** [1] - 102:11
**grant** [1] - 28:4
**granted** [2] - 19:12, 130:21
**great** [13] - 57:9, 82:3, 106:17, 108:23, 109:1, 114:18, 122:17, 126:11, 139:14, 141:12, 249:17
**greater** [1] - 119:8
**greatly** [2] - 225:25, 226:1
**grew** [3] - 48:7, 48:9, 102:5
**grounds** [2] - 30:13, 64:5
**Group** [1] - 228:9
**GROUP** [1] - 1:18
**group** [6] - 45:9, 125:19, 188:20, 209:23, 236:11
**grow** [3] - 80:23, 88:19, 125:21
**growing** [5] - 47:15, 48:17, 104:25, 112:3, 209:21
**guess** [32] - 4:11, 4:17, 10:6, 15:24, 33:18, 39:17, 42:17, 54:3, 60:18, 63:21, 66:2, 74:1, 94:4, 95:11, 97:2, 99:8, 124:10, 128:8, 136:12, 139:6, 141:7, 141:10, 141:14, 151:15, 157:14, 166:13, 178:20, 184:23, 193:21, 221:10, 249:21, 250:2
**guesswork** [1] - 268:14
**guidance** [2] - 22:17, 62:7
**guided** [1] - 268:11
**guidelines** [1] - 193:15
**guides** [1] - 77:9
**guiding** [1] - 63:4
**guilt** [1] - 149:7
**guilty** [5] - 100:4, 100:7, 100:8, 100:10, 149:19
**gun** [1] - 5:4

**gut** [1] - 273:25
**guy** [18] - 9:25, 10:2, 12:24, 13:6, 61:13, 62:23, 85:17, 88:24, 90:18, 103:13, 105:24, 142:22, 145:25, 146:5, 232:13, 232:19, 238:11, 250:14
**guys** [11] - 45:6, 47:10, 50:7, 94:15, 94:18, 96:7, 122:24, 131:5, 139:2, 160:5, 276:4

### H

**hacker** [1] - 48:25
**hackers** [1] - 105:5
**Haddonfield** [9] - 46:24, 47:2, 47:5, 178:24, 210:7, 212:25, 216:15, 216:21, 218:17
**half** [8] - 55:25, 98:8, 98:19, 115:10, 163:21, 165:17, 244:19, 244:22
**hall** [1] - 141:20
**hand** [10] - 10:9, 40:16, 92:25, 156:12, 177:23, 205:4, 208:17, 235:16, 235:22, 274:17
**handbook** [3] - 76:8, 77:8, 202:24
**handed** [1] - 232:20
**handing** [1] - 155:22
**handle** [1] - 9:24
**handles** [1] - 232:24
**hands** [4] - 111:13, 119:4, 119:15, 195:18
**hands-on** [1] - 119:15
**hang** [4] - 27:2, 73:15, 274:13, 274:16
**Hanks** [2] - 144:17, 169:23
**happiness** [1] - 135:14
**happy** [12] - 58:2, 60:6, 60:7, 60:14, 73:8, 75:7, 115:4, 126:22, 135:9, 135:12, 221:22
**harassed** [1] - 262:19
**harassing** [3] - 120:21, 262:20, 263:8

**harassment** [7] - 202:23, 203:4, 215:21, 215:25, 262:22, 264:3, 264:14
**harbor** [5] - 189:6, 190:3, 190:8, 190:13, 190:16
**hard** [12] - 20:15, 74:7, 103:3, 105:25, 109:3, 151:16, 159:8, 172:12, 177:8, 248:20, 248:21, 248:23
**harm** [1] - 269:11
**harmed** [1] - 263:6
**harp** [1] - 132:19
**harsh** [3] - 259:18, 262:16, 262:24
**harvested** [1] - 169:2
**hatch** [1] - 91:6
**HAVING** [3] - 40:17, 177:24, 205:5
**hazy** [2] - 129:11, 133:2
**hazy-ish** [1] - 129:11
**head** [16] - 51:22, 60:17, 68:9, 79:15, 79:21, 80:19, 83:22, 83:23, 84:1, 173:20, 178:15, 182:12, 205:1, 207:9, 273:12, 275:13
**heading** [2] - 203:8, 203:9
**heads** [2] - 152:25, 273:16
**health** [3] - 187:22, 187:25, 188:6
**hear** [29] - 8:8, 15:25, 16:4, 18:19, 24:23, 33:16, 67:21, 89:10, 89:16, 93:22, 93:25, 100:2, 102:2, 170:7, 211:5, 212:9, 218:8, 218:11, 220:8, 221:2, 223:10, 231:16, 237:5, 250:17, 251:2, 255:15, 271:11, 273:5, 273:10
**heard** [55] - 19:13, 21:25, 23:1, 46:13, 47:17, 49:12, 49:16, 50:20, 50:21, 71:14, 84:12, 94:12, 97:3, 97:14, 99:19, 100:4, 107:22, 113:12, 115:18, 118:22, 127:13, 127:14,

138:7, 140:5, 149:8, 149:23, 151:9, 151:18, 151:19, 157:20, 161:22, 163:7, 163:16, 164:12, 172:7, 172:14, 174:3, 178:22, 182:7, 183:18, 210:19, 220:14, 220:15, 221:14, 223:24, 235:13, 251:1, 252:16, 253:7, 253:9, 253:10, 254:19, 256:4, 273:6
**hearing** [7] - 8:10, 12:9, 99:24, 151:21, 172:21, 265:3, 274:9
**hearsay** [8] - 28:18, 28:25, 29:3, 29:7, 30:5, 30:24, 32:3
**heart** [1] - 127:6
**held** [12] - 4:1, 13:25, 65:5, 69:5, 106:24, 117:7, 157:22, 201:22, 202:6, 242:20, 243:24, 266:19
**help** [10] - 45:12, 45:24, 46:1, 48:21, 57:4, 61:6, 88:19, 88:25, 105:1, 251:11
**helped** [4] - 57:3, 165:11, 165:12, 171:10
**helpful** [1] - 5:20
**helping** [2] - 209:15, 209:20
**helps** [1] - 79:1
**hesitation** [2] - 106:3, 106:7
**hesitations** [1] - 106:5
**hi** [1] - 219:8
**hide** [1] - 90:19
**hierarchal** [1] - 226:1
**hierarchical** [1] - 226:7
**hierarchy** [2] - 107:25, 108:13
**high** [4] - 102:7, 102:9, 102:15, 103:18
**higher** [6] - 111:11, 111:15, 113:5, 136:11, 157:22, 159:2
**highest** [3] - 103:9, 109:22, 109:24
**highlight** [1] - 194:14
**highlighted** [3] -

155:11, 235:19, 235:23
**highly** [4] - 126:4, 190:3, 190:5, 190:10
**Highway** [1] - 47:14
**himself** [1] - 4:24
**hinder** [1] - 219:13
**hire** [23] - 55:15, 69:9, 71:17, 71:21, 111:24, 122:19, 130:7, 189:11, 191:18, 199:4, 199:9, 199:11, 199:15, 199:18, 199:23, 200:2, 200:4, 200:8, 200:10, 200:13, 200:15, 200:17, 200:18
**hired** [14] - 65:2, 65:8, 65:19, 66:8, 66:22, 67:25, 103:19, 106:10, 123:9, 158:23, 202:1, 202:2, 207:3, 207:13
**hiring** [8] - 46:3, 72:22, 74:22, 75:14, 77:10, 208:21, 209:6, 215:8
**hirings** [2] - 70:25, 75:24
**history** [4] - 89:22, 124:3, 206:12, 250:2
**hit** [7] - 80:22, 86:1, 151:15, 162:23, 177:8, 213:25
**hoc** [1] - 108:23
**hold** [10] - 12:15, 24:23, 39:6, 65:13, 71:1, 214:23, 214:25, 220:19, 222:22, 223:18
**Holley** [2] - 7:16, 14:5
**Holly** [2] - 8:5, 14:14
**Hollywood** [1] - 114:20
**home** [5] - 114:2, 146:21, 146:23, 173:1, 176:7
**honest** [3] - 98:17, 159:6, 239:17
**honestly** [5] - 54:23, 73:5, 74:9, 77:4, 179:16
**Honor** [77] - 4:13, 4:16, 4:22, 6:10, 11:25, 13:10, 13:22, 17:16, 21:4, 22:5, 24:17, 27:18, 31:2, 32:9, 34:1, 34:4,

37:3, 37:5, 40:3, 40:13, 40:25, 64:6, 64:8, 64:11, 74:14, 98:13, 101:20, 141:4, 144:10, 144:12, 147:12, 154:5, 156:3, 157:1, 159:4, 159:5, 160:10, 160:11, 174:25, 179:19, 181:15, 183:11, 183:16, 184:12, 198:13, 203:6, 203:20, 206:3, 214:24, 220:3, 220:5, 220:22, 221:4, 221:7, 221:10, 226:24, 228:8, 229:19, 230:3, 231:11, 231:14, 232:17, 233:3, 233:12, 234:19, 235:22, 235:24, 235:25, 240:17, 242:21, 243:4, 243:10, 247:6, 249:16, 249:19, 275:25, 276:3
**Honor's** [2] - 29:22, 31:9
**Honorable** [1] - 4:1
**HONORABLE** [1] - 1:15
**hope** [3] - 38:1, 135:15, 238:19
**hoped** [1] - 135:17
**hopeful** [1] - 135:9
**hopefully** [2] - 160:9, 274:9
**hopes** [1] - 59:21
**hoping** [2] - 126:8, 126:10
**horns** [1] - 57:2
**horrible** [3] - 111:25, 112:6, 151:15
**horseplay** [1] - 262:8
**hostile** [21] - 242:5, 251:16, 257:3, 260:5, 260:7, 260:17, 260:22, 260:24, 261:9, 261:14, 261:16, 262:10, 262:11, 262:15, 262:18, 263:2, 266:6, 266:7, 266:11, 266:14, 267:3
**hour** [7] - 153:1, 193:25, 245:19,

245:23, 245:25, 246:2, 248:8
**hours** [5] - 21:1, 170:21, 170:24, 171:16, 213:5
**house** [6] - 16:19, 46:22, 103:12, 110:21, 205:17
**HR** [6] - 77:6, 140:17, 149:17, 200:22, 201:2, 207:9
**hub** [1] - 109:6
**human** [2] - 46:8, 185:9
**humiliating** [1] - 262:3
**hundred** [3] - 16:16, 148:13, 188:12
**hundred-mile** [1] - 16:16
**hurdle** [1] - 209:5
**hurt** [1] - 95:18
**husband** [2] - 208:7, 213:25

## I

**idea** [31] - 8:19, 9:25, 27:13, 28:3, 44:1, 44:3, 44:5, 62:5, 68:20, 72:4, 77:2, 77:11, 77:15, 87:22, 87:23, 90:1, 95:10, 97:16, 98:21, 122:23, 123:2, 128:23, 139:8, 156:17, 181:18, 206:13, 222:3, 222:15, 223:13, 226:6, 245:8
**ideas** [2] - 80:3, 126:19
**identified** [4] - 9:21, 30:14, 169:3, 185:22
**identifies** [1] - 158:2
**identify** [1] - 161:19
**ignore** [1] - 254:5
**II** [3] - 70:14, 113:21, 113:22
**ill** [3] - 20:10, 20:11, 21:11
**illness** [1] - 22:22
**image** [1] - 173:20
**imagine** [1] - 177:10
**imbalances** [1] - 6:1
**immediate** [3] - 110:3, 136:23
**immediately** [3] - 134:22, 145:10, 190:17
**impact** [8] - 32:7,

109:2, 115:6, 131:20, 131:23, 146:18, 208:21, 273:11
**impacted** [2] - 18:7, 111:5
**impeach** [1] - 12:12
**impeachment** [7] - 10:5, 12:10, 12:12, 13:5, 71:4, 74:14
**implement** [1] - 77:7
**imply** [1] - 212:13
**important** [18] - 12:8, 15:13, 17:25, 19:19, 111:17, 123:21, 123:23, 133:11, 133:20, 134:1, 220:17, 250:13, 250:25, 251:5, 256:2, 263:1, 273:7, 273:9
**impossible** [2] - 56:11, 109:5
**impress** [1] - 28:8
**impression** [5] - 105:22, 110:6, 130:13, 139:20, 174:1
**improper** [1] - 254:2
**improve** [1] - 119:22
**IN** [2] - 3:13, 144:14
**Inaudible** [1] - 170:6
**incapacitated** [1] - 18:9
**incentives** [1] - 5:25
**incentivize** [1] - 5:13
**incident** [2] - 172:10, 213:3
**incidents** [3] - 80:9, 211:23, 262:14
**inclination** [1] - 159:16
**include** [1] - 261:17
**included** [2] - 41:14
**includes** [3] - 30:13, 155:20, 264:22
**including** [11] - 185:25, 238:10, 238:11, 255:14, 257:16, 257:23, 258:19, 260:13, 263:22, 267:4, 271:19
**inclusive** [1] - 186:11
**income** [5] - 64:3, 64:12, 157:7, 157:8, 157:21
**inconvenience** [1] - 268:16
**incorrect** [1] - 65:16

**increase** [8] - 64:19, 64:24, 67:17, 68:14, 81:3, 186:21, 186:25, 225:8
**increases** [1] - 271:18
**incredibly** [1] - 113:19
**indeed** [1] - 234:15
**Indeed** [1] - 72:16
**indelicate** [2] - 207:23, 208:23
**independent** [3] - 228:5, 234:25, 268:7
**independently** [1] - 266:8
**indicate** [1] - 6:13
**indicated** [3] - 14:25, 92:11, 175:8
**indicia** [1] - 226:11
**indifference** [5] - 239:23, 240:2, 270:6, 270:15, 270:19
**indirectly** [1] - 108:18
**individual** [2] - 200:24, 263:11
**individual's** [1] - 5:1
**induction** [1] - 216:16
**industry** [1] - 113:8
**infectious** [1] - 214:1
**infer** [1] - 258:15
**inferences** [1] - 268:13
**inflections** [1] - 184:5
**influence** [2] - 253:11, 271:14
**influenced** [2] - 253:24, 254:3
**informal** [2] - 75:16, 265:5
**information** [19] - 5:20, 9:13, 14:20, 14:21, 14:24, 19:15, 28:14, 28:15, 32:15, 87:1, 104:11, 156:23, 161:15, 162:14, 195:10, 196:18, 196:20, 202:4, 256:7
**informed** [1] - 222:19
**informing** [1] - 263:15
**infrastructure** [6] - 42:7, 48:17, 106:20, 107:9, 107:12, 197:15
**infuriating** [1] - 214:11
**inherited** [1] - 107:8
**initial** [3] - 4:23, 13:12, 110:6
**injuries** [1] - 268:4

*injury* [11] - 267:7, 267:15, 267:17, 267:18, 267:20, 267:25, 268:1, 268:2, 268:6, 268:8
*innocent* [3] - 98:4, 99:10, 141:14
*innovation* [1] - 80:2
*Inquirer* [3] - 83:16, 83:17, 147:25
*insinuated* [1] - 151:19
*instance* [2] - 67:12, 241:14
*instances* [1] - 108:25
*instead* [6] - 34:10, 108:24, 146:18, 154:9, 154:20, 155:6
*instinct* [1] - 68:22
*Institute* [1] - 103:6
*instruct* [6] - 252:13, 256:20, 257:7, 266:16, 266:24, 268:25
*instructed* [4] - 245:11, 254:6, 269:20, 271:24
*instructing* [1] - 266:17
*instruction* [3] - 250:18, 254:8, 273:1
*instructions* [4] - 239:4, 250:23, 271:12, 272:25
*insufficient* [1] - 222:1
*insult* [1] - 261:19
*insurance* [10] - 56:7, 56:8, 133:21, 187:22, 187:25, 188:7, 188:16, 188:18
*intangible* [1] - 268:19
*intend* [2] - 8:15, 35:20
*intended* [2] - 13:5, 13:14
*intent* [4] - 14:25, 258:9, 258:11, 258:14
*intention* [4] - 100:1, 123:9, 129:19, 241:8
*intentional* [4] - 258:15, 259:13, 259:17, 271:21
*intentionally* [3] - 257:14, 258:18, 267:2
*intentioned* [4] - 61:1, 61:5, 61:8, 106:2
*intentions* [2] - 61:9,

125:7
*interactions* [2] - 45:6, 49:4
*interconnection* [1] - 63:1
*interest* [3] - 127:6, 246:18, 255:18
*interested* [2] - 236:24, 241:21
*interesting* [1] - 212:22
*interfered* [2] - 239:16, 262:5
*internationally* [1] - 112:21
*Internet* [1] - 206:17
*internet* [4] - 83:20, 86:18, 139:13, 206:16
*interpret* [2] - 106:1, 168:23
*interrogatories* [5] - 9:5, 9:10, 97:20, 151:4, 237:18
*interrogatory* [3] - 97:21, 151:6, 157:25
*interruption* [1] - 66:1
*intervened* [1] - 268:7
*interview* [11] - 44:18, 45:21, 103:16, 120:12, 130:6, 130:21, 132:5, 207:11, 207:14, 207:18, 208:6
*interviewed* [6] - 44:17, 55:14, 103:17, 128:25, 208:2, 209:2
*interviewing* [1] - 129:13
*interviews* [1] - 44:13
*introduce* [2] - 32:22, 123:1
*introduced* [1] - 268:20
*intunement* [1] - 119:8
*inverse* [2] - 4:7, 6:7
*investigating* [1] - 167:8
*investigation* [18] - 166:24, 167:1, 167:2, 167:6, 167:11, 167:12, 167:14, 167:17, 167:25, 168:8, 168:12, 168:16, 168:19, 168:22, 169:1, 171:21, 183:22, 265:3
*invoke* [1] - 7:14

*involved* [5] - 84:18, 171:7, 171:8, 177:5, 185:11
*involvement* [1] - 167:19
*involving* [1] - 182:17
*IP* [1] - 111:9
*ire* [1] - 149:14
*ironic* [1] - 19:5
*irrelevant* [1] - 259:4
*IRS* [1] - 190:5
*ish* [1] - 129:11
*isolated* [1] - 262:14
*ISPs* [1] - 206:15
*issue* [54] - 4:18, 6:12, 13:22, 13:23, 24:18, 24:19, 24:21, 26:8, 28:7, 31:7, 31:22, 38:6, 79:17, 120:11, 125:2, 128:16, 129:12, 132:19, 134:25, 140:4, 140:17, 150:18, 151:23, 152:3, 156:13, 159:11, 159:15, 162:24, 170:14, 170:17, 171:19, 173:13, 190:6, 203:2, 210:12, 211:25, 212:1, 213:7, 213:12, 218:5, 226:17, 227:1, 227:23, 232:18, 234:22, 239:2, 240:10, 243:15, 244:1, 244:2, 245:14, 267:5, 275:15
*issues* [31] - 4:5, 4:9, 17:11, 23:23, 29:13, 29:22, 33:22, 34:9, 45:10, 55:20, 56:5, 59:18, 80:9, 104:24, 106:3, 113:6, 123:5, 128:14, 137:16, 138:16, 140:9, 145:15, 149:25, 150:3, 166:24, 211:14, 212:22, 221:20, 223:10, 231:20, 257:7
*IT* [1] - 107:10
*item* [1] - 254:6
*items* [1] - 190:15
*itself* [5] - 22:11, 167:6, 176:22, 229:18, 240:2

## J

*JACKSON* [1] - 2:2
*jail* [1] - 85:14
*James* [3] - 1:12, 198:3, 200:9
*January* [19] - 1:13, 63:17, 70:1, 73:19, 124:25, 125:3, 137:5, 138:11, 162:3, 167:4, 186:24, 187:4, 187:7, 200:4, 200:22, 224:24, 224:25, 231:14, 276:15
*Japan* [1] - 209:19
*Jeez* [1] - 44:17
*jeez* [1] - 46:13
*Jersey* [6] - 7:17, 43:25, 46:23, 102:6, 109:4, 210:6
*JILL* [1] - 2:3
*Job* [2] - 197:24, 200:3
*job* [41] - 44:13, 49:22, 55:14, 58:7, 73:3, 82:18, 103:10, 103:14, 106:6, 106:10, 110:16, 114:11, 124:19, 133:4, 133:5, 135:11, 135:12, 140:23, 182:12, 185:8, 197:6, 197:7, 197:12, 197:23, 197:25, 198:3, 198:7, 200:24, 201:8, 201:22, 202:6, 203:12, 207:1, 207:19, 209:11, 209:22, 210:4, 225:23, 241:2, 269:16, 269:19
*JOB* [1] - 197:24
*jobs* [1] - 44:12
*jog* [2] - 165:11, 165:12
*John* [33] - 8:12, 84:7, 84:16, 85:13, 87:3, 87:6, 87:10, 87:15, 87:18, 87:20, 87:21, 87:23, 89:21, 89:25, 94:13, 94:19, 144:22, 145:23, 145:24, 146:11, 148:4, 163:19, 166:24, 166:25, 167:20, 172:9, 174:12, 178:19,

178:22, 179:9, 246:7, 258:23
*John's* [2] - 86:1, 146:10
*Johnson* [2] - 103:10
*Johnstown* [1] - 114:4
*joint* [1] - 35:14
*joke* [1] - 112:12
*jokes* [1] - 262:9
*JONATHAN* [1] - 2:3
*JOSHUA* [2] - 1:15, 4:2
*Judge* [5] - 4:2, 7:13, 205:13, 246:3, 269:7
*JUDGE* [1] - 1:16
*judge* [1] - 58:2
*judges* [1] - 255:10
*judgment* [2] - 223:3, 223:7, 259:16, 259:18, 268:12
*judiciously* [1] - 252:24
*Julia* [1] - 13:24
*July* [4] - 156:6, 156:7, 200:20, 231:6
*jump* [4] - 5:4, 110:12, 207:24, 232:2
*jumping* [1] - 106:3
*June* [14] - 11:20, 12:4, 27:3, 186:16, 186:19, 186:21, 199:9, 229:22, 230:3, 231:6, 231:9, 231:10
*junior* [1] - 139:9
*Juniper* [1] - 209:17
*jurisdiction* [1] - 18:12
*juror* [1] - 273:2
*JUROR* [2] - 204:18, 204:20
*Jury* [8] - 40:6, 101:7, 101:17, 153:3, 160:21, 220:25, 250:5, 273:19
*jury* [78] - 4:6, 5:21, 18:13, 19:15, 19:17, 34:2, 77:18, 96:13, 101:15, 102:2, 104:16, 104:18, 106:9, 106:23, 108:2, 109:18, 110:2, 112:7, 113:16, 117:15, 117:19, 125:9, 129:9, 132:10, 133:8, 135:18, 139:1, 140:5, 140:8, 141:2, 143:18, 144:16, 145:21, 152:8, 155:15,

155:23, 159:13,
160:19, 182:9,
206:9, 206:13,
212:18, 221:15,
222:2, 222:6,
222:19, 223:5,
226:9, 226:17,
227:14, 227:23,
231:13, 233:13,
233:17, 237:8,
237:15, 238:19,
238:20, 240:5,
243:9, 243:16,
244:3, 244:5,
244:11, 244:25,
245:7, 245:14,
246:18, 247:3,
247:12, 249:18,
269:7, 270:2, 270:9,
272:7, 273:22,
275:5, 275:19
**JURY** [2] - 1:5, 204:16
**jury's** [1] - 273:25
**justify** [2] - 172:5,
172:6

