1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF PENNSYLVANIA
2

3   _____

    CARL WILLIAMS,                        CIVIL ACTION NUMBER:
4
         Plaintiff,                       2:22-CV-01618-JDW
5
         v.                               JURY TRIAL
6                                         DAY 7
    LINODE LIMITED LIABILITY
7   COMPANY, d/b/a LINODE, LLC,
    LINODIAN, LLC, d/b/a LINODE,
8   LLC, DANIEL SPATARO, and
    THOMAS ASARO
9
         Defendants.
10  _____

11

12       U.S. District Court, Eastern District of PA
         James A. Byrne U.S. Courthouse
13       601 Market Street
         Philadelphia, Pennsylvania 19106
14       January 31, 2024
         Commencing at 9:03 a.m.

15

16  B E F O R E:            THE HONORABLE JOSHUA D. WOLSON
                            UNITED STATES DISTRICT JUDGE

17

18  A P P E A R A N C E S:

19       DEREK SMITH LAW GROUP, PLLC
         BY:  SETH D. CARSON  ESQUIRE
20       1835 Market Street, Suite 2950
         Philadelphia, PA 19103
21       For the Plaintiff

22             Maureen McHugh, Official Court Reporter
                   maureen_mchugh@paed.uscourts.gov
23
       Proceedings recorded by mechanical stenography; transcript
24            produced by computer-aided transcription.

25

*United States District Court*

1    **A P P E A R A N C E S**:**(Cont'd)**

2

         JACKSON LEWIS, P.C.
3       BY:  STEPHANIE JILL PEET, ESQUIRE
              JONATHAN CAVALIER, ESQUIRE
4             TIMOTHY MCCARTHY, ESQUIRE
              1601 Cherry Street, Suite 1350
5             Philadelphia, PA 19102
              For the Defendant

6

7

8

9

10

     **ALSO PRESENT:**

11

12                    MELISSA MEYER, PARALEGAL

13                    SHARON SCOTT, COURTROOM DEPUTY

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

 1          (PROCEEDINGS held in open court before The Honorable

 2  JOSHUA D. WOLSON, United States District Judge, at 9:03 a.m.)

 3          THE COURTROOM DEPUTY:  All rise.

 4          THE COURT:  Good morning, everybody.  Have a seat,

 5  please.  I didn't see any email traffic, so I presume we're

 6  ready to close?

 7          MR. CAVALIER:  Yep.

 8          THE COURT:  Very good.  So we'll keep time for each of

 9  you.  From a preference standpoint, do you want us to give you

10  a five-minute warning?  A two-minute warning?  Do you want to

11  just go uninterrupted and just tell you when you're done if

12  you're over time?  How do you want to do it?

13          Mr. Carson?

14          MR. CARSON:  I guess a five-minute warning.

15          THE COURT:  Five-minute warning?

16          MR. CARSON:  Yeah.

17          THE COURT:  Okay.  Mr. Cavalier, what's your

18  preference?

19          MR. CAVALIER:  Just on the off-chance I need it, can I

20  get a one-minute warning?

21          THE COURT:  Okay.  All right.

22          Let's go ahead and bring the jury in, Ms. Scott.

23          THE COURTROOM DEPUTY:  All rise for the jury.

24          (Jury enters the courtroom at 9:04 a.m.)

25          THE COURT:  Good morning, everybody.  You can all have

*United States District Court*

1   a seat.  So what we're going to do this morning, as I said to

2   you when we finished up yesterday, is we're going to hear the

3   closing arguments from the parties.  The plaintiff will go

4   first, the defendant will go second, and the plaintiff gets a

5   brief chance to rebut.

6          And then I have one sort of final instruction for all

7   of you on how you dispatch your duties and deliberations, and

8   then the case will be yours.  My expectations will be to get

9   all that in before the mid-morning break.  Okay?  So by

10  10:45-ish you should have the case and be ready to deliberate.

11  Okay?

12         So with that, I'm going to call upon Mr. Carson to

13  deliver the plaintiff's closing.  Mr. Carson?

14         MR. CARSON:  Thank you, Your Honor.

15         So I know it's been a long journey, but this is the

16  end, and so my job now is to explain to you why the plaintiff

17  has satisfied his burden of proof legally.  And I would submit

18  to you that the plaintiff has, indeed, done so unequivocally,

19  and I'm going to tell you why I say that.  And I think you're

20  going to agree with me when I'm finished.

21         So this case, I told you at the beginning, was about

22  credibility.  Right?  I said sometimes they make it easy,

23  sometimes they make it hard.  And I think we've seen an example

24  in this case where they made it pretty easy.  Because in this

25  case, you've heard the defendants confirm without a shadow of a

*United States District Court*

1   doubt that they've lied repeatedly about the single most

2   important issue in this case.

3           And I would submit to you that we all have heard

4   stories growing up about why you don't do that, why you don't

5   lie, why it's just never a good idea.  It's just not a good

6   idea.  And that's because -- right? -- you can't tell one lie

7   without having to tell another.  And you can't tell a second

8   without having to tell a third.  And that goes on and on and on

9   and on.  It started in October -- sorry, it started in August

10  of 2020 -- you know, it actually started before the

11  termination.  We heard that it was a week before the

12  termination at the least that these lies started about this

13  investigation -- not into issues related to John Musbach.  That

14  never happened.  That was confirmed.  We all heard it.  Every

15  single person who got on that stand from the defendants

16  confirmed that.

17          The investigation was into policy violations.  And so

18  this investigation into policy violations, it begins and it

19  continues and it goes on and on and on.  And there's document

20  after document and there's proof after proof that what happened

21  was an investigation and a termination based on pretextual

22  policy violations.

23          And you know, people do lie.  That happens, right?

24  But guess what never lies?  Documents.  Documents tell the

25  truth every single time.  They can't lie, right?  They say what

*United States District Court*

1    they say.

2            And you know, the defendants have -- came up with

3    this, you know, with this tale, this story.  And this tale and

4    this story is intended to do one thing, shock and awe.  It's

5    intended to work on your fears.  I mean, they are trying to

6    trick you guys.  That's what they are doing.  And they think

7    that this trick is so bad -- pedophilia, murder, kids.

8    Obvious.

9            But what they don't want you to do and what they are

10   not going to ever tell you in this case, you will not hear it a

11   single time, Mr. Cavalier is not going to say it in his

12   closing, is that it doesn't matter one little bit if the reason

13   for terminating somebody is reasonable if it's based on not

14   wanting to be associated with some crazy crimes.  That's not

15   the question in this case.  It doesn't matter if that's

16   reasonable and that's not the analysis that Judge Wolson asked

17   you to perform and that's not what the law states.  The law

18   says, is it really the reason?  So we all can figure out, yeah,

19   if -- if all companies had to do is sometime two and a half

20   years after the termination is think of a reason that might be

21   reasonable, then the law would mean nothing.  Because that's

22   the easiest thing in the world to do, you just make something

23   up.  Right?

24           But that's not what defendants have to prove.  What

25   they have to prove is that the legitimate reason at the time

*United States District Court*

1  was this thing that they're saying happened, and there's not a

2  single shred of evidence to demonstrate that.

3          The defendants sat up there and they all were playing

4  on your fears and they were trying to trick you and they were

5  trying to -- legal tactics, smoke and mirrors, every single

6  time.  And I'm going to show you specific examples, and I think

7  you're going to agree that every single one of them is just a

8  trick.  It's not designed to enlighten you, it's not designed

9  to disclose information to you, it's not designed -- like, you

10  know, the last thing the defendants want to do is put all the

11  evidence on the table and let's just like leaf through it.  We

12  would love that to happen.

13          But that's not what the defendants want.  What they

14  want is for you to see little, tiny snippets of little pictures

15  from here and there and they want you to come to false and

16  incorrect conclusions about all of them.

17          Now, just so I can show you outright, right now,

18  before I move on.  You know, you saw Owen Conway on the stand

19  yesterday.  You know, he's on the video, but the defendants

20  didn't ask him how old he was when he was working at Linode.

21  They asked him how old he was now.  It's nothing to do with the

22  case.  It's nine years after he left.  Why does that matter?

23  Who cares that he's 51 now.  He was 42 when he was working

24  there.  And he testified when he was there, he was one of the

25  oldest guys.

*United States District Court*

 1          So Owen Conway got up there and he confirmed
 2   everything my client said is correct about the age of the
 3   people there, and the demographic of the people there, and that
 4   he is the oldest guy there, that they've hired anyone older
 5   after that.  They considered Owen Conway the old guy.  That's
 6   what he said.
 7          So the other thing, too, is I would submit to you --
 8   and I don't think I'm going to get any argument from the other
 9   side -- Owen Conway was asked how old he was when he
10   interviewed, and he said 46.  Now, I can show you clearly in
11   this case through the corporate designee testimony that was
12   read in.  And in case you don't understand what a corporate
13   designee testimony is, that is the statement of the company.
14   When Mr. Palochko testifies as a corporate designee, he's not
15   Vincent Palochko anymore; he is Linode.  And that's why I can
16   just read it to you.
17          Right?  So, you know, all those things you saw in this
18   case about laying a foundation, I don't have to do that with
19   Vincent Palochko's corporate designee testimony.  I can just
20   put my associate, my colleague Catherine on the stand and we
21   can just do a mock reading because that is the company
22   speaking.  And the company confirmed that Owen Conway worked
23   there between 2016 and 2017.  Right?  2016.  So he
24   interviewed -- and by the way, he started in February.  So he
25   interviewed in the very beginning of 2016.

*United States District Court*

1          So 2024 minus 2016, what's that?  8?  51 minus 8, it's

2    not 46.  If what he said is correct, it means that when he left

3    the company it was -- when he interviewed for the company, it

4    means he was 40 -- it was 2019 when he interviewed.  So I don't

5    know why -- I'm going to give him the benefit of the doubt, but

6    just another little fact that was misleading that you heard

7    from the defense side.

8          The plaintiff's side didn't provide a single

9    misleading fact.  And I'll submit to you almost the entire case

10   that we presented was confirmed through either evidence or

11   through the testimony of the people who worked at Linode, and

12   I'll show you that, too.

13         Sorry.  I'm putting my stopwatch on.

14         So now my client testifies in this case that he

15   started there in 2014.  And, you know, if you remember,

16   Mr. Cavalier's opening statement is that it ended with this

17   idea that opening statements are a promise, and that the side

18   who proves throughout the case that what was said in the

19   opening statement is true, that that side deserves the right to

20   come up and ask for the jury's vote.

21         Ladies and Gentlemen, I did that in this case.  Every

22   single thing I read to you -- and I apologize for reading,

23   that's not why I'm reading now.  Every single thing I read to

24   you in that opening statement was proven in this case.  Every

25   single thing.  And I'll walk you through it as quickly as I

*United States District Court*

1  can.

2          So my client started in 2014 at Linode after having a

3  vast amount of industry experience.  That was proven.  You

4  heard Defendants Dan Spataro, Tom Asaro, Vince Palochko talk

5  about his industry experience, that's why they valued him.  You

6  heard him say that he was an instrumental part of growing the

7  business.  That was also something I promised you would hear

8  throughout the case, that my client was instrumental, which

9  means he was a vital part of growing the global infrastructure

10 that Linode used and capitalized from in 2022 when it was sold

11 to Akamai.  Right?

12         And so my client begins in the Galloway office in 2015

13 and he talks about these things that happened at the Galloway

14 office.  We confirmed through testimony, everyone here, that my

15 client did start at the Galloway office, that he did move into

16 a big room at the Galloway office, that Lisa Brown did

17 sometimes walk around that room in the Galloway office.  The

18 defendants didn't deny that that happened.  Right?  They didn't

19 put anyone on the stand to say, no, that never happened, we

20 never saw that.  You know, they have people who said they don't

21 remember or they weren't there when it happened, but there

22 isn't anyone who refuted that happened.  Right?

23         And so my client's age is talked about.  And we saw --

24 we heard the names of the people that he worked with, and we

25 confirmed that those were the people he worked with, we

1  confirmed that they were the people he worked with at those

2  times.  Alex Forrester was the first person, and then Andrew

3  Dampf was hired on September 29th of 2014, less than two months

4  before my client.  My client is the third guy added to the

5  team, I said that.  And he helped the business grow from there,

6  I said that.  Right?

7          At the time that he started, Linode was a small

8  company in Galloway.  And Tom Asaro said, what, 35 people I

9  think he said, 35 employees to hundreds of employees when he

10  left.  Tom Asaro said the fastest growth was before he got

11  there.  That doesn't make a lot of sense, does it?  But that's

12  what he said.  You know, before he got there, they were

13  basically in London and -- data centers in London and in the

14  United States, a few places in the United States.  When he

15  left, there were data centers in Mumbai, there was data centers

16  in Toronto, there was data centers in Singapore and Australia,

17  just to name a few.  And they confirmed that my client was

18  instrumental in building that global network.  That's what --

19  that was his job, that's what he did.  He was making

20  introductions to people.  We saw that, too, during this case.

21  Right?  We saw the text thread between Carl and Chris Aker.  We

22  couldn't show you the Slack thread between them.  We don't have

23  any control of that.  You heard Tom Asaro talk about that on

24  the stand.  He said that he could go get those messages if he

25  wanted at any time.  Right?  There's messages between Carl and

*United States District Court*

1  Tom Asaro that we're not going to see in this case.  There's

2  messages between Carl --

3          MR. CAVALIER:  Objection.

4          THE COURT:  Yeah, the objection is sustained.

5          MR. CARSON:  Why is it sustained, Your Honor?

6          THE COURT:  Mr. Carson, no.

7          MR. CARSON:  I mean, if defendants are going to argue,

8  can I ask for a sidebar?  We can take a pause?

9          THE COURT:  Yeah, but it's going to come off your

10  time.

11          MR. CARSON:  It will be quick.

12          (Sidebar as follows:)

13          MR. CARSON:  Your Honor, you said this is fair game.

14  I'm not talking about anything to do with discovery, I'm

15  talking about what the witnesses said on the stand.  That's it.

16  I'm just saying what they said.

17          If you want, I can read it directly from what they

18  said if that makes it easier.

19          THE COURT:  You're talking about what was produced.

20  Right?  You're talking about --

21          MR. CARSON:  I didn't say anything -- I just said what

22  we have in this case and what was testified exists in this case

23  and what we have and what we don't have.  I'm not talking about

24  discovery issues in any way, shape, or form.  I won't.

25          THE COURT:  What did you --

*United States District Court*

1          MR. CAVALIER:  I heard, we couldn't show you all these

2  wonderful documents we have that aren't in evidence because

3  they didn't produce them.

4          MR. CARSON:  I didn't say that.  That's not what I

5  said.

6          THE COURT:  That's what I heard too.

7          MR. CARSON:  All right.  So can we agree that I am

8  allowed to talk about the things that Tom Asaro said in this

9  case, even if they have to do with documents?  I mean, it's

10  fair game.  They already heard it.

11          THE COURT:  You can talk about what Tom Asaro said.  I

12  don't know that Tom Asaro ever said that there are documents.

13  I think he said if there were documents, he could get them.

14          MR. CARSON:  Yeah, he said there were Slack messages

15  between him and between Carl, and that if he wanted to, he

16  could go look at them right now.  That's what he testified to.

17  I'll just read --

18          THE COURT:  Right, but there's evidence that that

19  hasn't been produced in the case.  So to suggest --

20          MR. CARSON:  Well, the jury will know what they have

21  and what they don't have.

22          THE COURT:  The jury will know what's been introduced

23  into evidence.  That doesn't mean it wasn't produced.  And I

24  think you are suggesting to them --

25          MR. CARSON:  No, that's --

*United States District Court*

1           THE COURT:  You a hundred percent are, Mr. Carson.

2    You're suggesting that you don't have them.

3           MR. CARSON:  All right.  Well, then I won't say I

4    don't have them.

5           THE COURT:  Well, you just did.  That's why I

6    sustained the objection.

7           MR. CARSON:  Well, then what I will say is that you

8    heard that these documents are out there and you can judge for

9    yourself.

10          THE COURT:  No, because that's -- you're asking the

11   jury to draw a negative inference and --

12          MR. CARSON:  They are allowed to do that, Your Honor.

13          THE COURT:  Not about what's been produced and what

14   hasn't.

15          MR. CARSON:  This is what he's going to say in his

16   closing, and a hundred percent we're going to hear it.  Ladies

17   and Gentlemen of the Jury, all those documents that you would

18   expect to see in this case we don't have.

19          So he's going to -- he said the same thing in his

20   opening.

21          THE COURT:  He's going to say that what you seen in

22   the documents doesn't support it.  Right?  We're not going to

23   get into the things that you speculate might have been there.

24   You're asking the jury to draw an adverse inference based on

25   the idea that the documents were not available.  That's what

*United States District Court*

1    you're asking them to do.

2           MR. CARSON:  But they are allowed to do that.  In the

3    Third Circuit, that is fair game.

4           THE COURT:  No.  Mr. Carson, we talked about this the

5    other day.

6           MR. CARSON:  It's not a discovery issue, Your Honor.

7           THE COURT:  No, I know.  We talked about this the

8    other day.  The issue the other day was that you showed me a

9    case that dealt with spoliation instructions.  Okay?  That's

10   the cases that you've pointed me to.  This is not a spoliation

11   issue and --

12          MR. CARSON:  Your Honor --

13          THE COURT:  Mr. Carson, I'm not done.  I'm not going

14   to have you get up in front of the jury and say to them that

15   there are documents and that they haven't seen them and that

16   they should draw an inference based on the fact that they

17   haven't seen them.

18          MR. CARSON:  No, I don't want to -- they can draw

19   whatever inference they want.

20          THE COURT:  No, but there is no inference to be drawn

21   because we are not going to argue about what was and wasn't

22   produced.  And ultimately, the core of what you are saying is

23   that something wasn't produced.

24          MR. CARSON:  But they've heard -- fine, I won't say

25   that, I won't say that.  But I think I can definitely refer to

1  their testimony where they talked about the things that are out

2  there.

3          THE COURT:  You can talk about what Mr. Asaro said.

4  But again, I don't think that Mr. Asaro said that there are

5  things that out there that haven't been produced.  And I don't

6  think you can suggest that Mr. Asaro said that there are

7  documents that are out there that weren't produced.

8          Mr. Asaro said that if there are Slack threads between

9  him and Carl, they exist.  That he could still -- he could go

10  look at them.  That's all he said.  That's how Slack works,

11  that's what he testified to.

12          MR. CARSON:  But if John Cavalier gets up and says

13  anything about well, all the documents you would expect to see

14  aren't here, then he is not allowed to say that then if I can't

15  say this.  Because that's not fair.  It's not fair for him to

16  open the door and me not be able to address it.

17          THE COURT:  Okay.  I haven't heard what he's going to

18  say.  Is it possible that he's going to say something that

19  opens the door?  It is, okay?  But as it stands now, I'm not

20  going to have you get up and make suggestions about the idea

21  that there are things that are out there that weren't produced

22  that would otherwise be in this case.

23          MR. CARSON:  All right.  I'll limit it to what was

24  said in the testimony.  I would request that this not come off

25  my time.

*United States District Court*

1          THE COURT:  No, this is an objection that I'm

2     sustaining, Mr. Carson.

3          MR. CARSON:  But still, that was something that you

4     did for the trial.  This is a closing statement.  I think I

5     should get 45 minutes to do my closing.

6          THE COURT:  Mr. Carson, I told you what was going to

7     happen if you asked for a sidebar, okay.  So I'm -- that's what

8     I'm doing.  Okay?  The clock is running.

9          MR. CARSON:  Yep.  Thanks, Your Honor.  I appreciate

10    it.

11          (Sidebar concluded.)

12          MR. CARSON:  So what you heard from Mr. Asaro is me

13    ask about certain documents, and this is what he said:

14          "QUESTION:  And you guys communicated for six years of

15    employment through Slack thread, right?

16          "ANSWER:  I don't know if we used Slack for all

17    six years.  I don't think we used it when we first started.

18          "QUESTION:  Yeah, that's a good point, so let's just

19    say from the time you started using Slack, that's when you and

20    Carl maintained those Slack conversations, correct?

21          "Yes.

22          "So that would have been like around -- do you

23    remember when you guys started using Slack?

24          "I do not.

25          "2017 sounds about right?

*United States District Court*

1          "I don't know."

2          You guys can easily see when Slack got started because

3   you are going to have a Slack thread from my client and Vince

4   Palochko, someone that he never accused of doing anything wrong

5   until Vince Palochko teamed up with Tom Asaro and Dan Spataro

6   to facilitate the termination based on false pretext.  So

7   you'll be able to see that, right?

8          Then I said:  "Well, we'll call it a thread.  Was

9   there a Slack thread between you, you and Carl and Dan Spataro,

10  right?

11         "Yes.

12         "There was also a Slack thread between you, Dan

13  Spataro and Carl and other people, too?

14         "Yes.  It worked just like text messages.

15         "And Slack is a cloud system, right?

16         "Yes.

17         "And you know what that is because you guys are a

18  cloud computing company, right?

19         "ANSWER:  Yes.

20         "And so probably you know better than most people what

21  cloud computing is?

22         "ANSWER:  Yes.

23         "And cloud computing means that the information is

24  stored in a server at a data center, correct?

25         "Yes.

*United States District Court*

1          "So do you know whether or not you have access to

2    those messages?

3          "Could you be more specific.

4          "Sure.  If you wanted to see what you sent to Carl the

5    month before he was terminated, you can go look, right?

6          "ANSWER:  Yes, I can look."

7          Right?  So we know that there was messages that they

8    all talked about.  There was a thread between --

9          MR. CAVALIER:  Objection.

10          THE COURT:  The objection is sustained.

11          MR. CARSON:  Your Honor, I'm just talking about the

12    testimony.

13          THE COURT:  Well -- okay.  You can say that there was

14    a thread between them, but that's all.

15          MR. CARSON:  Right.

16          There was testimony -- we heard testimony in this case

17    that there was a thread between Carl Williams and Dan Spataro.

18    We heard testimony in this case that there was a thread between

19    Carl Williams and Tom Asaro.  We heard testimony in this case

20    that there was a thread between Carl Williams and Dan Spataro

21    and Tom Asaro.  We heard testimony in this case that my client

22    was locked out of the system and asked to return property as of

23    August 19th.  We saw that, too, right?  There's documents to

24    show that the minute they got rid of him, they wanted him to

25    start returning property.

*United States District Court*

1        Of course, they were so scared that they just had the
2   officer manager do it.  They thought Carl was going to kill
3   somebody because, you know, his friend killed somebody or tried
4   to kill somebody.  And so they said, Lisa, why don't you go and
5   handle Carl for us.  That's how scared they were, right?  Tell
6   you that's something else in their story that makes no sense at
7   all.
8        So then we go to 2015 and 2016 and my client is
9   testifying about what it was like when Dan Spataro started.  He
10  testifies about what it was like when he tried to report
11  things.  He testified that he reported these interviews, these
12  inappropriate interviews where there is a deaf guy and they're
13  sitting there watching a video and making fun of the way he
14  talks.  You know, like, mean, right?  And they're doing that in
15  an open room in front of everyone.  We heard that.  We heard
16  that the guy was a little older.  We heard that there was
17  comments about older people.  We heard that that was just
18  something that they talked about and they thought was funny.
19  Right?
20       And then we hear about them moving to the Haddonfield
21  office and how my client worked right across from Dan.  Dan
22  doesn't remember.  My client remembered pretty clearly.  And we
23  heard about the conversations when Dan says these comments
24  about older people, and my client turns around and says, wait a
25  second, I don't agree with that.  I still got it.  I'm 50 and I

*United States District Court*

1  still got it.

2       I mean, if a 50-year-old guy who's been in the

3  networking industry for 30 years, hears someone say that older

4  people don't have it anymore, they don't have the chops, isn't

5  it the most reasonable thing in the word for Carl to turn

6  around and be like, what are you talking about?  I still got

7  it, look at me.  Right?  And that's what happened.  You didn't

8  hear Dan Spararo deny that specific conversation.  He generally

9  made denials when John asked him to -- leading questions.

10      So then that takes us to the network engineering

11  department continuing to grow.  And this is where I think

12  defendants made some admissions they didn't need to make.  We

13  heard in the opening statement, we heard a promise that there

14  wasn't one single report of age discrimination throughout this

15  case.  Now we know that's not true, right?  Several.

16      So we know that Carl Williams went to the Pennsylvania

17  Human Relations Commission -- pull that document up for the

18  jury while I talk about it -- went to the Pennsylvania Human

19  Relations Commission and he filled out a piece of paper there.

20  And you're going to have it back there, you're going to be able

21  to look at it, and that piece of paper has a date stamped on

22  it.  And it's a date stamp from the Pennsylvania Human

23  Relations Commission that says it was received on that day.

24      You know, John keeps making this big thing -- oh, I

25  call it a questionnaire, he calls it a charge.  I don't care

*United States District Court*

1    what you call it.  It's a questionnaire, great.  The point of

2    that document is not what it's called.  The point of that

3    document is that it has a date on it and it confirms what my

4    client was thinking and feeling that day.  And on that day what

5    he was thinking and feeling is that he was upset for age

6    discrimination -- you got it up there?

7              MS. MEYER:  Yes.

8              MR. CARSON:  I don't know if you guys can see it.

9    That he was upset because of age discrimination -- what number

10   is that one?

11             MS. MEYER:  34.

12             MR. CARSON:  And that he was so upset that he went to

13   the Pennsylvania Human Relations Commission to file a charge.

14   When you still work for a company, ladies and gentlemen, the

15   first time that you hear discrimination, you do not go to the

16   Pennsylvania Human Relations Commission.  This is not how it

17   works, right.

18             MR. CAVALIER:  Objection.

19             THE COURT:  It's overruled.

20             MR. CARSON:  That is a difficult step to take because

21   that is when you are going out in the public and you are

22   accusing your employer of illegal conduct, which is a big deal.

23   That's why there's a retaliation clause in the law.  In every

24   anti-discrimination law, there is a retaliation clause because

25   retaliation is not uncommon at all.  Companies don't like these

*United States District Court*

1  accusations.

2        So my client went out and he filed this document on

3  that day, and here's what we know.  Right?  We know that after

4  he filed that document, within a month, that there was a

5  meeting held.  And it wasn't a regular meeting, this was a

6  meeting that was specifically scheduled in the office of the

7  chief operating officer.  And Dan Spataro was present and Tom

8  Asaro was present.  And this is where their story -- they

9  didn't get their stories straight, right?  Tom Asaro says the

10 meeting was just to talk about his -- he wasn't mad at all, he

11 just wanted to be a director.  He thought that having a

12 director title over a manager title would be better.

13       Now, there's no evidence whatsoever that there was a

14 manager title given before that, but I like that.  If you guys

15 want to assume he had a manager title, that's great.  What it

16 means is that he was promoted to manager without any change in

17 income, without any announcement, without any change in what

18 his job responsibilities were.  Right?  But Dan Spataro didn't

19 agree with any of that.  He said that never happened.  Tom

20 Asaro, wrong.  He got on that stand under oath.  Wrong.

21       And Dan Spataro said that he was wrong about several

22 things, not just the manager title.  But Tom Asaro also denied

23 that he was upset during that meeting.  Dan Spataro didn't.  He

24 was upset.  And he said the reason why he was upset was age.

25 That, ladies and gentlemen, is a report of age discrimination.

*United States District Court*

1  Right?

2       And you can't pick and choose the reports you respond

3  to.  That's not the way the law works.  I know that the policy

4  they have is optional, which is why it's no policy whatsoever.

5  You cannot have an optional anti-discrimination policy.  It's

6  not disfavored.  It's illegal to discriminate.  It's not

7  something that you just want to try to minimize.  It's

8  something you need to prevent in the workplace.  And they have

9  a policy where people are just encouraged to go if they see

10 something.  Right?

11      And so my client reported it, and Dan Spataro and Tom

12 Asaro did nothing.  And you heard Dan say, oh, I didn't think

13 it was a big deal.  It was a throw-away sentence.  You think it

14 was a throw-away sentence to my client, who, by that point, was

15 so upset that he had filed a questionnaire?  Let's use their

16 words.  He filed a questionnaire at the Pennsylvania Human

17 Relations Commission.  He went to two different meetings.

18 First -- well, three actually.  First he went to Tom Asaro,

19 said that on direct examination.  Tom Asaro said, yeah, that's

20 what happened.  Not only did Tom Asaro say that that was what

21 happened, but he also said it happened exactly how my client

22 reported it and testified to.  That he went to him, he was

23 asking about the promotion, and Tom Asaro said it's not me,

24 it's Dan.  Dan has all the authority.