## K

**KAUFMAN** [1] -
197:20
**Kaufman** [25] - 52:13,
52:14, 65:11, 72:5,
108:10, 108:15,
121:11, 121:14,
122:1, 122:5, 123:5,
123:10, 124:7,
124:11, 124:17,
124:22, 125:2,
128:20, 197:20,
199:22, 202:12,
202:13, 202:14,
203:10, 203:17
**Kaufman's** [3] -
123:13, 130:19,
158:25
**kaufmann** [1] - 130:23
**Kaufmann** [1] -
225:14
**keep** [17] - 40:8,
96:10, 105:5, 105:9,
122:16, 146:15,
159:15, 184:24,
202:7, 209:21,
213:22, 220:18,
233:5, 233:6, 273:9,
273:12, 274:16
**kept** [1] - 151:21
**key** [4] - 82:22, 157:2,
196:10, 262:23
**Khamsao** [3] - 198:1,
200:7, 203:13

**KHAMSAO** [1] - 198:1
**kicking** [2] - 114:20,
275:16
**kid** [3] - 145:15,
179:10, 179:13
**kids** [3] - 104:15,
112:13, 146:21
**kind** [107] - 22:15,
26:13, 27:21, 28:9,
38:10, 44:13, 45:9,
45:11, 45:23, 45:25,
48:25, 49:8, 49:15,
49:22, 55:22, 56:7,
56:14, 58:11, 60:24,
60:25, 63:4, 69:12,
79:12, 81:11, 81:14,
82:7, 100:4, 100:5,
102:13, 102:15,
102:16, 102:25,
103:11, 104:5,
104:13, 104:25,
105:7, 105:11,
105:13, 105:17,
105:20, 105:24,
105:25, 106:21,
110:8, 110:10,
110:12, 110:14,
110:21, 111:11,
111:15, 112:21,
113:1, 114:2,
114:20, 114:22,
114:24, 116:1,
117:25, 118:25,
124:1, 124:5,
125:11, 125:23,
125:25, 126:23,
127:1, 129:11,
129:23, 132:3,
132:12, 134:8,
135:8, 135:25,
138:16, 139:9,
139:12, 139:17,
146:7, 148:19,
149:14, 149:18,
150:24, 159:12,
162:21, 162:23,
174:11, 184:24,
190:24, 191:18,
195:5, 205:18,
213:2, 213:5,
214:21, 215:2,
215:21, 215:25,
226:10, 236:7,
241:19, 249:7,
263:9, 275:16
**kindly** [2] - 145:14,
146:2
**kinds** [2] - 59:9, 255:4
**King's** [1] - 47:13
**kitchen** [1] - 15:5

**Kitonga** [3] - 197:24,
200:3, 203:13
**KITONGA** [1] - 197:25
**knowing** [3] - 87:6,
146:8, 179:16
**knowingly** [1] - 237:9
**knowledge** [20] - 5:1,
11:10, 33:4, 41:23,
43:2, 56:5, 105:7,
113:5, 120:25,
122:13, 141:16,
145:21, 145:24,
146:18, 154:4,
183:2, 183:5,
219:15, 259:2,
270:20
**known** [6] - 5:2, 15:11,
18:23, 89:22, 179:7,
247:7
**knows** [9] - 33:12,
142:8, 144:22,
148:21, 156:17,
163:24, 164:6,
254:17, 270:16

## L

**labeled** [1] - 190:13
**lack** [9] - 5:7, 5:10,
5:11, 6:15, 15:23,
39:19, 119:14,
163:23, 242:9
**ladder** [1] - 79:13
**ladders** [3] - 75:18,
76:5, 76:15
**ladies** [2] - 183:17,
204:4
**laid** [4] - 33:19,
123:20, 125:23,
133:3
**language** [3] - 227:19,
261:19, 262:9
**laptop** [5] - 84:8,
84:14, 87:4, 145:25,
177:7
**large** [2] - 96:19,
109:8
**large-scale** [1] - 109:8
**larger** [2] - 28:18,
104:4
**largest** [1] - 206:16
**last** [41] - 9:21, 12:16,
13:7, 18:14, 21:1,
21:24, 23:24, 27:20,
31:8, 39:13, 46:12,
77:18, 131:3, 151:7,
164:20, 164:23,
167:4, 171:4,
175:18, 176:4,
179:4, 179:5,

180:24, 192:20,
197:7, 197:22,
197:24, 198:1,
198:5, 198:9, 201:9,
201:11, 203:6,
204:4, 205:10,
218:15, 238:17,
244:1, 247:25,
250:18
**lastly** [5] - 19:9, 31:21,
32:5, 119:21, 223:4
**late** [5] - 34:12, 34:13,
79:22, 171:25, 274:4
**latest** [2] - 37:22,
77:16
**launch** [1] - 43:24
**Laura** [2] - 2:13, 35:7
**law** [26] - 6:12, 88:10,
220:14, 226:25,
227:13, 237:9,
237:13, 238:16,
239:2, 239:4,
245:13, 250:10,
251:6, 251:9, 255:5,
256:20, 269:22,
270:17, 270:20,
270:25, 271:6,
272:19, 272:22,
272:24, 273:1, 273:8
**LAW** [1] - 1:18
**laws** [1] - 256:14
**lawyer** [5] - 253:4,
253:19, 253:20,
253:21, 253:22
**lawyers** [7] - 220:12,
220:16, 253:3,
253:5, 253:25,
273:7, 273:8
**lay** [7] - 32:10, 33:1,
33:7, 33:11, 66:25,
67:2, 118:3
**lead** [3] - 57:11,
120:18, 123:22
**leader** [3] - 112:4,
123:21, 123:25
**leaders** [1] - 77:7
**Leaders** [1] - 218:12
**leading** [7] - 121:21,
124:21, 127:8,
151:24, 176:15,
185:9, 217:11
**leads** [1] - 253:16
**learn** [1] - 139:11
**learned** [1] - 21:11
**learning** [2] - 64:24,
209:13
**least** [24] - 6:19, 9:23,
19:10, 22:25, 49:24,
51:20, 52:22, 67:18,
92:20, 105:6,

106:21, 109:19,
116:18, 122:15,
148:24, 150:21,
160:12, 193:25,
211:25, 222:21,
222:24, 245:24,
245:25, 246:3
**leave** [3] - 91:12,
127:21, 213:6
**Leaving** [2] - 218:12
**leaving** [2] - 38:9, 39:9
**led** [2] - 120:14, 129:4
**left** [6] - 4:10, 9:18,
37:16, 96:10, 153:9,
200:15
**legal** [2] - 240:8, 271:4
**legally** [1] - 239:16
**legitimacy** [1] - 167:9
**legitimate** [4] - 167:7,
238:1, 239:8, 251:22
**lenient** [1] - 162:21
**less** [11] - 20:15,
189:19, 222:4,
222:10, 223:13,
223:23, 225:1,
236:24, 257:9,
267:9, 269:16
**letter** [13] - 58:8,
154:10, 155:6,
155:7, 155:22,
155:23, 157:3,
157:5, 158:1,
159:25, 201:15,
203:6
**level** [17] - 22:24,
61:17, 64:3, 64:24,
65:20, 110:15,
111:11, 111:15,
113:5, 117:24,
140:17, 157:7,
157:8, 157:21,
224:8, 224:11,
225:16
**levels** [1] - 64:12
**LEWIS** [1] - 2:2
**LEXIS** [1] - 7:23
**LGBT** [1] - 241:17
**LIABILITY** [1] - 1:6
**liability** [1] - 238:15
**liable** [2] - 266:19,
268:8
**liar** [1] - 90:19
**liberties** [1] - 140:13
**lie** [30] - 91:5, 91:6,
91:8, 95:2, 95:4,
95:8, 96:1, 96:8,
96:24, 96:25, 97:13,
98:8, 98:18, 99:5,
99:6, 99:22, 100:22,
100:24, 163:1,

163:9, 163:15,
163:17, 164:12,
171:10, 171:15,
237:11, 237:12,
238:3, 239:24
**lied** [6] - 95:21,
100:13, 234:4,
234:5, 234:6
**lies** [1] - 163:4
**lieu** [3] - 157:6,
159:21, 190:7
**life** [7] - 13:6, 115:10,
146:15, 152:16,
188:16, 188:18,
268:16
**lift** [1] - 212:7
**light** [5] - 173:20,
251:25, 253:13,
255:22, 268:23
**likely** [3] - 66:4, 252:1,
252:8
**limine** [2] - 274:23,
275:14
**limited** [1] - 254:7
**LIMITED** [1] - 1:6
**line** [8] - 60:11, 70:18,
73:12, 179:25,
184:11, 201:18,
202:10, 235:24
**Line** [4] - 168:14,
173:7, 180:8, 180:10
**lines** [5] - 11:4, 160:6,
167:24, 180:1,
235:17
**Lines** [1] - 179:22
**link** [3] - 53:20,
143:22, 146:7
**linked** [1] - 262:22
**Linode** [192] - 19:3,
32:13, 32:16, 41:8,
41:10, 41:11, 42:9,
42:12, 43:4, 43:12,
43:13, 43:14, 43:22,
44:4, 44:9, 44:11,
44:16, 44:22, 45:2,
45:3, 46:5, 46:9,
46:18, 47:17, 48:3,
54:15, 55:5, 57:3,
57:4, 57:16, 59:2,
62:6, 64:4, 67:25,
68:4, 75:13, 75:22,
79:10, 79:11, 84:8,
87:3, 88:19, 91:18,
104:1, 104:6, 104:8,
104:19, 104:21,
104:24, 105:6,
106:4, 106:10,
106:15, 106:25,
107:24, 108:17,
108:22, 109:10,

109:15, 110:3,
111:18, 120:3,
120:10, 120:22,
121:2, 121:14,
122:15, 122:16,
123:10, 140:9,
166:22, 167:14,
167:19, 169:22,
170:13, 175:8,
177:6, 178:10,
184:21, 184:23,
185:2, 185:8,
185:10, 185:20,
185:25, 186:7,
188:2, 188:12,
189:16, 190:7,
190:8, 192:23,
196:8, 198:16,
198:19, 198:20,
204:24, 206:11,
207:2, 207:4, 207:9,
207:13, 208:2,
208:11, 208:21,
209:1, 209:6,
209:11, 210:2,
210:4, 210:10,
211:10, 212:10,
212:15, 212:19,
213:17, 214:8,
214:10, 214:16,
215:6, 215:7,
215:11, 215:17,
215:20, 215:22,
215:24, 215:25,
216:13, 218:2,
218:12, 218:18,
219:9, 223:7,
225:25, 228:7,
230:12, 235:2,
235:6, 235:7, 235:8,
236:3, 236:5,
236:12, 239:15,
240:22, 251:15,
251:21, 252:3,
252:7, 257:4, 257:6,
257:9, 257:11,
257:13, 257:14,
257:19, 257:20,
257:21, 258:2,
258:3, 258:4, 258:8,
258:11, 258:17,
258:20, 258:25,
259:1, 259:2,
259:10, 259:18,
260:4, 263:14,
265:18, 266:10,
266:15, 266:18,
267:2, 267:23,
268:8, 268:9, 269:3,
269:5, 269:19,
270:14, 270:24,

271:5, 271:20,
272:17, 272:21
**LINODE** [3] - 1:6, 1:7,
1:7
**Linode's** [42] - 45:1,
62:10, 202:22,
218:12, 257:24,
258:7, 258:22,
258:24, 259:5,
259:6, 259:8,
259:11, 259:14,
259:16, 259:20,
259:21, 259:24,
260:10, 260:22,
261:3, 261:14,
265:7, 265:13,
265:16, 265:24,
267:8, 267:15,
267:16, 267:19,
267:21, 267:25,
268:3, 268:4, 268:7,
268:17, 269:9,
269:12, 270:5,
271:21, 272:12,
272:16, 272:24
**LINODIAN** [1] - 1:7
**liquidated** [1] - 266:23
**list** [40] - 6:8, 6:9,
8:15, 8:17, 8:18,
12:24, 14:17, 14:18,
14:20, 15:6, 30:12,
35:13, 35:14, 36:25,
154:13, 159:18,
169:6, 169:8, 169:9,
171:6, 171:8,
194:21, 194:25,
195:10, 195:14,
196:7, 228:9,
228:12, 229:21,
235:6, 235:7, 236:3,
236:12, 236:13,
236:15, 244:6, 244:8
**listed** [2] - 5:9, 159:10
**listen** [2] - 129:25,
251:12
**listened** [2] - 164:2,
222:14
**listing** [1] - 168:11
**literally** [3] - 139:13,
154:19, 216:16
**litigate** [1] - 17:9
**litigating** [2] - 270:1,
272:6
**litigation** [3] - 131:18,
237:18, 244:22
**live** [3] - 204:6,
204:10, 204:13
**lived** [9] - 178:19,
178:20, 178:22,
178:24, 179:2,

179:7, 179:15,
179:16, 208:7
**lives** [1] - 247:14
**living** [9] - 64:21,
177:5, 179:1, 180:6,
180:11, 180:14,
181:20, 182:1,
222:13
**LLC** [4] - 1:7, 1:7, 1:8,
251:15
**loaf** [1] - 146:4
**local** [1] - 133:12
**logic** [2] - 172:25,
174:6
**logistics** [1] - 273:24
**London** [1] - 206:17
**lonely** [1] - 112:14
**long-distance** [1] -
206:21
**look** [26] - 6:19, 12:10,
22:14, 26:21, 27:23,
92:17, 97:1, 119:1,
144:1, 145:13,
153:1, 161:7,
179:23, 180:3,
227:14, 231:13,
232:6, 234:12,
237:23, 243:15,
244:9, 246:8,
260:18, 261:10,
261:17, 273:15
**looked** [7] - 125:4,
167:19, 191:5,
194:9, 207:10,
249:15, 275:24
**looking** [12] - 11:12,
47:6, 47:7, 100:19,
105:18, 121:19,
122:3, 179:23,
188:21, 196:20,
201:17, 201:20
**looks** [3] - 8:2, 32:14,
141:12
**loop** [1] - 129:3
**loosely** [1] - 49:22
**looser** [1] - 170:23
**loss** [2] - 268:16,
269:10
**losses** [2] - 269:8,
269:23
**lost** [4] - 104:5,
157:16, 271:17,
272:11
**loud** [1] - 250:1
**loudly** [2] - 208:15,
208:17
**loved** [1] - 113:19
**lower** [9] - 64:15,
64:17, 106:14,
224:2, 224:7, 225:1,

225:10, 225:12,
226:8
**Lowry** [1] - 2:14
**lump** [3] - 191:1,
191:4, 192:12
**Lunch** [1] - 160:16
**lunch** [25] - 21:10,
23:19, 45:21, 45:25,
50:4, 50:7, 50:9,
50:11, 50:21, 50:22,
50:24, 85:24, 90:7,
105:17, 112:11,
115:21, 138:9,
146:4, 146:9,
152:20, 152:23,
159:15, 160:8,
166:11, 273:25
**lying** [6] - 100:13,
100:16, 237:25,
238:2, 239:2, 240:7

## M

**MacDavid** [2] -
197:10, 199:8
**MACDAVID** [1] -
197:10
**magically** [2] - 165:14,
172:6
**magnitude** [1] - 20:23
**main** [1] - 208:17
**maintain** [2] - 56:15,
209:21
**maintained** [1] -
200:23
**maker** [1] - 235:8
**makeup** [1] - 263:13
**Malaysia** [1] - 115:23
**male** [3] - 146:19,
147:7, 218:19
**malice** [4] - 270:6,
270:14, 270:16,
270:22
**man** [13] - 11:11, 54:1,
116:18, 116:19,
142:16, 146:13,
150:13, 207:25,
208:1, 208:3,
208:17, 208:20,
208:24
**manage** [3] - 43:18,
68:1, 124:1
**management** [4] -
79:10, 79:12, 124:2,
270:13
**manager** [29] - 52:4,
52:13, 57:21, 58:6,
60:16, 63:8, 65:20,
67:14, 68:15, 69:5,
72:6, 103:17, 104:9,

106:13, 107:1,
107:7, 118:14,
121:11, 122:18,
123:11, 125:13,
129:15, 135:19,
136:1, 136:7,
136:11, 140:23,
197:13, 197:21
**manager's** [1] - 67:13
**managers** [5] - 75:14,
75:23, 77:9, 78:14,
224:6
**manages** [1] - 111:10
**managing** [1] - 103:22
**manner** [3] - 184:8,
255:17, 265:3
**mannerisms** [1] -
184:6
**Marantz** [1] - 200:21
**March** [3] - 195:17,
199:9, 200:13
**marinate** [1] - 127:3
**Mark** [1] - 207:6
**marked** [3] - 35:14,
35:24, 153:15
**Market** [2] - 1:12, 1:19
**married** [7] - 90:4,
90:6, 104:14,
104:15, 206:20,
206:22, 208:7
**Marston's** [1] - 7:13
**match** [1] - 189:15
**matched** [1] - 134:12
**material** [1] - 262:12
**materially** [3] -
263:24, 264:10,
265:6
**materials** [2] - 30:14,
253:4
**mathematical** [1] -
269:23
**matter** [15] - 106:15,
144:19, 193:2,
218:6, 221:13,
222:7, 226:25,
227:3, 227:9,
227:10, 227:13,
232:25, 245:13,
256:19, 276:11
**Matter** [1] - 276:7
**maureen** [1] - 1:22
**Maureen** [3] - 246:23,
248:25, 276:13
**maureen.mchugh@
paed.uscourts.gov**
[1] - 1:22
**McCarthy** [1] - 156:9
**MCCARTHY** [6] - 2:4,
25:9, 156:10,
156:14, 156:20,

235:24
**McCowan** [6] - 6:22,
6:25, 7:6, 7:12, 14:5,
14:14
**McHugh** [2] - 1:22,
276:13
**meal** [1] - 116:1
**mean** [118] - 5:7, 6:20,
6:21, 13:16, 13:17,
16:25, 17:4, 17:20,
18:10, 20:11, 20:14,
27:10, 27:18, 29:8,
33:10, 34:4, 34:8,
34:12, 36:12, 39:15,
44:8, 50:8, 50:13,
56:5, 57:12, 60:13,
60:23, 61:16, 61:21,
62:1, 62:22, 67:3,
67:15, 71:4, 74:15,
75:2, 75:11, 75:21,
76:14, 79:19, 82:24,
84:6, 99:24, 100:14,
109:12, 109:19,
110:18, 110:23,
111:21, 112:12,
112:20, 113:18,
113:19, 118:25,
121:6, 123:17,
124:18, 125:11,
127:19, 128:7,
129:11, 133:2,
134:16, 135:11,
137:23, 140:13,
140:14, 141:2,
142:1, 143:1,
143:13, 146:21,
147:2, 148:6,
150:24, 151:15,
154:19, 155:3,
155:15, 156:5,
157:7, 157:24,
159:17, 168:5,
169:23, 171:12,
172:25, 177:4,
177:9, 177:12,
194:3, 208:8, 212:4,
212:17, 217:9,
219:20, 220:18,
225:6, 226:21,
227:13, 227:22,
228:15, 237:24,
239:24, 240:3,
242:8, 242:17,
245:7, 245:20,
246:17, 247:10,
247:11, 248:1,
249:21, 266:18,
274:6
**mean..** [1] - 92:13
**meaning** [5] - 10:23,
35:22, 108:15,

264:24
**meaningfully** [1] -
66:10
**means** [13] - 84:18,
97:21, 220:8, 227:5,
237:9, 237:15,
251:24, 253:22,
255:11, 259:25,
265:7, 266:1, 266:9
**meant** [2] - 80:8,
267:10
**measure** [1] - 109:2
**mechanical** [2] - 1:23,
190:14
**mechanism** [2] -
137:16, 176:21
**meet** [9] - 50:3, 55:16,
82:4, 103:3, 105:16,
129:21, 139:11,
207:15, 252:6
**Meet** [1] - 91:25
**meeting** [42] - 10:25,
50:17, 50:18, 60:10,
60:19, 60:22, 61:16,
61:20, 61:22, 61:24,
62:2, 62:23, 62:24,
63:12, 74:24, 75:3,
75:6, 75:8, 100:9,
128:9, 128:10,
128:15, 129:8,
129:10, 131:4,
131:15, 132:1,
132:11, 132:22,
132:25, 138:9,
149:8, 150:1, 150:4,
163:17, 175:25,
240:22, 240:23,
241:10, 242:1,
242:25, 243:14
**meetings** [2] - 76:21,
76:22
**Melissa** [1] - 2:12
**member** [2] - 260:19,
261:11
**memo** [7] - 5:15, 6:6,
8:11, 13:15, 15:6,
29:19, 159:8
**memorandum** [1] -
12:23
**memory** [11] - 51:19,
132:2, 161:7,
164:14, 165:5,
165:7, 165:11,
165:12, 166:15,
230:16, 255:17
**memos** [1] - 6:1
**mend** [1] - 139:18
**mental** [2] - 261:24,
268:16
**mention** [8] - 57:19,

75:10, 77:13,
113:12, 114:6,
199:21, 234:1, 234:3
**mentioned** [27] - 8:22,
8:25, 11:5, 11:16,
12:1, 12:5, 13:4,
19:14, 60:9, 60:18,
61:25, 74:24, 75:6,
75:8, 105:18,
106:23, 128:10,
132:8, 132:10,
138:24, 143:1,
149:7, 155:13,
193:6, 195:3, 256:8
**mentions** [3] - 61:23,
62:3, 77:8
**mentor** [1] - 82:4
**mentoring** [1] -
102:25
**merely** [2] - 259:22,
262:4
**merit** [2] - 41:19, 79:3
**merits** [3] - 23:3,
24:16, 264:17
**mess** [1] - 148:5
**message** [15] - 28:16,
37:23, 55:23, 58:21,
58:23, 63:3, 75:4,
83:6, 92:7, 92:10,
94:18, 125:5,
126:22, 128:5, 139:2
**messages** [5] - 35:2,
35:3, 39:14, 92:11,
145:9
**messaging** [1] - 59:9
**met** [10] - 24:1, 44:25,
45:4, 45:17, 45:20,
75:4, 114:21,
114:24, 116:21,
227:3
**method** [5] - 18:4,
59:1, 91:15, 91:17,
91:22
**Mets** [8] - 97:6, 97:11,
140:19, 142:2,
142:7, 142:8, 142:9,
182:18
**MEYER** [1] - 78:24
**Meyer** [1] - 2:12
**mic** [1] - 248:21
**microphone** [1] -
216:19
**mid** [11] - 49:21,
49:23, 50:1, 51:13,
218:20, 218:24,
220:7, 223:24,
244:22, 250:20,
273:13
**mid-afternoon** [1] -
220:7

**mid-morning** [2] -
250:20, 273:13
**mid-year** [4] - 49:21,
49:23, 50:1, 51:13
**middle** [7] - 45:25,
54:15, 155:5, 187:9,
187:23, 195:21,
205:10
**middlemen** [1] -
106:19
**might** [24] - 5:20, 8:23,
9:3, 22:2, 27:3, 54:1,
75:3, 98:1, 110:14,
116:19, 140:9,
159:5, 193:19,
205:23, 226:7,
228:4, 234:24,
239:25, 240:9,
242:5, 254:12,
254:13, 265:9, 269:9
**Mike** [2] - 87:23
**milberg** [1] - 236:6,
236:15
**Milberg** [8] - 191:20,
194:21, 195:9,
228:9, 236:2, 236:5,
236:11
**mile** [1] - 16:16
**miles** [1] - 19:2
**million** [2] - 42:24,
46:13
**millions** [1] - 111:9
**mimics** [1] - 184:3
**mind** [20] - 29:24,
74:3, 84:11, 84:20,
100:25, 122:7,
125:8, 125:23,
140:8, 140:16,
146:5, 148:24,
162:7, 204:19,
206:10, 220:18,
221:4, 233:18,
252:19, 273:9
**minds** [1] - 127:22
**minimum** [1] - 189:16
**minute** [8] - 12:20,
18:15, 21:24, 36:14,
150:1, 150:4, 216:9,
243:10
**minutes** [19] - 101:3,
101:8, 153:9,
153:10, 153:11,
175:22, 216:4,
220:11, 220:20,
237:4, 246:2,
246:11, 247:11,
247:23, 248:16,
248:18, 248:21,
250:1
**mischaracterization**