25      You heard Tom Asaro say that Dan had blanket

1  authority.  That's the word he used, blanket authority to do
2  whatever he wanted, hirings, firings, promotions, terminations.
3  Dan Spataro got up there and tried to deny that, disclaim it.
4          So then, lo and behold, there's a change in job title.
5  The very thing he complained about in the questionnaire is
6  amended or fixed, or whatever you want to use.  And then, lo
7  and behold, my client doesn't pursue that questionnaire, right?
8  They never have to hear from them again, right?  It didn't turn
9  into this, it didn't turn into a charge process.  It just
10 disappeared.  But they didn't know anything about it, there was
11 no conversation.  It was just a throw-away sentence during a
12 meeting.  That's what they want you to believe.
13         So now we're in 2019 and we know that Dan Spataro was
14 bringing friends along on these trips.  We saw pictures, right?
15 And my client testifies that when they went out at night, they
16 told him they didn't want him to come.  That's very credible,
17 right?
18         I mean, I really respect Carl Williams.  He's the
19 perfect person.  He's what you want your kid to be.  He grew up
20 in a small town in America.  Not a lot -- he's not wealthy.  He
21 didn't have a lot of money, a lot of support, a lot of family.
22 But what he did have is integrity and what he did have is a
23 good work ethic.  And so he went to school, he learned a trade.
24 He went directly -- high school, graduated; went directly to
25 college, graduated; went directly to get his master's;

*United States District Court*

1  graduated.  And then he begins working in this industry and he

2  becomes extremely proficient in this industry over the years.

3         And I actually know how he feels.  I don't know if you

4  might have noticed this during this trial, I'm a little

5  different, too.  There are things about me that I don't fit in

6  with people a lot of times either.  And I've experienced that

7  my whole life.  So I know how he feels to be in a situation

8  like that and have everyone just hate him.  I mean, you heard

9  about that Christmas party.  That's just the worst behavior

10  possible, correct?  You know what I mean?  You're going to tell

11  someone to come to a party and everyone is sitting with people

12  they know and say, hey, Carl, you're over there, dude.  Get

13  away from us.  No one goes over to talk to him.  The guy

14  quietly left and drove home crying.  He doesn't understand why.

15         And then in the final year of his employment, these

16  things start getting taken away from him, and Dan starts

17  telling people you're not going to have to worry about Carl

18  anymore.  He's not going to be here next year.  And he starts

19  telling Carl that Chris Aker is a generous guy.  He'll take

20  care of him if he just bounces out.  Go ahead and resign.

21  You'll get taken care of.

22         And then they begin an investigation into how to get

23  him out of there, and Dan elicits the help.  And this is what

24  they said.  He elicits the help of Vince Palochko and Tom

25  Asaro, and the three of them work together to come up with a

*United States District Court*

1  lie.  They could not say the truth.  They could not tell him

2  why he was going to be terminated.  They had to hide it because

3  the reason was bad.  And what they want you to believe is that

4  the reason had no negative effect on them, and that's not why

5  people lie.

6          The reasons why lies are an important part of cases

7  like this is because they show something.  It's evidence of

8  something, and it's consciousness of a guilty mind.  People lie

9  to get themselves out of trouble.  They don't lie because, hey,

10  you know, we could have said this other thing and this other

11  thing had no negative consequences, but we just decided to lie

12  for no reason.

13          Of course they had this other reason, right?  And I

14  can go over that with you, right?  So we heard

15  everything-but-the-kitchen-sink strategy when it comes to these

16  lies, right?  We heard that they lied because -- I'll just give

17  you -- so because they were aware of prior litigation, because

18  of the risk, because of a certain level of volatility.  I'll

19  submit to you, though, in this case we heard zero evidence of

20  any volatility coming from this guy because it just doesn't

21  exist.  They want you to just see right past that and only see

22  pedophilia, murder, pedophilia, murder.  Isn't that reasonable?

23  Isn't it reasonable, pedophilia and murder?

24          It's not the question.  The question is did it happen,

25  and it didn't happen.  It's not what happened.  He wasn't fired

*United States District Court*

1  because of those things.  And I will provide you with a little

2  explanation right now, and I'm going to base it on something

3  called Occam's Razor, and Occam's Razor is a very simple way of

4  thinking of things.  And I would ask you when you're back there

5  to please just consider this when you're looking at the

6  evidence.

7          Occam's Razor says the simplest -- all things being

8  equal, the simplest solution is the right solution.  And what

9  that means is it's the solution that creates the least

10  questions, it's the solution that answers the questions, and

11  it's the solution that requires the least amount of assumptions

12  to get to.  And defendant's reason for this lie does not answer

13  a single question about the evidence.  It only raises

14  questions.  And defendant's reason for this lie, it doesn't

15  explain anything.  It just creates more questions, questions

16  that were asked of every witness that went to that stand.  And

17  not one of them could provide a reasonable answer.

18          Vince Palochko was the most honest about it and he got

19  up and said, "I have no good reason for it."  That's what he

20  said, "I don't have a good reason."  Right?

21          Tom Asaro got up there and just said, "I don't know."

22          Dan Spataro, who had the benefit of watching me do it

23  to two other people before him, got up there and had some

24  excuse that had nothing to do with the question.  Well, I told

25  the truth at the deposition.

*United States District Court*

1         No, sir, you didn't, but here's the other thing, too.

2    We know, because there's evidence of it, when this lie, when

3    this plan, when this pretext was hatched.  We know exactly when

4    it happened, right?  Because we know that he was terminated in

5    August of 2020, and we know that the lie continued and that

6    every single document and every single shred of evidence showed

7    that the reason that he was fired was because of false policy

8    violations, all the way up to December -- to November 9th,

9    2022.

10         And then the next time that they go on record is

11   January 6, 2023, 56 days later.  So we can pin down a 56-day

12   window when this story changed.  And what happens within that

13   56 days?  Well, Dan Spataro is about to testify.  And if

14   they're looking at the evidence and they're looking at the

15   evidence that we see, they can't support a case with policy

16   violations, right?  They can't do it.  It's not going to work.

17   You can't fire someone for progressive discipline when the very

18   first disciplinary thing that shows up in their file is the day

19   of termination.  And we're going to see that.  I'm going to

20   show it to you in a minute.  And you can go back and look at

21   it.  It's the performance review that ends with the -- ends

22   with the -- everyone putting in their two cents about why the

23   termination happened.  I think it's Exhibit 49.

24         And so -- and so that's -- that's what they were

25   facing.  You can't -- you can't -- progressive discipline means

*United States District Court*

1   that it happened slowly over time.

2           And also, you can't have progressive discipline when

3   half the things on the investigation list are just made up.

4   They had like ten violations where what he did wrong -- he

5   requested a reimbursement for money he spent.  There's nothing

6   wrong with that.  If you spend your own money, you're allowed

7   to say, hey, guys.  I would submit this is for a business

8   purpose.  Can I have it back?  And they can say yes or no, and

9   that's it.  We heard them testify about it, and not one person

10  had ever been disciplined for that reason because companies

11  don't discipline for that.  It doesn't happen.

12          And so they're facing down a situation where they have

13  to go on record, they have to testify under oath, and they need

14  a better reason.

15          And then it hits them, right?  They remember,

16  termination, Carl.  Carl, at that termination, is the one who

17  gave them the idea, right?  Wasn't Carl screaming about John

18  Musbach?  When Dan Spataro testified in his deposition, he

19  couldn't remember who sent him the message.  He couldn't

20  remember -- he just remembered that somebody sent a message.

21          But we saw that message; was there a response?  Any

22  legitimate response?  Is there any suggestion that they were

23  panicked?  That it was an unprecedented crisis?  That it was --

24  that they were scared?  That they didn't know what to do?  No.

25  Nothing.  He ignored it because they were already working on

1  his termination.  He didn't care at all.  He just said

2  whatever.  He didn't send a single email or message to anybody.

3  And they didn't send any emails or messages to anyone.  There's

4  no evidence that they responded to that.  There's no evidence

5  that that -- during the termination meeting, he kept asking him

6  about it.  And that was the one thing they weren't scared to

7  talk about.  No, Carl, it's not that.  Over and over and over

8  again.

9          And if you want to hear the recording again, you can

10 ask us while you're deliberating.  And I think Judge Wolson

11 said you can come out and listen to it again.  Over and over

12 and over.  What they were scared to talk about was the policy

13 violations.  They had no problems answering questions about

14 that because they didn't even know what he was talking about.

15 Vince didn't.  There's no evidence that Dan ever told Vince,

16 right?  So Vince is like, Carl, no, it's 100 percent not that.

17 And every time he said it, he said with 100 percent confidence.

18          And I would ask you to think about that, because when

19 you look at every piece of evidence and you consider what the

20 defendants are trying to tell you and you consider this

21 alternative, right, this alternative -- and whether they got

22 the idea from Carl, which, I think, is -- first of all,

23 remember the scale, right?  I just have to tip the scale.

24 Probably, if I can prove that, that the plaintiff's position is

25 probably the right position, I win.  It certainly is a lot more

*United States District Court*

1  probable, right?

2         When you apply this theory to this case, it answers

3  every single question in this case perfectly.  You will be left

4  with no other questions.  You will be left with no doubt.  You

5  will be left with no -- it's like the final piece of a puzzle

6  that goes in and the puzzle's done and you know you did it

7  right; right?

8         It accounts for reason why there's no evidence.  It

9  accounts for the reasons why there's no messages.  It accounts

10 for the reason why every single time they're talking to each

11 other, all they care about is these policy violations.  And it

12 accounts for the investigation into the policy violations.  And

13 it accounts for interrogatories, and it accounts for the change

14 in the story, too.  It accounts for everything.  There's

15 nothing left to ask.  Boom.  That's what happened, right?

16        And whether he reminded them of it or whether they

17 just remembered about it, what they knew is that they couldn't

18 keep going with this story they were using for two years and

19 three months.  Had to change.

20        And I'll suggest to you, ladies and gentlemen, that

21 when you tell the same story consistently for two years and

22 three months and every single document that you see supports

23 that story -- and I'll just walk you through some of them,

24 right?

25        So we have the -- is it Exhibit 49 all the way to the

*United States District Court*

1   bottom.  So we have Exhibit 49, right at the bottom where Tom

2   Asaro is saying -- he's documenting policy violations, saying

3   add these to the file.  They talk about an investigation of

4   policy violations that happened before that, and there's 16 of

5   them.  And so Vince Palochko is confirming that they had a

6   conversation and that he was fired for policy violations.

7          And when Dan Spataro and Vince Palochko are having

8   private communications, they're confirming that he was fired

9   for policy violations.

10         And when Richard Ford got on the stand, no one updated

11  him, right?  When Richard Ford, the chief financial officer of

12  the company, was asked why he was fired, what did he say?  He

13  said policy violations, right?  That's what they told everyone.

14  That's what they did.  That's what they investigated, and

15  that's why they fired him.  And we know it's a false reason

16  because they've admitted it's false, and they want you to just,

17  just replace the false reason with something that was in their

18  heads, something that they cooked up, and something that

19  doesn't actually exist in reality.  There's not a single

20  document you're going to take back there that's going to

21  suggest anything about the policy violations, anything about

22  the false reason.

23         So here's what I'm going to do.  When you go back

24  there and you consider the evidence, I want you to think about

25  the damages that flow from that.  And you've heard about the

*United States District Court*

 1    damages, right?  And the damages in this case are several

 2    things, right?  But the number I want you to really think about

 3    is the past wage loss, what Carl lost between the day of the

 4    termination and the present.

 5              And, number one, we have these bonuses and you heard

 6    about them, right?  Andrew Dampf's was -- all right.  Tim

 7    Kaufman's bonus when Akamai purchased the company was $329,811.

 8    He's one position below my client and he started two years

 9    after, right?

10              Adam Rambo, the kid who started in 2018 in his 20s,

11    his bonus was $217,895.  By the way, he left the company.  They

12    brought him back right before the purchase.  I wonder why that

13    was.  We saw that in evidence too, right.

14              Tom Duff was two positions below my client.  His bonus

15    was $284,000, right?  $211.

16              The one person who has the same position as my client,

17    and my client started two years before him, was Dan Spataro.

18    They were both -- had a director position, right?  John is

19    going to get up and try to tell you how they are not similarly

20    situated.  They had the same title.  They worked in the same

21    department.  His bonus was just shy of $3 million.  That's what

22    he testified to, right?

23              Andrew Dampf is an important one because he talked --

24    Andrew Dampf was hired one month before him.  He was two

25    positions lower, and his bonus was $947,369, right?

*United States District Court*

1          THE COURT:  Five-minutes, Mr. Carson.

2          MR. CARSON:  Five-minutes.  Thank you.

3          And then I'm going to talk to you about the difference

4   in income.  So my client, as a director, you saw what he was

5   earning, right?  He was at 125 basically his entire career, and

6   then it went up a little bit and then it went up again.  And

7   when he left the company, it was around 139, right?

8          Tim Kaufman, a position below him, was earning -- in

9   2019, he was earning $162,000 a year, and his went up to

10  168,000, right?

11         My client was the least paid senior person there.  And

12  everyone who was paid more than him was younger than him,

13  substantially.

14         Andrew Dampf was at 142,000 in 2020 when my client was

15  terminated.  He was two positions below my client.

16         Steven Shaw, two positions below that, was at

17  $187,000.

18         So I'm going to ask you to go back and calculate these

19  differences and -- from the time that my client received the

20  director title.  And then we all heard what Chad Staller said,

21  that his past wage loss claim from the time that he was

22  terminated until -- until the -- until the present or until he

23  mitigated his losses -- my client is not the type of guy to sit

24  back and just take a loss, right?  He had to go out and get

25  another job.  And so his total -- his total past wage loss was

*United States District Court*

1  236,000 -- well, I'll put it up here.  It was $236,958.

2          So what we're asking for is a past wage loss award

3  that adds this number together, right?  And we think the two

4  numbers that you should consider the most relevant in this case

5  for the bonus is the 3 million and the 1 million because this,

6  you know, same position, two years' less seniority, two

7  positions above this guy with one month -- starting within

8  one month.  Almost the exact same start time.

9          So what we're asking for is that you award a past wage

10  loss that considers this number and this number as to what the

11  bonus should have been, and add it to this number, right?  And

12  then we want you to take the difference between what my client

13  earned at the time of termination, which was about 139,000, and

14  consider what you think is fair considering he was the least

15  paid person there.  And that when he received a raise for the

16  director, it wasn't a raise for the director.  It was far less

17  than what other people in the same department received.

18          And specifically, we heard from Dan Spataro, who said

19  that when he received a director of promotion, his was more

20  than $7,000.  I said significantly more?  He said I don't know,

21  but it was more than 7,000.  And Dan Spataro's income that he

22  testified to as a director was between 200,000 and 250,000,

23  right?  And then that would take care of the past wage loss

24  claim.

25          And then we also want you to award something, and what

*United States District Court*

1  we're requesting is that you consider his compensatory damage
2  claim.  And his compensatory damage claim is basically his
3  claim for emotional distress.  So it's up to you how you want
4  to handle that.  I'm not going to give you a lot of guidance,
5  but I would suggest that you should consider every single day
6  that he was subjected to discrimination, from the day that you
7  find that it started until the present, and that you should
8  come up with some kind of formula to consider what one day
9  emotional distress is like and then multiply that by the number
10 of days that he suffered that emotional distress, you know.
11        And the last thought I'm going to leave you with is
12 this:  Sometimes people tell the truth while they're lying,
13 right?  And in this case, we heard a lot of things in this case
14 that suggested the truth, right?  And that's because when
15 people lie, they can't help but just let things slip out.  And
16 we've seen a lot of evidence of things slipping out.  Not
17 one -- no two stories from the defendant's side fit together.
18        Vince Palochko admitted that the reason for the lie
19 was to hide the actual reason.  He said that.  We were just
20 trying to hide the actual reason.
21        I asked why he kept lying to -- and why -- why were
22 they keeping up this charade when my client wasn't around, and
23 he said, well, because it wasn't a charade.  That's right.  It
24 wasn't a charade, right?  That's what was really happening back
25 at that time.

*United States District Court*

1          THE COURT:  Time, Mr. Carson.

2          MR. CARSON:  Thank you, Your Honor.

3          THE COURT:  Mr. Cavalier.

4          MR. CAVALIER:  Thank you, Your Honor.

5          Good morning, folks.  So finally, we come to the end

6   here today, and I have a few minutes left to chat with you

7   before you start your deliberations.

8          Before I get into the substance, I do want to say

9   thank you for your willingness to serve on this jury and for

10  your attentiveness during these last seven days.  When we first

11  met, I told you that your time was precious.  You're spending

12  time away from your families, your jobs, the things you like to

13  do in your daily lives, and that we would try our best not to

14  waste any of it.  And I truly do hope that I've lived up to

15  that.

16         You know, this court, the Eastern District of

17  Pennsylvania, is a special and historic court.  In addition to

18  it being my home court, this is one of the 13 original federal

19  judicial districts that was established in 1789 by Congress.

20  The court used to sit right down the street -- I think it's

21  that way -- at Independence Hall.  There have been more than

22  100 judges to preside over this court.  They are all appointed

23  by the President, confirmed by the Senate.  Judge Wolson is

24  No. 102.  Thousands and thousands of juries have sat,

25  essentially, where you now sit and helped citizens of the state

*United States District Court*

1   decide disputes just like this.  And it's an honor to be here,

2   to be a member of this bar, to present my client's case to you.

3           And I told you in my opening remarks that, regardless

4   of your verdict, I hoped that when you left here after this

5   trial is over that you took with you some sense of civic pride

6   and satisfaction at having done your duty and at having been

7   the latest in a long line of juries to preside over disputes

8   and decide those disputes in this court.  So I just wanted to

9   thank you for that first.

10          In my first remarks to you, I also said, just as

11  Mr. Carson reminded you, I've always been taught to think of

12  opening statements as a promise to jury.  And I told you then,

13  and Mr. Carson reminded you, that if I was able to uphold those

14  promises, I would come back to you at the end and I would ask

15  you to rule in favor of my client.  So that's essentially what

16  I'm going to do now, I'm going to talk to you about some of

17  those promises.

18          First off, I told you this case was about a company

19  with a clear policy prohibiting discrimination, right?  We saw

20  those handbooks.  We saw the policies.  They included not only

21  a clear policy prohibiting discrimination based on age or

22  sexual orientation, they included a reporting mechanism whereby

23  employees can make complaints about discrimination to either

24  company leadership or to human resources.

25          Mr. Williams acknowledged that he knew of those

*United States District Court*

1  policies, he was aware of them, and he agreed with me when I

2  asked him whether he was aware that at all times during his

3  employment, age and sexual orientation discrimination were a

4  violation of those policies.  All of that is undisputed and

5  uncontradicted.

6        Mr. Carson continues to refer to it as an optional

7  policy.  The simple reason for that, as I think you've heard,

8  is that you can't force employees to report every instance that

9  the company might think is harassing, right?  You don't want to

10  have to discipline an employee for violating policy simply

11  because they chose not to report some harassment they might

12  have been receiving, right?  That's something that's very

13  deeply personal to the employee.  If the employee wants to come

14  forward, under Linode's policy during that time, they have that

15  right.

16        I also told you that Mr. Spataro and Mr. Asaro and

17  Mr. Palochko would all tell you, clear as day, that they never

18  saw any age discrimination or sexual orientation

19  discrimination, that no age discrimination or sexual

20  orientation discrimination was reported to any of them, that

21  Mr. Williams never reported any such discrimination to them or

22  anyone else at Linode, and that they never once treated

23  Mr. Williams differently based on his age or sexual

24  orientation.  And they testified to exactly that.

25        I told you that you'd hear evidence establishing, and

*United States District Court*

1    it's undisputed, that Mr. Williams was one of the -- he was the

2    highest paid employee at Linode when he was hired at 50.  I

3    think the testimony was also clear that throughout his

4    employment up until the very end, he was in the top 10 percent

5    of highly-compensated employees at Linode.  That's all

6    uncontradicted.

7         I told you you'd hear evidence establishing that,

8    while Mr. Williams was hired based on his impressive resume and

9    his stated technical abilities, it very quickly became apparent

10   at Linode that he was probably ill suited for that role.  You

11   heard Mr. Spataro talk about that.  You heard Mr. Conway talk

12   about it.  You heard several other witnesses explain why his

13   inability to participate in these outages and these hacking

14   attacks on a technical level was frustrating to them.

15        Did Linode terminate Mr. Williams for not living up to

16   the skills that he set forth in his resume that he claimed he

17   had?  Did they reduce his compensation?  Did they demote him to

18   a lower title?  Did they transfer him to a less desirable

19   assignment?  No.  They kept him on.  They found things that he

20   was good at.  They found things for him to do that suited the

21   talents that he did have.  And ultimately, over the period from

22   September 2018 to January 2019, they crafted a custom role to

23   promote him into, especially for him, so that he could do more

24   of what he liked to do at work, do more of the things that he

25   wanted to do at work, and find a place where he could exercise

1    the talents that he did have.

2            And when he came back to Linode and said, hey, listen,

3    I appreciate this promotion to manager but I think I'd be more

4    effective if I had a director title, what did the company do?

5    They gave it to him, right?

6            So I ask you, as you consider this and you go back to

7    deliberate, does that sound like the action of a company that's

8    just looking for an excuse to discriminate against somebody

9    because they're older or because they're gay?

10            And by the way, it's interesting to me that, on the

11    one hand, when he's claiming that Linode treated him poorly

12    based on his age or his orientation, according to Mr. Williams,

13    this promotion is just a sham -- right? -- just to shut him up

14    because he filed that PHRC questionnaire.

15            But when he asks you to compensate him for the alleged

16    harms, it's a real position, comparable to Mr. Spataro and his

17    $3 million bonus.  So why is that?  Which is true?  Ask

18    yourselves that.  I'll leave it up to you to decide.

19            I think this contradiction speaks to Mr. Williams'

20    credibility.  And on that note, I'm not going to go through all

21    of his testimony, right?  He was on the stand for four days.

22    You observed him the entire time and, again, credibility is

23    your province.  All right?  You make those determinations, not

24    me.

25            But I do want to point you to just a couple telling

*United States District Court*

1  pieces of that testimony in addition to the changing views on

2  whether this promotion to director was a scam for

3  discrimination purposes or a real promotion for damages

4  purposes.

5          You heard Mr. Williams tell you on direct from his

6  attorney, and this just sticks out in my head because I happen

7  to like the show, that he suggested at some point to

8  Mr. Spataro, his boss, that he watched the show *West World*.

9  Right?  It's this show on HBO about AI robots.  And apparently,

10  according to Mr. Williams, Mr. Spataro said, no, I don't like

11  sexuality in my TV shows.

12          And Mr. Williams told you that he was so hurt and his

13  identity was so offended by his boss' refusal to watch this TV

14  show that he went home, called his doctor, got his meds upped,

15  and cried in bed for three days.  Okay?

16          And yet, you heard me take him through the questions.

17  When I asked him what emotional distress he suffered when his

18  partner, his companion, as he called it, he said they were like

19  a married couple, was going through all of the fallout from his

20  earlier child pornography charges, what emotional distress he

21  felt when his companion of four years was busted for attempted

22  murder of that child, was ultimately incarcerated, he sat up

23  there on that stand and he said, nope, that didn't cause me any

24  emotional distress at all.  I was concerned.  Not distressed;

25  concerned.

*United States District Court*

1          The reason for this seemingly inexplicable

2   inconsistency is that Mr. Williams is seeking compensation for

3   emotional distress that he ties to the loss of his job at

4   Linode.  He's here to try to recover money for that emotional

5   distress.  He can't recover for emotional distress caused by

6   any external sources.  So you see, he couches it in terms that

7   will allow you, if you find in his favor, to compensate him for

8   it.  That's a credibility issue.  And I would respectfully

9   suggest to you -- and again, this is up to you to determine --

10  but this -- this seemingly unresolvable contradiction is at the

11  heart of his credibility in this case.  And it's exacerbated by

12  the fact that there is no documentation in this case showing

13  that he ever once complained to anyone at Linode about age

14  discrimination, sex discrimination, sexual orientation

15  discrimination, harassment, or anything.  And I'll get to that

16  in a second.

17          But for the time being, I wanted to remind you of one

18  other thing.  I told you right out of the gate that Mr. Spataro

19  and Mr. Asaro and Mr. Palochko, the three people ultimately

20  responsible for the decision to terminate Mr. Williams'

21  employment, would all testify that the decision had nothing to

22  do with his age, nothing to do with his sexual orientation, but

23  that it was caused by the fact that this article was published,

24  showing that he had not only been partnered up with someone who

25  had been convicted for child pornography crimes, which

1  Mr. Spataro I think testified very clearly about, but that he

2  remained with that person and now was exposed or magnified,

3  whatever you want to call it, in the newspaper, alleging or

4  telling the reporter that he had known about Mr. Musbach's

5  issues with child porn.  And that's a direct quote from the

6  article, by the way, "I'd known all about his issues with child

7  porn."

8        And Mr. Spataro got up on the stand and told you,

9  quite honestly, I felt, and powerfully that this hit him in his

10  gut.  Right?  I mean, he was disgusted by it.  And he said to

11  the company, flat out, either he goes or I go.  I'm not going

12  to work with him another day.  He verified that on the stand.

13  It was uncontradicted.  Mr. Asaro told you that that's exactly

14  what Mr. Spataro did.

15        And I submit to you that his reaction under these

16  circumstances is eminently reasonable, right?  I mean, look,

17  whether you think it's fair or unfair, the guy doesn't want to

18  work next to somebody who hangs with a pedophile.  I don't

19  think that's the most concerning character flaw for someone to

20  have.  There are certainly worse traits.  And ultimately,

21  that's a value judgment that Mr. Spataro is entitled to make,

22  right?  I mean, that's not against the law.  So consider that

23  when you go back to deliberate.

24        Again, I told you at the very beginning of this trial

25  that you wouldn't see one single piece of documented

*United States District Court*

1  contemporaneous evidence that Mr. Williams ever complained to

2  anyone, at any time, at Linode about age and sex

3  discrimination.  The only document that you're going to see in

4  the actual evidence when you go back there, you'll have these

5  exhibits, is this EEOC questionnaire, this PHRC questionnaire.

6  Right?  And the plaintiff focuses on that because he needs it

7  to rebut this idea that there is absolutely no evidence in the

8  case that he ever complained to anybody at Linode.

9       The problem is he didn't give it to anybody at Linode.

10  They didn't know about it when they had that meeting.  All

11  three of them testified that they never saw that document

12  before litigation.

13       I told you in the beginning that you would see

14  communications from Mr. Williams to the director of human

15  resources at Linode, Mr. Palochko.  It was a hundred pages

16  long.  It spanned four years.  I want you to think about --

17  you've all worked for a living.  Think about your human

18  resources director.  Think about whether you could ever imagine

19  yourself having a hundred pages of communications with that

20  person.  In the meantime, you're suffering age discrimination,

21  you're suffering sexual orientation discrimination, and not

22  once over four years with a direct line, a digital open door to

23  the human resources director of your company, dare I say it's

24  something approximating a friendship based on what those

25  documents say, and not one time in four years do you make one

*United States District Court*

1  single remark about this discrimination that you were

2  supposedly suffering.  Consider that.

3       And you saw in there, by the way, he wasn't shy about

4  complaining?  Right.  I mean, he complained about everything,

5  bugs in the salad, office is too cold, somebody moved the desk.

6  Right?  This was not somebody who was shy about making his

7  grievances known.

8       You'll have this document.  It's Exhibit 22.  Take a

9  look at it if you care to back in the deliberation room.  And I

10  challenge you, just as I challenged Mr. Williams on the stand

11  over the course of my cross-examination, to find me one

12  instance in that document where he complained about anything

13  that he's now alleging in this case.

14       As a matter of fact, the only mention of anything in

15  that document relating to this case at all is towards the end

16  in 2020.  Again, against the backdrop where Mr. Williams is now

17  telling you he's been through six years of hellish

18  discrimination at the company, the one single mention of

19  anything related to the issues in this case is when

20  Mr. Williams tells Mr. Palochko, I just wanted to let you know

21  that I think Chris Aker and you, Mr. Palochko, have been very

22  accommodating on LGBT issues since I started at the company.

23       I don't know how you can reconcile that with his

24  claims today, but, again, that's your job, not mine.

25       Speaking of Mr. Aker, I also showed him a thread with

*United States District Court*

1  Mr. Aker.  This is the founder of the company, the President.
2  Right?  100 percent owner.  And you'll recall that thread that
3  clearly shows they had a familiar relationship with one another
4  because of all those photos of fish dinners that Mr. Williams
5  was texting to him.  Again, an open line of communication.
6  Right?  It's the digital ages open-door policy to the owner of
7  the company, and never once does he say anything related to age
8  or sexual orientation.  Not a single remark.  Not a, hey, can I
9  pull you aside and talk to you about something that's bothering
10 me.  Not once.
11         I showed you and Mr. Williams a text thread between
12 himself, Mr. Spataro, and somebody named Jimmy G from that
13 business trip to Panama.  Right?  And Mr. Carson referenced it
14 during his closing to you.
15         As you recall, on direct examination, Mr. Williams
16 referenced this trip as the one where he felt like he got left
17 behind by these two guys while they went out, according to
18 Mr. Williams, trolling for girls.  You heard Mr. Spataro tell
19 you how he felt when he was essentially accused of infidelity
20 by his former colleague on the stand.
21         Again, contemporaneous communications among all three
22 of the principals and not one mention of age discrimination,
23 sexual orientation discrimination, not one stray remark, not
24 one ignorant comment, nothing.  It's just a vacuum.  That's
25 Exhibit 145, by the way, as you're back in the deliberations

*United States District Court*

1   room.  138 is the Chris Aker text thread.

2          And again, you didn't see one single piece of evidence

3   in any of the documents, any of the actual evidence that is

4   before you in this case, to indicate that prior to 2020,

5   Mr. Williams ever once, just once, took issue with anybody's

6   behavior at Linode on the basis of his age or sex.  Right?