*[1]* - 166:1

**misheard** *[2]* - 65:1, 65:23

**misinterpreted** *[1]* - 82:8

**miss** *[3]* - 20:6, 170:19, 190:11

**missed** *[4]* - 170:14, 173:9, 174:1, 240:12

**missing** *[3]* - 122:6, 172:19, 173:13

**mission** *[2]* - 117:24, 118:2

**misstatement** *[1]* - 163:10

**misunderstood** *[1]* - 53:14

**mitigate** *[2]* - 56:16, 105:9

**mix** *[1]* - 20:5

**mobility** *[2]* - 80:20, 81:5

**Mohammed** *[1]* - 87:17

**mom** *[6]* - 102:7, 113:18, 113:22, 114:3, 114:10, 114:18

**moment** *[6]* - 15:16, 58:17, 184:14, 220:6, 237:16, 238:8

**Monday** *[2]* - 20:9, 20:25

**monetary** *[2]* - 268:19, 269:8

**money** *[24]* - 69:13, 69:16, 81:3, 97:5, 136:5, 142:13, 142:22, 154:9, 154:10, 158:3, 182:13, 191:1, 224:3, 229:16, 231:15, 231:18, 232:8, 232:10, 233:4, 233:17, 233:19, 234:24, 235:3, 275:11

**monitor** *[1]* - 182:22

**monster** *[1]* - 151:20

**month** *[5]* - 8:12, 49:25, 207:19, 207:20, 222:13

**months** *[12]* - 27:5, 27:7, 28:6, 60:21, 99:5, 99:6, 100:23, 162:11, 165:9, 209:13, 214:7, 229:8

**moral** *[2]* - 88:13, 88:14

**moreover** *[1]* - 262:14

**morning** *[19]* - 4:4, 4:5, 34:5, 40:8, 101:3, 101:23, 101:24, 206:6, 206:8, 208:15, 246:14, 247:4, 248:12, 249:5, 250:20, 273:5, 273:13, 273:17, 274:9

**Morris** *[2]* - 43:25, 102:17

**most** *[8]* - 40:9, 87:16, 109:7, 118:3, 185:8, 199:20, 209:1, 212:24

**mostly** *[2]* - 5:17, 49:5

**mother** *[3]* - 90:16, 113:19, 114:9

**motion** *[9]* - 221:14, 223:20, 223:21, 227:12, 234:8, 244:13, 245:6, 274:23

**motions** *[8]* - 203:23, 204:3, 221:2, 221:9, 221:11, 222:23, 249:14, 275:15

**motivated** *[8]* - 234:10, 234:15, 235:3, 260:5, 260:14, 261:5, 267:22, 267:23

**motivation** *[1]* - 125:10

**motivations** *[1]* - 239:11

**motive** *[4]* - 92:23, 229:14, 229:18, 255:19

**mouth** *[1]* - 242:23

**movant** *[1]* - 243:18

**move** *[17]* - 12:17, 47:2, 47:3, 51:12, 51:13, 67:12, 67:14, 69:2, 73:3, 75:5, 137:2, 144:10, 148:19, 173:22, 221:21, 223:16, 244:16

**moved** *[6]* - 46:24, 47:5, 132:17, 206:22, 216:15, 240:11

**moving** *[4]* - 47:12, 133:10, 133:13, 245:16

**MR** *[478]* - 3:4, 3:5, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:10, 4:13,

4:16, 4:22, 6:10, 6:22, 7:2, 7:4, 7:6, 7:8, 7:9, 7:16, 7:21, 7:23, 8:2, 8:7, 8:9, 9:4, 9:7, 9:12, 9:16, 10:12, 11:19, 11:23, 11:25, 12:1, 12:4, 12:8, 12:25, 13:2, 13:7, 13:10, 13:17, 13:19, 16:3, 16:6, 16:12, 16:17, 17:16, 17:20, 18:22, 19:23, 20:1, 20:5, 20:12, 20:17, 20:21, 20:24, 21:2, 21:9, 21:16, 22:5, 23:13, 23:20, 24:3, 24:4, 24:6, 24:14, 25:4, 25:8, 25:9, 25:10, 25:11, 25:15, 25:18, 25:20, 25:21, 26:4, 26:12, 26:17, 26:21, 26:24, 27:2, 27:7, 27:10, 27:18, 28:9, 29:3, 31:2, 31:4, 31:14, 31:20, 31:24, 31:25, 32:9, 33:6, 33:13, 33:17, 33:24, 34:1, 34:4, 34:10, 34:15, 34:18, 34:19, 34:21, 34:22, 34:24, 35:2, 35:3, 35:4, 35:9, 35:13, 35:18, 35:24, 36:3, 36:7, 36:12, 36:17, 36:23, 36:25, 37:3, 37:5, 37:11, 37:15, 37:21, 37:22, 37:24, 38:12, 38:13, 38:19, 38:22, 38:25, 39:1, 39:2, 39:7, 39:13, 39:24, 40:1, 40:3, 40:13, 40:25, 41:2, 42:2, 42:4, 42:20, 42:22, 58:19, 62:18, 62:20, 63:24, 64:1, 64:5, 64:8, 64:11, 65:3, 65:5, 65:9, 65:11, 65:15, 66:13, 66:20, 66:23, 67:5, 67:7, 67:21, 67:24, 68:24, 69:1, 70:9, 70:13, 70:16, 70:23, 70:25, 71:2, 71:5, 74:13, 74:16, 76:11, 76:16, 77:17, 77:20, 78:23, 78:25, 83:3, 83:10, 86:5, 89:8, 89:18, 89:24, 93:23, 94:1, 98:13, 98:15, 101:1, 101:20, 101:22,

117:5, 117:8, 117:9, 121:21, 121:23, 121:25, 127:8, 127:10, 130:9, 130:14, 130:24, 131:1, 135:22, 140:11, 140:25, 141:4, 141:17, 141:24, 142:6, 144:5, 144:7, 144:10, 144:12, 144:15, 146:24, 147:4, 147:10, 147:12, 147:14, 148:2, 148:10, 151:24, 152:2, 152:4, 152:7, 152:18, 152:20, 153:8, 153:15, 153:19, 153:21, 154:4, 154:5, 154:15, 155:2, 155:10, 155:17, 155:24, 155:25, 156:10, 156:14, 156:20, 156:24, 156:25, 157:2, 157:10, 157:20, 158:6, 158:11, 158:15, 159:5, 160:7, 160:10, 160:11, 160:25, 161:2, 161:16, 161:18, 163:10, 163:12, 163:23, 164:1, 164:7, 164:17, 164:19, 165:4, 165:21, 165:23, 166:1, 166:9, 166:16, 166:18, 170:9, 173:23, 174:14, 174:24, 174:25, 175:2, 175:4, 175:11, 175:14, 176:8, 176:12, 176:15, 176:16, 176:20, 177:2, 177:15, 177:17, 177:20, 178:6, 179:19, 179:21, 181:12, 181:15, 181:17, 181:21, 181:23, 183:6, 183:8, 183:11, 183:13, 183:15, 184:12, 184:14, 184:16, 185:14, 185:17, 185:18, 186:5, 186:6, 186:13, 186:14,

186:17, 186:20, 187:2, 187:3, 187:9, 187:10, 187:18, 187:19, 187:23, 187:24, 188:10, 188:11, 188:14, 188:15, 188:17, 188:22, 188:23, 192:2, 192:3, 192:8, 192:13, 196:16, 196:22, 198:11, 198:15, 199:1, 199:5, 201:14, 201:19, 201:24, 202:8, 202:11, 202:20, 202:21, 203:1, 203:5, 203:18, 203:20, 203:23, 204:1, 204:24, 206:3, 206:5, 209:7, 209:10, 210:14, 210:17, 211:17, 211:19, 212:2, 212:6, 212:8, 214:22, 214:24, 215:5, 215:13, 215:16, 216:3, 216:5, 216:7, 216:9, 216:12, 216:20, 219:2, 219:4, 219:7, 219:16, 219:19, 219:22, 220:3, 220:5, 220:22, 221:4, 221:7, 221:10, 221:16, 221:19, 223:16, 223:19, 223:22, 224:16, 224:22, 224:24, 225:3, 225:5, 225:20, 226:14, 226:18, 226:24, 227:19, 228:8, 228:24, 229:6, 229:11, 229:16, 229:25, 230:2, 230:6, 230:13, 230:15, 231:3, 231:8, 231:11, 231:24, 232:5, 232:10, 232:17, 233:2, 233:11, 233:24, 234:9, 234:19, 235:5, 235:12, 235:15, 235:19, 235:20, 235:22, 235:24, 235:25, 236:10, 236:18, 237:6, 239:1, 240:16, 242:3,

242:12, 242:19, 242:21, 243:3, 243:6, 243:10, 243:22, 244:15, 245:18, 245:23, 246:6, 246:11, 246:13, 247:5, 247:25, 248:7, 248:14, 248:17, 248:20, 248:23, 249:3, 249:6, 249:9, 249:14, 249:15, 249:19, 249:23, 250:3, 274:21, 274:25, 275:10, 275:22, 275:25, 276:3

**MS** [1] - 78:24

**multiple** [2] - 48:9, 89:11

**Mumbai** [4] - 48:13, 48:15, 138:20, 138:21

**murder** [2] - 85:10, 85:11

**Musbach** [29] - 84:7, 85:13, 87:3, 87:10, 89:25, 94:13, 94:19, 144:22, 144:23, 145:2, 145:23, 145:24, 147:8, 148:4, 163:19, 166:25, 167:20, 172:9, 174:12, 176:14, 176:23, 178:19, 179:9, 180:17, 180:22, 181:20, 182:1, 239:9, 258:23

**Musbach's** [3] - 89:21, 258:25, 259:3

**must** [37] - 146:10, 172:20, 200:18, 251:25, 252:7, 252:25, 253:8, 254:7, 257:8, 257:13, 257:18, 258:1, 258:8, 258:25, 259:10, 259:23, 260:7, 260:25, 261:17, 262:18, 263:3, 263:5, 263:7, 263:19, 264:6, 265:7, 265:22, 267:5, 267:6, 267:9, 267:14, 267:16, 268:12, 269:25, 271:16, 272:5, 272:16

## N

**nail** [1] - 13:21

**nailed** [1] - 133:5

**name** [45] - 8:25, 9:12, 9:15, 9:21, 10:12, 10:14, 11:15, 13:4, 13:12, 14:15, 14:16, 19:14, 40:19, 40:20, 41:3, 46:12, 87:16, 102:5, 149:15, 151:21, 152:12, 178:1, 178:2, 178:8, 184:17, 195:1, 197:8, 197:22, 197:24, 198:5, 198:9, 200:21, 201:2, 205:7, 205:8, 205:9, 205:10, 207:5, 218:13, 226:8, 228:11, 244:8

**named** [2] - 69:19, 143:21

**nameless** [1] - 152:11

**names** [4] - 5:14, 13:20, 228:10

**narrow** [1] - 133:21

**National** [1] - 214:5

**nature** [1] - 262:21

**near** [1] - 131:14

**nearest** [1] - 268:4

**necessarily** [5] - 92:10, 184:5, 256:1, 265:19, 274:7

**necessary** [1] - 212:5

**need** [41] - 14:2, 15:24, 23:6, 23:7, 23:23, 33:15, 33:23, 34:5, 34:16, 38:2, 38:16, 79:7, 79:8, 79:24, 89:9, 101:10, 108:25, 122:14, 138:20, 153:7, 153:20, 159:25, 160:3, 160:4, 160:12, 214:1, 220:22, 241:17, 245:20, 245:21, 246:4, 247:17, 259:12, 262:20, 264:16, 265:10, 266:10, 266:15, 268:4, 268:20, 271:13

**needed** [16] - 50:1, 54:13, 96:2, 96:15, 103:4, 110:7, 111:10, 122:11, 122:13, 122:17, 123:19, 124:1,

125:22, 169:2, 169:3, 241:3

**needs** [2] - 40:1, 57:2

**negative** [6] - 108:6, 121:6, 210:25, 211:6, 217:20, 243:20

**negatively** [2] - 126:25, 138:11

**negligently** [1] - 272:21

**negotiate** [1] - 136:5

**negotiation** [1] - 131:5

**negotiations** [1] - 136:1

**nervous** [1] - 106:6

**Net** [17] - 43:9, 43:12, 43:14, 43:15, 44:22, 45:2, 45:3, 103:14, 103:20, 104:2, 104:4, 105:5, 105:14, 122:9, 122:11, 123:14, 123:18

**net** [3] - 43:11, 104:19, 104:21

**network** [117] - 9:17, 10:17, 10:21, 41:14, 41:17, 41:21, 42:5, 42:8, 42:11, 42:14, 42:25, 43:18, 44:12, 45:10, 48:16, 48:18, 49:2, 52:6, 56:6, 56:10, 56:16, 57:4, 57:20, 58:6, 60:15, 63:1, 63:10, 64:13, 68:1, 69:4, 72:6, 72:21, 72:24, 73:3, 80:20, 81:4, 81:16, 82:2, 103:22, 104:8, 104:9, 106:12, 106:13, 106:18, 107:1, 107:3, 107:14, 107:16, 107:18, 109:16, 109:21, 109:22, 121:11, 122:18, 122:23, 125:12, 129:15, 134:24, 135:1, 155:7, 157:7, 157:11, 157:13, 157:23, 158:10, 158:18, 158:21, 158:23, 196:1, 197:1, 197:3, 197:8, 197:11, 197:13, 197:14, 197:16, 197:17, 197:18, 197:20, 197:21, 197:23, 197:25,

198:1, 198:3, 198:6, 198:8, 198:10, 201:1, 201:3, 201:4, 201:6, 201:9, 201:22, 201:23, 201:25, 202:1, 202:6, 203:14, 206:14, 206:15, 206:18, 209:12, 209:21, 209:23, 214:6, 222:9, 224:6, 224:12, 224:13, 224:15, 224:17

**networking** [7] - 54:10, 54:14, 54:17, 54:22, 57:13, 206:25

**networks** [5] - 56:25, 109:8, 123:17, 133:23, 136:4

**never** [30] - 8:20, 9:2, 10:2, 13:21, 65:5, 79:16, 79:17, 81:21, 83:17, 88:24, 90:12, 90:14, 92:7, 93:3, 97:8, 98:1, 99:8, 105:6, 115:16, 131:12, 131:23, 132:17, 142:2, 142:10, 149:14, 201:22, 203:2, 208:14, 211:8

**new** [27] - 28:1, 73:3, 76:9, 76:20, 77:1, 104:12, 107:10, 113:10, 113:11, 114:19, 114:23, 114:25, 115:1, 115:16, 121:19, 131:21, 133:1, 133:4, 133:10, 134:19, 135:10, 138:5, 186:22, 209:18, 237:21

**New** [8] - 7:17, 43:25, 46:22, 102:6, 109:3, 109:8, 210:6

**news** [1] - 89:12

**newspapers** [1] - 83:20

**next** [35] - 34:19, 35:19, 38:2, 38:6, 39:8, 39:11, 39:22, 40:12, 65:20, 78:4, 118:19, 119:1, 119:14, 128:4, 128:5, 128:8, 128:11, 148:14, 150:18, 169:14, 177:19, 180:9, 186:23, 186:24, 187:5, 188:14,

196:16, 197:24, 198:1, 198:5, 199:1, 224:1, 225:10, 241:5, 246:1

**nice** [3] - 105:24, 139:16, 142:9

**NICHOLAS** [1] - 196:21

**Nicholas** [3] - 14:3, 196:20, 201:12

**niece** [2] - 90:16, 114:6

**night** [7] - 9:21, 13:7, 23:24, 102:11, 218:15, 250:11, 250:16

**nights** [1] - 115:25

**nine** [2] - 38:18, 197:22

**noise** [2] - 40:9, 210:19

**Non** [1] - 78:22

**non** [8] - 115:19, 233:19, 238:12, 239:8, 258:20, 258:22, 258:24, 262:25

**Non-Discrimination** [1] - 78:22

**non-discriminatory** [4] - 239:8, 258:20, 258:22, 258:24

**non-gay** [1] - 262:25

**non-payment** [1] - 233:19

**non-stop** [1] - 238:12

**none** [3] - 51:24, 209:9, 255:13

**nonstop** [1] - 37:15

**normal** [3] - 64:22, 91:2, 263:12

**northwest** [1] - 102:6

**Northwest** [1] - 46:22

**note** [6] - 24:17, 35:5, 67:7, 144:10, 251:3, 272:2

**notes** [9] - 16:21, 16:23, 119:14, 199:3, 242:21, 243:1, 243:2, 246:8, 251:9

**nothing** [21] - 26:10, 29:6, 32:5, 49:11, 50:25, 77:8, 79:1, 84:2, 88:25, 90:19, 95:22, 140:16, 147:17, 170:2, 171:13, 177:15, 177:17, 225:7, 237:24, 239:15,

*242:25*
**notice** *[7] - 5:7, 5:10,*
*5:21, 6:15, 29:5,*
*39:20, 150:20*
**noticed** *[1] - 252:24*
**noting** *[1] - 25:21*
**notion** *[1] - 120:5*
**November** *[8] - 55:25,*
*72:10, 98:22, 99:4,*
*178:12, 199:23,*
*200:11*
**NRTC** *[1] - 214:5*
**number** *[12] - 7:8,*
*7:10, 18:22, 25:22,*
*66:22, 185:24,*
*191:13, 198:16,*
*246:19, 248:8,*
*255:14, 256:1*
**NUMBER** *[1] - 1:3*
**Number** *[3] - 7:16,*
*197:2, 197:22*
**numbers** *[17] - 155:1,*
*155:4, 155:7,*
*155:25, 156:12,*
*156:14, 156:16,*
*156:18, 156:21,*
*156:25, 157:1,*
*157:2, 157:3, 157:6,*
*236:12*
**numerous** *[1] - 161:13*
**nutshell** *[1] - 106:21*

**O**

**o'clock** *[2] - 26:14,*
*101:4*
**oath** *[11] - 23:11, 70:4,*
*73:16, 97:18, 97:20,*
*99:11, 164:9,*
*169:14, 169:15,*
*171:5, 183:21*
**object** *[5] - 16:6,*
*89:18, 153:23,*
*155:24, 253:21*
**objected** *[1] - 31:11*
**objecting** *[1] - 253:22*
**objection** *[81] - 12:24,*
*29:23, 30:13, 30:17,*
*30:24, 31:6, 31:13,*
*31:14, 31:16, 31:18,*
*32:3, 33:19, 42:2,*
*42:3, 42:20, 42:21,*
*62:18, 63:24, 63:25,*
*64:5, 68:24, 68:25,*
*70:23, 71:3, 74:13,*
*76:11, 83:3, 121:21,*
*127:8, 130:9,*
*130:24, 135:22,*
*140:11, 141:4,*
*141:24, 144:12,*

*144:13, 146:24,*
*146:25, 147:10,*
*147:11, 147:13,*
*148:2, 151:24,*
*151:25, 152:4,*
*155:19, 161:16,*
*163:10, 163:23,*
*164:17, 165:21,*
*166:1, 166:16,*
*166:17, 175:11,*
*175:12, 176:8,*
*176:15, 176:18,*
*177:2, 177:3,*
*181:21, 209:7,*
*209:8, 210:14,*
*210:20, 211:17,*
*212:2, 212:6,*
*214:22, 214:24,*
*215:13, 249:9,*
*249:13, 249:16,*
*249:17, 253:24,*
*254:4, 274:19*
**objections** *[11] -*
*23:23, 24:7, 30:8,*
*30:12, 30:22,*
*153:20, 153:21,*
*160:1, 253:5,*
*253:25, 254:1*
**objective** *[1] - 94:23*
**objectively** *[1] - 263:9*
**objectives** *[4] -*
*117:25, 118:1,*
*118:2, 118:4*
**objects** *[1] - 4:14*
**obligation** *[2] - 14:12,*
*254:1*
**obligations** *[1] - 15:19*
**observations** *[1] -*
*204:11*
**observe** *[7] - 120:21,*
*204:8, 210:3,*
*210:25, 211:5,*
*217:5, 217:22*
**obtain** *[1] - 111:9*
**obtained** *[1] - 272:1*
**obtaining** *[1] - 135:20*
**obviously** *[14] - 17:24,*
*25:23, 27:25, 47:24,*
*84:14, 90:21, 102:5,*
*113:19, 116:21,*
*148:23, 180:13,*
*183:19, 183:20,*
*251:5*
**obviousness** *[1] -*
*214:12*
**occasion** *[5] - 101:2,*
*114:8, 115:19,*
*117:12, 138:10*
**occasional** *[3] -*
*262:8, 262:9*

**occupied** *[1] - 267:11*
**occurred** *[9] - 41:21,*
*50:18, 91:5, 240:19,*
*259:8, 260:3,*
*267:12, 267:15,*
*269:17*
**October** *[4] - 99:4,*
*199:16, 200:10,*
*212:20*
**OF** *[1] - 1:1*
**offended** *[1] - 263:6*
**offensive** *[1] - 261:22*
**offer** *[2] - 19:15, 61:1*
**offered** *[4] - 30:5,*
*32:2, 55:14, 254:2*
**offering** *[3] - 29:4,*
*29:8, 31:21*
**offers** *[1] - 253:19*
**office** *[28] - 46:19,*
*46:21, 46:24, 46:25,*
*47:5, 60:10, 73:22,*
*75:9, 115:14,*
*129:12, 146:3,*
*208:15, 208:16,*
*208:17, 210:6,*
*210:7, 211:14,*
*212:25, 213:1,*
*216:14, 216:15,*
*216:21, 216:24,*
*217:23, 218:9,*
*218:18, 219:17,*
*240:19*
**officer** *[4] - 61:12,*
*61:23, 232:19, 245:3*
**offices** *[2] - 45:9,*
*210:5*
**official** *[2] - 49:9,*
*270:14*
**Official** *[2] - 1:22,*
*276:13*
**often** *[1] - 74:8*
**old** *[8] - 11:5, 116:2,*
*116:8, 208:24,*
*208:25, 209:2,*
*219:11, 250:14*
**older** *[9] - 116:22,*
*116:24, 116:25,*
*121:6, 129:6, 150:9,*
*208:25, 223:25,*
*256:25*
**oldest** *[6] - 218:23,*
*219:9, 219:12,*
*223:23, 223:24,*
*224:1*
**on-call** *[2] - 110:10,*
*211:22*
**once** *[24] - 13:19,*
*49:7, 52:22, 61:1,*
*80:22, 84:12, 92:7,*
*100:16, 107:10,*