7   Just this PHRC questionnaire that nobody ever saw until years

8   later.

9          You know, I want to talk to you a little bit about the

10  evidence in the case.  I think this evidence that we're talking

11  about shows that Mr. Williams enjoyed his experience at Linode,

12  that he had a friendly relationship with all of his co-workers.

13  Now, you heard a lot about this during this trial, and you

14  heard Mr. Carson try to talk about it earlier.  And it's been

15  an issue throughout, right?

16         I mean, you've heard Mr. Williams on the stand say

17  that he has all of this documentation somewhere.  Right?  He

18  just doesn't have it.  He didn't bring it with him.  Right?

19  The smoking gun is out there somewhere, but nobody brought it

20  to court.

21         I'm going to ask you to look at Section 1(b) of the

22  instructions that His Honor gave you on Friday -- and you'll

23  have a copy back in the jury room -- that says the following

24  things are not evidence:  Statements, arguments, and questions

25  of the lawyers for the parties in the case; materials that a

1  lawyer or witness referenced that I have not admitted as

2  evidence.  All right?

3          This is a trial.  Okay?  This is serious business.  If

4  a plaintiff like Mr. Williams could just come to court and say,

5  you know, I have all this wonderful evidence at home, I just

6  didn't bring it to court with me, that's what every plaintiff

7  would do.  Right?  It's the whole idea of trial.  You show up

8  with your best evidence, the best that you got, you present it

9  to the jury and you let them decide.

10          Again, I encourage you, when you go back to the jury

11  room, you will have a binder of the exhibits in this case.

12  Flip through it and see if you can find what nobody else in

13  this trial could find.  Again, one single instance of alleged

14  discrimination by Mr. Williams against Mr. Spataro or anyone

15  else at Linode at any time prior to his termination.

16          By the way, on that note, where are the witnesses?

17  Right?  You heard Mr. Williams on the stand during his

18  testimony over four days mention a lot of names.  Where are

19  they?  All these people who made these ignorant remarks to him

20  allegedly, all these people who -- you know, making fun of the

21  deaf person.  I don't know what deafness has to do with this

22  case, but we just heard about it again during Mr. Carson

23  closing.  All of these things, these horrible things that

24  allegedly happened, where are the witnesses?  Right?  They

25  don't all still work for Linode.  We brought the only witness

*United States District Court*

1  in who's not connected to this case, Mr. Owen Conway, who

2  again, was brought up by Mr. Williams on the stand.

3          I would submit to you that if those people existed and

4  would say what Mr. Williams wanted them to say to support his

5  case, he would have brought them to trial.  But they are not

6  here.  Could have called any one of his co-workers to back up

7  what he was saying against Dan Spataro.  He didn't do it.

8          While we're talking about Owen Conway, I do want to

9  mention something about his testimony here.  He -- you know, in

10 my mind, he might be the most important witness in the entire

11 case.  He's not my client.  He doesn't work for Linode.  He

12 doesn't work for Akamai.  Right?  He's got no horse in this

13 race.  He's got nothing to gain or lose from his testimony

14 here.  He has no connection and, frankly, no real reason to

15 care what happens here.

16          And instead, he came in here as an out and proud

17 51-year-old gay man and told you that he never experienced or

18 saw any age or sexual orientation discrimination during his

19 time at Linode.  As a matter of fact, he told you -- and you

20 might remember this -- if he had seen any of that kind of

21 conduct by Mr. Spataro, he would have given him a slap because

22 he doesn't stand for that kind of thing.  I found that telling.

23 Again, I'll leave it to you to ascribe what importance to give

24 to a witness who has no reason to be here, no reason to lie, no

25 reason to tell you anything other that the truth.

*United States District Court*

1          And by the way, on that point, since we are here to
2    talk about age and sex discrimination, I also found it
3    interesting that Mr. Williams' team at the time, this team
4    where he was supposedly suffering all this age and sex
5    discrimination, is a four-man network engineering team in
6    Southern New Jersey.  Four people on the team, two guys that
7    are older, both of whom are gay.  50 percent older, gay men as
8    part of that team.  I'll tell you that if the company is
9    discriminating against people on the basis of age or sexual
10   orientation, they sure have a funny way of showing it.  Right?
11   I mean, we're in the 50 percent hit rate.
12          All right.  Let me move forward a little bit here.  I
13   told you in the beginning that it's helpful to think of this
14   trial really in two parts, right?  I mean, there's the
15   pre-termination conduct that Mr. Williams is alleging and then
16   there's the termination conduct.  I just told you all about why
17   there's not a lick of evidence in this case in evidence before
18   you on the pre-termination stuff.
19          Let me talk to you a little bit about the termination
20   itself.  You're going to see on the verdict sheet that
21   Mr. Williams bears the burden of proof.  Right?  He has to
22   prove his claims to you.  I heard Mr. Carson talking about what
23   defendant was trying to prove in this case.  We don't have to
24   prove anything to you.  I think we proved a lot, but it's not
25   our burden to prove anything to you.  It's his burden.

*United States District Court*

1        The rules of court require him to come to trial,

2   present his testimony, his evidence, his witnesses, his

3   documents, and to persuade you with that actual evidence.  Not

4   innuendo, not screaming and yelling, not -- you know, well, if

5   you think about it this way and you torque it the other way and

6   then you cram it into this logical hole, it says what I want it

7   to say.  Right?  Evidence.  Look for the evidence you're going

8   to have in front of you.  And I'm going to respectfully submit

9   to you that he's failed to carry his burden by a wide margin.

10  Okay?  Especially with respect to his termination.

11       There is no evidence in this case other than

12  Mr. Williams' own testimony to support this notion that his

13  termination had anything to do with his age or his sex.

14  Mr. Williams and his attorney know this.  Right?  They are

15  aware of it.  And so, instead, they are attempting to convince

16  you that because these guys lied to Mr. Williams about the

17  reason for his termination -- I said this to you in my opening

18  statement -- that somehow you're obligated to take the leap

19  from the lie to a finding that he was discriminated against.

20  That's a red herring, all right, and I'm going to tell you why.

21       They pin their entire case -- and Mr. Carson's entire

22  closing essentially was based on their hope that you would fall

23  for it and ignore the law and the facts in this case.  We have

24  a popular saying amongst lawyers.  I think it applies to this

25  case.  It goes like this:  If the facts are on your side, you

1  pound the facts.  If the law is on your side, you pound the
2  law.  And if you don't have either the facts or the law, you
3  pound a table.  What you saw from Mr. Carson and his client in
4  this case was pounding the table.
5          These guys told you why they lied to Mr. Williams
6  about his termination.  They told you that he had sued a prior
7  employer, they knew it, and they didn't want to get sued.
8  That's a reasonable reaction.  You may not like it, but given
9  the boat they were in, I think it's very reasonable and,
10  frankly, very credible to say we didn't want to get sued by
11  this guy.
12          They also knew -- and they told you this -- that
13  Mr. Williams was not a guy to take bad news well.  We all heard
14  that borne out in real-time when we listened to the 27-minute
15  recording that Mr. Carson played for you.  They played it for
16  you.  We didn't.  And we heard Mr. Williams yelling and
17  demanding and repeating himself, threatening.  Certainly I
18  think we heard a different Mr. Williams in that call than the
19  one that he portrayed to you on the stand.
20          For third, they told you they had safety concerns.
21  Mr. Carson ridiculed those concerns, but the witnesses told
22  you, and I submit to you that it's a reasonable response, that
23  given that this article had been published saying that this
24  former employee of theirs, Mr. Williams' partner, tried to go
25  out on the internet and hire a hitman to murder a child, it's

1    reasonable for them to have just the least bit of concern that

2    if they were to tell Mr. Williams we're firing you for your

3    relationship with this guy, and he went and told Mr. Musbach,

4    something bad could happen.  I don't know what, you don't know

5    what, but it's certainly reasonable fear under those

6    circumstances.

7            And finally, they told you that this was an

8    unprecedented situation at work, a potential crisis for the

9    company, and they were looking to handle it in the quickest,

10   cleanest, and safest way they possible could.  Right?  So they

11   told him we're terminating you for policy violations.  That had

12   nothing to do with his age or his sexual orientation and

13   there's no evidence in the record, no evidence that you are

14   going to have in the jury room, and frankly, no testimony other

15   than Mr. Williams' own self-serving remarks that even remotely

16   indicate that that was the case.

17           Mr. Williams knows that and he's known it from the

18   very beginning.  Right?  You heard that call.  You heard him

19   ask dozens of times in that call, this is because of what

20   happened with John Musbach last week, right?  He knew that at

21   the time.  He recorded the call at the time.  The reasonable

22   inference to draw from that is that he was planning to sue, and

23   he was planning to sue them because in his view -- just like he

24   said on the call -- it was somehow unlawful or illegal for the

25   company to fire him due to his relationship with Mr. Musbach.

*United States District Court*

1          Firing Mr. Williams because he was affiliated with
2    Mr. Musbach is not against the law.  You will find nothing in
3    the judge's instructions that indicate otherwise.  You may not
4    like it, right, you may not think it's fair, you may think it's
5    overly harsh, but it's not against the law.  And Mr. Spataro is
6    entitled under the law, given his personal preferences to not
7    work with people who associate with pedophiles, to make that
8    point known to his company, and his company is well within its
9    rights under the law to fire him for that reason.
10          Instead of confronting that, right, and instead of
11   coming to you with evidence, what do they do?  They bang the
12   table on and on and on about this lie.  Right?  We've heard far
13   more about the lie than we've heard about any actual evidence
14   of age discrimination, any evidence of sexual orientation
15   discrimination, any evidence that the lie was motivated by
16   those two things, any evidence that the lie was to cover those
17   things up.  There's no evidence in the case of that.  They want
18   you to make that long leap from the fact that they lied to him
19   about the reason for his termination to somehow out of thin air
20   conjuring up a finding that he was actually terminated for sex
21   or his age.
22          There's two problems with that, though.  Right?
23   First, you heard every witness who came in here to testify to
24   you from Linode that those policy violations were real.  They
25   actually happened, right?  And you heard Mr. Spataro talk about

1  them and you heard Mr. Asaro talk about them, and most

2  importantly, I think, you heard Mr. Ford come in here to tell

3  you about them.  And it's pretty clear that he was pissed off

4  about those violations, right?  And he kept coming to Dan

5  Spataro and telling him, look, you got to get this guy under

6  control.

7         Mr. Spataro never disciplined Mr. Williams for any of

8  those violations.  If he was just lurking and itching for a

9  reason to get rid of the guy because of his age or his sexual

10  orientation, why wouldn't he take the opportunity presented by

11  Mr. Ford when he comes to him and says, hey, Dan, Mr. Williams

12  is buying $1,400 Mets ticket on the company card.  Right?  This

13  can't happen.  You got to do something about it.  What a great

14  excuse, right?  This is the exact reason I was looking for to

15  get rid of the guy because he is old, because he's gay.

16         What did Dan Spataro do?  He says, don't worry about

17  it, Ford.  You know, he's my guy, I'll deal with it.  And they

18  treated him with kid gloves.  They treated him well.  They

19  treated him more fairly than I think a lot of people would have

20  been treated on that issue.  And frankly, some of that

21  treatment was self-interested, right?  I mean, maybe they were

22  being nice, but they were also protecting themselves.  They

23  knew the guy had sued a prior employer, and so these policy

24  violations that kept cropping up -- you know, he was providing

25  value to the company.  We acknowledge that.  It's okay, right?

*United States District Court*

1   We're going to let him get away with it, we're going to let him

2   slide.  That's not the response from a company that's just

3   looking for an excuse to get rid of somebody.

4         As I said -- and secondly, I want to be very clear on

5   this point.  There is nothing in the law, nothing in the

6   Judge's instructions, nothing in the evidence that requires you

7   to find that this reason, this lie, as Mr. Carson calls it,

8   that they told Mr Williams about at the time they fired him, is

9   linked in any way to age discrimination.  You need evidence to

10  make that link.  Even if you disagree -- as I told you, even if

11  you think it was wrong to lie to Mr. Williams -- right, maybe

12  you have a belief that employers should always be completely

13  open and honest, maybe you believe that, you know, their safety

14  concerns were overblown, whatever.  Even if you think it was

15  wrong or unfair or not the right decision or just flat-out

16  rude, it's not unlawful.

17        That's what we're here to decide.  This is a court of

18  law.  It's not the court of fairness, it's not the court of

19  hurt feelings.  It's the court of law.  Ultimately that

20  inference is not available to you if the evidence doesn't

21  support it.  And ultimately, that's really what we're here to

22  decide, right?  I mean, the issue that matters here is whether

23  Mr. Williams carried his burden of proving to you -- not

24  alluding to, not inferring, but proving to you with evidence

25  that his treatment at Linode was somehow discriminatory based

*United States District Court*

1   on his age or his sexual orientation, and there's just no
2   evidence of that.

3        And again, if I could refer you to the Judge's
4   instruction, this is under heading 2 in the document that
5   you'll have back there with you.  His Honor has already
6   instructed you on this yesterday, but I point you to the
7   section that says this.  This is a quote from his instructions:
8   For Mr. Williams to recover on his claims that Linode treated
9   him differently, he must prove by a preponderance of the
10  evidence that Linode intentionally discriminated against him on
11  the basis of either his age or his sex, including sexual
12  orientation.

13       You'll see that it also says that Mr. Williams must
14  prove that he was subjected to discriminatory treatment and
15  that his age or sexual orientation was a determinative factor
16  at the time.

17       Lie or no lie at the time that he was terminated about
18  whether his termination had anything to do with Mr. Musbach, he
19  hasn't provided any evidence at all of either discriminatory
20  treatment in the first instance and certainly not that any
21  discriminatory treatment that didn't occur was somehow
22  motivated or a determinative factor in their decision relating
23  to his employment, his termination.

24       And that in that same section of the Judge's decision,
25  you heard yesterday, and you'll hear and see again today, the

*United States District Court*

1    Judge is telling you that Linode has given a non-discriminatory

2    reason for its decisions regarding Mr. Williams' pay, profit

3    sharing, and termination.  Linode's non-discriminatory reason

4    is Mr. Williams' affiliation with John Musbach.

5          If you believe Linode's stated reason and if you find

6    that the decisions regarding pay, termination, and profit

7    sharing would have occurred because of Linode's stated reason,

8    regardless of Mr. Williams' sex or age, then you must find for

9    Linode.  That's it right there.  I want to repeat that because

10   I think it's critical, and this is the Judge, not me.

11         "If you believe that Mr. Williams was terminated or

12   discriminated against due to his affiliation with John Musbach

13   on the termination issue, you must find for Linode."

14         Judge Wolson also tells you that in determining

15   whether Linode's stated the reasons for its action -- again,

16   the stated reason for the actions in this courtroom, in this

17   case, is not the policy violations.  It's his affiliation with

18   Mr. Musbach.  You can't question Linode's business judgment.

19   You can't find intentional discrimination simply because you

20   disagree with the business judgment of Linode or believe it's

21   harsh or unreasonable.  You are not to consider Linode's

22   wisdom.  That's from the instructions that you received

23   yesterday and that you'll have with you today.

24         Again, I told you that even if you, therefore, think

25   that they did the wrong thing in lying to him, even if you

*United States District Court*

1  think that was despicable, that doesn't allow you to find that

2  they discriminated against him based on his age or his sexual

3  orientation.

4        Finally, Judge Wolson told you that you must decide

5  whether Mr. Williams has proven that his age or his sexual

6  orientation was a determinative factor in Linode's employment

7  decisions.  He defines it as a determinative factor for you as

8  meaning that if not for his sexual orientation or age, his

9  termination would not have occurred.

10        Listen, folks.  I know that you're eager to

11  deliberate.  I know that it's been a long week.  You're

12  probably sick of hearing lawyers talk.  I promise I'll let you

13  get to it in a minute, but I do want to say one more thing

14  before I sit down.

15        This is normally the part of the closing argument that

16  I make where I would do what I call the CYA paragraph, what you

17  might think of as just covering all your bases.  And what I

18  would normally do is I would tell you, listen, I think that you

19  should agree with me.  I think you should find for my clients,

20  but just in case you don't, I think you should only award a

21  small amount of money.

22        I'm not going to do that here.  I'm not going to waste

23  your time with it.  I'm not going to waste my time with it.

24  And the reason for it is that there is just no evidence here in

25  this case to support a liability finding for Mr. Williams.

*United States District Court*

 1          Lastly, I do want to acknowledge that -- I mean, look.

 2   There's no doubt that Mr. Williams has had a rough road over

 3   the last couple years.  Right?  I mean, he loses a job with

 4   Linode that, by all indications, including the documents, the

 5   guy really enjoyed.  He seemed to really enjoy his co-workers.

 6   He had to contend with the fact that his partner of four years

 7   was arrested for awful crimes, and all that after Mr. Williams

 8   helped the guy through these issues he had with child

 9   pornography.  You know, the guy gets arrested again.  Even

10   though Mr. Williams himself tried to convince you that that's

11   not enough to cause emotional distress, I think we all can

12   agree that's a pretty tough beat by any standard, right?

13          So when you go back to deliberate, you may find

14   yourself feeling sorry for the guy.  I don't think that's

15   unreasonable.  You may look at Linode as a company with

16   resources, and, I mean, after all, what difference would it

17   make if we threw the guy five grand, ten grand, you know, just

18   as an acknowledgment that we see his suffering.

19          You might feel a pull to disregard the instructions of

20   the Judge.  And from a place of really compassion, you might

21   decide that whatever the law says, whatever the Judge has told

22   us, whatever the evidence says, that -- the recognition of the

23   fact that the guy has had a hard time, we'll give him

24   something.

25          I'm going to ask you now to please resist that urge.

*United States District Court*

1    Okay?  Resist the urge to ignore the evidence and the lack of

2    it.  Resist the urge to ignore the Judge's instructions and the

3    law.  Feel good about the fact that you gave Mr. Williams

4    seven days of your time.  You gave him a forum to tell his

5    story.  You gave him your full attention for a week.  Feel good

6    about the fact that you gave him his day in court.  That's far

7    more than most employees who are terminated receive.

8         You also heard Mr. Spataro, Mr. Asaro, and

9    Mr. Palochko tell you what it's been like for them to be

10   accused of discrimination, to be accused of being a bigot in

11   today's age.  They are the accused.

12        Mr. Spataro sat on that stand.  He's been here all

13   week listening to the horrible things that Mr. Williams said

14   about him, and he told you very clearly how that felt.

15        Mr. Asaro, who you heard, is retired.  He doesn't work

16   for Linode or Akamai anymore.  He had no reason to come back

17   here and testify except to defend his reputation.  He came in

18   here, just like Mr. Spataro did and just like Mr. Palochko did,

19   and they told you that their reputations and their good names

20   were at issue in this case.

21        It's up to you to make sure that their reputations and

22   their good names are preserved.  And I'm asking you that, after

23   having this hanging over them for the past three and a half

24   years, that you finally let them get back to their lives, their

25   families, their reputations, and you free them from the burden

*United States District Court*

1    that these allegations put on them.

2         As you heard before, I told you that if I kept my

3    promises to you, I'd come back at the end and I'd ask you to

4    find for Linode.  As respectfully as I possibly can, I'm also

5    asking you to honor the promise that you made when you took

6    your oath as jurors, your promise to the Court and to the

7    parties, that you would decide what the facts are here, apply

8    the law that the Judge gave you, and to decide the case without

9    bias, without passion, without prejudice, and based only on the

10   evidence.

11        So I'm asking you now, before I sit down, to go back

12   into that room, to consider the actual evidence that was

13   presented at this trial and the lack of evidence that you

14   didn't see here, to follow the law as Judge Wolson gave you,

15   and to render the only verdict possible that you follow the

16   evidence and the law, and that is a verdict in favor of Linode.

17        Mr. Carson is going to talk to you again for a bit

18   now.  As Judge Wolson told you, he is the plaintiff.  He has

19   the burden.  He gets to go first and last.  I would ask you

20   during his argument to ask yourselves, as you're listening to

21   what he says, is he pounding the facts, is he pounding the law,

22   or is he pounding the table?

23        I hope we get a chance to talk again after your

24   deliberations are finished and your verdict is rendered, but if

25   this is the last time that I have the privilege of speaking

1  with you, I want to thank you again for your time and your

2  attention.  My clients certainly thank you for the same, and we

3  appreciate your work as jurors in this case.

4         And so on behalf of Linode, Mr. Spataro, Mr. Asaro,

5  Mr. Palochko, and certainly myself and my colleagues here,

6  thank you for all of your efforts, all of your attention, all

7  of your work, and all of your consideration this week.  Thanks.

8         THE COURT:  Mr. Cavalier, thank you.

9         Mr. Carson, rebuttal?

10        MR. CARSON:  I think I'm going to begin by just

11 pointing out -- there are so many things, but I'm going to

12 begin by pointing out the -- what Dan Spataro testified to.

13        "QUESTION:  Do you remember now that it was him who

14 called the meeting?

15        "ANSWER:  Yes.

16        "I'm sorry?

17        "ANSWER:  He called me in there.  I mean, I would

18 assume.

19        "So he asked for a meeting.  He wanted the chief

20 operating officer to be there, and he was upset and he

21 mentioned his age at the meeting, correct?

22        "ANSWER:  I think he briefly mentioned his age.

23 Yeah."

24        What does it mean to briefly mention your age?  Either

25 he mentions it or he doesn't, right?  He mentioned it.  So you

*United States District Court*

1  just heard from John Cavalier that there isn't a single piece

2  of evidence in this case to suggest he ever said one thing

3  about his age.  I think he said it like three times, he never

4  one time uttered a single word about his age.  But there's

5  more.

6          They're saying that my client is a guy who, if he's

7  upset, he's going to talk about it.  We know that he was upset

8  because Dan Spataro said he's upset.  He said he's upset.  He

9  said that he's talking about age.  The Pennsylvania Human

10 Relations Commission document says that it's about age.  But we

11 only see one thread.  One thread.

12         John asked you to think about the evidence that's here

13 and not here.  And he said that my client just didn't bring

14 this evidence from his house.  My client doesn't have access to

15 Linode's company stuff.  That's not at his house.  So if it's

16 not here, which side didn't bring it?

17         MR. CAVALIER:  Objection.

18         THE COURT:  Sustained.

19         MR. CARSON:  John Spataro (sic) said that my client

20 didn't show up because the information was at his house, ladies

21 and gentlemen.  He just left it at his house, apparently.

22         You heard in this case that there were Slack threads

23 between Carl Williams and Peter Fu, Slack threads between Carl

24 Williams and Dan Spataro, Slack threads between Carl Williams

25 and Tom Asaro, Slack threads between Carl Williams, Dan Spataro

*United States District Court*

1   and Tom Asaro, a sales channel Slack thread, a network
2   engineering thread.  They didn't -- we don't even have the
3   network engineering thread.  A thread between Dan Spataro and
4   Tom Asaro, a thread between Tom Asaro and Vince Palochko, a
5   thread between Dan Spataro, Vince Palochko, and Tom Asaro, a
6   thread between all these people and Chris Aker added to all of
7   them.  It wasn't me.  It was defense counsel who asked you to
8   consider the evidence that's here and the evidence that's not
9   here.
10          You also -- there's -- I mean, like 90 percent of what
11  you just heard from Mr. Cavalier is just misleading.  Right?
12  And here, I'll just give you a really good example.
13          So the law, the law says that you can rule in my
14  client's favor based only on the fact that you don't believe
15  what they're telling you as a reason for the termination, not
16  that you don't believe what they're telling you about anything
17  else.  If you disbelieve -- here, I'm going to point it out to
18  you.
19          So I would point you, when you are back there
20  deliberating, to please consider Section B, the disparate
21  treatment claims, and the section that says if you disbelieve
22  Linode's stated reason for its conduct, in other words, the
23  stated reason why they terminated him, you may, but need not,
24  find that Mr. Williams has proved intentional discrimination.
25          The fact that you don't believe them alone is enough

*United States District Court*

1  for you to find for my client, period, end of story.  That's
2  not what Mr. Cavalier just told you, but that's what the law is
3  going to tell you.  That's what Judge Wolson told you, and
4  that's what you'll read in the law.
5          So I think that -- I'm happy to pound the table if you
6  want me to.  I'm happy to pound the table if John wants me to.
7  I'm also happy to pound the evidence, and I'm also happy to
8  pound the law.  So the evidence is going to show that -- John's
9  words, John Cavalier's words, not mine, is going to show that
10 this was a -- this is a company that used electronic
11 communications for everything they did.  Every part of their
12 business was electronic communications.  Right?
13         And they're saying that one of the reasons why they
14 lied is because they thought that my client would -- some prior
15 litigation and they thought he was going to sue them again?
16 That's a reason -- that fact falls in our favor and my client's
17 favor 100 percent.  If you think that you're going to face a
18 lawsuit and if you think that you're dealing with a guy --
19         By the way, there's not a single shred of evidence
20 that any of that happened.  We heard about an email from Chris
21 Aker -- where is the e-mail?  We heard about this fear of
22 litigation but --
23         But if you think that you're going to get sued by
24 someone, then what you do is you create a false trail of the
25 evidence to point in the direction that you're breaking the law

*United States District Court*

1  and you don't create one single record to suggest that what

2  you're doing is really what you're doing?  You don't send an

3  email out or a text thread and say, hey, we told him this

4  reason but we really meant this reason, and we just want to

5  make sure that we're on the record saying it because, you know,

6  we're worried we might get sued in the future.  That didn't

7  happen.

8         What happened was -- well, we know what happened.  It

9  was two years and three months.  Right?  We saw evidence that

10  the statements that came through the lawyers had this false

11  reason in it.  The answers to interrogatories were verified

12  under penalty of perjury.  All right?  That is one of the

13  reasons why there's a punitive damage claim in this case.  That

14  is one of the reasons why we're going to ask you to apply

15  liquidated damages to the age claim.

16         The law doesn't tolerate perjury.  You can't perjure

17  yourself for two and a half years and then decide you're going

18  to change the story and ask for a ruling in your favor because

19  you say the word pedophile.  That's not how it works.  You got

20  to look at the evidence.  Right?  And when you look at the

21  evidence, ask yourself if what they're telling you made sense.

22  It doesn't.  It doesn't make any sense.  There's some other

23  misleading things.

24         So remember at the beginning of this case you were

25  told that there was going to be all these people who contacted

*United States District Court*

1  Vince Palochko and saying it's him or me?  Then Vince Palochko

2  got on the stand and said that never happened.  So you didn't

3  hear anything from that in his closing statement.  That's one

4  of those parts of the lie that we're going to pretend we never

5  told that lie.  Because it didn't happen.

6      Mr. Cavalier testifies that there's a clear policy for

7  discrimination.  Nobody there thought it was a clear policy.

8      This is what Dan Spataro said about the policy:

9      "QUESTION:  So if someone mention's age, though,

10  aren't you supposed to let Vince Palochko know?

11      "ANSWER:  I don't know.  I have no idea."

12      That's the director.  No idea what to do with a

13  discrimination complaint.  The word encouraged is not --

14  policies that prevent discrimination in the workplace have to

15  be mandatory, mandatory reporting.  And Mr. Cavalier tried to

16  like, play games with words, If something happens to you, you

17  don't want to force people to report it.  That's not what the

18  policy says that we're dealing with.  What the policy says, and

19  please take a look at it, it says if you see a discrimination,

20  do what you want with it.  We encourage you to report it, but

21  you don't have to.  And Vince Palochko confirmed that's what it

22  meant, and it never changed.  Year after year after year the

23  employee handbook changed, but no one cared to update the

24  policy because no one cared about the policy.

25      It didn't have a retaliation section.  It looked like

*United States District Court*

1   it was copied and pasted.  I mean, the guy who wrote it had

2   never written a policy before.  So honestly, it's kind of

3   understandable why it was deficient.  I mean, Tom Asaro hired a

4   guy with no HR experience and told him, hey, we want you to run

5   our HR department for this fast-growing multimillion-dollar

6   company.

7            THE COURT:  A minute and a half, Mr. Carson.

8            MR. CARSON:  How much?

9            THE COURT:  Minute and a half.

10           MR. CARSON:  Thank you.

11           John testified that my client said that they were like

12   a married couple.  I just searched the entire transcript.  The

13   word married has not been mentioned in this case once.  That is

14   just a false statement.  That's another false statement said to

15   you.

16           We heard about an ongoing FBI investigation.  That

17   never happened either.  Everyone confirmed the only FBI

18   investigation was about John Musbach in 2016.  So that was just

19   more fear.  You know, more fear, more smoke and mirrors, more

20   lies.  I mean, they can't win this case without lying to you,

21   and they can't win this case unless you accept the lies and

22   disregard all the evidence.

23           There's nothing -- there is nothing remotely

24   contradictory about my client saying to Vince Palochko and to

25   Chris Aker that he was happy about them or appreciated their

1   policy toward LGBT.  There had just been an LGBT event at the

2   Philadelphia headquarters, and he was saying thank you for

3   that.  And that has -- that could -- that email can live in the

4   world where everything my client said is true and it doesn't in

5   one way suggest or contradict anything in this case.  More

6   misdirection.

7           Owen Conway didn't confirm anything.  Oh, yeah.  Owen

8   Conway didn't work with Dan Spataro and Carl Williams.  The one

9   guy they can get to testify that he didn't hear anything is the

10  one guy who spent a couple days with them and then went to

11  another office.