*111:3, 128:16,*
*133:5, 146:7,*
*148:22, 158:10,*
*162:22, 191:3,*
*195:18, 221:14,*
*239:14, 239:20,*
*273:3, 274:5, 275:19*
**once-per-year** *[1] -*
*191:3*
**one** *[131] - 5:19, 6:19,*
*6:22, 9:16, 11:19,*
*11:24, 14:3, 17:1,*
*18:22, 20:6, 23:6,*
*23:9, 30:17, 31:1,*
*32:8, 39:17, 43:14,*
*44:12, 47:6, 48:20,*
*49:7, 49:24, 51:20,*
*51:21, 52:8, 54:4,*
*54:8, 58:14, 63:6,*
*68:22, 70:14, 70:15,*
*72:5, 73:19, 75:9,*
*77:5, 77:13, 77:16,*
*77:18, 77:23, 78:1,*
*78:3, 78:4, 78:6,*
*79:12, 79:14, 84:11,*
*91:18, 99:14,*
*100:20, 102:17,*
*109:24, 115:24,*
*116:15, 122:22,*
*127:20, 138:15,*
*138:17, 149:21,*
*151:7, 158:20,*
*159:10, 163:1,*
*167:4, 167:23,*
*168:2, 168:21,*
*171:6, 182:15,*
*184:14, 185:24,*
*187:4, 187:5,*
*187:11, 187:15,*
*189:10, 189:13,*
*192:18, 193:7,*
*193:10, 193:25,*
*194:4, 194:14,*
*196:16, 198:9,*
*200:14, 203:2,*
*204:4, 205:14,*
*206:16, 208:4,*
*208:15, 208:19,*
*213:3, 218:13,*
*218:23, 219:8,*
*219:9, 219:11,*
*223:1, 223:18,*
*225:14, 226:2,*
*226:20, 227:7,*
*228:14, 235:19,*
*235:22, 237:3,*
*240:10, 240:14,*
*240:15, 243:23,*
*250:18, 252:18,*
*254:15, 254:23,*
*257:2, 263:12,*

*264:23, 266:21,*
*266:23, 268:2,*
*273:1, 274:18*
**one-off** *[1] - 226:2*
**one-on-ones** *[4] -*
*49:24, 122:22,*
*138:15, 138:17*
**one-year** *[1] - 189:13*
**ones** *[7] - 35:15,*
*35:24, 35:25, 49:24,*
*122:22, 138:15,*
*138:17*
**online** *[3] - 87:4,*
*105:9, 146:1*
**open** *[9] - 4:1, 53:23,*
*59:20, 74:2, 129:15,*
*129:19, 132:5,*
*220:18, 273:9*
**opened** *[2] - 48:7,*
*72:13*
**opening** *[2] - 57:20,*
*151:18*
**openly** *[2] - 177:5,*
*208:10*
**operating** *[4] - 61:12,*
*61:22, 232:19, 245:3*
**operation** *[3] - 104:12,*
*111:14*
**operations** *[15] - 42:7,*
*80:8, 80:20, 107:10,*
*107:11, 185:9,*
*197:13, 197:14,*
*197:15, 197:21,*
*201:1, 201:3, 201:6,*
*212:5*
**opinion** *[6] - 7:13,*
*256:4, 256:5, 256:9,*
*256:12, 266:18*
**opinions** *[2] - 256:6,*
*256:7*
**opportunities** *[1] -*
*60:8*
**opportunity** *[10] -*
*16:7, 29:21, 64:23,*
*138:13, 210:3,*
*244:7, 246:14,*
*246:15, 248:1,*
*255:15*
**opposed** *[1] - 204:10*
**opposing** *[2] - 5:9,*
*264:23*
**opposite** *[1] - 252:4*
**optics** *[1] - 104:19*
**options** *[2] - 75:5,*
*110:24*
**OR** *[3] - 40:17, 177:24,*
*205:5*
**order** *[13] - 4:6, 4:7,*
*14:12, 20:22, 36:21,*
*37:9, 37:10, 39:20,*

168:25, 220:20, 236:10, 262:18, 273:25
**ordered** [1] - 254:9
**orderly** [2] - 14:10, 15:14
**orders** [1] - 27:4
**ordinary** [1] - 262:7
**organization** [3] - 124:2, 206:24, 212:25
**organizational** [1] - 77:7
**orientation** [38] - 11:8, 120:19, 120:23, 121:2, 121:5, 123:6, 129:1, 137:10, 143:9, 150:4, 152:16, 175:10, 210:13, 211:1, 211:11, 215:18, 216:1, 238:13, 240:21, 242:10, 242:25, 251:16, 256:22, 257:16, 257:24, 258:19, 259:9, 259:24, 260:1, 260:6, 260:10, 260:14, 262:19, 262:23, 263:4, 263:11, 263:23, 267:5
**original** [4] - 13:4, 32:17, 200:17, 200:18
**Otherwise** [1] - 5:2
**otherwise** [3] - 120:21, 173:22, 252:13
**outage** [4] - 213:4, 213:7, 213:10, 213:13
**outages** [1] - 119:3
**outcome** [4] - 63:15, 63:17, 94:23, 255:18
**outcomes** [1] - 127:22
**outreach** [1] - 226:1
**outside** [11] - 11:1, 16:10, 16:16, 54:20, 57:16, 121:20, 122:3, 203:4, 253:7, 253:11, 254:20
**overall** [3] - 106:1, 115:4, 120:2
**overarching** [1] - 22:17
**overnight** [1] - 275:5
**overrule** [1] - 42:21
**overruled** [30] - 30:25, 31:18, 76:12, 83:4,

121:22, 127:9, 130:10, 135:23, 140:12, 141:5, 141:25, 144:13, 146:25, 148:3, 163:24, 164:18, 165:22, 166:3, 166:17, 175:12, 176:9, 176:18, 177:3, 209:8, 210:15, 210:20, 211:18, 212:3, 215:14, 254:5
**overruling** [1] - 166:4
**overseeing** [1] - 107:18
**overtime** [2] - 189:22, 191:11
**overwhelm** [1] - 49:2
**overwhelmingly** [2] - 218:18, 218:19
**owe** [4] - 229:17, 231:18, 232:7, 232:10
**owed** [8] - 195:1, 231:15, 232:16, 233:4, 233:8, 233:17, 233:25, 257:12
**Owen** [16] - 8:16, 8:22, 10:21, 11:5, 11:6, 12:14, 12:21, 16:8, 55:12, 55:15, 55:17, 197:16, 199:14, 203:14, 204:25, 205:9
**OWEN** [4] - 3:9, 197:16, 205:5, 205:10
**own** [15] - 10:16, 67:19, 102:3, 106:9, 129:9, 139:1, 140:8, 143:18, 145:21, 205:16, 211:21, 233:21, 233:23, 242:23, 254:18

---

## P

**P-E-G-G** [1] - 196:21
**P.C** [1] - 2:2
**p.m** [11] - 19:10, 38:1, 153:3, 160:16, 160:21, 220:25, 250:5, 273:19, 274:3, 276:7
**PA** [3] - 1:11, 1:20, 2:5
**package** [6] - 187:21, 188:5, 196:5, 196:6, 196:7, 196:14
**packed** [1] - 47:11

**Page** [4] - 167:23, 173:6, 179:22, 180:8
**PAGE** [1] - 3:2
**page** [31] - 11:18, 11:20, 70:17, 70:18, 73:12, 78:7, 118:19, 155:18, 160:5, 180:9, 184:11, 184:15, 186:13, 187:2, 187:9, 187:18, 187:23, 188:10, 188:14, 188:22, 192:2, 198:12, 198:14, 199:2, 201:16, 202:10, 235:17, 235:20, 243:3, 243:6
**pages** [3] - 7:13, 12:6, 249:24
**paid** [32] - 19:7, 41:17, 63:22, 64:2, 65:14, 65:17, 81:4, 109:22, 109:24, 186:1, 192:21, 192:22, 193:4, 194:10, 196:8, 198:19, 198:20, 222:4, 223:13, 223:23, 225:1, 228:7, 228:16, 228:17, 229:9, 229:22, 231:2, 231:6, 231:10, 236:22, 257:9
**pain** [2] - 268:15, 268:20
**Paler** [1] - 198:5
**PALER** [1] - 198:6
**Palochko** [14] - 17:2, 35:21, 46:13, 46:14, 62:4, 62:11, 92:18, 163:15, 175:24, 184:19, 207:9, 237:11, 237:24
**Palochko's** [1] - 236:19
**Panama** [1] - 139:1
**pandemic** [5] - 22:8, 22:11, 213:25, 214:3, 214:4
**paper** [2] - 51:15, 148:8
**paragraph** [8] - 118:20, 118:22, 119:1, 119:14, 119:16, 119:19, 119:21, 192:20
**Paralegal** [1] - 2:12
**paraphrasing** [3] - 85:10, 143:22,

163:19
**park** [1] - 115:24
**parking** [1] - 11:1
**parse** [2] - 231:17, 243:16
**parsing** [1] - 244:9
**part** [34] - 9:10, 10:7, 10:18, 29:4, 30:1, 41:18, 45:14, 50:6, 52:23, 76:18, 80:16, 96:18, 106:3, 151:11, 163:9, 167:1, 169:7, 169:17, 171:7, 180:17, 182:12, 183:21, 185:11, 198:11, 213:7, 227:12, 234:22, 237:2, 255:12, 267:17, 267:19, 268:1, 270:4, 272:9
**partial** [1] - 28:24
**participate** [2] - 98:2, 151:4, 168:16
**participating** [1] - 265:2
**particular** [3] - 21:22, 253:23, 258:11
**parties** [4] - 6:16, 157:5, 252:23, 253:3
**partner** [5] - 45:12, 84:18, 146:19, 147:7, 177:6
**partners** [5] - 84:17, 85:19, 87:12, 87:14, 89:23
**partnership** [1] - 145:1
**parts** [2] - 31:6, 169:20
**party** [12] - 5:10, 6:8, 6:9, 14:7, 14:9, 19:6, 22:20, 30:11, 32:2, 103:12, 221:14
**party's** [1] - 5:9
**passage** [1] - 265:20
**passed** [6] - 16:21, 57:18, 89:11, 114:11, 128:20, 207:7
**passing** [2] - 114:9, 141:20
**passion** [1] - 102:13
**passions** [1] - 112:2
**past** [4] - 124:3, 214:8, 250:2, 269:2
**pasted** [1] - 26:14
**pasting** [1] - 94:6
**patchy** [1] - 211:23
**path** [4] - 17:9,

102:23, 126:2, 126:3
**patience** [1] - 250:7
**pattern** [1] - 9:20
**Paulk** [2] - 198:3, 200:9
**PAULK** [1] - 198:3
**pause** [3] - 58:18, 120:9, 221:3
**pay** [30] - 17:24, 65:25, 67:17, 95:23, 103:2, 136:4, 157:17, 159:3, 184:6, 186:8, 186:9, 186:12, 187:15, 188:12, 201:12, 223:1, 226:11, 232:8, 232:13, 234:10, 236:13, 251:19, 257:20, 258:3, 258:21, 259:7, 260:2, 269:5, 269:6, 272:18
**paying** [4] - 188:2, 231:13, 232:11, 232:12
**payment** [4] - 229:14, 233:19, 233:25, 234:1
**payments** [1] - 230:23
**payroll** [4] - 185:12, 190:12, 191:14, 192:11
**pays** [2] - 225:5, 269:16
**pedophile** [3] - 84:10, 90:18, 145:25
**peering** [1] - 114:21
**PEET** [1] - 2:3
**Pegg** [1] - 196:21
**Penn** [1] - 14:3
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania** [3] - 1:13, 18:17, 22:6
**Pennypack** [1] - 7:14
**pension** [2] - 271:19, 272:3
**people** [71] - 8:13, 8:15, 8:16, 9:16, 15:7, 15:13, 16:23, 19:7, 37:7, 49:1, 52:18, 54:11, 54:14, 54:17, 54:19, 54:22, 57:13, 57:16, 69:12, 71:11, 71:17, 71:18, 71:25, 72:1, 82:4, 84:9, 84:11, 91:6, 109:7, 110:13, 110:18, 110:22, 112:5, 112:25,

114:22, 114:24,
116:5, 126:1,
129:13, 133:18,
136:8, 139:11,
139:13, 140:15,
146:2, 152:14,
157:11, 157:12,
158:2, 158:4,
168:10, 185:9,
207:8, 209:1,
211:14, 211:15,
211:22, 211:24,
213:4, 213:16,
218:22, 218:23,
219:9, 219:12,
225:1, 228:10,
241:4, 241:21,
241:22, 253:14
**people's** [1] - 130:12
**per** [2] - 190:12, 191:3
**percent** [28] - 20:15,
87:1, 99:15, 109:20,
148:13, 188:12,
189:6, 189:8,
189:17, 189:18,
189:20, 190:2,
190:4, 190:8, 190:9,
190:12, 190:18,
190:21, 191:6,
191:10, 191:23,
191:24, 192:5,
192:11, 192:14,
225:8
**percentage** [1] - 191:9
**percentages** [1] -
109:20
**perception** [3] - 74:20,
74:21, 102:19
**perfect** [3] - 23:20,
126:11, 154:24
**perfectly** [2] - 95:18,
159:6
**perform** [1] - 124:17
**performance** [35] -
31:4, 49:12, 49:13,
49:15, 49:18, 49:20,
50:4, 50:7, 50:10,
50:14, 50:15, 51:13,
51:16, 52:1, 52:2,
52:7, 52:10, 52:16,
52:19, 52:24, 53:17,
55:19, 56:3, 79:16,
117:12, 117:16,
117:20, 117:22,
134:7, 138:12,
139:18, 211:14,
213:12, 241:6, 262:6
**performed** [1] -
118:11
**performing** [2] -

110:15, 210:4
**period** [39] - 9:1, 42:9,
47:15, 48:6, 52:5,
53:23, 56:4, 91:23,
108:3, 108:5,
108:10, 120:10,
120:13, 120:17,
121:1, 121:4,
128:13, 137:5,
137:19, 138:10,
138:23, 139:20,
150:22, 151:2,
151:5, 162:22,
167:17, 175:23,
176:3, 185:3, 185:6,
189:10, 189:25,
190:15, 192:23,
193:10, 194:4,
216:14, 272:1
**periods** [1] - 185:1
**perjury** [4] - 24:20,
30:2, 238:4, 244:17
**permissible** [1] -
270:12
**permit** [2] - 269:24,
271:12
**permitted** [3] - 6:16,
233:14, 253:21
**permitting** [1] - 16:5
**person** [42] - 18:21,
21:18, 27:13, 32:6,
42:17, 46:14, 50:3,
55:15, 64:13, 69:16,
82:22, 84:19, 92:6,
106:2, 110:21,
111:24, 123:25,
127:16, 127:19,
161:19, 169:21,
169:23, 177:6,
204:10, 204:22,
208:16, 212:23,
223:23, 223:24,
224:1, 224:2, 224:8,
238:9, 244:18,
244:21, 260:16,
261:8, 263:4, 263:6,
263:12, 270:16
**personable** [1] - 55:1
**personal** [4] - 33:3,
112:7, 151:18,
151:21
**personally** [1] -
270:14
**perspective** [7] -
33:25, 99:8, 150:18,
215:15, 221:20,
233:8, 263:3
**persuasion** [1] -
243:19
**pertains** [1] - 206:11

**pervasive** [3] - 260:15,
261:7, 262:1
**petty** [1] - 34:4
**phase** [2] - 110:5,
180:22
**Philadelphia** [17] -
1:13, 1:20, 2:5, 6:23,
7:7, 46:25, 47:3,
83:16, 83:17,
147:25, 148:8,
206:22, 208:8,
210:8, 213:21,
213:23, 213:24
**Philippines** [5] -
81:19, 82:9, 82:16,
116:2, 139:4
**phone** [6] - 86:11,
99:14, 99:16, 154:7,
156:3, 207:14
**photo** [1] - 141:8
**PHRC** [1] - 131:6
**physical** [1] - 261:18
**physically** [2] -
114:19, 262:3
**Physicians** [3] -
213:22, 213:23
**picked** [1] - 129:20
**picture** [5] - 140:21,
141:1, 141:6, 141:7,
182:17
**pictures** [5] - 26:2,
146:1, 179:9,
179:11, 179:12
**piece** [8] - 11:14,
11:17, 12:4, 15:24,
125:1, 226:23,
242:15, 244:20
**pin** [4] - 7:22, 7:23,
8:3, 237:3
**pissing** [1] - 137:22
**pivot** [2] - 18:25,
275:8
**pivoting** [1] - 15:21
**pizzeria** [1] - 114:4
**place** [24] - 9:19,
22:15, 47:12, 75:19,
75:22, 76:4, 76:6,
76:10, 76:17, 77:1,
77:3, 77:5, 102:20,
108:13, 112:1,
114:19, 115:8,
122:17, 192:6,
218:16, 232:21,
264:1, 264:12
**places** [1] - 115:15
**Plains** [1] - 43:25
**plaintiff** [15] - 4:13,
4:24, 5:12, 5:14,
13:11, 14:25, 29:24,
31:6, 32:6, 32:10,

33:9, 183:11,
203:20, 227:1,
251:14
**Plaintiff** [2] - 1:4, 1:20
**plaintiff's** [9] - 6:5,
10:13, 14:17, 30:1,
34:6, 221:12,
221:22, 237:8,
237:14
**plaintiffs** [1] - 266:20
**plan** [49] - 39:8, 91:4,
91:6, 96:5, 129:22,
152:23, 163:9,
188:12, 188:20,
189:6, 189:7, 189:9,
189:14, 190:3,
190:7, 190:25,
191:9, 191:15,
192:17, 193:8,
193:9, 193:14,
193:15, 193:16,
193:17, 193:23,
194:1, 195:5,
195:19, 227:14,
227:17, 227:20,
227:21, 228:23,
229:1, 231:19,
233:18, 233:20,
236:6, 236:25,
237:13, 237:15,
237:17, 237:19,
238:8, 238:15,
238:16, 238:17,
238:18
**planet** [2] - 47:19,
87:16
**planned** [1] - 38:7
**platform** [4] - 49:2,
80:9, 105:4, 125:21
**play** [5] - 24:9, 24:13,
239:11, 270:3, 272:8
**played** [2] - 267:16,
267:25
**playing** [2] - 24:14,
117:10
**pleased** [1] - 121:12
**plenty** [2] - 118:22,
140:6
**PLLC** [1] - 1:18
**plus** [2] - 191:24,
192:14
**podium** [2] - 93:21,
216:18
**point** [76] - 12:11,
12:14, 15:9, 17:1,
22:2, 23:6, 30:7,
52:8, 57:17, 61:14,
68:3, 75:25, 78:19,
79:12, 88:6, 94:10,
105:16, 107:13,

107:18, 107:23,
108:13, 109:14,
115:12, 118:21,
121:10, 122:12,
123:4, 124:12,
125:14, 126:6,
130:15, 130:18,
132:7, 132:21,
132:22, 135:25,
136:2, 137:2, 139:3,
145:22, 146:15,
149:21, 150:15,
159:12, 163:17,
167:23, 174:21,
175:7, 175:23,
180:7, 180:21,
181:19, 182:10,
182:21, 211:9,
212:9, 212:20,
213:2, 223:3, 223:7,
223:14, 226:21,
228:22, 229:13,
232:21, 233:9,
233:10, 233:12,
233:13, 235:17,
236:21, 240:4,
240:22, 260:18,
261:10
**pointed** [2] - 135:5,
231:20
**pointing** [2] - 83:7,
164:25
**points** [1] - 221:23
**policies** [5] - 36:18,
36:20, 62:6, 140:14,
271:1
**policy** [61] - 62:10,
77:12, 77:13, 79:1,
79:11, 92:24, 93:6,
93:9, 93:12, 93:13,
93:17, 94:4, 94:8,
94:24, 95:13, 97:1,
97:4, 99:20, 100:1,
100:2, 111:11,
140:4, 140:6,
140:10, 141:23,
142:24, 143:11,
148:24, 162:20,
163:1, 163:4, 163:8,
163:18, 168:4,
168:9, 168:11,
168:23, 169:1,
169:3, 169:6,
169:10, 171:6,
171:9, 171:17,
172:17, 174:19,
180:16, 180:18,
180:20, 180:22,
182:8, 182:10,
182:25, 183:3,
188:20, 202:22,

*United States District Court*

203:3, 244:19, 244:20, 245:3, 245:5
**poor** [2] - 80:6, 80:17
**pop** [1] - 275:24
**popular** [1] - 87:16
**population** [1] - 133:12
**porn** [1] - 144:23
**pornography** [3] - 85:9, 146:1, 177:7
**Port** [1] - 7:16
**portion** [2] - 48:19, 189:5
**portions** [1] - 184:1
**Portugal** [1] - 116:8
**pose** [1] - 9:9
**posed** [1] - 9:7
**position** [35] - 10:17, 10:22, 44:1, 55:21, 59:21, 59:22, 64:15, 69:5, 72:13, 74:2, 81:11, 95:17, 107:5, 121:13, 130:22, 132:5, 135:20, 157:22, 157:23, 158:18, 159:2, 178:10, 184:23, 185:7, 224:2, 224:16, 224:21, 225:8, 225:14, 247:4, 260:16, 261:8, 263:5, 267:11, 274:25
**positions** [6] - 72:25, 224:7, 225:1, 225:10, 225:12, 257:10
**positive** [4] - 49:5, 55:18, 56:3, 115:6
**positively** [1] - 120:3
**possible** [12] - 23:4, 51:23, 59:13, 79:19, 82:21, 92:9, 133:12, 134:18, 137:24, 217:14, 217:15, 217:21
**possibly** [6] - 44:1, 56:1, 125:25, 135:5, 153:10, 162:4
**post** [6] - 19:11, 21:14, 229:8, 230:24, 243:16, 244:9
**post-trial** [2] - 243:16, 244:9
**posted** [1] - 72:17
**potential** [1] - 125:24
**potentially** [2] - 33:15, 272:22
**pout** [1] - 127:1

**pouted** [1] - 60:24
**power** [3] - 16:10, 136:9, 148:19
**practice** [3] - 9:11, 159:17, 264:23
**pre** [2] - 138:1, 184:1
**precipitated** [1] - 239:13
**precision** [1] - 269:23
**preclude** [1] - 15:22
**predicate** [1] - 63:24
**prefer** [3] - 7:19, 246:11, 274:6
**preference** [6] - 38:15, 38:22, 39:3, 222:24, 246:16, 249:6
**preferred** [1] - 18:3
**prejudice** [11] - 6:15, 9:22, 10:3, 14:7, 14:9, 14:13, 14:19, 15:1, 15:9, 37:8, 255:19
**prejudicial** [1] - 5:6
**preliminary** [1] - 250:23
**prep** [1] - 5:19
**preparation** [1] - 196:18
**prepare** [2] - 5:11, 8:20
**preparing** [2] - 5:16, 40:3
**preponderance** [16] - 251:24, 252:9, 252:12, 257:14, 257:19, 258:2, 260:8, 261:1, 263:20, 264:7, 267:1, 267:14, 269:21, 270:13, 270:24, 272:15
**preselected** [1] - 72:19
**presence** [5] - 47:23, 47:25, 48:3, 48:5, 119:15
**present** [1] - 209:5
**PRESENT** [1] - 2:10
**presentation** [2] - 112:25, 250:9
**presentations** [1] - 81:15
**presented** [6] - 75:4, 132:11, 171:18, 175:15, 255:5, 268:24
**president** [5] - 42:6, 65:10, 107:12, 197:15, 245:4
**presuming** [1] -

222:21
**pretext** [3] - 240:4, 245:8, 259:15
**pretrial** [22] - 5:9, 5:15, 6:1, 6:6, 6:8, 8:11, 12:22, 13:15, 14:18, 15:6, 29:19, 29:20, 30:8, 30:10, 30:21, 31:17, 31:19, 34:9, 35:13, 159:7, 159:8, 275:14
**pretty** [22] - 16:25, 27:19, 46:3, 47:11, 50:12, 53:21, 55:19, 56:3, 57:17, 79:25, 104:2, 104:6, 104:23, 105:1, 115:3, 116:6, 134:4, 139:10, 145:16, 172:13, 175:21, 208:19
**prevail** [4] - 257:17, 257:25, 263:18, 264:5
**prevailed** [1] - 234:23
**prevailing** [1] - 266:20
**prevent** [2] - 202:22, 271:1
**previous** [1] - 146:20
**previously** [4] - 117:6, 144:6, 256:8, 269:20
**prey** [1] - 84:9
**preying** [2] - 86:21, 177:7
**primaries** [1] - 91:18
**primary** [6] - 18:3, 18:22, 59:1, 91:15, 91:17, 91:22
**principal** [2] - 125:24, 198:6
**privy** [1] - 169:7
**probable** [1] - 267:18
**problem** [15] - 23:13, 90:22, 91:1, 113:10, 113:11, 114:23, 115:1, 126:15, 136:16, 145:4, 154:24, 154:25, 155:10, 212:24, 219:3
**problems** [15] - 45:13, 91:2, 110:11, 113:7, 122:13, 123:18, 125:17, 125:18, 125:19, 125:21, 129:21, 135:4, 135:6, 212:23, 230:16
**Procedure** [1] - 16:2
**procedures** [2] -