12          THE COURT:  That's time, Mr. Carson.

13          MR. CARSON:  Thank you.

14          THE COURT:  Okay.  So you've heard the closing

15  arguments.  When you retire to the jury room to deliberate, you

16  may take with you these instructions, your notes, and the

17  exhibits that I've admitted into evidence.  Note that certain

18  numbered exhibits may appear to be missing; however, this is

19  intentional and you should not draw any inferences from it.

20          You should select one member of the jury as your

21  foreperson.  That person will preside over the deliberations

22  and speak for you here in open court.

23          You have two main duties as jurors.  The first one is

24  to decide what the facts are from the evidence that you saw and

25  heard here in court.  Deciding what the facts are is your job,

*United States District Court*

1   not mine, and nothing that I've said or done during this trial

2   was meant to influence your decision about the facts in any

3   way.

4         Your second duty is to take the law that I give you,

5   apply it to the facts, and decide if, under the appropriate

6   burden of proof, the parties have established their claims.  It

7   is my job to instruct you about the law, and you're bound by

8   the oath that you took at the beginning of the trial to follow

9   the instructions that I gave you, even if you personally

10  disagree with them.

11        This includes the instructions that I gave you before

12  and during the trial and these instructions.  All the

13  instructions are important and you should consider them

14  together as a whole.  Perform these duties fairly.  Do not let

15  any bias, sympathy, or prejudice that you may feel toward one

16  side or the other influence your decision in any way.

17        As jurors, you have a duty to consult with each other

18  and to deliberate with the intention of reaching a verdict.

19  Each of you must decide the case for yourself only after a full

20  and impartial consideration of all of the evidence with your

21  fellow jurors.  Listen to each other carefully.

22        In the course of your deliberations, you should feel

23  free to re-examine your own views and to change your opinion

24  based on the evidence, but you should not give up your honest

25  convictions about the evidence just because of the opinions of

*United States District Court*

1  your fellow jurors, nor should you change your mind just for

2  the purpose of obtaining enough votes for a verdict.

3          When you start deliberating, do not talk to any of the

4  court officers or to me or to anyone but each other about the

5  case.  During your deliberations, you must not communicate with

6  or provide any information to anyone by any means about the

7  case.  You may not use any electronic device or media such as a

8  cell phone, smart phone, tablet, or computer of any kind; the

9  internet, any internet service, or any text or messaging

10  service like Twitter, or any internet chat room, blog, website

11  or social networking service such as Facebook, LinkedIn,

12  Instagram, TikTok, Snapchat, GroupMe or YouTube to communicate

13  to anyone any information about this case or to conduct any

14  research about this case until I accept your verdict.

15          You may not use these electronic means to investigate

16  or communicate about the case because it is important that you

17  decide this case based solely on the evidence presented in this

18  courtroom.  Information on the internet or available through

19  social media might be wrong, incomplete, or inaccurate.

20  Information that you might see on the internet or on social

21  media has not been admitted into evidence and the parties have

22  not had a chance to discuss it with you.  You should not seek

23  or obtain such information and it must not influence your

24  decision in this case.

25          If you have any questions or messages for me, you must

*United States District Court*

1   write them down on a piece of paper, have the foreperson sign

2   them and give them to Ms. Abed, Ms. Scott, or whichever other

3   court officer is present.  That person will give them to me,

4   and I will respond as soon as I can.  I may have to talk to the

5   lawyers about what you've asked, so it may take some time to

6   get back to you.

7           One more thing about messages.  Never write down or

8   tell anyone how you stand on your votes.  For example, do not

9   write down or tell anyone that a certain number has voted one

10  way or another.  Your vote should stay secret until you are

11  finished.  Your verdict must represent the considered judgment

12  of each juror.  In order for you as a jury to return a verdict,

13  each juror must agree to the verdict.  Your verdict must be

14  unanimous.

15          A form of verdict has been prepared for you.  It has a

16  series of questions for you to answer.  You will take this form

17  to the jury room, and when you have reached agreement as to

18  your verdict, you will fill it in and have your foreperson date

19  and sign the form.  You will then return to the courtroom and

20  your foreperson will give your verdict.  Unless I direct you

21  otherwise, do not reveal your answers until you are discharged.

22          After you have reached a verdict, you are not required

23  to talk with anyone about the case unless I order you to do so.

24  Once again, I want to remind you that nothing about my

25  instructions and nothing about the form of verdict is intended

*United States District Court*

1    to suggest or convey in any way or manner what I think your

2    verdict should be.  It is your sole and exclusive duty and

3    responsibility to determine the verdict.

4         Okay.  Those are my instructions for you.  As I said,

5    we'll send you a copy.  You're going to have to give us a few

6    minutes to collate it and get it back to you.  We'll do the

7    same thing with the verdict sheet that you'll fill out.

8         When you have the verdict sheet, you'll see it has

9    questions and instructions after each question about how to

10   proceed.  Same thing goes, if you have questions about it, you

11   can write them down and let me know.  I think it's easy enough

12   to follow.  But I'm reading it and I don't know what you think

13   when you read it.

14        And then the final thing is the exhibits.  Again,

15   you'll get that binder.  I think it's just about ready, if it's

16   not already.  So it should be back to you shortly as well.  I

17   think you'll have everything in the next ten minutes or so.

18   You can start your discussions in the meantime.  You don't have

19   to wait for that, but you are free to.

20        So I'm going to send you back now, and Ms. Scott will

21   take you.  Thank you.

22             THE COURTROOM DEPUTY:  All rise.

23             (Jury exits the courtroom at 10:49 a.m.)

24             THE COURT:  Okay.  You can all be seated.  I gather --

25   I think I saw a nod that the exhibits are ready to go back to

*United States District Court*

1  them?  So we'll take them back when we send them the

2  instructions and the verdict sheet.

3         MR. CARSON:  I haven't seen them yet, though.

4         THE COURT:  You'll have some time to do that while we

5  collate them.

6         And then make sure that you've given a cell phone

7  number to Ms. Scott or to someone who can get in touch with

8  you.  I mean, my preference would be you be nearby, not

9  retreating back to your offices or anything like that.  My gut

10 is that we'll get a verdict today, but I don't know that for

11 certain.

12        And then the other issue that was still on the table

13 was this question about the Akamai financials for use, if there

14 is a punitives hearing.  I think I had tabled that question, I

15 think I raised it again yesterday.  I would like to get an

16 answer to it before we scatter so that if there is a verdict,

17 we're ready to go.

18        So am I correct that there's still an objection to the

19 use of those financials, Mr. Cavalier?

20        MR. CAVALIER:  To the Akamai financials, yes.

21        THE COURT:  Okay.  And have you all conferred about

22 it?  Have you reached any kind of agreement or resolution or do

23 I just need to hear argument on it?

24        MR. CARSON:  We haven't really conferred on it, but

25 there might be some agreement from me.

*United States District Court*

1            MR. CAVALIER:  Certainly Linode's financials at the
2  relevant time are relevant.  We can certainly agree to that.
3            Akamai's financials are a completely different ball
4  game in our view.  We think that -- first of all, that they are
5  irrelevant to the conduct at issue here.  It's a later
6  acquisition.
7            Secondly, we think it's prejudicial given the
8  jury's --
9            THE COURT:  Well, let me, before you -- I mean, I know
10  you are going down this road, but there is some case law I
11  believe that deals with the -- so first of all, as I understand
12  it -- I understand it's later in time, but generally you're
13  looking at the financials currently because the purpose is the
14  current punishment, not the past punishment.
15            MR. CAVALIER:  Right.
16            THE COURT:  I think there's some case law that deals
17  with this, that deals with the admissibility of the successor
18  entity's financials in the context of punitive damages.
19            I said I think there's case law.  I don't know exactly
20  what it says and I don't know if there's a factual predicate
21  here that would get me to admissibility, nor am I entirely
22  clear on whose burden that is right now.
23            So I flagged this issue a couple times.  What do you
24  all know or are there particular cases you want to point me to?
25  Where are we on this?

*United States District Court*

 1          MR. CAVALIER:  I can certainly take a look, but

 2     certain -- I mean, we, frankly, haven't had a chance to look

 3     deeply at this issue because there's been no presentation

 4     whatsoever that would even tend to establish the factual

 5     predicate and successor liability.  I'd be happy to take a look

 6     at it and give you, Judge, our position on the law on that

 7     issue.  I don't think it would take me very long.

 8          But ultimately, it's the plaintiff's burden, if they

 9     want successor liability against Akamai, to at least put forth

10     facts that could even potentially serve to suffice to carry

11     that burden, and there's just nothing in the record at the

12     present time.

13          THE COURT:  Well, I want to be clear.  It's not -- the

14     burden is different than it is in a pure successor liability

15     claim.  Right?  So it's not - I know this much.  It's not the

16     same as there was a fraudulent conveyance, I'm pursuing

17     successor liability, which is a fairly high burden and you have

18     to show a series of facts.  That's not what's here, what's at

19     issue.  I don't know, though, exactly where the standard is, is

20     the question for this, and it's the issue I need to hear is

21     both what the standard is, and then, you know, what's been

22     shown.  I mean, certainly, I know there's been an acquisition,

23     for example.

24          MR. CAVALIER:  Right.

25          MR. CARSON:  We know that all the Linode employees are

*United States District Court*

1  Akamai employees.

2          THE COURT:  Right.  And what I don't know, and I don't

3  know it's legally significant, for example, is whether this was

4  an asset purchase or a stock purchase.

5          MR. CAVALIER:  Exactly.

6          THE COURT:  I don't know if that's legally

7  significant.  I also don't know whose burden it is to put in

8  front of me to -- whether it's presumptively admissible or not.

9  I don't know any of these answers.

10          So these are the things that, I guess, I need

11  resolved.  If, I mean, I will leave you all.  I'm not going to

12  come back on the bench for a specific proceeding, but I will

13  say that, you know, the next time I'm back out here, whether

14  that is for a jury question or whether it is because I get word

15  that there's a verdict -- if it's a question, I might bring the

16  jury in and deal with the question and then try to get the

17  answer.  If it's a verdict, I'm going to want to answer this

18  before the jury comes in.  So that when the jury is seated, we

19  can just go.

20          MR. CAVALIER:  We'll have that for you.

21          THE COURT:  Okay.  All right.  So we'll get the

22  instructions ready and bring them out.  And why don't you all

23  confer, make sure the exhibits are okay so we can take the

24  exhibits back with the verdict sheet and the instructions.  And

25  then we'll make sure you've got -- given someone a cell phone

*United States District Court*

1   numbers for each of you if you are not going to be in the

2   courtroom.  Okay?  And I don't have anything in the courtroom

3   this afternoon.  You're welcome to stay here and work.  Okay?

4   Thanks.

5             (Recess at 10:55 a.m.)

6             THE COURTROOM DEPUTY:  All rise.

7             (In open court at 12:56 p.m.)

8             THE COURT:  All right.  Have a seat everybody.  All

9   right, so I have word that we have a verdict from the jury.  So

10  I can, I think, bring them out.  I know that we had talked

11  about the punitives question.  I don't know if I'm going to

12  answer that now or if you want to just hear what the jury has

13  to say first?

14            MR. CARSON:  Can we hear what the jury has to say

15  first?

16            MR. CAVALIER:  Yes, I agree.

17            THE COURT:  Okay.  Let's bring them out.

18            THE COURTROOM DEPUTY:  All rise for the jury.

19            (Jury enters the courtroom at 12:56 p.m.)

20            THE COURT:  All right.  Everybody can have a seat.

21            All right, it's my understanding you've reached a

22  verdict; is that right?

23            THE FOREPERSON:  Yes.

24            THE COURT:  Okay.  So I'm going to ask Ms. Scott to

25  take your verdict.

*United States District Court*

1          THE COURTROOM DEPUTY:  Will the foreperson of the jury

2     please rise.

3          Have the members of the jury agreed upon a verdict by

4     answering the interrogatories submitted to you by the Court?

5          THE FOREPERSON:  Yes.

6          THE COURT:  Okay.  Thank you.

7          THE COURTROOM DEPUTY:  Okay.  What is your verdict as

8     to question No. 1, which reads, "Do you find that plaintiff

9     Carl Williams proved by a preponderance of the evidence that

10    his sexual orientation was a determinative factor in Linode's

11    decision to either, one, pay Mr. Williams less than other

12    employees in similar positions; two, terminate Mr. Williams;

13    or, three, deny Mr. Williams a profit sharing bonus," yes or

14    no?

15         THE FOREPERSON:  No.

16         THE COURTROOM DEPUTY:  Question 2, "Do you find that

17    plaintiff Carl Williams proved by a preponderance of the

18    evidence that his complaint of discrimination based on sexual

19    orientation was a determinative factor in Linode's decision to

20    either, one, pay Mr. Williams less that other employees in

21    similar positions; two, terminate Mr. Williams; or, three, deny

22    Mr. Williams a profit sharing bonus," yes or no?

23         THE FOREPERSON:  No.

24         THE COURTROOM DEPUTY:  3, "Do you find that plaintiff

25    Carl Williams proved by a preponderance of the evidence that he

*United States District Court*

1  was subjected to a hostile work environment based on his sexual

2  orientation," yes or no?

3          THE FOREPERSON:  No.

4          THE COURTROOM DEPUTY:  Phase 2, Age Discrimination and

5  Employment Act, question 6, "Do you find that plaintiff Carl

6  Williams proved by a preponderance of the evidence that his age

7  was a determinative factor in Linode's decision to either, one,

8  pay Mr. Williams less than other employees in similar

9  positions; two, terminate Mr. Williams; or, three, deny

10  Mr. Williams a profit sharing bonus," yes or no?

11          THE FOREPERSON:  No.

12          THE COURTROOM DEPUTY:  Question 7, "Do you find that

13  plaintiff Carl Williams proved by a preponderance of the

14  evidence that his complaint of discrimination based on age was

15  a determinative factor in Linode's decision to either, one, pay

16  Mr. Williams less than other employees in similar positions;

17  two, terminate Mr. Williams; or, three, deny Mr. Williams a

18  profit sharing bonus," yes or no?

19          THE FOREPERSON:  No.

20          THE COURTROOM DEPUTY:  No. 8, "Do you find that

21  plaintiff Carl Williams proved by a preponderance of the

22  evidence that he was subjected to a hostile work environment

23  based on his age."

24          THE FOREPERSON:  No.

25          THE COURT:  Okay.

*United States District Court*

1            Thank you, Ms. Scott.

2            Mr. Carson, do you want me to poll the jury?

3            MR. CARSON:  Yes, Your Honor.

4            THE COURT:  Okay.  Ms. Scott, if you would.

5            THE COURTROOM DEPUTY:  Juror No. 1, please rise.

6            Do you agree with the verdict as rendered by your

7    foreperson?

8            JUROR NO. 1:  I do.

9            THE COURTROOM DEPUTY:  Juror No. 3, please rise -- you

10   can have a seat, sir --

11           Do you agree with the verdict as rendered by your

12   foreperson?

13           JUROR NO. 3:  I do.

14           THE COURTROOM DEPUTY:  Juror No. 4, please rise.

15           Do you agree with the verdict as rendered by your

16   foreperson?

17           JUROR NO. 4:  I do.

18           THE COURTROOM DEPUTY:  Juror No. 5, please rise.

19           Do you agree with the verdict as rendered by your

20   foreperson?

21           JUROR NO. 5:  I do.

22           THE COURTROOM DEPUTY:  Juror No. 6, please rise.

23           Do you agree with the verdict as rendered by your

24   fellow jurors?

25           JUROR NO. 6:  I do.

*United States District Court*

1          THE COURTROOM DEPUTY:  Juror No. 7, please rise.

2          Do you agree with the verdict as rendered by your

3    foreperson?

4          JUROR NO. 7:  I do.

5          THE COURTROOM DEPUTY:  I'm sorry.  I went out of order

6    there.

7          And Juror No. 7 -- or 8, please rise.

8          Do you agree with the verdict as rendered by your

9    foreperson?

10          JUROR NO. 8:  I do.

11          THE COURTROOM DEPUTY:  Thank you.

12          THE COURT:  Okay.  Any reason from counsels'

13    perspective not to record the verdict?

14          MR. CAVALIER:  None from the defense.

15          MR. CARSON:  No.

16          THE COURT:  Okay.  Ms. Scott, if you would.

17          THE COURTROOM DEPUTY:  Members of the jury, hearken

18    unto your verdict as the Court has recorded it in this issue

19    joins Civil Action 22-1618 between Carl Williams and Linode

20    Limited Liability Company, et al., by answering the

21    interrogatories submitted to you by the Court, you find in

22    favor of the defendant and so say you all.

23          THE JURY:  We do.

24          THE COURTROOM DEPUTY:  Thank you.

25          THE COURT:  Thank you, Ms. Scott.

*United States District Court*

1           All right.  So, Members of the jury, I want to thank

2    you.  Obviously, it was a long stretch of time, even beyond

3    what my estimates were when we conducted voir dire.

4           In paying attention, I've been watching, you were all

5    very attentive and engaged, and I really appreciate that.  I

6    appreciate your willingness to serve.

7           Really and truly, like, our system does not work

8    without people like you being willing to come and invest your

9    time and serve this role.

10          So I'm going to say two last things.  One -- aside

11   from thank you.  One is, as you go in the back, I'm going to

12   ask you to -- I know you're anxious to go home -- hang on for a

13   little bit.  I'd like to come back and thank you personally,

14   okay?  It's not a mandate.  If you want to go or have a reason

15   to go, go.  But it won't be long and I'd appreciate it.

16          Number two, I've been telling you throughout this

17   trial not to talk about the case.  You are released from that

18   obligation.  I'm actually going to encourage you to go talk

19   about what you've seen here.  Not so much the substance of the

20   case.  You're welcome to talk about that with other people if

21   you want to.

22          I happen to think that -- there's only three branches

23   of government, and it's the one that's probably most clouded in

24   mystery for most people.  They just don't really know what

25   happens in a courtroom.  We see what happens on TV.  We see

*United States District Court*

1    what happens in the movies.  It's not exactly what happens in

2    real life here.  And I think there's value in people knowing

3    what's happening in our courts and how things proceed.

4         So to the extent you are talking to people about your

5    experience or they're asking, I would encourage you to tell

6    them about what it's like and what happens in a trial and how

7    things really go because I think that's a valuable part of our

8    civic education.

9         So with that, I'm going to excuse you.  Thanks again

10   from the Court.  I really do appreciate it.  I know the parties

11   do as well.  And hopefully I'll see each of you in just a few

12   moments in the back.  Okay?  Thank you.

13        THE COURTROOM DEPUTY:  All rise.

14        (Jury exits the courtroom at 1:04 p.m.)

15        THE COURT:  You can all be seated.  Just as a matter

16   of process, my norm is to give the jurors the option of

17   sticking around for a little bit and chatting with you.  The

18   way I would do that, generally, is have them come out here and

19   just kind of talk to you in the -- from the jury box.  Someone

20   from, you know, either Ms. Scott or someone from my staff will

21   sort of stick around and just keep an eye on that.  So I don't

22   know how long that will be.  I don't know -- it's an option on

23   their part, obviously.  They may be anxious to get home, but

24   it's one o'clock, so it may not be a giant rush either.

25        So I'm going to talk to them for a little bit, and so

*United States District Court*

1  if you want to talk to them, just stick around for that.  Okay?

2          MR. CAVALIER:  Thank you, Your Honor.

3          THE COURT:  Anything else we need to do now,

4  Mr. Carson, from your perspective?

5          MR. CARSON:  No, Your Honor, thank you.

6          THE COURT:  Mr. Cavalier, anything else?

7          MR. CAVALIER:  Only to express our gratitude to the

8  Court and its staff for their hospitality.

9          THE COURT:  Okay.  Well, I appreciate everybody's

10  work.  It was an important case.  It was well tried.  The

11  downside to trials is there's always a winner and a loser, and

12  so someone walks out a little unhappy.

13          But I appreciate the efforts everyone put in, and, as

14  I said, I'll see what the jurors do as I'm chatting with you

15  momentarily.

16          Thanks, everybody.  Have a good afternoon.

17          MR. CARSON:  Thank you, Your Honor.

18          MR. CAVALIER:  Thank you, Your Honor.

19          (Matter adjourned at 1:05 p.m.)

20

21

22

23

24

25

*United States District Court*

1               - - - - - - - - - - - - - - - -

2   I certify that the foregoing is a correct transcript from the

3   record of proceedings in the above-entitled matter.

4

5   /S/ Maureen McHugh, RPR
    Official Court Reporter

6

7   January 31, 2024
        Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

**$**

**$1,400** [1] - 57:12
**$162,000** [1] - 35:9
**$187,000** [1] - 35:17
**$211** [1] - 34:15
**$217,895** [1] - 34:11
**$236,958** [1] - 36:1
**$284,000** [1] - 34:15
**$329,811** [1] - 34:7
**$7,000** [1] - 36:20
**$947,369** [1] - 34:25

**/**

**/S** [1] - 89:5

**1**

**1** [4] - 36:5, 82:8, 84:5, 84:8
**1(b** [1] - 49:21
**10** [1] - 41:4
**100** [5] - 31:16, 31:17, 38:22, 48:2, 68:17
**102** [1] - 38:24
**10:45-ish** [1] - 4:10
**10:49** [1] - 76:23
**10:55** [1] - 81:5
**125** [1] - 35:5
**12:56** [1] - 81:7, 81:19
**13** [1] - 38:18
**1350** [1] - 2:4
**138** [1] - 49:1
**139** [1] - 35:7
**139,000** [1] - 36:13
**142,000** [1] - 35:14
**145** [1] - 48:25
**16** [1] - 33:4
**1601** [1] - 2:4
**168,000** [1] - 35:10
**1789** [1] - 38:19
**1835** [1] - 1:19
**19102** [1] - 2:5
**19103** [1] - 1:20
**19106** [1] - 1:13
**19th** [1] - 19:23
**1:04** [1] - 87:14
**1:05** [1] - 88:19

**2**

**2** [3] - 59:4, 82:16, 83:4
**200,000** [1] - 36:22
**2014** [3] - 9:15, 10:2, 11:3
**2015** [2] - 10:12, 20:8
**2016** [6] - 8:23, 8:25, 9:1, 20:8, 71:18

**2017** [2] - 8:23, 17:25
**2018** [2] - 34:10, 41:22
**2019** [4] - 9:4, 25:13, 35:9, 41:22
**2020** [5] - 5:10, 29:5, 35:14, 47:16, 49:4
**2022** [2] - 10:10, 29:9
**2023** [1] - 29:11
**2024** [3] - 1:13, 9:1, 89:7
**20s** [1] - 34:10
**22** [1] - 47:8
**22-1618** [1] - 85:19
**236,000** [1] - 36:1
**250,000** [1] - 36:22
**27-minute** [1] - 54:14
**2950** [1] - 1:19
**29th** [1] - 11:3
**2:22-CV-01618-JDW** [1] - 1:4

**3**

**3** [6] - 34:21, 36:5, 42:17, 82:24, 84:9, 84:13
**30** [1] - 21:3
**31** [2] - 1:13, 89:7
**34** [1] - 22:11
**35** [2] - 11:8, 11:9

**4**

**4** [2] - 84:14, 84:17
**40** [1] - 9:4
**42** [1] - 7:23
**45** [1] - 17:5
**46** [2] - 8:10, 9:2
**49** [3] - 29:23, 32:25, 33:1

**5**

**5** [2] - 84:18, 84:21
**50** [4] - 20:25, 41:2, 52:7, 52:11
**50-year-old** [1] - 21:2
**51** [2] - 7:23, 9:1
**51-year-old** [1] - 51:17
**56** [2] - 29:11, 29:13
**56-day** [1] - 29:11

**6**

**6** [4] - 29:11, 83:5, 84:22, 84:25
**601** [1] - 1:12

**7**

**7** [5] - 1:6, 83:12, 85:1,

85:4, 85:7
**7,000** [1] - 36:21

**8**

**8** [5] - 9:1, 83:20, 85:7, 85:10

**9**

**90** [1] - 67:10
**9:03** [2] - 1:14, 3:2
**9:04** [1] - 3:24
**9th** [1] - 29:8

**A**

**a.m** [5] - 1:14, 3:2, 3:24, 76:23, 81:5
**Abed** [1] - 75:2
**abilities** [1] - 41:9
**able** [4] - 16:16, 18:7, 21:20, 39:13
**above-entitled** [1] - 89:3
**absolutely** [1] - 46:7
**accept** [2] - 71:21, 74:14
**access** [2] - 19:1, 66:14
**accommodating** [1] - 47:22
**according** [3] - 42:12, 43:10, 48:17
**accounts** [7] - 32:8, 32:9, 32:12, 32:13, 32:14
**accusations** [1] - 23:1
**accused** [5] - 18:4, 48:19, 63:10, 63:11
**accusing** [1] - 22:22
**acknowledge** [2] - 57:25, 62:1
**acknowledged** [1] - 39:25
**acknowledgment** [1] - 62:18
**acquisition** [2] - 78:6, 79:22
**Act** [1] - 83:5
**ACTION** [1] - 1:3
**action** [2] - 42:7, 60:15
**Action** [1] - 85:19
**actions** [1] - 60:16
**actual** [7] - 37:19, 37:20, 46:4, 49:3, 53:3, 56:13, 64:12
**Adam** [1] - 34:10
**add** [2] - 33:3, 36:11

**added** [2] - 11:4, 67:6
**addition** [2] - 38:17, 43:1
**address** [1] - 16:16
**adds** [1] - 36:3
**adjourned** [1] - 88:19
**admissibility** [2] - 78:17, 78:21
**admissible** [1] - 80:8
**admissions** [1] - 21:12
**admitted** [5] - 33:16, 37:18, 50:1, 72:17, 74:21
**adverse** [1] - 14:24
**affiliated** [1] - 56:1
**affiliation** [3] - 60:4, 60:12, 60:17
**afternoon** [2] - 81:3, 88:16
**age** [50] - 8:2, 10:23, 21:14, 22:5, 22:9, 23:24, 23:25, 39:21, 40:3, 40:18, 40:19, 40:23, 42:12, 44:13, 44:22, 46:2, 46:20, 48:7, 48:22, 49:6, 51:18, 52:2, 52:4, 52:9, 53:13, 55:12, 56:14, 56:21, 57:9, 58:9, 59:1, 59:11, 59:15, 60:8, 61:2, 61:5, 61:8, 63:11, 65:21, 65:22, 65:24, 66:3, 66:4, 66:9, 66:10, 69:15, 70:9, 83:6, 83:14, 83:23
**Age** [1] - 83:4
**ages** [1] - 48:6
**agree** [17] - 4:20, 7:7, 13:7, 20:25, 23:19, 61:19, 62:12, 75:13, 78:2, 81:16, 84:6, 84:11, 84:15, 84:19, 84:23, 85:2, 85:8
**agreed** [2] - 40:1, 82:3
**agreement** [3] - 75:17, 77:22, 77:25
**ahead** [2] - 3:22, 26:20
**AI** [1] - 43:9
**aided** [1] - 1:24
**air** [1] - 56:19
**Akamai** [8] - 10:11, 34:7, 51:12, 63:16, 77:13, 77:20, 79:9, 80:1
**Akamai's** [1] - 78:3
**Aker** [5] - 11:21, 26:19, 47:21, 47:25, 48:1, 49:1, 67:6,

**68:21, 71:25**
**al** [1] - 85:20
**Alex** [1] - 11:2
**allegations** [1] - 64:1
**alleged** [2] - 42:15, 50:13
**allegedly** [2] - 50:20, 50:24
**alleging** [3] - 45:3, 47:13, 52:15
**allow** [2] - 44:7, 61:1
**allowed** [5] - 13:8, 14:12, 15:2, 16:14, 30:6
**alluding** [1] - 58:24
**almost** [2] - 9:9, 36:8
**alone** [1] - 67:25
**ALSO** [1] - 2:10
**alternative** [1] - 31:21
**amended** [1] - 25:6
**America** [1] - 25:20
**amount** [3] - 10:3, 28:11, 61:21
**analysis** [1] - 6:16
**Andrew** [5] - 11:2, 34:6, 34:23, 34:24, 35:14
**announcement** [1] - 23:17
**ANSWER** [8] - 17:16, 18:19, 18:22, 19:6, 65:15, 65:17, 65:22, 70:11
**answer** [2] - 28:12, 28:17, 75:16, 77:16, 80:17, 81:12
**answering** [3] - 31:13, 82:4, 85:20
**answers** [5] - 28:10, 32:2, 69:11, 75:21, 80:9
**anti** [2] - 22:24, 24:5
**anti-discrimination** [2] - 22:24, 24:5
**anxious** [2] - 86:12, 87:23
**apologize** [1] - 9:22
**apparent** [1] - 41:9
**appear** [1] - 72:18
**applies** [1] - 53:24
**apply** [4] - 32:2, 64:7, 69:14, 73:5
**appointed** [1] - 38:22
**appreciate** [9] - 17:9, 42:3, 65:3, 86:5, 86:6, 86:15, 87:10, 88:9, 88:13
**appreciated** [1] - 71:25
**appropriate** [1] - 73:5