29:22, 271:1
**proceed** [2] - 40:11, 206:2
**proceeding** [5] - 265:3, 271:13, 271:14, 274:20, 275:8
**proceedings** [3] - 183:24, 240:8, 276:11
**Proceedings** [1] - 1:23
**PROCEEDINGS** [1] - 4:1
**process** [34] - 16:8, 32:13, 45:22, 52:1, 52:21, 52:23, 57:20, 73:6, 73:7, 73:8, 73:9, 74:10, 74:11, 74:22, 75:7, 75:13, 75:22, 76:4, 76:6, 76:9, 76:17, 76:20, 77:1, 104:18, 111:25, 117:15, 117:19, 126:13, 148:14, 207:18, 208:21, 209:6, 250:18
**processes** [1] - 15:4
**produce** [1] - 258:13
**produced** [9] - 1:24, 26:18, 28:5, 28:23, 29:14, 29:16, 31:7, 31:8, 252:15
**product** [5] - 79:22, 80:5, 80:15, 80:16, 80:17
**professional** [2] - 149:18, 206:12
**professionalism** [1] - 39:19
**proffers** [1] - 5:15
**profile** [4] - 134:6, 138:21, 141:6, 141:8
**profit** [46] - 181:2, 181:3, 181:9, 189:5, 190:9, 190:14, 190:16, 190:22, 190:23, 190:25, 191:22, 191:24, 192:5, 192:10, 193:23, 194:7, 194:17, 194:23, 195:22, 195:24, 222:12, 222:15, 222:16, 223:1, 226:19, 228:1, 228:6, 228:10, 228:12, 228:16, 234:15, 236:4,

236:22, 244:2, 251:20, 257:11, 257:22, 258:5, 258:21, 259:7, 260:2, 264:3, 264:14, 266:3, 272:18
**profit-sharing** [9] - 189:5, 190:9, 190:14, 190:25, 192:10, 193:23, 226:19, 228:1, 228:6
**program** [1] - 103:7
**progress** [2] - 75:18, 122:17
**progressed** [4] - 42:13, 75:15, 103:21, 104:8
**progressing** [1] - 122:16
**progression** [8] - 47:1, 54:12, 73:4, 103:25, 104:13, 107:13, 122:5, 135:7
**progressions** [1] - 73:2
**progressive** [4] - 93:9, 93:13, 93:17, 94:2
**prohibited** [2] - 272:19, 272:24
**prohibiting** [1] - 270:17
**prohibits** [2] - 256:17, 256:24
**project** [1] - 124:2
**projects** [2] - 124:4, 209:16
**prolonging** [1] - 159:21
**promise** [1] - 273:14
**promised** [1] - 129:17
**promote** [10] - 69:8, 69:9, 69:15, 69:17, 78:15, 79:5, 122:22, 124:14, 130:23, 131:21
**promoted** [21] - 9:17, 10:21, 52:13, 65:11, 68:9, 71:25, 72:2, 72:5, 80:1, 107:3, 107:4, 107:16, 124:12, 129:5, 133:7, 157:11, 157:12, 158:14, 158:17, 158:21, 178:13
**promoting** [2] - 71:11, 121:11
**promotion** [25] - 57:18, 69:11, 74:22,

82:18, 82:19, 107:2,
120:11, 121:17,
124:7, 124:22,
128:17, 128:20,
128:24, 128:25,
134:23, 135:8,
135:19, 136:19,
136:21, 136:24,
158:19, 197:6,
226:2, 242:9, 242:10
**promotions** [6] -
71:18, 75:13, 75:24,
77:13, 79:2, 157:18
**promptly** [3] - 30:12,
273:21, 276:5
**pronouns** [1] - 208:13
**proof** [3] - 67:19,
252:16, 254:23
**properly** [1] - 133:23
**proportionate** [2] -
191:7, 196:14
**prospect** [1] - 73:6
**protected** [26] -
239:17, 240:2,
240:13, 240:15,
241:11, 241:24,
242:6, 242:11,
243:17, 243:18,
260:19, 261:11,
263:15, 263:21,
263:25, 264:8,
264:11, 264:17,
264:21, 265:8,
265:13, 265:18,
265:23, 266:2,
270:7, 270:15
**protests** [1] - 265:5
**prove** [17] - 28:11,
91:13, 94:5, 217:20,
251:25, 255:25,
257:13, 257:18,
258:1, 258:8,
258:10, 260:7,
260:25, 263:19,
264:6, 264:17,
269:22
**proved** [6] - 223:22,
227:13, 252:9,
252:11, 259:13,
271:5
**proven** [4] - 226:24,
259:21, 259:23,
265:21
**proves** [1] - 270:24
**provide** [16] - 10:20,
36:7, 134:20,
156:17, 161:15,
191:17, 194:21,
194:25, 195:3,
195:9, 197:5, 197:6,

226:10, 236:3,
236:5, 236:10
**provided** [10] - 6:15,
8:17, 29:5, 140:18,
162:14, 187:16,
189:6, 190:8,
230:12, 244:7
**provider** [3] - 106:18,
106:21, 109:8
**providers** [4] - 57:7,
57:10, 105:1, 134:2
**providing** [3] - 45:11,
120:6, 156:22
**proving** [5] - 243:20,
251:23, 267:13,
269:21, 272:14
**proximate** [1] - 67:17
**proximity** [2] - 225:5,
225:23
**psychological** [1] -
263:10
**PTO** [1] - 172:21
**public** [2] - 84:15,
89:22
**publicly** [2] - 144:22,
177:6
**publish** [1] - 77:18
**pull** [4] - 58:14, 117:5,
125:5, 199:3
**pulled** [1] - 191:14
**punish** [1] - 270:9
**punitive** [14] - 223:6,
237:6, 238:21,
266:22, 270:8,
270:9, 270:12,
270:23, 271:3,
271:4, 271:7, 271:9,
271:13, 275:11
**punitives** [7] - 237:5,
240:9, 274:19,
275:1, 275:7, 275:21
**purchase** [3] - 41:21,
41:22, 42:19
**purchased** [6] - 142:3,
182:18, 185:2,
198:17, 198:19
**purchasing** [1] - 136:9
**purportedly** [1] -
32:11
**purpose** [5] - 13:14,
15:7, 173:18,
189:14, 254:7
**purposes** [4] - 5:3,
6:5, 242:7, 272:13
**purse** [2] - 69:7, 71:12
**push** [1] - 136:13
**pushing** [1] - 136:15
**put** [34] - 6:20, 6:21,
13:22, 35:19, 36:25,
75:16, 75:19, 76:6,

76:10, 76:17, 77:1,
77:5, 77:16, 77:17,
78:5, 86:2, 87:11,
91:19, 97:4, 112:1,
120:9, 141:11,
153:17, 204:2,
208:16, 227:14,
227:22, 235:1,
237:3, 247:3,
247:10, 252:2,
252:19, 267:10
**putting** [2] - 10:7,
232:18
**puzzled** [1] - 218:4

## Q

**qualifications** [2] -
79:3, 256:6
**quality** [1] - 255:16
**quarrel** [1] - 120:5
**quarter** [7] - 189:13,
193:9, 195:15,
195:16, 229:10,
229:20, 231:6
**queer** [1] - 208:16
**QUESTION** [9] - 11:5,
11:8, 11:10, 73:22,
73:25, 74:5, 167:25,
168:15, 168:19
**questionnaire** [1] -
131:6
**questions** [44] - 4:19,
11:13, 29:15, 29:17,
36:17, 36:19, 36:20,
65:16, 65:21, 67:5,
69:22, 70:4, 71:2,
73:15, 80:15, 86:4,
98:17, 101:1,
113:13, 125:6,
132:7, 154:9,
154:20, 154:21,
165:15, 166:11,
171:16, 174:24,
181:12, 182:15,
183:8, 184:25,
185:1, 205:13,
207:23, 208:4,
208:24, 215:9,
219:8, 223:11,
253:3, 253:25
**quick** [7] - 11:23, 31:5,
108:8, 142:7, 144:1,
175:21, 205:13
**quickly** [6] - 68:20,
78:21, 113:10,
242:17, 242:19,
249:10
**quirky** [1] - 105:24
**quit** [1] - 207:1
**quite** [3] - 182:20,

217:16, 273:13
**quote** [4] - 5:1, 85:7,
103:5
**quoted** [1] - 148:6
**quoting** [1] - 74:19

## R

**R(Sic)** [1] - 196:24
**radar** [1] - 150:19
**raincoat** [1] - 254:25
**raining** [3] - 254:19,
254:21, 255:2
**raise** [14] - 29:22,
40:15, 66:4, 123:5,
128:16, 136:21,
158:14, 158:19,
159:14, 177:23,
205:3, 224:17,
224:20, 244:13
**raised** [7] - 24:18,
121:1, 121:8,
134:25, 142:25,
221:21, 231:21
**raises** [1] - 64:22
**raising** [4] - 35:9,
149:25, 150:3,
251:17
**RAMBO** [1] - 198:7
**Rambo** [7] - 81:23,
198:7, 200:12,
200:14, 202:13,
202:14, 203:11
**ran** [3] - 43:17, 57:2,
178:15
**random** [2] - 155:12,
155:25
**range** [1] - 250:2
**Rather** [1] - 262:21
**rather** [5] - 6:19,
127:16, 156:16,
235:17, 275:6
**reach** [6] - 10:3,
54:19, 105:11,
105:20, 134:5,
253:17
**reached** [4] - 43:24,
44:5, 46:4, 213:2
**reaching** [2] - 141:19,
254:15
**reaction** [6] - 127:17,
145:21, 146:18,
147:9, 260:20,
261:12
**read** [62] - 7:12, 10:10,
10:15, 37:22, 38:25,
39:1, 53:7, 53:8,
70:19, 77:21, 78:1,
78:6, 78:18, 83:7,
83:13, 83:25, 84:12,

85:2, 85:4, 85:6,
85:8, 86:8, 91:1,
118:24, 146:8,
147:21, 148:11,
153:13, 154:17,
155:9, 155:21,
155:23, 159:16,
159:24, 164:15,
165:6, 166:7,
166:20, 167:11,
169:22, 170:10,
172:19, 173:17,
173:19, 173:24,
180:1, 180:9,
180:10, 184:1,
184:7, 203:8, 204:9,
218:11, 218:14,
218:15, 227:22,
243:9, 244:3, 250:1,
250:24, 251:7
**reading** [9] - 153:11,
153:25, 155:11,
155:16, 160:1,
160:6, 222:7, 236:1,
236:14
**reads** [1] - 221:13
**ready** [7] - 34:3,
104:5, 180:3, 180:4,
246:20, 273:22,
275:9
**real** [23] - 31:5, 83:15,
83:18, 86:17, 86:20,
87:25, 88:2, 88:5,
89:4, 97:1, 108:8,
109:3, 136:19,
142:7, 144:1, 168:5,
172:2, 172:23,
182:8, 182:25,
245:10, 249:10,
274:4
**realize** [1] - 151:18
**realized** [1] - 206:25
**really** [57] - 8:13,
13:16, 13:17, 17:8,
28:8, 49:11, 50:16,
55:15, 62:6, 69:11,
75:15, 81:13, 86:6,
86:24, 98:17, 100:5,
102:9, 102:12,
103:8, 105:10,
106:15, 109:1,
111:25, 113:18,
113:20, 113:23,
114:5, 114:16,
115:2, 116:14,
124:1, 132:17,
134:7, 136:18,
143:11, 143:13,
143:14, 144:9,
146:3, 148:18,
149:15, 151:15,

166:13, 168:18, 170:17, 171:25, 177:8, 209:20, 209:21, 212:21, 214:11, 228:19, 243:12, 245:15, 250:15, 251:5, 273:7

**realm** [1] - 20:19

**reason** [45] - 9:9, 18:1, 18:3, 20:3, 32:23, 41:7, 60:7, 61:7, 89:4, 93:20, 95:21, 96:24, 96:25, 103:7, 139:23, 147:24, 167:10, 168:5, 168:8, 172:9, 174:17, 180:15, 180:19, 217:25, 228:14, 232:12, 238:1, 238:5, 239:3, 239:8, 239:24, 239:25, 245:10, 250:11, 251:22, 258:20, 258:22, 258:24, 259:5, 259:6, 259:8, 259:11, 259:14, 259:22

**reasonable** [19] - 51:4, 222:19, 244:21, 244:25, 252:16, 255:21, 260:16, 260:19, 261:8, 261:11, 261:21, 263:4, 263:6, 263:11, 263:12, 264:18, 265:9, 268:13

**reasonably** [6] - 226:9, 234:14, 253:16, 267:18, 268:9, 271:17

**reasoning** [2] - 14:14, 163:20

**reasons** [11] - 18:5, 20:5, 30:4, 137:13, 174:13, 177:8, 229:4, 232:14, 239:6, 244:24, 256:6

**reattach** [1] - 26:13

**rebut** [1] - 248:2

**rebuttal** [4] - 74:11, 220:4, 248:2, 248:16

**receive** [23] - 49:15, 49:18, 52:6, 53:16, 62:25, 181:2, 187:25, 189:24, 190:2, 190:4, 191:9, 193:24, 194:7, 194:22, 195:11,

195:12, 196:11, 198:24, 218:1, 236:4, 236:16, 236:17, 256:10

**received** [34] - 41:22, 41:24, 42:25, 52:11, 56:3, 64:18, 81:3, 145:8, 155:6, 157:21, 158:16, 161:12, 190:18, 190:19, 190:22, 194:17, 195:19, 196:2, 196:3, 196:4, 198:23, 202:13, 202:14, 224:3, 229:21, 231:4, 252:15, 252:22, 253:18, 254:7, 258:17, 269:5, 271:20

**RECEIVED** [2] - 3:13, 144:14

**receives** [1] - 235:6

**receiving** [4] - 30:10, 190:11, 225:6, 227:8

**recent** [1] - 214:8

**recess** [2] - 101:12, 160:16

**reckless** [8] - 239:23, 240:2, 270:6, 270:14, 270:19, 270:22, 272:17, 272:23

**recklessly** [1] - 239:16

**reckoning** [1] - 162:18

**recognize** [3] - 118:6, 193:12, 193:13

**recollection** [9] - 31:18, 135:24, 154:23, 154:24, 156:15, 173:7, 179:18, 180:5, 213:11

**reconvene** [2] - 156:16, 156:17

**record** [40] - 6:17, 6:21, 10:10, 12:2, 12:11, 13:25, 24:25, 25:1, 40:20, 41:3, 70:13, 117:7, 147:5, 148:8, 156:2, 178:2, 184:18, 184:24, 200:23, 205:8, 221:1, 222:2, 225:21, 226:12, 230:5, 230:11, 230:21, 235:2, 239:12, 239:15, 240:12, 242:4, 242:5, 242:20,

243:24, 244:15, 245:2, 254:10, 276:11

**recorded** [1] - 1:23

**recording** [9] - 24:9, 24:13, 25:6, 49:17, 50:20, 99:23, 149:8, 149:24

**records** [4] - 191:14, 200:22, 201:2, 229:24

**recover** [2] - 257:12, 272:10

**recovery** [1] - 269:4

**RECROSS** [2] - 3:6, 175:3

**RECROSS-EXAMINATION** [2] - 3:6, 175:3

**redirect** [3] - 153:7, 153:10, 219:4

**REDIRECT** [4] - 3:5, 3:10, 161:1, 219:6

**redo** [1] - 79:24

**refer** [4] - 107:22, 185:1, 192:17, 208:14

**reference** [2] - 183:18, 251:10

**referenced** [4] - 154:2, 156:4, 249:12, 253:4

**referencing** [2] - 47:21, 93:9

**referred** [1] - 84:16

**referring** [5] - 73:23, 108:10, 119:2, 119:3, 144:8

**refine** [1] - 80:4

**refresh** [5] - 173:6, 179:18, 180:5, 275:5, 275:18

**refreshed** [1] - 161:7

**refusal** [2] - 234:1, 234:10

**refused** [2] - 161:15, 232:8

**regard** [3] - 70:20, 79:17, 230:17

**regarded** [1] - 261:25

**regarding** [7] - 49:12, 93:12, 137:16, 179:9, 198:16, 258:21, 259:7

**regardless** [8] - 189:7, 192:24, 227:16, 252:14, 252:15, 259:9, 266:9, 266:13

**rehire** [1] - 200:18

**reimbursement** [1] - 97:5

**related** [16] - 10:25, 59:18, 92:23, 109:15, 115:19, 123:6, 149:25, 166:24, 185:24, 203:3, 211:14, 216:1, 235:4, 242:10, 265:10

**relates** [2] - 26:11, 251:19

**relating** [1] - 117:22

**relationship** [21] - 11:11, 32:8, 84:9, 84:16, 84:21, 85:17, 87:4, 87:5, 87:7, 88:21, 90:11, 110:2, 112:8, 112:10, 115:6, 126:23, 137:18, 145:1, 146:14, 177:11, 206:21

**relationships** [3] - 57:7, 57:9, 57:15

**release** [1] - 250:10

**relevance** [3] - 64:5, 141:4, 165:21

**relevant** [7] - 9:13, 14:24, 18:24, 242:7, 270:2, 272:7, 275:1

**reliability** [1] - 256:7

**relied** [2] - 14:5, 104:25

**relief** [4] - 28:2, 28:7, 238:20, 238:21

**rely** [3] - 106:19, 223:15, 256:12

**remained** [1] - 66:24

**remark** [1] - 262:4

**remarks** [1] - 74:6

**remedy** [1] - 28:1

**remember** [99] - 20:8, 21:2, 25:16, 27:12, 46:23, 47:9, 47:12, 50:11, 50:15, 50:16, 51:8, 51:16, 51:20, 52:9, 53:4, 53:7, 54:11, 58:9, 58:11, 58:13, 61:16, 61:19, 63:2, 63:15, 68:14, 73:11, 74:7, 74:8, 74:12, 75:10, 75:19, 76:7, 76:25, 79:13, 80:19, 81:25, 82:1, 82:6, 82:7, 82:14, 92:14, 99:24, 107:2, 109:12, 111:5, 113:20, 118:13, 118:16, 119:10, 121:12, 129:11, 131:2, 131:8,

131:10, 132:3, 136:15, 141:19, 145:12, 148:24, 149:10, 150:3, 150:21, 156:6, 161:6, 162:1, 162:21, 164:3, 164:21, 164:22, 164:23, 164:24, 165:8, 165:9, 165:16, 166:7, 166:10, 166:12, 166:13, 169:16, 169:20, 171:17, 173:4, 173:5, 173:21, 173:24, 179:5, 184:4, 188:3, 193:20, 208:5, 234:21, 242:14, 250:14, 274:21, 274:23, 275:13, 275:15

**remembered** [1] - 161:10

**reminders** [1] - 54:2

**remotely** [3] - 22:7, 88:9, 88:12

**remove** [1] - 244:7

**removed** [1] - 223:8

**render** [1] - 222:2

**rendered** [2] - 222:23, 223:3

**reopening** [1] - 159:22

**repeated** [1] - 242:24

**repeatedly** [2] - 12:5, 163:15

**rephrase** [2] - 152:1, 152:5

**replace** [1] - 81:22

**replacement** [1] - 209:17

**reply** [3] - 126:10, 126:11, 126:13

**report** [6] - 52:8, 52:17, 108:18, 182:3, 182:5, 210:9

**reported** [4] - 52:14, 52:15, 73:6, 162:19

**REPORTER** [2] - 170:7, 246:25

**Reporter** [2] - 1:22, 276:13

**reporter** [2] - 66:1, 183:24

**reporting** [3] - 65:6, 208:18, 212:22

**reports** [2] - 49:23, 122:22

**represented** [2] - 97:22, 97:24

**reputation** [3] - 151:23, 152:3, 269:11
**request** [3] - 22:6, 64:8, 97:4
**requesting** [2] - 238:20, 253:22
**requests** [2] - 241:3, 241:19
**require** [4] - 62:10, 119:3, 239:5, 269:22
**required** [3] - 18:25, 258:10, 258:13
**requirement** [6] - 193:4, 193:7, 227:7, 232:22, 236:7, 239:4
**requirements** [4] - 195:6, 222:15, 227:3, 271:4
**requires** [3] - 260:18, 261:10, 269:23
**requiring** [1] - 5:15
**research** [1] - 6:3
**resent** [1] - 185:8
**reserved** [1] - 31:14
**residential** [1] - 56:8
**resign** [1] - 213:17
**resolve** [7] - 17:11, 23:3, 24:4, 153:20, 211:24, 275:6
**resolved** [2] - 24:2, 275:19
**resolving** [1] - 17:12
**resources** [3] - 46:8, 185:10, 241:3
**respect** [19] - 14:13, 19:4, 71:6, 111:1, 115:5, 116:22, 120:11, 121:1, 128:17, 128:23, 133:1, 136:25, 141:23, 211:6, 213:7, 222:1, 222:12, 245:8, 274:19
**respected** [1] - 126:3
**respectfully** [1] - 223:5
**respective** [1] - 245:17
**respects** [1] - 266:21
**respond** [8] - 80:8, 112:16, 123:2, 126:21, 126:25, 223:19, 223:21, 241:3
**responded** [1] - 234:25
**responding** [3] - 39:18, 151:4, 213:14

**response** [7] - 15:21, 60:3, 184:2, 211:22, 241:20, 265:8, 265:13
**responses** [3] - 9:4, 9:13, 97:25
**responsibilities** [6] - 107:14, 117:22, 133:4, 133:6, 185:9, 225:25
**responsibility** [1] - 111:23
**responsible** [3] - 48:16, 48:18, 182:13
**rest** [5] - 153:11, 183:13, 183:14, 199:20, 220:8
**restate** [2] - 121:23, 121:24
**restroom** [1] - 220:23
**rests** [3] - 183:11, 203:21, 220:3
**result** [11] - 131:7, 132:2, 153:25, 183:3, 260:22, 261:14, 267:8, 267:18, 269:9, 269:12, 270:7
**resulting** [1] - 269:11
**resume** [4] - 101:4, 207:5, 207:7, 207:10
**retained** [1] - 269:19
**retaliated** [4] - 251:17, 263:14, 266:11, 267:4
**retaliation** [9] - 235:4, 240:13, 257:3, 257:5, 263:18, 264:5, 266:5, 266:7, 266:14
**retaliatory** [2] - 232:3, 234:16
**retention** [3] - 214:13, 214:19, 218:1
**retirement** [9] - 188:20, 188:25, 189:4, 190:25, 191:15, 192:16, 193:14, 195:19, 196:13
**return** [5] - 79:23, 195:7, 195:10, 236:8, 271:10
**returns** [1] - 236:12
**reveals** [2] - 5:19, 5:20
**revenue** [1] - 104:2
**review** [11] - 31:4, 32:13, 32:17, 51:14, 52:1, 52:7, 52:10, 52:16, 52:24, 118:9,