*approximating* [1] - 46:24
*argue* [2] - 12:7, 15:21
*argument* [4] - 8:8, 61:15, 64:20, 77:23
*arguments* [3] - 4:3, 49:24, 72:15
*arrested* [2] - 62:7, 62:9
*article* [3] - 44:23, 45:6, 54:23
*Asaro* [42] - 10:4, 11:8, 11:10, 11:23, 12:1, 13:8, 13:11, 13:12, 16:3, 16:4, 16:6, 16:8, 17:12, 18:5, 19:19, 19:21, 23:8, 23:9, 23:20, 23:22, 24:12, 24:18, 24:19, 24:20, 24:23, 24:25, 26:25, 28:21, 33:2, 40:16, 44:19, 45:13, 57:1, 63:8, 63:15, 65:4, 66:25, 67:1, 67:4, 67:5, 71:3
*ASARO* [1] - 1:8
*ascribe* [1] - 51:23
*aside* [2] - 48:9, 86:10
*asset* [1] - 80:4
*assignment* [1] - 41:19
*associate* [2] - 8:20, 56:7
*associated* [1] - 6:14
*assume* [2] - 23:15, 65:18
*assumptions* [1] - 28:11
*attacks* [1] - 41:14
*attempted* [1] - 43:21
*attempting* [1] - 53:15
*attention* [4] - 63:5, 65:2, 65:6, 86:4
*attentive* [1] - 86:5
*attentiveness* [1] - 38:10
*attorney* [2] - 43:6, 53:14
*August* [3] - 5:9, 19:23, 29:5
*Australia* [1] - 11:16
*authority* [3] - 24:24, 25:1
*available* [3] - 14:25, 58:20, 74:18
*award* [4] - 36:2, 36:9, 36:25, 61:20
*aware* [4] - 27:17, 40:1, 40:2, 53:15

*awe* [1] - 6:4
*awful* [1] - 62:7

## B

*backdrop* [1] - 47:16
*bad* [4] - 6:7, 27:3, 54:13, 55:4
*ball* [1] - 78:3
*bang* [1] - 56:11
*bar* [1] - 39:2
*base* [1] - 28:2
*based* [21] - 5:21, 6:13, 14:24, 15:16, 18:6, 39:21, 40:23, 41:8, 42:12, 46:24, 53:22, 58:25, 61:2, 64:9, 67:14, 73:24, 74:17, 82:18, 83:1, 83:14, 83:23
*bases* [1] - 61:17
*basis* [3] - 49:6, 52:9, 59:11
*bears* [1] - 52:21
*beat* [1] - 62:12
*became* [1] - 41:9
*becomes* [1] - 26:2
*bed* [1] - 43:15
*begin* [3] - 26:22, 65:10, 65:12
*beginning* [8] - 4:21, 8:25, 45:24, 46:13, 52:13, 55:18, 69:24, 73:8
*begins* [3] - 5:18, 10:12, 26:1
*behalf* [1] - 65:4
*behavior* [2] - 26:9, 49:6
*behind* [1] - 48:17
*behold* [2] - 25:4, 25:7
*belief* [1] - 58:12
*below* [5] - 34:8, 34:14, 35:8, 35:15, 35:16
*bench* [1] - 80:12
*benefit* [2] - 9:5, 28:22
*best* [3] - 38:13, 50:8
*better* [3] - 18:20, 23:12, 30:14
*between* [28] - 8:23, 11:21, 11:22, 11:25, 12:2, 13:15, 16:8, 18:9, 18:12, 19:8, 19:14, 19:17, 19:18, 19:20, 34:3, 36:12, 36:22, 48:11, 66:23, 66:24, 66:25, 67:3, 67:4, 67:5, 67:6, 85:19

*beyond* [1] - 86:2
*bias* [2] - 64:9, 73:15
*big* [4] - 10:16, 21:24, 22:22, 24:13
*bigot* [1] - 63:10
*binder* [2] - 50:11, 76:15
*bit* [10] - 6:12, 35:6, 49:9, 52:12, 52:19, 55:1, 64:17, 86:13, 87:17, 87:25
*blanket* [2] - 24:25, 25:1
*blog* [1] - 74:10
*boat* [1] - 54:9
*bonus* [12] - 34:7, 34:11, 34:14, 34:21, 34:25, 36:5, 36:11, 42:17, 82:13, 82:22, 83:10, 83:18
*bonuses* [1] - 34:5
*boom* [1] - 32:15
*borne* [1] - 54:14
*boss* [1] - 43:8
*boss'* [1] - 43:13
*bothering* [1] - 48:9
*bottom* [2] - 33:1
*bounces* [1] - 26:20
*bound* [1] - 73:7
*box* [1] - 87:19
*branches* [1] - 86:22
*break* [1] - 4:9
*breaking* [1] - 68:25
*brief* [1] - 4:5
*briefly* [2] - 65:22, 65:24
*bring* [9] - 3:22, 49:18, 50:6, 66:13, 66:16, 80:15, 80:22, 81:10, 81:17
*bringing* [1] - 25:14
*brought* [5] - 34:12, 49:19, 50:25, 51:2, 51:5
*Brown* [1] - 10:16
*bugs* [1] - 47:5
*building* [1] - 11:18
*burden* [15] - 4:17, 52:21, 52:25, 53:9, 58:23, 63:25, 64:19, 73:6, 78:22, 79:8, 79:11, 79:14, 79:17, 80:7
*business* [8] - 10:7, 11:5, 30:7, 48:13, 50:3, 60:18, 60:20, 68:12
*busted* [1] - 43:21
*buying* [1] - 57:12
*BY* [2] - 1:19, 2:3

*Byrne* [1] - 1:12

## C

*calculate* [1] - 35:18
*cannot* [1] - 24:5
*capitalized* [1] - 10:10
*card* [1] - 57:12
*care* [8] - 21:25, 26:20, 26:21, 31:1, 32:11, 36:23, 47:9, 51:15
*cared* [2] - 70:23, 70:24
*career* [1] - 35:5
*carefully* [1] - 73:21
*cares* [1] - 7:23
*Carl* [39] - 11:21, 11:25, 12:2, 13:15, 16:9, 17:20, 18:9, 18:13, 19:4, 19:17, 19:19, 19:20, 20:2, 20:5, 21:5, 21:16, 25:18, 26:12, 26:17, 26:19, 30:16, 30:17, 31:7, 31:16, 31:22, 34:3, 66:23, 66:24, 66:25, 72:8, 82:9, 82:17, 82:25, 83:5, 83:13, 83:21, 85:19
*CARL* [1] - 1:3
*carried* [1] - 58:23
*carry* [2] - 53:9, 79:10
*Carson* [28] - 3:13, 4:12, 4:13, 12:6, 14:1, 15:4, 15:13, 17:2, 17:6, 35:1, 38:1, 39:11, 39:13, 40:6, 48:13, 49:14, 50:22, 52:22, 54:3, 54:15, 54:21, 58:7, 64:17, 65:9, 71:7, 72:12, 84:2, 88:4
*CARSON* [47] - 1:19, 3:14, 3:16, 4:14, 12:5, 12:7, 12:11, 12:13, 12:21, 13:4, 13:7, 13:14, 13:20, 13:25, 14:3, 14:7, 14:12, 14:15, 15:2, 15:6, 15:12, 15:18, 15:24, 16:12, 16:23, 17:3, 17:9, 17:12, 19:11, 19:15, 22:8, 22:12, 22:20, 35:2, 38:2, 65:10, 66:19, 71:8, 71:10, 72:13, 77:24, 79:25, 81:14, 84:3, 85:15, 88:5, 88:17
*cARSON* [1] - 77:3

*Carson's* [1] - 53:21
*case* [94] - 4:8, 4:10, 4:21, 4:24, 4:25, 5:2, 6:10, 6:15, 7:22, 8:11, 8:12, 8:18, 9:9, 9:14, 9:18, 9:21, 9:24, 10:8, 11:20, 12:1, 12:22, 13:9, 13:19, 14:18, 15:9, 16:22, 19:16, 19:18, 19:19, 19:21, 21:15, 27:19, 29:15, 32:2, 32:3, 34:1, 36:4, 37:13, 39:2, 39:18, 44:11, 44:12, 46:8, 47:13, 47:15, 47:19, 49:4, 49:10, 49:25, 50:11, 50:22, 51:1, 51:5, 51:11, 52:17, 52:23, 53:11, 53:21, 53:23, 53:25, 54:4, 55:16, 56:17, 60:17, 61:20, 61:25, 63:20, 64:8, 65:3, 66:2, 66:22, 69:13, 69:24, 71:13, 71:20, 71:21, 72:5, 73:19, 74:5, 74:7, 74:13, 74:14, 74:16, 74:17, 74:24, 75:23, 78:10, 78:16, 78:19, 86:17, 86:20, 88:10
*cases* [3] - 15:10, 27:6, 78:24
*Catherine* [1] - 8:20
*caused* [2] - 44:5, 44:23
*Cavalier* [12] - 3:17, 6:11, 16:12, 38:3, 65:8, 66:1, 67:11, 68:2, 70:6, 70:15, 72:19, 88:6
*CAVALIER* [21] - 2:3, 3:7, 3:19, 12:3, 13:1, 19:9, 22:18, 38:4, 66:17, 77:20, 78:1, 78:15, 79:1, 79:24, 80:5, 80:20, 81:16, 85:14, 88:2, 88:7, 88:18
*Cavalier's* [2] - 9:16, 68:9
*cell* [3] - 74:8, 77:6, 80:25
*center* [1] - 18:24
*centers* [4] - 11:13, 11:15, 11:16
*cents* [1] - 29:22
*certain* [6] - 17:13, 27:18, 72:17, 75:9,

77:11, 79:2
**certainly** [11] - 31:25, 45:20, 54:17, 55:5, 59:20, 65:2, 65:5, 78:1, 78:2, 79:1, 79:22
**certify** [1] - 89:2
**Chad** [1] - 35:20
**challenge** [1] - 47:10
**challenged** [1] - 47:10
**chance** [5] - 3:19, 4:5, 64:23, 74:22, 79:2
**change** [8] - 23:16, 23:17, 25:4, 32:13, 32:19, 69:18, 73:23, 74:1
**changed** [3] - 29:12, 70:22, 70:23
**changing** [1] - 43:1
**channel** [1] - 67:1
**character** [1] - 45:19
**charade** [3] - 37:22, 37:23, 37:24
**charge** [3] - 21:25, 22:13, 25:9
**charges** [1] - 43:20
**chat** [2] - 38:6, 74:10
**chatting** [2] - 87:17, 88:14
**Cherry** [1] - 2:4
**chief** [3] - 23:7, 33:11, 65:19
**child** [7] - 43:20, 43:22, 44:25, 45:5, 45:6, 54:25, 62:8
**choose** [1] - 24:2
**chops** [1] - 21:4
**chose** [1] - 40:11
**Chris** [7] - 11:21, 26:19, 47:21, 49:1, 67:6, 68:20, 71:25
**Christmas** [1] - 26:9
**Circuit** [1] - 15:3
**circumstances** [2] - 45:16, 55:6
**citizens** [1] - 38:25
**civic** [2] - 39:5, 87:8
**CIVIL** [1] - 1:3
**Civil** [1] - 85:19
**claim** [8] - 35:21, 36:24, 37:2, 37:3, 69:13, 69:15, 79:15
**claimed** [1] - 41:16
**claiming** [1] - 42:11
**claims** [5] - 47:24, 52:22, 59:8, 67:21, 73:6
**clause** [2] - 22:23, 22:24
**cleanest** [1] - 55:10

**clear** [10] - 39:19, 39:21, 40:17, 41:3, 57:3, 58:4, 70:6, 70:7, 78:22, 79:13
**clearly** [5] - 8:10, 20:22, 45:1, 48:3, 63:14
**client** [46] - 8:2, 9:14, 10:2, 10:8, 10:12, 10:15, 11:4, 11:17, 18:3, 19:21, 20:8, 20:21, 20:22, 20:24, 22:4, 23:2, 24:11, 24:14, 24:21, 25:7, 25:15, 34:8, 34:14, 34:16, 34:17, 35:4, 35:11, 35:14, 35:15, 35:19, 35:23, 36:12, 37:22, 39:15, 51:11, 54:3, 66:6, 66:13, 66:14, 66:19, 68:1, 68:14, 71:11, 71:24, 72:4
**client's** [4] - 10:23, 39:2, 67:14, 68:16
**clients** [2] - 61:19, 65:2
**clock** [1] - 17:8
**close** [1] - 3:6
**closing** [12] - 4:3, 4:13, 6:12, 14:16, 17:4, 17:5, 48:14, 50:23, 53:22, 61:15, 70:3, 72:14
**cloud** [4] - 18:15, 18:18, 18:21, 18:23
**clouded** [1] - 86:23
**co** [3] - 49:12, 51:6, 62:5
**co-workers** [3] - 49:12, 51:6, 62:5
**cold** [1] - 47:5
**collate** [2] - 76:6, 77:5
**colleague** [2] - 8:20, 48:20
**colleagues** [1] - 65:5
**college** [1] - 25:25
**coming** [3] - 27:20, 56:11, 57:4
**Commencing** [1] - 1:14
**comment** [1] - 48:24
**comments** [2] - 20:17, 20:23
**Commission** [7] - 21:17, 21:19, 21:23, 22:13, 22:16, 24:17, 66:10
**communicate** [3] - 74:5, 74:12, 74:16

**communicated** [1] - 17:14
**communication** [1] - 48:5
**communications** [6] - 33:8, 46:14, 46:19, 48:21, 68:11, 68:12
**Companies** [1] - 22:25
**companies** [2] - 6:19, 30:10
**companion** [2] - 43:18, 43:21
**COMPANY** [1] - 1:7
**Company** [1] - 85:20
**company** [35] - 8:13, 8:21, 8:22, 9:3, 11:8, 18:18, 22:14, 33:12, 34:7, 34:11, 35:7, 39:18, 39:24, 40:9, 42:4, 42:7, 45:11, 46:23, 47:18, 47:22, 48:1, 48:7, 52:8, 55:9, 55:25, 56:8, 57:12, 57:25, 58:2, 62:15, 66:15, 68:10, 71:6
**comparable** [1] - 42:16
**compassion** [1] - 62:20
**compensate** [2] - 42:15, 44:7
**compensated** [1] - 41:5
**compensation** [2] - 41:17, 44:2
**compensatory** [2] - 37:1, 37:2
**complained** [6] - 25:5, 44:13, 46:1, 46:8, 47:4, 47:12
**complaining** [1] - 47:4
**complaint** [3] - 70:13, 82:18, 83:14
**complaints** [1] - 39:23
**completely** [2] - 58:12, 78:3
**computer** [2] - 1:24, 74:8
**computer-aided** [1] - 1:24
**computing** [3] - 18:18, 18:21, 18:23
**concern** [1] - 55:1
**concerned** [2] - 43:24, 43:25
**concerning** [1] - 45:19
**concerns** [3] - 54:20, 54:21, 58:14
**concluded** [1] - 17:11

**conclusions** [1] - 7:16
**conduct** [7] - 22:22, 51:21, 52:15, 52:16, 67:22, 74:13, 78:5
**conducted** [1] - 86:3
**confer** [1] - 80:23
**conferred** [2] - 77:21, 77:24
**confidence** [1] - 31:17
**confirm** [2] - 4:25, 72:7
**confirmed** [12] - 5:14, 5:16, 8:1, 8:22, 9:10, 10:14, 10:25, 11:1, 11:17, 38:23, 70:21, 71:17
**confirming** [2] - 33:5, 33:8
**confirms** [1] - 22:3
**confronting** [1] - 56:10
**Congress** [1] - 38:19
**conjuring** [1] - 56:20
**connected** [1] - 51:1
**connection** [1] - 51:14
**consciousness** [1] - 27:8
**consequences** [1] - 27:11
**consider** [17] - 28:5, 31:19, 31:20, 33:24, 36:4, 36:14, 37:1, 37:5, 37:8, 42:6, 45:22, 47:2, 60:21, 64:12, 67:8, 67:20, 73:13
**consideration** [2] - 65:7, 73:20
**considered** [2] - 8:5, 75:11
**considering** [1] - 36:14
**considers** [1] - 36:10
**consistently** [1] - 32:21
**consult** [1] - 73:17
**contacted** [1] - 69:25
**contemporaneous** [2] - 46:1, 48:21
**contend** [1] - 62:6
**context** [1] - 78:18
**continued** [1] - 29:5
**continues** [2] - 5:19, 40:6
**continuing** [1] - 21:11
**contradict** [1] - 72:5
**contradiction** [2] - 42:19, 44:10
**contradictory** [1] - 71:24

**control** [2] - 11:23, 57:6
**conversation** [3] - 21:8, 25:11, 33:6
**conversations** [2] - 17:20, 20:23
**convey** [1] - 76:1
**conveyance** [1] - 79:16
**convicted** [1] - 44:25
**convictions** [1] - 73:25
**convince** [2] - 53:15, 62:10
**Conway** [10] - 7:18, 8:1, 8:5, 8:9, 8:22, 41:11, 51:1, 51:8, 72:7, 72:8
**cooked** [1] - 33:18
**copied** [1] - 71:1
**copy** [2] - 49:23, 76:5
**core** [1] - 15:22
**corporate** [4] - 8:11, 8:12, 8:14, 8:19
**correct** [8] - 8:2, 9:2, 17:20, 18:24, 26:10, 65:21, 77:18, 89:2
**couches** [1] - 44:6
**counsel** [1] - 67:7
**counsels'** [1] - 85:12
**couple** [6] - 42:25, 43:19, 62:3, 71:12, 72:10, 78:23
**course** [4] - 20:1, 27:13, 47:11, 73:22
**court** [21] - 3:1, 38:16, 38:17, 38:18, 38:20, 38:22, 39:8, 49:20, 50:4, 50:6, 53:1, 58:17, 58:18, 58:19, 63:6, 72:22, 72:25, 74:4, 75:3, 81:7
**COURT** [64] - 1:1, 3:4, 3:8, 3:15, 3:17, 3:21, 3:25, 12:4, 12:6, 12:9, 12:19, 12:25, 13:6, 13:11, 13:18, 13:22, 14:1, 14:5, 14:10, 14:13, 14:21, 15:4, 15:7, 15:13, 15:20, 16:3, 16:17, 17:1, 17:6, 19:10, 19:13, 22:19, 35:1, 38:1, 38:3, 65:8, 66:18, 71:7, 71:9, 72:12, 72:14, 76:24, 77:4, 77:21, 78:9, 78:16, 79:13, 80:2, 80:6, 80:21, 81:8, 81:17, 81:20, 81:24,

*82:6, 83:25, 84:4, 85:12, 85:16, 85:25, 87:15, 88:3, 88:6, 88:9*
**Court** *[9] - 1:11, 1:22, 64:6, 82:4, 85:18, 85:21, 87:10, 88:8, 89:5*
**Courthouse** *[1] - 1:12*
**courtroom** *[10] - 3:24, 60:16, 74:18, 75:19, 76:23, 81:2, 81:19, 86:25, 87:14*
**COURTROOM** *[24] - 2:13, 3:3, 3:23, 76:22, 81:6, 81:18, 82:1, 82:7, 82:16, 82:24, 83:4, 83:12, 83:20, 84:5, 84:9, 84:14, 84:18, 84:22, 85:1, 85:5, 85:11, 85:17, 85:24, 87:13*
**courts** *[1] - 87:3*
**cover** *[1] - 56:16*
**covering** *[1] - 61:17*
**crafted** *[1] - 41:22*
**cram** *[1] - 53:6*
**crazy** *[1] - 6:14*
**create** *[2] - 68:24, 69:1*
**creates** *[2] - 28:9, 28:15*
**credibility** *[5] - 4:22, 42:20, 42:22, 44:8, 44:11*
**credible** *[2] - 25:16, 54:10*
**cried** *[1] - 43:15*
**crimes** *[3] - 6:14, 44:25, 62:7*
**crisis** *[2] - 30:23, 55:8*
**critical** *[1] - 60:10*
**cropping** *[1] - 57:24*
**cross** *[1] - 47:11*
**cross-examination** *[1] - 47:11*
**crying** *[1] - 26:14*
**current** *[1] - 78:14*
**custom** *[1] - 41:22*
**CYA** *[1] - 61:16*

**D**

**d/b/a** *[2] - 1:7, 1:7*
**daily** *[1] - 38:13*
**damage** *[3] - 37:1, 37:2, 69:13*
**damages** *[6] - 33:25, 34:1, 43:3, 69:15, 78:18*
**Dampf** *[4] - 11:3,*

*34:23, 34:24, 35:14*
**Dampf's** *[1] - 34:6*
**Dan** *[44] - 10:4, 18:5, 18:9, 18:12, 19:17, 19:20, 20:9, 20:21, 20:23, 21:8, 23:7, 23:18, 23:21, 23:23, 24:11, 24:12, 24:24, 24:25, 25:3, 25:13, 26:16, 26:23, 28:22, 29:13, 30:18, 31:15, 33:7, 34:17, 36:18, 36:21, 51:7, 57:4, 57:11, 57:16, 65:12, 66:8, 66:24, 66:25, 67:3, 67:5, 70:8, 72:8*
**DANIEL** *[1] - 1:8*
**dare** *[1] - 46:23*
**data** *[5] - 11:13, 11:15, 11:16, 18:24*
**Date** *[1] - 89:7*
**date** *[4] - 21:21, 21:22, 22:3, 75:18*
**DAY** *[1] - 1:6*
**days** *[9] - 29:11, 29:13, 37:10, 38:10, 42:21, 43:15, 50:18, 63:4, 72:10*
**deaf** *[2] - 20:12, 50:21*
**deafness** *[1] - 50:21*
**deal** *[4] - 22:22, 24:13, 57:17, 80:16*
**dealing** *[2] - 68:18, 70:18*
**deals** *[3] - 78:11, 78:16, 78:17*
**dealt** *[1] - 15:9*
**December** *[1] - 29:8*
**decide** *[15] - 39:1, 39:8, 42:18, 50:9, 58:17, 58:22, 61:4, 62:21, 64:7, 64:8, 69:17, 72:24, 73:5, 73:19, 74:17*
**decided** *[1] - 27:11*
**deciding** *[1] - 72:25*
**decision** *[12] - 44:20, 44:21, 58:15, 59:22, 59:24, 73:2, 73:16, 74:24, 82:11, 82:19, 83:7, 83:15*
**decisions** *[3] - 60:2, 60:6, 61:7*
**deeply** *[2] - 40:13, 79:3*
**defend** *[1] - 63:17*
**Defendant** *[1] - 2:5*
**defendant** *[3] - 4:4, 52:23, 85:22*

**defendant's** *[3] - 28:12, 28:14, 37:17*
**defendants** *[12] - 4:25, 5:15, 6:2, 6:24, 7:3, 7:10, 7:13, 7:19, 10:18, 12:7, 21:12, 31:20*
**Defendants** *[2] - 1:9, 10:4*
**defense** *[3] - 9:7, 67:7, 85:14*
**deficient** *[1] - 71:3*
**defines** *[1] - 61:7*
**definitely** *[1] - 15:25*
**deliberate** *[7] - 4:10, 42:7, 45:23, 61:11, 62:13, 72:15, 73:18*
**deliberating** *[3] - 31:10, 67:20, 74:3*
**deliberation** *[1] - 47:9*
**deliberations** *[7] - 4:7, 38:7, 48:25, 64:24, 72:21, 73:22, 74:5*
**deliver** *[1] - 4:13*
**demanding** *[1] - 54:17*
**demographic** *[1] - 8:3*
**demonstrate** *[1] - 7:2*
**demote** *[1] - 41:17*
**denials** *[1] - 21:9*
**denied** *[1] - 23:22*
**deny** *[7] - 10:18, 21:8, 25:3, 82:13, 82:21, 83:9, 83:17*
**department** *[4] - 21:11, 34:21, 36:17, 71:5*
**deposition** *[2] - 28:25, 30:18*
**DEPUTY** *[24] - 2:13, 3:3, 3:23, 76:22, 81:6, 81:18, 82:1, 82:7, 82:16, 82:24, 83:4, 83:12, 83:20, 84:5, 84:9, 84:14, 84:18, 84:22, 85:1, 85:5, 85:11, 85:17, 85:24, 87:13*
**DEREK** *[1] - 1:18*
**deserves** *[1] - 9:19*
**designed** *[3] - 7:8, 7:9*
**designee** *[4] - 8:11, 8:13, 8:14, 8:19*
**desirable** *[1] - 41:18*
**desk** *[1] - 47:5*
**despicable** *[1] - 61:1*
**determinations** *[1] - 42:23*
**determinative** *[8] - 59:15, 59:22, 61:6, 61:7, 82:10, 82:19,*

*83:7, 83:15*
**determine** *[2] - 44:9, 76:3*
**determining** *[1] - 60:14*
**device** *[1] - 74:7*
**difference** *[3] - 35:3, 36:12, 62:16*
**differences** *[1] - 35:19*
**different** *[5] - 24:17, 26:5, 54:18, 78:3, 79:14*
**differently** *[2] - 40:23, 59:9*
**difficult** *[1] - 22:20*
**digital** *[2] - 46:22, 48:6*
**dinners** *[1] - 48:4*
**dire** *[1] - 86:3*
**direct** *[6] - 24:19, 43:5, 45:5, 46:22, 48:15, 75:20*
**direction** *[1] - 8:25*
**directly** *[4] - 12:17, 15:24, 25:25*
**director** *[15] - 23:11, 23:12, 34:18, 35:4, 35:20, 36:16, 36:19, 36:22, 42:4, 43:2, 46:14, 46:18, 46:23, 70:12*
**disagree** *[3] - 58:10, 60:20, 73:10*
**disappeared** *[1] - 25:10*
**disbelieve** *[2] - 67:17, 67:21*
**discharged** *[1] - 75:21*
**disciplinary** *[1] - 29:18*
**discipline** *[5] - 29:17, 29:25, 30:2, 30:11, 40:10*
**disciplined** *[2] - 30:10, 57:7*
**disclaim** *[1] - 25:3*
**disclose** *[1] - 7:9*
**discovery** *[3] - 12:14, 12:24, 15:6*
**discriminate** *[2] - 24:6, 42:8*
**discriminated** *[4] - 53:19, 59:10, 60:12, 61:2*
**discriminating** *[1] - 52:9*
**discrimination** *[44] - 21:14, 22:6, 22:9, 22:15, 22:24, 23:25, 24:5, 37:6, 39:19,*

*39:21, 39:23, 40:3, 40:18, 40:19, 40:20, 40:21, 43:3, 44:14, 44:15, 46:3, 46:20, 46:21, 47:1, 47:18, 48:22, 48:23, 50:14, 51:18, 52:2, 52:5, 56:14, 56:15, 58:9, 60:19, 63:10, 67:24, 70:7, 70:13, 70:14, 70:19, 82:18, 83:14*
**Discrimination** *[1] - 83:4*
**discriminatory** *[6] - 58:25, 59:14, 59:19, 59:21, 60:1, 60:3*
**discuss** *[1] - 74:22*
**discussions** *[1] - 76:18*
**disfavored** *[1] - 24:6*
**disgusted** *[1] - 45:10*
**disparate** *[1] - 67:20*
**dispatch** *[1] - 4:7*
**disputes** *[3] - 39:1, 39:7, 39:8*
**disregard** *[2] - 62:19, 71:22*
**distress** *[10] - 37:3, 37:9, 37:10, 43:17, 43:20, 43:24, 44:3, 44:5, 62:11*
**distressed** *[1] - 43:24*
**DISTRICT** *[3] - 1:1, 1:1, 1:16*
**District** *[4] - 1:11, 3:2, 38:16*
**districts** *[1] - 38:19*
**doctor** *[1] - 43:14*
**document** *[17] - 5:19, 5:20, 21:17, 22:2, 22:3, 23:2, 23:4, 29:6, 32:22, 33:20, 46:3, 46:11, 47:8, 47:12, 47:15, 59:4, 66:10*
**documentation** *[2] - 44:12, 49:17*
**documented** *[1] - 45:25*
**documenting** *[1] - 33:2*
**documents** *[19] - 5:24, 13:2, 13:9, 13:12, 13:13, 14:8, 14:17, 14:22, 14:25, 15:15, 16:7, 16:13, 17:13, 19:23, 46:25, 49:3, 53:3, 62:4*
**dollar** *[1] - 71:5*
**done** *[6] - 3:11, 4:18,*

15:13, 32:6, 39:6, 73:1
**door** [4] - 16:16, 16:19, 46:22, 48:6
**doubt** [4] - 5:1, 9:5, 32:4, 62:2
**down** [10] - 29:11, 30:12, 38:20, 61:14, 64:11, 75:1, 75:7, 75:9, 76:11, 78:10
**downside** [1] - 88:11
**dozens** [1] - 55:19
**draw** [6] - 14:11, 14:24, 15:16, 15:18, 55:22, 72:19
**drawn** [1] - 15:20
**drove** [1] - 26:14
**dude** [1] - 26:12
**due** [2] - 55:25, 60:12
**Duff** [1] - 34:14
**during** [17] - 11:20, 23:23, 25:11, 26:4, 31:5, 38:10, 40:2, 40:14, 48:14, 49:13, 50:17, 50:22, 51:18, 64:20, 73:1, 73:12, 74:5
**duties** [3] - 4:7, 72:23, 73:14
**duty** [4] - 39:6, 73:4, 73:17, 76:2