118:11, 118:17, 138:7
**reviewed** [2] - 32:6, 120:2
**reviewing** [3] - 117:15, 117:22, 221:11
**reviews** [8] - 51:16, 52:2, 52:19, 56:3, 117:12, 118:3, 235:7, 241:7
**revised** [1] - 78:7
**rhythm** [1] - 209:15
**Rich** [7] - 37:1, 140:21, 141:19, 141:22, 142:19, 153:11, 177:20
**RICHARD** [2] - 3:7, 177:24
**Richard** [2] - 178:3, 178:8
**rid** [13] - 90:24, 91:10, 96:7, 96:8, 96:15, 96:17, 110:17, 110:24, 237:16, 238:9, 238:14, 241:8
**rights** [6] - 239:17, 240:2, 258:12, 270:7, 270:15, 270:23
**rise** [12] - 4:3, 40:5, 101:6, 101:13, 101:16, 153:2, 160:15, 160:17, 160:20, 220:21, 250:4, 273:18
**rising** [1] - 22:24
**risking** [1] - 214:2
**Ritchey** [3] - 197:22, 200:1, 203:12
**RITCHEY** [1] - 197:22
**Road** [1] - 46:19
**road** [2] - 115:14, 275:16
**Roberts** [2] - 2:13, 205:2
**role** [30] - 54:14, 60:16, 63:18, 74:2, 80:23, 106:13, 110:16, 114:20, 121:11, 121:19, 122:2, 123:11, 124:17, 125:23, 125:24, 129:14, 129:15, 129:20, 130:23, 131:21, 131:22, 133:1, 133:8, 133:10, 134:10, 134:12, 134:15, 134:20,

135:10
**roles** [2] - 133:4, 133:5
**roll** [4] - 117:25, 118:1, 209:16, 275:21
**rolling** [1] - 138:2
**romantic** [1] - 144:25
**romantically** [1] - 84:18
**room** [1] - 127:21
**roommate** [4] - 86:1, 87:15, 89:23, 146:10
**roughly** [1] - 224:20
**roughs** [1] - 242:16
**route** [2] - 148:25, 149:2
**router** [1] - 213:10
**routers** [1] - 209:17
**routine** [1] - 248:25
**Roxbury** [1] - 102:6
**RPR** [1] - 276:13
**Rule** [19] - 5:1, 5:3, 6:4, 6:14, 7:15, 14:6, 30:9, 30:15, 30:18, 203:23, 221:2, 221:9, 221:11, 221:22, 222:23, 234:8, 244:14, 249:14
**rule** [6] - 16:1, 17:18, 30:9, 32:3, 221:13, 253:23
**ruled** [1] - 265:19
**rules** [11] - 6:2, 9:10, 30:18, 190:2, 193:15, 194:8, 195:6, 236:7, 253:18, 253:21, 254:3
**Rules** [1] - 16:2
**ruling** [3] - 5:24, 222:22, 254:4
**rumors** [1] - 253:9
**run** [10] - 23:6, 23:18, 105:19, 106:12, 160:13, 195:4, 236:6, 246:4, 274:15
**rung** [1] - 136:11
**running** [2] - 72:25, 226:4
**runs** [1] - 236:11
**Rural** [1] - 214:5

**S**

**S-P-A-T-A-R-O** [1] - 40:22
**S:(Cont'd** [1] - 2:1
**sacrifice** [1] - 139:15

**sad** [1] - 114:14
**safe** [5] - 189:6, 190:3, 190:8, 190:13, 190:16
**safeguard** [1] - 23:11
**safeguards** [3] - 17:19, 18:6, 18:16
**saga** [1] - 150:19
**salaries** [2] - 157:9, 203:14
**salary** [31] - 63:23, 64:20, 64:24, 66:7, 66:8, 66:17, 68:7, 68:11, 108:21, 109:11, 109:15, 157:10, 158:9, 186:10, 186:11, 186:15, 186:19, 186:22, 186:23, 187:6, 187:8, 187:12, 187:20, 189:20, 189:21, 191:11, 196:11, 196:14, 202:3, 271:19
**Salesforce** [1] - 207:6
**San** [1] - 109:9
**sardines** [1] - 47:11
**sat** [5] - 47:10, 99:11, 163:13, 164:2, 222:13
**satisfied** [3] - 21:20, 135:10, 271:5
**save** [2] - 50:2, 110:12
**saw** [22] - 53:12, 77:12, 86:12, 93:3, 97:8, 97:19, 98:1, 103:1, 113:22, 115:7, 131:12, 131:23, 142:10, 146:7, 151:10, 164:2, 167:22, 169:8, 182:10, 212:22, 253:9, 254:19
**scale** [3] - 105:1, 109:8, 252:4
**scales** [1] - 252:5
**scaling** [2] - 45:10, 104:24
**schedule** [1] - 28:5
**scheduling** [2] - 34:5, 38:6
**school** [8] - 102:7, 102:9, 102:11, 102:15, 103:5, 103:7, 103:18
**scoffed** [1] - 19:6
**scope** [2] - 124:4, 156:21

**scramble** [1] - 275:6
**scrambled** [1] - 9:24
**screen** [6] - 18:15, 19:17, 23:17, 150:19, 204:7, 204:15
**screws** [1] - 57:10
**scroll** [3] - 78:12, 93:8, 118:6
**search** [1] - 8:1
**Sears** [2] - 102:21, 103:2
**seasonal** [1] - 20:18
**seat** [9] - 40:7, 40:23, 101:14, 101:18, 153:4, 160:18, 160:22, 178:4, 250:6
**seated** [1] - 273:20
**second** [25] - 6:23, 12:16, 15:24, 17:3, 45:20, 73:15, 73:23, 117:6, 118:20, 120:9, 159:11, 180:22, 195:16, 223:24, 229:10, 229:20, 231:6, 243:23, 257:23, 258:6, 260:12, 261:4, 263:24, 264:10, 265:6
**secondhand** [1] - 84:12
**secondly** [1] - 30:7
**seconds** [3] - 175:22, 221:5, 249:15
**secretly** [2] - 16:23, 92:23
**secrets** [1] - 208:9
**section** [2] - 193:17, 193:21
**Security** [1] - 272:3
**See** [1] - 26:10
**see** [58] - 8:4, 8:5, 13:10, 14:14, 15:5, 15:21, 23:17, 28:13, 29:8, 30:20, 31:14, 39:2, 53:5, 53:9, 53:25, 63:22, 64:23, 66:11, 78:8, 78:10, 78:20, 78:22, 87:25, 93:7, 111:17, 114:25, 118:6, 118:8, 118:23, 119:16, 119:22, 119:23, 143:24, 144:9, 153:1, 167:15, 169:9, 183:23, 187:11, 194:16, 202:8, 204:15, 204:17,

204:18, 214:10, 215:20, 215:24, 217:8, 220:20, 236:14, 243:19, 255:3, 255:15, 273:16, 275:16, 276:4
**seeing** [5] - 15:19, 19:16, 116:9, 194:13, 243:20
**seek** [1] - 28:1
**seem** [3] - 60:12, 62:8, 126:22
**seemingly** [1] - 214:12
**sees** [1] - 238:19
**selection** [1] - 243:9
**selling** [1] - 133:17
**semantics** [2] - 93:12, 94:3
**send** [11] - 12:23, 28:15, 28:16, 35:10, 38:7, 39:8, 92:11, 154:10, 154:21, 251:6, 273:3
**sending** [2] - 16:23, 63:3
**sends** [1] - 235:7
**senior** [24] - 9:17, 10:17, 10:21, 72:24, 73:4, 155:7, 157:7, 157:11, 157:13, 157:23, 158:17, 158:21, 158:23, 197:8, 197:17, 197:20, 198:10, 201:25, 202:1, 203:14, 206:18, 209:12, 224:6
**sense** [14] - 24:12, 60:1, 66:11, 97:17, 98:20, 100:20, 119:8, 119:9, 152:20, 237:22, 246:9, 247:18, 253:12, 268:11
**senses** [1] - 254:18
**sensitivity** [1] - 263:12
**sent** [23] - 23:25, 26:12, 29:10, 58:8, 59:18, 59:21, 60:23, 75:3, 80:14, 92:7, 92:10, 126:8, 127:7, 127:15, 128:5, 133:6, 143:22, 147:18, 147:19, 153:19, 154:11, 156:1, 161:20
**sentence** [3] - 77:12,

96:19, 192:20
**sentiment** [3] - 119:12, 119:18, 119:25
**separate** [2] - 70:21, 229:7
**separated** [2] - 48:4, 76:3
**separately** [1] - 35:22
**separation** [1] - 111:22
**September** [9] - 26:24, 26:25, 58:10, 58:11, 99:4, 120:12, 121:9, 124:24, 200:8
**sequester** [1] - 39:24
**sequestered** [1] - 40:1
**seriatim** [1] - 223:12
**serious** [4] - 49:11, 163:6, 262:15, 265:8
**seriously** [1] - 263:10
**serve** [2] - 30:12, 193:7
**service** [9] - 47:23, 53:18, 104:25, 106:18, 106:19, 109:8, 133:15, 193:25, 194:5
**services** [2] - 43:18, 43:19
**session** [1] - 131:5
**set** [11] - 8:9, 14:3, 16:9, 30:11, 45:24, 55:21, 80:10, 110:22, 126:18, 134:17
**Seth** [2] - 37:24, 38:4
**SETH** [1] - 1:19
**sets** [1] - 14:5
**setting** [3] - 81:15, 159:11, 209:18
**settle** [1] - 111:3
**setup** [2] - 104:24, 105:2
**seven** [1] - 241:7
**several** [7] - 28:6, 66:9, 183:1, 206:15, 207:8, 211:23, 213:5
**severe** [3] - 20:19, 260:15, 261:7
**severity** [1] - 261:23
**sex** [20] - 84:17, 150:1, 240:13, 240:15, 256:19, 256:23, 257:15, 257:17, 257:23, 258:9, 258:19, 260:7, 260:13, 262:20, 263:17, 263:19, 263:22, 264:20,

264:24, 267:4
**sex-based** [5] - 240:13, 240:15, 257:17, 263:22, 264:24
**sexual** [39] - 11:8, 120:19, 120:23, 121:2, 121:5, 123:6, 128:25, 137:10, 143:9, 150:4, 152:16, 175:9, 203:4, 210:13, 211:1, 211:11, 215:18, 216:1, 238:13, 240:21, 242:10, 242:25, 251:16, 256:21, 257:16, 257:23, 258:19, 259:9, 259:23, 260:1, 260:6, 260:10, 260:13, 262:19, 262:23, 263:4, 263:11, 263:23, 267:5
**sham** [1] - 126:5
**share** [1] - 181:9
**shared** [1] - 169:24
**sharing** [46] - 181:2, 181:3, 189:5, 190:9, 190:14, 190:16, 190:22, 190:23, 190:25, 191:22, 191:24, 191:25, 192:5, 192:10, 193:22, 193:23, 194:7, 194:18, 194:23, 195:22, 195:24, 222:12, 222:15, 222:16, 223:1, 226:19, 228:1, 228:6, 228:11, 228:12, 228:16, 234:15, 236:4, 236:22, 244:2, 251:20, 257:11, 257:22, 258:5, 258:22, 259:8, 260:2, 264:3, 264:14, 266:3, 272:19
**Shaw** [6] - 158:21, 198:9, 200:19, 201:22, 203:16, 225:12
**SHAW** [1] - 198:10
**sheet** [2] - 223:8, 249:11
**shifts** [1] - 208:13
**Shirakawa** [1] -

209:19
**shocking** [2] - 89:2, 92:5
**shore** [1] - 63:5
**short** [11] - 21:22, 22:20, 22:21, 159:20, 188:19, 210:7, 216:14, 220:9, 220:20, 247:2, 271:14
**short-change** [1] - 247:2
**short-circuit** [1] - 159:20
**short-term** [1] - 188:19
**shortly** [1] - 265:17
**shoulder** [1] - 54:5
**show** [21] - 18:14, 29:9, 36:10, 76:8, 76:9, 78:13, 78:20, 92:14, 94:18, 117:3, 122:25, 173:18, 194:14, 194:25, 226:21, 265:7, 265:14, 267:14, 267:16, 272:20
**showed** [6] - 94:7, 168:11, 173:19, 176:14, 238:2, 272:17
**shown** [3] - 31:25, 254:13, 265:21
**shows** [4] - 78:14, 232:22, 238:7, 239:15
**shred** [1] - 244:23
**shut** [1] - 126:5
**shy** [1] - 42:24
**sick** [3] - 18:9, 19:9, 19:10
**side** [8] - 56:22, 57:13, 82:20, 115:8, 129:6, 158:9, 252:5, 253:20
**sidebar** [2] - 64:8, 234:21
**Sidebar** [2] - 64:10, 67:23
**sides** [1] - 252:4
**sight** [1] - 100:24
**sign** [2] - 47:22, 98:2
**signatures** [1] - 105:8
**signed** [2] - 97:20, 244:18
**significance** [1] - 15:20
**significant** [3] - 21:23, 22:25, 157:15
**significantly** [1] - 68:19

*similar* [9] - 8:6, 201:7, 202:5, 222:4, 225:24, 232:3, 257:10, 258:1, 260:25
*similarity* [1] - 225:23
*similarly* [4] - 42:18, 63:21, 158:2, 223:14
*simple* [3] - 13:2, 75:21, 86:9
*simply* [6] - 13:15, 135:1, 226:6, 253:22, 259:17, 263:12
*singing* [1] - 116:6
*single* [14] - 5:8, 6:4, 27:11, 32:18, 36:8, 92:7, 155:4, 169:21, 174:18, 174:21, 175:7, 224:2, 244:20, 244:23
*sink* [1] - 15:5
*sister* [1] - 103:18
*sisters* [1] - 102:8
*sit* [5] - 16:18, 127:20, 149:18, 243:10, 251:8
*site* [2] - 174:11
*sitting* [6] - 103:13, 107:6, 143:21, 181:18, 204:12, 230:19
*situated* [6] - 42:18, 63:21, 158:2, 201:7, 202:5, 223:14
*situation* [11] - 6:14, 21:23, 22:12, 52:17, 64:13, 91:12, 92:20, 141:16, 147:7, 150:24, 213:15
*situations* [2] - 55:4, 222:5
*six* [8] - 13:13, 77:12, 155:7, 155:25, 157:6, 206:19, 241:7, 266:4
*six-sentence* [1] - 77:12
*sixth* [1] - 29:25
*size* [2] - 42:18, 43:1
*skewed* [1] - 108:25
*skills* [5] - 54:21, 54:24, 119:22, 212:1, 212:5
*skillset* [3] - 122:11, 123:19, 135:5
*skip* [8] - 185:14, 192:2, 198:11, 198:12, 201:15, 201:16, 202:8, 203:5

*Skip* [1] - 198:11
*skipped* [1] - 171:20
*Skipping* [1] - 187:18
*skipping* [5] - 186:5, 186:13, 187:2, 192:8
*Slack* [20] - 58:21, 58:23, 59:1, 75:3, 76:20, 83:6, 91:16, 91:18, 91:23, 92:1, 92:21, 125:4, 127:16, 128:5, 128:14, 141:7, 141:8, 141:11, 144:17, 205:19
*slapped* [1] - 211:2
*slash* [1] - 206:14
*sleep* [1] - 172:25
*sliding* [1] - 204:19
*slightly* [1] - 222:10
*slowed* [1] - 79:16
*slowly* [1] - 241:1
*small* [1] - 141:9
*SMITH* [1] - 1:18
*sniffles* [1] - 20:18
*snip* [1] - 144:9
*snippet* [1] - 28:18
*so..* [1] - 208:9
*Social* [1] - 272:2
*socializing* [1] - 262:7
*software* [2] - 53:17, 53:18
*sold* [2] - 214:8, 218:3
*sole* [2] - 193:22, 255:10
*solely* [1] - 48:18
*solution* [2] - 125:18, 126:15
*solve* [12] - 45:12, 113:7, 113:11, 114:23, 115:1, 122:13, 122:14, 125:18, 125:22, 129:21, 135:4, 135:6
*solved* [1] - 123:17
*solving* [1] - 125:20
*someone* [34] - 8:23, 9:1, 17:6, 21:17, 32:16, 52:9, 53:5, 54:3, 62:3, 69:19, 73:3, 74:3, 79:7, 82:2, 84:7, 87:24, 105:18, 112:15, 122:17, 123:23, 124:1, 136:2, 136:6, 139:9, 146:5, 160:12, 160:13, 184:3, 204:5, 204:12, 226:6, 229:17, 254:24, 264:19

*something..* [1] - 147:3
*sometime* [5] - 50:23, 181:4, 181:5, 195:21, 195:24
*sometimes* [4] - 57:11, 68:22, 74:8, 127:21
*somewhat* [5] - 66:4, 112:14, 115:11, 118:16, 244:3
*somewhere* [3] - 20:19, 32:15, 107:24
*soon* [3] - 175:18, 232:10, 273:22
*sorry* [40] - 17:16, 25:15, 25:17, 26:12, 31:15, 37:4, 39:25, 40:8, 44:19, 45:3, 51:6, 71:24, 73:14, 93:23, 96:12, 98:13, 108:1, 121:16, 125:3, 127:12, 139:5, 147:11, 147:15, 157:21, 158:22, 162:7, 170:7, 177:20, 183:12, 183:15, 186:17, 188:17, 192:21, 197:1, 202:14, 212:17, 213:21, 224:23, 235:25
*Sorry* [1] - 120:7
*sort* [29] - 4:7, 7:12, 7:13, 9:11, 10:5, 15:24, 22:17, 23:25, 28:4, 29:18, 38:5, 45:21, 64:21, 66:13, 119:3, 131:4, 161:4, 184:2, 186:12, 204:11, 209:20, 210:19, 212:22, 213:2, 231:6, 234:11, 244:1, 244:5
*sound* [4] - 70:1, 218:16, 229:9, 268:12
*sounds* [2] - 51:4, 126:11
*Southern* [1] - 109:3
*southern* [1] - 210:6
*space* [3] - 47:13, 249:25, 268:5
*spans* [1] - 124:24
*Spataro* [55] - 11:14, 23:24, 25:3, 25:7, 25:13, 26:1, 29:5, 29:10, 29:14, 31:5, 32:11, 32:20, 33:3,

33:8, 33:11, 34:19, 35:12, 35:20, 36:4, 39:20, 39:22, 40:13, 40:14, 40:21, 41:4, 41:5, 64:25, 67:9, 70:9, 101:23, 102:5, 160:23, 161:3, 177:18, 181:19, 182:24, 183:2, 197:12, 199:10, 207:13, 210:10, 210:25, 211:5, 212:9, 225:16, 225:17, 225:24, 237:10, 238:11, 240:18, 240:25, 241:16, 241:20, 241:25
*SPATARO* [4] - 1:8, 3:4, 40:17, 197:12
*Spataro's* [4] - 210:12, 239:10, 239:20, 241:20
*spawned* [1] - 125:11
*speaking* [5] - 36:4, 75:25, 116:22, 132:1, 139:4, 149:9, 162:7, 191:22, 193:12, 193:13, 194:20, 195:15, 198:24, 211:21, 211:22
*speaks* [2] - 118:23, 119:21
*Spearman* [1] - 6:24
*specific* [10] - 22:16, 22:19, 85:7, 110:16, 117:21, 126:19, 128:12, 185:22, 188:3, 191:8
*specifically* [24] - 17:15, 38:20, 39:4, 39:10, 50:15, 50:16, 53:4, 53:5, 53:8, 73:9, 73:23, 82:6, 91:19, 91:24, 110:24, 113:20, 161:23, 161:24, 194:13, 194:19, 221:25, 223:4, 230:22, 266:21
*speculate* [2] - 51:2, 254:12
*speculation* [1] - 268:14
*spell* [3] - 40:20, 178:2, 205:8
*spend* [2] - 84:19, 115:9, 115:13
*spending* [1] - 182:13

*spent* [2] - 30:20, 97:5
*spirit* [1] - 6:2
*spoken* [1] - 10:2
*spot* [2] - 139:15, 226:2
*spousal* [1] - 145:1
*spreadsheet* [2] - 32:14, 32:16
*squeezed* [1] - 250:12
*staff* [1] - 23:21
*staffed* [3] - 72:17, 72:19, 72:25
*staffing* [1] - 69:3
*Staller* [1] - 256:5
*Staller's* [1] - 256:12
*stand* [4] - 4:12, 10:7, 127:15, 131:4, 183:16, 204:18, 204:20, 204:21, 232:20, 242:23, 245:4, 275:17
*standard* [5] - 19:12, 189:4, 189:8, 252:17, 268:21
*standing* [2] - 177:21, 222:14
*standpoint* [2] - 157:17, 221:11
*stands* [2] - 38:18, 244:10
*start* [16] - 4:9, 4:11, 4:19, 12:14, 40:3, 63:3, 91:5, 101:19, 184:15, 201:16, 202:10, 220:13, 223:9, 249:4, 250:21, 273:21
*started* [45] - 9:16, 13:23, 34:3, 34:10, 43:22, 44:11, 46:18, 48:22, 55:5, 55:23, 56:1, 64:14, 67:25, 76:2, 77:22, 77:23, 78:2, 80:7, 102:7, 102:21, 107:1, 109:10, 109:13, 111:3, 114:10, 115:2, 178:12, 186:7, 189:24, 193:11, 205:14, 206:24, 207:1, 207:16, 207:17, 207:19, 214:4, 216:13, 221:8, 237:18, 241:1, 241:4, 241:5, 276:5
*starting* [11] - 21:3, 114:25, 118:13, 135:25, 186:8, 186:9, 187:12,

*187*:15, *202*:2,
*224*:25, *246*:19
**starts** [1] - *275*:19
**Starts** [1] - *10*:24
**startup** [1] - *122*:12
**State** [1] - *14*:4
**state** [6] - *40*:19, *41*:3,
*178*:1, *184*:17,
*184*:23, *205*:7
**statement** [4] -
*127*:18, *151*:19,
*170*:22, *173*:12
**statements** [4] -
*28*:22, *183*:21,
*253*:2, *258*:14
**states** [2] - *192*:21,
*193*:15
**STATES** [2] - *1*:1, *1*:16
**States** [1] - *4*:2
**statues** [1] - *116*:10
**status** [2] - *192*:24,
*194*:11
**statute** [3] - *242*:7,
*257*:4, *264*:23
**statutes** [1] - *257*:1
**statutory** [2] - *195*:6,
*236*:7
**stay** [5] - *93*:21,
*101*:10, *177*:21,
*185*:3, *274*:4
**stayed** [1] - *214*:2
**stenography** [1] -
*1*:23
**step** [10] - *101*:11,
*153*:5, *177*:18,
*177*:21, *183*:9,
*203*:19, *211*:24,
*213*:4, *221*:4, *238*:17
**STEPHANIE** [1] - *2*:3
**Stephen** [2] - *197*:10,
*199*:8
**STEPHEN** [1] - *197*:10
**stepping** [1] - *56*:14
**steps** [1] - *79*:7
**Steve** [1] - *201*:22
**Steven** [5] - *158*:21,
*198*:9, *200*:19,
*203*:16, *225*:12
**stew** [1] - *60*:25
**stick** [2] - *160*:14,
*274*:5
**sticking** [1] - *61*:14
**still** [25] - *4*:14, *21*:14,
*48*:2, *81*:4, *84*:15,
*98*:18, *124*:18,
*173*:25, *174*:7,
*190*:12, *199*:18,
*199*:20, *199*:21,
*206*:8, *207*:7,
*207*:10, *214*:10,