### E

**e-mail** [1] - 68:21
**eager** [1] - 61:10
**earned** [1] - 36:13
**earning** [3] - 35:5, 35:8, 35:9
**easier** [1] - 12:18
**easiest** [1] - 6:22
**easily** [1] - 18:2
**EASTERN** [1] - 1:1
**Eastern** [2] - 1:11, 38:16
**easy** [3] - 4:22, 4:24, 76:11
**education** [1] - 87:8
**EEOC** [1] - 46:5
**effect** [1] - 27:4
**effective** [1] - 42:4
**efforts** [2] - 65:6, 88:13
**either** [15] - 9:10, 26:6, 39:23, 45:11, 54:2, 59:11, 59:19, 65:24, 71:17, 82:11, 82:20, 83:7, 83:15, 87:20, 87:24
**electronic** [4] - 68:10,

68:12, 74:7, 74:15
**elicits** [2] - 26:23, 26:24
**email** [5] - 3:5, 31:2, 68:20, 69:3, 72:3
**emails** [1] - 31:3
**eminently** [1] - 45:16
**emotional** [10] - 37:3, 37:9, 37:10, 43:17, 43:20, 43:24, 44:3, 44:4, 44:5, 62:11
**employee** [6] - 40:10, 40:13, 41:2, 54:24, 70:23
**employees** [12] - 11:9, 39:23, 40:8, 41:5, 63:7, 79:25, 80:1, 82:12, 82:20, 83:8, 83:16
**employer** [3] - 22:22, 54:7, 57:23
**employers** [1] - 58:12
**employment** [7] - 17:15, 26:15, 40:3, 41:4, 44:21, 59:23, 61:6
**Employment** [1] - 83:5
**encourage** [1] - 50:10, 70:20, 86:18, 87:5
**encouraged** [2] - 24:9, 70:13
**end** [7] - 4:16, 38:5, 39:14, 41:4, 47:15, 64:3, 68:1
**ended** [1] - 9:16
**ends** [2] - 29:21
**engaged** [1] - 86:5
**engineering** [4] - 21:10, 52:5, 67:2, 67:3
**enjoy** [1] - 62:5
**enjoyed** [2] - 49:11, 62:5
**enlighten** [1] - 7:8
**enters** [2] - 3:24, 81:19
**entire** [7] - 9:9, 35:5, 42:22, 51:10, 53:21, 71:12
**entirely** [1] - 78:21
**entitled** [3] - 45:21, 54:6, 89:3
**entity's** [1] - 78:18
**environment** [2] - 83:1, 83:22
**equal** [1] - 28:8
**especially** [2] - 41:23, 53:10
**ESQUIRE** [4] - 1:19,

2:3, 2:3, 2:4
**essentially** [4] - 38:25, 39:15, 48:19, 53:22
**establish** [1] - 79:4
**established** [2] - 38:19, 73:6
**establishing** [2] - 40:25, 41:7
**estimates** [1] - 86:3
**et** [1] - 85:20
**ethic** [1] - 25:23
**event** [1] - 72:1
**everything-but-the-kitchen-sink** [1] - 27:15
**evidence** [91] - 7:2, 7:11, 9:10, 13:2, 13:18, 13:23, 23:13, 27:7, 27:19, 28:6, 28:13, 29:2, 29:6, 29:14, 29:15, 31:4, 31:15, 31:19, 32:8, 33:24, 34:13, 37:16, 40:25, 41:7, 46:1, 46:4, 46:7, 49:2, 49:3, 49:10, 49:24, 50:2, 50:5, 50:8, 52:17, 53:2, 53:3, 53:7, 53:11, 55:13, 56:11, 56:13, 56:14, 56:15, 56:16, 56:17, 58:6, 58:9, 58:20, 58:24, 59:2, 59:10, 59:19, 61:24, 62:22, 63:1, 64:10, 64:12, 64:13, 64:16, 66:2, 66:12, 66:14, 67:8, 68:7, 68:8, 68:19, 68:25, 69:9, 69:20, 69:21, 71:22, 72:17, 72:24, 73:20, 73:24, 73:25, 74:17, 74:21, 82:9, 82:18, 82:25, 83:6, 83:14, 83:22
**exacerbated** [1] - 44:11
**exact** [2] - 36:8, 57:14
**exactly** [8] - 24:21, 29:3, 40:24, 45:13, 78:19, 79:19, 80:5, 87:1
**examination** [3] - 24:19, 47:11, 48:15
**examine** [1] - 73:23
**example** [5] - 4:23, 67:12, 75:8, 79:23, 80:3
**examples** [1] - 7:6
**except** [1] - 63:17
**exclusive** [1] - 76:2

**excuse** [5] - 28:24, 42:8, 57:14, 58:3, 87:9
**exercise** [1] - 41:25
**Exhibit** [5] - 29:23, 32:25, 33:1, 47:8, 48:25
**exhibits** [8] - 46:5, 50:11, 72:17, 72:18, 76:14, 76:25, 80:23, 80:24
**exist** [3] - 16:9, 27:21, 33:19
**existed** [1] - 51:3
**exists** [1] - 12:22
**exits** [2] - 76:23, 87:14
**expect** [2] - 14:18, 16:13
**expectations** [1] - 4:8
**experience** [5] - 10:3, 10:5, 49:11, 71:4, 87:5
**experienced** [2] - 26:6, 51:17
**explain** [3] - 4:16, 28:15, 41:12
**explanation** [1] - 28:2
**exposed** [1] - 45:2
**express** [1] - 88:7
**extent** [1] - 87:4
**external** [1] - 44:6
**extremely** [1] - 26:2
**eye** [1] - 87:21

### F

**face** [1] - 68:17
**Facebook** [1] - 74:11
**facilitate** [1] - 18:6
**facing** [2] - 29:25, 30:12
**fact** [15] - 9:6, 9:9, 15:16, 44:12, 44:23, 47:14, 51:19, 56:18, 62:6, 62:23, 63:3, 63:6, 67:14, 67:25, 68:16
**factor** [8] - 59:15, 59:22, 61:6, 61:7, 82:10, 82:19, 83:7, 83:15
**facts** [12] - 53:23, 53:25, 54:1, 54:2, 64:7, 64:21, 72:24, 72:25, 73:2, 73:5, 79:10, 79:18
**factual** [2] - 78:20, 79:4
**failed** [1] - 53:9
**fair** [8] - 12:13, 13:10,

15:3, 16:15, 36:14, 45:17, 56:4
**fairly** [3] - 57:19, 73:14, 79:17
**fairness** [1] - 58:18
**fall** [1] - 53:22
**fallout** [1] - 43:19
**falls** [1] - 68:16
**false** [11] - 7:15, 18:6, 29:7, 33:15, 33:16, 33:17, 33:22, 68:24, 69:10, 71:14
**familiar** [1] - 48:3
**families** [2] - 38:12, 63:25
**family** [1] - 25:21
**far** [3] - 36:16, 56:12, 63:6
**fast** [1] - 71:5
**fast-growing** [1] - 71:5
**fastest** [1] - 11:10
**favor** [8] - 39:15, 44:7, 64:16, 67:14, 68:16, 68:17, 69:18, 85:22
**FBI** [2] - 71:16, 71:17
**fear** [4] - 55:5, 68:21, 71:19
**fears** [2] - 6:5, 7:4
**February** [1] - 8:24
**federal** [1] - 38:18
**feelings** [1] - 58:19
**fellow** [3] - 73:21, 74:1, 84:24
**felt** [5] - 43:21, 45:9, 48:16, 48:19, 63:14
**few** [5] - 11:14, 11:17, 38:6, 76:5, 87:11
**figure** [1] - 6:18
**file** [2] - 22:13, 29:18, 33:3
**filed** [5] - 23:2, 23:4, 24:15, 24:16, 42:14
**fill** [2] - 75:18, 76:7
**filled** [1] - 21:19
**final** [4] - 4:6, 26:15, 32:5, 76:14
**finally** [4] - 38:5, 55:7, 61:4, 63:24
**financial** [1] - 33:11
**financials** [7] - 77:13, 77:19, 77:20, 78:1, 78:3, 78:13, 78:18
**fine** [1] - 15:24
**finished** [4] - 4:2, 4:20, 64:24, 75:11
**fire** [3] - 29:17, 55:25, 56:9
**fired** [7] - 27:25, 29:7, 33:6, 33:8, 33:12,

33:15, 58:8
**firing** [2] - 55:2, 56:1
**firings** [1] - 25:2
**first** [18] - 4:4, 11:2, 17:17, 22:15, 24:18, 29:18, 31:22, 38:10, 39:9, 39:10, 56:23, 59:20, 64:19, 72:23, 78:4, 78:11, 81:13, 81:15
**First** [2] - 24:18, 39:18
**fish** [1] - 48:4
**fit** [2] - 26:5, 37:17
**five** [5] - 3:10, 3:14, 35:1, 35:2, 62:17
**Five** [1] - 3:15
**five-minute** [2] - 3:10, 3:14
**Five-minute** [1] - 3:15
**five-minutes** [2] - 35:1, 35:2
**fixed** [1] - 25:6
**flagged** [1] - 78:23
**flat** [2] - 45:11, 58:15
**flat-out** [1] - 58:15
**flaw** [1] - 45:19
**flip** [1] - 50:12
**flow** [1] - 33:25
**focuses** [1] - 46:6
**folks** [2] - 38:5, 61:10
**follow** [4] - 64:14, 64:15, 73:8, 76:12
**following** [1] - 49:23
**follows** [1] - 12:12
**force** [2] - 40:8, 70:17
**Ford** [5] - 33:10, 33:11, 57:2, 57:11, 57:17
**foregoing** [1] - 89:2
**foreperson** [11] - 72:21, 75:1, 75:18, 75:20, 82:1, 84:7, 84:12, 84:16, 84:20, 85:3, 85:9
**FOREPERSON** [8] - 81:23, 82:5, 82:15, 82:23, 83:3, 83:11, 83:19, 83:24
**form** [5] - 12:24, 75:15, 75:16, 75:19, 75:25
**former** [2] - 48:20, 54:24
**formula** [1] - 37:8
**Forrester** [1] - 11:2
**forth** [2] - 41:16, 79:9
**forum** [1] - 63:4
**forward** [2] - 40:14, 52:12
**foundation** [1] - 8:18

**founder** [1] - 48:1
**four** [9] - 42:21, 43:21, 46:16, 46:22, 46:25, 50:18, 52:5, 52:6, 62:6
**four-man** [1] - 52:5
**frankly** [5] - 51:14, 54:10, 55:14, 57:20, 79:2
**fraudulent** [1] - 79:16
**free** [3] - 63:25, 73:23, 76:19
**Friday** [1] - 49:22
**friend** [1] - 20:3
**friendly** [1] - 49:12
**friends** [1] - 25:14
**friendship** [1] - 46:24
**front** [4] - 15:14, 20:15, 53:8, 80:8
**frustrating** [1] - 41:14
**Fu** [1] - 66:23
**full** [2] - 63:5, 73:19
**fun** [2] - 20:13, 50:20
**funny** [2] - 20:18, 52:10
**future** [1] - 69:6

## G

**gain** [1] - 51:13
**Galloway** [6] - 10:12, 10:13, 10:15, 10:16, 10:17, 11:8
**game** [4] - 12:13, 13:10, 15:3, 78:4
**games** [1] - 70:16
**gate** [1] - 44:18
**gather** [1] - 76:24
**gay** [5] - 42:9, 51:17, 52:7, 57:15
**generally** [3] - 21:8, 78:12, 87:18
**generous** [1] - 26:19
**Gentlemen** [2] - 9:21, 14:17
**gentlemen** [4] - 22:14, 23:25, 32:20, 66:21
**giant** [1] - 87:24
**girls** [1] - 48:18
**given** [9] - 23:14, 51:21, 54:8, 54:23, 56:6, 60:1, 77:6, 78:7, 80:25
**global** [2] - 10:9, 11:18
**gloves** [1] - 57:18
**government** [1] - 86:23
**graduated** [3] - 25:24, 25:25, 26:1

**grand** [2] - 62:17
**gratitude** [1] - 88:7
**great** [3] - 22:1, 23:15, 57:13
**grew** [1] - 25:19
**grievances** [1] - 47:7
**GROUP** [1] - 1:18
**GroupMe** [1] - 74:12
**grow** [1] - 11:5, 21:11
**growing** [4] - 5:4, 10:6, 10:9, 71:5
**growth** [1] - 11:10
**guess** [3] - 3:14, 5:24, 80:10
**guidance** [1] - 37:4
**guilty** [1] - 27:8
**gun** [1] - 49:19
**gut** [2] - 45:10, 77:9
**guy** [32] - 8:4, 8:5, 11:4, 20:12, 20:16, 21:2, 26:13, 26:19, 27:20, 35:23, 36:7, 45:17, 54:11, 54:13, 55:3, 57:5, 57:9, 57:15, 57:17, 57:23, 62:5, 62:8, 62:9, 62:14, 62:17, 62:23, 66:6, 68:18, 71:1, 71:4, 72:9, 72:10
**guys** [13] - 6:6, 7:25, 17:14, 17:23, 18:2, 18:17, 22:8, 23:14, 30:7, 48:17, 52:6, 53:16, 54:5

## H

**hacking** [1] - 41:13
**Haddonfield** [1] - 20:20
**half** [6] - 6:19, 30:3, 63:23, 69:17, 71:7, 71:9
**Hall** [1] - 38:21
**hand** [1] - 42:11
**handbook** [1] - 70:23
**handbooks** [1] - 39:20
**handle** [2] - 20:5, 37:4, 55:9
**hang** [1] - 86:12
**hanging** [1] - 63:23
**hangs** [1] - 45:18
**happy** [6] - 68:5, 68:6, 68:7, 71:25, 79:5
**harassing** [1] - 40:9
**harassment** [2] - 40:11, 44:15
**hard** [4] - 4:23, 62:23
**harms** [1] - 42:16
**harsh** [2] - 56:5, 60:21

**hatched** [1] - 29:3
**hate** [1] - 26:8
**HBO** [1] - 43:9
**head** [1] - 43:6
**heading** [1] - 59:4
**headquarters** [1] - 72:2
**heads** [1] - 33:18
**hear** [18] - 4:2, 6:10, 10:7, 14:16, 20:20, 21:8, 22:15, 25:8, 31:9, 40:25, 41:7, 59:25, 70:3, 72:9, 77:23, 79:20, 81:12, 81:14
**heard** [75] - 4:25, 5:3, 5:11, 5:14, 9:6, 10:4, 10:6, 10:24, 11:23, 13:1, 13:6, 13:10, 14:8, 15:24, 16:17, 17:12, 19:16, 19:18, 19:19, 19:21, 20:15, 20:16, 20:17, 20:23, 21:13, 24:12, 24:25, 26:8, 27:14, 27:16, 27:19, 30:9, 33:25, 34:5, 35:20, 36:18, 37:13, 40:7, 41:11, 41:12, 43:5, 43:16, 48:18, 49:13, 49:14, 49:16, 50:17, 50:22, 52:22, 54:13, 54:16, 54:18, 55:18, 56:12, 56:13, 56:23, 56:25, 57:1, 57:2, 59:25, 63:8, 63:15, 64:2, 66:1, 66:22, 67:11, 68:20, 68:21, 71:16, 72:14, 72:25
**hearing** [2] - 61:12, 77:14
**hearken** [1] - 85:17
**hears** [1] - 21:3
**heart** [1] - 44:11
**held** [2] - 3:1, 23:5
**hellish** [1] - 47:17
**help** [3] - 26:23, 26:24, 37:15
**helped** [3] - 11:5, 38:25, 62:8
**helpful** [1] - 52:13
**herring** [1] - 53:20
**hide** [3] - 27:2, 37:19, 37:20
**high** [2] - 25:24, 79:17
**highest** [1] - 41:2
**highly** [1] - 41:5
**highly-compensated** [1] - 41:5
**himself** [3] - 48:12,

**hire** [1] - 54:25
**hired** [6] - 8:4, 11:3, 34:24, 41:2, 41:8, 71:3
**hirings** [1] - 25:2
**historic** [1] - 38:17
**hit** [2] - 45:9, 52:11
**hitman** [1] - 54:25
**hits** [1] - 30:15
**hole** [1] - 53:6
**home** [6] - 26:14, 38:18, 43:14, 50:5, 86:12, 87:23
**honest** [3] - 28:18, 58:13, 73:24
**honestly** [2] - 45:9, 71:2
**Honor** [17] - 4:14, 12:5, 12:13, 14:12, 15:6, 15:12, 17:9, 19:11, 38:2, 38:4, 49:22, 59:5, 84:3, 88:2, 88:5, 88:17, 88:18
**honor** [2] - 39:1, 64:5
**Honorable** [1] - 3:1
**HONORABLE** [1] - 1:15
**hope** [3] - 38:14, 53:22, 64:23
**hoped** [1] - 39:4
**hopefully** [1] - 87:11
**horrible** [2] - 50:23, 63:13
**horse** [1] - 51:12
**hospitality** [1] - 88:8
**hostile** [2] - 83:1, 83:22
**house** [4] - 66:14, 66:15, 66:20, 66:21
**HR** [2] - 71:4, 71:5
**Human** [7] - 21:17, 21:18, 21:22, 22:13, 22:16, 24:16, 66:9
**human** [4] - 39:24, 46:14, 46:17, 46:23
**hundred** [4] - 14:1, 14:16, 46:15, 46:19
**hundreds** [1] - 11:9
**hurt** [2] - 43:12, 58:19

## I

**idea** [11] - 5:5, 5:6, 9:17, 14:25, 16:20, 30:17, 31:22, 46:7, 50:7, 70:11, 70:12
**identity** [1] - 43:13
**ignorant** [2] - 48:24,

50:19
*ignore* [3] - 53:23, 63:1, 63:2
*ignored* [1] - 30:25
*ill* [1] - 41:10
*illegal* [3] - 22:22, 24:6, 55:24
*imagine* [1] - 46:18
*impartial* [1] - 73:20
*importance* [1] - 51:23
*important* [7] - 5:2, 27:6, 34:23, 51:10, 73:13, 74:16, 88:10
*importantly* [1] - 57:2
*impressive* [1] - 41:8
*inability* [1] - 41:13
*inaccurate* [1] - 74:19
*inappropriate* [1] - 20:12
*incarcerated* [1] - 43:22
*included* [2] - 39:20, 39:22
*includes* [1] - 73:11
*including* [2] - 59:11, 62:4
*income* [3] - 23:17, 35:4, 36:21
*incomplete* [1] - 74:19
*inconsistency* [1] - 44:2
*incorrect* [1] - 7:16
*indeed* [1] - 4:18
*Independence* [1] - 38:21
*indicate* [3] - 49:4, 55:16, 56:3
*indications* [1] - 62:4
*industry* [5] - 10:3, 10:5, 21:3, 26:1, 26:2
*inexplicable* [1] - 44:1
*inference* [7] - 14:11, 14:24, 15:16, 15:19, 15:20, 55:22, 58:20
*inferences* [1] - 72:19
*inferring* [1] - 58:24
*infidelity* [1] - 48:19
*influence* [3] - 73:2, 73:16, 74:23
*Information* [1] - 74:20
*information* [7] - 7:9, 18:23, 66:20, 74:6, 74:13, 74:18, 74:23
*infrastructure* [1] - 10:9
*innuendo* [1] - 53:4
*Instagram* [1] - 74:12
*instance* [4] - 40:8,

47:12, 50:13, 59:20
*instead* [4] - 51:16, 53:15, 56:10
*instruct* [1] - 73:7
*instructed* [1] - 59:6
*instruction* [2] - 4:6, 59:4
*instructions* [19] - 15:9, 49:22, 56:3, 58:6, 59:7, 60:22, 62:19, 63:2, 72:16, 73:9, 73:11, 73:12, 73:13, 75:25, 76:4, 76:9, 77:2, 80:22, 80:24
*instrumental* [3] - 10:6, 10:8, 11:18
*integrity* [1] - 25:22
*intended* [3] - 6:4, 6:5, 75:25
*intention* [1] - 73:18
*intentional* [3] - 60:19, 67:24, 72:19
*intentionally* [1] - 59:10
*interested* [1] - 57:21
*interesting* [3] - 42:10, 52:3
*internet* [6] - 54:25, 74:9, 74:10, 74:18, 74:20
*interrogatories* [4] - 32:13, 69:11, 82:4, 85:21
*interviewed* [5] - 8:10, 8:24, 8:25, 9:3, 9:4
*interviews* [2] - 20:11, 20:12
*introduced* [1] - 13:22
*introductions* [1] - 11:20
*invest* [1] - 86:8
*investigate* [1] - 74:15
*investigated* [1] - 33:14
*investigation* [10] - 5:13, 5:17, 5:18, 5:21, 26:22, 30:3, 32:12, 33:3, 71:16, 71:18
*irrelevant* [1] - 78:5
*issue* [19] - 5:2, 15:6, 15:8, 15:11, 44:8, 49:5, 49:15, 57:20, 58:22, 60:13, 63:20, 77:12, 78:5, 78:23, 79:3, 79:7, 79:19, 79:20, 85:18
*issues* [7] - 5:13, 12:24, 45:5, 45:6,

47:19, 47:22, 62:8
*itching* [1] - 57:8
*itself* [1] - 52:20

## J

*JACKSON* [1] - 2:2
*James* [1] - 1:12
*January* [4] - 1:13, 29:11, 41:22, 89:7
*Jersey* [1] - 52:6
*JILL* [1] - 2:3
*Jimmy* [1] - 48:12
*job* [10] - 4:16, 11:19, 23:18, 25:4, 35:25, 44:3, 47:24, 62:3, 72:25, 73:7
*jobs* [1] - 38:12
*John* [16] - 5:13, 16:12, 21:9, 21:24, 30:17, 34:18, 55:20, 60:4, 60:12, 66:1, 66:12, 66:19, 68:6, 68:9, 71:11, 71:18
*John's* [1] - 68:8
*joins* [1] - 85:19
*JONATHAN* [1] - 2:3
*JOSHUA* [2] - 1:15, 3:2
*journey* [1] - 4:15
*judge* [3] - 14:8, 38:23, 60:14
*Judge* [13] - 3:2, 6:16, 31:10, 60:1, 60:10, 61:4, 62:20, 62:21, 64:8, 64:14, 64:18, 68:3, 79:6
*JUDGE* [1] - 1:16
*judge's* [1] - 56:3
*Judge's* [4] - 58:6, 59:3, 59:24, 63:2
*judges* [1] - 38:22
*judgment* [4] - 45:21, 60:18, 60:20, 75:11
*judicial* [1] - 38:19
*juries* [2] - 38:24, 39:7
*juror* [3] - 75:12, 75:13, 84:5
*JUROR* [7] - 84:8, 84:13, 84:17, 84:21, 84:25, 85:4, 85:10
*Juror* [6] - 84:9, 84:14, 84:18, 84:22, 85:1, 85:7
*jurors* [9] - 64:6, 65:3, 72:23, 73:17, 73:21, 74:1, 84:24, 87:16, 88:14
*jury* [32] - 3:22, 3:23, 13:20, 13:22, 14:11,

14:24, 15:14, 21:18, 38:9, 39:12, 49:23, 50:9, 50:10, 55:14, 72:15, 72:20, 75:12, 75:17, 80:14, 80:16, 80:18, 81:9, 81:12, 81:14, 81:18, 82:1, 82:3, 84:2, 85:17, 86:1, 87:19
*JURY* [2] - 1:5, 85:23
*Jury* [5] - 3:24, 14:17, 76:23, 81:19, 87:14
*jury's* [2] - 9:20, 78:8

## K

*Kaufman* [1] - 35:8
*Kaufman's* [1] - 34:7
*keep* [3] - 3:8, 32:18, 87:21
*keeping* [1] - 37:22
*keeps* [1] - 21:24
*kept* [6] - 31:5, 37:21, 41:19, 57:4, 57:24, 64:2
*kid* [3] - 25:19, 34:10, 57:18
*kids* [1] - 6:7
*kill* [2] - 20:2, 20:4
*killed* [1] - 20:3
*kind* [7] - 37:8, 51:20, 51:22, 71:2, 74:8, 77:22, 87:19
*kitchen* [1] - 27:15
*knowing* [1] - 87:2
*known* [5] - 45:4, 45:6, 47:7, 55:17, 56:8
*knows* [1] - 55:17

## L

*lack* [2] - 63:1, 64:13
*Ladies* [1] - 9:21, 14:16
*ladies* [4] - 22:14, 23:25, 32:20, 66:20
*last* [8] - 7:10, 37:11, 38:10, 55:20, 62:3, 64:19, 64:25, 86:10
*lastly* [1] - 62:1
*latest* [1] - 39:7
*law* [37] - 6:17, 6:21, 22:23, 22:24, 24:3, 45:22, 53:23, 54:1, 54:2, 56:2, 56:5, 56:6, 56:9, 58:5, 58:18, 58:19, 62:21, 63:3, 64:8, 64:14, 64:16, 64:21, 67:13, 68:2, 68:4, 68:8,

68:25, 69:16, 73:4, 73:7, 78:10, 78:16, 78:19, 79:6
*LAW* [1] - 1:18
*lawsuit* [1] - 68:18
*lawyer* [1] - 50:1
*lawyers* [5] - 49:25, 53:24, 61:12, 69:10, 75:5
*laying* [1] - 8:18
*leadership* [1] - 39:24
*leading* [1] - 21:9
*leaf* [1] - 7:11
*leap* [2] - 53:18, 56:18
*learned* [1] - 25:23
*least* [7] - 5:12, 28:9, 28:11, 35:11, 36:14, 55:1, 79:9
*leave* [4] - 37:11, 42:18, 51:23, 80:11
*left* [15] - 7:22, 9:2, 11:10, 11:15, 26:14, 32:3, 32:4, 32:5, 32:15, 34:11, 35:7, 38:6, 39:4, 48:16, 66:21
*legal* [1] - 7:5
*legally* [3] - 4:17, 80:3, 80:6
*legitimate* [2] - 6:25, 30:22
*less* [8] - 11:3, 36:6, 36:16, 41:18, 82:11, 82:20, 83:8, 83:16
*level* [2] - 27:18, 41:14
*LEWIS* [1] - 2:2
*LGBT* [3] - 47:22, 72:1
*liability* [5] - 61:25, 79:5, 79:9, 79:14, 79:17
*LIABILITY* [1] - 1:6
*Liability* [1] - 85:20
*lick* [1] - 52:17
*lie* [27] - 5:5, 5:6, 5:23, 5:25, 27:1, 27:5, 27:8, 27:9, 27:11, 28:12, 28:14, 29:2, 29:5, 37:15, 37:18, 51:24, 53:19, 56:12, 56:13, 56:15, 56:16, 58:7, 58:11, 59:17, 70:4, 70:5
*lied* [6] - 5:1, 27:16, 53:16, 54:5, 56:18, 68:14
*lies* [6] - 5:12, 5:24, 27:6, 27:16, 71:20, 71:21
*life* [2] - 26:7, 87:2
*limit* [1] - 16:23

*United States District Court*

**LIMITED** [1] - 1:6
**Limited** [1] - 85:20
**line** [3] - 39:7, 46:22, 48:5
**link** [1] - 58:10
**linked** [1] - 58:9
**LinkedIn** [1] - 74:11
**Linode** [41] - 7:20, 8:15, 9:11, 10:2, 10:10, 11:7, 40:22, 41:2, 41:5, 41:10, 41:15, 42:2, 42:11, 44:4, 44:13, 46:2, 46:8, 46:9, 46:15, 49:6, 49:11, 50:15, 50:25, 51:11, 51:19, 56:24, 58:25, 59:8, 59:10, 60:1, 60:9, 60:13, 60:20, 62:4, 62:15, 63:16, 64:4, 64:16, 65:4, 79:25, 85:19
**LINODE** [3] - 1:6, 1:7, 1:7
**Linode's** [15] - 40:14, 60:3, 60:5, 60:7, 60:15, 60:18, 60:21, 61:6, 66:15, 67:22, 78:1, 82:10, 82:19, 83:7, 83:15
**LINODIAN** [1] - 1:7
**liquidated** [1] - 69:15
**Lisa** [2] - 10:16, 20:4
**list** [1] - 30:3
**listen** [5] - 31:11, 42:2, 61:10, 61:18, 73:21
**listened** [1] - 54:14
**listening** [2] - 63:13, 64:20
**litigation** [4] - 27:17, 46:12, 68:15, 68:22
**live** [1] - 72:3
**lived** [1] - 38:14
**lives** [2] - 38:13, 63:24
**living** [2] - 41:15, 46:17
**LLC** [3] - 1:7, 1:7, 1:8
**lo** [2] - 25:4, 25:6
**locked** [1] - 19:22
**logical** [1] - 53:6
**London** [2] - 11:13
**look** [21] - 13:16, 16:10, 19:5, 19:6, 21:7, 21:21, 29:20, 31:19, 45:16, 47:9, 49:21, 53:7, 57:5, 62:1, 62:15, 69:20, 70:19, 79:1, 79:2, 79:5
**looked** [1] - 70:25