*222*:14, *228*:17,
*231*:13, *232*:8,
*233*:9, *238*:16,
*245*:11, *274*:18
**stink** [1] - *159*:14
**stint** [1] - *213*:20
**stipulate** [1] - *234*:22
**stipulated** [1] - *252*:23
**stop** [5] - *35*:7, *73*:22,
*154*:19, *173*:16,
*238*:12
**stopped** [2] - *218*:2,
*241*:6
**stoppers** [1] - *122*:25
**story** [16] - *92*:12,
*94*:2, *96*:16, *99*:6,
*99*:8, *104*:7, *163*:3,
*169*:13, *172*:18,
*177*:13, *237*:19,
*237*:20, *237*:21,
*244*:22, *244*:24
**straight** [3] - *51*:12,
*124*:11, *124*:15
**strategy** [4] - *56*:21,
*80*:1, *113*:6, *113*:7
**stream** [1] - *38*:10
**Street** [3] - *1*:12, *1*:19,
*2*:4
**street** [2] - *47*:13,
*115*:25
**strength** [1] - *110*:11
**strengths** [3] - *111*:6,
*111*:8, *123*:20
**stricken** [1] - *254*:10
**strike** [5] - *21*:22,
*22*:24, *122*:1,
*138*:23, *210*:3
**stringing** [2] - *248*:5,
*248*:7
**strings** [2] - *69*:7,
*71*:12
**strong** [6] - *56*:11,
*56*:13, *56*:18, *56*:21,
*111*:16
**struck** [1] - *254*:11
**structure** [1] - *65*:7
**struggling** [2] - *110*:8,
*247*:7
**stuff** [28] - *32*:21, *38*:8,
*75*:17, *77*:7, *81*:16,
*85*:10, *85*:11, *86*:6,
*90*:12, *90*:14, *92*:8,
*92*:23, *109*:9,
*112*:22, *113*:1,
*113*:21, *113*:23,
*114*:2, *114*:6,
*133*:17, *137*:21,
*139*:18, *140*:22,
*144*:23, *148*:5,
*152*:25, *153*:1,

*273*:15
**subject** [11] - *29*:4,
*29*:23, *31*:13, *33*:7,
*104*:17, *128*:4,
*144*:19, *146*:19,
*186*:3, *249*:14,
*271*:20
**subjected** [18] - *217*:4,
*217*:8, *217*:9,
*217*:15, *217*:21,
*238*:12, *251*:16,
*257*:2, *257*:19,
*258*:2, *260*:4, *260*:9,
*261*:2, *262*:24,
*263*:24, *264*:10,
*266*:11, *267*:3
**subjecting** [1] - *40*:9
**subjects** [1] - *185*:22
**submit** [9] - *6*:17,
*223*:4, *225*:20,
*226*:17, *226*:25,
*233*:17, *233*:24,
*234*:1, *241*:10
**submitted** [4] - *6*:1,
*28*:19, *221*:15, *228*:9
**submitting** [1] - *28*:11
**suboptimal** [1] - *21*:14
**suborn** [1] - *30*:2
**subpoena** [3] - *16*:9,
*16*:10, *16*:12
**subsequent** [1] -
*259*:3
**substance** [3] -
*155*:22, *155*:23,
*243*:8
**substantial** [3] -
*267*:17, *267*:19,
*268*:1
**substantiated** [1] -
*174*:5
**succeed** [3] - *111*:17,
*111*:21, *111*:25
**success** [6] - *55*:21,
*80*:10, *110*:22,
*112*:3, *114*:17,
*238*:18
**successful** [2] -
*115*:9, *134*:14
**suddenly** [1] - *76*:10
**sued** [2] - *150*:21,
*269*:14
**suffer** [1] - *269*:9
**suffered** [3] - *257*:5,
*269*:12, *271*:2
**suffering** [3] - *215*:25,
*268*:15, *268*:20
**sufficient** [4] - *225*:21,
*226*:10, *231*:12,
*265*:16
**sufficiently** [1] - *5*:2,

*67*:16
**suggest** [4] - *39*:20,
*228*:22, *232*:11,
*237*:25
**suggested** [7] - *18*:6,
*24*:12, *54*:9, *62*:25,
*82*:5, *97*:4, *235*:9
**suggests** [3] - *12*:19,
*174*:18, *174*:21
**suing** [1] - *152*:11
**Suite** [2] - *1*:19, *2*:4
**suited** [1] - *134*:9
**sum** [3] - *191*:1, *191*:4,
*192*:12
**summary** [1] - *193*:14
**summations** [1] -
*220*:16
**summer** [1] - *138*:7
**summertime** [1] -
*50*:23
**Sunday** [3] - *20*:9,
*20*:25, *21*:10
**Sundial** [1] - *206*:24
**super** [4] - *55*:18,
*75*:20, *141*:8
**supervising** [2] -
*108*:15, *226*:4
**supervisor** [3] - *108*:4,
*108*:6, *108*:11
**Supp** [1] - *6*:23
**supplied** [2] - *14*:20,
*15*:11
**support** [10] - *25*:13,
*67*:18, *96*:1, *96*:4,
*103*:15, *103*:21,
*174*:18, *176*:13,
*176*:21, *212*:25
**supporting** [3] -
*24*:20, *177*:5, *256*:7
**supports** [1] - *244*:24
**supposed** [14] - *52*:2,
*52*:6, *62*:3, *77*:9,
*78*:14, *79*:5, *79*:6,
*100*:14, *102*:10,
*194*:22, *195*:12,
*228*:10, *236*:4,
*236*:16
**supposedly** [2] - *97*:8,
*129*:18
**surprise** [8] - *6*:11,
*12*:17, *13*:11, *14*:7,
*14*:13, *14*:19, *14*:23,
*15*:1
**surprising** [2] - *22*:1,
*147*:17
**suspected** [1] -
*116*:19
**suspicions** [1] -
*253*:10
**sustain** [2] - *71*:3,

*170*:20
**sustained** [13] - *42*:3,
*62*:19, *63*:25, *64*:7,
*68*:25, *130*:25,
*147*:13, *151*:25,
*161*:17, *163*:11,
*181*:22, *254*:4, *267*:8
**swear** [1] - *205*:1
**sword** [1] - *100*:6
**SWORN** [3] - *40*:17,
*177*:24, *205*:5
**Sydney** [5] - *48*:14,
*133*:18, *133*:24
**sympathy** [1] - *268*:14
**system** [4] - *52*:24,
*79*:13, *142*:18,
*209*:17
**systems** [3] - *52*:22,
*104*:10, *107*:8

---

**T**

---

**table** [3] - *78*:13,
*78*:14, *251*:10
**tabled** [1] - *275*:12
**tackle** [3] - *4*:5, *4*:6,
*26*:7
**tacos** [2] - *50*:11,
*85*:25
**tailor** [1] - *153*:16
**tale** [1] - *170*:13
**talent** [2] - *44*:13,
*109*:3
**talents** [1] - *134*:12
**tangents** [1] - *74*:8
**tap** [1] - *248*:4
**Tara** [2] - *218*:13,
*241*:19
**task** [3] - *92*:25, *124*:4,
*149*:22
**tasks** [1] - *124*:5
**tasteless** [2] - *262*:4,
*262*:9
**taught** [2] - *112*:20,
*112*:22
**Taylor** [2] - *218*:13,
*241*:19
**team** [14] - *37*:7,
*44*:18, *57*:1, *76*:21,
*79*:16, *107*:15,
*122*:20, *123*:1,
*123*:2, *123*:19,
*123*:21, *129*:21,
*139*:17
**teams** [1] - *41*:16
**teasing** [1] - *262*:9
**tech** [3] - *103*:15,
*103*:21, *109*:6
**technical** [10] - *82*:19,
*82*:20, *111*:12,

118:23, 123:13,
130:16, 130:19,
212:11, 212:14,
221:11
**technicalities** [1] -
94:4
**technically** [1] -
123:23
**technician** [1] -
103:22
**Technologies** [2] -
41:6, 41:7
**Technology** [1] -
103:6
**technology** [2] -
104:11, 212:21
**Telecommunication
s** [1] - 214:5
**telephone** [1] - 234:5
**temporal** [6] - 66:6,
66:18, 67:16,
224:10, 225:5,
225:23
**tenure** [3] - 54:15,
196:19, 215:17
**term** [6] - 84:18,
167:18, 188:19,
188:20, 252:16,
265:6
**terminate** [5] - 111:24,
149:1, 149:2,
149:13, 168:25
**terminated** [16] -
163:18, 164:10,
180:16, 180:18,
180:21, 180:22,
194:8, 229:3,
239:24, 257:10,
257:20, 258:3,
259:2, 266:3,
269:13, 271:22
**terminating** [2] - 89:4,
251:22
**termination** [36] -
61:18, 92:18, 137:4,
143:15, 148:15,
149:8, 150:1,
150:15, 150:23,
151:3, 163:17,
170:14, 172:5,
175:24, 178:25,
180:19, 191:18,
199:4, 199:15,
199:20, 199:21,
200:10, 228:5,
229:8, 234:23,
239:3, 239:7,
239:13, 244:23,
251:19, 258:21,
259:7, 260:1, 264:3,

264:14, 272:18
**terminations** [2] -
71:7, 79:2
**terms** [11] - 21:20,
28:8, 33:22, 75:23,
204:13, 224:11,
227:17, 250:25,
256:18, 262:12,
273:24
**terrible** [3] - 79:23,
85:11, 152:13
**terrified** [1] - 221:16
**test** [10] - 10:1, 14:2,
17:13, 17:18, 21:19,
23:6, 23:18, 160:13,
267:19, 267:20
**testified** [39] - 13:4,
13:12, 17:2, 17:3,
18:24, 46:15, 49:1,
49:14, 60:17, 73:16,
74:17, 75:16, 82:12,
106:8, 111:8,
115:12, 132:6,
138:8, 141:3, 163:8,
165:19, 165:24,
176:6, 214:25,
225:24, 226:2,
230:6, 230:9,
230:17, 232:5,
232:6, 234:2,
235:10, 236:21,
237:24, 240:17,
254:19, 256:1
**TESTIFIED** [3] - 40:18,
177:25, 205:6
**testifies** [3] - 17:6,
254:17, 255:16
**testify** [26] - 5:23,
16:5, 16:18, 18:4,
18:9, 18:12, 18:17,
18:18, 18:20, 19:6,
19:18, 19:20, 21:18,
22:4, 22:7, 32:6,
47:17, 151:10,
161:3, 164:5,
185:19, 186:3,
204:6, 228:8, 230:16
**testifying** [7] - 19:16,
85:13, 96:3, 171:5,
204:10, 255:18,
265:2
**testimony** [85] - 4:24,
5:3, 5:20, 10:15,
10:16, 10:18, 15:20,
15:22, 15:25, 17:12,
17:23, 18:7, 19:1,
19:13, 21:25, 22:25,
23:8, 23:17, 29:5,
33:16, 44:3, 45:8,
45:14, 91:20, 96:8,

96:13, 96:17, 96:21,
96:23, 115:18,
118:22, 119:2,
124:24, 127:13,
127:14, 131:9,
131:10, 131:11,
140:6, 149:23,
151:10, 151:19,
153:25, 154:3,
155:11, 155:13,
157:15, 159:19,
159:20, 159:23,
160:9, 163:10,
166:2, 174:20,
184:3, 202:12,
222:8, 222:14,
223:25, 227:2,
234:3, 235:6,
235:13, 236:2,
239:10, 239:20,
241:15, 242:12,
242:15, 242:22,
243:13, 244:17,
252:13, 252:21,
253:6, 254:9,
254:11, 255:9,
255:22, 256:3,
256:4, 256:5, 256:9
**text** [11] - 28:16, 35:2,
35:3, 37:23, 38:10,
59:9, 85:2, 85:4,
85:6, 141:20, 205:19
**texts** [1] - 39:18
**THE** [398] - 1:15, 4:3,
4:4, 4:15, 4:17, 6:7,
6:19, 6:25, 7:3, 7:10,
7:20, 7:22, 7:25, 8:4,
8:8, 8:24, 9:5, 9:9,
9:14, 10:9, 11:17,
11:22, 12:2, 12:7,
13:1, 13:9, 13:24,
14:1, 16:4, 16:10,
16:14, 17:4, 17:18,
18:19, 19:22, 19:25,
20:3, 20:11, 20:13,
20:22, 20:25, 21:5,
21:12, 21:17, 22:10,
23:14, 23:22, 24:5,
24:11, 24:23, 25:5,
25:14, 25:16, 25:19,
25:23, 26:7, 26:16,
26:20, 26:23, 27:1,
27:4, 27:9, 27:15,
27:23, 29:2, 30:3,
31:3, 31:12, 31:16,
33:10, 33:14, 33:18,
33:25, 34:2, 34:8,
34:12, 34:16, 34:20,
34:23, 34:25, 35:7,
35:10, 35:16, 35:22,
36:2, 36:6, 36:10,

36:14, 36:19, 36:24,
37:2, 37:4, 37:8,
37:13, 37:19, 37:23,
38:21, 38:24, 39:6,
39:12, 39:15, 39:25,
40:2, 40:4, 40:5,
40:7, 40:14, 40:15,
40:19, 40:21, 40:23,
42:3, 42:21, 62:19,
63:25, 64:7, 64:9,
65:1, 65:4, 65:8,
65:10, 65:13, 65:22,
66:2, 66:18, 66:21,
67:2, 67:6, 67:11,
67:22, 68:25, 70:12,
71:1, 71:3, 74:15,
76:12, 76:14, 83:4,
83:6, 85:22, 85:24,
89:6, 89:19, 89:21,
93:21, 93:24, 98:11,
98:14, 101:2, 101:6,
101:8, 101:10,
101:11, 101:13,
101:14, 101:16,
101:18, 121:22,
121:24, 127:9,
130:10, 130:11,
130:25, 135:23,
135:24, 140:12,
140:13, 141:5,
141:6, 141:25,
142:1, 144:13,
146:25, 147:2,
147:11, 147:13,
148:3, 148:4,
151:25, 152:5,
152:19, 152:22,
153:2, 153:4, 153:6,
153:13, 153:18,
153:20, 154:1,
154:13, 154:23,
155:14, 155:20,
156:5, 156:11,
156:15, 157:8,
157:14, 158:5,
158:7, 158:13,
159:16, 160:8,
160:12, 160:15,
160:17, 160:18,
160:20, 160:22,
161:17, 163:11,
163:24, 164:4,
164:18, 165:2,
165:22, 166:3,
166:7, 166:17,
170:7, 173:16,
174:8, 174:10,
175:1, 175:12,
175:13, 176:9,
176:10, 176:18,
176:19, 177:3,

177:4, 177:16,
177:18, 177:21,
177:22, 177:23,
178:1, 178:3, 178:4,
179:20, 181:14,
181:22, 183:7,
183:9, 183:12,
183:14, 183:17,
184:13, 185:15,
186:18, 188:18,
192:10, 196:17,
199:3, 201:18,
201:20, 202:7,
203:2, 203:10,
203:19, 203:22,
203:24, 204:2,
204:16, 204:17,
204:18, 204:19,
204:20, 204:21,
205:1, 205:3, 205:7,
205:9, 205:12,
205:16, 205:18,
205:21, 205:22,
205:25, 206:1,
209:8, 209:9,
210:15, 210:16,
211:18, 212:3,
212:4, 212:7,
214:23, 214:25,
215:4, 215:14,
215:15, 216:4,
216:6, 216:8,
216:18, 218:25,
219:1, 219:3, 219:5,
219:17, 219:23,
220:1, 220:2, 220:4,
220:6, 220:21,
220:24, 221:1,
221:6, 221:8,
221:13, 221:18,
223:9, 223:18,
223:21, 224:10,
224:19, 224:23,
224:25, 225:4,
225:19, 226:13,
226:16, 226:19,
227:11, 227:21,
228:19, 228:25,
229:7, 229:12,
229:24, 230:1,
230:4, 230:9,
230:14, 230:19,
231:5, 231:9,
231:16, 231:25,
232:9, 232:15,
232:24, 233:5,
233:15, 234:7,
234:17, 235:10,
235:13, 235:16,
235:21, 236:2,
236:14, 236:24,

238:24, 240:3, 242:2, 242:8, 242:13, 243:1, 243:5, 243:7, 243:11, 243:23, 243:25, 245:6, 245:20, 245:25, 246:9, 246:16, 246:25, 247:1, 247:7, 248:1, 248:10, 248:15, 248:18, 248:21, 248:24, 249:4, 249:7, 249:10, 249:17, 249:21, 249:24, 250:4, 250:6, 273:18, 273:20, 274:22, 275:2, 275:12, 275:23, 276:2, 276:4
**theirs** [1] - 159:2
**theory** [3] - 162:10, 162:11, 237:8
**there'd** [1] - 127:24
**therefore** [3] - 14:22, 270:3, 272:8
**they've** [8] - 9:2, 30:23, 231:20, 234:4, 234:5, 234:6, 246:18
**thicker** [1] - 167:23
**thin** [2] - 125:19, 244:3
**thinking** [9] - 38:6, 38:9, 39:7, 39:9, 39:10, 62:21, 249:25, 273:11, 275:25
**thinks** [1] - 253:20
**Third** [1] - 22:17
**third** [7] - 22:20, 208:12, 260:13, 261:5, 264:2, 264:13, 265:12
**third-party** [1] - 22:20
**Thomas** [4] - 197:18, 199:17, 203:11, 237:12
**THOMAS** [1] - 1:8
**thoughts** [1] - 176:11
**thousand** [1] - 224:13
**thread** [6] - 59:4, 59:7, 59:10, 59:14, 93:1, 93:3
**threads** [1] - 59:12
**threatening** [1] - 262:3
**three** [36] - 9:18, 10:13, 28:22, 35:15, 35:23, 35:25, 36:1,

91:5, 99:5, 99:6, 100:22, 103:21, 110:5, 135:8, 157:11, 157:12, 189:6, 189:8, 189:17, 189:18, 189:20, 190:2, 190:4, 190:8, 190:9, 190:12, 190:16, 190:18, 190:21, 191:23, 192:5, 192:11, 192:14, 242:24, 257:3, 265:2
**thrive** [3] - 135:13, 135:15, 135:16
**throughout** [11] - 42:9, 42:12, 49:4, 59:5, 75:15, 103:24, 104:13, 162:15, 215:11, 215:17, 240:7
**throw** [1] - 15:4
**throwaway** [2] - 60:11, 132:13
**throwaway-type** [1] - 60:11
**Thursday** [2] - 131:3, 274:9
**tickets** [6] - 97:6, 140:19, 142:2, 142:7, 142:10, 182:18
**tie** [2] - 225:21, 226:23
**tier** [2] - 103:21, 188:4
**tier-three** [1] - 103:21
**tiers** [1] - 188:6
**tightened** [1] - 248:11
**Tim** [41] - 24:7, 25:8, 52:13, 52:14, 52:15, 53:7, 53:9, 53:11, 65:11, 72:5, 73:5, 108:10, 117:5, 117:10, 121:12, 121:14, 122:9, 122:19, 122:22, 122:24, 123:2, 123:23, 124:3, 124:7, 124:21, 125:1, 125:2, 125:12, 129:20, 129:22, 130:7, 130:18, 130:23, 158:25, 199:22, 202:12, 202:13, 202:14, 203:10, 203:17, 225:14
**Tim's** [4] - 52:16, 53:11, 53:12, 125:23
**timed** [1] - 246:7
**timeline** [1] - 55:13

**timing** [4] - 233:24, 233:25, 246:6, 265:16
**TIMOTHY** [1] - 2:4
**Timothy** [1] - 197:20
**tip** [1] - 252:5
**tired** [3] - 106:12, 182:20, 212:23
**Title** [13] - 222:1, 222:25, 223:1, 256:15, 256:17, 264:21, 264:25, 265:4, 266:6, 266:20, 266:21, 266:25, 269:6
**title** [41] - 52:12, 62:25, 63:11, 63:13, 63:16, 65:6, 66:3, 66:14, 68:6, 68:15, 81:11, 81:16, 82:18, 106:10, 106:14, 126:16, 132:23, 134:22, 135:20, 136:3, 136:8, 136:13, 136:17, 137:3, 137:20, 138:5, 185:8, 197:6, 197:7, 197:23, 197:25, 198:1, 198:3, 198:6, 198:7, 198:10, 201:8, 201:22, 202:6, 226:3, 226:7
**titles** [9] - 106:14, 106:23, 106:24, 107:21, 136:18, 196:25, 197:12, 200:25, 225:25
**Tobias** [1] - 198:5
**TOBIAS** [1] - 198:5
**today** [21] - 4:8, 15:16, 20:16, 37:20, 96:9, 151:6, 161:20, 161:21, 162:6, 162:9, 164:14, 165:16, 166:23, 181:18, 184:20, 185:19, 231:14, 245:4, 245:21, 247:1, 247:17
**together** [34] - 21:3, 28:10, 30:13, 36:25, 45:12, 80:4, 86:2, 87:11, 90:13, 91:6, 112:11, 114:22, 114:23, 115:14, 128:1, 128:3, 135:8, 137:22, 138:3, 138:4, 142:5, 178:23, 179:1,

179:2, 179:8, 179:15, 179:17, 180:6, 180:11, 180:14, 237:10, 237:13, 238:15
**Tom** [56] - 17:3, 43:23, 46:3, 46:4, 47:17, 52:25, 55:14, 55:23, 59:8, 59:11, 60:20, 61:14, 62:16, 62:17, 62:21, 63:13, 71:10, 71:14, 73:24, 75:9, 89:14, 91:11, 92:5, 104:3, 105:3, 105:10, 105:20, 110:8, 118:13, 118:18, 119:10, 128:9, 128:10, 128:15, 129:13, 130:4, 132:4, 145:11, 145:12, 145:13, 145:17, 145:19, 147:22, 148:16, 148:20, 162:19, 163:16, 165:6, 165:8, 176:5, 176:25, 240:19
**Tom's** [3] - 60:10, 129:12, 132:4
**tomorrow** [16] - 246:14, 248:6, 248:12, 248:15, 250:20, 251:7, 251:12, 273:2, 273:14, 273:17, 273:21, 274:1, 274:3, 274:8, 274:12, 276:5
**ton** [2] - 133:20, 133:22
**tonight** [1] - 38:5
**tons** [1] - 92:2
**took** [17] - 9:19, 35:13, 35:19, 45:21, 56:24, 81:17, 84:13, 100:9, 104:10, 106:13, 112:21, 140:13, 149:2, 156:7, 196:18, 263:25, 264:11
**tool** [2] - 91:21, 126:14
**tools** [2] - 92:2, 92:3
**tooth** [1] - 38:1
**top** [10] - 28:10, 51:22, 79:15, 79:21, 80:19, 117:24, 184:15, 186:13, 196:16, 275:13
**topic** [2] - 56:9, 62:2

**topics** [1] - 50:14
**total** [3] - 261:18, 263:7, 266:5
**totality** [3] - 162:24, 173:11, 234:12
**totally** [5] - 80:19, 92:12, 110:14, 127:21, 167:20
**touch** [1] - 22:1
**touched** [2] - 50:14, 254:18
**touching** [1] - 50:15
**touchstone** [1] - 5:6
**toward** [3] - 265:17, 265:21, 265:22
**towards** [5] - 54:14, 76:7, 100:8, 195:15, 262:2
**towers** [1] - 115:23
**township** [3] - 46:21, 102:6, 217:1
**toxic** [1] - 218:8
**traditional** [2] - 115:25, 116:5
**traffic** [1] - 49:3
**training** [1] - 79:13
**trample** [1] - 149:16
**transcribed** [1] - 183:23
**transcribing** [1] - 183:24
**transcript** [19] - 1:23, 70:10, 73:12, 153:12, 154:18, 155:15, 156:4, 156:25, 167:22, 232:6, 235:17, 235:18, 235:21, 237:23, 242:22, 243:3, 243:17, 244:10, 276:10
**transcription** [1] - 1:24
**transcripts** [1] - 242:16
**transferred** [1] - 41:11
**travel** [14] - 16:18, 17:22, 17:25, 18:17, 22:23, 82:4, 90:15, 112:21, 113:22, 138:24, 139:3, 139:15, 177:11, 241:4
**traveled** [2] - 112:10, 115:15
**traveling** [7] - 18:11, 81:13, 138:3, 138:4, 139:8, 139:21, 139:23
**treat** [2] - 121:4, 254:5