**looking** [8] - 28:5, 29:14, 42:8, 55:9, 57:14, 58:3, 78:13
**lose** [1] - 51:13
**loser** [1] - 88:11
**loses** [1] - 62:3
**loss** [8] - 34:3, 35:21, 35:24, 35:25, 36:2, 36:10, 36:23, 44:3
**losses** [1] - 35:23
**lost** [1] - 34:3
**love** [1] - 7:12
**lower** [2] - 34:25, 41:18
**lurking** [1] - 57:8
**lying** [4] - 37:12, 37:21, 60:25, 71:20

## M

**mad** [1] - 23:10
**magnified** [1] - 45:2
**mail** [1] - 68:21
**main** [1] - 72:23
**maintained** [1] - 17:20
**man** [2] - 51:17, 52:5
**manager** [7] - 20:2, 23:12, 23:14, 23:15, 23:16, 23:22, 42:3
**mandate** [1] - 86:14
**mandatory** [2] - 70:15
**manner** [1] - 76:1
**margin** [1] - 53:9
**Market** [2] - 1:12, 1:19
**married** [3] - 43:19, 71:12, 71:13
**master's** [1] - 25:25
**materials** [1] - 49:25
**Matter** [1] - 88:19
**matter** [7] - 6:12, 6:15, 7:22, 47:14, 51:19, 87:15, 89:3
**matters** [1] - 58:22
**Maureen** [1] - 89:5
**maureen** [1] - 1:22
**maureen_mchugh@paed.uscourts.gov** [1] - 1:22
**MCCARTHY** [1] - 2:4
**McHugh** [2] - 1:22, 89:5
**mean** [33] - 6:5, 6:21, 12:7, 13:9, 13:23, 20:14, 21:2, 25:18, 26:8, 26:10, 45:10, 45:16, 45:22, 47:4, 49:16, 52:11, 52:14, 57:21, 58:22, 62:1, 62:3, 62:16, 65:17, 65:24, 67:10, 71:1,

71:3, 71:20, 77:8, 78:9, 79:2, 79:22, 80:11
**meaning** [1] - 61:8
**means** [9] - 9:2, 9:4, 10:9, 18:23, 23:16, 28:9, 29:25, 74:6, 74:15
**meant** [3] - 69:4, 70:22, 73:2
**meantime** [2] - 46:20, 76:18
**mechanical** [1] - 1:23
**mechanism** [1] - 39:22
**media** [3] - 74:7, 74:19, 74:21
**meds** [1] - 43:14
**meeting** [11] - 23:5, 23:6, 23:10, 23:23, 25:12, 31:5, 46:10, 65:14, 65:19, 65:21
**meetings** [1] - 24:17
**MELISSA** [1] - 2:12
**member** [2] - 39:2, 72:20
**members** [1] - 82:3
**Members** [2] - 85:17, 86:1
**men** [1] - 52:7
**mention** [6] - 47:14, 47:18, 48:22, 50:18, 51:9, 65:24
**mention's** [1] - 70:9
**mentioned** [6] - 65:21, 65:22, 65:25, 71:13
**mentions** [1] - 65:25
**message** [4] - 30:19, 30:20, 30:21, 31:2
**messages** [1] - 11:24, 11:25, 12:2, 13:14, 18:14, 19:2, 19:7, 31:3, 32:9, 74:25, 75:7
**messaging** [1] - 74:9
**met** [1] - 38:11
**Mets** [1] - 57:12
**MEYER** [3] - 2:12, 22:7, 22:11
**mid** [1] - 4:9
**mid-morning** [1] - 4:9
**might** [15] - 6:20, 14:23, 26:4, 40:9, 40:11, 51:10, 51:20, 61:17, 62:19, 62:20, 69:6, 74:19, 74:20, 77:25, 80:15
**million** [4] - 34:21, 36:5, 42:17
**mind** [3] - 27:8, 51:10,

74:1
**mine** [3] - 47:24, 68:9, 73:1
**minimize** [1] - 24:7
**minus** [2] - 9:1
**minute** [10] - 3:10, 3:14, 3:15, 3:20, 19:24, 29:20, 61:13, 71:7, 71:9
**minutes** [6] - 17:5, 35:1, 35:2, 38:6, 76:6, 76:17
**mirrors** [2] - 7:5, 71:19
**misdirection** [1] - 72:6
**misleading** [4] - 9:6, 9:9, 67:11, 69:23
**missing** [1] - 72:18
**mitigated** [1] - 35:23
**mock** [1] - 8:21
**momentarily** [1] - 88:15
**moments** [1] - 87:12
**money** [5] - 25:21, 30:5, 30:6, 44:4, 61:21
**month** [5] - 19:5, 23:4, 34:24, 36:7, 36:8
**months** [4] - 11:3, 32:19, 32:22, 69:9
**morning** [5] - 3:4, 3:25, 4:1, 4:9, 38:5
**most** [11] - 5:1, 18:20, 21:5, 28:18, 36:4, 45:19, 51:10, 57:1, 63:7, 86:23, 86:24
**motivated** [2] - 56:15, 59:22
**move** [3] - 7:18, 10:15, 52:12
**moved** [1] - 47:5
**movies** [1] - 87:1
**moving** [1] - 20:20
**MR** [67] - 3:7, 3:14, 3:16, 3:19, 4:14, 12:3, 12:5, 12:7, 12:11, 12:13, 12:21, 13:1, 13:4, 13:7, 13:14, 13:20, 13:25, 14:3, 14:7, 14:12, 14:15, 15:2, 15:6, 15:12, 15:18, 15:24, 16:12, 16:23, 17:3, 17:9, 17:12, 19:9, 19:11, 19:15, 22:8, 22:12, 22:18, 22:20, 35:2, 38:2, 38:4, 65:10, 66:17, 66:19, 71:8, 71:10, 72:13, 77:3, 77:20, 77:24, 78:1, 78:15, 79:1,

79:24, 79:25, 80:5, 80:20, 81:14, 81:16, 84:3, 85:14, 85:15, 88:2, 88:5, 88:7, 88:17, 88:18
**MS** [2] - 22:7, 22:11
**multimillion** [1] - 71:5
**multimillion-dollar** [1] - 71:5
**multiply** [1] - 37:9
**Mumbai** [1] - 11:15
**murder** [6] - 6:7, 27:22, 27:23, 43:22, 54:25
**Musbach** [11] - 5:13, 30:18, 55:3, 55:20, 55:25, 56:2, 59:18, 60:4, 60:12, 60:18, 71:18
**Musbach's** [1] - 45:4
**must** [12] - 59:9, 59:13, 60:8, 60:13, 61:4, 73:19, 74:5, 74:23, 74:25, 75:11, 75:13
**mystery** [1] - 86:24

## N

**name** [1] - 11:17
**named** [1] - 48:12
**names** [4] - 10:24, 50:18, 63:19, 63:22
**nearby** [1] - 77:8
**need** [10] - 3:19, 21:12, 24:8, 30:13, 58:9, 67:23, 77:23, 79:20, 80:10, 88:3
**needs** [1] - 46:6
**negative** [3] - 14:11, 27:4, 27:11
**network** [5] - 11:18, 21:10, 52:5, 67:1, 67:3
**networking** [2] - 21:3, 74:11
**never** [22] - 5:5, 5:14, 5:24, 10:19, 10:20, 18:4, 23:19, 25:8, 40:17, 40:21, 40:22, 46:11, 48:7, 51:17, 57:7, 66:3, 70:2, 70:4, 70:22, 71:2, 71:17, 75:7
**New** [1] - 52:6
**news** [1] - 54:13
**newspaper** [1] - 45:3
**next** [5] - 26:18, 29:10, 45:18, 76:17, 80:13
**nice** [1] - 57:22

*night* [1] - 25:15
*nine* [1] - 7:22
*NO* [7] - 84:8, 84:13, 84:17, 84:21, 84:25, 85:4, 85:10
*nobody* [4] - 49:7, 49:19, 50:12, 70:7
*non* [2] - 60:1, 60:3
*non-discriminatory* [2] - 60:1, 60:3
*none* [1] - 85:14
*norm* [1] - 87:16
*normally* [2] - 61:15, 61:18
*note* [2] - 42:20, 50:16
*Note* [1] - 72:17
*notes* [1] - 72:16
*nothing* [22] - 6:21, 7:21, 24:12, 28:24, 30:5, 30:25, 32:15, 44:21, 44:22, 48:24, 51:13, 55:12, 56:2, 58:5, 58:6, 71:23, 73:1, 75:24, 75:25, 79:11
*noticed* [1] - 26:4
*notion* [1] - 53:12
*November* [1] - 29:8
*number* [10] - 22:9, 34:2, 34:5, 36:3, 36:10, 36:11, 37:9, 75:9, 77:7
*Number* [1] - 86:16
*NUMBER* [1] - 1:3
*numbered* [1] - 72:18
*numbers* [2] - 36:4, 81:1

## O

*o'clock* [1] - 87:24
*oath* [4] - 23:20, 30:13, 64:6, 73:8
*objection* [9] - 12:3, 12:4, 14:6, 17:1, 19:9, 19:10, 22:18, 66:17, 77:18
*obligated* [1] - 53:18
*obligation* [1] - 86:18
*observed* [1] - 42:22
*obtain* [1] - 74:23
*obtaining* [1] - 74:2
*obvious* [1] - 6:8
*obviously* [2] - 86:2, 87:23
*Occam's* [3] - 28:3, 28:7
*occur* [1] - 59:21
*occurred* [2] - 60:7, 61:9

*October* [1] - 5:9
*OF* [1] - 1:1
*off-chance* [1] - 3:19
*offended* [1] - 43:13
*office* [9] - 10:12, 10:14, 10:15, 10:16, 10:17, 20:21, 23:6, 47:5, 72:11
*officer* [5] - 20:2, 23:7, 33:11, 65:20, 75:3
*officers* [1] - 74:4
*offices* [1] - 77:9
*Official* [2] - 1:22, 89:5
*old* [5] - 7:20, 7:21, 8:5, 8:9, 57:15
*older* [8] - 8:4, 20:16, 20:17, 20:24, 21:3, 42:9, 52:7
*oldest* [2] - 7:25, 8:4
*once* [9] - 40:22, 44:13, 46:22, 48:7, 48:10, 49:5, 71:13, 75:24
*one* [70] - 3:20, 4:6, 5:6, 6:4, 6:12, 7:7, 7:24, 21:14, 22:10, 26:13, 28:17, 30:9, 30:16, 31:6, 33:10, 34:5, 34:8, 34:16, 34:23, 34:24, 36:7, 36:8, 37:8, 37:17, 38:18, 41:1, 42:11, 44:17, 45:25, 46:25, 47:11, 47:18, 48:3, 48:16, 48:22, 48:23, 48:24, 49:2, 50:13, 51:6, 54:19, 61:13, 66:2, 66:4, 66:11, 68:13, 69:1, 69:12, 69:14, 70:3, 70:23, 70:24, 72:5, 72:8, 72:10, 72:20, 72:23, 73:15, 75:7, 75:9, 82:11, 82:20, 83:7, 83:15, 86:10, 86:11, 86:23, 87:24
*one-minute* [1] - 3:20
*ongoing* [1] - 71:16
*open* [9] - 3:1, 16:16, 20:15, 46:22, 48:5, 48:6, 58:13, 72:22, 81:7
*open-door* [1] - 48:6
*opening* [9] - 9:16, 9:17, 9:19, 9:24, 14:20, 21:13, 39:3, 39:12, 53:17
*opens* [1] - 16:19
*operating* [2] - 23:7, 65:20

*opinion* [1] - 73:23
*opinions* [1] - 73:25
*opportunity* [1] - 57:10
*option* [2] - 87:16, 87:22
*optional* [3] - 24:4, 24:5, 40:6
*order* [3] - 75:12, 75:23, 85:5
*orientation* [25] - 39:22, 40:3, 40:18, 40:20, 40:24, 42:12, 44:14, 44:22, 46:21, 48:8, 48:23, 51:18, 52:10, 55:12, 56:14, 57:10, 59:1, 59:12, 59:15, 61:3, 61:6, 61:8, 82:10, 82:19, 83:2
*original* [1] - 38:18
*otherwise* [3] - 16:22, 56:3, 75:21
*outages* [1] - 41:13
*outright* [1] - 7:17
*overblown* [1] - 58:14
*overly* [1] - 56:5
*overruled* [1] - 22:19
*Owen* [9] - 7:18, 8:1, 8:5, 8:9, 8:22, 51:1, 51:8, 72:7
*own* [4] - 30:6, 53:12, 55:15, 73:23
*owner* [2] - 48:2, 48:6

## P

*P.C* [1] - 2:2
*p.m* [4] - 81:7, 81:19, 87:14, 88:19
*PA* [3] - 1:11, 1:20, 2:5
*pages* [2] - 46:15, 46:19
*paid* [4] - 35:11, 35:12, 36:15, 41:2
*Palochko* [25] - 8:14, 8:15, 10:4, 18:4, 18:5, 26:24, 28:18, 33:5, 33:7, 37:18, 40:17, 44:19, 46:15, 47:20, 47:21, 63:9, 63:18, 65:5, 67:4, 67:5, 70:1, 70:10, 70:21, 71:24
*Palochko's* [1] - 8:19
*Panama* [1] - 48:13
*panicked* [1] - 30:23
*paper* [3] - 21:19, 21:21, 75:1
*paragraph* [1] - 61:16

*PARALEGAL* [1] - 2:12
*part* [8] - 10:6, 10:9, 27:6, 52:8, 61:15, 68:11, 87:7, 87:23
*participate* [1] - 41:13
*particular* [1] - 78:24
*parties* [6] - 4:3, 49:25, 64:7, 73:6, 74:21, 87:10
*partner* [3] - 43:18, 54:24, 62:6
*partnered* [1] - 44:24
*parts* [2] - 52:14, 70:4
*party* [2] - 26:9, 26:11
*passion* [1] - 64:9
*past* [9] - 27:21, 34:3, 35:21, 35:25, 36:2, 36:9, 36:23, 63:23, 78:14
*pasted* [1] - 71:1
*pause* [1] - 12:8
*pay* [6] - 60:2, 60:6, 82:11, 82:20, 83:8, 83:15
*paying* [1] - 86:4
*pedophile* [2] - 45:18, 69:19
*pedophiles* [1] - 56:7
*pedophilia* [4] - 6:7, 27:22, 27:23
*PEET* [1] - 2:3
*penalty* [1] - 69:12
*PENNSYLVANIA* [1] - 1:1
*Pennsylvania* [9] - 1:13, 21:16, 21:18, 21:22, 22:13, 22:16, 24:16, 38:17, 66:9
*people* [41] - 5:23, 8:3, 9:11, 10:20, 10:24, 10:25, 11:1, 11:8, 11:20, 18:13, 18:20, 20:17, 20:24, 21:4, 24:9, 26:6, 26:11, 26:17, 27:5, 27:8, 28:23, 36:17, 37:12, 37:15, 44:19, 50:19, 50:20, 51:3, 52:6, 52:9, 56:7, 57:19, 67:6, 69:25, 70:17, 86:8, 86:20, 86:24, 87:2, 87:4
*percent* [10] - 14:1, 14:16, 31:16, 31:17, 41:4, 48:2, 52:7, 52:11, 67:10, 68:17
*perfect* [1] - 25:19
*perfectly* [1] - 32:3
*perform* [1] - 6:17,

73:14
*performance* [1] - 29:21
*period* [2] - 41:21, 68:1
*perjure* [1] - 69:16
*perjury* [2] - 69:12, 69:16
*person* [12] - 5:15, 11:2, 25:19, 30:9, 34:16, 35:11, 36:15, 45:2, 46:20, 50:21, 72:21, 75:3
*personal* [2] - 40:13, 56:6
*personally* [2] - 73:9, 86:13
*perspective* [2] - 85:13, 88:4
*persuade* [1] - 53:3
*Peter* [1] - 66:23
*phase* [1] - 83:4
*Philadelphia* [4] - 1:13, 1:20, 2:5, 72:2
*phone* [4] - 74:8, 77:6, 80:25
*photos* [1] - 48:4
*PHRC* [2] - 42:14, 46:5, 49:7
*pick* [1] - 24:2
*pictures* [2] - 7:14, 25:14
*piece* [8] - 21:19, 21:21, 31:19, 32:5, 45:25, 49:2, 66:1, 75:1
*pieces* [1] - 43:1
*pin* [2] - 29:11, 53:21
*pissed* [1] - 57:3
*place* [2] - 41:25, 62:20
*places* [1] - 11:14
*plaintiff* [14] - 4:3, 4:4, 4:16, 4:18, 46:6, 50:4, 50:6, 64:18, 82:8, 82:17, 82:24, 83:5, 83:13, 83:21
*Plaintiff* [2] - 1:4, 1:20
*plaintiff's* [4] - 4:13, 9:8, 31:24, 79:8
*plan* [1] - 29:3
*planning* [2] - 55:22, 55:23
*play* [1] - 70:16
*played* [2] - 54:15
*playing* [1] - 7:3
*PLLC* [1] - 1:18
*point* [14] - 17:18, 22:1, 22:2, 24:14, 42:25, 43:7, 52:1,

56:8, 58:5, 59:6, 67:17, 67:19, 68:25, 78:24
**pointed** [1] - 15:10
**pointing** [2] - 65:11, 65:12
**policies** [4] - 39:20, 40:1, 40:4, 70:14
**policy** [37] - 5:17, 5:18, 5:22, 24:3, 24:4, 24:5, 24:9, 29:7, 29:15, 31:12, 32:11, 32:12, 33:2, 33:4, 33:6, 33:9, 33:13, 33:21, 39:19, 39:21, 40:7, 40:10, 40:14, 48:6, 55:11, 56:24, 57:23, 60:17, 70:6, 70:7, 70:8, 70:18, 70:24, 71:2, 72:1
**poll** [1] - 84:2
**poorly** [1] - 42:11
**popular** [1] - 53:24
**porn** [2] - 45:5, 45:7
**pornography** [3] - 43:20, 44:25, 62:9
**portrayed** [1] - 54:19
**position** [9] - 31:24, 31:25, 34:8, 34:16, 34:18, 35:8, 36:6, 42:16, 79:6
**positions** [9] - 34:14, 34:25, 35:15, 35:16, 36:7, 82:12, 82:21, 83:9, 83:16
**possible** [4] - 16:18, 26:10, 55:10, 64:15
**possibly** [1] - 64:4
**potential** [1] - 55:8
**potentially** [1] - 79:10
**pound** [7] - 54:1, 54:3, 68:5, 68:6, 68:7, 68:8
**pounding** [4] - 54:4, 64:21, 64:22
**powerfully** [1] - 45:9
**pre** [2] - 52:15, 52:18
**pre-termination** [2] - 52:15, 52:18
**precious** [1] - 38:11
**predicate** [2] - 78:20, 79:5
**preference** [3] - 3:9, 3:18, 77:8
**preferences** [1] - 56:6
**prejudice** [2] - 64:9, 73:15
**prejudicial** [1] - 78:7
**prepared** [1] - 75:15

**preponderance** [7] - 59:9, 82:9, 82:17, 82:25, 83:6, 83:13, 83:21
**PRESENT** [1] - 2:10
**present** [7] - 23:7, 23:8, 34:4, 35:22, 37:7, 39:2, 50:8, 53:2, 75:3, 79:12
**presentation** [1] - 79:3
**presented** [4] - 9:10, 57:10, 64:13, 74:17
**preserved** [1] - 63:22
**preside** [3] - 38:22, 39:7, 72:21
**President** [2] - 38:23, 48:1
**presume** [1] - 3:5
**presumptively** [1] - 80:8
**pretend** [1] - 70:4
**pretext** [2] - 18:6, 29:3
**pretextual** [1] - 5:21
**pretty** [4] - 4:24, 20:22, 57:3, 62:12
**prevent** [2] - 24:8, 70:14
**pride** [1] - 39:5
**principals** [1] - 48:22
**private** [1] - 33:8
**privilege** [1] - 64:25
**probable** [1] - 32:1
**problem** [1] - 46:9
**problems** [2] - 31:13, 56:22
**proceed** [2] - 76:10, 87:3
**proceeding** [1] - 80:12
**Proceedings** [1] - 1:23
**proceedings** [1] - 89:3
**PROCEEDINGS** [1] - 3:1
**process** [2] - 25:9, 87:16
**produce** [1] - 13:3
**produced** [10] - 1:24, 12:19, 13:19, 13:23, 14:13, 15:22, 15:23, 16:5, 16:7, 16:21
**proficient** [1] - 26:2
**profit** [6] - 60:2, 60:6, 82:13, 82:22, 83:10, 83:18
**progressive** [3] - 29:17, 29:25, 30:2
**prohibiting** [2] - 39:19, 39:21
**promise** [6] - 9:17,

21:13, 39:12, 61:12, 64:5, 64:6
**promised** [1] - 10:7
**promises** [3] - 39:14, 39:17, 64:3
**promote** [1] - 41:23
**promoted** [1] - 23:16
**promotion** [6] - 24:23, 36:19, 42:3, 42:13, 43:2, 43:3
**promotions** [1] - 25:2
**proof** [5] - 4:17, 5:20, 52:21, 73:6
**property** [2] - 19:22, 19:25
**protecting** [1] - 57:22
**proud** [1] - 51:16
**prove** [9] - 6:24, 6:25, 31:24, 52:22, 52:23, 52:24, 52:25, 59:9, 59:14
**proved** [8] - 52:24, 67:24, 82:9, 82:17, 82:25, 83:6, 83:13, 83:21
**proven** [3] - 9:24, 10:3, 61:5
**proves** [1] - 9:18
**provide** [4] - 9:8, 28:1, 28:17, 74:6
**provided** [1] - 59:19
**providing** [1] - 57:24
**province** [1] - 42:23
**proving** [2] - 58:23, 58:24
**public** [1] - 22:21
**published** [2] - 44:23, 54:23
**pull** [3] - 21:17, 48:9, 62:19
**punishment** [2] - 78:14
**punitive** [2] - 69:13, 78:18
**punitives** [2] - 77:14, 81:11
**purchase** [3] - 34:12, 80:4
**purchased** [1] - 34:7
**pure** [1] - 79:14
**purpose** [3] - 30:8, 74:2, 78:13
**purposes** [2] - 43:3, 43:4
**pursue** [1] - 25:7
**pursuing** [1] - 79:16
**put** [8] - 7:10, 8:20, 10:19, 36:1, 64:1, 79:9, 80:7, 88:13
**putting** [2] - 9:13,

29:22
**puzzle** [1] - 32:5
**puzzle's** [1] - 32:6

**Q**

**QUESTION** [4] - 17:14, 17:18, 65:13, 70:9
**questionnaire** [10] - 21:25, 22:1, 24:15, 24:16, 25:5, 25:7, 42:14, 46:5, 49:7
**questions** [14] - 21:9, 28:10, 28:14, 28:15, 31:13, 32:4, 43:16, 49:24, 74:25, 75:16, 76:9, 76:10
**quick** [1] - 12:11
**quickest** [1] - 55:9
**quickly** [2] - 9:25, 41:9
**quietly** [1] - 26:14
**quite** [1] - 45:9
**quote** [2] - 45:5, 59:7

**R**

**race** [1] - 51:13
**raise** [2] - 36:15, 36:16
**raised** [1] - 77:15
**raises** [1] - 28:13
**Rambo** [1] - 34:10
**rate** [1] - 52:11
**Razor** [2] - 28:3, 28:7
**re** [1] - 73:23
**re-examine** [1] - 73:23
**reached** [4] - 75:17, 75:22, 77:22, 81:21
**reaching** [1] - 73:18
**reaction** [2] - 45:15, 54:8
**read** [8] - 8:12, 8:16, 9:22, 9:23, 12:17, 13:17, 68:4, 76:13
**reading** [4] - 8:21, 9:22, 9:23, 76:12
**reads** [1] - 82:8
**ready** [6] - 3:6, 4:10, 76:15, 76:25, 77:17, 80:22
**real** [6] - 42:16, 43:3, 51:14, 54:14, 56:24, 87:2
**real-time** [1] - 54:14
**reality** [1] - 33:19
**really** [18] - 6:18, 25:18, 34:2, 37:24, 52:14, 58:21, 62:5, 62:20, 67:12, 69:2, 69:4, 77:24, 86:5,

86:7, 86:24, 87:7, 87:10
**reason** [52] - 6:12, 6:18, 6:20, 6:25, 23:24, 27:3, 27:4, 27:12, 27:13, 28:12, 28:14, 28:19, 28:20, 29:7, 30:10, 30:14, 32:8, 32:10, 33:15, 33:17, 33:22, 37:18, 37:19, 37:20, 40:7, 44:1, 51:14, 51:24, 51:25, 53:17, 56:9, 56:19, 57:9, 57:14, 58:7, 60:2, 60:3, 60:5, 60:7, 60:16, 61:24, 63:16, 67:15, 67:22, 67:23, 68:16, 69:4, 69:11, 85:12, 86:14
**reasonable** [14] - 6:13, 6:16, 6:21, 21:5, 27:22, 27:23, 28:17, 45:16, 54:8, 54:9, 54:22, 55:1, 55:5, 55:21
**reasons** [6] - 27:6, 32:9, 60:15, 68:13, 69:13, 69:14
**rebut** [2] - 4:5, 46:7
**rebuttal** [1] - 65:9
**receive** [1] - 63:7
**received** [6] - 21:23, 35:19, 36:15, 36:17, 36:19, 60:22
**receiving** [1] - 40:12
**recess** [1] - 81:5
**recognition** [1] - 62:22
**reconcile** [1] - 47:23
**record** [8] - 29:10, 30:13, 55:13, 69:1, 69:5, 79:11, 85:13, 89:3
**recorded** [3] - 1:23, 55:21, 85:18
**recording** [2] - 31:9, 54:15
**recover** [3] - 44:4, 44:5, 59:8
**red** [1] - 53:20
**reduce** [1] - 41:17
**refer** [3] - 15:25, 40:6, 59:3
**referenced** [3] - 48:13, 48:16, 50:1
**refusal** [1] - 43:13
**refuted** [1] - 10:22
**regarding** [2] - 60:2, 60:6

**regardless** [2] - 39:3, 60:8
**regular** [1] - 23:5
**reimbursement** [1] - 30:5
**related** [3] - 5:13, 47:19, 48:7
**relating** [2] - 47:15, 59:22
**Relations** [7] - 21:17, 21:19, 21:23, 22:13, 22:16, 24:17, 66:10
**relationship** [4] - 48:3, 49:12, 55:3, 55:25
**released** [1] - 86:17
**relevant** [3] - 36:4, 78:2
**remained** [1] - 45:2
**remark** [3] - 47:1, 48:8, 48:23
**remarks** [4] - 39:3, 39:10, 50:19, 55:15
**remember** [11] - 9:15, 10:21, 17:23, 20:22, 30:15, 30:19, 30:20, 31:23, 51:20, 65:13, 69:24
**remembered** [3] - 20:22, 30:20, 32:17
**remind** [2] - 44:17, 75:24
**reminded** [3] - 32:16, 39:11, 39:13
**remotely** [2] - 55:15, 71:23
**render** [1] - 64:15
**rendered** [8] - 64:24, 84:6, 84:11, 84:15, 84:19, 84:23, 85:2, 85:8
**repeat** [1] - 60:9
**repeatedly** [1] - 5:1
**repeating** [1] - 54:17
**replace** [1] - 33:17
**report** [7] - 20:10, 21:14, 23:25, 40:8, 40:11, 70:17, 70:20
**reported** [5] - 20:11, 24:11, 24:22, 40:20, 40:21
**Reporter** [2] - 1:22, 89:5
**reporter** [1] - 45:4
**reporting** [2] - 39:22, 70:15
**reports** [1] - 24:2
**represent** [1] - 75:11
**reputation** [1] - 63:17
**reputations** [3] - 63:19, 63:21, 63:25

**request** [1] - 16:24
**requested** [1] - 30:5
**requesting** [1] - 37:1
**require** [1] - 53:1
**required** [1] - 75:22
**requires** [2] - 28:11, 58:6
**research** [1] - 74:14
**resign** [1] - 26:20
**resist** [3] - 62:25, 63:1, 63:2
**resolution** [1] - 77:22
**resolved** [1] - 80:11
**resources** [5] - 39:24, 46:15, 46:18, 46:23, 62:16
**respect** [2] - 25:18, 53:10
**respectfully** [3] - 44:8, 53:8, 64:4
**respond** [2] - 24:2, 75:4
**responded** [1] - 31:4
**response** [4] - 30:21, 30:22, 54:22, 58:2
**responsibilities** [1] - 23:18
**responsibility** [1] - 76:3
**responsible** [1] - 44:20
**resume** [2] - 41:8, 41:16
**retaliation** [4] - 22:23, 22:24, 22:25, 70:25
**retire** [1] - 72:15
**retired** [1] - 63:15
**retreating** [1] - 77:9
**return** [3] - 19:22, 75:12, 75:19
**returning** [1] - 19:25
**reveal** [1] - 75:21
**review** [1] - 29:21
**Richard** [2] - 33:10, 33:11
**rid** [4] - 19:24, 57:9, 57:15, 58:3
**ridiculed** [1] - 54:21
**rights** [1] - 56:9
**rise** [14] - 3:3, 3:23, 76:22, 81:6, 81:18, 82:2, 84:5, 84:9, 84:14, 84:18, 84:22, 85:1, 85:7, 87:13
**risk** [1] - 27:18
**road** [2] - 62:2, 78:10
**robots** [1] - 43:9
**role** [3] - 41:10, 41:22, 86:9
**room** [12] - 10:16,