**treated** [4] - 137:7, 137:9, 191:1, 257:13
**treating** [2] - 120:22, 137:12
**treatment** [12] - 32:8, 64:12, 65:24, 66:5, 66:6, 67:19, 175:9, 210:13, 228:4, 251:18, 265:24
**tree** [4] - 86:1, 226:1, 226:7, 226:15
**TRIAL** [1] - 1:5
**trial** [36] - 5:11, 5:14, 5:18, 6:6, 8:12, 9:6, 9:22, 9:23, 12:17, 13:13, 13:23, 15:15, 15:20, 16:15, 18:24, 21:3, 22:1, 22:7, 23:1, 29:25, 31:15, 34:13, 37:6, 37:16, 48:24, 83:2, 154:14, 175:5, 175:16, 183:21, 184:2, 243:16, 244:9, 255:21, 268:24
**tried** [3] - 5:19, 102:18, 234:22
**trip** [6] - 81:19, 82:9, 82:16, 115:2, 139:1, 139:4
**trips** [7] - 81:20, 82:2, 115:17, 115:18, 115:23, 116:17, 140:2
**trivial** [4] - 140:15, 143:13, 163:5
**Trompta(PH)** [1] - 48:15
**trouble** [1] - 143:25
**troublemaker** [1] - 241:13
**true** [28] - 10:1, 17:6, 36:7, 45:14, 64:23, 65:18, 72:24, 84:22, 84:23, 84:24, 85:3, 85:4, 85:6, 90:2, 91:2, 91:4, 92:10, 97:2, 99:7, 119:7, 196:1, 198:16, 216:13, 217:24, 217:25, 218:4, 235:5, 252:25
**trust** [3] - 51:5, 51:7, 218:6
**truth** [17] - 28:11, 28:12, 28:19, 29:4, 29:8, 30:6, 95:15, 95:17, 95:18, 97:18, 99:12, 99:13, 99:14, 99:16, 169:15,

174:22, 239:6
**truthful** [1] - 100:18
**try** [9] - 9:24, 23:3, 33:2, 40:8, 49:2, 64:19, 153:16, 173:6, 242:19
**trying** [31] - 17:9, 55:20, 69:10, 79:18, 94:5, 94:9, 98:16, 105:12, 105:25, 106:1, 109:20, 110:24, 111:6, 115:8, 115:22, 123:1, 125:9, 125:17, 125:19, 126:18, 139:2, 142:9, 172:4, 231:17, 235:18, 238:17, 241:14, 241:16, 241:19, 247:2, 247:3
**Tuesday** [1] - 131:2
**tuned** [1] - 135:5
**turn** [7] - 21:22, 23:23, 57:10, 167:23, 173:6, 179:22, 180:8
**turnaround** [2] - 22:20, 22:22
**turned** [2] - 149:14, 170:19
**turning** [1] - 240:22
**twice** [2] - 49:24, 58:20
**two** [54] - 6:20, 7:8, 7:10, 7:16, 8:24, 12:15, 23:5, 45:12, 70:14, 71:25, 72:1, 93:5, 98:8, 98:18, 99:2, 99:4, 99:6, 99:9, 100:22, 102:8, 104:15, 107:6, 115:23, 127:21, 137:16, 162:11, 163:21, 165:9, 189:3, 190:15, 197:2, 205:13, 214:1, 216:4, 216:6, 216:7, 216:8, 216:9, 219:8, 225:10, 225:12, 238:2, 238:3, 244:19, 244:22, 251:3, 254:14, 256:14, 257:2, 258:1, 265:1, 266:22, 266:23
**Two** [1] - 216:9
**Two-minute** [1] - 216:9
**type** [12] - 60:11, 90:10, 116:4,

136:25, 145:14, 149:20, 168:16, 170:23, 178:14, 254:15, 254:22, 261:19
**types** [3] - 122:13, 254:14, 266:19
**typical** [1] - 126:23
**typically** [3] - 49:20, 111:22, 191:5

---

**U**

**U.S** [4] - 1:11, 1:12, 206:20, 208:6
**UK** [1] - 206:15
**ultimate** [1] - 132:22
**ultimately** [8] - 5:7, 37:7, 135:20, 156:22, 176:25, 207:12, 243:18, 259:22
**Ultimately** [1] - 265:22
**umbrella** [2] - 174:13, 255:1
**unclear** [1] - 153:22
**uncontroverted** [2] - 239:12, 239:20
**under** [46] - 4:25, 5:16, 6:14, 9:2, 9:13, 14:6, 19:3, 19:20, 23:11, 30:8, 30:15, 30:18, 41:16, 48:23, 70:4, 73:16, 97:18, 97:20, 99:11, 112:21, 164:9, 169:14, 169:15, 171:5, 173:25, 183:21, 221:22, 222:25, 223:1, 223:2, 233:17, 239:4, 254:2, 256:14, 257:1, 264:18, 264:21, 265:3, 266:6, 266:7, 266:20, 266:25, 269:5, 271:16, 272:11
**underlies** [1] - 240:13
**underlying** [1] - 239:18
**underneath** [2] - 41:15, 52:18
**understood** [7] - 34:20, 58:3, 115:13, 160:7, 171:8, 210:9, 237:9
**undisputed** [2] - 67:8, 239:10
**unemployment** [1] -

272:3
**unequal** [2] - 260:2, 272:18
**unequivocally** [1] - 223:22
**unfair** [3] - 5:6, 5:22, 13:11
**unfairly** [1] - 120:22
**unfortunate** [1] - 114:9
**unfortunately** [2] - 15:3, 204:5
**unfriendly** [1] - 262:17
**unique** [1] - 150:5
**United** [1] - 4:2
**UNITED** [2] - 1:1, 1:16
**universe** [1] - 35:23
**University** [1] - 14:4
**unlawful** [4] - 264:24, 268:18, 269:12, 271:1
**unless** [8] - 21:5, 30:19, 38:5, 252:12, 262:14, 267:25, 268:8, 275:1
**unpleasant** [2] - 262:1, 262:17
**unquote** [1] - 103:5
**unreal** [1] - 182:9
**unreasonable** [1] - 259:19
**unreasonably** [1] - 262:5
**untoward** [1] - 32:5
**untrue** [1] - 132:15
**unwanted** [1] - 262:1
**unwelcome** [1] - 261:25
**up** [99] - 4:6, 4:8, 9:15, 10:9, 16:9, 18:14, 20:5, 33:23, 35:14, 38:16, 39:12, 40:14, 44:1, 45:9, 45:24, 47:13, 47:22, 48:7, 50:19, 55:21, 56:14, 58:9, 58:13, 58:14, 63:5, 65:20, 67:5, 72:13, 77:16, 78:5, 80:10, 81:15, 90:18, 90:24, 95:21, 96:1, 96:2, 96:5, 96:7, 96:16, 97:3, 102:6, 102:10, 103:15, 103:21, 105:7, 105:15, 108:18, 110:22, 112:23, 117:5, 118:1, 118:5, 124:5, 124:21, 125:5, 126:5, 132:10, 132:21,

134:17, 135:21, 136:2, 136:23, 141:11, 143:6, 148:5, 153:1, 156:22, 157:3, 159:6, 160:9, 160:23, 160:24, 161:7, 162:7, 162:20, 163:9, 171:1, 171:15, 175:18, 177:21, 180:3, 184:10, 199:3, 208:4, 208:16, 209:18, 224:4, 224:5, 225:7, 235:16, 235:22, 237:17, 246:1, 247:16, 251:12, 273:15, 275:15, 275:24
**upset** [18] - 57:18, 57:24, 58:1, 58:2, 58:4, 59:17, 60:5, 60:14, 60:15, 60:22, 61:13, 61:15, 61:23, 62:23, 74:1, 127:15, 132:3, 173:14
**upstream** [1] - 212:23
**upward** [9] - 52:20, 52:25, 53:2, 53:5, 53:8, 53:11, 53:15, 80:20, 81:5
**urgency** [1] - 119:9
**usual** [1] - 41:18

---

**V**

**vacation** [1] - 141:7
**valid** [1] - 239:18
**valuable** [2] - 19:15, 113:2
**value** [4] - 15:8, 120:6, 134:20, 268:19
**variables** [1] - 79:18
**various** [3] - 80:9, 208:13, 209:16
**vary** [2] - 226:1, 227:17
**vendors** [1] - 241:5
**verbal** [2] - 76:23, 241:24
**verbiage** [1] - 160:5
**verdict** [13] - 221:21, 222:23, 223:8, 223:17, 227:1, 244:16, 249:11, 252:6, 254:15, 271:11, 271:23, 274:12, 274:15
**verification** [1] -

244:18
*verified* [1] - 234:5
*verify* [3] - 76:23, 86:20, 147:16
*Verizon* [1] - 133:24
*version* [2] - 7:14, 237:14
*versus* [1] - 109:1
*vested* [1] - 190:17
*vesting* [2] - 190:15, 190:16
*vet* [2] - 44:13, 44:15
*vetted* [1] - 74:3
*via* [4] - 91:14, 127:16, 137:15, 204:10
*VIA* [1] - 205:6
*Via* [1] - 3:9
*vice* [5] - 42:6, 65:10, 107:12, 197:15, 245:4
*victim* [2] - 146:22, 269:13
*video* [14] - 18:7, 18:9, 18:15, 19:16, 21:13, 91:14, 92:19, 100:2, 133:17, 145:10, 165:6, 171:1, 172:3, 173:3
*view* [14] - 16:5, 131:25, 136:19, 140:8, 143:11, 182:11, 204:22, 211:25, 219:14, 233:10, 234:20, 242:9, 260:19, 261:11
*viewing* [1] - 133:19
*views* [1] - 147:8
*VII* [13] - 222:1, 222:25, 223:1, 256:15, 256:17, 264:21, 264:25, 265:4, 266:6, 266:20, 266:21, 266:25, 269:6
*Vince* [10] - 17:1, 35:21, 46:14, 59:11, 62:4, 62:11, 92:17, 93:5, 95:8, 163:15
*Vince's* [1] - 95:10
*Vincent* [14] - 75:16, 94:3, 94:5, 94:7, 95:7, 149:14, 184:19, 198:1, 200:7, 203:13, 207:8, 236:18, 237:11, 237:23
*Vinny* [8] - 46:10, 46:11, 46:12, 100:5, 100:8, 142:4,

149:14, 149:16
*violate* [3] - 233:20, 258:11, 270:20
*violated* [3] - 228:23, 257:4, 264:20
*violates* [1] - 270:17
*violation* [5] - 97:4, 100:3, 163:19, 228:25, 272:16
*violations* [44] - 92:24, 93:6, 94:5, 94:8, 94:24, 95:13, 97:1, 99:20, 100:1, 140:4, 140:7, 141:23, 142:24, 143:11, 148:24, 162:20, 163:1, 163:4, 163:8, 168:4, 168:9, 168:11, 168:23, 169:1, 169:4, 169:6, 169:10, 171:6, 171:9, 171:17, 172:17, 174:19, 180:16, 180:18, 180:20, 180:23, 182:8, 182:10, 182:25, 183:3, 244:19, 244:20, 245:3, 245:5
*vision* [1] - 188:7
*visit* [1] - 113:24
*voice* [3] - 38:10, 136:24, 141:20
*voiced* [1] - 125:14
*voicing* [1] - 123:4
*Volume* [2] - 70:14, 70:17
*voluntarily* [3] - 22:3, 22:4, 213:17
*VP* [2] - 142:21, 178:13
*vs* [5] - 6:22, 6:24, 7:6, 7:16, 14:3
*vulgar* [1] - 262:17

## W

*wages* [7] - 195:20, 269:1, 269:4, 269:18, 271:18, 271:25, 272:11
*wait* [10] - 8:24, 35:16, 36:14, 164:4, 165:2, 214:19, 230:19
*waited* [1] - 13:7
*waiting* [2] - 40:8, 102:2
*waived* [2] - 30:18, 30:23
*waiver* [1] - 221:17

*walk* [1] - 115:22
*walked* [4] - 15:3, 85:25, 115:24, 254:24
*walking* [2] - 93:24, 116:9
*wall* [3] - 15:5, 47:7, 47:8
*walls* [1] - 116:3
*wants* [3] - 18:17, 155:21, 155:23
*War* [2] - 113:21, 113:22
*warm* [1] - 50:23
*warrant* [1] - 28:25
*warranted* [1] - 238:22
*WAS* [2] - 3:13, 144:14
*was..* [1] - 62:9
*waste* [3] - 130:12, 207:25, 247:12
*watched* [1] - 129:22
*water* [4] - 58:15, 116:10, 254:25
*waves* [1] - 110:19
*ways* [2] - 109:2, 265:14
*weaknesses* [1] - 111:7
*wearing* [1] - 254:25
*web* [2] - 53:18, 53:19
*website* [3] - 53:20, 133:16, 143:22
*Wednesday* [1] - 131:3
*week* [24] - 9:23, 12:15, 20:7, 20:24, 26:22, 26:23, 27:7, 27:9, 27:16, 49:24, 101:25, 125:4, 131:3, 139:5, 140:5, 147:17, 151:9, 152:9, 176:2, 176:3, 182:7, 207:17, 208:12, 222:13
*weekend* [2] - 13:6, 176:1
*weekly* [1] - 76:21
*weeks* [1] - 13:13
*weigh* [2] - 134:6, 258:16
*weighing* [4] - 148:23, 253:12, 256:5, 256:8
*weighs* [1] - 23:1
*weight* [8] - 33:9, 136:7, 253:14, 255:5, 255:7, 255:25, 256:3, 256:10
*weird* [2] - 146:3, 148:18

*welcome* [2] - 260:12, 261:4
*well-intentioned* [4] - 61:1, 61:5, 61:8, 106:2
*wellbeing* [2] - 261:24, 263:10
*Wendy's* [2] - 102:12, 102:19
*Westlaw* [3] - 7:18, 7:19, 7:24
*wet* [1] - 255:1
*whatsoever* [3] - 131:20, 136:25, 150:12
*white* [5] - 23:17, 40:9, 204:7, 218:18, 249:25
*whole* [11] - 94:15, 96:16, 100:9, 105:4, 116:4, 134:7, 171:15, 172:1, 173:11, 225:9, 232:18
*widespread* [1] - 48:23
*wife* [4] - 90:7, 90:8, 112:12, 151:20
*willful* [3] - 272:13, 272:17, 272:24
*willfully* [1] - 239:16
*willfulness* [5] - 14:11, 15:18, 239:23, 272:14, 272:20
*Williams* [200] - 10:18, 13:3, 14:21, 18:24, 31:5, 31:25, 32:23, 63:13, 65:6, 70:21, 78:23, 105:22, 106:4, 107:23, 107:24, 108:18, 111:2, 111:17, 112:8, 113:13, 114:8, 115:6, 115:20, 116:12, 116:17, 116:21, 117:13, 118:12, 119:19, 119:22, 120:2, 120:11, 120:13, 120:22, 121:1, 121:8, 124:8, 124:15, 126:5, 127:14, 128:5, 128:14, 128:15, 130:21, 131:3, 131:14, 131:21, 132:7, 134:9, 134:14, 134:19, 135:9, 136:13, 136:19, 136:24,

137:3, 137:6, 137:18, 138:5, 138:8, 139:21, 140:9, 141:23, 143:9, 143:19, 144:24, 145:18, 146:19, 147:6, 147:22, 149:11, 149:25, 150:3, 150:12, 150:13, 151:1, 151:10, 157:16, 171:20, 175:8, 175:25, 176:5, 176:14, 178:17, 181:24, 182:14, 182:24, 183:3, 186:1, 187:20, 189:24, 194:6, 194:17, 201:13, 201:21, 210:1, 210:4, 210:9, 211:1, 211:6, 211:9, 212:1, 212:10, 213:8, 219:20, 222:3, 222:4, 222:10, 223:13, 225:22, 226:3, 226:8, 229:15, 241:25, 242:23, 244:6, 251:14, 251:22, 251:23, 252:3, 252:4, 252:6, 256:14, 257:1, 257:5, 257:9, 257:12, 257:18, 257:20, 257:21, 257:22, 257:23, 258:1, 258:3, 258:4, 258:5, 258:8, 258:10, 258:13, 258:18, 259:2, 259:12, 259:21, 259:23, 260:4, 260:9, 260:12, 260:21, 261:2, 261:4, 261:13, 261:20, 261:21, 261:25, 262:2, 262:19, 262:24, 263:14, 263:19, 263:21, 263:24, 264:6, 264:8, 264:10, 264:16, 265:7, 265:14, 265:17, 265:21, 265:22, 265:25, 266:4, 266:11, 266:15, 267:2, 267:3, 267:4, 267:6, 267:10, 267:13, 267:14, 267:16,

267:24, 268:17, 269:2, 269:4, 269:9, 269:18, 269:20, 269:22, 271:2, 271:17, 271:19, 271:20, 271:22, 271:25, 272:10
**WILLIAMS** [1] - 1:3
**williams** [1] - 272:14
**williams'** [1] - 268:8
**Williams'** [74] - 10:16, 11:15, 12:5, 14:21, 15:20, 18:25, 108:3, 109:11, 109:15, 113:2, 117:16, 117:20, 127:6, 130:15, 134:22, 135:19, 138:12, 148:15, 150:15, 150:19, 168:17, 168:22, 180:12, 181:19, 185:24, 186:1, 186:2, 213:12, 222:20, 228:11, 239:16, 251:19, 258:6, 258:11, 258:21, 258:22, 259:9, 260:1, 260:5, 260:6, 260:13, 260:16, 260:17, 260:19, 260:20, 260:24, 261:5, 261:8, 261:9, 261:11, 261:12, 261:18, 261:24, 262:5, 262:22, 263:4, 263:11, 264:4, 264:15, 265:11, 265:13, 265:18, 265:23, 266:2, 266:9, 266:13, 268:3, 268:6, 269:11, 270:5, 270:6, 270:15, 270:23, 272:18
**willing** [1] - 22:4
**win** [1] - 238:18
**window** [2] - 22:21, 120:23
**wine** [1] - 114:1
**wing** [1] - 112:22
**winter** [1] - 105:4
**wires** [1] - 127:24
**wisdom** [1] - 259:20
**wishes** [1] - 221:23
**withdraw** [1] - 131:8
**withheld** [2] - 228:13, 257:11
**withholding** [4] -

234:15, 251:19, 257:22, 258:5
**withstanding** [1] - 194:10
**WITNESS** [47] - 40:21, 76:14, 83:6, 85:24, 89:21, 98:14, 101:10, 130:11, 135:24, 140:13, 141:6, 142:1, 147:2, 148:4, 166:7, 174:10, 175:13, 176:10, 176:19, 177:4, 177:22, 178:3, 185:15, 186:18, 188:18, 192:10, 196:17, 199:3, 201:18, 201:20, 202:7, 203:2, 203:10, 205:9, 205:16, 205:21, 205:25, 209:9, 210:16, 212:4, 212:7, 215:4, 215:15, 219:1, 219:3, 219:17, 220:1
**witness** [61] - 5:9, 5:11, 5:22, 6:4, 6:5, 6:6, 6:8, 6:16, 10:6, 12:10, 12:12, 12:13, 12:24, 13:5, 13:14, 13:15, 14:6, 14:17, 14:18, 14:20, 16:15, 17:1, 18:14, 18:24, 19:5, 19:7, 19:16, 20:17, 22:2, 22:7, 22:20, 27:11, 34:19, 35:6, 40:12, 144:6, 156:11, 184:4, 184:9, 204:6, 204:10, 204:25, 224:1, 233:1, 253:4, 254:12, 254:16, 254:17, 254:18, 254:19, 255:11, 255:12, 255:15, 255:16, 255:18, 255:20, 255:23, 256:9, 256:13
**witness's** [6] - 13:12, 14:15, 22:22, 255:17, 255:21
**witnesses** [13] - 5:15, 5:16, 8:20, 18:4, 36:22, 140:6, 163:7, 183:13, 252:13, 252:21, 255:10, 256:1, 256:2
**WL** [1] - 7:21
**Wolson** [1] - 205:13
**WOLSON** [2] - 1:15,

4:2
**Woodhouse** [1] - 6:24
**Word** [2] - 128:2, 133:3
**word** [10] - 36:4, 56:6, 72:12, 163:15, 232:15, 237:10, 237:11, 237:12, 242:24, 250:24
**words** [20] - 7:25, 29:7, 33:20, 60:6, 66:21, 73:11, 102:3, 106:9, 129:9, 139:1, 143:18, 145:21, 155:18, 155:20, 155:21, 160:3, 184:7, 228:2, 229:3, 267:23
**work-related** [1] - 115:19
**worker** [1] - 265:9
**workplace** [7] - 202:23, 215:12, 238:12, 241:18, 262:8, 263:3, 265:11
**works** [3] - 59:9, 86:18, 124:18
**world** [8] - 47:24, 48:1, 112:11, 115:15, 126:11, 133:12, 177:11, 206:17
**World** [2] - 113:21, 113:22
**worried** [1] - 95:12
**worry** [1] - 50:25
**worst** [1] - 84:11
**worth** [2] - 109:2, 275:11
**worthy** [1] - 255:11
**wow** [1] - 146:5
**wrap** [1] - 160:9
**write** [2] - 38:13, 143:6
**writing** [7] - 51:20, 53:10, 54:5, 61:4, 119:10, 127:20, 240:16
**written** [8] - 32:12, 32:19, 32:20, 33:4, 76:24, 97:3, 127:23, 251:6
**wrote** [2] - 32:10, 255:20

## Y

**year** [47] - 41:19, 49:19, 49:21, 49:23, 50:1, 51:13, 51:14, 55:25, 70:1, 73:20,

77:1, 98:25, 118:18, 158:20, 162:11, 165:9, 165:16, 189:10, 189:13, 191:3, 191:5, 191:19, 192:4, 193:5, 193:7, 193:10, 194:1, 194:4, 194:6, 194:7, 194:23, 195:8, 195:16, 201:9, 201:12, 224:4, 224:14, 225:11, 225:13, 225:15, 225:18, 227:7, 231:4, 236:9, 240:25, 241:6
**year's** [1] - 195:20
**year-end** [1] - 41:19
**years** [38] - 9:18, 57:4, 66:9, 66:22, 75:15, 78:18, 88:6, 88:7, 88:8, 90:13, 97:14, 98:8, 98:19, 99:2, 99:4, 99:6, 99:9, 100:14, 100:22, 103:20, 104:13, 113:9, 117:20, 163:21, 169:13, 172:17, 190:16, 206:19, 208:25, 218:2, 223:25, 224:4, 238:2, 238:3, 244:19, 244:23, 256:25
**yelling** [3] - 10:24, 11:1, 61:17
**yes-or-no** [1] - 75:21
**yesterday** [12] - 4:11, 16:1, 19:10, 20:14, 21:4, 21:6, 21:7, 21:10, 22:14, 37:24, 38:1, 164:3
**York** [2] - 7:17, 109:9
**young** [1] - 218:20
**younger** [5] - 124:8, 128:21, 218:22, 224:9, 262:25
**yourself** [3] - 100:2, 206:10, 255:3
**yourselves** [3] - 274:16, 275:5, 275:18
**youthful** [1] - 208:25

## Z

**Zinburger** [1] - 43:25
**zone** [1] - 112:23
**ZOOM** [1] - 205:6
**Zoom** [14] - 3:9, 15:25,

16:5, 16:6, 16:23, 17:5, 17:6, 17:12, 160:13, 204:7, 204:10, 205:22, 205:23, 216:19