10:17, 20:15, 47:9, 49:1, 49:23, 50:11, 55:14, 64:12, 72:15, 74:10, 75:17
**rough** [1] - 62:2
**RPR** [1] - 89:5
**rude** [1] - 58:16
**rule** [2] - 39:15, 67:13
**rules** [1] - 53:1
**ruling** [1] - 69:18
**run** [1] - 71:4
**running** [1] - 17:8
**rush** [1] - 87:24

---

**S**

**S:(Cont'd** [1] - 2:1
**safest** [1] - 55:10
**safety** [2] - 54:20, 58:13
**salad** [1] - 47:5
**sales** [1] - 67:1
**sat** [4] - 7:3, 38:24, 43:22, 63:12
**satisfaction** [1] - 39:6
**satisfied** [1] - 4:17
**saw** [22] - 7:18, 8:17, 10:20, 10:23, 11:20, 11:21, 19:23, 25:14, 30:21, 34:13, 35:4, 39:19, 39:20, 40:18, 46:11, 47:3, 49:7, 51:18, 54:3, 69:9, 72:24, 76:25
**scale** [2] - 31:23
**scam** [1] - 43:2
**scared** [5] - 20:1, 20:5, 30:24, 31:6, 31:12
**scatter** [1] - 77:16
**scheduled** [1] - 23:6
**school** [2] - 25:23, 25:24
**Scott** [10] - 3:22, 75:2, 76:20, 77:7, 81:24, 84:1, 84:4, 85:16, 85:25, 87:20
**SCOTT** [1] - 2:13
**screaming** [2] - 30:17, 53:4
**searched** [1] - 71:12
**seat** [5] - 3:4, 4:1, 81:8, 81:20, 84:10
**seated** [1] - 76:24, 80:18, 87:15
**second** [5] - 4:4, 5:7, 20:25, 44:16, 73:4
**secondly** [1] - 58:4, 78:7
**secret** [1] - 75:10

**Section** [2] - 49:21, 67:20
**section** [4] - 59:7, 59:24, 67:21, 70:25
**see** [34] - 3:5, 7:14, 12:1, 14:18, 16:13, 18:2, 18:7, 19:4, 22:8, 24:9, 27:21, 29:15, 29:19, 32:22, 44:6, 45:25, 46:3, 46:13, 49:2, 50:12, 52:20, 59:13, 59:25, 62:18, 64:14, 66:11, 70:19, 74:20, 76:8, 86:25, 87:11, 88:14
**seek** [1] - 74:22
**seeking** [1] - 44:2
**seemingly** [2] - 44:1, 44:10
**select** [1] - 72:20
**self** [2] - 55:15, 57:21
**self-interested** [1] - 57:21
**self-serving** [1] - 55:15
**Senate** [1] - 38:23
**send** [6] - 31:2, 31:3, 69:2, 76:5, 76:20, 77:1
**senior** [1] - 35:11
**seniority** [1] - 36:6
**sense** [5] - 11:11, 20:6, 39:5, 69:21, 69:22
**sent** [3] - 19:4, 30:19, 30:20
**sentence** [3] - 24:13, 24:14, 25:11
**September** [1] - 11:3, 41:22
**series** [2] - 75:16, 79:18
**serious** [1] - 50:3
**serve** [4] - 38:9, 79:10, 86:6, 86:9
**server** [1] - 18:24
**service** [3] - 74:9, 74:10, 74:11
**serving** [1] - 55:15
**set** [1] - 41:16
**SETH** [1] - 1:19
**seven** [2] - 38:10, 63:4
**several** [4] - 21:15, 23:21, 34:1, 41:12
**sex** [9] - 44:14, 46:2, 49:6, 52:2, 52:4, 53:13, 56:20, 59:11, 60:8
**sexual** [24] - 39:22, 40:3, 40:18, 40:19,

40:23, 44:14, 44:22, 46:21, 48:8, 48:23, 51:18, 52:9, 55:12, 56:14, 57:9, 59:1, 59:11, 59:15, 61:2, 61:5, 61:8, 82:10, 82:18, 83:1
**sexuality** [1] - 43:11
**shadow** [1] - 4:25
**sham** [1] - 42:13
**shape** [1] - 12:24
**sharing** [6] - 60:3, 60:7, 82:13, 82:22, 83:10, 83:18
**SHARON** [1] - 2:13
**Shaw** [1] - 35:16
**sheet** [5] - 52:20, 76:7, 76:8, 77:2, 80:24
**shock** [1] - 6:4
**shortly** [1] - 76:16
**show** [18] - 7:6, 7:17, 8:10, 9:12, 11:22, 13:1, 19:24, 27:7, 29:20, 43:7, 43:8, 43:9, 43:14, 50:7, 66:20, 68:8, 68:9, 79:18
**showed** [4] - 15:8, 29:6, 47:25, 48:11
**showing** [3] - 44:12, 44:24, 52:10
**shown** [1] - 79:22
**shows** [4] - 29:18, 43:11, 48:3, 49:11
**shred** [3] - 7:2, 29:6, 68:19
**shut** [1] - 42:13
**shy** [3] - 34:21, 47:3, 47:6
**sic** [1] - 66:19
**sick** [1] - 61:12
**side** [10] - 8:9, 9:7, 9:8, 9:17, 9:19, 37:17, 53:25, 54:1, 66:16, 73:16
**sidebar** [2] - 12:8, 17:7
**Sidebar** [2] - 12:12, 17:11
**sign** [2] - 75:1, 75:19
**significant** [2] - 80:3, 80:7
**significantly** [1] - 36:20
**similar** [4] - 82:12, 82:21, 83:8, 83:16
**similarly** [1] - 34:19
**simple** [2] - 28:3, 40:7
**simplest** [2] - 28:7, 28:8

**simply** [2] - 40:10, 60:19
**Singapore** [1] - 11:16
**single** [31] - 5:1, 5:15, 5:25, 6:11, 7:2, 7:5, 7:7, 9:8, 9:22, 9:23, 9:25, 21:14, 28:13, 29:6, 31:2, 32:3, 32:10, 32:22, 33:19, 37:5, 45:25, 47:1, 47:18, 48:8, 49:2, 50:13, 66:1, 66:4, 68:19, 69:1
**sink** [1] - 27:15
**sit** [5] - 35:23, 38:20, 38:25, 61:14, 64:11
**sitting** [2] - 20:13, 26:11
**situated** [1] - 34:20
**situation** [3] - 26:7, 30:12, 55:8
**six** [3] - 17:14, 17:17, 47:17
**skills** [1] - 41:16
**Slack** [19] - 11:22, 13:14, 16:8, 16:10, 17:15, 17:16, 17:19, 17:20, 17:23, 18:2, 18:3, 18:9, 18:12, 18:15, 66:22, 66:23, 66:24, 66:25, 67:1
**slap** [1] - 51:21
**slide** [1] - 58:2
**slip** [1] - 37:15
**slipping** [1] - 37:16
**slowly** [1] - 30:1
**small** [3] - 11:7, 25:20, 61:21
**smart** [1] - 74:8
**SMITH** [1] - 1:18
**smoke** [2] - 7:5, 71:19
**smoking** [1] - 49:19
**Snapchat** [1] - 74:12
**snippets** [1] - 7:14
**social** [3] - 74:11, 74:19, 74:20
**sold** [1] - 10:10
**sole** [1] - 76:2
**solely** [1] - 74:17
**solution** [5] - 28:8, 28:9, 28:10, 28:11
**someone** [13] - 18:4, 21:3, 26:11, 29:17, 44:24, 45:19, 68:24, 70:9, 77:7, 80:25, 87:19, 87:20, 88:12
**sometime** [1] - 6:19
**sometimes** [4] - 4:22, 4:23, 10:17, 37:12
**somewhere** [2] -

49:17, 49:19
**soon** [1] - 75:4
**sorry** [5] - 5:9, 9:13, 62:14, 65:16, 85:5
**sort** [2] - 4:6, 87:21
**sound** [1] - 42:7
**sounds** [1] - 17:25
**sources** [1] - 44:6
**Southern** [1] - 52:6
**spanned** [1] - 46:16
**SPATARO** [1] - 1:8
**Spataro** [54] - 10:4, 18:5, 18:9, 18:13, 19:17, 19:20, 20:9, 21:8, 23:7, 23:18, 23:21, 23:23, 24:11, 25:3, 25:13, 28:22, 29:13, 30:18, 33:7, 34:17, 36:18, 40:16, 41:11, 42:16, 43:8, 43:10, 44:18, 45:1, 45:8, 45:14, 45:21, 48:12, 48:18, 50:14, 51:7, 51:21, 56:5, 56:25, 57:5, 57:7, 57:16, 63:8, 63:12, 63:18, 65:4, 65:12, 66:8, 66:19, 66:24, 66:25, 67:3, 67:5, 70:8, 72:8
**Spataro's** [1] - 36:21
**speaking** [3] - 8:22, 47:25, 64:25
**speaks** [1] - 42:19
**special** [1] - 38:17
**specific** [4] - 7:6, 19:3, 21:8, 80:12
**specifically** [2] - 23:6, 36:18
**speculate** [1] - 14:23
**spend** [1] - 30:6
**spending** [1] - 38:11
**spent** [2] - 30:5, 72:10
**spoliation** [2] - 15:9, 15:10
**staff** [2] - 87:20, 88:8
**Staller** [1] - 35:20
**stamp** [1] - 21:22
**stamped** [1] - 21:21
**stand** [23] - 5:15, 7:18, 8:20, 10:19, 11:24, 12:15, 13:20, 28:16, 33:10, 42:21, 43:23, 45:8, 45:12, 47:10, 48:20, 49:16, 50:17, 51:2, 51:22, 54:19, 63:12, 70:2, 75:8
**standard** [3] - 62:12, 79:19, 79:21
**standpoint** [1] - 3:9

**stands** [1] - 16:19
**start** [7] - 10:15, 19:25, 26:16, 36:8, 38:7, 74:3, 76:18
**started** [18] - 5:9, 5:10, 5:12, 8:24, 9:15, 10:2, 11:7, 17:17, 17:19, 17:23, 18:2, 20:9, 34:8, 34:10, 34:17, 37:7, 47:22
**starting** [1] - 36:7
**starts** [2] - 26:16, 26:18
**state** [1] - 38:25
**statement** [10] - 8:13, 9:16, 9:19, 9:24, 17:4, 21:13, 53:18, 70:3, 71:14
**statements** [4] - 9:17, 39:12, 49:24, 69:10
**state** [1] - 6:17
**STATES** [2] - 1:1, 1:16
**States** [3] - 3:2, 11:14
**stay** [2] - 75:10, 81:3
**stenography** [1] - 1:23
**step** [1] - 22:20
**STEPHANIE** [1] - 2:3
**Steven** [1] - 35:16
**stick** [2] - 87:21, 88:1
**sticking** [1] - 87:17
**sticks** [1] - 43:6
**still** [9] - 16:9, 17:3, 20:25, 21:1, 21:6, 22:14, 50:25, 77:12, 77:18
**stock** [1] - 80:4
**stopwatch** [1] - 9:13
**stored** [1] - 18:24
**stories** [3] - 5:4, 23:9, 37:17
**story** [12] - 6:3, 6:4, 20:6, 23:8, 29:12, 32:14, 32:18, 32:21, 32:23, 63:5, 68:1, 69:18
**straight** [1] - 23:9
**strategy** [1] - 27:15
**stray** [1] - 48:23
**street** [1] - 38:20
**Street** [3] - 1:12, 1:19, 2:4
**stretch** [1] - 86:2
**stuff** [2] - 52:18, 66:15
**subjected** [4] - 37:6, 59:14, 83:1, 83:22
**submit** [10] - 4:17, 5:3, 8:7, 9:9, 27:19, 30:7, 45:15, 51:3, 53:8, 54:22

**submitted** [2] - 82:4, 85:21
**substance** [2] - 38:8, 86:19
**substantially** [1] - 35:13
**successor** [5] - 78:17, 79:5, 79:9, 79:14, 79:17
**sue** [3] - 55:22, 55:23, 68:15
**sued** [6] - 54:6, 54:7, 54:10, 57:23, 68:23, 69:6
**suffered** [1] - 37:10, 43:17
**suffering** [5] - 46:20, 46:21, 47:2, 52:4, 62:18
**suffice** [1] - 79:10
**suggest** [10] - 13:19, 16:6, 32:20, 33:21, 37:5, 44:9, 66:2, 69:1, 72:5, 76:1
**suggested** [2] - 37:14, 43:7
**suggesting** [2] - 13:24, 14:2
**suggestion** [1] - 30:22
**suggestions** [1] - 16:20
**Suite** [2] - 1:19, 2:4
**suited** [2] - 41:10, 41:20
**support** [7] - 14:22, 25:21, 29:15, 51:4, 53:12, 58:21, 61:25
**supports** [1] - 32:22
**supposed** [1] - 70:10
**supposedly** [2] - 47:2, 52:4
**sustained** [5] - 12:4, 12:5, 14:6, 19:10, 66:18
**sustaining** [1] - 17:2
**sympathy** [1] - 73:15
**system** [3] - 18:15, 19:22, 86:7

**T**

**table** [8] - 7:11, 54:3, 54:4, 56:12, 64:22, 68:5, 68:6, 77:12
**tabled** [1] - 77:14
**tablet** [1] - 74:8
**tactics** [1] - 7:5
**tale** [2] - 6:3
**talents** [2] - 41:21, 42:1

**talks** [2] - 10:13, 20:14
**taught** [1] - 39:11
**team** [6] - 11:5, 52:3, 52:5, 52:6, 52:8
**teamed** [1] - 18:5
**technical** [2] - 41:9, 41:14
**ten** [3] - 30:4, 62:17, 76:17
**tend** [1] - 79:4
**terminate** [6] - 41:15, 44:20, 82:12, 82:21, 83:9, 83:17
**terminated** [10] - 19:5, 27:2, 29:4, 35:15, 35:22, 56:20, 59:17, 60:11, 63:7, 67:23
**terminating** [2] - 6:13, 55:11
**termination** [30] - 5:11, 5:12, 5:21, 6:20, 18:6, 29:19, 29:23, 30:16, 31:1, 31:5, 34:4, 36:13, 50:15, 52:15, 52:16, 52:18, 52:19, 53:10, 53:13, 53:17, 54:6, 56:19, 59:18, 59:23, 60:3, 60:6, 60:13, 61:9, 67:15
**terminations** [1] - 25:2
**terms** [1] - 44:6
**testified** [14] - 7:24, 12:22, 13:16, 16:11, 20:11, 24:22, 30:18, 34:22, 36:22, 40:24, 45:1, 46:11, 65:12, 71:11
**testifies** [5] - 8:14, 9:14, 20:10, 25:15, 70:6
**testify** [7] - 29:13, 30:9, 30:13, 44:21, 56:23, 63:17, 72:9
**testifying** [1] - 20:9
**testimony** [22] - 8:11, 8:13, 8:19, 9:11, 10:14, 16:1, 16:24, 19:12, 19:16, 19:18, 19:19, 19:21, 41:3, 42:21, 43:1, 50:18, 51:9, 51:13, 53:2, 53:12, 55:14
**text** [6] - 11:21, 18:14, 48:11, 49:1, 69:3, 74:9
**texting** [1] - 48:5
**THE** [96] - 1:15, 3:3, 3:4, 3:8, 3:15, 3:17,

3:21, 3:23, 3:25,
12:4, 12:6, 12:9,
12:19, 12:25, 13:6,
13:11, 13:18, 13:22,
14:1, 14:5, 14:10,
14:13, 14:21, 15:4,
15:7, 15:13, 15:20,
16:3, 16:17, 17:1,
17:6, 19:10, 19:13,
22:19, 35:1, 38:1,
38:3, 65:8, 66:18,
71:7, 71:9, 72:12,
72:14, 76:22, 76:24,
77:4, 77:21, 78:9,
78:16, 79:13, 80:2,
80:6, 80:21, 81:6,
81:8, 81:17, 81:18,
81:20, 81:23, 81:24,
82:1, 82:5, 82:6,
82:7, 82:15, 82:16,
82:23, 82:24, 83:3,
83:4, 83:11, 83:12,
83:19, 83:20, 83:24,
83:25, 84:4, 84:5,
84:9, 84:14, 84:18,
84:22, 85:1, 85:5,
85:11, 85:12, 85:16,
85:17, 85:23, 85:24,
85:25, 87:13, 87:15,
88:3, 88:6, 88:9
**theirs** [1] - 54:24
**themselves** [2] - 27:9,
57:22
**theory** [1] - 32:2
**therefore** [1] - 60:24
**they've** [4] - 5:1, 8:4,
15:24, 33:16
**thin** [1] - 56:19
**thinking** [3] - 22:4,
22:5, 28:4
**Third** [1] - 15:3
**third** [3] - 5:8, 11:4,
54:20
**THOMAS** [1] - 1:8
**thousands** [2] - 38:24
**thread** [26] - 11:21,
11:22, 17:15, 18:3,
18:8, 18:9, 18:12,
19:8, 19:14, 19:17,
19:18, 19:20, 47:25,
48:2, 48:11, 49:1,
66:11, 67:1, 67:2,
67:3, 67:4, 67:5,
67:6, 69:3
**threads** [5] - 16:8,
66:22, 66:23, 66:24,
66:25
**threatening** [1] -
54:17
**three** [16] - 24:18,

26:25, 32:19, 32:22,
43:15, 44:19, 46:11,
48:21, 63:23, 66:3,
69:9, 82:13, 82:21,
83:9, 83:17, 86:22
**threw** [1] - 62:17
**throughout** [6] - 9:18,
10:8, 21:14, 41:3,
49:15, 86:16
**throw** [3] - 24:13,
24:14, 25:11
**throw-away** [3] -
24:13, 24:14, 25:11
**ticket** [1] - 57:12
**ties** [1] - 44:3
**TikTok** [1] - 74:12
**Tim** [2] - 34:6, 35:8
**TIMOTHY** [1] - 2:4
**tiny** [1] - 7:14
**tip** [1] - 31:23
**title** [10] - 23:12,
23:14, 23:15, 23:22,
25:4, 34:20, 35:20,
41:18, 42:4
**today** [5] - 38:6,
47:24, 59:25, 60:23,
77:10
**today's** [1] - 63:11
**together** [4] - 26:25,
36:3, 37:17, 73:14
**tolerate** [1] - 69:16
**Tom** [31] - 10:4, 11:8,
11:10, 11:23, 12:1,
13:8, 13:11, 13:12,
18:5, 19:19, 19:21,
23:7, 23:9, 23:19,
23:22, 24:11, 24:18,
24:19, 24:20, 24:23,
24:25, 26:24, 28:21,
33:1, 34:14, 66:25,
67:1, 67:4, 67:5,
71:3
**took** [4] - 39:5, 49:5,
64:5, 73:8
**top** [1] - 41:4
**Toronto** [1] - 11:16
**torque** [1] - 53:5
**total** [2] - 35:25
**touch** [1] - 77:7
**tough** [1] - 62:12
**toward** [2] - 72:1,
73:15
**towards** [1] - 47:15
**town** [1] - 25:20
**trade** [1] - 25:23
**traffic** [1] - 3:5
**trail** [1] - 68:24
**traits** [1] - 45:20
**transcript** [3] - 1:23,
71:12, 89:2

**transcription** [1] -
1:24
**transfer** [1] - 41:18
**treated** [7] - 40:22,
42:11, 57:18, 57:19,
57:20, 59:8
**treatment** [6] - 57:21,
58:25, 59:14, 59:20,
59:21, 67:21
**TRIAL** [1] - 1:5
**trial** [17] - 17:4, 26:4,
39:5, 45:24, 49:13,
50:3, 50:7, 50:13,
51:5, 52:14, 53:1,
64:13, 73:1, 73:8,
73:12, 86:17, 87:6
**trials** [1] - 88:11
**trick** [4] - 6:6, 6:7, 7:4,
7:8
**tried** [7] - 20:3, 20:10,
25:3, 54:24, 62:10,
70:15, 88:10
**trip** [2] - 48:13, 48:16
**trips** [1] - 25:14
**trolling** [1] - 48:18
**trouble** [1] - 27:9
**true** [4] - 9:19, 21:15,
42:17, 72:4
**truly** [2] - 38:14, 86:7
**truth** [6] - 5:25, 27:1,
28:25, 37:12, 37:14,
51:25
**try** [6] - 24:7, 34:19,
38:13, 44:4, 49:14,
80:16
**trying** [6] - 6:5, 7:4,
7:5, 31:20, 37:20,
52:23
**turn** [3] - 21:5, 25:8,
25:9
**turns** [1] - 20:24
**TV** [3] - 43:11, 43:13,
86:25
**Twitter** [1] - 74:10
**two** [32] - 3:10, 6:19,
11:3, 24:17, 28:23,
29:22, 32:18, 32:21,
34:8, 34:14, 34:17,
34:24, 35:15, 35:16,
36:3, 36:6, 37:17,
48:17, 52:6, 52:14,
56:16, 56:22, 69:9,
69:17, 72:23, 82:12,
82:21, 83:9, 83:17,
86:10, 86:16
**two-minute** [1] - 3:10
**type** [1] - 35:23

## U

**U.S** [2] - 1:11, 1:12
**ultimately** [8] - 15:22,
41:21, 43:22, 44:19,
45:20, 58:19, 58:21,
79:8
**unanimous** [1] - 75:14
**uncommon** [1] - 22:25
**uncontradicted** [3] -
40:5, 41:6, 45:13
**under** [11] - 23:20,
30:13, 40:14, 45:15,
55:5, 56:6, 56:9,
57:5, 59:4, 69:12,
73:5
**understandable** [1] -
71:3
**undisputed** [2] - 40:4,
41:1
**unequivocally** [1] -
4:18
**unfair** [2] - 45:17,
58:15
**unhappy** [1] - 88:12
**uninterrupted** [1] -
3:11
**United** [3] - 3:2, 11:14
**UNITED** [2] - 1:1, 1:16
**unlawful** [2] - 55:24,
58:16
**unless** [3] - 71:21,
75:20, 75:23
**unprecedented** [2] -
30:23, 55:8
**unreasonable** [2] -
60:21, 62:15
**unresolvable** [1] -
44:10
**unto** [1] - 85:18
**up** [49] - 4:2, 5:4, 6:2,
6:23, 7:3, 8:1, 9:20,
15:14, 16:12, 16:20,
18:5, 21:17, 22:6,
25:3, 25:19, 26:25,
28:19, 28:21, 28:23,
29:8, 29:18, 30:3,
33:18, 34:19, 35:6,
35:9, 36:1, 37:3,
37:8, 37:22, 38:14,
41:4, 41:15, 42:13,
42:18, 43:22, 44:9,
44:24, 45:8, 50:7,
51:2, 51:6, 56:17,
56:20, 57:24, 63:21,
66:20, 73:24
**update** [1] - 70:23
**updated** [1] - 33:10
**uphold** [1] - 39:13
**upped** [1] - 43:14

**upset** [12] - 22:5, 22:9,
22:12, 23:23, 23:24,
24:15, 65:20, 66:7,
66:8
**urge** [3] - 62:25, 63:1,
63:2
**uttered** [1] - 66:4

## V

**vacuum** [1] - 48:24
**valuable** [1] - 87:7
**value** [3] - 45:21,
57:25, 87:2
**valued** [1] - 10:5
**vast** [1] - 10:3
**verdict** [41] - 39:4,
52:20, 64:15, 64:16,
64:24, 73:18, 74:2,
74:14, 75:11, 75:12,
75:13, 75:15, 75:18,
75:20, 75:22, 75:25,
76:2, 76:3, 76:7,
76:8, 77:2, 77:10,
77:16, 80:15, 80:17,
80:24, 81:9, 81:22,
81:25, 82:3, 82:7,
84:6, 84:11, 84:15,
84:19, 84:23, 85:2,
85:8, 85:13, 85:18
**verified** [2] - 45:12,
69:11
**video** [2] - 7:19, 20:13
**view** [2] - 55:23, 78:4
**views** [2] - 43:1, 73:23
**Vince** [18] - 10:4, 18:3,
18:5, 26:24, 28:18,
31:15, 31:16, 33:5,
33:7, 37:18, 67:4,
67:5, 70:1, 70:10,
70:21, 71:24
**Vincent** [2] - 8:15,
8:19
**violating** [1] - 40:10
**violation** [1] - 40:4
**violations** [21] - 5:17,
5:18, 5:22, 29:8,
29:16, 30:4, 31:13,
32:11, 32:12, 33:2,
33:4, 33:6, 33:9,
33:13, 33:21, 55:11,
56:24, 57:4, 57:8,
57:24, 60:17
**vital** [1] - 10:9
**voir** [1] - 86:3
**volatility** [2] - 27:18,
27:20
**vote** [2] - 9:20, 75:10
**voted** [1] - 75:9
**votes** [2] - 74:2, 75:8

## W

**wage** [6] - 34:3, 35:21, 35:25, 36:2, 36:9, 36:23
**wait** [2] - 20:24, 76:19
**walk** [3] - 9:25, 10:17, 32:23
**walks** [1] - 88:12
**wants** [2] - 40:13, 68:6
**warning** [5] - 3:10, 3:14, 3:15, 3:20
**waste** [3] - 38:14, 61:22, 61:23
**watch** [1] - 43:13
**watched** [1] - 43:8
**watching** [3] - 20:13, 28:22, 86:4
**wealthy** [1] - 25:20
**website** [1] - 74:10
**week** [6] - 5:11, 55:20, 61:11, 63:5, 63:13, 65:7
**welcome** [2] - 81:3, 86:20
**West** [1] - 43:8
**whatsoever** [3] - 23:13, 24:4, 79:4
**whereby** [1] - 39:22
**whichever** [1] - 75:2
**whole** [3] - 26:7, 50:7, 73:14
**wide** [1] - 53:9
**Williams** [84] - 19:17, 19:19, 19:20, 21:16, 25:18, 39:25, 40:21, 40:23, 41:1, 41:8, 41:15, 42:12, 43:5, 43:10, 43:12, 44:2, 46:1, 46:14, 47:10, 47:16, 47:20, 48:4, 48:11, 48:15, 48:18, 49:5, 49:11, 49:16, 50:4, 50:14, 50:17, 51:2, 51:4, 52:15, 52:21, 53:14, 53:16, 54:5, 54:13, 54:16, 54:18, 55:2, 55:17, 56:1, 57:7, 57:11, 58:8, 58:11, 58:23, 59:8, 59:13, 60:11, 61:5, 61:25, 62:2, 62:7, 62:10, 63:3, 63:13, 66:23, 66:24, 66:25, 67:24, 72:8, 82:9, 82:11, 82:12, 82:13, 82:17, 82:20, 82:21, 82:22, 82:25, 83:6, 83:8, 83:9, 83:10, 83:13, 83:16,

83:17, 83:21, 85:19
**WILLIAMS** [1] - 1:3
**Williams'** [9] - 42:19, 44:20, 52:3, 53:12, 54:24, 55:15, 60:2, 60:4, 60:8
**willing** [1] - 86:8
**willingness** [2] - 38:9, 86:6
**win** [3] - 31:25, 71:20, 71:21
**window** [1] - 29:12
**winner** [1] - 88:11
**wisdom** [1] - 60:22
**witness** [6] - 28:16, 50:1, 50:25, 51:10, 51:24, 56:23
**witnesses** [6] - 12:15, 41:12, 50:16, 50:24, 53:2, 54:21
**Wolson** [8] - 6:16, 31:10, 38:23, 60:14, 61:4, 64:14, 64:18, 68:3
**WOLSON** [2] - 1:15, 3:2
**wonder** [1] - 34:12
**wonderful** [2] - 13:2, 50:5
**word** [8] - 21:5, 25:1, 66:4, 69:19, 70:13, 71:13, 80:14, 81:9
**words** [5] - 24:16, 67:22, 68:9, 70:16
**workers** [3] - 49:12, 51:6, 62:5
**workplace** [2] - 24:8, 70:14
**works** [4] - 16:10, 22:17, 24:3, 69:19
**world** [2] - 6:22, 72:4
**World** [1] - 43:8
**worried** [1] - 69:6
**worry** [2] - 26:17, 57:16
**worse** [1] - 45:20
**worst** [1] - 26:9
**write** [4] - 75:1, 75:7, 75:9, 76:11
**written** [1] - 71:2
**wrote** [1] - 71:1

## Y

**year** [6] - 26:15, 26:18, 35:9, 70:22
**years** [21] - 6:20, 7:22, 17:14, 17:17, 21:3, 26:2, 32:18, 32:21, 34:8, 34:17, 43:21,

46:16, 46:22, 46:25, 47:17, 49:7, 62:3, 62:6, 63:24, 69:9, 69:17
**years'** [1] - 36:6
**yelling** [2] - 53:4, 54:16
**yesterday** [6] - 4:2, 7:19, 59:6, 59:25, 60:23, 77:15
**younger** [1] - 35:12
**yourself** [6] - 14:9, 46:19, 62:14, 69:17, 69:21, 73:19
**yourselves** [2] - 42:18, 64:20
**YouTube** [1] - 74:12

## Z

**zero** [1] - 27:19

*United States District Court*